# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Melinda and Mark Loe, et al.,

            Plaintiffs,

    v.

Willie Jett, et al.,

            Defendants.

Court File No. 23-CV-01527 (NEB/JFD)

**DEFENDANT/CROSSCLAIM PLAINTIFF MINNESOTA DEPARTMENT OF EDUCATION'S BRIEF IN RESPONSE TO PLAINTIFFS/CROSSCLAIM DEFENDANTS CROWN COLLEGE AND UNIVERSITY OF NORTHWESTERN – ST. PAUL'S MOTION TO DISMISS COUNTERCLAIMS**

---

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................3

BACKGROUND .........................................................................................................7

LEGAL STANDARD ..................................................................................................9

ARGUMENT ...........................................................................................................10

I.     MDE HAS STANDING, SO PLAINTIFFS' 12(B)(1) ARGUMENT FAILS AS TO MDE'S
       COUNTERCLAIMS ...........................................................................................11

       A.     MDE's Pleadings Establish Direct Standing. ..........................................12

       B.     MDE's Pleadings Also Independently Establish *Parens-Patriae* Standing. ........18

       C.     MDE Also has Standing to Bring its Counterclaim Under the Minnesota
              Human Rights Act ...................................................................................24

II.    MDE SUFFICIENTLY ALLEGES THAT THE SCHOOLS ARE STATE ACTORS WHEN THEY
       PROVIDE FREE PUBLIC EDUCATION ................................................................25

       A.     MDE Delegated a Traditional, Exclusive State Function to the Schools .............28

       B.     Constitutional Norms Require the Conclusion that the Schools Engage in
              State Action via PSEO .............................................................................36

III.   THE MHRA COUNTERCLAIM SURVIVES 12(B)(6)...........................................37

       A.     In Providing Free Public Education, the Schools are Engaged in Secular
              Activity Subject to the MHRA .................................................................38

       B.     The First Amendment does not Compel Dismissal of MDE's MHRA
              Counterclaim ...........................................................................................39

              1.     The MHRA is Neutral and Generally Applicable...........................40

              2.     The MHRA is Reasonable and Viewpoint Neutral .......................43

              3.     The MHRA Furthers a Compelling State Interest .......................45

CONCLUSION.........................................................................................................47

## INTRODUCTION

In 2020, over 10,000 high-school students participated in Minnesota's Post-Secondary Enrollment Options (PSEO) program. Minn. Dep't of Educ., *Rigorous Course Taking: Advanced Placement, International Baccalaureate, Concurrent Enrollment and Postsecondary Options Programs* 22 (Feb. 2, 2023), https://perma.cc/84DY-85TD. PSEO is a program for tenth-, eleventh-, and twelfth-grade students in Minnesota to simultaneously earn credits toward their high-school graduation requirements and complete college general education classes. *Id.* at 21.

Seventy-two percent of these students attended public high schools at the time. *Id.* at 22. To facilitate these students' participation in the PSEO program, Minnesota partnered with postsecondary institutions throughout the state and disbursed over $39 million in return for these schools' delivery of approximately 181,000 credits of coursework. *Id.* at 25.

Although they were but two of sixty-one eligible institutions, Plaintiffs Crown College (Crown) and University of Northwestern—St. Paul (Northwestern) (collectively, the Schools) provided 18% of these credits and in exchange received $7,295,021 in taxpayer money from the Minnesota Department of Education (MDE)—funds which, for public high-school students, were diverted from their local school districts. *Id.* at 52-53.

Less tangible than these statistics, perhaps, but no less significant, are the constitutional questions prompted by the Schools' conduct. These questions demonstrate that this case is one about conflicting rights and how the Constitution allocates its promises of liberty and equal protection in our pluralist society. On one hand, MDE seeks to administer PSEO in a lawful manner that creates meaningful educational opportunities while upholding the dignity and individual freedoms of all participating high-school students, including barring discrimination based on sex, sexual orientation, and religion. On the other, institutions like Crown and Northwestern seek to participate in PSEO without sacrificing their values. Stuck in the middle are students who simply want to go to school.

Rather than acknowledge the legitimate liberty interests at stake on both sides, however, Plaintiffs frame this case as an all-or-nothing referendum on their right to free exercise of religion. (ECF No. 36 ¶ 3 (framing the statute the Schools challenge as a "force[d]" choice between "living their faith and participating in PSEO").) This approach distorts the actual conflict between the parties, places the Constitution's many rights in uneasy tension, and leaves room for little more than a winner-take-all constitutional battlefield in which certain rights exist exclusively at the expense of others and are thereby relegated to second-class status.

Our democracy is not so simple: Multiple rights can and do coexist. Indeed, the First Amendment itself encompasses myriad rights: to speak, to not speak, to worship freely, to assemble peacefully, to petition for redress, and so forth. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2426 (2022) (The First Amendment's clauses have "complementary purposes, not warring ones where one Clause is always sure to prevail over the others."); *Prince v. Massachusetts*, 321 U.S. 158, 164–65 (1944) ("[I]t may be doubted that any of the great liberties insured by the First [Amendment] can be given higher place than the others . . . All are interwoven there together."). This case involves several such First-Amendment rights, as well as Fourteenth-Amendment rights to equal protection.

When rights bump into each other, the Constitution contemplates a careful search for facts followed by an earnest balancing of competing legal interests—in short, the exercise of legal judgment. Courts are well-suited to this task and should seek an outcome that reflects "the underlying purposes of the rights at issue" and accounts for "context and consequences as measured in light of those purposes." *Van Orden v. Perry*, 545 U.S. 677, 700 (2005). Standalone constitutional claims routinely turn on specific facts, a reality that underscores the importance of a robust record in cases—like this one—that

feature multiple, colliding rights.[1]  In opposing the Schools' motion to dismiss, MDE seeks the opportunity to develop a full and fair record and illustrate precisely how the rights at issue in this matter unfold when Minnesota's public high-school students seek to enroll in on-campus PSEO courses at the Schools.

MDE respectfully asks that the School's motion be denied for three reasons.  First, MDE's standing is proper.  Second, the Schools are appropriately classified as state actors.  And third, the Schools level no attack on the legal sufficiency of MDE's pleadings, focusing instead on potential fact-dependent defenses that cannot be resolved at the pleading stage and which are nonetheless unavailing.  As such, MDE is entitled to discovery on its counterclaims and to litigate these counterclaims on the merits.

---

[1] To appreciate why, consider the Supreme Court's recent decision in *303 Creative LLC v. Elenis*, 143 S.Ct. 2298 (2023).  In that case, the State of Colorado—for undisclosed reasons—stipulated to numerous material facts, including that a Christian businessowner had been asked by a gay man to design a website for his wedding.  In reality, the man in question never sought out the businessowner's services; he was already married—to a woman. *See* Melissa Gira Grant, *The Mysterious Case of the Fake Gay Marriage Website, the Real Straight Man, and the Supreme Court*, NEW REPUBLIC, June 29, 2023, https://perma.cc/6N49-WLFD; *cf. Telescope Media Grp. v. Lucero*, No. 16-4094 (JRT/LIB), 2021 WL 2525412, at *3 (D. Minn. Apr. 21, 2021) (The Court "is sympathetic to [the State] Defendants' position, as they have been compelled to litigate what has likely been a smoke or mirrors case or controversy from the beginning, likely conjured up by Plaintiffs to establish binding First Amendment precedent rather than to allow [Plaintiffs] to craft wedding videos, of which they have made exactly two.").

## BACKGROUND

Plaintiffs—the Schools and two Christian families—commenced this action on May 24, 2023 to challenge a law (H.F. 2497) passed by the Minnesota Legislature one week prior and enacted that same day (Act of May 24, 2023, ch. 55, Art. 2, sec. 45) (hereinafter, the Amendment). (ECF No. 1; *id.* at ¶ 5.)

