# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MELINDA and MARK LOE, *et al.*, | Civil No. 0:23-cv-01527-NEB-JFD |
| *Plaintiffs,* | **PLAINTIFFS CROWN COLLEGE AND UNIVERSITY OF NORTHWESTERN – ST. PAUL'S REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| WILLIE JETT, *et al.*, | |
| *Defendants.* | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................ 2

I.  MDE Lacks Standing................................................................ 2

    A.  MDE Itself Lacks an Injury ..................................................... 2

    B.  MDE Lacks *Parens Patriae* Standing ........................................ 7

    C.  MDE Lacks Standing Under the MHRA ..................................... 14

II. The Schools Are Not State Actors ................................................ 15

    A.  The Schools Do Not Perform a Traditional,
    Exclusive State Function.................................................... 16

    B.  The Schools' Admissions Policies Are Not
    Attributable to the State .................................................. 20

III. MDE's MHRA Claim Also Fails .................................................. 22

    A.  The MHRA's Exemptions Apply to the Schools........................... 22

    B.  MDE's Proposed Application of the
    MHRA Would Interfere with the Schools'
    Religious Governance ...................................................... 24

    C.  MDE's Proposed Application of the
    MHRA Would Violate the Schools'
    Associational and Assembly Rights ......................................... 27

CONCLUSION ......................................................................... 30

CERTIFICATE OF COMPLIANCE ..................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   143 S. Ct. 2298 (2023)........................................................................29

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982)....................................................................*passim*

*Animal Legal Def. Fund v. Vaught,*
   8 F.4th 714 (8th Cir. 2021) ..................................................................8

*Askew v. Trs. of Gen. Assembly,*
   644 F. Supp. 2d 584 (E.D. Pa. 2009) ..................................................26

*Bd. of Educ. v. Ill. State Bd. of Educ.,*
   810 F.2d 707 (7th Cir. 1987)................................................................7

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023)......................................................................2-3

*Black v. Snyder,*
   471 N.W.2d 715 (Minn. Ct. App. 1991) .............................................26

*Bd. of Educ. v. Allen,*
   392 U.S. 236 (1968)..............................................................................5

*Bob Jones Univ. v. United States,*
   461 U.S. 574 (1983) ...........................................................................29

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ...........................................................................28

*Brewer v. Hoxie Sch. Dist.,*
   238 F.2d 91 (8th Cir. 1956)..................................................................6

*Bryce v. Episcopal Church,*
   289 F.3d 648 (10th Cir. 2002)............................................................25

*Bus. Leaders in Christ v. Univ. of Iowa,*
991 F.3d 969 (8th Cir. 2021) ................................................................ 28

*Carson v. Makin,*
142 S. Ct. 1987 (2022) .............................................................. 17-18, 20

*Caviness v. Horizon Cmty. Learning Ctr., Inc.,*
590 F.3d 806 (9th Cir. 2010) .......................................................... 16, 17

*Cheng v. WinCo Foods LLC,*
No. 14-cv-483, 2014 WL 2735796
(N.D. Cal. June 11, 2014) .................................................................... 7

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ............................................................... 29

*Christian Legal Soc'y v. Martinez,*
561 U.S. 661 (2010) ........................................................................... 28

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989) ............................................................................. 3

*Dale v. U.S. Steel Corp.,*
No. 13-cv-1046, 2015 WL 4138869
(D. Minn. July 2, 2015) ...................................................................... 15

*In re Edmond,*
934 F.2d 1304 (4th Cir. 1991) ............................................................ 7-8

*Egan v. Hamline United Methodist Church,*
679 N.W.2d 350 (Minn. Ct. App. 2004) ......................................... 23, 26

*Estados Unidos Mexicanos v. DeCoster,*
229 F.3d 332 (1st Cir. 2000) ............................................................ , 14

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ................................................................. 25, 29

*Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.,*
377 F. Supp. 2d 379 (S.D.N.Y. 2005) ................................................. 16

iv

*Harrison v. Jefferson Parish Sch. Bd.*,
   No. 22-30143, 2023 WL 5359049
   (5th Cir. Aug. 22, 2023) ............................................................ *passim*

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.*
   *EEOC*,
   565 U.S. 171 (2012) ................................................................ 25, 27

*Hous. Auth. of the Kaw Tribe of Indians v. Ponca City*,
   952 F.2d 1183 (10th Cir. 1991) ............................................... 7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ................................................................. 29

*Igbanugo v. Minn. Off. of Laws. Pro. Resp.*,
   56 F.4th 561 (8th Cir. 2022) .................................................... 2

*Illinois v. City of Chicago*,
   137 F.3d 474 (7th Cir. 1998) ................................................... 4

*Johnson v. Pinkerton*,
   861 F.2d 335 (1st Cir. 1988) ................................................... 20

*Kickapoo Traditional Tribe of Tex. v. Chacon*,
   46 F. Supp. 2d 644 (W.D. Tex. 1999) ...................................... 10

*Missouri ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017) ................................................. 9, 13

*Krueger v. Zeman Constr. Co.*,
   781 N.W.2d 858 (Minn. 2010) .............................................. 14, 15

*Logiodice v. Trs. of Me. Cent. Inst.*,
   296 F.3d 22 (1st Cir. 2002) ................................................ 17-18, 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................. 8

*Lynch v. Nat'l Prescription Adm'rs, Inc.*,
   787 F.3d 868 (8th Cir. 2015) ................................................... 8

v

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ........................................................................ 22

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ........................................................................ 29

*Missouri v. Biden*,
    No. 3:22-cv-1213, 2023 WL 2578260
    (W.D. La. Mar. 20, 2023) .................................................................... 10

*New York by Abrams v. 11 Cornwell Co.*,
    695 F.2d 34 (2d Cir. 1982) .................................................................... 9

*Nichols v. Metro. Ctr. for Indep. Living, Inc.*,
    50 F.3d 514 (8th Cir. 1995) ................................................................ 21

