**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Melinda and Mark Loe, et al.,

      Plaintiffs,

v.

Willie Jett, et al.,

        Defendants.

Case No. 23-cv-1527 (NEB/JFD)

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

UNDISPUTED FACTS ................................................................................... 2

I.   PSEO. ............................................................................................... 2

II.   THE AMENDMENT'S BACKGROUND AND PURPOSE. ................... 4

III.   MDE'S MANAGEMENT OF PSEO. ................................................... 6

    A.   Determining Institution eligibility. ................................... 6

    B.   Monitoring PSEO compliance. ........................................... 7

IV.   THE SCHOOLS' FAITH REQUIREMENTS AND PSEO MODALITIES. ........... 8

    A.   Northwestern's on-campus modality. .............................. 9

    B.   Crown's on-campus modality. ......................................... 11

    C.   The Schools' online modalities. ....................................... 13

    D.   The Schools' pervasively-sectarian PSEO courses. ........ 14

V.   DAWN ERICKSON. .......................................................................... 16

VI.   THE LOES. ....................................................................................... 16

STANDARD .................................................................................................. 17

ARGUMENT ................................................................................................. 18

I.   MDE'S COUNTERCLAIMS PREVAIL ............................................ 18

    A.   Undisputed evidence confirms MDE's standing. ........... 19

    B.   The Schools are state actors when providing PSEO. ...... 22

        1.   The Schools perform a traditional and exclusive public function. .......................................................... 22

        2.   Via PSEO, the Schools participate in joint action with MDE. ........ 25

    C.   The Schools violated the rights of PSEO applicants. ...... 27

i

II.    PLAINTIFFS' CLAIMS FAIL. ................................................................. 33

       A.    Plaintiffs' claims are nonjusticiable. .......................................... 33

             1.    State actors cannot bring constitutional claims. ............... 34

             2.    The families are not injured by the Amendment. ............. 34

       B.    The Amendment advances compelling interests. ........................ 37

       C.    The Amendment does not burden Plaintiffs' rights. ................... 40

             1.    Free Exercise (Counts I-V, and IX). ................................ 40

             2.    The Schools are not categorically excluded from PSEO (Count I). ................................................................... 42

             3.    The Amendment is neutral and generally applicable, and neither favors nor targets religion (Counts II, III, V). ..................... 43

             4.    The church-autonomy doctrine is inapplicable (Count IV). ............ 45

             5.    The Amendment is not an unconstitutional condition (Count VI). ................................................................... 45

             6.    The Amendment regulates conduct, not speech (Count VII). ........... 47

             7.    *Telescope* forecloses the Expressive Association and Equal Protection claims (Counts VII and VIII). ......................... 49

III.   EQUITY FORECLOSES THE SCHOOLS' CLAIMS. ....................................... 52

       CONCLUSION ..................................................................................... 53

## INTRODUCTION

The judiciary's "historic duty to expound the meaning of the Constitution has encountered few issues more intricate or more demanding than that of the relationship between religion and the public schools."[1] Such issues are intricate and demanding, indeed, but this case is far easier. Rather than searching for that elusive space where free exercise ends and establishment begins, this Court need only answer whether discrimination in public schools is unconstitutional. It is.

The Minnesota Department of Education (MDE) administers Postsecondary Enrollment Options (PSEO), a dual-credit program for high-school students that MDE implements in partnership with postsecondary institutions (Institutions) across the state. Two of these Institutions, Crown and Northwestern (Schools),[2] exclude broad categories of Minnesota students from admission to PSEO on the basis of protected classes including religion, sexual orientation, and gender identity. MDE proposed curative legislation that passed in 2023,[3] narrowly amending the PSEO statute to prohibit all Institutions from discriminating on the basis of protected classes in PSEO admissions.

Plaintiffs—the Schools and two families[4]—sued Defendants over the Amendment; MDE answered and filed compulsory counterclaims. Defendants are entitled to summary

---

[1] *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring).

[2] Crown College and University of Northwestern-St. Paul.

[3] Act of May 24, 2023, ch. 55, art. 2, sec. 45 (Amendment).

[4] Dawn Erickson and Mark and Melinda Loe (Families).

judgment on Plaintiffs' claims, and MDE to the same on its counterclaims, because the Schools are state actors who violate students' right to a public education free from discrimination. The Amendment serves a compelling interest of the highest order by protecting this right, and the Schools, as state actors, have no excuses and must be held to constitutional standards.

## UNDISPUTED FACTS

### I.    PSEO.

PSEO was created in 1985 to enable high-school students to take nonsectarian college courses for dual credit. Act of June 27, 1985, ch. 12, art. 2, § 1 (Act); Minn. Stat. § 124D.09, subd. 2. MDE was contemporaneously charged with administering PSEO and issued program guidelines.[5] Originally, only public-school students could participate. (Ex. 1, at 2.)

Twelve years later, the legislature amended PSEO to include private and homeschooled students, who must register with MDE to participate. Act of June 27, 1997, ch. 4, art. 1, § 3; Minn. Stat. § 124D.09, subd. 4(a). For PSEO purposes only, these students participate in Minnesota's public-education system. *Id.*[6] Only Minnesota students are eligible, and only Institutions in Minnesota may offer PSEO. *Id.* subd. 3(a).[7] Over sixty

---

[5] *See* <u>Exhibit 1</u> to Declaration of Jeff Timmerman in Support of Defendants' Motion for Summary Judgment. All <u>Exhibits</u> are attached to this declaration.

[6] *See also* Sally Reynolds Deposition Transcript, Volume I, at 56-58, 162-64 (<u>Exhibit 2</u>).

[7] *See also* <u>Exhibit 3</u>, at 14.

Institutions—including more than a dozen private, religious schools—are presently authorized by MDE to provide PSEO. (Reynolds Dep. I, at 17, 88-92.)[8]

Institutions determine their PSEO admission criteria and courses. (Ex. 3, at 17.) All PSEO courses must meet graduation and subject-area requirements for enrollees' high schools, (*id.* 15, 23; Reynolds Dep. I, at 65-67, 81-82),[9] and be nonsectarian, Minn. Stat. § 124D.09, subd. 2. MDE sets curricular standards that Institutions must meet. (Reynolds Dep. II, at 36.) MDE reallocates state aid from local school districts on a pro-rata basis when students take PSEO, redirecting those funds to the Institutions providing PSEO. (Ex. 3, at 26-27; Ex. 6; Ex. 7, at 2-3; Unni Dep. 195); Minn. Stat. § 124D.09, subd. 13.[10] Similarly, private secondary schools must prorate tuition for PSEO participants. Minn. Stat. § 124D.09, subd. 18.

To access PSEO, students must give up a high-school class(es) during their school day. (Ex. 3, at 15.) For some students, PSEO is their only opportunity to take courses not offered at their secondary schools. Regardless of whether they attend public or private schools, or homeschool, students pay nothing for PSEO. (*Id.* 23); Minn. Stat. § 124D.09, subd. 19. MDE also pays PSEO transportation costs for low-income families. (Ex. 3, at 21); Minn. Stat. § 124D.09, subd. 22. Institutions must follow individual

---

[8] *See also Postsecondary Enrollment Options (PSEO)*, Minn. Dep't of Educ., https://perma.cc/A22Q-4AR2.

[9] *See also* Sally Reynolds Deposition Transcript, Volume II, at 34-35 (Exhibit 4); Adosh Unni Deposition Transcript 162-63 (Exhibit 5); *PSEO Eligibility: Student and Course Requirements*, Minn. Dep't of Educ., https://perma.cc/HJX6-EGVR.

[10] *See also* Exhibit 8, at 22.

education plans for students in PSEO with disability-related needs. (Ex. 3, at 9, 29);
Minn. Stat. § 124D.09, subd. 21.

## II.   THE AMENDMENT'S BACKGROUND AND PURPOSE.

In 2018, MDE received complaints from a student and a parent about
Northwestern's religious admissions criteria for PSEO. (Exs. 66-67.) MDE was previously
unaware that Northwestern was restricting PSEO admission based on faith.
(Reynolds Dep. I, at 155-58.) MDE viewed Northwestern's criteria as violating the Act's
nonsectarian provision, which MDE could enforce. (Unni Dep. 132-33.)

The complaints prompted a meeting with Northwestern in May 2018, when MDE
conveyed its stance that Northwestern's admissions standards were discriminatory.
(Unni Dep. 136-42.) Northwestern brought counsel to the meeting who sent MDE a letter
afterward defending Northwestern's admission standards and warning that any action by
MDE to curtail them would be ill-received. (Ex. 68.)

MDE was thereafter advised that it lacked authority to eliminate discrimination in
PSEO admissions and would require a legislative fix. (Unni Dep. 55, 111-14, 165-66, 183-
84.) In 2019, MDE first proposed what would ultimately become the Amendment.
(Ex. 69.) The intent of MDE's 2019 legislative proposal was to ensure equal access for
PSEO students by eliminating barriers to admission. (Ex. 70; Reynolds Dep. I, at 38-40.)

The 2019 proposal failed. MDE tried again in 2020, 2021, and 2022. (Unni Dep.
60-67, 71-73, 88-91; Exs. 71-73.) Meanwhile, MDE continued to receive complaints about
religious tests during PSEO admissions, including from one of its staff whose son was
denied admission to PSEO at Northwestern for refusing to profess faith in Jesus. (Ex. 74.)

4

MDE also received a complaint from a LGBTQ+ student who was denied admission to PSEO at Northwestern because of sexual orientation.[11] (Reynolds Dep. I, at 175-76, 182-84.) A Northwestern PSEO professor notified MDE that Northwestern "does not admit gay students and would expel 'unrepentant' gay students[.]" (Ex. 75.) In response, MDE staff confirmed that MDE was seeking legislation to address the instructor's concerns, which aligned with other complaints MDE had received. (Ex. 76.) MDE leadership remained troubled by how the Schools' admission standards impacted PSEO students in protected classes, including students limited to certain Institutions based on logistical considerations like location. (Unni Dep. 109-10, 189.)[12]

MDE reproposed legislation in 2023. (Ex. 77.) It passed. It is undisputed that MDE's sole purpose in pursuing the Amendment was always to eliminate discrimination in education. (Unni Dep. 197, 202-03; Reynolds Dep. I, at 15-16; Jett Dep. 44-45, 73; Ex. 79.)

