# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

MELINDA and MARK LOE,
*et al.*,

     *Plaintiffs,*

  v.

WILLIE JETT, *et al.*,

     *Defendants.*

Civil No. 0:23-cv-01527-NEB-JFD

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ............................................................................... 1

FACTUAL BACKGROUND .................................................................2

    A.    The PSEO Program ..............................................................2

    B.    The Plaintiff Schools............................................................4

    C.    The Plaintiff Families...........................................................8

    D.    The Exclusion of Crown and Northwestern.............................9

    E.    Procedural History............................................................15

LEGAL STANDARD ........................................................................16

ARGUMENT ..................................................................................16

I.    Plaintiffs Are Entitled to Summary Judgment on
Counts I-VI of Their Complaint. ....................................................16

    A.    The Amendment Categorically Excludes the
Schools from PSEO Because of Their Religious
Practices (Count I) ............................................................16

        1. The Amendment Is an Unlawful Religious
Exclusion ....................................................................16

        2. The Amendment Cannot Meet Strict Scrutiny ....................18

    B.    The Amendment Is Not Neutral or Generally
Applicable ......................................................................26

        1. The Amendment Is Not Neutral (Count V) ........................26

        2. The Amendment Is Not Generally Applicable
(Count II)....................................................................30

    C.    The Amendment Impermissibly Discriminates
Among Religions (Count III) ...............................................32

    D.    The Amendment Violates the Church Autonomy
Doctrine (Count IV) ..........................................................33

E.    The Amendment Imposes an Unconstitutional Condition (Count VI) ....................................... 34

II.    Plaintiffs Are Entitled to Summary Judgment on All of MDE's Counterclaims............................................... 35

A.    MDE Lacks Standing to Bring Counterclaims ......................... 35

B.    MDE's Constitutional Counterclaims Fail Because Plaintiffs Are Not State Actors .................................. 37

1.    The State and the Schools Are Not Pervasively Entwined ........................................... 38

2.    The Schools Do Not Perform a Traditionally Exclusive State Function.............................. 41

C.    MDE's MHRA Claim Independently Fails............................... 45

1.    The Schools Are Exempt from the MHRA........................... 45

2.    Applying the MHRA Would Violate the Schools' First Amendment Rights to Association and Assembly................................. 47

D.    MDE's Counterclaims Excessively Entangle the Court in Religious Issues, Violating the Church Autonomy Doctrine....................................... 49

CONCLUSION ................................................................. 53

CERTIFICATE OF COMPLIANCE....................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023)................................................................ 19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982)................................................................ 36

*Ark. Times LP v. Waldrip,*
   37 F.4th 1386 (8th Cir. 2022) ............................................... 34

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000).................................................... 19, 47-49

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001)................................................................ 38

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014)................................................................ 24

*Butler v. St. Stanislaus Kostka Cath. Acad.,*
   609 F. Supp. 3d 184 (E.D.N.Y. 2022)................................... 50

*Carson v. Makin,*
   596 U.S. 767 (2022)....................................................... *passim*

*Caviness v. Horizon Cmty. Learning Ctr., Inc.,*
   590 F.3d 806 (9th Cir. 2010)..................................... 41, 42, 43

*Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle,*
   212 F.3d 1084 (8th Cir. 2000)............................................... 32

*Christian Legal Soc'y v. Walker,*
   453 F.3d 853 (7th Cir. 2006)................................................. 49

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)....................................................... *passim*

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)................................................................35

*Cuffley v. Mickes,*
    208 F.3d 702 (8th Cir. 2000)................................... 19-20, 35

*Dale v. U.S. Steel Corp.,*
    No. 0:13-cv-1046, 2015 WL 4138869
    (D. Minn. July 2, 2015) ......................................................37

*Doe v. Lutheran High Sch. of Greater Minneapolis,*
    702 N.W.2d 322 (Minn. Ct. App. 2005) ...........................45-46

*Drevlow v. Lutheran Church, Missouri Synod,*
    991 F.2d 468 (8th Cir. 1993)......................................... 34, 50

*Egan v. Hamline United Methodist Church,*
    679 N.W.2d 350 (Minn. Ct. App. 2004) ..............................46

*Employment Division v. Smith,*
    494 U.S. 872 (1990)................................................................26

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020)............................................... 1-2, 17

*FCA v. District of Columbia,*
    No. 24-cv-1332, 2024 WL 3400104
    (D.D.C. July 11, 2024)....................................................21-22

*FCA v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) (en banc) ...............................32

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021)................................................ *passim*

*Garrick v. Moody Bible Inst.,*
    95 F.4th 1104 (7th Cir. 2024) ..............................................50

*Gonzales v. O Centro,*
    546 U.S. 418 (2006)................................................................19

*Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.*,
377 F. Supp. 2d 379 (S.D.N.Y. 2005)..............................................41-42

*Harrison v. Jefferson Par. Sch. Bd.*,
78 F.4th 765 (5th Cir. 2023) ...........................................................36

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v EEOC*,
565 U.S. 171 (2012)...........................................................................48

*Hous. Auth. of the Kaw Tribe of Indians v. Ponca City*,
952 F.2d 1183 (10th Cir. 1991)........................................................36

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa*,
5 F.4th 855 (8th Cir. 2021) ..............................................................25

*Johnson v. Minneapolis Park & Recreation Bd.*,
729 F.3d 1094 (8th Cir. 2013)..........................................................26

*Kedroff v. Saint Nicholas Cathedral*,
344 U.S. 94 (1952)........................................................................33-34

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................................................................28, 30

*Klunder v. Brown Univ.*,
778 F.3d 24 (1st Cir. 2015) ..........................................................42-43

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013)...........................................................................34

*Krueger v. Zeman Constr. Co.*,
781 N.W.2d 858 (Minn. 2010)..........................................................37

*L.P. v. Marian Catholic High Sch.*,
852 F.3d 690 (7th Cir. 2017)............................................................42

*Larson v. Valente*,
456 U.S. 228 (1982).....................................................................32, 33

*Logiodice v. Trs. of Me. Cent. Inst.*,
296 F.3d 22 (1st Cir. 2002) ...........................................40-41, 42, 43

*Manhattan Cmty. Access Corp. v. Halleck,*
  587 U.S. 802 (2019) ................................................................ 37, 41, 44

*Marmo v. Tyson Fresh Meats, Inc.,*
  457 F.3d 748 (8th Cir. 2006) ............................................................ 52

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
  584 U.S. 617 (2018) ...................................................................... 28, 30

*Maxon v. Fuller Theological Seminary,*
  No. 20-56156, 2021 WL 5882035
  (9th Cir. Dec. 13, 2021) ................................................................... 49

*McDaniel v. Paty,*
  435 U.S. 618 (1978) ........................................................................... 28

*Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.,*
  817 F.2d 1310 (8th Cir. 1987) .......................................................... 39

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ............................................................ 28

*Minn. Fed'n of Tchrs. v. Mammenga,*
  500 N.W.2d 136 (Minn. Ct. App. 1993) ........................................... 20

*Minn. Fed'n of Tchrs v. Nelson,*
  740 F. Supp. 694 (D. Minn. 1990) .................................................... 50

*Native Am. Council of Tribes v. Weber,*
  750 F.3d 742 (8th Cir. 2014) ............................................................ 25

*New Hope Family Servs., Inc. v. Poole,*
  966 F.3d 145 (2d Cir. 2020) ........................................................ 28, 29

*Nichols v. Metro. Ctr. for Indep. Living, Inc.,*
  50 F.3d 514 (8th Cir. 1995) .............................................................. 40

*NLRB v. Catholic Bishop of Chi.,*
  440 U.S. 490 (1979) ........................................................................... 50

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  591 U.S. 732 (2020) ...................................................................... 33, 48

vii

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*,
  83 F.4th 658 (8th Cir. 2023) ...............................................................22

*Powe v. Miles*,
  407 F.2d 73 (2d Cir. 1968) ................................................................42

*Rayburn v. Gen. Conf. of Seventh-day Adventists*,
  772 F.2d 1164 (4th Cir. 1985)........................................................49-50

*Rendell-Baker v. Kohn*,
  457 U.S. 830 (1982)...........................................................37-38, 39, 41

*Republican Party of Minn. v. White*,
  416 F.3d 738 (8th Cir. 2005) (en banc)................................. 20, 21, 22

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019).............................................................21

*Sabri v. Whittier All.*,
  833 F.3d 995 (8th Cir. 2016).............................................................38

*Sinn v. The Daily Nebraskan*,
  829 F.2d 662 (8th Cir. 1987)........................................................39-40

*State v. Wicklund*,
  589 N.W.2d 793 (Minn. 1999)...........................................................37

*Tandon v. Newsom*,
  593 U.S. 61 (2021) (per curiam).........................................................31

*Thomas v. Review Bd.*,
  450 U.S. 707 (1981).....................................................................24, 51-52

*Thorson v. Billy Graham Evangelistic Ass'n*,
  687 N.W.2d 652 (Minn. Ct. App. 2004) .............................................46

*Torcaso v. Watkins*,
  367 U.S. 488 (1961).........................................................................27

*Tovar v. Essentia Health*,
  857 F.3d 771 (8th Cir. 2017).............................................................37

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) ............................................................... 17, 18

*United States v. Scott,*
  450 F.3d 863 (9th Cir. 2006) ............................................................ 35

*Wickersham v. City of Columbia,*
  481 F.3d 591 (8th Cir. 2007) ............................................................ 38

*Williams v. York,*
  891 F.3d 701 (8th Cir. 2018) .............................................................. 4

**Statutes**

An Act to Incorporate St. John Seminary,
  1857 Minn. Laws 207-08 .................................................................. 42

Minn. Stat. § 124D.09 ........................................................... 2, 40, 43

Minn. Stat. § 124D.09, subd. 3 .................................................. *passim*

