**Ex. 2**

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
             FOR THE STATE OF MINNESOTA
2    _____
3    Melinda and Mark Loe,
     et al.,
4
                 Plaintiffs,
5
                                Case No.:
6    vs.                        0:23-cv-01527-NEB-JFD
7
     Willie Jett, et al.,
8
                 Defendants.
9    _____
10
11          Rule 30(b)(6) DEPOSITION OF
12                SALLY REYNOLDS
13
14   DATE:      February 8, 2024
15   TIME:      9:05 a.m. (CST)
16   PLACE:     Lathrop GPM LLP
17              80 South Eighth Street
18              3100 IDS Center
19              Minneapolis, Minnesota 55402
20
21
22
23
24   REPORTED BY:   Valerie J. Riske
25   JOB NO.:       PA 6439163
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4   THE BECKET FUND FOR RELIGIOUS LIBERTY
       BY:  Diana Verm Thomson, Esq.
 5        Eric S. Baxter, Esq.
          Benjamin A. Fleshman, Esq.
 6        Andrea R. Butler, Esq.
          1919 Pennsylvania Avenue Northwest
 7        Suite 400
          Washington, D.C. 20006
 8        Phone:  (202) 955-0095
          Email: dthomson@becketlaw.org
 9            ebaxter@becketlaw.org
              bfleshman@becketlaw.org
10            abutler@becketlaw.org
11
12   ON BEHALF OF THE DEFENDANTS:
13   OFFICE OF THE MINNESOTA ATTORNEY GENERAL
       BY:  Jeffrey Timmerman, Esq.
14        Madeleine Demeules, Esq.
          445 Minnesota Street
15        Suite 1400
          St. Paul, Minnesota 55101
16        Phone:  (651) 583-7660
          Email: jeffrey.timmerman@ag.state.mn.us
17            madeleine.demeules@ag.state.mn.us
18
19   ALSO APPEARED:

          Richard C. Landon, Esq., Lathrop GMP LLP
20
21
22
23
24
25
```

Page 3

```
 1             I N D E X
 2   WITNESS:  SALLY REYNOLDS            PAGE
 3   Examination by Ms. Thomson..................  7
 4   Examination by Mr. Timmerman................ 184
 5
 6
 7   SPECIAL REQUESTS or INSTRUCTIONS
 8       Page 177
 9
10
11
12           E X H I B I T S
13   EXHIBITS MARKED AND FIRST REFERRED TO:
14   Exhibit 1   Crown College PSEO Application   20
                 dated 04/15/2002
15               CONFIDENTIAL
                 MDE001903 to 1907
16
     Exhibit 2   Letter from the Minnesota       20
17               Department of Children,
                 Families & Learning dated
18               06/10/2002
                 CONFIDENTIAL
19               MDE001884 to 1893
20   Exhibit 3   University of Minnesota web     27
                 page on Post-Secondary
21               Enrollment Options (PSEO)
                 (No Bates)
22
     Exhibit 4   Bethel College Application for  30
23               Admission Post Secondary
                 Enrollment Options
24               CONFIDENTIAL
                 MDE001771 to 1785
25
```

Page 4

```
 1   EXHIBITS (Continued):           PAGE
 2   Exhibit 5   Minnesota Department of     31
                 Education's Rule 30(b)(6)
 3               Designations and Objections
                 (No Bates)
 4
     Exhibit 6   Letter dated 03/01/2006 to Jay  54
 5               Fedje from Morgan Brown
                 CONFIDENTIAL
 6               MDE001786 to 1795
 7   Exhibit 7   Bethany Lutheran College    58
                 Statement on Admission,
 8               Enrollment, and Student Life
                 CONFIDENTIAL
 9               LOE00004571
10   Exhibit 8   Minnesota Department of     67
                 Education, Institutional
11               Eligibility Under the
                 Postsecondary Enrollment
12               Options Program
                 CONFIDENTIAL
13               MDE001416 to 1417
14   Exhibit 9   Email dated 03/07/2022,     92
                 Subject:  22-23 Statement of
15               Assurance for Eligible PSEO
                 Courses, with attachment
16               CONFIDENTIAL
                 MDE001592 to 1594
17
     Exhibit 10  Email chain, top-dated      99
18               04/17/2008,
                 Subject: Northwestern College
19               CONFIDENTIAL
                 MDE001072 to 1075
20
     Exhibit 11  Minnesota Department of     104
21               Education memo dated 08/05/2013
                 CONFIDENTIAL
22               MDE001428 to 1429
23   Exhibit 12  Minnesota Department of     109
                 Education Postsecondary
24               Enrollment Options (PSEO)
                 Reference Guide, November 2021
25               MDE001535 to 1568
```

Page 5

```
 1   EXHIBITS (Continued):           PAGE
 2   Exhibit 13  Email chain, top-dated      114
                 04/11/2016,
 3               Subject: Complaint about PSEO
                 CONFIDENTIAL
 4               MDE001052 to 1058
 5
     Exhibit 14  Email chain 08/10/2017,     127
 6               Subject: Document1
                 CONFIDENTIAL
 7               MDE001010 to 1011
 8   Exhibit 15  Email chain, top-dated      134
                 12/03/2019, Subject:  PSEO in
 9               Discriminatory Program
                 CONFIDENTIAL
10               MDE000015 to 16
11   Exhibit 16  Email chain, top-dated      137
                 11/18/2020, Subject:  PSEO On
12               Campus Application Question
                 CONFIDENTIAL
13               MDE001080 to 1081
14   Exhibit 17  Email chain, top-dated      139
                 12/06/2021, Subject:  PSEO
15               Program
                 CONFIDENTIAL
16               MDE001624 to 1626
17   Exhibit 18  Email chain, top-dated      145
                 03/09/2023, Subject:
18               Legislator request re
                 demographics in PSEO student
19               application
                 CONFIDENTIAL
20               MDE001716 to 1720
21   Exhibit 19  Office of Governor Tim Walz and  151
                 Lieutenant Governor Peggy
22               Flanagan, Appendix A:
                 Preliminary Form, 09/09/2021
23               CONFIDENTIAL
                 MDE004685 to 4688
24
25
```

Page 6

1 EXHIBITS (Continued):                    PAGE
2 Exhibit 20  Office of Governor Tim Walz and  155
           Lieutenant Governor Peggy
3          Flanagan, Appendix A:
           Preliminary Form, 09/14/2020
4          CONFIDENTIAL
           MDE004689 to 4694
5
   Exhibit 21  Minnesota Department of        162
6          Education, Postsecondary
           Enrollment Options (PSEO)
7          Reference Guide, August 2019
           CONFIDENTIAL
8          MDE003489 to 3521
9 Exhibit 22  Minnesota Department of         164
           Education K-12 Accredited
10         Nonpublic School Questions and
           Answers
11         (No Bates)
12 Exhibit 23  Minnesota Department of        169
           Education, Rigorous Course
13         Taking
           MDE000451 to 522
14
   Exhibit 24  Event: MCTC PSEO Appeal Year   177
15         2020-21
           CONFIDENTIAL
16         MDE003729 to 3733
17
   REPORTERS NOTE:  All quotations from exhibits are
18 reflected in the manner in which they were read
   into the record and do not necessarily indicate an
19 exact quote from the document.
20
21
22
23
24
25

Page 7

1          (PROCEEDINGS, 02/08/2024, 9:05 a.m.)
2                  * * *
3          SALLY REYNOLDS
4 duly sworn, was examined and testified as follows:
5                EXAMINATION
6 BY MS. THOMSON:
7     Q.  Could you please state your name for the
8 record.
9     A.  Sally Reynolds.
10    Q.  All right.  And you know that I'm here to
11 ask you questions for Loe v. Jett?
12    A.  Correct.
13    Q.  You understand that this case is a
14 challenge to the 2023 amendment to the PSEO program
15 that prohibits the use of PSEO funds at schools if
16 they restrict admission on the basis of religion or
17 other protected categories?
18    A.  Correct.
19    Q.  So if I say "the amendment" going forward,
20 you understand what I'm referring to in this case?
21    A.  I do.
22    Q.  Okay.  And you understand that you're
23 answering under oath?
24    A.  Yes.
25    Q.  Okay.  So a few preliminaries.  The court

Page 8

1 reporter is taking down everything we say, so
2 she'll remind us if we don't speak slowly.  And I
3 ask that we not talk over each other.  Allow me to
4 finish my question, and I'll try to let you finish
5 your answers.
6          And please use verbal answers.  So nods or
7 shakes of the head is hard to transcribe, "uh-huh"
8 and "huh-uh" are hard to transcribe, so just try to
9 say "yes" or "no."
10         If you need a break, let me know.  We'll
11 usually finish a line of questions, and then we can
12 take a break.  We usually will break every 60 to 90
13 minutes.
14         If you do not understand a question, please
15 let me know.  I will assume, if you answer the
16 question, that you understood it.
17         Is there any reason why you wouldn't be
18 able to give a full, complete, and truthful answer
19 to my questions here today?
20    A.  No.
21    Q.  Okay.  Have you ever been deposed before?
22    A.  No.
23    Q.  Have you ever participated as a plaintiff
24 or a defendant in a lawsuit before?
25    A.  No.

Page 9

1     Q.  Have you ever testified in court before?
2     A.  No.
3     Q.  Have you, over the course of this lawsuit,
4 looked for documents in your possession related to
5 this lawsuit?
6     A.  Yes.
7     Q.  What did you find?
8     A.  Communications, planning documents related
9 to the legislation, all of which were submitted.
10    Q.  Okay.  Do you keep a journal?
11    A.  I do not.
12    Q.  Did you look on your calendar?
13    A.  I did.
14    Q.  Okay.  To-do lists?
15    A.  I don't keep notes.  I don't journal, so...
16    Q.  Other than speak with your attorneys, which
17 is -- I do not want to know what you spoke with
18 your attorneys about, what did you do to prepare
19 for this deposition?
20    A.  I spoke with Beth Barsness, who is the
21 program PSEO lead at MDE, and Jeanne Krile, who is
22 the financial lead for PSEO.
23    Q.  Anyone else?
24    A.  No.
25    Q.  Did you review any documents?

3 (Pages 6 - 9)

1    A.  Documents that I had submitted, yeah.
2    Q.  Okay.
3    A.  Yes.  Sorry.
4    Q.  Did you -- do you have any notes with you
5  today?
6    A.  I do not.
7    Q.  Okay.  Just a couple of background
8  questions.  Where were you born?
9    A.  Edina.
10   Q.  Where is that?
11   A.  Edina, Minnesota.
12   Q.  And did you grow up in Minnesota?
13   A.  I did.
14   Q.  Are you personally religious?
15   A.  I was raised Lutheran.
16   Q.  Okay.  And where did you attend college?
17   A.  A few different colleges.  Do you want all
18  of them?
19   Q.  Sure.
20   A.  Okay.
21   Q.  Where did you get your undergraduate
22  degree?
23   A.  The University of Minnesota.
24   Q.  Okay.
25   A.  And a master's from Augsburg College.  And

1  a post-master's K-12 principal certification from
2  Saint Mary's.
3    Q.  Okay.  And why did you choose Augsburg?
4    A.  They had the program and it was local and
5  it was flexible.  Because I was also a parent.
6    Q.  Is that a Lutheran school?
7    A.  It is.
8    Q.  Any religious content in the program you
9  did?
10   A.  Not that I recall.
11   Q.  And what made you choose Saint Mary's for
12  your postgraduate?
13   A.  Saint Mary's again due to the flexibility
14  of the program and -- pretty much.
15   Q.  Any religious content in that program?
16   A.  No.
17   Q.  Did you take PSEO when you were in high
18  school?
19   A.  I took one PSEO course.
20   Q.  What was that?
21   A.  It was a vocal chorus course at Fergus
22  Falls Technical College.
23   Q.  Fergus Falls.  What was your first job
24  after earning your master's degree?
25   A.  Working for Minneapolis Public Schools.

1    Q.  And how long were you in Minneapolis Public
2  Schools?
3    A.  Combined, maybe 12 years.
4    Q.  And what did you do right -- what was the
5  last job you had before you came to MDE?
6    A.  I was an assistant principal in North
7  Carolina with a high school.
8    Q.  So you came back to Minnesota for MDE?
9    A.  I came back to Minnesota.  My mother passed
10  away and my father needed care.
11   Q.  What was your first role at MDE?
12   A.  I was an education specialist 2 working
13  with alternative and extended learning programs.
14   Q.  And when was that?
15   A.  2017.
16   Q.  And so when did you start your current
17  role?
18   A.  August 3rd of '22.
19   Q.  And what is that role?
20   A.  I am the director of the career and college
21  success division.
22   Q.  What are your areas of responsibility?
23   A.  Within the division is adult basic
24  education, career and technical education, online
25  learning alternative programs, dual credit

1  programs, and the Minnesota Career Information
2  System program.
3    Q.  Do you have any role in working with the
4  legislative process?
5    A.  Yes.  We provide feedback on external bills
6  and we propose legislation to the Department that
7  then reviews it.  And it goes through multiple
8  reviews.  Sometimes it's submitted in the
9  governor's plan and sometimes it is not.
10   Q.  And the Department is MDE?
11   A.  Yes.
12   Q.  Okay.  And who do you report to?
13   A.  I report to Angela Mansfield, the assistant
14  commissioner at MDE.
15   Q.  And who are your main reports?  Who are the
16  people who are reporting to you?
17   A.  My direct reports are the three
18  supervisors:  Eric Billiet, Michelle Kamenov, and
19  Brad Hasskamp.
20   Q.  Are you ever called on to apply the First
21  Amendment in your role?
22   A.  I'm not sure I understand.
23   Q.  Are you -- do you ever have to make
24  decisions that require you to understand the
25  requirements of the First Amendment?

4 (Pages 10 - 13)

Page 14

1    MR. TIMMERMAN:  Objection.  Vague.
2    You can answer if you know.
3    A.  I guess I'm not -- like, do people say,
4  "Comment directly on the First Amendment"?  No,
5  ma'am.  I guess I'm not -- it's not a part of my
6  job --
7    Q.  Okay.
8    A.  -- duty as listed, I guess.  So I guess
9  it's pretty vague.
10    Q.  Do you have a sense of, like, what the
11  First Amendment requires -- sorry, the Free
12  Exercise requires?
13    A.  Freedom of speech.
14    Q.  The Free Exercise Clause.
15    A.  No, I do not.
16    Q.  Okay.  The Establishment Clause?
17    A.  No, I do not.
18    Q.  Okay.  Who was in your role before you?
19    A.  Paula Palmer.
20    Q.  Okay.  So would she have been the person
21  who introduced the amendment as a legislative
22  proposal originally?
23    A.  Not directly.  There's a process, and
24  ultimately it's MDE that determines that the
25  legislation moves to the governor, and then the

Page 15

1  governor's team determines if it will be included.
2    Q.  Would she have been the one proposing it to
3  be introduced to -- like, proposing it to the
4  Department or spearheading it?
5    A.  Ultimately, yes, that would -- the
6  assistant commissioner may be the person that
7  actually -- it moves up the chain.  We're a
8  bureaucracy, and so it moves up the chain.  And so
9  ultimately the commissioner would have to be the
10  one that approves it and then moves it forward to
11  the governor's -- the initial proposal comes from
12  program.
13    Q.  Okay.  So when you started your role, what
14  would your role have been in seeking the
15  amendment -- passage of the amendment?
16    A.  So at that point -- that was last year -- I
17  was the supervisor of dual credit.  So I would have
18  reviewed the proposal, worked with the proposal
19  on -- to program, and passed it up to the director.
20    Q.  What did you see as the problem that the
21  amendment was trying to solve?
22    A.  To offer clarity on the expectation for
23  PSIs --
24    Q.  So you --
25    A.  -- participating in PSEO.

Page 16

1    Q.  So you thought there wasn't sufficient
2  clarity before?
3    A.  Correct.
4    Q.  So you thought -- so you thought that this
5  was something that the statute required that it was
6  wasn't clear to schools?
7    MR. TIMMERMAN:  Objection.
8  Mischaracterizes testimony.
9    You can answer.
10    A.  It had been stated on -- it had been stated
11  that it was unclear and that the statute did not
12  provide clarity on what our -- what the intention
13  is, to provide access to PSEO without barriers.
14    Q.  Is that something that MDE could have done
15  through regulation?
16    A.  Unclear what you are asking.
17    Q.  Could MDE not have clarified itself what
18  the requirements were?
19    A.  That was not the guidance that we received.
20    Q.  Okay.  I have some questions about how
21  PSEOs -- PSEO schools seek to participate in the
22  program.  How -- what's the overview of how does a
23  school apply to be an eligible institution under
24  the PSEO statute?
25    A.  A postsecondary institution?

Page 17

1    Q.  Yes.
2    A.  They submit a letter stating their intent
3  with accompanying documentation that satisfies the
4  criteria in the statute.
5    Q.  Do you know what that usually consists of,
6  the accompanying materials?
7    A.  I do not.
8    Q.  Where would a -- do you know where a school
9  would look -- a college or university would look to
10  find out how to submit a request?
11    A.  It is online, and it's in a PSEO handbook.
12  And there are not many anymore, but there are
13  webinars that are held to support completion of the
14  letter and process.
15    Q.  How is a school's application evaluated?
16    A.  As long as it aligns with statute and that
17  the courses appear to be nonsectarian that they
18  submit, if they meet statute requirements, they are
19  typically approved.
20    Q.  How often do you see new applications?
21    A.  Rarely in -- rarely.  I think it probably
22  ebbs and flows, but we did expand from, in '21, 59
23  programs providing PSEO to 64 this year.
24    Q.  Okay.  Can you think of the last time a
25  school with a religious mission applied?

5 (Pages 14 - 17)

1          MR. TIMMERMAN:  Objection.  Vague as to
2     the phrase "religious mission."
3          You can answer.
4     A.    The number of approved private institutions
5     is the same as it was the previous year.
6     Q.    Okay.  Do schools have to submit a mission
7     statement with their application?
8     A.    I do not know.
9     Q.    After an institution is approved for
10    eligibility, what information does MDE review to
11    ensure that it remains eligible?
12    A.    We do not periodically review.  Once you're
13    approved -- once an institution is approved, we do
14    not.
15    Q.    Does MDE require schools to submit changes
16    to their student handbook?
17    A.    We do not.
18    Q.    Academic admissions requirements?
19    A.    We do not.
20    Q.    Okay.  Why is that?
21    A.    The original application or letter of
22    intent also includes assurances and that they
23    are -- and a signature from the institution stating
24    that they are going to follow the processes and
25    procedures and guidelines of offering a PSEO course

1     to students.
2     Q.    Does MDE keep a list of schools that are
3     eligible to participate in PSEO?
4     A.    Yes.  It's available on the website.
5     Q.    Are you aware of any tribal schools that
6     participate in the PSEO program?
7     A.    There are.
8     Q.    Have you ever reviewed their admissions
9     requirements?
10    A.    They would have submitted the same
11    information per statute as anyone else.  It's a
12    static process for all institutions.
13    Q.    Are admissions requirements one of the
14    required items to submit when you become an
15    eligible institution?
16    A.    It's not a part of statute.  I don't know.
17    Q.    Does MDE keep track of admissions policies
18    that the schools have?
19    A.    I do not know.
20    Q.    If you wanted to find out about private
21    school admission policies, how would you go about
22    doing that?
23    A.    Well, we do ask if we receive a complaint,
24    and then we ask the institution.
25    Q.    Would the answer be different for public

1     schools?
2     A.    It would be consistent for any institution
3     offering PSEO.
4     Q.    Okay.  Let's look at our first document.
5          (Exhibit 1 was marked for
6          identification.)
7     Q.    Please take a look at this and take your
8     time to review it.
9     A.    (Reviewing document.)
10    Q.    You've had a chance to review?
11    A.    I have, yes.
12    Q.    Do you recognize this document?
13    A.    I do not.
14    Q.    Can you tell me what it is?
15    A.    It appears to be a letter and application
16    of becoming a postsecondary enrollment provider.
17    Q.    Did you review any records in addition to
18    this regarding Crown's initial approval to
19    participate in the PSEO program in preparing for
20    this deposition?
21    A.    I did not.
22    Q.    Okay.  Let's look at this one next.
23          (Exhibit 2 was marked for
24          identification.)
25    Q.    Take a look and let me know when you've had

1     a chance to review.
2     A.    (Reviewing document.)
3          MR. TIMMERMAN:  There's one more on the
4     back here.
5          THE WITNESS:  Oh, thank you.
6          MR. TIMMERMAN:  And I just want to
7     clarify for you, Ms. Reynolds, when she's asking
8     you if you've reviewed things to prepare, that
9     would include anything that was provided to you in
10    preparation for today.
11         THE WITNESS:  Correct.
12    A.    Okay.
13    Q.    Are you familiar with this document?
14    A.    Not in its entirety.  I did not review much
15    about Crown.
16    Q.    Okay.
17    A.    I do not recall reviewing much about Crown.
18    Q.    Do you know Jessie?
19    A.    I do not.
20    Q.    Okay.  So if you look at page 1890 on the
21    bottom right, that first paragraph of the letter
22    says that Crown was approved as an eligible
23    institution for the PSEO program; is that correct?
24    A.    That is what it says, yes.
25    Q.    Okay.  Did you review any records in

Page 22

1  addition to those here regarding Crown's
2  application?
3      A.  I did not.
4      Q.  So you're not aware of any further records
5  pertaining to the approval of Crown's application
6  to participate in the PSEO program, correct?
7      A.  I am not.
8      Q.  And you haven't talked with anyone who had
9  firsthand knowledge of the approval process?
10     A.  I did talk with Jeanne Krile.
11     Q.  And was she familiar with the original
12  approval process?
13     A.  No, she wasn't, in her role.
14     Q.  Okay.  So turning to 1886, there's a few
15  duplicates here, but in the second paragraph, it
16  says, "We request..."
17     A.  Yes.
18     Q.  Okay.  "We request that Crown develop a
19  separate, less restrictive application process for
20  PSEO students.  Once that process is ready to go,
21  our approval of Crown College to receive PSEO
22  funding will become effective."
23         Did I read that correctly?
24     A.  Yes.
25     Q.  Okay.  So it says that Crown was going to

Page 23

1  have to modify its application for approval,
2  correct?
3      A.  Yes.  Well, to receive funding.
4      Q.  Do you know if Crown modified its
5  application?
6      A.  I do not.
7      Q.  Is there anything here that says Crown
8  would have to notify MDE of changes made to its
9  application process in the future?
10     A.  It appears that they're requesting that
11  they submit it at this point, and once that process
12  is ready to go, our approval will move forward so
13  they could receive funding.
14     Q.  So it doesn't say to let them know if they
15  modify their application in the future, correct?
16     A.  Correct.
17     Q.  Do you know if Crown ever modified its
18  application?
19     A.  I do not.
20     Q.  Would MDE have a record of that modified
21  application?
22     A.  I do not know.
23     Q.  Okay.  If you look at the back page, 1893,
24  is this document dated?
25     A.  "Application deadline:  June 1."  I do not

Page 24

1  see a date.
2      Q.  At the top it just says, "Second Draft with
3  Changes"; is that correct?
4      A.  Yes.
5      Q.  So could you -- you can't say one way or
6  another if this was the final Crown application
7  that MDE approved?
8      A.  I cannot.
9      Q.  And you couldn't know with certainty what
10  the approved application included?
11     A.  I cannot.
12     Q.  Are you aware what statutory authority the
13  Department believed it had to make that request of
14  Crown to change its application process?
15     A.  So 124D.09 clarifies nonsectarian courses
16  and that to exclude students from a public
17  postsecondary education option would also be a
18  barrier, using public funds to support a sectarian
19  worldview.
20     Q.  So do you believe that authority comes from
21  the nonsectarian requirement?
22     A.  I don't know for certain.  I wouldn't say
23  that conclusively, but it's certainly -- if it
24  creates a barrier, then MDE is going to address it.
25     Q.  Has the Department's understanding of its

Page 25

1  authority changed since this time, since this
2  application?
3      A.  I'm not sure I understand what you're
4  asking.
5      Q.  If it had received this application in
6  2023, before the amendment passed, would it have
7  been able to request this change under the statute?
8      A.  Yes.
9      Q.  Because of the nonsectarian courses
10  requirement?
11     A.  Because of the barrier that it creates for
12  students to take PSEO at an institution that's been
13  approved using public funds.
14     Q.  And does -- is that a statutory
15  requirement, that there not be barriers on
16  institutions that are approved?
17     A.  Barriers on institutions or barriers by
18  institutions?
19     Q.  By institutions.
20     A.  Correct.
21     Q.  Okay.  Were any other schools instructed to
22  adopt a less restrictive application process for
23  PSEO students?
24     A.  I don't know.
25     Q.  Okay.  What about schools that only have a

7 (Pages 22 - 25)

1  small -- space for a small number of PSEO students?
2  Is that a barrier?
3       MR. TIMMERMAN: Objection. Vague.
4       You can answer if you know.
5    A.  We don't keep track of how many spaces PSEO
6  institution -- or PSIs report. We don't collect
7  that information. So the enrollment -- application
8  enrollment process is based on their
9  self-determined capacity. MDE doesn't know what
10  that is.
11   Q.  And they don't submit that as part of the
12  application process?
13   A.  Not that I'm aware.
14   Q.  What does PSI stand for?
15   A.  Postsecondary institution.
16   Q.  Okay. What about schools with high GPA
17  requirements? Is that a barrier?
18   A.  The statute pertains to that
19  postsecondaries determine what their entrance
20  admissions process is; we do not. If they have a
21  GPA requirement, that, in statute, is their right
22  to do so.
23   Q.  But it's not their right -- so how is that
24  different for what -- for Crown's application?
25       MR. TIMMERMAN: Objection. Vague.

1  BY MS. THOMSON:
2    Q.  So if the statute says that schools create
3  their own admissions -- are responsible for their
4  own admissions policies, how does MDE get the
5  authority to change Crown's admissions policies?
6       MR. TIMMERMAN: Objection. Asked and
7  answered.
8       You can answer again.
9    A.  Within statute, postsecondaries determine
10  how students are admitted to their postsecondary
11  courses. To the PSEO courses.
12   Q.  What about schools that only accept
13  seniors, high school seniors, not juniors or
14  sophomores? Is that a barrier?
15       MR. TIMMERMAN: Objection. Vague.
16       You can answer if you know.
17   A.  Again, statute clarifies that students that
18  are going to take a PSEO course are determined by
19  the institution.
20   Q.  Okay. Let's look at this document.
21       (Exhibit 3 was marked for
22          identification.)
23   Q.  I'll represent that this a printout from
24  the University of Minnesota website. And I'm
25  interested in just the first seven pages.

1       MR. TIMMERMAN: And I'll object on
2  grounds that this has not been previously produced,
3  but that's fine. I'll take your word that it's a
4  public document since it has a URL at the bottom.
5    A.  (Reviewing document.) The first seven?
6    Q.  Mm-hmm. Yes.
7    A.  So up to "Apply to Multiple PSEO Programs"?
8    Q.  Yes.
9    A.  Okay.
10   Q.  So I'm looking at page 4 right now.
11   A.  "Course transferability"?
12   Q.  Yes. So it says the average unweighted GPA
13  of admitted students is 3.93; is that correct?
14   A.  I see that on the page, yes.
15   Q.  And it says students who apply to U of M
16  PSEO are admitted at a rate of 45 percent?
17   A.  That is what I see.
18   Q.  Okay. So according to this, the University
19  of Minnesota's PSEO program is not available to all
20  students who want to participate in it, correct?
21   A.  It is available to all students to apply to
22  participate in it. These are the outcomes of those
23  applications, if I'm understanding your question
24  correctly.
25   Q.  And on page 7, second paragraph at the

1  bottom, it says, "Given the competitive admissions
2  process and the challenge of accessing these
3  courses, we encourage you to apply to multiple PSEO
4  programs to broaden your options"; is that correct?
5    A.  That is what I read, yes.
6    Q.  Okay. So more than half of the students
7  that apply to the University of Minnesota are not
8  allowed to take PSEO there because of their
9  admissions requirements; is that correct?
10       MR. TIMMERMAN: Objection. The
11  document speaks for itself.
12       You can answer.
13   A.  This is determined by the U of M based on
14  their capacity. So many factors. I can't speak to
15  why it's 45 percent.
16   Q.  Would you consider that restrictive?
17   A.  Not understanding how they calculated that,
18  no.
19   Q.  So the University of Minnesota is allowed
20  to restrict access to its program based on academic
21  performance, correct?
22   A.  The University of Minnesota has established
23  an admissions process that is wholly their
24  responsibility in statute, and I can't characterize
25  it one way or the other.

8 (Pages 26 - 29)

Page 30

1    Q.  What's the difference between that
2  admissions process and Crown's admissions process?
3    A.  I'm not -- I wouldn't have the -- I don't
4  know what their -- I don't participate in the
5  U of M's application process and I do not
6  participate in any other school's application
7  process, so I am not aware of what is considered.
8  All the data that they collect in their
9  applications, we don't manage that at MDE.
10    Q.  Okay.
11        (Exhibit 4 was marked for
12        identification.)
13    Q.  Take a look and review this.
14    A.  And are we considering the entire -- do I
15  need to look at the whole thing?
16    Q.  Let's see.  Just the first few pages.  Just
17  up to the actual application, so 1775.
18    A.  (Reviewing document.)  I've read up to
19  "Bethel Covenant Commitments," 1779.  Would you
20  like me to go further?
21    Q.  That's okay.  I'm looking at the front
22  page.
23        MR. TIMMERMAN:  I'm going to object to
24  this line of questioning regarding Exhibit 4 and
25  Exhibit 3, because I think it's outside the scope

Page 31

1  of the 30(b)(6) notice.  Individual schools'
2  admissions criteria is not a topic that
3  Ms. Reynolds has been identified to testify to nor
4  is it a topic that's listed in the Rule 30(b)(6)
5  notice.
6        So with that caveat, Ms. Reynolds is
7  testifying with respect to these exhibits based on
8  her personal knowledge and in her personal
9  capacity.
10  BY MS. THOMSON:
11    Q.  We'll introduce this exhibit.
12        (Exhibit 5 was marked for
13        identification.)
14    Q.  Could you read Request for Designation
15  Number 5?  You can identify the whole document
16  first.
17    A.  Could you restate, please, what your
18  request is?
19    Q.  Sure.  Are you familiar with this document?
20    A.  I have seen it, yes.
21    Q.  Could you read Request for Designation
22  Number 5 on page 3?
23    A.  "The process and procedures by which
24  families and postsecondary institutions can seek to
25  participate in the PSEO program."

Page 32

1    Q.  Are you prepared to testify on that topic?
2    A.  As it relates to MDE's role, yes.
3    Q.  So you would be aware of MDE's role in the
4  application process?
5    A.  Of individual institutions?  No.
6    Q.  Okay.  The front -- the first page of
7  this -- Exhibit 4, I think, there's a note that
8  says, "Requires:  church background, accept
9  lifestyle, and pastor's recommendation"; is that
10  correct?
11    A.  I see that, yes.
12    Q.  And there's another note that says, "For
13  comparison."  Do you know what this would have been
14  compared to?
15    A.  I do not.
16    Q.  Could it have been Crown's application?
17        MR. TIMMERMAN:  Objection.  Asked and
18  answered.
19        You can answer again.
20    A.  I have no idea where this comes from.
21    Q.  Okay.  I'm looking at 1773.  At the top it
22  says -- under "Applying to Bethel," it says,
23  "Bethel College has participated in the
24  Postsecondary Enrollment Options Act since the
25  program's inception in 1985"; is that correct?

Page 33

1    A.  That could be correct.
2    Q.  And then under "Application Procedures,"
3  the second-to-last requirement is a signed
4  commitment to Bethel's Covenant for Life Together
5  in the online application; is that correct?
6    A.  That's what I see, yes.
7    Q.  So would that have been a statement of
8  faith?
9    A.  I don't know what the online application
10  says.
11    Q.  You can look at page 1778 and 1779 and
12  1780.  I can wait.
13    A.  (Reviewing document.)  Yes, this would be a
14  concern.  And if we received a complaint, we would
15  have addressed it.
16    Q.  Do you know if MDE told Bethel they weren't
17  allowed to require PSEO students to sign a
18  statement of faith when it received these
19  materials?
20    A.  I don't know what the original submission
21  for the application in 1985 was, so I don't know
22  what the communication was.
23    Q.  If it received -- but if it had received
24  this as part of its application, do you know what
25  they would have had to say?

9 (Pages 30 - 33)

Page 34

1      MR. TIMMERMAN: Objection. Calls for
2 speculation.
3    You can answer if you know.
4    A. If we received this in the time that I've
5 been at MDE as a review for a submission to provide
6 PSEO, we would have stated that this is not -- this
7 would not be acceptable and could not be asked.
8    MS. THOMSON: We've been going for
9 about an hour. Let's take a break.
10    MR. TIMMERMAN: Sure.
11    (Break: 9:54 a.m. to 10:18 a.m.)
12 BY MS. THOMSON:
13    Q. So you said that you would have approved --
14 remind me what you said when you talked about the
15 legislative process. You would have approved the
16 proposal to go to the Department and then on to the
17 legislature?
18    A. I believe what I said, and this should be
19 consistent to my previous answer, I do not recall,
20 but the process is the program proposes it, it goes
21 to the supervisor, who then approves it and moves
22 it on to the director, who then approves it, and it
23 goes to the AC and cabinet. And ultimately the
24 commissioner determines if that proposal is
25 submitted to the governor's office.

Page 35

1    Q. So "the program" would have been Beth
2 Barsness?
3    A. Yes. Well, Beth Barsness and Jeanne Krile
4 and others that also support the -- both the
5 processes.
6    Q. So did you talk to them about the proposal
7 that became the amendment when it was going through
8 the process?
9    A. Yes.
10    Q. What did you talk about?
11    A. In collaboration with gov relations, and I
12 don't recall who would have been our contact at
13 that point, we discussed crafting language that
14 clarified that faith statements could not be used
15 to determine whether or not a student had access to
16 PSEO courses.
17    Q. So this was something MDE had been doing
18 and you wanted to clarify it in the statute?
19    A. That we had been doing?
20    Q. You'd been --
21    A. We had -- when we received complaints and
22 we worked with -- had discussions with
23 institutions, which is evidenced, I think, in some
24 of the emails going back and forth, they were
25 saying we did not have the authority to enforce the

Page 36

1 nonsectarian and the creation of barriers for
2 students to take PSEO courses.
3    Q. So you were told you did not have the
4 authority to do that and the statute was required
5 to -- an amendment to the statute was required to
6 create that authority?
7    A. That was the path that we took. There may
8 have been other suggestions as well, but that was
9 the one that we took.
10    Q. So who is "they"? Who told you that?
11    A. It was in collaboration with gov relations.
12    Q. So someone in government relations?
13    A. Was having conversations above us related
14 to the practice of faith statements.
15    Q. Would it have been Adosh Unni?
16    A. I believe so. But I don't know that we
17 were communicating directly with Adosh. We were
18 probably communicating with someone that he
19 directs.
20    Q. And would that have been people at the
21 program level doing that communication, like Beth
22 and Jeanne, or would it have been you?
23    A. It would have been all of us.
24    Q. And you said the problem the amendment was
25 trying to solve was to clarify the process. Any

Page 37

1 other problems it was trying to solve?
2    A. We were attempting to clarify the stated
3 intention that we'd been stating for 20, 30 years,
4 and to reduce barriers for students taking PSEO
5 courses that are funded with public dollars.
6    Q. So you said you talked to Beth Barsness and
7 Jeanne Krile.
8    A. Krile.
9    Q. Krile. Anyone else?
10    A. No.
11    Q. Those would -- they would have been the
12 only two people you'd have talked to --
13    A. Oh, about the legislation?
14    Q. About -- yes. About the proposal.
15    A. No. My role changed, so Eric Billiet would
16 have also been involved. Gayra Ostgaard. I'm not
17 sure that's the exhaustive list of people, but...
18    Q. And what were your thoughts about the
19 amendment when you first heard about it?
20    MR. TIMMERMAN: And I'll just object on
21 grounds that this is beyond the scope of the
22 30(b)(6) topics that Ms. Reynolds has been
23 identified to testify to.
24    So you can answer as to your personal
25 opinion, but you're not answering on behalf of MDE.

Page 38

1    A.  I'm not -- I guess I'm not clear what
2  you're asking for.  So it was a process, so it was
3  a series of discussions.  So it wasn't as if the
4  amendment was presented to me.  It was a rigorous
5  process of creating language that was acceptable to
6  government relations, to the commissioner, to the
7  assistant commissioners.  And so there was a lot of
8  back-and-forth.  So it wasn't necessarily having a
9  reaction to it.
10   Q.  When did you first hear about this
11 legislative proposal?
12   A.  I couldn't even -- I couldn't recall a
13 specific date.  I knew that it -- I knew we were
14 developing it.
15   Q.  When you first started at MDE or when you
16 first started at -- in your current role?
17   A.  When I started as a supervisor.  Mary
18 Barrie, I think, was the first supervisor when it
19 was introduced.  And it was not included -- I'm not
20 sure at what level it wasn't included, so I don't
21 know if it made it through the commissioner to the
22 governor's plan or the governor's -- I'm not really
23 sure where it was not moved forward.
24   Q.  So by the time you started your role, it
25 had already been submitted as a proposal?

Page 39

1    A.  Correct.
2    Q.  And you're not aware, before that, when it
3  would have initiated -- when it would have been
4  initiated?
5    A.  From reviewing documents, it looks like
6  2018, 2019.
7    Q.  While you were -- so while you were at MDE?
8    A.  While I was at MDE in another role, yes.
9    Q.  And would you have had any role in that in
10 your prior roles?
11   A.  No.
12   Q.  And what did you think about it when you
13 started your role?
14        MR. TIMMERMAN:  I'll object again on
15 grounds that this exceeds the scope of the topics
16 Ms. Reynolds has been identified to testify on
17 MDE's behalf about.
18        You can testify in your personal capacity.
19   A.  When I became a supervisor or a director?
20   Q.  A director.
21   A.  So I was aware of it by the time I was a
22 director and supported the submission for
23 consideration of our legislative proposals.
24   Q.  And you thought the problem was religious
25 statements of faith; is that correct?

Page 40

1        MR. TIMMERMAN:  Objection.
2  Mischaracterizes testimony.
3        You can answer.
4    A.  The interest of the program in putting this
5  forward to MDE leadership was to resolve the issue
6  of barriers created to students accessing PSEO
7  courses that are funded with public dollars.
8    Q.  Barriers to accessing PSEO courses funded
9  with PSEO dollars?
10   A.  Public dollars.
11   Q.  Public dollars.  And you mentioned that
12 that is -- that there was statutory authority for
13 that kind of interest in preventing barriers; is
14 that right?
15   A.  The nonsectarian clause, to us, clarified
16 that no specific line of belief or thought could
17 exclude students' access to taking PSEO courses
18 that are funded with public dollars.
19   Q.  So you listed -- so when I asked you
20 before, you listed the nonsectarian clause and the
21 barriers as two separate kinds of authority,
22 sources of authority.  But you only see that as one
23 source of -- like, do you see them as tied
24 together?
25   A.  So if we had a public school or a public

Page 41

1  institution that was creating barriers related to
2  religion, race, gender affiliation, any of those,
3  we would address it in the same way.  Because this
4  is public funding, and they are providing credits
5  for students to graduate based on the public
6  statutes for what is required for graduation.  In a
7  public institution, we would address it in the
8  exact same way.  So they are related to one
9  another.
