**Ex. 5**

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MINNESOTA

3    _____

4    MELINDA and MARK LOE, et al.,

5             Plaintiffs,

6         v.          Case No. 0:23-cv-01527-NEB-JFD

7    WILLIE JETT, et al.,

8         Defendants.

9    _____

10              DEPOSITION OF ADOSH UNNI

11                 January 29, 2024

12                    9:00 a.m.

13

14    _____

15

16

17                File # MW 6439446

18

19

20

21

22

23

24

25         COURT REPORTER:  Christina DeGrande

Page 2

1  APPEARANCES:

2  On Behalf of Plaintiff:

3  Eric Baxter, Esq.

4  Andrea Butler, Esq.

5  Ben Fleshman, Esq.

6  Becket Law

7  1919 Pennsylvania Avenue Northwest, Suite 400

8  Washington D.C.  20006

9  202-349-7221

10  Ebaxter@becketlaw.org

11

12  On Behalf of the Attorney General's Office:

13  Jeff Timmerman, Assistant Attorney General

14  Madeleine Demeules, Assistant Attorney General

15  445 Minnesota Street, Suite 1400

16  St. Paul, Minnesota  55101

17  651-300-6807

18  Jeff.timmermmerman@ag.state.mn.us

19

20  ALSO PRESENT:  Richard Landon, Esq., Lathrop GMP LLP

21

22

23

24

25

Page 3

1    I N D E X

2  WITNESS        EXAMINATION          PAGE

3  ADOSH UNNI        DIRECT            4

4

5      E X H I B I T S

6  NUMBER     DESCRIPTION          MARKED

7  Exhibit 1  Notice of Deposition        5

8  Exhibit 2  4/17/2008 Email          118

9  Exhibit 3  4/11/2018 Email          121

10  Exhibit 4  2/16/2023 Email          131

11  Exhibit 5  11/8/2020 Email          143

12  Exhibit 6  2/6/2021  Email          146

13  Exhibit 7  12/6/2021 Email          150

14  Exhibit 8  3/7/2022 Email           155

15  Exhibit 9  2/7/2023 Email           160

16  Exhibit 10  3/6/2023 Email          163

17  Exhibit 11  10/10/2023 Email        167

18  Exhibit 12  3/09/2023 Email         174

19  Exhibit 13  3/16/2023 Email         181

20  Exhibit 14  3/17/2023 Email         192

21  Exhibit 15  Bethany Lutheran College    201

22       Statement

23

24

25

Page 4

1         BE IT REMEMBERED that the deposition upon

2  oral examination of Adosh Unni was taken on January

3  29th, 2024, at 9:00 a.m., at 80 South 8th Street,

4  Suite 3100, Minneapolis, Minnesota, before Christina

5  DeGrande, Professional Stenographer, Notary Public

6  in and for the State of Minnesota.

7         Whereupon, the following proceedings were

8  had, to wit:

9         THE COURT REPORTER:  Please raise your

10  right hand.

11         Do you swear or affirm that the

12  testimony you are about to provide for the

13  cause under consideration will be the truth

14  and the whole truth, so help you?

15         THE WITNESS:  I do.

16

17         DIRECT EXAMINATION

18  BY MR. BAXTER:

19  Q.  Good morning, Mr. Unni.  Am I saying that right?

20  A.  Yes.

21  Q.  Could you state your full name for the record?

22  A.  Adosh Unni.

23  Q.  Okay.  And you know that you're here to answer

24    questions about the lawsuit in Loe versus Jett,

25    correct?

Page 5

1  A.  Yes.

2  Q.  And you understand that the lawsuit is a challenge

3    to the 2023 amendment to the PSEO program that

4    prohibits the use of PSEO funds at schools that

5    restrict admission based on religion or other

6    protected categories; is that accurate?

7  A.  Yes.

8         (Exhibit 1 was marked for

9      identification.)

10  BY MR. BAXTER:

11  Q.  Showing you a document that's been marked as

12    Exhibit 1.  Are you familiar with this document?

13  A.  Yes, I'm familiar with these themes and topics.

14  Q.  Okay.  And you're aware that you've been asked to

15    testify today on behalf of the Minnesota Department

16    of Education; is that correct?

17  A.  Yes.

18  Q.  And that you've specifically been asked to answer --

19    respond to the topics designated as Numbers 2, 3,

20    and 11 on this document; is that correct?

21  A.  Yes, yes.

22  Q.  And you were aware of that before coming to this

23    deposition?

24  A.  Yes, I was.

25  Q.  Okay.  And you understand that you're answering

2 (Pages 2 - 5)

Page 6

1    questions today under oath?
2    A.  Yes.
3    Q.  As you may know, the reporter is taking down
4        everything we say, so it's important to speak slowly
5        so that she can take down what we say, not to talk
6        over each other, wait for each other to answer
7        before we continue.
8            It's also important that you give verbal
9        answers, not shaking your head, which the reporter
10       can't capture.  It's also difficult to transcribe
11       "Uh-huh" and "Huh-uh," so we ask you to use "Yes" or
12       "No" when you answer questions where appropriate.
13       If you need a break at any time, let me know.  We'll
14       usually try to take one every 60 to 90 minutes.  But
15       if you need one in between, we'll finish our line of
16       questioning and then do that.
17           If you don't understand a question, just let me
18       know.  Is there any reason why you wouldn't be able
19       to give full, complete, and truthful answers to my
20       questions today?
21   A.  No.
22   Q.  Have you ever been deposed before?
23   A.  No.
24   Q.  Okay.  Have you ever been involved in a lawsuit
25       before?

Page 7

1    A.  In what capacity?  I was -- I mean, I was a law
2        clerk.
3    Q.  Okay.  Have you ever been named in a lawsuit before?
4    A.  No.
5    Q.  And have you ever been -- worked for an institution
6        that was named in a lawsuit at the time that you
7        worked for them?
8    A.  Yes.
9    Q.  And were you personally involved in those lawsuits?
10   A.  Can you ask some further clarifying questions?
11   Q.  Sure.  Can you tell me what -- when you said, "Yes,"
12       what lawsuits did you have in mind?
13   A.  Well, just to the -- Cruz-Guzman.
14   Q.  And where -- which -- why were you involved in that?
15       What was your involvement in that lawsuit?
16   A.  Just gathering documentation for discovery.
17   Q.  Okay.  And were you in the case for plaintiff or the
18       defendant?
19   A.  Defendant.
20   Q.  And who is Guzman?
21   A.  A parent on behalf of a child.
22   Q.  And what was your role there?
23   A.  My role, in my current role as director of
24       government relations.
25   Q.  Okay.  So this was a lawsuit that involved MDE?

Page 8

1    A.  Yes.
2    Q.  And what was MDE's involvement?
3    A.  As a party, as a defendant being named in the suit.
4    Q.  Were you asked to testify in that case?
5    A.  No.
6    Q.  You just gathered documents?
7    A.  Yeah, correct.
8    Q.  Any other cases?
9    A.  No.
10   Q.  And so you've never testified in court; is that
11       correct?
12   A.  Correct.
13   Q.  Do you keep a journal?
14   A.  No.
15   Q.  Have you ever written anything related to -- if I
16       say the word, "amendment," you know that I'm
17       referring to the PSEO amendment that's at issue in
18       this case; is that correct?
19   A.  Yeah.  For the purposes of this, yes.  I mean, in
20       the course of our work, we wouldn't call it an
21       amendment.
22   Q.  What do you call it?
23   A.  We call it a legislative proposal.  So amendment
24       normally is an amendment to a bill, so it's a change
25       to a bill that's a legislative proposal.  But we

Page 9

1    would normally call it a legislative proposal or a
2    change of statute.  But for the purposes of this, I
3    would --
4    Q.  You'll understand what I mean when I say,
5        "amendment"?
6    A.  Yes.
7    Q.  Okay.
8    A.  It just throws me off a little bit.
9    Q.  Okay.  Hopefully, we'll be used to that by the end
10       of the deposition.  You said you don't keep a
11       journal.  Have you written anything related to the
12       amendment since the time that you first became aware
13       of it?
14   A.  I do not -- I don't know.  I may have -- may have
15       taken notes.
16   Q.  Do you regularly maintain a calendar?
17   A.  A digital calendar, yes.
18   Q.  Okay.  Do you maintain a to-do list?
19   A.  Yes.
20   Q.  And would that to-do list have included items
21       related to this lawsuit or the amendment?
22   A.  Possibly.
23   Q.  And do you have a notebook where you take notes of
24       meetings?
25   A.  Yes.

1  Q.  Okay.  Is that just a single notebook?  Is it on

2      your computer?

3  A.  It is a single notebook.

4  Q.  At any point in this lawsuit, were you asked to look

5      for documents in your possession related to this

6      lawsuit?

7  A.  Yes.

8  Q.  Okay.  And what did you do to look?

9  A.  I looked through my emails, I looked through my --

10     any memos or anything I would have -- would have

11     produced, and I looked through my notes.

12 Q.  And can you give me a general sense of what you

13     found or the quantity?

14 A.  Just emails.  I found that I did not produce any

15     memos or any -- anything on that and that I did not

16     produce -- I'm sorry.  I did not create any, like,

17     notes in my notebook of any meetings.

18 Q.  And did you review your calendar?

19 A.  Yes.  I believe I did.  Yep.

20 Q.  And was there anything on your calendar related to

21     the lawsuit?

22 A.  I believe just the meetings that we had with the

23     representatives of some of the colleges in question

24     who were questioning the proposal.

25 Q.  Okay.  Did you look at your to-do list?

1  A.  Yes.  I'm trying to remember where I had my to-do

2      list at that time.  Yes.

3  Q.  And besides emails, did you find anything else --

4      and the -- the calendar items that you mentioned,

5      did you find anything else related to this lawsuit?

6  A.  No.

7  Q.  Did you check texts -- text messages?

8  A.  Yes.

9  Q.  And was there anything in your text messages related

10     to this lawsuit?

11 A.  Other than we met with individuals, nothing.

12 Q.  Do you use any social media?

13 A.  No.  Well, work-related, no.

14 Q.  Okay.  Would you have put anything on your

15     personal --

16 A.  Let me amend that.  I have -- I note on my -- I

17     think, on my Twitter account that I work for the

18     Department of Education, but I don't post at all.

19 Q.  Would you ever have posted anything online related

20     to this lawsuit or the amendment?

21 A.  I don't believe so.

22 Q.  Have you checked for that?

23 A.  I have not, but I have not posted on Twitter for

24     many years.

25 Q.  Understood.  You mentioned that you did find some

1      emails related to this lawsuit or the amendment.

2      About how many emails did you find?

3  A.  I don't remember.  I don't remember the number.

4  Q.  Was it in the hundreds?  In the dozens?

5  A.  Oh, jeez, no.  Probably in the dozen, couple dozen

6      or so.

7  Q.  And you turned those emails over to your counsel?

8  A.  Correct.

9  Q.  Do you remember the general content of those emails?

10 A.  Yes.

11 Q.  And what -- can you describe for me what you

12     remember?

13 A.  I believe it was a discussion of -- the most recent

14     ones were conversations around the -- about the

15     proposal going to the legislature around meetings we

16     have coming up or that we had with representatives

17     from, I believe, Northwestern and Crown College.

18     And then in the past, back a few years, it was

19     around the practice in question in the suit that was

20     the subject of the legislation and I believe some

21     emails around past actions the Department -- or past

22     activities the Department had in this space, I

23     believe, specific to Northwestern.  But those were

24     time -- from time before I was at the Department,

25     just, like, refreshers of what other staff had

1      encountered in their history in this space and then,

2      I believe, around staff opinions in that space.  And

3      then I think I opined in that space and then maybe

4      preparation for a meeting that we had with one of

5      the colleges.  I can't remember which one it was at

6      this time.

7  Q.  And were most of those emails with outside parties?

8  A.  Almost all of the emails from before were with

9      internal staff to the Department.  Although, I feel

10     like maybe there were some emails -- I feel like

11     there were some emails with maybe an attorney here

12     at Lathrop or -- it was Gray Plant Mooty at the

13     time.  And then in terms of the more recent emails,

14     I believe there was some email exchanges with

15     representatives from Crown College and the

16     University of Northwestern.

17 Q.  Thank you.  And on those internal emails, were

18     those -- were there attorneys involved in those

19     communications?

20 A.  I'm an attorney.  Not acting in my capacity as an

21     attorney for the Department then -- I -- yes.  In

22     the more recent emails, there were attorneys.  Like,

23     our general counsel was on some of the emails

24     internally.  And then I believe there may have been

25     some emails with the Attorney General's Office in

1　　earlier -- earlier times.
2　Q.　Okay.  Can you tell me about the texts that you said
3　　you found?  I believe you said there were texts
4　　related to meetings you had with outside parties and
5　　perhaps others; is that accurate?
6　A.　I think there were just texts about, I'm joining
7　　this meeting.
8　Q.　Okay.
9　A.　Yeah.
10　Q.　And did you produce those -- copies of those texts
11　　to your counsel?
12　A.　I cannot remember if I had them or not.
13　Q.　And do you remember who those texts would have been
14　　with?
15　A.　They would have been with my -- with counsel and
16　　maybe, I think, letting -- maybe -- trying to think
17　　if there was anybody.  I think it was just counsel,
18　　internal counsel, general counsel to the Minnesota
19　　Department of Education.
20　Q.　Do you recall any others?
21　A.　No.
22　Q.　Other than speaking with your attorney, what did you
23　　do to prepare for this deposition today?
24　A.　Reviewed some emails.
25　Q.　Okay.  And as far as you know, were those emails the

1　　same ones that you gave to your counsel that were
2　　related to this case?
3　A.　Yes.
4　Q.　Did you review any other documents?
5　A.　No.
6　Q.　Did you bring any of those documents with you today?
7　A.　No.
8　Q.　Did you take any notes?
9　A.　No.
10　Q.　Did you meet with anyone besides your attorney?
11　A.　No.
12　Q.　I'm going to get some background information from
13　　you.  Do you mind telling me where you were born?
14　A.　Minnesota, Rochester, Minnesota.
15　Q.　Okay.  And you lived your -- grew up in Minnesota?
16　A.　Yes.
17　Q.　Share with me what your religions background is, if
18　　any?
19　A.　I have no religious background.
20　Q.　Okay.  What's your -- mind sharing your view on the
21　　role of religion in the world?
22　　　　MR. TIMMERMAN:  Objection, relevance.
23　　　You can answer.
24　　　　THE WITNESS:  My personal or
25　　professional?

1　BY MR. BAXTER:
2　Q.　Both.
3　A.　Personal view in religion in the world is everybody
4　　has the right to have their own religion.  And my
5　　professional is that religion is, you know,
6　　everybody's allowed to have their religion in the
7　　world, and that's a constitutionally protected
8　　right.
9　Q.　And you're not personally religious?
10　A.　No.
11　Q.　Do you participate in any religious communities?
12　　　　THE WITNESS:  What's relevance
13　　pertained to this whole --
14　　　　MR. TIMMERMAN:  You can answer.
15　　Standing objection as to relevance.
16　　But you can answer these questions.
17　　　　THE WITNESS:  All right.  Can you
18　　repeat the question, please?
19　BY MR. BAXTER:
20　Q.　Yeah.  Just do you participate in any religious
21　　communities?
22　A.　No.
23　Q.　Do you observe any religious holidays?
24　A.　Yes.
25　Q.　And what are those?

1　A.　Christmas.
2　Q.　Okay.  Any others?
3　A.　Diwali every once in a while.
4　Q.　Can you explain what Diwali is?
5　A.　Festival of lights, Indian, Hindu religious holiday.
6　Q.　Any other religious activities that you participate
7　　in?
8　A.　No, no.
9　Q.　Do you have a personal understanding of what the
10　　Free Exercise Clause is?
11　A.　Yes.
12　Q.　And what's your understanding of the Free Exercise
13　　Clause?
14　A.　My understanding is that it's a constitutionally
15　　protected right to be able to practice one's
16　　religion --
17　Q.　And do you have --
18　A.　-- without infringement by the government.
19　Q.　And do you have a personal perspective on the
20　　importance of the Free Exercise Clause?
21　A.　I -- not any more than any other personal rights.
22　　So I -- I mean, I -- actually, I should answer the
23　　question yes.
24　Q.　Okay.  And what is that view?
25　A.　My view is that it's a constitutionally protected

1   right and that people, to protect that right, should
2   be able to avail themselves of the legal system to
3   be able to protect themselves if they feel it's been
4   infringed, that right has been infringed.
5   Q.  Are you familiar with recent Supreme Court cases on
6   the Free Exercise Clause?
7   A.  Vaguely familiar.
8   Q.  With which ones?
9   A.  I mean, I couldn't name any right now.
10  Q.  What's your personal understanding of the
11  Establishment Clause?
12  A.  My understanding is that the government can't make
13  any laws that puts one religion over the other or
14  seems to make laws that favor one religion over
15  another.
16  Q.  Do you have a -- what's your personal sense of the
17  importance of the Establishment Clause to our system
18  of governments?
19  A.  I'd say, to be able to treat people equally under
20  the law that it's fundamental to the government's
21  interaction with its citizenry.
22  Q.  Do you have any perspective on what the limitations
23  or flaws might be in the Free Exercise Clause or the
24  Establishment Clause?
25         MR. TIMMERMAN:  Objection to the extent

1   it calls for a legal conclusion.  And I just
2   want to make clear, he's testifying in his
3   personal capacity as to these questions.
4          Go ahead.
5          THE WITNESS:  Thank you.
6          Yeah.  Can you repeat the question?
7   BY MR. BAXTER:
8   Q.  Yeah.  Just a sense of personal view on limitations
9   or flaws in the Free Exercise Clause or the
10  Establishment Clause.
11  A.  You know, I haven't really thought much about the
12  limitations or flaws, so...
13  Q.  You studied at Carleton College?
14  A.  Correct.
15  Q.  Is that here in Minnesota?
16  A.  Yes.
17  Q.  Your degree in international relationships --
18  A.  Correct.
19  Q.  -- relations.  While a student on campus, did you
20  participate in any student groups?
21  A.  Yes.
22  Q.  Which ones?
23  A.  Trying to remember.  I haven't reviewed my CV in
24  quite a while.  Probably a soccer club, a radio
25  station.  I can't remember which else.

1   Q.  What was your role at the radio station?
2   A.  I was a DJ for four years.
3   Q.  Okay.  And was it all music, or was it, like, talk?
4   A.  Ninety-five percent of it was music, and then five
5   percent, I did, like, a -- like a pre-recorded,
6   like, this is the news of the day.
7   Q.  What kind of music?
8   A.  Classic rock, vinyl.
9   Q.  And did your news of the day -- it was just the news
10  of the day, or did it have opinion in it?
11  A.  No opinion, all just news of the day.
12  Q.  Other interests that you pursued while in
13  undergraduate?
14  A.  Sports and just some music.
15  Q.  And during college, did you have a job?
16  A.  For, like, a couple terms as a -- as an intermural,
17  like, monitor, intermural sports monitor.
18  Q.  Did you work at the -- after college where did you
19  go to work?
20  A.  I taught English abroad for a year.
21  Q.  Where was that?
22  A.  In Chili.
23  Q.  Did you already speak Spanish?
24  A.  Barely.
25  Q.  Where else did you work?

1   A.  I worked in Washington D.C.
2   Q.  As?
3   A.  As a -- what was it?  A paralegal assistant and then
4   as a reporter.
5   Q.  A paralegal assistant in a law firm?
6   A.  Yes.
7   Q.  And can you remember the law firm?
8   A.  Again, haven't reviewed -- I can't remember the
9   name, but it was, like, an insurance law firm.
10  Q.  Okay.  And then you said a reporter?
11  A.  Yes.
12  Q.  A legal reporter or news reporter?
13  A.  News reporter.
14  Q.  Okay.  Was that at The Gray Sheet?
15  A.  Yes.
16  Q.  And what's The Gray Sheet?
17  A.  They report on, not just -- I mean, solely on
18  medical device news.
19  Q.  And so you were -- is that what you were writing on,
20  or were there other topics you were --
21  A.  Only medical devices.
22  Q.  And what was your background for that?
23  A.  I could write well.
24  Q.  You turned to the University of Minnesota for your
25  law degree; is that correct?

Page 22

1   A.  Correct.
2   Q.  Before that, was there any other place you were
3      employed?
4   A.  No.
5   Q.  While you were at the University of Minnesota, were
6      there any student groups you participated in?
7   A.  Yes.  I was on Law Council, so that's the student
8      government, on health law -- I can't remember the
9      title of it.  I was in the soccer club.  I was on
10     their governing board of that, and.  I know there
11     was one or two other -- oh, Asylum Law Project.  I
12     was on their board.  And there was, like, one or two
13     other small groups.  I can't remember.
14  Q.  Okay.
15  A.  Oh, TORT.  It was, like, the drama club.
16  Q.  You actually produced dramas?
17  A.  Yeah.  Student written, produced, music, everything.
18     Acted, performed at the Pantages.
19  Q.  And were you a writer?
20  A.  No.  I was a performer.
21  Q.  These are student written?
22  A.  Mm-hmm.
23  Q.  Did you -- were you involved in any political
24     activities while in law school?
25  A.  Yes.

Page 23

1   Q.  What were those?
2   A.  Like door-knocked.
3   Q.  Okay.  For?
4   A.  For the DFL and for a nonpartisan just
5      get-out-and-vote organization.
6   Q.  Okay.  And what year was that?
7   A.  Gosh, that would have been 2008.
8   Q.  Do you remember what you were door-knocking for
9      specifically?
10  A.  I -- for the get-out-to-vote.  It was literally just
11     get-out-to-vote.  And then for the DFL, I can't
12     remember -- I think, it was just for a slate of
13     candidates.  And then I did election -- one activity
14     I forgot to mention is in 2008, I did election
15     monitoring or poll monitoring for the DFL.
16  Q.  Okay.  Had you previously been involved in any
17     political activities?
18  A.  Yes.
19  Q.  And what were those?
20  A.  I was a field intern for the DFL in 2003.
21  Q.  Okay.  So that was when you were in college as an
22     undergrad?
23  A.  Yes, when I was an undergrad.
24  Q.  And what did that involve?
25  A.  It was running phone banks for the DFL.

Page 24

1   Q.  Okay.  Any other political involvement?
2   A.  Yes.  I was an intern on Capitol Hill.
3   Q.  In Washington D.C.?
4   A.  Yes.
5   Q.  For who?
6   A.  For Senator Clinton and for Representative
7      Gutknecht.
8   Q.  What years was that?
9   A.  Summer of 2002 and summer of 2003.
10  Q.  And what were your responsibilities?
11  A.  So I was an -- as an intern for Representative
12     Gutknecht, it was drafting, doing mail stuff, and
13     helping draft letters for constituent responses.
14     That was, like, predominantly the activities.  And
15     similar for Secretary Clinton -- or I'm sorry --
16     Senator Clinton at the time.
17  Q.  And any other political activities?
18  A.  In -- can I ask just a clarifying question?
19  Q.  Sure.
20  A.  Is that in general?
21  Q.  Up to law school.
22  A.  Up to law school.  I don't think so, other than
23     voting.
24  Q.  What triggered your interest in politics?
25  A.  That's a good question.  I don't know.  I

Page 25

1    honestly don't know.  That's something I'll have to
2    go back and think about.  I'll give a general
3    answer.  Probably where it came from is that my
4    decision to pursue international relations and
5    political science degree probably spurred an
6    interest to then engage in the political system.
7  Q.  So in high school, no real political --
8  A.  No.
9  Q.  -- activities?  What activities did you pursue in
10    high school?
11  A.  Sports, drama.  That's pretty much it.
12  Q.  During law school, did you have summer internships
13    or jobs in between your years of law school?
14  A.  Yes.
15  Q.  And where were those?
16  A.  After first year, Kennedy & Graven, which is a law
17    firm downtown here.
18  Q.  What did you do for Kennedy?
19  A.  Just normal first-year law clerk stuff, like help
20    draft stuff and review documents and produce
21    research.  After second year -- yeah, was
22    second-year law clerk, clerkship at Briggs & Morgan.
23  Q.  What did you do for them?
24  A.  Normal stuff like do research, draft memos, produce
25    legal writing.

7 (Pages 22 - 25)

Page 26

1  Q.  And in law school, did you develop any relationships
2      with any professors, faculty, or staff who played
3      any role in the amendment at issue in this lawsuit?
4  A.  No.
5  Q.  What about at Kennedy & Graven?
6  A.  No.
7  Q.  What about at Briggs & Morgan?
8  A.  No.
9  Q.  After law school, where did you go to work?
10 A.  I went to work in district court -- Minnesota
11     District Court for Judge Phil Bush, Philip Bush.
12 Q.  Was that a one-year clerkship?
13 A.  Yes, kind of.  Let me clarify just to be completely
14     accurate.  It was a three-month internship --
15     fellowship, and then that extended into roughly
16     around a year and three months.  It was three
17     months, and then I think we tacked on a year.
18 Q.  And the kind of work you did there?
19 A.  Drafting, doing, like, draft opinions for the judge,
20     doing research, sitting in on court cases to take
21     notes, assisting with, like, court just like
22     logistics.
23 Q.  And the name of the judge again was?
24 A.  Philip D. Bush.
25 Q.  Debush, and is Judge Debush still on the --

Page 27

1  A.  D. Bush.  Sorry, D is his middle initial.
2  Q.  Oh.
3  A.  No.  He is retired.
4  Q.  He's retired.  Have you maintained contact with
5      Judge Bush?
6  A.  No.
7  Q.  As far as you know, did he have any role in this --
8      the amendment that led to this litigation?
9  A.  No, as far as I know.
10 Q.  After working for the judge, where did you go?
11 A.  I went to do document review --
12 Q.  Okay.
13 A.  -- at a range of places.
14 Q.  Okay.  And how long did you do that?
15 A.  Roughly around a year, I think.  Let me think.
16     Yeah.  Roughly around a year, like, 9 to 11 months,
17     somewhere in that range.
18 Q.  Was that for one firm or you said several different
19     firms?
20 A.  Several firms.
21 Q.  And after that concluded, where did you go?
22 A.  I then worked -- and that was project-based, so did
23     not work, worked, did not work.  But then my
24     employment thereafter was with the House DFL Caucus,
25     Minnesota House of Representative DFL Caucus.

Page 28

1  Q.  How did you get that job?
2  A.  I applied.
3  Q.  Okay.  Any particular reason why you applied?
4  A.  Because I was then interested in getting into
5      government.
6  Q.  And why was that?
7  A.  Because I didn't like practicing law.
8  Q.  Fair enough.  When you were hired there, with whom
9      did you work?
10 A.  I was -- a lot of different people.
11 Q.  Okay.  So the DFL Caucus is a group of members in
12     the House who are members of the DFL; is that
13     correct?
14 A.  Yes.
15 Q.  And what -- what's the role of the Caucus?
16 A.  The Caucus is basically constitutes the body of
17     lawmakers in one particular party or who affiliates
18     with that party.  And then they have a number of
19     staff that they -- based on if they're a majority or
20     minority, they have a number of staff who fulfill
21     various roles.
22 Q.  What was the type of work that you were doing?
23 A.  So I was a caucus researcher, so I carried out
24     research projects for any member of the caucus that
25     requested it, but specifically, my main role was to

Page 29

1      staff the education committees -- education-focused
2      committees in the House of Representative for the
3      DFL.
4  Q.  When you say your role was to staff those
5      committees, what do you mean by that?
6  A.  So I would be the main researcher -- the researcher
7      for those committees where I would research the
8      bills that were up, provide background memos for DFL
9      members who sat on those committees, and helped
10     assist the -- I assisted the committee chairs in any
11     tasks that they needed done.
12 Q.  Did you work on any PSEO-related issues while you
13     were working for the caucus?
14 A.  I am sure I did.
15 Q.  Do you remember any of them?
16 A.  No, not specifically the details, but I'm sure I did
17     work on PSEO issues.
18 Q.  And why are you sure?
19 A.  Because that has been a focus -- I do remember one
20     specific issue on PSEO.  It was around advertising.
21     Could postsecondary institutions advertise, where
22     could they advertise to high school students, like
23     on billboards and on flyers to come to their
24     programs.  And that was the one issue.  I'm sure
25     there were more.  But that was the one issue that

Page 30

1    was the biggest issue.
2  Q.  What was the concern there?
3  A.  It's about aid. It's about money. If a student
4    spends more time -- the more time a student spends
5    on campus at a PSEO institution, the less money a
6    district or charter school gets for that student.
7  Q.  And so what does that have to do with advertising?
8  A.  So the more a postsecondary institution advertises
9    to students to come to their institution, the more
10    time or more likely they are to realize that it
11    exists and go and get access to higher education
12    credits and then -- so the more likely they are to
13    spend time on the postsecondary institution, meaning
14    the less money a school district will have for its
15    operations.
16  Q.  And what was the caucus's interest in that
17    situation? Were they trying to increase
18    opportunities to get into PSEO or to decrease the
19    opportunity?
20  A.  I don't know about the caucus -- I can't remember
21    the full -- I can't speak for the full caucus. I
22    would say the opinion was split on the issue.
23  Q.  And what about on the committee, the education
24    committee?
25  A.  I would say the issue was split. I would say that

Page 31

1    was a -- like, it was a -- wasn't, like, a political
2    position. It was more of a geographic position.
3  Q.  Okay. And what -- how did geography impact the
4    issue?
5  A.  It's, I think, when you have smaller districts with
6    fewer students, the more students you get pulled
7    away, the bigger impact that has on your budget.
8    And so for Greater Minnesota, so rural Minnesota,
9    Greater Minnesota districts and with postsecondary
10    institutions near them, it was a bigger deal for
11    them. And at the time, you know, geographically
12    diverse DFL Caucus.
13  Q.  And just for clarity, the committee you were sent
14    to, was -- is it just called the education
15    committee?
16  A.  No.
17  Q.  What was the name of it?
18  A.  There were multiple committees.
19  Q.  Okay.
20  A.  At the time, it was Education Finance Committee,
21    Education Policy Committee, and I also called, at
22    the time, it was the Children Family -- no.
23    Childhood and Youth Development Committee.
24  Q.  Okay. And you were staffed with all three of
25    those -- to all three of those committees?

Page 32

1  A.  Correct.
2  Q.  Okay. Any other committees that you were staffed
3    to?
4  A.  Not as a regular committee.
5  Q.  While you were working for the caucus, did you ever
6    work on any issues concerning religious
7    institutions?
8  A.  Not that I recall.
9  Q.  Any issues regarding admissions of students into
10    religious institutions?
11  A.  Not that I recall.
12  Q.  Do you remember ever having discussions with anybody
13    about religious institutions of education?
14  A.  No.
15  Q.  Who did you -- were there any -- this was in the
16    Minnesota House; is that correct?
17  A.  Correct.
18  Q.  Okay. Were there any House members that you worked
19    with in particular?
20  A.  The chairs of the committees.
21  Q.  Okay. Anyone else?
22  A.  And then to a lesser extent, the member -- the DFL
23    members of the committees.
24  Q.  Okay. Were there any with whom you developed a
25    special relationship?

Page 33

1  A.  The chairs of the committees.
2  Q.  Okay. And who were those chairs?
3  A.  The chairs that I developed a relationship with were
4    representative -- former Representative Carlos
5    Mariani with the House Education Committee and then
6    Representative Paul Marquart of the Education
7    Finance Committee.
8  Q.  Okay. Is -- you said, "the former." He's now
9    retired?
10  A.  He's no longer a representative.
11  Q.  And when did he leave?
12  A.  After 2022, yeah.
13  Q.  Okay. So before the time of the current amendment
14    that we're talking about in this lawsuit?
15  A.  Before the legislation that passed.
16  Q.  Okay. What -- then the second individual you
17    mentioned was?
18  A.  Paul Marquart.
19  Q.  And is he still serving?
20  A.  He is no longer a representative. He's commissioner
21    of the Department of Revenue.
22  Q.  And did he have any involvement in the amendment or
23    the activities leading up to the amendment?
24  A.  No.
25  Q.  And the first gentleman you mentioned, his name was?

9 (Pages 30 - 33)

Page 34

1   A.   Carlos Mariani.
2   Q.   Okay.
3   A.   Oh, and then there's another representative I failed
4        to remember, Representative Jim Davnie.
5   Q.   Okay.  And is Davnie still serving?
6   A.   No.  He retired after 2022 as well.
7   Q.   And Mariani --
8   A.   Mariani.
9   Q.   Mariani, did he have any involvement in the
10       amendment or the efforts leading up to the
11       amendment?
12  A.   In the amendment -- so we're speaking specifically
13       to this last legislative session?
14  Q.   Or anything leading up to it, related amendment,
15       similar efforts to pass the amendment, something
16       like the amendment?
17  A.   If the language was in any bill that was passed out
18       of the House, it would have to go back to the voting
19       record.  But I would imagine -- I would have to go
20       back to the voting record.
21  Q.   Okay.  But he was involved in the issue?
22  A.   I'm not quite sure what "involved" means.
23  Q.   Well, why don't you tell me what relationship
24       Mariani had to the amendment or prior efforts to
25       pass something like the amendment?

Page 35

1   A.   He may or may not have voted for it on the floor.
2        And I also just don't remember what his committee
3        membership was.  It was a period of time where I was
4        out of the Department of Education.
5   Q.   And did you ever have any conversations with him
6        about the amendment or the issues related to the
7        amendment?
8   A.   No.
9   Q.   Did you have any sense of what his position would
10       have been on the amendment or issues like the
11       amendment?
12  A.   I would have to go and check his voting record.
13  Q.   Okay.  What about -- was it Davnie?
14  A.   Davnie.
15  Q.   Did he have any involvement, to your knowledge, in
16       the amendment or prior efforts to pass similar
17       legislation?
18  A.   He was the House Education Finance Chair, so as the
19       chair of one of the committees that would have
20       passed omnibus bills, to that extent yes.
21  Q.   Okay.  Did you ever have any conversations with him
22       about the amendment or prior efforts to pass the
23       amendment?
24  A.   I don't recall.
25  Q.   It's possible you did?

Page 36

1   A.   It's possible.
2   Q.   And when would those have been?
3   A.   I don't know, 2022 or '21 or '20.  I'm just
4        remembering the years that I was back because I
5        wasn't in my role in 2019 in the last however many
6        years I've been there.  It would have been those
7        years, but I will say no specific conversation
8        stands out to me in talking to him in over those
9        three years.
10  Q.   When you say, "no conversation stands out," does
11       that mean you do remember some specific
12       conversations?
13  A.   About other proposals.
14  Q.   Okay.  Other proposals that are similar to the
15       amendment?
16  A.   Just proposals in general.  I mean, I can -- I just
17       feel like context may be important for the level of
18       conversation, divided government versus not divided
19       government.
20  Q.   Sure.  Go ahead and provide that context.
21  A.   I would just say under divided government, there is
22       more conversation in detail about proposals that
23       people feel are priority shared by both -- both
24       parties that are a divided government.  And so I
25       don't recall detailed conversations in that '20 to

Page 37

1        '22 period around many policy proposals just in
2        general --
3   Q.   Okay.
4   A.   -- compared to last session.
5   Q.   Okay.  Well, I'll come back to that.  While you were
6        on the DFL Caucus, did you develop any relationships
7        that became relevant to the amendment or the issue
8        that the amendment addresses?
9   A.   I'm sorry.  Say that again.  When I was in the DFL
10       Caucus?
11  Q.   Right.
12  A.   No.
13  Q.   Okay.  And do you remember having any conversations
14       during that time about the amendment or issues
15       similar to the amendment?
16  A.   When I was in the DFL Caucus?
17  Q.   Correct.
18  A.   No.
19  Q.   You hesitate.  Why?
20  A.   I just wasn't aware of, like, the issue.
21  Q.   Okay.  You weren't aware of the issue at that time?
22  A.   Yeah.  I mean, it just like -- it wasn't -- it never
23       came before us.
24  Q.   Okay.  And that was the entire time you were on
25       the -- with the caucus?

10 (Pages 34 - 37)

Page 38

1  A.  Correct.
2  Q.  After the caucus, where did you go?
3  A.  I went to the Minnesota Department of Education.
4  Q.  And what year was that?
5  A.  End of 2014.
6  Q.  Okay.  And you were there for how long?
7  A.  Three years and nine months.
8  Q.  Okay.  And what inspired your interest in that job?
9  A.  I was recruited to be there.
10 Q.  Who recruited you there?
11 A.  The commissioner of education.
12 Q.  Who was that?
13 A.  Brenda Cassellius.
14 Q.  Can you spell that?
15 A.  Brenda Cassellius.
16 Q.  And her last name, can you spell that?
17 A.  Cassellius, C-a-s-s-e-l-l-i-u-s.
18 Q.  Okay.  And had you worked with her before she
19     started recruiting you?
20 A.  Yes.
21 Q.  In what capacity?
22 A.  As she was commissioner of education, and I was a
23     caucus researcher, and so as partners in developing
24     legislation from different parties we -- not
25     political parties, but different just actors, we

Page 39

1      interacted in certain spaces.
2  Q.  So how did she reach out to you about the job?
3  A.  Directly and through the staff.
4  Q.  And did you accept immediately?  Was there a process
5      of applying?
6  A.  I did not accept immediately and kind of a process.
7  Q.  What was that process?
8  A.  Just some conversations with the commissioner and
9      staff.
10 Q.  Did you interview with anyone in the office?
11 A.  No, no formal interview.
12 Q.  And what were your major responsibilities during the
13     time -- that first time as MDE Director of
14     Government Relations?
15 A.  Gosh, represent the Department at the legislature,
16     helped develop governor's legislative proposals, and
17     track state and federal legislation and sometimes
18     provide just opinions on how to implement statutes.
19 Q.  While you were there, did you personally work on or
20     advise on any issues regarding PSEO?
21 A.  Yes.
22 Q.  And do you remember what those issues were?
23 A.  A range of issues for PSEO.  We had a range of
24     legislative proposals.
25 Q.  Okay.  Were any of them related to the amendment or

Page 40

1      similar issues?
2  A.  Yes.
3  Q.  Okay.  And do you recall when those first -- that
4      issue -- those issues first arose?
5  A.  Yes, yes.
6  Q.  When was that?
7  A.  I believe it was 2016 or '17.
8  Q.  Okay.  And in what context were the issues?
9  A.  My -- my understanding of the issue.
10 Q.  And what was your understanding of the issue at the
11     time?
12 A.  Well, I think you asked two questions.  Did I miss
13     the first question when I tried to --
14 Q.  Well, I guess my question now is what was -- what
15     did you understand that issue to be?
16 A.  My understanding of the issue was that there were
17     concerns raised around students attending PSEO
18     courses at certain higher education institutions and
19     having to take an admissions process that had a
20     religious framing to it.  That's how I understood
21     the issue at a time.
22 Q.  Do you remember how it arose?
23 A.  I believe staff reached out and put the issue in
24     front of me.
25 Q.  And do you remember what your reaction was?

Page 41

1  A.  My reaction was a standard reaction of, I need to
2      analyze the issue and provide advice.
3  Q.  And do you remember what advice you provided at that
4      time?
5  A.  I believe I said that -- that, in my opinion, the --
6      as the issue was laid out to me, that religious
7      framing in an admissions process would not be
8      allowable under statute.
9  Q.  And did you -- did anyone counter that conclusion?
10 A.  Yes.
11 Q.  And do you remember who?
12 A.  The institutions.
13 Q.  What do you mean, "the institution" -- oh, the --
14 A.  The higher-ed institutions.
15 Q.  Okay.
16 A.  And their -- and their counsel.
17 Q.  And were there internal discussions at MDE about
18     that issue then?
19 A.  Yes.
20 Q.  And what was the tenor of those discussions?
21 A.  Trying to ascertain if parameters around admissions,
22     religious admissions tests -- just for lack of
23     better phrasing -- admissions tests were allowable
24     or not and whether administrative decisions could
25     resolve that matter.

11 (Pages 38 - 41)

1  Q.  And was the conclusion that MDE came to in those
2      discussions?
3  A.  That we would have conversations with the
4      institution.  I can't remember if it was University
5      of Northwestern or Crown College -- I just can't
6      remember, I think one or the other -- and to consult
7      with the Attorney General's Office.
8  Q.  Okay.  And what was the ultimate decision that came
9      out about whether MDE had control or influence over
10     religious admissions decisions?
11 A.  I think the result was is that we had to pursue
12     legislation if that was the route that we -- that we
13     thought was the right route to go.
14 Q.  And during that first time that you were at MDE as
15     the director of government relations, did the
16     Department pursue any legislation on this issue?
17 A.  No.
18 Q.  Okay.  Did it internally propose any legislation?
19 A.  By the time I left, I cannot recall.  I left at -- I
20     left in August of 2018.
21 Q.  Okay.
22 A.  So I cannot recall if that was -- was there.
23 Q.  And had -- were there ongoing discussions at the
24     time that you left about potential legislative
25     proposals?

1  A.  In the context of the conclusion was we did not have
2      the necessary administrative authority at the time.
3  Q.  Okay.  At the -- as far as you're aware, before you
4      left, was anyone actively thinking about
5      legislation, strategizing about legislation, or
6      anything like that?
7  A.  It's possible.
8  Q.  Okay.  But do you have any recollection?
9  A.  I just -- I just don't remember about the -- I just
10     can't recall a specific conversation about that in
11     the time, like, the remaining time in 2018 that I
12     was there.
13 Q.  At the time the issue came up and through the time
14     you had discussions with the Attorney General, did
15     you feel like there was extensive discussion that
16     followed that, or did the issue die out?
17 A.  I will conjecture that there was discussion because
18     I know that there was a resulting legislative
19     proposal.  I can't remember if 2019 was the first
20     year or 2020.
21 Q.  Okay.  And who -- to the extent you know, who at MDE
22     would most likely have been the person who would
23     have spearheaded any efforts that were happening
24     during your first period of time at MDE?
25 A.  Who would have put the proposals forward and would

1      have made sure that it got into any resulting --
2  Q.  Correct.
3  A.  -- platform from the administration, from the
4      Department?  I think that would have started from
5      the division overseeing PSEO.
6  Q.  And do you remember who was heading that at the
7      time?
8  A.  I believe that it was Paula Palmer.
9  Q.  You said in August 2018 you left MDE?
10 A.  Yes.
11 Q.  And you went where?
12 A.  To Education of Minnesota.
13 Q.  What's Education of Minnesota?
14 A.  They are the public teacher's union in the state of
15     Minnesota.
16 Q.  And what drew you there?
17 A.  They had an opportunity to -- to work in their legal
18     department, and I felt that that was the -- an
19     appropriate move at the time.
20 Q.  You got sucked back into being a lawyer?  What was
21     your -- what was your major responsibility?
22 A.  So there -- the major responsibilities in the legal
23     department that I fulfilled were representing
24     teacher clients and any legal issues they may or may
25     have and providing advice where the -- where there

1      was advice sought in representing the teacher at the
2      local district.  I provided training for educators
3      around the state.  Those were the major tasks and
4      roles.
5  Q.  Any other responsibilities that took a significant
6      amount of your time while you were there?
7  A.  I think I served on, like, an elections committee.
8      So unions have election procedures for local and
9      statewide, so I helped provide legal assistance in
10     that space.
11 Q.  And on the legal issues you were advising on, were
12     those new issues for you?  You were kind of starting
13     from ground zero?
14 A.  It was labor and employment, which I did not have a
15     whole lot of familiar -- familiarity with before
16     that.
17 Q.  While you were at Education Minnesota, did you work
18     on anything PSEO related?
19 A.  No.
20 Q.  Do you know if the union took a position on any
21     PSEO-related issues?
22 A.  I do not recall any formal positions.
23 Q.  Did you work on any issues that involved private
24     religious schools --
25 A.  No.

1 Q. -- while you were at the Minnesota Education --
2     Education Minnesota, right?
3 A. Correct.
4 Q. As far as you know, while you were there, did
5     Education Minnesota take any positions on issues
6     concerning religious educational institutions?
7 A. I was not aware of any formal positions.
8 Q. Okay. And are you aware of anyone at Education
9     Minnesota who was discussing issues around religious
10    institutions of education?
11 A. I was not aware of that.
12 Q. Have you maintained connections with anyone with
13    whom you worked at Education Minnesota?
14 A. Yes.
15 Q. And with whom?
16 A. With the -- with the lobbyists. They operate in the
17    same sphere as me and then with some people in the
18    legal department who provide opinions.
19 Q. And since you left, have you worked with any of
20    those issues -- any of those individuals on
21    PSEO-related issues?
22 A. Not that I recall specifically. It's possible on
23    some -- some smaller PSEO issues around when a
24    student could withdraw from a course or enter a
25    course. I think that's one proposal that maybe they

1     had some small opinion on. But I can't recall any
2     specific conversations.
3 Q. And have you worked with any of those individuals
4     since you left on issues regarding religious
5     schools?
6 A. No.
7 Q. Why did you leave Education Minnesota?
8 A. I no longer wanted to practice law.
9 Q. Okay. Any other reasons?
10 A. No.
11 Q. Did Commissioner Jett ever have connections to
12    Education Minnesota?
13 A. I do not know.
14 Q. And how did you end up coming back to MDE?
15 A. I applied for a similar role to what I had, a step
16    down, at the Department of Human Services and was
17    lucky enough to get the role. And then around the
18    same time, my former role, so my successor, left
19    that role. And that role came open right in the
20    middle of the 2020 legislative session or the
21    beginning of it. And so I was asked to fulfill this
22    role on an interim basis.
23 Q. Who was the predecessor?
24 A. Kate Lynne Snyder.
25 Q. And did she fill the entire time from when you left

1     to when you came back?
2 A. Yes.
3 Q. And how long were you in the -- the initial role you
4     went to MDE for? You said you went back and you --
5     you applied for a lower position?
6 A. At Department of -- at Department of Human Services.
7 Q. Oh, at Department of Human Services?
8 A. And I was loaned over.
9 Q. Got it. What were your responsibilities at
10    Department of Human Services?
11 A. I did not serve there for more than three hours of
12    training.
13 Q. Okay.
14 A. It was a very --
15 Q. It literally happened that quickly?
16 A. Yeah.
17 Q. Then you were asked to fill the interim position?
18 A. Correct.
19 Q. How long were you in the interim role?
20 A. I believe I was there from February, whatever,
21    middle of February till June, so how many months is
22    that? Four months.
23 Q. Okay. And then how did you move from being interim
24    to permanent?
25 A. I was invited to take on the role permanently.

1 Q. And when does -- when did the legislative session
2     start in 2020?
3 A. Maybe started end of January. I came on after
4     legislative session started, so we'll put probably
5     end of January.
6 Q. So you were involved immediately in live legislative
7     issues?
8 A. Yeah.
9 Q. Who did you report to when you came back to MDE?
10 A. I reported to a -- what was her role? She was the
11    -- I can't remember if it was an assistant
12    commissioner or director of external communications.
13 Q. And who did she report to?
14 A. I believe she -- I believe, she reported to either
15    the deputy commissioner or the commissioner.
16 Q. And who was the commissioner at that time?
17 A. Mary Cathryn Ricker.
18 Q. And who was the deputy commissioner?
19 A. I can't remember who the deputy commissioner was at
20    that exact time.
21 Q. Did you have direct interactions with the
22    commissioner or the deputy commissioner?
23 A. Yes.
24 Q. Has that chain of command stayed similar, or has it
25    changed?

Page 50

1  A.  It's changed.
2  Q.  How has it changed over time?
3  A.  That director of external relations -- that position
4      was eliminated.  And the -- when I was brought on to
5      serve as interim, after interim to permanent, my
6      role was then formally made as a director role.  And
7      then I directly reported to the deputy commissioner.
8  Q.  Okay.  And who is the deputy commissioner now?
9  A.  Stephanie Graff.
10 Q.  Has she be the deputy commissioner since you started
11     reporting?  Became a --
12 A.  No.
13 Q.  Okay.  There's been other people in that role?
14 A.  Correct.
15 Q.  How many?
16 A.  I think two others.
17 Q.  Who are they?
18 A.  Heather Mueller and Stephanie Burrage.  And I
19     apologize.  I also reported to a chief of staff for
20     a short period of time.
21 Q.  And you said your current supervisor is Stephanie?
22 A.  Graff.
23 Q.  Graff?
24 A.  G-r-a-f-f.
25 Q.  How then long has Commissioner Jett been in his

Page 51

1      role?
2  A.  I believe formally since January of last year.
3  Q.  January of 2023?
4  A.  Yes.
5  Q.  And who was in the role before him?
6  A.  Heather Mueller.
7          MR. BAXTER:  It's been an hour.  Do you
8      want to take a break now?
9          THE WITNESS:  Sure.
10         MR. BAXTER:  Okay.  Let's do that.
11     (A recess was had from 10:28 a.m. until
12     10:41 a.m.)
13 BY MR. BAXTER:
14 Q.  Mr. Unni, prior to the break, we spent a significant
15     amount of time talking about your time at MDE from
16     2014 to 2018, correct?
17 A.  Correct.
18 Q.  And we talked about any efforts during that time to
19     address issues like those addressed in the
20     amendment; is that correct?
21 A.  Correct.
22 Q.  And on that issue, you know that you're testifying
23     on behalf of MDE, correct?
24 A.  Correct.
25 Q.  And did you go back and talk to anyone at MDE about

Page 52

1      what might have been happening during that time
2      period on issues similar to those in the amendment?
3  A.  Can you clarify?  Like, at any time did I go back
4      and talk?
5  Q.  In preparing for this deposition.
6  A.  Oh, no.  Other that just discussions around the fact
7      that this deposition was happening.
8  Q.  Okay.  And were those discussions with counsel or
9      someone else?
10 A.  With counsel.
11 Q.  Okay.  And did you have discussions with anyone else
12     about preparing for the deposition?
13 A.  No.
14 Q.  On any topic?
15 A.  Related to -- I mean, just we've made leadership
16     and -- not substance.  So procedure.  We've had
17     inquiries from the legislature of just where's the
18     lawsuit at, and we said it's in discovery phase.
19 Q.  So you didn't talk to anyone about the discussions
20     that might have been happening at MDE about the
21     amendment or similar issues?
22 A.  Outside of counsel, no.
23 Q.  Okay.
24 A.  And substantively.  I mean, I've told people we're
25     part of discovery process and I have a deposition.

Page 53

1  Q.  And besides counsel, is there anyone at MDE now who
2      would have better knowledge of what discussions were
3      happening from 2014 to 2018 around this issue?
4  A.  Better knowledge --
5  Q.  Than you?
6  A.  In terms of just any workings or like any -- you
7      mean like any facet of the issue?
8  Q.  Right.
9  A.  Any particular facet.  Yes, I'm sure.
10 Q.  And who would that be?
11 A.  Division of staff who oversee the PSEO program.
12 Q.  But you didn't talk to any of them about that?
13 A.  No.
14 Q.  And you said you didn't talk to any of those
15     division staff to prepare for this deposition?
16 A.  No.
17 Q.  You came back to MDE in February 2020; is that
18     correct?
19 A.  Correct.
20 Q.  Okay.  And when did you first become aware of the
21     issue that was addressed by -- ultimately addressed
22     by the amendment?
23 A.  Of the issue in general?
24 Q.  Yes.
25 A.  Either in 2018 or slightly before then.

14 (Pages 50 - 53)

Page 54

1   Q. Okay. In 2018 while you were at MDE?
2   A. Correct. I believe we covered this --
3   Q. Right.
4   A. -- in the prior portion.
5   Q. And when you came back to MDE, when did the issue
6      first come up?
7   A. Oh, I -- if it was in the bill, which would have
8      already been crafted -- so an omnibus bill, omnibus
9      policy bill, I imagine, it would have been in -- if
10     it was in there, and I have not gone back and taken
11     a look at prior year's legislation, it would have
12     been in there. And I cannot recall. Because if you
13     remember the spring of 2020 was a tumultuous time
14     for everybody on the planet. I cannot recall when I
15     first became acquainted with the proposal or the
16     bill, if it was in the bill.
17  Q. Okay. Did you -- are you aware of any prior
18     legislative proposals to address the issue that was
19     ultimately addressed in the amendment?
20  A. I cannot say for sure, but if it were, it was
21     possible it was in the 2019 when I was not at the
22     Department of Education.
23  Q. Okay. And why did you think that was a possibility?
24  A. My guess is because in 2018, when we were -- when we
25     concluded that it was not -- and within our

Page 55

1      administrative authority, my guess is if what
2      resulted later was a legislative ask that it's
3      possible that the next year it would have been
4      proposed. But I have not gone back and looked at
5      the bill from 2019.
6   Q. Why did MDE at that time conclude that it was not
7      within its authority to take the action it was being
8      discussed?
9   A. On the advice of counsel --
10     MR. TIMMERMAN: Yeah, I'll object to
11        the extent that it calls for attorney-client
12        privileged information. I don't know that
13        he can answer that without disclosing.
14  BY MR. BAXTER:
15  Q. Is there anything you can answer without disclosing
16     conversations with your attorney?
17  A. No.
18  Q. Could you -- you have in front of you the document
19     marked Exhibit 1, correct?
20  A. Yes.
21  Q. Can you flip to page 3 of that? And the third
22     topic, could you read that?
23  A. "The Department's involvement in and discussions
24     about previous efforts to pass legislation or
25     regulations similar to the May 24th, 2023, amendment

Page 56

1      to the Postsecondary Enrollment Options Act.
2   Q. And this is one of the topics that you have been
3      designated to testify about, correct?
4   A. Yes.
5   Q. And other than conversations with counsel, am I
6      correct that you've not talked to anyone to prepare
7      to testify for this topic?
8   A. Correct.
9   Q. Did you review documents to prepare for this topic?
10  A. Yes.
11  Q. Okay. What were those document?
12  A. I believe they were emails.
13  Q. Okay. Emails from whom?
14  A. From department staff.
15  Q. So --
16  A. And -- and I believe they included emails with
17     representatives from Crown College and University of
18     Northwestern.
19  Q. And what was the nature of those emails?
20  A. They were regarding -- the ones with the
21     representatives from Crown College and University of
22     Northwestern were around the legislative proposal,
23     this last legislative session, and I think the
24     implementation of it if it were going to go into
25     effect.

Page 57

1   Q. And I'm asking specifically about what's listed in
2      Number 3 as previous efforts to pass legislation --
3   A. Oh, okay.
4   Q. -- similar to the amendment that ultimately passed.
5      Did you do anything to prepare to talk about that
6      issue?
7   A. Oh, to pass legislation. So the 2018 and whatever
8      before in my prior time emails were about not -- not
9      the legislation. Yeah. I just kind of reviewed my,
10     like, memory and familiarity with the prior efforts
11     in '21 and '22.
12  Q. Okay. So you didn't do anything to inquire about
13     efforts that may have been made in 2019 or '20?
14  A. 2019 I was not at the Department, so I did not look
15     at that.
16  Q. But you are here to testify about what happened at
17     the Department during that time, correct?
18  A. It appears, yes.
19  Q. Okay. And you didn't do anything to prepare for
20     that?
21  A. Not for 2019.
22  Q. Okay. And what about for 2020?
23  A. Just from memory.
24  Q. Okay. And what's in your memory from 2020?
25  A. My memory is that I know I said it was probably in

15 (Pages 54 - 57)

Page 58

1      the bill, and I'm guessing it was, but I did not
2      recall any specific in-depth conversation in the
3      time I was there around the particular proposal.
4   Q.  Okay. And you didn't talk to anyone to kind of
5      refresh your recollection about that?
6   A.  No, I did not.
7   Q.  When you came back to MDE, you said the proposal
8      already would have been in the legislation; is that
9      correct?
10   A.  Yes.
11   Q.  And do you have any knowledge of who -- how that
12      legislation was introduced?
13   A.  I can talk about general practice.
14   Q.  Okay.
15   A.  And so in general practice, the divisions -- so
16      different divisions that oversee different areas
17      come up with proposals that they feel need to have a
18      legislative fix or statutory fix. They propose them
19      through our process where government relations
20      solicits the -- my current division, government
21      relations, solicits the proposals. We aggregate
22      them. We bring them to leadership to make the
23      decisions, and then the decisions about what will
24      move forward is submitted to -- back to the
25      divisions to then develop them. The bills are then

Page 59

1      drafted and then submitted to the legislature for
2      authorship. We usually get authorship from the
3      legislative committee chairs, whichever party has
4      the chairs. And then they bring the -- that they
5      introduced on our behalf, and at the legislature, we
6      bring the bills.
7   Q.  And you speak about divisions. You're referring to
8      divisions with the MDE; is that correct?
9   A.  Correct.
10   Q.  And do you know which division originated the
11      proposal for the legislation that initiated the --
12   A.  Yes, the Office of Career and College Success.
13   Q.  Thank you. And do you know who within that division
14      raised that proposal?
15   A.  I don't know specifically who all of the people who
16      would have, but I know the director at the time when
17      it was originally proposed was Paula Palmer.
18   Q.  Okay.
19   A.  It was the director. I -- I believe the individual
20      who oversees PSEO is Beth Barsness.
21   Q.  And how did you know that the proposal arose with
22      that division?
23   A.  But that is the division that submitted it to us
24      through our normal process.
25   Q.  Okay. But was that submitted while you were there

Page 60

1      or submitted before you were there?
2   A.  If it -- I believe -- I believe it was submitted in
3      2019, and even if it was submitted in the 2020
4      session for the first time, that would have been
5      before I returned.
6   Q.  Okay.
7   A.  Because I left before it was proposed formally in
8      the -- before it would have been proposed in 2018
9      leading up to 2019.
10   Q.  So when you say it came from that division, are you
11      speaking from personal knowledge because you spoke
12      to someone else and learned that, or that's way the
13      process normally would have worked?
14   A.  That's the way the process normally works. That's
15      the division that oversees that issue.
16   Q.  And did you talk to anyone to confirm that's that
17      what happened in this instance?
18   A.  I have consulted, in the past before this legal
19      issue arose, with that division -- or consulted the
20      submission documents that we have that that division
21      had submitted it in recent years, and they would
22      have submitted it in the past.
23   Q.  Okay. So could you give me a little more detail on
24      that? When did you look back to see what other
25      proposals there were and where they had come from?

Page 61

1   A.  From my recollection, I know specifically in 2021,
2      we have documents that show that that division
3      submitted this proposal for the legislative -- for
4      the legislative bill and would have been the same
5      for 2022 and 2023.
6   Q.  Okay. But you don't have any direct evidence how it
7      happened in 2020?
8   A.  I'm sure there is -- I'm sure there's, you know,
9      some -- I'm just trying to think. I was not back at
10      the Department, so I did not have active email or
11      active access to those files at that time --
12   Q.  Okay.
13   A.  -- for the submission process.
14   Q.  But you think there would be a document trail
15      showing which division your proposal originated in?
16   A.  I would imagine so.
17   Q.  And did you review those documents in preparation
18      for this deposition or otherwise --
19   A.  No, leading up to 2020, no.
20   Q.  And just remember to let me finish my sentences
21      before you go. And did you talk to anyone from
22      those divisions about the 2020 proposal?
23   A.  No.
24   Q.  What became of the 2020 proposal once you came into
25      -- back into the position?

1  A.  2020 proposal would have been in the bill that would
2      have been already submitted to the legislature and
3      already on its way to being heard.
4  Q.  Would that have been a house bill or a senate bill?
5  A.  Both.
6  Q.  Both.  Okay.  Simultaneous introduction in both
7      houses?
8  A.  Correct.
9  Q.  And what -- what do you recall about the process?
10  A.  The process in 2020 was not the normal process.
11      Once the pandemic hit and everybody went remote, all
12      focus went on emergency solutions.
13  Q.  Do you recall any specific discussions about the
14      proposed legislation?
15  A.  In 2020, no.
16  Q.  Okay.  And did you have any conversations with
17      anyone that you recall about the proposed
18      legislation?
19  A.  In 2020, no.
20  Q.  And have you subsequently had any discussions with
21      anyone about the 2020 legislation?
22  A.  Specifically about 2020 in any substantive way, no.
23  Q.  After the 2020 session, when did the topic next come
24      up?
25  A.  Leading up to the 2021 session.

1  Q.  Okay.  And when would that have been, about?
2  A.  Late summer, early fall.
3  Q.  And do you have any speculation how that came?
4  A.  Through the standard legislative submission process.
5  Q.  Okay.  Was the first time you heard about it when
6      you received something from the division?
7  A.  Yes.
8  Q.  And you hadn't had any prior discussion about it
9      after the 2020 session?
10  A.  No.
11  Q.  And did you have any specific recollection of how it
12      came up, or you're just remembering from the
13      process?
14  A.  From the process -- from the -- so the process
15      works, not through, like, a conversation process.
16      Through emails or through meetings, we remind
17      people, this is the submission process, and they
18      submit it to you.
19  Q.  And would that proposal have come to you through
20      email?
21  A.  Either that or it may have not come directly to me.
22      It may have come to other staff members.
23  Q.  But there would -- there should be emails about that
24      proposal?
25  A.  Possibly, yes.

1  Q.  In the normal course, there would be?
2  A.  Normal course, yes.
3  Q.  And did you review any of those documents in
4      preparation for this deposition?
5  A.  No.
6  Q.  Did you ever gather any of those documents to give
7      to counsel?
8  A.  I am not sure if I had -- if I had received those
9      emails.
10  Q.  Okay.  And what's your first recollection of --
11      well, was there -- were there any -- what would have
12      happened after that proposal surfaced in late summer
13      or early fall of 2020?
14  A.  It would have -- we aggregate all our proposals
15      together, and then we bring them to our executive
16      committee to -- to review and then to approve for
17      further development.  And during those
18      conversations, many proposals are reviewed in 30
19      seconds to a minute.  And several proposals take
20      half an hour.  I believe that this proposal did not
21      take very long as it had been proposed before, which
22      is very standard for proposals that have been
23      proposed before.
24  Q.  Okay.  And do you recall who was in that meeting?
25  A.  It would have been fall of 2020, so it would have

1      been Commissioner Ricker and the assistant
2      commissioners and government relations team.
3  Q.  Okay.  Was counsel for MDE in those meetings?
4  A.  I believe so.
5  Q.  Okay.  Is that the normal course for counsel to be
6      in those meetings?
7  A.  Yes.
8  Q.  Okay.
9  A.  Once you brought counsel on.
10      MR. BAXTER:  Okay.  And counsel, are
11      you asserting that those meetings are
12      privileged?
13      MR. TIMMERMAN:  To the extent there was
14      legal advice regarding proposals, yeah.
15  BY MR. BAXTER:
16  Q.  What was the general discussion by the members of
17      the committee, other than the lawyer, about the
18      proposal?
19  A.  Just whether it's necessary, what are kind of, like,
20      the nuts and bolts of the proposal.  We're trying to
21      evaluate whether this is something that should be in
22      the administration or MDE's proposals for the
23      following year in terms of just whatever analysis
24      each issue deserves.
25  Q.  And do you recall what the -- the tenor of the

17 (Pages 62 - 65)

Page 66

1    conversation was, generally?  Were committee members
2    in favor the amendment?  Did they have concerns
3    about the proposal?
4    A.  My recollection is that there wasn't much
5    discussion.
6    Q.  Okay.  Do you have any specific recollection of any
7    of the discussion other than what counsel might have
8    said?
9    A.  I think it was that I had said we -- and this is, I
10   think, my -- my standard reminder for committee
11   members is this is something that we had tried
12   administratively to see if there was a solution back
13   in the prior administration, so under the Dayton
14   administration found that it wasn't and that we
15   determined that this was a -- needing legislative
16   solution and statute.  So that was kind of the
17   background for it and that it was -- and that was
18   generally -- the general tenor of what my
19   contributions were in this space.  And then
20   generally, there were -- pretty much there were not
21   many questions in terms of, like, the general
22   course, and it was generally one of those shorter
23   conversations around legislative proposals.
24   Q.  Any discussions around why the proposal was
25   necessary?

Page 67

1          MR. TIMMERMAN:  I'll object on
2       privilege grounds here.  If there was a
3       lawyer present and there was conversation
4       regarding advice on legislative proposals,
5       then we assert the privilege with respect to
6       the communications -- the entire
7       communications.
8          BY MR. BAXTER:
9    Q.  And to be clear, I'm not asking what the lawyer
10   said, but I'm just wondering what the reaction of
11   the commissioners were as to the need for this
12   legislation.
13   A.  I would say, again, it was positive that this is
14   something that we should propose.
15   Q.  Why?
16   A.  Because it's about -- it was framed as equitable
17   access to opportunities.
18   Q.  Meaning what?
19   A.  Meaning that all students who want to avail
20   themselves of the opportunity should be able to.
21   Q.  And was this specifically around religious schools
22   or increasing access for other schools as well?
23   A.  It was about making sure that access to any schools
24   was -- any schools in this program was equitable.
25   Q.  What were the perceived barriers to access?

Page 68

1    A.  Any test based on any protected class, like,
2    religion or race or ethnicity.
3    Q.  Any concerns related to access based on academic
4    performance?
5    A.  Not pertaining to this proposal.  It was about the
6    admission process based on the protected class.
7    Q.  Okay.
8    A.  There are proposals we've had over my course that
9    are around academic performance.
10   Q.  Tell me about those proposals.
11   A.  One was around, I think, maybe 2015 or 2016 around
12   10th-graders' access to PSEO programs and what
13   grades they would need to have, the authority of a
14   PSEO institution to be able to say -- to determine
15   the student meets their minimum qualifications, one
16   of which could be academic performance in high
17   school, so basically, their maturity level and
18   academic abilities.
19   Q.  And what kind of legislative proposals have come out
20   of that concern?
21   A.  I think it was a limitation on what -- how many
22   courses a tenth-grader could take -- PSEO courses a
23   tenth-grader could take.  And I can't remember
24   specifically.  There was one around a tenth -- or
25   what level a PSEO institution could take academic

Page 69

1    rigor into account.  And then I think there was
2    another around -- I think there's been proposals, I
3    don't think from us -- discussion around what level
4    a high school could then weight courses that are
5    given at PSEO -- or at higher-ed institutions when
6    they factor GPAs.
7    Q.  You mentioned concern about the level of academic
8    rigor that schools could require of PSEO students,
9    correct?
10   A.  No.  It was PSEO student -- PSEO institutions
11   determining the academic rigor of the courses that
12   tenth-graders have taken to determine, are they
13   mature enough to take a course at their own
14   institution.
15   Q.  Have there ever been -- well, did any legislation
16   come out of that?
17   A.  I think that there was one around that, but I was --
18   it was, like, '15 or '16, so I can't remember
19   specifically what the words were in that
20   legislation.  But I know we passed some legislation
21   in '15 or '16 around limiting how many courses a
22   tenth-grader could take.
23   Q.  Any discussions about, for example, students not
24   being able to get into universities near them
25   because the academic requirements were too high?

18 (Pages 66 - 69)

1  A. There were discussions, and I can't remember if
2     there was a proposal around -- I remember being
3     involved in around just the different abilities of
4     student to take a PSEO course at, like, state system
5     institutions versus, like, private colleges. But I
6     cannot -- I don't believe that we had -- we had a
7     proposal in the Department bill around that topic.
8  Q. Was that topic related to GPA standards or other
9     academic admissions standards?
10  A. It would have been probably a range of factors that
11     a PSEO institution could -- could -- could take into
12     account, but I believe that that would have been a
13     proposal that an advocacy group or a legislator had
14     brought forward and maybe one that we had given an
15     opinion on.
16  Q. Not one that MDE pursued directly?
17  A. Not that I recall.
18  Q. Okay. After the committee -- what was the -- was
19     there a vote in the committee about whether to let
20     the proposal go forward, or how does that work?
21  A. So it's -- I'll just clarify. So it's not a
22     committee. It's our executive committee, so it's
23     just leadership at the time, which is changing,
24     right? No. There's no votes. It's just kind of an
25     overall tenor of, yes, this should go forward.

1  Q. What was the conclusion on the 20 -- for the 2021
2     session?
3  A. That it should more forward.
4  Q. What was the next step after that?
5  A. Next step is going back to divisions and asking them
6     it develop the -- proposal further.
7  Q. And how do they do that?
8  A. They -- they provide -- they provide, like, what's
9     the background of proposal? Like, what's the --
10     like, why is it necessary? What the -- like, what
11     is the benefit? Like, what's the purpose of it?
12     Oh, and then they have to answer, like, is there any
13     -- will the State spend any money or not -- any
14     money?
15  Q. And what do you mean, "Will the State spend any
16     money?" Will it cost the State money?
17  A. Right. Are we, like, asking the State to spend
18     whatever, X amount on it.
19  Q. And in the normal course, would there have been a
20     lot of internal email communication in that
21     development internal process?
22  A. Not -- not with government relations.
23  Q. Okay. But within the MDE itself, within the
24     divisions?
25  A. Possibly. It depends on the proposal.

1  Q. Okay. And at any time, did you talk to anybody what
2     was involved in that development process?
3  A. I did.
4  Q. About the -- about the process for this bill?
5  A. About this process. It -- in leading from it 2020
6     to 2021, I don't believe that I had -- I may have
7     had some conversations about, just generally, like,
8     what is your division -- like, division proposing
9     and how are they -- how are the proposals coming
10     along?
11  Q. Okay.
12  A. But at this -- at this point, if -- so normally what
13     happens is if a proposal has been proposed before
14     and there's no changes to it, they generally just
15     propose the same thing again and there's no general
16     questions about it if it's a normal one.
17  Q. Okay. And in preparation for this deposition, did
18     you go back and talk to anyone who might have been
19     involved in that process?
20  A. No.
21  Q. Did you ask them for any documents?
22  A. No.
23  Q. Did anyone give you documents to review from that
24     time period?
25  A. From the 2020 to --

1  Q. 2021.
2  A. -- 2021 time period? No.
3  Q. Okay. And do you remember anything specific about
4     the language that was documented through that
5     process?
6  A. It would have been what we had proposed in the 2023
7     session.
8  Q. You think it's the exact same language that was --
9     that would have passed?
10  A. It's largely similar.
11  Q. Okay.
12  A. If -- I mean, at the least.
13  Q. That's not --
14  A. Let me say -- because I -- I -- there may have been
15     -- from what we introduced in 2023 to what passed at
16     the end, there may have been a tweak along the
17     way --
18  Q. Okay.
19  A. -- in a session, but it largely would have been
20     similar.
21  Q. Do you remember what those tweaks would have been?
22  A. I can't remember the specific words, but I can look
23     at -- you know, I could look at the document from
24     what we -- what we submitted and what we passed and
25     probably be able to tell you quickly.

Page 74

1    Q.  Okay.  Whatever was proposed for the 2021 session,
2       would that have been developed by the division in
3       that post-executive review process?
4    A.  Yes, yeah.
5    Q.  And what would they do with that language once it --
6    A.  They submitted it to us.
7    Q.  When you say, "us," you mean?
8    A.  I'm sorry.  Government Relations Division, and then
9       we would send it along in the process.
10   Q.  And what would -- do you review it?  Do you make
11      your own assessment of it?  Did you write a memo
12      about it?
13   A.  Yeah.  So we review it.  We have the -- you know,
14      whoever the assistant commissioner was who oversaw
15      it, they review the language.  Generally, it's
16      pretty -- pretty -- like, just make sure that it
17      makes sense pretty quickly.  And they're reviewing,
18      like, all of the proposals in totality, not just a
19      single proposal.  And it's usually that there may be
20      some proposals here and there that gets individual
21      reviews.  But this one was never one that got
22      singled out for individual review.  I do remember
23      that.  And then it is -- the bill is then reviewed
24      by multiple -- multiple channels in the Department.
25      We do send bills past the governor's office as

Page 75

1      they have final sign-off on all legislative bills.
2      And they read the bill in totality.  It's usually
3      just a policy advisor.  And then they give the go
4      ahead and then we submit through the Revisor.  Or
5      the whole time we're drafting this, we're working
6      with the Revisor, which is a nonpartisan office in
7      the legislature who draft bills.  And then they send
8      back to us, and we review for just making sure
9      language is consistent with what the intent was.
10     And then we submit to the legislative chairs for --
11     hopefully for their authorship and introducing the
12     legislature, and then we'd get a hearing.
13   Q.  Okay.  So it sounds like there would have been
14     communications internally at MDE reviewing the
15     language and then some communications with the
16     governor and then with the office.  You said it was
17     the office -- the nonpartisan office?
18   A.  Revisor's Office.
19   Q.  Revisor's Office.  Would that have been
20     communications with any outside organizations?
21   A.  No, not -- not on this proposal leading up -- during
22     that time.
23   Q.  Okay.  There were no outside interest groups
24     reaching out to MDE about the proposal?
25   A.  In the legislative constructive process that I was

Page 76

1      involved with, no.
2    Q.  Okay.  And would -- in the normal course with those
3      communications that did happen, would they have
4      normally been emailed or in person?
5    A.  Probably over, like, verbal conversations.
6    Q.  Okay.  And when -- when the bill is sent to the
7      governor's office, how would that be done?
8    A.  That would be done via email.
9    Q.  How about when -- with the --
10   A.  The Revisor.
11   Q.  The Revisor's Office.  Thank you.
12   A.  That would be done via email.
13   Q.  Okay.  Did you go back to review those emails in
14     preparation for this deposition?
15   A.  With the Revisor's Office, I am not in charge of
16     submitting the Revisor's Office emails.  I've got --
17     I'm usually made aware.  I get the email back from
18     the team that, "Here's the bill," and bill in
19     totality.
20   Q.  We already clarified you were assigned to speak on
21     behalf of MDE on this issue, right?
22   A.  Yeah.
23   Q.  So did you go back and learn how -- what was said to
24     the Revisor's Office?
25   A.  Yeah.  I mean, my familiarity with the topic didn't

Page 77

1      require me to, like, look at the specific emails
2      about this.  What we do is, we send a batch of
3      proposals to the Revisor's Office, usually, like, 20
4      to 50 proposals, and we say, "Here are -- here's the
5      language that we have that we believe is appropriate
6      for this proposal."  Send it to the Revisor.
7      Revisor basically puts them all together and then
8      sends it back to us in one big bill.
9    Q.  And in that email, would there have been anything
10     specific about the proposed amendment that we're
11     concerned with in this case?
12   A.  In the 2020 to 2021, there would have been maybe the
13     background document about just what -- what the
14     purpose was of the proposal.
15   Q.  Okay.  And did you go back and look at that or
16     produce that to anyone for this lawsuit?
17   A.  I -- I cannot recall if I -- I would -- I looked at
18     -- the last time I looked at that document was
19     during the legislative proposal process.  I did not
20     look at it for preparation for here, because I'm
21     very familiar with the background and purpose of the
22     proposal.
23   Q.  What about with the communication for the governor's
24     office?  Who would have been responsible for that
25     communication?

1   A.  It would have been someone on the Government
2       Relations team, and it would have been here's a
3       batch proposal, like here's the -- here's the
4       document of, like, all of our proposals together or
5       maybe, like, one article, here's for your review.
6   Q.  In preparation for this deposition, did you go back
7       and review that document?
8   A.  No.  I did not review it specifically because I know
9       it would have been a batch proposal where it was our
10      large bill.
11  Q.  Would there have been -- possibly have been anything
12      specific about the proposal in that communication?
13  A.  In the 2020-2021 time period, maybe only a bullet
14      point that said, "This is the proposal," that it is,
15      the adjustment to the PSEO admissions.
16  Q.  After those emails were -- and communications were
17      sent -- let me ask you, first, about internal
18      communications.  Did you go back and see if there
19      were any internal communications about the proposal
20      in that phase of the development?
21  A.  I would have done that when we were asked to produce
22      documents.
23  Q.  In the normal course, would you have expected there
24      to be a lot of communications about that?
25  A.  No.

1   Q.  Not a lot of verbal communications?
2   A.  Not, not at a time.
3   Q.  Okay.  And why not?
4   A.  Because it was a proposal that had come before, we
5       generally don't have -- during that time period --
6       again, during divided government, we generally don't
7       -- didn't have -- for proposals that weren't new, we
8       generally didn't have a lot of in-depth
9       conversations about proposals that we proposed
10      before.
11  Q.  Okay.  Any other modes of communication that might
12      have been used?
13  A.  Via email or via like a --
14  Q.  Text or --
15  A.  -- Teams or Zoom?  We may have had, like, a Teams
16      conversation just noting what was in the bill.
17  Q.  What happened after the proposals were sent to the
18      Revisor's Office and the governor's office?
19  A.  Yep.  So we got the go ahead, language looks good
20      with a note the proposal's been in there before.
21      That's generally an indication that it's easier --
22      the scrutiny usually come with new proposals, right?
23      It's new language we haven't seen before.  After
24      that, we reach out to the legislative chairs to
25      author the bill.  They generally agree, and then the

1       language is sent from the Revisor's Office to the
2       chairs, to their staff, and then they do their
3       signatures, and then they put it in their hoppers.
4       It's called the -- literally, a basket outside their
5       leadership office, and then it's submitted for
6       introduction into their respective chambers.
7   Q.  Okay.  In the 2020-2021 cycle, were any changes
8       proposed by the Revisor's Office, the governor's
9       office, or the chairs of committees?
10  A.  To those proposals, no.
11  Q.  Okay.
12  A.  To that proposal, sorry.
13  Q.  Were there any significant discussion that you had
14      with any of those offices after they sent -- you
15      know, got back to you?
16  A.  No.
17  Q.  What happened after that?
18  A.  In the 2021 session -- who was chair then?  We had
19      an election in 2020, right?  Yeah.  I'm just -- it
20      -- all that blurs together.  For other people,
21      obviously, all this blurs together for me as I'm,
22      like, trying to stack these things together.  So
23      there would have been new leadership, right, in the
24      committee in 2021.  And so in the 2021 session, we
25      were -- we got hearings in the senate and the house.

1       The house was a longer hearing than in the senate.
2   Q.  And were those hearings for members only, or was it
3       public?
4   A.  Public.
5   Q.  And did the public testify or just listen?
6   A.  They would have -- it depends.  Either chamber
7       allows different amounts of testimony.  In 20 -- in
8       the House, for our presentation of the bill, the
9       chairs decide whether they want to sit with us or
10      sit up at their desks.  And it's generally, we --
11      the -- the -- my staff and I give line-by-line,
12      basically, or section-by-section descriptions of
13      what's in the bill.  But we are given -- we were
14      given different amounts of time in the House and
15      Senate, so the presentation was slightly different
16      between the two.
17  Q.  Okay.  Do you have those statements that were made?
18  A.  They would be public.  We recorded on the House and
19      the Senate websites.
20  Q.  Would have had them written out?
21  A.  For those, I don't believe so.  I believe I read off
22      the bill.
23  Q.  Okay.  Were -- was there -- how did those hearings
24      go?
25  A.  And let me just be accurate.  I would have read off

1    the bill probably with, like, a notation here or
2    there, but after the session, I throw out all my
3    bills, like, after the hearings because I don't want
4    to end up with a ton of paper.
5    Q.  So anything you would have written on those papers
6    would have been discarded at the time?
7    A.  Yeah, yeah, like, right after the hearing.  It's
8    general practice for me.
9    Q.  What do you recall from the hearings?
10   A.  I recall going through the proposals in the House,
11   like, every section, and I do not recall, like, in
12   the -- like, anybody testifying about that proposal.
13   And then in the Senate, I remember it being a very
14   short presentation, comparatively short presentation
15   where we talked about major buckets.  And I did not
16   mention that proposal specifically in that as we did
17   not have enough time to go into smaller proposals.
18   Q.  Did the proposal generate much controversy?
19   A.  At the time, no.
20   Q.  Okay.  What happened after the committee hearings?
21   A.  Nothing until the omnibus bills were put together by
22   the respective chairs.
23   Q.  Okay.  And what happened then?
24   A.  It was included in the House bill and was not
25   included in the Senate bill.

1    Q.  Okay.  And did this create any public controversy?
2    A.  No.
3    Q.  And did you have any discussions with people on the
4    -- in the legislature about that?
5    A.  Just merely what our intent was.
6    Q.  Okay.  Who were those discussions with?
7    A.  It would have been with the respective chairs at the
8    time.
9    Q.  Okay.  And those would be -- how long would those
10   conversations have lasted?
11   A.  Three or four minutes.
12   Q.  Okay.  And do you remember anything specific about
13   those conversations?
14   A.  Explaining the proposal.  We would have explained it
15   to the House chair, House Education Policy Chair
16   Cheryl Youakim, I think, was the chair at the time.
17   Nope.  Ruth Richardson.  Sorry.  Former Rep
18   Richardson and then Representative Davnie.
19   Q.  And did either of them express particular interest
20   in this proposal?
21   A.  Insomuch as yep, it's going to be in the bill.  I
22   think they -- they -- we explain the purpose of what
23   I explained earlier in terms of what our purpose was
24   of the proposal, and they included it in the bill.
25   Q.  What happened after that?

1    A.  After that, then the bill was released for public
2    consumption.  The bill got a hearing, and, again,
3    these bills are, like, 120 pages.  So you got a
4    range of other proposals that were the focus of
5    conversation.  I do not recall any specific
6    discussion or hearing from any entity about this
7    specific proposal, the amendment in the House.
8    I also -- in the Senate side, we did not have
9    any particular -- any specific conversation about
10   this proposal with the chair, and then there was
11   also no mention of the proposal in any public
12   testimony in the Senate during their respective
13   hearings.
14   Q.  At any point, did the proposal generate public
15   interest or controversy?
16   A.  In the 2021 session, no, not that I recall.
17   Q.  Okay.  What happened after it was introduced into
18   the House omnibus bill?
19   A.  Then it was -- then there was the process, standard
20   process.  There was an omnibus bill.  It made it out
21   of the House Policy Committee, most likely on a
22   party line vote.  In -- within the policy bill, I do
23   not recall any public discussion on it, and then it
24   was sent to the House Education Finance Committee.
25   Q.  And what happened there?

1    A.  Same process for the House Education Finance
2    Committee, but then it was combined with the House
3    Education -- I'm sorry -- the education finance
4    omnibus bill, so then it was just the education
5    finance and policy omnibus bill, and then it was
6    passed out of that committee on a party line vote.
7    Q.  And after it went from that committee, it went to a
8    floor vote?
9    A.  It went to Ways and Means, which is kind of, like,
10   the fiscal gatekeeper for the House.
11   Q.  Did they address anything about the amendment?
12   A.  No.
13   Q.  And what --
14   A.  And then it would have gone to the floor where in
15   the floor, it got -- it got passed on, most likely,
16   a party line vote.  Actually, you know, I think
17   there were one or two minority party members who
18   would have voted for it.
19   Q.  Okay.  And do you remember who that would have been?
20   A.  I believe it was -- I would have to go back and
21   refresh my memory on that, but probably
22   Representative Urdahl.
23   Q.  So it did pass the House?
24   A.  Yeah.
25   Q.  What happened after that?

Page 86

1   A.   Then the Senate passed their bill through their same
2        process.
3   Q.   Which did have the amendment?
4   A.   Did have -- did not have the amendment.  The
5        education policy, the education -- no.  They had
6        combined committees back then, so the education --
7        held over, put into their -- they put out their
8        education financing policy bill.  They sent it to
9        what's called senate finance, which is their fiscal
10       gatekeeper.  No.  I apologize.  It went to taxes
11       first.  Then it went to -- and it probably would
12       have gone to taxes in the House as well.  No
13       discussion in either body.  Then it went to --
14       because it's outside -- and that topic would have
15       been outside of jurisdiction.  Then it went to
16       senate finance.  No discussion there.  It's a policy
17       proposal.  It would have been outside of
18       jurisdiction.  And then it got sent to their
19       respective floor.  No discussion about whether it
20       was in and out in the Senate.  They had the vote.
21           And what happens when bills are not the same in
22       the Senate or House but they were the same companion
23       bills, they -- both bodies assign what is called a
24       conference committee whereas members, usually three
25       to five, five usually in the education bill --

Page 87

1        education bill in -- in their history, and then five
2        members from both chambers that meet in what is
3        called a conference committee, and then they
4        basically work with a blank page.  They have their
5        representative bills, and then they put together
6        proposals through negotiations and then sign a final
7        agreement to send back to their respective chambers
8        which cannot be amended on the floor.  That's called
9        a conference committee report.
10           Once that is passed, if it is passed by the
11       respective bodies, then it is sent to the governor
12       for signature.
13   Q.   And what happened in the -- in the conference
14       committee?
15   A.   To my recollection, it was proposed -- I can't
16       remember -- publicly to the -- to the Senate by the
17       House for adoption and never accepted for adoption.
18   Q.   Okay.  So when the bill came out of the committee,
19       was the language stripped from the bill?
20   A.   The language -- so the conference committee report
21       did not include the proposal.
22   Q.   Okay.  And then the conference report, is that
23       reintroduced in both houses for a final vote?
24   A.   Yes, it is.  The conference committee report is then
25       sent to the House floor and the Senate floor for a

Page 88

1        final vote by the full bodies.
2   Q.   And during that entire course, there was no
3        particular discussion that you recall about the PSEO
4        amendment?
5   A.   No.
6   Q.   When was the next time the issue came up, as far as
7        you know?
8   A.   The same legislative proposal process for the 2022
9        session.
10   Q.   Okay.  And that would have started in the summer or
11       fall?
12   A.   Yeah, same.
13   Q.   Same questions as before.  Did you go back and look
14       at any document related to that period?  Did you
15       talk to anyone about the 2021-'22 proposal?
16   A.   No, just my recollection of engaging in the process.
17   Q.   Was the tenor of the discussion any different that
18       year at MDE?
19   A.   No.
20   Q.   Okay.  Was there any -- do you think there were any
21       additional -- and you testified in the 2020 to 2021,
22       there was almost no internal communication about it;
23       is that correct?
24   A.   Correct.
25   Q.   And was that the same for 2021-'22 period?

Page 89

1   A.   Yes.  Same political makeup at the legislature, and
2        it would have been the -- and same chairs.  So the
3        decision-making process would have -- or I'm sorry.
4        The discussion process with the legislature would
5        have been -- would have been the same.  In fact, we
6        got even less time to testify in the Senate.
7   Q.   Was there any increase in the public attention to
8        the provision in the 2021-'22 cycle?
9   A.   To my recollection, no.
10   Q.   Did you ever hear from constituents, from
11       universities, anyone about the issue?
12   A.   No.
13   Q.   Had anyone reached out to you to express interest in
14       the proposal?
15   A.   No.
16   Q.   Once the process was passed over to the legislature,
17       was there anything significantly different than
18       happened in the prior cycle?
19   A.   No.
20   Q.   Did either house pass a bill with the provision in
21       it?
22   A.   Yes, the House.
23   Q.   The House.  And then it was stripped out in the
24       committee or the conference committee; is that
25       correct?

23 (Pages 86 - 89)

Page 90

1  A.  It just wasn't a topic.
2  Q.  Okay.  After the 2021-'22 cycle, when was the next
3      time it came up?
4  A.  In the submission process for the 2023 legislative
5      session.
6  Q.  Was there anything different about the process that
7      time?
8  A.  No.
9  Q.  Did you go back and talk to anyone who was involved
10     in the development of the proposal for that year?
11 A.  As it was the same as the prior years, nothing more
12     than just verifying.  As with all of their proposals
13     just like we did in the prior years, does this look
14     right to you in the bill?
15 Q.  And when the proposed language went to the internal
16     executive review process, were there any different
17     types of discussions about it?
18 A.  No.
19 Q.  Okay.  And any different discussions with the
20     governor or the Revisor's Office?
21 A.  No.
22 Q.  Any different communication with the chairs of the
23     committees?
24 A.  No.  Leading up to the session?
25 Q.  Right.

Page 91

1  A.  No, other than their standard process where we
2      walked them through the proposals.
3  Q.  So basically, so things that happened the prior
4      years and the same process --
5  A.  Yes.
6  Q.  -- in 20 -- what was now 2023?
7  A.  Yes.
8  Q.  Okay.  The leadership had changed by then?
9  A.  Yes.
10 Q.  And did you have any discussion with the new leaders
11     about the proposal?
12 A.  The new leaders?
13 Q.  The new chairs of the committee?
14 A.  Yes.  In describing -- walking through all the
15     proposals, yes.
16 Q.  Okay.  Any different -- was it -- was the nature of
17     the discussion the same as it had been in previous
18     years?
19 A.  In the House, it was the same new chairs, Youakim
20     and Pryor, but them having been on the committees
21     prior were familiar with the proposals that they
22     read through the -- what they're passing in general
23     and having sat on the committees before.
24         In the Senate, it was new leadership, so we
25     just, like, walked through every single proposal and

Page 92

1      had the opportunity to walk through the proposal.
2      Whereas with the Senate in the prior, we didn't --
3      weren't able to have that meeting.
4  Q.  And was there any pushback from either of the
5      chairs?
6  A.  No.
7  Q.  Was there any expression of appreciation for the
8      bill?
9  A.  For the bills in --
10 Q.  The proposed --
11 A.  -- that proposal?
12 Q.  -- the proposed PSEO amendment.
13 A.  Insofar as they understood the purposes.
14 Q.  Do you remember anything specific about those
15     discussions?
16 A.  Yes.  I mean, when we talked to the Senate, when we
17     explained the purpose around equitable access to
18     opportunity for students in PSEO, I remember them
19     just saying, "That make sense to us."
20 Q.  Okay.
21 A.  "Seems like a pretty straightforward proposal."
22 Q.  And who was the leader in the Senate chair?
23 A.  The Senate chairs are Steve Cwodzinski in education
24     policy and Mary Kunesh for senate finance.
25 Q.  And how did the committee handle the process the

Page 93

1      2023 amendment?
2  A.  So they -- same process kind of leading up with the
3      hearing.  We had the hearing, and then --
4  Q.  And when would that have been, roughly?
5  A.  I'm sorry.  Did we have -- the hearings would have
6      been end of February, beginning of -- middle to end
7      of February in the 2023 session on the Department's
8      education policy bill.
9  Q.  Okay.  Middle to end of February?
10 A.  Yes, on the initial introduction of the bill, not
11     introduction but, like, our explanatory
12     conversation.
13 Q.  To the committee?
14 A.  To the committees.
15 Q.  Okay.  To the committees.  And then what happened?
16 A.  Then -- and I -- I -- just can't remember, like,
17     dates.  It all happened around the same couple of
18     weeks.  So these happened kind of contiguous or
19     contemporaneously.  Representatives of the -- I
20     can't remember who was first, University of
21     Northwestern or Crown College reached out to have a
22     conversation to just understand the proposal, and we
23     then agreed to -- to meet with them to talk through
24     concerns, and I think there were some emails asking
25     questions as well.

24 (Pages 90 - 93)

1    Q.  Okay.  And just for clarity, the bill -- when you
2    send the bill over, you talk to the committee
3    chairs.  Is it initially introduced within the House
4    committee?  Do they initially introduce it on the
5    House, and the House refers it back to the
6    committee, or it just automatically starts in the
7    committee?
8    A.  That's a good question.  I'm interrupting you.  I
9    apologize.
10   Q.  That's fine.
11   A.  So what happens is, the author of any bill gets the
12   bill, and then in the House, they have green
13   jackets.  In the Senate, they have yellow jackets.
14   And on the jacket, they do the signature, and then
15   depending on if it's a budget or policy bill, they
16   have to get a couple other signatures.  They have to
17   get, like, a co-author.  Once they have the
18   requisite number of co-authors and whatever other
19   details they need to fill on there, they drop it in
20   what's called the hopper in front of leadership's
21   office.
22        And then leadership then puts it on the
23   schedule for introduction on the House floor for the
24   next legislative day that's scheduled, and that's up
25   to leadership to determine that.  And then on the

1    floor, they then re-refer it after introduction to
2    the committee that is suggested.  They get a
3    suggestion for a -- for referral to the committee,
4    and then they make the determination.  It's usually
5    based on jurisdiction.  So for our education omnibus
6    policy bill, it would have been referred to the
7    education policy bill.  Once they receive that,
8    which takes, I don't know, one or two days for them
9    to get the documentation, then they make the
10   decision of when or if they want to schedule a
11   particular bill for hearing in their committee.
12   Q.  Okay.  And who was the author for the proposal on
13   PSEO admission requirement?
14   A.  The author for the MDE education policy -- omnibus
15   policy bill was Chair Laurie Pryor.
16   Q.  Okay.  And is it usually the chair that becomes the
17   author?
18   A.  Of the Department's education policy bill, yes.
19   Q.  Okay.
20   A.  Usually.
21   Q.  And on the Senate side, was there a separate author?
22   A.  Yes.
23   Q.  And who was that?
24   A.  That was Chair Steve Cwodzinski.
25   Q.  So it was introduced in early February, presumably,

1    and gone back to the committees for --
2    A.  The bills most likely would have been introduced in
3    -- on -- into the chambers in late January, early
4    February.
5    Q.  Okay.
6    A.  And then the hearings would have been late February
7    or early March.
8    Q.  Okay.  And did you have any -- other than what
9    you've already mentioned, did you have any
10   discussion with either authors of the bill about its
11   purpose or what -- what MDE was trying to
12   accomplish?
13   A.  Would have had updates to them that we've had
14   conversations and outreach from the universities
15   that I mentioned.
16   Q.  Okay.  When -- as -- when did the public -- the bill
17   come to the public attention, as far as you recall?
18   A.  The whole omnibus bill, when it would have been
19   introduced.
20   Q.  How about the PSEO provision specifically?
21   A.  Whoever read the bill would have recognized that.  I
22   just can't remember the exact date when we got
23   outreach.  That would have been my first indication
24   that there was public interest in -- in the
25   provision.

1    Q.  Okay.  Kim Hicks eventually became a co-author of
2    bill; is that correct?
3    A.  If her name is on the bill.  I did not refresh
4    myself who all the co-authors were.
5    Q.  Did you have any involvement in any of the hearings
6    that took place --
7    A.  Yes.
8    Q.  -- with the -- what was your involvement?
9    A.  For on the introductory hearings, I either -- in
10   portions or in -- in this instance in the Senate, my
11   colleague and I presented the bill section by
12   section and answered questions or fielded comments
13   from members.  And then in the House, I believe I
14   presented the bill with two of my colleagues from my
15   government relations team and fielded questions and
16   comments.
17   Q.  Okay.  What was your -- what efforts did you make to
18   persuade legislators to pass the proposal,
19   specifically the PSEO proposal regarding admissions
20   requirement?
21   A.  It would have been general conversations explaining
22   it and explaining the -- explaining the -- the
23   purpose.  Usually how it works with a proposal is
24   when a chair -- especially when it's not a budget
25   proposal, when it's a policy proposal -- if the

Page 98

1 chairs have no specific questions about a proposal
2 and, you know, have said, okay, we understand the
3 purpose and believe that it's the -- you know, we
4 agree with the purpose, that's generally the extent
5 of it.
6     In this situation, we would have just updated
7 them that we met with members from the colleges I
8 mentioned to just to provide the progress updates on
9 conversations.
10 Q.  Did you feel like you had to engage what we might
11 call lobbying of specific representative or senators
12 to try to get them to vote a certain way?
13 A.  On this proposal, no.
14 Q.  Okay.  And why not?
15 A.  Generally, when we have -- in any policy proposal,
16 when we have a chair, chairs say that they express
17 positive sentiment towards a proposal and don't have
18 questions, like, oh, you're going to have to
19 convince people in our caucus we don't engage in
20 lobbying efforts.  And we got generally positive
21 responses about this in the right direction.
22 Q.  Did you have any conversation during the entire 2023
23 legislative process with outside organize -- other
24 than universities, with other outside organizations
25 that were either for or against the proposal?

Page 99

1 A.  I'm trying to think.  I think we may have.  So
2 generally what happens is, if there is particular
3 interest in a proposal that isn't, like, a big, big
4 item normally, right -- because this one, as I had
5 mentioned, had gone under the radar over the last
6 few legislations with our partners who are kind of
7 the usual suspects at the legislature, like, our
8 school district representatives, like, you know, the
9 teacher group representatives, we just kind of let
10 them know, you know, this is something that's kind
11 of popped up and just give them -- you know, like,
12 letting them know there is particular interest in
13 this proposal just so you're aware.
14 Q.  Okay.
15 A.  But we would have mentioned that to them that -- you
16 know, just in our normal check-in.
17 Q.  Did anyone ever approach you or your colleagues at
18 MDE with concerns that the proposal might be
19 unconstitutional?
20 A.  Yes.
21 Q.  Who was that?
22 A.  That would have been the representatives from Crown
23 College and in University of Northwestern.
24 Q.  Did anyone else raise those concerns?
25 A.  No.  Like, when you say, "Approach MDE," like, we

Page 100

1 were aware of or, like, literally reached out to us
2 and told us?
3 Q.  Well, were you aware that there was a concern?
4 A.  From the representative and then from those colleges
5 and, I believe, a few legislators.  The one that
6 comes to mind is Representative Harry Niska.
7 Q.  Okay.  And did he reach out to you directly, or how
8 did you --
9 A.  I believe he may have -- to me personally, no.
10 Q.  Okay.  Did he reach out to others in MDE?
11 A.  He may have sent a message via, like, a letter.
12 Q.  Okay.  And why do you think that?
13 A.  Because legislators normally send the letters to us
14 when they're irritated about something.
15 Q.  Okay.  Did you go back to look to see if there was
16 such a letter?
17 A.  I have not.
18 Q.  And did you ask anybody else if they saw such a
19 letter?
20 A.  I have not.
21 Q.  Did you have conversation with any other senators or
22 representatives, you know, one on one or in small
23 groups about the proposal?
24 A.  Just with the chairs, just as -- yes, with the
25 chairs.

Page 101

1 Q.  In communication with -- was it Senator -- or
2 Congressman Bakeberg?
3 A.  Representative Bakeberg.
4 Q.  Representative Bakeberg?
5 A.  Yeah.
6 Q.  Did you have any conversations with him?
7 A.  I can't remember, but it's possible he talked to me
8 about a range of issues.
9 Q.  Do your recall if he specifically spoke about the
10 PSEO issue?
11 A.  He may have.
12 Q.  Okay.  But you don't have -- you do or don't have a
13 specific recollection of that?
14 A.  I don't recall a specific recollection of the
15 conversation with him.
16 Q.  Would you have made notes of it if you did?
17 A.  No.
18 Q.  Okay.  What -- what happened on the floor votes?
19 Was -- was the proposed language in both the House
20 and Senate bill?
21 A.  Yes.
22 Q.  Okay.  And what happened on the floor in both?
23 A.  On the floor, there were at least -- at least one
24 amendment proposed to remove it from the bill, and I
25 do remember Representative Niska kind of -- so how

1 floor conversations usually go is, the author of the
2 amendment is the one who kind of speaks to it and
3 kind of leads and organizes the discussion around
4 it. So I believe, if my recollection serves me
5 right, the main amendment discussing this proposal
6 are removing the amendment, removing the proposals.
7 The amendment to remove the proposal was led by
8 Presentative Niska and several other legislators
9 stood up, I can't remember who they were, but I
10 think it was a range of legislators that stood up
11 opposing the proposal. I believe on the Senate
12 side, I believe -- in know that Senator Matthews
13 spoke. I just can't remember if he led an
14 amendment. There were several other amendments that
15 stripped it out with other proposals being stripped
16 out, like, delete alls and those type of things that
17 would not have included it as well.
18 Q. So what ultimately happened on the Senate floor?
19 A. It passed.
20 Q. Okay. And then on the House?
21 A. It passed.
22 Q. Okay. And then -- so when it went to the committee,
23 it just stays in the committee report?
24 A. It gets included into the --
25 Q. It gets included in the committee report?

1 A. Yeah.
2 Q. And then it comes out there's a final vote on the
3 committee report?
4 A. There's a conference committee report on both the
5 House and Senate.
6 Q. And it passed?
7 A. Yes.
8 Q. In that process, did you ever have any conversation
9 with legislators or others about -- let me restate
10 that. At that time, the bill had become quite
11 publicly controversial; is that fair?
12 A. Yes.
13 Q. Okay. And were there internal discussions at MDE
14 about the controversy?
15 MR. TIMMERMAN: Just want to object to
16 the extent it calls for you to disclose
17 privilege communications and instruct you
18 not to answer to the extent it does.
19 BY MR. BAXTER:
20 Q. Outside of what counsel, your attorneys, may have
21 given, were there instructions given internally
22 about the controversy?
23 A. There was an update to leadership and to just staff
24 in general of what was in the bill overall, this
25 included.

1 Q. Okay. And did -- how did they respond to the
2 update?
3 A. Generally when the staff sees a proposal that they
4 have put forward, they will express gratitude in one
5 way or another, you know, letting us, you know --
6 Teams chat or whatever, like, you know, little
7 clapping hands. I believe that in this instance,
8 division staff would have let us know on the whole
9 range of proposals, like, you know, good to see
10 these proposals are in the bill.
11 Q. Did you -- did anyone at MDE, other than counsel,
12 ever make comments about the opponents of the bill?
13 A. In -- can you clarify? Like, are you talking about
14 after the bill passed, or --
15 Q. Just during the entire 2023 process of -- of while
16 the bill was pending.
17 A. Just -- I think I heard from division staff of just,
18 we understand that this is -- this is who would be
19 opposing the bill and practices we've heard about.
20 Q. Okay. And what kind of practices have they heard
21 about?
22 A. The admissions practices.
23 Q. Okay. And did any MDE staffers or others, other
24 than counsel with MDE, express any opinions about
25 those practices?

1 A. That they felt that that -- the admission practices
2 that have a religious test was not an appropriate
3 use of PSEO dollars, you know, that phrasing makes
4 sense and that it wasn't equitable access for all
5 students and that that was why they support the --
6 that's what supported the legislative proposal.
7 Q. And do you remember who, specifically, would have
8 said that?
9 A. Beth Barsness is who we worked with.
10 Q. And what, exactly, did Beth Barsness say about that?
11 A. At that point, the proposal, we explained it in
12 briefing, and it was just explained, again, like,
13 the familiarity with -- you know, University of
14 Northwestern had been one of the institutions that
15 had had the test, and then I think after we had said
16 -- you know, we had outreach from Crown College, I
17 think. Then there was expression that Crown College
18 would have one as well.
19 Q. Did Beth Barsness ever express a negative opinion
20 about either of those institutions?
21 A. Insofar as those admission tests from those
22 institution -- that the institutions had were not in
23 line with how we would want to say the PSEO program
24 operated for equitable access.
25 Q. Do you recall any specific language that she used?

27 (Pages 102 - 105)

Page 106

1 A. No.

2 Q. Okay. In anyone -- any language from anyone else at

3 MDE at the same time?

4 A. On -- just about the institution.

5 Q. Negative opinions about the institutions?

6 A. I'm trying to think. I'm just trying to think. I'm

7 just trying to think anything different that we

8 don't agree with, like, practice of the admissions

9 test and how the purpose of the PSEO program, not

10 about the institutions themselves.

11 Q. What about the individuals who were proposing the

12 legislation?

13 A. No.

14 Q. Okay. Any negative statements about anything else

15 related to the amendment?

16 A. Related to --

17 Q. Well, when you said, "Not about the institutions in

18 particular," I want to know if you had something in

19 mind but not -- again, not asking you what

20 counsel said but what anyone else might have said.

21 A. I think there were some expression and some concern

22 about some of the questions that were -- like, some

23 of the questions that were asked of applicants into

24 those programs and, like, what position and

25 expressing kind of concern around, like, the fact

Page 107

1 that kids were -- or applicants, high school

2 students were asked to declare those -- make

3 statements on those questions.

4 Q. And what, specifically, do you remember people at

5 MDE saying about that?

6 MR. TIMMERMAN: And again, I'll just

7 object to the extent that it's -- any

8 conversation involving a lawyer which

9 attorney advice was sought or provided, that

10 would be privileged.

11 So subject to that caveat, you can

12 answer.

13 THE WITNESS: Just that kids shouldn't

14 have to answer those questions.

15 BY MR. BAXTER:

16 Q. Okay. Do you remember which questions were being

17 referred to?

18 A. The -- I can't remember exact phrasing in the

19 admissions test for -- I think it was University of

20 Northwestern, but it was, you know, how does -- and

21 this is just me repeating it, not me making any

22 personal judgment myself, but that -- "How does" --

23 I think it was, "How does Jesus Christ" or "God

24 guide you in your daily life, and can you

25 demonstrate a value there" or "demonstrate instances

Page 108

1 how that guides you in your daily life," or

2 something to that extent.

3 Q. And did any MDE employees, other than counsel, say

4 anything specifically about those requirements that

5 you recall?

6 A. That kids shouldn't have to do that to access a

7 state-funded program.

8 Q. Did you consider whether -- which institutions did

9 you know might be affected by the bill?

10 A. What came up to me in the process was University of

11 Northwestern and Crown College --

12 Q. Okay.

13 A. -- based on the conversation.

14 Q. And did MDE do any other investigations as to what

15 other institutions might be affected?

16 A. I believe that division staff would have -- would

17 have looked, at least in -- in -- in general or had

18 -- had discussed that, but I was not part of any of

19 those investigations, that program area

20 implementation.

21 Q. Okay. Was there any discussion about universities

22 that don't have statements of faith but enforce

23 religious requirements in other ways?

24 A. I believe in the course of the 2023 session, there

25 were several other institutions that I personally

Page 109

1 learned about that were -- are religiously

2 affiliated but don't have admissions test questions.

3 Q. And did MDE ever consider taking action to address

4 enforcement of religious standards beyond admissions

5 requirement?

6 A. In terms of ever, I believe that that -- like, there

7 may have been questions around that before my time

8 at MDE, but I know that during my time in 2018 when

9 this issue was, like, an administrative matter, you

10 know, I was refreshed many times around the caselaw

11 from the 1990s that allowed for religious

12 institutions to participate in the PSEO program.

13 MR. BAXTER: Okay. We've been going

14 about an hour and a half, I think. Maybe we

15 came back an hour and ten minutes or so ago.

16 Just give me five minutes.

17 Why don't we break for lunch. It's

18 noon, almost.

19 MR. TIMMERMAN: 11:48.

20 (A recess was had from 11:48 p.m. until

21 12:34 p.m.

22 BY MR. BAXTER:

23 Q. Mr. Unni, before we broke for lunch, we had some

24 discussions about the 2023 legislative process, and

25 you mentioned during that, if I recall correctly,

28 (Pages 106 - 109)

1    that when the proposal came up in the 2022-'23
2    cycle, it would have gone to the executive officers
3    of the MDE, that kind of committee meeting that
4    wasn't really a formal committee. And you mentioned
5    there was, if I'm recalling correctly, concern about
6    protecting students on -- you know, protected
7    category. Do you recall that?
8    A. Yes.
9    Q. And what were the -- do you know what, generally,
10    those protected categories are?
11    A. Yeah. So religion, race, ethnicity, national
12    origin, sexual orientation, gender.
13    Q. Okay. And are you familiar with the Minnesota Human
14    Rights Act?
15    A. I mean, generally, the nuts and bolts, not down
16    into, but yeah.
17    Q. And what's your understanding of the Human Rights
18    Act?
19    A. That it provides protections for a range of
20    categories, including, I think -- including all the
21    ones including some additional ones.
22    Q. Why did MDE think it needed something more than
23    what's already provided in the MHRA?
24    MR. TIMMERMAN: I'll just object to the
25    extent it calls for disclosure of privileged

1    information.
2    Instruct you not to answer to that
3    extent.
4    THE WITNESS: I think after the result
5    of discussions in 2018, it was determined
6    that we needed a legislative proposal to be
7    clear that the equitable access that we
8    wanted to pursue for protected classes that
9    are laid out in the proposal, right, needed
10    a legislative proposal.
11    BY MR. BAXTER:
12    Q. And was there any discussions about where the MHRA
13    didn't already solve those concerns?
14    MR. TIMMERMAN: Same objection, but you
15    can answer.
16    THE WITNESS: Policy-wise, I did not
17    recall having specific conversations around
18    that.
19    BY MR. BAXTER:
20    Q. You do not recall any specific discussions. Do you
21    know, did those discussions happen even if you don't
22    recall the specifics?
23    A. At that point in 2023, it had been established
24    pretty much that we needed a legislative proposal to
25    change the statutes, and so those discussions in the

1    '23 cycle and '22 cycle did not come up.
2    Q. And what had helped establish that? And what -- did
3    you establish there needed to be a fix because of
4    complaints you had received?
5    A. We had received, at least what staff had told me in
6    the past, is how the issue came up around admissions
7    processes, that we had received several parent
8    complaints around their students having to engage in
9    certain admissions tests and questions. In this
10    particular circumstance that we heard around was
11    around religious -- religious tests. And then I
12    think, as I think we had discussed earlier, we had
13    had those conversations in around 2018 around was
14    there an administrative solution to this after
15    determining through that process that that was not
16    within our authority. That's when we pursued a
17    legislative fix.
18    Q. So were any of the concerns you heard based around
19    racial admission requirements?
20    A. That I'm familiar with, no.
21    Q. Okay. Any other category other that religion?
22    A. That we heard about? Specifically around the --
23    actually what the test asked for, it -- what the
24    test asked for was based on religious questions, but
25    the implication concerns from staff is that that

1    implication could have an impact on other protected
2    classes.
3    Q. Like what?
4    A. Like orientation.
5    Q. What do you mean when you say, "orientation"?
6    A. Sexual orientation.
7    Q. Any other categories?
8    A. Based on my conversations, no.
9    Q. Okay. And you said, "Based on your conversations."
10    Who were those conversations with?
11    A. They would have been with division staff that we've
12    mentioned before and probably, you know, with
13    Government Relations staff.
14    Q. Okay. And what kind of things did they say?
15    A. They talked about the parent complaints which were
16    generally around not feeling uncomfortable and
17    feeling like -- with the specific religious
18    questions in the admissions test. And then there
19    were discussions around it could have an impact on
20    students' sexual orientation and their -- just how
21    that impacts their rights.
22    Q. Was it your sense that the concerns were about
23    religious schools restricting people of their same
24    faith, that that was discriminatory, or was it
25    really about the sexual orientation and gender -- or

Page 114

1  sexual orientation issue?
2  A.  That was kind of a secondary kind of concern.  It
3      really was about restricting based on -- at least in
4      those specific instances was around restricting
5      based on faith-based questions specific to the
6      faith.
7  Q.  And so what do you mean when you say it was based on
8      that?  Students couldn't -- Catholics couldn't get
9      into a certain school or something like that?
10 A.  I did not see to that specific level of conversation
11     or have specific level of conversation about
12     someone's specific faith and the faith of any
13     particular institution, but it was around the
14     concern that answering in a particular way a
15     question about, do you have this particular faith,
16     or do you follow, you know, a particular tenet of a
17     religion, answering in a certain way would have a
18     qualitative impact on their admission.
19 Q.  And do you -- do you remember who first raised a
20     concern that that could impact individuals based on
21     their sexual orientation?
22 A.  I believe it was from division staff in
23     conversations about what the impact could have.  I
24     believe it was in 2018, and then I know when we've
25     had conversations in, like, the 2023 cycle when we

Page 115

1  started to have substantive conversations about it
2  because then people started to pay attention to the
3  proposal more than they had before, there were
4  conversations about the implications around what the
5  language was as laid out in terms of laying out all
6  the classes, how that could all play out.  Because
7  this is protecting students on all the classes that
8  were protected.  It just so happens fact-based that
9  can -- how it's being implemented -- implicated now
10 or how that proposal is implicated now is just
11 because of those religious tests.
12     But that -- back to the point, the sexual
13 orientation question just came up or considerations
14 came up in conversations there.  I know that they
15 were raised in -- before in terms of that could be a
16 consequence of the process, but I never had any
17 in-depth conversations about that component of it --
18 Q.  Okay.
19 A.  -- up until 2023.
20 Q.  And what in-depth conversation did you have about it
21     in 2023?
22 A.  Right.  So --
23     MR. TIMMERMAN:  Just going to jump in
24     and object.  To the extent it calls for
25     privileged information, I'm going to

Page 116

1  instruct you not to answer, but otherwise,
2  you can.
3     THE WITNESS:  Sure.  Just with -- in
4  talking through when there were questions
5  from -- in conversation from, like,
6  legislators or with staff talking about the
7  implications of it is how could an
8  admissions decision or a question -- sorry
9  -- how could admissions questions intersect
10 with someone's sexual orientation.  And so
11 if someone looked at the question or maybe
12 looked at -- and the question talked about,
13 I don't know, something like a Student Code
14 of Conduct, right, and a Student Code of
15 Conduct had something to say about someone's
16 sexual orientation or something like that,
17 how would that make a student answer a
18 question about following the practices at
19 that school and being truthful about who
20 they were.
21 BY MR. BAXTER:
22 Q.  And who are the individuals who are most engaged in
23     this type of conversation?
24 A.  Probably legislative staff.
25 Q.  And do you remember any specific individuals you

Page 117

1  spoke to about it?
2  A.  I'm trying to think.  I think I probably spoke with
3      the chairs about it.  So our Chair Pryor; Chair, I
4      think, Youakim; Chair Kunesh; Chair Cwodzinski I
5      mostly likely had a conversation with.
6  Q.  What about within MDE?  Anyone who was particularly
7      keyed into this issue?
8  A.  My -- my team, my legislative team, but I let those
9      -- Shana Morse and Megan Ariola.  But I'm the one
10     who, like, leads on those conversations, so they
11     would have been present for the conversations, so
12     they would have been present for the conversation or
13     maybe had, you know, through me signing off on
14     maybe, like, responses, maybe have answered
15     inquiries from people.
16 Q.  Okay.  And outside of asking counsel about it, did
17     any of those individuals ever express an opinion
18     about why Minnesota Human Rights Act didn't already
19     solve this problem?
20 A.  I don't remember conversations about that.
21 Q.  Okay.  Did you ever personally investigate that
22     yourself?
23 A.  I -- outside of discussion with counsel, I did not
24     have conversations with that -- regarding that.
25 Q.  Okay.  I'm going to go back to 2008.  I know this

30 (Pages 114 - 117)

1 was before your time. I would like you to review a
2 document I'll label as Exhibit 2.
3     (Exhibit 2 was marked for
4 identification.)
5 BY MR. BAXTER:
6 Q. Just take minute to look at that and just wanted to
7     make sure you had a chance to review.
8 A. I'm done.
9 Q. Have you seen this document before?
10 A. Yes.
11 Q. And in what context?
12 A. I was -- I reviewed it in preparation for this.
13 Q. In preparation for this deposition?
14 A. Yes.
15 Q. Was that the first time you had seen it?
16 A. I don't -- I think it may have been. I think it may
17     have been forwarded to me way back long ago as an
18     attachment for prior staff being familiar with this
19     issue having come up before.
20 Q. Okay. And did you look for that email in
21     preparation for this?
22 A. I -- pardon me?
23 Q. For this deposition, namely that email where this
24     might have been forwarded to you?
25 A. I believe if it would have been forwarded to me when

1 we last dealt with it, it would have been in 2016 or
2 '18, and I believe I looked for emails back in that
3 time period.
4     MR. BAXTER: Okay. And Jeff, I know
5     this is unintentional. I'm going to ask you
6     not to nod along with the witness.
7     MR. TIMMERMAN: Oh, yeah. Sorry.
8     MR. BAXTER: Just because --
9     MR. TIMMERMAN: It's a habit. Sorry.
10     MR. BAXTER: No problem. Thanks.
11 BY MR. BAXTER:
12 Q. And what's your understanding of what the purpose of
13     this email?
14 A. It is an issue around the actual -- the nature of
15     the course -- course substance that is provided to
16     students through the PSEO program.
17 Q. And what was the concern?
18 A. It appears that the concern from staff here is that
19     the courses being taught were not in line with the
20     statute that was already in place around prohibiting
21     sectarian courses to be offered through the -- for
22     PSEO participants.
23 Q. Do you know if MDE took any action in response to
24     this concern at a time?
25 A. I don't know the full extent of what has been, but

1 in reviewing, you know, documents from that time
2 period, I think this was the extent of reviewing
3 whether they could, and then I think -- maybe it's
4 in some other documents -- seen some responses from
5 the University and representation talking about the
6 ability to participate in the program, but I think
7 it was just to the level of an inquiry is my
8 familiarity with it.
9 Q. And you came in as the director of Government
10     Relations to MDE the first time in 2014; is that
11     correct?
12 A. Correct.
13 Q. Were there any guidelines in place at the time for
14     PSEO institutions about what it meant to offer
15     sectarian versus nonsectarian courses?
16 A. I, at the time in 2014, did not have the issue come
17     in front of me, so I can't speak to that.
18 Q. Okay. At some point, did that issue come in front
19     of you?
20 A. The -- the issue that came in front of me was around
21     the admissions process, so what -- how I was
22     familiarized with the sectarian question was just made aware
23     sectarian coursework question was just made aware
24     that we had kind of looked at issues in this same
25     kind of area, the same realm. But where I was

1 mostly focused on or completely focused on was the
2 admissions process.
3 Q. Okay. And at that time, were there any guidelines
4     within MDE distinguishing sectarian and nonsectarian
5     courses?
6 A. I would have to defer to my colleagues in that
7     program.
8     MR. BAXTER: Okay. Ask the reporter to
9     mark this as Exhibit 3.
10     (Exhibit 3 was marked for
11     identification.)
12 BY MR. BAXTER:
13 Q. Just take a minute and just review this document.
14 A. Sure.
15 Q. Okay. Are you familiar with this document?
16 A. Yeah. Sorry. I nodded. I was just refreshing my
17     memory on how this started.
18 Q. Are you familiar with this document?
19 A. Yes.
20 Q. What is it?
21 A. It is an email exchange between Beth Barsness and
22     myself regarding an inquiry from a student about the
23     admissions process at -- or a concern from a student
24     regarding the admissions process at Northwestern
25     University.

1   Q.  And this would have been a few months before you
2        left your first stint at MDE; is that correct?
3   A.  Correct.
4   Q.  And was this the first time you had received any
5        complaint on the PSEO admissions issue?
6   A.  To my recollection, this is the first -- the first
7        time that I had seen a direct complaint from a
8        student, but in 2616, I think, when the issue may
9        have come up from our school finance team, there --
10       I think there may have been contemplation that the
11       team had heard about the -- from the parent.  But I
12       believe this is the first time I saw an actual
13       complaint.
14  Q.  Did Beth Barsness reach out to you about the subject
15       of this email other than what's in the email?
16  A.  I believe after we had meetings, including a call
17       with, I think, someone from University of
18       Northwestern, so I don't think this is -- this
19       specific complaint, I think this is it, but the
20       broader issue we, obviously, had discussion about it
21       later.
22  Q.  You see that Beth emailed you on April 11th, right,
23       and she said that each postsecondary institution
24       sets its own requirements for PSEO enrollment.  Do
25       you see that, the third bullet point?

1   A.  Correct.
2   Q.  She said that, "Their admissions process, which
3        requires profession of faith, is discriminatory."
4        Do you know if that was -- if she was making a
5        statement on behalf of MDE with that, or was that
6        her personal --
7   A.  I -- reading it here, I think that is her personal
8        professional opinion as the administrator of the
9        program, and she was seeking advice as to if that
10       was in line with -- if that was the correct
11       interpretation.
12  Q.  Okay.  And then she said, "The PSEO statute does not
13       address enrollment procedures," correct?
14  A.  Correct.  That's what's in the email.
15  Q.  And was it your understanding that she thought that
16       MDE couldn't do anything about this issue at that
17       time?
18  A.  I think here, she is laying out what her analysis is
19       of the practice and then where the guidelines exist
20       in statute, and she's seeking advice on how can we
21       administratively -- is there a way to
22       administratively pursue a solution, and it appears
23       that her suggestion is that we would like to see if
24       there's an administrative process here.
25  Q.  Okay.  And your response was essentially that having

1        religious admission requirements made the courses
2        nonsectarian.  Is that a summary of your response?
3   A.  Yes.  Setting it as a precondition of a course would
4        make it nonsectarian.  That was my opinion at the
5        time.
6   Q.  And what was your -- the basis for that opinion?
7   A.  I believe that I thought that threshold for
8        admissions into any course was a component of a
9        program workhorse and, therefore, it made kind of
10       the whole process nonsectarian.
11  Q.  And did your opinion change after you wrote this
12       email?
13  A.  Ultimately, I accepted the decision that an
14       administrative solution was not through basically
15       saying that its precondition was not -- was not the
16       right route and that we need to pursue a
17       legislative -- clear legislative statutory
18       guidelines around it.
19  Q.  And before you wrote this email, did you consult
20       with anyone, other than your attorneys, about what
21       to do in this situation?
22  A.  No.
23  Q.  And how about after you wrote the email?
24  A.  After the email was written and we had a range of
25       conversations, including one with individuals from

1        -- or individual from University of Northwestern
2        around the administrative process.
3   Q.  Okay.  And what was the conclusion of that
4        discussion process?
5   A.  Yeah.  The conclusion of the process, it was
6        determined that the administrative solution was not
7        the route we could go and that we would need to seek
8        a statutory solution.
9   Q.  So when you said here, "I would tell Northwestern
10       they could not require that solution of PSEO
11       students," did anybody ever carry out that
12       instruction?
13  A.  My guess -- and I would -- I would have to -- again,
14       I would have to defer to my colleagues in that
15       division who would have conversations with the
16       University of Northwestern is that my guess is based
17       on resulting conversations that we had, I just
18       remember if there was an explicit, like, you cannot
19       do this, I think, but based on my recollection of
20       the process where we then ultimately had a
21       conversation with University of Northwestern, I
22       swear, Dean of Admissions, and then, I believe, an
23       attorney -- yes, with an attorney that -- that we
24       communicated that that was the direction we were
25       going to go.  And then there was, obviously,

32 (Pages 122 - 125)

Page 126

1    pushback, and that resulted in the conversation.
2  Q.  Okay.  If you had been asked at a time if the
3    student had complained about a GPA requirement for
4    admission, would you have responded at that time
5    that Northwestern couldn't require a certain GPA
6    standard for a student?
7  A.  I would have to familiarize with the statutes on
8    hand --
9  Q.  Okay.
10  A.  -- to see if there would be any -- if there was a
11    statute saying they could not prevent somebody
12    without a -- that didn't meet a certain threshold,
13    if that statute did not exist and they did that, I
14    would question that.
15  Q.  You would question, meaning you would what?
16  A.  I would investigate and analyze the practice based
17    on what the statutory structure is, or if there was
18    a constitutional protection around being able to
19    enter based on a GPA.
20  Q.  And what within the PSEO made you think that it was
21    a problem to ask a religious requirement?
22  A.  I think it was not just the PSEO law but also the
23    constitution.
24  Q.  And what about the constitution made you think that?
25  A.  That you shouldn't be able to -- that if a state

Page 127

1    provides funding for a high school student to attend
2    a program out of their public school that they can
3    be prevented from attending that program based on
4    their religion.
5  Q.  Because of the --
6  A.  Or any class -- or any class.
7  Q.  Because of the State funding of why -- why?
8  A.  Yeah.  Because it's a State program, State action
9    and so based on protection for religious or any
10    other protected class.
11  Q.  And was it that -- at that time, was it your
12    understanding that there was no State aid going to
13    religious institutions that had a religious
14    requirement for admission?
15  A.  My -- my understanding was that there was funding
16    going to the institutions, and it wasn't about the
17    funding going -- my understanding was that the
18    pursuit of the policy was not about the
19    institutions.  It was about the practice that the
20    institutions were implementing as a barrier to
21    entry.
22  Q.  Were you aware of other state funding outside of the
23    PSEO program going to religious institutions?
24  A.  To religious institutions, yes.
25  Q.  Religious institutions with religious admissions

Page 128

1    requirements?
2  A.  No.
3  Q.  That hadn't occurred to you before?
4  A.  I mean, it had occurred to me that could be the
5    case, but I don't have familiarity with religious
6    institutions in the higher education setting in
7    other programs.  And I'll --
8  Q.  Go ahead.
9  A.  This is -- we -- in very narrow areas or several
10    areas, the Department -- Minnesota Department of
11    Education interacts with the higher education space.
12    There were separate state agencies and university
13    systems that oversee the higher education system.
14    So I know other states have them as combined
15    entities.  But we usually deal with, like, the early
16    education to 12th grade setting, and in some
17    situations, we deal with higher education.
18  Q.  And I'm just trying to understand your state of mind
19    at the time.  But is it fair to say that at that
20    time, you thought that the constitution prohibited
21    state funding going to a religious institution if it
22    had religious participation requirements?
23        MR. TIMMERMAN:  I'll just object to the
24    extent it calls for legal collection and
25    exceeds the -- he's testifying in his

Page 129

1    personal capacity now as opposed to on
2    behalf of the organization.
3  BY MR. BAXTER:
4  Q.  Just asking your personal understanding, not what
5    the law actually --
6  A.  Correct.  My understanding is that -- I should say,
7    yes, I understand your question.  I would say it --
8    the law prohibited higher-ed -- in this program,
9    higher education institutions from establishing
10    admissions requirements that prohibited somebody
11    from entering based on a protected class and State
12    funding to support that system.  It just so happened
13    in these cases it was a religious test that would
14    prevent somebody from entering based on a religion
15    on its face.
16  Q.  And at some point, did you come to understand that
17    was an incorrect understanding, or is that still
18    your understanding?
19  A.  My understanding that I came to is that we required
20    a statute explicitly to be clear that that was not
21    an allowed practice.
22  Q.  So then you came to understand that the constitution
23    itself didn't prohibit that?
24  A.  I -- for clear practice -- for clear direction under
25    the statute, I came to understand that we would need

33 (Pages 126 - 129)

Page 130

1    a statute for it.

2    Q.  Okay.  Did -- did MDE ever consider, around that

3        time or in the years that followed, bringing a

4        lawsuit against these religious institutions for

5        violating the constitution?

6    A.  No.

7    Q.  Did it ever consider bringing a lawsuit against

8        Northwestern, Crown, or similar institutions for

9        violating the Minnesota Human Rights Act?

10   A.  No.

11   Q.  Why not?

12   A.  I don't know.

13   Q.  Are you aware that the State has brought a lawsuit

14       now claiming that Crown and Northwestern are

15       violating the constitution by their religious

16       admission requirements?

17   A.  As a component of this whole litigation?

18   Q.  Yes.  Are you aware of that?

19   A.  Yes, a counterclaim, yeah.

20   Q.  And they brought a counterclaim also alleging that

21       the schools are violating the Minnesota Human Rights

22       Act?

23   A.  I mean, if that's the case, yes, I'm very familiar.

24       I just haven't familiarized with that.

25   Q.  And do you have understanding why Minnesota or MDE

Page 131

1    never did that before now?

2        MR. TIMMERMAN:  Just object on the

3       grounds, again, that this exceeds the

4       30(b)(6) topics.  So this is testimony in

5       your personal capacity.

6       But you can answer.

7       THE WITNESS:  My understand that we --

8       in my involvement in the process, not as

9       legal counsel, is that we tried to pursue an

10      administrative solution and that my part of

11      the process was that if that was not a -- an

12      allowable route that we would pursue a

13      legislative route.

14   BY MR. BAXTER:

15   Q.  I'm going to ask the reporter to mark this as

16       Exhibit Number 4.

17       (Exhibit 4 was marked for

18       identification.)

19   BY MR. BAXTER:

20   Q.  Take a minute to look at this and let me know when

21       you're finished.

22   A.  Okay.

23   Q.  Do you recognize this document?

24   A.  Yes.

25   Q.  And what is it?

Page 132

1   A.  This is a communication between staff at the

2       Department about a legal response from the

3       University of Northwestern based on the

4       administrative direction that we were looking to go

5       around PSEO administration criteria.

6    Q.  So do you recall the last document I had you look

7       at?  It was a complaint from someone name Kamela

8       Tran?  Do you recall that?

9    A.  Yes, I do.

10   Q.  Was -- and this email that we're looking at right

11       now, particularly the one at the bottom dated Friday

12       June 15th, 2018 --

13   A.  Mm-hmm.

14   Q.  -- attaching a legal memorandum from Gray Plant

15       Mooty; is that correct?

16   A.  Correct.

17   Q.  And was this letter send to MDE in response to --

18       did it arise out of the MDE's treatment of the

19       Kamela Tran complaint?

20   A.  I can't remember if it was specifically tied to the

21       Kamela Tran complaint that was listed in the last

22       exhibit.  I do know that it was a result of the

23       conversation that I believe I was a part of that --

24       and if it wasn't a part of this one, it was a

25       follow-up conversation with -- but with staff from

Page 133

1    University of Northwestern and, I believe, an

2       attorney from Gray Plant Mooty.

3    Q.  And in response to the Kamela Tran complaint, you

4       indicated that you thought that Northwestern was

5       violating the -- a nonsectarian requirement; is that

6       correct?

7    A.  Correct.

8    Q.  And had someone reached out to Northwestern to

9       express that concern, or do you know what would

10      triggered this, the legal letter that came in from

11      Gray Plant Mooty?

12   A.  Just based on my recollection from the -- the

13      documents here, the exhibits here, and kind of what

14      I believe we discussed in the last set of questions

15      is that my assumption is that staff would have

16      reached out to the University of Northwestern based

17      on kind of the thought process that we did as a team

18      and then that -- what that then resulted in was the

19      meeting we had in May with representatives from the

20      University of Northwestern and their legal counsel.

21   Q.  Okay.  And do you recall if anyone reached out

22      specifically to convey to your counsel that

23      Northwestern could not ask religious questions in

24      the admission process?

25   A.  I don't have a recollection of any -- like, being

34 (Pages 130 - 133)

Page 134

1    notified of the outreach to University of
2    Northwestern. I'm just making an assumption based
3    on this line of events I'm drawing out of those
4    emails.
5    Q. Great. The next email in that chain of Exhibit 4 is
6       from Paula Palmer to you and others. And at that
7       time, Paula was your district supervisor; is that
8       correct?
9    A. No, she was not.
10   Q. Remind, what --
11   A. The she was another director.
12   Q. Okay.
13   A. I'm and have been a director, so we were on the same
14      level, just different departments.
15   Q. And she was the director of the --
16   A. Officer of Career and College Success.
17   Q. Right. Okay. She proposes bringing Mary Kay into
18      the conversation. Who is Mary Kay?
19   A. Correct. She was another director of -- hmm. She
20      was the director of special education, so maybe
21      she's talking about a different Mary Kay.
22   Q. Okay. It wouldn't make sense to you that Mary Kay
23      in special education would be involved in this
24      conversation?
25   A. Not the Mary Kay I'm thinking of.

Page 135

1    Q. Okay. Who was Mary -- what was Mary Barrie's role
2       at that time?
3    A. I believe at that time, Mary Barrie was a supervisor
4       in that space, and one of her -- part of her
5       portfolio would have been college opportunities for
6       high school students.
7    Q. What about Daron Korte?
8    A. Daron Korte, he, at a time, was an assistant
9       commissioner who oversaw a range of issue areas. I
10      don't remember if Career and College Success was in
11      his portfolio, but he also is an attorney, and so
12      his advice was sought just from an analysis
13      perspective.
14   Q. Was he working as an attorney at the time for the --
15   A. I believe in a certain capacity, he may have been
16      legal counsel, but I can't remember to what extent.
17   Q. Okay. And how about Beth Barsness?
18   A. Beth Barsness is a staff member in the Office of
19      Career and College Success, and she is -- works most
20      closely, my understanding is, with the PSEO program.
21   Q. And Paula proposed getting together to review the
22      letter; is that correct?
23   A. Correct.
24   Q. And did you have a meeting about the letter?
25   A. I would assume we did.

Page 136

1    Q. Okay. Do you have any recollection about what would
2       have happened in that meeting?
3    A. I believe we would have discussed -- and now let me
4       just say, I may not have been able to make that
5       meeting because it was in the middle of legislative
6       session. So I may have not been able to and others
7       had the meeting without me. But what we would have
8       discussed is my assumption is what is the next
9       pathway forward in terms of a solution in this
10      space?
11   Q. Okay. Beth Barsness then chimes in saying, "The
12      faith statement issue came up in 2018 when Mary was
13      supervisor." Who is the Mary there? Is she
14      referring to Mary Barrie or Mary Kay?
15   A. It would be Mary Barrie.
16   Q. Marry Barrie. Okay. When she says, "The faith
17      statement issue," do you know what she's referring
18      to there?
19   A. She -- my understanding -- my memory is that she's
20      referring to the admission process in PSEO.
21   Q. Okay. And then so -- the admission process in PSEO
22      accepts certain schools?
23   A. Admissions process of the -- let me rephrase that.
24      The 2018 series of events pertaining to complaints
25      that we had received that are discussed in the other

Page 137

1    exhibit and that we had ended up having
2    conversations with the University of Northwestern
3    that were around faith statements being used in the
4    admission process for PSEO programs.
5    Q. So far, I think we've seen only one complaint from
6       Kamela Tran in 2018. Do you think there was others?
7    A. I had been informed that other parents had reached
8       out in the past, but I may or may not have seen
9       those particular complaints or email summaries of
10      those complaints.
11   Q. At that time, did you have a sense of what schools
12      in Minnesota had religious admissions requirements?
13   A. "At that time" being?
14   Q. When you got this email in 20 -- well, I guess in
15      2018 when the initial email was going around.
16   A. In 2018, my understanding was the college or the
17      university we had received a complaint about and had
18      conversations with, which was the University of
19      Northwestern.
20   Q. And you hadn't asked about other universities?
21   A. That's --
22   Q. Had you asked about other universities?
23   A. I -- I may have, but this was just the one I recall
24      being aware of at a time.
25   Q. And do you recall any others that you thought at

35 (Pages 134 - 137)

Page 138

1    that time had religious admissions requirements?

2    A.  I thought there had -- there could have been, but

3    nothing was provided to demonstrate that.

4    Q.  I should have noted the last email from Beth

5    Barsness came in 2023, so almost five years later?

6    A.  Correct.

7    Q.  What was the trigger for that email coming to you?

8    Do you know?  Well, it didn't come to you.  It came

9    to Eric Billiet; is that correct?

10    A.  Yes.

11    Q.  Do you know what the impetus for that email would

12    have been?

13    A.  It probably would have been regarding -- if it's

14    February 16th of 2013, our policy bill would have

15    been out at the legislature, and we most likely

16    would have had a hearing, and so it would have been

17    an inquiry either from myself or another staff

18    member about the history in this space and probably

19    comment as -- as a refresher.

20    Q.  Who is Eric Billiet?

21    A.  I can't remember what division he's in, but I

22    believe his title is a supervisor.

23    Q.  Okay.  And did this email -- this February 16th

24    email ever make it to you?

25    A.  I have reviewed this email.

Page 139

1    Q.  Okay.  Did you review it in preparation for this

2    deposition?

3    A.  Yes.

4    Q.  Before then, had this email ever made it to your

5    attention?

6    A.  The 2018 line, yes, because I'm on there, but in

7    terms of Beth and Eric, I don't believe so, but

8    maybe.

9    Q.  Okay.  You see Beth says, "We already had the

10    Statement of Assurance Form in place."  What is the

11    Statement of Assurance Form?

12    A.  As I understand in this issue area, it's a statement

13    of assurance around providing nonsectarian courses

14    and a range of other issues.  And I just bring up

15    nonsectarian because that is the substance of our

16    conversation.

17    Q.  And then she says, "Form A.  We've submitted Form A

18    ever since."  Do you have any idea what --

19    A.  That's the propose -- legislative proposal process.

20    Q.  Could you explain that to me?

21    A.  It's just the document that we discussed earlier

22    that explains kind of what the proposal is doing.

23    Q.  Okay.

24    A.  The background, the proposal, why?

25    Q.  That Form A, I think you said you didn't review that

Page 140

1    before coming to this deposition?

2    A.  No.

3    Q.  You didn't produce it to counsel for production?

4    A.  I just -- I can't recall.  I went through a range of

5    items and documents.  I can't recall if I did or

6    not.

7    Q.  Okay.  Then Beth says, "We met with Adosh numerous

8    times about this."  Do you recall what any of those

9    meetings were about?

10    A.  Those were the meetings that were in -- like, in the

11    2018 series about the discussion from the complaint

12    from the last exhibit as well as the conversations

13    leading up to the meeting we had with Northwestern

14    University and follow-up we had after that.

15    Q.  And what happened in the meeting with Northwestern

16    legal?

17    A.  We had a conversation about the practice.  We had a

18    conversation -- practice happening in admissions

19    criteria.  We had a conversation about what we were

20    trying to do administratively.  I believe staff

21    talked about they received student or parent

22    complaints.  And then there was discussion with

23    counsel about the, you know, strong belief that

24    religious private colleges could participate in the

25    program based on caselaw, and then -- then, I think,

Page 141

1    after that conversation, we received the legal

2    opinion.

3    Q.  Okay.  And so at some point -- at the end, what did

4    you tell Northwestern?

5    A.  At the end of?

6    Q.  Of this process.  Like, there was this concern that

7    they were doing something illegal?  What did MDE end

8    up telling Northwestern about their admissions

9    process?

10    A.  In what -- like, what year?

11    Q.  Well, in -- in -- in response to the 2018 --

12    A.  2018.

13    Q.  -- complaint?

14    A.  I believe what we ended up overall communicating is

15    that the -- that's the direction we wanted to go.

16    The result of the process was that we didn't have

17    the administrative authority to pursue that route.

18    And then, ultimately, what ended up happening in

19    future legislative sessions is we pursued a

20    statutory solution.

21    Q.  And at the end of this process in 2018, did MDE ever

22    tell Northwestern, we think what you're doing

23    violates the constitution?

24    A.  I don't know if we said it in that many -- in that

25    exact phrasing, but I think in discussions with

36 (Pages 138 - 141)

Page 142

1  University of -- or Northwestern University and
2  their team who was on the call, we just derived how
3  we believed that the practice was discriminatory.
4  Q.  Okay.  But did you tell -- did you believe that the
5  practice was a violation of the United States
6  constitution?
7  A.  In my personal capacity, yes.
8  Q.  Okay.  And what is it in the constitution that binds
9  a private religious institution like Northwestern
10  entitles that it can discriminate on the basis of
11  religion?
12          MR. TIMMERMAN:  Objection, calls for a
13      legal conclusion, but, again, you can --
14  BY MR. BAXTER:
15  Q.  To the extent you know.
16  A.  To the extent I know is that it was using State aid
17  -- a State-funded program that pulled students from
18  the school setting to participate in a program that
19  had a process that screened them out based on --
20  based on religion.
21  Q.  Okay.  And did you ever tell MDE -- I'm sorry.  Did
22  MDE ever tell Northwestern that it thought
23  Northwestern was violating the Minnesota Human
24  Rights Act?
25  A.  I cannot recall if we, as an institution, informed

Page 143

1  them explicitly around Minnesota Human Rights Act.
2  I can't remember if we did in that conversation, and
3  I can't remember if -- if staff may have done that
4  in other venues.
5  Q.  Okay.  Would any of those communications have been
6  in writing?
7  A.  It is possible if staff had been communicating via
8  email, but I can't say for certain because I was not
9  -- I was not in conversation outside of that phone
10  conversation, I mean, the phone conversation we had
11  with them regularly enough in terms of the
12  administrative actions that our staff would have
13  taken.
14  Q.  And in preparation for this deposition, did you ask
15  any MDE staff to look for communications they had
16  with Northwestern or Crown College or any other
17  parties to this lawsuit?
18  A.  No.
19          (Exhibit 5 was marked for
20      identification.)
21  BY MR. BAXTER:
22  Q.  The reporter has handed an exhibit marked as Exhibit
23      5.  Take a minute to review that.
24  A.  Okay.
25  Q.  Are you familiar with this document?

Page 144

1  A.  Yes.
2  Q.  Did you see it in preparation for -- review it in
3      preparation for this deposition?
4  A.  I believe so.
5  Q.  Were you familiar with it before then?
6  A.  I'm not sure, not from my memory, but it's possible
7      that I've seen this.
8  Q.  And what's your understanding of what this document
9      is?
10  A.  This is a request from -- it appears to be
11      University of Northwestern staff asking an applicant
12      to supply an admissions question answer or fulfill
13      an admissions question in writing that hadn't been
14      provided to them or they didn't receive before.  And
15      then this was forwarded to MDE staff by, it appears,
16      maybe the student or the -- it looks like MDE staff
17      having their -- someone who happened to be a staff
18      member of MDE forwarding this to the finance team to
19      ask if that's an allowable practice and then a
20      follow-up to Career and College Success staff who
21      oversee PSEO to discuss about it.
22  Q.  And the complaint came from someone named Noah
23      Berger, correct?
24  A.  Yes.
25  Q.  And he forwarded it to Denise Berger within MDE,

Page 145

1  correct?
2  A.  Correct.
3  Q.  Do you know Denise Berger?
4  A.  I do not recall Denise Berger.
5  Q.  Okay.  Do you know the relationship between Denise
6      and Noah?
7  A.  It appears from this email that they are related.
8  Q.  Okay.  And who is Jeanne Krill?
9  A.  Jeanne is a -- she works in the Education Finance
10      division.
11  Q.  Okay.  And do you know if there were any internal
12      discussions at MDE about this email?
13  A.  I do not know.  I would imagine there were.
14  Q.  Okay.  And says, "If we have time in the meeting
15      today, could we briefly chat about the email?"  Do
16      you recall being in a meeting where this email was
17      discussed?
18  A.  I do not.
19  Q.  Okay.  Are you aware of what happened to Denise
20      Berger's older son whom she says had this same
21      issue?
22  A.  I am not.
23  Q.  Are you aware that he did PSEO work at Hamline
24      University?
25  A.  Based on the email, it appears so, but I'm not

37 (Pages 142 - 145)

1  familiar with anything other than what's in the
2  email.
3      (Exhibit 6 was marked for
4      identification.)
5  BY MR. BAXTER:
6  Q.  The reporter's handed you a document marked Exhibit
7      6.  Could you take a minute to review that document?
8  A.  Okay.
9  Q.  Are you familiar with this document?
10  A.  Yes.
11  Q.  Okay.  And what is it?
12  A.  It is an inquiry from, it appears, St. Cloud State
13      to Beth Barsness in our Career and College Success
14      division.  She works with PSEO about the practice of
15      a private school accepting PSEO classes and their
16      limitation on which -- which PSEO institution they
17      would accept credits from and then a response from
18      staff saying that they -- from staff saying that we
19      have no authority over which -- how a private school
20      would -- would be able to provide guardrails around
21      which credits they receive from which institutions.
22  Q.  So is it your understanding that the student at
23      Maranatha Christian Academy wanted to go get PSEO at
24      St. Cloud, and her school told her she could only
25      get it at Bethel or Northwestern.  Is that a fair

1      reading of that email?
2  A.  It would appear so.
3  Q.  So this was the case of a private secondary school
4      restricting PSEO credits to only those offered at
5      private religious schools; is that correct?
6  A.  Yeah.  That's my understanding.
7  Q.  Were you brought into this conversation about this
8      email?
9  A.  I can't remember if this was raised up to me or not.
10      I can't remember an explicit conversation around
11      this particular instance.
12  Q.  Okay.  At that time, would you have thought that
13      Maranatha Christian Academy was violating the
14      constitution?
15          MR. TIMMERMAN:  Objection, calls for a
16      legal conclusion.
17          But you can answer in your personal
18      capacity, if you have an opinion.
19          THE WITNESS:  Yeah.  In my personal
20      capacity, I would not have.
21  BY MR. BAXTER:
22  Q.  And why not?
23  A.  That's a private school, and they are limiting it to
24      these schools.  Based on the information that was
25      presented to me, I would not have.

1  Q.  Okay.  Do you see at the top of the document where
2      Dr. Barrie says, "Save this one for Adosh in case he
3      needs more ammunition"?
4  A.  Yes, I see that.
5  Q.  Why would that Mary have thought you were stocking
6      ammunition?
7          MR. TIMMERMAN:  Objection, calls for
8      speculation.
9          THE WITNESS:  Yeah.  I can't speak to
10      the terminology she's using, but my -- my
11      understanding is that if generally in
12      situations where we have legislative
13      proposals that we put forward in multiple
14      years, especially 2021 in January, that's
15      where everyone in the MDE, and every
16      government agency, is well aware that the
17      legislative session is upon us, and they
18      were aware anything could happen with the
19      proposals they put forward.  So staff, in
20      situations like this, may cast a wide net in
21      anything that even touches on the issue area
22      of their proposal they put forward to us and
23      makes it into the bill.  So they might have
24      thought the Government Relations team would
25      have been interested in this scenario.  My

1      guess is if we needed it as an example --
2      yeah.  That's my guess in terms of why they
3      would want to save it for my attention.
4  BY MR. BAXTER:
5  Q.  Did you ever express to staff at MDE that you were
6      specifically looking for complaints like this?
7  A.  Our -- in this specific issue area, I can't recall.
8      But in general, our instruction to staff is that if
9      you have issues that come up that implicate
10      legislative issues, whether it's our bill or
11      another, please make us aware so that we know or so
12      that we're up to date on current happening.
13  Q.  And remind me.  Did you say you -- at this time, you
14      were aware of the issue with Maranatha or you were
15      not aware?
16  A.  I can't recall if I was or not.
17  Q.  Did you ever, at any time, have any concern whether
18      Bethel might be violating the constitution or the
19      Minnesota Human Rights Act?
20  A.  As it pertains to what we were trying to put
21      parameters or guidelines around their legislative
22      proposal, I did not contemplate Bethel or any -- I
23      mean, I approached this -- the situations that came
24      in front of me.  This is an area we wanted to cure,
25      but I do believe Bethel was brought up in the -- in

Page 150

1    the last exhibit in the legal memo as one of the
2    private school institutions, and I believe they were
3    one of the litigants in the 1992 and 1993 caselaw.
4    So I understood they maybe came under the umbrella
5    at a time.
6         I think I heard -- I believe I heard thirdhand
7    or secondhand during the legislative session that
8    they may have not have had an admissions question
9    that would be implicated by this -- by this law, but
10   I never went myself and checked their admission
11   criteria.
12        MR. BAXTER:  We've been going about an
13        hour.  Why don't we take a ten-minute break
14        and come back?
15        MR. TIMMERMAN:  Sure.
16        (A recess was had from 1:31 p.m. until
17        1:42 p.m.)
18        (Exhibit 7 was marked for
19        identification.)
20   BY MR. BAXTER:
21   Q.  Could you take a look at this Exhibit 7, and let me
22       know once you've had a chance to review it.
23   A.  Okay.
24   Q.  Prior to reading this right now, are you familiar
25       with this document?

Page 151

1    A.  Yes.
2    Q.  And did you read it in preparation for this
3        deposition?
4    A.  I did, yes.
5    Q.  And had you -- were you familiar with it before
6        then?
7    A.  I don't know if I saw this exact email exchange.
8    Q.  Okay.  Is this the type of email that would have
9        been brought to your attention generally?
10   A.  The email itself probably not, but in general tenor
11       around we've gotten inquiries around this in
12       conversation.
13   Q.  And do you recall any discussion you had internally
14       at MDE that might have arisen from this email?
15   A.  It would have come in the context of are there
16       anything new in this space when we asked staff, and
17       they say we continued to receive -- would have been
18       we continued to receive complaints in this space.
19   Q.  Okay.  And who is Sally Reynolds?
20   A.  Sally Reynolds currently is the director of the
21       Office of Career and College Success, which is the
22       office or division that PSEO oversight for
23       administration sits within.  I believe at the time
24       in 2021 -- yes.  She was a supervisor of high school
25       initiatives, which would have included PSEO.

Page 152

1    Q.  Okay.  Do you see where she says on the first page,
2        "The policy is clear as are the statements and/or
3        the practices of both PSIs."  At that time, did you
4        think the policy with regard to religious admissions
5        -- or to religious admission or religious schools
6        was clear?
7    A.  I am not sure if she's referring to -- I'm not sure
8        what, exactly, she's referring to, "policies."  I'll
9        speak generally.  I think I've seen from the
10       preparation documents that they've included or
11       contemplated two different areas.  Our legislation
12       contemplated admission criteria, but I've seen two
13       areas contemplated, whether a course itself is
14       sectarian or nonsectarian, and I'm not sure if this
15       is referring to -- I'm not sure if this is referring
16       to admissions or course content because it looks
17       like the complaint may also be contemplating content
18       areas as well, so I'm not sure if -- what the policy
19       is she's referring to.
20   Q.  But by December 2021, it was clear within MDE that
21       religious institutions offering PSEO credits could
22       have religious admissions policies, correct?
23   A.  It was -- I'll phrase it like this:  It was clear
24       that we did not have an administrative solution for
25       curtailing that.

Page 153

1    Q.  Okay.  You see here that Mary Barrie says,
2        "University of Northwestern gets more public dollars
3        than any other PSI in the state, number one, and yet
4        if you are not actively practicing your Christian
5        faith, you cannot attend in person."  Do you see
6        that?
7    A.  I do.
8    Q.  And then you see where she says, "They will allow
9        you to attend online so you to do not contaminate
10       other students.  Yes, they use that term."
11   A.  I see that.
12   Q.  Were you ever in a conversation with Northwestern
13       where they use the term, "contaminate"?
14   A.  I do not remember them using that term.
15   Q.  Was Mary Barrie ever in a role where she would have
16       had direct communication Northwestern?
17   A.  Let's see here.  It is possible.
18   Q.  In what context?
19   A.  In the context of being a long-term employee who has
20       a lot of experience in operating in this space.
21       It's possible that she may have had oversight of the
22       program in the past and had experience providing
23       assistance for who I would imagine would be Beth and
24       Sally in this space.
25   Q.  What is an education specialist?

39 (Pages 150 - 153)

Page 154

1  A.  Education specialist is someone who works on
2      specific issue areas.  They're the expert that's
3      brought in, and they do not have any supervising
4      roles.
5  Q.  Okay.  And would it be unusual for an education
6      specialist to be in direct communication with
7      private universities?
8  A.  As it pertains to the private university being an
9      actor in a field that they work with, no.  It would
10     be completely normal.
11 Q.  Have you ever heard Mary Barrie express animosity
12     towards religious institutions --
13 A.  No.
14 Q.  -- or their religious admission requirements?
15 A.  Not animosity.  Concern.
16 Q.  Okay.  And what has she said?
17 A.  Concern kind of in line with what's been kind of --
18     - like, that it doesn't provide equitable access for
19     all students to -- to opportunities that are State
20     funded.
21 Q.  And has she ever expressed concern about equitable
22     access based on other admissions requirements,
23     nonreligious admission requirements?
24 A.  In the context of our legislative proposal needs to
25     ensure that all protected classes are -- are

Page 155

1      covered, but in terms of practices that have risen
2      to any team members' attention at Department of
3      Education, they have, I believe, all been around
4      this, you know --
5  Q.  Around religion?
6  A.  -- admissions criteria that are around religion.  So
7      she -- and on reflecting upon any specific instance,
8      it would be to that instance, which is religious
9      admission criteria.
10         (Exhibit 8 was marked for
11         identification.)
12 BY MR. BAXTER:
13 Q.  Could you look at this document, which has been
14     marked as Exhibit 8, and then let me know when
15     you're done.
16 A.  Okay.
17 Q.  What do you understand this to be?
18 A.  My understanding of this is this is Beth Barsness,
19     who oversees the PSEO program or works with the PSEO
20     program, sending a general email to eligible -- or I
21     shouldn't say, "eligible," but to participating or
22     aspiring, participating, not sure which,
23     postsecondary institutions for the PSEO program to
24     provide their assurances, and the Statement of
25     Assurances is around -- at least this component, it

Page 156

1      looks to be around the Statement of Assurance that
2      their programs comply with 1224D09 sub 2 around the
3      rigorous nature of courses and that they are
4      nonsectarian courses.
5  Q.  Okay.
6  A.  And it looks like it lays out the intent of how --
7      in these bullet points of what course could or
8      couldn't be.
9  Q.  And those bullet points are, essentially, MDE
10     definition of what it means to be nonsectarian,
11     correct?
12 A.  Yes.  This is our guidance of what would not be
13     eligible for PSEO payment.
14 Q.  Okay.  And were you familiar with this document
15     before the lawsuit?
16 A.  I -- I had -- this specific document, I don't
17     believe I was.
18 Q.  Okay.
19 A.  I -- I'm speaking to -- I was vaguely familiar or
20     familiar with, like, we had guidelines or we had
21     bullet points around, like, Statements of Assurance
22     for different -- like, different things that
23     institutions needed to fill out so that they -- to
24     show they can were able to participate in the
25     program.  But this exchange or response from

Page 157

1      Ms. Hoefs I was not familiar with.
2  Q.  Okay.  And did you -- do you know how this document
3      came to be?  Let me -- let me -- let me clarify.  Do
4      you know specifically --
5  A.  This, you're talking about?
6  Q.  -- the Statement of Assurances with the definition
7      of what's -- you know, definition of nonsectarian
8      courses, do you know when MDE started using this
9      form?
10 A.  I do not recall explicitly, no.
11 Q.  And -- but is this a document that goes out to every
12     PSEO school every year?
13 A.  I -- I -- to my understanding, it -- it -- I believe
14     all participating PSEO institutions need to provide
15     statements of assurance.
16 Q.  So obviously, this PSEO -- this form went to
17     Northwestern and presumably would have gone to Crown
18     as well?
19 A.  Yes, presumably.
20 Q.  And did you communicate to anyone about these forms,
21     their purpose, specifically any communications
22     around them of Northwestern and Crown?
23 A.  Not specifically with Northwestern and Crown.  I
24     know in conversations with -- I believe with
25     legislative staff about common -- common practice in

40 (Pages 154 - 157)

1    all of our programs, we receive Statements of
2    Assurance, and I believe we had let them know that
3    in the course of conversation that we would have had
4    Statements of Assurance for the program, just, like,
5    a range of other programs.  I can't remember if I
6    mentioned this specific form or not.
7    Q.  Do you know how the three bullets points were
8    developed as a definition of what qualifies as
9    nonsectarian or not?
10   A.  I do not.
11   Q.  Do you see on the next-to-last page the email from
12   Beth Barsness?  This is MDE 1593.  There's a
13   paragraph that says, "We ask that you review the
14   courses."  Do you see that paragraph?
15   A.  Mm-hmm.
16   Q.  And then the next sentence says, "Merriam-Webster
17   defines 'nonsectarian' as 'Not limited to a
18   particular religious group or sect.'"  Was that
19   language an official part of MDE's interpretation of
20   the nonsectarian requirement?
21       MR. TIMMERMAN:  Object to the extent --
22       object to the extent that he's not here to
23       testify on behalf of the organization
24       regarding this issue, but you can testify
25       with respect to your personal knowledge.

1        THE WITNESS:  I would -- I was not a
2        part of the construction of this.  My
3        feeling on the normal course and nature and
4        my experience of how we create guidance
5        would be that they're relying on
6        Merriam-Webster to cite something that has
7        some authority, and that that would be kind
8        of like the guiding framework for the
9        further bullet points that are there.  I'm
10       not sure if I completely answered your
11       question, but...
12   BY MR. BAXTER:
13   Q.  Sure.  Well, is there -- would this guidance, like,
14   defining "nonsectarian," would that be found
15   somewhere in the official statement of MDE?
16   A.  It appears that this is right here in this official
17   Statement of Assurance Form for participating
18   institutions.  So that would be official, I believe.
19   Q.  And -- but would there be anything in the
20   regulations or code or are you aware of anywhere
21   that you would be derived?
22   A.  No.  I -- I am not aware of this existing in statute
23   or in rule.
24   Q.  Okay.  And you were designated to testify regarding
25   communication between MDE and the plaintiffs in this

1    case, correct?
2    A.  Correct.
3    Q.  And this is a communication between Northwestern and
4    MDE, correct?
5    A.  Correct.
6    Q.  Okay.
7        (Exhibit 9 was marked for
8        identification.)
9    BY MR. BAXTER:
10   Q.  If you can take a look at this document marked
11   Exhibit 9.
12   A.  Okay.
13   Q.  Are you familiar with this document?
14   A.  I am now, yes.
15   Q.  Had you read it before?
16   A.  I may have, but I -- you know, I familiarized myself
17   with the content.
18   Q.  What's your understanding what this is about?
19   A.  This is an inquiry from, I believe, was a counselor
20   at a charter school inquiring about how to handle a
21   request from a student to accept credits taken at
22   University of Northwestern.  They've been framed as
23   religious courses and talking about the
24   understanding that they -- they can -- they have to
25   be nonsectarian and wanting some information about

1    that response from Beth Barsness to this individual
2    saying, by statute, course must be nonsectarian and
3    MDE won't pay for them, and that it's -- but that it
4    -- the high school has the authority to accept the
5    courses or not.
6    Q.  Okay.  And this was at a charter school; is that
7    correct?
8    A.  Correct.
9    Q.  And is your -- you -- well, so if I'm understanding
10   it correctly, Beth Barsness took the position that
11   MDE wouldn't have to pay for the courses but that
12   the charter school could count religious courses for
13   credit?
14   A.  They can count those that qualify for credit.  Let
15   me see.  Courses must be nonsectarian.  Yes.  MDE
16   wouldn't -- won't pay for those courses, and so
17   schools -- my understanding of her interpretation
18   that schools can accept coursework that meet
19   academic standards for -- so they have to -- courses
20   or activities that meet academic standards can
21   qualify to generate credit at a school.
22   Q.  And she said even religious credits could count at
23   the school's discretion, right?
24   A.  Yes.
25   Q.  All right.  Did this ever come to your attention

41 (Pages 158 - 161)

Page 162

1    when this was happening?
2    A.  No.
3    Q.  Okay.  Would it have been your understanding that
4        that would have been a violation of the constitution
5        for a charter school to grant credit for religious
6        courses?
7              MR. TIMMERMAN:  Objection, calls for
8        legal conclusion.
9              You can answer in your personal
10       capacity to the extent you have an opinion.
11             THE WITNESS:  Yeah.  I'm not -- I'm not
12       the implementer or overseer of advice that
13       the Department gives to districts around
14       what qualifies for meeting State academic
15       standards, and we're in a local control
16       state, so we can't ultimately tell a
17       district what is or isn't -- we can provide
18       guidance and advice, but it's really up to
19       the local district or charter school to
20       determine what meets their academic
21       standards.
22             I believe if a parent wanted to audit
23       that or someone wanted to -- if we had a law
24       authorizing us to audit it, we could look at
25       it, but it's a local control state.  So

Page 163

1        districts have to be kind of -- develop
2        their ability in law to determine what meets
3        the state academic standards.
4              (Exhibit 10 was marked for
5        identification.)
6    BY MR. BAXTER:
7    Q.  The reporter handed you a document marked
8        Exhibit 10; is that correct?
9    A.  Okay.
10   Q.  And before coming to this deposition, were you
11       familiar with this document?
12   A.  I may have been.  I had to read it, though, to
13       familiarize myself.
14   Q.  Okay.  I'm going to point your attention to the page
15       that's labeled LOE621.
16   A.  Okay.
17   Q.  And do you see where this is a report where it says,
18       "Jen Niska from Crown and I had a 30-minute call
19       with the Government Relations staff from MDE"?
20   A.  Yes.
21   Q.  And this was on March 4th.  Do you recall having a
22       call around that time with Jen and Greg?
23   A.  Yes.  It would have been sometime around then.
24   Q.  Okay.  And what was the nature of that call?
25   A.  That, to my recollection, was around -- a little bit

Page 164

1        around the intent and the, like, firmness on the
2        position and then moving into what the implications
3        would be in terms of just practice, I believe.
4    Q.  Okay.  And then the second bullet point, you say,
5        "In the past, MDE hasn't had the clear authority
6        based on state statute to determine admissions for
7        PSEO students," is that correct?
8              MR. TIMMERMAN:  Object to the question
9        to the extent it mischaracterizes the
10       document.  I don't believe he's copied on
11       any of these.
12   BY MR. BAXTER:
13   Q.  I'm just saying, do you see in the email where it
14       says that?
15   A.  Yes, where it states the recollection of a purpose
16       from --
17   Q.  Right, correct?
18   A.  I see that, yep.
19   Q.  And is that something you said on the call that MDE,
20       in the past, hasn't had clear authority or something
21       along those lines?
22   A.  "To determine admissions for PSEO students related
23       to protected classes of people."  I think that's,
24       like, a general framing, accurate general framing.
25   Q.  And then do you recall saying on that call what's

Page 165

1        recorded or what's summarized in the next sentence
2        that only in recent years has MDE received
3        affirmation from the State Attorney General's Office
4        that they could have the authority to do so?
5    A.  I'm going to be frank.  I'm a little bit confused by
6        that framing because it seems like the second
7        sentence is saying that we got authority from a
8        state attorney general that we have the authority to
9        do so but we would be seeking that authority.  So I
10       guess I can't agree with that framing of that
11       sentence.  I probably see that they're trying to
12       say, but as it's written, I'm a little bit confused
13       because it conflicts with the following sentence.
14   Q.  On that call, what did you share with them from what
15       the AG had told you about the amendment?
16   A.  As it is framed here, what we had shared was that we
17       were told that we did not have the authority via
18       statute or administrative authority to limit the
19       practice of admissions criteria based on a factor
20       that would implicate someone's protected class and
21       that then we determined that we would need to pursue
22       legislative authority for it.
23   Q.  I'm asking from your own memory --
24   A.  Yeah.
25   Q.  -- what you said on that call -- what you shared on

42 (Pages 162 - 165)

Page 166

1     that call from what the Attorney General had told
2     you.
3     A.  Yeah, correct.  I mean, that's -- that we didn't
4     have the authority to do it administratively and
5     there was no statute allowing it, and then that's --
6     I mean, that's what we were told by the Attorney
7     General, and that's what I would have communicated
8     in that meeting.
9     Q.  Okay.  Was there anything else the AG told you that
10    you communicated in this call?
11    A.  I don't know.  I'm trying to remember.  Really,
12    those are the things that we would have communicated
13    in that call that we did not have the administrative
14    authority to do it, that I guess that made it clear
15    -- I think we affirmed -- I think we affirmed to the
16    representative that -- that we knew that private --
17    I'm paraphrasing -- that religiously-affiliated
18    colleges could participate in the PSEO.  That was
19    made clear to us and clear based on caselaw, and we
20    did not -- so we did not have administrative
21    authority, could not participate, and we didn't --
22    it was clear we didn't have statutory authority to
23    do so.
24    Q.  So at this point, you knew from the AG that it was
25    not a constitutional violation for religious

Page 167

1     institutions to use PSEO funds, even thought they
2     had religious admission requirements?
3             MR. TIMMERMAN:  Object to the form of
4         the question and also instruct you not to
5         answer to the extent that you would violate
6         the attorney-client privilege or disclose
7         privileged information beyond what you
8         shared in this phone call.
9     BY MR. BAXTER:
10    Q.  I'm not asking what you shared in this call.  You
11    shared at the time you understood it was not a
12    problem for religious institution to have religious
13    admissions requirements and still participate in
14    PSEO.
15    A.  I did not phrase it as not a problem to participate
16    in the program.  That -- I communicated we did not
17    have the administrate -- based on what we were told,
18    what I communicated was that we did not have the
19    statutory or administrative authority to limit it.
20    Q.  On this call, did you tell the participants that the
21    AG had told you that there was no constitutional
22    problem with the schools use of PSEO funds?
23    A.  I do not recall saying that.
24    Q.  Okay.
25          (Exhibit 11 was marked for

Page 168

1     identification.)
2     BY MR. BAXTER:
3     Q.  Were you familiar with this document before coming
4     to this deposition?
5     A.  I have -- in reviewing it, I vaguely remember the
6     exchange.
7     Q.  Okay.  And this exchange, is it fair to say, was
8     triggered by a request from Senator Mary Kunesh?
9     A.  Kunesh, yeah.
10    Q.  Kunesh.  And as you understand it, what was the
11    nature of her request?
12    A.  It was just about background information for
13    participation by students and private PSEO
14    providers.
15    Q.  And she wanted specifically to know if you had data
16    on the districts or schools from which private PSEO
17    institutions were pulling high schoolers; is that
18    correct?
19    A.  Yes.
20    Q.  Do you have any sense why she would have wanted that
21    information?
22    A.  Generally, when legislators ask kind of questions
23    around this, they want to understand the space of
24    students that institutions are serving.  They really
25    want to get an understanding of the implications of

Page 169

1     policy that they're pursuing.  What is the impact
2     going to be on the students?  What is the impact
3     going to be on institution?  What is the impact
4     going to be on the districts, charters which
5     includes -- nonpublic students, sorry -- -- which
6     includes private schools and home school students.
7     So it's really kind of getting an understanding of
8     the lay of the land is my understanding from these
9     inquiries in general.
10    Q.  Do you think she was possibly trying to know if her
11    own constituent would be affected if Northwestern
12    lost PEO -- PSEO funding?
13    A.  I can't speculate to that.  I would -- I would say
14    in general, legislators are always interested in how
15    their constituents are impacted.  So she's a chair,
16    so she's got to think about the whole state.
17    Q.  If you look at page 1396, there's a suggestion here
18    that there was interest in how they spend -- this is
19    the second point at the very bottom of the page.
20    She's also wondering of those institutions have to
21    report to MDE if they spend their State dollars on
22    recruitment and marketing.  Is that something that
23    MDE tracks?
24    A.  No.  That issue is just -- it's coming just in
25    general over the years for a range of different

Page 170

1    issues, and I don't believe that we track how much
2    funds postsecondary institutions use for recruiting
3    and marketing.
4    Q.  Okay.  Do you know why that is of such interest?
5    A.  Well, how it came up to me, which I mentioned
6    earlier in our conversation, in 14, which is the
7    biggest issue, is just postsecondary institutions
8    pull students from secondary settings, and
9    especially in Greater Minnesota, rural Minnesota
10   where there's not a lot of students, that pulls a
11   significant amount of funding away from schools.
12   And so there's that concern about maintaining
13   students in settings.
14        I'll just -- I'll just note that there's a
15   competing program where high school profs can teach
16   the same courses in their schools.  So schools spend
17   a lot of time saying, "Our courses are just as
18   good."  They offer a -- they also offer secondary
19   and postsecondary credits, so stick on campus so we
20   can continue to generate funding.
21   Q.  And what's that program you're referring to?  Is
22   that the PSOC?
23   A.  No.  Concurrent enrollment is what's that's called.
24   Q.  What is PSOC?
25   A.  PSEO?

Page 171

1    Q.  PSOC, does that mean anything to you?
2    A.  Say it again.
3    Q.  PSOC.
4    A.  No.
5    Q.  I'm now on page 1396 at the top.  It also says,
6    "Finally, she'd like to know if private colleges
7    need to submit to MDE a list of the courses they
8    offer."  And then the answer is, "All PSIs sign a
9    Statement of Assurance."  Does MDE otherwise track
10   the courses that are offered -- the PSEO courses
11   that are offered at private institutions?
12   A.  Yeah.  I don't think in any regular way we track
13   that.
14   Q.  Okay.  And do you ever commit -- perform audits on
15   schools to see if they're providing appropriate
16   courses?
17   A.  I don't know if we do in this program.  I feel like
18   there are other program areas that have engaged in
19   audits of particular schools.  I'm not sure if we do
20   of postsecondary institutions.  I don't want to say
21   one way or another if we have or haven't in the
22   history of this program.
23   Q.  As far as you know, has MDE ever conducted a -- a
24   review of whether religious PSEO schools are
25   providing only nonsectarian courses?

Page 172

1    A.  I don't know.  That would be a question for the
2    program implementation area.
3    Q.  Okay.  If you look on page 1393.  Do you see where
4    Jeanne Krill, at the bottom, says, "I'm very
5    surprised Beth does not comment about the annual
6    Statement of Assurances sent to private colleges.
7    That's material to the issue and the bill author.
8    Others would appreciate knowing this."  Do you see
9    that?
10   A.  Mm-hmm.
11   Q.  Do you have any idea why Jeanne would have thought
12   that the Statement of Assurances or the nonsectarian
13   requirement would have been of interest during the
14   amendment process?
15   A.  My assumption here is that the -- I'm just trying to
16   see if this was mentioned in the framing.  My
17   understanding is that Jeanne most likely knew that
18   the proposal that we had, the amendment that we're
19   referring to was in our bill, proposed around that,
20   and that she felt that the nonsectarian course issue
21   that is contemplated by the Statements of Assurance
22   we reviewed in the other exhibits was material to
23   this question, which I don't necessarily know if it
24   was.  So that's probably why she was bringing it up
25   because we were talking about this issue area in

Page 173

1    general.  And I think from other exhibits, she --
2    it's indicated that she is familiar with this topic
3    area and has been engaged in it.
4    Q.  Okay.  Do you see at the -- on 1392 where Lehmann,
5    Daley Lehmann says, "Remind him that part of the
6    governor's proposals includes a provision that made
7    sure private colleges do not make students take a
8    statement of faith before they take their classes."
9    Do you know who that's referring to, "remind him"?
10   A.  I don't -- let's see.  I do not.
11   Q.  Okay.  And then right above that, it says, "If they
12   want to take off their guardrails, then I guess they
13   can, but school finance can be held responsible."
14   Do you have any sense what she might have been
15   thinking there?
16   A.  I don't.
17   Q.  Okay.  Did Senator Kunesh get the data that she
18   requested?
19   A.  She would have.
20   Q.  And do you know what her response was?
21   A.  I do not recall what the response is.
22   Q.  Do you have any idea what the data showed?
23   A.  Other than what's in here, what we provided in this
24   set of questions that's on 1394 to 1395, the draft
25   email that Megan Ariola drafted to send to Senator

44 (Pages 170 - 173)

1    Kunesh and then with the suggestions added in to
2    Beth, my assumption is that that's probably what it
3    would have -- what it would have shared.
4    Q.   Okay.  As the director of communication -- or of
5         government affairs, would you have reviewed it
6         before it went over to the senator?
7    A.   Yeah.  I most -- I would have.  There are times
8         where I would have been caught up with other things
9         and don't have time, necessarily to review
10        everything.
11            (Exhibit 12 was marked for
12            identification.)
13        BY MR. BAXTER:
14   Q.   You've had a chance to review the document?
15   A.   Yes.
16   Q.   Have you -- do you recall it from before coming to
17        this deposition?
18   A.   I do recall the general, like, request around data.
19   Q.   And this is a follow-up request from Senator Kunesh,
20        right?
21   A.   Yes.
22   Q.   And she was asking for info on race, ethnicity,
23        religion for PSEO students and also whether they
24        were fully online or in person; is that correct?
25   A.   Correct.

1    Q.   Do you have any knowledge why she wanted this
2         information?
3    A.   It would have been pertaining as to -- as a
4         follow-up to an earlier question on our
5         understanding of the impact of the proposal, the
6         amendment that they were proposing.
7    Q.   And was any of the information that she requested,
8         was it ultimately given to her?
9    A.   I believe the limited set of what she was asking for
10        was given, and based on what we collect and what we
11        do not collect.
12   Q.   Okay.  And do you have the -- and that's why you
13        say, "maybe limited"?
14   A.   I think she asked for on campus, off campus.  It's
15        just -- there's just data we don't collect.
16   Q.   What -- what of that data would you have collected?
17        Would you have information on the race and ethnicity
18        of PSEO students?
19   A.   Yes.
20   Q.   Of their religious --
21   A.   I don't believe we carry -- we collect that
22        information.
23   Q.   Do you track online versus off-campus participation?
24   A.   I don't believe we do.
25   Q.   Do you see on page MDE 1717?

1    A.   Yes.
2    Q.   It says, "The commissioner would like to see this
3         information first."  Do you see that?
4    A.   Mm-hmm.
5    Q.   Had he reached out to you about this?  Or how did
6         you know about this request?
7    A.   I would have provided him an update on just kind of
8         what inquiries or what questions we were getting
9         from the legislature in general, most likely
10        probably on, like, more the higher level issues or
11        just, say, controversial issues, issues getting
12        public attention.  At this point, given the outreach
13        and conversations we had, we -- I mentioned this is
14        one area we were getting inquiry, and he kind of
15        wanted to know what --
16   Q.   Did he ask to see the data from the prior request
17        from Senator Kunesh?
18   A.   I do not recall.
19   Q.   Do you know why he was particularly interested in
20        this data?
21   A.   I think as an update on wanting to know what our
22        legislative partners were seeing, because it may
23        come up in conversations, it's normal for our
24        commissioners in general to have conversations with
25        chairs.  And so if it was referenced in any

1         discussion, he wanted to be just kind of up to
2         speed.
3    Q.   Was there anything particularly interesting about
4         the data?
5    A.   I cannot recall what the data explicitly said.
6    Q.   Okay.  Did you review the data?
7    A.   It is included.  I -- I know there's data on race
8         and ethnicity participation in PSEO courses in our
9         report -- taking report, which I generally reviewed,
10        but I did not review the data included in this
11        request.
12   Q.   Okay.  And is there any reason why you didn't?
13   A.   In preparation for this?
14   Q.   No.  I'm saying at the time.
15   A.   Oh, I must have looked at it if I reported it to the
16        commissioner.  I just don't remember right now.
17   Q.   Okay.  And you didn't look at it in preparation for
18        this meeting?
19   A.   No.
20   Q.   Okay.  Do you have any idea why Sally Reynolds would
21        have made the statement, "Interesting data"?
22   A.   I do not.
23   Q.   Do you recall there being any conversation with
24        other data within MDE?
25   A.   Other than me prepping the data to the commissioner,

1 I don't believe I was engaged in any conversations.

2 Q. Okay.  And is there anything from this email that

3 you can see that would have caused -- might have

4 caused Beth Barsness to say that she thought the

5 email chain was pretty interesting too?

6 A. Let's take a look.  I think it's just a reflection

7 on -- an interest in how the conversation in general

8 is going on an issue they've already been involved

9 with for quite some time.

10 Q. That's just your speculation, right?

11 A. Yes.

12 Q. Do you think they would have found it odd that the

13 commissioner checked in and wanted to see the data?

14 A. I don't think it would have been odd.  It would have

15 been an indication that, okay, this issue, clearly,

16 is elevated, but it's not abnormal for a

17 commissioner to be referenced as being interested in

18 -- in data or in -- in information in general.

19 Q. Did it raise red flags, in your mind, that the

20 Senator wanted information about the race and

21 ethnicity and makeup of Crown and Northwestern in

22 particular?

23 A. Not -- I mean, not particularly red flags.  I

24 wouldn't say, "red flags."  I would just say that --

25 I was interested in them -- her just wanting to

1 understand all the different angles of it.  It was

2 just, you know, sometimes senators can -- or

3 representatives dig into issues further than I would

4 have dug into, so...

5 Q. But was the issue wanting to know that information

6 that it would be pursued for all the PSEO schools?

7   MR. TIMMERMAN:  Objection, calls for

8 speculation.

9   You can answer.

10   THE WITNESS:  Yeah.  I'm not sure about

11 what her overall intent was, but I think it

12 does -- at private postsecondary

13 institutions, so...

14 BY MR. BAXTER:

15 Q. And it said that she was particularly interested,

16 right.  If you look on 17, 18, the main request is

17 for race, ethnicity of the student bodies of Crown

18 and Northwestern, correct?

19 A. Correct.

20 Q. Did that raise any red flags in your mind that MDE

21 would be engaged in religious targeting by looking

22 at that information for just two religious schools?

23 A. No.  I think that this was happening

24 contemporaneously with the public outreach that

25 Crown and Northwestern were engaged in that point to

1 the Department.  I'm going to speculate that this

2 outreach happened to the legislators as well.  And

3 so in response, they're like, okay.  These entities

4 that are concerned about the impact on the programs,

5 they -- this is my speculation, is that the

6 legislators wanted to know what the impact was in

7 the programs that were reaching out to them.

8 Q. Were you aware at the that time that Crown and

9 Northwestern were understood to be the only two

10 schools affected by the amendment?

11 A. I don't know on this particular date.  I think I

12 learned through secondhand or thirdhand that, like,

13 over the course of, I think it was sometime in

14 March, that no other institution maybe had -- I

15 still don't know if this is the case.  I mean, maybe

16 you're telling me.  But I learned that no -- or was

17 told that no other institution than those two had

18 the type of admissions process that that institution

19 felt would not comply with the proposal that we were

20 putting forward.

21 Q. At some point, were you aware that, for example,

22 Senators on the floor were acknowledging that the

23 legislation would only impact two religious schools?

24 A. I remember hearing statements in the legislature on

25 the floor discussion reference those two schools.

1 From all of what was stated on the public record,

2 I'm not entirely sure if that statement was made,

3 that these are the only two institutions.

4 Q. They never triggered any concern in your mind that

5 MDE's proposal might be an example of religious

6 targeting?

7 A. No.  I mean, I think concern from me, I think we

8 were, obviously, always willing to hear people.

9 That's, obviously, one of the reasons why we took

10 the meetings with Northwestern.  It's just good

11 partnership, right, to hear their concerns.  So

12 those were, obviously, raised.  I think that

13 argument was raised by the institutions.  The

14 argument was raised by the legislators to us.

15   I think our approach has always been that it

16 wasn't targeting of any type.  We were trying to

17 approach equitable access to institution, and that's

18 why it was based off of any protected class.

19 Q. And did anybody within MDE ever express concerns

20 about religious targeting?

21 A. No, not to me.

22   (Exhibit 13 was marked for

23 identification.)

24 BY MR. BAXTER:

25 Q. Take a look at this document that's been marked

1      Exhibit 12 -- or 13.
2  A.  Okay.
3  Q.  Okay.  Have you reviewed this document before this
4      deposition?
5  A.  I have not.
6  Q.  Okay.  Is it fair to say that this appears to be a
7      summary of a conversation -- in part, a conversation
8      that you had with Congressman -- or Representative
9      Bakeberg?
10 A.  This may have either been a conversation I had with
11     him one on one, or it could have been questions to
12     me.  What date was this?  The 16th.  It could have
13     been conversation or questions to me that I had on
14     the stand.
15 Q.  When you say --
16 A.  Testifying table in a committee.  Sorry.
17 Q.  Okay.  What -- how many conversations have you had
18     with -- one-on-one conversations have you had with
19     Representative Bakeberg around the amendment?
20 A.  Maybe one or two.
21 Q.  Okay.  And do you remember when those were?
22 A.  Probably around March.  The -- I'm guessing --
23     whenever this issue, I think, was raised, it would
24     have been in the range of probably middle of
25     February to probably the middle of April is when

1      those one or two -- clearly, this happened first
2      couple weeks of march.
3  Q.  Okay.  And where did those conversations happen?
4  A.  Probably in the committee room, in the committee
5      room, which is in the Capitol.
6  Q.  And those would have been, like, standing around in
7      the committee room or --
8  A.  Standing in the hallway or those type of situations.
9      There are one or two times that he called in,
10     though.  The reason I'm not being precise is because
11     he -- he talked to me on a range of issues pretty
12     regularly.
13 Q.  Do you see where it says, the second bullet point,
14     "the Department has had five years to address this
15     issue."  If they had legal standing to stop the
16     statement of faith, they would have, in my opinion"?
17 A.  I see that, correct.
18 Q.  Did you tell Bakeberg in a conversation something
19     along the lines that the AG told you that the MDE
20     could not pursue this initially?
21 A.  I believe that I had, in questions or framing the
22     issue when there was a question, even in committee,
23     I believe, I had said that one of the reasons why
24     we're pursuing this legislatively is because we were
25     informed at the time that we could not pursue this

1      initially.  That's what I would have said at the
2      time.
3  Q.  Informed by the AG?
4  A.  Yes.
5  Q.  When did the AG tell you that?
6  A.  I would have stated that it would have happened, I
7      believe, in the 2018 period.
8  Q.  Okay.  And was that -- do you remember a
9      conversation with the AG about this?
10 A.  I -- I remember a conversation about this topic with
11     someone from the AG's office about -- about this or
12     about the initial, like, root conversation.
13 Q.  You said that the AG told you the MDE couldn't
14     pursue this initially.  I'm asking if you remember
15     that conversation.
16 A.  Yes, I do.
17 Q.  And which AG was that?
18 A.  Kathryn Woodruff.
19 Q.  Okay.  So here, he says he wasn't sure if it was
20     Ellison or Swanson, but you think it was --
21 A.  Oh, my apologies.  When he's referring to "AG," he's
22     referring to the actual attorney, whether it's --
23     I'm assuming Lori Swanson who was, up until 2018,
24     and current Attorney General Keith Ellison.  I would
25     always frame it as "The Attorney General's Office"

1      when speaking about it.  So I would be speaking to,
2      like, an AG assistant, assistant or associate, but
3      the individual from the office was Kathy Woodruff.
4  Q.  Kathy Woodruff?
5  A.  Yes.
6  Q.  And what, exactly, did Kathy say to you?
7          MR. TIMMERMAN:  I'm going to object on
8      this line of questioning.  It calls for
9      privileged information.
10         MR. BAXTER:  We'll he's already -- he
11     said what she said.
12 BY MR. BAXTER:
13 Q.  So I'm just asking what she said to you?
14         MR. TIMMERMAN:  He shared.  What he
15     shared publicly is one thing.  The specifics
16     that she told him, I'm going to instruct him
17     not to answer.
18         MR. BAXTER:  We'll hold that -- reserve
19     that question for later, then.
20 BY MR. BAXTER:
21 Q.  The next couple lines down, he says that Bakeberg
22     shared with you that the bill was seen as an attack
23     of people -- attack on people of faith.  Do you see
24     that?
25 A.  Yes, I do.

47 (Pages 182 - 185)

Page 186

1  Q.  Then he says, "Commissioner Jett was surprised by
2     that comment." Is that something you told him, that
3     Commissioner Jett was surprised?
4  A.  I don't recall saying that to him.
5  Q.  Did you ever have a conversation with Commissioner
6     Jett about -- about whether this bill was an attack
7     on people of faith?
8  A.  I would not have framed it as such.
9  Q.  And how did you frame it?
10  A.  I would have framed it as people are -- opponents of
11     the proposal are claiming that it is an attack on
12     faith as -- in the context of explaining what
13     proponents and opponents are saying to give them a
14     fair lay of the land.
15  Q.  Did you have that conversation with Commissioner
16     Jett?
17  A.  I cannot recall a specific conversation, but in
18     updates to the commissioner, I regularly give him
19     updates of what the more heavier things that are
20     said, and I -- I probably informed him that that is
21     one of the complaints about the proposal.
22  Q.  And how did he respond to the knowledge that that
23     was one of the complaints?
24  A.  To me?
25  Q.  Yes.

Page 187

1  A.  To me, I think he probably would have reacted with
2     -- I don't know if I would say surprised but a
3     little bit of an eyebrow raise, probably. But I
4     can't recall what it would have been, but this is
5     just speculation. It's a fast-paced environment.
6  Q.  Is there any specific conversation about this topic
7     that you remember having with Commissioner Jett?
8  A.  I can't remember lines of lines, but I do kind of
9     remember providing him updates that this is how the
10     conversation is going at the -- at the Capitol.
11     These are the types of, you know, data that's being
12     requested. These are what you're going to probably
13     hear about from -- or hear about that's being said
14     in committee or on the floor.
15  Q.  And from that conversation, do you remember how he
16     reacted?
17  A.  I think after the first few kind of -- first few
18     updates, I think he then became kind of
19     understanding there are people going to be
20     opponents. There are people going to be
21     proponents. Then I think he responded kind of
22     understanding.
23  Q.  Did he ever express interest in trying to resolve
24     the religious institutions' concerns?
25  A.  To the extent of having conversations with people as

Page 188

1     working towards resolution, making relationship,
2     yes. He -- it's my understanding that he had
3     meetings with the presidents of the two, you know,
4     colleges/universities.
5  Q.  Okay. Then it says, "Other MDE staff were
6     uncomfortable." Is that something you told
7     Representative Bakeberg?
8  A.  No. I don't know how I would have used the
9     terminology "uncomfortable."
10  Q.  Okay. Did you ever feel like anyone at MDE was
11     uncomfortable with the proposal as its meaning and
12     impact came to light through the 2022 session?
13  A.  Did anybody express discomfort with the proposal
14     that we put forward?
15  Q.  Right.
16  A.  No, never.
17  Q.  It says that "MDE has dug in on this because they
18     feel a kid in St. Boni cannot go to Crown unless
19     they agree with the statement of faith." Is that
20     something you conveyed?
21  A.  No. I would have not used that reference or that
22     example.
23  Q.  Which reference?
24  A.  "St. Boni cannot go to Crown," I'm not sure where
25     St. Boni is.

Page 189

1  Q.  St. Bonifacius is where Crown is located, I believe,
2     but --
3  A.  Is that -- I mean, I -- I'm just going to conjecture
4     here for context. I wonder if Representative
5     Bakeberg's district is near Crown, so that's --
6  Q.  You don't remember ever expressing concern about the
7     distance students might have to go to get into a
8     nonreligious school if they couldn't get into Crown?
9  A.  Oh, on the distance portion, yes. There were
10     discussions around an example of why having -- so
11     there was a discussion point around could students
12     just go to another entity. And so distance became a
13     discussion point, I think, in that context.
14  Q.  Okay. And distance would be an issue regardless of
15     whether a school was religious or not, correct?
16  A.  Yeah, for a variety of reasons, I'm sure.
17  Q.  Okay. And has MDE ever taken measures to try to
18     solve that problem?
19  A.  No.
20  Q.  Are you aware of --
21  A.  Not to my knowledge.
22  Q.  Okay. Are you aware that State dollars go to
23     religious schools through school lunch programs?
24  A.  Yes.
25  Q.  Would you have been aware of that the entire time

1  you worked it the MDE?
2  A.  I can't say the entire time but the majority of the
3      time, yes.  I would have been aware of that.
4  Q.  Early in your time?
5  A.  Yeah.  I -- yeah.
6  Q.  Okay.  The State funds go to private religious
7      schools for textbooks.
8  A.  Correct, for nonsectarian textbooks.
9  Q.  But they go to religious schools?
10  A.  Funding to purchase textbooks.
11  Q.  And there's funding that goes to religious schools
12      for transportation?
13  A.  Nonpublic people pay transportation -- yes, correct.
14  Q.  Do you know what SPED services are?
15  A.  Special education services?
16  Q.  And are you aware that special education services
17      and funding go the private religious schools?
18  A.  I'm not aware of them going to private schools.  I'm
19      aware of -- this is what I'm aware of:  I'm aware of
20      students who attend private schools being able to
21      avail themselves of the FAPE or Free and Appropriate
22      Education, and that's where special education
23      services fall under.  Or is it GAPE?  One of those
24      two.  Federal law requires all students to be able
25      to access special education services at public

1      schools.
2  Q.  Okay.  And where private schools receive funding for
3      the lunch program, textbooks, transportation, some
4      those private schools are religious schools,
5      correct?
6  A.  Correct.
7  Q.  And they're elementary schools, middle schools, high
8      schools, postsecondary, correct?
9  A.  Correct.
10  Q.  And many of those schools have religious admissions
11      requirements, correct?
12  A.  I would say -- I don't know.  I haven't screened
13      those institutions.  I have not screened what the
14      admission criteria are for K through 12 schools.
15  Q.  Have you ever raised those concerns that those
16      schools might have religious admission requirements
17      even though they're receiving State funding?
18  A.  No.
19  Q.  Just at the -- just at the PSEO program level?
20  A.  I can't say that that's the entirety of concerns
21      that I've raised around admission criteria.  But I
22      think -- I don't recall having concerns around
23      admissions criteria for -- raising concerns around
24      admissions criteria for lunches, textbooks,
25      transportation.  I'm not going to go to include SPED

1      services because I don't think that's accurate.
2  Q.  And MDE has never proposed legislation to stop State
3      funding from going to religious school with
4      religious admission requirements except in the PSEO
5      program, correct?
6  A.  I don't know the answer to that.  In my tenure, no.
7  Q.  Okay.  And is there any reason why it hasn't been
8      concerned about those other alleged constitutional
9      violations?
10  A.  I can't -- I can't speak to the nuances of access
11      for meals, access for nonsectarian textbooks, and
12      I'll remind you that it's -- there's no challenge to
13      nonsectarian -- participation in nonsectarian course
14      at religiously-affiliated institutions, and I
15      believe there's -- we've -- I actually believe we've
16      had proposals for PSEO dollars to be spent on
17      transportation to any public or private entity in
18      the past.  And so I don't think we've ever proposed
19      any type of legislation to restrict access to those
20      services since I've been there.
21  Q.  Okay.
22      (Exhibit 14 was marked for
23      identification.)
24  BY MR. BAXTER:
25  Q.  All Right.  Have you take a look at this document

1      which has been marked Exhibit 14.  Let me know when
2      you've had a chance to look at it.
3  A.  Okay.
4  Q.  Are you familiar with this document?
5  A.  I am.
6  Q.  What is it?
7  A.  It's an exchange between Greg Johnson and Heidi
8      Hoefs, Jen Niska, and Todd -- nope.  It's just Greg
9      and Jen with myself around the questions that they
10      had about implications to their programming if the
11      law were to go into place.  And they provided some
12      examples to which we provided responses.
13  Q.  Okay.  And Greg emailed you -- Greg and Jen emailed
14      you on March 9th; is that correct?
15  A.  Correct.
16  Q.  And you responded on March 17th?
17  A.  Yes.
18  Q.  And were there discussions internally at MDE about
19      how to respond?
20  A.  Yes.
21  Q.  And who were those discussions with?
22  A.  I believe counsel and then probably -- probably
23      someone on my Government Relations team was cc'ed on
24      that.  It may or may not have included members of
25      the -- probably did, but members of the Career and

Page 194

1    College Services Department.
2    Q.  Outside of counsel, what were the -- were there
3        different opinions within MDE about how the
4        effective date would impact which student could get
5        PSEO funding and which student couldn't?
6              MR. TIMMERMAN:  I'll just jump in here
7        to advise you not to answer to the extent it
8        would reveal any information shared at any
9        meeting which counsel was present to provide
10       legal advice.
11             THE WITNESS:  Yeah.  I don't think I
12       engaged in conversations to answer this
13       without counsel.
14   BY MR. BAXTER:
15   Q.  Okay.  What was your understanding of what advice
16       MDE gave Northwestern and Crown in response to their
17       questions?
18   A.  My understanding is what we provided here in the
19       email, that they would be clarifying how it would
20       apply and the examples they brought up would be in
21       compliance based on when the effective date of the
22       policy passage would be.
23   Q.  And your response was, essentially, if I'm recalling
24       correctly, is that anybody enrolled before
25       August 1st, they could still use the PSEO dollars at

Page 195

1        Crown and Northwestern, correct?
2    A.  Just reframe how it works.  So the student gets
3        accepted into the PSEO program, and then the PSI,
4        postsecondary institution, gets reimbursement from
5        the State.  So it's not like the student has these
6        portable dollars.  It's not like a scholarship or
7        voucher or anything like that.
8    Q.  They can choose to take it anywhere they want,
9        right?
10   A.  They can.  They can.
11   Q.  They'll reimburse that institution?
12   A.  Yeah, the institution, yeah.  So there's no flow
13       through through the student.  That's just what I
14       wanted to make clear.  Yeah.  So this -- I think
15       it's -- the question was, is that postsecondary
16       institution, Northwestern, being used as an example
17       here, could continue with its current admissions
18       process for students who are accepted, I believe as
19       we stated before, and the admissions process
20       completed before August 1st.
21   Q.  Okay.  So long as the student was admitted to the
22       PSI before August 1st, the State would continue to
23       reimburse as long as they were in the program or
24       just for the next year or --
25   A.  I believe it appears what we've said here.  So as

Page 196

1        long as I'm not contradicting what we said here, I
2        believe it's if they were admitted in that summer,
3        so this last summer and they continued on for two
4        years, they wouldn't have to -- I believe they said
5        we wouldn't have to reapply.
6    Q.  So why didn't why -- why would MDE have continued to
7        pay just because people applied before August 1st if
8        you were trying to end inequitable access?
9    A.  As a policy decision, it was -- it was -- for the
10       intent that we didn't want to rip away the
11       opportunity for students who were already engaged in
12       making the decisions about where they wanted to take
13       PSEO or those that were already in the program.  So
14       it was focused on the students.
15   Q.  And was it ever a concern that the students who
16       applied after August 1st would have that funding
17       ripped away from them?
18   A.  The intent was that the -- the intent -- the policy
19       intent of the proposal was that the practice would
20       stop and the opportunity would remain to attend the
21       programs.
22   Q.  And did it ever occur to you that the religious
23       school might stop offering PSEO to maintain their
24       religious environments on campus?
25   A.  That was presented as an option that they could

Page 197

1        avail themselves of by -- by them.
2    Q.  And was that a concern that that would then be
3        cutting off the largest number of -- the largest
4        PSEO provider in the state?
5    A.  I think that prevailing concern was equitable access
6        based on protected class.
7    Q.  And how would that help protected classes get into
8        Northwestern if they stopped offering PSEO credit?
9    A.  I think that would then be that was the choice --
10       our opinion was that was the choice of the
11       postsecondary institution to stop offering it.
12   Q.  So you didn't care as long as the school chose not
13       to offer it to them?
14   A.  I wouldn't say we didn't care.  I would say that it
15       was about maintaining or creating or establishing
16       clear equitable access to programs where no one was
17       denied the opportunity based on a protected class.
18   Q.  And why did you stop at protected classes?  Why not
19       focus on students that lack the same intelligence as
20       other students.  Because isn't it correct that a lot
21       of schools have academic requirements for admission?
22   A.  I think that each postsecondary institution is
23       allowed to establish, like, academic rigor.  Maybe
24       some -- some -- they can look at GPA or something
25       like that.  I think that might be the case.  I would

50 (Pages 194 - 197)

Page 198

1  have to -- for the nuances of that, I would have to
2  defer to the program staff.
3  Q.  You know -- you applied at the University of
4  Minnesota.  You knew that they were looking at your
5  GPA, right?
6  A.  Yeah.  I mean, right.
7  Q.  And you know that most schools do that?
8  A.  I -- but you're talking about -- to me -- for law
9  school, yes.
10  Q.  Okay.  And you're --
11  A.  You're talking about PSEO.  I don't think every
12  institution has the same criteria that they
13  establish for entering into the PSEO program.
14  Q.  But you must be aware that many students do have --
15  I mean -- sorry -- many schools do have academic
16  requirement for those PSEO students.
17  A.  Yes.
18  Q.  And that means that students with lower IQs have
19  less opportunity to get into those schools, correct?
20      MR. TIMMERMAN:  Objection, calls for
21      speculation.
22      THE WITNESS:  I don't know if lower IQ
23  -- I just -- like, I'm kind of uncomfortable
24  with that question.  Can you rephrase it?
25      BY MR. BAXTER:

Page 199

1  Q.  Sure.  If the student -- if the school has a certain
2  academic rigor requirement, students who may not be
3  able to meet that requirement, they're -- they're
4  precluded from going to that school and using PSEO
5  funds; is that correct?
6  A.  If someone doesn't meet an academic rigor
7  qualification, my understanding is a school can use
8  that one factor to determine if the student is able
9  to gain access to the program.
10  Q.  They could exclude a student based on that factor,
11  correct?
12  A.  I don't know if any does.  I guess, maybe.
13  Q.  It's -- there's nothing in MDE that stops a school
14  from excluding students from meeting certain
15  academic requirements, correct?
16  A.  Correct.
17  Q.  And it makes sense that that would -- or would
18  disproportionately affect students who had less
19  educational opportunities, who maybe have less
20  innate talents.  That's a fair statement, right?
21      MR. TIMMERMAN:  Objection, calls for
22      speculation.
23      You can answer, if you want.
24      THE WITNESS:  The academic rigor
25  requirements of postsecondary institutions

Page 200

1  for access to their programs, to access
2  their extracurricular activities have had a
3  long history, I think, of exclusion based on
4  people's access to opportunities.
5  BY MR. BAXTER:
6  Q.  And MDE hasn't proposed any legislation to overcome
7  that barrier to PSEO, has it?
8  A.  We have.
9  Q.  Okay.  How have you done that?
10  A.  In the 2021, I think, the 2022 legislative sessions,
11  we proposed a, gosh, $5 million -- I can't remember
12  what it was -- to improve access for
13  underrepresented communities both geographically and
14  based, I think, on income and based on race for
15  access to PSEO, concurrent enrollment, APIB courses,
16  as well as CT courses.  So those would have been
17  grants to districts and charters to increase access
18  to those, so it would be historically
19  underrepresented communities in those programs.
20  Q.  So one way to approach this problem is to kind of
21  give more money to schools to encourage broader
22  application in admissions practices?
23  A.  I think it would be for more funding for districts.
24  I think it was to districts and charters -- it may
25  have been to postsecondary institutions -- to find

Page 201

1  creative ways to create programming for students.  I
2  don't know if we delved into any rules or guidelines
3  around their admission program.  That may have very
4  well if those things passed.  It may very well have
5  been a portion of the grant application, but I don't
6  know.
7  Q.  But MDE has never proposed legislation that would
8  bar funds -- PSEO funds going to schools that have
9  academic admission requirements, correct?
10  A.  Not in my tenure.  Not to my recollection.
11  Q.  Okay.  Are you familiar with Bethany College?
12  A.  I -- I've heard of Bethany.
13  Q.  Bethany Lutheran College?
14  A.  I've heard of Bethany.
15  Q.  Are you familiar with Bethany's religious identity?
16  A.  I am not.
17  Q.  Have you looked at their religious requirements for
18  students?
19  A.  I have not.
20      (Exhibit 15 was marked for
21      identification.)
22      BY MR. BAXTER:
23  Q.  Do you see where this says that -- that "Bethany is
24  an arm of the Evangelical Luther Synod that upholds
25  the teachings of the bible"?  It's the third line

51 (Pages 198 - 201)

Page 202

1    down.
2    A.  I do see that.
3    Q.  Okay.  And then do you see the first sentence of the
4    second paragraph that says, "In cases when a student
5    challenges or disparages the teaching, operations,
6    or beliefs of the college in a manner that disrupts
7    an atmosphere of Christina teaching, learning, or
8    living," then it says, "The college will work with
9    the student," and then going down two lines, "If the
10    student persists in challenging or disparaging the
11    teachings of the Synod, the college reserves the
12    right to advise the student to continue his or her
13    education elsewhere."
14        So at face value, this suggests that at
15    Bethany, the school reserves the right to expel
16    students who don't live up to its religious
17    expectations, correct?
18    A.  I -- it appears that that's what they're saying.
19    Q.  Is there any reason why MDE has gone after schools
20    that have religious admission requirements but not
21    schools that reserve the right to expel students for
22    religious noncompliance?
23    A.  I don't know.  I haven't contemplated that question.
24    Q.  Okay.
25    A.  And I wouldn't -- I wouldn't phrase it as, "Gone

Page 203

1    after schools."  It's we're trying to curtail an
2    inequitable practice.
3    Q.  Are you familiar with the section of the Minnesota
4    Code that addresses PSEO programming?
5    A.  Generally.
6    Q.  Okay.
7    A.  I will admit, at times, it's a confusing statute.
8    Q.  Sure.  Does Code 124D.09 mean anything to you?
9    A.  Yes.
10    Q.  And are you aware of the provision in that code that
11    provides for solutions for students who have to
12    travel more than 40 miles to get to a PSEO school?
13    A.  Is that around marketing or advertising to them?
14    Q.  Not sure.  Do you have any familiarity with --
15    A.  Not off the top -- I could take a look at the
16    statute and...
17    Q.  Did MDE ever consider taking a broader view on the
18    amendment besides, for example, to consider tribal
19    colleges that restrict admission to alignment with
20    tribal values?
21    A.  I did not engage in any of those conversations.
22    Q.  Okay.
23    A.  I think this -- I mean, this provision, I believe,
24    applies to all participant institutions in this
25    program and their admission status.

Page 204

1    Q.  So is it your understanding that would bar tribal
2    schools from restricting admissions to students who
3    share affinity with the tribe's creed or values?
4    A.  I don't -- I'm not aware -- I think if -- I think
5    any participating institution in the program would
6    have to comply with the law.
7    Q.  Have you ever seen a syllabus from any PSEO courses
8    offered by Crown and Northwestern?
9    A.  I believe -- I may have in preparation for this.
10    Q.  Okay.  Are you aware that Crown and Northwestern
11    have long disclosed to MDE that their PSEO courses
12    are offered through a lens of faith?
13    A.  My understanding -- I'm trying to think back to the
14    documents we reviewed from, like, the 2008 and 2016.
15    I mean, the most concrete, like, familiarity I have
16    is that they've signed the Statements of Assurance
17    that the courses are nonsectarian.
18    Q.  And are you currently investigating any religious
19    schools for compliance with the nonsectarian
20    requirement?
21    A.  I'm not aware of that.  I'm not part of those
22    activities if that is or isn't occurring.
23    Q.  And is it your understanding that that requirement
24    is not at issue in this case?
25    A.  I don't -- I mean, my understanding -- what I'm here

Page 205

1    to discuss in my personal and 30(b)(6) capacity is
2    around the law that was passed, which contemplates
3    admission criteria. I know there are documents that
4    contemplate that other issue, though.
5    Q.  Okay.  Did you hear other legislators -- during the
6    2022-2023 legislative session or cycle, did you ever
7    hear any of them say anything negative about Crown's
8    religious belief?
9    A.  No.
10    Q.  About Northwestern's religious beliefs?
11    A.  No.
12    Q.  Did you ever hear them saying they didn't agree with
13    those beliefs?
14    A.  Actually, can you go back and rephrase those first
15    two questions again?
16    Q.  Asked if you ever heard legislators ever say
17    anything negative about Crown's religious beliefs?
18    A.  I did hear critical remarks about statements that
19    were made on their website, on Crown and -- no -- on
20    Northwestern's website.  I don't know about Crown's.
21    Q.  And who did you hear that from?
22    A.  I cannot remember if it was legislators' staff or
23    legislators specifically.  It would have been the
24    chairs in the Senate and possibly the House but I
25    think in the Senate.

52 (Pages 202 - 205)

1  Q. Do you remember specifically what was said?
2  A. I think it was comments around statement -- critical
3     comments of statements on sexual orientation and
4     gender identity that are on the Student Code of
5     Conduct.
6  Q. And did you ever hear legislators or anyone else
7     involved in the amendment accuse Crown or
8     Northwestern of being anti-LGBT or bigots or
9     anything like that?
10 A. Certainly not using the word "bigots." I'm just
11    trying to think about the first question. I think I
12    -- think it was more comments reflective of what's
13    on the page, and the Student Code of Conduct appears
14    to us to be at odds with being support of the LGBTQ
15    community.
16 Q. Do you remember who said that?
17 A. Maybe the chairs and the staff.
18 Q. Do you remember if it was the chair in the House or
19    the Senate?
20 A. I think it was the Senate, maybe the House. I just
21    don't remember. It was solely when -- I know those
22    conversation came up, but I just, like -- these
23    conversations were fluid. We're goin in and out
24    other topics.
25 Q. There seems to be something specific you're

1     recalling? Is there any more detail you have about
2     that?
3  A. No. I think it was -- I think it was a reference --
4     someone had looked up the Student Code of Conduct.
5     Because they kind of delved into what do you need to
6     -- what do you -- what would you need to affirm
7     statements? And I think a Student Code of Conduct
8     is a very common thing that you have to affirm that
9     you're upholding when you're applying to
10    postsecondary institutions, and I think someone took
11    a look at it and saw that.
12        MR. BAXTER: Why don't we take just a
13    five-minute break and see if there's
14    anything else? Like I said, we'll leave the
15    deposition open for potential follow-up.
16        (A recess was had from 3:09 p.m. until
17    3:14 p.m.
18        MR. BAXTER: Okay. Back on the record.
19    I just want to note on the record that I
20    would like to ask Mr. Unni questions about
21    what the AG told him that he then disclosed
22    to third parties. Are you going to instruct
23    him not to answer those questions?
24        MR. TIMMERMAN: Yes.
25        MR. BAXTER: I just want to make clear

1     for the record that we think that that
2     objection has been waived by Mr. Adosh's
3     [sic] admissions or his discussions with
4     third parties and intend to challenge that.
5     And that's it for the record.
6         MR. TIMMERMAN: Understood.
7         MR. BAXTER: That's it. We'll leave
8     the deposition open for potential
9     continuation, but for today, we'll --
10        MR. TIMMERMAN: We'll read and sign.
11    Condensed electronic for us would be great.
12        MR. BAXTER: Yeah.
13        (The foregoing proceeding concluded at
14    3:15 p.m.)

1  STATE OF MINNESOTA    )
                          ) ss
2  COUNTY OF ANOKA       )
3      BE IT KNOWN THAT I, Christina M. De Grande,
   the undersigned professional stenographic court
4  reporter took the proceedings on January 29, 2024.
5      I do hereby certify that I was then and there a
   notary public in and for the County of Anoka, State
6  of Minnesota, and by virtue thereof, I am duly
7  authorized to administer an oath;
8      That before testifying, the witnesses were
9  first duly sworn under oath by me to testify to the
10 whole truth relative to the cause under
11 consideration.
12     The foregoing 208 pages are a true and accurate
13 copy of my original stenotype notes as transcribed
14 by computer-aided transcription taken relative to
15 the aforementioned matter.
16     I am not related to any of the parties hereto
17 nor am I interested in the outcome of the action.
18
19 WITNESS MY HAND AND SEAL this 3rd day of
20
21 February, 2024.
22
23                    _____
   CHRISTINA M. DE GRANDE
24 Professional Stenographic Court Reporter
   And Notary Public
25 Commission expires January 31, 2027

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 210

1  Jeff Timmerman, Esquire
2  Jeff.timmermmerman@ag.state.mn.us
3
4  RE:   Loe, Melinda And Mark v. Jett, Willie Et Al.
5     1/29/2024, Adosh Unni (MDE 30(b)(6)) (#6439446)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-midatlantic@veritext.com.
16  Return completed errata within 30 days from
17 receipt of testimony.
18  If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 211

1  Loe, Melinda And Mark v. Jett, Willie Et Al.
2  Adosh Unni (MDE 30(b)(6)) (#6439446)
3       E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Adosh Unni           Date
25

Page 212

1  Loe, Melinda And Mark v. Jett, Willie Et Al.
2  Adosh Unni (MDE 30(b)(6)) (#6439446)
3       ACKNOWLEDGEMENT OF DEPONENT
4   I, Adosh Unni, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Adosh Unni           Date
13 *If notary is required
14     SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18     _____
19     NOTARY PUBLIC
20
21
22
23
24
25

**[& - 2021]**                                                                Page 1

| **&** | **13** 3:19 181:22 | **192** 3:20 | **2018** 42:20 |
|---|---|---|---|

**&**   25:16,22
26:5,7

**0**

**01527**   1:6
**0:23**   1:6

**1**

**1**   3:7 5:8,12
55:19
**1/29/2024**
210:5
**10**   3:16 163:4,8
**10/10/2023**
3:17
**10:28**   51:11
**10:41**   51:12
**10th**   68:12
**11**   3:17 5:20
27:16 167:25
**11/8/2020**   3:11
**118**   3:8
**11:48**   109:19
109:20
**11th**   122:22
**12**   3:18 174:11
182:1 191:14
**12/6/2021**   3:13
**120**   84:3
**121**   3:9
**1224d09**   156:2
**124d.09**   203:8
**12:34**   109:21
**12th**   128:16

**13**   3:19 181:22
182:1
**131**   3:10
**1392**   173:4
**1393**   172:3
**1394**   173:24
**1395**   173:24
**1396**   169:17
171:5
**14**   3:20 170:6
192:22 193:1
**1400**   2:15
**143**   3:11
**146**   3:12
**15**   3:21 69:18
69:21 201:20
**150**   3:13
**155**   3:14
**1593**   158:12
**15th**   132:12
**16**   69:18,21
**160**   3:15
**163**   3:16
**167**   3:17
**16th**   138:14,23
182:12
**17**   40:7 179:16
**1717**   175:25
**174**   3:18
**17th**   193:16
**18**   119:2
179:16
**181**   3:19
**1919**   2:7

**192**   3:20
**1990s**   109:11
**1992**   150:3
**1993**   150:3
**1:31**   150:16
**1:42**   150:17
**1st**   194:25
195:20,22
196:7,16

**2**

**2**   3:8 5:19
118:2,3 156:2
**2/16/2023**   3:10
**2/6/2021**   3:12
**2/7/2023**   3:15
**20**   36:3,25
57:13 71:1
77:3 81:7 91:6
137:14 212:15
**20006**   2:8
**2002**   24:9
**2003**   23:20
24:9
**2008**   23:7,14
117:25 204:14
**201**   3:21
**2013**   138:14
**2014**   38:5
51:16 53:3
120:10,16
**2015**   68:11
**2016**   40:7
68:11 119:1
204:14

**2018**   42:20
43:11 44:9
51:16 53:3,25
54:1,24 57:7
60:8 109:8
111:5 112:13
114:24 132:12
136:12,24
137:6,15,16
139:6 140:11
141:11,12,21
184:7,23
**2019**   36:5
43:19 54:21
55:5 57:13,14
57:21 60:3,9
**202-349-7221**
2:9
**2020**   43:20
47:20 49:2
53:17 54:13
57:22,24 60:3
61:7,19,22,24
62:1,10,15,19
62:21,22,23
63:9 64:13,25
72:5,25 77:12
80:19 88:21
**2020-2021**
78:13 80:7
**2021**   61:1
62:25 71:1
72:6 73:1,2
74:1 77:12
80:18,24,24

[2021 - access]                                                                 Page 2

84:16 88:15,21
88:25 89:8
90:2 148:14
151:24 152:20
200:10
**2022**  33:12
34:6 36:3 61:5
88:8 110:1
188:12 200:10
**2022-2023**
205:6
**2023**  5:3 51:3
55:25 61:5
73:6,15 90:4
91:6 93:1,7
98:22 104:15
108:24 109:24
111:23 114:25
115:19,21
138:5
**2024**  1:11 4:3
209:5,21
**2027**  209:25
**208**  209:14
**21**  36:3 57:11
**22**  37:1 57:11
88:15,25 89:8
90:2 112:1
**23**  110:1 112:1
**24th**  55:25
**2616**  122:8
**28414**  209:22
**29**  1:11 209:5
**29th**  4:3

### 3

**3**  3:9 5:19
55:21 57:2
121:9,10
**3/09/2023**  3:18
**3/16/2023**  3:19
**3/17/2023**  3:20
**3/6/2023**  3:16
**3/7/2022**  3:14
**30**  64:18 131:4
163:18 205:1
210:5,16 211:2
212:2
**31**  209:25
**3100**  4:4
**3:09**  207:16
**3:14**  207:17
**3:15**  208:14
**3rd**  209:20

### 4

**4**  3:3,10 131:16
131:17 134:5
**4/11/2018**  3:9
**4/17/2008**  3:8
**40**  203:12
**400**  2:7
**445**  2:15
**4th**  163:21

### 5

**5**  3:7,11 143:19
143:23 200:11
**50**  77:4
**55101**  2:16

### 6

**6**  3:12 131:4
146:3,7 205:1
210:5 211:2
212:2
**60**  6:14
**6439446**  1:17
210:5 211:2
212:2
**651-300-6807**
2:17

### 7

**7**  3:13 150:18
150:21

### 8

**8**  3:14 155:10
155:14
**80**  4:3
**8th**  4:3

### 9

**9**  3:15 27:16
160:7,11
**90**  6:14
**9:00**  1:12 4:3
**9th**  193:14

### a

**a.m.**  1:12 4:3
51:11,12
**abilities**  68:18
70:3
**ability**  120:6
163:2

**able**  6:18 17:15
18:2,3,19
67:20 68:14
69:24 73:25
92:3 126:18,25
136:4,6 146:20
156:24 190:20
190:24 199:3,8
**abnormal**
178:16
**above**  173:11
210:6 212:7
**abroad**  20:20
**academic**  68:3
68:9,16,18,25
69:7,11,25
70:9 161:19,20
162:14,20
163:3 197:21
197:23 198:15
199:2,6,15,24
201:9
**academy**
146:23 147:13
**accept**  39:4,6
146:17 160:21
161:4,18
**accepted**  87:17
124:13 195:3
195:18
**accepting**
146:15
**accepts**  136:22
**access**  30:11
61:11 67:17,22

67:23,25 68:3
68:12 92:17
105:4,24 108:6
111:7 154:18
154:22 181:17
190:25 192:10
192:11,19
196:8 197:5,16
199:9 200:1,1
200:4,12,15,17
**accomplish**
96:12
**account** 11:17
69:1 70:12
**accuracy** 210:9
**accurate** 5:6
14:5 26:14
81:25 164:24
192:1 209:14
**accuse** 206:7
**acknowledge...**
212:3
**acknowledging**
180:22
**acknowledg...**
210:12
**acquainted**
54:15
**act** 56:1 110:14
110:18 117:18
130:9,22
142:24 143:1
149:19
**acted** 22:18

**acting** 13:20
**action** 55:7
109:3 119:23
127:8 209:19
**actions** 12:21
143:12
**active** 61:10,11
**actively** 43:4
153:4
**activities** 12:22
17:6 22:24
23:17 24:14,17
25:9,9 33:23
161:20 200:2
204:22
**activity** 23:13
**actor** 154:9
**actors** 38:25
**actual** 119:14
122:12 184:22
**actually** 17:22
22:16 85:16
112:23 129:5
192:15 205:14
**added** 174:1
**additional**
88:21 110:21
**additions** 212:6
**address** 51:19
54:18 85:11
109:3 123:13
183:14
**addressed**
51:19 53:21,21
54:19

**addresses** 37:8
203:4
**adjustment**
78:15
**administer**
209:9
**administrate**
167:17
**administration**
44:3 65:22
66:13,14 132:5
151:23
**administrative**
41:24 43:2
55:1 109:9
112:14 123:24
124:14 125:2,6
131:10 132:4
141:17 143:12
152:24 165:18
166:13,20
167:19
**administrativ...**
66:12 123:21
123:22 140:20
166:4
**administrator**
123:8
**admission** 5:5
68:6 95:13
105:1,21
112:19 114:18
124:1 126:4
127:14 130:16
133:24 136:20

136:21 137:4
150:10 152:5
152:12 154:14
154:23 155:9
167:2 191:14
191:16,21
192:4 197:21
201:3,9 202:20
203:19,25
205:3
**admissions**
32:9 40:19
41:7,21,22,23
42:10 70:9
78:15 97:19
104:22 106:8
107:19 109:2,4
112:6,9 113:18
116:8,9 120:21
121:2,23,24
122:5 123:2
124:8 125:22
127:25 129:10
136:23 137:12
138:1 140:18
141:8 144:12
144:13 150:8
152:4,16,22
154:22 155:6
164:6,22
165:19 167:13
180:18 191:10
191:23,24
195:17,19
200:22 204:2

208:3
admit 203:7
admitted
  195:21 196:2
adoption 87:17
  87:17
adosh 1:10 3:3
  4:2,22 140:7
  148:2 210:5
  211:2,24 212:2
  212:4,12
adosh's 208:2
advertise 29:21
  29:22
advertises 30:8
advertising
  29:20 30:7
  203:13
advice 41:2,3
  44:25 45:1
  55:9 65:14
  67:4 107:9
  123:9,20
  135:12 162:12
  162:18 194:10
  194:15
advise 39:20
  194:7 202:12
advising 45:11
advisor 75:3
advocacy 70:13
affairs 174:5
affect 199:18
affected 108:9
  108:15 169:11

180:10
affiliated 109:2
  166:17 192:14
affiliates 28:17
affinity 204:3
affirm 4:11
  207:6,8
affirmation
  165:3
affirmed
  166:15,15
aforemention...
  209:17
ag 165:15
  166:9,24
  167:21 183:19
  184:3,5,9,13,17
  184:21 185:2
  207:21
ag's 184:11
ag.state.mn.us
  2:18 210:2
agencies
  128:12
agency 148:16
aggregate
  58:21 64:14
ago 109:15
  118:17
agree 79:25
  98:4 106:8
  165:10 188:19
  205:12
agreed 93:23

agreement 87:7
ahead 19:4
  36:20 75:4
  79:19 128:8
aid 30:3 127:12
  142:16
aided 209:16
al 1:4,7 210:4
  211:1 212:1
alignment
  203:19
alleged 192:8
alleging 130:20
allotted 210:19
allow 153:8
allowable 41:8
  41:23 131:12
  144:19
allowed 16:6
  109:11 129:21
  197:23
allowing 166:5
allows 81:7
alls 102:16
amend 11:16
amended 87:8
amendment 5:3
  8:16,17,21,23
  8:24 9:5,12,21
  11:20 12:1
  26:3 27:8
  33:13,22,23
  34:10,11,12,14
  34:15,16,24,25
  35:6,7,10,11,16

35:22,23 36:15
37:7,8,14,15
39:25 51:20
52:2,21 53:22
54:19 55:25
57:4 66:2
77:10 84:7
85:11 86:3,4
88:4 92:12
93:1 101:24
102:2,5,6,7,14
106:15 165:15
172:14,18
175:6 180:10
182:19 203:18
206:7
amendments
  102:14
ammunition
  148:3,6
amount 45:6
  51:15 71:18
  170:11
amounts 81:7
  81:14
analysis 65:23
  123:18 135:12
analyze 41:2
  126:16
andrea 2:4
angles 179:1
animosity
  154:11,15
annual 172:5

**anoka** 209:2,7
**answer** 4:23
  5:18 6:6,12
  15:23 16:14,16
  17:22 25:3
  55:13,15 71:12
  103:18 107:12
  107:14 111:2
  111:15 116:1
  116:17 131:6
  144:12 147:17
  162:9 167:5
  171:8 179:9
  185:17 192:6
  194:7,12
  199:23 207:23
**answered**
  97:12 117:14
  159:10
**answering** 5:25
  114:14,17
**answers** 6:9,19
**anti** 206:8
**anybody** 14:17
  32:12 72:1
  82:12 100:18
  125:11 181:19
  188:13 194:24
**apib** 200:15
**apologies**
  184:21
**apologize** 50:19
  86:10 94:9
**appear** 147:2

**appearances**
  2:1
**appears** 57:18
  119:18 123:22
  144:10,15
  145:7,25
  146:12 159:16
  182:6 195:25
  202:18 206:13
**appended**
  212:7
**applicable**
  210:8
**applicant**
  144:11
**applicants**
  106:23 107:1
**application**
  200:22 201:5
**applied** 28:2,3
  47:15 48:5
  196:7,16 198:3
**applies** 203:24
**apply** 194:20
**applying** 39:5
  207:9
**appreciate**
  172:8
**appreciation**
  92:7
**approach**
  99:17,25
  181:15,17
  200:20

**approached**
  149:23
**appropriate**
  6:12 44:19
  77:5 105:2
  171:15 190:21
**approve** 64:16
**april** 122:22
  182:25
**area** 108:19
  120:25 139:12
  148:21 149:7
  149:24 172:2
  172:25 173:3
  176:14
**areas** 58:16
  128:9,10 135:9
  152:11,13,18
  154:2 171:18
**argument**
  181:13,14
**ariola** 117:9
  173:25
**arisen** 151:14
**arm** 201:24
**arose** 40:4,22
  59:21 60:19
**article** 78:5
**ascertain** 41:21
**asked** 5:14,18
  8:4 10:4 40:12
  47:21 48:17
  78:21 106:23
  107:2 112:23
  112:24 126:2

  137:20,22
  151:16 175:14
  205:16
**asking** 57:1
  67:9 71:5,17
  93:24 106:19
  117:16 129:4
  144:11 165:23
  167:10 174:22
  175:9 184:14
  185:13
**aspiring** 155:22
**assert** 67:5
**asserting** 65:11
**assessment**
  74:11
**assign** 86:23
**assigned** 76:20
**assist** 29:10
**assistance** 45:9
  153:23
**assistant** 2:13
  2:14 21:3,5
  49:11 65:1
  74:14 135:8
  185:2,2
**assisted** 29:10
**assisting** 26:21
**associate** 185:2
**assume** 135:25
**assuming**
  184:23
**assumption**
  133:15 134:2
  136:8 172:15

174:2

**assurance**
139:10,11,13
156:1,21
157:15 158:2,4
159:17 171:9
172:21 204:16

**assurances**
155:24,25
157:6 172:6,12

**asylum** 22:11

**atmosphere**
202:7

**attached**
210:11

**attaching**
132:14

**attachment**
118:18

**attack** 185:22
185:23 186:6
186:11

**attend** 127:1
153:5,9 190:20
196:20

**attending**
40:17 127:3

**attention** 89:7
96:17 115:2
139:5 149:3
151:9 155:2
161:25 163:14
176:12

**attorney** 2:12
2:13,14 13:11

13:20,21,25
14:22 15:10
42:7 43:14
55:11,16 107:9
125:23,23
133:2 135:11
135:14 165:3,8
166:1,6 167:6
184:22,24,25
210:13

**attorneys** 13:18
13:22 103:20
124:20

**audit** 162:22,24

**audits** 171:14
171:19

**august** 42:20
44:9 194:25
195:20,22
196:7,16

**author** 79:25
94:11,17 95:12
95:14,17,21
97:1 102:1
172:7

**authority** 43:2
55:1,7 68:13
112:16 141:17
146:19 159:7
161:4 164:5,20
165:4,7,8,9,17
165:18,22
166:4,14,21,22
167:19

**authorized**
209:9

**authorizing**
162:24

**authors** 94:18
96:10 97:4

**authorship**
59:2,2 75:11

**automatically**
94:6

**avail** 18:2
67:19 190:21
197:1

**available** 210:6

**avenue** 2:7

**aware** 5:14,22
9:12 37:20,21
43:3 46:7,8,11
53:20 54:17
76:17 99:13
100:1,3 120:23
127:22 130:13
130:18 137:24
145:19,23
148:16,18
149:11,14,15
159:20,22
180:8,21
189:20,22,25
190:3,16,18,19
190:19,19
198:14 203:10
204:4,10,21

## b

**b** 3:5 131:4
205:1 210:5
211:2 212:2

**back** 12:18
25:2 34:18,20
36:4 37:5
44:20 47:14
48:1,4 49:9
51:25 52:3
53:17 54:5,10
55:4 58:7,24
60:24 61:9,25
66:12 71:5
72:18 75:8
76:13,17,23
77:8,15 78:6
78:18 80:15
85:20 86:6
87:7 88:13
90:9 94:5 96:1
100:15 109:15
115:12 117:25
118:17 119:2
150:14 204:13
205:14 207:18

**background**
15:12,17,19
21:22 29:8
66:17 71:9
77:13,21
139:24 168:12

**bakeberg** 101:2
101:3,4 182:9
182:19 183:18

185:21 188:7
**bakeberg's**
  189:5
**banks**   23:25
**bar**   201:8
  204:1
**barely**   20:24
**barrie**   135:3
  136:14,15,16
  148:2 153:1,15
  154:11
**barrie's**   135:1
**barrier**   127:20
  200:7
**barriers**   67:25
**barsness**   59:20
  105:9,10,19
  121:21 122:14
  135:17,18
  136:11 138:5
  146:13 155:18
  158:12 161:1
  161:10 178:4
**based**   5:5 27:22
  28:19 68:1,3,6
  95:5 108:13
  112:18,24
  113:8,9 114:3
  114:5,5,7,20
  115:8 125:16
  125:19 126:16
  126:19 127:3,9
  129:11,14
  132:3 133:12
  133:16 134:2

140:25 142:19
142:20 145:25
147:24 154:22
164:6 165:19
166:19 167:17
175:10 181:18
194:21 197:6
197:17 199:10
200:3,14,14
**basically**   28:16
  68:17 77:7
  81:12 87:4
  91:3 124:14
**basis**   47:22
  124:6 142:10
**basket**   80:4
**batch**   77:2 78:3
  78:9
**baxter**   2:3 4:18
  5:10 16:1,19
  19:7 51:7,10
  51:13 55:14
  65:10,15 67:8
  103:19 107:15
  109:13,22
  111:11,19
  116:21 118:5
  119:4,8,10,11
  121:8,12 129:3
  131:14,19
  142:14 143:21
  146:5 147:21
  149:4 150:12
  150:20 155:12
  159:12 160:9

163:6 164:12
167:9 168:2
174:13 179:14
181:24 185:10
185:12,18,20
192:24 194:14
198:25 200:5
201:22 207:12
207:18,25
208:7,12
**becket**   2:6
**becketlaw.org**
  2:10
**beginning**
  47:21 93:6
**behalf**   2:2,12
  5:15 7:21
  51:23 59:5
  76:21 123:5
  129:2 158:23
**belief**   140:23
  205:8
**beliefs**   202:6
  205:10,13,17
**believe**   10:19
  10:22 11:21
  12:13,17,20,23
  13:2,14,24
  14:3 40:7,23
  41:5 44:8
  48:20 49:14,14
  51:2 54:2
  56:12,16 59:19
  60:2,2 64:20
  65:4 70:6,12

72:6 77:5
81:21,21 85:20
97:13 98:3
100:5,9 102:4
102:11,12
104:7 108:16
108:24 109:6
114:22,24
118:25 119:2
122:12,16
124:7 125:22
132:23 133:1
133:14 135:3
135:15 136:3
138:22 139:7
140:20 141:14
142:4 144:4
149:25 150:2,6
151:23 155:3
156:17 157:13
157:24 158:2
159:18 160:19
162:22 164:3
164:10 170:1
175:9,21,24
178:1 183:21
183:23 184:7
189:1 192:15
192:15 193:22
195:18,25
196:2,4 203:23
204:9
**believed**   142:3
**ben**   2:5

**benefit** 71:11
**berger** 144:23
  144:25 145:3,4
**berger's** 145:20
**beth** 59:20
  105:9,10,19
  121:21 122:14
  122:22 135:17
  135:18 136:11
  138:4 139:7,9
  140:7 146:13
  153:23 155:18
  158:12 161:1
  161:10 172:5
  174:2 178:4
**bethany** 3:21
  201:11,12,13
  201:14,23
  202:15
**bethany's**
  201:15
**bethel** 146:25
  149:18,22,25
**better** 41:23
  53:2,4
**beyond** 109:4
  167:7
**bible** 201:25
**big** 77:8 99:3,3
**bigger** 31:7,10
**biggest** 30:1
  170:7
**bigots** 206:8,10
**bill** 8:24,25
  34:17 54:7,8,9

54:16,16 55:5
58:1 61:4 62:1
62:4,4 70:7
72:4 74:23
75:2 76:6,18
76:18 77:8
78:10 79:16,25
81:8,13,22
82:1,24,25
83:21,24 84:1
84:2,18,20,22
85:4,5 86:1,8
86:25 87:1,18
87:19 89:20
90:14 92:8
93:8,10 94:1,2
94:11,12,15
95:6,7,11,15,18
96:10,16,18,21
97:2,3,11,14
101:20,24
103:10,24
104:10,12,14
104:16,19
108:9 138:14
148:23 149:10
172:7,19
185:22 186:6
**billboards**
  29:23
**billiet** 138:9,20
**bills** 29:8 35:20
  58:25 59:6
  74:25 75:1,7
  82:3,21 84:3

86:21,23 87:5
92:9 96:2
**binds** 142:8
**bit** 9:8 163:25
  165:5,12 187:3
**blank** 87:4
**blurs** 80:20,21
**board** 22:10,12
**bodies** 86:23
  87:11 88:1
  179:17
**body** 28:16
  86:13
**bolts** 65:20
  110:15
**boni** 188:18,24
  188:25
**bonifacius**
  189:1
**born** 15:13
**bottom** 132:11
  169:19 172:4
**break** 6:13 51:8
  51:14 109:17
  150:13 207:13
**brenda** 38:13
  38:15
**briefing** 105:12
**briefly** 145:15
**briggs** 25:22
  26:7
**bring** 15:6
  58:22 59:4,6
  64:15 139:14

**bringing** 130:3
  130:7 134:17
  172:24
**broader** 122:20
  200:21 203:17
**broke** 109:23
**brought** 50:4
  65:9 70:14
  130:13,20
  147:7 149:25
  151:9 154:3
  194:20
**buckets** 82:15
**budget** 31:7
  94:15 97:24
**bullet** 78:13
  122:25 156:7,9
  156:21 159:9
  164:4 183:13
**bullets** 158:7
**burrage** 50:18
**bush** 26:11,11
  26:24 27:1,5
**butler** 2:4

**c**

**c** 38:17
**calendar** 9:16
  9:17 10:18,20
  11:4
**call** 8:20,22,23
  9:1 98:11
  122:16 142:2
  163:18,22,24
  164:19,25
  165:14,25

[call - charters]                                              Page 9

166:1,10,13
167:8,10,20
**called** 31:14
80:4 86:9,23
87:3,8 94:20
170:23 183:9
**calls** 19:1 55:11
103:16 110:25
115:24 128:24
142:12 147:15
148:7 162:7
179:7 185:8
198:20 199:21
**campus** 19:19
30:5 170:19
175:14,14,23
196:24
**candidates**
23:13
**capacity** 7:1
13:20 19:3
38:21 129:1
131:5 135:15
142:7 147:18
147:20 162:10
205:1
**capitol** 24:2
183:5 187:10
**capture** 6:10
**care** 197:12,14
**career** 59:12
134:16 135:10
135:19 144:20
146:13 151:21
193:25

**carleton** 19:13
**carlos** 33:4
34:1
**carried** 28:23
**carry** 125:11
175:21
**case** 1:6 7:17
8:4,18 15:2
77:11 128:5
130:23 147:3
148:2 160:1
180:15 197:25
204:24
**caselaw** 109:10
140:25 150:3
166:19
**cases** 8:8 18:5
26:20 129:13
202:4
**cassellius** 38:13
38:15,17
**cast** 148:20
**categories** 5:6
110:10,20
113:7
**category** 110:7
112:21
**catholics** 114:8
**cathryn** 49:17
**caucus** 27:24
27:25 28:11,15
28:16,23,24
29:13 30:20,21
31:12 32:5
37:6,10,16,25

38:2,23 98:19
**caucus's** 30:16
**caught** 174:8
**cause** 4:13
209:12
**caused** 178:3,4
**caveat** 107:11
**cc'ed** 193:23
**certain** 39:1
40:18 98:12
112:9 114:9,17
126:5,12
135:15 136:22
143:8 199:1,14
**certainly**
206:10
**certify** 209:6
**chain** 49:24
134:5 178:5
**chair** 35:18,19
80:18 83:15,15
83:16 84:10
92:22 95:15,16
95:24 97:24
98:16 117:3,3
117:4,4 169:15
206:18
**chairs** 29:10
32:20 33:1,2,3
59:3,4 75:10
79:24 80:2,9
81:9 82:22
83:7 89:2
90:22 91:13,19
92:5,23 94:3

98:1,16 100:24
100:25 117:3
176:25 205:24
206:17
**challenge** 5:2
192:12 208:4
**challenges**
202:5
**challenging**
202:10
**chamber** 81:6
**chambers** 80:6
87:2,7 96:3
**chance** 118:7
150:22 174:14
193:2
**change** 8:24 9:2
111:25 124:11
211:4,7,10,13
211:16,19
**changed** 49:25
50:1,2 91:8
**changes** 72:14
80:7 210:10
212:6
**changing** 70:23
**channels** 74:24
**charge** 76:15
**charter** 30:6
160:20 161:6
161:12 162:5
162:19
**charters** 169:4
200:17,24

**[chat - command]**                                                    Page 10

**chat**  104:6
  145:15
**check**  11:7
  35:12 99:16
**checked**  11:22
  150:10 178:13
**cheryl**  83:16
**chief**  50:19
**child**  7:21
**childhood**
  31:23
**children**  31:22
**chili**  20:22
**chimes**  136:11
**choice**  197:9,10
**choose**  195:8
**chose**  197:12
**christ**  107:23
**christian**
  146:23 147:13
  153:4
**christina**  1:25
  4:4 202:7
  209:3,23
**christmas**  17:1
**circumstance**
  112:10
**cite**  159:6
**citizenry**  18:21
**claiming**
  130:14 186:11
**clapping**  104:7
**clarified**  76:20
**clarify**  26:13
  52:3 70:21

104:13 157:3
**clarifying**  7:10
  24:18 194:19
**clarity**  31:13
  94:1
**class**  68:1,6
  127:6,6,10
  129:11 165:20
  181:18 197:6
  197:17
**classes**  111:8
  113:2 115:6,7
  146:15 154:25
  164:23 173:8
  197:7,18
**classic**  20:8
**clause**  17:10,13
  17:20 18:6,11
  18:17,23,24
  19:9,10
**clear**  19:2 67:9
  111:7 124:17
  129:20,24,24
  152:2,6,20,23
  164:5,20
  166:14,19,19
  166:22 195:14
  197:16 207:25
**clearly**  178:15
  183:1
**clerk**  7:2 25:19
  25:22
**clerkship**  25:22
  26:12

**client**  55:11
  167:6
**clients**  44:24
**clinton**  24:6,15
  24:16
**closely**  135:20
**cloud**  146:12
  146:24
**club**  19:24 22:9
  22:15
**code**  116:13,14
  159:20 203:4,8
  203:10 206:4
  206:13 207:4,7
**colleague**  97:11
**colleagues**
  97:14 99:17
  121:6 125:14
**collect**  175:10
  175:11,15,21
**collected**
  175:16
**collection**
  128:24
**college**  3:21
  12:17 13:15
  19:13 20:15,18
  23:21 42:5
  56:17,21 59:12
  93:21 99:23
  105:16,17
  108:11 134:16
  135:5,10,19
  137:16 143:16
  144:20 146:13

151:21 194:1
  201:11,13
  202:6,8,11
**colleges**  10:23
  13:5 70:5 98:7
  100:4 140:24
  166:18 171:6
  172:6 173:7
  188:4 203:19
**combined**  85:2
  86:6 128:14
**come**  29:23
  30:9 37:5 54:6
  58:17 60:25
  62:23 63:19,21
  63:22 68:19
  69:16 79:4,22
  96:17 112:1
  118:19 120:16
  120:18 122:9
  129:16 138:8
  149:9 150:14
  151:15 161:25
  176:23
**comes**  100:6
  103:2
**coming**  5:22
  12:16 47:14
  72:9 138:7
  140:1 163:10
  168:3 169:24
  174:16
**command**
  49:24

**comment**
138:19 172:5
186:2
**comments**
97:12,16
104:12 206:2,3
206:12
**commission**
209:25
**commissioner**
33:20 38:11,22
39:8 47:11
49:12,15,15,16
49:18,19,22,22
50:7,8,10,25
65:1 74:14
135:9 176:2
177:16,25
178:13,17
186:1,3,5,15,18
187:7
**commissioners**
65:2 67:11
176:24
**commit**   171:14
**committee**
29:10 30:23,24
31:13,15,20,21
31:23 32:4
33:5,7 35:2
45:7 59:3
64:16 65:17
66:1,10 70:18
70:19,22,22
80:24 82:20

84:21,24 85:2
85:6,7 86:24
87:3,9,14,18,20
87:24 89:24,24
91:13 92:25
93:13 94:2,4,6
94:7 95:2,3,11
102:22,23,25
103:3,4 110:3
110:4 182:16
183:4,4,7,22
187:14
**committees**
29:1,2,5,7,9
31:18,25 32:2
32:20,23 33:1
35:19 80:9
86:6 90:23
91:20,23 93:14
93:15 96:1
**common**
157:25,25
207:8
**communicate**
157:20
**communicated**
125:24 166:7
166:10,12
167:16,18
**communicating**
141:14 143:7
**communication**
71:20 77:23,25
78:12 79:11
88:22 90:22

101:1 132:1
153:16 154:6
159:25 160:3
174:4
**communicati...**
13:19 49:12
67:6,7 75:14
75:15,20 76:3
78:16,18,19,24
79:1 103:17
143:5,15
157:21
**communities**
16:11,21
200:13,19
**community**
206:15
**companion**
86:22
**comparatively**
82:14
**compared**   37:4
**competing**
170:15
**complained**
126:3
**complaint**
122:5,7,13,19
132:7,19,21
133:3 137:5,17
140:11 141:13
144:22 152:17
**complaints**
112:4,8 113:15
136:24 137:9

137:10 140:22
149:6 151:18
186:21,23
**complete**   6:19
212:8
**completed**
195:20 210:16
**completely**
26:13 121:1
154:10 159:10
**compliance**
194:21 204:19
**comply**   156:2
180:19 204:6
**component**
115:17 124:8
130:17 155:25
**computer**   10:2
209:16
**concern**   30:2
68:20 69:7
100:3 106:21
106:25 110:5
114:2,14,20
119:17,18,24
121:23 133:9
141:6 149:17
154:15,17,21
170:12 181:4,7
189:6 196:15
197:2,5
**concerned**
77:11 180:4
192:8

[concerning - conversation]                                    Page 12

concerning
  32:6 46:6
concerns  40:17
  66:2 68:3
  93:24 99:18,24
  111:13 112:18
  112:25 113:22
  181:11,19
  187:24 191:15
  191:20,22,23
conclude  55:6
concluded
  27:21 54:25
  208:13
conclusion  19:1
  41:9 42:1 43:1
  71:1 125:3,5
  142:13 147:16
  162:8
concrete
  204:15
concurrent
  170:23 200:15
condensed
  208:11
conduct  116:14
  116:15 206:5
  206:13 207:4,7
conducted
  171:23
conference
  86:24 87:3,9
  87:13,20,22,24
  89:24 103:4

confirm  60:16
conflicts
  165:13
confused  165:5
  165:12
confusing
  203:7
congressman
  101:2 182:8
conjecture
  43:17 189:3
connections
  46:12 47:11
consequence
  115:16
consider  108:8
  109:3 130:2,7
  203:17,18
consideration
  4:13 209:13
considerations
  115:13
consistent  75:9
constituent
  24:13 169:11
constituents
  89:10 169:15
constitutes
  28:16
constitution
  126:23,24
  128:20 129:22
  130:5,15
  141:23 142:6,8
  147:14 149:18

162:4
constitutional
  126:18 166:25
  167:21 192:8
constitutional...
  16:7 17:14,25
construction
  159:2
constructive
  75:25
consult  42:6
  124:19
consulted
  60:18,19
consumption
  84:2
contact  27:4
contaminate
  153:9,13
contemplate
  149:22 205:4
contemplated
  152:11,12,13
  172:21 202:23
contemplates
  205:2
contemplating
  152:17
contemplation
  122:10
contemporan...
  93:19 179:24
content  12:9
  152:16,17
  160:17

context  36:17
  36:20 40:8
  43:1 118:11
  151:15 153:18
  153:19 154:24
  186:12 189:4
  189:13
contiguous
  93:18
continuation
  208:9
continue  6:7
  170:20 195:17
  195:22 202:12
continued
  151:17,18
  196:3,6
contradicting
  196:1
contributions
  66:19
control  42:9
  162:15,25
controversial
  103:11 176:11
controversy
  82:18 83:1
  84:15 103:14
  103:22
conversation
  36:7,10,18,22
  43:10 58:2
  63:15 66:1
  67:3 79:16
  84:5,9 93:12

[conversation - course]                                                Page 13

93:22 98:22
100:21 101:15
103:8 107:8
108:13 114:10
114:11 115:20
116:5,23 117:5
117:12 125:21
126:1 132:23
132:25 134:18
134:24 139:16
140:17,18,19
141:1 143:2,9
143:10,10
147:7,10
151:12 153:12
158:3 170:6
177:23 178:7
182:7,7,10,13
183:18 184:9
184:10,12,15
186:5,15,17
187:6,10,15
206:22
**conversations**
12:14 35:5,21
36:12,25 37:13
39:8 42:3 47:2
55:16 56:5
62:16 64:18
66:23 72:7
76:5 79:9
83:10,13 96:14
97:21 98:9
101:6 102:1
111:17 112:13

113:8,9,10
114:23,25
115:1,4,14,17
117:10,11,20
117:24 124:25
125:15,17
137:2,18
140:12 157:24
176:13,23,24
178:1 182:17
182:18 183:3
187:25 194:12
203:21 206:23
**convey**  133:22
**conveyed**
188:20
**convince**  98:19
**copied**  164:10
**copies**  14:10
210:14
**copy**  209:15
**correct**  4:25
5:16,20 8:7,11
8:12,18 12:8
19:14,18 21:25
22:1 28:13
32:1,16,17
37:17 38:1
44:2 46:3
48:18 50:14
51:16,17,20,21
51:23,24 53:18
53:19 54:2
55:19 56:3,6,8
57:17 58:9

59:8,9 62:8
69:9 88:23,24
89:25 97:2
120:11,12
122:2,3 123:1
123:10,13,14
129:6 132:15
132:16 133:6,7
134:8,19
135:22,23
138:6,9 144:23
145:1,2 147:5
152:22 156:11
160:1,2,4,5
161:7,8 163:8
164:7,17 166:3
168:18 174:24
174:25 179:18
179:19 183:17
189:15 190:8
190:13 191:5,6
191:8,9,11
192:5 193:14
193:15 195:1
197:20 198:19
199:5,11,15,16
201:9 202:17
212:8
**corrections**
212:6
**correctly**
109:25 110:5
161:10 194:24
**cost**  71:16

**council**  22:7
**counsel**  12:7
13:23 14:11,15
14:17,18,18
15:1 41:16
52:8,10,22
53:1 55:9 56:5
64:7 65:3,5,9
65:10 66:7
103:20 104:11
104:24 106:20
108:3 117:16
117:23 131:9
133:20,22
135:16 140:3
140:23 193:22
194:2,9,13
210:14
**counselor**
160:19
**count**  161:12
161:14,22
**counter**  41:9
**counterclaim**
130:19,20
**county**  209:2,7
**couple**  12:5
20:16 93:17
94:16 183:2
185:21
**course**  8:20
46:24,25 64:1
64:2 65:5
66:22 68:8
69:13 70:4

71:19 76:2
78:23 88:2
108:24 119:15
119:15 124:3,8
152:13,16
156:7 158:3
159:3 161:2
172:20 180:13
192:13
**courses** 40:18
68:22,22 69:4
69:11,21
119:19,21
120:15 121:5
124:1 139:13
156:3,4 157:8
158:14 160:23
161:5,11,12,15
161:16,19
162:6 170:16
170:17 171:7
171:10,10,16
171:25 177:8
200:15,16
204:7,11,17
**coursework**
120:23 161:18
**court** 1:1,25
4:9 8:10 18:5
26:10,11,20,21
209:4,24
**covered** 54:2
155:1
**crafted** 54:8

**create** 10:16
83:1 159:4
201:1
**creating** 197:15
**creative** 201:1
**credit** 161:13
161:14,21
162:5 197:8
**credits** 30:12
146:17,21
147:4 152:21
160:21 161:22
170:19
**creed** 204:3
**criteria** 132:5
140:19 150:11
152:12 155:6,9
165:19 191:14
191:21,23,24
198:12 205:3
**critical** 205:18
206:2
**crown** 12:17
13:15 42:5
56:17,21 93:21
99:22 105:16
105:17 108:11
130:8,14
143:16 157:17
157:22,23
163:18 178:21
179:17,25
180:8 188:18
188:24 189:1,5
189:8 194:16

195:1 204:8,10
205:19 206:7
**crown's** 205:7
205:17,20
**cruz** 7:13
**cs** 210:15
**ct** 200:16
**cure** 149:24
**current** 7:23
33:13 50:21
58:20 149:12
184:24 195:17
**currently**
151:20 204:18
**curtail** 203:1
**curtailing**
152:25
**cutting** 197:3
**cv** 1:6 19:23
**cwodzinski**
92:23 95:24
117:4
**cycle** 80:7 89:8
89:18 90:2
110:2 112:1,1
114:25 205:6

| d |
|---|

**d** 3:1 26:24
27:1,1
**d.c.** 2:8 21:1
24:3
**daily** 107:24
108:1
**daley** 173:5

**daron** 135:7,8
**data** 168:15
173:17,22
174:18 175:15
175:16 176:16
176:20 177:4,5
177:6,7,10,21
177:24,25
178:13,18
187:11
**date** 96:22
149:12 180:11
182:12 194:4
194:21 211:24
212:12
**dated** 132:11
**dates** 93:17
**davnie** 34:4,5
35:13,14 83:18
**day** 20:6,9,10
20:11 94:24
209:20 212:15
**days** 95:8
210:16
**dayton** 66:13
**de** 209:3,23
**deal** 31:10
128:15,17
**dealt** 119:1
**dean** 125:22
**debush** 26:25
26:25
**december**
152:20

decide  81:9
decision  25:4
  42:8 89:3
  95:10 116:8
  124:13 196:9
decisions  41:24
  42:10 58:23,23
  196:12
declare  107:2
  212:4
decrease  30:18
deemed  212:6
defendant  7:18
  7:19 8:3
defendants  1:8
defer  121:6
  125:14 198:2
defines  158:17
defining  159:14
definition
  156:10 157:6,7
  158:8
degrande  1:25
  4:5
degree  19:17
  21:25 25:5
delete  102:16
delved  201:2
  207:5
demeules  2:14
demonstrate
  107:25,25
  138:3
denied  197:17

denise  144:25
  145:3,4,5,19
department
  5:15 11:18
  12:21,22,24
  13:9,21 14:19
  33:21 35:4
  38:3 39:15
  42:16 44:4,18
  44:23 46:18
  47:16 48:6,6,7
  48:10 54:22
  56:14 57:14,17
  61:10 70:7
  74:24 128:10
  128:10 132:2
  155:2 162:13
  180:1 183:14
  194:1
department's
  55:23 93:7
  95:18
departments
  134:14
depending
  94:15
depends  71:25
  81:6
deponent
  210:13 212:3
deposed  6:22
deposing
  210:13
deposition  1:10
  3:7 4:1 5:23

9:10 14:23
  52:5,7,12,25
  53:15 61:18
  64:4 72:17
  76:14 78:6
  118:13,23
  139:2 140:1
  143:14 144:3
  151:3 163:10
  168:4 174:17
  182:4 207:15
  208:8
depth  58:2 79:8
  115:17,20
deputy  49:15
  49:18,19,22
  50:7,8,10
derived  142:2
  159:21
describe  12:11
describing
  91:14
description  3:6
descriptions
  81:12
deserves  65:24
designated
  5:19 56:3
  159:24
desks  81:10
detail  36:22
  60:23 207:1
detailed  36:25
details  29:16
  94:19

determination
  95:4
determine
  68:14 69:12
  94:25 162:20
  163:2 164:6,22
  199:8
determined
  66:15 111:5
  125:6 165:21
determining
  69:11 112:15
develop  26:1
  37:6 39:16
  58:25 71:6
  163:1
developed
  32:24 33:3
  74:2 158:8
developing
  38:23
development
  31:23 64:17
  71:21 72:2
  78:20 90:10
device  21:18
devices  21:21
dfl  23:4,11,15
  23:20,25 27:24
  27:25 28:11,12
  29:3,8 31:12
  32:22 37:6,9
  37:16
die  43:16

**different**  27:18
28:10 38:24,25
58:16,16 70:3
81:7,14,15
88:17 89:17
90:6,16,19,22
91:16 106:7
134:14,21
152:11 156:22
156:22 169:25
179:1 194:3
**difficult**  6:10
**dig**  179:3
**digital**  9:17
**direct**  3:3 4:17
49:21 61:6
122:7 153:16
154:6
**direction**  98:21
125:24 129:24
132:4 141:15
**directly**  39:3
50:7 63:21
70:16 100:7
**director**  7:23
39:13 42:15
49:12 50:3,6
59:16,19 120:9
134:11,13,15
134:19,20
151:20 174:4
**discarded**  82:6
**disclose**  103:16
167:6

**disclosed**
204:11 207:21
**disclosing**
55:13,15
**disclosure**
110:25
**discomfort**
188:13
**discovery**  7:16
52:18,25
**discretion**
161:23
**discriminate**
142:10
**discriminatory**
113:24 123:3
142:3
**discuss**  144:21
205:1
**discussed**  55:8
108:18 112:12
133:14 136:3,8
136:25 139:21
145:17
**discussing**  46:9
102:5
**discussion**
12:13 43:15,17
63:8 65:16
66:5,7 69:3
80:13 84:6,23
86:13,16,19
88:3,17 89:4
91:10,17 96:10
102:3 108:21

117:23 122:20
125:4 140:11
140:22 151:13
177:1 180:25
189:11,13
**discussions**
32:12 41:17,20
42:2,23 43:14
52:6,8,11,19
53:2 55:23
62:13,20 66:24
69:23 70:1
83:3,6 90:17
90:19 92:15
103:13 109:24
111:5,12,20,21
111:25 113:19
141:25 145:12
189:10 193:18
193:21 208:3
**disparages**
202:5
**disparaging**
202:10
**disproportion...**
199:18
**disrupts**  202:6
**distance**  189:7
189:9,12,14
**distinguishing**
121:4
**district**  1:1,2
26:10,11 30:6
30:14 45:2
99:8 134:7

162:17,19
189:5
**districts**  31:5,9
162:13 163:1
168:16 169:4
200:17,23,24
**diverse**  31:12
**divided**  36:18
36:18,21,24
79:6
**division**  44:5
53:11,15 58:20
59:10,13,22,23
60:10,15,19,20
61:2,15 63:6
72:8,8 74:2,8
104:8,17
108:16 113:11
114:22 125:15
138:21 145:10
146:14 151:22
**divisions**  58:15
58:16,25 59:7
59:8 61:22
71:5,24
**diwali**  17:3,4
**dj**  20:2
**document**  5:11
5:12,20 27:11
55:18 56:11
61:14 73:23
77:13,18 78:4
78:7 88:14
118:2,9 121:13
121:15,18

[document - email]                                                Page 17

131:23 132:6
139:21 143:25
144:8 146:6,7
146:9 148:1
150:25 155:13
156:14,16
157:2,11
160:10,13
163:7,11
164:10 168:3
174:14 181:25
182:3 192:25
193:4
**documentation**
7:16 95:9
**documented**
73:4
**documents** 8:6
10:5 15:4,6
25:20 56:9
60:20 61:2,17
64:3,6 72:21
72:23 78:22
120:1,4 133:13
140:5 152:10
204:14 205:3
**doing** 24:12
26:19,20 28:22
139:22 141:7
141:22
**dollars** 105:3
153:2 169:21
189:22 192:16
194:25 195:6

**door** 23:2,8
**downtown**
25:17
**dozen** 12:5,5
**dozens** 12:4
**dr** 148:2
**draft** 24:13
25:20,24 26:19
75:7 173:24
**drafted** 59:1
173:25
**drafting** 24:12
26:19 75:5
**drama** 22:15
25:11
**dramas** 22:16
**drawing** 134:3
**drew** 44:16
**drop** 94:19
**dug** 179:4
188:17
**duly** 209:8,11

**e**

**e** 3:1,5 38:17
211:3,3,3
**earlier** 14:1,1
83:23 112:12
139:21 170:6
175:4
**early** 63:2
64:13 95:25
96:3,7 128:15
190:4
**easier** 79:21

**ebaxter** 2:10
**ed** 41:14 69:5
129:8
**education** 5:16
11:18 14:19
29:1,1 30:11
30:23 31:14,20
31:21 32:13
33:5,6 35:4,18
38:3,11,22
40:18 44:12,13
45:17 46:1,2,5
46:8,10,13
47:7,12 54:22
83:15 84:24
85:1,3,3,4 86:5
86:5,6,8,25
87:1 92:23
93:8 95:5,7,14
95:18 128:6,11
128:11,13,16
128:17 129:9
134:20,23
145:9 153:25
154:1,5 155:3
190:15,16,22
190:22,25
202:13
**educational**
46:6 199:19
**educators** 45:2
**effect** 56:25
**effective** 194:4
194:21

**efforts** 34:10,15
34:24 35:16,22
43:23 51:18
55:24 57:2,10
57:13 97:17
98:20
**either** 49:14
53:25 63:21
81:6 83:19
86:13 89:20
92:4 96:10
97:9 98:25
105:20 138:17
182:10
**election** 23:13
23:14 45:8
80:19
**elections** 45:7
**electronic**
208:11
**elementary**
191:7
**elevated** 178:16
**eligible** 155:20
155:21 156:13
**eliminated** 50:4
**ellison** 184:20
184:24
**email** 3:8,9,10
3:11,12,13,14
3:15,16,17,18
3:19,20 13:14
61:10 63:20
71:20 76:8,12
76:17 77:9

[email - exact]                                                    Page 18

79:13 118:20
118:23 119:13
121:21 122:15
122:15 123:14
124:12,19,23
124:24 132:10
134:5 137:9,14
137:15 138:4,7
138:11,23,24
138:25 139:4
143:8 145:7,12
145:15,16,25
146:2 147:1,8
151:7,8,10,14
155:20 158:11
164:13 173:25
178:2,5 194:19
**emailed**  76:4
122:22 193:13
193:13
**emails**  10:9,14
11:3 12:1,2,7,9
12:21 13:7,8
13:10,11,13,17
13:22,23,25
14:24,25 56:12
56:13,16,19
57:8 63:16,23
64:9 76:13,16
77:1 78:16
93:24 119:2
134:4
**emergency**
62:12

**employed**  22:3
**employee**
153:19
**employees**
108:3
**employment**
27:24 45:14
**encountered**
13:1
**encourage**
200:21
**ended**  137:1
141:14,18
**enforce**  108:22
**enforcement**
109:4
**engage**  25:6
98:10,19 112:8
203:21
**engaged**  116:22
171:18 173:3
178:1 179:21
179:25 194:12
196:11
**engaging**  88:16
**english**  20:20
**enrolled**  194:24
**enrollment**
56:1 122:24
123:13 170:23
200:15
**ensure**  154:25
**enter**  46:24
126:19

**entering**
129:11,14
198:13
**entire**  37:24
47:25 67:6
88:2 98:22
104:15 189:25
190:2
**entirely**  181:2
**entirety**  191:20
**entities**  128:15
180:3
**entitles**  142:10
**entity**  84:6
189:12 192:17
**entry**  127:21
**environment**
187:5
**environments**
196:24
**equally**  18:19
**equitable**  67:16
67:24 92:17
105:4,24 111:7
154:18,21
181:17 197:5
197:16
**eric**  2:3 138:9
138:20 139:7
**errata**  210:11
210:13,16
**especially**
97:24 148:14
170:9

**esq**  2:3,4,5,20
**esquire**  210:1
**essentially**
123:25 156:9
194:23
**establish**  112:2
112:3 197:23
198:13
**established**
111:23
**establishing**
129:9 197:15
**establishment**
18:11,17,24
19:10
**et**  1:4,7 210:4
211:1 212:1
**ethnicity**  68:2
110:11 174:22
175:17 177:8
178:21 179:17
**evaluate**  65:21
**evangelical**
201:24
**events**  134:3
136:24
**eventually**  97:1
**everybody**  16:3
54:14 62:11
**everybody's**
16:6
**evidence**  61:6
**exact**  49:20
73:8 96:22
107:18 141:25

151:7
exactly   105:10
152:8 173:21
185:6
examination
3:2 4:2,17
example   69:23
149:1 180:21
181:5 188:22
189:10 195:16
203:18
examples
193:12 194:20
exceeds   128:25
131:3
except   192:4
exchange
121:21 151:7
156:25 168:6,7
193:7
exchanges
13:14
exclude   199:10
excluding
199:14
exclusion   200:3
executive   64:15
70:22 74:3
90:16 110:2
exercise   17:10
17:12,20 18:6
18:23 19:9
exhibit   3:7,8,9
3:10,11,12,13
3:14,15,16,17

3:18,19,20,21
5:8,12 55:19
118:2,3 121:9
121:10 131:16
131:17 132:22
134:5 137:1
140:12 143:19
143:22,22
146:3,6 150:1
150:18,21
155:10,14
160:7,11 163:4
163:8 167:25
174:11 181:22
182:1 192:22
193:1 201:20
exhibits   133:13
172:22 173:1
exist   123:19
126:13
existing   159:22
exists   30:11
expectations
202:17
expected   78:23
expel 202:15,21
experience
153:20,22
159:4
expert   154:2
expires   209:25
explain   17:4
83:22 139:20
explained
83:14,23 92:17

105:11,12
explaining
83:14 97:21,22
97:22 186:12
explains   139:22
explanatory
93:11
explicit   125:18
147:10
explicitly
129:20 143:1
157:10 177:5
express   83:19
89:13 98:16
104:4,24
105:19 117:17
133:9 149:5
154:11 181:19
187:23 188:13
expressed
154:21
expressing
106:25 189:6
expression   92:7
105:17 106:21
extended   26:15
extensive   43:15
extent   18:25
32:22 35:20
43:21 55:11
65:13 98:4
103:16,18
107:7 108:2
110:25 111:3
115:24 119:25

120:2 128:24
135:16 142:15
142:16 158:21
158:22 162:10
164:9 167:5
187:25 194:7
external   49:12
50:3
extracurricular
200:2
eyebrow   187:3

f

f  50:24,24
face   129:15
202:14
facet   53:7,9
fact   52:6 89:5
106:25 115:8
factor   69:6
165:19 199:8
199:10
factors   70:10
faculty   26:2
failed   34:3
fails   210:18
fair   28:8
103:11 128:19
146:25 168:7
182:6 186:14
199:20
faith   108:22
113:24 114:5,6
114:12,12,15
123:3 136:12
136:16 137:3

153:5 173:8
183:16 185:23
186:7,12
188:19 204:12
**fall**  63:2 64:13
64:25 88:11
190:23
**familiar**  5:12
5:13 18:5,7
45:15 77:21
91:21 110:13
112:20 118:18
121:15,18
130:23 143:25
144:5 146:1,9
150:24 151:5
156:14,19,20
157:1 160:13
163:11 168:3
173:2 193:4
201:11,15
203:3
**familiarity**
45:15 57:10
76:25 105:13
120:8 128:5
203:14 204:15
**familiarize**
126:7 163:13
**familiarized**
120:22 130:24
160:16
**family**  31:22
**fape**  190:21

**far**  14:25 27:7
27:9 43:3 46:4
88:6 96:17
137:5 171:23
**fast**  187:5
**favor**  18:14
66:2
**february**  48:20
48:21 53:17
93:6,7,9 95:25
96:4,6 138:14
138:23 182:25
209:21
**federal**  39:17
190:24
**feel**  13:9,10
18:3 36:17,23
43:15 58:17
98:10 171:17
188:10,18
**feeling**  113:16
113:17 159:3
**fellowship**
26:15
**felt**  44:18 105:1
172:20 180:19
**festival**  17:5
**fewer**  31:6
**field**  23:20
154:9
**fielded**  97:12
97:15
**file**  1:17
**files**  61:11

**fill**  47:25 48:17
94:19 156:23
**final**  75:1 87:6
87:23 88:1
103:2
**finally**  171:6
**finance**  31:20
33:7 35:18
84:24 85:1,3,5
86:9,16 92:24
122:9 144:18
145:9 173:13
**financing**  86:8
**find**  11:3,5,25
12:2 200:25
**fine**  94:10
**finish**  6:15
61:20
**finished**  131:21
**firm**  21:5,7,9
25:17 27:18
**firmness**  164:1
**firms**  27:19,20
**first**  9:12 25:16
25:19 33:25
39:13 40:3,4
40:13 42:14
43:19,24 53:20
54:6,15 60:4
63:5 64:10
78:17 86:11
93:20 96:23
114:19 118:15
120:10 122:2,4
122:6,6,12

152:1 176:3
183:1 187:17
187:17 202:3
205:14 206:11
209:11
**fiscal**  85:10
86:9
**five**  20:4,4
86:25,25 87:1
109:16 138:5
183:14 207:13
**fix**  58:18,18
112:3,17
**flags**  178:19,23
178:24 179:20
**flaws**  18:23
19:9,12
**fleshman**  2:5
**flip**  55:21
**floor**  35:1 85:8
85:14,15 86:19
87:8,25,25
94:23 95:1
101:18,22,23
102:1,18
180:22,25
187:14
**flow**  195:12
**fluid**  206:23
**flyers**  29:23
**focus**  29:19
62:12 84:4
197:19
**focused**  29:1
121:1,1 196:14

**[follow - gentleman]** Page 21

**follow** 114:16 132:25 140:14 144:20 174:19 175:4 207:15
**followed** 43:16 130:3
**following** 4:7 65:23 116:18 165:13
**foregoing** 208:13 209:14 212:5
**forgot** 23:14
**form** 139:10,11 139:17,17,25 157:9,16 158:6 159:17 167:3
**formal** 39:11 45:22 46:7 110:4
**formally** 50:6 51:2 60:7
**former** 33:4,8 47:18 83:17
**forms** 157:20
**forward** 43:25 58:24 70:14,20 70:25 71:3 104:4 136:9 148:13,19,22 180:20 188:14
**forwarded** 118:17,24,25 144:15,25

**forwarding** 144:18
**found** 10:13,14 14:3 66:14 159:14 178:12
**four** 20:2 48:22 83:11
**frame** 184:25 186:9
**framed** 67:16 160:22 165:16 186:8,10
**framework** 159:8
**framing** 40:20 41:7 164:24,24 165:6,10 172:16 183:21
**frank** 165:5
**free** 17:10,12 17:20 18:6,23 19:9 190:21
**friday** 132:11
**front** 40:24 55:18 94:20 120:17,18,20 149:24
**fulfill** 28:20 47:21 144:12
**fulfilled** 44:23
**full** 4:21 6:19 30:21,21 88:1 119:25
**fully** 174:24

**fundamental** 18:20
**funded** 108:7 142:17 154:20
**funding** 127:1 127:7,15,17,22 128:21 129:12 169:12 170:11 170:20 190:10 190:11,17 191:2,17 192:3 194:5 196:16 200:23
**funds** 5:4 167:1 167:22 170:2 190:6 199:5 201:8,8
**further** 7:10 64:17 71:6 159:9 179:3
**future** 141:19

**g**

**g** 50:24
**gain** 199:9
**gape** 190:23
**gatekeeper** 85:10 86:10
**gather** 64:6
**gathered** 8:6
**gathering** 7:16
**gender** 110:12 113:25 206:4
**general** 2:13,14 10:12 12:9 13:23 14:18

24:20 25:2 36:16 37:2 43:14 53:23 58:13,15 65:16 66:18,21 72:15 82:8 91:22 97:21 103:24 108:17 149:8 151:10 155:20 164:24,24 165:8 166:1,7 169:9,14,25 173:1 174:18 176:9,24 178:7 178:18 184:24
**general's** 2:12 13:25 42:7 165:3 184:25
**generally** 66:1 66:18,20,22 72:7,14 74:15 79:5,6,8,21,25 81:10 98:4,15 98:20 99:2 104:3 110:9,15 113:16 148:11 151:9 152:9 168:22 177:9 203:5
**generate** 82:18 84:14 161:21 170:20
**gentleman** 33:25

**geographic**
  31:2
**geographically**
  31:11 200:13
**geography** 31:3
**getting** 28:4
  135:21 169:7
  176:8,11,14
**give** 6:8,19
  10:12 25:2
  60:23 64:6
  72:23 75:3
  81:11 99:11
  109:16 186:13
  186:18 200:21
**given** 69:5
  70:14 81:13,14
  103:21,21
  175:8,10
  176:12 212:9
**gives** 162:13
**gmp** 2:20
**go** 19:4 20:19
  25:2 26:9
  27:10,21 30:11
  34:18,19 35:12
  36:20 38:2
  42:13 51:25
  52:3 56:24
  61:21 70:20,25
  72:18 75:3
  76:13,23 77:15
  78:6,18 79:19
  81:24 82:17
  85:20 88:13

90:9 100:15
  102:1 117:25
  125:7,25 128:8
  132:4 141:15
  146:23 188:18
  188:24 189:7
  189:12,22
  190:6,9,17
  191:25 193:11
  205:14
**god** 107:23
**goes** 157:11
  190:11
**going** 12:15
  15:12 56:24
  71:5 82:10
  83:21 98:18
  109:13 115:23
  115:25 117:25
  119:5 125:25
  127:12,16,17
  127:23 128:21
  131:15 137:15
  150:12 163:14
  165:5 169:2,3
  169:4 178:8
  180:1 185:7,16
  187:10,12,19
  187:20 189:3
  190:18 191:25
  192:3 199:4
  201:8 202:9
  206:23 207:22
**good** 4:19
  24:25 79:19

94:8 104:9
  170:18 181:10
**gosh** 23:7 39:15
  200:11
**gotten** 151:11
**governing**
  22:10
**government**
  7:24 17:18
  18:12 22:8
  28:5 36:18,19
  36:21,24 39:14
  42:15 58:19,20
  65:2 71:22
  74:8 78:1 79:6
  97:15 113:13
  120:9 148:16
  148:24 163:19
  174:5 193:23
**government's**
  18:20
**governments**
  18:18
**governor** 75:16
  87:11 90:20
**governor's**
  39:16 74:25
  76:7 77:23
  79:18 80:8
  173:6
**gpa** 70:8 126:3
  126:5,19
  197:24 198:5
**gpas** 69:6

**grade** 128:16
**grader** 68:22
  68:23 69:22
**graders** 68:12
  69:12
**grades** 68:13
**graff** 50:9,22
  50:23
**grande** 209:3
  209:23
**grant** 162:5
  201:5
**grants** 200:17
**gratitude** 104:4
**graven** 25:16
  26:5
**gray** 13:12
  21:14,16
  132:14 133:2
  133:11
**great** 134:5
  208:11
**greater** 31:8,9
  170:9
**green** 94:12
**greg** 163:22
  193:7,8,13,13
**grew** 15:15
**ground** 45:13
**grounds** 67:2
  131:3
**group** 28:11
  70:13 99:9
  158:18

[groups - hold]                                              Page 23

| | | | |
|---|---|---|---|
| **groups**  19:20 | **hamline**  145:23 | **harry**  100:6 | 112:2 |
| 22:6,13 75:23 | **hand**  4:10 | **head**  6:9 | **helping**  24:13 |
| 100:23 | 126:8 209:20 | **heading**  44:6 | **hereto**  209:18 |
| **guardrails** | **handed**  143:22 | **health**  22:8 | 212:7 |
| 146:20 173:12 | 146:6 163:7 | **hear**  89:10 | **hesitate**  37:19 |
| **guess**  40:14 | **handle**  92:25 | 181:8,11 | **hicks**  97:1 |
| 54:24 55:1 | 160:20 | 187:13,13 | **high**  25:7,10 |
| 125:13,16 | **hands**  104:7 | 205:5,7,12,18 | 29:22 68:16 |
| 137:14 149:1,2 | **happen**  76:3 | 205:21 206:6 | 69:4,25 107:1 |
| 165:10 166:14 | 111:21 148:18 | **heard**  62:3 63:5 | 127:1 135:6 |
| 173:12 199:12 | 183:3 | 104:17,19,20 | 151:24 161:4 |
| **guessing**  58:1 | **happened** | 112:10,18,22 | 168:17 170:15 |
| 182:22 | 48:15 57:16 | 122:11 150:6,6 | 191:7 |
| **guidance** | 60:17 61:7 | 154:11 201:12 | **higher**  30:11 |
| 156:12 159:4 | 64:12 79:17 | 201:14 205:16 | 40:18 41:14 |
| 159:13 162:18 | 80:17 82:20,23 | **hearing**  75:12 | 69:5 128:6,11 |
| **guide**  107:24 | 83:25 84:17,25 | 81:1 82:7 84:2 | 128:13,17 |
| **guidelines** | 85:25 87:13 | 84:6 93:3,3 | 129:8,9 176:10 |
| 120:13 121:3 | 89:18 91:3 | 95:11 138:16 | **hill**  24:2 |
| 123:19 124:18 | 93:15,17,18 | 180:24 | **hindu**  17:5 |
| 149:21 156:20 | 101:18,22 | **hearings**  80:25 | **hired**  28:8 |
| 201:2 | 102:18 129:12 | 81:2,23 82:3,9 | **historically** |
| **guides**  108:1 | 136:2 140:15 | 82:20 84:13 | 200:18 |
| **guiding**  159:8 | 144:17 145:19 | 93:5 96:6 97:5 | **history**  13:1 |
| **gutknecht**  24:7 | 180:2 183:1 | 97:9 | 87:1 138:18 |
| 24:12 | 184:6 | **heather**  50:18 | 171:22 200:3 |
| **guzman**  7:13 | **happening** | 51:6 | **hit**  62:11 |
| 7:20 | 43:23 52:1,7 | **heavier**  186:19 | **hmm**  22:22 |
| | 52:20 53:3 | **heidi**  193:7 | 132:13 134:19 |
| **h** | 140:18 141:18 | **held**  86:7 | 158:15 172:10 |
| **h**  3:5 211:3 | 149:12 162:1 | 173:13 | 176:4 |
| **habit**  119:9 | 179:23 | **help**  4:14 25:19 | **hoefs**  157:1 |
| **half**  64:20 | **happens**  72:13 | 197:7 | 193:8 |
| 109:14 | 86:21 94:11 | **helped**  29:9 | **hold**  185:18 |
| **hallway**  183:8 | 99:2 115:8 | 39:16 45:9 | |

holiday  17:5
holidays  16:23
home  169:6
honestly  25:1
hopefully  9:9
  75:11
hopper  94:20
hoppers  80:3
hour  51:7
  64:20 109:14
  109:15 150:13
hours  48:11
house  27:24,25
  28:12 29:2
  32:16,18 33:5
  34:18 35:18
  62:4 80:25
  81:1,8,14,18
  82:10,24 83:15
  83:15 84:7,18
  84:21,24 85:1
  85:2,10,23
  86:12,22 87:17
  87:25 89:20,22
  89:23 91:19
  94:3,5,5,12,23
  97:13 101:19
  102:20 103:5
  205:24 206:18
  206:20
houses  62:7
  87:23
huh  6:11,11
human  47:16
  48:6,7,10

110:13,17
117:18 130:9
130:21 142:23
143:1 149:19
hundreds  12:4

**i**

idea  139:18
  172:11 173:22
  177:20
identification
  5:9 118:4
  121:11 131:18
  143:20 146:4
  150:19 155:11
  160:8 163:5
  168:1 174:12
  181:23 192:23
  201:21
identity  201:15
  206:4
illegal  141:7
imagine  34:19
  54:9 61:16
  145:13 153:23
immediately
  39:4,6 49:6
impact  31:3,7
  113:1,19
  114:18,20,23
  169:1,2,3
  175:5 180:4,6
  180:23 188:12
  194:4
impacted
  169:15

impacts  113:21
impetus  138:11
implement
  39:18
implementati...
  56:24 108:20
  172:2
implemented
  115:9
implementer
  162:12
implementing
  127:20
implicate  149:9
  165:20
implicated
  115:9,10 150:9
implication
  112:25 113:1
implications
  115:4 116:7
  164:2 168:25
  193:10
importance
  17:20 18:17
important  6:4
  6:8 36:17
improve
  200:12
include  87:21
  191:25
included  9:20
  56:16 82:24,25
  83:24 102:17
  102:24,25

103:25 151:25
152:10 177:7
177:10 193:24
includes  169:5
  169:6 173:6
including
  110:20,20,21
  122:16 124:25
income  200:14
incorrect
  129:17
increase  30:17
  89:7 200:17
increasing
  67:22
indian  17:5
indicated  133:4
  173:2
indication
  79:21 96:23
  178:15
individual
  33:16 59:19
  74:20,22 125:1
  161:1 185:3
individuals
  11:11 46:20
  47:3 106:11
  114:20 116:22
  116:25 117:17
  124:25
inequitable
  196:8 203:2
influence  42:9

**[info - internal]**                                                    Page 25

| | | | |
|---|---|---|---|
| **info** 174:22 | **inquiry** 120:7 | 105:14,20,22 | 164:1 179:11 |
| **information** | 121:22 138:17 | 106:5,10,17 | 196:10,18,18 |
| 15:12 55:12 | 146:12 160:19 | 108:8,15,25 | 196:19 |
| 111:1 115:25 | 176:14 | 109:12 120:14 | **interacted** 39:1 |
| 147:24 160:25 | **insofar** 92:13 | 127:13,16,19 | **interaction** |
| 167:7 168:12 | 105:21 | 127:20,23,24 | 18:21 |
| 168:21 175:2,7 | **insomuch** | 127:25 128:6 | **interactions** |
| 175:17,22 | 83:21 | 129:9 130:4,8 | 49:21 |
| 176:3 178:18 | **inspired** 38:8 | 146:21 150:2 | **interacts** |
| 178:20 179:5 | **instance** 60:17 | 152:21 154:12 | 128:11 |
| 179:22 185:9 | 97:10 104:7 | 155:23 156:23 | **interest** 24:24 |
| 194:8 | 147:11 155:7,8 | 157:14 159:18 | 25:6 30:16 |
| **informed** 137:7 | **instances** | 167:1 168:17 | 38:8 75:23 |
| 142:25 183:25 | 107:25 114:4 | 168:24 169:20 | 83:19 84:15 |
| 184:3 186:20 | **institution** 7:5 | 170:2,7 171:11 | 89:13 96:24 |
| **infringed** 18:4 | 30:5,8,9,13 | 171:20 179:13 | 99:3,12 169:18 |
| 18:4 | 41:13 42:4 | 181:3,13 | 170:4 172:13 |
| **infringement** | 68:14,25 69:14 | 187:24 191:13 | 178:7 187:23 |
| 17:18 | 70:11 105:22 | 192:14 199:25 | **interested** 28:4 |
| **initial** 27:1 | 106:4 114:13 | 200:25 203:24 | 148:25 169:14 |
| 48:3 93:10 | 122:23 128:21 | 207:10 | 176:19 178:17 |
| 137:15 184:12 | 142:9,25 | **instruct** 103:17 | 178:25 179:15 |
| **initially** 94:3,4 | 146:16 167:12 | 111:2 116:1 | 209:19 |
| 183:20 184:1 | 169:3 180:14 | 167:4 185:16 | **interesting** |
| 184:14 | 180:17,18 | 207:22 | 177:3,21 178:5 |
| **initiated** 59:11 | 181:17 195:4 | **instruction** | **interests** 20:12 |
| **initiatives** | 195:11,12,16 | 125:12 149:8 | **interim** 47:22 |
| 151:25 | 197:11,22 | **instructions** | 48:17,19,23 |
| **innate** 199:20 | 198:12 204:5 | 103:21 | 50:5,5 |
| **inquire** 57:12 | **institutions** | **insurance** 21:9 | **intermural** |
| **inquiries** 52:17 | 29:21 31:10 | **intelligence** | 20:16,17 |
| 117:15 151:11 | 32:7,10,13 | 197:19 | **intern** 23:20 |
| 169:9 176:8 | 40:18 41:12,14 | **intend** 208:4 | 24:2,11 |
| **inquiring** | 46:6,10 69:5 | **intent** 75:9 | **internal** 13:9 |
| 160:20 | 69:10 70:5 | 83:5 156:6 | 13:17 14:18 |

41:17 71:20,21
78:17,19 88:22
90:15 103:13
145:11
**internally**
13:24 42:18
75:14 103:21
151:13 193:18
**international**
19:17 25:4
**internship**
26:14
**internships**
25:12
**interpretation**
123:11 158:19
161:17
**interrupting**
94:8
**intersect**  116:9
**interview**  39:10
39:11
**introduce**  94:4
**introduced**
58:12 59:5
73:15 84:17
94:3 95:25
96:2,19
**introducing**
75:11
**introduction**
62:6 80:6
93:10,11 94:23
95:1

**introductory**
97:9
**investigate**
117:21 126:16
**investigating**
204:18
**investigations**
108:14,19
**invited**  48:25
**involve**  23:24
**involved**  6:24
7:9,14,25
13:18 22:23
23:16 34:21,22
45:23 49:6
70:3 72:2,19
76:1 90:9
134:23 178:8
206:7
**involvement**
7:15 8:2 24:1
33:22 34:9
35:15 55:23
97:5,8 131:8
**involving**  107:8
**iq**  198:22
**iqs**  198:18
**irritated**
100:14
**issue**  8:17 26:3
29:20,24,25
30:1,22,25
31:4 34:21
37:7,20,21
40:4,9,10,15,16

40:21,23 41:2
41:6,18 42:16
43:13,16 51:22
53:3,7,21,23
54:5,18 57:6
60:15,19 65:24
76:21 88:6
89:11 101:10
109:9 112:6
114:1 117:7
118:19 119:14
120:16,18,20
122:5,8,20
123:16 135:9
136:12,17
139:12 145:21
148:21 149:7
149:14 154:2
158:24 169:24
170:7 172:7,20
172:25 178:8
178:15 179:5
182:23 183:15
183:22 189:14
204:24 205:4
**issues**  29:12,17
32:6,9 35:6,10
37:14 39:20,22
39:23 40:1,4,8
44:24 45:11,12
45:21,23 46:5
46:9,20,21,23
47:4 49:7
51:19 52:2,21
101:8 120:24

139:14 149:9
149:10 170:1
176:10,11,11
179:3 183:11
**item**  99:4
**items**  9:20 11:4
140:5

## j

**jacket**  94:14
**jackets**  94:13
94:13
**january**  1:11
4:2 49:3,5 51:2
51:3 96:3
148:14 209:5
209:25
**jeanne**  145:8,9
172:4,11,17
**jeez**  12:5
**jeff**  2:13 119:4
210:1
**jeff.timmerm...**
2:18 210:2
**jen**  163:18,22
193:8,9,13
**jesus**  107:23
**jett**  1:7 4:24
47:11 50:25
186:1,3,6,16
187:7 210:4
211:1 212:1
**jfd**  1:6
**jim**  34:4
**job**  20:15 28:1
38:8 39:2

**jobs** 25:13
**johnson** 193:7
**joining** 14:6
**journal** 8:13
  9:11
**judge** 26:11,19
  26:23,25 27:5
  27:10
**judgment**
  107:22
**jump** 115:23
  194:6
**june** 48:21
  132:12
**jurisdiction**
  86:15,18 95:5

**k**

**k** 191:14
**kamela** 132:7
  132:19,21
  133:3 137:6
**kate** 47:24
**kathryn** 184:18
**kathy** 185:3,4,6
**kay** 134:17,18
  134:21,22,25
  136:14
**keep** 8:13 9:10
**keith** 184:24
**kennedy** 25:16
  25:18 26:5
**keyed** 117:7
**kid** 188:18
**kids** 107:1,13
  108:6

**kim** 97:1
**kind** 20:7 26:13
  26:18 39:6
  45:12 57:9
  58:4 65:19
  66:16 68:19
  70:24 85:9
  93:2,18 99:6,9
  99:10 101:25
  102:2,3 104:20
  106:25 110:3
  113:14 114:2,2
  120:24,25
  124:9 133:13
  133:17 139:22
  154:17,17
  159:7 163:1
  168:22 169:7
  176:7,14 177:1
  187:8,17,18,21
  198:23 200:20
  207:5
**knew** 166:16,24
  172:17 198:4
**knocked** 23:2
**knocking** 23:8
**know** 4:23 6:3
  6:13,18 8:16
  9:14 14:25
  16:5 19:11
  22:10 24:25
  25:1 27:7,9
  30:20 31:11
  36:3 43:18,21
  45:20 46:4

47:13 51:22
55:12 57:25
59:10,13,15,16
59:21 61:1,8
69:20 73:23
74:13 78:8
80:15 85:16
88:7 95:8 98:2
98:3 99:8,10
99:10,11,12,16
100:22 102:12
104:5,5,6,8,9
105:3,13,16
106:18 107:20
108:9 109:8,10
110:6,9 111:21
113:12 114:16
114:24 115:14
116:13 117:13
117:25 119:4
119:23,25
120:1 123:4
128:14 130:12
131:20 132:22
133:9 136:17
138:8,11
140:23 141:24
142:15,16
145:3,5,11,13
149:11 150:22
151:7 155:4,14
157:2,4,7,8,24
158:2,7 160:16
166:11 168:15
169:10 170:4

171:6,17,23
172:1,23 173:9
173:20 176:6
176:15,19,21
177:7 179:2,5
180:6,11,15
187:2,11 188:3
188:8 190:14
191:12 192:6
193:1 198:3,7
198:22 199:12
201:2,6 202:23
205:3,20
206:21
**knowing** 172:8
**knowledge**
  35:15 53:2,4
  58:11 60:11
  158:25 175:1
  186:22 189:21
**known** 209:3
**korte** 135:7,8
**krill** 145:8
  172:4
**kunesh** 92:24
  117:4 168:8,9
  168:10 173:17
  174:1,19
  176:17

**l**

**l** 38:17,17
**label** 118:2
**labeled** 163:15
**labor** 45:14

**lack**  41:22
  197:19
**laid**  41:6 111:9
  115:5
**land**  169:8
  186:14
**landon**  2:20
**language**  34:17
  73:4,8 74:5,15
  75:9,15 77:5
  79:19,23 80:1
  87:19,20 90:15
  101:19 105:25
  106:2 115:5
  158:19
**large**  78:10
**largely**  73:10
  73:19
**largest**  197:3,3
**lasted**  83:10
**late**  63:2 64:12
  96:3,6
**lathrop**  2:20
  13:12
**laurie**  95:15
**law**  2:6 7:1
  18:20 21:5,7,9
  21:25 22:7,8
  22:11,24 24:21
  24:22 25:12,13
  25:16,19,22
  26:1,9 28:7
  47:8 126:22
  129:5,8 150:9
  162:23 163:2

  190:24 193:11
  198:8 204:6
  205:2
**lawmakers**
  28:17
**laws**  18:13,14
**lawsuit**  4:24
  5:2 6:24 7:3,6
  7:15,25 9:21
  10:4,6,21 11:5
  11:10,20 12:1
  26:3 33:14
  52:18 77:16
  130:4,7,13
  143:17 156:15
**lawsuits**  7:9,12
**lawyer**  44:20
  65:17 67:3,9
  107:8
**lay**  169:8
  186:14
**laying**  115:5
  123:18
**lays**  156:6
**leader**  92:22
**leaders**  91:10
  91:12
**leadership**
  52:15 58:22
  70:23 80:5,23
  91:8,24 94:22
  94:25 103:23
**leadership's**
  94:20

**leading**  33:23
  34:10,14 60:9
  61:19 62:25
  72:5 75:21
  90:24 93:2
  140:13
**leads**  102:3
  117:10
**learn**  76:23
**learned**  60:12
  109:1 180:12
  180:16
**learning**  202:7
**leave**  33:11
  47:7 207:14
  208:7
**led**  27:8 102:7
  102:13
**left**  42:19,19,20
  42:24 43:4
  44:9 46:19
  47:4,18,25
  60:7 122:2
**legal**  18:2 19:1
  21:12 25:25
  44:17,22,24
  45:9,11 46:18
  60:18 65:14
  128:24 131:9
  132:2,14
  133:10,20
  135:16 140:16
  141:1 142:13
  147:16 150:1
  162:8 183:15

  194:10 210:23
**legislation**
  12:20 33:15
  35:17 38:24
  39:17 42:12,16
  42:18 43:5,5
  54:11 55:24
  57:2,7,9 58:8
  58:12 59:11
  62:14,18,21
  67:12 69:15,20
  69:20 106:12
  152:11 180:23
  192:2,19 200:6
  201:7
**legislations**
  99:6
**legislative**  8:23
  8:25 9:1 34:13
  39:16,24 42:24
  43:18 47:20
  49:1,4,6 54:18
  55:2 56:22,23
  58:18 59:3
  61:3,4 63:4
  66:15,23 67:4
  68:19 75:1,10
  75:25 77:19
  79:24 88:8
  90:4 94:24
  98:23 105:6
  109:24 111:6
  111:10,24
  112:17 116:24
  117:8 124:17

124:17 131:13
136:5 139:19
141:19 148:12
148:17 149:10
149:21 150:7
154:24 157:25
165:22 176:22
200:10 205:6
**legislatively**
183:24
**legislator**  70:13
**legislators**
97:18 100:5,13
102:8,10 103:9
116:6 168:22
169:14 180:2,6
181:14 205:5
205:16,22,23
206:6
**legislature**
12:15 39:15
52:17 59:1,5
62:2 75:7,12
83:4 89:1,4,16
99:7 138:15
176:9 180:24
**lehmann**  173:4
173:5
**lens**  204:12
**lesser**  32:22
**letter**  100:11,16
100:19 132:17
133:10 135:22
135:24

**letters**  24:13
100:13
**letting**  14:16
99:12 104:5
**level**  36:17
68:17,25 69:3
69:7 114:10,11
120:7 134:14
176:10 191:19
**lgbt**  206:8
**lgbtq**  206:14
**life**  107:24
108:1
**light**  188:12
**lights**  17:5
**likely**  30:10,12
43:22 84:21
85:15 96:2
117:5 138:15
172:17 176:9
**limit**  165:18
167:19
**limitation**
68:21 146:16
**limitations**
18:22 19:8,12
**limited**  158:17
175:9,13
**limiting**  69:21
147:23
**line**  6:15 81:11
81:11 84:22
85:6,16 105:23
119:19 123:10
134:3 139:6

154:17 185:8
201:25 211:4,7
211:10,13,16
211:19
**lines**  164:21
183:19 185:21
187:8,8 202:9
**list**  9:18,20
10:25 11:2
171:7
**listed**  57:1
132:21
**listen**  81:5
**literally**  23:10
48:15 80:4
100:1
**litigants**  150:3
**litigation**  27:8
130:17
**little**  9:8 60:23
104:6 163:25
165:5,12 187:3
**live**  49:6
202:16
**lived**  15:15
**living**  202:8
**llp**  2:20
**loaned**  48:8
**lobbying**  98:11
98:20
**lobbyists**  46:16
**local**  45:2,8
162:15,19,25
**located**  189:1

**loe**  1:4 4:24
210:4 211:1
212:1
**loe621**  163:15
**logistics**  26:22
**long**  27:14 38:6
48:3,19 50:25
64:21 83:9
118:17 153:19
195:21,23
196:1 197:12
200:3 204:11
**longer**  33:10,20
47:8 81:1
**look**  10:4,8,25
54:11 57:14
60:24 73:22,23
77:1,15,20
88:13 90:13
100:15 118:6
118:20 131:20
132:6 143:15
150:21 155:13
160:10 162:24
169:17 172:3
177:17 178:6
179:16 181:25
192:25 193:2
197:24 203:15
207:11
**looked**  10:9,9
10:11 55:4
77:17,18
108:17 116:11
116:12 119:2

**[looked - mde]**                                                          Page 30

120:24 177:15
201:17 207:4
**looking**  132:4
132:10 149:6
179:21 198:4
**looks**  79:19
144:16 152:16
156:1,6
**lori**  184:23
**lost**  169:12
**lot**  28:10 45:15
71:20 78:24
79:1,8 153:20
170:10,17
197:20
**lower**  48:5
198:18,22
**lucky**  47:17
**lunch**  109:17
109:23 189:23
191:3
**lunches**  191:24
**luther**  201:24
**lutheran**  3:21
201:13
**lynne**  47:24

**m**

**m**  209:3,23
**made**  44:1 50:6
52:15 57:13
76:17 81:17
84:20 101:16
120:23 124:1,9
126:20,24
139:4 166:14

166:19 173:6
177:21 181:2
205:19 212:5
**madeleine**  2:14
**mail**  24:12
**main**  28:25
29:6 102:5
179:16
**maintain**  9:16
9:18 196:23
**maintained**
27:4 46:12
**maintaining**
170:12 197:15
**major**  39:12
44:21,22 45:3
82:15
**majority**  28:19
190:2
**make**  18:12,14
19:2 58:22
74:10,16 92:19
95:4,9 97:17
104:12 107:2
116:17 118:7
124:4 134:22
136:4 138:24
149:11 173:7
195:14 207:25
**makes**  74:17
105:3 148:23
199:17
**makeup**  89:1
178:21

**making**  67:23
75:8 89:3
107:21 123:4
134:2 188:1
196:12
**manner**  202:6
**maranatha**
146:23 147:13
149:14
**march**  96:7
163:21 180:14
182:22 183:2
193:14,16
**mariani**  33:5
34:1,7,8,9,24
**mark**  1:4 121:9
131:15 210:4
211:1 212:1
**marked**  3:6 5:8
5:11 55:19
118:3 121:10
131:17 143:19
143:22 146:3,6
150:18 155:10
155:14 160:7
160:10 163:4,7
167:25 174:11
181:22,25
192:22 193:1
201:20
**marketing**
169:22 170:3
203:13
**marquart**  33:6
33:18

**marry**  136:16
**mary**  49:17
92:24 134:17
134:18,21,22
134:25 135:1,1
135:3 136:12
136:13,14,14
136:15 148:5
153:1,15
154:11 168:8
**material**  172:7
172:22
**matter**  41:25
109:9 209:17
**matthews**
102:12
**mature**  69:13
**maturity**  68:17
**mde**  7:25 39:13
41:17 42:1,9
42:14 43:21,24
44:9 47:14
48:4 49:9
51:15,23,25
52:20 53:1,17
54:1,5 55:6
58:7 59:8 65:3
70:16 71:23
75:14,24 76:21
88:18 95:14
96:11 99:18,25
100:10 103:13
104:11,23,24
106:3 107:5
108:3,14 109:3

109:8 110:3,22
117:6 119:23
120:10 121:4
122:2 123:5,16
130:2,25
132:17 141:7
141:21 142:21
142:22 143:15
144:15,16,18
144:25 145:12
148:15 149:5
151:14 152:20
156:9 157:8
158:12 159:15
159:25 160:4
161:3,11,15
163:19 164:5
164:19 165:2
169:21,23
171:7,9,23
175:25 177:24
179:20 181:19
183:19 184:13
188:5,10,17
189:17 190:1
192:2 193:18
194:3,16 196:6
199:13 200:6
201:7 202:19
203:17 204:11
210:5 211:2
212:2
**mde's**  8:2 65:22
132:18 158:19
181:5

**meals**  192:11
**mean**  7:1 8:19
9:4 17:22 18:9
21:17 29:5
36:11,16 37:22
41:13 52:15,24
53:7 71:15
73:12 74:7
76:25 92:16
110:15 113:5
114:7 128:4
130:23 143:10
149:23 166:3,6
171:1 178:23
180:15 181:7
189:3 198:6,15
203:8,23
204:15,25
**meaning**  30:13
67:18,19
126:15 188:11
**means**  34:22
85:9 156:10
198:18
**meant**  120:14
**measures**
189:17
**media**  11:12
**medical**  21:18
21:21
**meet**  15:10
87:2 93:23
126:12 161:18
161:20 199:3,6

**meeting**  13:4
14:7 64:24
92:3 110:3
133:19 135:24
136:2,5,7
140:13,15
145:14,16
162:14 166:8
177:18 194:9
199:14
**meetings**  9:24
10:17,22 12:15
14:4 63:16
65:3,6,11
122:16 140:9
140:10 181:10
188:3
**meets**  68:15
162:20 163:2
**megan**  117:9
173:25
**melinda**  1:4
210:4 211:1
212:1
**member**  28:24
32:22 135:18
138:18 144:18
**members**  28:11
28:12 29:9
32:18,23 63:22
65:16 66:1,11
81:2 85:17
86:24 87:2
97:13 98:7
155:2 193:24

193:25
**membership**
35:3
**memo**  74:11
150:1
**memorandum**
132:14
**memory**  57:10
57:23,24,25
85:21 121:17
136:19 144:6
165:23
**memos**  10:10
10:15 25:24
29:8
**mention**  23:14
82:16 84:11
**mentioned**  11:4
11:25 33:17,25
69:7 96:9,15
98:8 99:5,15
109:25 110:4
113:12 158:6
170:5 172:16
176:13
**merely**  83:5
**merriam**
158:16 159:6
**message**  100:11
**messages**  11:7
11:9
**met**  11:11 98:7
140:7
**mhra**  110:23
111:12

**midatlantic**
  210:15
**middle**  27:1
  47:20 48:21
  93:6,9 136:5
  182:24,25
  191:7
**miles**  203:12
**million**  200:11
**mind**  7:12
  15:13,20 100:6
  106:19 128:18
  178:19 179:20
  181:4
**minimum**
  68:15
**minneapolis**
  4:4
**minnesota**  1:2
  2:15,16 4:4,6
  5:15 14:18
  15:14,14,15
  19:15 21:24
  22:5 26:10
  27:25 31:8,8,9
  32:16 38:3
  44:12,13,15
  45:17 46:1,2,5
  46:9,13 47:7
  47:12 110:13
  117:18 128:10
  130:9,21,25
  137:12 142:23
  143:1 149:19
  170:9,9 198:4

203:3 209:1,8
**minority**  28:20
  85:17
**minute**  64:19
  118:6 121:13
  131:20 143:23
  146:7 150:13
  163:18 207:13
**minutes**  6:14
  83:11 109:15
  109:16
**mischaracteri...**
  164:9
**mm**  22:22
  132:13 158:15
  172:10 176:4
**modes**  79:11
**money**  30:3,5
  30:14 71:13,14
  71:16,16
  200:21
**monitor**  20:17
  20:17
**monitoring**
  23:15,15
**month**  26:14
**months**  26:16
  26:17 27:16
  38:7 48:21,22
  122:1
**mooty**  13:12
  132:15 133:2
  133:11
**morgan**  25:22
  26:7

**morning**  4:19
**morse**  117:9
**move**  44:19
  48:23 58:24
**moving**  164:2
**mueller**  50:18
  51:6
**multiple**  31:18
  74:24,24
  148:13
**music**  20:3,4,7
  20:14 22:17
**mw**  1:17

**n**

**n**  3:1
**name**  4:21 18:9
  21:9 26:23
  31:17 33:25
  38:16 97:3
  132:7
**named**  7:3,6
  8:3 144:22
**narrow**  128:9
**national**  110:11
**nature**  56:19
  91:16 119:14
  156:3 159:3
  163:24 168:11
**near**  31:10
  69:24 189:5
**neb**  1:6
**necessarily**
  172:23 174:9
**necessary**  43:2
  65:19 66:25

71:10 212:6
**need**  6:13,15
  41:1 58:17
  67:11 68:13
  94:19 124:16
  125:7 129:25
  157:14 165:21
  171:7 207:5,6
**needed**  29:11
  110:22 111:6,9
  111:24 112:3
  149:1 156:23
**needing**  66:15
**needs**  148:3
  154:24
**negative**
  105:19 106:5
  106:14 205:7
  205:17
**negotiations**
  87:6
**net**  148:20
**never**  8:10
  37:22 74:21
  87:17 115:16
  131:1 150:10
  181:4 188:16
  192:2 201:7
**new**  45:12 79:7
  79:22,23 80:23
  91:10,12,13,19
  91:24 151:16
**news**  20:6,9,9
  20:11 21:12,13
  21:18

**nine** 38:7
**ninety** 20:4
**niska** 100:6
  101:25 102:8
  163:18 193:8
**noah** 144:22
  145:6
**nod** 119:6
**nodded** 121:16
**noncompliance**
  202:22
**nonpartisan**
  23:4 75:6,17
**nonpublic**
  169:5 190:13
**nonreligious**
  154:23 189:8
**nonsectarian**
  120:15 121:4
  124:2,4,10
  133:5 139:13
  139:15 152:14
  156:4,10 157:7
  158:9,17,20
  159:14 160:25
  161:2,15
  171:25 172:12
  172:20 190:8
  192:11,13,13
  204:17,19
**noon** 109:18
**nope** 83:17
  193:8
**normal** 25:19
  25:24 59:24

62:10 64:1,2
65:5 71:19
72:16 76:2
78:23 99:16
154:10 159:3
176:23
**normally** 8:24
9:1 60:13,14
72:12 76:4
99:4 100:13
**northwest** 2:7
**northwestern**
12:17,23 13:16
42:5 56:18,22
93:21 99:23
105:14 107:20
108:11 121:24
122:18 125:1,9
125:16,21
126:5 130:8,14
132:3 133:1,4
133:8,16,20,23
134:2 137:2,19
140:13,15
141:4,8,22
142:1,9,22,23
143:16 144:11
146:25 153:2
153:12,16
157:17,22,23
160:3,22
169:11 178:21
179:18,25
180:9 181:10
194:16 195:1

195:16 197:8
204:8,10 206:8
**northwestern's**
205:10,20
**notary** 4:5
209:7,24
212:13,19
**notation** 82:1
**note** 11:16
79:20 170:14
207:19 210:10
**notebook** 9:23
10:1,3,17
**noted** 138:4
212:7
**notes** 9:15,23
10:11,17 15:8
26:21 101:16
209:15
**notice** 3:7
**notified** 134:1
**noting** 79:16
**nuances** 192:10
198:1
**number** 3:6
12:3 28:18,20
57:2 94:18
131:16 153:3
197:3
**numbers** 5:19
**numerous**
140:7
**nuts** 65:20
110:15

**o**

**oath** 6:1 209:9
209:11
**object** 55:10
67:1 103:15
107:7 110:24
115:24 128:23
131:2 158:21
158:22 164:8
167:3 185:7
**objection** 15:22
16:15 18:25
111:14 142:12
147:15 148:7
162:7 179:7
198:20 199:21
208:2
**observe** 16:23
**obviously**
80:21 122:20
125:25 157:16
181:8,9,12
**occur** 196:22
**occurred** 128:3
128:4
**occurring**
204:22
**odd** 178:12,14
**odds** 206:14
**offer** 120:14
170:18,18
171:8 197:13
**offered** 119:21
147:4 171:10
171:11 204:8

**[offered - okay]** Page 34

| | | | |
|---|---|---|---|
| 204:12 | 14:25 15:15,20 | 79:3,11 80:7 | 139:23 140:7 |
| **offering**  152:21 | 17:2,24 20:3 | 80:11 81:17,23 | 141:3 142:4,8 |
| 196:23 197:8 | 21:10,14 22:14 | 82:20,23 83:1 | 142:21 143:5 |
| 197:11 | 23:3,6,16,21 | 83:6,9,12 | 143:24 145:5,8 |
| **office**  2:12 | 24:1 27:12,14 | 84:17 85:19 | 145:11,14,19 |
| 13:25 39:10 | 28:3,11 31:3 | 87:18,22 88:10 | 146:8,11 |
| 42:7 59:12 | 31:19,24 32:2 | 88:20 90:2,19 | 147:12 148:1 |
| 74:25 75:6,16 | 32:18,21,24 | 91:8,16 92:20 | 150:23 151:8 |
| 75:17,17,18,19 | 33:2,8,13,16 | 93:9,15 94:1 | 151:19 152:1 |
| 76:7,11,15,16 | 34:2,5,21 | 95:12,16,19 | 153:1 154:5,16 |
| 76:24 77:3,24 | 35:13,21 36:14 | 96:5,8,16 97:1 | 155:16 156:5 |
| 79:18,18 80:1 | 37:3,5,13,21,24 | 97:17 98:2,14 | 156:14,18 |
| 80:5,8,9 90:20 | 38:6,8,18 | 99:14 100:7,10 | 157:2 159:24 |
| 94:21 135:18 | 39:25 40:3,8 | 100:12,15 | 160:6,12 161:6 |
| 151:21,22 | 41:15 42:8,18 | 101:12,18,22 | 162:3 163:9,14 |
| 165:3 184:11 | 42:21 43:3,8 | 102:20,22 | 163:16,24 |
| 184:25 185:3 | 43:21 46:8 | 103:13 104:1 | 164:4 166:9 |
| **officer**  134:16 | 47:9 48:13,23 | 104:20,23 | 167:24 168:7 |
| **officers**  110:2 | 50:8,13 51:10 | 106:2,14 | 170:4 171:14 |
| **offices**  80:14 | 52:8,11,23 | 107:16 108:12 | 172:3 173:4,11 |
| **official**  158:19 | 53:20 54:1,17 | 108:21 109:13 | 173:17 174:4 |
| 159:15,16,18 | 54:23 56:11,13 | 110:13 112:21 | 175:12 177:6 |
| **oh**  12:5 22:11 | 57:3,12,19,22 | 113:9,14 | 177:12,17,20 |
| 22:15 27:2 | 57:24 58:4,14 | 115:18 117:16 | 178:2,15 180:3 |
| 34:3 41:13 | 59:18,25 60:6 | 117:21,25 | 182:2,3,6,17,21 |
| 48:7 52:6 54:7 | 60:23 61:6,12 | 118:20 119:4 | 183:3 184:8,19 |
| 57:3,7 71:12 | 62:6,16 63:1,5 | 120:18 121:3,8 | 188:5,10 |
| 98:18 119:7 | 64:10,24 65:3 | 121:15 123:12 | 189:14,17,22 |
| 177:15 184:21 | 65:5,8,10 66:6 | 123:25 125:3 | 190:6 191:2 |
| 189:9 | 68:7 70:18 | 126:2,9 130:2 | 192:7,21 193:3 |
| **okay**  4:23 5:14 | 71:23 72:1,11 | 131:22 133:21 | 193:13 194:15 |
| 5:25 6:24 7:3 | 72:17 73:3,11 | 134:12,17,22 | 195:21 198:10 |
| 7:17,25 9:7,9 | 73:18 74:1 | 135:1,17 136:1 | 200:9 201:11 |
| 9:18 10:1,8,25 | 75:13,23 76:2 | 136:11,16,21 | 202:3,24 203:6 |
| 11:14 14:2,8 | 76:6,13 77:15 | 138:23 139:1,9 | 203:22 204:10 |

205:5 207:18
older 145:20
omnibus 35:20
54:8,8 82:21
84:18,20 85:4
85:5 95:5,14
96:18
once 17:3 61:24
62:11 65:9
74:5 87:10
89:16 94:17
95:7 150:22
one's 17:15
ones 12:14 15:1
18:8 19:22
56:20 110:21
110:21
ongoing 42:23
online 11:19
153:9 174:24
175:23
open 47:19
207:15 208:8
operate 46:16
operated
105:24
operating
153:20
operations
30:15 202:5
opined 13:3
opinion 20:10
20:11 30:22
41:5 47:1
70:15 105:19

117:17 123:8
124:4,6,11
141:2 147:18
162:10 183:16
197:10
opinions 13:2
26:19 39:18
46:18 104:24
106:5 194:3
opponents
104:12 186:10
186:13 187:20
opportunities
30:18 67:17
135:5 154:19
199:19 200:4
opportunity
30:19 44:17
67:20 92:1,18
196:11,20
197:17 198:19
opposed 129:1
opposing
102:11 104:19
option 196:25
options 56:1
oral 4:2
organization
23:5 129:2
158:23
organizations
75:20 98:24
organize 98:23
organizes
102:3

orientation
110:12 113:4,5
113:6,20,25
114:1,21
115:13 116:10
116:16 206:3
origin 110:12
original 209:15
originally
59:17
originated
59:10 61:15
outcome
209:19
outreach 96:14
96:23 105:16
134:1 176:12
179:24 180:2
outside 13:7
14:4 52:22
75:20,23 80:4
86:14,15,17
98:23,24
103:20 117:16
117:23 127:22
143:9 194:2
overall 70:25
103:24 141:14
179:11
overcome
200:6
oversaw 74:14
135:9
oversee 53:11
58:16 128:13

144:21
overseeing 44:5
overseer
162:12
oversees 59:20
60:15 155:19
oversight
151:22 153:21
own 16:4 69:13
74:11 122:24
165:23 169:11

**p**

p.m. 109:20,21
150:16,17
207:16,17
208:14
paced 187:5
page 3:2 55:21
87:4 152:1
158:11 163:14
169:17,19
171:5 172:3
175:25 206:13
211:4,7,10,13
211:16,19
pages 84:3
209:14
palmer 44:8
59:17 134:6
pandemic
62:11
pantages 22:18
paper 82:4
papers 82:5

[paragraph - period]                                    Page 36

**paragraph**
  158:13,14
  202:4
**paralegal**  21:3
  21:5
**parameters**
  41:21 149:21
**paraphrasing**
  166:17
**pardon**  118:22
**parent**  7:21
  112:7 113:15
  122:11 140:21
  162:22
**parents**  137:7
**part**  52:25
  108:18 131:10
  132:23,24
  135:4 158:19
  159:2 173:5
  182:7 204:21
**participant**
  203:24
**participants**
  119:22 167:20
**participate**
  16:11,20 17:6
  19:20 109:12
  120:6 140:24
  142:18 156:24
  166:18,21
  167:13,15
**participated**
  22:6

**participating**
  155:21,22
  157:14 159:17
  204:5
**participation**
  128:22 168:13
  175:23 177:8
  192:13
**particular**  28:3
  28:17 32:19
  53:9 58:3
  83:19 84:9
  88:3 95:11
  99:2,12 106:18
  112:10 114:13
  114:14,15,16
  137:9 147:11
  158:18 171:19
  178:22 180:11
**particularly**
  117:6 132:11
  176:19 177:3
  178:23 179:15
**parties**  13:7
  14:4 36:24
  38:24,25
  143:17 207:22
  208:4 209:18
**partners**  38:23
  99:6 176:22
**partnership**
  181:11
**party**  8:3 28:17
  28:18 59:3
  84:22 85:6,16

  85:17
**pass**  34:15,25
  35:16,22 55:24
  57:2,7 85:23
  89:20 97:18
**passage**  194:22
**passed**  33:15
  34:17 35:20
  57:4 69:20
  73:9,15,24
  85:6,15 86:1
  87:10,10 89:16
  102:19,21
  103:6 104:14
  201:4 205:2
**passing**  91:22
**past**  12:18,21
  12:21 60:18,22
  74:25 112:6
  137:8 153:22
  164:5,20
  192:18
**pathway**  136:9
**paul**  2:16 33:6
  33:18
**paula**  44:8
  59:17 134:6,7
  135:21
**pay**  115:2
  161:3,11,16
  190:13 196:7
**payment**
  156:13
**pending**  104:16

**pennsylvania**
  2:7
**peo**  169:12
**people**  18:1,19
  28:10 36:23
  46:17 50:13
  52:24 59:15
  63:17 80:20
  83:3 98:19
  107:4 113:23
  115:2 117:15
  164:23 181:8
  185:23,23
  186:7,10
  187:19,20,25
  190:13 196:7
**people's**  200:4
**perceived**
  67:25
**percent**  20:4,5
**perform**  171:14
**performance**
  68:4,9,16
**performed**
  22:18
**performer**
  22:20
**period**  35:3
  37:1 43:24
  50:20 52:2
  72:24 73:2
  78:13 79:5
  88:14,25 119:3
  120:2 184:7

permanent
48:24 50:5
permanently
48:25
persists 202:10
person 43:22
76:4 153:5
174:24
personal 11:15
15:24 16:3
17:9,19,21
18:10,16 19:3
19:8 60:11
107:22 123:6,7
129:1,4 131:5
142:7 147:17
147:19 158:25
162:9 205:1
personally 7:9
16:9 39:19
100:9 108:25
117:21
perspective
17:19 18:22
135:13
persuade 97:18
pertained
16:13
pertaining 68:5
136:24 175:3
pertains 149:20
154:8
phase 52:18
78:20

phil 26:11
philip 26:11,24
phone 23:25
143:9,10 167:8
phrase 152:23
167:15 202:25
phrasing 41:23
105:3 107:18
141:25
place 22:2 97:6
119:20 120:13
139:10 193:11
places 27:13
plaintiff 2:2
7:17
plaintiffs 1:5
159:25
planet 54:14
plant 13:12
132:14 133:2
133:11
platform 44:3
play 115:6
played 26:2
please 4:9
16:18 149:11
point 10:4
72:12 78:14
84:14 105:11
111:23 115:12
120:18 122:25
129:16 141:3
163:14 164:4
166:24 169:19
176:12 179:25

180:21 183:13
189:11,13
points 156:7,9
156:21 158:7
159:9
policies 152:8
152:22
policy 31:21
37:1 54:9 75:3
83:15 84:21,22
85:5 86:5,8,16
92:24 93:8
94:15 95:6,7
95:14,15,18
97:25 98:15
111:16 127:18
138:14 152:2,4
152:18 169:1
194:22 196:9
196:18
political 22:23
23:17 24:1,17
25:5,6,7 31:1
38:25 89:1
politics 24:24
poll 23:15
popped 99:11
portable 195:6
portfolio 135:5
135:11
portion 54:4
189:9 201:5
portions 97:10
position 31:2,2
35:9 45:20

48:5,17 50:3
61:25 106:24
161:10 164:2
positions 45:22
46:5,7
positive 67:13
98:17,20
possession 10:5
possibility
54:23
possible 35:25
36:1 43:7
46:22 54:21
55:3 101:7
143:7 144:6
153:17,21
possibly 9:22
63:25 71:25
78:11 169:10
205:24
post 11:18 74:3
posted 11:19
11:23
postsecondary
29:21 30:8,13
31:9 56:1
122:23 155:23
170:2,7,19
171:20 179:12
191:8 195:4,15
197:11,22
199:25 200:25
207:10
potential 42:24
207:15 208:8

**practice** 12:19
17:15 47:8
58:13,15 82:8
106:8 123:19
126:16 127:19
129:21,24
140:17,18
142:3,5 144:19
146:14 157:25
164:3 165:19
196:19 203:2
**practices**
104:19,20,22
104:25 105:1
116:18 152:3
155:1 200:22
**practicing** 28:7
153:4
**pre** 20:5
**precise** 183:10
**precluded**
199:4
**precondition**
124:3,15
**predecessor**
47:23
**predominantly**
24:14
**preparation**
13:4 61:17
64:4 72:17
76:14 77:20
78:6 118:12,13
118:21 139:1
143:14 144:2,3

151:2 152:10
177:13,17
204:9
**prepare** 14:23
53:15 56:6,9
57:5,19
**preparing** 52:5
52:12
**prepping**
177:25
**present** 2:20
67:3 117:11,12
194:9
**presentation**
81:8,15 82:14
82:14
**presentative**
102:8
**presented**
97:11,14
147:25 196:25
**presidents**
188:3
**presumably**
95:25 157:17
157:19
**pretty** 25:11
66:20 74:16,16
74:17 92:21
111:24 178:5
183:11
**prevailing**
197:5
**prevent** 126:11
129:14

**prevented**
127:3
**previous** 55:24
57:2 91:17
**previously**
23:16
**prior** 34:24
35:16,22 51:14
54:4,11,17
57:8,10 63:8
66:13 89:18
90:11,13 91:3
91:21 92:2
118:18 150:24
176:16
**priority** 36:23
**private** 45:23
70:5 140:24
142:9 146:15
146:19 147:3,5
147:23 150:2
154:7,8 166:16
168:13,16
169:6 171:6,11
172:6 173:7
179:12 190:6
190:17,18,20
191:2,4 192:17
**privilege** 67:2,5
103:17 167:6
**privileged**
55:12 65:12
107:10 110:25
115:25 167:7
185:9

**probably** 12:5
19:24 25:3,5
49:4 57:25
70:10 73:25
76:5 82:1
85:21 86:11
113:12 116:24
117:2 138:13
138:18 151:10
165:11 172:24
174:2 176:10
182:22,24,25
183:4 186:20
187:1,3,12
193:22,22,25
**problem**
117:19 119:10
126:21 167:12
167:15,22
189:18 200:20
**procedure**
52:16
**procedures**
45:8 123:13
**proceeding**
208:13
**proceedings**
4:7 209:5
**process** 39:4,6
39:7 40:19
41:7 52:25
58:19 59:24
60:13,14 61:13
62:9,10,10
63:4,13,14,14

**[process - proposals]** Page 39

63:15,17 68:6
71:21 72:2,4,5
72:19 73:5
74:3,9 75:25
77:19 84:19,20
85:1 86:2 88:8
88:16 89:3,4
89:16 90:4,6
90:16 91:1,4
92:25 93:2
98:23 103:8
104:15 108:10
109:24 112:15
115:16 120:21
121:2,23,24
123:2,24
124:10 125:2,4
125:5,20 131:8
131:11 133:17
133:24 136:20
136:21,23
137:4 139:19
141:6,9,16,21
142:19 172:14
180:18 195:18
195:19
**processes** 112:7
**produce** 10:14
10:16 14:10
25:20,24 77:16
78:21 140:3
**produced**
10:11 22:16,17
**production**
140:3

**profession**
123:3
**professional**
4:5 15:25 16:5
123:8 209:4,24
**professors** 26:2
**profs** 170:15
**program** 5:3
53:11 67:24
105:23 106:9
108:7,19
109:12 119:16
120:6 121:7
123:9 124:9
127:2,3,8,23
129:8 135:20
140:25 142:17
142:18 153:22
155:19,20,23
156:25 158:4
167:16 170:15
170:21 171:17
171:18,22
172:2 191:3,19
192:5 195:3,23
196:13 198:2
198:13 199:9
201:3 203:25
204:5
**programming**
193:10 201:1
203:4
**programs**
29:24 68:12
106:24 128:7

137:4 156:2
158:1,5 180:4
180:7 189:23
196:21 197:16
200:1,19
**progress** 98:8
**prohibit** 129:23
**prohibited**
128:20 129:8
129:10
**prohibiting**
119:20
**prohibits** 5:4
**project** 22:11
27:22
**projects** 28:24
**proponents**
186:13 187:21
**proposal** 8:23
8:25 9:1 10:24
12:15 43:19
46:25 54:15
56:22 58:3,7
59:11,14,21
61:3,15,22,24
62:1 63:19,24
64:12,20 65:18
65:20 66:3,24
68:5 70:2,7,13
70:20 71:6,9
71:25 72:13
74:19 75:21,24
77:6,14,19,22
78:3,9,12,14,19
79:4 80:12

82:12,16,18
83:14,20,24
84:7,10,11,14
86:17 87:21
88:8,15 89:14
90:10 91:11,25
92:1,11,21
93:22 95:12
97:18,19,23,25
97:25 98:1,13
98:15,17,25
99:3,13,18
100:23 102:5,7
102:11 104:3
105:6,11 110:1
111:6,9,10,24
115:3,10
139:19,22,24
148:22 149:22
154:24 172:18
175:5 180:19
181:5 186:11
186:21 188:11
188:13 196:19
**proposal's**
79:20
**proposals**
36:13,14,16,22
37:1 39:16,24
42:25 43:25
54:18 58:17,21
60:25 64:14,18
64:19,22 65:14
65:22 66:23
67:4 68:8,10

[proposals - public]                                    Page 40

68:19 69:2
72:9 74:18,20
77:3,4 78:4
79:7,9,17,22
80:10 82:10,17
84:4 87:6
90:12 91:2,15
91:21 102:6,15
104:9,10
148:13,19
173:6 192:16
**propose** 42:18
58:18 67:14
72:15 139:19
**proposed** 55:4
59:17 60:7,8
62:14,17 64:21
64:23 72:13
73:6 74:1
77:10 79:9
80:8 87:15
90:15 92:10,12
101:19,24
135:21 172:19
192:2,18 200:6
200:11 201:7
**proposes**
134:17
**proposing** 72:8
106:11 175:6
**protect** 18:1,3
**protected** 5:6
16:7 17:15,25
68:1,6 110:6
110:10 111:8

113:1 115:8
127:10 129:11
154:25 164:23
165:20 181:18
197:6,7,17,18
**protecting**
110:6 115:7
**protection**
126:18 127:9
**protections**
110:19
**provide** 4:12
29:8 36:20
39:18 41:2
45:9 46:18
71:8,8 98:8
146:20 154:18
155:24 157:14
162:17 194:9
**provided** 41:3
45:2 107:9
110:23 119:15
138:3 144:14
173:23 176:7
193:11,12
194:18
**provider** 197:4
**providers**
168:14
**provides**
110:19 127:1
203:11
**providing**
44:25 139:13
153:22 171:15

171:25 187:9
**provision** 89:8
89:20 96:20,25
173:6 203:10
203:23
**pryor** 91:20
95:15 117:3
**pseo** 5:3,4 8:17
29:12,17,20
30:5,18 39:20
39:23 40:17
44:5 45:18,21
46:21,23 53:11
59:20 68:12,14
68:22,25 69:5
69:8,10,10
70:4,11 78:15
88:3 92:12,18
95:13 96:20
97:19 101:10
105:3,23 106:9
109:12 119:16
119:22 120:14
122:5,24
123:12 125:10
126:20,22
127:23 132:5
135:20 136:20
136:21 137:4
144:21 145:23
146:14,15,16
146:23 147:4
151:22,25
152:21 155:19
155:19,23

156:13 157:12
157:14,16
164:7,22
166:18 167:1
167:14,22
168:13,16
169:12 170:25
171:10,24
174:23 175:18
177:8 179:6
191:19 192:4
192:16 194:5
194:25 195:3
196:13,23
197:4,8 198:11
198:13,16
199:4 200:7,15
201:8 203:4,12
204:7,11
**psi** 153:3 195:3
195:22
**psis** 152:3
171:8
**psoc** 170:22,24
171:1,3
**public** 4:5
44:14 81:3,4,5
81:18 83:1
84:1,11,14,23
89:7 96:16,17
96:24 127:2
153:2 176:12
179:24 181:1
190:25 192:17
209:7,24

212:19
**publicly** 87:16
103:11 185:15
**pull** 170:8
**pulled** 31:6
142:17
**pulling** 168:17
**pulls** 170:10
**purchase**
190:10
**purpose** 71:11
77:14,21 83:22
83:23 92:17
96:11 97:23
98:3,4 106:9
119:12 157:21
164:15
**purposes** 8:19
9:2 92:13
**pursue** 25:4,9
42:11,16 111:8
123:22 124:16
131:9,12
141:17 165:21
183:20,25
184:14
**pursued** 20:12
70:16 112:16
141:19 179:6
**pursuing** 169:1
183:24
**pursuit** 127:18
**pushback** 92:4
126:1

**put** 11:14 40:23
43:25 49:4
80:3 82:21
86:7,7 87:5
104:4 148:13
148:19,22
149:20 188:14
**puts** 18:13 77:7
94:22
**putting** 180:20

**q**

**qualification**
199:7
**qualifications**
68:15
**qualifies** 158:8
162:14
**qualify** 161:14
161:21
**qualitative**
114:18
**quantity** 10:13
**question** 6:17
10:23 12:19
16:18 17:23
19:6 24:18,25
40:13,14 94:8
114:15 115:13
116:8,11,12,18
120:22,23
126:14,15
129:7 144:12
144:13 150:8
159:11 164:8
167:4 172:1,23

175:4 183:22
185:19 195:15
198:24 202:23
206:11
**questioning**
6:16 10:24
185:8
**questions** 4:24
6:1,12,20 7:10
16:16 19:3
40:12 66:21
72:16 88:13
93:25 97:12,15
98:1,18 106:22
106:23 107:3
107:14,16
109:2,7 112:9
112:24 113:18
114:5 116:4,9
133:14,23
168:22 173:24
176:8 182:11
182:13 183:21
193:9 194:17
205:15 207:20
207:23
**quickly** 48:15
73:25 74:17
**quite** 19:24
34:22 103:10
178:9

**r**

**r** 50:24 211:3,3
**race** 68:2
110:11 174:22

175:17 177:7
178:20 179:17
200:14
**racial** 112:19
**radar** 99:5
**radio** 19:24
20:1
**raise** 4:9 99:24
178:19 179:20
187:3
**raised** 40:17
59:14 114:19
115:15 147:9
181:12,13,14
182:23 191:15
191:21
**raising** 191:23
**range** 27:13,17
39:23,23 70:10
84:4 101:8
102:10 104:9
110:19 124:24
135:9 139:14
140:4 158:5
169:25 182:24
183:11
**reach** 39:2
79:24 100:7,10
122:14
**reached** 40:23
89:13 93:21
100:1 133:8,16
133:21 137:7
176:5

**reaching** 75:24
180:7
**reacted** 187:1
187:16
**reaction** 40:25
41:1,1 67:10
**read** 55:22 75:2
81:21,25 91:22
96:21 151:2
160:15 163:12
208:10 210:9
212:5
**reading** 123:7
147:1 150:24
**real** 25:7
**realize** 30:10
**really** 19:11
110:4 113:25
114:3 162:18
166:11 168:24
169:7
**realm** 120:25
**reapply** 196:5
**reason** 6:18
28:3 177:12
183:10 192:7
202:19 210:11
211:6,9,12,15
211:18,21
**reasons** 47:9
181:9 183:23
189:16
**recall** 14:20
32:8,11 35:24
36:25 40:3

42:19,22 43:10
45:22 46:22
47:1 54:12,14
58:2 62:9,13
62:17 64:24
65:25 70:17
77:17 82:9,10
82:11 84:5,16
84:23 88:3
96:17 101:9,14
105:25 108:5
109:25 110:7
111:17,20,22
132:6,8 133:21
137:23,25
140:4,5,8
142:25 145:4
145:16 149:7
149:16 151:13
157:10 163:21
164:25 167:23
173:21 174:16
174:18 176:18
177:5,23 186:4
186:17 187:4
191:22
**recalling** 110:5
194:23 207:1
**receipt** 210:17
**receive** 95:7
144:14 146:21
151:17,18
158:1 191:2
**received** 63:6
64:8 112:4,5,7

122:4 136:25
137:17 140:21
141:1 165:2
**receiving**
191:17
**recent** 12:13
13:13,22 18:5
60:21 165:2
**recess** 51:11
109:20 150:16
207:16
**recognize**
131:23
**recognized**
96:21
**recollection**
43:8 58:5 61:1
63:11 64:10
66:4,6 87:15
88:16 89:9
101:13,14
102:4 122:6
125:19 133:12
133:25 136:1
163:25 164:15
201:10
**record** 4:21
34:19,20 35:12
181:1 207:18
207:19 208:1,5
**recorded** 20:5
81:18 165:1
**recruited** 38:9
38:10

**recruiting**
38:19 170:2
**recruitment**
169:22
**red** 178:19,23
178:24 179:20
**refer** 95:1
**reference**
180:25 188:21
188:23 207:3
**referenced**
176:25 178:17
210:6
**referral** 95:3
**referred** 95:6
107:17
**referring** 8:17
59:7 136:14,17
136:20 152:7,8
152:15,15,19
170:21 172:19
173:9 184:21
184:22
**refers** 94:5
**reflecting**
155:7
**reflection**
178:6
**reflective**
206:12
**reframe** 195:2
**refresh** 58:5
85:21 97:3
**refreshed**
109:10

| | | | |
|---|---|---|---|
| **refresher** | 35:6 39:25 | 129:14 142:11 | 181:20 187:24 |
| 138:19 | 45:18,21 46:21 | 142:20 155:5,6 | 189:15,23 |
| **refreshers** | 52:15 68:3 | 174:23 | 190:6,9,11,17 |
| 12:25 | 70:8 88:14 | **religions** 15:17 | 191:4,10,16 |
| **refreshing** | 106:15,16 | **religious** 15:19 | 192:3,4 196:22 |
| 121:16 | 145:7 164:22 | 16:9,11,20,23 | 196:24 201:15 |
| **regard** 152:4 | 209:18 | 17:5,6 32:6,10 | 201:17 202:16 |
| **regarding** 32:9 | **relations** 7:24 | 32:13 40:20 | 202:20,22 |
| 39:20 47:4 | 19:19 25:4 | 41:6,22 42:10 | 204:18 205:8 |
| 56:20 65:14 | 39:14 42:15 | 45:24 46:6,9 | 205:10,17 |
| 67:4 97:19 | 50:3 58:19,21 | 47:4 67:21 | **religiously** |
| 117:24 121:22 | 65:2 71:22 | 105:2 108:23 | 109:1 166:17 |
| 121:24 138:13 | 74:8 78:2 | 109:4,11 | 192:14 |
| 158:24 159:24 | 97:15 113:13 | 112:11,11,24 | **relying** 159:5 |
| **regardless** | 120:10 148:24 | 113:17,23 | **remain** 196:20 |
| 189:14 | 163:19 193:23 | 115:11 124:1 | **remaining** |
| **regular** 32:4 | **relationship** | 126:21 127:9 | 43:11 |
| 171:12 | 32:25 33:3 | 127:13,13,23 | **remarks** |
| **regularly** 9:16 | 34:23 145:5 | 127:24,25,25 | 205:18 |
| 143:11 183:12 | 188:1 | 128:5,21,22 | **remember** 11:1 |
| 186:18 | **relationships** | 129:13 130:4 | 12:3,3,9,12 |
| **regulations** | 19:17 26:1 | 130:15 133:23 | 13:5 14:12,13 |
| 55:25 159:20 | 37:6 | 137:12 138:1 | 19:23,25 21:7 |
| **reimburse** | **relative** 209:12 | 140:24 142:9 | 21:8 22:8,13 |
| 195:11,23 | 209:16 | 147:5 152:4,5 | 23:8,12 29:15 |
| **reimbursement** | **released** 84:1 | 152:5,21,22 | 29:19 30:20 |
| 195:4 | **relevance** | 154:12,14 | 32:12 34:4 |
| **reintroduced** | 15:22 16:12,15 | 155:8 158:18 | 35:2 36:11 |
| 87:23 | **relevant** 37:7 | 160:23 161:12 | 37:13 39:22 |
| **related** 8:15 | **religion** 5:5 | 161:22 162:5 | 40:22,25 41:3 |
| 9:11,21 10:5 | 15:21 16:3,4,5 | 166:25 167:2 | 41:11 42:4,6 |
| 10:20 11:5,9 | 16:6 17:16 | 167:12,12 | 43:9,19 44:6 |
| 11:13,19 12:1 | 18:13,14 68:2 | 171:24 175:20 | 49:11,19 54:13 |
| 14:4 15:2 | 110:11 112:21 | 179:21,22 | 61:20 68:23 |
| 29:12 34:14 | 114:17 127:4 | 180:23 181:5 | 69:18 70:1,2 |

73:3,21,22
74:22 82:13
83:12 85:19
87:16 92:14,18
93:16,20 96:22
101:7,25 102:9
102:13 105:7
107:4,16,18
114:19 116:25
117:20 125:18
132:20 135:10
135:16 138:21
143:2,3 147:9
147:10 153:14
158:5 166:11
168:5 177:16
180:24 182:21
184:8,10,14
187:7,8,9,15
189:6 200:11
205:22 206:1
206:16,18,21
**remembered**
4:1
**remembering**
36:4 63:12
**remind**  63:16
134:10 149:13
173:5,9 192:12
**reminder**  66:10
**remote**  62:11
**remove**  101:24
102:7
**removing**
102:6,6

**rep**  83:17
**repeat**  16:18
19:6
**repeating**
107:21
**rephrase**
136:23 198:24
205:14
**report**  21:17
49:9,13 87:9
87:20,22,24
102:23,25
103:3,4 163:17
169:21 177:9,9
**reported**  49:10
49:14 50:7,19
177:15
**reporter**  1:25
4:9 6:3,9 21:4
21:10,12,12,13
121:8 131:15
143:22 163:7
209:5,24
**reporter's**
146:6
**reporting**
50:11
**represent**
39:15
**representation**
120:5
**representative**
24:6,11 27:25
29:2 33:4,4,6
33:10,20 34:3

34:4 83:18
85:22 87:5
98:11 100:4,6
101:3,4,25
166:16 182:8
182:19 188:7
189:4
**representatives**
10:23 12:16
13:15 56:17,21
93:19 99:8,9
99:22 100:22
133:19 179:3
**representing**
44:23 45:1
**request**  144:10
160:21 168:8
168:11 174:18
174:19 176:6
176:16 177:11
179:16
**requested**
28:25 173:18
175:7 187:12
**require**  69:8
77:1 125:10
126:5
**required**
129:19 212:13
**requirement**
95:13 97:20
109:5 126:3,21
127:14 133:5
158:20 172:13
198:16 199:2,3

204:20,23
**requirements**
69:25 108:4,23
112:19 122:24
124:1 128:1,22
129:10 130:16
137:12 138:1
154:14,22,23
167:2,13
191:11,16
192:4 197:21
199:15,25
201:9,17
202:20
**requires**  123:3
190:24
**requisite**  94:18
**research**  25:21
25:24 26:20
28:24 29:7
**researcher**
28:23 29:6,6
38:23
**reserve**  185:18
202:21
**reserves**  202:11
202:15
**resolution**
188:1
**resolve**  41:25
187:23
**respect**  67:5
158:25
**respective**  80:6
82:22 83:7

**[respective - role]**

84:12 86:19
87:7,11
**respond**  5:19
104:1 186:22
193:19
**responded**
126:4 187:21
193:16
**response**
119:23 123:25
124:2 132:2,17
133:3 141:11
146:17 156:25
161:1 173:20
173:21 180:3
194:16,23
**responses**
24:13 98:21
117:14 120:4
193:12
**responsibilities**
24:10 39:12
44:22 45:5
48:9
**responsibility**
44:21
**responsible**
77:24 173:13
**restate**  103:9
**restrict**  5:5
192:19 203:19
**restricting**
113:23 114:3,4
147:4 204:2

**result**  42:11
111:4 132:22
141:16
**resulted**  55:2
126:1 133:18
**resulting**  43:18
44:1 125:17
**retired**  27:3,4
33:9 34:6
**return**  210:13
210:16
**returned**  60:5
**reveal**  194:8
**revenue**  33:21
**review**  10:18
15:4 25:20
27:11 56:9
61:17 64:3,16
72:23 74:3,10
74:13,15,22
75:8 76:13
78:5,7,8 90:16
118:1,7 121:13
135:21 139:1
139:25 143:23
144:2 146:7
150:22 158:13
171:24 174:9
174:14 177:6
177:10 210:7
**reviewed**  14:24
19:23 21:8
57:9 64:18
74:23 118:12
138:25 172:22

174:5 177:9
182:3 204:14
**reviewing**
74:17 75:14
120:1,2 168:5
**reviews**  74:21
**revisor**  75:4,6
76:10 77:6,7
**revisor's**  75:18
75:19 76:11,15
76:16,24 77:3
79:18 80:1,8
90:20
**reynolds**
151:19,20
177:20
**richard**  2:20
**richardson**
83:17,18
**ricker**  49:17
65:1
**right**  4:10,19
16:4,8,17
17:15 18:1,1,4
18:9 37:11
42:13 46:2
47:19 53:8
54:3 70:24
71:17 76:21
79:22 80:19,23
82:7 90:14,25
98:21 99:4
102:5 111:9
115:22 116:14
122:22 124:16

132:10 134:17
150:24 159:16
161:23,25
164:17 173:11
174:20 177:16
178:10 179:16
181:11 188:15
192:25 195:9
198:5,6 199:20
202:12,15,21
**rights**  17:21
110:14,17
113:21 117:18
130:9,21
142:24 143:1
149:19
**rigor**  69:1,8,11
197:23 199:2,6
199:24
**rigorous**  156:3
**rip**  196:10
**ripped**  196:17
**risen**  155:1
**rochester**  15:14
**rock**  20:8
**role**  7:22,23,23
15:21 20:1
26:3 27:7
28:15,25 29:4
36:5 47:15,17
47:18,19,19,22
48:3,19,25
49:10 50:6,6
50:13 51:1,5
135:1 153:15

roles  28:21
 45:4 154:4
room  183:4,5,7
root  184:12
roughly  26:15
 27:15,16 93:4
route  42:12,13
 124:16 125:7
 131:12,13
 141:17
rule  159:23
rules  201:2
running  23:25
rural  31:8
 170:9
ruth  83:17

**s**

s  3:5 38:17,17
 38:17 211:3
sally  151:19,20
 153:24 177:20
sat  29:9 91:23
save  148:2
 149:3
saw  100:18
 122:12 151:7
 207:11
saying  4:19
 92:19 107:5
 124:15 126:11
 136:11 146:18
 146:18 161:2
 164:13,25
 165:7 167:23
 170:17 177:14

186:4,13
 202:18 205:12
says  136:16
 139:9,17 140:7
 145:14,20
 148:2 152:1
 153:1,8 158:13
 158:16 163:17
 164:14 171:5
 172:4 173:5,11
 176:2 183:13
 184:19 185:21
 186:1 188:5,17
 201:23 202:4,8
scenario
 148:25
schedule  94:23
 95:10
scheduled
 94:24
scholarship
 195:6
school  22:24
 24:21,22 25:7
 25:10,12,13
 26:1,9 29:22
 30:6,14 68:17
 69:4 99:8
 107:1 114:9
 116:19 122:9
 127:1,2 135:6
 142:18 146:15
 146:19,24
 147:3,23 150:2
 151:24 157:12

160:20 161:4,6
 161:12,21
 162:5,19 169:6
 170:15 173:13
 189:8,15,23
 192:3 196:23
 197:12 198:9
 199:1,4,7,13
 202:15 203:12
school's  161:23
schoolers
 168:17
schools  5:4
 45:24 47:5
 67:21,22,23,24
 69:8 113:23
 130:21 136:22
 137:11 147:5
 147:24 152:5
 161:17,18
 167:22 168:16
 169:6 170:11
 170:16,16
 171:15,19,24
 179:6,22
 180:10,23,25
 189:23 190:7,9
 190:11,17,18
 190:20 191:1,2
 191:4,4,7,7,8
 191:10,14,16
 197:21 198:7
 198:15,19
 200:21 201:8
 202:19,21

203:1 204:2,19
science  25:5
screened
 142:19 191:12
 191:13
scrutiny  79:22
seal  209:20
second  25:21
 25:22 33:16
 164:4 165:6
 169:19 183:13
 202:4
secondary
 114:2 147:3
 170:8,18
secondhand
 150:7 180:12
seconds  64:19
secretary  24:15
sect  158:18
sectarian
 119:21 120:15
 120:22,23
 121:4 152:14
section  81:12
 81:12 82:11
 97:11,12 203:3
see  60:24 66:12
 78:18 100:15
 104:9 114:10
 122:22,25
 123:23 126:10
 139:9 144:2
 148:1,4 152:1
 153:1,5,8,11,17

158:11,14
161:15 163:17
164:13,18
165:11 171:15
172:3,8,16
173:4,10
175:25 176:2,3
176:16 178:3
178:13 183:13
183:17 185:23
201:23 202:2,3
207:13
**seeing** 176:22
**seek** 125:7
**seeking** 123:9
123:20 165:9
**seems** 18:14
92:21 165:6
206:25
**seen** 79:23
118:9,15 120:4
122:7 137:5,8
144:7 152:9,12
185:22 204:7
**sees** 104:3
**senate** 62:4
80:25 81:1,15
81:19 82:13,25
84:8,12 86:1,9
86:16,20,22
87:16,25 89:6
91:24 92:2,16
92:22,23,24
94:13 95:21
97:10 101:20

102:11,18
103:5 205:24
205:25 206:19
206:20
**senator** 24:6,16
101:1 102:12
168:8 173:17
173:25 174:6
174:19 176:17
178:20
**senators** 98:11
100:21 179:2
180:22
**send** 74:9,25
75:7 77:2,6
87:7 94:2
100:13 132:17
173:25
**sending** 155:20
**sends** 77:8
**sense** 10:12
18:16 19:8
35:9 74:17
92:19 105:4
113:22 134:22
137:11 168:20
173:14 199:17
**sent** 31:13 76:6
78:17 79:17
80:1,14 84:24
86:8,18 87:11
87:25 100:11
172:6 210:14
**sentence**
158:16 165:1,7

165:11,13
202:3
**sentences** 61:20
**sentiment**
98:17
**separate** 95:21
128:12
**series** 136:24
140:11
**serve** 48:11
50:5
**served** 45:7
**serves** 102:4
**services** 47:16
48:6,7,10
190:14,15,16
190:23,25
192:1,20 194:1
**serving** 33:19
34:5 168:24
**session** 34:13
37:4 47:20
49:1,4 56:23
60:4 62:23,25
63:9 71:2 73:7
73:19 74:1
80:18,24 82:2
84:16 88:9
90:5,24 93:7
108:24 136:6
148:17 150:7
188:12 205:6
**sessions** 141:19
200:10

**set** 133:14
173:24 175:9
**sets** 122:24
**setting** 124:3
128:6,16
142:18
**settings** 170:8
170:13
**several** 27:18
27:20 64:19
102:8,14
108:25 112:7
128:9
**sexual** 110:12
113:6,20,25
114:1,21
115:12 116:10
116:16 206:3
**shaking** 6:9
**shana** 117:9
**share** 15:17
165:14 204:3
**shared** 36:23
165:16,25
167:8,10,11
174:3 185:14
185:15,22
194:8
**sharing** 15:20
**she'd** 171:6
**sheet** 21:14,16
210:11
**short** 50:20
82:14,14

shorter 66:22
show 61:2
   156:24
showed 173:22
showing 5:11
   61:15
sic 208:3
side 84:8 95:21
   102:12
sign 75:1 87:6
   171:8 208:10
   210:12
signature 87:12
   94:14 209:22
signatures 80:3
   94:16
signed 204:16
   210:19
significant 45:5
   51:14 80:13
   170:11
significantly
   89:17
signing 117:13
similar 24:15
   34:15 35:16
   36:14 37:15
   40:1 47:15
   49:24 52:2,21
   55:25 57:4
   73:10,20 130:8
simultaneous
   62:6
single 10:1,3
   74:19 91:25

singled 74:22
sit 81:9,10
sits 151:23
sitting 26:20
situation 30:17
   98:6 124:21
situations
   128:17 148:12
   148:20 149:23
   183:8
slate 23:12
slightly 53:25
   81:15
slowly 6:4
small 22:13
   47:1 100:22
smaller 31:5
   46:23 82:17
snyder 47:24
soccer 19:24
   22:9
social 11:12
solely 21:17
   206:21
solicits 58:20
   58:21
solution 66:12
   66:16 112:14
   123:22 124:14
   125:6,8,10
   131:10 136:9
   141:20 152:24
solutions 62:12
   203:11 210:23

solve 111:13
   117:19 189:18
somebody
   126:11 129:10
   129:14
someone's
   114:12 116:10
   116:15 165:20
son 145:20
sorry 10:16
   24:15 27:1
   37:9 74:8
   80:12 83:17
   85:3 89:3 93:5
   116:8 119:7,9
   121:16 142:21
   169:5 182:16
   198:15
sought 45:1
   107:9 135:12
sounds 75:13
south 4:3
space 12:22
   13:1,2,3 45:10
   66:19 128:11
   135:4 136:10
   138:18 151:16
   151:18 153:20
   153:24 168:23
spaces 39:1
spanish 20:23
speak 6:4 20:23
   30:21 59:7
   76:20 120:17
   148:9 152:9

   192:10
speaking 14:22
   34:12 60:11
   156:19 185:1,1
speaks 102:2
spearheaded
   43:23
special 32:25
   134:20,23
   190:15,16,22
   190:25
specialist
   153:25 154:1,6
specific 12:23
   29:20 36:7,11
   43:10 47:2
   58:2 62:13
   63:11 66:6
   73:3,22 77:1
   77:10 78:12
   83:12 84:5,7,9
   92:14 98:1,11
   101:13,14
   105:25 111:17
   111:20 113:17
   114:4,5,10,11
   114:12 116:25
   122:19 149:7
   154:2 155:7
   156:16 158:6
   186:17 187:6
   206:25
specifically
   5:18 23:9
   28:25 29:16

34:12 46:22
57:1 59:15
61:1 62:22
67:21 68:24
69:19 78:8
82:16 96:20
97:19 101:9
105:7 107:4
108:4 112:22
132:20 133:22
149:6 157:4,21
157:23 168:15
205:23 206:1
**specifics**
111:22 185:15
**speculate**
169:13 180:1
**speculation**
63:3 148:8
178:10 179:8
180:5 187:5
198:21 199:22
**sped** 190:14
191:25
**speed** 177:2
**spell** 38:14,16
**spend** 30:13
71:13,15,17
169:18,21
170:16
**spends** 30:4,4
**spent** 51:14
192:16
**sphere** 46:17

**split** 30:22,25
**spoke** 60:11
101:9 102:13
117:1,2
**sports** 20:14,17
25:11
**spring** 54:13
**spurred** 25:5
**ss** 209:1
**st** 2:16 146:12
146:24 188:18
188:24,25
189:1
**stack** 80:22
**staff** 12:25 13:2
13:9 26:2
28:19,20 29:1
29:4 39:3,9
40:23 50:19
53:11,15 56:14
63:22 80:2
81:11 103:23
104:3,8,17
108:16 112:5
112:25 113:11
113:13 114:22
116:6,24
118:18 119:18
132:1,25
133:15 135:18
138:17 140:20
143:3,7,12,15
144:11,15,16
144:17,20
146:18,18

148:19 149:5,8
151:16 157:25
163:19 188:5
198:2 205:22
206:17
**staffed** 31:21
31:24 32:2
**staffers** 104:23
**stand** 182:14
**standard** 41:1
63:4 64:22
66:10 84:19
91:1 126:6
**standards** 70:8
70:9 109:4
161:19,20
162:15,21
163:3
**standing** 16:15
183:6,8,15
**stands** 36:8,10
**start** 49:2
**started** 38:19
44:4 49:3,4
50:10 88:10
115:1,2 121:17
157:8
**starting** 45:12
**starts** 94:6
**state** 4:6,21
39:17 44:14
45:3 70:4
71:13,15,16,17
108:7 126:25
127:7,8,8,12,22

128:12,18,21
129:11 130:13
142:16,17
146:12 153:3
154:19 162:14
162:16,25
163:3 164:6
165:3,8 169:16
169:21 189:22
190:6 191:17
192:2 195:5,22
197:4 209:1,7
**stated** 181:1
184:6 195:19
**statement** 3:22
123:5 136:12
136:17 139:10
139:11,12
155:24 156:1
157:6 159:15
159:17 171:9
172:6,12 173:8
177:21 181:2
183:16 188:19
199:20 206:2
**statements**
81:17 106:14
107:3 108:22
137:3 152:2
156:21 157:15
158:1,4 172:21
180:24 204:16
205:18 206:3
207:7

**[states - sucked]** Page 50

states   1:1
   128:14 142:5
   164:15
statewide   45:9
station   19:25
   20:1
status   203:25
statute   9:2 41:8
   66:16 119:20
   123:12,20
   126:11,13
   129:20,25
   130:1 159:22
   161:2 164:6
   165:18 166:5
   203:7,16
statutes   39:18
   111:25 126:7
statutory   58:18
   124:17 125:8
   126:17 141:20
   166:22 167:19
stayed   49:24
stays   102:23
stenographer
   4:5
stenographic
   209:4,24
stenotype
   209:15
step   47:15 71:4
   71:5
stephanie   50:9
   50:18,21

steve   92:23
   95:24
stick   170:19
stint   122:2
stocking   148:5
stood   102:9,10
stop   183:15
   192:2 196:20
   196:23 197:11
   197:18
stopped   197:8
stops   199:13
straightforward
   92:21
strategizing
   43:5
street   2:15 4:3
stripped   87:19
   89:23 102:15
   102:15
strong   140:23
structure
   126:17
student   19:19
   19:20 22:6,7
   22:17,21 30:3
   30:4,6 46:24
   68:15 69:10
   70:4 116:13,14
   116:17 121:22
   121:23 122:8
   126:3,6 127:1
   140:21 144:16
   146:22 160:21
   179:17 194:4,5

195:2,5,13,21
199:1,8,10
202:4,9,10,12
206:4,13 207:4
207:7
students   29:22
   30:9 31:6,6
   32:9 40:17
   67:19 69:8,23
   92:18 105:5
   107:2 110:6
   112:8 113:20
   114:8 115:7
   119:16 125:11
   135:6 142:17
   153:10 154:19
   164:7,22
   168:13,24
   169:2,5,6
   170:8,10,13
   173:7 174:23
   175:18 189:7
   189:11 190:20
   190:24 195:18
   196:11,14,15
   197:19,20
   198:14,16,18
   199:2,14,18
   201:1,18
   202:16,21
   203:11 204:2
studied   19:13
stuff   24:12
   25:19,20,24

sub   156:2
subject   12:20
   107:11 122:14
submission
   60:20 61:13
   63:4,17 90:4
submit   63:18
   75:4,10 171:7
submitted
   58:24 59:1,23
   59:25 60:1,2,3
   60:21,22 61:3
   62:2 73:24
   74:6 80:5
   139:17
submitting
   76:16
subscribed
   212:14
subsequently
   62:20
substance
   52:16 119:15
   139:15
substantive
   62:22 115:1
substantively
   52:24
success   59:12
   134:16 135:10
   135:19 144:20
   146:13 151:21
successor   47:18
sucked   44:20

[suggested - tell]                                                    Page 51

suggested   95:2
suggestion   95:3
  123:23 169:17
suggestions
  174:1
suggests   202:14
suit   8:3 12:19
suite   2:7,15 4:4
summaries
  137:9
summarized
  165:1
summary   124:2
  182:7
summer   24:9,9
  25:12 63:2
  64:12 88:10
  196:2,3
supervising
  154:3
supervisor
  50:21 134:7
  135:3 136:13
  138:22 151:24
supply   144:12
support   105:5
  129:12 206:14
supported
  105:6
supreme   18:5
sure   7:11 24:19
  29:14,16,18,24
  34:22 36:20
  44:1 51:9 53:9
  54:20 61:8,8

64:8 67:23
74:16 75:8
116:3 118:7
121:14 144:6
150:15 152:7,7
152:14,15,18
155:22 159:10
159:13 171:19
173:7 179:10
181:2 184:19
188:24 189:16
199:1 203:8,14
surfaced   64:12
surprised
  172:5 186:1,3
  187:2
suspects   99:7
swanson
  184:20,23
swear   4:11
  125:22
sworn   209:11
  212:14
syllabus   204:7
synod   201:24
  202:11
system   18:2,17
  25:6 70:4
  128:13 129:12
systems   128:13

**t**

t   3:5 211:3,3
table   182:16
tacked   26:17

take   6:5,14
  9:23 15:8
  26:20 40:19
  46:5 48:25
  51:8 55:7
  64:19,21 68:22
  68:23,25 69:13
  69:22 70:4,11
  118:6 121:13
  131:20 143:23
  146:7 150:13
  150:21 160:10
  173:7,8,12
  178:6 181:25
  192:25 195:8
  196:12 203:15
  207:12
taken   4:2 9:15
  54:10 69:12
  143:13 160:21
  189:17 209:16
takes   95:8
talents   199:20
talk   6:5 20:3
  51:25 52:4,19
  53:12,14 57:5
  58:4,13 60:16
  61:21 72:1,18
  88:15 90:9
  93:23 94:2
talked   51:18
  56:6 82:15
  92:16 101:7
  113:15 116:12
  140:21 183:11

talking   33:14
  36:8 51:15
  104:13 116:4,6
  120:5 134:21
  157:5 160:23
  172:25 198:8
  198:11
targeting
  179:21 181:6
  181:16,20
tasks   29:11
  45:3
taught   20:20
  119:19
taxes   86:10,12
teach   170:15
teacher   44:24
  45:1 99:9
teacher's   44:14
teaching   202:5
  202:7
teachings
  201:25 202:11
team   65:2
  76:18 78:2
  97:15 117:8,8
  122:9,11
  133:17 142:2
  144:18 148:24
  155:2 193:23
teams   79:15,15
  104:6
tell   7:11 14:2
  34:23 68:10
  73:25 125:9

**[tell - thought]**                                                    Page 52

141:4,22 142:4
142:21,22
162:16 167:20
183:18 184:5
**telling**  15:13
141:8 180:16
**ten**  109:15
150:13
**tenet**  114:16
**tenor**  41:20
65:25 66:18
70:25 88:17
151:10
**tenth**  68:22,23
68:24 69:12,22
**tenure**  192:6
201:10
**term**  153:10,13
153:14,19
**terminology**
148:10 188:9
**terms**  13:13
20:16 53:6
65:23 66:21
83:23 109:6
115:5,15 136:9
139:7 143:11
149:2 155:1
164:3
**test**  68:1 105:2
105:15 106:9
107:19 109:2
112:23,24
113:18 129:13

**testified**  8:10
88:21
**testify**  5:15 8:4
56:3,7 57:16
81:5 89:6
158:23,24
159:24 209:11
**testifying**  19:2
51:22 82:12
128:25 182:16
209:10
**testimony**  4:12
81:7 84:12
131:4 210:9,17
212:8
**tests**  41:22,23
105:21 112:9
112:11 115:11
**text**  11:7,9
79:14
**textbooks**
190:7,8,10
191:3,24
192:11
**texts**  11:7 14:2
14:3,6,10,13
**thank**  13:17
19:5 59:13
76:11
**thanks**  119:10
**themes**  5:13
**thereof**  209:8
**thing**  72:15
185:15 207:8

**things**  80:22
91:3 102:16
113:14 156:22
166:12 174:8
186:19 201:4
**think**  11:17
13:3 14:6,16
14:16,17 23:12
24:22 25:2
26:17 27:15,15
31:5 40:12
42:6,11 44:4
45:7 46:25
50:16 54:23
56:23 61:9,14
66:9,10 68:11
68:21 69:1,2,3
69:17 73:8
83:16,22 85:16
88:20 93:24
99:1,1 100:12
102:10 104:17
105:15,17
106:6,6,7,21
107:19,23
109:14 110:20
110:22 111:4
112:12,12
117:2,2,4
118:16,16
120:2,3,6
122:8,10,17,18
122:19 123:7
123:18 125:19
126:20,22,24

137:5,6 139:25
140:25 141:22
141:25 150:6
152:4,9 164:23
166:15,15
169:10,16
171:12 173:1
175:14 176:21
178:6,12,14
179:11,23
180:11,13
181:7,7,12,15
182:23 184:20
187:1,17,18,21
189:13 191:22
192:1,18
194:11 195:14
197:5,9,22,25
198:11 200:3
200:10,14,23
200:24 203:23
204:4,4,13
205:25 206:2
206:11,11,12
206:20 207:3,3
207:7,10 208:1
**thinking**  43:4
134:25 173:15
**third**  55:21
122:25 201:25
207:22 208:4
**thirdhand**
150:6 180:12
**thought**  19:11
42:13 123:15

124:7 128:20
133:4,17
137:25 138:2
142:22 147:12
148:5,24 167:1
172:11 178:4
**three** 26:14,16
26:16 31:24,25
36:9 38:7
48:11 83:11
86:24 158:7
**threshold**
124:7 126:12
**throw** 82:2
**throws** 9:8
**tied** 132:20
**till** 48:21
**time** 6:13 7:6
9:12 11:2
12:24,24 13:6
13:13 24:16
30:4,4,10,13
31:11,20,22
33:13 35:3
37:14,21,24
39:13,13 40:11
40:21 41:4
42:14,19,24
43:2,11,11,13
43:13,24 44:7
44:19 45:6
47:18,25 49:16
49:20 50:2,20
51:15,15,18
52:1,3 54:13

55:6 57:8,17
58:3 59:16
60:4 61:11
63:5 70:23
72:1,24 73:2
75:5,22 77:18
78:13 79:2,5
81:14 82:6,17
82:19 83:8,16
88:6 89:6 90:3
90:7 103:10
106:3 109:7,8
118:1,15 119:3
119:24 120:1
120:10,13,16
121:3 122:4,7
122:12 123:17
124:5 126:2,4
127:11 128:19
128:20 130:3
134:7 135:2,3
135:8,14
137:11,13,24
138:1 145:14
147:12 149:13
149:17 150:5
151:23 152:3
163:22 167:11
170:17 174:9
177:14 178:9
180:8 183:25
184:2 189:25
190:2,3,4
210:18

**timeframe**
210:8
**times** 14:1
109:10 140:8
174:7 183:9
203:7
**timmerman**
2:13 15:22
16:14 18:25
55:10 65:13
67:1 103:15
107:6 109:19
110:24 111:14
115:23 119:7,9
128:23 131:2
142:12 147:15
148:7 150:15
158:21 162:7
164:8 167:3
179:7 185:7,14
194:6 198:20
199:21 207:24
208:6,10 210:1
**title** 22:9
138:22
**today** 5:15 6:1
6:20 14:23
15:6 145:15
208:9
**todd** 193:8
**together** 64:15
77:7 78:4
80:20,21,22
82:21 87:5
135:21

**told** 52:24
100:2 112:5
146:24 165:15
165:17 166:1,6
166:9 167:17
167:21 180:17
183:19 184:13
185:16 186:2
188:6 207:21
**ton** 82:4
**took** 45:5,20
97:6 119:23
161:10 181:9
207:10 209:5
**top** 148:1 171:5
203:15
**topic** 52:14
55:22 56:7,9
62:23 70:7,8
76:25 86:14
90:1 173:2
184:10 187:6
**topics** 5:13,19
21:20 56:2
131:4 206:24
**tort** 22:15
**totality** 74:18
75:2 76:19
**touches** 148:21
**towards** 98:17
154:12 188:1
**track** 39:17
170:1 171:9,12
175:23

**tracks** 169:23
**trail** 61:14
**training** 45:2
  48:12
**tran** 132:8,19
  132:21 133:3
  137:6
**transcribe** 6:10
**transcribed**
  209:15
**transcript**
  210:6,19 212:5
  212:8
**transcription**
  209:16
**transportation**
  190:12,13
  191:3,25
  192:17
**travel** 203:12
**treat** 18:19
**treatment**
  132:18
**tribal** 203:18
  203:20 204:1
**tribe's** 204:3
**tried** 40:13
  66:11 131:9
**trigger** 138:7
**triggered** 24:24
  133:10 168:8
  181:4
**true** 209:14
  212:8

**truth** 4:13,14
  209:12
**truthful** 6:19
  116:19
**try** 6:14 98:12
  189:17
**trying** 11:1
  14:16 19:23
  30:17 41:21
  61:9 65:20
  80:22 96:11
  99:1 106:6,6,7
  117:2 128:18
  140:20 149:20
  165:11 166:11
  169:10 172:15
  181:16 187:23
  196:8 203:1
  204:13 206:11
**tumultuous**
  54:13
**turned** 12:7
  21:24
**tweak** 73:16
**tweaks** 73:21
**twitter** 11:17
  11:23
**two** 22:11,12
  40:12 50:16
  81:16 85:17
  95:8 97:14
  152:11,12
  179:22 180:9
  180:17,23,25
  181:3 182:20

  183:1,9 188:3
  190:24 196:3
  202:9 205:15
**type** 28:22
  102:16 116:23
  151:8 180:18
  181:16 183:8
  192:19
**types** 90:17
  187:11

**u**

**u** 38:17
**uh** 6:11,11
**ultimate** 42:8
**ultimately**
  53:21 54:19
  57:4 102:18
  124:13 125:20
  141:18 162:16
  175:8
**umbrella** 150:4
**uncomfortable**
  113:16 188:6,9
  188:11 198:23
**unconstitutio...**
  99:19
**under** 4:13 6:1
  18:19 36:21
  41:8 66:13
  99:5 129:24
  150:4 190:23
  209:11,12
**undergrad**
  23:22,23

**undergraduate**
  20:13
**underreprese...**
  200:13,19
**undersigned**
  209:4
**understand** 5:2
  5:25 6:17 9:4
  40:15 93:22
  98:2 104:18
  128:18 129:7
  129:16,22,25
  131:7 139:12
  155:17 168:10
  168:23 179:1
**understanding**
  17:9,12,14
  18:10,12 40:9
  40:10,16
  110:17 119:12
  123:15 127:12
  127:15,17
  129:4,6,17,18
  129:19 130:25
  135:20 136:19
  137:16 144:8
  146:22 147:6
  148:11 155:18
  157:13 160:18
  160:24 161:9
  161:17 162:3
  168:25 169:7,8
  172:17 175:5
  187:19,22
  188:2 194:15

194:18 199:7
204:1,13,23,25
**understood**
11:25 40:20
92:13 150:4
167:11 180:9
208:6
**unintentional**
119:5
**union** 44:14
45:20
**unions** 45:8
**united** 1:1
142:5
**universities**
69:24 89:11
96:14 98:24
108:21 137:20
137:22 154:7
188:4
**university**
13:16 21:24
22:5 42:4
56:17,21 93:20
99:23 105:13
107:19 108:10
120:5 121:25
122:17 125:1
125:16,21
128:12 132:3
133:1,16,20
134:1 137:2,17
137:18 140:14
142:1,1 144:11
145:24 153:2

154:8 160:22
198:3
**unni** 1:10 3:3
4:2,19,22
51:14 109:23
207:20 210:5
211:2,24 212:2
212:4,12
**unusual** 154:5
**update** 103:23
104:2 176:7,21
**updated** 98:6
**updates** 96:13
98:8 186:18,19
187:9,18
**upholding**
207:9
**upholds** 201:24
**urdahl** 85:22
**use** 5:4 6:11
11:12 105:3
153:10,13
167:1,22 170:2
194:25 199:7
**used** 9:9 79:12
105:25 137:3
188:8,21
195:16 210:19
**using** 142:16
148:10 153:14
157:8 199:4
206:10
**usual** 99:7
**usually** 6:14
59:2 74:19

75:2 76:17
77:3 79:22
86:24,25 95:4
95:16,20 97:23
102:1 128:15

**v**

**v** 1:6 210:4
211:1 212:1
**vaguely** 18:7
156:19 168:5
**value** 107:25
202:14
**values** 203:20
204:3
**variety** 189:16
**various** 28:21
**venues** 143:4
**verbal** 6:8 76:5
79:1
**verify** 210:9
**verifying** 90:12
**veritext** 210:14
210:23
**veritext.com.**
210:15
**versus** 4:24
36:18 70:5
120:15 175:23
**view** 15:20 16:3
17:24,25 19:8
203:17
**vinyl** 20:8
**violate** 167:5
**violates** 141:23

**violating** 130:5
130:9,15,21
133:5 142:23
147:13 149:18
**violation** 142:5
162:4 166:25
**violations**
192:9
**virtue** 209:8
**vote** 23:5,10,11
70:19 84:22
85:6,8,16
86:20 87:23
88:1 98:12
103:2
**voted** 35:1
85:18
**votes** 70:24
101:18
**voting** 24:23
34:18,20 35:12
**voucher** 195:7

**w**

**wait** 6:6
**waived** 208:2
**walk** 92:1
**walked** 91:2,25
**walking** 91:14
**want** 19:2 51:8
67:19 81:9
82:3 95:10
103:15 105:23
106:18 149:3
168:23,25
171:20 173:12

195:8 196:10
199:23 207:19
207:25
**wanted** 47:8
111:8 118:6
141:15 146:23
149:24 162:22
162:23 168:15
168:20 175:1
176:15 177:1
178:13,20
180:6 195:14
196:12
**wanting** 160:25
176:21 178:25
179:5
**washington** 2:8
21:1 24:3
**way** 60:12,14
62:3,22 73:17
98:12 104:5
114:14,17
118:17 123:21
171:12,21
200:20
**ways** 85:9
108:23 201:1
**we've** 52:15,16
68:8 96:13
104:19 109:13
113:11 114:24
137:5 139:17
150:12 151:11
192:15,15,18
195:25

**website** 205:19
205:20
**websites** 81:19
**webster** 158:16
159:6
**weeks** 93:18
183:2
**weight** 69:4
**went** 26:10
27:11 38:3
44:11 48:4,4
62:11,12 85:7
85:7,9 86:10
86:11,13,15
90:15 102:22
140:4 150:10
157:16 174:6
**whichever** 59:3
**wide** 148:20
**willie** 1:7 210:4
211:1 212:1
**willing** 181:8
**wise** 111:16
**wit** 4:8
**withdraw**
46:24
**witness** 3:2
4:15 15:24
16:12,17 19:5
51:9 107:13
111:4,16 116:3
119:6 131:7
147:19 148:9
159:1 162:11
179:10 194:11

198:22 199:24
209:20 210:8
210:10,12,18
**witnesses**
209:10
**wonder** 189:4
**wondering**
67:10 169:20
**woodruff**
184:18 185:3,4
**word** 8:16
206:10
**words** 69:19
73:22
**work** 8:20
11:13,17 20:18
20:19,25 26:9
26:10,18 27:23
27:23 28:9,22
29:12,17 32:6
39:19 44:17
45:17,23 70:20
87:4 145:23
154:9 202:8
**worked** 7:5,7
21:1 27:22,23
32:18 38:18
46:13,19 47:3
60:13 105:9
190:1
**workhorse**
124:9
**working** 27:10
29:13 32:5
75:5 135:14

188:1
**workings** 53:6
**works** 60:14
63:15 97:23
135:19 145:9
146:14 154:1
155:19 195:2
**world** 15:21
16:3,7
**write** 21:23
74:11
**writer** 22:19
**writing** 21:19
25:25 143:6
144:13
**written** 8:15
9:11 22:17,21
81:20 82:5
124:24 165:12
**wrote** 124:11
124:19,23

| **x** |
| :-: |

**x** 3:1,5 71:18

| **y** |
| :-: |

**yeah** 8:7,19
14:9 16:20
19:6,8 22:17
25:21 27:16
33:12 37:22
48:16 49:8
55:10 57:9
65:14 74:4,13
76:22,25 80:19
82:7,7 85:24

88:12 101:5
103:1 110:11
110:16 119:7
121:16 125:5
127:8 130:19
147:6,19 148:9
149:2 162:11
165:24 166:3
168:9 171:12
174:7 179:10
189:16 190:5,5
194:11 195:12
195:12,14
198:6 208:12
**year**   20:20 23:6
25:16,19,21,22
26:12,16,17
27:15,16 38:4
43:20 51:2
55:3 65:23
88:18 90:10
141:10 157:12
195:24
**year's**   54:11
**years**   11:24
12:18 20:2
24:8 25:13
36:4,6,7,9 38:7
60:21 90:11,13
91:4,18 130:3
138:5 148:14
165:2 169:25
183:14 196:4
**yellow**   94:13

**yep**   10:19
79:19 83:21
164:18
**youakim**   83:16
91:19 117:4
**youth**   31:23

**z**

**zero**   45:13
**zoom**   79:15

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.