The Amendment states that to participate in the PSEO program, a postsecondary institution cannot require a faith statement from high-school students or make admission decisions based on students' gender, sexual orientation, religious beliefs, or other legally protected statuses. (*Id.* at ¶ 14.) Plaintiffs claim the Amendment violates their rights under the First and Fourteenth Amendments to the United States Constitution and the Minnesota Constitution's free-exercise provision. (*Id.* at ¶¶ 161–247.)

MDE counterclaimed against the Schools on July 7, 2023.[2] (ECF No. 27.) It seeks to stop the Schools from violating the civil rights of public high-school students who wish to take PSEO courses on these campuses. (*Id.* at ¶¶ 1–5.)

MDE is the state agency charged with overseeing the provision and funding of public education and administering Minnesota's PSEO program. (*Id.* at ¶ 16.) PSEO allows qualifying high-school students to earn dual high school and college credits tuition-free through enrollment in and successful

---

[2] In the interim, the parties stipulated to, and the Court entered, a preliminary injunction order pausing enforcement of the Amendment during the course of this litigation. (ECF Nos. 19, 20.)

completion of PSEO courses at qualifying postsecondary institutions. (*Id*. at ¶ 17.) These courses must meet graduation and subject-area requirements of public high-school students' local school districts. (*Id*. at ¶ 19.) For some students, the PSEO program is their only means of taking courses that are not offered at their public high schools. *Id*.

Public high-school students who participate in the PSEO program give up at least one class at their high schools during the core school day, and their school districts lose a corresponding amount of general education funding from the State, which MDE redirects and remits to the postsecondary institutions that provide PSEO courses to these students. (*Id*. at ¶¶ 26–27.) Put differently, MDE pays colleges like Crown and Northwestern public funds to teach public high-school students PSEO courses that count toward their public high school graduation requirements; these institutions receive this funding solely because MDE has authorized them to participate in the PSEO program. (*Id*. at ¶ 28.) Since the 2017–2018 school year, MDE has paid Crown[3] and Northwestern a combined total of more than $31 million for providing PSEO courses to more than 10,000 students. (*Id*. at ¶¶ 29–30.)

The Schools each require—as a mandatory condition of in-person PSEO enrollment on their campuses—that all students, including those from public

---

[3] Crown enjoys a veritable monopoly on PSEO in the St. Bonifacius area as the only postsecondary institution in a 25-mile radius of the city. (ECF No. 27 ¶¶ 33–34.)

high schools, publicly agree to the Schools' faith statements, which collectively include attestations such as 1) Jesus Christ is the one true God, 2) same-sex relationships are an abomination, and 3) non-cisgender persons are mired in "confusion and brokenness." (*Id.* at ¶¶ 35–39.) Students who refuse to agree to these covenants are not allowed on-campus and those who violate them face institutional discipline, including expulsion. (*Id.*)

By its Counterclaim, MDE seeks a ruling that the Schools' admissions criteria and conduct violate the free-speech, free-exercise, and equal-protection rights of public high-school students, separately violate the Minnesota Human Rights Act (MHRA), and unconstitutionally favor one religion above all others. (*Id.* at ¶¶ 40–84.)

## LEGAL STANDARD

The Schools move to dismiss MDE's counterclaims for lack of subject-matter jurisdiction on the basis of standing and failure to state a claim.

With respect to standing, Rule 12(b)(1) governs. The Court must accept MDE's counterclaim allegations as true and view them in the light most favorable to MDE. *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016). The party asserting jurisdiction bears the burden of establishing jurisdiction, but the heft of that burden hews closely to the current stage of litigation. *See Lujan v. Nat'l Wildlife Fed'n*, 504 U.S. 555, 561 (1992). At the pleading stage, therefore, standing is "merely a threshold inquiry" and "does not present the higher hurdles of pleading a claim to relief on the merits"

that attend a 12(b)(6) analysis. *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 811 (8th Cir. 2022) (*per curiam*) (internal citation omitted) (reversing district court's dismissal for lack of standing). Thus, pleading standing requires "only general allegations of injury, causation, and redressability," as courts presume "that general allegations embrace those specific facts that are necessary." *Id.* at 811–12 (cleaned up). And critically, standing analyses at this stage may not rest on premature considerations of the merits. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 878 (8th Cir. 2003).

As to the sufficiency of MDE's pleadings, Rule 12(b)(6) governs. The Court likewise must accept MDE's counterclaims as true and view these allegations in the light most favorable to MDE. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On that review, all allegations that pass the line between possibility and plausibility—which MDE's plainly do—suffice. *Id.*

## ARGUMENT

MDE first addresses standing in Section I, application of the state-action doctrine to the Schools' conduct in Section II, and the plausibility of its MHRA counterclaim in Section III.

As to MDE's constitutional counterclaims, the Schools do not contend that these counterclaims lack adequate factual pleading.[4]  Rather, the Schools challenge these claims on two strictly legal grounds: (1) standing, which the Schools say MDE lacks; and (2) state action, in which the Schools say they do not engage.  On both counts, the Schools are mistaken: MDE has alleged sufficient facts to establish standing and that the Schools are state actors.

For these reasons, and those that follow, MDE respectfully requests that the Court deny the Schools' motion.[5]

## I.  MDE HAS STANDING, SO PLAINTIFFS' 12(B)(1) ARGUMENT FAILS AS TO MDE'S COUNTERCLAIMS

In this matter, MDE pleads jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as to its federal-constitutional counterclaims and 28 U.S.C. 1367(a) as to its state-constitutional counterclaims.  At the Rule-12 stage, the party seeking to invoke jurisdiction must plead standing.

---

[4] The Schools argue in a footnote that precedent forecloses MDE's federal- and state-establishment claims, but cite inapposite cases and ignore that MDE has pleaded that the Schools are state actors for the purposes of its constitutional claims.  As state actors, Crown and Northwestern are subject to the same religious-establishment prohibitions as MDE.  Independent student choice is of no consequence.  *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 119 (4th Cir. 2022) (en banc) ("[T]he fact that students are not compelled to attend CDS . . . does not bear on the question of whether CDS is a state actor."), *cert. denied*, __ S. Ct. __, 2023 WL 4163208 (June 26, 2023).

[5] Alternatively, any dismissal the Court grants should be without prejudice as any defects in MDE's pleadings are of specificity, not of plausibility, and can therefore be clarified on repleading.  *See Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1079–80 (D. Minn. 2021).

Traditionally, this requirement encompasses the three elements that comprise standing: injury, causation, and redressability. *See Lujan*, 504 U.S. at 560–61. In addition to direct standing, courts recognize several representational theories of standing including, as relevant here, *parens-patriae* standing.

### A.   MDE's Pleadings Establish Direct Standing.

In their moving papers, the Schools primarily challenge MDE's direct standing on the basis of injury. (ECF No. 36 ¶ 8 (asserting that MDE lacks standing "[b]ecause MDE has alleged no facts relevant to its own injury").) For the reasons discussed below, this argument fails. Although the Schools do not contest the remaining elements of standing, MDE's pleadings also satisfy the causation and redressability elements of a standing analysis. As such, MDE has met its Rule-12 burden to plead direct standing.

MDE is the state agency responsible for K–12 education in Minnesota, and its work flows from the State's commitment to public education as a fundamental right, enshrined in Article XIII, Section 1 of the Minnesota Constitution. (ECF No. 27 ¶¶ 13–15); *see Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993). By statute, MDE's commissioner and at least some of its employees "take an oath or affirmation to support the constitution of the United States and of [Minnesota] and to discharge faithfully the duties of [their] office to the best of [their] judgment and ability." Minn. Const. art. V, § 6; *accord* Minn. Stat. § 358.05. Moreover, state statutes charge MDE with carrying out Minnesota's education laws.