*North Dakota v. Heydinger*,
    No. 11-cv-3232, 2016 WL 5661926
    (D. Minn. Sept. 29, 2016) ...................................................................... 3

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ............................................................................... 3

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ............................................................................ 29

*Peltier v. Charter Day Sch., Inc.*,
    37 F.4th 104 (4th Cir. 2022) ........................................................ 18, 19

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ........................................................................ 9, 13

*Pennsylvania v. Porter*,
    659 F.2d 306 (3d Cir. 1981) ................................................................ 14

*Rayburn v. Gen. Conf.*,
    772 F.2d 1164 (4th Cir. 1985) ............................................................ 27

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ................................................................... *passim*

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................................... 28

*Rosenblum v. Does 1-10*,
    474 F. Supp. 3d 1128 (D. Ore. 2020) ................................................... 9

*Sabri v. Whittier All.*,
    833 F.3d 995 (8th Cir. 2016) .......................................................... 21-22

*Saginaw Cnty v. STAT Emergency Med. Servs., Inc.*,
    946 F.3d 951 (6th Cir. 2020) ............................................................ 4, 5

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
    584 F.3d 253 (6th Cir. 2009) ............................................................... 3

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ...................................................................... 25, 26

*South Dakota v. Adams*,
    506 F. Supp. 50 (D.S.D. 1980) ........................................................... 10

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ....................................................................... 25

*Thorson v. Billy Graham Evangelistic Ass'n*,
    687 N.W.2d 652 (Minn. Ct. App. 2004) ............................................ 23

*Tovar v. Essentia Health*,
    857 F.3d 771 (8th Cir. 2017) .............................................................. 15

*United States v. Santee Sioux Tribe of Neb.*,
    254 F.3d 728 (8th Cir. 2001) ............................................................... 9

*United States v. West Virginia*,
    295 U.S. 463 (1935) ............................................................................. 5

*Wickersham v. City of Columbia*,
    481 F.3d 591 (8th Cir. 2007) .............................................................. 21

**Statutes**

Minn. Stat. § 8.31 ................................................................................. 15

Minn. Stat. § 124D.09...................................................................... 4, 19, 20

Minn. Stat. § 363A.33.............................................................................. 15

# INTRODUCTION

MDE's response confirms its novel counterclaims are both meritless and retaliatory.

To begin, MDE's standing arguments are fundamentally flawed. Multiple courts have rejected its direct standing theory and have held that state agencies cannot invoke *parens patriae* standing absent an explicit grant of authority from the State itself (which MDE has not alleged). Separately, MDE fails to explain how it meets the standing requirements under the Minnesota Human Rights Act (MHRA) when it is not an aggrieved party as defined by the statute and binding precedent.

MDE's merits arguments fall equally flat. MDE fails to distinguish this case from *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), meaning that its constitutional counterclaims cannot proceed. And it concedes that the MHRA's explicit religious exemptions apply to Crown and Northwestern, defeating its counterclaim under that statute.

Worse still, MDE's own explanation makes clear that its counter-claims are transparently retaliatory: "the Schools invited this constitutional melee" by filing their lawsuit "and must be held to answer for their part in it." Resp.47. In other words, had Crown and Northwestern not asserted their First Amendment rights, MDE would not have sued them. This is confirmed by the more than two decades during which MDE reimbursed the Schools for their participation in the PSEO program without objecting to their admissions policies. Instead,

1

MDE waited until after the Schools filed their complaint, after MDE had already filed its initial answer, after MDE had agreed to a preliminary injunction, and after the Schools sought permission to file for summary judgment early. Moreover, MDE has not pursued claims against any other school with a similar admissions policy. Filing meritless, retaliatory claims is not mandatory, as MDE suggests, *see* Resp.20 n.7; it is sanctionable. *See Igbanugo v. Minn. Off. of Laws. Pro. Resp.*, 56 F.4th 561, 567 (8th Cir. 2022). This Court should not allow MDE to proceed with counterclaims designed to harass the Schools for striving to protect their First Amendment rights. MDE's counterclaims must be dismissed.

## ARGUMENT

## I. MDE Lacks Standing

### A. MDE Itself Lacks an Injury

MDE does not cite a single case holding that a state agency has standing to sue either its political subdivision or a contractor participating in a state program for alleged constitutional injuries to private citizens. Instead, it presents two arguments for direct standing, neither of which is correct.

First, MDE contends that it is financially injured by being "forced to finance the Schools' endorsement of religion and discrimination." Resp.13. But MDE provides no case recognizing standing for such an alleged injury. Instead, MDE points to cases involving actual pecuniary loss—the typical financial injury. Resp.13-14. In *Biden v. Nebraska*, the

Supreme Court held that a state could sue the federal government over actual lost revenue—money that MOHELA, a state instrumentality, should have received but would not under the federal government's policy. 143 S. Ct. 2355, 2366 (2023). Similarly, *School District of Pontiac v. Secretary of U.S. Department of Education* concluded that a school district had standing to sue the U.S. Secretary of Education because certain unfunded mandates would require the schools to "spend state and local funds" that they would not otherwise have spent. 584 F.3d 253, 261 (6th Cir. 2009). And in *North Dakota v. Heydinger*, North Dakota sued Minnesota officials over Minnesota's energy policy that violated the dormant Commerce Clause, "reduced the value and benefits of lignite resources in North Dakota," and "interfered with the development of clean coal technology" and related research, further devaluing the State's lignite resources. No. 11-cv-3232, 2016 WL 5661926, at *4 (D. Minn. Sept. 29, 2016).[1]

MDE's situation is nothing like these cases. MDE has not alleged, for example, that the Schools improperly claimed funds they were unqualified to receive. MDE alleges only that it must divert funds away from public schools to Crown and Northwestern when they provide PSEO courses. Resp.13. Although MDE does reallocate funds from public school

---

[1]   Two of the cases MDE cites do not address standing at all, but rather a state or local government's authority to *legislatively* address discrimination. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492-93 (1989); *Norwood v. Harrison*, 413 U.S. 455, 463 (1973).

districts for the PSEO program, it does not *lose* any money in the process. All PSEO funds follow the students, not the schools. *See generally* Minn. Stat. § 124D.09 (2023). MDE's financial status is thus no different if a student chooses to remain in a public high school, participate in PSEO at Crown or Northwestern, or participate in PSEO at a state school—it pays the same amount of money in each scenario, and the student earns the necessary high school credit in each scenario. *See id.* § 124D.09, subds. 13-21. MDE has identified no financial injury.