---

[11] This complaint was echoed in legislative testimony of Beatrice Handlin, a college student who identifies as lesbian, before the Minnesota Senate Committee on Education. Ms. Handlin was provisionally accepted to PSEO at Northwestern but declined to attend after learning she needed to agree to Northwestern's Declaration. As Ms. Handlin poignantly stated in support of the Amendment, "the State is allowing institutions to target an already-vulnerable population by threatening their education and portraying teenagers who identify as queer as dangerous and immoral for who they are." *Committee on Education Policy*, Minn. Senate 1:16:25-:19:05 (Mar. 8, 2023), https://perma.cc/RFH4-C72F?type=standard; https://www.youtube.com/watch?v=vnFzp-Wqmt0.

[12] *See also* Willie Jett Deposition Transcript 45-48 (Exhibit 78).

## III.   MDE's MANAGEMENT OF PSEO.

### A.   Determining Institution eligibility.

MDE gatekeeps Institution eligibility pursuant to statutory parameters. Minn. Stat. § 124D.09, subd. 3(a). To apply, an Institution must make a written request to MDE and submit its mission statement, PSEO course catalog and descriptions, and other information MDE requests. (Ex. 9.) Institutions are not required to submit student handbooks or conduct codes during this process. (Reynolds Dep. I, at 18.) Institutions are approved as long as they meet statutory requirements and offer nonsectarian courses only. (*Id.* 17-18.)

Relevant here, MDE has historically guarded against discriminatory PSEO admissions criteria and sectarian course offerings. For example, when Crown first applied to be an Institution, MDE conditioned approval on Crown's elimination of requirements that applicants "give satisfactory evidence of Christian conversion" and provide a pastoral recommendation.[13] When Bethel College applied in 2006, MDE directed it to remove similar criteria.[14] Earlier still, North Central Bible College was rejected as an Institution in 1985 because it existed "to educate students for ministry,"[15] as was Oak Hills Christian College because its PSEO courses were pervasively sectarian.[16] Once an Institution is approved, MDE generally does not reevaluate its eligibility. (*Id.* 18.)

---

[13] Exhibit 10; Dr. Chris Mathews Deposition Transcript 87-89 (Exhibit 11).

[14] Exhibit 12.

[15] Exhibit 13.

[16] Exhibit 14.

B.      **Monitoring PSEO compliance.**

MDE provides annual PSEO program guidance to Institutions,[17] and hosts refresher sessions for Institution staff. (Reynolds Dep. I, at 88-92.)[18] All Institutions must use a standard PSEO application form created by MDE, (Reynolds Dep. I, at 81-82),[19] which MDE audits to ensure only valid PSEO courses are funded.[20]

When questions arise about the Act's requirements, MDE has sole authority to resolve them. For instance, MDE determines student and Institution eligibility issues, (Exs. 19-24); settles disputes regarding student fees for course materials, (Exs. 25-28); dictates dual-credit logistics, and when and where PSEO courses may be taught, (Exs. 29-36); audits PSEO payments, claws-back funds improperly paid to Institutions, and provides Institutions an appeal process to challenge reimbursement decisions, (Exs. 37-44).

MDE also monitors PSEO courses for compliance with the nonsectarian requirement in two ways: annually reviewing PSEO course titles and responding to complaints. (Reynolds Dep. I, at 139; Reynolds Dep. II, at 24.) MDE lacks staffing to audit all courses at each Institution and expects Institutions to ensure their courses are nonsectarian. (Reynolds Dep. I, at 88-92, 103-04, 108-09; Reynolds Dep. II, at 16-17.) To assist Institutions, MDE developed a Statement of Assurance (SOA) in 2016. (Reynolds

---

[17] *E.g.,* Exhibit 15.

[18] *See also* Exhibit 16.

[19] *See also* Exhibit 17.

[20] *E.g.*, Exhibit 18.

Dep. I, at 93-95).[21] The SOA contained MDE's definition of "sectarian" and required Institutions to attest that their PSEO courses were all nonsectarian.[22] Compliance issues and complaints persisted, however, so MDE ceased using the SOA in 2023. (*Id.* 97-99.)

Before deeming a PSEO course sectarian, MDE seeks context and clarification from Institutions and complainants. (*Id.* 61-63, 102-03; Reynolds Dep. II, at 17.) When MDE determines that a PSEO course is sectarian, however, it regularly disallows or denies funding for that course. (Exs. 53-65.)

Regarding complaints, MDE has received several over the years pertaining to sectarian courses. For example, MDE learned in 2003 that Crown required PSEO students to pray at the beginning of class; MDE promptly instructed Crown to stop this practice. (Ex. 48.) A parent complained in 2008 about the sectarian nature of an ethics course at Northwestern; MDE responded by reminding Northwestern of the nonsectarian requirement. (Exs. 49-51.) And in 2016, a public-school superintendent notified MDE of a parent's concern about the religious content of a Northwestern economics PSEO course and the instructor's facilitation of a student prayer group. (Ex. 52.)

## IV.   THE SCHOOLS' FAITH REQUIREMENTS AND PSEO MODALITIES.

Located in St. Paul, Northwestern is "[o]ne of the best Minnesota Christian universities" and home to 3,000-plus students, more than half of whom participate in PSEO.[23] Crown is the "Midwest's Boldly Christian College" and enrolls more than 1,000

---

[21] Exhibit 45.

[22] Exhibits 46 and 47 (Schools' 2022-23 SOAs).

[23] *At a Glance*, Univ. Nw., https://perma.cc/55VG-G76T.

students on campus in St. Bonifacius.[24] Crown is the only on-campus PSEO provider in a 25-mile radius.[25]

### A.      Northwestern's on-campus modality.

Students who apply for on-campus PSEO at Northwestern must attest that: (1) they have entrusted themselves to Jesus Christ; and (2) "the Bible alone is the final authority and standard in all matters of faith and personal conduct." (Ex. 80.)[26] These questions are "carefully kept off" Northwestern's PSEO website. (Ex. 82.) Failure to make these attestations results in disqualification. (Cline-Cole Dep. 136-39.) Applicants also must write an essay on how Jesus has worked in their lives, submit a video on how Northwestern will impact their spiritual growth, and provide a spiritual reference. (*Id*. 114-16, 128-31; Ex. 80.)

Northwestern also requires on-campus PSEO applicants to abide by its Declaration of Christian Community (Declaration). (Ex. 83; Cline-Cole Dep. 32-33, 38-39, 45, 128.) The Declaration states that same-sex relationships are "sexual immorality" and non-cisgender persons suffer from "confusion and brokenness." (Ex. 83; Cline-Cole Dep. 53.) Failure to acknowledge Northwestern's "noncompromising" Declaration likewise results in disqualification. (Cline-Cole Dep. 48-49, 98-99.) And violating the Declaration can lead

---

[24] *Be Bold: 2028 Strategic Plan*, Crown Coll. 3, 16, https://perma.cc/CL7Y-R5MF.

[25] *Postsecondary Enrollment Options (PSEO)*, Minn. Dep't Educ., https://perma.cc/A22Q-4AR2.

[26] *See also* Anita Cline-Cole Deposition Transcript 31-32, 127-28 (Exhibit 81).

to expulsion. (*Id.* 60-61, 68.) A LGBTQ+ student who reveals their orientation or has a relationship would be expelled. (*Id.* 79-82; Ex. 84.)

These admissions criteria are intended to guarantee "faith and lifestyle alignment" amongst Northwestern's student population. (Ex. 85.) They work. There is no evidence that any non-Christian or LGBTQ+ student has ever attended on-campus PSEO at Northwestern. (Cline-Cole Dep. 14, 18-20, 136.) Relatedly, white students comprise 88% of Northwestern's on-campus PSEO student body,[27] suggesting its admissions criteria have the added effect of excluding students of color—a statistic the legislature inquired about in considering the Amendment. (Exs. 86-87.) Northwestern admits it excludes non-Christian PSEO students and treats LGBTQ+ students different than their heterosexual peers. (Cline-Cole Dep. 12-13.) Even so, Northwestern claims all students are welcome to take classes on its campus—regardless of their beliefs or identity—if they acknowledge faith in Christ and agree to the Declaration. (*Id.* 16-18.)

Northwestern's sectarian approach to PSEO is not limited to admissions; it extends throughout the PSEO experience. Northwestern is clear about why it admits only students who are a "spiritual fit," (*id.* 46-47), to on-campus PSEO. Northwestern believes homogeneity breeds "safety" and maintains community. (*Id.* 51-52, 96-97.) On-campus PSEO students are expected to put Jesus at the center of their lives, participate fully in the faith community, bear witness to "God's truth," and be ambassadors of Christ. (*Id.* 32, 50-51, 60, 94.) PSEO students living on campus are even required to attend chapel and earn

---

[27] By comparison, in 2019, 72% of PSEO students statewide were white. (Ex. 8, at 25.)

spiritual formation credits. (*Id.* 40-41.) In keeping with these expectations, each on-campus PSEO course is taught from a biblical viewpoint. (*Id.* 101-03, 160.) Northwestern utilizes the same educational philosophy and syllabi for on-campus PSEO students as it does for its traditional undergraduates. (*Id.* 92, 101-03.)

PSEO is a boon for Northwestern, equaling one-fifth of its undergraduate tuition revenue. (Ex. 88.) Since the 2017-18 school year, MDE has paid Northwestern more than $33 million for PSEO courses that Northwestern provided to more than 10,000 students.[28] Northwestern spends $60,000 annually to market PSEO and employs several staff whose job is to persuade PSEO students to matriculate. (Exs. 89-90.) Of the 300-plus PSEO students at Northwestern annually, 40% matriculate for undergraduate studies; that percentage is higher for on-campus PSEO students. (Ex. 86; Cline-Cole Dep. 47.) Matriculation is a business objective of PSEO at Northwestern. (Cline-Cole Dep. 47 (citing matriculation as a "goal" of PSEO consistent with Cline-Cole's enrollment-related job responsibilities.)

### B.   Crown's on-campus modality.

Students applying to on-campus PSEO at Crown must describe: (1) how they committed their life to Jesus; (2) how faith affects their daily life, including experiences or influences that have impacted their spiritual development; and (3) how Crown fits with their character. (Ex. 91.) These questions have long been part of Crown's application. (Mathews Dep. 85; *but see* Ex. 10.)

---

[28] *See* Declaration of Daley Lehmann in Support of Defendants' Motion for Summary Judgment (Lehmann Dec.) ¶¶ 3, 5.