Minn. Stat. § 124D.09, subd. 4 ...................................................... 2, 44

Minn. Stat. § 124D.09, subd. 5 ............................................................ 4

Minn. Stat. § 124D.09, subd. 9 ........................................................... 43

Minn. Stat. § 124D.09, subd. 10 ........................................................... 3

Minn. Stat. § 124D.09, subd. 12 .......................................................... 43

Minn. Stat. § 124D.09, subds. 13-21 ...................................................... 3

Minn. Stat. § 124D.09, subd. 19 ........................................................... 3

Minn. Stat. § 124D.09, subd. 22 ........................................................... 3

Minn. Stat. § 363A.13 ..................................................................... 24

Minn. Stat. § 363A.26 ...................................................... 20, 24, 27, 46

Minn. Stat. § 363A.26, subd. 1 ........................................................... 45

Minn. Stat. § 363A.26, subd. 2 .............................................................. 45

**Other Authorities**

H.F. 2497, 93rd Leg. (Minn. 2023) ........................................................... 9

Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, YouTube (Apr. 21, 2023) ............................... *passim*

Minnesota Senate, *Senate Floor Session – Part 3 – 05/16/23*, YouTube (May 16, 2023) ............................................................. 15, 30

Minnesota Senate, *Senate Floor Session – 04/24/23*, YouTube (Apr. 24, 2023) ....................................................... 14, 29, 30

*PSEO Students*, Bethel University ........................................................ 33

## INTRODUCTION

For nearly 40 years, Minnesota's Postsecondary Enrollment Options program (PSEO) has given high school students a free head start on their college education. The program pays for students to simultaneously earn college and high school credits at a public or private postsecondary school of their choice. This gives students flexibility to advance their education at an institution that meets their individual needs.

But last year, Minnesota barred students from using PSEO funds at targeted religious institutions, specifically Plaintiffs Crown College and University of Northwestern – St. Paul (the Schools). Under the new law, schools that ask their students to sign a "faith statement" or that select students based on "religious beliefs" are now excluded. Minn. Stat. § 124D.09, subd. 3(a). For more than 20 years, Crown and Northwestern have served thousands of Minnesota students who wish to pursue their education in a religious environment. Now Minnesota has singled them out: their and their students' religious beliefs are not welcome.

The Constitution forbids this religious discrimination. The Supreme Court has repeatedly held that once a state opens funding to private institutions, the Free Exercise Clause forbids it from excluding participants based on their religious status or their religious use of the funds. *See, e.g., Carson v. Makin*, 596 U.S. 767, 779-80 (2022). Minnesota's religious institutions and students "are members of the

1

community too" and deserve equal access to government programs. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488-89 (2020).

But when Plaintiffs sought to vindicate those rights, Defendant Minnesota Department of Education (MDE) counterclaimed, arguing for the first time in the PSEO program's 40-year history that the Schools are state actors and that their religious practices violate the federal and state constitutions and the Minnesota Human Rights Act (MHRA). Extensive discovery has confirmed that the Schools are private institutions that offer PSEO according to their own academic standards with negligible state oversight. Discovery has further shown that the true aim of MDE's counterclaims is to intrude upon the Schools' religious decision-making and to pressure them to give up their disfavored religious beliefs. None of this is permissible under the First Amendment. The Court should accordingly grant Plaintiffs' motion for summary judgment.

## FACTUAL BACKGROUND

### A. The PSEO Program

Since 1985, Minnesota has partnered with public and private post-secondary schools to give high school students the opportunity to earn concurrent college and high school credit for free. Minn. Stat. § 124D.09. This PSEO program has enabled students across Minnesota to graduate high school with up to two years of free college credits. *See* Ex. 1 at 21.

PSEO is open to public, private, and home school juniors and seniors throughout Minnesota. Minn. Stat. § 124D.09, subd. 4. To participate,

2

students apply directly to their choice of "Eligible Institution," as defined by the PSEO Act. *Id.* § 124D.09, subd. 3(a); Ex. 2 at 6-7, 9. Colleges and universities set their own admissions criteria, decide how many PSEO students to accept, and determine which courses to offer. Ex. 2 at 17; Ex. 3 ("Reynolds.Tr.1") 26:5-10. The institution can also decide how it offers classes: on-campus, online, or even at public or private high schools. Minn. Stat. § 124D.09, subd. 10. Once admitted, a student chooses which of the school's PSEO-eligible courses to take, and the school provides the student all necessary textbooks and materials. Minn. Stat. § 124D.09, subd. 19; Ex. 2 at 19, 24. At the end of the semester, MDE reimburses the school with a flat fee for each PSEO-eligible credit. Minn. Stat. § 124D.09, subds. 13-21; Ex. 2 at 26. PSEO students may also request reimbursement for transportation costs associated with commuting to the eligible institution of their choice. Minn. Stat. § 124D.09, subd. 22; Ex. 4 at 27.

Prior to July 1, 2023, the PSEO Act defined an "Eligible Institution" as "a Minnesota public postsecondary institution … or a private, residential, two-year or four-year, liberal arts, degree-granting college or university located in Minnesota." Minn. Stat. § 124D.09, subd. 3(a) (2023). To become an eligible institution, a school submits a written request to the Commissioner of Education. Ex. 2 at 16-17. A school is usually approved if it meets the statutorily defined criteria, and MDE does not monitor the institutions to ensure they meet eligibility

3

requirements going forward. Reynolds.Tr.1 17:16-19; 18:9-19. Approximately 60 postsecondary institutions in Minnesota currently participate in PSEO, including both secular and religious schools. Ex. 1 at 52-54.

Schools retain academic control over their PSEO offerings. MDE does not set grading standards, review PSEO curricula or require that specific courses be offered; nor does it have any say over the faculty schools employ to teach PSEO classes. Ex. 5 ("Reynolds.Tr.2") 35:25-37:12. MDE may review course curricula to ensure they meet the statute's "nonsectarian" requirement, *see* Minn. Stat. § 124D.09, subd. 5, but only if it receives a complaint. Reynolds.Tr.2 17:1-3. MDE does not keep records of schools' application processes, academic standing requirements, or enrollment caps for their PSEO offerings. Reynolds.Tr.1 18:9-19, 26:5-10. A student's high school decides how many high school credits the student receives for PSEO courses. Ex. 2 at 20.

## B. The Plaintiff Schools

### *Crown College*

Crown College is a private Christian college in Saint Bonifacius, Minnesota. *See* Compl. (ECF 1) ¶ 82.[1] It began in 1916, when a local farmer asked Reverend J.D. Williams to teach him the Word of God. *Id.*

---

[1]  Plaintiffs' "verified complaint must be treated as the equivalent of an affidavit for summary judgment purposes." *Williams v. York*, 891 F.3d 701, 703 n.2 (8th Cir. 2018).

4

¶ 83; Ex. 6 ("Mathews.Tr.") 32:15-25. Reverend Williams soon established a school with just over 40 students. Compl. ¶ 84. That school became Crown College. It has been aligned with the Christian and Missionary Alliance denomination since its inception. *Id.* ¶ 85; Mathews.Tr. 20:16-21. Crown's mission is "to provide a Biblically-based education for Christian leadership in The Christian and Missionary Alliance, the church-at-large, and the world." Ex. 7 at 3.

Crown is committed to being a boldly Christian and academically excellent institution. *Id.* Providing a Christ-focused environment for its students is core to its religious mission. Compl. ¶ 109; Mathews.Tr. 34:1-8. Everything Crown does serves that purpose. Ex. 7 at 4. Courses present subjects from a Christ-centered worldview. Mathews.Tr. 38:18-19. Faculty and students pray together before classes, meetings, and other events. Compl. ¶ 89; Mathews.Tr. 103:13-15, 112:5-7. And undergraduates participate in the Spiritual Formation Program, which encourages them to attend chapel services and serve their community. *See* Ex. 8.

All on-campus students must affirm that they align with Crown's Christian tenets by signing its Community Covenant ("Covenant"). Mathews Decl. ¶ 10; Ex. 9. This is to foster a strong Christian community and Christ-centered culture. Compl. ¶ 92; Mathews.Tr. 34:20-35:1. In affirming the Covenant, students pledge "to live out Christian character toward one another" and to build a Christ-centered community through

"prayer, worship, Bible study, fasting, discipleship, witnessing, and using [their] time, gifts and finances for His glory." Ex. 9. This includes a promise to avoid certain behaviors such as "abusive anger," "sexually immoral behavior," "prejudice (based on race, gender, or socioeconomic status)," and "profanity, lying, drunkenness, stealing and dishonesty." *Id.* While Crown's Covenant is critical to cultivating spiritual community on campus, Crown approaches any failures to abide by its commitments with the goal of reconciliation and growth and does not typically discipline students for disagreements over faith or identity. *See* Mathews.Tr. 41:11-21, 45:7-46:9.

Crown's desire to foster a Christ-centered community extends to its PSEO program. Crown has offered PSEO courses since 2002. Ex. 10 at 1. It admits a growing number of students to the on-campus PSEO program each year and has consistently required them to sign the same Covenant as other campus community members. Mathews.Tr. 47:15-25; Mathews Decl. ¶ 10. Indeed, students come to Crown for PSEO *because* they are looking for a Christ-centered community and education, and many matriculate after their PSEO experience ends. *See, e.g.*, Mathews.Tr. 72:12-19; Ex. 11.

*University of Northwestern – St. Paul*

Northwestern was founded in 1902 as the Northwestern Bible and Missionary Training School. Ex. 12 ("Cline-Cole.Tr.") 30:10-18. Northwestern's second president, evangelist Reverend Billy Graham,

6

helped the school gain national prominence. Compl. ¶ 126. Under the guidance of many faithful leaders, Northwestern has continued to flourish and provide a nondenominational Christian education to thousands of students. *Id.* ¶ 128.