10   Q.  But not a barrier based on GPA?
11        MR. TIMMERMAN:  Objection.  Vague.
12        You can answer if you know.
13   A.  We -- those are admission criteria that
14 is -- if we received a complaint from a public
15 institution where they were using a protected
16 status as admissions to their program, we would
17 address it the exact same way.
18   Q.  So -- but a student who couldn't attend a
19 school like Northwestern because their GPA wasn't
20 high enough, would that be a barrier to PSEO?
21   A.  That's a determination for that
22 institution.
23   Q.  But the student can't attend?
24        MR. TIMMERMAN:  Objection.  Asked and
25 answered.

11 (Pages 38 - 41)

1    You can answer again.
2    A.   I stand with the answer that I -- we
3    don't -- we are not a part of the application
4    review process at each postsecondary institution,
5    so I don't know what considerations go into their
6    decisions, and so I can't speak to that.
7    Q.   Without regard to their considerations,
8    though, if a student came to you and said, "I
9    couldn't get into this school because my GPA wasn't
10   high enough," would you agree that they couldn't
11   get into that school because their GPA wasn't high
12   enough?
13        MR. TIMMERMAN:  Objection.  Calls for
14   speculation.
15   A.   And we don't have standing.  We don't have
16   standing related to the GPA required or the
17   analysis made by that institution to admit that
18   student based on the GPA.
19   Q.   So you don't have standing if the complaint
20   is based on GPA?
21   A.   We don't have standing related to the
22   application requirements of a public institution
23   related to what prerequisites, what GPAs, as long
24   as it is consistent across for every single
25   student.  Unless we received a complaint and we

1    reached out and found that, you know, the GPA was
2    masking something else, we couldn't address it.
3    Q.   You said public institution.  Is that the
4    case for a private institution too?
5    A.   It is the same.
6    Q.   So you wouldn't address a complaint based
7    on academic achievement; that a student couldn't
8    get into a PSEO school based on academic
9    achievement?
10   A.   We do not address that.  That's up to the
11   individual institution.
12   Q.   Okay.  But a student that said, "I couldn't
13   get in because of an application requirement that I
14   sign a statement of faith," you wouldn't be able to
15   address that?
16   A.   We would be able to address that as a
17   barrier.
18   Q.   And that would be an admissions requirement
19   that you'd be addressing?
20   A.   That would be a barrier to the student
21   participating in PSEO courses with public funding.
22   Q.   And the barrier is an admissions
23   requirement?
24   A.   It wouldn't have to be exclusively an
25   admissions requirement.  Because they each have

1    different admission -- there's not a uniform:  You
2    have to have this as part of an admissions process
3    that comes from MDE.  That admissions process is
4    determined at the local postsecondary institution.
5    If it creates a barrier related to protected
6    classes, then we would address it.
7    Q.   So the problem is if there's a barrier
8    related to a protected class, whether it's an
9    admissions requirement or a course -- whether it's
10   at the admissions level or the course level?
11   A.   The institution admits students to their
12   programs.  We address PSEO course requirements and
13   application requirements as a secondary
14   consideration if there is bias that is contained in
15   the admissions process.  We don't regulate the
16   admissions process.  We do, because of the
17   nonsectarian courses, do have a say in whether
18   those courses will be funded.
19        So if a sectarian course is provided to a
20   student and it is named something else other than
21   Pastoral Studies and it's named Civics, if it's
22   named Civics, we would go through the file and not
23   find an objection.  If a parent or a student
24   contacts us and says, "Well, it's really a pastoral
25   class," then we address that with the institution

1    to get clarity.  So we address it at how we fund
2    the courses.
3    Q.   Not at the admissions level?
4    A.   If the admission is part of the barrier to
5    getting access to courses that are funded with
6    public dollars, then we address the admission.
7    Q.   And this -- the Bethel document we just
8    reviewed, that's an admissions issue?
9        MR. TIMMERMAN:  Objection.  Vague.  The
10   document speaks for itself.
11       You can answer if you know.
12   A.   As it's presented, that would be a concern,
13   and we would reach out to the institution to ask.
14   Q.   Okay.  But if a student can't get into the
15   University of Minnesota because of their GPA,
16   that's a program that's funded by public dollars,
17   correct?
18   A.   But that's their admission criteria based
19   on academic performance of the student.  So I think
20   I've stated that before; that is up to the
21   institution.  If they want to require course
22   prerequisites, if they want to require GPA to
23   participate in PSEO, each individual institution
24   has the authority to do that under statute.
25   Q.   So there's no problem with public dollars

Page 46

1  going to that?
2      A.  Statute doesn't prohibit that.
3      Q.  What prevents a PSI from making religious
4  admissions requirements?
5      A.  It shows we would not allow a public school
6  to make religious requirements or implement
7  discriminatory practices of taking courses.  It's
8  the same for a private institution.  And so our
9  technical guidance is exactly the same.
10     Q.  Okay.  So we were talking about the
11 legislative process.  What -- when did the proposal
12 go -- so it had already become a proposal by the
13 time you became a director.  Where was it in the
14 process when you became a director?
15     A.  So the program had put it forward already
16 as a proposal for consideration under the new --
17 the next legislative session.  I believe it was the
18 fourth or fifth year that it had been put forward.
19 So when I became a director, it moved to gov
20 relations, I believe.
21     Q.  Remind me, when was that?  When did you
22 become a director?
23     A.  August of '22.
24     Q.  '22.  So it was in 2023 that the
25 proposal -- so in 2022, did it make it into the

Page 47

1  bill language?
2      A.  I don't know about '22, which would have
3  been before I started.  That would have been in
4  January.
5      Q.  So you would not have been involved in
6  that?
7      A.  I don't recall.
8      Q.  So were you involved in the 2023 process?
9      A.  It was already with gov relations, so, yes,
10 then I was part of that process and that
11 discussion.  I would have been part of the
12 discussion previously.  I was a supervisor.  But I
13 don't -- it had already been submitted and it was
14 repeatedly submitted.  So it was already submitted
15 and everyone was familiar with the language.
16     Q.  So what kind of discussions were happening
17 at the time that you became a director as it was
18 going into the -- as it was making it into the bill
19 language?
20         MR. TIMMERMAN:  I'm going to object.
21 This entire line of questioning is well beyond the
22 scope of what Ms. Reynolds has been designated to
23 testify to.  This is what Mr. Unni was designated
24 to testify to.
25         So any testimony you give in this regard is

Page 48

1  in your personal capacity.  You can answer, but
2  it's not on behalf of MDE.
3  BY MS. THOMSON:
4      Q.  You can answer on your personal capacity.
5      A.  We have -- we have -- had a lot of
6  legislative proposals, internal and external.  So I
7  know that the ultimate outcome was that it was
8  included with the governor's bill.  I don't
9  remember having -- I don't remember individual
10 conversations about this until it was introduced.
11     Q.  Once it was introduced you had
12 conversations about it?
13     A.  With Adosh Unni, who was providing feedback
14 on multiple bills from legislators and community
15 members.
16     Q.  And you said you were also talking with
17 Beth Barsness and Jeanne?
18     A.  Well, they would have been included in the
19 conversations to a degree, but at that point it's
20 part of the governor's plan, so there isn't much
21 more -- you know, the governor may ask for the
22 language to be tweaked, and so then Adosh delivers
23 that to us and we consider it.  And I don't
24 remember any of that happening.  It was more of
25 updates on reactions to the language that was

Page 49

1  included in the governor's plan.
2      Q.  So there would have been updates and you
3  would have reacted to those updates?
4      A.  Again, we get -- we would get biweekly
5  updates as a whole agency, as MDE.  And Adosh would
6  reach out specifically, so I can't speak to the
7  frequency of those updates specifically on this
8  legislation.  I don't recall.
9      Q.  Was this an important proposal for you to
10 see pass in the bill?
11     A.  I supported the submission of it.  And,
12 again, I believe it was the fourth or fifth time
13 that it had been submitted, so we were realistic.
14     Q.  Do you know what was different this time
15 than the prior times?
16     A.  I do not.
17     Q.  What -- so once the bill -- so you received
18 updates.  Were you aware of the bill as it was
19 going through the House and the Senate process?  Of
20 the language.
21     A.  Not specifically.
22     Q.  Did you have any conversations about it at
23 that point?
24     A.  When it was going through the House, the
25 updates from Adosh, when he provided them,

Page 50

1   specifically about that statute.  Or that proposed
2   bill its progress or the questions that were
3   coming up.
4       Q.  And were you -- after the language passed,
5   were you aware of that?
6       A.  I'm sure I was.  We had a lot of
7   legislative proposals, and a number of them passed
8   and had to be processed through our division.
9       Q.  Did you have any conversations about it at
10  that point once it passed?
11      A.  I don't recall.
12      Q.  And what --
13      A.  Not specifically.
14      Q.  What would the processing have looked like?
15      A.  Creating guidance around the statute
16  language.
17      Q.  Has guidance been created around that
18  statutory language yet?
19      A.  I do not recall.
20      Q.  So you talked with Adosh Unni.  Anyone else
21  from government relations that you're aware of?
22      A.  Oh, it could have been Shana Morse.  It may
23  have been Megan Arriola.
24      Q.  And Beth and Jeanne.  Anyone else from your
25  department?

Page 51

1       A.  So Jeanne's not -- she's in finance, so
2   she's not a member of my staff.  So at that point,
3   once it was introduced, I wouldn't have continued
4   to talk with Jeanne.  I would have been talking
5   with the finance director.
6       Q.  Okay.  And who was the finance director?
7       A.  I think it was either vacant or Cathy
8   Erickson had taken it at that point.
9       Q.  And what would you have talked about with
10  her?
11      A.  Probably the collaborative rolling out of
12  guidance.
13      Q.  And, again, you said there hasn't been
14  guidance on this yet?
15      A.  Not that I recall.
16      Q.  Have you started working on guidance for
17  this?
18      A.  I don't -- no, I think they put this on
19  hold.  It's been on hold.
20      Q.  Because of the lawsuit, the injunction?
21      A.  And we had many other legislative proposals
22  that we had to provide guidance on, so we
23  prioritized those.
24      Q.  Okay.  Anyone else you would have talked to
25  about it, in or out of MDE?

Page 52

1       A.  We would not have discussed it outside of
2   MDE.
3       Q.  Okay.  And with the people you talked
4   about, what was the opinion -- what were their
5   opinions of the proposal and the amendment?
6           MR. TIMMERMAN:  Objection.  Calls for
7   speculation.
8   BY MS. THOMSON:
9       Q.  To your knowledge.  As far as you know.
10      A.  I don't recall.
11      Q.  Beth Barsness?
12          MR. TIMMERMAN:  Objection.  Asked and
13  answered.
14      A.  She was -- she's program, so she helped to
15  develop it in the first place when it was
16  originally introduced.
17      Q.  So she thought it was important?
18      A.  I can't determine what her level of support
19  was.  She supported it being forwarded to the
20  legislature for consideration.
21      Q.  And Jeanne?
22      A.  I have no idea.
23      Q.  Cathy Erickson?
24      A.  She was new.  I don't recall.
25      Q.  Mm-hmm.  What about Adosh?

Page 53

1       A.  I don't recall.  That's --
2       Q.  I should have asked --
3       A.  He rarely -- he doesn't necessarily weigh
4   in.  Once it's on the governor's plan, it's on the
5   governor's plan.
6       Q.  Did you speak with Adosh about his
7   testimony with -- his meeting with us the other
8   day, his deposition?
9       A.  I didn't.
10      Q.  Can you recall anything specific he would
11  have said about it, about the proposal?
12      A.  Related to his feelings about the proposal?
13  I'm not clear what you're asking.
14      Q.  Yeah, or anything -- yeah, anything
15  specific.
16      A.  We had conversations about the wording.
17  There was maybe some discussion of is it -- you
18  know, do we call it faith statement?  Do we call it
19  something else?  And I think that was in response
20  to a legislator's questioning.  I don't recall
21  specifically.  But that's my vague recollection.  I
22  don't have specifics.
23      Q.  Do you recall anything that Beth said
24  specifically about it?
25      A.  No.  At what point?

14 (Pages 50 - 53)

Page 54

1     Q. At any time since you were a specialist.
2     A. Not specifically. I mean, I'm sure we had
3 conversations. I don't recall.
4     Q. Okay. All right. Let's look at the next
5 document.
6        (Exhibit 6 was marked for
7        identification.)
8     Q. Just the first page.
9     A. (Reviewing document.)
10     Q. Have you had a chance to review?
11     A. I did.
12     Q. So this is a 2006 approval for Bethel to
13 participate in the PSEO program; is that right?
14     A. That's what it appears to be, yes.
15     Q. Do you know, if Bethel had been
16 participating in PSEO since 1985, why they would
17 have been accepted as an eligible institution in
18 2006?
19     A. I do not.
20     Q. In the second paragraph -- if you could
21 just take a look at the second paragraph. Does
22 that say anything about Bethel's requirement of a
23 signed commitment to Bethel's covenant life
24 together that we looked at in the last document?
25        MR. TIMMERMAN: Objection. The

Page 55

1 document speaks for itself.
2        You can read it and answer.
3     A. It appears to say that it is too
4 restrictive and they would not be able to access
5 PSEO program funding with that requirement in
6 place.
7     Q. So the first sentence in that second
8 paragraph says, "Bethel's current admission process
9 requires applicants to 'give evidence of Christian
10 faith' and be recommended by a pastor."
11        So that's two of the three requirements we
12 looked at in the -- in Bethel's application. Does
13 it say anything about the signed statement of
14 faith?
15        MR. TIMMERMAN: Same objection.
16     A. It references the application process.
17     Q. But not the signed lifestyle statement?
18     A. It just references the application process,
19 so I don't know if that was included or not.
20     Q. So as far as you know, it doesn't
21 specifically say that Bethel cannot include the
22 lifestyle requirement of the covenant life --
23 covenant for life together?
24     A. It references a less restrictive
25 application process. I don't know if that was

Page 56

1 limited to what they cited or if that's the entire
2 application process. I wouldn't know that.
3     Q. Does MDE consider Bethel to be providing a
4 public education for purposes of the PSEO program?
5        MR. TIMMERMAN: Objection. Vague.
6       You can answer if you understand.
7     A. I'm not really understanding. I don't want
8 to guess.
9     Q. Does MDE have a definition of what it means
10 to provide a public education?
11     A. So a public education, I don't know if we
12 have an official definition. I guess we all know
13 what it means. Public education is something that
14 is accessible to any student in the state for
15 purposes of meeting the graduation requirements for
16 public education students in the state of
17 Minnesota. And at the local level as well.
18     Q. So would you consider Bethel's
19 participation in the PSEO program to be providing a
20 public education?
21     A. They are providing courses that apply to
22 the public education requirements in the state.
23        (Ms. Demeules entered the proceedings.)
24     Q. The public education requirements. So
25 could a private school -- so a private school

Page 57

1 providing a private education, would that
2 contribute to the public school requirements? What
3 do you mean by "public school requirements"? I'm
4 trying to understand.
5     A. So public school graduation requirements.
6 So the state has standard requirements for content
7 areas that are required for graduation and --
8     Q. High school graduation?
9     A. For high school graduation. Yes. Thank
10 you. And then local districts for which these
11 students are also enrolled, and have to be to be in
12 PSEO, can also have local graduation requirements
13 on top of that. So it's -- there's the state
14 requirements and then there are local requirements
15 for the districts to which the students are
16 enrolled.
17     Q. So how does a student at a private high
18 school meet public graduation requirements? How
19 does that work?
20     A. Related to PSEO?
21     Q. No.
22     A. They --
23     Q. Just a student at a private high school.
24     A. That's not a requirement of a student in a
25 private high school.

15 (Pages 54 - 57)

Page 58

1    Q.   So there's no graduation requirements for a
2  student at a private high school?
3    A.   Correct.
4    Q.   So if you're participating in a public
5  education program, you have graduation requirements
6  and your education has to meet those requirements,
7  but if you are participating in a private school,
8  you don't have to meet those -- you don't have to
9  meet high school graduation requirements for
10  purposes of MDE?
11   A.   If you are enrolled in a public institution
12  that is funded by public dollars, then those
13  institutions follow the graduation standards,
14  correct.
15   Q.   Are there standards that private schools
16  have to follow?
17   A.   No.
18   Q.   Okay.
19       MR. BAXTER:  Was that a yes or a no?
20   A.   No.
21       (Exhibit 7 was marked for
22       identification.)
23       MR. TIMMERMAN:  I'm going to object to
24  that last line of questioning also just on grounds
25  that it exceeds the scope of the 30(b)(6) topics

Page 59

1  Ms. Reynolds has been designated to testify to.  So
2  treat those answers as her personal opinion.  Go
3  ahead.
4  BY MS. THOMSON:
5    Q.   You've had a chance to review?
6    A.   I have.
7    Q.   Do you recognize this document?
8    A.   I do not.
9    Q.   Is it a Statement of Admission from Bethany
10  Lutheran College?
11   A.   That's what it says at the top.
12   Q.   Okay.  And it says in the first
13  paragraph -- I'm sorry.  Second paragraph, it says
14  the college provides "an atmosphere of Christian
15  teaching, learning, and living"; is that right?
16   A.   That is what it says.
17   Q.   Okay.  Would that affect its eligibility
18  for PSEO?
19       MR. TIMMERMAN:  Objection.  Vague.
20       You can answer if you know.
21   A.   It is very vague.  I don't -- I'm not sure
22  what "Christian teaching, learning, and living" is
23  defined as, so I don't know what that would mean,
24  and we would engage in a conversation.
25   Q.   So without more information, you wouldn't

Page 60

1  say that that would affect its eligibility?
2    A.   It would take further conversation,
3  correct.
4    Q.   Is ability to provide nonsectarian courses
5  the same answer?
6    A.   I don't see courses listed on here, so I
7  couldn't speak to what courses they're offering.
8    Q.   So if it teaches courses in an atmosphere
9  of Christian teaching, learning, and living, that
10  doesn't tell you enough?
11   A.   Correct.
12   Q.   What would a further conversation on that
13  look like?
14   A.   Without the other person here, I don't
15  know.
16   Q.   Would you only have that conversation if
17  you had a complaint about it or would this be
18  something that MDE would ever review on its own?
19   A.   We would not be -- we would not be
20  reviewing documents like this.  So typically it's
21  provided from outside, and we don't regularly
22  review admissions.  So once we became aware of it,
23  we would ask.
24   Q.   And what kind of questions would you ask?
25   A.   What does "an atmosphere of Christian

Page 61

1  teaching, learning, and living," how are you
2  defining that?
3    Q.   And how would you evaluate the answer?
4    A.   Based on the responses they give to that
5  question.
6    Q.   But what would you need to know to
7  determine --
8    A.   I can't consider a hypothetical.  Like, I
9  don't know what they mean by "Christian teaching,
10  learning, and living."  If that means -- if every
11  course is precluded with prayer and that's how they
12  define it, then that would be a concern for us.
13   Q.   So it says -- the last sentence, it says,
14  "If a student persists in challenging or
15  disparaging the teachings of the Synod, the college
16  reserves the right" to eventually terminate
17  enrollment at Bethany; is that right?
18   A.   That's what it says.
19   Q.   So would that be considered a statement of
20  faith requirement --
21       MR. TIMMERMAN:  Objection --
22  BY MS. THOMSON:
23   Q.   -- under the amendment?
24       MR. TIMMERMAN:  Objection.  Vague.
25       You can answer if you know.

16 (Pages 58 - 61)

1  A. Well, and this appears to be for the
2  college students, so I don't know if this is also
3  their admission policies for PSEO students. That's
4  not clear to me on here, so...
5  Q. If it was a PSEO policy?
6  MR. TIMMERMAN: Objection. Vague and
7  calls for speculation.
8  You can answer.
9  A. I don't have a response.
10  Q. So you wouldn't -- you don't have a
11  response on whether that would be restrictive?
12  A. Without additional conversation, no.
13  MR. TIMMERMAN: Objection.
14  BY MS. THOMSON:
15  Q. What would be the first step to approach a
16  complaint about a student who had been terminated
17  under these criteria?
18  MR. TIMMERMAN: Objection. Vague.
19  Calls for speculation.
20  You can answer if you know.
21  A. If the student contacted us, it would be
22  getting initially probably a conversation with the
23  student and/or their family. And then it would
24  be -- based on those answers, it would be reaching
25  out to Bethany Lutheran College to ask -- to have

1  further conversation.
2  Q. So what would you -- like, what would be
3  the line -- are you prepared to testify on the
4  process and procedures by which families and
5  postsecondary institutions can seek to participate
6  in the PSEO program?
7  A. Yes.
8  Q. Okay. So what is the line that MDE has
9  that would have to be violated in a situation like
10  this where a student was expelled because they
11  challenged or disparaged the teachings of the --
12  the religious teachings of the schools?
13  A. So it doesn't say "expulsion." It says
14  "terminate enrollment." And so the line would be
15  if the student was objecting because they were
16  being asked to pray, for example. Or the course,
17  even though it was listed as sectarian, was
18  actually -- or as nonsectarian was.
19  So, again, it's based on the answers, the
20  concerns brought by the student, and if the
21  responses by the postsecondary institution
22  supported that they were creating barriers to
23  accessing PSEO that violated nonsectarian
24  expectations, that would be continued conversation.
25  Q. So terminating enrollment because a student

1  challenged or disparaged the teachings of the
2  church is not clear to you if that's creating a
3  barrier?
4  A. If enrollment is terminated, then we do not
5  pay for the course.
6  Q. So MDE would have no involvement after
7  termination, after enrollment was terminated?
8  A. It's not a situation we've run into, no.
9  Q. No matter what the reason for the
10  termination was?
11  A. It would be hard to determine that based on
12  trying to guess at all the possibilities that
13  students could be terminated. So, again, it would
14  be part of a conversation, and depending on what
15  was the outcome of that conversation, we would have
16  continued conversation, perhaps, with the family
17  and with the postsecondary institution.
18  Q. And a continuing conversation, could that
19  lead -- could that lead to the school being denied
20  eligibility to the program?
21  MR. TIMMERMAN: Objection. Calls for
22  speculation.
23  A. Right. And they're already approved. So
24  if they're already approved, it's not an
25  eligibility requirement; it is whether or not we

1  will fund their PSEO courses.
2  Q. So the consequence would be not funding the
3  course?
4  A. Correct.
5  Q. Would you consider Bethany, in providing
6  PSEO classes, to be providing a public education?
7  A. Correct.
8  Q. And Augsburg, do their PSEO classes provide
9  a public education?
10  A. They meet public education requirements for
11  students, yes.
12  Q. And same for other private schools
13  participating in the PSEO program?
14  A. Correct. Because to be a dual credit PSEO,
15  you have to award credit at the high school and the
16  college level, so...
17  Q. The college has to award credit at the high
18  school level?
19  A. The high school has to award credit at the
20  high school level. Without the dual credit
21  assignment, then, again, that course would not be
22  paid -- the postsecondary would not be paid for
23  that course. It is a requirement that high schools
24  transcript award credit.
25  Q. Is that the same for private and public

1  high schools?
2    A. It's the same, yes, requirement.
3    Q. If -- does MDE have a position on what it
4  means to be a state actor?
5        MR. TIMMERMAN: Objection. Calls for a
6  legal conclusion.
7        You can answer if you know.
8    A. We never had a decision about state actors.
9    Q. Have you ever -- has MDE ever informed
10 private schools that they consider them to be
11 providing a public education in the PSEO process?
12   A. So, again, I would say it's the providing
13 and awarding credit that also relates to graduation
14 credits required for public school institutions.
15 And based on the fact they cannot provide non- --
16 they cannot provide sectarian -- sorry for the
17 fatigue. They cannot require religiously focused
18 courses because of the public funding.
19        Has it been explicitly stated? Probably,
20 but I couldn't recall a specific document. But
21 that would be part of the expectation, and has been
22 a part of the conversations we've had when we've
23 received complaints.
24   Q. That -- so part of the conversations when
25 you receive a complaint is that you believe the

1  schools are providing a public education to PSEO
2  students?
3    A. They are receiving public funding to
4  provide graduation requirements against the public
5  graduation requirements and credits and standards
6  and the local public school graduation
7  requirements, yes.
8        MR. TIMMERMAN: We've been going about
9  an hour here. Would you like to take a break?
10       THE WITNESS: Do I need it? Yes, I
11 probably do.
12       (Break: 11:08 a.m. to 11:22 a.m.)
13 BY MS. THOMSON:
14   Q. Let's look at the next document.
15       (Exhibit 8 was marked for
16       identification.)
17   A. (Reviewing document.)
18   Q. Okay?
19   A. Okay.
20   Q. Are you familiar with this document?
21   A. I have not seen it before.
22   Q. It's an institutional eligibility form; is
23 that correct?
24   A. Yes. I've seen a blank institutional
25 eligibility form, but not Augsburg's.

1    Q. So this is Augsburg's form from 2023; is
2  that correct?
3    A. That's what it says.
4    Q. Is this the current eligibility form if a
5  school applies for the PSEO program?
6    A. I don't know.
7    Q. Are you familiar with the current form?
8    A. I'm familiar that there is a form. I have
9  seen the form before. I don't know if it is the
10 current form. That's a program decision.
11   Q. How long has this form been in place?
12   A. I do not know.
13   Q. Do you know why it was created?
14   A. To provide clarity to programs who are
15 applying, postsecondary institutions applying to
16 provide PSEO courses.
17   Q. So the school fills this out and submits it
18 to MDE?
19   A. Correct.
20   Q. It's not a form that -- it's not an
21 internal MDE form?
22   A. No, it is outward-facing. Correct.
23   Q. So is this available to schools on MDE's
24 website?
25   A. I believe so.

1    Q. You testified before that once a school is
2  eligible, that doesn't change. So is it correct to
3  say that this does not apply retroactively to
4  schools that are already eligible?
5        MR. TIMMERMAN: Objection. Vague.
6    A. I'm not sure what you're asking.
7    Q. So this is the form. This is the
8  current -- this is a 2023 eligibility form. If
9  there's a school that has already received
10 eligibility without this form, would this form
11 dictate that school's eligibility for PSEO?
12   A. I can't speak to why a program would
13 have -- I don't know the status of Augsburg
14 previous to July 31st of 2023. I don't know if
15 they added additional programming, additional
16 courses. I don't know why this form was completed,
17 so I can't speak to that.
18   Q. Not this specific form. In general.
19   A. But in general, I don't know. It wouldn't
20 seem necessary. We don't -- it's not in statute
21 that we revisit eligibility unless we have a
22 concern.
23   Q. What would precipitate a school reapplying
24 for PSEO if it had already been eligible before?
25   A. I believe if -- and this is really a

Page 70

1  finance question -- if they have not submitted for
2  reimbursement of a PSEO course for -- I want to say
3  five years, but it could be three years, they may
4  have to submit another eligibility because they
5  would not have been included in the system.
6      Q.  So if they -- so you're saying if they
7  missed a year?
8      A.  I don't believe it's as little as a year.
9  I believe it's defined, but I don't know
10 specifically.  It's three to five years.  So if
11 they have not submitted for PSEO reimbursement for
12 a specified period of time as determined by
13 finance, they may be required to submit this again
14 so that they can receive funding for PSEO courses.
15     Q.  Do you know if Northwestern ever had to
16 resubmit its application?
17     A.  I do not.
18     Q.  Or Crown?
19     A.  I do not.  No, I do not know.  Sorry.
20     Q.  Okay.  I want to look at paragraph 4 on the
21 second page.  Section (a) says to take courses, the
22 school cannot require a student "to take courses
23 based upon a particular set of religious beliefs."
24     How does MDE define when a course is based
25 upon a particular set of religious beliefs?

Page 71

1      A.  So that's in the statute as nonsectarian.
2  So if we received a complaint that stated that a
3  course was asserting a particular set of religious
4  beliefs, we would have a conversation, again, with
5  the postsecondary institution to get clarity on
6  what the student or family is sharing and then
7  determine that if it is focused on a specific set
8  of religious beliefs that are specific to a
9  religion or et cetera, then we would address it
10 with them.
11     Q.  So do you have -- so does MDE have
12 discretion to determine whether a course is based
13 upon a particular set of religious beliefs or are
14 there specific criteria that create that?
15     A.  So these are the specific criteria that MDE
16 reviews to determine nonsectarian or sectarian.
17     Q.  So if a course was identical to a course
18 taught at a public school but it started with a
19 prayer, would that be based upon a particular set
20 of religious beliefs?
21     A.  Correct.
22     Q.  It would?
23     A.  If they prayed -- if they mandated that the
24 students pray before the course began, yes.
25     Q.  So if a professor, at the beginning of the

Page 72

1  course, says, "I'm going to start the course with a
2  prayer.  Our Father, who art in heaven, amen,"
3  would that be requiring students to pray?
4      A.  That would not -- that would be counted as
5  sectarian.
6      Q.  Would it be based on a particular set of
7  religious beliefs?
8      A.  It's sectarian to a specific belief, yes.
9      Q.  So the -- so a professor praying at the
10 beginning of class is requiring students to pray?
11     A.  In your example it was the Lord's Prayer,
12 so that would be a sectarian prayer and it would be
13 deemed as such.
14     Q.  So if a professor started the class with a
15 devotional reading from the Bible, that would be --
16 would that be based upon -- would that be a course
17 based upon a particular set of religious beliefs?
18     A.  Correct.
19     Q.  If the teacher asks students what the Bible
20 says about a particular topic, would that be basing
21 a course upon a particular set of religious
22 beliefs?
23         MR. TIMMERMAN:  Objection.  Calls for
24 speculation.
25         You can answer if you know.

Page 73

1      A.  A lot more context would be required to
2  know why the professor was asking that.
3      Q.  So you have a math class.  The students
4  learn the same math, Calc 2, Calculus 2, but the
5  teacher adds in religious encouragement, religious
6  insight.  Is that based upon a particular set of
7  religious beliefs?
8          MR. TIMMERMAN:  Objection.  Vague and
9  calls for speculation.
10         You can answer if you know.
11     A.  I don't know.
12     Q.  Is it -- so you receive a complaint about a
13 professor including a religious encouragement or
14 religious insight, how would that be -- how would
15 that complaint be handled?
16     A.  As stated previously, we would take the
17 complaint and reach out to the postsecondary
18 institution to inquire about the complaint and what
19 was asserted and have continued conversation
20 depending on what their responses were.
21     Q.  And the outcome of the conversation would
22 be:  Is the course going to be funded or not?
23     A.  We would provide guidance that the
24 postsecondary could incorporate or not.  And
25 depending on whether they incorporated it or not

19 (Pages 70 - 73)

1  would determine whether they'd receive public
2  funding for that course.
3     Q.  Whether the -- so when you say "incorporate
4  it or not," what do you mean?
5     A.  If we provide guidance that the religious
6  encouragement meets the criteria for a sectarian
7  course, and the possibility would be that the
8  course would not be funded if they did not follow
9  it.
10    Q.  And how would it be decided what guidance
11  would be provided?  Is that up to the individual
12  person who receives the complaint at MDE?
13    A.  Well, the program person receives the
14  complaint.
15    Q.  So Beth Barsness?
16    A.  So Beth Barsness typically.  Sometimes -- I
17  can't even say that.  Let me clarify.  Anyone at
18  MDE could possibly receive a complaint, and it is
19  typically funneled to the program specialist.  And
20  they weigh:  Is it sectarian or it is nonsectarian?
21  And if it ascribes to a specific worldview, then
22  the guidance is that should be removed from the
23  course; otherwise the course would be considered
24  sectarian and not available for public funding.
25    Q.  And when you say "they weigh," who is that

1  doing the weighing?
2     A.  It could be -- it typically starts with the
3  program specialist, who would be gathering the
4  information, having the conversation.  They may
5  consult with their supervisor, which -- they may
6  consult with government relations, finance, any
7  entity in MDE that may help them determine if it --
8  if what was provided is sectarian or nonsectarian.
9     Q.  So the specialist, that would have been
10  your role before --
11    A.  No, I was not the specialist.  I'm not the
12  specialist for dual credit.
13    Q.  Okay.
14    A.  I have never been.
15    Q.  Okay.  So anyone can receive a complaint,
16  and the complaint goes to the program specialist,
17  not necessarily to the program -- to Beth Barsness?
18    A.  Beth Barsness is the program specialist.
19  So it typically gets routed to her, and then she
20  will have a conversation usually.  Or if she has
21  questions, she consults with other areas to get
22  clarification before contacting the postsecondary.
23  Has conversations with the person sometimes who
24  made the complaint, although sometimes they're
25  anonymous.

1     Q.  Is she required to get clarification or
2  does she have authority to determine the
3  termination?
4     A.  She was the authority to determine if
5  something is sectarian or nonsectarian.
6     Q.  Okay.
7     A.  In theory.  But she always consults.  I
8  mean, that is, again, the bureaucratic nature of --
9  especially if it's going to be something that says
10  this is a sectarian course, she's going to consult
11  with other entities within MDE to ensure that MDE
12  supports her analysis.
13    Q.  So (b) in this list is the school may not
14  require a student "to receive instruction intended
15  to propagate or promote any religious beliefs."
16       Does MDE have a definition of that?
17    A.  Well, I think it's pretty self-explanatory,
18  so I'm not sure what you're asking.
19    Q.  Would that preclude a teacher from sharing
20  his or her religious perspective with students?
21       MR. TIMMERMAN:  Objection.  Vague.
22  Calls for speculation.
23    A.  I would agree.  I don't know what that
24  would mean.  Religious beliefs are -- expressing or
25  testifying to something in your life, that can come

1  in many ways.  So it could end up being an
2  encouragement.  It could end up just being a
3  statement of -- you know, I can't speak to that.
4  That's too vague.
5     Q.  So a professor telling the students:  This
6  is my religious belief and this is how it applies
7  in this discussion of what we're talking about.
8       MR. TIMMERMAN:  Objection.  Calls for
9  speculation.
10      You can answer.
11    A.  Yeah, I don't -- again, it would take more
12  conversation.  If we received a complaint that was
13  characterized as you've stated, then it would be
14  further conversation.
15    Q.  But you don't know?
16    A.  I can't know without context, so...
17    Q.  Without context you wouldn't say it's a
18  violation?
19    A.  I can't speak to if it is sectarian or
20  nonsectarian without a conversation.
21    Q.  Are there any factors MDE considers in
22  determining when a teacher crosses the line to
23  propagating or promoting a religious belief?
24    A.  So typically we receive complaints, so it's
25  the discomfort that the student is experiencing

Page 78

1  with the conversation that's occurring in the
2  classroom.
3      Q.  So it's based on the student's perception?
4          MR. TIMMERMAN:  Objection.
5  Mischaracterizes testimony.
6      You can answer.
7      A.  So it's based -- well, sometimes it's the
8  student who's uncomfortable.  Sometimes we receive
9  information from teachers, from families, teachers
10  within the institution, teachers at the high
11  school, counselors at the high school.  So it's not
12  limited -- there's discomfort on some level by
13  someone reaching out to MDE to say this appears to
14  be a sectarian course, approach to the course, and
15  that's what we seek clarification on.
16      Q.  So the school says, "We teach our courses
17  from a biblical worldview," would that be intended
18  to propagate or promote religious beliefs?
19      A.  It would take further clarification and
20  conversation with them to say, "What does that look
21  like, then, in a PSEO course?"
22      Q.  So not without a complaint?
23      A.  Well, if it was in the application, we
24  would ask for clarification as well, which I think
25  has been evidenced.  If something, a particular

Page 79

1  worldview is expressed in the admissions process or
2  a course, that would be a clarification for us.
3      Q.  I think we have that in Exhibit 2.  If you
4  just look at the last page, it's at the bottom in
5  the pink -- the first pink box.  It says, the
6  second sentence, "I recognize that Crown College is
7  a distinctively Christian college whose programs
8  are based upon biblical teachings and standards."
9      Would this have been approved?
10      A.  Well, the following sentence is, "I
11  recognize that Bible and theology classes are not
12  part of the PSEO option."  So, while recognizing
13  Crown College, it states -- I believe -- well, I
14  don't know.  I don't know why, but that last
15  sentence recognizes that those will not be a part
16  of the PSEO options.
17      Q.  So that's enough of a clarification on the
18  biblical worldview statement?
19      A.  It was for whoever reviewed it.
20      Q.  Is that MDE's position?
21      A.  What's that?
22      Q.  That that is enough of a clarification that
23  that biblical worldview statement is acceptable?
24          MR. TIMMERMAN:  Objection.  Vague.
25  ///

Page 80

1  BY MS. THOMSON:
2      Q.  You can answer if you know.
3          MR. TIMMERMAN:  Also vague as to time
4  as well.  Was it MDE's position at the time or is
5  that MDE's position today?  You're here to talk
6  about what MDE's position is today.
7  BY MS. THOMSON:
8      Q.  I'm asking about today.
9      A.  MDE's position today would not approve that
10  "I recognize that Crown College is a distinctively
11  Christian college" without a more clear follow-up
12  sentence.  "I recognize that these Christian" --
13  "this Christian college approach is not a part of
14  PSEO."  I mean, they can be a Christian college,
15  and that does not -- who they are doesn't impact
16  the course -- the PSEO courses that they can offer
17  and be funded public dollars for.
18      Q.  So PSEO courses could not be taught from a
19  biblical worldview?
20      A.  That is really general too.  I don't know
21  what a biblical worldview is, so...
22      Q.  Well, that's what it says on the
23  application.
24      A.  Well, I don't know what -- and I'm guessing
25  that that's maybe why they let it go.  Like, "on

Page 81

1  biblical teachings and standards."  So, again, PSEO
2  is addressing graduation standards that are
3  publicly funded through PSEO.  So the college
4  itself has biblical teachings and standards that
5  they are -- they have created for themselves, but
6  in relation to PSEO, you have to teach standards as
7  they apply to the graduation standards for public
8  high schools.
9      Q.  Even if you have students coming from
10  private high schools?
11      A.  It has to provide dual credit.  Private
12  high schools, they have to attest that they are
13  taking courses that apply to graduation at that
14  private school.  If they are sectarian, they will
15  not be --
16      Q.  Who has to attest to that?
17      A.  The student and the postsecondary, I
18  believe.  That's through the NOSR, the Notice of
19  Student Registration.  And then there's -- any
20  private school student or homeschool student is
21  considered an alternative student and has to make
22  application to MDE of their intent to take PSEO
23  courses.
24      Q.  Okay.
25      A.  So they still have to be for dual credit.

21 (Pages 78 - 81)

Page 82

1     Q.  So going back to "intended to propagate or
2  promote religious beliefs."  A course that begins
3  with voluntary prayer, would that be intended to
4  propagate or promote religious beliefs?
5     A.  It would be considered sectarian.
6     Q.  Even if it's voluntary?
7     A.  It would be considered sectarian.
8     Q.  Is that -- if that's MDE's official
9  position, is that written down anywhere?
10     A.  It's in the statute.
11     Q.  Voluntary prayer is -- that is --
12     A.  PSEO public funding supports coursework
13  that is nonsectarian.  So if that's determined to
14  be sectarian, then that would not be eligible for
15  PSEO funding.  The course.
16     Q.  Any -- so any inclusion of prayer in a
17  course, voluntary or not, would make a course
18  sectarian?
19         MR. TIMMERMAN:  Objection.  Calls for a
20  legal conclusion.
21         You can answer.
22     A.  Any course that --
23     Q.  Under MDE's understanding.
24     A.  -- we deem sectarian would not be eligible
25  for funding for a PSEO course.

Page 83

1     Q.  And if a school -- if a course included
2  voluntary prayer, it would not be -- it would be
3  considered sectarian by MDE?