Minn. Stat. § 120A.02.  Accordingly, MDE oversees a host of education-related work such as enforcing high school graduation requirements, *id.* at § 120B.02; promoting student health, *id.* at §§ 121A.15–39; preventing harassment, *id.* at § 121A.03; ensuring that educational funding is distributed "in accordance with law," *id.* at § 127A.41; and administering dual-enrollment programs such as PSEO, *id.* at § 124D.09.  (ECF No. 27 ¶¶ 6, 13–16.)

For purposes of standing, an "injury" is "an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted).  The Schools' conduct—compelling PSEO's public high-school students to agree to the faith statements at issue—directly injures MDE in two independent ways.

First, the Schools' conduct, if upheld, stands to injure MDE financially. Financial harms to public entities are "injur[ies] in fact" sufficient to establish standing.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023).  Here, MDE would be forced to finance the Schools' endorsement of religion and discrimination using public dollars diverted from local school districts that are prohibited by law from engaging in these practices.  *See* Minn. Stat. § 126C.05, subd. 13 (establishing formulas for diverting general education funding from public school districts for PSEO pupils).

This funding reduction impairs MDE's ability to support the free-and-uniform system of public education it is obligated to provide Minnesotan

students.  *See Biden*, 143 S. Ct. at 2366 (finding standing when financial harm to Missouri state agency would impair its ability to aid Missourian students' education); *Sch. Dist. v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009) (finding school district had standing to challenge federal law that caused funds to be diverted from its educational programs and priorities). And this reduction unilaterally renders MDE a "passive participant" in the Schools' exclusionary admission policies. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492–93 (1989) ("It is beyond dispute that any public entity … has a compelling interest in assuring that tax dollars … do not finance the evil of private prejudice."); *Norwood v. Harrison*, 413 U.S. 455, 463 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

Notably, MDE's financial injury mirrors similar proprietary injuries that have supported the direct standing of other state governments in Section-1983 suits.  *See, e.g.*, *North Dakota v. Heydinger*, No. 11-cv-3232 (SRN/SER), 2016 WL 5661926, at *5 (D. Minn. Sep. 29, 2016) (citing *Inyo Cnty v. Paiute-Shoshone Indians*, 537 US 701, 711 (2003) and collecting cases).  This theory of standing does not turn on the State's sovereignty, nor does it stem from any sort of intramural squabble better suited to state court.  Rather, the financial harm that MDE alleges tees up a dispute between a holder of

14

proprietary interests—MDE—that has been injured in a direct and particular manner by entities engaging in state action—the Schools, *see infra* Section II— a dispute that checks all the boxes of a classic 1983 action and establishes MDE's standing to seek relief in this forum.

Second, and relatedly, Plaintiffs' conduct forces MDE into the untenable dilemma of violating its constitutional duties by sending public high-school students to schools that, under the auspices of the state-run PSEO program, will subject these students to compelled and discriminatory speech.  If MDE refuses or attempts to curtail the Schools' conduct, it risks sanctions absent the protection of a favorable judgment.

The Supreme Court addressed a similar case when a New York school board sued the state education commissioner over a textbook-subsidy statute that the board believed violated the Establishment Clause.  *See Bd. of Ed. v. Allen*, 392 U.S. 236, 241 n.5 (1968); *accord Regents of Univ. of Minn. v. Nat'l Collegiate Athletic Ass'n*, 560 F.2d 352, 363–64 (8th Cir. 1977) (applying *Allen*), *abrogated on unrelated grounds*, *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179 (1988).  Observing that the board's members had "taken an oath to support the United States Constitution," the Court explained that having to choose between violating this oath and risking harm such as expulsion or even changes in funds to its district left "no doubt" of the board's standing.  *Allen*, 392 U.S. at 241 n.5; *see also Brewer v. Hoxie Sch. Dist. No. 46*,

15

238 F.2d 91, 98–99 (8th Cir. 1956) (concluding that school district had a "federal right [] to be free from direct interference in the performance of" constitutionally imposed duties).

MDE faces the same quandary as these school boards: if the Schools prevail, MDE must abdicate its constitutional obligations or risk the harms that would attend noncompliance.[6]  This situation makes MDE's stake in its counterclaims significant and concrete.  A judgment favorable to the Schools would require MDE to support conduct that prevents MDE from discharging its statutory duties to supervise the distribution of school funding in accordance with law and to prevent harassment in Minnesota schools. *See* Minn. Stat. §§ 127A.03, 41.  To "strip" MDE of its ability to discharge these duties is a "deprivation" amenable in its own right to remediation by a judgment in favor of MDE.  *Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n*, 576 U.S. 787, 800 (2015).  As such, MDE's counterclaim pleadings allege a direct injury sufficient to confer standing.

Finally, MDE has also satisfied its burden as to causation and redressability.  Causation requires the party invoking jurisdiction to establish

---

[6] Whether Plaintiffs' rights prohibit MDE from discharging these duties is a merits question that does not preclude MDE's interest in their fulfillment from serving as a legal interest sufficient to confer standing.  *See Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (finding standing and emphasizing, "one must not confuse [potential] weakness on the merits with the absence of Article III standing").

that its injury is "fairly traceable" to the challenged conduct. *Miller v. Thurston*, 968 F.3d 727, 735 (8th Cir. 2020).  Traceability requires a showing that the opposing party's conduct, rather than the conduct of a third party not before the court, caused the injuries at issue. *See id.*  Here, the Schools are the actors that require PSEO students to publicly agree to the disputed faith statements.  (ECF No. 27 ¶¶ 35–36, 38; ECF No. 36 ¶¶ 4–5.)  Because no other actor related to PSEO contributes to this requirement, its injuries to MDE are fairly traceable to the Schools' conduct. *See Miller*, 968 F.3d at 735.  Because traceability exists between MDE's injuries and the Schools' conduct, causation is satisfied.

Pleading redressability requires allegations that would show "it is 'likely' and not merely 'speculative' that [the] injury would be redressed" by a judgment granting the remedy that the injured party seeks. *Wieland v. U.S. Dep't of Health & Hum. Servs.*, 793 F.3d 949, 956 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561); *see also ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011) (finding that a favorable judicial determination about the constitutionality of certain conduct satisfies redressability).  Here, any favorable judgment as to MDE will require the Court to resolve at least one of the constitutional or statutory questions at issue in MDE's favor.  Because such a judgment would almost certainly preclude the Schools from compelling PSEO's public high-school students to engage in the

17

disputed faith statements, it is "likely and not merely speculative" that a judgment granting the relief that MDE seeks would redress MDE's injuries. *Wieland*, 793 F.3d at 956 (quotation omitted). Redressability is, therefore, established.

For these reasons, MDE's counterclaims adequately plead injury, causation, and traceability, thus establishing direct standing.

### B. MDE's Pleadings Also Independently Establish *Parens-Patriae* Standing.

Beyond allegations of direct-standing injuries, MDE's pleadings also encompass allegations that support *parens patriae* as an additional, independent basis to establish standing. The Schools portray these aspects of MDE's counterclaims as a deficient attempt to plead third-party standing. (ECF No. 36 ¶ 8.) But the single sentence that the Schools devote to this argument ignores that MDE's counterclaim allegations "embrace those specific facts that are necessary" to establish a *parens-patriae* theory of standing. *Huizenga*, 44 F.4th at 811–12. As now explained, MDE's pleadings sufficiently allege *parens–patriae* standing.

"*Parens patriae* means literally parent of the country," and identifies a prerogative "inherent in the supreme power of every State." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982). To establish *parens-patriae* standing, a state "must assert an injury to what has been characterized as a 'quasi-sovereign' interest." *Id.* at 601.