At its core, MDE's alleged financial injury collapses into its second standing argument: MDE claims it is injured by becoming complicit in the alleged constitutional violations of another "state actor" and that this inhibits its own ability to uphold the Constitution. *See* Resp.13, 15. But MDE fails to note that multiple courts have already rejected this argument. *See, e.g.*, *Harrison v. Jefferson Parish Sch. Bd.*, No. 22-30143, 2023 WL 5359049, at *4-5 (5th Cir. Aug. 22, 2023) (holding state had no standing to sue a local school board for violating constitutional rights of students); *Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956 (6th Cir. 2020) (holding county had no standing to sue company violating the law); *Illinois v. City of Chicago*, 137 F.3d 474, 476-78 (7th Cir. 1998) (holding Illinois did not have standing to sue Chicago). This is because a violation of law that could be enforced by the government "does not by itself injure the government in an Article III way. Only 'actual or threatened interference with [its] authority' does."

*Saginaw County*, 946 F.3d at 956 (quoting *United States v. West Virginia*, 295 U.S. 463, 473 (1935)). In *Harrison*, for example, Louisiana argued (just as MDE has argued here) that it had standing because a local school board's violation of students' constitutional rights would "interfere with the performance of the obligation of executive officers of the State to uphold and enforce those rights." 2023 WL 5359049, at *4. The Fifth Circuit rejected that argument because Louisiana could "use its full arsenal of enforcement mechanisms to force JPSB to comply with state law." *Id.* Thus, Louisiana faced no "infringement" of its ability to enforce the constitution. *See id.* at *5 ("Violating the law is different from hindering its enforcement.").

Rather than acknowledging these cases, MDE relies principally on *Board of Education v. Allen*, 392 U.S. 236 (1968), where the Supreme Court concluded that a local school board had standing to sue the state commissioner of education because the state's policy would force the school board to allegedly violate the Constitution. *Id.* at 241 & n.5. MDE tries to flip that case on its head, contending that it authorizes MDE, as the sovereign entity, to sue the Schools, as program participants, for violating the constitutional rights of others. But MDE cites no case holding that the injury flows in that direction. It does not work that way because the sovereign has power to enforce the law against the subordinate, not the other way around.

5

The Eighth Circuit's decision in *Brewer v. Hoxie School District*, 238 F.2d 91 (8th Cir. 1956), does not support MDE's position either. There, a local school district sued several members of the community who directly interfered with the school district's desegregation efforts through numerous acts of trespass, threats of physical violence and intimidation directed at school officials, and a host of other unlawful actions that ultimately "caused discontinuance of a school session." *Id.* at 93-94. Unlike the defendants in *Harrison* and *Chicago*, the defendants in *Brewer* were not contractors or political subdivisions subject to the school district's direct authority. *See id.* at 93. They were external actors interfering with the district's duties and could not be dealt with through the school district's own enforcement powers.

In this case, however, MDE has not alleged that the Schools are outside of its enforcement authority. Indeed, Minnesota passed a law that, if upheld, would authorize MDE to exclude the Schools from the PSEO program unless they abandoned their religious policies. If MDE is correct that the law is constitutional, then nothing prevents it from using its sovereign power to force the Schools to comply with the law. It does not need a federal court for that.

MDE has alleged neither that it has lost any money nor that the Schools have interfered with its ability to enforce the law. It lacks an injury, and without an injury, it cannot show causation or redressability. It thus lacks standing.

6

### B.   MDE Lacks *Parens Patriae* Standing

MDE belatedly asserts that it has *parens patriae* standing. Resp.18. But MDE cannot rely on *parens patriae* standing for three reasons. First, no state law authorizes MDE to represent Minnesota's interests in that capacity. Multiple courts have held that a state agency does not have *parens patriae* standing in the absence of express authority to represent the State's interests—aligned interests are insufficient. *See, e.g.*, *Hous. Auth. of the Kaw Tribe of Indians v. Ponca City*, 952 F.2d 1183, 1193 (10th Cir. 1991) (holding that an Oklahoma state agency did not have *parens patriae* standing because it presented "no authorization by the State of Oklahoma to represent the state's sovereign interest"); *Bd. of Educ. v. Ill. State Bd. of Educ.*, 810 F.2d 707, 709-12 & n.6 (7th Cir. 1987) (looking to state law to determine that a local school board could not sue to represent Illinois's interests); *Cheng v. WinCo Foods LLC*, No. 14-cv-483, 2014 WL 2735796, at *9-10 (N.D. Cal. June 11, 2014) ("An administrative agency only represents the State's interests insofar as it has been granted the power to do so.").

MDE cites no case to the contrary, insisting without any supporting caselaw that, because the agency's interests are the same as the State of Minnesota's, it can assert *parens patriae* authority whenever it wants. Resp.23-24. Indeed, its only cited case dooms the argument. *In re Edmond* involved "explicit" state law granting the agency authority to "act[] on behalf of the state's quasi-sovereign interest[.]" 934 F.2d 1304,

7

1310 (4th Cir. 1991). MDE cites no "explicit" or even implicit authority here, and it therefore cannot assert *parens patriae* standing. *See Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021) (the party asserting jurisdiction bears the burden of establishing each element).