Additionally, Crown requires on-campus PSEO applicants to follow its Community Covenant (Covenant), which also applies to Crown's college students. (Ex. 92; Mathews Dep. 47, 77-78, 110.) The Covenant states that same-sex relationships are "sexually immoral behavior" and on-campus PSEO students must agree not to have them. (Ex. 92; Mathews Dep. 40, 48-49, 63-64.) If Crown discovered an openly gay on-campus PSEO student, it would seek "reconciliation" for that student. (Mathews Dep. 41-43.) On-campus PSEO students must also agree to abide by Crown's gender-identity policy, which rejects "adoption of a gender identity opposite of one's gender at birth."[29] (*Id.* 51.) Dressing contrary to one's biological sex can lead to expulsion. (*Id.* 52-53.) Crown prohibits discrimination against some protected classes, but not sexual orientation or gender identity. (*Id.* 57-58; Ex. 92.)

Crown posits that admitting on-campus PSEO students who cannot or will not agree with the aforementioned admissions criteria would not foster "an optimal learning environment." (Ex. 94.) Crown's admission criteria are meant to guard against "risking the culture" and achieve their desired effect. (Ex. 93.) Crown is not aware of any LGBTQ+ student having ever taken on-campus classes. (Mathews Dep. 44.) White students make up 90% of Crown's on-campus PSEO population, suggesting its admission criteria similarly influence its student body's racial makeup. (Ex. 92.) Crown excludes all on-campus PSEO applicants who do not completely align with its beliefs. (Mathews Dep. 99-100.) As a Crown executive aptly put it: █████████████████████████████

---

[29] *See Crown College Community Covenant*, Crown Coll., https://perma.cc/K7NM-4ACU.

██████████████ (Ex. 95.) Still, Crown states that it welcomes LGBTQ+ students to attend on-campus classes as long as they profess faith in Christ and abide by Crown's Covenant. (Mathews Dep. 40-41, 97.)

As part and parcel of its admissions standards, Crown expects on-campus PSEO students to embrace their identity in Christ, have faith in Christ, apply the Bible to their lives, and actively participate in Crown's Christian community. (*Id*. 65-66.) Crown's mission to provide biblically-based education applies equally to PSEO. (*Id.* 37.) PSEO courses at Crown are based heavily on scripture and must present a Christian worldview and seek to develop a biblical perspective. (*Id.* 37-38, 96; Ex. 93.)

PSEO is a moneymaker for Crown, too. Since 2017-18, MDE has paid Crown more than $5 million for PSEO courses that Crown provided to more than 2,000 students. (Lehmann Dec. ¶¶ 4, 6.) PSEO revenue is part of Crown's operating budget. (Mathews Dep. 18, 130-32.) Crown views PSEO as "a service" it offers. (*Id.* 33.) Thirty-three percent of the 70 students who annually attend on-campus PSEO at Crown matriculate as undergraduates. (Ex. 86.)

### C.    The Schools' online modalities.

The Schools have also offered online PSEO for more than a decade.[30] (Cline-Cole Dep. 11-12, 39; Mathews Dep. 24.) Online PSEO students are not required to make faith statements or acknowledge the Declaration or Covenant. (Cline-Cole Dep. 13, 31, 43-44; Ex. 96.) Still, Northwestern tracks the faith of its online PSEO students and Crown

---

[30] Neither School considers proximity, transportation challenges, or financial status in the PSEO admissions process. (Cline-Cole Dep. 125-26; Mathews Dep. 58-59, 74.)

anticipates its online PSEO students are Christian. (Cline-Cole Dep. 12, 44-45 (noting annual report); Mathews Dep. 60-61.)

Online PSEO courses at the Schools are asynchronous. (Cline-Cole Dep. 121; Mathews Dep. 59.) Online PSEO students do not regularly interact with the instructors or classmates. (Cline-Cole Dep. 121, 177; Mathews Dep. 59.) Some PSEO classes, like science labs, are not available online. (Cline-Cole Dep. 119, 166, 176-77.) Online PSEO students at Crown are ineligible to participate in an honors cohort. (Mathews Dep. 117-18.) On-campus and online PSEO are not coequal and online courses are not viable for some students. (Cline-Cole Dep. 45-48; Mathews Dep. 59-61.)

### D.      The Schools' pervasively-sectarian PSEO courses.

The Schools have repeatedly certified to MDE that all their PSEO courses are nonsectarian. (Exs. 46-47; Cline-Cole Dep. 154-55; Mathews Dep. 126-28.) The Schools' representatives reiterated these promises in this litigation. (Cline-Cole Dep. 25-26, 91-94, 100, 105, 155; Mathews Dep. 124, 126-29.)

Yet the Schools' PSEO syllabi produced in litigation show otherwise. For instance, the entire syllabus of an introductory music class at Northwestern ███████████ ███████████████████████████████████████ (Ex. 97.) A fitness class at Northwestern included, among its primary topics, ██████████████████████ ███████████████████████ (Ex. 98.)

Students in a human resources class at Crown were required to write a paper—███ ███████████████████████████████████████████████ ████████████████████████████████████ (Ex. 99.)

14

A communications class at Crown required students to write a ████████████ ██████████████████████████████████ (Ex. 100.) The outcomes of a Northwestern literature course included seeing ████████████████████████ ████████████████████████████████████████████████████ ████████████████ (Ex. 101.) And ████████████████████████████ ████████████████████████████████████████████████████ ████████████████ (Ex. 102.)

Moreover, the Schools have required students to pray in PSEO classes—and sometimes even graded students on devotional participation. (Exs. 103-106; Cline-Cole Dep. 164-69.) At Crown, PSEO instructors have discretion to begin class with prayer; PSEO students are not informed they may opt-out. (Mathews Dep. 111-13.)

The sectarian nature of the Schools' PSEO courses is further illustrated in student evaluations. Some students enjoyed it. A student in a communications class at Crown relished ████████████████████████████ (Ex. 107.) A Northwestern student liked that a marketing instructor ████████████████████████████████ ████████████████ (Ex. 108.)

Others did not. One Crown student complained that ████████████████ ████████████████████████████ (Ex. 109.) A Northwestern student wished that a chemistry professor would have taken ████████████████████████████ ████████████████████████████████████████ (Ex. 110 (████████ ████████████).)

## V.    DAWN ERICKSON.

Plaintiff Dawn Erickson homeschooled her four children.[31] Her three oldest children attended PSEO at Northwestern. (Erickson Dep. 21.) Ms. Erickson's oldest child, J.G., did not get to decide where to go for PSEO. (*Id.* 24.) Ms. Erickson considered only Northwestern and Bethel College for H.G. based on "[l]ocation, location, location," as Northwestern is close to their home and Ms. Erickson is a single mom. (*Id.* 25-26.)

Ms. Erickson believes the Amendment prevents her youngest child (J.G.) from attending PSEO at Northwestern because she thinks it "prohibits" Northwestern from offering PSEO. (*Id.* 51-52.) J.G. could take PSEO elsewhere, but she wants him to attend an Institution with "faith values" (*Id.* 52-54.) Bethel is an option; Ms. Erickson would not prevent him from attending an Institution that does not require a faith statement.[32] (*Id.* 54-55.) She agrees that online and on-campus PSEO are qualitatively different. (*Id.* 28, 30-36.)

## VI.    THE LOES.

Plaintiffs Melinda and Mark Loe have seven children whom they home schooled.[33] The oldest, G.L., did on-campus PSEO at Crown because it was close to home and she preferred to learn in a classroom environment. (Loe Dep. 11-14.) The Loes would have supported G.L. doing PSEO at the University of Minnesota. (*Id.* 17.) The Loes' second

---

[31] *See* Dawn Erickson Deposition Transcript 10-12 (Exhibit 116).

[32] Bethel does not require PSEO applicants to profess any particular faith. (Ex. 111.)

[33] *See* Melinda Loe Deposition Transcript 11, 21, 23 (Exhibit 117).

oldest child, J.L., did PSEO at Northwestern and likewise preferred PSEO in-person learning. (*Id.* 11-12, 15-16.)

 R.L., the Loes' third-oldest child, currently attends on-campus PSEO at Northwestern. (*Id.* 11, 16.) R.L. wants to be a nurse and can access certain lab classes on-campus only. (*Id.* 16, 43.) O.L. is fourteen and wants to attend on-campus or online PSEO at Northwestern or Crown. (*Id.* 20.) The Loes prefer these schools because they provide a Christian education, which is the biggest factor in the Loes' decisionmaking process. (*Id.* 48-49, 59-60.) They expect that all PSEO students at the Schools share their religious beliefs. (*Id.* 81.) The Loes have never paid anything out-of-pocket for PSEO. (*Id.* 56.)

The Loes have no objection to their children attending PSEO with non-Christian or LGBTQ+ students. (*Id.* 42-43.) Nor do they mind online PSEO, though Mrs. Loe acknowledges it is not equivalent to in-person learning. (*Id.* 75, 82-83.) They would consider keeping R.L. at Northwestern for PSEO even if the Amendment prevails. (*Id.* 45.)

Like Ms. Erickson, the Loes believe the Amendment prevents their children from taking PSEO at the Schools and obtaining a Christian PSEO education. (*Id.* 74, 96; Erickson Dep. 69-71)

### STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party establishes its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the lawsuit's outcome; a dispute is genuine if the evidence could lead a reasonable trier of fact to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

17

## ARGUMENT

Defendants begin with MDE's counterclaims. The record establishes that MDE still has standing, the Schools engage in state action when providing PSEO, and the Schools have violated multiple civil-rights laws.

Because MDE prevails on the state-action issue, the Schools lack standing for their claims. The Families likewise lack standing because they cannot demonstrate injury from the Amendment.

On the merits, Plaintiffs' claims must yield to Minnesota's overriding obligation to provide public education free from discrimination. The State's interests, rooted in core, historical police powers and the Minnesota Constitution, are of the highest constitutional order and defeat Plaintiffs' claims entirely. Beyond these interests, the Amendment is a neutral law of general applicability that does not burden or target faith, categorically exclude the Schools from PSEO, compel speech, or impose any illegal condition. The Schools's attempt to invoke the church-autonomy doctrine is futile, and their expressive association and equal protection claims foreclosed by precedent and Plaintiffs' admissions.

Finally, equity demands that the Schools lose because they lulled MDE into believing no discrimination was occurring and surreptitiously violated the Act's nonsectarian requirement despite repeatedly promising otherwise.

## I.    MDE'S COUNTERCLAIMS PREVAIL

Post-discovery, MDE's counterclaims triumph as a matter of law. MDE's standing is secure because undisputed evidence demonstrates that the Schools' discriminatory admissions standards directly and indirectly harm MDE's quasi-sovereign interest in

safeguarding our youth. In providing PSEO, the Schools perform a traditional and exclusive state function and engage in joint action with MDE, which makes them state actors in this narrow context only. And the Schools openly admit their admissions criteria violate the civil rights of high-school students.