From its humble beginnings, Northwestern has stayed true to its mission "to provide Christ-centered higher education equipping students to grow intellectually and spiritually, to serve effectively in their professions, and to give God-honoring leadership in the home, church, community and world." *Id.* ¶ 129. Northwestern integrates its Christian worldview into all its courses. Ex. 13 at 1-3. Students and faculty pray together before classes, meetings, and events. Compl. ¶ 131. Northwestern provides regular chapel services and other faith-formation events for its campus community. Cline-Cole.Tr. 94:21-95:5. And the school encourages its students and faculty to continually worship God, strengthen their faith, and serve the community in accordance with their Christian beliefs. *See* Ex. 14 at 1-2.

Those Christian beliefs are embodied in Northwestern's Declaration of Christian Community, which the school requires all members of its on-campus community to sign. *Id.* at 4; Cline-Cole Decl. ¶ 7. In this Declaration, on-campus students and faculty promise to "strive to create an atmosphere of Christ-centered community" and to keep their "relationship to Jesus Christ and commitment to obey God's Word … at the very center" of all they do. Ex. 14 at 1-2. Members of the

Northwestern campus community "condemn oppression" in all forms and "humbly work[] toward loving all people with the genuine love of Christ." *Id.* at 2. They also "support the sanctity of marriage," which Northwestern defines "as being a covenant between one man and one woman." *Id.* Northwestern believes that its Declaration serves a vital spiritual role on campus, but it does not typically invoke the policy in student disciplinary matters. Cline-Cole.Tr. 62:15-64:4.

Northwestern has been providing PSEO students with a top-tier education for over 25 years and is now the state's largest PSEO provider. Ex. 1 at 53. Each year, Northwestern admits between 200 and 300 on-campus PSEO students, and roughly 1200 to 1300 students take courses remotely. Cline-Cole.Tr. 121:24-122:10. In 2021, Minnesota postsecondary institutions submitted over 180,000 credit hours for reimbursement, and Northwestern accounted for more than 15 percent of that total. Ex. 1 at 53-54.

**C. The Plaintiff Families**

Melinda and Mark Loe are longtime Minnesotans and the parents of seven children. Ex. 15 ("Loe.Tr.") 7:1, 11:5. They raise their children in accordance with their Christian faith, striving to put Jesus Christ and His teachings at the center of everything they do. Compl. ¶ 59. The Loes' two oldest children benefitted from PSEO when they were in high school. Their oldest took PSEO courses through Crown, and their second

8

participated through Northwestern. Loe.Tr. 11:19-12:17. Both got a significant head start on college and saved substantial time and money.

The Loes' child R.L. is a high school senior and does PSEO on campus at Northwestern. Loe.Tr. 17:24-18:9. R.L. chose Northwestern because she wanted a faith-based community where she could join fellow believers in receiving a quality, Christ-centered education. Ex. 16 at 10.

Another child, O.L., will be a junior beginning fall 2025. When O.L. becomes eligible for PSEO, she hopes to attend on-campus at Crown or Northwestern. Loe.Tr. 20:5-18. O.L. wants a high-caliber, Christian education and a religious community that will bolster her faith. Ex. 16 at 10.

Dawn Erickson lives in Minnesota and is a mother of four. Ex. 17 ("Erickson.Tr.") 10:12-17. Ms. Erickson's three oldest children participated in PSEO at Northwestern. Erickson.Tr. 21:11-15. Her second initially planned to attend college out of state, but participating in PSEO at Northwestern changed his mind; he will now graduate from Northwestern in 2025. Compl. ¶ 75. Ms. Erickson's youngest, J.G., wants the option to participate in PSEO through Northwestern as a senior. Ex. 16 at 11.

### D. The Exclusion of Crown and Northwestern

In May 2023, Minnesota passed H.F. 2497, 93rd Leg. (Minn. 2023) (the Amendment), which amended the PSEO Act's definition of "Eligible Institution." The Amendment explicitly targets religious institutions that

9

cultivate on-campus religious communities by imposing the following two restrictions: (1) "An eligible institution must not require a *faith statement* from a secondary student seeking to enroll" (the faith statement ban); and (2) it must not "base any part of the admission decision on a student's race, creed, ethnicity, disability, gender, or sexual orientation or *religious beliefs or affiliations*" (the nondiscrimination requirement). Minn. Stat. § 124D.09, subd. 3(a) (emphasis added).

For religious institutions that seek to build a community of faith with students who share their beliefs, the law imposes a stark choice: abandon your religious practices or forgo participation in PSEO. Families with students who want to use PSEO funds at schools that share their beliefs likewise are forced to choose between participating in PSEO and attending the religious school of their choice. *See* Erickson.Tr. 54:1-12; Loe.Tr. 94:20-95:16.

The Amendment arose from MDE's long-standing efforts to force religious colleges and universities, and Crown and Northwestern in particular, to abandon faith statements in their admissions processes. Beginning in 2018, MDE told Northwestern it could not require PSEO applicants to sign a faith statement. Ex. 18 ("Unni.Tr.") 41:5-42:7; Ex. 19 at 3. Ultimately, however, the Minnesota Attorney General's office informed MDE that it lacked statutory authority to force Northwestern to change its admissions policies, Unni.Tr. 42:8-13, 166:3-8, and that it

10

would have to amend the PSEO statute altogether—an effort that ultimately resulted in the Amendment. *Id*. 111:4-10.

PSEO staff within MDE first proposed the Amendment in 2019. *See* Ex. 20 at 1-2. From proposal through passage, the Amendment targeted Plaintiffs. Staff admitted the proposal was motivated by objections to any admissions standards requiring students to be "actively practicing [their] Christian faith." Ex. 21 at 1. MDE also wanted to eliminate any messaging that "may communicate to a potential student that they are not welcome to take a PSEO course … because of [the school's] biblical worldview." Reynolds.Tr.1 132:8-133:19.

MDE officials, including the Commissioner of Education, admitted that the Amendment's purpose was to force Crown and Northwestern to abandon their faith statements. MDE Director over PSEO, Sally Reynolds, testified that the Amendment sought to have Crown and Northwestern "[r]emove the faith statement." *Id*. 148:3-149:3. And, Beth Barsness, MDE's PSEO Enrollment Specialist, explained that "we are not trying to stop [C]hristian colleges from participating, we just want them to take their faith stateme[nt] out of the application process." Ex. 22 at 1. MDE Commissioner Willie Jett himself testified that "[t]he hope was that [the Schools] would remove the [faith statements]." Ex. 23 ("Jett.Tr.") 73:1-10.

MDE staff shared this express intention with legislators. For example, Adosh Unni, MDE's Director of Government Affairs, told Representative

11

Laurie Pryor's staff that "faith statements are the general problem" the Amendment seeks to solve. Ex. 24 at 1. The Governor's legislative staffers echoed this sentiment: "We aren't eliminating their eligibility we are just asking them to choose between funding and a religious screener for admission …. And they chose the option where they don't get funding." Ex. 25 at 1. And when legislators raised concerns that the Amendment targeted religious institutions, MDE staff brainstormed new statutory language "to get to the same intent, while removing faith language, which is threatening to tank [the Amendment]" (though no changes were ultimately made). Ex. 26 at 1.

MDE's representatives also testified the Amendment was meant to exclude schools whose religious beliefs "could have an impact on students' sexual orientation," Unni.Tr. 112:2-113:21, and agreed that schools with traditional beliefs regarding marriage and sexuality should not be able to participate, Ex. 27 at 1-2. In discussions with MDE's governmental affairs team, Representative Sandra Feist stated that "what we're trying to prohibit" through the Amendment is "the use of these faith attestations as an excuse to discriminate" and prevent schools from telling students "you have to sign our creepy anti-LGBTQ screed." Ex. 28 at 5.

When the Amendment passed, MDE knew it would only affect Christian schools and consistently referred to the Amendment as the "Northwestern issue." *See* Reynolds.Tr.1 157:7-10; Ex. 29 at 1. MDE acknowledged as much when it proposed the Amendment to the

Governor's office. Ex. 30 at 2 (noting that "the majority of private postsecondary institutions who require faith statements are Christian-based institutions"). The Amendment is the first and only admissions requirement MDE has imposed on eligible institutions, and institutions remain free to select students using other criteria such as academic performance and high school grade level. Reynolds.Tr.1 26:16-27:19, 151:7-11. Apart from Christian schools' use of faith statements, MDE has never investigated or sought to prohibit another eligible institution's admission requirements. *Id.* 113:4-24.

The official legislative history further confirms that the Amendment targeted the Schools' for their religious beliefs. Representative Laurie Pryor, the Amendment's author, admitted during a floor debate that she was aware of only two institutions that the Amendment would affect: Crown and Northwestern. Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, at 3:22:55-3:23:30, YouTube (Apr. 21, 2023), https://bit.ly/4dXW6kt. She acknowledged both institutions shared "a particular understanding of the Christian faith." *Id.* at 3:25:00-3:25:20. And when asked whether the Amendment was intended to force these two institutions to abandon their beliefs, Representative Pryor explained that the goal was to make these institutions eliminate their faith-based admissions requirements. She said, "the intent of the provision … is to make sure that our high school students can go to the postsecondary institutions of their choice … and they will not be

13

compelled to sign a statement." *Id.* at 3:27:45-3:28:30. During that same debate, Representative Pryor clarified that both the faith-statement ban and the nondiscrimination requirement were meant to accomplish the same goal. *See id.* at 3:15:00-3:16:18.

Other supporters reiterated that their goal was to eliminate schools' ability to require students to affirm the schools' faith. Representative Mike Freiberg asserted that "[these schools] just shouldn't be able to require students to sign faith statements using public funds." *Id.* at 3:41:50-3:42:04. Senator Mary Kunesh likewise declared, "We're not saying that these schools can't provide PSEO programs. We're just saying that they can't sort them out by those who are Christian and those who are not. … [A]dmit everybody that meets the requirements without that question, and you can continue the program." Minnesota Senate, *Senate Floor Session – 04/24/23*, at 1:38:03-1:38:31, YouTube (Apr. 24, 2023), https://bitly.cx/7yPTV.