4     A.  Correct.
5     Q.  A syllabus that offers students
6  opportunities to send prayer requests to the
7  professor, the professor offers to pray for the
8  students, would that be intended to propagate or
9  promote religious beliefs?
10         MR. TIMMERMAN:  Objection.  Calls for
11  speculation.
12     A.  Correct.
13     Q.  Okay.  So (c) is "participate in religious
14  activities."
15         Does MDE have a definition of what it means
16  to participate in religious activities?
17     A.  Any activities that are focused on
18  religion.  This is the definition of -- MDE's
19  position on defining what would be considered
20  sectarian.
21     Q.  So a course -- again, a course that begins
22  with voluntary prayer would be requiring a student
23  to participate in religious activities?
24     A.  Correct.  It would be considered sectarian.
25     Q.  So MDE -- how does MDE decide what's an

Page 84

1  appropriate level of participation?  Any
2  participation at all?
3         MR. TIMMERMAN:  Objection.  Vague.
4  Calls for speculation.
5         You can answer.
6     A.  Participation in -- I'm unclear.
7     Q.  Participation in a religious activity.
8  What's an appropriate level of participation?
9     A.  Are you able to provide an example of what
10  you're --
11     Q.  So, I mean, it sounds like -- is there a
12  difference between a professor starting a class
13  with prayer and a student raising their hand and
14  saying, "I'd like to begin this class with prayer
15  really quick," and the professor allowing that?
16         MR. TIMMERMAN:  Objection.  Vague.
17  Calls for speculation.  You can answer if you know.
18     A.  So the teacher initiating prayer or
19  sanctioning a request for prayer would still be on
20  the institution, as it would be the professor that
21  is making the determination.  So that would be
22  considered secular and would not be fundable under
23  PSEO.
24     Q.  Under MDE's understanding of sectarian?
25     A.  Correct.

Page 85

1     Q.  So the professor's responsible for the
2  student volunteering to pray?
3         MR. TIMMERMAN:  Objection.
4  Mischaracterizes testimony.
5  BY MS. THOMSON:
6     Q.  Do you have an answer?
7     A.  You want to restate your question, please?
8     Q.  All right.  Did you say --
9         MS. THOMSON:  Yeah, could you repeat
10  the question?
11         (The requested portion was read back by
12         the court reporter:
13         "QUESTION:  So, I mean, it sounds like --
14         is there a difference between a professor
15         starting a class with prayer and a student
16         raising their hand and saying, "I'd like to
17         begin this class with prayer really quick,"
18         and the professor allowing that?")
19  BY MS. THOMSON:
20     Q.  I think I was saying:  So it's the
21  professor who's responsible for the student
22  volunteering to pray?  And I think before that -- I
23  think that was the question before that.
24         And what's your answer to that question?
25     A.  So if the institution, the professor, is

22 (Pages 82 - 85)

Page 86

1  allowing for prayer, that would classify it as
2  sectarian, correct.
3      Q.  Section (d), "to maintain affiliation with
4  a particular church or religious organizations."
5      Would that include signing a statement of
6  faith?
7      A.  It would depend on what was included in the
8  statement of faith, if it was particular to a
9  specific affiliation with a church or religion.
10     Q.  Okay.  And (e), "to attest to any
11  particular religious beliefs."
12     Does this require some kind of formal
13  attestation or any -- does it require a formal
14  attestation?
15     A.  Any required attestation to -- for a
16  student to agree or address their religious beliefs
17  at all.
18     Q.  Is it MDE's view that requiring students to
19  sign a statement of faith makes all of that -- that
20  course -- all of that institution's courses
21  sectarian?
22     A.  It is our position that if a program is
23  requiring that for admission for students that it
24  is not eligible for funding.
25     Q.  Even as the law currently stands?  Even --

Page 87

1  like, there's a -- are you aware that there's a
2  preliminary injunction in place preventing the
3  amendment from taking effect?
4      A.  Correct.
5      Q.  So --
6      A.  I am aware.
7      Q.  So even with that injunction in place, it's
8  your view -- it's MDE's view that requiring
9  students to sign a statement of faith makes the
10  school ineligible?
11     A.  That is our current position.  But with the
12  injunction, that will be determined, what MDE and
13  the State's position is, after the injunction is
14  lifted.
15     Q.  So does MDE have discretion to determine
16  what it means to be sectarian or nonsectarian?
17     A.  That is demonstrated in (4) --
18     Q.  Mm-hmm.
19     A.  -- that that is the criteria that we use to
20  determine if something is sectarian or nonsectarian
21  and available for public funding.
22     Q.  And it's -- you have discretion to
23  determine what those criteria -- what falls under
24  those criteria?
25     A.  MDE has provided these clarifications to

Page 88

1  determine what we look at to see if a course or a
2  program is sectarian or nonsectarian and therefore
3  fundable by public dollars.
4      Q.  So this form was in place before the
5  amendment was introduced?
6      A.  It appears so, yes.
7      Q.  And it's -- as far as you know, is it still
8  the form that would be used by an institution
9  applying right now?
10     A.  Under the injunction, yes, that would be
11  correct.  And it would contain -- it may look
12  different, but it contains the same information.
13     Q.  With the same criteria?
14     A.  Correct.
15     Q.  Do you know how many religious schools
16  provide PSEO courses?
17     A.  18 are approved.
18         (Clarification requested by the
19          court reporter.)
20     A.  18 as of the fiscal year '22.
21     Q.  Has MDE ever audited any of those schools
22  for compliance of these standards?
23     A.  In my experience, I do not know of any
24  audits that take place of individual programs to
25  determine if they're in compliance or not.  When we

Page 89

1  receive complaints, then we reach out for
2  clarification and provide guidance.
3      Q.  So we've looked at -- so this definition is
4  for eligibility of an institution.  Is that the
5  same definition for whether a course is
6  nonsectarian or sectarian?
7      A.  I would say largely it is the same.
8  However, you're talking about what is the course
9  named, what is the focus.  But it, again, tends to
10  be:  Is it a sectarian course or a nonsectarian
11  course?  Which is based pretty much on the same
12  criteria.
13     Q.  So a school wants to know how to prevent a
14  course from becoming sectarian and wants to comply
15  with MDE's requirements.  Where should it look for
16  the -- for the definition of a sectarian course?
17     A.  To these criteria.  The course is related
18  to curriculum, so if the curriculum can be framed
19  under any four of these -- and maybe not the
20  activities -- but maybe if it is promulgating a
21  particular belief for a religion or a point of
22  view, that would be considered sectarian.
23     Q.  So a school would have to go to the website
24  and look up the eligibility form to -- like, where
25  would it find these criteria?

23 (Pages 86 - 89)

1    A. It is in the PSEO handbook. We offer
2  professional development sessions that clarify --
3  where Beth Barsness and Jeanne Krile provide
4  clarification as to how we define sectarian related
5  to a course or to a program.
6    Q. Is there a --
7    A. It's in statute. Nonsectarian is in
8  statute. There are letters that have been sent in
9  clarification to institutions if we receive a
10  complaint. That's also a part of our standard
11  guidance.
12    Q. You mentioned the development courses. Is
13  that right? Did I say that right? Develop -- what
14  would -- what would MDE provide to the schools if
15  they were -- if Beth Barsness was going to help
16  them -- did you say development course?
17    A. No. We don't have anything to do with the
18  development of courses. The application that they
19  submit has to have a listing of courses already.
20  So perhaps she's doing a PD for an institution that
21  is considering applying, and she would clarify,
22  pretty much along these same lines, what would be
23  considered a sectarian course versus a nonsectarian
24  course.
25    Q. So what's a PD?

1    A. Oh, professional development. I apologize.
2    Q. Professional development. Okay. That's
3  what I was looking for.
4    A. Sorry.
5    Q. So she would do a professional development?
6    A. She and Jeanne will typically do it
7  together and they will define the terms because
8  postsecondaries go through Jeanne for payment.
9    Q. And that would be -- does that happen
10  anytime a school becomes eligible or only if the
11  school requests it?
12    A. A professional development?
13    Q. Mm-hmm.
14    A. They offer professional development that
15  institutions can voluntarily join. They can be --
16  if we receive a complaint, we say, "Hey, this
17  training is coming up. It would be good for you to
18  attend it." And they can independently register
19  off the calendar on MDE.
20    Q. Would those professional development
21  trainings have written materials provided to the
22  schools?
23    A. Some of them do. Some of them you -- they
24  record the webinar so that you can view it again.
25  Some of them have written materials. Some of them

1  show -- most of them show where on the website you
2  can find the information.
3    Q. Would there be written materials that Beth
4  and Jeanne would teach from that they would have
5  prepared before the training?
6    A. Typically from slides, PowerPoint slides
7  sometimes. It's changed as technology has changed.
8    Q. Did you review any of those -- any of those
9  written materials in preparation for this
10  deposition?
11    A. I did see some.
12    Q. Did you provide them to your counsel for
13  production of documents?
14    A. They were part of the upload.
15    Q. Okay. Let's look at the next exhibit.
16    (Exhibit 9 was marked for
17    identification.)
18    Q. Are you familiar with this -- are you
19  familiar with the form on the last page of this
20  document?
21    A. Correct. Yes, I am.
22    Q. Is it a -- what is it?
23    A. It was a statement of assurance of
24  nonsectarian courses for the '22/'23 academic year.
25    Q. Who created this form?

1    A. I believe it was created by Paula Palmer in
2  partnership with Tom Melcher.
3    Q. Paula Palmer was your predecessor in this
4  role?
5    A. Correct.
6    Q. And who is Tom Melcher?
7    A. Tom Melcher was a finance director two or
8  three ago. And I believe that was his role. He
9  wasn't there very long after I got there, so --
10  he's related to finance.
11    Q. When was this form created?
12    A. I would -- I'm guessing about 2016, in
13  response to some repeated complaints.
14    Q. Okay. So in the form, the school certifies
15  that its courses are nonsectarian, and it says,
16  "These courses are not," and it lists -- has three
17  bullet points. Was this definition created by
18  Paula Palmer and Tom Melcher?
19    A. That, I'm not aware of.
20    Q. You don't know how this definition was
21  developed, these bullet points were developed?
22    A. It may have been in consultation with MDE
23  counsel at the time. I do not know the process
24  that these were created.
25    Q. What was in use before this?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    A.  Before the assurances?

2    Q.  Before 2016.

3    A.  Other than the applications that were

4  received from the postsecondaries with the same

5  assurance, I don't believe any -- there was not a

6  statement of assurance.

7    Q.  Eligibility applications?

8    A.  So eligibility applications, correct.

9    Q.  Is this form considered regulation or

10  guidance?

11       MR. TIMMERMAN: Objection. Vague.

12  Calls for a legal conclusion.

13       You can answer if you know.

14    A.  It was -- my understanding was that it was

15  done in response to remind private institutions

16  that were providing PSEO that this is the

17  definition of nonsectarian, and getting them to

18  acknowledge it annually, I believe, so that there

19  was a record that they were made aware that this is

20  what's considered sectarian and is not fundable for

21  public dollars.

22    Q.  So is this the binding definition of

23  nonsectarian or is it the one that we looked at in

24  the last document?

25    A.  I would say that the previous definition

1  relates to this definition when it comes to

2  curriculum and a course. So I feel that they're

3  one in the same but that they're defined

4  differently related to a specific course.

5    Q.  So does this definition include required

6  participation in religious activities?

7       MR. TIMMERMAN: Objection. The

8  document speaks for itself.

9       You can answer.

10    A.  Anything intended to propagate or promote

11  any one religious belief or viewpoint. So

12  anything. So that would include activities within

13  a course, yes.

14    Q.  So it's MDE's position that requiring

15  students to participate in a religious activity

16  falls under "intended to propagate or promote any

17  one religious belief or viewpoint"?

18    A.  Related to the activities of a course.

19    Q.  Related to the activities of a course. So

20  that's spelled out in the eligibility form but not

21  in this form?

22    A.  The eligibility form is related to program,

23  and these are speaking specifically to courses.

24    Q.  So is there a different requirement for

25  courses in the program -- in the broad program?

1    A.  I'm not sure I understand what you're

2  asking.

3    Q.  So the eligibility form we looked at,

4  that's relating to the program, not to specific

5  courses?

6    A.  I would state that this is a more specific

7  way to address courses, nonsectarian courses, and

8  then a program that would require any engagement or

9  requirement laid out here. So, yes, I would say an

10  institutional eligibility would be related to

11  program and courses, and this is specific to

12  courses.

13    Q.  So just for the reporter, when you say,

14  "This is specific to courses," you mean --

15    A.  I'm sorry. Institutional Eligibility Form

16  is addressing an institution cannot require

17  students within that program (a), (b), (c), (d), or

18  (e).

19       The Eligible Courses for Postsecondary

20  Enrollment is specific to what that sectarian

21  approach would be for a specific course.

22    Q.  And it's MDE's position that requiring

23  that -- a voluntary prayer at the beginning of

24  class would fall under "intended to propagate or

25  promote any one religious belief or viewpoint"?

1    A.  Correct.

2    Q.  And would be requiring a student to

3  participate in a religious activity?

4       MR. TIMMERMAN: Objection. Asked and

5  answered.

6    A.  Correct.

7    Q.  Okay. Does this go -- does this form go to

8  schools -- to PSEO schools every year?

9    A.  We stopped sending the assurances

10  statement. So this would have been the first

11  school year, the '23/'24 school year, we did not

12  send it out.

13    Q.  Why not?

14    A.  We continued to receive complaints even

15  though these had been acknowledged and virtually

16  signed. And so the utility of doing it, it was

17  just an exercise and additional work for our staff

18  because the complaints persisted.

19    Q.  What was the nature of the complaints you

20  received after the -- after these forms were filed,

21  these forms started?

22    A.  We received, again, verbal, telephone,

23  email sent to various points of contacts within MDE

24  of prayer and references in courses, discomfort. A

25  teacher from one of the schools called and shared

Page 98

1    their concern, after they resigned, about what was
2    being required and requested of students and that
3    they believed that to be highly sectarian.
4        Q.  So while this form was in place between
5    2016 and 2023 -- or 2022 academic year, did it go
6    out every year?
7        A.  My understanding is that it did, yes.
8        Q.  Which schools received this form?
9        A.  I don't know.  I would have to get
10   clarification.  It may have gone out to every
11   single one of them.
12       Q.  Okay.  The Merriam-Webster definition at
13   the top of the form, do you know how that came to
14   be part of the form?
15       A.  I do not.  I had not seen it before the
16   form was created.
17       Q.  Do you know why it would be in there?
18       A.  As a definition of nonsectarian.
19       Q.  Is that a binding definition?
20           MR. TIMMERMAN:  Objection.  Calls for a
21   legal conclusion.  Vague.
22           You can answer if you know.
23       A.  It's identifying Merriam-Webster as an
24   agreed-upon source of defining nonsectarian, I
25   believe.

Page 99

1        Q.  So as far as you're aware, this form was in
2    place from 2016 to 2022.  You're not aware of any
3    changes to the form during that time?
4        A.  Approximately 2016.  I know the issue came
5    up in 2016, and I believe that it stayed -- while
6    it may look different, it contained the same
7    information.
8        Q.  Okay.
9            MS. THOMSON:  Would you like to take a
10   lunch break?
11           MR. TIMMERMAN:  Sure.  How long would
12   you like?  Until 1:00?
13           MS. THOMSON:  Yeah.
14           (Break:  12:17 p.m. to 1:06 p.m.)
15   BY MS. THOMSON:
16       Q.  We'll start with the next document.
17           (Exhibit 10 was marked for
18                identification.)
19       A.  (Reviewing document.)
20       Q.  You've had a chance to review?
21       A.  Yeah.
22       Q.  Are you familiar with this document?
23       A.  I have seen it, yes.
24       Q.  What is it?
25       A.  It appears to be the Department inquiring

Page 100

1    further about a complaint that it received.
2        Q.  Who is Karen Johnson?
3        A.  So the positions weren't configured the
4    same in 2008.  So I believe Karen Johnson was in
5    partnership with Carol Hokenson addressing the
6    issues around PSEO implementation.  That's my
7    understanding.
8        Q.  So she would have been the PSEO
9    program's -- like, a similar role to Beth Barsness
10   or similar level?
11       A.  That is not clear to me.  It appears that
12   Carol and Karen kind of worked on things together,
13   but they didn't have, like, a specific -- Sharon
14   Peck would have been finance specifically.
15       Q.  Okay.
16       A.  And this is per Beth and Jeanne.
17       Q.  So Karen Johnson had a PSEO role --
18       A.  Yes.
19       Q.  -- at that time?
20           And who -- did you say who -- who did you
21   say she would've worked with?
22       A.  Beth Barsness and Jeanne Krile.  Preceded
23   them, but they had heard of her.
24       Q.  Okay.  And who did you say she was working
25   with at the time?  Did you know?

Page 101

1        A.  Karen Johnson?
2        Q.  Yeah.  Did you give me another name?
3        A.  Yeah, Carol Hokenson.
4        Q.  Carol Hokenson.
5        A.  Who's also on the email.
6        Q.  Okay.  So they would've both been PSEO, had
7    PSEO roles?
8        A.  Part of their job would've been PSEO.
9        Q.  Okay.  What about Morgan Brown?
10       A.  Nobody knew who that was.
11       Q.  Okay.  And Julie Henderson?
12       A.  Again, no certainty.
13       Q.  Okay.  Could you look at the -- on the
14   second-to-last page of this document, it's the
15   original email, second paragraph, that starts with
16   "It appears..."
17       A.  Mm-hmm.
18       Q.  "It appears that very few of the courses
19   they" -- referring to Northwestern -- "are offering
20   to PSEO students meet the nonsectarian definition
21   since their curriculum follows a biblical
22   worldview."
23           Is that correct?  Did I read that
24   correctly?
25       A.  That is what it says, yes.

1    Q.  Would you agree with that statement that
2  Karen is making?
3         MR. TIMMERMAN:  Objection.  Calls for
4  speculation.
5    A.  I've not seen the courses, so I don't know
6  if her assessment was accurate or not.  I presumed.
7    Q.  So the statement that their courses are not
8  nonsectarian since they follow a biblical
9  worldview, does that reflect MDE's current
10  position?
11    A.  Regarding what specifically?
12    Q.  Regarding whether a curriculum following a
13  biblical worldview would be beneath a nonsectarian
14  definition.
15    A.  We would have questions of whether it did.
16  It's pretty general.  It's a general statement.  So
17  we would, again, talk with the postsecondary
18  institution to find out:  What does that look like
19  in practice?
20    Q.  Does it appear that Karen had done that
21  here?
22    A.  It appears that there was some conversation
23  and they were going to be having a conversation at
24  2:00 p.m. at MDE, so...
25    Q.  So you can't say --

1    A.  I'm guessing they were taking the same tack
2  that we would if we had questions.
3    Q.  And she described the -- she described the
4  problem as a biblical worldview?
5         MR. TIMMERMAN:  Objection.  The
6  document speaks for itself.  Mischaracterizes what
7  the document says.
8         But you can answer.
9    A.  If that's what they assessed at the time,
10  then I have nothing to counter that.
11    Q.  Can you look at the last paragraph on that
12  page that says, "My recommendation..."  "My
13  recommendation would be that a review of all
14  private colleges on the eligible list per their
15  course catalogs and websites (perhaps also student
16  interviews) and a letter be issued from the
17  commissioner's office (or upper administration)
18  requesting compliance with the nonsectarian
19  requirement of PSEO."
20         Was that review done in 2008?
21    A.  I don't believe so.
22    Q.  Was it done at any time?
23    A.  Not that I'm aware of.
24    Q.  Why not?
25    A.  I wouldn't know.  Likely capacity.  I

1  wouldn't have the context to know why that didn't
2  occur.  And they may have done some portion.  I
3  haven't seen records that any of what she lists as
4  a path forward was executed.  I haven't seen that.
5    Q.  On the very last page, she says, "The
6  reason I believe we should have a tentative plan
7  for review in place is that Northwestern may
8  believe they've been unfairly singled out."
9         Do you know if there's any other way that
10  that concern would have been addressed?
11    A.  Northwestern's concern that they had been
12  singled out?
13    Q.  Yes.
14    A.  I'm not aware of that concern at this time
15  or how it was addressed.  Our response would be we
16  are addressing a complaint that we received about
17  your specific program, and so the questions come
18  specifically to you to clarify.
19    Q.  Okay.  Let's look at the next document.
20         (Exhibit 11 was marked for
21         identification.)
22    Q.  So I'm looking at 1429.
23    A.  Yeah.  Okay.
24    Q.  Are you familiar with this document?
25    A.  I've seen it, yes.

1    Q.  Is it a memo from MDE to participating PSEO
2  institutions?
3    A.  That is what it appears to be, yes.
4    Q.  Okay.  And it says -- at the top of 1429 it
5  says, "To meet the intent of the statute, in 2008,
6  MDE developed a policy clarifying the definition of
7  'nonsectarian' as it pertains to PSEO."
8         Is that correct?
9    A.  Yes.  That's how I read it.
10    Q.  Does this definition reflect the current
11  definition?
12    A.  This continues -- yes, the same language
13  continues to be used.
14    Q.  Why is this not the language that's used on
15  the form that the schools sign?
16         MR. TIMMERMAN:  Objection.  Vague.
17    A.  On the assurances form?
18    Q.  Mm-hmm.  Yes.
19    A.  I guess I'm unclear on what you're asking,
20  because I see this same point related to the
21  course.  This addresses only the courses, the
22  assurances.  And I see that -- unless I'm looking
23  at it -- it kind of goes back and forth what it
24  seems to be...
25         MR. TIMMERMAN:  Would you like her to

27 (Pages 102 - 105)

1  repeat the question?
2  BY MS. THOMSON:
3    Q.  Oh.  Why is there a difference between
4  what's on the --
5    A.  No, I'm sorry.  I was asking:  What is the
6  difference?  I don't see it.
7    Q.  Okay.  So the form -- this includes (a),
8  (b), (c), and then 1, 2, 3, 4, 5.  And that's the
9  memo that went out in 2013.
10   A.  So this, to me, is including the program as
11  well.  This is specific to the courses, which are
12  included within this statement.  I can't tell you
13  why they're different.  MDE strives to have plain
14  language so that -- especially when we have
15  questions coming from the community and
16  disagreement about statute language, we work with
17  communications to make it clear.  So that would be
18  my guess.
19       This related to courses is more clear to
20  me, but I like this visually better.  So this is --
21  this looks like it's a restatement of policy.
22   Q.  Do you think it might -- could a school be
23  confused in looking at the assurance form and not
24  seeing the "requires a student to" -- the language
25  that they're not allowed to require a student to

1  participate in a religious activity, about what it
2  means to provide a course that does not require --
3  that is not -- that does not propagate a
4  religious -- set of religious beliefs?
5       MR. TIMMERMAN:  Objection.  Vague.
6  Calls for speculation.
7       And I'm not clear what you're asking.
8    Q.  This definition from this 2013 memo is the
9  same as the definition from the eligibility form;
10  is that correct?  And -- go ahead.
11   A.  It appears primarily the same.  The
12  formatting is still awkward, but...
13   Q.  So this memo says the definition of
14  nonsectarian is what's on the eligibility form, or
15  at least substantially the same?
16       MR. TIMMERMAN:  And just to clarify,
17  when you say "eligibility form," you're referencing
18  Exhibit 8, correct?
19       MS. THOMSON:  Yes.
20   A.  So this is the application -- yes.  So this
21  is the application to provide PSEO programming at
22  your institution.  This one is for the courses that
23  are offered for PSEO.  And this one does seem to
24  jibe more with the program but also seems to
25  include some of the courses.

1       And so I'm -- I assume it's their
2  attempt -- and I don't know; I didn't craft it --
3  to create clarity.  Whether they were successful at
4  that, but I think the spirit of the language is
5  exactly the same.
6    Q.  The paragraph that says, "Periodically..."
7  the last paragraph of this memo.  It says,
8  "Periodically, the Minnesota Department of
9  Education is requested to review PSEO course
10  syllabi and/or institutional course catalogs in an
11  effort to verify whether courses submitted for
12  state reimbursement align with PSEO law."
13       Has that -- when that request happens, does
14  MDE review those syllabi or course catalogs?
15   A.  I believe the "periodically" references
16  when we receive a concern from a constituent.  We
17  do not have a scheduled review.
18   Q.  So the next sentence says, "We ask that you
19  review the content of courses you currently offer
20  to Minnesota high school students as part of your
21  postsecondary enrollment option program to ensure
22  they do meet the above criteria."
23       Does MDE always rely on the schools to
24  review their own courses --
25   A.  The --

1    Q.  -- unless there's a complaint?
2    A.  The schools apply to offer PSEO and
3  generate public funding for a PSEO course offered
4  to a student, having agreed to what -- that
5  nonsectarian courses -- sectarian courses cannot be
6  offered.  If at some point they change that, then
7  it is up to them to review and determine whether or
8  not they are still in alignment with what the law
9  and the original approval dictated, expected.  Yes.
10   Q.  So the only time you would review course
11  content like that is if there was a complaint?
12   A.  Unless dictated to us from higher
13  leadership, yes, the only time that we would review
14  would be when we receive a complaint, because that
15  is the capacity that exists.
16   Q.  Okay.
17   A.  Currently, I should add.
18       (Exhibit 12 was marked for
19        identification.)
20   Q.  Take a look at this document and let me
21  know if you're familiar with it.
22   A.  I'm very familiar with it, yes.
23   Q.  Okay.  I'm looking at page 7 of this
24  document, 1541.  So this is a PSEO reference guide
25  from 2021; is that right?

1    A.   That appears to be correct.
2    Q.   Is that the document you referred to before
3  when you said schools could look here for guidance
4  on their PSEO programs?
5    A.   This is a guide, yes, that they can
6  reference.
7    Q.   Can you look at the definition of
8  nonsectarian on this page and tell me what it says?
9    A.   "Not affiliated with or restricted to a
10  particular religious group."
11    Q.   What does that mean?
12    A.   So I think it does not include sect but
13  that it does not take -- it does not present
14  information through a specific religious viewpoint.
15    Q.   Okay.  Is this definition binding on PSEO
16  schools?
17         MR. TIMMERMAN:  Objection.  Calls for a
18  legal conclusion.  Vague.
19         You can answer if you know.
20    A.   It seems affiliated with the previous
21  definitions.  I don't know why it was restated this
22  way.
23    Q.   Are you aware that Crown College is -- has
24  a religious affiliation with the Christian
25  Missionary Alliance church?

1    A.   I did.
2    Q.   Are you aware that Crown has a statement of
3  faith from that church?
4    A.   I've heard that, yes.  We've had
5  conversations.
6    Q.   You and your colleagues?
7    A.   Probably government relations.
8    Q.   Adosh or anyone else?
9    A.   I'm not sure if Adosh was there when that
10  conversation was had.  He had left MDE for a while,
11  and I can't remember -- it was someone else that
12  was there in the interim.
13    Q.   So you discussed Crown's religious
14  affiliation before your current role?
15    A.   As a supervisor I was informed by Crown of
16  their religious affiliation when I sat in a meeting
17  with government relations after a complaint.
18    Q.   Okay.  Do you know what year that would
19  have been?
20    A.   It would have had to have been 2020.  It
21  was right -- it was COVID.  So it was '20 or -- it
22  was probably '20.
23    Q.   So it happened over --
24    A.   But it was before I was reassigned, yes.
25    Q.   It happened remotely?  Okay.

1         Do courses taught in alignment -- that are
2  taught in alignment with Crown's statement of faith
3  constitute courses affiliated with a particular
4  religious group under this definition?
5         MR. TIMMERMAN:  Objection.  Vague.
6  Calls for speculation.
7         You can answer if you know.
8    A.   If a course is sectarian, it is affiliated
9  with their worldview.  So whether they have an
10  affiliation with a church, for PSEO that
11  affiliation, if it exists, then is not fundable as
12  a PSEO course by MDE.  So they can have as many
13  affiliated courses as they want.  It wouldn't meet
14  the nonsectarian of reimbursement from MDE for a
15  PSEO course.
16    Q.   So they could not teach their PSEO courses
17  in alignment with the CMA church?
18         MR. TIMMERMAN:  Objection.  Calls for
19  speculation.
20         You can answer if you know.
21    A.   If we determined that they were -- that
22  this affiliation impacted how they delivered PSEO
23  courses, they would not -- they would be determined
24  to be sectarian and not fundable.
25    Q.   Okay.  Let's look at page 15 of this

1  document.  I'm sorry.  17.  Okay.  Could you read
2  the first two sentences of the third paragraph from
3  the bottom?
4    A.   That starts "Postsecondary institutions
5  determine..."?
6    Q.   Yes.  "...admission" --
7    A.   "...determine admission standards to
8  participate in specific PSEO programs and courses."
9    Q.   Okay.  Does MDE ever review schools'
10  admission standards?
11    A.   If we receive a complaint or are directed
12  to do so.
13    Q.   So you yourself would never go out of your
14  way to review schools' admission standards unless
15  you received a complaint?
16    A.   No, I believe what I said is unless there
17  was a directive to do so from the commissioner, for
18  example.
19    Q.   Have you ever received a directive like
20  that from the commissioner to review admissions
21  standards?
22    A.   Not in my experience.
23    Q.   Do you know if there ever has been one?
24    A.   I've never seen a directive.
25    Q.   Okay.  We'll go to the next document.

Page 114

1      (Exhibit 13 was marked for
2      identification.)
3      Q.  When you've had a chance to review, just
4  let me know.
5      A.  (Reviewing document.)  Okay.  Well, I have
6  seen the letter.  This is --
7      Q.  It's small.
8      A.  It is beyond my ability to read it.
9      Q.  You've reviewed this before?
10      A.  I have -- I've seen the emails.  I have not
11  seen the screenshots.
12      Q.  What is this document?
13      A.  This appears to be a response to a parent
14  who emailed the commissioner, whose home district
15  appears to be Red Wing High School -- or Red Wing
16  School Direct, with concerns about an econ class
17  and screenshots of examples.  So this must have
18  been a virtual online course primarily.
19      Q.  Is there anything you see here that would
20  violate MDE policies?
21          MR. TIMMERMAN:  Objection.  Vague.
22      Feel free to take your time and review it.
23      A.  I mean, as well as I can see it, yes, there
24  would be some concerns about sectarian approaches
25  to the course.

Page 115

1      Q.  Okay.
2      A.  Having a virtual prayer room.  Referencing
3  the Bible as a context for examining poverty, I
4  guess, in an econ class, which includes -- oh,
5  that's the extra credit option where they can read
6  through the Old Testament, I guess, and the New
7  Testament.  And then a reflection activity that
8  also includes Bible verses.  That is what I can
9  see.
10      Q.  Okay.  So including a prayer room -- so it
11  looks like this professor included a prayer room
12  and wrote, "Please know that as we go throughout
13  the semester, I will be praying for each of you by
14  name.  If you have a specific prayer request you
15  would like to share with the class, feel free to
16  share them here.  Or if you rather it just be
17  between you and I, feel free to email me your
18  prayer request and I would be honored to pray for
19  you in that specific way throughout the semester."
20          Is that -- as best as you can tell, is that
21  what that says?
22      A.  I will take your word for it.  I cannot
23  read it.  It is just too small.  Sorry.
24      Q.  Does that --
25      A.  It looks about right from the words that I

Page 116

1  can pick out randomly.
2      Q.  Is that a requirement for students to pray?
3      A.  That is a direction from the person from
4  the institution that is implementing the course
5  that includes a sectarian -- yes, it's
6  approaching -- it's not nonsectarian.  It is
7  sectarian if it is driven by the instructor of the
8  course.
9      Q.  What makes it sectarian?  What part of the
10  definition does it violate?
11      A.  The encouragement to pray.
12      Q.  Okay.
13      A.  And pray for others.  And repeated options
14  to engage in praying.
15      Q.  Okay.  So you said an extra credit option
16  allowing students to read verses from the Bible
17  would be considered sectarian?
18      A.  Yes.
19      Q.  Do you know how this complaint was
20  resolved?
21      A.  I do not.
22      Q.  So you don't know if anyone reached out to
23  Northwestern about this?
24      A.  I see that they involved Tom Melcher, which
25  would have been around the finance piece, and Paula

Page 117

1  Palmer, who was the director at the time.  But I do
2  not know the specific resolution to this complaint.
3      Q.  Did you discuss this complaint with anyone
4  in preparation for this deposition?
5      A.  This complaint did not come up, no.
6      Q.  But you had seen it before?
7      A.  I had seen the emails from Tom Melcher and
8  the letter from the parent -- or from Red Wing,
9  from the superintendent.
10      Q.  In preparation for this deposition or
11  before that?
12      A.  I may have seen it before.
13      Q.  How would it have come across your desk
14  before?
15      A.  Reviewing complaints about -- historical
16  complaints related to any sectarian requirements.
17      Q.  And that's part of your role outside of
18  preparing for this deposition?
19      A.  We would have looked at it, yes, outside of
20  the role -- I mean, for -- I believe I also saw
21  this in -- at least the emails in preparation for
22  the deposition.  But I've seen this before.
23      Q.  Would you have ever talked to --
24      A.  But not in real time.  It would be
25  obviously much later.

30 (Pages 114 - 117)

Page 118

1    Q.  Would you have ever talked to Tom or Paula
2  or anyone else on this -- on this list about this
3  complaint?
4    A.  No.  None of the original -- no, none of
5  the original people.
6    Q.  Including Jeanne?
7    A.  Jeanne?  Yeah, I don't believe that we ever
8  spoke about it.  It was a program review.
9    Q.  So you don't know if anyone responded to
10  the superintendent?
11    A.  I do not.
12    Q.  Would that response be in MDE's records?
13    A.  I don't know how it was responded to, so I
14  wouldn't know if it is or isn't.  It could have
15  been the commissioner calling the superintendent
16  back.  I don't know what the -- like, how they
17  responded.  They may have responded.
18    Q.  Is there anyone who would know that?
19    A.  I don't know.
20    Q.  Would course -- so what would be the
21  response today to a complaint like this?
22    A.  We would reach out to -- this is
23  Northwestern -- to share with them what had been
24  shared by the district superintendent.  We may
25  follow up with the parent who filed the complaint

Page 119

1  with the district, as well as the student, to get
2  more information.  And then we would contact
3  Northwestern to say, "We received a complaint.  Can
4  you provide more context?  We have information, it
5  appears, in the screenshots included that this
6  appears to have a sectarian focus."  And we would
7  await their response and probably have a few more
8  conversations.
9    Q.  And if they confirmed that the screenshots
10  were correct, that they're -- you know, if they
11  confirm that the screenshots were presented in an
12  online course, would that mean -- would the
13  response be to not fund the course?
14    A.  Correct.  We would provide guidance to
15  change the course so that it meets the nonsectarian
16  requirement, and then we would work with student
17  accounting to determine how many -- or finance.  It
18  depends on where the student is.  So if -- to
19  determine how many students had been in this
20  course.  And then they would be likely not funded
21  when the invoices were presented by Northwestern.
22    Q.  At this point in this -- assuming that this
23  had already been presented to students, would it be
24  too late to correct the course for that semester?
25    A.  Correct.

Page 120

1    Q.  Would the -- what would the guidance to
2  Northwestern be to correct the sectarian elements?
3    A.  To make them nonsectarian.
4    Q.  So would they be instructed to remove all
5  references to the Bible?
6    A.  Correct.
7    Q.  And all references to prayer?
8    A.  Correct.  For it to be funded by MDE.
9    Q.  Would MDE ever have cause to audit a school
10  if it received complaints that it was violating the
11  nonsectarian requirement?
12    A.  Yes.  The commissioner could, in
13  consultation with legal, we could -- we would call
14  it a desk review, so it's not necessarily an audit,
15  where we could review the syllabus for courses that
16  we had questions.  Or in this case it's called an
17  economics class, and maybe we have questions or
18  maybe we audit all the classes.
19      So MDE can determine that that's a course
20  of action, but that's not an individual -- that
21  course of action is not something that's
22  individually determined by the program specialist
23  or by the supervisor or by the director or any --
24  like, that is a collaborative decision that's
25  reached, and usually in consultation with the

Page 121

1  governor and his team as well.  So...
2    Q.  What would prompt an audit in the normal
3  course of things?
4    A.  Repeated complaints and -- repeated
5  complaints.  And it would be -- you know, it would
6  be one or the other.  Either we would just continue
7  to audit when invoices were submitted for courses
8  to ensure that they're nonsectarian and then not
9  pay the invoice, or the decision could be, again,
10  by those much above us that we want to audit the
11  entire program.
12    Q.  Would that happen for requirements other
13  than the nonsectarian requirement for other MDE
14  policies?
15    A.  Oh, that could be for any institution that
16  is offering PSEO.
17    Q.  Are you aware of audits for issues other
18  than religious content of courses?
19    A.  I'm -- I'm not aware of audits even for
20  religious purposes, so I'm not sure of any
21  full-blown audit that's ever occurred.
22    Q.  So you're not aware of an audit for the
23  nonsectarian requirement either?
24    A.  I've not aware of any audits related to
25  PSEO.  It doesn't mean they don't exist or they

Page 122

1  didn't occur at some point, but I'm not aware of
2  them.
3      Q.  If an audit did -- were to happen, would
4  you have a role in it?  What would be your role?
5      A.  My role would be to collaborate with our
6  divisional team, because the lift that an audit --
7  and I would collaborate with finance.  So that
8  would be a heavy lift for us, because we have one
9  person who's dedicated to PSEO overall, dual credit
10  overall.
11      So that would be working with the agency to
12  ensure that we have the staffing and the resources
13  needed to do a full-scale audit, which may also
14  include -- which would have to include finance and
15  may be led by finance, as finance is the one who
16  pays for the -- works with postsecondaries and pays
17  for the courses.
18      Q.  Outside of the complaint process, would you
19  ever review the content of a course?
20      A.  Outside of a complaint?  Yes, if directed
21  to by someone above me.
22      Q.  Has that happened?
23      A.  No.
24      Q.  You said that in this -- if -- in this
25  instance, the consequence would be to not pay for

Page 123

1  the -- not reimburse the school for the course?
2      A.  That would be an option, yes.
3      Q.  Are you aware of that having ever happened
4  because of the sectarian content of a course?
5      A.  Yes.
6      Q.  Are you -- do you know which schools that
7  would have happened to?
8      A.  No.  We had one last year that was related
9  to Hennepin Technical College.
10      Q.  Because of sectarian content?
11      A.  They were partnering with Maranatha.  And
12  it wasn't actually a course that was eligible for
13  PSEO reimbursement, but that's my most recent
14  memory.  And, again, that's finance.  Finance
15  usually makes the determining consultation with
16  program.  Does this appear to be -- program does
17  the digging or reaches out to the high school or
18  often gets the complaint.  So it's a partnership
19  between PSEO finance and PSEO program.
20      Q.  Is Maranatha a Christian high school?
21      A.  Correct.  A private high school, yep.
22  Maybe -- it may be K-12.
23      Q.  So outside of the complaints it's received,
24  MDE has never investigated Crown or Northwestern
25  for compliance with the nonsectarian requirement?

Page 124

1      A.  Well, we have when we've received
2  complaints.  So what you're describing as a
3  full-out audit, that has not occurred with either
4  institution.
5      Q.  Okay.  You said last year you denied
6  funding for a course.  Are you aware of other
7  instances of that happening?