18

Quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Id.* Although neither "an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract," the Supreme Court has identified a litmus test for identifying qualifying interests. *Id.* at 607. Specifically, a "helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Id.*

In *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982), the Supreme Court found that Puerto Rico possessed *parens-patriae* standing to pursue a federal-court suit against a corporation that disfavored Puerto Rican workers. The Court's decision rested on allegations that the corporation's conduct harmed Puerto Rico's ability to protect its people from discrimination. *Id.* at 597–98. In reaching this conclusion, the Court recognized a state's separate and unique quasi-sovereign interest in "securing [its] residents from the harmful effects of discrimination." *Id.* at 609; *cf. Obergefell v. Hodges*, 576 U.S. 644, 678 (2015) (noting how injuries from discrimination linger: "Dignitary wounds cannot always be healed with the stroke of a pen."). For similar reasons, the current forum is an appropriate venue for MDE to resolve its claims against the Schools. *See Commonwealth v. Porter*, 659 F.2d 306,

317 (3rd Cir. 1981) (noting that federal-court remedies are "available to the states for the enforcement of the fourteenth amendment").[7]

Here, MDE's pleadings explain that it seeks to administer PSEO in a manner such that no public high-school student's participation hinges on their participation in compelled and discriminatory speech.[8] (ECF No. 27 ¶¶ 1–5). As it is beyond debate that discrimination and educational opportunities directly impact individual and public health, the origin of these efforts is

---

[7] In *Commonwealth v. Porter*, 659 F.2d 306 (3rd Cir. 1981), the United States Court of Appeals for the Third Circuit dismissed the argument that *parens-patriae* standing should not lie in a similar case simply because Pennsylvania could sue in a state forum:

> We . . . have no legitimate reason for inquiring why [Pennsylvania] chose to bring an action for the vindication of federally protected rights in a federal forum. . . . None of the familiar rhetoric of 'equity, comity and federalism,' which is advanced so often in support of federal door closing devices when the state is resisting relief in favor of private plaintiffs, has any applications to cases in which the state, acting through one of its highest executive officers, seeks the aid of a federal court in assisting it in the discharge of its freely acknowledged duty to enforce the provisions of the federal constitution.

659 U.S. at 319. The same reasoning support MDE's standing here. Plaintiffs, not MDE, chose federal court. Having been haled here by Plaintiffs, MDE should be permitted to raise its counterclaims—which are likely compulsory—in this forum. *See* Fed. R. Civ. P. 13(a)(1). MDE's quasi-sovereign interests more than entitle it to do so on the basis of *parens-patriae* standing.

[8] Indeed, Minnesota's interest in protecting students who participate in PSEO extends not only to public high-school students, but also to students who attend private schools. Minnesota Statutes section 124D.09, subdivision 18, treats private-school students who participate in PSEO as functionally public students, to the extent of their enrollment in PSEO. *See infra*, § II.A, at 30.

MDE's steadfast interests in preventing discrimination and protecting Minnesotans' health and welfare.  *See generally, e.g.*, Elizabeth A. Pascoe & Laura S. Richman, *Perceived Discrimination and Health: A Meta-Analytic Review*, 135 Psych. Bull. 531, (2009) (linking even the perception of discrimination to negative health outcomes); David R. Williams et al., *Understanding How Discrimination Can Affect Health*, 54 Health Servs. Rsch 1374 (2019) (identifying discrimination as "emerging risk factor for disease"); Anna Zajacova & Elizabeth M. Lawrence, *The Relationship Between Education and Health: Reducing Disparities Through a Contextual Approach*, 39 Ann. Rev. Pub. Health 273 (2018) (documenting link between educational experiences and health outcomes) .

Two facets of MDE's efforts are noteworthy.  First, MDE's counterclaims accrue to the benefit of minor Minnesotans who may otherwise lack the ability to assert their own rights.  *See Alfred*, 458 U.S. at 600 (tracing historical roots of *parens patriae* to a sovereign's right and responsibility to care for people legally unable to care for themselves including, as relevant here, due to "nonage"); *see also Prince*, 321 U.S. at 166 (recognizing *parens patriae* encompasses "acting to guard the general interest in youth's well being"); *Milliman v. Lindemoen*, No. 01-1563 (RHK/RLE), 2005 WL 1270844, at *4 (D. Minn. Apr. 29, 2005) ("[A]s *parens patriae*, the government has an extraordinary compelling interest in the physiological and psychological well-

being of children.") (quotation marks omitted), *adopted by* 2005 WL 1421512 (D. Minn. June 15, 2005); *New York by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 748 (N.D.N.Y. 2016) (concluding that injury to children in a single school district supported *parens-patriae* standing).[9]

Second, MDE's counterclaims track the animating principles of its statutory obligations rather than topics of particular concern only to small or specific sects of Minnesotans. *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954) ("[E]ducation is perhaps the most important function of state and local governments."). In light of these facets, MDE's counterclaims seek to vindicate interests that comport with historical understandings of *parens patriae* and go beyond interests held by private individuals. MDE's interests, therefore, mirror those that the Supreme Court treated as quasi-sovereign in *Alfred L. Snapp.* 458 U.S. at 607.

---

[9] Many LGBTQ+ youth live with non-supportive families who would not assist them in asserting their own rights. In a recent study, LGBTQ+ youth who wanted mental health care but were unable to access that care cited concerns with obtaining caregiver permission (60%), and actual lack of caregiver permission (20%), as reasons for their inability to get the care they needed. *See 2022 Nat'l Survey on LGBTQ Youth Mental Health*, The Trevor Project 12 (2022), https://perma.cc/WL2C-V6M5. It is difficult to imagine how a youth who cannot get permission from their parents to seek mental health care would have the support and permission needed to bring a civil-rights lawsuit. Moreover, such youth may, due to parental control, find that the only schools their parents will allow them to attend are the very schools that engage in the sort of conduct that the Schools do. For these reasons, it is all the more vital that states be able to protect their youth through *parens-patriae* standing.

Thus, MDE's counterclaims, read liberally and with favorable inferences, are rooted firmly in the quasi-sovereign interests of preventing discrimination, protecting public health and welfare, ensuring that education funds are used lawfully to provide constitutionally adequate education, and defending Minnesotans' full access to federal rights.   Each of these quasi-sovereign interests independently satisfies Article III's requirements for *parens-patriae* standing.   *See id.* at 608, 612 (preventing discrimination and segregation); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 799 (D. Minn. 2020) (protecting health and welfare); *Missouri v. Biden*, __ F. Supp. 3d __, 2023 WL 2578260, at *13 (E.D. La. Mar. 20, 2023) (defending federal First-Amendment rights). That Minnesota not only could have, but here actually *did* via the Amendment, "attempt to address these issues through its sovereign lawmaking powers" confirms that MDE's counterclaims encompass quasi-sovereign interests sufficient to confer *parens-patriae* standing.   *Alfred*, 458 U.S. at 607; *id.* at 612 (Brennan, J., concurring) ("As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention.").

Finally, MDE, as a state agency, is an appropriate arm of the state to raise and vindicate Minnesota's quasi-sovereign interests.   "[B]y law and function," MDE is "an instrumentality of" Minnesota, so its interests necessarily mirror those of Minnesota itself.   *Biden*, 143 S. Ct. at 2366;

*In re Edmond*, 934 F.2d 1304, 1310 (4th Cir. 1991) (finding that state consumer-protection agency had Article-III standing when litigating issues pertaining to customer refunds, because of agency's statutory obligation to protect consumers).  Just as MOHELA, a Missouri state agency charged with administering student loans, provided a nexus between Missouri and a federal student-loan policy sufficient to establish direct standing, MDE's power and obligation to administer Minnesota's education laws facilitates a nexus between Minnesota's quasi-sovereign interests and the Schools' challenged conduct sufficient to establish *parens-patriae* (in addition to direct) standing in this matter.  There can be no question that MDE's stake in its counterclaims against the School assures "that concrete adverseness which sharpens the presentation of issues." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

Therefore, MDE sufficiently alleges standing as *parens patriae*.