Second, MDE's pleadings fail entirely to invoke *parens patriae* standing. Its counterclaims are also devoid of the necessary facts, such as the existence of a "quasi-sovereign interest" or an "injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). As MDE itself acknowledges, "[t]he party asserting jurisdiction bears the burden of establishing jurisdiction," Resp.9 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), meaning that the pleadings must contain "sufficient facts to support a reasonable inference that [MDE] can satisfy the elements of standing." *Vaught*, 8 F.4th at 718. But the pleadings are silent. MDE's failure to allege such facts means its counterclaims must be dismissed. *See Snapp*, 458 U.S. at 607 ("The State must express a quasi-sovereign interest."); *cf. Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 872 (8th Cir. 2015) (state attorney general could not claim *parens patriae* authority under New York law because "[n]othing in th[e] court's record indicates the AG invoked *parens patriae* authority").

Third, even if MDE had authority to represent Minnesota's interests and had properly pleaded *parens patriae* standing, it would still be inappropriate here. It is "settled doctrine that a State has standing to sue

8

only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976). And the alleged injury must pertain to the state's "residents in general," not just to "an identifiable group of individual residents[.]" *Snapp*, 458 U.S. at 607; *see also United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 734 (8th Cir. 2001) ("[T]his doctrine is reserved for actions which are asserted on behalf of *all* of the sovereign's citizens.").

Multiple courts have interpreted *Snapp*'s requirements to mean "that *parens patriae* standing is inappropriate where an aggrieved party could seek private relief" in its own lawsuit. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017); *accord New York by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc) ("*Parens patriae* standing . . . requires a finding that individuals could not obtain complete relief through a private suit."). And several courts have held that a sovereign does not have *parens patriae* standing to bring First Amendment claims on behalf of groups of individual citizens when the government's distinct interests are not implicated. *See, e.g.*, *Rosenblum v. Does 1-10*, 474 F. Supp. 3d 1128, 1135-36 (D. Ore. 2020) ("[T]he State of Oregon has not explained . . . why the chilled speech it alleges here injures the state in a way that is distinct from the individual harms that it also alleges."); *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F.

Supp. 2d 644, 652 (W.D. Tex. 1999) (holding Tribe did not have *parens patriae* standing to assert a First Amendment violation "because the rights which [the Tribe] seeks to assert are primarily those of a small group of tribe members"); *South Dakota v. Adams*, 506 F. Supp. 50, 59 (D.S.D. 1980) (holding no *parens patriae* standing because "[t]he alleged First Amendment rights . . . are only those of the individual citizens").

The single case MDE identifies where a court recognized *parens patriae* standing when a state pursued First Amendment claims on behalf of its citizens is inapposite. *See* Resp.23. In that case, the federal government (not an internal contractor of the plaintiff states) allegedly "censor[ed]" politically disfavored "viewpoints and speakers" on social media, meaning that "millions of Missourians and Louisianians" had their First Amendment right to speak and to listen allegedly violated. *Missouri v. Biden*, No. 3:22-cv-1213, 2023 WL 2578260, at *1, *13 (W.D. La. Mar. 20, 2023). There, because the states' own subdivisions had been subject to interference, the district court held that the states had both direct injuries and *parens patriae* standing on behalf of "a substantial segment of each State's population[.]" *Id.* at *10. Here, no state actor has been directly injured. And far from pursuing the rights of "a substantial segment of each State's population," *id.*, MDE is improperly trying to assert First Amendment rights on behalf of a small, "identifiable group

10

of individual" students who could easily bring their own claims. *Snapp*, 458 U.S. at 607.[2]

More on point is the Fifth Circuit's recent decision in *Harrison*, where Louisiana asserted *parens patriae* standing to sue a local school board because it had a "quasi-sovereign interest in preventing its political subdivisions from violating the constitutional rights of 52,000 public schoolchildren." 2023 WL 5359049, at *6. The Fifth Circuit rejected that argument, concluding that "Louisiana's asserted interest . . . is wholly derivative of the interests of JPSB's students," each of whom could "sue to get relief from JPSB's alleged discrimination" if they chose. *Id.* The State was "not asserting a separate injury" to the State's interests, "nor d[id] it allege injury to its citizens health or economic well-being in a way that also implicates its own interests." *Id.* Thus, the Fifth Circuit held that Louisiana lacked *parens patriae* standing. *Id.* at *6-7.

This case is on all fours with *Harrison*. MDE avers that it has an interest in "preventing discrimination, protecting public health and welfare," not funding "discriminatory" activity, and protecting the constitutional rights of its citizens. Resp.23. But those interests were all present and found insufficient to confer standing in *Harrison*, where the alleged injury accrued only to the students who faced the various harms

---

[2]  Even if some individual students may face unique difficulties in bringing a lawsuit, Resp.22 n.9, MDE cites no case supporting *parens patriae* standing based on an individual's personal challenges in bringing their claim.

associated with the discrimination. *See Harrison*, 2023 WL 5359049, at *4-7. Likewise, the only harm that MDE has alleged in this case is to individual high school students. *See* Countercl. ¶¶ 49-54, 58-60, 64-65, 71, 76-77, 82-83. Any of MDE's asserted interests, like Louisiana's in *Harrison*, are "wholly derivative of the interests of" a few Minnesota high school students. *Harrison*, 2023 WL 5359049, at *6. The agency has not asserted any harm to the State's interests that are distinct from the individual claims it is trying to represent.