### A. Undisputed evidence confirms MDE's standing.

Post-discovery, MDE's standing as parens patriae, which flows from Minnesota's inherent state authority, remains intact. *Alfred L. Snapp v. Puerto Rico*, 458 U.S. 592, 600 (1982). MDE has a steadfast interest in preventing discrimination and protecting public health and welfare, which this Court previously characterized as "quasi-sovereign." (ECF 66, at 4.) The remaining question is thus whether the Schools' conduct has injured this interest. MDE must demonstrate injury, through proof of direct or indirect effects, to a "sufficiently substantial segment of its population." *Snapp*, 458 U.S. at 607-09 (identifying as sufficient the "political, social, and moral damage of discrimination").

Start with direct consequences. Since 2017, more than 60,000 secondary students have participated in PSEO, including more than 12,500 at the Schools. (Lehmann Dec. ¶¶ 2-4.) MDE has received numerous complaints about the Schools' admissions standards, including about discrimination based on religion and LGBTQ+ status; MDE took remedial measures within its authority to respond. (Exs. 48-52, 66-67, 74-75; Reynolds Dep. I, at 175-76, 182-84.) The Schools likewise received alumni feedback supporting the Amendment and describing how their experiences at the Schools harmed them. (Exs. 112-113.) This evidence establishes that PSEO applicants and undergraduates alike experienced the "universal sting" of the School's discrimination. *Snapp*, 458 U.S. at 607.

19

Then there are the indirect effects. Dr. Jenifer McGuire, a Professor of Family Social Science and leader in her field, explains that "[r]esearch has long established the deleterious effects of discrimination in education on LGBTQ+ young people."[34] As Dr McGuire opined:

> Policies like Northwestern's Declaration of Christian Community and Crown's Community Covenant contribute to the harm experienced by LGBTQ+ youth through a variety of mechanisms. These statements are counter to the extensive research documenting the importance of an accepting school climate, teaching LGBTQ+ issues in the curricula, including LGBTQ+ persons as full members of society, and supporting their LGBTQ+ specific social needs .... Such faith statements speak to an element of LGBTQ+ experience that is often described as among the most painful and harmful forms of rejection—moral isolation and condemnation. Faith statements deny the LGBTQ+ students access to a safe space where they can feel included and valued for who they are, which can interfere with learning capacity and long-term health. Finally, they enforce concealment among LGBTQ+ students who would like to attend PSEO, or students who begin to develop awareness of their LGBTQ+ identity during this period of their life. Concealment is a particularly harmful element of minority stress.

(Ex. 114, at 5-7.) Dr. McGuire further noted that anti-LGBTQ+ discrimination impacts *non*-LGBTQ+ students' feelings of safety at school and is amplified by and "works intersectionally" with other forms of discrimination, like religious discrimination. (*Id.* 7-9.) The real-life statements of the Schools' alumni personify this research: one Crown alum described how frequently its ministry students called him "f*got." (Ex. 112). Dr. McGuire concluded that the Schools' admissions criteria pose "a significant threat to the well-being

---

[34] Expert Report of Dr. Jenifer McGuire 2 (Exhibit 114).

of LGBTQ+ students who will or will not choose to attend" PSEO at the Schools. (Ex. 114, at. 9.)

Dr. Stephen Shoemaker, a scholar on the history of Christianity, opined on the history and religious effects of compelled faith statements.[35] For Muslim PSEO students, agreeing to the Schools' faith statement would mean converting to Christianity, as all that is required to become a Muslim is a profession of faith. (Ex. 115, at 16-17.) The same goes for Buddhist and Baha'i students. (*Id.*) Moreover, faith statements like those the Schools require have been used throughout Christianity's history to persecute, marginalize, and abridge the rights of persons of other faiths. (*Id.* 16-22.) Dr. Shoemaker explains:

> [I]t seems inevitable that imposition of such faith statements will have one of two unacceptable consequences. Either the institution will exclude non-Christians from this education resource offered to all Minnesotans equally by the MDE (particularly in the case of Crown, where there is no other institutions providing PSEO in a 25-mile radius), or it will result in forced conversions and insincere professions of faith by non-Christian students who have need of the opportunities afforded by PSEO and must resort to such measures to obtain them.

(*Id.* 26.)

Were more required, MDE's repeated attempts to address these significant harms through legislation clinches standing. MDE began searching for a legislative fix when complaints resurfaced in 2018. (Unni Dep. 55, 111-14, 165-66, 183-84; Ex. 69.) These efforts culminated in 2023, when the Amendment passed—an exercise of the "sovereign lawmaking powers" associated with parens patriae under *Snapp*. 458 U.S. at 607. The

---

[35] Expert Report of Dr. Stephen Shoemaker (Exhibit 115).

State's exercise of lawmaking power is strong, unrebutted evidence that the Schools' conduct injured Minnesota's quasi-sovereign interests to the point of requiring legal remediation.

The record thus establishes that MDE still has standing to advance its counterclaims and protect Minnesota's quasi-sovereign interests.

**B.      The Schools are state actors when providing PSEO.**

Undisputed evidence likewise proves that, in their capacity as Institutions only, the Schools are state actors. To assess state action, the Eighth Circuit asks whether (1) a deprivation alleged resulted "from the exercise of a right or privilege having its source in state authority"; and (2) the party in question "may be appropriately characterized as a state actor." *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022).

The Schools easily satisfy the first question because they derive their authority to offer PSEO exclusively from statute. Minn. Stat. § 124D.09. Were that not enough, the Schools' status under the public-function test confirms that they exercise state authority when providing PSEO. As to the second, courts employ several tests, including public function and joint action/pervasive entwinement. *Roberson*, 42 F.4th at 928-29. While these tests are fact-intensive, there is no material fact dispute here.

**1.      The Schools perform a traditional and exclusive public function.**

A particular function may establish a nexus sufficient to create state action if it is traditionally and exclusively reserved to the state. *Id.* at 938. Under the public-function

22

test, an actor's "function within the state system" determines state action, not the terms of its relationship to the state. *West v. Atkins*, 487 U.S. 42, 55-56 (1988).

The Schools provide free, public education via PSEO. *See Minn. Fed'n of Tchrs. v. Randall*, 891 F.2d 1354, 1362 (8th Cir. 1989) (PSEO is "public spending on public education") (Heaney, J., concurring). MDE also considers PSEO public education. (Reynolds Dep. I, at 162-64; Reynolds Dep. II, at 56-58, 65-67.) This function stems from Minnesota's constitutional obligation to provide a "free and uniform education." Minn. Const. art. XIII, § 1; *Cruz-Guzman v. State*, 998 N.W.2d 262, 271-72 (Minn. 2023).[36]

In Minnesota, this function is traditionally and exclusively the province of the state. Since statehood, Minnesota has exercised exclusive control over public education, without outsourcing its responsibility or accountability for this function to the private sector. *See* An Act to Provide for a General System of Common Schools, the Officers thereof and their Respective Powers and Duties, 1861 Minn. Laws ch. XI (establishing in "[e]ach township a School District—each school district a body corporate"). Indeed, Minnesota cannot delegate its constitutional obligation to provide free and uniform public education and remains responsible even for deficiencies it does not cause.[37] *Cruz-Guzman*, 998 N.W.2d

---

[36] If the Court disagrees, certification to the Minnesota Supreme Court is appropriate because whether Minnesota's Education Clause encompasses PSEO is a question of state law, and MDE is not the party that invoked federal jurisdiction at the outset of this case. Minn. Stat. § 480.065, subd. 3; *Salier v. Walmart, Inc.*, 76 F.4th 796, 804 (8th Cir. 2023).

[37] States *can* be responsible for remedying discrimination in education. *Cruz-Guzman,* 998 N.W.2d at 265. At least two state courts have considered programs like PSEO in assessing whether students received adequate education under their state constitutions. *Boyd v. State*, 275 A.3d 155, 162-63 (Vt. 2022); *Davis v. State*, 804 N.W.2d 618, 655-56 (S.D. 2011).

at 275. Minnesota's provision of public education since statehood, not just recently, makes this function traditional. *See id.* at 271-72; *see also Roberson*, 42 F.4th at 930-33.

No entity but MDE has administered PSEO since its inception. (Ex. 1.) This makes sense, as PSEO was initially designed for public-school students only, which further cements the state-exclusivity of PSEO consistent with today's statutory scheme. Minn. Stat. § 120A.02(b); *contra Carson v. Makin*, 596 U.S. 767, 773 (2022). Although Minnesota permits private Institutions to offer PSEO, MDE has never delegated its supervisory control of PSEO. On the contrary, the legislature explicitly defined private and homeschooled students who participate in PSEO as *part of* Minnesota's public education system. The power to administer PSEO in Minnesota thus "rests with the state," and always has. *Doe v. North Homes*, 11 F.4th 633, 637 (8th Cir. 2021); *cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) ("[PSEO] was created by a special statute, explicitly for the furtherance of [state] government goals."); *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch.*, __ P.3d __, 2024 WL 3155937, at *7 (Okla. June 25, 2024) ("The provision of education may not be a traditionally exclusive public function, but the Oklahoma Constitutional provision for *free public* education is exclusively a public function." (emphasis in original)).

To MDE's knowledge, no court has analyzed whether state action applies to dual-enrollment programs, but courts have analyzed whether closely-analogous charter schools are state actors. These courts consistently treat charter schools as state actors because they perform functions inextricably linked to their state-constitutional obligations to provide a free and public education. *E.g.*, *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 118 (4th

24

Cir. 2022); *Riester v. Riverside Comm. Sch.*, 257 F. Supp. 2d 968, 972 (S.D. Ohio 2002);

*Drummond*, 2024 WL 3155937, at *7; *Woolard v. Thurmond*, No. 2:23-cv-02304-JAM-

JDP, 2024 WL 3010899, at *2, *5 (E.D. Cal. June 10, 2024); *ACLU of Minn. v. Tarek Ibn

Ziyad Acad.*, No. 09-cv-138 (DWF/JJF), 2009 WL 2215072, at *9 (D. Minn. July 21,

2009); *Scaggs v. N.Y. Dep't of Educ.*, No. 06-cv-0799 (JFB)(VVP), 2007 WL 1456221, at

*13 (E.D.N.Y. May 16, 2007). PSEO functions almost identically: Institutions operate

pursuant to Section 124D.09 and fund free, state-sponsored high-school credits to which

Minnesota students are constitutionally entitled, (Ex. 3, at 15, 23; Reynolds Dep. I, at 65-

67, 81-82), just like charter schools operate "under authority conferred by the [state]

legislature and funded with public dollars, functioning as a component unit in furtherance

of the state's constitutional obligation to provide free, universal elementary and secondary

education to its residents." *Peltier*, 37 F.4th at 119.