Proponents of the Amendment also displayed hostility toward the religious practice of using faith statements. Representative Pryor compared such schools unfavorably to preferred faith-based institutions, pointing out that "many, many faith institutions across the country and in Minnesota are able to be true to their faith and their mission and still accept students without compelling them to sign a statement." Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, at 3:23:56-3:24:14. She and others also voiced disagreement with the beliefs

14

embodied in those faith statements. Representative Pryor said, "I've looked at the faith statement. I am a person of faith and practicing. I cannot sign that faith statement that they put before me, and that would be a barrier for me attending. They're rejecting *me* based on my beliefs." *Id.* at 3:15:44-3:16:06. And during the final Senate debate, Senator Kunesh read out some of Northwestern's beliefs then declared, "This is unacceptable!" Minnesota Senate, *Senate Floor Session – Part 3 – 05/16/23*, at 5:59:10-6:00:58, YouTube (May 16, 2023), https://bitly.cx/ZgVH.

### E. Procedural History

Plaintiffs sued shortly after the Amendment's enactment in May 2023. Plaintiffs assert that the Amendment violates their free exercise, association, and assembly rights, and the church autonomy doctrine. They seek permanent declaratory and injunctive relief. Compl. ¶¶ 161-247. In July 2023, Defendants counterclaimed against Crown and Northwestern, alleging that the Schools' admissions policies and practices violate Minnesota students' rights under the Free Exercise and Establishment Clauses of the First Amendment and corresponding provisions of the Minnesota Constitution, and the MHRA. Counterclaim, ECF 27 ¶¶ 40-84. This Court denied Plaintiffs' motion to dismiss MDE's counterclaims, determining that MDE had *parens patrie* standing to support its claims and that discovery was necessary before it could decide whether the Schools were state actors. Order, ECF 66 at 5, 8, 10.

15

The parties have completed discovery, and Plaintiffs seek summary judgment on Counts I-VI of their complaint and on all of MDE's counterclaims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. Plaintiffs Are Entitled to Summary Judgment on Counts I-VI of Their Complaint.

#### A. The Amendment Categorically Excludes the Schools from PSEO Because of Their Religious Practices (Count I)

Absent a compelling government interest, a State cannot exclude participants from an otherwise-available benefit because of their religion. But that's precisely what the Amendment was designed to do. MDE has no adequate justification, making summary judgment appropriate.

#### 1. The Amendment Is an Unlawful Religious Exclusion

"[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778. That is precisely what occurred here. Despite Crown and Northwestern participating in PSEO for decades, the Amendment specifically excludes them because they "require a faith statement" or select students based on their "religious beliefs." Minn. Stat. § 124D.09, subd. 3(a). The Amendment thus categorically excludes the Schools from

16

receiving otherwise-available benefits solely because of their religious admissions requirements—requirements that are key elements of their religious identity and practice. Absent a compelling government justification, that categorial exclusion violates the Free Exercise Clause.

The Supreme Court's recent holding in *Carson v. Makin* is illustrative. There, Maine had a tuition assistance program for parents in school districts without public secondary schools to send their kids to private schools. *Carson*, 596 U.S. at 771-72. To be eligible, a private school had to be "nonsectarian." *Id.* at 775. That clearly violated two earlier Supreme Court rulings that prohibited discrimination "based on religious status." *Espinoza*, 591 U.S. at 479; *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017) (policy violated Free Exercise Clause by "disqualifying [schools] because of their religious character").

Maine sought to avoid these cases by construing "sectarian" to include only schools that actually "promote[d] [their] faith or belief system" or "taught through the lens of this faith." *Carson*, 596 U.S. at 775. Thus, it claimed that its program discriminated only on "religious use," not "religious status." *Id.* at 782, 786. The Court rejected that argument, holding that "[t]he 'unremarkable' principles applied in *Trinity Lutheran* and *Espinoza* suffice[d] to resolve this case." *Id.* at 780. "[T]hose decisions never suggested that use-based discrimination is any less offensive to the Free Exercise Clause." *Id.* at 787. That's because "[e]ducating young people in their faith, inculcating its teachings, and training them to live

17

their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020)). Exclusion based on religious use *is* exclusion because of religious status.

That rule resolves this case. By excluding religious schools that—absent their religious exercise—would be eligible for its PSEO program, Minnesota has repeated the mistakes identified in *Trinity Lutheran*, *Espinoza*, and *Carson*. Because of the Amendment, Crown and Northwestern—which strive to build a Christ-centered community through their religious admissions criteria—"are disqualified from this generally available benefit 'solely because of their religious character.'" *Carson*, 596 U.S. at 780 (quoting *Trinity Lutheran*, 582 U.S. at 462). And students who want to attend these schools are also excluded from PSEO. Such discrimination against schools and students because of their faith is "odious to our Constitution" and "cannot stand." *Trinity Lutheran*, 582 U.S. at 467.

### 2. The Amendment Cannot Meet Strict Scrutiny

#### a. Minnesota Has No Compelling Interest in Excluding Plaintiffs from Participating in PSEO

"A law that targets religious conduct for distinctive treatment ... will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780-81. This is not one of them. To survive strict scrutiny, a policy must "advance[] interests of the highest order and [be] narrowly tailored to

18

achieve those interests." *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021). In the Free Exercise context, courts must "look[] beyond broadly formulated interests justifying" a policy "and scrutinize[] the asserted harm" the government is trying to address. *Gonzales v. O Centro*, 546 U.S. 418, 431 (2006); *see also Fulton*, 593 U.S. at 541. The state's action must be tailored to its interest. The question here, then, is whether Minnesota has a compelling interest in preventing postsecondary schools from asking PSEO students to share their faith and comply with religious standards set forth in their statements of faith. *See Fulton*, 593 U.S. at 541. Minnesota does not.

In enacting the Amendment, the legislature relied on two justifications: (1) it would address perceived religious discrimination; and (2) it would maximize the number of PSEO offerings. Ex. 30 at 2 ("The intended results are to establish equitable access to Minnesota students who would like to enroll in PSEO courses at the institution of their choice.")

The first interest cannot justify the Amendment. Although reducing discrimination is a weighty interest, "no [anti-discrimination] law is immune from the demands of the Constitution." *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) ("The state interests embodied in New Jersey's [anti-discrimination] law do not justify such a severe intrusion on the Boy Scouts'" First Amendment rights); *Cuffley v. Mickes*, 208 F.3d 702, 708

19

(8th Cir. 2000) (similar). Minnesota's asserted interest in preventing religious discrimination against students cannot justify its own discrimination against religious schools.[2]

Further, Minnesota's approach "undermines [its] contention that its non-discrimination policies can brook no departures," *Fulton*, 593 U.S. at 542, because religious schools throughout the state may still use religious admissions criteria for non-PSEO students. The Amendment is "woefully underinclusive," calling into question "that the interest it purportedly serves is sufficiently compelling to abridge core First Amendment rights." *Republican Party of Minn. v. White*, 416 F.3d 738, 756 (8th Cir. 2005) (en banc). Here, Minnesota claimed the Amendment was meant to reduce religious discrimination in education. But the MHRA, Minnesota's anti-discrimination law, explicitly preserves a religious school's right to use faith-based admissions criteria: "Nothing in [the Act] prohibits … any institution organized for educational purposes that is operated, supervised, or controlled by a religious association, religious corporation, or religious society" from "limiting admission to or giving preference to persons of the same religion or denomination." Minn. Stat. § 363A.26(1).

---

[2] MDE has also reasoned that PSEO is publicly funded, and some legislators referred to the Minnesota Constitution's limitation on funding religious schools as a justification. Even if that were a legitimate interest, Minnesota courts have already held that religious schools can use PSEO funds consistent with Minnesota's establishment clause. *Minn. Fed'n of Tchrs. v. Mammenga*, 500 N.W.2d 136, 138-39 (Minn. Ct. App. 1993).

The MHRA therefore allows religious schools to give admissions preference to students whose beliefs align with their own. *Id.*; *see also id.* § 363A.26(2). The Amendment then strips the Schools of this critical protection without good reason. Religious high schools *can* have faith-based admissions criteria for the very same students that participate in PSEO. And the Schools are barred only from asking *PSEO students* to sign their faith statements. The Schools can still use faith-based admissions criteria for all other students. Minnesota has "offered no justification for its decision to single out" one kind of student and no others. *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019). Because the Amendment introduces serious "underinclusiv[ity]" into Minnesota's nondiscrimination policy, it fails strict scrutiny. *Id.*

MDE further undermined its asserted interests when it stipulated to the entry of a preliminary injunction, ECF 18. Willing to maintain the 40-year "status quo" during this lawsuit, MDE cannot now show that the Amendment meets an interest sufficiently compelling to pass strict scrutiny. The state's asserted interest cannot be considered one "of the highest order" because it "leaves appreciable damage to the supposedly vital interest unprohibited." *Republican Party of Minn.,* 416 F.3d at 760.

Further, a general interest in "equitable access" to education, while commendable, is "standardless" and "not sufficiently coherent for purposes of strict scrutiny" because a court "has no way to 'measure' the equity of the school environment." *FCA v. District of Columbia,* No. 24-

21

cv-1332, 2024 WL 3400104, at *8 (D.D.C. July 11, 2024) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023)). Minnesota thus cannot "avoid the strictures of the First Amendment simply by defining" religious activities as inequitable. *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023).