8      A.  Over the years I've been at MDE, yes.  But,
9  again, we don't -- we're -- MDE has, yes, for all
10  kinds of different reasons that -- and it's mostly
11  around eligibility.  So if the course is found not
12  to be eligible for funding, the student was not
13  eligible to take the PSEO course, those are usually
14  the two primary reasons why funding does not occur.
15      Q.  Have you yourself ever seen a syllabus from
16  a Crown College course?
17      A.  I have not.
18      Q.  Northwestern?
19      A.  I have not.
20      Q.  If you had received multiple complaints and
21  you wanted to review courses that were being
22  provided by a specific school, how would you go
23  about doing that?  Would it be through the audit
24  process or would -- or is there another process?
25      A.  So if we received -- let me just -- I want

Page 125

1  to check my understanding.  So if we received a
2  complaint similar to this, how would we go about
3  reviewing the syllabus?  It would be through a
4  conversation with the institution to say, "Could
5  you" -- well, it would probably be in written form
6  and verbal form.  "We're going to send you a
7  request.  Please send over the syllabus.  Please
8  send over related printed items tied to the
9  course."
10      We would rarely get into the curriculum,
11  but we could ask for an outline of the curriculum.
12  We could ask for the curriculum.  We would just ask
13  for it.
14      Q.  And you wouldn't have access to it unless
15  you asked for it?
16      A.  Correct.  Unless it's provided, as in this
17  case, by a complaint.  Someone who's filing the
18  complaint who has the materials, they would provide
19  it to us.  We have that happen often.
20      Q.  And then you would take it to the school?
21      A.  It would be a conversation with the school,
22  correct.
23      Q.  Does MDE have access to student records at
24  private schools that provide PSEO?
25      A.  We don't have access to records of any

1 student who participates in any postsecondary
2 institution other than what the school district
3 where the student is enrolled provides through
4 MARSS, which is our student information system.
5    Q. And I think I've seen that somewhere.
6 M-A-R- --
7    A. M-A-R-S-S, Minnesota -- I don't know. I
8 would fail and butcher it. I just say MARSS. It
9 is very long.
10    Q. So it's the public school districts that
11 provide you any data that you have?
12    A. Until the postsecondary invoices MDE for
13 the PSEO course they offered, that is the
14 information that we have access to.
15    Q. And what information does the invoice
16 contain when you receive an invoice from a PSEO
17 school?
18    A. It lists the student, the course that the
19 student took, and which semester that the student
20 took the course.
21    Q. So you do have student names from the
22 invoices?
23    A. Yes.
24    Q. Okay.
25    A. It's a secure file that's uploaded to

1 finance, yes.
2    Q. So if you wanted to pull data about
3 students participating in PSEO, you would have --
4 would you refer to the invoices or would you refer
5 to MARSS, or both?
6    A. So there is a special report that's built
7 that records -- that marries some of that
8 information so that in the rigorous course-taking
9 report we identify overall, not individual students
10 but overall, some demographic indicators for all
11 students taking PSEO. But we do not do that at the
12 granular postsecondary level.
13    Q. Okay.
14      (Exhibit 14 was marked for
15      identification.)
16    A. (Reviewing document.)
17    Q. You've had a chance to review?
18    A. Yes, ma'am.
19    Q. Have you reviewed this before?
20    A. I've seen this before, yes.
21    Q. This email and the attachment?
22    A. I have not seen the email. I've seen the
23 screenshot of the --
24    Q. Okay.
25    A. -- University of Northwestern.

1    Q. This is from -- this email is from 2017?
2    A. I don't know. Oh, the email? Yes.
3    Q. About Christ-centered language on
4 Northwestern's website?
5    A. I see that, yes.
6    Q. Okay. Would you have been at MDE at this
7 time?
8    A. No.
9    Q. Okay. Do you see the religious language on
10 the printout?
11    A. Yes.
12    Q. It says, "Christ-centered. All of our
13 professors have a foundation of faith and teach
14 from a biblical worldview."
15      Did I read that correctly?
16    A. Yes. That's how I read it.
17    Q. So since 2017, MDE knew that Northwestern
18 professors taught their PSEO classes from a
19 biblical worldview?
20      MR. TIMMERMAN: Objection. Calls for
21 speculation.
22      You can answer if you know.
23    A. I do not know.
24    Q. Could you just -- so this is an email from
25 Jeanne Krile to Mary Barrie and Sharon Peck. Those

1 are all MDE employees, right?
2    A. Correct.
3    Q. Okay. And the email says, "In the event
4 you get comments, the attachment shows Northwestern
5 College and their recent PSEO website updates. I
6 had a phone message from an unknown number pointing
7 out the 'Christ-centered' language on the PSEO web
8 page."
9      Is that correct?
10    A. That is what it says.
11    Q. Did MDE take any action against
12 Northwestern for this at the time?
13    A. I do not know.
14    Q. Has Northwestern -- was Northwestern a part
15 of the PSEO program in 2017?
16    A. To my knowledge it was, yes.
17    Q. And it has continued to be since then?
18    A. That is correct. To my understanding.
19    Q. So you don't know if Mary or Jeanne
20 believed that this language violated MDE policies
21 in 2017?
22    A. So it's not violating MDE policy. It would
23 be considered sectarian. And so, again, knowing
24 Mary, and Beth was there as well, I would presume
25 they would reach out and have a conversation about

1  it. Do I know the outcome of that conversation --
2  likely conversation? I do not.
3      Q.  What do you know about Mary that makes you
4  think she would have reached out?
5      A.  They worked through a lot of these issues,
6  and so if Jeanne is saying -- this may have been a
7  new posting on -- again, I don't know the full
8  context of this, but for Jeanne to reach out to
9  Mary, who was the supervisor of the PSEO
10  specialist, program specialist, which was Beth
11  Barsness, she must have just -- she must have been
12  giving her a heads up that perhaps it didn't exist
13  before.
14      I don't know why it appears to be new
15  information to them. But both are diligent in
16  saying, "Hey, can you explain further?" So I would
17  anticipate they did.
18      Q.  Is there an explanation with the -- so is
19  there an explanation that Northwestern could give
20  that would make this language permissible on their
21  website today?
22          MR. TIMMERMAN: Objection. Calls for
23  speculation.
24          You can answer if you know.
25      A.  I don't know if it persists or not. I

1  think guidance would be -- that it isn't necessary
2  to put that on a PSEO -- for PSEO.
3      Q.  So is it -- if you're a Christian school
4  and you want to participate in the PSEO program,
5  are you allowed to choose your professors on the
6  basis of their faith?
7      A.  We do not get into the hiring practices.
8  What our position is is if you offer PSEO that is
9  funded by public dollars flowing through MDE, that
10  it -- you cannot appear to be sectarian. And this
11  could give the impression of sectarian being that
12  it's headed as Christ-centered.
13      Q.  So it's --
14      A.  But that has nothing to do with the hiring
15  practices of the institution.
16      Q.  So if Christian schools are allowed to
17  participate in the PSEO program, how can they
18  communicate their Christian identity to prospective
19  students?
20      A.  Well, the question would be: If it's a
21  publicly funded PSEO program, why do you need to
22  communicate that? Because the courses have to be
23  nonsectarian to be funded. And I don't like
24  answering with a question, but that would be the
25  question: Why would you need to broadcast that?

1      Q.  So it would not be allowed for a school to
2  have the appearance of being sectarian in its
3  communication to PSEO students?
4          MR. TIMMERMAN: Objection.
5  Mischaracterizes testimony and calls for
6  speculation.
7          You can answer if you know.
8      A.  The courses cannot be sectarian. So
9  anything that may communicate to a potential
10  student that they are or are not welcome to take a
11  PSEO course from Northwestern University because of
12  their biblical worldview, we would say that that
13  promotes a sectarian and therefore limiting
14  message.
15      Q.  So it's your -- so it's MDE's position that
16  schools can't give students the appearance of being
17  sectarian?
18      A.  Not on a PSEO web page for high school
19  students, no.
20      Q.  And the language, "All of our professors
21  have a foundation of faith and teach from a
22  biblical worldview," gives -- in your opinion,
23  gives students the impression that they might not
24  be welcome in a PSEO course on the basis of faith?
25      A.  PSEO provides for nonsectarian courses that

1  are publicly funded. Northwestern can do what they
2  want around the courses that they teach. We will
3  not fund courses that are taught from a sectarian
4  point of view.
5      So to remove any question, we would provide
6  guidance to review the Christ-centered, "Our staff,
7  our professors have a foundation of faith and teach
8  from a biblical worldview."
9      Q.  So it that a yes or a no? They can or
10  cannot include this language on their website?
11      A.  We would provide guidance that they remove
12  it.
13      Q.  And if it's not removed, what's the
14  consequence?
15          MR. TIMMERMAN: Objection. Calls for
16  speculation.
17          You can answer if you know.
18      A.  It would call into question their
19  eligibility to provide PSEO courses.
20      Q.  Okay. Let's look at the next one.
21          MR. TIMMERMAN: Diana, we've been going
22  another hour.
23          MS. THOMSON: That's right. Let's take
24  a break.
25          (Break: 2:10 p.m. to 2:26 p.m.)

34 (Pages 130 - 133)

Page 134

BY MS. THOMSON:
1
2    Q.  Let's look at this last document we were
3  just reviewing.  So you had seen this screenshot
4  but you had not seen the email exchange?
5    A.  Correct.
6    Q.  Did you ever talk to Jeanne or any of the
7  people on this email about this topic, the language
8  on the website?
9    A.  No, I don't believe I did.
10    Q.  Do you know if anyone reached out to
11  Northwestern about this?
12    A.  I do not.
13    Q.  Okay.  Let's look at the next document
14  here.
15        (Exhibit 15 was marked for
16        identification.)
17    Q.  Let me know when you've had a chance to
18  review.
19    A.  (Reviewing document.)  Okay.
20    Q.  Are you familiar with this document?
21    A.  I have seen this complaint, yes.
22    Q.  Did you review it in preparation for this
23  deposition?
24    A.  I did.
25    Q.  Had you seen it before that?

Page 135

1    A.  I don't think so.
2    Q.  What is it?
3    A.  It appears to be a complaint from a prior
4  employee of Northwestern who was upset about tax
5  dollars going to a private school that
6  discriminated -- that they felt was anti-LGBT and
7  that they did not admit gay students and would
8  expel unrepentant gay students who did not adhere
9  to the school's declaration of Christian community.
10    Q.  And on the second page, it says he thinks
11  this would be a violation of the Minnesota Human
12  Rights statute; is that right?
13    A.  Yes.  That's what I'm reading.
14    Q.  Did anyone at MDE look into that in
15  response to this complaint?
16    A.  From what I recall, the -- I feel like this
17  was tied to a parent too, but perhaps not, and the
18  recommendation or guidance to this person was to go
19  to the human rights agency at the -- with the State
20  to file this complaint about discrimination.
21    Q.  Did -- so is that what they would have --
22  so do you know what the response was to Mr. Kaiser?
23    A.  I do not.
24    Q.  Dr. Kaiser.
25        Did MDE agree that there was a violation of

Page 136

1  the MHRA?
2        MR. TIMMERMAN:  Objection.  Calls for a
3  legal conclusion.  Outside the scope of the topics
4  she's been designated to testify about.
5        You can answer if you know.
6    A.  I don't -- I -- this is outside of our
7  purview.
8    Q.  Did you talk to anyone who was involved in
9  this --
10    A.  I --
11    Q.  -- complaint process?
12    A.  I did speak with Mary Barrie, yes.
13    Q.  And she would have --
14    A.  Been the --
15    Q.  -- received this?
16    A.  -- supervisor over dual credit.
17    Q.  So she interacted with this complaint at
18  the time?
19    A.  It was directed to the director, Paula
20  Palmer, and then directed to Mary.  And then I
21  believe it was guidance via gov relations that this
22  was not our purview and that -- I'm not sure who
23  provided the guidance to go to the Minnesota
24  Department of Human Rights.
25    Q.  And you don't know if that guidance

Page 137

1  actually -- if that communication was ever sent to
2  Dr. Kaiser?
3    A.  Correct.  I haven't seen that
4  communication.
5    Q.  Okay.
6        (Exhibit 16 was marked for
7        identification.)
8    Q.  Take a look at this and let me know when
9  you've had a chance to review.
10    A.  (Reviewing document.)  All right.
11    Q.  Are you familiar with this email chain?
12    A.  Yes.
13    Q.  What is it?
14    A.  It appears to be from a staff member at MDE
15  sharing with finance PSEO about the question that
16  was asked of her son Noah, who was applying.  And
17  that there -- it seemed -- the application seemed
18  to be incomplete.  I'm not going to say
19  "application."  Submitting documents to us.  I'm
20  assuming that it's in applying for the program.
21        And asking for a "How Jesus Christ at work
22  in" -- "How have you seen Jesus Christ working
23  through...and how will you" -- I saw this in much
24  bigger font in preparation for this hearing.  So
25  asking secular questions around the application for

Page 138

1  PSEO.
2      Q.  Were you involved in this exchange or this
3  conversation at the time?
4      A.  I don't recall being included in this.
5      Q.  But you reviewed it in preparation for this
6  deposition?
7      A.  Correct.
8      Q.  So you would not have been in the meeting
9  about -- the meeting they mentioned about this --
10 Jeanne mentioned in the last email?
11     A.  I may have been redirected to COVID at that
12 point.  It seems like I would have been.  So I
13 would not have been a part of these.
14     Q.  Okay.  Did you talk to anyone who was
15 involved in this about this --
16     A.  No, I did not ask Jeanne about this.
17     Q.  -- conversation?
18         So you don't know what happened at the
19 meeting?
20     A.  I do not.
21     Q.  You mentioned PSEO courses that have been
22 denied funding based on eligibility.  Are you aware
23 of any that are specifically -- that were
24 specifically denied because of sectarian content?
25     A.  I have a working knowledge that some have

Page 139

1  been denied, but I don't have any specific
2  recollection of which.  In which institution.
3      Q.  So you think that there have been denials
4  on the basis of -- denials of reimbursement on the
5  basis of sectarian content in a course?
6      A.  If the name of a course -- so we review
7  this large file.  If the file seems to have a
8  course that implies a sectarian vent, then we reach
9  out to the program.  We get clarification.  We may
10 look at a syllabus.  If that is confirmed, then
11 that becomes a secular course and is not fundable
12 for PSEO.  That has happened.
13     Q.  So if you saw the name of a course, that
14 could prompt an investigation?
15     A.  Well, it's not an investigation.  It's just
16 a conversation with them to --
17     Q.  Further --
18     A.  -- find out more.
19     Q.  So that would be an inquiry --
20     A.  An inquiry.
21     Q.  -- in the absence of a complaint?
22     A.  Correct.
23     Q.  Okay.
24         (Exhibit 17 was marked for
25         identification.)

Page 140

1      A.  (Reviewing document.)
2      Q.  Are you familiar with this document?
3      A.  I recognize it as something that we
4  received from the commissioner.  It was sent to the
5  commissioner and forwarded to us.
6      Q.  It was a complaint about public money being
7  used to support discrimination; is that correct?
8      A.  That's what it appears to be, yes.  That's
9  the concern from the person sending the email.
10     Q.  Was there a response to this communication?
11     A.  I believe this was also one where it was
12 forwarded to the Human Rights, as it was determined
13 that we didn't have standing to address it.
14     Q.  Why not?
15     A.  So it relates to discrimination against
16 their admissions, and we were told that we didn't
17 have standing to address that with them directly;
18 that that would be a Human Rights -- Department of
19 Human Rights again.  There were -- as Mary
20 asserted, she said that we have a lot of these.
21 And after working with -- we didn't have special
22 counsel at that point located in MDE.  We do now.
23     Q.  When you say you were told, who told you?
24     A.  It was likely my supervisor, which was
25 Stephanie Graff at the time.

Page 141

1      Q.  So was this addressing admissions
2  requirements?
3      A.  It is addressing discrimination in
4  admissions requirements.
5      Q.  So it wasn't discussed -- so was there a
6  discussion about whether this was a violation of
7  the nonsectarian language?
8      A.  It was discussed that the practices should
9  make the institution ineligible to be part of PSEO.
10     Q.  Dr. Barrie said Northwestern used the
11 language -- they used the term "contaminate,"
12 referring to students.  Do you know where she heard
13 that?
14     A.  I do not, actually.  She said it was used.
15 She was the supervisor before I was the supervisor,
16 so I don't know if it was in a meeting or -- I
17 don't know, actually.
18     Q.  Would she have been in a position to
19 communicate back and forth with the school?
20     A.  As supervisor, as the previous supervisor
21 for dual credit, if she received -- if MDE received
22 complaints, those complaints would have likely been
23 directed to her.  And she may have taken them or
24 directed them back -- directed them on to Beth
25 Barsness.  Or finance, if they were finance issues.

36 (Pages 138 - 141)

1    Q.  Have you ever heard anyone from
2  Northwestern use the word "contaminate"?
3    A.  No.
4    Q.  In your experience, how does Dr. Barrie
5  feel about religious schools receiving PSEO
6  funding?
7        MR. TIMMERMAN:  Objection.  Relevance.
8  Outside the scope of the 30(b)(6) designated
9  topics.
10     You can answer if you know.
11    A.  I have no idea.  She's -- I have no idea.
12    Q.  So you said you'd shared this with Paula.
13  What was Paula's response?
14    A.  Paula would have taken it to Stephanie, and
15  we would have been directed by MDE leadership how
16  to progress.  And it was that this a human rights
17  issue.
18    Q.  So you say that it was forwarded to the
19  Human Rights Department?
20    A.  I don't know we -- if MDE forwarded it or
21  communicated back with Mr. Connolly that this
22  needed to go to the Human Rights -- in line with
23  the previous --
24    Q.  Who would have --
25    A.  -- recommendation.  I don't know who would

1  have.  I did not.  Paula may have.  Stephanie may
2  have.  The commissioner may have.  I don't know.
3    Q.  So you don't know if there was any further
4  written communication after this?
5    A.  Not that I'm aware of.
6    Q.  You said the policy is clear.  What policy
7  were you referring to?
8    A.  I don't recall.  It must have been the
9  nonsectarian, which I can look back now at this
10  statement and attest to that I learned way more
11  about PSEO after becoming supervisor.  This was in
12  December, and I became supervisor, I'm not sure,
13  maybe in September or -- September or October.
14    Q.  Do you mean you became director?
15    A.  In '21 I was the supervisor.  Paula was the
16  director.
17    Q.  Okay.  I want to make sure I understand.
18  When this happened, you were not yet a supervisor?
19  Or you had just become a supervisor?
20    A.  I had become a supervisor --
21    Q.  Okay.  So you were still learning?
22    A.  -- over dual credit.  Correct.  I mean,
23  I -- I did not know the ins and outs like I do now.
24  And so I was -- I don't know.  I don't know how I
25  was looking at it.  Probably the nonsectarian piece

1  and the -- what appeared to be discrimination,
2  which we were -- that was clarified for us by
3  saying that that was not our role and that there
4  was another agency for that.
5    Q.  So when you say -- you said is this a
6  program issue?
7    A.  Program or finance.  So --
8    Q.  Okay.  So when you -- the answer -- so
9  you asked the question:  What would be the
10  recourse?  And it seems like you're asking whether
11  the school would be unapproved to offer PSEO?
12    A.  Ineligible.  Correct.
13    Q.  And the answer to that -- did you get an
14  answer to that question?
15    A.  That was not the direction.  We did not get
16  an answer to that question.  That was not the
17  direction that leadership was going in.
18    Q.  So you didn't get a yes-or-no answer?
19    A.  Correct.
20    Q.  The answer was:  This is not MDE's purview?
21    A.  Correct.
22    Q.  Was there any discussion that the schools
23  would be -- might be violating the First Amendment,
24  the Free Exercise Clause or the Establishment
25  Clause?

1    A.  Having stated that I'm not clear on the
2  details of either one of those, I don't know.
3    Q.  Are you aware that the First Amendment
4  applies to public schools but not to private
5  schools?
6        MR. TIMMERMAN:  Objection.  Calls for a
7  legal conclusion.
8     You can answer if you know.
9    A.  I would presume they apply to both, but I
10  don't know.  I wouldn't even -- I wouldn't posit an
11  answer.  How about that?  I don't know.
12    Q.  Okay.
13       (Mr. Landon exited the proceedings.)
14       (Exhibit 18 was marked for
15         identification.)
16    Q.  Let me know when you've had a chance to
17  look.
18    A.  (Reviewing document.)
19    Q.  You've had a chance to review?
20    A.  I did.
21    Q.  Okay.  Are you familiar with this document?
22    A.  I am.
23    Q.  It's an email chain about some information
24  that Senator Kunesh requested?
25    A.  Correct.

37 (Pages 142 - 145)

1  Q.  What was your sense of why Senator Kunesh
2  requested this information?
3      MR. TIMMERMAN:  Object to this line of
4  questioning on the grounds that it's beyond the
5  scope of topics she's been identified to testify
6  about.
7      You can testify in your individual
8  capacities to the extent you know.
9  A.  I don't know.  It doesn't say.
10  Q.  Do you know how she used the information?
11  A.  I have no idea.
12  Q.  Okay.  On the first page, the second email,
13  you sent an email to Eric Billiet?
14  A.  Billiet.
15  Q.  And Beth Barsness?
16  A.  Mm-hmm.
17  Q.  Saying, "Interesting data."
18      Is that correct?
19  A.  Correct.
20  Q.  Did you attach the data to that email?
21  A.  It must have been.
22  Q.  Did you provide that email to your counsel
23  when they were collecting information relevant to
24  this case?
25  A.  I don't recall.  We -- they scanned our

1  email, so I'm assuming so.
2  Q.  Do you -- what did you think was
3  interesting about the data?
4  A.  I don't recall, honestly.
5  Q.  Do you recall why Beth would have thought
6  the chain was interesting?
7  A.  Because of the request and that it was --
8  well, I can't really speak to why.  I'm assuming
9  the request and going back and forth and what data
10  we have and what data we don't have.  She may have
11  found that interesting.  I guess I can't speak to
12  that.
13  Q.  Did you understand Crown and Northwestern
14  to be the only two schools with faith statements
15  during the legislative process?
16  A.  Yes, during the legislative process.
17  Q.  Do you still have that understanding?
18      MR. TIMMERMAN:  Object to the extent
19  this is beyond the scope of the topics she's been
20  identified to testify to.
21      You can answer to the extent you know
22  personally.
23  A.  I don't know.
24  Q.  Have you ever heard any MDE staff make
25  negative comments about Crown or Northwestern?

1      MR. TIMMERMAN:  Same objection.
2      You can answer.
3  A.  Have I heard people say things that
4  Northwestern and Crown would take as negative?
5  Yes.
6  Q.  Can you give an example?
7      MR. TIMMERMAN:  Same objection.  This
8  whole line of questioning is beyond the scope of
9  what she's been designated to testify to under
10  Rule 30(b)(6).
11      You can testify on your individual
12  capacity.
13  A.  Frustration that repeated conversations
14  yield the same result and did not change the faith
15  statement requirement by the college.
16  Q.  So MDE has requested that the schools --
17  that Crown or Northwestern change their faith
18  statement?
19  A.  Remove the faith statement.
20  Q.  MDE has made that request?
21  A.  Yes, I believe.
22  Q.  And there have been repeated conversations
23  about it?
24  A.  Yes.
25  Q.  Would those have been in writing?

1  A.  Some of them are in writing.  I've seen
2  them.  Some of them are conversations which led to
3  the legislative language.
4  Q.  But they were not excluded from the PSEO
5  program?
6  A.  They were eligible to offer courses.  If
7  all their courses were funded, that I don't know.
8  Q.  Who would have expressed that frustration?
9  A.  Finance.  Individuals in meetings talking
10  about:  How do we address this through the various
11  complaints that we received?
12  Q.  So is that Jeanne in finance?
13  A.  It would be Jeanne.  It would be Beth.  It
14  would be myself.  It would be Mary Barrie.  It
15  would be Eric Billiet.  It would be Sharon Peck.
16  It would be Stephanie Graff.  It would be Paula
17  Palmer.  It would be Tom Melcher.  It would be --
18  pretty much everyone on all of these communications
19  has expressed frustration.
20  Q.  To your -- do Crown and Northwestern
21  currently meet the eligibility requirements for
22  PSEO while the amendment is not in effect?
23      MR. TIMMERMAN:  Object to the extent
24  this is beyond the topics she's been identified to
25  testify to.

38 (Pages 146 - 149)

1    You can answer to the extent you know
2 personally.
3    A.  Northwestern and Crown are still eligible
4 to submit funding for PSEO -- the invoices for PSEO
5 courses.
6        MR. TIMMERMAN:  Actually, I'll strike
7 that objection.
8        MS. THOMSON:  Yeah.
9        MR. TIMMERMAN:  This is under Request
10 for Designation Number 6, so please strike my last
11 objection.
12        MS. THOMSON:  Thank you.
13 BY MS. THOMSON:
14    Q.  And as far as you know, if the amendment
15 takes effect and Crown and Northwestern continue
16 their current policies, they will no longer be
17 eligible institutions for PSEO?
18    A.  Not speaking to the timeline of that, yes,
19 they would become ineligible.
20    Q.  Is there anything else keeping either of
21 them from being eligible?
22    A.  Offering nonsectarian courses repeatedly.
23 I mean repeatedly offering sectarian courses.
24 Thank you.
25    Q.  So repeatedly offering sectarian courses

1 would not only make the courses ineligible but it
2 would make the schools ineligible under the
3 statute?
4    A.  The courses are ineligible.  The statute,
5 if it is implemented, then makes the program
6 ineligible to be -- to provide PSEO courses.
7    Q.  Has MDE ever asked an institution to change
8 its admissions practices outside of the faith
9 statement requirement?
10    A.  Not that I'm aware of.  Not that I'm aware
11 of.
12    Q.  Would you like to take a break?
13    A.  Sure.
14        (Break:  3:00 p.m. to 3:13 p.m.)
15 BY MS. THOMSON:
16    Q.  Let's take a look at the next document.
17        (Exhibit 19 was marked for
18          identification.)
19    A.  (Reviewing document.)
20    Q.  Ready?
21    A.  Mm-hmm.
22    Q.  Are you familiar with this document?
23    A.  I am.
24    Q.  What is it?
25    A.  This is a Preliminary Form A.  It looks

1 like it was the one submitted from MDE to the
2 governor's -- for the governor's consideration.
3    Q.  And I'm looking at page 2 where it says,
4 "Impact to the Agency" -- "to Your Agency."  In red
5 line, "More students would participate in PSEO" is
6 crossed out?
7    A.  Correct.  I see that.
8    Q.  Do you know who made this edit?
9    A.  I do not.
10    Q.  Is that -- would it have been because the
11 amendment wouldn't allow more students to
12 participate in PSEO?
13        MR. TIMMERMAN:  Objection.  Calls for
14 speculation.
15        You can answer if you know.
16    A.  It was -- it would have been after us.  We
17 don't see it when it says the education
18 commissioner; that means that it's being submitted
19 to the governor for his platform or her platform.
20    Q.  So MDE would not have made these edits?
21    A.  Someone in MDE would have made this edit
22 before it went to the governor's office.
23    Q.  Is MDE aware that institutions might choose
24 not to offer on-campus PSEO if they have to give up
25 their statements of faith?

1    A.  We are aware that postsecondary
2 institutions have said that, yeah.
3    Q.  So does that mean that the amendment would
4 not allow more students to participate in PSEO if
5 they can't participate in those on-campus programs?
6        MR. TIMMERMAN:  Objection.  Calls for
7 speculation.
8        You can answer if you know.
9    A.  I have no idea.
10    Q.  Did MDE understand that fewer students
11 would be able to take PSEO if schools choose not to
12 participate without their statement of faith?
13    A.  There are currently 64 other institutions
14 minus the 18.  So I'm not in a position to do math
15 right now, but there are other institutions where
16 students would be able to access PSEO as well.  So
17 I don't think that was our understanding.  I don't
18 recall that being a part of our conversations.
19    Q.  Let's look at page 3 where it says "One
20 Minnesota Goals."  What does "One Minnesota Goals"
21 mean?
22    A.  One Minnesota is the governor's platform or
23 vision for Minnesota as the governor of Minnesota.
24 And when we make proposals, we have to identify
25 where it ties into the One Minnesota goals for this

1  governor.
2     Q.  So here, "This proposal would help to
3  increase the four-year graduation rate overall by
4  expanded participation in rigorous courses" is
5  crossed out, and it says this proposal "Would help
6  ensure every student receives a word-class
7  education by reducing barriers to accessing
8  rigorous coursework," correct?
9     A.  That is the -- that is what I see.
10    Q.  So the goal was not to increase the
11 graduation rate?
12          MR. TIMMERMAN:  Objection.  Calls for
13 speculation.  Also outside the scope.
14    A.  I did not make this change, so I'm not sure
15 what -- I don't know why they selected this.
16    Q.  Did MDE consider other options that would
17 have increased the graduation rate for legislative
18 proposals?
19    A.  Overall?  Like, all of our -- or just our
20 divisions?  Or, I mean, I think most of the
21 proposals put forward legislatively are to increase
22 access to opportunities and increase the graduation
23 rate.
24    Q.  If the schools choose not to change their
25 faith statement requirements, did anyone at MDE

1  consider that it would create barriers for students
2  who want to take classes on campus at those
3  schools?
4     A.  That was not a part of our discussion, no.
5     Q.  Okay.
6          (Exhibit 20 was marked for
7          identification.)
8     Q.  Next exhibit.  Are you familiar with this
9  document?
10    A.  I have seen it, yes.
11    Q.  What is it?
12    A.  It is the 2020 or '21 legislative session
13 proposal put forward by the division to -- for
14 consideration from the commissioner.
15    Q.  And this would have -- would this have been
16 the final version of that?
17    A.  I can't speak to that.  That, I'm not sure.
18    Q.  Okay.  On page 4, the last bullet point
19 under "Impact on Children and Families," it says,
20 "How have children and families been engaged by
21 creating this policy?"
22          And the answer says, "This was brought to
23 our attention by families"; is that correct?
24    A.  That is what I see, yes.
25    Q.  Would MDE have been unaware of the schools'

1  admissions policies if families had not brought
2  them to their attention?
3     A.  Families and other community members.  We
4  do not regularly review admission policies.  So
5  yes.
6     Q.  So you wouldn't have had any way to find
7  out without hearing about them from the families?
8     A.  And former staff and others, correct.
9     Q.  Okay.  I'm on -- I'm turning back to
10 page 3, the paragraph where it says, "What groups
11 are impacted by the proposed policy item?" at the
12 top.
13    A.  Mm-hmm.
14    Q.  Okay.  The last sentence in that bullet
15 point -- in the sub-bullet point says, "Since the
16 two private postsecondary institutions that we know
17 of who require faith statements are Christian-based
18 institutions, groups impacted by this policy item
19 would be any group or individual that does not
20 practice Christianity or anyone who feels that this
21 is not an appropriate thing to require from
22 publicly funded students."
23          Is that what that says?
24    A.  That's how I'm reading it.
25    Q.  So when MDE made this proposal, it was

1  attempting to address a perceived problem with the
2  practices of two specific Christian universities?
3          MR. TIMMERMAN:  Objection.  Foundation.
4  Calls for speculation.  Outside the scope of
5  designated topics.
6          You can answer if you know.
7     A.  MDE was attempting to address the concerns
8  and complaints that we received from the community,
9  which happened to be about those two, related to
10 this issue.
11    Q.  Those two schools?
12    A.  Related to this issue, yes.
13    Q.  And it was not aware of any other
14 institutions where this was a problem?
15    A.  We did not receive complaints from other --
16 about other institutions.
17    Q.  So MDE was aware that the amendment would
18 only impact Christian institutions that qualified
19 as religious institutions at the time it proposed
20 the amendment?
21          MR. TIMMERMAN:  Objection.  Vague.
22 Calls for speculation.
23          You can answer if you know.
24          Also outside the scope.
25          You can answer if you know.

Page 158

1 A. What we knew is that, going forward, that
2 any institution that attempted to provide PSEO and
3 then highly secularized those courses for PSEO or
4 the program for PSEO would be addressed by the
5 statute going forward, whether we knew about the
6 potential or not. So, no, it wasn't specific to
7 Christian organizations.
8 Q. But the only complaints you had received
9 were about Christian institutions?
10 A. Correct.
11 Q. Can you tell me about the concurrent
12 enrollment program?
13 A. The concurrent enrollment program is a
14 capped amount of funding where high schools partner
15 with a postsecondary institution to offer on-site
16 dual credit-bearing courses with either a qualified
17 high school district employee or a postsecondary
18 institution's staff.
19 Q. And that's separate from the PSEO program,
20 right?
21 A. It is a different funding source, yes.
22 Q. So you said it's capped funding. How --
23 what is the -- how does the funding work? Does the
24 funding go to the high school that's offering the
25 course?

Page 159

1 A. Correct. It's $4 million per year, and it
2 affords up to $150 per course taken by a student,
3 concurrent enrollment student. We have much more
4 utilization of concurrent enrollment. The ADM
5 remains the same at the district high school. And
6 from $150, it's proportioned -- I think the last
7 one was, like, $52 per student to defray costs for
8 concurrent enrollment courses.
9 Q. You said ADM?
10 A. Average daily membership. So the revenue
11 that's generated by school districts.
12 Q. And is that funding that goes from MDE to
13 the school?
14 A. Correct.
15 Q. And some of those courses are provided in
16 partnership with private colleges and some with
17 public?
18 MR. TIMMERMAN: I'm going to object on
19 the grounds that she's not been designated to talk
20 about concurrent enrollment, nor is that a topic in
21 the 30(b)(6) notice.
22 So you can testify, but you're testifying
23 based on your own personal understanding.
24 BY MS. THOMSON:
25 Q. Are you prepared to talk about the

Page 160

1 Department's treatment of other private
2 institutions and state actors outside of the PSEO
3 program?
4 A. If it -- it depends on how far outside of
5 the PSEO program and what you're designating as
6 MDE. So I'm prepared to talk about PSEO. I can
7 speak to concurrent enrollment.
8 Q. Is that an MDE program?
9 A. Concurrent enrollment is a duel credit
10 program that operates within the duel credit and
11 our division.
12 Q. And do private institutions participate in
13 that program?
14 A. They participate either through -- well,
15 they all participate through contract with the
16 school district. So the district is the
17 contracting entity with the postsecondaries, not
18 MDE.
19 Q. Does MDE oversee that program?
20 A. We verify that the programs that are
21 providing -- the postsecondaries that are providing
22 the concurrent enrollment -- the credit for the
23 concurrent enrollment course are NACEP approved.
24 Certificated.
25 Q. Are what approved?

Page 161

1 A. NACEP, National -- I'd have to look it up.
2 It's an accrediting body. Many states use NACEP
3 accreditation so they verify that they are eligible
4 to provide a credit, essentially.
5 Q. So the funding comes from the school
6 district, not from MDE, but MDE oversees the
7 program?
8 A. We do not oversee. We verify that the
9 postsecondary -- and this is if we pay the district
10 for the concurrent enrollment. Probably more than
11 half of the concurrent enrollment, we don't collect
12 data on that. That's just the current guess. Many
13 districts have private contracts with postsecondary
14 institutions that we know nothing about, and they
15 fund it out of the revenue that they generate and
16 it does not come through MDE.
17 Q. But there are instances where the funding
18 comes through MDE?
19 A. To the district.
20 Q. To the district.
21 A. So that capped amount. Correct.
22 Q. Are there private high schools that
23 participate in that program?
24 A. No. Private high schools cannot offer
25 concurrent enrollment. Unless -- I mean, they can,

41 (Pages 158 - 161)

1  but it's not funded through the State. Let me
2  clarify.
3      Q.  Okay. Let's look at the next exhibit.
4          (Exhibit 21 was marked for
5          identification.)
6      Q.  And I'm looking at page 22 of this
7  document. Are you familiar with this document?
8      A.  Yes.
9      Q.  Okay. It's a PSEO reference guide?
10     A.  Yes.
11     Q.  Okay. There's an -- under "Choosing to
12  Participate," there's a note, and it says,
13  "Nonpublic schools are not required to follow all
14  sections of the PSEO law. Students and families
15  attending nonpublic schools are encouraged to
16  discuss the school's PSEO policy with a counselor
17  or program advisor."
18         Is that correct?
19     A.  I see that.
20     Q.  What are the sections that nonpublic
21  schools are not required to follow?
22     A.  Nonpublic schools, being a K-12. So if a
23  student earns a credit while attending a PSEO
24  course, the high school has to provide the dual
25  credit. So they have to provide credit on the high

1  school transcript. Nonpublic schools are not bound
2  by that in statute. So if I attend Maranatha, from
3  an earlier example, Maranatha could say, "We are
4  not going to provide dual credit."
5      Q.  So would that still -- so would MDE still
6  consider that credit to be public education?
7      A.  We would not fund that if Maranatha did not
8  provide dual credit because PSEO requires dual
9  credit.
10     Q.  If they did provide the dual credit, if the
11  high school -- the private high school provided the
12  dual credit, would MDE consider that to be public
13  education?
14     A.  It is through the PSEO public school
15  option, correct.
16     Q.  Is it the funding that makes it public
17  education that it's funded by MDE?
18     A.  It's the dual credit that is awarded and
19  then the determination that the course can be
20  funded.
21     Q.  So even though it's a -- may be a student
22  attending a private postsecondary institution and a
23  private high school, the duel credit makes it --
24  has an influence on whether it's --
25     A.  Well, and it's nonsecular. Correct. So if

1  it's a nonsecular course that was --
2      Q.  Nonsectarian?
3      A.  Yes. What did I say? I don't even know.
4         Yes. Nonsectarian course, and the
5  postsecondary submits the invoice and Maranatha has
6  provided dual credit, then the postsecondary will
7  be -- receive payment for the course with public
8  funds.
9      Q.  Have you ever heard anyone say that -- at
10  MDE say that public dollars should not go towards
11  discriminatory schools that have discriminatory
12  policies?
13     A.  Yes.
14     Q.  Okay. Do you know who that was?
15     A.  It wouldn't be one person over the course
16  of my time at MDE.
17     Q.  Numerous people?
18     A.  Legislators. Yes. We've heard it from
19  many people.
20     Q.  Including MDE staff?
21     A.  In the course of a conversation. That's
22  the belief.
23     Q.  Okay.
24         (Exhibit 22 was marked for
25         identification.)

1      Q.  And I can represent that this is a printout
2  from MDE's website, and you can take a look at it.
3      A.  (Reviewing document.)
4      Q.  Sorry there's not page numbers, but I'm
5  looking towards the middle. At the top there's a
6  question about transportation.
7          MR. TIMMERMAN: I'm sorry, Diana. What
8  page is that?
9          MS. THOMSON: It's page 5. No. Let me
10  look again.
11         MR. TIMMERMAN: Maybe 6. I see.
12         MS. THOMSON: Okay.
13         MR. TIMMERMAN: "Do all nonpublic K-12
14  students qualify for transportation...?" Is that
15  the --
16         MS. THOMSON: Yes.
17         MR. TIMMERMAN: Okay.
18  BY MS. THOMSON:
19     Q.  So I'm just looking at that paragraph, and
20  I have some questions about bussing. My
21  understanding from reviewing this is that all
22  public school districts are required to provide
23  transportation within the district for all
24  schoolchildren to any school if transportation is
25  necessary for those kids, even if it's to private

42 (Pages 162 - 165)

Page 166

1    schools; is that correct?
2        A.   That is my understanding.
3        Q.   Would MDE consider the financial benefit to
4    the school to constitute state dollars going to a
5    private school?