## C.    MDE Also has Standing to Bring its Counterclaim Under the Minnesota Human Rights Act

MDE pleads jurisdiction pursuant to 28 U.S.C. § 1367(a) as to its state-statutory counterclaim under the MHRA.

The plain language of the MHRA defeats the Schools' argument that MDE lacks standing to sue the Schools under the Act.  Per the MHRA's express terms, "[t]he [MHRA] commissioner *or a person* may bring a civil action seeking redress for an unfair discriminatory practice[.]" Minn. Stat. § 363A.33, subd. 1 (emphasis provided).  In turn, the MHRA defines "person" to include

24

"the state and its departments, agencies, and political subdivisions." *Id.* at § 363A.03, subd. 30. There can be no question, therefore, that MDE has statutory standing to pursue MHRA claims against the Schools.

MDE is also a "person aggrieved" for MHRA purposes. Minn. Stat. § 363A.28, subd. 1. As above, MDE is aggrieved in myriad ways by the Schools' unlawful admission practices, including being forced to passively participate in the Schools' discriminatory exclusion of public high-school students, impelled to violate its statutory and constitutional duties to shield students from discrimination and ensure education funds are distributed and used lawfully, and foreclosed from advancing quasi-sovereign interests in protecting the health and wellbeing of Minnesota's youth. *See E.E.O.C. v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 197–98 (E.D.N.Y. 2003) (holding that "Congress intended to permit *parens patriae* actions" under Title VII, a federal analogue of the MHRA, when it included governments in the statutory definition of "persons"). Just as MDE has direct and prudential standing to bring its constitutional claims, so too is MDE's standing proper for its statutory claim under the MHRA.

## II.   MDE SUFFICIENTLY ALLEGES THAT THE SCHOOLS ARE STATE ACTORS WHEN THEY PROVIDE FREE PUBLIC EDUCATION

Claims under Section 1983 require a state actor, as do claims under Minnesota's constitution. *Doe v. North Homes, Inc.*, 11 F.4th 633, 637

(8th Cir. 2021).[10] Whether an entity should be treated as a state actor depends not on labels of public or private, but on whether the entity's conduct is "fairly attributable to the state." *West v. Atkins*, 487 U.S. 42, 54 (1988).

Since the  Supreme Court last discussed the state-action doctrine's application to private parties, *see Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019), the United States Court of Appeals for the Eighth Circuit has applied this doctrine to private parties on at least three occasions. Each time, the Eighth Circuit reversed a district court that failed to afford this doctrine its appropriate breadth.  *See Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 935 (8th Cir. 2022) (reversing 12(b)(6) dismissal); *North Homes*, 11 F.4th at 639 (same); *Meier v. St. Louis*, 934 F.3d 824, 829-30 (8th Cir. 2019). These cases—which involved obligations that the state alone could delegate— establish that the Schools are state actors when they provide PSEO to public high-school students.

To assess state action, the Eighth Circuit asks two questions.  "First, whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority," and second, "whether the party

---

[10]  Although the argument in this Section proceeds in terms of federal-constitutional rights, its logic applies with equal force to MDE's state-constitutional counterclaims.  *See State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1993).

engaged in the deprivation may be appropriately characterized as a state actor." *Roberson*, 42 F.4th at 928 (citations omitted).

As to the first question, grants of authority from a state to a private party satisfy the state-authority requirement. *See Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). Here, MDE alleges that the Schools have violated various constitutional requirements by conditioning their provision of PSEO to Minnesota's high-school students on compelled and discriminatory speech. (ECF No. 27 ¶¶ 1–3.) The Schools' participation in PSEO—including their remuneration—depends on their status as "eligible institutions" within the meaning of the PSEO statute and approval by MDE. This participation, therefore, stems solely from state authority. (*Id.* ¶¶ 24–25); Minn. Stat. § 124D.09. The Schools do not contest this proposition.

As to the second question, circumstances indicative of state action include private performance of a traditional, exclusive public function; joint action with the government; or pervasive entwinement with the state. *See Roberson*, 42 F.4th at 928 (citations omitted). These circumstances, or tests, "are merely examples" and not exclusive. *Wickersham*, 481 F.3d at 597. The principal requirement for a private party to be treated as a state actor is a close nexus "between the state and the alleged deprivation." *Id.* (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001)). The Eighth Circuit evaluates this requirement with a fact-dependent analysis.

"[O]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.* (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)). Here, *Wickersham*'s public-function test and the Fourth Circuit's factually-analogous, en banc decision in *Peltier v. Charter Day School, Inc.*, 37 F.4th 104 (2022), establish that the Schools are state actors in their limited capacity of providing PSEO to public high-school students.

### A.   MDE Delegated a Traditional, Exclusive State Function to the Schools

To determine if the performance of a particular function establishes a nexus between private conduct and the state sufficient to implicate state action, the function at issue must be one traditionally and exclusively reserved to the state. *See Roberson*, 42 F.4th at 938. Courts applying this public-function test to educational actors acknowledge that states engage in a variety of educational functions. Thus, the Supreme Court has treated a school that "specializes in dealing with students who have experienced difficulty completing public high schools" as performing the specific function of educating maladjusted youth, not all education broadly. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 832, 842 (1982); *accord Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 120 (4th Cir. 2022) (en banc) (treating charter school as serving function of operating North Carolina's public-school system), *cert. denied*, __ S. Ct. __, 2023 WL 4163208 (June 26, 2023); *Robert S. v. Stetson Sch., Inc.*,

28

256 F.3d 159, 166 (1st Cir. 2001) (defining function as the education of juvenile sex offenders, not all juvenile education); *ACLU of Minn. v. Tarek ibn Ziyad Acad.*, No. 09–138 (DWF/JJG), 2009 WL 2215072, at *9 (D. Minn. Jul. 21, 2009) (identifying function of Minnesota charter school as provision of free and public education). That discrete educational functions exist is reflected in the distinct underlying purposes that courts recognize such functions serve. *Compare, e.g.*, *Cruz-Guzman v. State*, 916 N.W.2d 1, 12 (Minn. 2018) (identifying purpose of free-and-uniform education in Minnesota as preparing the republic's citizenry), *with Robert S.*, 256 F.3d at 163 (identifying treatment as a purpose of educating juvenile sex offenders).

Courts that have probed the public-function requirement in state-action cases emphasize the importance of ensuring an appropriate level of specificity. The "proper inquiry requires a narrow lens, identifying the function within the state system that [the private actor] serves." *Peltier*, 37 F.4th at 119 (quoting *West*, 487 U.S. at 55–56). As "examples may be the best teachers" in state-action analyses, *Brentwood*, 531 U.S. at 296, the Court should follow *Peltier*'s lead and calibrate its analysis in this matter to an appropriate level of specificity. Even if educating high-school students is not a traditionally- and

exclusively-public function, which MDE does not concede,[11] MDE's counterclaim pleadings encompass a narrower, specific function that independently satisfies this test. Specifically, MDE alleges that the Schools perform the function of providing a free-and-uniform education—namely, an education that satisfies Minnesota's constitutional guarantee to public high-school students, historically termed "common," and now "public," education.