MDE proffers two additional arguments as to why *parens patriae* applies here, but each fails. First, MDE argues that, because Minnesota enacted legislation that targeted the Schools' admissions policies, it automatically has a quasi-sovereign interest that confers *parens patriae* standing. Resp.19, 23. Not so. In *Harrison*, the Fifth Circuit held that there was no distinct, quasi-sovereign interest at stake even though "Louisiana ha[d] already corrected JPSB's allegedly discriminatory policies through legislation." 2023 WL 5359049, at *7. Although the desire to legislate regarding a particular issue can be a "helpful indication" of a quasi-sovereign interest, *Snapp*, 458 U.S. at 607, that does not create a quasi-sovereign interest out of whole cloth. "[T]he State must articulate an interest *apart from the interests of particular private parties*" to support *parens patriae* standing. *Id.* (emphasis added). Here, MDE's counterclaims derive solely from the injuries allegedly sustained by particular high school students. Any students allegedly injured by the

12

Schools' policies could bring their own claims. *See Harris*, 847 F.3d at 652. MDE's argument to the contrary, Resp.21, is both wrong, s*ee Harrison*, 2023 WL 5359049, at *6, and disingenuous considering the plaintiffs in this very lawsuit include PSEO students and their families who brought their own First Amendment claims against MDE. MDE is simply suing as a "volunteer" for the claims of individual high school students. *Pennsylvania*, 426 U.S. at 665. It therefore lacks *parens patriae* standing. *Id.*

Finally, MDE contends that *Snapp* authorizes standing here, but *Snapp* actually commands the opposite. There, the Supreme Court held that Puerto Rico's standing to protect its citizens from employment discrimination by the state of Virginia hinged on a quasi-sovereign interest in "full and equal participation in the federal employment service scheme established" by two federal statutes. *Snapp*, 458 U.S. at 609. Had federalism concerns not been at stake, "Puerto Rico would have simply been asserting the interests of the citizens and thus its interests would not have satisfied the requirement that the state assert 'interest[s] apart from the interests of particular private parties.'" *Harrison*, 2023 WL 5359049, at *7 (quoting *Snapp*, 458 U.S. at 607). *Snapp* therefore does not establish "parens patriae standing in a State in the absence of federalism concerns where the quasi-sovereign interest at stake is the prevention of discrimination against that State's citizens." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 339 (1st Cir. 2000). MDE

has not identified any federalism concerns that flow from Crown's and Northwestern's admissions policies because there are none. Nor has MDE identified any harm to a quasi-sovereign interest separate from the alleged discriminatory injuries to individual high school students.[3] *Snapp* therefore does not authorize *parens patriae* standing here. *See id.* Because MDE has not alleged facts sufficient to support *parens patriae* standing, its claims must be dismissed.

## C.  MDE Lacks Standing Under the MHRA

MDE argues that it falls within the MHRA's definition of any "person," meaning it has standing to bring an MHRA claim. Resp.24-25. The primary problem with this argument is that the Minnesota Supreme Court has already rejected it. In *Krueger v. Zeman Constr. Co.*, the Court explained that "a 'person' can bring a claim under the MHRA" only "if 'aggrieved by a violation of this chapter.'" 781 N.W.2d 858, 862 (Minn. 2010). That is, merely meeting the definition of "person" is not enough. Accepting MDE's interpretation of the statute leads to a situation in which "there is virtually no limit on the persons who can sue" under the MHRA—a consequence rejected by the Court because "[t]here is no

---

[3]  MDE's reliance on the Third Circuit's pre-*Snapp* decision in *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981) is also misplaced. As the Fifth Circuit explained in *Harrison*, "*Porter* is not on all fours with *Snapp*. Lacking the benefit of *Snapp*, the *Porter* court failed to explain how Pennsylvania suffered an injury separate from the citizens subjected to the alleged police misconduct . . . And we can divine no such separate injury." 2023 WL 5359049, at *7.

14

indication that the legislature intended such an expansive reading of the statute." *Id.* at 864. Both this Court and the Eighth Circuit have followed suit, holding that non-aggrieved persons cannot sue under the MHRA. *See Dale v. U.S. Steel Corp.*, No. 13-cv-1046, 2015 WL 4138869, at *5-7 (D. Minn. July 2, 2015); *Tovar v. Essentia Health*, 857 F.3d 771, 775-76 (8th Cir. 2017).

Thus, MDE must show it is an aggrieved party to have standing under the MHRA, but it cannot do so. That status is reserved for a person who "suffer[s] discrimination on the basis of her own protected characteristic." *Tovar*, 857 F.3d at 776; *Krueger*, 781 N.W.2d at 862-64. MDE's supposed injury stems not from an act of discrimination against *the agency* based on *the agency*'s protected characteristic (as it must under *Krueger* and *Tovar*), but from alleged injuries to Minnesota students based on *their* protected characteristics. Resp.25. MDE therefore has no standing to pursue its counterclaim under the MHRA.[4]

## II.  The Schools Are Not State Actors

Even if this Court concludes that MDE has standing to bring its claims, the Court should still dismiss MDE's claims because they are

---

[4]  Nor does MDE have *parens patriae* standing under the MHRA. MDE cites no direct statutory authority to pursue claims under the MHRA. Indeed, the statute expressly grants authority to enforce the MHRA to another agency. *See* Minn. Stat. § 363A.33. Minnesota knows how to grant *parens patriae* authority when it wants to. *See, e.g.*, Minn. Stat. § 8.31 (granting Attorney General *parens patriae* authority to pursue certain commercial claims). But it did not do so here.

meritless. As explained in the motion, MDE's constitutional claims are foreclosed by *Rendell-Baker v. Kohn*, which held that a private school did not become a state actor simply because it accepted state funds to carry out a state-created education program. 457 U.S. 830, 837 (1982); Mem.10-11. None of MDE's contrary arguments withstand scrutiny.

## A.  The Schools Do Not Perform a Traditional, Exclusive State Function

To support its state-actor argument, MDE contends that, despite *Rendell-Baker*, the Schools perform a function which has traditionally been the exclusive prerogative of the state. Resp.28. This attempt to circumvent *Rendell-Baker* fails. First, MDE tries to cabin *Rendell-Baker*'s holding to the precise educational services described in the opinion, arguing that the school did not perform an exclusive function because it was dedicated to providing education services for a handful of "maladjusted youth." Resp.28, 30 (quoting *Rendell-Baker*, 457 U.S. at 842). But many subsequent courts have held that *Rendell-Baker* foreclosed the argument that the provision of educational services in general (and public education specifically) made a private institution a state actor. *See, e.g.*, *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814-15 (9th Cir. 2010); *Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.*, 377 F. Supp. 2d 379, 386 (S.D.N.Y. 2005) (collecting cases). *Rendell-Baker* likewise applies with full force in this case.