The Schools indisputably perform a traditionally- and exclusively-public function

in providing PSEO, thereby making them state actors under the public-function test.

**2.    Via PSEO, the Schools participate in joint action with MDE.**

Alternatively, the Schools are state actors through their willful participation in joint

action with MDE. This test requires evidence that the state "so far insinuated itself … that

it must be recognized as a joint participant in the challenged activity." *Burton v.

Wilmington Parking Auth.*, 366 U.S. 715, 725 (1961). Thus, when a state lends its "power,

property, and prestige," private action "cannot be considered to have been so 'purely

private' as to fall without the scope of the Fourteenth Amendment." *Id.* at 725.

*Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, is instructive. 509 F.3d 406 (8th Cir. 2006). Iowa contracted with a private party, InnerChange, to provide rehabilitation services to incarcerated persons. *Id.* at 413-14. Participation was voluntarily, and participants were required to sign a faith covenant and acknowledge the programming was based on "Christian values." *Id.* at 414-15. The state lacked control over InnerChange's curriculum or personnel. *Id.* Even so, the Eighth Circuit concluded InnerChange was a state actor under the joint-action test, because Iowa affirmatively granted the state's "24-hour power to incarcerate, treat, and discipline inmates" to InnerChange for its provision of rehabilitation services. *Id.* at 422-23.

The nature of the educational responsibilities that MDE delegates to the Schools, and the extent to which PSEO binds MDE to the Schools, establishes sufficient overlap to charge the Schools with state action when providing PSEO. Just as Iowa gave InnerChange "control of prisoners, and substantial aid to effectuate [its] program," MDE has given the Schools control of high-school students and substantial aid to effectuate PSEO. *Id.* at 422. The discriminatory injuries that flow from the Schools' conduct are "possible *because of* privileges created by [MDE] in its contracts with [Institutions]." *Id.* (emphasis added).

Indeed, joint action here is more pronounced.[38] While the Schools establish their own admissions criteria and curriculum, MDE reviews each Institutions' reimbursement requests for statutory compliance. (*E.g.*, Ex. 18; Reynolds Dep. I, at 139.) MDE actively

---

[38] The deeply-enmeshed relationship between the Schools and MDE independently establishes state action under the entwinement test. *See Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007); *Sybalski v. Ind. Grp. Home Living Program, Inc.*, 546 F.3d 255, 258 (2d Cir. 2008) (treating joint-action and entwinement tests as related).

partners with the Schools and has final say on student eligibility, student-fee disputes, where and when PSEO courses are taught, and dual-credit logistics. (Exs. 19-36.) MDE pays Institutions for PSEO[39] and also recoups wrongly-remitted funds, including for sectarian courses, and routinely bars Institutions from teaching such courses. (Exs. 37-44, 53-65.) Institutions cannot offer PSEO as of right: they must satisfy MDE's criteria—including those intended to prevent religious entanglement—and secure approval to become an Institution.[40] (Exs. 3, 9-10, 12-14; Reynolds Dep. I, at 17-18.) And critically, when students and families take umbrage with the Schools' PSEO admissions criteria, they complain to MDE, suggesting MDE is perceived as either causing or controlling this discrimination. (Exs. 48-52, 66-67, 74-75; Reynolds Dep. I, at 175-76, 182-84.)

At bottom, MDE lends the Schools its traditional and exclusive power to provide free and uniform public education to high-school students through PSEO—a program that enmeshes MDE and the Schools in joint action. The Schools "ought to be charged with a public character and judged by constitutional standards." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298, 302 (2001). Regardless of the test applied, PSEO forges a tight nexus between MDE and the Schools that imparts state action.

### C.    The Schools violated the rights of PSEO applicants.

On the merits, MDE's counterclaims are open and shut. The Schools openly admit in the Complaint that their PSEO admissions standards inhibit students' free exercise

---

[39] PSEO dollars belong to Institutions, not students, which distinguishes PSEO from voucher programs. Minn. Stat. § 124D.09, subd. 13.

[40] *Gilmore*, 417 U.S. at 574.

rights; discriminate on the basis of protected characteristics; compel speech; and endorse specific formulations of Christianity while disavowing other faiths. *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012) ("Allegations in a complaint are binding admissions."). The record is replete with evidence of this conduct in practice. (Exs. 48-52, 66-67, 74-76; Reynolds Dep. I, at 175-76, 182-84.) Further, as state actors, the Schools cannot assert any constitutional rights or corollary exemptions as defenses to MDE's counterclaims.

**Free Exercise and Establishment (Counts I, IV).**[41] The Schools' undisputed admissions practices are simple: non-Christians need not apply. *See Trinity Lutheran Church v. Comer*, 582 U.S. 449, 465 (2017). Such express and unabashed discrimination against otherwise-eligible students "solely because of their religious character … imposes a penalty on the free exercise of religion." *Id.* at 462; *Fulton v. City of Phila.*, 593 U.S. 522, 532 (2021) (finding burden in forced affirmations).

The Schools' admissions standards also blatantly preference their understanding of Christianity over other faiths and ratify Christianity as the sole and institutional religion of PSEO. This violates the Establishment Clause as the Schools *literally* "promote a preferred system of belief or code of moral behavior." *Town of Greece v. Galloway*, 572 U.S. 565, 581 (2014). Making "religious observance compulsory" and requiring students to "engage

---

[41] *Hill-Murray Fed'n of Tchrs. v. Hill-Murray High Sch.*, 487 N.W.2d 857, 865 (Minn. 1992) (free exercise test under Minnesota Constitution); *Ams. United Inc. v. Ind. Sch. Dist. No. 622*, 179 N.W.2d 146, 201 (Minn. 1970) (same for establishment).

in a formal religious exercise" is precisely the sort of coercion the framers sought to prohibit. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (cleaned up).

**Compelled Speech (Count II).** "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, *religion*, or other matters of opinion *or force citizens to confess by word or act their faith therein*." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphases added). It undisputed that the Schools do precisely this by requiring PSEO students to "commit to the Lordship of Jesus Christ" and "declare that their relationship to Jesus Christ and commitment to obey God's Word will be at the very center of all that they do." (ECF 1, at ¶¶ 93, 133.) "No one," as the Supreme Court says, "would seriously argue that the First Amendment permits this." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 893 (2018).

**Equal Protection (Counts III, V).**[42] These counterclaims start and end with *Brown v. Board of Education*: The right to a public education "must be made available to all on equal terms." *Students for Fair Admission, Inc. v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181, 204 (2023) (citing *Brown*, 347 U.S. 483, 493 (1954)); Minn. Stat. § 363A.12, subd. 1; *id.* § 363A.13, subd. 1. Neither School makes PSEO available to all students on equal terms, because they systematically reject applicants who are not Christian, straight, or cisgender; to the extent any enrolled students disclose such identities, the Schools may

---

[42] *State v. Johnson*, 813 N.W.2d 1, 11 (Minn. 2012) (equal protection under Minnesota Constitution analyzed consistent with federal standard).

discipline them to the point of expulsion. (Ex. 84; Cline-Cole Dep. 60-61, 68, 79-82; Mathews Dep. 41-43, 52-53.)

The Schools quibble that disfavored students are not rejected *for* their protected characteristics, but because of "lifestyle" or "culture" considerations the Schools presumably infer from those characteristics. (Exs. 85, 94; Cline-Cole Dep. 46-47, 51-52, 96-97.) The Supreme Court has expressly rejected that distinction. Schools may not treat protected classes as monoliths for "further[ing] stereotypes that treat individuals as the product of their [protected class], evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Fair Admissions*, 600 U.S. at 221 (quotations omitted).

The Schools also purport to welcome LGBTQ+ students and those of other faiths to on-campus PSEO, as long as they conceal their beliefs or identities and abide by the Schools' social codes. (Cline-Cole Dep. 16-18; Mathews Dep. 40-41, 97.) Yet such conduct prohibitions are simply a proxy for illegal discrimination. *Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez*, 561 U.S. 661, 672 (2010) (student organization discriminated on sexual orientation by excluding anyone engaged in "unrepentant homosexual conduct").

Adding insult to injury, the Schools claim that students in these protected classes can still participate in PSEO—they just need to attend online. (ECF 1, at ¶¶ 97, 138.) But courts "have long rejected the notion that the provision of 'separate but equal' services is anything but discrimination by another name." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 770 (8th Cir. 2019) (Kelly, J., concurring). It is undisputed that online PSEO is

categorically different from, and usually inferior to, on-campus school. The Schools admit as much when they describe how on-campus students—but not those learning online—are "welcomed and integrated" and "made to feel as much a part of the community as any other student." (ECF 1, at ¶ 105.) Thus, "by virtue of their exclusion" from campus life, students relegated to online PSEO lack the benefits of in-person education, an injury many of the Schools' preferred students "would deem intolerable in their own lives."[43] *Obergefell v. Hodges*, 576 U.S. 644, 670 (2015).

Limiting qualified students to an inferior version of PSEO for no reason other than protected characteristics "bears an eerie similarity to stigmatic discrimination in the separate-but equal context," and operates as such, producing "deeply corrosive, irreversible harm across a human life." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 626 (4th Cir. 2020) (Wynn, J., concurring); (Ex. 114, at 5-9). The Schools cannot resurrect what *Brown* condemned: separate but equal is not equal.

*MHRA* (Count VI). Finally, the Schools' admissions standards offend the MHRA, which prohibits discrimination in education based on religion, sexual orientation, and gender identity. Minn. Stat. § 363A.13, subds. 1, 2; *accord N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553, 562-65 (Minn. Ct. App. 2020). The MHRA generally exempts religious schools from its antidiscrimination provisions, but not for "secular

---

[43] Loe Dep. 16, 43.

business activities" that are "unrelated to the religious and education purposes" for which such schools are established.[44]

The Schools engage in purely-secular business activity wholly unrelated to their core religious or educational purposes when participating in PSEO. Crown and Northwestern exist to provide private, Christian postsecondary education—not free, public secondary education. Indeed, most PSEO students at the Schools take PSEO courses online and are not required to attest to belief in Christ or follow the Schools' social contracts. (ECF 1, at ¶¶ 97, 138; Ex. 97; Cline-Cole Dep. 13, 31, 43-44.)