Minnesota's alleged interest in expanding access to PSEO also cannot justify the law. This interest fails because the Amendment *decreases* the number of PSEO programs available and *decreases* student options. In *Fulton*, Philadelphia refused to renew its foster care contract with a Catholic adoption agency because the agency would not certify same-sex couples as foster parents due to its religious beliefs. 593 U.S. at 526-28. The city asserted an interest in "maximizing the number of foster parents" as one justification for its decision. *Id.* at 541. The Court held this interest was "insufficient" because "the City fail[ed] to show that granting [the agency] an exception [would] put [the City's] goal[] at risk." *Id.* at 541-42. "If anything, including [the agency] in the program seems likely to increase, not reduce, the number of available foster parents." *Id.* at 542; *see also Republican Party of Minn.,* 416 F.3d at 766 (ban on judicial candidates soliciting campaign contributions failed strict scrutiny because it was "barely tailored … in any way" to advance the asserted interest of preserving "the open-mindedness of a judge").

22

The same is true here. Defendants have not shown that excluding the Schools from the program would put the state's goal of expanding PSEO access at risk. Indeed, the Schools serve hundreds of PSEO students, and Northwestern is one of the largest providers in the state. Ex. 1 at 53. By forcing the Schools to stop offering on-campus PSEO courses, Minnesota will *reduce* PSEO availability and access. *See* Jett.Tr. 66:14-19 (acknowledging "[i]t would be in the Department's interest to have as many eligible institutions as possible … so that as many students who want to participate can"); Reynolds.Tr.1 174:2-6 ("[I]t's in the students' interest to have as many dual credit opportunities as they want to participate in."). Allowing the Schools to offer on-campus PSEO courses would *help* Minnesota's goal of expanding PSEO access, not hurt it.

Furthermore, after months of discovery, MDE cannot show that the Amendment is needed to serve its asserted interest in expanding access. MDE cannot point to any eligible student who was unable to participate in PSEO because of the Schools' religious practices. Reynolds.Tr.1 175:4-7. And that is true because students have over 60 PSEO schools to choose from, including 15 in the Twin Cities area. Ex. 1 at 52-54. Further, Crown and Northwestern both offer online PSEO courses that do not require a statement of faith, *see* Cline-Cole.Tr. 42:13-21, Mathews.Tr. 58:16-23, as do several other post-secondary institutions. Students already have a broad range of PSEO options, and the Amendment only *decreases* those options.

23

The Amendment thus fails strict scrutiny because it does not further a compelling governmental interest.

### b. Excluding Plaintiffs from PSEO Is Not the Least Restrictive Means of Furthering the State's Interest

Even if Defendants could show that Minnesota's stated interests were "of the highest order," the Amendment would still fail strict scrutiny because it is not "the least restrictive means of achieving" those interests. *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). This "standard is exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). If there is *any* viable alternative for achieving the government's goals, then the test is not satisfied. *Id.*

Here, Minnesota has already identified a less restrictive way to achieve its goals of preventing discrimination—the MHRA. That law prohibits discrimination in education based on several criteria, including religion. *See* Minn. Stat. § 363A.13. But it also preserves the right of religious institutions to have faith-based admissions criteria. *See* Minn. Stat. § 363A.26. MDE has acknowledged this, referring some complaints about PSEO schools' religious exercise to the Human Rights Commission. *See* Reynolds.Tr.1 135:3-20, 140:3-22. That approach makes sense. The MHRA prohibits religious discrimination in education generally, while simultaneously allowing religious schools to ask their students to share their beliefs. And even under the Amendment, Minnesota still allows this approach for religious schools outside the PSEO program. Where the

24

government "offers no compelling reason why it has a particular interest in denying an exception to [one particular religious group] while making them available to others," its action is not narrowly tailored. *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 865 (8th Cir. 2021). The Amendment does not reduce discrimination materially more than the MHRA; it only burdens religious exercise more.

MDE's other justification—expanding access to PSEO programs—is not narrowly tailored because the Amendment actively works against that goal by removing PSEO providers. *See supra* pp. 22-23. Eliminating PSEO options is not a means of increasing access to PSEO—much less the means that is the "least restrictive of religion."

Indeed, faith statements are the *only* admissions requirement that MDE has addressed, and there is no evidence that MDE considered less restrictive alternatives to improve PSEO access. *See Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 751 (8th Cir. 2014) (government must offer evidence that it "meaningfully considered any of the alternatives or tested the effectiveness of such alternatives"). MDE has not attempted expand access to PSEO by eliminating other "barrier[s]" to access, such as requiring institutions to provide certain college courses at a PSEO level, or to open a specific number of spots for PSEO students. *See* Reynolds.Tr.1 25:25-26:10. And eligible institutions may still exclude PSEO students for any reason other than those enumerated in the Amendment's non-discrimination language, including by grade-level and

25

academic ability. *See* Reynolds.Tr.1 26:16-27:19. But where, as here, "a regulation restricts a [protected activity] in the name of a particular interest but leaves unfettered other [activities] that implicate the same interest, the regulation's underinclusiveness" means it is not narrowly tailored. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1100 (8th Cir. 2013).

## B.   The Amendment Is Not Neutral or Generally Applicable

Under the Free Exercise Clause, laws that burden religion also must be "neutral and generally applicable," or else satisfy strict scrutiny.[3] *Fulton*, 593 U.S. at 533. The Amendment fails this test as well.

### 1. The Amendment Is Not Neutral (Count V)

The Amendment lacks neutrality for two reasons—it facially targets religious exercise and was enacted with impermissible animus. And because laws that facially target religion or are enacted with animus fail strict scrutiny per se, each of these reasons is sufficient to establish a Free Exercise violation.

---

[3]   Even if the Amendment were neutral and generally applicable, the Free Exercise Clause requires strict scrutiny whenever government "imposes a substantial burden on religious exercise." *See Fulton*, 593 U.S. at 614 (Alito, J., concurring in judgment). Plaintiffs recognize that this argument is barred by *Employment Division v. Smith*, 494 U.S. 872, 874 (1990), but preserve it for appeal.

### a. The Amendment Facially Targets Religion

"[A] law targeting religious beliefs as such is never permissible." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The Amendment is such a law. It lacks even "facial neutrality" because it expressly regulates "a religious practice without a secular meaning discernable from the language or context." *Id.* Specifically, the Amendment excludes from PSEO schools that "require a faith statement" or select students based on their "religious beliefs." Minn. Stat. § 124D.09, subd. 3(a). This targets a purely religious practice with no possible secular meaning. Only religious schools like Crown and Northwestern "require a faith statement," and they do so because of their religious convictions. *See* Cline-Cole Decl. ¶¶ 5-9; Mathews Decl. ¶¶ 5-11. Thus, by its very text the Amendment targets a purely religious practice.

This is true of the nondiscrimination requirement as well. The MHRA already prevents every PSEO provider from basing admissions decisions on any of the protected criteria included in the Amendment—except that religious schools are exempt when it comes to "limiting admission to or giving preference to persons *of the same religion or denomination.*" Minn. Stat. § 363A.26 (emphasis added). Thus, the nondiscrimination language's *only* practical effect is to remove this longstanding religious exemption. Such religious targeting is alone grounds for this Court to declare the Amendment unlawful. *See Torcaso v. Watkins*, 367 U.S. 488, 496 (1961) (religious requirement violated free exercise without strict

27

scrutiny); *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating … religious beliefs" without need to "evaluate the interests assertedly justifying" the regulation).

### b. The Legislature Enacted the Amendment with Religious Hostility

"A plaintiff may also prove a free exercise violation by showing that official expressions of hostility to religion accompany laws or policies burdening religious exercise." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (cleaned up). Courts must "set aside such policies without further inquiry"—*i.e.*, without strict scrutiny. *Id.* (cleaned up).

Evidence of animus may be found in "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018). Or it may be manifest in pressuring statements from government officials that other religious organizations "have decided to compromise" or that there is "no place for providers that choose not to follow the law." *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 168 (2d Cir. 2020). Or it may be evident in government statements that "deride[]" individuals' or organizations' "good-faith convictions." *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021). Such evidence abounds here.

28

MDE proposed the Amendment after several years of unsuccessful attempts to pressure the Schools to abandon their faith statements. Unni.Tr. 41:5-42:7; Ex. 20 at 1-2. These attempts were based on complaints MDE received against the Schools' practices. *See* Reynolds.Tr.1 157:7-16. MDE made clear to legislators that they proposed the Amendment because "faith statements are the general problem." Ex. 24 at 1; *see also* Jett.Tr. 73:1-10 ("[T]he hope was that [the Schools] would remove the [faith statements]."); Ex. 21 at 1 (similar).

The legislative animosity was even more "overt." *Lukumi*, 508 U.S. at 534. In a House debate, Representative Pryor, the Amendment's author, admitted that schools would be impacted because of their "particular understanding of the Christian faith," which she compared unfavorably to her own faith and to other Christian schools that "are able to be true to their faith … without compelling [students] to sign a statement." Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, at 3:22:55-3:23:30, 3:25:00-3:25:20, 3:23:56-3:24:14. Representative Freiberg and Senator Kunesh suggested the Schools could keep their beliefs, they just couldn't apply them in the admissions process. *Id.* at 3:41:50-3:42:04; Minnesota Senate, *Senate Floor Session – 04/24/23*, at 1:38:03-1:38:31. This insistence that religious institutions "'compromise'—*i.e.*, abandon—[their] own religious views … and subscribe to the state's orthodoxy" is sufficient to establish religious animus violating the Free Exercise Clause. *New Hope*, 966 F.3d at 168;

29

*see also Masterpiece*, 584 U.S. at 634-35 (finding animus based on statement that plaintiff could "believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state'").