6            MR. TIMMERMAN: Objection. Vague.
7    Calls for speculation.
8            You can answer if you know.
9        A.   So can you restate? Because I'm not sure I
10   understand your question.
11       Q.   Okay. Would -- so if students are being
12   bussed by the public school district to a private
13   school, is that a financial benefit -- is that
14   state dollars going to private -- a private school?
15       A.   The dollars don't go to the private school.
16   It is a requirement of the district that is
17   providing the transportation. So there are no
18   dollars that go to the public schools. The public
19   school is expected -- the district is expected to
20   provide that transportation.
21       Q.   So even though the private school
22   benefits --
23       A.   Well, the students benefit.
24       Q.   I mean, doesn't the private school benefit
25   too if they're not having to provide

Page 167

1    transportation?
2            MR. TIMMERMAN: Objection. Calls for
3    speculation.
4            You can answer if you know.
5        A.   I would presume that the perspective is
6    that it supports students and families.
7        Q.   So is it MDE's position that private
8    schools who have students that are bussed to the
9    school by the public school district are providing
10   a public education?
11       A.   I don't know what MDE's position on this
12   transportation option is.
13       Q.   So the next question on that is the
14   Nonpublic Pupil Aids Program. It says, "The
15   Nonpublic Pupil Aids Program allows nonpublic
16   students to receive publically funded textbooks on
17   a loan basis and health, guidance, and counseling
18   services."
19           Does that mean that public -- that students
20   at private schools can receive publicly funded
21   textbooks?
22       A.   For the use during a course, yes.
23       Q.   Does that constitute public dollars going
24   to private schools?
25       A.   That constitutes support for students and

Page 168

1    families who attend nonpublic schools.
2        Q.   So is it MDE's position that if a school
3    has students that receive free textbooks, that
4    they're providing a public education?
5        A.   They are not receiving the textbooks. They
6    are receiving the loan of the textbooks during the
7    course of a course is what I anticipate. But they
8    do not receive the textbooks.
9        Q.   Is there not a financial benefit to the
10   school if they don't have to provide the textbook
11   to the student?
12           MR. TIMMERMAN: Objection. Calls for
13   speculation.
14           You can answer.
15       A.   The benefit is to the student and families.
16       Q.   So MDE does not consider that to be
17   providing a public education?
18           MR. TIMMERMAN: Objection. Asked and
19   answered.
20           You can answer again.
21       A.   Same. It's in support of students and
22   families.
23       Q.   Is that a no? It's a yes-or-no question.
24           MR. TIMMERMAN: Same objection.
25       A.   Can you restate it, please?

Page 169

1        Q.   So MDE does not consider it to be providing
2    a public education for students to receive free
3    textbooks at private schools?
4        A.   No.
5        Q.   Okay.
6            (Exhibit 23 was marked for
7             identification.)
8        Q.   Let me know if you're familiar with this
9    document.
10       A.   I am.
11       Q.   Okay. What is it?
12       A.   It is the rigorous course taking report.
13   It's a required legislative annual report
14   summarizing -- it's due February 1st, summarizing
15   the most current year's finalized data --
16       Q.   Okay.
17       A.   -- around all dual credit and international
18   baccalaureate and advanced placement courses.
19       Q.   On the second page, it says this was
20   prepared by the Career and College Success
21   Division. Would you have reviewed this document
22   before it was submitted?
23       A.   Yes.
24       Q.   So it's fair to say this report reflects
25   the Department's views on the programs in it?

43 (Pages 166 - 169)

1    A.  It is a summary of the data that we collect
2  for the report that's asked for by the legislature,
3  correct.
4    Q.  And it reflects the Department's views on
5  that data?
6        MR. TIMMERMAN:  Objection.  Asked and
7  answered.
8        You can answer it.
9    A.  Yes.
10    Q.  Okay.  I'm looking at page 5.  The first
11  paragraph, it says -- the second sentence says,
12  "These programs" -- including PSEO -- "offer
13  pathways to Minnesota students, provide
14  opportunities and preparation for the world beyond
15  high school, and gives students the opportunity to
16  earn college credit while in high school."
17        Is that correct?
18    A.  Correct.
19    Q.  And those are MDE's goals in offering the
20  PSEO program?
21    A.  I believe those are the stated legislative
22  goals when the -- it was implemented.
23    Q.  So yes?
24    A.  Yes.
25    Q.  On page -- on the next page, it says,

1  "Challenging, rigorous learning opportunities are
2  essential in preparing students for success in
3  postsecondary institutions and ensuring career and
4  college readiness.  Minnesota's rigorous course
5  programs include Advanced Placement, International
6  Baccalaureate, Postsecondary Enrollment Options,
7  and concurrent enrollment.  These programs allow
8  high school students the opportunity to take
9  rigorous, college-level courses and the potential
10  to earn college credit while in high school.
11  Research shows that participation in rigorous
12  courses, specifically dual enrollment, leads to
13  better outcomes in high school as well as college
14  enrollment and persistence."
15        Is that correct?
16    A.  Yes.
17    Q.  Fair to say that PSEO has positive impacts
18  for high school students that participate in the
19  program?
20    A.  Correct.
21    Q.  Because it prepares students for success in
22  postsecondary institutions?
23    A.  That is what research shows, yes.
24    Q.  And because it allows students to earn
25  college credits while in high school?

1    A.  Potentially.
2    Q.  And it leads to better high school and
3  college outcomes?
4    A.  Potentially.
5    Q.  So is it fair to say that MDE wants to
6  encourage as many students as possible to
7  participate in the program?
8    A.  MDE encourages students to participate in
9  any -- we do not specify which program.  We
10  encourage students to try that if they are ready
11  and it fits with their goals.
12    Q.  So fair to say that it wants to encourage
13  students who can take the program, who can
14  participate in the program to participate?
15    A.  In any one of the programs.  Any one of the
16  options that best fits them.
17    Q.  And one way to encourage participation is
18  to ensure that there are enough postsecondary
19  institutions participating in the program; is that
20  correct?
21    A.  It has not been an active consideration,
22  but, yes, you would need obviously postsecondaries
23  participating.
24    Q.  Because not every postsecondary institution
25  can open all of their classes to all students,

1  correct?
2        MR. TIMMERMAN:  Objection.  Calls for
3  speculation.
4        You can answer if you know.
5    A.  Courses have to be offered to the
6  postsecondary students first, and then those
7  available spaces are what are open up to the
8  postsecondary students.  I mean to secondary
9  students.  That is how the statute reads.  So a
10  course couldn't be offered in a postsecondary for
11  PSEO if it is not also offered in the general
12  course for the postsecondary students.
13    Q.  And just as a practical matter, there's
14  limitations on how many students can take a
15  particular PSEO course at a specific school?
16        MR. TIMMERMAN:  Objection.  Calls for
17  speculation.
18        You can answer if you know.
19    A.  Each institution determines what the limit
20  is, and then each student determines, for their --
21  for their goals, how many courses they can take.
22    Q.  So generally it's in MDE's interest to have
23  as many eligible institutions as possible
24  participating in PSEO because it allows more
25  students to participate in the program?

1    A.  Again, this isn't centered solely on PSEO.
2  It is in MDE's -- MDE believes that it's in the
3  students' interest to have as many dual credit
4  opportunities as they want to participate in.
5    Q.  And PSEO is one of those opportunities?
6    A.  PSEO is one of those opportunities.
7    Q.  And so it's in MDE's interest to have
8  eligible institutions available to participate in
9  PSEO; is that correct?
10    A.  MDE has eligible institutions that provide
11  that service to students, yes.
12    Q.  And it's in their interest to have those
13  available to students?
14    A.  We have not encountered or had
15  conversations about whether it's in our interest.
16  It exists as an option, and we support those
17  options according to statute.
18    Q.  Are you aware of any student who was not
19  able to participate in Crown or Northwestern's PSEO
20  program because of their faith that was not able to
21  participate in another PSEO program?
22    A.  I wouldn't know.
23    Q.  Is that because there's enough PSEO
24  programs?
25    A.  I wouldn't know, if they were rejected, if

1  they attempted to go and enroll in another PSEO
2  course and where that would be until it was billed.
3  And we would have -- yeah, I don't know.
4    Q.  So you've never received a complaint from a
5  student saying, "I cannot participate in PSEO
6  because I cannot attend Crown or Northwestern"?
7    A.  We've not had that messaging.  We've had
8  students who have gone to enroll in Crown or
9  Northwestern and were rejected to participate in
10  that program.
11    Q.  On campus?
12    A.  The program.
13    Q.  So they were rejected from the school
14  entirely and not just from the on-campus program?
15    A.  Likely both.
16    Q.  Would you have reviewed those complaints in
17  preparation for this deposition?
18    A.  I reviewed a number of complaints so I
19  can't give you specifics, but I believe it was both
20  a student who would not complete the faith
21  statement and so could not be enrolled in
22  program --
23    Q.  Either -- sorry.
24    A.  Or the faith statement -- or they professed
25  to be LGBTQ+ and were not invited to come on campus

1  because they wanted to come on campus.  So I'm not
2  sure -- like, some of the complaints we get aren't
3  always about us knowing whether they applied --
4  because they don't apply -- it's a program.  You
5  apply for the program.  We don't always know if
6  it's online.  Sometimes we know it's in person
7  because they state it in the complaint.
8    Q.  So you -- you don't know if you've seen any
9  complaints of students being rejected from the
10  online programs at Crown or Northwestern for --
11  because of the statement of faith?
12    A.  I don't know that.
13    Q.  Do you know -- have you received -- I think
14  you said you received complaints from students who
15  were rejected from on-campus participation in PSEO
16  at Northwestern or Crown because they were LGBTQ?
17    A.  I believe it was Northwestern.
18    Q.  Have you -- did you review that complaint
19  in advance of this deposition?
20    A.  I'm sure I did.
21    Q.  Did you provide it to your counsel?
22    A.  That's where I reviewed it, yes.  They were
23  documents that we provided.
24    Q.  Do you recall the name of the student?
25    A.  I don't.

1    Q.  Do you recall when that complaint happened?
2    A.  I want to say 2018.
3    Q.  And it was Northwestern?
4    A.  I believe so.
5    Q.  I don't believe I've seen that complaint,
6  so I'd like to see it.
7      Okay.  Let's see.
8      (Exhibit 24 was marked for
9      identification.)
10    Q.  Let me know if you're familiar with this
11  document.
12      MR. TIMMERMAN:  I just want to -- if
13  it's okay to designate -- since we're talking about
14  an institution that's not a party to this
15  litigation, if we could designate this portion of
16  the transcript as confidential, that'd be helpful.
17  If there's no objection.
18      MS. THOMSON:  No objection.
19      MR. TIMMERMAN:  Thank you.
20    A.  I'm not familiar with this document.
21    Q.  Okay.  Is it about a PSEO postsecondary
22  institution being put on a corrective action
23  program at -- by MDE?
24    A.  So this includes finance staff.
25    Q.  I just have some general questions about

1  the corrective action program.
2      A.  Sure.
3      Q.  The corrective action plan is what it looks
4  like.  It looks like this was a school that was
5  being put on a corrective action plan for PSEO
6  requirements; is that right?
7          MR. TIMMERMAN:  Object on foundation
8  grounds.
9      You can answer if you know.
10     A.  The best that I can surmise is that this --
11  they were not following reporting guidelines, it
12  looks like, around the submission of PSEO that was
13  offered and then invoiced to MDE is what it looks
14  like.
15     Q.  Would a corrective action plan be an option
16  for a school if you received complaints like the
17  ones you've received about Crown and Northwestern's
18  statement of faith requirements?
19     A.  So within program, it isn't formalized.  So
20  when we have conversations with programs to ask
21  them about practices or lack of practices around
22  implementing coursework, that is different from the
23  requirements for a postsecondary institution to
24  submit their invoicing for those PSEO courses in a
25  timely manner.  We don't, in program, typically

1  implement corrective action plans.  It's a
2  continuous process that could be characterized as
3  such.
4          But a corrective action plan for finance is
5  based around fiscal considerations, like end of
6  fiscal year, and if something is submitted after
7  the 30th of June and we can now not process your
8  payment out of -- so it creates extra in the
9  finance area.  So that's my take on this corrective
10  action plan.
11     Q.  So this would not be available for a
12  programming -- so this would fall under the finance
13  department and not programming?
14     A.  This falls under PSIs submitting their
15  invoices for the courses offered in a time frame
16  that allows for them to get paid out of the correct
17  budget.
18     Q.  So this would not be used for a religious
19  school that you had received complaints about their
20  admissions program -- their admissions policies or
21  their course content?
22          MR. TIMMERMAN:  Objection.
23  Mischaracterizes testimony.
24      You can answer.
25     A.  A corrective action plan is not typically

1  offered through program because it isn't a
2  document.  It is an interaction and a conversation
3  and providing guidance to get compliance with how
4  program -- how programming is delivered.  A
5  corrective action plan around finance is adherence
6  to timelines so that timely payment can be made to
7  the postsecondaries for the PSEO courses that they
8  offered.
9      Q.  So this would not be an option for a
10  religious complaint?
11     A.  It hasn't been an option.  I can't say that
12  it wouldn't be an option.  But it wouldn't be this
13  because that's not fiscal.  This is a fiscal
14  corrective action plan.
15     Q.  But -- okay.  So could there be a
16  corrective action plan for a school whom you'd
17  received multiple complaints about the content --
18  the sectarian content of their courses?
19     A.  That would be up to MDE leadership to
20  consider the context and the repeated guidance --
21     Q.  So one option would be --
22     A.  -- to determine that that's -- if that's an
23  option or not.
24     Q.  So one option would be an audit?
25     A.  Desk review.

1      Q.  Or desk review.  And one option would be a
2  corrective action plan?
3          MR. TIMMERMAN:  Objection.
4  Mischaracterizes testimony.
5      You can answer.
6      A.  I didn't say it could be.  I said it's a
7  possibility that a plan could be developed.  That
8  isn't typically done for program.  It is done for
9  finance.
10     Q.  Okay.  So you're not aware of a corrective
11  action plan being used for a religious school
12  because of the religious content of their courses?
13     A.  I'm not familiar with a corrective action
14  plan that program has implemented with a
15  postsecondary institution to rectify concerns about
16  program, no.
17     Q.  Okay.
18          MS. THOMSON:  Would you like to take a
19  five-minute break?
20          MR. TIMMERMAN:  Sure.
21      (Break:  4:03 p.m. to 4:13 p.m.)
22  BY MS. THOMSON:
23     Q.  So you mentioned you reviewed a complaint
24  from Northwestern from a student who was rejected
25  because they were LGBT.

46 (Pages 178 - 181)

Page 182

1      MS. THOMSON:  And can I just ask
2  counsel:  Have you seen that document and produced
3  it?
4      MR. TIMMERMAN:  We have not seen that
5  document or produced it.
6      MS. THOMSON:  Okay.
7  BY MS. THOMSON:
8      Q.  So was that a -- would that have been a
9  written complaint that you reviewed?
10     A.  It could have been a written complaint or
11  it could have been an oral conversation about a
12  complaint.  It could be either one.
13     Q.  And is it possible that did not happen,
14  that you're mistaken about what happened?
15     A.  The details, I could be mistaken, but I do
16  recall -- but I don't remember the year maybe.  I
17  may be off on the year.
18     Q.  You remember it being a student?
19     A.  I remember it being about a student.  It
20  could have been from the parent of the student.  I
21  would have recalled it in terms of the student.
22     Q.  What do you remember about -- what details
23  do you remember about it?
24     A.  The details I remember, as best as I can at
25  this point, was it could have been an email about a

Page 183

1  complaint that came from -- but it was about a
2  student who was LGBT and would not attest to that;
3  that they wouldn't recant or -- they were open in
4  stating that they were gay and that the program
5  declined to have them participate.  Now, were they
6  given an online option?  That part, I don't recall.
7      Q.  And is that something that you had
8  knowledge of before preparation for this lawsuit or
9  is it only in preparation for the deposition?
10     A.  It's only in preparation.  I was not with
11  the agency, I believe, when it --
12     Q.  So you would have had a conversation with
13  someone about it?
14     A.  I could have been, yes.  I've had --
15     Q.  Do you recall who you would've talked to
16  about that?
17     A.  It would have been Beth or Jeanne.
18     Q.  So they relayed to you a student -- a
19  complaint from a student with those details?
20     A.  It likely was Beth, because Beth would have
21  gotten the problematic concern about --
22     Q.  Yeah.  Do you know who Beatrice Handlin is?
23     A.  I do not.
24     Q.  Are you aware of any former PSEO students
25  testifying at the Minnesota Legislature in support

Page 184

1  of the amendment?
2      A.  I don't.  We don't go to those unless we're
3  invited, so...
4      Q.  So you're not aware of those and you
5  wouldn't have reviewed any of that in preparation
6  for this deposition?
7      A.  No.
8      Q.  Okay.  So to make sure I understand, you
9  would have had a conversation with Beth or Jeanne
10  where they relayed a complaint to you.  You -- we
11  don't have the written -- we don't have a written
12  complaint reflecting that today that counsel --
13  that your counsel has seen?
14     A.  No.  Obviously -- so I may be getting it
15  confused with an oral discussion.  Or that it was
16  something that was relayed orally and summarized in
17  an email.  I don't recall.
18     Q.  Okay.  All right.  Thank you very much.
19     MS. THOMSON:  That's all the questions
20  I have.  We'll leave this deposition open.
21     MR. TIMMERMAN:  I just have a couple of
22  follow-up questions.
23          EXAMINATION
24  BY MR. TIMMERMAN:
25     Q.  Just to clarify, Ms. Reynolds, is it fair

Page 185

1  to say that MDE doesn't care if a postsecondary
2  institution has a religious affiliation as long as
3  that institution only offers nonsectarian PSEO
4  courses and doesn't discriminate in the admissions
5  process?
6      A.  Correct.
7      Q.  And you've mentioned the word "standing"
8  today in response to some questions about
9  complaints that were made to MDE.  Do you recall
10  that earlier today?
11     A.  I do.
12     Q.  When you've used the word "standing" today,
13  were you referring to the Department's
14  administrative authority to -- under the existing
15  PSEO law --
16     A.  Correct.
17     Q.  -- to enforce?
18     A.  Correct.
19     Q.  Okay.
20     MR. TIMMERMAN:  No further questions.
21     MS. THOMSON:  I have no further
22  questions for today.  We'll leave this open.
23     MR. TIMMERMAN:  Sure.  And we will read
24  and sign.  Condensed electronic, I believe, please.
25     (Time Noted:  4:20 p.m., February 8, 2024.)

47 (Pages 182 - 185)

Page 186

1        REPORTER'S CERTIFICATE
2
STATE OF MINNESOTA   )
3                    ) ss.
COUNTY OF HENNEPIN   )
4
     I hereby certify that I reported the
5  deposition of SALLY REYNOLDS, on February 8, 2024,
in Minneapolis, Minnesota, and that the witness was
6  by me first duly sworn to tell the whole truth;
7      That the testimony was transcribed by me and
is a true record of the testimony of the witness;
8
     That the cost of the original has been
9  charged to the party who noticed the deposition,
and that all parties who ordered copies have been
10  charged at the same rate for such copies;
11     That I am not a relative or employee or
attorney or counsel of any of the parties, or a
12  relative or employee of such attorney or counsel;
13     That I am not financially interested in the
action and have no contract with the parties,
14  attorneys, or persons with an interest in the
action that affects or has a substantial tendency
15  to affect my impartiality;
16     That the right to read and sign the
deposition by the witness was preserved.
17
18     WITNESS MY HAND AND SEAL THIS 20th day of
February, 2024.
19
20
21
22
23     _Valerie Riske_
       Valerie J. Riske, Court Reporter
24     Notary Public, Hennepin County, Minnesota
       My commission expires January 31, 2029
25

Page 187

1  Jeffrey Timmerman, Esq.
2  Jeffrey.Timmerman@ag.state.mn.us
3        February 20, 2024
4  RE:   Loe, Melinda And Mark v. Jett, Willie Et Al.
5  2/8/2024, Sally Reynolds (#6439163)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com.
16  Return completed errata within 30 days from
17  receipt of testimony.
18  If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22     Yours,
23     Veritext Legal Solutions
24
25

Page 188

1  Loe, Melinda And Mark v. Jett, Willie Et Al.
2  Sally Reynolds (#6439163)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____    _____
24  Sally Reynolds              Date
25

Page 189

1  Loe, Melinda And Mark v. Jett, Willie Et Al.
2  Sally Reynolds (#6439163)
3        ACKNOWLEDGEMENT OF DEPONENT
4     I, Sally Reynolds, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Sally Reynolds              Date
13  *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15     _____ DAY OF _____, 20___.
16
17
18     _____
19     NOTARY PUBLIC
20
21
22
23
24
25

48 (Pages 186 - 189)

[& - 2022]                                                    Page 1

| & |
| --- |

**&**   3:17

| 0 |
| --- |

**01527**  1:6
**02/08/2024**   7:1
**03/01/2006**   4:4
**03/07/2022**
  4:14
**03/09/2023**
  5:17
**04/11/2016**   5:2
**04/15/2002**
  3:14
**04/17/2008**
  4:18
**06/10/2002**
  3:18
**08/05/2013**
  4:21
**08/10/2017**   5:5
**09/09/2021**
  5:22
**09/14/2020**   6:3
**0:23**   1:6

| 1 |
| --- |

**1**   3:14 20:5
  23:25 106:8
**10**   4:17 99:17
**1011**   5:7
**104**   4:20
**1058**   5:4
**1075**   4:19
**1081**   5:13

**109**   4:23
**10:18**   34:11
**11**   4:20 104:20
**11/18/2020**
  5:11
**114**   5:2
**11:08**   67:12
**11:22**   67:12
**12**   4:23 6:9
  11:1 12:3
  109:18 123:22
  162:22 165:13
**12/03/2019**   5:8
**12/06/2021**
  5:14
**124d.09**   24:15
**127**   5:5
**12:17**   99:14
**13**   5:2 114:1
**134**   5:8
**137**   5:11
**139**   5:14
**14**   5:5 127:14
**1400**   2:15
**1417**   4:13
**1429**   4:22
  104:22 105:4
**145**   5:17
**15**   5:8 112:25
  134:15
**150**   159:2,6
**151**   5:21
**1541**   109:24
**155**   6:2

**1568**   4:25
**1594**   4:16
**16**   5:10,11
  137:6
**162**   6:5
**1626**   5:16
**164**   6:9
**169**   6:12
**17**   5:14 113:1
  139:24
**1720**   5:20
**177**   3:8 6:14
**1773**   32:21
**1775**   30:17
**1778**   33:11
**1779**   30:19
  33:11
**1780**   33:12
**1785**   3:24
**1795**   4:6
**18**   5:17 88:17
  88:20 145:14
  153:14
**184**   3:4
**1886**   22:14
**1890**   21:20
**1893**   3:19
  23:23
**19**   5:21 151:17
**1907**   3:15
**1919**   2:6
**1985**   32:25
  33:21 54:16
**1:00**   99:12

**1:06**   99:14
**1st**   169:14

| 2 |
| --- |

**2**   3:16 12:12
  20:23 73:4,4
  79:3 106:8
  152:3
**2/8/2024**   187:5
**20**   3:14,16 6:2
  37:3 111:21,22
  155:6 187:3
  189:15
**20006**   2:7
**2006**   54:12,18
**2008**   100:4
  103:20 105:5
**2013**   106:9
  107:8
**2016**   93:12
  94:2 98:5 99:2
  99:4,5
**2017**   12:15
  128:1,17
  129:15,21
**2018**   39:6
  177:2
**2019**   6:7 39:6
**202**   2:8
**2020**   111:20
  155:12
**2020-21**   6:15
**2021**   4:24
  109:25
**2022**   46:25
  98:5 99:2

**[2023 - access]**

**2023** 7:14 25:6 46:24 47:8 68:1 69:8,14 98:5

**2024** 1:14 185:25 186:5 186:18 187:3

**2029** 186:24

**20th** 186:18

**21** 6:5 17:22 143:15 155:12 162:4

**22** 6:9 12:18 46:23,24 47:2 88:20 92:24 162:6 164:24

**22-23** 4:14

**23** 6:12 92:24 97:11 169:6

**24** 6:14 97:11 177:8

**25369** 186:23

**27** 3:20

**2:00** 102:24

**2:10** 133:25

**2:26** 133:25

**3**

**3** 3:20 27:21 30:25 31:22 106:8 153:19 156:10

**3.93** 28:13

**30** 1:11 3:22 4:2 31:1,4 37:3 37:22 58:25

142:8 148:10 159:21 187:16

**30th** 179:7

**31** 4:2 186:24

**3100** 1:18

**31st** 69:14

**3521** 6:8

**3733** 6:16

**3:00** 151:14

**3:13** 151:14

**3rd** 12:18

**4**

**4** 3:22 28:10 30:11,24 32:7 70:20 87:17 106:8 155:18 159:1

**400** 2:7

**445** 2:14

**45** 28:16 29:15

**4688** 5:23

**4694** 6:4

**4:03** 181:21

**4:13** 181:21

**4:20** 185:25

**5**

**5** 4:2 31:12,15 31:22 106:8 165:9 170:10

**52** 159:7

**522** 6:13

**54** 4:4

**55101** 2:15

**55402** 1:19

**58** 4:7

**583-7660** 2:16

**59** 17:22

**6**

**6** 1:11 4:2,4 31:1,4 37:22 54:6 58:25 142:8 148:10 150:10 159:21 165:11

**60** 8:12

**64** 17:23 153:13

**6439163** 1:25 187:5 188:2 189:2

**651** 2:16

**67** 4:10

**7**

**7** 3:3 4:7 28:25 58:21 109:23

**8**

**8** 1:14 4:10 67:15 107:18 185:25 186:5

**80** 1:17

**9**

**9** 4:14 92:16

**90** 8:12

**92** 4:14

**955-0095** 2:8

**99** 4:17

**9:05** 1:15 7:1

**9:54** 34:11

**a**

**a.m.** 1:15 7:1 34:11,11 67:12 67:12

**ability** 60:4 114:8

**able** 8:18 25:7 43:14,16 55:4 84:9 153:11,16 174:19,20

**above** 36:13 108:22 121:10 122:21 187:6 189:7

**absence** 139:21

**abutler** 2:10

**ac** 34:23

**academic** 18:18 29:20 43:7,8 45:19 92:24 98:5

**accept** 27:12 32:8

**acceptable** 34:7 38:5 79:23

**accepted** 54:17

**access** 16:13 29:20 35:15 40:17 45:5 55:4 125:14,23 125:25 126:14 153:16 154:22

**[accessible - agency]**                                                    Page 3

**accessible**
  56:14
**accessing**  29:2
  40:6,8 63:23
  154:7
**accompanying**
  17:3,6
**accounting**
  119:17
**accreditation**
  161:3
**accredited**  6:9
**accrediting**
  161:2
**accuracy**  187:9
**accurate**  102:6
**achievement**
  43:7,9
**acknowledge**
  94:18
**acknowledged**
  97:15
**acknowledge...**
  189:3
**acknowledg...**
  187:12
**act**  32:24
**action**  120:20
  120:21 129:11
  177:22 178:1,3
  178:5,15 179:1
  179:4,10,25
  180:5,14,16
  181:2,11,13
  186:13,14

**active**  172:21
**activities**  83:14
  83:16,17,23
  89:20 95:6,12
  95:18,19
**activity**  84:7
  95:15 97:3
  107:1 115:7
**actor**  66:4
**actors**  66:8
  160:2