The provision of free-and-uniform education is a discrete function, distinct from other educational functions such as educating maladjusted youth, sex offenders, pre-school children, or students with developmental disabilities; or "military-style" and many other forms of education. *See, e.g.*, *Rendell-Baker*, 457 U.S. at 842 (maladjusted youth); *Robert S.*, 256 F.3d at 166 (sex offenders); *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997)

---

[11] In their discussion of *Rendell-Baker v. Kohn*, 457 U.S. at 830 (1982), the Schools not only construe the focal function at an incorrectly-high level of generality, but also neglect to address the stark factual contrast between the targets of unconstitutional conduct in *Rendell-Baker* and those in this matter. *Rendell-Baker* addressed a private school's decision to terminate an *employee*, which the Supreme Court treated as conduct wholly unrelated to the school's arrangement with Massachusetts to teach students with behavioral issues who would otherwise be in public school. 457 U.S. 830, 841–42 (1982) (explaining that personnel decisions, which did not involve students, fell outside of the school's student-centric nexus with Massachusetts). Here, however, MDE's counterclaims implicate the core of the Schools' nexus with the State because MDE challenges the Schools' requirement that public high-school students affirm statements with sectarian and discriminatory content as a condition of enrollment in the state-run PSEO program at these campuses. *See Peltier*, 37 F.4th at 120 (distinguishing *Rendell-Baker* based on the relationship between the private conduct and state-delegated functions at issue).

(preschoolers); *McElroy v. Pac. Autism Ctr. For Educ.*, No. 14-CV-04118-LHK, 2016 WL 3029782, at \*12–13 (N.D. Ca. May 27, 2016) (disabled); *Mentavlos v. Anderson*, 249 F.3d 301, 316 (4th Cir. 2001) (military-style).

Indeed, the PSEO statute confirms this understanding. Section 124D.09, for example, requires a reduction in private-school tuition for private-high-school students who enroll in PSEO. Minn. Stat. § 124d.09, subd. 18. The reduction must correspond to the amount of time the enrollee spends in PSEO classes. *See id.* If students attending private schools and public schools were recipients of the same, broad educational system that the Schools argue they are, there would be no need for a private school to adjust its tuition because private-school students who enroll in PSEO would neither leave their original system nor join a new one. But Section 124D.09 *does* require such adjustments, and thereby treats private-school students who enroll in PSEO as having moved—to the extent of their PSEO enrollment—from one educational system to another, namely, from a private system to the free-and-uniform system that Minnesota provides. Thus, it makes sense that Section 124D.09 reduces tuition rather than reallocating payments from a private school to the State in accordance with the extent of a student's PSEO participation: Minnesota's system of free-and-uniform education is, of course, free. Private-school students who enroll in PSEO participate in this system and are entitled to its benefits.

In Minnesota, the distinct function of providing free-and-uniform education is a traditionally- and exclusively-public function. The Minnesota Constitution, art. XIII, § 1, guarantees a free-and-uniform system of education. The State is the entity that provides this system to Minnesotans and has for the duration of the function's existence, which originated at statehood. *See* John N. Greer, *The History of Education in Minnesota* 9 (Herbert B. Adams ed., 1902), https://perma.cc/9DA2-4BSK (Minnesota's system of common schools "has from the first been *unified* in the department of public instruction." (emphasis added)). Minnesota's practice of providing this educational system since statehood, not just in recent years, establishes this function as a traditional one. *See Rendell-Baker*, 457 U.S. at 842.

Moreover, the State provides this system of education because Minnesota's Constitution affirmatively obligates the State—and no other entity—to do so. *See Cruz-Guzman*, 916 N.W.2d at 8. This nature of this obligation, therefore, demonstrates that this function is exclusive to the State. *See Peltier*, 37 F.4th at 118 (concluding that similar obligation arising under North Carolina's constitution rendered educational function at issue exclusive to the state); *Roberson*, 42 F.4th at 930 (treating focal function as exclusive to the state because of origin in North Dakota's "constitutional obligation"). Other courts have confirmed these principles in public-education contexts and on motions to dismiss, and this Court should too. *See Tarek ibn Ziyad Acad.*,

2009 WL 2215072, at *9–10; *Riester v. Riverside Comm. Sch.*, 257 F. Supp. 2d 968, 972 (S.D. Ohio 2002) ("[F]ree, public education, whether provided by public or private actors, is an historical, exclusive, and traditional state function."); *Skaggs v. N.Y. Dep't of Educ.*, No. 06-CV-0799 (JFB) (VVP), 2007 WL 1456221, at *13 (E.D.N.Y. May 16, 2007) (collecting cases); *Melvin v. Atlanta Ind. Sch. Sys.*, No. 1:08-CV-1435-BBM, 2008 WL 11342510, at *8 (N.D. Ga. July 10, 2008) (fact discovery necessary to decide if private company operating school performed a public function); *Unity Healthcare, Inc. v. Cnty. of Hennepin*, No. 14-CV-114 (JNE/JJK), 2014 WL 6775293, at *4 (D. Minn. Dec. 2, 2014) (deeming plausible under Rule 12 allegations that private provider of case-management services to disabled persons was a state actor).

Comparator experiences illustrate that Minnesota has consistently depended on public schools to the exclusion of private ones when providing the educational function at issue in this case. Other states that provide similar functions but face unique challenges, such as Maine with its realities of rural statehood, have designed systems that depend on, and indeed assume, partnerships with private schools. *See Carson v. Makin*, 142 S. Ct. 1987, 1993 (2022) (explaining that fewer than half of Maine's school districts operate even one public secondary school); *cf. Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26–27 (1st Cir. 2002) (relying on historical sources specific to

Maine).   In contrast, Minnesota has, since statehood, assumed exclusive control over and responsibility for the provision of public education, without outsourcing wholesale its accountability for this function to the private sector. *See An Act to Provide for a General System of Common Schools, the Officers thereof and their Respective Powers and Duties*, 1861 Minn. Laws ch. XI (establishing in "[e]ach township a School District—each school district a body corporate"); *accord An Act to Establish and Maintain Common Schools*, 1849 Minn. Territorial Laws ch. VII (pre-statehood analogue).   That private institutions participate in Minnesota's public education system through the state-run PSEO program does not evince any cession by the State of its final responsibility over this function to private institutions.

Quite the opposite, the foregoing analysis remains intact even when scrutinizing the dual-enrollment aspect of free-and-uniform education in Minnesota.  No entity other than MDE has operated PSEO or another similar program for the duration of dual enrollment's existence in Minnesota, likely because state law reserves this aspect exclusively to MDE.  *See* Minn. Stat. § 120A.02(b).  Thus, the power to administer dual-enrollment programs for Minnesota's public high-school students "rests with the state," as it has since PSEO's inception.   *North Homes*, 11 F.4th at 637; *cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) ("[PSEO] was created by a special statute, explicitly for the furtherance of [state] government goals.").

Although dual enrollment has a shorter history than other aspects of free-and-uniform education in Minnesota due to its recent innovation in 1985, the span of this history is extensive enough to apply the public-function test. *See Manhattan Comm. Access*, 139 S. Ct. at 1929 (analyzing history of public-access cable between the 1970s and 2019). While MDE may delegate the implementation of PSEO to private partners, (ECF No. 27 ¶¶ 24–25), the underlying function remains one of state provenance because MDE and the Minnesota legislature, not other entities, have traditionally and exclusively controlled the legal contours of PSEO and partner institutions' administration of any delegated authority.

In sum, MDE has adequately pleaded that the Schools exercise a traditional and exclusive state function, delegated from MDE, when they provide PSEO as part of Minnesota's free-and-uniform education system. This delegation intertwines MDE with the Schools in their capacity as PSEO providers. *See, e.g.*, Minn. Stat. § 124D.09, subd. 13 (establishing interconnected funding scheme between PSEO, partner institutions, and state school districts); subd. 2 (imposing nonsectarian course requirements on partner institutions' curricula); subd. 19 (regulating tuition charges and disability-accommodation policies of partner institutions with respect to PSEO enrollees); subd. 21 (imposing IEP-observance requirement for partner institutions). And this delegation does so pervasively—the Schools participate

35

in PSEO to a disproportionately large degree, accounting for almost 20% of total PSEO activity even though they are just two of sixty-one participating institutions. *See supra*, Introduction. This "pervasive entwinement" supports the conclusion that the Schools "ought to be charged with a public character and judged by constitutional standards." *Brentwood*, 531 U.S. at 298, 302.