16

Next, MDE asserts that the Court should conclude that providing a *public* education (as opposed to an education generally) qualifies as an exclusive state function. Resp.30. *Rendell-Baker* precludes this argument, too. That case involved a tuition assistance program paid for entirely by the state—in other words, a publicly funded education. 457 U.S. at 832-33. There is no basis for distinguishing between the tuition program at issue there and the PSEO program at issue here.

Even if there were some daylight between the cases, however, other courts have already considered and rejected MDE's argument. For example, in *Caviness*, the plaintiff argued that "'education in general' can be provided by anyone, while '*public* educational services' are traditionally and exclusively the province of the state." 590 F.3d at 815. The Ninth Circuit held that the plaintiff's argument was "foreclosed by *Rendell-Baker*" because in both cases, the private entities "contracted with the state to provide students with educational services that are funded by the state." Though "[t]he Arizona legislature chose to provide alternative learning environments at public expense, . . . as in *Rendell-Baker*, that 'legislative policy choice in no way makes these services the exclusive province of the State.'" *Id.* (quoting *Rendell-Baker*, 457 U.S. at 842).

Likewise, in *Logiodice v. Trustees of Maine Central Institute*, the plaintiff argued that a private school participating in Maine's town-tuitioning program (the same program at issue in *Carson v. Makin*, 142

S. Ct. 1987 (2022)) was a state actor because "'it was performing the traditional public function of providing public educational services' to the school district's high school students." 296 F.3d 22, 26 (1st Cir. 2002). The First Circuit rejected the plaintiff's attempt to "refine the category as that of providing a publicly funded education" as opposed to education generally. *Id.* at 27. Even though the state funded the education of these high school students at a private school, the private school was not performing an exclusive public function. *Id.*

MDE argues, as did the plaintiffs in *Logiodice*, that providing a "public" education, as opposed to providing education generally, changes the state actor analysis. Resp.33-36. That meaningless distinction would eviscerate the Supreme Court's declaration in *Rendell-Baker* that a "school's receipt of public funds does not make [its actions] acts of the State." 457 U.S. at 840. Accepting MDE's argument would transform any school that accepts tuition vouchers into state actors. But as *Caviness*, *Logiodice*, and *Rendell-Baker* demonstrate, that's simply not the case. Minnesota's "legislative policy choice" to pay for high school students to attend a private institution instead of a public one "in no way makes these services the exclusive province of the State." *Id.* at 842.

To get around decisions like these, MDE relies heavily on the Fourth Circuit's decision in *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022), *cert. denied* 143 S. Ct. 2657 (2023), as well as other cases concerning the operation of charter schools and schools specifically

18

designated by statute as public. Resp.33. But *Peltier* concerned whether "the operation of schools designated as 'public' under North Carolina law is an exclusively public function." 37 F.4th at 116. Crown and Northwestern are both decidedly private schools, and they are neither operating a public institution nor subject to extensive oversight or control by Minnesota. *See infra* II.B. Even if operating a public school is a traditionally exclusive function of the state, it does not follow that private schools who accept tuition funding become state actors. Even accepting all of MDE's allegations as true, this case is much more like *Rendell-Baker* and *Logiodice*—where Massachusetts and Maine paid the tuition at private schools to educate children—than it is like *Peltier*.

MDE's final gambit fares no better. It argues, in essence, that because it created the PSEO program as an extension of its state constitutional obligation to educate students, all schools that shoulder the responsibility of participating in the PSEO program thereby become state actors. Resp.32-34. This ignores the nature of the PSEO program, which is to provide tuition for students to obtain not just a secondary education but also a *postsecondary* education—which MDE has not alleged to be a part of its constitutional obligation. The program does not contain any explicit requirement that private schools provide a "public education." Instead, it provides for the payment of tuition at private schools, just like in *Logiodice*. *See* Minn. Stat. § 124D.09, subds. 13, 19. Moreover, the PSEO program itself—like the town-tuitioning program in *Logiodice* and

19

*Carson*—has always included private schools, meaning that it has not been traditionally exclusive to the state. Minn. Stat. § 124D.09, subd. 3. MDE has never before treated those private schools as state actors. Moreover, private schools (including Northwestern) offer dual-credit classes *outside* of the PSEO framework for any students who want to take them. *See* Compl. ¶ 144. Thus, the PSEO program specifically, and dual-credit education in Minnesota generally, have not traditionally been exclusive to the state.

Indeed, just like the benefit available in *Logiodice* and *Carson*, the benefit to Minnesota high schoolers here "is *tuition* at a public *or* private school, selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education." *Carson*, 142 S. Ct. 1987, at 1998-99. Just because Minnesota "requires that its children, to a certain age, be educated, even to the extent of assuming full tuition cost of all who do not voluntarily pay their own way, it does not follow that the mechanics of furnishing the education is exclusively a state function." *Johnson v. Pinkerton*, 861 F.2d 335, 338 (1st Cir. 1988). MDE provides no valid distinction between other tuition-payment cases—where courts have held that the private school was not a state actor—and this case.