As a Crown executive acknowledges, PSEO is a *service* the Schools offer—a commercial activity that funds their other, religious functions. (Mathews Dep. 33.) To this end, unlike their postsecondary curriculum, all PSEO courses the Schools offer must be nonsectarian; MDE monitors the Schools' compliance and takes remedial action when a PSEO course encroaches students' religious freedom. (Exs. 53-65.) By contrast, MDE does not regulate the Schools' religious pedagogy or programming for undergraduate students. That PSEO is a traditional and exclusive public function delegated to the Schools seals the deal, as public functions are by definition secular. The MHRA thus offers no safe harbor; the Schools' admissions standards strike at the heart of what the MHRA proscribes.

* * *

---

[44] *See* Act of May 14, 2024, ch. 105, § 12 (amending Minn. Stat. § 363A.26). While Section 363A.26 previously permitted religious schools to limit admission based on religion even when engaged in secular business activities, the amended statute eliminates this carve-out.

The Schools have no merits defense to MDE's counterclaims. Undisputed evidence establishes their status as state actors who must conform their conduct to the law.

## II.   PLAINTIFFS' CLAIMS FAIL.[45]

Plaintiffs claim the Amendment is facially unconstitutional. Facial claims are the "most difficult challenge to mount successfully" because they require establishing that "no set of circumstances exists under which the [Amendment] would be valid." *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, 1898 (2024) (quotation omitted). Defendants, therefore, "need only demonstrate that [the Amendment] is constitutional in some of its applications." *Id.* It plainly is.

Plaintiffs' claims fail for three independently-sufficient reasons. First, justiciability rules bar the Court from reaching their claims. Second, the State's compelling interest in eradicating discrimination from public education is one of the most compelling interests in our constitutional order, and protects the Amendment at each level of constitutional scrutiny that could apply. And third, the insulation from this compelling interest aside, the Amendment does not even burden Plaintiffs' rights. The record establishes each of these reasons beyond dispute, so Defendants are entitled to judgment in full.

### A.   Plaintiffs' claims are nonjusticiable.

Neither the Schools nor the Families have standing.

---

[45] Sovereign immunity bars claims against MDE and damages claims against Commissioner Jett, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-102 (1984); the only claims remaining are those for injunctive relief against Commissioner Jett.

### 1.    State actors cannot bring constitutional claims.

As state actors, the Schools lack constitutionally-protected rights when providing PSEO. *See Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual."); *Commonwealth v. Porter*, 659 F.2d 306, 314 (3rd Cir. 1981). Nor can the Schools invoke parens patriae as they do not assert interests "apart from [those] of particular private parties." *Snapp*, 458 U.S. at 607. The Schools, therefore, lack standing.

### 2.    The families are not injured by the Amendment.[46]

The Families pursue claims premised on their theory that they have a constitutional right to Christian PSEO in an environment—Crown or Northwestern—that excludes all non-Christians and where all students have agreed to follow specific social codes. The only way the Families can obtain this education is if MDE countenances the Schools' discrimination. (Erickson Dep. 69-71; Loe Dep. 63-65, 78-79, 86-87.) Multiple problems with this theory defeat standing.[47]

***Injury.*** Standing requires invasion of a legally-protected interest. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The Families cannot show this. No right

---

[46] Defendants preserve for reply and appeal the redressability argument that the Families seek relief dependent on "nonparties who would not be bound" by any judgment that could issue. *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

[47] Arguably, mootness also bars their claims for R.L. and J.G. *E.g., Atherton Mills v. Johnston*, 259 U.S. 13, 15-16 (1922); *DeFunis v. Odegaard*, 416 U.S. 312, 318-19 (1974). R.L. already attends Northwestern (Loe Dep. 11, 16), and J.G. is old enough that he may have enrolled as well, (Erickson Dep. 10). The Families have everything they want; there is nothing for the Court to provide.

exists under the First Amendment to send one's children to a school that discriminates in admission. *Runyon v. McCrary*, 427 U.S. 160, 176 (1976). While the Free Exercise Clause is a shield against unlawful religious burdening, it does not "allow an individual to extract special treatment from the government." *Swanson v. Guthrie Indep. Sch. Dist. No.1-L*, 135 F.3d 694, 702 (10th Cir. 1998); *see also Bowen v. Roy*, 476 U.S. 693, 699 (1986) (Free Exercise Clause does not force "Government itself to behave in ways that [an] individual believes will further his or her spiritual development or that or his or her family"); *Mahmoud v. McKnight*, 102 F.4th 191, 211-12 (4th Cir. 2024) (collecting cases).

*McKnight* underscores a related impediment. In *McKnight*, parents sued about their inability to opt-out their children from schoolbooks portraying LGBTQ+ characters. 102 F.4th at 197. The Fourth Circuit found that mere exposure to books did not compel the parents or children to change their beliefs—or even indirectly pressure them. *Id.* at 209-10 ("In the absence of that coercive effect, a government action does not burden religious exercise."); *accord Apache Stronghold v. U.S.*, 101 F.4th 1036, at 1051-52 (9th Cir. 2024) (implying no burden even when government action would "interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs" but lacked coercion). There is no evidence that attending PSEO in an all-comers environment would cause J.G., RL., or O.L. to disavow Jesus. In fact, the Families are comfortable with their children attending an Institution other than Crown or Northwestern, because their children's beliefs are firm. (Erickson Dep. 52-55; Loe Dep. 17, 42-45.)

The Families' purported injuries are also speculative. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The Families assume both that J.G. and O.L. will apply

and be admitted to PSEO at Crown or Northwestern and that the Schools will no longer offer PSEO when they do. As to R.L., the Families assume that Northwestern will cease offering on-campus PSEO before she meets her high-school graduation requirements. Both assumptions contravene the requirement that threatened injuries be "*certainly impending*" to establish standing. *Id.* (emphasis in original).

   ***Causation.*** This requirement precludes speculative or attenuated theories of injury. *Hippocratic Med.*, 602 U.S. at 383. Here, the Families' asserted injuries are a product of how MDE regulates Institutions, making standing "substantially more difficult to establish" given its dependence on "regulation (or lack of regulation) of someone else." *Id.* at 382. For an unregulated party to piggyback on the regulation of another for standing, "a predictable chain of events [must lead] from the government action" to the unregulated party's injury. *Id.* at 384-85 (collecting cases).

   This the Families *cannot* show. The Amendment does not change Institution eligibility requirements or disqualify Christian or religious Institutions. It simply clarifies acceptable conduct for existing Institutions. *Contra Trinity*, 582 U.S. at 456. It is not predictable that a law *permitting* Christian and religious Institutions to participate in PSEO would spark of chain of events that would altogether eliminate Christian Institutions, especially since other Christian Institutions do not discriminate in admissions. (Ex. 111.) Because the causal chain the Families must establish depends on "officials of [Crown and Northwestern]," and every other Christian Institution "whose independent decisions may

not collectively have a significant effect" on the Families' pursuit of Christian PSEO, the Families cannot establish standing.[48] *Allen v. Wright*, 468 U.S. 737, 759 (1984).[49]

**B.     The Amendment advances compelling interests.**

Standing aside, Plaintiffs' claims each require analysis of whether the Amendment is narrowly tailored to serve a compelling state interest. Compelling interests of the highest order animate the Amendment, so Defendants start there. Separately and together, these interests establish beyond dispute that the Amendment passes constitutional muster no matter which level of scrutiny applies.

First, and most paramount, Minnesota has a compelling interest in educating its school-aged citizens. *Murphy v. State of Ark.*, 852 F.2d 1039, 1041 (8th Cir. 1998). "[E]ducation is perhaps the most important function of state and local governments." *Brown*, 347 U.S. at 493; *accord Plyler v. Doe*, 457 U.S. 202, 221 (1982). This interest encompasses even students not enrolled in public schools. *Murphy*, 852 F.2d at 1044; *Fellowship Baptist Church v. Benton*, 815 F.2d 485, 490-95 (8th Cir. 1987).

From this broad interest flows several subsidiary interests, each of which is of the highest order. Since *Brown*, the Supreme Court has held to the Constitution's promise that state-provided education "is a right which must be made available to all on equal terms."

---

[48] Nor is it predictable that the Schools will forgo offering on-campus PSEO, given its considerable economic benefits, (Ex. 88). *Allen*, 468 U.S. at 758 ("[I]t is entirely speculative … whether withdrawal of a tax exemption from any particular schools would lead the school to change its policies.").

[49] *Abrogated on unrelated grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

347 U.S. at 493; *accord Fair Admissions*, 600 U.S. at 203-07 (eliminating discrimination "means eliminating all of it"). Eradicating discriminatory barriers to education is thus a second "fundamental, overriding interest" supporting the Amendment. *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983); *see also St. Dominic Acad. v. Makin*, ___ F.3d ___, 2024 WL 3718386, at *27 (D. Me. Aug. 8, 2024) ("Maine's asserted interest in eliminating discriminating within publicly funded institutions is compelling.").

Third, Minnesota has a compelling interest in safeguarding its youth's civil rights, including from incursion on their free exercise of religion, compelled speech, and invidious discrimination. This interest lies at the heart of Minnesota's police power. *Olympus Spa v. Armstrong*, 675 F. Supp. 3d 1168, 1194-95 (W.D. Wash. 2023) (collecting cases). Fourth, Minnesota has a compelling interest in ensuring it does not become a "passive participant" in violating these rights. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492-93 (1989); *Concrete Works of Colo., Inc. v. City and County of Denver*, 321 F.3d 950, 976-977 (10th Cir. 2003) (compelling interest in eliminating discrimination when city had passively participated through indirect funding).

Finally, the State has a compelling interest in complying with the Minnesota Constitution's Education Clause. *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993) (holding that "education *is* a fundamental right under the state constitution" and "the Education Clause *is* a mandate, not simply a grant of power[.]" (emphasis in original)); *Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 729-30 (Minn. 2003) (Minnesota has "a compelling interest in preserving" fundamental rights.). While Minnesota can commit

some educational tasks to other actors (as with PSEO), the Education Clause's affirmative duty is nondelegable. *Cruz-Guzman*, 998 N.W.2d at 275

Minnesota's compelling interests are not phantasmic. Prospective PSEO applicants have complained to MDE about the Schools' discriminatory admission criteria. (Exs. 48-52, 66-67, 74-75.) Alumni have described how these criteria foster a hurtful learning environment. (Exs. 112-13.) The Schools will continue to discriminate if allowed. (Ex. 93.) Drs. McGuire and Shoemaker explained how the Schools' admissions standards jeopardize the safety and wellbeing of LGBTQ+ youth and could force some non-Christian students to choose between abandoning their faith or foregoing PSEO. (Ex. 114, at 5-9; Ex. 115, at 16-17, 22.)