Legislators also made disparaging comments about the Schools' beliefs. Representative Sandra Feist accused the Schools of telling students "you have to sign our creepy anti-LGBTQ screed." Ex. 28 at 5. And Senator Kunesh further argued that the Schools' religious beliefs were "unacceptable!" Minnesota Senate, *Senate Floor Session – Part 3 – 05/16/23*, at 5:59:10-6:00:58. Various other statements by lawmakers similarly targeted the Schools for their beliefs. Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, at 3:27:45-3:28:30; *Id.* at 3:41:50-3:42:04; *Senate Floor Session – 04/24/23*, at 1:38:03-1:38:30. And all understood that the law would affect only a small handful of Christian schools. Even a facially neutral law (which this is not) still violates the Free Exercise Clause if its burden falls solely on religious people. *Lukumi*, 508 U.S. at 534.

**2. The Amendment Is Not Generally Applicable (Count II)**

The Amendment further violates the Free Exercise Clause because it is not generally applicable. A law fails "the general applicability requirement if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 597 U.S. at 526 (cleaned up). Whether two activities are

30

comparable is "judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

MDE's asserted interests are undermined by secular exceptions that MDE allows. MDE claims an interest in ensuring that Minnesota students have "equitable access" to PSEO options. Ex. 30 at 2. But every secular admissions requirement potentially removes a student's ability to access a particular PSEO provider. Yet eligible institutions may still exclude PSEO students for any reason other than those enumerated in the Amendment's non-discrimination language, including by grade-level and academic ability. *See* Reynolds.Tr.1 26:16-27:19.

And, to the extent MDE interprets the Amendment as barring eligible institutions from teaching from a Christian viewpoint, that is also not generally applicable. *See* Reynolds.Tr.1 132:20-133:19 (schools also may not "teach from a biblical worldview" without "call[ing] into question their eligibility to provide PSEO courses."). The Free Exercise Clause does not allow Minnesota to prefer secular values over religious ones, but that is precisely what MDE does here. For example, MDE allows tribal colleges to provide education grounded in Native American culture and values, while saying Christian schools cannot teach from a biblical worldview. *Compare* Reynolds.Tr.2 14:16-15:3; Ex. 31 at 3-4; Reynolds.Tr.2 27:21-28:14 (courses designed to "develop an Anishinaabe personal philosophy, paying special attention to Anishinaabe values" are

31

PSEO-eligible because they are "characterized as cultural" and "not considered religious") *with* Reynolds.Tr.1 131:7-12 (the Schools may not advertise its PSEO program as "Christ-centered" because "if you offer PSEO that is funded by public dollars flowing through MDE, … you cannot appear to be" or be "Christ-centered").

There is no "meaningful constitutionally acceptable distinction" in treating these secular activities more favorably than the Schools' religious exercise. *FCA v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc). Because MDE runs afoul of the requirement that laws must be generally applicable, and because the Amendment cannot satisfy strict scrutiny, *see supra* § I.A.2, the law must be set aside.

## C. The Amendment Impermissibly Discriminates Among Religions (Count III)

Laws that discriminate between religions violate the Free Exercise Clause. *Lukumi*, 508 U.S. at 536. Thus, if a law's text, object, or motive demonstrates a preference for conduct by members of some religions over others, the law triggers strict scrutiny. *Larson v. Valente*, 456 U.S 228, 245-47 (1982); *see also Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1090 (8th Cir. 2000).

On its face, the Amendment forbids religious conduct that is practiced by some religious schools but not others. Thus, schools like Crown and Northwestern, which cultivate a community of faith on campus by

32

requiring that their students share their beliefs, are excluded from the PSEO program, while other religious schools whose religious beliefs do not require a statement of faith can stay in the program. *See, e.g.*, *PSEO Students*, Bethel University, https://perma.cc/QVS8-8XXV ("we do not require faith statements from PSEO students"). The discriminatory intent of the provision was emphasized in the legislative process, where Representative Pryor, argued that "many, many faith institutions across the country, and in Minnesota, are able to be true to their faith and their mission and still accept students without compelling them to sign a statement." Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*, at 3:23:56-3:24:14. By purposely singling out one specific religious practice and pressuring schools to abandon it without a compelling justification, *supra* § I.A.2, Minnesota is violating the First Amendment's prohibition of "official denominational preference." *Larson*, 456 U.S. at 245.

## D. The Amendment Violates the Church Autonomy Doctrine (Count IV)

The Amendment also violates the First Amendment by allowing the state to intrude on the Schools' internal religious affairs. The Religion Clauses protect the freedom of religious groups "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady,* 591 U.S. at 737. A state may not obtain "conformity" to matters of "faith" by "legislative fiat." *Kedroff v.*

33

*Saint Nicholas Cathedral*, 344 U.S. 94, 107-08 (1952). This sphere of independence includes the behavioral standards that organizations apply to their members. *See Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 472 n.3 (8th Cir. 1993).

The Amendment intrudes on this right by compelling the Schools to abandon their faith statements and prohibiting them from asking students to share their beliefs. Defendants have unambiguously stated that their goal was for the Schools to "[r]emove [their] faith statement[s]." Reynolds.Tr.1 148:3-149:3; Jett.Tr. 73:1-10. And Defendants maintain that the Amendment is "not trying to stop Christian colleges from participating," as long as the Schools "get rid of their faith stateme[nt] out of the application process." Ex. 22 at 1. Defendants are thus attempting to direct the Schools' religious practices by "legislative fiat," *Kedroff*, 344 U.S. at 107-08—an attempt that must be set aside.

### E. The Amendment Imposes an Unconstitutional Condition (Count VI)

The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). This includes government conditions "that chill or deter" First Amendment activity. *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1391 (8th Cir. 2022).

34

Here, Minnesota extracts a surrender of Plaintiffs' First Amendment rights by forcing them to abandon their religious exercise and religious autonomy as a condition of accessing otherwise available public funding. The unconstitutional conditions doctrine forecloses this choice. Once Minnesota has created the PSEO program, it "cannot condition participation in its … program on the manner in which a group exercises its constitutionally protected freedom" of religious exercise. *Cuffley*, 208 F.3d at 709; *see also United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (government may not "attach[] strings strategically" to "end-run[] around the [constitutional] barriers to direct commands"). The Court should grant summary judgment in Plaintiffs' favor on these grounds.

## II. Plaintiffs Are Entitled to Summary Judgment on All of MDE's Counterclaims.

### A. MDE Lacks Standing to Bring Counterclaims

The Court should grant summary judgment on MDE's counterclaims because MDE has failed to establish standing. "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (cleaned up).

MDE cannot support standing under a *parens patriae* theory.[4] It cannot support that it has authority to represent the State's interest in enforcing the MHRA or the state or federal constitutions. *See, e.g.*, *Hous. Auth. of the Kaw Tribe of Indians v. Ponca City*, 952 F.2d 1183, 1193 (10th Cir. 1991) (state agency lacked *parens patriae* standing because it presented "no authorization by the State of Oklahoma to represent the state's sovereign interests"). MDE also cannot produce facts establishing a "quasi-sovereign interest" or an "injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). MDE's asserted interest in protecting students' rights is "wholly derivative of the interests of" those students, each of whom could "sue to get relief from [the Schools'] alleged discrimination." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 773 (5th Cir. 2023). MDE has not shown any injury "to its citizens health or economic well-being in a way that also implicates its own interests." *Id.* Further, MDE has not identified *any* student that has been turned away from the School's PSEO programs based on protected characteristics. The evidence simply does not establish *parens patriae* standing. *See id.*

---

[4]  As explained in the Schools' Motion to Dismiss, MDE has no direct injury resulting from the Schools' admissions policies. ECF 36 at 7-8. MDE has again failed to provide any evidence demonstrating direct injury and cannot establish standing on that ground.

36

MDE also lacks standing under the MHRA because it is not an aggrieved person under that law. That status is reserved exclusively for a person who "suffer[s] discrimination on the basis of her own protected characteristic." *Tovar v. Essentia Health*, 857 F.3d 771, 775-76 (8th Cir. 2017); *accord Dale v. U.S. Steel Corp.*, No. 13-cv-1046, 2015 WL 4138869, at *5-7 (D. Minn. July 2, 2015); *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 862 (Minn. 2010). Although this court held that MDE had alleged that it was aggrieved under the MHRA "because it is foreclosed from advancing quasi-sovereign interests," ECF 66 at 9, that is impossible to square with the Eighth Circuit's definition of "aggrieved" in *Tovar*. MDE has not suffered any "discrimination on the basis of [its] own protected characteristic." *Tovar*, 857 F.3d at 775-76.

## B. MDE's Constitutional Counterclaims Fail Because Plaintiffs Are Not State Actors

Even if it could establish standing, MDE's federal and state constitutional counterclaims (Counts I-V) still fail because the undisputed facts establish the Schools are not state actors. Both the United States and Minnesota Constitutions "constrain[] governmental actors and protect[] private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019); *accord State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1999). Private actions do not violate either constitution unless they "can fairly be seen as state action." *Rendell-Baker v. Kohn*,

37

457 U.S. 830, 838 (1982). This occurs only under rare circumstances, none of which apply here.

### 1. The State and the Schools are Not Pervasively Entwined

A private entity may be a state actor where there is "pervasive entwinement to the point of largely overlapping identity" between the state and the private entity. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001). Under this test, "the one unyielding requirement is that there be a close nexus not merely between the state and the private party, but between the state and the alleged deprivation itself." *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007) (cleaned up). Both the Supreme Court and the Eighth Circuit have been clear: "[m]ere regulation does not convert a private organization's actions into state action … 'even if [the regulation is] extensive and detailed.'" *Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016) (quoting *Rendell-Baker*, 457 U.S. at 841).