**actual**  30:17
**actually**  15:7
  63:18 123:12
  137:1 141:14
  141:17 150:6
**add**  109:17
**added**  69:15
**addition**  20:17
  22:1
**additional**
  62:12 69:15,15
  97:17
**additions**  189:6
**address**  24:24
  41:3,7,17 43:2
  43:6,10,15,16
  44:6,12,25
  45:1,6 71:9
  86:16 96:7
  140:13,17
  149:10 157:1,7
**addressed**
  33:15 104:10
  104:15 158:4

**addresses**
  105:21
**addressing**
  43:19 81:2
  96:16 100:5
  104:16 141:1,3
**adds**  73:5
**adhere**  135:8
**adherence**
  180:5
**adm**  159:4,9
**administration**
  103:17
**administrative**
  185:14
**admission**  3:23
  4:7 7:16 19:21
  41:13 44:1
  45:4,6,18 55:8
  59:9 62:3
  86:23 113:6,7
  113:10,14
  156:4
**admissions**
  18:18 19:8,13
  19:17 26:20
  27:3,4,5 29:1,9
  29:23 30:2,2
  31:2 41:16
  43:18,22,25
  44:2,3,9,10,15
  44:16 45:3,8
  46:4 60:22
  79:1 113:20
  140:16 141:1,4

  151:8 156:1
  179:20,20
  185:4
**admit**  42:17
  135:7
**admits**  44:11
**admitted**  27:10
  28:13,16
**adopt**  25:22
**adosh**  36:15,17
  48:13,22 49:5
  49:25 50:20
  52:25 53:6
  111:8,9
**adult**  12:23
**advance**  176:19
**advanced**
  169:18 171:5
**advisor**  162:17
**affect**  59:17
  60:1 186:15
**affects**  186:14
**affiliated**  110:9
  110:20 112:3,8
  112:13
**affiliation**  41:2
  86:3,9 110:24
  111:14,16
  112:10,11,22
  185:2
**affords**  159:2
**ag.state.mn.us**
  2:16,17 187:2
**agency**  49:5
  122:11 135:19

144:4 152:4,4
183:11
**ago** 93:8
**agree** 42:10
76:23 86:16
102:1 135:25
**agreed** 98:24
109:4
**ahead** 59:3
107:10
**aids** 167:14,15
**al** 1:3,7 187:4
188:1 189:1
**align** 108:12
**alignment**
109:8 112:1,2
112:17
**aligns** 17:16
**alliance** 110:25
**allotted** 187:19
**allow** 8:3 46:5
152:11 153:4
171:7
**allowed** 29:8
29:19 33:17
106:25 131:5
131:16 132:1
**allowing** 84:15
85:18 86:1
116:16
**allows** 167:15
171:24 173:24
179:16
**alternative**
12:13,25 81:21

**amen** 72:2
**amendment**
7:14,19 13:21
13:25 14:4,11
14:21 15:15,15
15:21 25:6
35:7 36:5,24
37:19 38:4
52:5 61:23
87:3 88:5
144:23 145:3
149:22 150:14
152:11 153:3
157:17,20
184:1
**amount** 158:14
161:21
**analysis** 42:17
76:12
**andrea** 2:6
**angela** 13:13
**annual** 169:13
**annually** 94:18
**anonymous**
75:25
**answer** 8:15,18
14:2 16:9 18:3
19:25 26:4
27:8,16 29:12
32:19 34:3,19
37:24 40:3
41:12 42:1,2
45:11 48:1,4
55:2 56:6
59:20 60:5

61:3,25 62:8
62:20 66:7
72:25 73:10
77:10 78:6
80:2 82:21
84:5,17 85:6
85:24 94:13
95:9 98:22
103:8 110:19
112:7,20
128:22 130:24
132:7 133:17
136:5 142:10
144:8,13,14,16
144:18,20
145:8,11
147:21 148:2
150:1 152:15
153:8 155:22
157:6,23,25
166:8 167:4
168:14,20
170:8 173:4,18
178:9 179:24
181:5
**answered** 27:7
32:18 41:25
52:13 97:5
168:19 170:7
**answering** 7:23
37:25 131:24
**answers** 6:10
8:5,6 59:2
62:24 63:19

**anti** 135:6
**anticipate**
130:17 168:7
**anymore** 17:12
**anytime** 91:10
**apologize** 91:1
**appeal** 6:14
**appear** 17:17
102:20 123:16
131:10
**appearance**
132:2,16
**appeared** 2:18
144:1
**appears** 20:15
23:10 54:14
55:3 62:1
78:13 88:6
99:25 100:11
101:16,18
102:22 105:3
107:11 110:1
114:13,15
119:5,6 130:14
135:3 137:14
140:8
**appended**
189:7
**appendix** 5:22
6:3
**applicable**
187:8
**applicants** 55:9
**application**
3:14,22 5:12

5:19 17:15
18:7,21 20:15
22:2,5,19 23:1
23:5,9,15,18,21
23:25 24:6,10
24:14 25:2,5
25:22 26:7,12
26:24 30:5,6
30:17 32:4,16
33:2,5,9,21,24
42:3,22 43:13
44:13 55:12,16
55:18,25 56:2
70:16 78:23
80:23 81:22
90:18 107:20
107:21 137:17
137:19,25

**applications**
17:20 28:23
30:9 94:3,7,8

**applied**   17:25
176:3

**applies**   68:5
77:6 145:4

**apply**   13:20
16:23 28:7,15
28:21 29:3,7
56:21 69:3
81:7,13 109:2
145:9 176:4,5

**applying**   32:22
68:15,15 88:9
90:21 137:16
137:20

**approach**
62:15 78:14
80:13 96:21

**approaches**
114:24

**approaching**
116:6

**appropriate**
84:1,8 156:21

**approval**   20:18
22:5,9,12,21
23:1,12 54:12
109:9

**approve**   80:9

**approved**
17:19 18:4,9
18:13,13 21:22
24:7,10 25:13
25:16 34:13,15
64:23,24 79:9
88:17 160:23
160:25

**approves**   15:10
34:21,22

**approximately**
99:4

**area**   179:9

**areas**   12:22
57:7 75:21

**arriola**   50:23

**art**   72:2

**ascribes**   74:21

**asked**   27:6
32:17 34:7
40:19 41:24

52:12 53:2
63:16 97:4
125:15 137:16
144:9 151:7
168:18 170:2,6

**asking**   16:16
21:7 25:4 38:2
53:13 69:6
73:2 76:18
80:8 96:2
105:19 106:5
107:7 137:21
137:25 144:10

**asks**   72:19

**asserted**   73:19
140:20

**asserting**   71:3

**assessed**   103:9

**assessment**
102:6

**assignment**
65:21

**assistant**   12:6
13:13 15:6
38:7

**assume**   8:15
108:1

**assuming**
119:22 137:20
147:1,8

**assurance**   4:15
92:23 94:5,6
106:23

**assurances**
18:22 94:1

97:9 105:17,22

**atmosphere**
59:14 60:8,25

**attach**   146:20

**attached**
187:11

**attachment**
4:15 127:21
129:4

**attempt**   108:2

**attempted**
158:2 175:1

**attempting**
37:2 157:1,7

**attend**   10:16
41:18,23 91:18
163:2 168:1
175:6

**attending**
162:15,23
163:22

**attention**
155:23 156:2

**attest**   81:12,16
86:10 143:10
183:2

**attestation**
86:13,14,15

**attorney**   2:13
186:11,12
187:13

**attorneys**   9:16
9:18 186:14

**audit**   120:9,14
120:18 121:2,7

121:10,21,22
122:3,6,13
124:3,23
180:24
**audited** 88:21
**audits** 88:24
121:17,19,24
**augsburg** 10:25
11:3 65:8
69:13
**augsburg's**
67:25 68:1
**august** 6:7
12:18 46:23
**authority** 24:12
24:20 25:1
27:5 35:25
36:4,6 40:12
40:21,22 45:24
76:2,4 185:14
**available** 19:4
28:19,21 68:23
74:24 87:21
173:7 174:8,13
179:11 187:6
**avenue** 2:6
**average** 28:12
159:10
**await** 119:7
**award** 65:15,17
65:19,24
**awarded**
163:18
**awarding**
66:13

**aware** 19:5
22:4 24:12
26:13 30:7
32:3 39:2,21
49:18 50:5,21
60:22 87:1,6
93:19 94:19
99:1,2 103:23
104:14 110:23
111:2 121:17
121:19,22,24
122:1 123:3
124:6 138:22
143:5 145:3
151:10,10
152:23 153:1
157:13,17
174:18 181:10
183:24 184:4
**awkward**
107:12

**b**

**b** 1:11 3:12 4:2
31:1,4 37:22
58:25 76:13
96:17 106:8
142:8 148:10
159:21
**baccalaureate**
169:18 171:6
**back** 12:8,9
21:4 23:23
35:24 38:8
82:1 85:11
105:23 118:16

141:19,24
142:21 143:9
147:9 156:9
**background**
10:7 32:8
**barrie** 38:18
128:25 136:12
141:10 142:4
149:14
**barrier** 24:18
24:24 25:11
26:2,17 27:14
41:10,20 43:17
43:20,22 44:5
44:7 45:4 64:3
**barriers** 16:13
25:15,17,17
36:1 37:4 40:6
40:8,13,21
41:1 63:22
154:7 155:1
**barsness** 9:20
35:2,3 37:6
48:17 52:11
74:15,16 75:17
75:18 90:3,15
100:9,22
130:11 141:25
146:15
**based** 26:8
29:13,20 31:7
41:5,10 42:18
42:20 43:6,8
45:18 61:4
62:24 63:19

64:11 66:15
70:23,24 71:12
71:19 72:6,16
72:17 73:6
78:3,7 79:8
89:11 138:22
156:17 159:23
179:5
**basic** 12:23
**basing** 72:20
**basis** 7:16
131:6 132:24
139:4,5 167:17
**bates** 3:21 4:3
6:11
**baxter** 2:5
58:19
**bearing** 158:16
**beatrice** 183:22
**becket** 2:4
**becketlaw.org**
2:8,9,9,10
**becoming**
20:16 89:14
143:11
**began** 71:24
**beginning**
71:25 72:10
96:23
**begins** 82:2
83:21
**behalf** 2:3,12
37:25 39:17
48:2

**belief** 40:16
72:8 77:6,23
89:21 95:11,17
96:25 164:22
**beliefs** 70:23,25
71:4,8,13,20
72:7,17,22
73:7 76:15,24
78:18 82:2,4
83:9 86:11,16
107:4
**believe** 24:20
34:18 36:16
46:17,20 49:12
66:25 68:25
69:25 70:8,9
79:13 81:18
93:1,8 94:5,18
98:25 99:5
100:4 103:21
104:6,8 108:15
113:16 117:20
118:7 134:9
136:21 140:11
148:21 170:21
175:19 176:17
177:4,5 183:11
185:24
**believed** 24:13
98:3 129:20
**believes** 174:2
**beneath** 102:13
**benefit** 166:3
166:13,23,24
168:9,15

**benefits** 166:22
**benjamin** 2:5
**best** 115:20
172:16 178:10
182:24
**beth** 9:20 35:1
35:3 36:21
37:6 48:17
50:24 52:11
53:23 74:15,16
75:17,18 90:3
90:15 92:3
100:9,16,22
129:24 130:10
141:24 146:15
147:5 149:13
183:17,20,20
184:9
**bethany** 4:7
59:9 61:17
62:25 65:5
**bethel** 3:22
30:19 32:22,23
33:16 45:7
54:12,15 55:21
56:3
**bethel's** 33:4
54:22,23 55:8
55:12 56:18
**better** 106:20
171:13 172:2
**beyond** 37:21
47:21 114:8
146:4 147:19
148:8 149:24

170:14
**bfleshman** 2:9
**bias** 44:14
**bible** 72:15,19
79:11 115:3,8
116:16 120:5
**biblical** 78:17
79:8,18,23
80:19,21 81:1
81:4 101:21
102:8,13 103:4
128:14,19
132:12,22
133:8
**bigger** 137:24
**bill** 47:1,18
48:8 49:10,17
49:18 50:2
**billed** 175:2
**billiet** 13:18
37:15 146:13
146:14 149:15
**bills** 13:5 48:14
**binding** 94:22
98:19 110:15
**biweekly** 49:4
**blank** 67:24
**blown** 121:21
**body** 161:2
**born** 10:8
**bottom** 21:21
28:4 29:1 79:4
113:3
**bound** 163:1

**box** 79:5
**brad** 13:19
**break** 8:10,12
8:12 34:9,11
67:9,12 99:10
99:14 133:24
133:25 151:12
151:14 181:19
181:21
**broad** 95:25
**broadcast**
131:25
**broaden** 29:4
**brought** 63:20
155:22 156:1
**brown** 4:5
101:9
**budget** 179:17
**built** 127:6
**bullet** 93:17,21
155:18 156:14
156:15
**bureaucracy**
15:8
**bureaucratic**
76:8
**bussed** 166:12
167:8
**bussing** 165:20
**butcher** 126:8
**butler** 2:6

**c**

**c** 2:1,19 83:13
96:17 106:8

**[cabinet - christian]**

cabinet 34:23
calc 73:4
calculated 29:17
calculus 73:4
calendar 9:12 91:19
call 53:18,18 120:13 133:18
called 13:20 97:25 120:16
calling 118:15
calls 34:1 42:13 52:6 62:7,19 64:21 66:5 72:23 73:9 76:22 77:8 82:19 83:10 84:4,17 94:12 98:20 102:3 107:6 110:17 112:6,18 128:20 130:22 132:5 133:15 136:2 145:6 152:13 153:6 154:12 157:4 157:22 166:7 167:2 168:12 173:2,16
campus 5:12 152:24 153:5 155:2 175:11 175:14,25 176:1,15

capacities 146:8
capacity 26:9 29:14 31:9 39:18 48:1,4 103:25 109:15 148:12
capped 158:14 158:22 161:21
care 12:10 185:1
career 12:20,24 13:1 169:20 171:3
carol 100:5,12 101:3,4
carolina 12:7
case 1:5 7:13 7:20 43:4 120:16 125:17 146:24
catalogs 103:15 108:10,14
categories 7:17
cathy 51:7 52:23
cause 120:9
caveat 31:6
center 1:18
centered 128:3 128:12 129:7 131:12 133:6 174:1
certain 24:22

certainly 24:23
certainty 24:9 101:12
certificate 186:1
certificated 160:24
certification 11:1
certifies 93:14
certify 186:4
cetera 71:9
chain 4:17 5:2 5:8,11,14,17 15:7,8 137:11 145:23 147:6
challenge 7:14 29:2
challenged 63:11 64:1
challenging 61:14 171:1
chance 20:10 21:1 54:10 59:5 99:20 114:3 127:17 134:17 137:9 145:16,19
change 24:14 25:7 27:5 69:2 109:6 119:15 148:14,17 151:7 154:14 154:24 188:4,7 188:10,13,16

188:19
changed 25:1 37:15 92:7,7
changes 18:15 23:8 24:3 99:3 187:10 189:6
characterize 29:24
characterized 77:13 179:2
charged 186:9 186:10
check 125:1
children 3:17 155:19,20
choose 11:3,11 131:5 152:23 153:11 154:24
choosing 162:11
chorus 11:21
christ 128:3,12 129:7 131:12 133:6 137:21 137:22
christian 55:9 59:14,22 60:9 60:25 61:9 79:7 80:11,12 80:13,14 110:24 123:20 131:3,16,18 135:9 156:17 157:2,18 158:7 158:9

[christianity - community] Page 9

**christianity**
  156:20
**church**  32:8
  64:2 86:4,9
  110:25 111:3
  112:10,17
**cited**  56:1
**civics**  44:21,22
**clarification**
  75:22 76:1
  78:15,19,24
  79:2,17,22
  88:18 89:2
  90:4,9 98:10
  139:9
**clarifications**
  87:25
**clarified**  16:17
  35:14 40:15
  144:2
**clarifies**  24:15
  27:17
**clarify**  21:7
  35:18 36:25
  37:2 74:17
  90:2,21 104:18
  107:16 162:2
  184:25
**clarifying**
  105:6
**clarity**  15:22
  16:2,12 45:1
  68:14 71:5
  108:3

**class**  44:8,25
  72:10,14 73:3
  84:12,14 85:15
  85:17 96:24
  114:16 115:4
  115:15 120:17
  154:6
**classes**  44:6
  65:6,8 79:11
  120:18 128:18
  155:2 172:25
**classify**  86:1
**classroom**  78:2
**clause**  14:14,16
  40:15,20
  144:24,25
**clear**  16:6 38:1
  53:13 62:4
  64:2 80:11
  100:11 106:17
  106:19 107:7
  143:6 145:1
**cma**  112:17
**collaborate**
  122:5,7
**collaboration**
  35:11 36:11
**collaborative**
  51:11 120:24
**colleagues**
  111:6
**collect**  26:6
  30:8 161:11
  170:1

**collecting**
  146:23
**college**  3:14,22
  4:7,18 10:16
  10:25 11:22
  12:20 17:9
  22:21 32:23
  59:10,14 61:15
  62:2,25 65:16
  65:17 79:6,7
  79:13 80:10,11
  80:13,14 81:3
  110:23 123:9
  124:16 129:5
  148:15 169:20
  170:16 171:4,9
  171:10,13,25
  172:3
**colleges**  10:17
  103:14 159:16
**combined**  12:3
**come**  76:25
  104:17 117:5
  117:13 161:16
  175:25 176:1
**comes**  15:11
  24:20 32:20
  44:3 95:1
  161:5,18
**coming**  50:3
  81:9 91:17
  106:15
**comment**  14:4
**comments**
  129:4 147:25

**commission**
  186:24
**commissioner**
  13:14 15:6,9
  34:24 38:6,21
  113:17,20
  114:14 118:15
  120:12 140:4,5
  143:2 152:18
  155:14
**commissioner's**
  103:17
**commissioners**
  38:7
**commitment**
  33:4 54:23
**commitments**
  30:19
**communicate**
  131:18,22
  132:9 141:19
**communicated**
  142:21
**communicating**
  36:17,18
**communication**
  33:22 36:21
  132:3 137:1,4
  140:10 143:4
**communicati...**
  9:8 106:17
  149:18
**community**
  48:14 106:15
  135:9 156:3

157:8
**compared**
32:14
**comparison**
32:13
**competitive**
29:1
**complaint** 5:3
19:23 33:14
41:14 42:19,25
43:6 60:17
62:16 66:25
71:2 73:12,15
73:17,18 74:12
74:14,18 75:15
75:16,24 77:12
78:22 90:10
91:16 100:1
104:16 109:1
109:11,14
111:17 113:11
113:15 116:19
117:2,3,5
118:3,21,25
119:3 122:18
122:20 123:18
125:2,17,18
134:21 135:3
135:15,20
136:11,17
139:21 140:6
175:4 176:7,18
177:1,5 180:10
181:23 182:9
182:10,12

183:1,19
184:10,12
**complaints**
35:21 66:23
77:24 89:1
93:13 97:14,18
97:19 117:15
117:16 120:10
121:4,5 123:23
124:2,20
141:22,22
149:11 157:8
157:15 158:8
175:16,18
176:2,9,14
178:16 179:19
180:17 185:9
**complete** 8:18
175:20 189:8
**completed**
69:16 187:16
**completion**
17:13
**compliance**
88:22,25
103:18 123:25
180:3
**comply** 89:14
**concern** 33:14
45:12 61:12
69:22 98:1
104:10,11,14
108:16 140:9
183:21

**concerns** 63:20
114:16,24
157:7 181:15
**conclusion** 66:6
82:20 94:12
98:21 110:18
136:3 145:7
**conclusively**
24:23
**concurrent**
158:11,13
159:3,4,8,20
160:7,9,22,23
161:10,11,25
171:7
**condensed**
185:24
**confidential**
3:15,18,24 4:5
4:8,12,16,19,21
5:3,6,9,12,15
5:19,23 6:4,7
6:15 177:16
**configured**
100:3
**confirm** 119:11
**confirmed**
119:9 139:10
**confused**
106:23 184:15
**connolly**
142:21
**consequence**
65:2 122:25
133:14

**consider** 29:16
48:23 56:3,18
61:8 65:5
66:10 154:16
155:1 163:6,12
166:3 168:16
169:1 180:20
**consideration**
39:23 44:14
46:16 52:20
152:2 155:14
172:21
**considerations**
42:5,7 179:5
**considered**
30:7 61:19
74:23 81:21
82:5,7 83:3,19
83:24 84:22
89:22 90:23
94:9,20 116:17
129:23
**considering**
30:14 90:21
**considers** 77:21
**consistent** 20:2
34:19 42:24
**consists** 17:5
**constituent**
108:16
**constitute**
112:3 166:4
167:23
**constitutes**
167:25

**consult** 75:5,6
  76:10
**consultation**
  93:22 120:13
  120:25 123:15
**consults** 75:21
  76:7
**contact** 35:12
  119:2
**contacted**
  62:21
**contacting**
  75:22
**contacts** 44:24
  97:23
**contain** 88:11
  126:16
**contained**
  44:14 99:6
**contains** 88:12
**contaminate**
  141:11 142:2
**content** 11:8,15
  57:6 108:19
  109:11 121:18
  122:19 123:4
  123:10 138:24
  139:5 179:21
  180:17,18
  181:12
**context** 73:1
  77:16,17 104:1
  115:3 119:4
  130:8 180:20

**continue** 121:6
  150:15
**continued** 4:1
  5:1 6:1 51:3
  63:24 64:16
  73:19 97:14
  129:17
**continues**
  105:12,13
**continuing**
  64:18
**continuous**
  179:2
**contract**
  160:15 186:13
**contracting**
  160:17
**contracts**
  161:13
**contribute** 57:2
**conversation**
  59:24 60:2,12
  60:16 62:12,22
  63:1,24 64:14
  64:15,16,18
  71:4 73:19,21
  75:4,20 77:12
  77:14,20 78:1
  78:20 102:22
  102:23 111:10
  125:4,21
  129:25 130:1,2
  138:3,17
  139:16 164:21
  180:2 182:11

183:12 184:9
**conversations**
  36:13 48:10,12
  48:19 49:22
  50:9 53:16
  54:3 66:22,24
  75:23 111:5
  119:8 148:13
  148:22 149:2
  153:18 174:15
  178:20
**copies** 186:9,10
  187:14
**correct** 7:12,18
  16:3 21:11,23
  22:6 23:2,15
  23:16 24:3
  25:20 28:13,20
  29:4,9,21
  32:10,25 33:1
  33:5 39:1,25
  45:17 58:3,14
  60:3,11 65:4,7
  65:14 67:23
  68:2,19,22
  69:2 71:21
  72:18 83:4,12
  83:24 84:25
  86:2 87:4
  88:11,14 92:21
  93:5 94:8 97:1
  97:6 101:23
  105:8 107:10
  107:18 110:1
  119:10,14,24

119:25 120:2,6
  120:8 123:21
  125:16,22
  129:2,9,18
  134:5 137:3
  138:7 139:22
  140:7 143:22
  144:12,19,21
  145:25 146:18
  146:19 152:7
  154:8 155:23
  156:8 158:10
  159:1,14
  161:21 162:18
  163:15,25
  166:1 170:3,17
  170:18 171:15
  171:20 172:20
  173:1 174:9
  179:16 185:6
  185:16,18
  189:8
**corrections**
  189:6
**corrective**
  177:22 178:1,3
  178:5,15 179:1
  179:4,9,25
  180:5,14,16
  181:2,10,13
**correctly** 22:23
  28:24 101:24
  128:15
**cost** 186:8

**[costs - creation]**                                     Page 12

| | | | |
|---|---|---|---|
| **costs** 159:7 | 83:21,21 86:20 | 36:2 37:5 40:7 | 171:12 173:5 |
| **counsel** 92:12 | 88:1 89:5,8,10 | 40:8,17 43:21 | 173:21 178:24 |
| 93:23 140:22 | 89:11,14,16,17 | 44:17,18 45:2 | 179:15 180:7 |
| 146:22 176:21 | 90:5,16,23,24 | 45:5 46:7 | 180:18 181:12 |
| 182:2 184:12 | 95:2,4,13,18,19 | 56:21 60:4,6,7 | 185:4 |
| 184:13 186:11 | 96:21 103:15 | 60:8 65:1 | **coursework** |
| 186:12 187:14 | 105:21 107:2 | 66:18 68:16 | 82:12 154:8 |
| **counseling** | 108:9,10,14 | 69:16 70:14,21 | 178:22 |
| 167:17 | 109:3,10 112:8 | 70:22 78:16 | **court** 1:1 7:25 |
| **counselor** | 112:12,15 | 80:16,18 81:13 | 9:1 85:12 |
| 162:16 | 114:18,25 | 81:23 86:20 | 88:19 186:23 |
| **counselors** | 116:4,8 118:20 | 88:16 90:12,18 | **covenant** 30:19 |
| 78:11 | 119:12,13,15 | 90:19 92:24 | 33:4 54:23 |
| **counted** 72:4 | 119:20,24 | 93:15,16 95:23 | 55:22,23 |
| **counter** 103:10 | 120:19,21 | 95:25 96:5,7,7 | **covid** 111:21 |
| **county** 186:3 | 121:3 122:19 | 96:11,12,14,19 | 138:11 |
| 186:24 | 123:1,4,12 | 97:24 101:18 | **craft** 108:2 |
| **couple** 10:7 | 124:6,11,13,16 | 102:5,7 105:21 | **crafting** 35:13 |
| 184:21 | 125:9 126:13 | 106:11,19 | **create** 27:2 |
| **course** 6:12 9:3 | 126:18,20 | 107:22,25 | 36:6 71:14 |
| 11:19,21 18:25 | 127:8 132:11 | 108:11,19,24 | 108:3 155:1 |
| 27:18 28:11 | 132:24 139:5,6 | 109:5,5 112:1 | **created** 40:6 |
| 44:9,10,12,19 | 139:8,11,13 | 112:3,13,16,23 | 50:17 68:13 |
| 45:21 61:11 | 158:25 159:2 | 113:8 120:15 | 81:5 92:25 |
| 63:16 64:5 | 160:23 162:24 | 121:7,18 | 93:1,11,17,24 |
| 65:3,21,23 | 163:19 164:1,4 | 122:17 124:21 | 98:16 |
| 70:2,24 71:3 | 164:7,15,21 | 131:22 132:8 | **creates** 24:24 |
| 71:12,17,17,24 | 167:22 168:7,7 | 132:25 133:2,3 | 25:11 44:5 |
| 72:1,1,16,21 | 169:12 171:4 | 133:19 138:21 | 179:8 |
| 73:22 74:2,7,8 | 173:10,12,15 | 149:6,7 150:5 | **creating** 38:5 |
| 74:23,23 76:10 | 175:2 179:21 | 150:22,23,25 | 41:1 50:15 |
| 78:14,14,21 | **courses** 4:15 | 151:1,4,6 | 63:22 64:2 |
| 79:2 80:16 | 17:17 24:15 | 154:4 158:3,16 | 155:21 |
| 82:2,15,17,17 | 25:9 27:11,11 | 159:8,15 | **creation** 36:1 |
| 82:22,25 83:1 | 29:3 35:16 | 169:18 171:9 | |

**credit** 12:25
  15:17 65:14,15
  65:17,19,20,24
  66:13 75:12
  81:11,25 115:5
  116:15 122:9
  136:16 141:21
  143:22 158:16
  160:9,10,22
  161:4 162:23
  162:25,25
  163:4,6,8,9,10
  163:12,18,23
  164:6 169:17
  170:16 171:10
  174:3
**credits** 41:4
  66:14 67:5
  171:25
**criteria** 17:4
  31:2 41:13
  45:18 62:17
  71:14,15 74:6
  87:19,23,24
  88:13 89:12,17
  89:25 108:22
**crossed** 152:6
  154:5
**crosses** 77:22
**crown** 3:14
  21:15,17,22
  22:18,21,25
  23:4,7,17 24:6
  24:14 70:18
  79:6,13 80:10

  110:23 111:2
  111:15 123:24
  124:16 147:13
  147:25 148:4
  148:17 149:20
  150:3,15
  174:19 175:6,8
  176:10,16
  178:17
**crown's** 20:18
  22:1,5 26:24
  27:5 30:2
  32:16 111:13
  112:2
**cs** 187:15
**cst** 1:15
**current** 12:16
  38:16 55:8
  68:4,7,10 69:8
  87:11 102:9
  105:10 111:14
  150:16 161:12
  169:15
**currently** 86:25
  108:19 109:17
  149:21 153:13
**curriculum**
  89:18,18 95:2
  101:21 102:12
  125:10,11,12
**cv** 1:6

---

|                     **d**                     |

**d** 3:1 86:3
  96:17

**d.c.** 2:7
**daily** 159:10
**data** 30:8
  126:11 127:2
  146:17,20
  147:3,9,10
  161:12 169:15
  170:1,5
**date** 1:14 24:1
  38:13 188:24
  189:12
**dated** 3:14,17
  4:4,14,17,21
  5:2,5,8,11,14
  5:17 23:24
**day** 53:8
  186:18 189:15
**days** 187:16
**deadline** 23:25
**december**
  143:12
**decide** 83:25
**decided** 74:10
**decision** 66:8
  68:10 120:24
  121:9
**decisions** 13:24
  42:6
**declaration**
  135:9
**declare** 189:4
**declined** 183:5
**dedicated**
  122:9

**deem** 82:24
**deemed** 72:13
  189:6
**defendant** 8:24
**defendants** 1:8
  2:12
**define** 61:12
  70:24 90:4
  91:7
**defined** 59:23
  70:9 95:3
**defining** 61:2
  83:19 98:24
**definition** 56:9
  56:12 76:16
  83:15,18 89:3
  89:5,16 93:17
  93:20 94:17,22
  94:25 95:1,5
  98:12,18,19
  101:20 102:14
  105:6,10,11
  107:8,9,13
  110:7,15 112:4
  116:10
**definitions**
  110:21
**defray** 159:7
**degree** 10:22
  11:24 48:19
**delivered**
  112:22 180:4
**delivers** 48:22
**demeules** 2:14
  56:23

**demographic**
  127:10
**demographics**
  5:18
**demonstrated**
  87:17
**denials** 139:3,4
**denied** 64:19
  124:5 138:22
  138:24 139:1
**department**
  3:17 4:2,10,20
  4:23 6:5,9,12
  13:6,10 15:4
  24:13 34:16
  50:25 99:25
  108:8 136:24
  140:18 142:19
  179:13
**department's**
  24:25 160:1
  169:25 170:4
  185:13
**depend** 86:7
**depending**
  64:14 73:20,25
**depends** 119:18
  160:4
**deponent**
  187:13 189:3
**deposed** 8:21
**deposing**
  187:13
**deposition** 1:11
  9:19 20:20

53:8 92:10
117:4,10,18,22
134:23 138:6
175:17 176:19
183:9 184:6,20
186:5,9,16
**described**
  103:3,3
**describing**
  124:2
**designate**
  177:13,15
**designated**
  47:22,23 59:1
  136:4 142:8
  148:9 157:5
  159:19
**designating**
  160:5
**designation**
  31:14,21
  150:10
**designations**
  4:3
**desk** 117:13
  120:14 180:25
  181:1
**details** 145:2
  182:15,22,24
  183:19
**determination**
  41:21 84:21
  163:19
**determine**
  26:19 27:9

35:15 52:18
61:7 64:11
71:7,12,16
74:1 75:7 76:2
76:4 87:15,20
87:23 88:1,25
109:7 113:5,7
119:17,19
120:19 180:22
**determined**
  26:9 27:18
  29:13 44:4
  70:12 82:13
  87:12 112:21
  112:23 120:22
  140:12
**determines**
  14:24 15:1
  34:24 173:19
  173:20
**determining**
  77:22 123:15
**develop** 22:18
  52:15 90:13
**developed**
  93:21,21 105:6
  181:7
**developing**
  38:14
**development**
  90:2,12,16,18
  91:1,2,5,12,14
  91:20
**devotional**
  72:15

**diana** 2:4
  133:21 165:7
**dictate** 69:11
**dictated** 109:9
  109:12
**difference** 30:1
  84:12 85:14
  106:3,6
**different** 10:17
  19:25 26:24
  44:1 49:14
  88:12 95:24
  99:6 106:13
  124:10 158:21
  178:22
**differently** 95:4
**digging** 123:17
**diligent** 130:15
**direct** 13:17
  114:16
**directed** 113:11
  122:20 136:19
  136:20 141:23
  141:24,24
  142:15
**direction** 116:3
  144:15,17
**directive**
  113:17,19,24
**directly** 14:4,23
  36:17 140:17
**director** 12:20
  15:19 34:22
  39:19,20,22
  46:13,14,19,22

47:17 51:5,6
93:7 117:1
120:23 136:19
143:14,16
**directs** 36:19
**disagreement**
106:16
**discomfort**
77:25 78:12
97:24
**discretion**
71:12 87:15,22
**discriminate**
185:4
**discriminated**
135:6
**discrimination**
135:20 140:7
140:15 141:3
144:1
**discriminatory**
5:9 46:7
164:11,11
**discuss** 117:3
162:16
**discussed** 35:13
52:1 111:13
141:5,8
**discussion**
47:11,12 53:17
77:7 141:6
144:22 155:4
184:15
**discussions**
35:22 38:3

47:16
**disparaged**
63:11 64:1
**disparaging**
61:15
**distinctively**
79:7 80:10
**district** 1:1
114:14 118:24
119:1 126:2
158:17 159:5
160:16,16
161:6,9,19,20
165:23 166:12
166:16,19
167:9
**districts** 57:10
57:15 126:10
159:11 161:13
165:22
**division** 12:21
12:23 50:8
155:13 160:11
169:21
**divisional**
122:6
**divisions**
154:20
**document** 6:19
20:4,9,12 21:2
21:13 23:24
27:20 28:4,5
29:11 30:18
31:15,19 33:13
45:7,10 54:5,9

54:24 55:1
59:7 66:20
67:14,17,20
92:20 94:24
95:8 99:16,19
99:22 101:14
103:6,7 104:19
104:24 109:20
109:24 110:2
113:1,25 114:5
114:12 127:16
134:2,13,19,20
137:10 140:1,2
145:18,21
151:16,19,22
155:9 162:7,7
165:3 169:9,21
177:11,20
180:2 182:2,5
**document1** 5:6
**documentation**
17:3
**documents** 9:4
9:8,25 10:1
39:5 60:20
92:13 137:19
176:23
**doing** 19:22
35:17,19 36:21
75:1 90:20
97:16 124:23
**dollars** 37:5
40:7,9,10,11,18
45:6,16,25
58:12 80:17

88:3 94:21
131:9 135:5
164:10 166:4
166:14,15,18
167:23
**dr** 135:24
137:2 141:10
142:4
**draft** 24:2
**driven** 116:7
**dthomson** 2:8
**dual** 12:25
15:17 65:14,20
75:12 81:11,25
122:9 136:16
141:21 143:22
158:16 162:24
163:4,8,8,10,12
163:18 164:6
169:17 171:12
174:3
**due** 11:13
169:14
**duel** 160:9,10
163:23
**duly** 7:4 186:6
**duplicates**
22:15
**duty** 14:8

**e**

**e** 2:1,1 3:1,12
86:10 96:18
188:3,3,3
**earlier** 163:3
185:10

earn   170:16
   171:10,24
earning   11:24
earns   162:23
ebaxter   2:9
ebbs   17:22
econ   114:16
   115:4
economics
   120:17
edina   10:9,11
edit   152:8,21
edits   152:20
education   4:10
   4:21,23 6:6,9
   6:12 12:12,24
   12:24 24:17
   56:4,10,11,13
   56:16,20,22,24
   57:1 58:5,6
   65:6,9,10
   66:11 67:1
   108:9 152:17
   154:7 163:6,13
   163:17 167:10
   168:4,17 169:2
education's   4:2
effect   87:3
   149:22 150:15
effective   22:22
effort   108:11
eighth   1:17
either   51:7
   121:6,23 124:3
   145:2 150:20

158:16 160:14
   175:23 182:12
electronic
   185:24
elements   120:2
eligibility   4:11
   18:10 59:17
   60:1 64:20,25
   67:22,25 68:4
   69:8,10,11,21
   70:4 89:4,24
   94:7,8 95:20
   95:22 96:3,10
   96:15 107:9,14
   107:17 124:11
   133:19 138:22
   149:21
eligible   4:15
   16:23 18:11
   19:3,15 21:22
   54:17 69:2,4
   69:24 82:14,24
   86:24 91:10
   96:19 103:14
   123:12 124:12
   124:13 149:6
   150:3,17,21
   161:3 173:23
   174:8,10
email   2:8,16
   4:14,17 5:2,5,8
   5:11,14,17
   97:23 101:5,15
   115:17 127:21
   127:22 128:1,2

128:24 129:3
   134:4,7 137:11
   138:10 140:9
   145:23 146:12
   146:13,20,22
   147:1 182:25
   184:17
emailed   114:14
emails   35:24
   114:10 117:7
   117:21
employee   135:4
   158:17 186:11
   186:12
employees
   129:1
encountered
   174:14
encourage   29:3
   172:6,10,12,17
encouraged
   162:15
encouragement
   73:5,13 74:6
   77:2 116:11
encourages
   172:8
enforce   35:25
   185:17
engage   59:24
   116:14
engaged   155:20
engagement
   96:8

enroll   175:1,8
enrolled   57:11
   57:16 58:11
   126:3 175:21
enrollment
   3:21,23 4:8,11
   4:24 6:6 20:16
   26:7,8 32:24
   61:17 63:14,25
   64:4,7 96:20
   108:21 158:12
   158:13 159:3,4
   159:8,20 160:7
   160:9,22,23
   161:10,11,25
   171:6,7,12,14
ensure   18:11
   76:11 108:21
   121:8 122:12
   154:6 172:18
ensuring   171:3
entered   56:23
entire   30:14
   47:21 56:1
   121:11
entirely   175:14
entirety   21:14
entities   76:11
entity   75:7
   160:17
entrance   26:19
eric   2:5 13:18
   37:15 146:13
   149:15

**erickson**  51:8
52:23
**errata**  187:11
187:13,16
**especially**  76:9
106:14
**esq**  2:4,5,5,6,13
2:14,19 187:1
**essential**  171:2
**essentially**
161:4
**established**
29:22
**establishment**
14:16 144:24
**et**  1:3,7 71:9
187:4 188:1
189:1
**evaluate**  61:3
**evaluated**
17:15
**event**  6:14
129:3
**eventually**
61:16
**evidence**  55:9
**evidenced**
35:23 78:25
**exact**  6:19 41:8
41:17
**exactly**  46:9
108:5
**examination**
3:3,4 7:5
184:23

**examined**  7:4
**examining**
115:3
**example**  63:16
72:11 84:9
113:18 148:6
163:3
**examples**
114:17
**exceeds**  39:15
58:25
**exchange**  134:4
138:2
**exclude**  24:16
40:17
**excluded**  149:4
**exclusively**
43:24
**executed**  104:4
**exercise**  14:12
14:14 97:17
144:24
**exhaustive**
37:17
**exhibit**  3:14,16
3:20,22 4:2,4,7
4:10,14,17,20
4:23 5:2,5,8,11
5:14,17,21 6:2
6:5,9,12,14
20:5,23 27:21
30:11,24,25
31:11,12 32:7
54:6 58:21
67:15 79:3

92:15,16 99:17
104:20 107:18
109:18 114:1
127:14 134:15
137:6 139:24
145:14 151:17
155:6,8 162:3
162:4 164:24
169:6 177:8
**exhibits**  3:13
4:1 5:1 6:1,17
31:7
**exist**  121:25
130:12
**existing**  185:14
**exists**  109:15
112:11 174:16
**exited**  145:13
**expand**  17:22
**expanded**
154:4
**expectation**
15:22 66:21
**expectations**
63:24
**expected**  109:9
166:19,19
**expel**  135:8
**expelled**  63:10
**experience**
88:23 113:22
142:4
**experiencing**
77:25

**expires**  186:24
**explain**  130:16
**explanation**
130:18,19
**explanatory**
76:17
**explicitly**  66:19
**expressed**  79:1
149:8,19
**expressing**
76:24
**expulsion**
63:13
**extended**  12:13
**extent**  146:8
147:18,21
149:23 150:1
**external**  13:5
48:6
**extra**  115:5
116:15 179:8

**f**

**facing**  68:22
**fact**  66:15
**factors**  29:14
77:21
**fail**  126:8
**fails**  187:18
**fair**  169:24
171:17 172:5
172:12 184:25
**faith**  33:8,18
35:14 36:14
39:25 43:14
53:18 55:10,14

61:20 86:6,8
86:19 87:9
111:3 112:2
128:13 131:6
132:21,24
133:7 147:14
148:14,17,19
151:8 152:25
153:12 154:25