The state-action doctrine, therefore, comfortably applies to the Schools when they provide PSEO to public high-school students.

### B. Constitutional Norms Require the Conclusion that the Schools Engage in State Action via PSEO

By its nature, the state-action doctrine surpasses formalities in favor of function. *Cf. Roberson*, 42 F.4th at 935 (discussing *West*, 487 U.S. at 935: "the salient fact" is whether a private actor's relationship with the state is "cooperative"). Otherwise, private actors and governments alike could engineer constitution-free zones, creating patchwork landscapes of rights that turn on idiosyncrasies of geography—whether, for instance, a Minnesota high-school student lives closer to Crown or a state college—rather than the import of protected liberties. *See, e.g.*, *Lebron*, 513 U.S. at 397; *Peltier*, 37 F.4th at 122 ("Innovative programs in [Minnesota's] public schools can and should continue to flourish, but not at the expense of constitutional protections for students.").

Indeed, the logical consequence of the Schools' arguments is not only that some of Minnesota's public high-school students may attend PSEO with the benefit of their constitutional rights, while others may not; but that *a single*

*student* could attend one high-school class in the morning protected by the Constitution, and yet attend a PSEO class later that afternoon with no rights to speak of. Such a system is unworkable and unconstitutional, especially in an educational context where students are entitled to expect respect and dignity from their schools. *Cf. Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 626 (4th Cir. 2020) (*en banc*) (Floyd, J., concurring) (explaining how discrimination against LGBTQ+ students "bears an eerie similarity to stigmatic discrimination in the separate-but-equal context—which produces deeply corrosive, irreversible harm across a human life."); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 621–22 (1991) ("It is relevant to examine whether the injury caused is aggravated in a unique way by the incidents of governmental authority" when analyzing state-action doctrine.).

The "plain and obvious answer to the problem is to ensure that [the Schools] are not insulated from [] constitutional accountability." *Peltier*, 47 F.4th at 123. For these reasons, the Schools function as state actors when they provide PSEO to Minnesota's public high-school students and, therefore, are fairly subject to MDE's constitutional counterclaims.

## III.   THE MHRA COUNTERCLAIM SURVIVES 12(B)(6)

Beyond standing, the Schools assert that they are exempt from the MHRA's anti-discrimination provisions both statutorily and because, they argue, the MHRA violates their First-Amendment rights to free exercise, expressive association, and assembly. Again, the Schools are wrong: the nature

of the School's conduct at issue here is subject to the MHRA and permits a constitutional application of the MHRA to the Schools.

### A.   In Providing Free Public Education, the Schools are Engaged in Secular Activity Subject to the MHRA

The MHRA does not prevent an "institution organized for educational purposes that is operated, supervised, or controlled by a religious association, religious corporation, or religious society that is not organized for private profit" from discriminating on the bases of religion or sexual orientation (which by definition includes gender identity). Minn. Stat. § 363A.26. This exclusion does not, however, apply to secular activity "unrelated to the religious and educational purposes for which [the religious association] is organized." *Egan v. Hamline Un. Methodist Church*, 679 N.W.2d 350, 355 (Minn. Ct. App. 2004) (quoting Minn. Stat. § 363A.26, subd. 2).

The Schools allege—and MDE recognizes—that they are organized to provide Christian postsecondary education. (ECF No. 1 ¶¶ 82–90, 128–31.) But in providing free and public *secondary* education to Minnesota's public high-school students, the Schools unquestionably engage in purely secular activity. The PSEO statute confirms as much, as public funds cannot be used to teach sectarian PSEO courses. Minn. Stat. § 124D.09, subds. 2, 3(a), and 10.

Further, accepting the Schools' allegations as true, their participation in PSEO is totally unrelated to the core religious and educational purposes that animate their postsecondary functions; rather, the Schools participate in

PSEO for primarily financial reasons.  (ECF No. 1 ¶¶ 116, 157 (alleging that their disqualification from PSEO will "significantly harm" the Schools "in the form of lost revenue and recruiting opportunities").)  And accepting MDE's counterclaim allegations as true, the Schools operate as state actors—not sectarian entities—when they participate in PSEO and therefore, like MDE, must comply with the MHRA.  As such, MDE has alleged a plausible MHRA claim.  *See State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn. 1985) ("[W]hen appellants entered into the economic arena and began trafficking in the marketplace, they have subjected themselves to the [MHRA]."); *Thorson v. Billy Graham Evangelistic Ass'n*, 687 N.W.2d 652, 657–58 (Minn. Ct. App. 2004) (noting that for-profit business activity is secular for MHRA purposes).  Thus, the MHRA's religious-function exception does not apply to the Schools in their capacity as providers of PSEO.

## B.   The First Amendment does not Compel Dismissal of MDE's MHRA Counterclaim

Alternatively, the Schools contend that applying the MHRA to their PSEO conduct would violate their First-Amendment rights to free exercise,

expressive association, and assembly.  Even if these affirmative defenses were susceptible to adjudication on a Rule-12 motion,[12] they are unavailing.

### 1.  The MHRA is Neutral and Generally Applicable

The "right to free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (quotation omitted); *accord B.W.C. v. Williams*, 990 F.3d 614, 620 (8th Cir. 2021).[13]  A law is neutral and generally applicable as long as its object is not to regulate religious practices.  *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008); *see also Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Absent evidence of such intent, a neutral law of general applicability must only be rationally related to a legitimate government objective to pass constitutional muster.  *Doe v. Parson*, 960 F.3d 1115, 1119 (8th Cir. 2020).

---

[12] *Cf. Ference v. Roman Cath. Diocese of Greensburg*, No. 22-797, 2023 WL 3876584, at *5 (W.D. Pa. Jan. 18, 2023) (applying church-autonomy doctrine is fact intensive and "not appropriately raised at the motion to dismiss stage"), *adopted in relevant part*, 2023 WL 3300499 (W.D. Pa. May 8, 2023); *Roiger v. Veterans Affs. Health Care Sys.*, No. 18-cv-591 (ECT/TNL), 2019 WL 572655, at *7 (D. Minn. Feb. 12, 2019) (observing that affirmative defenses ordinarily do not subject claims to dismissal under Rule 12).

[13] *Smith* has taken heavy fire recently.  *See, e.g., Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1883 (2021) (Alito, J., concurring) (urging reexamination of *Smith*). Yet it remains good law.

The Schools do not contend, and no party has plausibly pleaded, that the intent of the MHRA is to target religious institutions for dissimilar treatment. Nor can they, as the MHRA explicitly carves out sectarian activity from its purview—an exclusion which does not apply to the Schools because, again, their participation in the PSEO program is strictly a secular business activity. Minn. Stat. § 363A.26; *see also Black v. Snyder*, 471 N.W.2d 715, 719 (Minn. Ct. App. 1991) (observing that MHRA is a neutral law of general applicability). Furthermore, it is indisputable that the MHRA is rationally related to Minnesota's valid interest in eradicating discrimination. *Telescope Media Grp. v. Lindsey*, 271 F. Supp. 3d 1090, 1123 (D. Minn. 2017), *rev'd in part on other grounds sub nom.*, 936 F.3d 740 (8th Cir. 2019).