## B. The Schools' Admissions Policies Are Not Attributable to the State

Not only has MDE failed to show that the Schools perform an exclusive state function; it also fails to show that the Schools' admissions policies

20

are attributable to the state in any other way. MDE suggests that participation in the PSEO program necessarily leads to entwinement with the state. Resp.35. Yet, as the Eighth Circuit has explained, "[t]he one unyielding requirement" to attribute private action to the state "is that there be a 'close nexus' not merely between the state and the private party, but between the state and the alleged deprivation itself. No such nexus exists where a private party acts with the mere approval or acquiescence of the state. . . ." *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). MDE has not alleged that Minnesota exercises any degree of control over the Schools in general or their admissions decisions specifically. *See, e.g.*, *Nichols v. Metro. Ctr. for Indep. Living, Inc.*, 50 F.3d 514, 518 (8th Cir. 1995) ("What was missing here and in *Rendell-Baker* . . . is direct government control, either of the organization . . . or of the conduct that caused the alleged deprivation of plaintiff's rights."); *Logiodice*, 296 F.3d at 28 (holding that because Maine did not control "the particular activity sought to be classed as state action," there was "no entwinement" between the state and the private school). Nor has it alleged that the Schools' admissions policies were "compelled or even influenced by any state regulation." *Rendell-Baker*, 457 U.S. at 841. What it has pointed to amounts to general oversight of a state-created program. *See* Resp.35. But as both the Supreme Court and the Eighth Circuit have said, "[m]ere regulation does not convert a private organization's actions into state action . . . 'even if [the regulation is] extensive and detailed.'"

21

*Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016) (quoting *Rendell-Baker*, 457 U.S. at 841); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) ("Put simply, being regulated by the State does not make one a state actor.").

*Rendell-Baker* and its progeny squarely foreclose MDE's state actor arguments, even when all its factual allegations are accepted as true. This Court should therefore dismiss MDE's constitutional claims.[5]

## III. MDE's MHRA Claim Also Fails

MDE's MHRA claim is equally meritless. The MHRA expressly exempts religious institutions like Crown and Northwestern from liability here. Even if it did not, multiple, overlapping First Amendment rights would prevent its application against the Schools.

### A.   The MHRA's Exemptions Apply to the Schools

MDE "recognizes" that the MHRA's religious exemptions apply to schools like Crown and Northwestern that are "organized to

---

[5]   MDE's contention, Resp.36-37, that unnamed "constitutional norms" somehow require treating private schools like state actors ignores the foundational truth that only the government is subject to constitutional standards—not private entities. *See Halleck*, 139 S. Ct. at 1932. Indeed, students at public and private schools already diverge in their ability to assert constitutional claims against their respective schools. Holding that the Schools here are state actors would create an even odder situation in which two students in the same classroom—a traditional student and a PSEO student—are entitled to different protections. Moreover, it would deprive Crown and Northwestern of their own First Amendment rights. *See infra* III.B-C. MDE provides no basis for such a constitutional anomaly.

provide Christian postsecondary education." Resp.38. That should end
the inquiry. Yet MDE contends that, by participating in the PSEO
program, the Schools somehow engage in "secular activity 'unrelated to
[these] religious and educational purposes'" and thus are subject to the
MHRA. *Id.* The idea that the Schools' PSEO offerings are "purely secular"
and unrelated to their religious and educational purposes is farcical.

Minnesota Courts have held that "the phrase 'secular business
activities' is properly considered in light of the purpose and mission of
the entire entity." *Thorson v. Billy Graham Evangelistic Ass'n*, 687
N.W.2d 652, 657 (Minn. Ct. App. 2004) (holding that the operation of a
mail room at an evangelical ministry was not a "secular business
activity"); *see also Egan v. Hamline United Methodist Church*, 679
N.W.2d 350, 355-56 (Minn. Ct. App. 2004) (holding music director
position was religious, not secular). For the exemption not to apply, a
religious association must be "engaged in ordinary commerce" unrelated
to its religious or educational mission. *Thorson*, 687 N.W.2d at 658.

Providing PSEO education fits squarely within the core religious and
educational missions of both Crown and Northwestern. Crown alleges
that its mission "is to provide a biblically-based education for Christian
leadership in the Christian and Missionary Alliance, the Church-at-
large, and the world." Compl. ¶ 87; *see also id.* ¶ 109. Northwestern
"exists to provide Christ-centered higher education equipping students to
grow intellectually and spiritually, to serve effectively in their

23

professions, and to give God-honoring leadership in the home, church, community and world." *Id.* ¶ 129. And both allege that their PSEO courses, while complying with MDE's exclusion of "sectarian" courses, are not "purely secular," Resp.38, but are presented from a distinctly Christian worldview in furtherance of their religious educational missions. *See* Compl. ¶¶ 88-89, 98, 130, 139. The schools thus participate in PSEO to further their religious educational missions and not, as MDE avers, for "primarily financial reasons." Resp.39. More to the point, providing dual-credit classes for high school students is not "unrelated" to the core religious and educational mission of either school. It is part and parcel with providing a Christian education that equips students to grow spiritually and intellectually and to lead in their communities. The statute's religious exemptions thus completely bar MDE's counterclaim under the MHRA.

### B. MDE's Proposed Application of the MHRA Would Interfere with the Schools' Religious Governance

As explained in the motion, the Schools' internal religious practice of choosing students who agree with their faith is protected by the Religion Clauses' church autonomy doctrine. Mem.17-18. MDE's arguments that the MHRA is neutral and generally applicable and that it furthers a compelling state interest are beside the point. Resp.40-46.[6] That's

---

[6] While irrelevant, MDE's *Smith* argument is also outdated. MDE's reliance on a 2008 case, Resp.40, evades several recent Supreme Court

because the church autonomy doctrine acts as a complete bar on state interference with or intervention in "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976). The *Smith* analysis does not apply to "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). And courts do not engage in a strict scrutiny analysis when considering church autonomy defenses because the doctrine flatly "prohibits civil court review of internal church disputes" involving such matters. *Bryce v. Episcopal Church*, 289 F.3d 648, 655 (10th Cir. 2002). Church autonomy likewise "prohibits" this Court from applying the MHRA in such a way that would cause it to wade into the Schools' internal religious affairs.