As to the Amendment's scope, it is narrowly tailored to prohibit discrimination in PSEO admissions *only*. *See St. Mary Cath. Par. v. Roy*, ___ F.3d ___, 2024 WL 3160324, at *34 (D. Colo. June 4, 2024) (law aimed at "discriminatory barriers" in education narrowly tailored); *St. Dominic*, 2024 WL 3718386, at *28 (analogous law "narrowly tailored because it is written to encompass discriminatory conduct, and nothing more"). No less restrictive means exists for Minnesota to eliminate discriminatory barriers to PSEO, protect the rights of PSEO students, avoid passively participating in discrimination, or carry out its mandate to provide free and uniform public education.

The State must prevail in this constitutional conflict: Minnesota's compelling interests, as embodied in the Amendment, override and extinguish Plaintiffs' claims. *Bob Jones*, 461 U.S. at 604; *Roy*, 2024 WL 3160324, at *44 ("When a community, via government, elects to confer a benefit on a school, the values that community holds, such

as preventing the exclusion of certain historically disfavored groups, may—and in some cases must—be placed as a limited condition on receiving the related benefit.").

### C.     The Amendment does not burden Plaintiffs' rights.

Turning to the merits of Plaintiffs' claims, each fails because the Amendment does not interfere with Plaintiffs' First Amendment rights or offend the Establishment Clause.

There is zero evidence that the Amendment will cause the parade of horribles the Schools portend or make the Families' children abandon their beliefs, which means the Amendment does not substantially burden Plaintiffs' free exercise of religion.

The Amendment does not categorically exclude the Schools from PSEO and is a neutral and generally applicable law that neither targets nor endorses religion, nor imposes unconstitutional conditions. The church-autonomy doctrine is an affirmative defense, not an offensive claim, and in any event is inapplicable here.

The Amendment permissibly regulates conduct, not speech. Plaintiffs admit the Amendment does not violate their expressive association. The equal protection claim is specious. And equity favors rejecting the Schools' claims because their hands are unclean.

### 1.     Free Exercise (Counts I-V, and IX).

Counts I-V allege violation of the Free Exercise and/or Establishment Clauses on theories of categorical exclusion, general applicability, neutrality, religious autonomy, and targeting. None holds water.[50]

---

[50] Plaintiffs also fail to establish burden as to their state-constitutional claim (Count IX). *Newstrand v. Arend*, 869 N.W.2d 681, 687 (Minn. App. 2015).

As a threshold matter, Plaintiffs fail to establish any burdening of their faith, a requisite component of free exercise claims. The Schools contend that their faith statements and social codes promote "safety" and "optimal learning," and prevent "risking the culture." (Cline-Cole Dep. 46-47, 51-52, 96-97; Ex. 94.) But there is no evidence they actually achieve any of these ends. Likewise, there is zero evidence that admitting non-Christian and LGBTQ+ students to PSEO will burden the Schools' core function of delivering postsecondary Christian education. Non-Christian and LGBTQ+ students are already welcome in their midst. (ECF 1, at ¶¶ 97, 138; Cline Cole Dep. 16-18; Mathews Dep. 40-41, 97.)

In *Stevens v. Optimum Health Institute*, a blind woman sued a religious non-profit after she was denied services. 810 F. Supp. 2d 1074, 1078 (S.D. Cal. 2011). The organization responded that admitting her would disrupt "the sanctity of [others'] spiritual paths" and impair its expressive association. *Id.* at 1092-96. The court rejected these claims, finding no evidence that admitting the plaintiff would have the effects the organization claimed. *Id.* at 1094; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) (organizations cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message"); *Christian Legal Soc'y Chapter of Univ. of Cal. v. Kane*, No. C 04-04484 JSW, 2006 WL 997217, at *23 (N.D. Cal. May 19, 2016) (no evidence that admitting non-Christian or LGBTQ+ members would impair religious club in conveying its beliefs); *aff'd* 561 U.S. 661 (2010). Similarly, the Schools simply ignore their obligation to prove *substantial* burdening, which dooms their claims.

41

The Families fare no better. Again, they have no right to attend PSEO at the Schools (or another religious Institution). *Bowen*, 476 U.S. at 699. The Families must show the Amendment will coerce "them or their children to believe or act contrary to their religious views." *McKnight*, 102 F.4th at 208. They have neither done so nor intimated that attending PSEO at a nonreligious Institution, or a religious Institution other than Crown or Northwestern, will pressure them to abandon their beliefs—a conclusion reinforced by their decision to participate in secular programs like PSEO. And the Families have no qualms with non-Christian or LGBTQ+ students participating in PSEO alongside their children. (Erickson Dep. 52-55; Loe Dep. 42-45.) "[U]nlike the isolation sought by the Amish in *Yoder*, the Families simultaneously seek a "separate religious education *and* the benefits of [PSEO]," a secular program. *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 137 n.10 (emphasis added). They cannot have it both ways, and consequently cannot establish burden.

### 2. The Schools are not categorically excluded from PSEO (Count I).

Express discrimination through "automatic and absolute exclusion from the benefits of a public program" because of religious status is substantial burdening. *Carson*, 596 U.S. at 778-79. But "regulation that indirectly and incidentally calls for a choice between securing a governmental benefit and adherence to religious beliefs is wholly different." *Bowen*, 476 U.S. at 706.

The Schools' claim of categorical exclusion from PSEO misapprehends the Amendment. Nothing in its text changes the criteria to be an "eligible institution." Minn. Stat. § 124D.09. The Amendment simply sets forth standards of conduct for already-

42

eligible Institutions and, therefore, does not facially disqualify any religious Institution. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993); *contra Trinity*, 582 U.S. at 463 (church from public program solely for its status as a church). Thus, no exclusion from otherwise-available benefits exists, and the *Trinity/Espinoza/Carson* line of cases is inapposite. *Roy*, 2024 WL 3160324, at *21-22.

### 3. The Amendment is neutral and generally applicable, and neither favors nor targets religion (Counts II, III, V).

Burden notwithstanding, the Amendment is a "neutral law of general applicability." *Emp. Div. v. Smith*, 494 U.S. 872, 878-79 (1990). This is so *because* the Schools cannot establish any burdening of their religious beliefs. *See Lukumi*, 508 U.S. at 531 (allowing "incidental effects of burdening" as neutral and generally applicable).

*Smith* remains good law. The Amendment is generally applicable: *all* Institutions are prohibited from discriminating in PSEO admissions, not just religious ones. *Id*. at 543 (laws are generally applicable when they do not selectively burden religiously-motivated conduct); *accord McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142 (W.D. Wash. 2023) (Title VII and state antidiscrimination law applied generally). Nothing in the record establishes that the Amendment affords any exceptions or that MDE treats any *comparable* secular activity more favorably than the Schools' discrimination.[51] *See Fulton*, 593 U.S. at 536 (law not generally applicable for providing exceptions); *Roy*, 2024 WL 3160324, at *33 (same as to religious-affiliation provision).

---

[51] There is no evidence that any Institution requires secular pledges or affirmations for admission to PSEO. But if any did, the Amendment would bar these requirements to the extent they exclude high-school students belonging to a protected class.

The Amendment is also neutral. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir. 2020) ("[A] generally applicable anti-discrimination regulation will usually be understood to indicate neutrality rather than religious animosity.") It proscribes all types of protected-class discrimination, not just religious. Its object is not "to infringe upon or restrict practices because of their religious motivation," *Lukumi*, 508 U.S. at 533, but to combat discrimination in PSEO regardless of motivation. *See Roy*, 2024 WL 3160324, at *22-25 (equal-opportunity requirement was facially neutral and applied neutrally). Although the Amendment mentions faith statements, this reference is illustrative; uncompromising faith statements are simply one form of discrimination, and nothing in the Amendment's broad prohibition against discrimination remotely suggests these are the only prohibited forms of discrimination (even as to religion).

Because the Amendment is neutral, generally applicable, and has a rational basis, it withstands Plaintiffs' free exercise challenge. *Smith*, 494 U.S. at 878-80. This would not change if Plaintiffs had a viable speech claim (they do not) and could invoke strict scrutiny under a hybrid-rights theory, or even if *Smith* is overturned, because Minnesota's interests here are too compelling and historically-rooted to be displaced.

Plaintiffs' Establishment Clause theory fares no better. They contend that by naming faith statements as one form of religious discrimination, the Amendment favors religious Institutions that do not require faith statements. But "a state does not establish religion by passing a law that just happens to coincide or harmonize with the tenets of some or all religions." *Doe v. Parson*, 960 F.3d 1115, 1118 (8th Cir. 2020) (quotations omitted). Religious Institutions that do not require a faith statement are still prohibited from

44

discriminating based on religion in admissions; the Amendment aligns with these Institutions only insofar as they do not engage in one form of outlawed religious discrimination (faith statements). *Id.* ("Mere alignment with certain religious beliefs … is not enough.") If anything, the Establishment Clause cuts in Defendants' favor because the Schools are state actors, another compelling interest in MDE's overbrimming quill. *Drummond*, 2024 WL 3155937, at *11.

### 4.   The church-autonomy doctrine is inapplicable (Count IV).

Plaintiffs' invocation of religious autonomy merits little discussion. Also termed "church autonomy," religious autonomy is not a standalone constitutional claim, but an affirmative defense. *Hosanna-Tabor Evangelical Lutheran Church, Inc. v. EEOC*, 565 U.S. 171, 195 n.4 (2012); *accord Gaddy v. Corp. of Pres.*, 551 F. Supp. 3d 1206, 1225 (D. Utah 2021). And it gives the Schools no cover here because the Eighth Circuit rejects religious autonomy as a defense to claims alleging discrimination in education. *Wells v. Creighton Preparatory Sch.*, 82 F.4th 586, 594 n.5 (8th Cir. 2023); *accord Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 553 (8th Cir. 2015) (defense inapplicable to disputes resolvable with neutral principles of law). For the same reasons, this theory also does not advance any Establishment Clause claim.

### 5.   The Amendment is not an unconstitutional condition (Count VI).

The unconstitutional conditions doctrine prohibits the government from coercing people into giving up fundamental rights. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). Plaintiffs' claim that the Amendment does so fails.

As state actors the Schools lack fundamental rights, and the Families lack any protected interest in PSEO at the Schools in particular, *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 967 (8th Cir. 2015) (rejecting proposition that "a parent's ability to choose where his or her child is educated *within the public school system* is a fundamental right or liberty") (emphasis added); *accord Cornerstone*, 563 F.3d at 136. Moreover, this claim reaches for a second bite at the free-exercise apple: Plaintiffs misapprehend unremarkable government regulation as conditions on their PSEO eligibility. The Amendment, however, is not "actually coercive" because it defines the limits of PSEO rather than regulating protected rights "outside the contours of [PSEO] itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

In *International Development*, the Supreme Court invalidated a law requiring participants in a government-funded health program to have a policy explicitly opposing prostitution and sex trafficking, *id.* at 208, reasoning that this condition regulated participants' speech in every aspect of their work and not just as participants in the government-funded program, *id.* at 218-19. Plaintiffs face no such universal regulation.