Although MDE disclaimed this argument at the motion to dismiss stage, ECF 49 at 57:13-58:3, the Court held that further discovery was necessary to determine whether there was sufficient entwinement for the Schools to be considered state actors. *See* ECF 66 at 10-13. With the benefit of a full record, it is clear no pervasive entwinement exists. *Wickersham*, 481 F.3d at 597. Apart from the Amendment, MDE does not control any aspect of any PSEO provider's admissions policies or practices. Reynolds.Tr.1 27:9-19. In fact, MDE has long given PSEO

providers freedom to set their own admissions criteria. *See id.*; Ex. 2 at 17, 25; Ex. 32 at 1 ("[T]he PSEO statute does not address enrollment procedures."). MDE does not set enrollment limitations for any school, either. Reynolds.Tr.1 26:5-10. Nor does MDE participate in or review any school's enrollment decisions or processes. Reynolds.Tr.1 30:3-9. In short, nothing more than a single (newly passed) regulation connects the State to the Schools' admissions policies. Just as in *Rendell-Baker*, "[s]uch a regulation is not sufficient" to make their admissions policies "state action." 457 U.S. at 842; *see also Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1313-14 (8th Cir. 1987) ("[T]hat the DOE regulates the procedures to be used in deciding whether to accredit is not enough to compel a finding of governmental action.").

If anything, the Schools' admissions policies exist in spite of, not because of, MDE actions. MDE has previously attempted to tell Northwestern that it could not require PSEO applicants to sign a faith statement. Unni.Tr. 41:5-42:7; Ex. 19 at 3. But the Minnesota Attorney General's office informed MDE that it lacked statutory authority to force Northwestern to change its admissions policies. Unni.Tr. 42:8-13; 166:3-8. In response, MDE pushed for a statutory change—the Amendment at issue here. Unni.Tr. 111:4-10. But since the Amendment was passed *in response to* the Schools' longstanding practices, MDE cannot argue that it had the kind of direct control over the Schools' admissions practices necessary to fairly attribute them to the State. *See Sinn v. The Daily*

39

*Nebraskan*, 829 F.2d 662, 666 (8th Cir. 1987) ("[T]here are insufficient indicia of state control in this case to render the [university] newspaper's editorial decisions 'state action.'").

To the extent Minnesota's other PSEO regulations are relevant, none is sufficiently entangling to meet this test. MDE has little-to-no direct control over how schools run their PSEO programs. While the state has a few regulations about which types of classes qualify for reimbursement (*i.e.*, nonsectarian college courses that also meet high school graduation requirements), that's it. *See* Minn. Stat. § 124D.09. MDE does not tell schools how many or which PSEO courses to offer, how to grade PSEO courses, how many students must be included in each course, how many credits each course must be worth, who must teach the course, or any of the course contents. Reynolds.Tr.1 26:5-22, 27:9-19, 30:3-9; Reynolds.Tr.2 12:8-16, 35:15-37:12; Ex. 2 at 17-18, 25. Instead, MDE reviews basic course descriptions and then reimburses the Schools a set amount per credit. Reynolds.Tr.2 33:15-24. If the process of reimbursement were enough of a "nexus" to create state action, then any private organizations that accept public funds would instantly become state actors.

"What was missing here and in *Rendell-Baker* … is direct government control, either of the organization … or of the conduct that caused the alleged deprivation" of students' rights. *Nichols v. Metro. Ctr. for Indep. Living, Inc.*, 50 F.3d 514, 518 (8th Cir. 1995); *accord Logiodice v. Trs. of*

40

*Me. Cent. Inst.*, 296 F.3d 22, 28 (1st Cir. 2002) (holding that because Maine did not control "the particular activity sought to be classed as state action" there was "no entwinement"). Without that strong nexus, the Schools' admissions policies cannot be attributed to the state.

## 2. The Schools Do Not Perform a Traditionally Exclusive State Function

A private entity may also become a state actor by exercising a function that traditionally belongs exclusively to the state. *See Halleck*, 587 U.S. at 809. "[I]t is not enough that the function serves the public good or the public interest in some way," but "the government must have traditionally *and* exclusively performed the function." *Id.* The Supreme Court "has stressed that 'very few' functions fall into that category." *Id.* The Schools' provision of dual-credit courses does not qualify

In *Rendell-Baker*, the Supreme Court held that a private school did not become a state actor simply because it participated in a state-created special education program. 457 U.S. at 837. Although the education program was "a public function"— created, paid for, and regulated by the state—it was not a function that was traditionally "the exclusive province of the State." *Id.* at 842. Multiple courts have agreed, holding that providing educational services is not an exclusive state function. *See, e.g.*, *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814-15 (9th Cir. 2010); *Hamlin ex rel. Hamlin v. City of Peekskill Bd. of Educ.*, 377 F. Supp. 2d 379, 386 (S.D.N.Y. 2005) (collecting cases). While private

41

entities may "contract[] with the state to provide … educational services that are funded by the state," that "legislative policy choice" to "provide alternative learning environments at public expense … in no way makes these [educational] services the exclusive province of the State." *Caviness*, 590 F.3d at 815 (quoting *Rendell-Baker*, 457 U.S. at 842).

For example, in *Logiodice*, 296 F.3d 22, the First Circuit held that a private school participating in Maine's town-tuitioning program was not a state actor because it was not performing a traditionally exclusive state function. There, private schools were complete substitutes for public high schools anywhere local governments did not operate their own public schools. *Id.* at 24. Thus, because "schooling, including high school education, is regularly and widely performed by private entities," "education is not and never has been a function reserved to the state." *Id.* at 26-27; *accord Powe v. Miles*, 407 F.2d 73, 80 (2d Cir. 1968); *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 697 (7th Cir. 2017). The same is true in Minnesota. Private schools in Minnesota have been educating high school students for more than 160 years. *See* An Act to Incorporate St. John Seminary, 1857 Minn. Laws 207-08 (establishing a private school for "youths"). Thus, educating high schoolers has never been an "exclusive" state function.

If anything, the function performed by the Schools here is even less "exclusive" to the state because the Schools are providing a *college* education. "Education, *especially secondary and collegiate education*, is

42

not, and never has been, exclusively maintained by the state." *Klunder v. Brown Univ.*, 778 F.3d 24, 32 (1st Cir. 2015) (emphasis added). Here, all PSEO courses are dual-credit. *See* Minn. Stat. § 124D.09. These courses must be "college level," *id.* subd. 9(b), and are the same courses offered to traditional undergraduate students. *See* Cline-Cole.Tr. 93:5-8, 101:18-24, 103:5-23, 145:1-146:8; Mathews.Tr. 116:24-117:8, 122:20-123:16. The Schools provide college credit and a college transcript for any courses completed, while the student's high school awards high school credit. *See* Minn. Stat. § 124D.09, subd. 12(b). And both Schools currently offer dual-credit classes to high school students *outside* of PSEO and have provided postsecondary education for decades. *See* Cline-Cole.Tr. 30:10-18; Mathews.Tr. 32:15-25.

MDE's attempt to reclassify private collegiate education as a public education is "foreclosed by *Rendell-Baker*." *Caviness*, 590 F.3d at 815; *see also Logiodice*, 296 F.3d at 27 (rejecting attempt to "refine the category as that of providing a publicly funded education" as opposed to education generally). It is also belied by the PSEO Act, which explicitly describes eligible post-secondary institutions like Crown and Northwestern as "private" schools. Minn. Stat. § 124D.09, subd. 3. The Act also prescribes very little state regulation and supervision. MDE does not dictate which or how many PSEO courses a school must offer, how the courses are graded, how many credits are offered for each class, or any of the course contents (aside from the requirement that courses be nonsectarian). *See*

Reynolds.Tr.1 26:5-22, 27:9-19, 30:3-9; Reynolds.Tr.2 12:8-16, 35:15-37:12; Ex. 2 at 17-18, 25. And unlike a public education, PSEO education is neither uniform nor universal, as post-secondary institutions are free to limit admissions based on grade-level, academic performance, and space limitations, and countless other discretionary criteria. *See, e.g.,* Reynolds.Tr.1 27:23-29:25, 45:14-24. Indeed, there is no guarantee that a high school student that wants to participate in PSEO will be admitted to *any* post-secondary institution.

Further, the Schools offer the exact same PSEO courses to private and homeschool students as to public-school students, often in the same classroom. In providing the *exact same* instruction, the Schools are not offering a "public" education to some students, but not to others. And the PSEO Act recognizes that private and homeschool students do not suddenly become public school students simply by participating in PSEO. *See* Minn. Stat. § 124D.09, subd. 4.

At bottom, the statute provides for "*tuition* at a public *or* private school," selected by the student, "with no suggestion that the 'private school' must somehow provide a 'public' education." *Carson*, 596 U.S. at 782-83. In short, the Schools do not perform a function "traditionally *and* exclusively performed" by the state. *Halleck*, 587 U.S. at 809.

44

### C. MDE's MHRA Claim Independently Fails

#### 1. The Schools Are Exempt from the MHRA

MDE's counterclaim under the MHRA also fails as a matter of law because the MHRA expressly exempts religious schools from liability based on their religious admissions criteria. Indeed, although this Court's ruling on Plaintiffs' motion to dismiss did not address this exemption, the statute is clear that "[n]othing" in the MHRA prevents religious schools from "limiting admission to or giving preference to persons of the same religion or denomination." Minn. Stat. § 363A.26, subd. 1. It is undisputed that both Schools ask students to affirm their agreement with certain doctrinal tenets and their willingness to live by a described set of biblical principles. Compl. ¶¶ 91, 132; Cline-Cole Decl. ¶ 7; Mathews Decl. ¶ 5. Because these admissions requirements simply "limit[] admission to or giv[e] preference to" PSEO students who share the Schools' faith, they are perfectly legal under the MHRA. Minn. Stat. § 363A.26, subd. 1. This provision alone requires dismissing the MHRA claim.