156:17 174:20
175:20,24
176:11 178:18
**fall** 96:24
179:12
**falls** 11:22,23
87:23 95:16
179:14
**familiar** 21:13
22:11 31:19
47:15 67:20
68:7,8 92:18
92:19 99:22
104:24 109:21
109:22 134:20
137:11 140:2
145:21 151:22
155:8 162:7
169:8 177:10
177:20 181:13
**families** 3:17
31:24 63:4
78:9 155:19,20
155:23 156:1,3
156:7 162:14
167:6 168:1,15

168:22
**family** 62:23
64:16 71:6
**far** 52:9 55:20
88:7 99:1
150:14 160:4
**father** 12:10
72:2
**fatigue** 66:17
**february** 1:14
169:14 185:25
186:5,18 187:3
**fedje** 4:5
**feedback** 13:5
48:13
**feel** 95:2 114:22
115:15,17
135:16 142:5
**feelings** 53:12
**feels** 156:20
**felt** 135:6
**fergus** 11:21,23
**fewer** 153:10
**fifth** 46:18
49:12
**file** 44:22
126:25 135:20
139:7,7
**filed** 97:20
118:25
**filing** 125:17
**fills** 68:17
**final** 24:6
155:16

**finalized**
169:15
**finance** 51:1,5
51:6 70:1,13
75:6 93:7,10
100:14 116:25
119:17 122:7
122:14,15,15
123:14,14,19
127:1 137:15
141:25,25
144:7 149:9,12
177:24 179:4,9
179:12 180:5
181:9
**financial** 9:22
166:3,13 168:9
**financially**
186:13
**find** 9:7 17:10
19:20 44:23
89:25 92:2
102:18 139:18
156:6
**fine** 28:3
**finish** 8:4,4,11
**first** 3:13 11:23
12:11 13:20,25
14:4,11 20:4
21:21 27:25
28:5 30:16
31:16 32:6
37:19 38:10,15
38:16,18 52:15
54:8 55:7

59:12 62:15
79:5 97:10
113:2 144:23
145:3 146:12
170:10 173:6
186:6
**firsthand** 22:9
**fiscal** 88:20
179:5,6 180:13
180:13
**fits** 172:11,16
**five** 70:3,10
181:19
**flanagan** 5:22
6:3
**fleshman** 2:5
**flexibility**
11:13
**flexible** 11:5
**flowing** 131:9
**flows** 17:22
**focus** 89:9
119:6
**focused** 66:17
71:7 83:17
**follow** 18:24
58:13,16 74:8
80:11 102:8
118:25 162:13
162:21 184:22
**following** 79:10
102:12 178:11
**follows** 7:4
101:21

**font** 137:24
**foregoing**
  189:5
**form** 5:22 6:3
  67:22,25 68:1
  68:4,7,8,9,10
  68:11,20,21
  69:7,8,10,10,16
  69:18 88:4,8
  89:24 92:19,25
  93:11,14 94:9
  95:20,21,22
  96:3,15 97:7
  98:4,8,13,14,16
  99:1,3 105:15
  105:17 106:7
  106:23 107:9
  107:14,17
  125:5,6 151:25
**formal** 86:12
  86:13
**formalized**
  178:19
**formatting**
  107:12
**former** 156:8
  183:24
**forms** 97:20,21
**forth** 35:24
  38:8 105:23
  141:19 147:9
**forward** 7:19
  15:10 23:12
  38:23 40:5
  46:15,18 104:4

  154:21 155:13
  158:1,5
**forwarded**
  52:19 140:5,12
  142:18,20
**found** 43:1
  124:11 147:11
**foundation**
  128:13 132:21
  133:7 157:3
  178:7
**four** 89:19
  154:3
**fourth** 46:18
  49:12
**frame** 179:15
**framed** 89:18
**free** 14:11,14
  114:22 115:15
  115:17 144:24
  168:3 169:2
**freedom** 14:13
**frequency** 49:7
**front** 30:21
  32:6
**frustration**
  148:13 149:8
  149:19
**full** 8:18 121:21
  122:13 124:3
  130:7
**fund** 2:4 45:1
  65:1 119:13
  133:3 161:15
  163:7

**fundable** 84:22
  88:3 94:20
  112:11,24
  139:11
**funded** 37:5
  40:7,8,18
  44:18 45:5,16
  58:12 73:22
  74:8 80:17
  81:3 119:20
  120:8 131:9,21
  131:23 133:1
  149:7 156:22
  162:1 163:17
  163:20 167:16
  167:20
**funding** 22:22
  23:3,13 41:4
  43:21 55:5
  65:2 66:18
  67:3 70:14
  74:2,24 82:12
  82:15,25 86:24
  87:21 109:3
  124:6,12,14
  138:22 142:6
  150:4 158:14
  158:21,22,23
  158:24 159:12
  161:5,17
  163:16
**funds** 7:15
  24:18 25:13
  164:8

**funneled** 74:19
**further** 22:4
  30:20 60:2,12
  63:1 77:14
  78:19 100:1
  130:16 139:17
  143:3 185:20
  185:21
**future** 23:9,15

### g

**gathering** 75:3
**gay** 135:7,8
  183:4
**gayra** 37:16
**gender** 41:2
**general** 2:13
  69:18,19 80:20
  102:16,16
  173:11 177:25
**generally**
  173:22
**generate** 109:3
  161:15
**generated**
  159:11
**getting** 45:5
  62:22 94:17
  184:14
**give** 8:18 47:25
  55:9 61:4
  101:2 130:19
  131:11 132:16
  148:6 152:24
  175:19

given 29:1
183:6 189:9
gives 132:22,23
170:15
giving 130:12
gmp 2:19
go 19:21 22:20
23:12 30:20
34:16 42:5
44:22 46:12
59:2 80:25
89:23 91:8
97:7,7 98:5
107:10 113:13
113:25 115:12
124:22 125:2
135:18 136:23
142:22 158:24
164:10 166:15
166:18 175:1
184:2
goal 154:10
goals 153:20,20
153:25 170:19
170:22 172:11
173:21
goes 13:7 34:20
34:23 75:16
105:23 159:12
going 7:19
18:24 22:25
24:24 27:18
30:23 34:8
35:7,24 46:1
47:18,20 49:19

49:24 58:23
67:8 72:1
73:22 76:9,10
82:1 90:15
102:23 125:6
133:21 135:5
137:18 144:17
147:9 158:1,5
159:18 163:4
166:4,14
167:23
good 91:17
gotten 183:21
gov 35:11
36:11 46:19
47:9 136:21
government
36:12 38:6
50:21 75:6
111:7,17
governor 5:21
5:21 6:2,2
14:25 48:21
121:1 152:19
153:23 154:1
governor's
13:9 15:1,11
34:25 38:22,22
48:8,20 49:1
53:4,5 152:2,2
152:22 153:22
gpa 26:16,21
28:12 41:10,19
42:9,11,16,18
42:20 43:1

45:15,22
gpas 42:23
gpm 1:16
graduate 41:5
graduation
41:6 56:15
57:5,7,8,9,12
57:18 58:1,5,9
58:13 66:13
67:4,5,6 81:2,7
81:13 154:3,11
154:17,22
graff 140:25
149:16
granular
127:12
grounds 28:2
37:21 39:15
58:24 146:4
159:19 178:8
group 110:10
112:4 156:19
groups 156:10
156:18
grow 10:12
guess 14:3,5,8,8
38:1 56:8,12
64:12 105:19
106:18 115:4,6
147:11 161:12
guessing 80:24
93:12 103:1
guidance 16:19
46:9 50:15,17
51:12,14,16,22

73:23 74:5,10
74:22 89:2
90:11 94:10
110:3 119:14
120:1 131:1
133:6,11
135:18 136:21
136:23,25
167:17 180:3
180:20
guide 4:24 6:7
109:24 110:5
162:9
guidelines
18:25 178:11

**h**

h 3:12 188:3
half 29:6
161:11
hand 84:13
85:16 186:18
handbook
17:11 18:16
90:1
handled 73:15
handlin 183:22
happen 91:9
121:12 122:3
125:19 182:13
happened
111:23,25
122:22 123:3,7
138:18 139:12
143:18 157:9
177:1 182:14

**[happening - inception]**

**happening**
47:16 48:24
124:7
**happens**
108:13
**hard** 8:7,8
64:11
**hasskamp**
13:19
**head** 8:7
**headed** 131:12
**heads** 130:12
**health** 167:17
**hear** 38:10
**heard** 37:19
100:23 111:4
141:12 142:1
147:24 148:3
164:9,18
**hearing** 137:24
156:7
**heaven** 72:2
**heavy** 122:8
**held** 17:13
**help** 75:7 90:15
154:2,5
**helped** 52:14
**helpful** 177:16
**henderson**
101:11
**hennepin** 123:9
186:3,24
**hereto** 189:7
**hey** 91:16
130:16

**high** 11:17 12:7
26:16 27:13
41:20 42:10,11
57:8,9,17,23,25
58:2,9 65:15
65:17,19,20,23
66:1 78:10,11
81:8,10,12
108:20 114:15
123:17,20,21
132:18 158:14
158:17,24
159:5 161:22
161:24 162:24
162:25 163:11
163:11,23
170:15,16
171:8,10,13,18
171:25 172:2
**higher** 109:12
**highly** 98:3
158:3
**hiring** 131:7,14
**historical**
117:15
**hmm** 28:6
52:25 87:18
91:13 101:17
105:18 146:16
151:21 156:13
**hokenson**
100:5 101:3,4
**hold** 51:19,19
**home** 114:14

**homeschool**
81:20
**honestly** 147:4
**honored**
115:18
**hour** 34:9 67:9
133:22
**house** 49:19,24
**huh** 8:7,8
**human** 135:11
135:19 136:24
140:12,18,19
142:16,19,22
**hypothetical**
61:8

**i**

**idea** 32:20
52:22 142:11
142:11 146:11
153:9
**identical** 71:17
**identification**
20:6,24 27:22
30:12 31:13
54:7 58:22
67:16 92:17
99:18 104:21
109:19 114:2
127:15 134:16
137:7 139:25
145:15 151:18
155:7 162:5
164:25 169:7
177:9

**identified** 31:3
37:23 39:16
146:5 147:20
149:24
**identify** 31:15
127:9 153:24
**identifying**
98:23
**identity** 131:18
**ids** 1:18
**impact** 80:15
152:4 155:19
157:18
**impacted**
112:22 156:11
156:18
**impacts** 171:17
**impartiality**
186:15
**implement** 46:6
179:1
**implementati...**
100:6
**implemented**
151:5 170:22
181:14
**implementing**
116:4 178:22
**implies** 139:8
**important** 49:9
52:17
**impression**
131:11 132:23
**inception** 32:25

| | | | |
|---|---|---|---|
| **include**  21:9 | **indicators** | **initially**  62:22 | 125:4 126:2 |
| 55:21 86:5 | 127:10 | **initiated**  39:3,4 | 131:15 139:2 |
| 95:5,12 107:25 | **individual**  31:1 | **initiating**  84:18 | 141:9 151:7 |
| 110:12 122:14 | 32:5 43:11 | **injunction** | 158:2,15 |
| 122:14 133:10 | 45:23 48:9 | 51:20 87:2,7 | 163:22 172:24 |
| 171:5 | 74:11 88:24 | 87:12,13 88:10 | 173:19 177:14 |
| **included**  15:1 | 120:20 127:9 | **inquire**  73:18 | 177:22 178:23 |
| 24:10 38:19,20 | 146:7 148:11 | **inquiring**  99:25 | 181:15 185:2,3 |
| 48:8,18 49:1 | 156:19 | **inquiry**  139:19 | **institution's** |
| 55:19 70:5 | **individually** | 139:20 | 86:20 158:18 |
| 83:1 86:7 | 120:22 | **ins**  143:23 | **institutional** |
| 106:12 115:11 | **individuals** | **insight**  73:6,14 | 4:10 67:22,24 |
| 119:5 138:4 | 149:9 | **instance**  122:25 | 96:10,15 |
| **includes**  18:22 | **ineligible**  87:10 | **instances**  124:7 | 108:10 |
| 106:7 115:4,8 | 141:9 144:12 | 161:17 | **institutions** |
| 116:5 177:24 | 150:19 151:1,2 | **institution** | 18:4 19:12 |
| **including**  73:13 | 151:4,6 | 16:23,25 18:9 | 25:16,17,18,19 |
| 106:10 115:10 | **influence** | 18:13,23 19:15 | 31:24 32:5 |
| 118:6 164:20 | 163:24 | 19:24 20:2 | 35:23 58:13 |
| 170:12 | **information** | 21:23 25:12 | 63:5 66:14 |
| **inclusion**  82:16 | 13:1 18:10 | 26:6,15 27:19 | 68:15 90:9 |
| **incomplete** | 19:11 26:7 | 41:1,7,15,22 | 91:15 94:15 |
| 137:18 | 59:25 75:4 | 42:4,17,22 | 105:2 113:4 |
| **incorporate** | 78:9 88:12 | 43:3,4,11 44:4 | 150:17 152:23 |
| 73:24 74:3 | 92:2 99:7 | 44:11,25 45:13 | 153:2,13,15 |
| **incorporated** | 110:14 119:2,4 | 45:21,23 46:8 | 156:16,18 |
| 73:25 | 126:4,14,15 | 54:17 58:11 | 157:14,16,18 |
| **increase**  154:3 | 127:8 130:15 | 63:21 64:17 | 157:19 158:9 |
| 154:10,21,22 | 145:23 146:2 | 71:5 73:18 | 160:2,12 |
| **increased** | 146:10,23 | 78:10 84:20 | 161:14 171:3 |
| 154:17 | **informed**  66:9 | 85:25 88:8 | 171:22 172:19 |
| **independently** | 111:15 | 89:4 90:20 | 173:23 174:8 |
| 91:18 | **initial**  15:11 | 96:16 102:18 | 174:10 |
| **indicate**  6:18 | 20:18 | 107:22 116:4 | **instructed** |
| | | 121:15 124:4 | 25:21 120:4 |

**instruction**
76:14
**instructions**
3:7
**instructor**
116:7
**intended** 76:14
78:17 82:1,3
83:8 95:10,16
96:24
**intent** 17:2
18:22 81:22
105:5
**intention** 16:12
37:3
**interacted**
136:17
**interaction**
180:2
**interest** 40:4,13
173:22 174:3,7
174:12,15
186:14
**interested**
27:25 186:13
**interesting**
146:17 147:3,6
147:11
**interim** 111:12
**internal** 48:6
68:21
**international**
169:17 171:5
**interviews**
103:16

**introduce**
31:11
**introduced**
14:21 15:3
38:19 48:10,11
51:3 52:16
88:5
**investigated**
123:24
**investigation**
139:14,15
**invited** 175:25
184:3
**invoice** 121:9
126:15,16
164:5
**invoiced**
178:13
**invoices** 119:21
121:7 126:12
126:22 127:4
150:4 179:15
**invoicing**
178:24
**involved** 37:16
47:5,8 116:24
136:8 138:2,15
**involvement**
64:6
**issue** 40:5 45:8
99:4 142:17
144:6 157:10
157:12
**issued** 103:16

**issues** 100:6
121:17 130:5
141:25
**item** 156:11,18
**items** 19:14
125:8

**j**

**j** 1:24 186:23
**january** 47:4
186:24
**jay** 4:4
**jeanne** 9:21
22:10 35:3
36:22 37:7
48:17 50:24
51:4 52:21
90:3 91:6,8
92:4 100:16,22
118:6,7 128:25
129:19 130:6,8
134:6 138:10
138:16 149:12
149:13 183:17
184:9
**jeanne's** 51:1
**jeffrey** 2:13
187:1
**jeffrey.timme...**
2:16 187:2
**jessie** 21:18
**jesus** 137:21,22
**jett** 1:7 7:11
187:4 188:1
189:1

**jfd** 1:6
**jibe** 107:24
**job** 1:25 11:23
12:5 14:6
101:8
**johnson** 100:2
100:4,17 101:1
**join** 91:15
**journal** 9:10,15
**julie** 101:11
**july** 69:14
**june** 23:25
179:7
**juniors** 27:13

**k**

**k** 6:9 11:1
123:22 162:22
165:13
**kaiser** 135:22
135:24 137:2
**kamenov** 13:18
**karen** 100:2,4
100:12,17
101:1 102:2,20
**keep** 9:10,15
19:2,17 26:5
**keeping** 150:20
**kids** 165:25
**kind** 40:13
47:16 60:24
86:12 100:12
105:23
**kinds** 40:21
124:10

**knew**  38:13,13
101:10 128:17
158:1,5
**know**  7:10 8:10
8:15 9:17 14:2
17:5,8 18:8
19:16,19 20:25
21:18 23:4,14
23:17,22 24:9
24:22 25:24
26:4,9 27:16
30:4 32:13
33:9,16,20,21
33:24 34:3
36:16 38:21
41:12 42:5
43:1 45:11
47:2 48:7,21
49:14 52:9
53:18 54:15
55:19,20,25
56:2,11,12
59:20,23 60:15
61:6,9,25 62:2
62:20 66:7
68:6,9,12,13
69:13,14,16,19
70:9,15,19
72:25 73:2,10
73:11 76:23
77:3,15,16
79:14,14 80:2
80:20,24 84:17
88:7,15,23
89:13 93:20,23

94:13 98:9,13
98:17,22 99:4
100:25 102:5
103:25 104:1,9
108:2 109:21
110:19,21
111:18 112:7
112:20 113:23
114:4 115:12
116:19,22
117:2 118:9,13
118:14,16,18
118:19 119:10
121:5 123:6
126:7 128:2,22
128:23 129:13
129:19 130:1,3
130:7,14,24,25
132:7 133:17
134:10,17
135:22 136:5
136:25 137:8
138:18 141:12
141:16,17
142:10,20,25
143:2,3,23,24
143:24 145:2,8
145:10,11,16
146:8,9,10
147:21,23
149:7 150:1,14
152:8,15 153:8
154:15 156:16
157:6,23,25
161:14 164:3

164:14 166:8
167:4,11 169:8
173:4,18
174:22,25
175:3 176:5,6
176:8,12,13
177:10 178:9
183:22
**knowing**
129:23 176:3
**knowledge**
22:9 31:8 52:9
129:16 138:25
183:8
**krile**  9:21 22:10
35:3 37:7,8,9
90:3 100:22
128:25
**kunesh**  145:24
146:1

## l

**lack**  178:21
**laid**  96:9
**landon**  2:19
145:13
**language**  35:13
38:5 47:1,15
47:19 48:22,25
49:20 50:4,16
50:18 105:12
105:14 106:14
106:16,24
108:4 128:3,9
129:7,20
130:20 132:20

133:10 134:7
141:7,11 149:3
**large**  139:7
**largely**  89:7
**late**  119:24
**lathrop**  1:16
2:19
**law**  86:25
108:12 109:8
162:14 185:15
**lawsuit**  8:24
9:3,5 51:20
183:8
**lead**  9:21,22
64:19,19
**leadership**  40:5
109:13 142:15
144:17 180:19
**leads**  171:12
172:2
**learn**  73:4
**learned**  143:10
**learning**  3:17
12:13,25 59:15
59:22 60:9
61:1,10 143:21
171:1
**leave**  184:20
185:22
**led**  122:15
149:2
**left**  111:10
**legal**  66:6
82:20 94:12
98:21 110:18

[legal - looks]

Page 25

120:13 136:3
145:7 187:23
**legislation**  9:9
13:6 14:25
37:13 49:8
**legislative**  13:4
14:21 34:15
38:11 39:23
46:11,17 48:6
50:7 51:21
147:15,16
149:3 154:17
155:12 169:13
170:21
**legislatively**
154:21
**legislator**  5:18
**legislator's**
53:20
**legislators**
48:14 164:18
**legislature**
34:17 52:20
170:2 183:25
**letter**  3:16 4:4
17:2,14 18:21
20:15 21:21
103:16 114:6
117:8
**letters**  90:8
**level**  36:21
38:20 44:10,10
45:3 52:18
56:17 65:16,18
65:20 78:12

84:1,8 100:10
127:12 171:9
**lgbt**  135:6
181:25 183:2
**lgbtq**  175:25
176:16
**liberty**  2:4
**lieutenant**  5:21
6:2
**life**  4:8 33:4
54:23 55:22,23
76:25
**lifestyle**  32:9
55:17,22
**lift**  122:6,8
**lifted**  87:14
**likely**  103:25
119:20 130:2
140:24 141:22
175:15 183:20
**limit**  173:19
**limitations**
173:14
**limited**  56:1
78:12
**limiting**  132:13
**line**  8:11 30:24
40:16 47:21
58:24 63:3,8
63:14 77:22
142:22 146:3
148:8 152:5
188:4,7,10,13
188:16,19

**lines**  90:22
**list**  19:2 37:17
76:13 103:14
118:2
**listed**  14:8 31:4
40:19,20 60:6
63:17
**listing**  90:19
**lists**  9:14 93:16
104:3 126:18
**litigation**
177:15
**little**  70:8
**living**  59:15,22
60:9 61:1,10
**llp**  1:16 2:19
**loan**  167:17
168:6
**local**  11:4 44:4
56:17 57:10,12
57:14 67:6
**located**  140:22
**loe**  1:3 7:11
187:4 188:1
189:1
**loe00004571**
4:9
**long**  12:1 17:16
42:23 68:11
93:9 99:11
126:9 185:2
**longer**  150:16
**look**  9:12 17:9
17:9 20:4,7,22
20:25 21:20

23:23 27:20
30:13,15 33:11
54:4,21 60:13
67:14 70:20
78:20 79:4
88:1,11 89:15
89:24 92:15
99:6 101:13
102:18 103:11
104:19 109:20
110:3,7 112:25
133:20 134:2
134:13 135:14
137:8 139:10
143:9 145:17
151:16 153:19
161:1 162:3
165:2,10
**looked**  9:4
50:14 54:24
55:12 89:3
94:23 96:3
117:19
**looking**  28:10
30:21 32:21
91:3 104:22
105:22 106:23
109:23 143:25
152:3 162:6
165:5,19
170:10
**looks**  39:5
106:21 115:11
115:25 151:25
178:3,4,12,13

[lord's - mde]                                                      Page 26

**lord's** 72:11
**lot** 38:7 48:5
  50:6 73:1
  130:5 140:20
**lunch** 99:10
**lutheran** 4:7
  10:15 11:6
  59:10 62:25

**m**

**m** 28:15 29:13
  126:6,7
**ma'am** 14:5
  127:18
**made** 11:11
  23:8 38:21
  42:17 75:24
  94:19 148:20
  152:8,20,21
  156:25 180:6
  185:9 189:5
**madeleine** 2:14
**madeleine.de...**
  2:17
**main** 13:15
**maintain** 86:3
**make** 13:23
  24:13 46:6,25
  81:21 82:17
  106:17 120:3
  130:20 141:9
  143:17 147:24
  151:1,2 153:24
  154:14 184:8
**makes** 86:19
  87:9 116:9

123:15 130:3
  151:5 163:16
  163:23
**making** 46:3
  47:18 84:21
  102:2
**manage** 30:9
**mandated**
  71:23
**manner** 6:18
  178:25
**mansfield**
  13:13
**maranatha**
  123:11,20
  163:2,3,7
  164:5
**mark** 1:3 187:4
  188:1 189:1
**marked** 3:13
  20:5,23 27:21
  30:11 31:12
  54:6 58:21
  67:15 92:16
  99:17 104:20
  109:18 114:1
  127:14 134:15
  137:6 139:24
  145:14 151:17
  155:6 162:4
  164:24 169:6
  177:8
**marries** 127:7
**marss** 126:4,8
  127:5

**mary** 38:17
  128:25 129:19
  129:24 130:3,9
  136:12,20
  140:19 149:14
**mary's** 11:2,11
  11:13
**masking** 43:2
**master's** 10:25
  11:1,24
**materials** 17:6
  33:19 91:21,25
  92:3,9 125:18
**math** 73:3,4
  153:14
**matter** 64:9
  173:13
**mctc** 6:14
**mde** 9:21 12:5
  12:8,11 13:10
  13:14 14:24
  16:14,17 18:10
  18:15 19:2,17
  23:8,20 24:7
  24:24 26:9
  27:4 30:9
  33:16 34:5
  35:17 37:25
  38:15 39:7,8
  40:5 44:3 48:2
  49:5 51:25
  52:2 56:3,9
  58:10 60:18
  63:8 64:6 66:3
  66:9 68:18,21

70:24 71:11,15
  74:12,18 75:7
  76:11,11,16
  77:21 78:13
  81:22 83:3,15
  83:25,25 87:12
  87:15,25 88:21
  90:14 91:19
  93:22 97:23
  102:24 105:1,6
  106:13 108:14
  108:23 111:10
  112:12,14
  113:9 114:20
  120:8,9,19
  121:13 123:24
  124:8,9 125:23
  126:12 128:6
  128:17 129:1
  129:11,20,22
  131:9 135:14
  135:25 137:14
  140:22 141:21
  142:15,20
  147:24 148:16
  148:20 151:7
  152:1,20,21,23
  153:10 154:16
  154:25 155:25
  156:25 157:7
  157:17 159:12
  160:6,8,18,19
  161:6,6,16,18
  163:5,12,17
  164:10,16,20

166:3 168:16
169:1 172:5,8
174:2,10
177:23 178:13
180:19 185:1,9
**mde's** 32:2,3
39:17 68:23
79:20 80:4,5,6
80:9 82:8,23
83:18 84:24
86:18 87:8
89:15 95:14
96:22 102:9
118:12 132:15
144:20 165:2
167:7,11 168:2
170:19 173:22
174:2,7
**mde000015**
5:10
**mde000451**
6:13
**mde001010** 5:7
**mde001052** 5:4
**mde001072**
4:19
**mde001080**
5:13
**mde001416**
4:13
**mde001428**
4:22
**mde001535**
4:25

**mde001592**
4:16
**mde001624**
5:16
**mde001716**
5:20
**mde001771**
3:24
**mde001786** 4:6
**mde001884**
3:19
**mde001903**
3:15
**mde003489** 6:8
**mde003729**
6:16
**mde004685**
5:23
**mde004689** 6:4
**mean** 54:2 57:3
59:23 61:9
74:4 76:8,24
80:14 84:11
85:13 96:14
110:11 114:23
117:20 119:12
121:25 143:14
143:22 150:23
153:3,21
154:20 161:25
166:24 167:19
173:8
**means** 56:9,13
61:10 66:4
83:15 87:16

107:2 152:18
**meet** 17:18
57:18 58:6,8,9
65:10 101:20
105:5 108:22
112:13 149:21
**meeting** 53:7
56:15 111:16
138:8,9,19
141:16
**meetings** 149:9
**meets** 74:6
119:15
**megan** 50:23
**melcher** 93:2,6
93:7,18 116:24
117:7 149:17
**melinda** 1:3
187:4 188:1
189:1
**member** 51:2
137:14
**members** 48:15
156:3
**membership**
159:10
**memo** 4:21
105:1 106:9
107:8,13 108:7
**memory** 123:14
**mentioned**
40:11 90:12
138:9,10,21
181:23 185:7

**merriam** 98:12
98:23
**message** 129:6
132:14
**messaging**
175:7
**mhra** 136:1
**michelle** 13:18
**midatlantic**
187:15
**middle** 165:5
**million** 159:1
**minneapolis**
1:19 11:25
12:1 186:5
**minnesota** 1:1
1:19 2:13,14
2:15 3:16,20
4:2,10,20,23
6:5,9,12 10:11
10:12,23 12:8
12:9 13:1
27:24 29:7,19
29:22 45:15
56:17 108:8,20
126:7 135:11
136:23 153:20
153:20,22,23
153:23,25
170:13 183:25
186:2,5,24
**minnesota's**
28:19 171:4
**minus** 153:14

minute  181:19
minutes  8:13
mischaracteri...
  16:8 40:2 78:5
  85:4 103:6
  132:5 179:23
  181:4
missed  70:7
mission  17:25
  18:2,6
missionary
  110:25
mistaken
  182:14,15
mm  28:6 52:25
  87:18 91:13
  101:17 105:18
  146:16 151:21
  156:13
modified  23:4
  23:17,20
modify  23:1,15
money  140:6
morgan  4:5
  101:9
morse  50:22
mother  12:9
move  23:12
moved  38:23
  46:19
moves  14:25
  15:7,8,10
  34:21
multiple  13:7
  28:7 29:3

48:14 124:20
180:17

**n**

n  2:1 3:1
nacep  160:23
  161:1,2
name  7:7 101:2
  115:14 139:6
  139:13 176:24
named  44:20
  44:21,22 89:9
names  126:21
national  161:1
nature  76:8
  97:19
neb  1:6
necessarily
  6:18 38:8 53:3
  75:17 120:14
necessary
  69:20 131:1
  165:25 189:6
need  8:10 30:15
  61:6 67:10
  131:21,25
  172:22
needed  12:10
  122:13 142:22
negative
  147:25 148:4
never  66:8
  75:14 113:13
  113:24 123:24
  175:4

new  17:20
  46:16 52:24
  115:6 130:7,14
noah  137:16
nods  8:6
non  66:15
nonpublic  6:10
  162:13,15,20
  162:22 163:1
  165:13 167:14
  167:15,15
  168:1
nonsectarian
  17:17 24:15,21
  25:9 36:1
  40:15,20 44:17
  60:4 63:18,23
  71:1,16 74:20
  75:8 76:5
  77:20 82:13
  87:16,20 88:2
  89:6,10 90:7
  90:23 92:24
  93:15 94:17,23
  96:7 98:18,24
  101:20 102:8
  102:13 103:18
  105:7 107:14
  109:5 110:8
  112:14 116:6
  119:15 120:3
  120:11 121:8
  121:13,23
  123:25 131:23
  132:25 141:7

143:9,25
  150:22 164:2,4
  185:3
nonsecular
  163:25 164:1
normal  121:2
north  12:6
northwest  2:6
northwestern
  4:18 41:19
  70:15 101:19
  104:7 116:23
  118:23 119:3
  119:21 120:2
  123:24 124:18
  127:25 128:17
  129:4,12,14,14
  130:19 132:11
  133:1 134:11
  135:4 141:10
  142:2 147:13
  147:25 148:4
  148:17 149:20
  150:3,15 175:6
  175:9 176:10
  176:16,17
  177:3 181:24
northwestern's
  104:11 128:4
  174:19 178:17
nosr  81:18
notary  186:24
  189:13,19
note  6:17 32:7
  32:12 162:12

**[note - okay]**

187:10
noted 185:25
  189:7
notes 9:15 10:4
notice 31:1,5
  81:18 159:21
noticed 186:9
notify 23:8
november 4:24
number 18:4
  26:1 31:15,22
  50:7 129:6
  150:10 175:18
numbers 165:4
numerous
  164:17

**o**

oath 7:23
object 28:1
  30:23 37:20
  39:14 47:20
  58:23 146:3
  147:18 149:23
  159:18 178:7
objecting 63:15
objection 14:1
  16:7 18:1 26:3
  26:25 27:6,15
  29:10 32:17
  34:1 40:1
  41:11,24 42:13
  44:23 45:9
  52:6,12 54:25
  55:15 56:5
  59:19 61:21,24

62:6,13,18
64:21 66:5
69:5 72:23
73:8 76:21
77:8 78:4
79:24 82:19
83:10 84:3,16
85:3 94:11
95:7 97:4
98:20 102:3
103:5 105:16
107:5 110:17
112:5,18
114:21 128:20
130:22 132:4
133:15 136:2
142:7 145:6
148:1,7 150:7
150:11 152:13
153:6 154:12
157:3,21 166:6
167:2 168:12
168:18,24
170:6 173:2,16
177:17,18
179:22 181:3
objections 4:3
obviously
  117:25 172:22
  184:14
occur 104:2
  122:1 124:14
occurred
  121:21 124:3

occurring 78:1
october 143:13
offer 15:22
  80:16 90:1
  91:14 108:19
  109:2 131:8
  144:11 149:6
  152:24 158:15
  161:24 170:12
offered 107:23
  109:3,6 126:13
  173:5,10,11
  178:13 179:15
  180:1,8
offering 18:25
  20:3 60:7
  101:19 121:16
  150:22,23,25
  158:24 170:19
offers 83:5,7
  185:3
office 2:13 5:21
  6:2 34:25
  103:17 152:22
official 56:12
  82:8
oh 21:5 37:13
  50:22 91:1
  106:3 115:4
  121:15 128:2
okay 7:22,25
  8:21 9:10,14
  10:2,7,16,20,24
  11:3 13:12
  14:7,16,18,20

15:13 16:20
17:24 18:6,20
20:4,22 21:12
21:16,20,25
22:14,18,25
23:23 25:21,25
26:16 27:20
28:9,18 29:6
30:10,21 32:6
32:21 43:12
45:14 46:10
51:6,24 52:3
54:4 58:18
59:12,17 63:8
67:18,19 70:20
75:13,15 76:6
81:24 83:13
86:10 91:2
92:15 93:14
97:7 98:12
99:8 100:15,24
101:6,9,11,13
104:19,23
105:4 106:7
109:16,23
110:15 111:18
111:25 112:25
113:1,9,25
114:5 115:1,10
116:12,15
124:5 126:24
127:13,24
128:6,9 129:3
133:20 134:13
134:19 137:5

**[okay - paragraph]**                                                    Page 30

| | | | |
|---|---|---|---|
| 138:14 139:23 | 132:22 | **ostgaard** 37:16 | **pa** 1:25 |
| 143:17,21 | **opinions** 52:5 | **outcome** 48:7 | **page** 3:2,8,20 |
| 144:8 145:12 | **opportunities** | 64:15 73:21 | 4:1 5:1 6:1 |
| 145:21 146:12 | 83:6 154:22 | 130:1 | 21:20 23:23 |
| 155:5,18 156:9 | 170:14 171:1 | **outcomes** 28:22 | 28:10,14,25 |
| 156:14 162:3,9 | 174:4,5,6 | 171:13 172:3 | 30:22 31:22 |
| 162:11 164:14 | **opportunity** | **outline** 125:11 | 32:6 33:11 |
| 164:23 165:12 | 170:15 171:8 | **outs** 143:23 | 54:8 70:21 |
| 165:17 166:11 | **option** 24:17 | **outside** 30:25 | 79:4 92:19 |
| 169:5,11,16 | 79:12 108:21 | 52:1 60:21 | 101:14 103:12 |
| 170:10 177:7 | 115:5 116:15 | 117:17,19 | 104:5 109:23 |
| 177:13,21 | 123:2 163:15 | 122:18,20 | 110:8 112:25 |
| 180:15 181:10 | 167:12 174:16 | 123:23 136:3,6 | 129:8 132:18 |
| 181:17 182:6 | 178:15 180:9 | 142:8 151:8 | 135:10 146:12 |
| 184:8,18 | 180:11,12,21 | 154:13 157:4 | 152:3 153:19 |
| 185:19 | 180:23,24 | 157:24 160:2,4 | 155:18 156:10 |
| **old** 115:6 | 181:1 183:6 | **outward** 68:22 | 162:6 165:4,8 |
| **once** 18:12,13 | **options** 3:21,23 | **overall** 122:9 | 165:9 169:19 |
| 22:20 23:11 | 4:12,24 6:6 | 122:10 127:9 | 170:10,25,25 |
| 48:11 49:17 | 29:4 32:24 | 127:10 154:3 | 188:4,7,10,13 |
| 50:10 51:3 | 79:16 116:13 | 154:19 | 188:16,19 |
| 53:4 60:22 | 154:16 171:6 | **oversee** 160:19 | **pages** 27:25 |
| 69:1 | 172:16 174:17 | 161:8 | 30:16 |
| **ones** 178:17 | **oral** 182:11 | **oversees** 161:6 | **paid** 65:22,22 |
| **online** 12:24 | 184:15 | **overview** 16:22 | 179:16 |
| 17:11 33:5,9 | **orally** 184:16 | **own** 27:3,4 | **palmer** 14:19 |
| 114:18 119:12 | **ordered** 186:9 | 60:18 108:24 | 93:1,3,18 |
| 176:6,10 183:6 | **organizations** | 159:23 | 117:1 136:20 |
| **open** 172:25 | 86:4 158:7 | | 149:17 |
| 173:7 183:3 | **original** 18:21 | **p** | **paragraph** |
| 184:20 185:22 | 22:11 33:20 | | 21:21 22:15 |
| **operates** | 101:15 109:9 | **p** 2:1,1 | 28:25 54:20,21 |
| 160:10 | 118:4,5 186:8 | **p.m.** 99:14,14 | 55:8 59:13,13 |
| **opinion** 37:25 | **originally** | 102:24 133:25 | 70:20 101:15 |
| 52:4 59:2 | 14:22 52:16 | 133:25 151:14 | 103:11 108:6,7 |
| | | 151:14 181:21 | |
| | | 181:21 185:25 | |

[paragraph - personal]                                                        Page 31

113:2 156:10
165:19 170:11
**parent**  11:5
44:23 114:13
117:8 118:25
135:17 182:20
**part**  14:5 19:16
26:11 33:24
42:3 44:2 45:4
47:10,11 48:20
64:14 66:21,22
66:24 79:12,15
80:13 90:10
92:14 98:14
101:8 108:20
116:9 117:17
129:14 138:13
141:9 153:18
155:4 183:6
**participate**
16:21 19:3,6
20:19 22:6
28:20,22 30:4
30:6 31:25
45:23 54:13
63:5 83:13,16
83:23 95:15
97:3 107:1
113:8 131:4,17
152:5,12 153:4
153:5,12
160:12,14,15
161:23 162:12
171:18 172:7,8
172:14,14

173:25 174:4,8
174:19,21
175:5,9 183:5
**participated**
8:23 32:23
**participates**
126:1
**participating**
15:25 43:21
54:16 58:4,7
65:13 105:1
127:3 172:19
172:23 173:24
**participation**
56:19 84:1,2,6
84:7,8 95:6
154:4 171:11
172:17 176:15
**particular**
70:23,25 71:3
71:13,19 72:6
72:17,20,21
73:6 78:25
86:4,8,11
89:21 110:10
112:3 173:15
**parties**  186:9
186:11,13
**partner**  158:14
**partnering**
123:11
**partnership**
93:2 100:5
123:18 159:16

**party**  177:14
186:9
**pass**  49:10
**passage**  15:15
**passed**  12:9
15:19 25:6
50:4,7,10
**pastor**  55:10
**pastor's**  32:9
**pastoral**  44:21
44:24
**path**  36:7 104:4
**pathways**
170:13
**paul**  2:15
**paula**  14:19
93:1,3,18
116:25 118:1
136:19 142:12
142:14 143:1
143:15 149:16
**paula's**  142:13
**pay**  64:5 121:9
122:25 161:9
**payment**  91:8
164:7 179:8
180:6
**pays**  122:16,16
**pd**  90:20,25
**peck**  100:14
128:25 149:15
**peggy**  5:21 6:2
**pennsylvania**
2:6

**people**  13:16
14:3 36:20
37:12,17 52:3
118:5 134:7
148:3 164:17
164:19
**perceived**
157:1
**percent**  28:16
29:15
**perception**
78:3
**performance**
29:21 45:19
**period**  70:12
**periodically**
18:12 108:6,8
108:15
**permissible**
130:20
**persisted**  97:18
**persistence**
171:14
**persists**  61:14
130:25
**person**  14:20
15:6 60:14
74:12,13 75:23
116:3 122:9
135:18 140:9
164:15 176:6
**personal**  31:8,8
37:24 39:18
48:1,4 59:2
159:23

**[personally - practice]** Page 32

personally
    10:14 147:22
    150:2
persons   186:14
perspective
    76:20 167:5
pertaining   22:5
pertains   26:18
    105:7
phone   2:8,16
    129:6
phrase   18:2
pick   116:1
piece   116:25
    143:25
pink   79:5,5
place   1:16
    52:15 55:6
    68:11 87:2,7
    88:4,24 98:4
    99:2 104:7
placement
    169:18 171:5
plain   106:13
plaintiff   8:23
plaintiffs   1:4
    2:3
plan   13:9 38:22
    48:20 49:1
    53:4,5 104:6
    178:3,5,15
    179:4,10,25
    180:5,14,16
    181:2,7,11,14

planning   9:8
plans   179:1
platform
    152:19,19
    153:22
please   7:7 8:6
    8:14 20:7
    31:17 85:7
    115:12 125:7,7
    150:10 168:25
    185:24
point   15:16
    23:11 35:13
    48:19 49:23
    50:10 51:2,8
    53:25 89:21
    105:20 109:6
    119:22 122:1
    133:4 138:12
    140:22 155:18
    156:15,15
    182:25
pointing   129:6
points   93:17,21
    97:23
policies   19:17
    19:21 27:4,5
    62:3 114:20
    121:14 129:20
    150:16 156:1,4
    164:12 179:20
policy   62:5
    105:6 106:21
    129:22 143:6,6
    155:21 156:11

156:18 162:16
portion   85:11
    104:2 177:15
posit   145:10
position   66:3
    79:20 80:4,5,6
    80:9 82:9
    83:19 86:22
    87:11,13 95:14
    96:22 102:10
    131:8 132:15
    141:18 153:14
    167:7,11 168:2
positions   100:3
positive   171:17
possession   9:4
possibilities
    64:12
possibility   74:7
    181:7
possible   172:6
    173:23 182:13
possibly   74:18
post   3:20,23
    11:1
postgraduate
    11:12
posting   130:7
postsecondar...