Nor does the church-autonomy doctrine give the Schools safe harbor from the MHRA. This narrow doctrine does not entitle religious institutions to general immunity from secular laws. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Rather, it requires deference to religious institutions only on matters of faith, doctrine, and internal governance. *See id.* at 2061; *accord Serb. E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09 (1976); *Watson v. Jones*, 80 U.S. 679, 710 (1871). Put differently, the doctrine prevents the judiciary from "lend[ing] its power to one side or the other side in controversies over authority or dogma." *Smith*, 494 U.S. at 877.

41

To adjudicate MDE's MHRA counterclaim, the Court need not parse the content of the Schools' religious beliefs or wade into their ecclesiastical governance. That is because the School's participation in PSEO constitutes purely secular activity—per their own pleadings and the PSEO statute.

> [S]ecular components of a dispute involving religious parties are not insulated from judicial review; a court may use the neutral principles of law approach. So long as the court relies exclusively on objective, well-established legal concepts, it may permissibly resolve a dispute even when parties are religious bodies. This is a common-sense approach: When a case can be resolved by applying well-established law to secular components of a dispute, such resolution by a secular court presents no infringement upon a religious association's independence. Thus, simply having a religious association on one side of the "v" does not automatically mean a district court must dismiss the case or limit discovery.

*Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022) (cleaned up).

No religious controversy exists here. MDE's counterclaim under the MHRA does not dispute the Schools' ability to discriminate when they provide sectarian postsecondary education. Instead, MDE challenges whether the Schools may accept taxpayer money to perform a traditional, secular, public function in a manner that discriminates against public high-school students and forces MDE to passively participate in illegal conduct. The MHRA counterclaim thus challenges the Schools' secular *conduct*, not their sectarian beliefs, so the church-autonomy doctrine poses no barrier to judicial resolution of this claim. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*,

561 U.S. 661, 699–700 (2010) (Stevens, J., concurring) (recognizing that accept-all-comers policy targeted discriminatory conduct, not religious beliefs, and therefore did not implicate the Free Exercise Clause); *see also Gen. Council on Fin. & Admin. v. Super. Ct. of Cal.*, 439 U.S. 1369, 1372 (1978) (Rehnquist, J., in chambers) (indicating that church-autonomy doctrine does not apply to "purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which . . . statutory violations are alleged").

Because the MHRA is a neutral law of general applicability and the church-autonomy doctrine does not apply, the Schools' free-exercise rights do not bar the MHRA counterclaim.

### 2. The MHRA is Reasonable and Viewpoint Neutral

Supreme Court precedent also dictates that nondiscrimination laws like the MHRA do not offend the First Amendment's guarantees of expressive association or assembly. *Christian Legal Society Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010), involved a challenge to a law school's "accept-all-comers policy," which required student groups to open eligibility for membership and leadership to all students, regardless of religion or sexual orientation, as a condition to accessing school-sponsored forums. 561 U.S. at 668. The chapter of Christian Legal Society at this law school sought a policy exemption so it could require members and officers to sign a faith statement similar to those at issue here. When its exemption request was

43

denied, the chapter sued, alleging that the policy violated its First-Amendment rights to free speech, expressive association, and free exercise. *Id.* at 671–73.

Applying intermediate scrutiny, the Supreme Court upheld the law school's policy, finding it both reasonable and viewpoint neutral. The policy was reasonable because it ensured equal access for all students, avoided inquiries into exclusionary motivations, promoted tolerance and learning, and embodied state-law proscriptions on discrimination. *Id.* at 687–90. As to neutrality, the Supreme Court found it "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* at 694 (emphasis in original).

The MHRA is, by its very nature, an accept-all-comers law, and that is precisely how MDE seeks to apply it here. The MHRA advances the same reasonable objectives as the policy in *Martinez* and is a textbook example of a viewpoint-neutral law. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984) (determining that the MHRA is facially neutral). As such, the Schools' expressive-association and assembly defenses do not warrant dismissal of MDE's claim under the MHRA. *See Mahoney v. U.S. Capitol Police Bd.*, 566 F. Supp. 3d 1, 16 (D.D.C. 2022) (indicating that *Martinez* also applies to free-assembly claims).

### 3.  The MHRA Furthers a Compelling State Interest

Neither *Smith* nor *Martinez* requires MDE to prove—especially at the pleading stage—that the MHRA is narrowly tailored to serve a compelling state interest to survive constitutional scrutiny. Still, the MHRA is so tailored.

Nearly forty years ago, the Supreme Court rebuffed a free-association challenge to the MHRA, holding that the law, "which reflects the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services," unequivocally "serves compelling state interests of the highest order." *Roberts*, 468 U.S. at 624.  The MHRA protects Minnesotans "from a number of serious social and personal harms" and is narrowly tailored to achieve these ends. *Id.* at 625–26.

Two years prior, the Supreme Court upheld an Internal Revenue Service (IRS) anti-discrimination regulation akin to the MHRA against a free-exercise challenge. *Bob Jones Univ. v. U.S. Goldsboro Christian Schs., Inc.*, 461 U.S. 574 (1983).  After the IRS refused to subsidize schools that discriminated based on race, Bob Jones University and other institutions sued, claiming their religious beliefs prohibited their admission of Black applicants. *Id.* at 578–80.  The schools lost because the government's interest in eradicating discrimination in education is "fundamental" and "overriding," and the IRS

45

regulation was the least restrictive means of achieving this interest.[14]
*Id.* at 604; *see also Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941, 945 (D.S.C. 1966) (holding that restaurant owner could not refuse to serve Black patrons based on religious beliefs opposing racial integration), *aff'd in relevant part and rev'd in part on other grounds*, 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968).

*Roberts* and *Bob Jones* illustrate how the Supreme Court has historically resolved collisions of individual and religious rights like those percolating here. Even if the Schools' First-Amendment defenses were susceptible to resolution at this early stage of the case (they are not), these defenses are overcome by Minnesota's compelling interest in eliminating discrimination, as effectuated through the provisions of the narrowly-tailored MHRA.

---

[14] *Bob Jones University*, the Supreme Court explained, was the latest in an "unbroken line of cases following *Brown v. Board of Education*" which established that "discrimination in education violates a most fundamental national public policy, as well as rights of individuals." 461 U.S. 574, 593 (1983). It is not lost on MDE that by providing a separate, online PSEO program for public high-school students who refuse to submit to faith statements, the Schools are engaged in conduct that is anathema to *Brown* and its progeny.

## CONCLUSION

Our constitutional equilibrium demands more than radical, uncompromising positions like those the Schools take in this case. Under the Schools' version of the Constitution:

> They are entitled to use public funds to openly discriminate against students participating in a state-run program, some of whom through no fault of their own have no PSEO options other than Crown or Northwestern.

> They are entitled to tell students that their religious beliefs are wrong, their sexual orientation a sin, and their gender identity a mistake—and then force them to publicly acknowledge these propositions through compelled speech.

> MDE cannot protect its youth from this conduct because, while the conduct may injure Minnesotan children, the State itself is not sufficiently harmed.

> The Court is prohibited from ending—or even questioning— this discriminatory and compelled speech because, like Bob Jones University, it is the Schools' religious prerogative to engage in this conduct and require Minnesota's public students to do so as well.

The Schools invited this constitutional melee and must be held to answer for their part in it. MDE has adequately pleaded that the Schools are obligated to follow—and have unabashedly violated—civil-rights laws governing the treatment of students who receive free, public education. The Schools' motion to dismiss must be denied.

Dated: August 18, 2023

KEITH ELLISON
Attorney General
State of Minnesota

s/ Jeff Timmerman
JEFF TIMMERMAN (#0352561)
MARTHA J. CASSERLY (#0148271)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
(651) 757-1214 (Casserly)
(651) 300-6807 (DeMeules)
jeffrey.timmerman@ag.state.mn.us
marty.casserly@ag.state.mn.us
madeleine.demeules@ag.state.mn.us

ATTORNEYS FOR DEFENDANTS

|#5558182-v1