MDE's assertion that its MHRA counterclaims can be resolved without interfering with the Schools' internal religious governance is simply wrong. MDE makes no effort to respond to the numerous cases holding

---

cases explaining ways that laws fail the neutral and generally applicable test other than intentional discrimination. *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (laws "are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise").

that the First Amendment precludes a court from adjudicating admissions-based claims against a religious school because an admissions decision "necessarily involves doctrinal criteria." *Askew v. Trs. of Gen. Assembly*, 644 F. Supp. 2d 584, 594 n.8 (E.D. Pa. 2009); *compare* Mem.18, *with* Resp.40-42. And Minnesota courts have recognized that "the constitutional policy of avoiding entanglement" in "matters of church government as well as those of faith and doctrine" precludes courts from applying the MHRA in a way that would enmesh the court in theological matters. *Egan*, 679 N.W.2d at 357-58; *see also Black v. Snyder*, 471 N.W.2d 715, 720 (Minn. Ct. App. 1991) (dismissing retaliation claim under the MHRA because it was "fundamentally connected to issues of church doctrine and governance and would require court review of the church's motives for discharging" the plaintiff). The First Amendment clearly precludes applying the MHRA in a way that would "deprive [Crown and Northwestern] of the right of construing their own" religious beliefs. *Serbian*, 426 U.S. at 714.

Yet that's precisely what MDE's MHRA counterclaim invites this Court to do. The counterclaim relies exclusively on the Schools' requirement that on-campus PSEO students agree with the Schools' religious beliefs—a quintessentially *religious* criteria tied directly to the Schools' doctrinal beliefs. Countercl. ¶¶ 35-36, 38. Indeed, MDE's own argument hinges on acknowledging that the Schools' conduct is not secular. Resp.42. Its core objection is to the underlying religious beliefs.

26

Resp.9. MDE would have this Court delve into the Schools' doctrinal beliefs, determine that that doctrine is discriminatory, and force the Schools to admit students who cannot join their faith communities as the cost of doing business with the state. That ruling would not only chill the rights of religious colleges and universities across the country that participate in government programs; it would interfere with the "sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., joined by Kagan, J., concurring); *see also Rayburn v. Gen. Conf.*, 772 F.2d 1164, 1169 (4th Cir. 1985) ("In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content.").

## C.  MDE's Proposed Application of the MHRA Would Violate the Schools' Associational and Assembly Rights

MDE is also incorrect that its MHRA claim would not violate the Schools' rights to assembly and expressive association. Resp.43-46. MDE does not dispute that Crown and Northwestern, as Christian schools, are engaged in religious expression. Nor does it dispute that the MHRA would interfere with their ability to express their religious viewpoints. Instead, MDE insists that Minnesota's interests justify the intrusion. But Minnesota does not engage with the Schools' controlling precedent that says otherwise. Mem.19-20.

27

MDE's cases also cut against its position. *Christian Legal Society v. Martinez* emphasized that free association rights lose strict scrutiny protections only in limited-public-forum cases. 561 U.S. 661, 681-82 (2010). MDE has not argued that Crown and Northwestern are speaking in a limited public forum. *Martinez*'s intermediate scrutiny framework thus does not apply here. Moreover, *Martinez* involved an all-comers policy. But the MHRA, as MDE concedes, has express exemptions that allow religious organizations to base membership decisions on religion and sexual orientation, Resp.38, so it does not enforce an all-comers policy on the Schools. *See, e.g.*, *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 973-74 (8th Cir. 2021). *Martinez* is thus inapposite and strict scrutiny applies.

Nor do *Roberts* and *Bob Jones* support MDE's stated interests. *Roberts* itself distinguished relationships "cultivating and transmitting shared ideals and beliefs" such as "the raising and education of children." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984). And it applies only where "the enforcement of [the law] would not materially interfere with the ideas that the organization sought to express." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657 (2000). Here, MDE's forced inclusion of certain students would directly interfere with the Schools' ability to maintain

28

their core message and a cohesive Christian community. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863-64 (7th Cir. 2006).[7]

In *Bob Jones University v. United States*, the government passed strict scrutiny based on its "fundamental, overriding interest in eradicating racial discrimination." 461 U.S. 574, 604 (1983). But the Supreme Court has never applied the same reasoning to "decent and honorable" beliefs regarding sexuality.[8] *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). Instead, the Court has repeatedly and recently explained that "[w]hen a state public accommodations law and the Constitution collide, there can be no question which must prevail." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2315 (2023); *see also Fulton*, 141 S. Ct. at 1882; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578-79 (1995). MDE provides no reason why the MHRA's interest in preventing discrimination is any different than the same interests found insufficient to overcome the First Amendment in each of those cases.

*     *     *

Through its legislative power, Minnesota is seeking to block Crown and Northwestern specifically from engaging in their core religious exercise while participating in the PSEO program. This lawsuit already tests the constitutionality of that targeted act. MDE's sudden

---

[7]   MDE also ignores the associational rights of the Loes and Ericksons, who seek an educational environment that supports their religious beliefs.

[8]   Beliefs MDE uncharitably mischaracterizes. Resp.9.

accusation—after decades of PSEO funding—that the Schools are State Actors engaged in unlawful discrimination adds nothing. Making that assertion here, for the first time, against Crown and Northwestern alone, only reinforces that MDE's counterclaims are both meritless and sanctionable.

## CONCLUSION

MDE's counterclaims should be dismissed.

Respectfully submitted this 1st day of September, 2023.

/s/ Diana Verm Thomson
Diana Verm Thomson*
Eric S. Baxter*
Benjamin A. Fleshman*
The Becket Fund for Religious
   Liberty
1919 Pennsylvania Ave. NW,
   Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
dthomson@becketlaw.org
*Admitted pro hac vice

Emily E. Mawer
   (No. 0396329)
Dion Farganis
   (No. 0399219)
Lathrop GPM
80 South Eighth Street
500 IDS Center
Minneapolis, MN 55402

Counsel for Plaintiff Schools

30

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the form and length requirements of Local Rule 7.1(f) and (h) because it contains 7,154 words and has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font. When combined with the supporting memorandum, the total word count of the two memoranda is 11,994 words.

/s/ Diana Verm Thomson
Diana Verm Thomson

*Counsel for Plaintiff Schools*