The Schools are left "unfettered" to use Christ-centric processes in their traditional undergraduate programs and hiring. *Id.* at 217. Nor is the Amendment coercive. The record establishes that the Schools weighed how they would proceed were it enacted. (Cline-Cole Dep. 141-42 (referencing Board decision); Mathews Dep. 73 (indicating Crown has not yet "made a final decision"); Ex. 88). In preserving this decisional freedom, the Amendment avoids any extortionate effects. *See Koontz*, 570 U.S. at 605. The Families complain they must relinquish their belief in a faith-based education. But even if the Amendment

46

extinguished PSEO at the Schools—a speculative scenario—Christian and religious Institutions alike remain eligible to provide PSEO, and the Families free to attend. The Families do not contend that their faith *requires* them to attend the Schools, but merely that the Schools are best adapted to their beliefs. The state, however, need not indulge this preference so long as it refrains from forcing the Families to relinquish their faith in exchange for financial assistance. *See Phan v. Commonwealth*, 806 F.2d 516, 520 (4th Cir. 1986)*.* Since the Families can continue to practice their religion and attend PSEO, their free exercise rights are intact. *Id.* (rejecting unconstitutional-conditions claim).

### 6.    The Amendment regulates conduct, not speech (Count VII).

Speech and conduct are not synonymous under the First Amendment. Laws regulating speech are disfavored; those regulating activity and incidentally burdening speech are fundamentally different. *Texas v. Johnson*, 491 U.S. 397, 407 (1989). The Amendment falls in the latter category and advances a compelling interest, so it does not violate the Schools' freedom from compelled speech.

*Telescope* illustrates this distinction. In *Telescope*, the Eighth Circuit treated videography as protected speech that the MHRA's public-accommodation and commercial provisions could not compel. *Id.* at 756-57. No daylight existed between the MHRA and the First Amendment because video-making was precisely the "commercial conduct" and "economic activity" the MHRA regulated; the law's direct object was speech. *Id.*

The Eighth Circuit distinguished "antidiscrimination laws that actually *do* target conduct, which are generally constitutional even when they incidentally effect speech." *Id.* at 757 (emphasis in original); *accord R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992)

("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). Examples of regulatable conduct include hiring employees and serving customers. *Telescope*, 936 F.3d at 757. For instance, laws "can unquestionably require an employer to take down a sign reading 'White Applicants Only.'" *Id.* (quoting *Rumsfeld v. FAIR, Inc.*, 547 U.S 47, 62 (2006)). *Telescope* thus instructs that the MHRA can regulate speech-adjacent conduct, such as discriminatory hiring. *E.g.*, *Hishon v. King & Spalding*, 468, U.S. 69, 78 (1984) (rejecting First Amendment challenge to Title VII); *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1065, 1070 (8th Cir. 2024) (upholding law even though it proscribed "false statements" because the basis for proscription "consists entirely of the very reason that the entire class of speech at issue is proscribable").

The Amendment clearly targets conduct. Its narrow tailoring permits the Schools to discriminate in employment and postsecondary education; it only prohibits discrimination in PSEO admissions, just like Title VII proscribes discrimination in hiring. The Amendment affects what the Schools "must *do*—afford equal access to [all students]—not what they may or may not say." *Rumsfeld*, 547 U.S. at 60 (emphasis in original).

Nor is there any risk prospective PSEO applicants would perceive the Amendment as evidencing the Schools' endorsement of other faiths or agreement with same-sex relationships or gender fluidity. *Id.* at 65 ("[H]igh school students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so." (citations omitted)). The Schools may still broadcast their religious and social beliefs—they just cannot use these beliefs to discriminate in admissions.

Because the Amendment regulates conduct, it need only satisfy intermediate scrutiny. *Johnson* 491 U.S. at 407. The Amendment easily clears this hurdle, as it is narrowly tailored to serve a compelling interest. *Telescope*, 936 F.3d at 754 (expressing "no doubt" that the MHRA serves a compelling interest of "a substantial constitutional pedigree"). Defendants are entitled to judgment on Count VII's compelled-speech theory.

### 7. *Telescope* forecloses the Expressive Association and Equal Protection claims (Counts VII and VIII).

Plaintiffs' expressive association and equal protection claims fail for the same reasons their other claims do—the Amendment's compelling interest and its neutral and generally-applicable character. *Locke v. Davy*, 540 U.S. 712, 720 n.3 (2004); *accord St. Dominic*, 2024 WL 3718386, at *28 n.13. But these claims also fail for the simple reason that the Schools cannot prove that the Amendment even implicates the rights at issue.

*Expressive Association*. The Schools concede they have no problem admitting PSEO students who are non-Christian, gay, or transgender for online and on-campus PSEO, (*e.g.*, ECF 1, at ¶¶ 97, 106, 138), which dooms their expressive association claims as poorly-disguised speech claims. Forced inclusion of unwanted members only infringes expressive association[52] if the unwanted members significantly affect a group's ability to advocate public or private viewpoints. *Telescope*, 936 F.3d at 760.

---

[52] Defendants preserve for reply and appeal argument on the Schools' lack of expressive rights in offering PSEO. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 635-36 (1984) (O'Connor, J., concurring) ("An association must choose its market. Once it enters the marketplace of commerce in any substantial degree it loses the complete control over its membership that it would otherwise enjoy if it confined its affairs to the marketplace of ideas.").

Allowing high-school students to attend on-campus PSEO at Institutions they may already attend online does not affect the Schools' ability to advocate viewpoints, let alone significantly. When a videographer claimed an expressive-association violation from being forced to make wedding videos for gay couples, the Eighth Circuit explained that simply requiring the videographer to serve, speak to, and otherwise associate with same-sex couples does not affect protected expression. *Id*. This is all the Amendment asks the Schools to do by prohibiting discrimination in admissions.

Indeed, the students the Schools seek to exclude are children—students who lack any categorical authority to set or communicate the Schools' institutional viewpoints, unlike the Scoutmaster in *Dale* who occupied an influential leadership role. *Roy*, 2024 WL 3160324, at *40. The record lacks evidence that the Schools' expression suffers from PSEO students with dissenting viewpoints who attend online. Moreover, statements by alumni dispel any notion that the on-campus admissions policies actually create any expressive community that might need protection from nonconforming applicants. (Ex. 112 ("[T]he statement of faith acts merely as a formality so administrators, funders, and some students can believe in [a] rosey [sic] conception" of the Schools' religious environment.).)

The Schools' burden of proof prevents them from "erect[ing] a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair [their] message," *Dale*, 530 U.S. at 653, but they offer no evidence that anything would change if dissenting students were allowed on-campus. *Cf. Christian Legal Soc'y*, 561 U.S. at 690 (university's nondiscrimination policy "all the

more creditworthy" because plaintiffs retained many avenues for expressing message). Accordingly, Plaintiffs' expressive association claim fails.

  ***Equal Protection.*** Once again, Plaintiffs rely on a patently-incorrect understanding of the Amendment as an eligibility rule to advance a meritless equal protection claim. The Amendment "does not classify anyone based on their views about [religion]." *Telescope*, 936 F.3d at 761; *accord Plaintiff A v. Park Hill Sch. Dist.*, 97 F.4th 586, 592 (8th Cir. 2024) (requiring differential treatment to prove equal protection claim). It simply requires all Institutions to refrain from discrimination, and in fact imposes no regulation on families or students. Plaintiffs' dissatisfaction with the Amendment is just that—dissatisfaction, not a constitutional injury. *Id.* ("Many laws affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law." (cleaned up)). Plaintiffs have no viable equal protection claim.

* * *

  There can be no dispute: the Amendment clears all levels of constitutional scrutiny and burdens no rights. Defendants are entitled to judgment as a matter of law.

### III.   EQUITY FORECLOSES THE SCHOOLS' CLAIMS.

Defendants invite the Court to end where this case started. Almost twenty years ago, the Schools promised MDE that they would *eliminate* faith statements from their PSEO admissions processes when first applying to become eligible Institutions. (Ex. 10.) Now, the Schools ask the Court to strike down a presumptively-constitutional statute, claiming it  prevents them from doing the very thing they said they would stop. Entertaining their claims, let alone granting relief, would defy equitable principles. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (equity unavailable "to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief").

The Amendment was necessary only because the Schools reneged on promises they made in the early 2000s and reinstated discriminatory admissions criteria. The Schools neither asked MDE about reverting to these practices nor notified MDE when they did so. Perhaps the Schools never stopped; the Complaint says as much. (ECF 1, at ¶¶ 4, 101, 142.) And during argument on their motion to dismiss, the Schools confirmed the same:

> **Court**: How long have [the Schools] required the faith statements?
>
> **Schools**: For their entire existence as schools.… These policies have existed for the entire time that they've been part of the PSEO program.

(ECF 49, at 5 ¶ 25-6 ¶ 3; *id.* 11 ¶ 25-12 ¶ 1.)

The record compels the conclusion that the Schools misled MDE when they first applied to provide PSEO, or at some point shortly thereafter. The Schools also violated their statutory obligation and to teach nonsectarian PSEO courses only, despite repeated assurances otherwise. (*Compare* Exs. 46-47 *with* Exs. 97-111.) In a case implicating

52

Minnesota's compelling interest in eradicating discrimination from public education, dismissing the Schools' claims will prevent them "from enjoying the fruits of [their] transgression" while "avert[ing] an injury to the public." *Precision*, 324 U.S. at 815.

## CONCLUSION

This case involves hard questions. The Schools play an important role in Minnesota, including delivery of PSEO, and Defendants hold them and their participants in high esteem. MDE's counterclaims are not intended to impugn their venerable beliefs.

But those beliefs must give way to Minnesota's first-order compelling interests, which converge to guarantee all our youth free and uniform education, without barriers. By participating in PSEO, the Schools are legally bound to help keep this promise. Defendants are entitled to complete judgment.

Dated:  September 3, 2024         Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Jeff Timmerman
JEFF TIMMERMAN (#0352561)
MARTHA J. CASSERLY (#0148271)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
(651) 757-1214 (Casserly)
(651) 300-6807 (DeMeules)
jeffrey.timmerman@ag.state.mn.us
marty.casserly@ag.state.mn.us
madeleine.demeules@ag.state.mn.us
**ATTORNEYS FOR DEFENDANTS**

53