The MHRA further protects the Schools because "[n]othing" prohibits religious schools from "taking *any* action with respect to education, employment, housing, and real property, or use of facilities." Minn. Stat. § 363A.26, subd. 2 (emphasis added). "[A]ny action with respect to education" includes admissions decisions, even those based on otherwise protected characteristics. *Id.*; *see, e.g.*, *Doe v. Lutheran High Sch. of*

45

*Greater Minneapolis*, 702 N.W.2d 322, 330-31 (Minn. Ct. App. 2005) (MHRA claims unavailable to individual fired from religious school because of sexuality).

MDE has previously argued that the MHRA's exemptions do not apply because the Schools engage in "secular business activities" "unrelated to" their educational mission by allowing PSEO students to participate in college courses. ECF 39 at 38; *see also* Minn. Stat. § 363A.26. This is incorrect.

"[T]he phrase 'secular business activities' is properly considered in light of the purpose and mission of the entire entity"—in this case, the Schools. *Thorson v. Billy Graham Evangelistic Ass'n*, 687 N.W.2d 652, 657 (Minn. Ct. App. 2004). Activities that might be considered "secular" in other contexts still fall within the scope of the exemption if they are "related to the religious [or educational] purpose for which [the religious institution] was organized." *Id.* at 657-58. (operation of a mail room at evangelical ministry was not a secular business activity); *see also Egan v. Hamline United Methodist Church*, 679 N.W.2d 350, 355-56 (Minn. Ct. App. 2004) (music director position at a church was religious, not "secular").

The record shows that providing PSEO courses is "entirely related" to the Schools' religious and educational missions. *Thorson*, 687 N.W.2d at 657. Crown's mission "is to provide a Biblically-based education for Christian leadership in The Christian and Missionary Alliance, the

46

church-at-large, and the world." Ex. 7 at 3. Northwestern "exists to provide Christ-centered higher education equipping students to grow intellectually and spiritually, to serve effectively in their professions, and to give God-honoring leadership in the home, church, community and world." Compl. ¶ 129. All courses at both Schools are taught with their respective missions in mind. *See* Ex. 13 at 1-2.; Mathews.Tr. 37:9-38:19. PSEO courses are not separate classes for high school students to take, and PSEO students are in the same courses as college students, learn from the same professors, and are part of the same community. *See* Compl. ¶ 119; Cline-Cole.Tr. 93:5-8, 101:18-24, 103:5-23, 142:21-143:13, 145:1-146:5; Mathews.Tr. 34:1-8, 116:24-117:23, 119:16-24, 122:20-123:16. In all material respects, educating a PSEO student is no different than educating a traditional student. Allowing PSEO students to participate in already-existing courses and programs is not "unrelated" to the core religious and educational mission of either school. The MHRA's exemptions for religious institutions thus bar MDE's MHRA counterclaim.

### 2. Applying the MHRA Would Violate the Schools' First Amendment Rights to Association and Assembly

MDE's counterclaim under MHRA is also barred by the Schools' First Amendment rights to association and assembly. "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of" those activities. *Dale*, 530

U.S. at 647 (cleaned up). This freedom of association "plainly presupposes a freedom not to associate" and thus protects against laws that "force[] [a] group to accept members it does not desire." *Id.* at 648. The First Amendment protects religious groups' rights to exclude individuals who undermine the group's Christian teachings. *Id.* at 659. And it specifically protects school admissions decisions. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v EEOC*, 565 U.S. 171, 189 (2012) (noting EEOC concession that "it would violate the First Amendment for courts" to compel the admission of women "by an Orthodox Jewish seminary"); *Our Lady*, 591 U.S. at 738 ("formation of students is the very reason for the existence of most private religious schools").

These rights are violated where, as here, a group "engage[s] in some form of expression," and the law at issue "significantly affect[s] the [organization's] ability to advocate public or private viewpoints," as well as gather to advance those viewpoints. *Dale*, 530 U.S. at 648-50. As religious institutions whose purpose is to provide biblically based education, the Schools are "the archetype of associations formed for expressive purposes," and their ability to gather as a shared faith community is critical to carrying out those purposes. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring).

Enforcing the MHRA against the Schools "significantly affect[s] [their] ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 650. Courts must "give deference to an association's view of what would

48

impair its expression." *Id.* at 653. Here, the harm is plain: punishing the schools for their religious practices undermines their ability to establish Christian standards for their campus communities. That is precisely the kind of "interfer[ence] with the internal organization or affairs of the group" forbidden by the First Amendment. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)).

### D. MDE's Counterclaims Excessively Entangle the Court in Religious Issues, Violating the Church Autonomy Doctrine

MDE's counterclaims violate the Schools' church autonomy rights by excessively entangling the Court in religious issues. Not only are the Schools' internal religious decisions protected from interference by the legislature,[5] *see supra* § I.D, but they are also protected from government entanglement through litigation and by the courts. "[C]hurches" should not have to be so "wary of [administrative] or judicial review of their decisions" that they make religious decisions "with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of

---

[5] For the same reasons the Amendment violates the Schools' church autonomy rights, MDE's interpretation of the MHRA also deprives the Schools of their right to manage their internal affairs. *See supra* § I.D; *Maxon v. Fuller Theological Seminary*, No. 20-56156, 2021 WL 5882035, at *2 (9th Cir. Dec. 13, 2021) (citing *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)).

their own personal and doctrinal assessments." *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).

Here, "the very process of inquiry" into MDE's counterclaims has led to further "impinge[ment] on the rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979). After the Schools sought to vindicate their First Amendment rights, MDE asserted for the first time in PSEO's 40-year history that private religious institutions are state actors subject to the strictures of the First Amendment. *See* Counterclaim ¶¶ 45-47. MDE makes these claims despite this Court having held more than 30 years ago that it does not violate the Establishment Clause for religious institutions to participate in PSEO. *Minn. Fed'n of Tchrs v. Nelson*, 740 F. Supp. 694, 720 (D. Minn. 1990).

In litigating these ill-founded claims, MDE has violated the Schools' religious autonomy. In cases implicating church autonomy, discovery "may not explore the sincerity or significance of [a party's] religious doctrine, question the validity of that belief, or challenge policies related to it." *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1117 (7th Cir. 2024); *see also Drevlow*, 991 F.2d at 472 (directing district court "to limit the evidence at trial in order to avoid determining religious controversies"); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 199 n.14 (E.D.N.Y. 2022) (deposition centering on theological questions violated church autonomy principles designed to "prevent a 'trolling'

50

through [school's] religious beliefs"). MDE's counsel has repeatedly violated these limits. For example, counsel questioned the validity and internal consistency of Northwestern's interpretation of the Bible, *see* Cline-Cole.Tr. 69:25-70:23, demanded Plaintiff Melinda Loe explain "what book of the Bible talks about having a relationship with someone of your own sex" and "[w]hat did Jesus say" about that issue, *see* Loe.Tr. 37:25-41:4, and repeatedly questioned Plaintiff Dawn Erickson as to whether she thought "gay marriage is immoral," *see* Erickson.Tr. 79:7-81:6.

MDE also disclosed a purported religious history expert, Dr. Stephen Shoemaker, who opined that the Schools should adopt a "missional" instead of "covenantal" approach to Christian community life. Ex. 33 at 19-20. Dr. Shoemaker went so far as to say that Christian institutions that do not require a faith statement have the better take on Christianity. *See id.* at 20 ("Obviously, it is much easier for a Christian institution to fulfill" Jesus's commandments "if it welcomes nonbelievers into its community and engages them in learning and conversation rather than excluding them or forcing them to submit to a compulsory statement of faith that they do not believe."); *see also id.* at 26 ("I think it is worth asking these Christian educational institutions just what would Jesus do? Based on the words attributed to him in the New Testament gospels I feel confident in concluding: not this."). MDE offered this opinion even though "it is not within the judicial function and judicial competence to

51

inquire whether" one religious group or another "more correctly perceived the commands of their common faith." *Thomas*, 450 U.S. at 716. Moreover, Dr. Shoemaker's testimony violates the First Amendment's clear prohibition on official comparisons between religions.[6] *See supra* § I.C.

These tactics have little point but to impermissibly entangle this Court in the Schools' internal religious decisions and to use the litigation process to punish the Schools and Plaintiff parents for maintaining their disfavored religious beliefs. This Court should grant summary judgment dismissing Defendants' counterclaims on the grounds they violate the Schools' church autonomy rights.

---

[6]   Dr. Shoemaker's testimony is also unreliable, as he is not an expert in the subject on which he opines—modern evangelical practices—and he offers no valid methodological support for his conclusions (including that he fails to cite the majority of sources consulted in forming his opinion). *See, e.g.*, Ex. 34 ("Shoemaker.Tr.") 22:1-15, 93:9-19, 155:12-156:1 (illustrating lack of expertise); *id.* at 27:2-6 (illustrating lack of methodology); *id.* at 43:14-44:12, 55:18-56:3 (illustrating lack of research and citation); Ex. 33 at 15 (offering no citation for conclusions and only stating that "[i]t is entirely obvious"); Shoemaker.Tr 69:22-70:23 (illustrating lack of research and citation). Further, his consistent comparisons between the Schools' religious practices and violent medieval religious persecution are irrelevant and prejudicial. *See, e.g.*, Ex. 33 at 25. This Court should exclude Dr. Shoemaker's proposed testimony in its entirety. *See, e.g.*, *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment on Counts I-VI of Plaintiffs' complaint and enter summary judgment dismissing MDE's counterclaims.

Dated: September 3, 2024                     Respectfully submitted:


*/s/ Eric S. Baxter*
Eric S. Baxter*
  (DC Bar No. 479221)
Diana Verm Thomson*
Benjamin A. Fleshman*
Andrea R. Butler*
The Becket Fund for
 Religious Liberty
1919 Pennsylvania Ave. NW,
 Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
ebaxter@becketlaw.org

Richard C. Landon
(No. 0392306)
Lathrop GPM
80 South Eighth Street
500 IDS Center
Minneapolis, MN 55402

*Admitted pro hac vice*

*Counsel for Plaintiffs*