    26:19 27:9
    91:8 94:4
    122:16 160:17
    160:21 172:22
    180:7

postsecondary
    4:11,23 6:6
    16:25 20:16
    24:17 26:15
    27:10 31:24
    32:24 42:4
    44:4 63:5,21
    64:17 65:22
    68:15 71:5
    73:17,24 75:22
    81:17 96:19
    102:17 108:21
    113:4 126:1,12
    127:12 153:1
    156:16 158:15
    158:17 161:9
    161:13 163:22
    164:5,6 171:3
    171:6,22
    172:18,24
    173:6,8,10,12
    177:21 178:23
    181:15 185:1
potential   132:9
    158:6 171:9
potentially
    172:1,4
poverty   115:3
powerpoint
    92:6
practical
    173:13
practice   36:14
    102:19 156:20

**practices** 46:7
131:7,15 141:8
151:8 157:2
178:21,21
**pray** 63:16
71:24 72:3,10
83:7 85:2,22
115:18 116:2
116:11,13
**prayed** 71:23
**prayer** 61:11
71:19 72:2,11
72:12 82:3,11
82:16 83:2,6
83:22 84:13,14
84:18,19 85:15
85:17 86:1
96:23 97:24
115:2,10,11,14
115:18 120:7
**praying** 72:9
115:13 116:14
**preceded**
100:22
**precipitate**
69:23
**preclude** 76:19
**precluded**
61:11
**predecessor**
93:3
**preliminaries**
7:25
**preliminary**
5:22 6:3 87:2

151:25
**preparation**
21:10 92:9
117:4,10,21
134:22 137:24
138:5 170:14
175:17 183:8,9
183:10 184:5
**prepare** 9:18
21:8
**prepared** 32:1
63:3 92:5
159:25 160:6
169:20
**prepares**
171:21
**preparing**
20:19 117:18
171:2
**prerequisites**
42:23 45:22
**present** 110:13
**presented** 38:4
45:12 119:11
119:21,23
**preserved**
186:16
**presume**
129:24 145:9
167:5
**presumed**
102:6
**pretty** 11:14
14:9 76:17
89:11 90:22

102:16 149:18
**prevent** 89:13
**preventing**
40:13 87:2
**prevents** 46:3
**previous** 18:5
34:19 69:14
94:25 110:20
141:20 142:23
**previously** 28:2
47:12 73:16
**primarily**
107:11 114:18
**primary**
124:14
**principal** 11:1
12:6
**printed** 125:8
**printout** 27:23
128:10 165:1
**prior** 39:10
49:15 135:3
**prioritized**
51:23
**private** 18:4
19:20 43:4
46:8 56:25,25
57:1,17,23,25
58:2,7,15
65:12,25 66:10
81:10,11,14,20
94:15 103:14
123:21 125:24
135:5 145:4
156:16 159:16

160:1,12
161:13,22,24
163:11,22,23
165:25 166:5
166:12,14,14
166:15,21,24
167:7,20,24
169:3
**probably** 17:21
36:18 51:11
62:22 66:19
67:11 111:7,22
119:7 125:5
143:25 161:10
**problem** 15:20
36:24 39:24
44:7 45:25
103:4 157:1,14
**problematic**
183:21
**problems** 37:1
**procedures**
18:25 31:23
33:2 63:4
**proceedings**
7:1 56:23
145:13
**process** 13:4
14:23 17:14
19:12 22:9,12
22:19,20 23:9
23:11 24:14
25:22 26:8,12
26:20 29:2,23
30:2,2,5,7

31:23 32:4
34:15,20 35:8
36:25 38:2,5
42:4 44:2,3,15
44:16 46:11,14
47:8,10 49:19
55:8,16,18,25
56:2 63:4
66:11 79:1
93:23 122:18
124:24,24
136:11 147:15
147:16 179:2,7
185:5
**processed**   50:8
**processes**   18:24
35:5
**processing**
50:14
**produced**   28:2
182:2,5
**production**
92:13
**professed**
175:24
**professional**
90:2 91:1,2,5
91:12,14,20
**professor**   71:25
72:9,14 73:2
73:13 77:5
83:7,7 84:12
84:15,20 85:14
85:18,21,25
115:11

**professor's**
85:1
**professors**
128:13,18
131:5 132:20
133:7
**program**   4:12
5:9,15 7:14
9:21 11:4,8,14
11:15 13:2
15:12,19 16:22
19:6 20:19
21:23 22:6
28:19 29:20
31:25 34:20
35:1 36:21
40:4 41:16
45:16 46:15
52:14 54:13
55:5 56:4,19
58:5 63:6
64:20 65:13
68:5,10 69:12
74:13,19 75:3
75:16,17,18
86:22 88:2
90:5 95:22,25
95:25 96:4,8
96:11,17
104:17 106:10
107:24 108:21
118:8 120:22
121:11 123:16
123:16,19
129:15 130:10

131:4,17,21
137:20 139:9
144:6,7 149:5
151:5 158:4,12
158:13,19
160:3,5,8,10,13
160:19 161:7
161:23 162:17
167:14,15
170:20 171:19
172:7,9,13,14
172:19 173:25
174:20,21
175:10,12,14
175:22 176:4,5
177:23 178:1
178:19,25
179:20 180:1,4
181:8,14,16
183:4
**program's**
32:25 100:9
**programming**
69:15 107:21
179:12,13
180:4
**programs**
12:13,25 13:1
17:23 28:7
29:4 44:12
68:14 79:7
88:24 110:4
113:8 153:5
160:20 169:25
170:12 171:5,7

172:15 174:24
176:10 178:20
**progress**   50:2
142:16
**prohibit**   46:2
**prohibits**   7:15
**promote**   76:15
78:18 82:2,4
83:9 95:10,16
96:25
**promotes**
132:13
**promoting**
77:23
**prompt**   121:2
139:14
**promulgating**
89:20
**propagate**
76:15 78:18
82:1,4 83:8
95:10,16 96:24
107:3
**propagating**
77:23
**proportioned**
159:6
**proposal**   14:22
15:11,18,18
34:16,24 35:6
37:14 38:11,25
46:11,12,16,25
49:9 52:5
53:11,12 154:2
154:5 155:13

| | | | |
|---|---|---|---|
| 156:25 | 166:25 168:10 | 26:1,5 27:11 | 122:9 123:13 |
| **proposals** | 170:13 174:10 | 27:18 28:7,16 | 123:19,19 |
| 39:23 48:6 | 176:21 | 28:19 29:3,8 | 124:13 125:24 |
| 50:7 51:21 | **provided** 21:9 | 31:25 33:17 | 126:13,16 |
| 153:24 154:18 | 44:19 49:25 | 34:6 35:16 | 127:3,11 |
| 154:21 | 60:21 74:11 | 36:2 37:4 40:6 | 128:18 129:5,7 |
| **propose** 13:6 | 75:8 87:25 | 40:8,9,17 | 129:15 130:9 |
| **proposed** 50:1 | 91:21 124:22 | 41:20 43:8,21 | 131:2,2,4,8,17 |
| 156:11 157:19 | 125:16 136:23 | 44:12 45:23 | 131:21 132:3 |
| **proposes** 34:20 | 159:15 163:11 | 54:13,16 55:5 | 132:11,18,24 |
| **proposing** 15:2 | 164:6 176:23 | 56:4,19 57:12 | 132:25 133:19 |
| 15:3 | **provider** 20:16 | 57:20 59:18 | 137:15 138:1 |
| **prospective** | **provides** 59:14 | 62:3,5 63:6,23 | 138:21 139:12 |
| 131:18 | 126:3 132:25 | 65:1,6,8,13,14 | 141:9 142:5 |
| **protected** 7:17 | **providing** | 66:11 67:1 | 143:11 144:11 |
| 41:15 44:5,8 | 17:23 41:4 | 68:5,16 69:11 | 149:4,22 150:4 |
| **provide** 13:5 | 48:13 56:3,19 | 69:24 70:2,11 | 150:4,17 151:6 |
| 16:12,13 34:5 | 56:21 57:1 | 70:14 78:21 | 152:5,12,24 |
| 51:22 56:10 | 65:5,6 66:11 | 79:12,16 80:14 | 153:4,11,16 |
| 60:4 65:8 | 66:12 67:1 | 80:16,18 81:1 | 158:2,3,4,19 |
| 66:15,16 67:4 | 94:16 160:21 | 81:3,6,22 | 160:2,5,6 |
| 68:14,16 73:23 | 160:21 166:17 | 82:12,15,25 | 162:9,14,16,23 |
| 74:5 81:11 | 167:9 168:4,17 | 84:23 88:16 | 163:8,14 |
| 84:9 88:16 | 169:1 180:3 | 90:1 94:16 | 170:12,20 |
| 89:2 90:3,14 | **pseo** 3:14,21 | 97:8 100:6,8 | 171:17 173:11 |
| 92:12 107:2,21 | 4:15,24 5:3,8 | 100:17 101:6,7 | 173:15,24 |
| 119:4,14 | 5:11,14,18 6:6 | 101:8,20 | 174:1,5,6,9,19 |
| 125:18,24 | 6:14 7:14,15 | 103:19 105:1,7 | 174:21,23 |
| 126:11 133:5 | 9:21,22 11:17 | 107:21,23 | 175:1,5 176:15 |
| 133:11,19 | 11:19 15:25 | 108:9,12 109:2 | 177:21 178:5 |
| 146:22 151:6 | 16:13,21,24 | 109:3,24 110:4 | 178:12,24 |
| 158:2 161:4 | 17:11,23 18:25 | 110:15 112:10 | 180:7 183:24 |
| 162:24,25 | 19:3,6 20:3,19 | 112:12,15,16 | 185:3,15 |
| 163:4,8,10 | 21:23 22:6,20 | 112:22 113:8 | **pseos** 16:21 |
| 165:22 166:20 | 22:21 25:12,23 | 121:16,25 | |

**psi** 26:14 46:3
**psis** 15:23 26:6
179:14
**public** 11:25
12:1 19:25
24:16,18 25:13
28:4 37:5 40:7
40:10,11,18,25
40:25 41:4,5,7
41:14 42:22
43:3,21 45:6
45:16,25 46:5
56:4,10,11,13
56:16,20,22,24
57:2,3,5,18
58:4,11,12
65:6,9,10,25
66:11,14,18
67:1,3,4,6
71:18 74:1,24
80:17 81:7
82:12 87:21
88:3 94:21
109:3 126:10
131:9 140:6
145:4 159:17
163:6,12,14,16
164:7,10
165:22 166:12
166:18,18
167:9,10,19,23
168:4,17 169:2
186:24 189:19
**publically**
167:16

**publicly** 81:3
131:21 133:1
156:22 167:20
**pull** 127:2
**pupil** 167:14,15
**purposes** 56:4
56:15 58:10
121:20
**purview** 136:7
136:22 144:20
**put** 46:15,18
51:18 131:2
154:21 155:13
177:22 178:5
**putting** 40:4

## q

**qualified**
157:18 158:16
**qualify** 165:14
**question** 5:12
8:4,14,16
28:23 61:5
70:1 85:7,10
85:13,23,24
106:1 131:20
131:24,25
133:5,18
137:15 144:9
144:14,16
165:6 166:10
167:13 168:23
**questioning**
30:24 47:21
53:20 58:24
146:4 148:8

**questions** 6:10
7:11 8:11,19
10:8 16:20
50:2 60:24
75:21 102:15
103:2 104:17
106:15 120:16
120:17 137:25
165:20 177:25
184:19,22
185:8,20,22
**quick** 84:15
85:17
**quotations** 6:17
**quote** 6:19

## r

**r** 2:1,6 126:6,7
188:3,3
**race** 41:2
**raised** 10:15
**raising** 84:13
85:16
**randomly**
116:1
**rarely** 17:21,21
53:3 125:10
**rate** 28:16
154:3,11,17,23
186:10
**rather** 115:16
**reach** 45:13
49:6 73:17
89:1 118:22
129:25 130:8
139:8

**reached** 43:1
116:22 120:25
130:4 134:10
**reaches** 123:17
**reaching** 62:24
78:13
**reacted** 49:3
**reaction** 38:9
**reactions** 48:25
**read** 6:18 22:23
29:5 30:18
31:14,21 55:2
85:11 101:23
105:9 113:1
114:8 115:5,23
116:16 128:15
128:16 185:23
186:16 187:9
189:5
**readiness** 171:4
**reading** 72:15
135:13 156:24
**reads** 173:9
**ready** 22:20
23:12 151:20
172:10
**real** 117:24
**realistic** 49:13
**really** 38:22
44:24 56:7
69:25 80:20
84:15 85:17
147:8
**reapplying**
69:23

**reason** 8:17
64:9 104:6
187:11 188:6,9
188:12,15,18
188:21
**reasons** 124:10
124:14
**reassigned**
111:24
**recall** 11:10
21:17 34:19
35:12 38:12
47:7 49:8
50:11,19 51:15
52:10,24 53:1
53:10,20,23
54:3 66:20
135:16 138:4
143:8 146:25
147:4,5 153:18
176:24 177:1
182:16 183:6
183:15 184:17
185:9
**recalled** 182:21
**recant** 183:3
**receipt** 187:17
**receive** 19:23
22:21 23:3,13
66:25 70:14
73:12 74:1,18
75:15 76:14
77:24 78:8
89:1 90:9
91:16 97:14

108:16 109:14
113:11 126:16
157:15 164:7
167:16,20
168:3,8 169:2
**received** 16:19
25:5 33:14,18
33:23,23 34:4
35:21 41:14
42:25 49:17
66:23 69:9
71:2 77:12
94:4 97:20,22
98:8 100:1
104:16 113:15
113:19 119:3
120:10 123:23
124:1,20,25
125:1 136:15
140:4 141:21
141:21 149:11
157:8 158:8
175:4 176:13
176:14 178:16
178:17 179:19
180:17
**receives** 74:12
74:13 154:6
**receiving** 67:3
142:5 168:5,6
**recent** 123:13
129:5
**recognize**
20:12 59:7
79:6,11 80:10

80:12 140:3
**recognizes**
79:15
**recognizing**
79:12
**recollection**
53:21 139:2
**recommendat...**
32:9 103:12,13
135:18 142:25
**recommended**
55:10
**record** 6:18 7:8
23:20 91:24
94:19 186:7
**records** 20:17
21:25 22:4
104:3 118:12
125:23,25
127:7
**recourse**
144:10
**rectify** 181:15
**red** 114:15,15
117:8 152:4
**redirected**
138:11
**reduce** 37:4
**reducing** 154:7
**refer** 127:4,4
**reference** 4:24
6:7 109:24
110:6 162:9
**referenced**
187:6

**references**
55:16,18,24
97:24 108:15
120:5,7
**referencing**
107:17 115:2
**referred** 3:13
110:2
**referring** 7:20
101:19 141:12
143:7 185:13
**reflect** 102:9
105:10
**reflected** 6:18
**reflecting**
184:12
**reflection**
115:7
**reflects** 169:24
170:4
**regard** 42:7
47:25
**regarding**
20:18 22:1
30:24 102:11
102:12
**register** 91:18
**registration**
81:19
**regularly** 60:21
156:4
**regulate** 44:15
**regulation**
16:15 94:9

**reimburse**
123:1
**reimbursement**
70:2,11 108:12
112:14 123:13
139:4
**rejected** 174:25
175:9,13 176:9
176:15 181:24
**related** 9:4,8
36:13 41:1,8
42:16,21,23
44:5,8 53:12
57:20 89:17
90:4 93:10
95:4,18,19,22
96:10 105:20
106:19 117:16
121:24 123:8
125:8 157:9,12
**relates** 32:2
66:13 95:1
140:15
**relating** 96:4
**relation** 81:6
**relations** 35:11
36:11,12 38:6
46:20 47:9
50:21 75:6
111:7,17
136:21
**relative** 186:11
186:12
**relayed** 183:18
184:10,16

**relevance**
142:7
**relevant** 146:23
**religion** 7:16
41:2 71:9
83:18 86:9
89:21
**religious** 2:4
10:14 11:8,15
17:25 18:2
39:24 46:3,6
63:12 70:23,25
71:3,8,13,20
72:7,17,21
73:5,5,7,13,14
74:5 76:15,20
76:24 77:6,23
78:18 82:2,4
83:9,13,16,23
84:7 86:4,11
86:16 88:15
95:6,11,15,17
96:25 97:3
107:1,4,4
110:10,14,24
111:13,16
112:4 121:18
121:20 128:9
142:5 157:19
179:18 180:10
181:11,12
185:2
**religiously**
66:17

**rely** 108:23
**remains** 18:11
159:5
**remember** 48:9
48:9,24 111:11
182:16,18,19
182:22,23,24
**remind** 8:2
34:14 46:21
94:15
**remotely**
111:25
**remove** 120:4
133:5,11
148:19
**removed** 74:22
133:13
**repeat** 85:9
106:1
**repeated** 93:13
116:13 121:4,4
148:13,22
180:20
**repeatedly**
47:14 150:22
150:23,25
**report** 13:12,13
26:6 127:6,9
169:12,13,24
170:2
**reported** 1:24
186:4
**reporter** 8:1
85:12 88:19
96:13 186:23

**reporter's**
186:1
**reporters** 6:17
**reporting**
13:16 178:11
**reports** 13:15
13:17
**represent**
27:23 165:1
**request** 5:18
17:10 22:16,18
24:13 25:7
31:14,18,21
84:19 108:13
115:14,18
125:7 147:7,9
148:20 150:9
**requested**
85:11 88:18
98:2 108:9
145:24 146:2
148:16
**requesting**
23:10 103:18
**requests** 3:7
83:6 91:11
**require** 13:24
18:15 33:17
45:21,22 66:17
70:22 76:14
86:12,13 96:8
96:16 106:25
107:2 156:17
156:21

**[required - reviewing]** Page 39

**required** 16:5
19:14 36:4,5
41:6 42:16
57:7 66:14
70:13 73:1
76:1 86:15
95:5 98:2
162:13,21
165:22 169:13
189:13
**requirement**
24:21 25:10,15
26:21 33:3
43:13,18,23,25
44:9 54:22
55:5,22 57:24
61:20 64:25
65:23 66:2
95:24 96:9
103:19 116:2
119:16 120:11
121:13,23
123:25 148:15
151:9 166:16
**requirements**
13:25 16:18
17:18 18:18
19:9,13 26:17
29:9 42:22
44:12,13 46:4
46:6 55:11
56:15,22,24
57:2,3,5,6,12
57:14,14,18
58:1,5,6,9

65:10 67:4,5,7
89:15 117:16
121:12 141:2,4
149:21 154:25
178:6,18,23
**requires** 14:11
14:12 32:8
55:9 106:24
163:8
**requiring** 72:3
72:10 83:22
86:18,23 87:8
95:14 96:22
97:2
**research**
171:11,23
**reserves** 61:16
**resigned** 98:1
**resolution**
117:2
**resolve** 40:5
**resolved**
116:20
**resources**
122:12
**respect** 31:7
**responded**
118:9,13,17,17
**response** 53:19
62:9,11 93:13
94:15 104:15
114:13 118:12
118:21 119:7
119:13 135:15
135:22 140:10

142:13 185:8
**responses** 61:4
63:21 73:20
**responsibility**
12:22 29:24
**responsible**
27:3 85:1,21
**restate** 31:17
85:7 166:9
168:25
**restated** 110:21
**restatement**
106:21
**restrict** 7:16
29:20
**restricted**
110:9
**restrictive**
22:19 25:22
29:16 55:4,24
62:11
**resubmit** 70:16
**result** 148:14
**retroactively**
69:3
**return** 187:13
187:16
**revenue** 159:10
161:15
**review** 9:25
18:10,12 20:8
20:10,17 21:1
21:14,25 30:13
34:5 42:4
54:10 59:5

60:18,22 92:8
99:20 103:13
103:20 104:7
108:9,14,17,19
108:24 109:7
109:10,13
113:9,14,20
114:3,22 118:8
120:14,15
122:19 124:21
127:17 133:6
134:18,22
137:9 139:6
145:19 156:4
176:18 180:25
181:1 187:7
**reviewed** 15:18
19:8 21:8 45:8
79:19 114:9
127:19 138:5
169:21 175:16
175:18 176:22
181:23 182:9
184:5
**reviewing** 20:9
21:2,17 28:5
30:18 33:13
39:5 54:9
60:20 67:17
99:19 114:5
117:15 125:3
127:16 134:3
134:19 137:10
140:1 145:18
151:19 165:3

165:21
**reviews**  13:7,8
71:16
**revisit**  69:21
**reynolds**  1:12
3:2 7:3,9 21:7
31:3,6 37:22
39:16 47:22
59:1 184:25
186:5 187:5
188:2,24 189:2
189:4,12
**richard**  2:19
**right**  7:10 12:4
21:21 26:21,23
28:10 40:14
54:4,13 59:15
61:16,17 64:23
85:8 88:9
90:13,13
109:25 111:21
115:25 129:1
133:23 135:12
137:10 153:15
158:20 178:6
184:18 186:16
**rights**  135:12
135:19 136:24
140:12,18,19
142:16,19,22
**rigorous**  6:12
38:4 127:8
154:4,8 169:12
171:1,4,9,11

**riske**  1:24
186:23
**role**  12:11,17
12:19 13:3,21
14:18 15:13,14
22:13 32:2,3
37:15 38:16,24
39:8,9,13
75:10 93:4,8
100:9,17
111:14 117:17
117:20 122:4,4
122:5 144:3
**roles**  39:10
101:7
**rolling**  51:11
**room**  115:2,10
115:11
**routed**  75:19
**rule**  1:11 4:2
31:4 148:10
**run**  64:8

**s**

**s**  2:1,5 3:12
126:7,7 188:3
**saint**  11:2,11
11:13
**sally**  1:12 3:2
7:3,9 186:5
187:5 188:2,24
189:2,4,12
**sanctioning**
84:19
**sat**  111:16

**satisfies**  17:3
**saw**  117:20
137:23 139:13
**saying**  35:25
70:6 84:14
85:16,20 130:6
130:16 144:3
146:17 175:5
**says**  21:22,24
22:16,25 23:7
24:2 27:2
28:12,15 29:1
32:8,12,22,22
33:10 44:24
55:8 59:11,12
59:13,16 61:13
61:13,18 63:13
68:3 70:21
72:1,20 76:9
78:16 79:5
80:22 93:15
101:25 103:7
103:12 104:5
105:4,5 107:13
108:6,7,18
110:8 115:21
128:12 129:3
129:10 135:10
152:3,17
153:19 154:5
155:19,22
156:10,15,23
162:12 167:14
169:19 170:11
170:11,25

**scale**  122:13
**scanned**  146:25
**scheduled**
108:17
**school**  6:10
11:6,18 12:7
16:23 17:8,25
19:21 27:13
40:25 41:19
42:9,11 43:8
46:5 56:25,25
57:2,3,5,8,9,18
57:23,25 58:2
58:7,9 64:19
65:15,18,19,20
66:14 67:6
68:5,17 69:1,9
69:23 70:22
71:18 76:13
78:11,11,16
81:14,20 83:1
87:10 89:13,23
91:10,11 93:14
97:11,11
106:22 108:20
114:15,16
120:9 123:1,17
123:20,21
124:22 125:20
125:21 126:2
126:10,17
131:3 132:1,18
135:5 141:19
144:11 158:17
158:24 159:5

159:11,13
160:16 161:5
162:24 163:1
163:11,11,14
163:23 165:22
165:24 166:4,5
166:12,13,14
166:15,19,21
166:24 167:9,9
168:2,10
170:15,16
171:8,10,13,18
171:25 172:2
173:15 175:13
178:4,16
179:19 180:16
181:11
**school's** 17:15
30:6 69:11
135:9 162:16
**schoolchildren**
165:24
**schools** 7:15
11:25 12:2
16:6,21 18:6
18:15 19:2,5
19:18 20:1
25:21,25 26:16
27:2,12 31:1
58:15 63:12
65:12,23 66:1
66:10 67:1
68:23 69:4
81:8,10,12
88:15,21 90:14

91:22 97:8,8
97:25 98:8
105:15 108:23
109:2 110:3,16
113:9,14 123:6
125:24 131:16
132:16 142:5
144:22 145:4,5
147:14 148:16
151:2 153:11
154:24 155:3
155:25 157:11
158:14 161:22
161:24 162:13
162:15,21,22
163:1 164:11
166:1,18 167:8
167:20,24
168:1 169:3
**scope** 30:25
37:21 39:15
47:22 58:25
136:3 142:8
146:5 147:19
148:8 154:13
157:4,24
**screenshot**
127:23 134:3
**screenshots**
114:11,17
119:5,9,11
**seal** 186:18
**second** 22:15
24:2 28:25
33:3 54:20,21

55:7 59:13
70:21 79:6
101:14,15
135:10 146:12
169:19 170:11
**secondary** 3:20
3:23 44:13
173:8
**sect** 110:12
**sectarian** 24:18
44:19 63:17
66:16 71:16
72:5,8,12 74:6
74:20,24 75:8
76:5,10 77:19
78:14 81:14
82:5,7,14,18,24
83:3,20,24
84:24 86:2,21
87:16,20 88:2
89:6,10,14,16
89:22 90:4,23
94:20 96:20
98:3 109:5
112:8,24
114:24 116:5,7
116:9,17
117:16 119:6
120:2 123:4,10
129:23 131:10
131:11 132:2,8
132:13,17
133:3 138:24
139:5,8 150:23
150:25 180:18

**section** 70:21
86:3
**sections** 162:14
162:20
**secular** 84:22
137:25 139:11
**secularized**
158:3
**secure** 126:25
**see** 15:20 17:20
24:1 28:14,17
30:16 32:11
33:6 40:22,23
49:10 60:6
88:1 92:11
105:20,22
106:6 114:19
114:23 115:9
116:24 128:5,9
152:7,17 154:9
155:24 162:19
165:11 177:6,7
**seeing** 106:24
**seek** 16:21
31:24 63:5
78:15
**seeking** 15:14
**seem** 69:20
107:23
**seemed** 137:17
137:17
**seems** 105:24
107:24 110:20
138:12 139:7
144:10

**[seen - specialist]** Page 42

**seen** 31:20
67:21,24 68:9
98:15 99:23
102:5 104:3,4
104:25 113:24
114:6,10,11
117:6,7,12,22
124:15 126:5
127:20,22,22
134:3,4,21,25
137:3,22 149:1
155:10 176:8
177:5 182:2,4
184:13
**selected** 154:15
**self** 26:9 76:17
**semester**
115:13,19
119:24 126:19
**senate** 49:19
**senator** 145:24
146:1
**send** 83:6 97:12
125:6,7,8
**sending** 97:9
140:9
**seniors** 27:13
27:13
**sense** 14:10
146:1
**sent** 90:8 97:23
137:1 140:4
146:13 187:14
**sentence** 55:7
61:13 79:6,10

79:15 80:12
108:18 156:14
170:11
**sentences** 113:2
**separate** 22:19
40:21 158:19
**september**
143:13,13
**series** 38:3
**service** 174:11
**services** 167:18
**session** 46:17
155:12
**sessions** 90:2
**set** 70:23,25
71:3,7,13,19
72:6,17,21
73:6 107:4
**seven** 27:25
28:5
**shakes** 8:7
**shana** 50:22
**share** 115:15
115:16 118:23
**shared** 97:25
118:24 142:12
**sharing** 71:6
76:19 137:15
**sharon** 100:13
128:25 149:15
**she'll** 8:2
**sheet** 187:11
**show** 92:1,1
**shows** 46:5
129:4 171:11

171:23
**sign** 33:17
43:14 86:19
87:9 105:15
185:24 186:16
187:12
**signature** 18:23
186:23
**signed** 33:3
54:23 55:13,17
97:16 187:19
**signing** 86:5
**similar** 100:9
100:10 125:2
**single** 42:24
98:11
**singled** 104:8
104:12
**site** 158:15
**situation** 63:9
64:8
**slides** 92:6,6
**slowly** 8:2
**small** 26:1,1
114:7 115:23
**solely** 174:1
**solutions**
187:23
**solve** 15:21
36:25 37:1
**son** 137:16
**sophomores**
27:14
**sorry** 10:3
14:11 59:13

66:16 70:19
91:4 96:15
106:5 113:1
115:23 165:4,7
175:23
**sounds** 84:11
85:13
**source** 40:23
98:24 158:21
**sources** 40:22
**south** 1:17
**space** 26:1
**spaces** 26:5
173:7
**speak** 8:2 9:16
29:14 42:6
49:6 53:6 60:7
69:12,17 77:3
77:19 136:12
147:8,11
155:17 160:7
**speaking** 95:23
150:18
**speaks** 29:11
45:10 55:1
95:8 103:6
**spearheading**
15:4
**special** 3:7
127:6 140:21
**specialist** 12:12
54:1 74:19
75:3,9,11,12,16
75:18 120:22
130:10,10

**specific** 38:13
40:16 53:10,15
66:20 69:18
71:7,8,14,15
72:8 74:21
86:9 95:4 96:4
96:6,11,14,20
96:21 100:13
104:17 106:11
110:14 113:8
115:14,19
117:2 124:22
139:1 157:2
158:6 173:15
**specifically**
49:6,7,21 50:1
50:13 53:21,24
54:2 55:21
70:10 95:23
100:14 102:11
104:18 138:23
138:24 171:12
**specifics** 53:22
175:19
**specified** 70:12
**specify** 172:9
**speculation**
34:2 42:14
52:7 62:7,19
64:22 72:24
73:9 76:22
77:9 83:11
84:4,17 102:4
107:6 112:6,19
128:21 130:23

132:6 133:16
152:14 153:7
154:13 157:4
157:22 166:7
167:3 168:13
173:3,17
**speech** 14:13
**spelled** 95:20
**spirit** 108:4
**spoke** 9:17,20
118:8
**ss** 186:3
**st** 2:15
**staff** 51:2 97:17
133:6 137:14
147:24 156:8
158:18 164:20
177:24
**staffing** 122:12
**stand** 26:14
42:2
**standard** 57:6
90:10
**standards**
58:13,15 67:5
79:8 81:1,2,4,6
81:7 88:22
113:7,10,14,21
**standing** 42:15
42:16,19,21
140:13,17
185:7,12
**stands** 86:25
**start** 12:16
72:1 99:16

**started** 15:13
38:15,16,17,24
39:13 47:3
51:16 71:18
72:14 97:21
**starting** 84:12
85:15
**starts** 75:2
101:15 113:4
**state** 1:1 7:7
56:14,16,22
57:6,13 66:4,8
96:6 108:12
135:19 160:2
162:1 166:4,14
176:7 186:2
**state's** 87:13
**stated** 16:10,10
34:6 37:2
45:20 66:19
71:2 73:16
77:13 145:1
170:21
**statement** 4:7
4:14 18:7 33:7
33:18 43:14
53:18 55:13,17
59:9 61:19
77:3 79:18,23
86:5,8,19 87:9
92:23 94:6
97:10 102:1,7
102:16 106:12
111:2 112:2
143:10 148:15

148:18,19
151:9 153:12
154:25 175:21
175:24 176:11
178:18
**statements**
35:14 36:14
39:25 147:14
152:25 156:17
**states** 1:1 79:13
161:2
**static** 19:12
**stating** 17:2
18:23 37:3
183:4
**status** 41:16
69:13
**statute** 16:5,11
16:24 17:4,16
17:18 19:11,16
25:7 26:18,21
27:2,9,17
29:24 35:18
36:4,5 45:24
46:2 50:1,15
69:20 71:1
82:10 90:7,8
105:5 106:16
135:12 151:3,4
158:5 163:2
173:9 174:17
**statutes** 41:6
**statutory** 24:12
25:14 40:12
50:18

stayed  99:5
step  62:15
stephanie
  140:25 142:14
  143:1 149:16
stopped  97:9
street  1:17 2:14
strike  150:6,10
strives  106:13
student  4:8
  5:18 18:16
  35:15 41:18,23
  42:8,18,25
  43:7,12,20
  44:20,23 45:14
  45:19 56:14
  57:17,23,24
  58:2 61:14
  62:16,21,23
  63:10,15,20,25
  70:22 71:6
  76:14 77:25
  78:8 81:17,19
  81:20,20,21
  83:22 84:13
  85:2,15,21
  86:16 97:2
  103:15 106:24
  106:25 109:4
  119:1,16,18
  124:12 125:23
  126:1,3,4,18,19
  126:19,21
  132:10 154:6
  159:2,3,7

162:23 163:21
168:11,15
173:20 174:18
175:5,20
176:24 181:24
182:18,19,20
182:21 183:2
183:18,19
student's  78:3
students  19:1
  22:20 24:16
  25:12,23 26:1
  27:10,17 28:13
  28:15,20,21
  29:6 33:17
  36:2 37:4 40:6
  40:17 41:5
  44:11 56:16
  57:11,15 62:2
  62:3 64:13
  65:11 67:2
  71:24 72:3,10
  72:19 73:3
  76:20 77:5
  81:9 83:5,8
  86:18,23 87:9
  95:15 96:17
  98:2 101:20
  108:20 116:2
  116:16 119:19
  119:23 127:3,9
  127:11 131:19
  132:3,16,19,23
  135:7,8 141:12
  152:5,11 153:4

153:10,16
155:1 156:22
162:14 165:14
166:11,23
167:6,8,16,19
167:25 168:3
168:21 169:2
170:13,15
171:2,8,18,21
171:24 172:6,8
172:10,13,25
173:6,8,9,12,14
173:25 174:3
174:11,13
175:8 176:9,14
183:24
studies  44:21
sub  156:15
subject  4:14,18
  5:3,6,8,11,14
  5:17
submission
  33:20 34:5
  39:22 49:11
  178:12
submit  17:2,10
  17:18 18:6,15
  19:14 23:11
  26:11 70:4,13
  90:19 150:4
  178:24
submits  68:17
  164:5
submitted  9:9
  10:1 13:8

19:10 34:25
38:25 47:13,14
47:14 49:13
70:1,11 108:11
121:7 152:1,18
169:22 179:6
submitting
  137:19 179:14
subscribed
  189:14
substantial
  186:14
substantially
  107:15
success  12:21
  169:20 171:2
  171:21
successful
  108:3
sufficient  16:1
suggestions
  36:8
suite  2:7,15
summarized
  184:16
summarizing
  169:14,14
summary  170:1
superintendent
  117:9 118:10
  118:15,24
supervisor
  15:17 34:21
  38:17,18 39:19
  47:12 75:5

**[supervisor - termination]** Page 45

111:15 120:23
130:9 136:16
140:24 141:15
141:15,20,20
143:11,12,15
143:18,19,20
**supervisors**
13:18
**support**  17:13
24:18 35:4
52:18 140:7
167:25 168:21
174:16 183:25
**supported**
39:22 49:11
52:19 63:22
**supports**  76:12
82:12 167:6
**sure**  10:19
13:22 25:3
31:19 34:10
37:17 38:20,23
50:6 54:2
59:21 69:6
76:18 96:1
99:11 111:9
121:20 136:22
143:12,17
151:13 154:14
155:17 166:9
176:2,20 178:2
181:20 184:8
185:23
**surmise**  178:10

**sworn**  7:4
186:6 189:14
**syllabi**  108:10
108:14
**syllabus**  83:5
120:15 124:15
125:3,7 139:10
**synod**  61:15
**system**  13:2
70:5 126:4

**t**

**t**  3:12 188:3,3
**tack**  103:1
**take**  8:12 11:17
20:7,7,25
25:12 27:18
28:3 29:8
30:13 34:9
36:2 54:21
60:2 67:9
70:21,22 73:16
77:11 78:19
81:22 88:24
99:9 109:20
110:13 114:22
115:22 124:13
125:20 129:11
132:10 133:23
137:8 148:4
151:12,16
153:11 155:2
165:2 171:8
172:13 173:14
173:21 179:9
181:18

**taken**  51:8
141:23 142:14
159:2
**takes**  150:15
**talk**  8:3 22:10
35:6,10 51:4
80:5 102:17
134:6 136:8
138:14 159:19
159:25 160:6
**talked**  22:8
34:14 37:6,12
50:20 51:9,24
52:3 117:23
118:1 183:15
**talking**  46:10
48:16 51:4
77:7 89:8
149:9 177:13
**taught**  71:18
80:18 112:1,2
128:18 133:3
**tax**  135:4
**teach**  78:16
81:6 92:4
112:16 128:13
132:21 133:2,7
**teacher**  72:19
73:5 76:19
77:22 84:18
97:25
**teachers**  78:9,9
78:10
**teaches**  60:8

**teaching**  59:15
59:22 60:9
61:1,9
**teachings**  61:15
63:11,12 64:1
79:8 81:1,4
**team**  15:1
121:1 122:6
**technical**  11:22
12:24 46:9
123:9
**technology**
92:7
**telephone**
97:22
**tell**  20:14 60:10
106:12 110:8
115:20 158:11
186:6
**telling**  77:5
**tendency**
186:14
**tends**  89:9
**tentative**  104:6
**term**  141:11
**terminate**
61:16 63:14
**terminated**
62:16 64:4,7
64:13
**terminating**
63:25
**termination**
64:7,10 76:3

| | | | |
|---|---|---|---|
| **terms** 91:7 | **theory** 76:7 | 177:18 181:18 | **timeline** 150:18 |
| 182:21 | **thing** 30:15 | 181:22 182:1,6 | **timelines** 180:6 |
| **testament** | 156:21 | 182:7 184:19 | **timely** 178:25 |
| 115:6,7 | **things** 21:8 | 185:21 | 180:6 |
| **testified** 7:4 9:1 | 100:12 121:3 | **thought** 16:1,4 | **times** 49:15 |
| 69:1 | 148:3 | 16:4 39:24 | **timmerman** |
| **testify** 31:3 | **think** 17:21,24 | 40:16 52:17 | 2:13 3:4 14:1 |
| 32:1 37:23 | 30:25 32:7 | 147:5 | 16:7 18:1 21:3 |
| 39:16,18 47:23 | 35:23 38:18 | **thoughts** 37:18 | 21:6 26:3,25 |
| 47:24 59:1 | 39:12 45:19 | **three** 13:17 | 27:6,15 28:1 |
| 63:3 136:4 | 51:7,18 53:19 | 55:11 70:3,10 | 29:10 30:23 |
| 146:5,7 147:20 | 76:17 78:24 | 93:8,16 | 32:17 34:1,10 |
| 148:9,11 | 79:3 85:20,22 | **tied** 40:23 | 37:20 39:14 |
| 149:25 159:22 | 85:23 106:22 | 125:8 135:17 | 40:1 41:11,24 |
| **testifying** 31:7 | 108:4 110:12 | **ties** 153:25 | 42:13 45:9 |
| 76:25 159:22 | 126:5 130:4 | **tim** 5:21 6:2 | 47:20 52:6,12 |
| 183:25 | 131:1 135:1 | **time** 1:15 17:24 | 54:25 55:15 |
| **testimony** 16:8 | 139:3 147:2 | 20:8 25:1 34:4 | 56:5 58:23 |
| 40:2 47:25 | 153:17 154:20 | 38:24 39:21 | 59:19 61:21,24 |
| 53:7 78:5 85:4 | 159:6 176:13 | 46:13 47:17 | 62:6,13,18 |
| 132:5 179:23 | **thinks** 135:10 | 49:12,14 54:1 | 64:21 66:5 |
| 181:4 186:7,7 | **third** 113:2 | 70:12 80:3,4 | 67:8 69:5 |
| 187:9,17 189:8 | **thomson** 2:4 | 93:23 99:3 | 72:23 73:8 |
| **textbook** | 3:3 7:6 27:1 | 100:19,25 | 76:21 77:8 |
| 168:10 | 31:10 34:8,12 | 103:9,22 | 78:4 79:24 |
| **textbooks** | 48:3 52:8 59:4 | 104:14 109:10 | 80:3 82:19 |
| 167:16,21 | 61:22 62:14 | 109:13 114:22 | 83:10 84:3,16 |
| 168:3,5,6,8 | 67:13 80:1,7 | 117:1,24 128:7 | 85:3 94:11 |
| 169:3 | 85:5,9,19 99:9 | 129:12 136:18 | 95:7 97:4 |
| **thank** 21:5 57:9 | 99:13,15 106:2 | 138:3 140:25 | 98:20 99:11 |
| 150:12,24 | 107:19 133:23 | 157:19 164:16 | 102:3 103:5 |
| 177:19 184:18 | 134:1 150:8,12 | 179:15 185:25 | 105:16,25 |
| **that'd** 177:16 | 150:13 151:15 | 187:18 | 107:5,16 |
| **theology** 79:11 | 159:24 165:9 | **timeframe** | 110:17 112:5 |
| | 165:12,16,18 | 187:8 | 112:18 114:21 |

128:20 130:22
132:4 133:15
133:21 136:2
142:7 145:6
146:3 147:18
148:1,7 149:23
150:6,9 152:13
153:6 154:12
157:3,21
159:18 165:7
165:11,13,17
166:6 167:2
168:12,18,24
170:6 173:2,16
177:12,19
178:7 179:22
181:3,20 182:4
184:21,24
185:20,23
187:1
**today** 8:19 10:5
21:10 80:5,6,8
80:9 118:21
130:21 184:12
185:8,10,12,22
**together** 33:4
40:24 54:24
55:23 91:7
100:12
**told** 33:16 36:3
36:10 140:16
140:23,23
**tom** 93:2,6,7,18
116:24 117:7
118:1 149:17

**took** 11:19 36:7
36:9 126:19,20
**top** 4:17 5:2,8
5:11,14,17
24:2 32:21
57:13 59:11
98:13 105:4
156:12 165:5
**topic** 31:2,4
32:1 72:20
134:7 159:20
**topics** 37:22
39:15 58:25
136:3 142:9
146:5 147:19
149:24 157:5
**towards** 164:10
165:5
**track** 19:17
26:5
**training** 91:17
92:5
**trainings** 91:21
**transcribe** 8:7
8:8
**transcribed**
186:7
**transcript**
65:24 163:1
177:16 187:6
187:19 189:5,8
**transferability**
28:11
**transportation**
165:6,14,23,24

166:17,20
167:1,12
**treat** 59:2
**treatment**
160:1
**tribal** 19:5
**true** 186:7
189:8
**truth** 186:6
**truthful** 8:18
**try** 8:4,8
172:10
**trying** 15:21
36:25 37:1
57:4 64:12
**turning** 22:14
156:9
**tweaked** 48:22
**two** 37:12
40:21 55:11
93:7 113:2
124:14 147:14
156:16 157:2,9
157:11
**typically** 17:19
60:20 74:16,19
75:2,19 77:24
91:6 92:6
178:25 179:25
181:8

| u |
| --- |

**u** 28:15 29:13
30:5
**uh** 8:7,8

**ultimate** 48:7
**ultimately**
14:24 15:5,9
34:23
**unapproved**
144:11
**unaware**
155:25
**unclear** 16:11
16:16 84:6
105:19
**uncomfortable**
78:8
**under** 4:11
7:23 16:23
25:7 32:22
33:2 45:24
46:16 61:23
62:17 82:23
84:22,24 87:23
88:10 89:19
95:16 96:24
112:4 148:9
150:9 151:2
155:19 162:11
179:12,14
185:14
**undergraduate**
10:21
**understand**
7:13,20,22
8:14 13:22,24
25:3 56:6 57:4
96:1 143:17
147:13 153:10

166:10 184:8
**understanding**
24:25 28:23
29:17 56:7
82:23 84:24
94:14 98:7
100:7 125:1
129:18 147:17
153:17 159:23
165:21 166:2
**understood**
8:16
**unfairly** 104:8
**uniform** 44:1
**united** 1:1
**universities**
157:2
**university** 3:20
10:23 17:9
27:24 28:18
29:7,19,22
45:15 127:25
132:11
**unknown** 129:6
**unni** 36:15
47:23 48:13
50:20
**unrepentant**
135:8
**unweighted**
28:12
**updates** 48:25
49:2,3,5,7,18
49:25 129:5

**upload** 92:14
**uploaded**
126:25
**upper** 103:17
**upset** 135:4
**url** 28:4
**use** 7:15 8:6
87:19 93:25
142:2 161:2
167:22
**used** 35:14 88:8
105:13,14
140:7 141:10
141:11,14
146:10 179:18
181:11 185:12
187:19
**using** 24:18
25:13 41:15
**usually** 8:11,12
17:5 75:20
120:25 123:15
124:13
**utility** 97:16
**utilization**
159:4

| v |
| --- |

**v** 7:11 187:4
188:1 189:1
**vacant** 51:7
**vague** 14:1,9
18:1 26:3,25
27:15 41:11
45:9 53:21
56:5 59:19,21

61:24 62:6,18
69:5 73:8
76:21 77:4
79:24 80:3
84:3,16 94:11
98:21 105:16
107:5 110:18
112:5 114:21
157:21 166:6
**valerie** 1:24
186:23
**various** 97:23
149:10
**vent** 139:8
**verbal** 8:6
97:22 125:6
**verify** 108:11
160:20 161:3,8
187:9
**veritext** 187:14
187:23
**veritext.com.**
187:15
**verm** 2:4
**verses** 115:8
116:16
**version** 155:16
**versus** 90:23
**view** 86:18 87:8
87:8 89:22
91:24 133:4
**viewpoint**
95:11,17 96:25
110:14

**views** 169:25
170:4
**violate** 114:20
116:10
**violated** 63:9
63:23 129:20
**violating**
120:10 129:22
144:23
**violation** 77:18
135:11,25
141:6
**virtual** 114:18
115:2
**virtually** 97:15
**vision** 153:23
**visually** 106:20
**vocal** 11:21
**voluntarily**
91:15
**voluntary** 82:3
82:6,11,17
83:2,22 96:23
**volunteering**
85:2,22
**vs** 1:6

| w |
| --- |

**wait** 33:12
**walz** 5:21 6:2
**want** 9:17
10:17 21:6
28:20 45:21,22
56:7 70:2,20
85:7 112:13
121:10 124:25

**[want - yield]** Page 49

131:4 133:2
143:17 155:2
174:4 177:2,12
**wanted** 19:20
35:18 124:21
127:2 176:1
**wants** 89:13,14
172:5,12
**washington** 2:7
**way** 24:5 29:25
41:3,8,17 96:7
104:9 110:22
113:14 115:19
143:10 156:6
172:17
**ways** 77:1
**we've** 34:8 64:8
66:22,22 67:8
89:3 111:4
124:1 133:21
164:18 175:7,7
**web** 3:20 129:7
132:18
**webinar** 91:24
**webinars** 17:13
**website** 19:4
27:24 68:24
89:23 92:1
128:4 129:5
130:21 133:10
134:8 165:2
**websites**
103:15
**webster** 98:12
98:23

**weigh** 53:3
74:20,25
**weighing** 75:1
**welcome**
132:10,24
**went** 106:9
152:22
**wholly** 29:23
**willie** 1:7 187:4
188:1 189:1
**wing** 114:15,15
117:8
**witness** 3:2
21:5,11 67:10
186:5,7,16,18
187:8,10,12,18
**word** 28:3
115:22 142:2
154:6 185:7,12
**wording** 53:16
**words** 115:25
**work** 57:19
97:17 106:16
119:16 137:21
158:23
**worked** 15:18
35:22 100:12
100:21 130:5
**working** 11:25
12:12 13:3
51:16 100:24
122:11 137:22
138:25 140:21
**works** 122:16

**world** 170:14
**worldview**
24:19 74:21
78:17 79:1,18
79:23 80:19,21
101:22 102:9
102:13 103:4
112:9 128:14
128:19 132:12
132:22 133:8
**would've**
100:21 101:6,8
183:15
**writing** 148:25
149:1
**written** 82:9
91:21,25 92:3
92:9 125:5
143:4 182:9,10
184:11,11
**wrote** 115:12

| x |
|---|
| **x** 3:1,12 |

| y |
|---|

**yeah** 10:1
53:14,14 77:11
85:9 99:13,21
101:2,3 104:23
118:7 150:8
153:2 175:3
183:22
**year** 6:14 15:16
17:23 18:5
46:18 70:7,8

88:20 92:24
97:8,11,11
98:5,6 111:18
123:8 124:5
154:3 159:1
179:6 182:16
182:17
**year's** 169:15
**years** 12:3 37:3
70:3,3,10
124:8
**yep** 123:21
**yield** 148:14

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.