Ex. 11

**In The Matter Of:**

*Melinda and Mark Loe, et al vs.*
*Willie Jett, et al*

---

*CHRISTOPHER MATHEWS*
*January 31, 2024*
*Christopher Mathews - 1-31-24*

---

*Shaddix & Associates*
*7400 Lyndale Avenue South*
*Suite 190*
*Richfield, MN 55423*

**Min-U-Script® with Word Index**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 2 of 55

Melinda and Mark Loe, et al vs.                Christopher Mathews          CHRISTOPHER MATHEWS
Willie Jett, et al                                  1-31-24                      January 31, 2024

**Page 1**

```
 1                 UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA
 2
 3   -------------------------------------------------
     Melinda and Mark Loe, on their
 4   own behalf and as next friends
     of their children R.L. and O.L.;
 5   Dawn Erickson, on her own behalf
     and as next friend of her child
 6   J.G.; Crown College; and
     University of Northwestern
 7   St. Paul,
 8                    Plaintiffs,
 9   vs.                              Case No. 23-CV-1527
                                              (NEB/JFD)
10   Willie Jett, in his official
     capacity as Minnesota
11   Commissioner of Education;
     and Minnesota Department of
12   Education,
13                    Defendants.
14   -------------------------------------------------
15
16
17                    Deposition of
18                  Christopher Mathews
19                  January 31, 2024
20                9:05 a.m. - 2:01 p.m.
21
22
23   Taken by:  Jackie Young, RPR
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3   BECKET LAW
     1919 Pennsylvania Avenue Northwest
 4   Suite 400
     Washington, D.C. 20006
 5   Dthomson@becketlaw.org
 6   By:  Ms. Diana Verm Thomson, Esquire
          Mr. Eric Baxter, Esquire
 7        Mr. Benjamin Fleshman, Esquire
          Ms. Andrea Butler, Esquire
 8        Appeared on behalf of the Plaintiffs
 9
10   LATHROP GPM
     80 South Eighth Street
11   3100 IDS Center
     Minneapolis, Minnesota 55402
12   Richard.landon@lathropgpm.com
13   By:  Mr. Richard Landon, Esquire
          Appeared on behalf of the Plaintiffs
14
15
16   MINNESOTA ATTORNEY GENERAL'S OFFICE
     445 Minnesota Street
17   Suite 1400
     St. Paul, Minnesota 55101-2131
18   Jeffrey.Timmerman@ag.state.mn.us
     Madeleine.demeules@ag.state.mn.us
19
20   By:  Mr. Jeffrey Timmerman, Esquire
          Ms. Madeleine Demeules, Esquire
          Appeared on behalf of the Defendants
21
22
23
24
25
```

**Page 3**

```
 1                  I N D E X
 2                                              PAGE:
```
```
 3   TITLE.............................................    1
 4   APPEARANCES.......................................    2
 5   INDEX.............................................    3
 6   EXAMINATION BY:
 7     MR. TIMMERMAN...................................    5
 8   EXHIBITS MARKED:
 9   No. 1:  Second Amended Notice of Deposition........  19
10   No. 2:  PSEO Data..................................  22
11   No. 3:  E-mail dated March 8, 2023.................  29
12   No. 4:  2028 Strategic Plan........................  31
13   No. 5:  Mission and Vision.........................  36
14   No. 6:  Crown College 2023-2024 Handbook...........  46
             Community Covenant
15
16   No. 7:  Crown College 2023-2024 Student Conduct....  58
             Discipline and Grievances
17   No. 8:  Crown College School of Arts & Sciences....  64
             2023-2024 Handbook
18
19   No. 9:  Crown College 2023-2024 Handbook...........  67
             Spiritual Life
20   No. 10: Crown College 2023-2024 Admissions Catalog.  68
21   No. 11: E-mails dated June 6, 2023.................  74
22   No. 12: Crown College Application for Admission....  80
23   No. 13: Letter dated May 22, 2002, to Dr. Moats....  86
24   No. 14: PSEO Discussion Attendees, 2-20-2023.......  91
25   No. 15: Memo to Representative Jim Abeler..........  94
```

**Page 4**

```
 1   No. 16: E-mails dated May 25, 2023................ 101
 2   No. 17: E-mails dated June 15, 2023.............. 105
 3   No. 18: E-mails dated March 6, 2023.............. 110
 4   No. 19: Crown College PSEO Advising Form......... 113
 5   No. 20: MN Dept. of Education, Eligible Courses... 125
             for the PSEO program.
 6
 7   No. 21: E-mails dated March 3, 2023.............. 133
     No. 22: Letter re PSEO Legislation and Lawsuit... 138
 8
 9   OBJECTIONS BY MS. THOMSON:  14, 21, 22, 42, 63, 73, 87,
10     91, 93, 94, 97, 98, 99, 101, 103, 104, 107, 109, 110,
       114, 122, 131, 132, 136
11   REPORTER'S CERTIFICATE........................... 141
12   VERIFICATION..................................... 142
13
14   *Original transcript and exhibits are in the custody of
        Mr. Timmerman.
15
```
```
16
17
18
19
20
21
22
23
24
25
```

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 3 of 55

Melinda and Mark Loe, et al vs.    Christopher Mathews    CHRISTOPHER MATHEWS
Willie Jett, et al    1-31-24    January 31, 2024

Page 5

1   P R O C E E D I N G S
2   (Minnesota Statute 486.10 was
3   complied with.)
4   CHRISTOPHER MATHEWS,
5   called as a witness, being first
6   duly sworn, was examined and
7   testified on his oath as follows:
8   **EXAMINATION**
9   **BY MR. TIMMERMAN:**
10  Q.  Dr. Mathews, we met informally just now.  I'm --
11  A.  **Good afternoon.**
12  Q.  -- Jeff Timmerman.
13  A.  **Gotcha.**
14  Q.  Could you state your full name for the record?
15  A.  **Sure.  Christopher Wayne Mathews.**
16  Q.  And it's one T, Mathews; correct?
17  A.  **Yes.  That's for noticing.  My family has never been**
18  **good at spelling.**
19  Q.  I get the two Ms in Timmerman so I understand.
20      And what's your position currently at
21  Crown College?
22  A.  **Vice president of academic affairs.**
23  Q.  And how long have you been in that role?
24  A.  **Two and a half years.**
25  Q.  And what about before that?  Where did you work

Page 6

1  or --
2  A.  **Sure.**
3  Q.  -- where were you employed?
4  A.  **Sure.  Immediately previous to that I was the dean**
5  **of the College of Fine Arts at Oklahoma Baptist**
6  **University.**
7  Q.  And where is that?
8  A.  **It's in Shawnee, just outside of Oklahoma City.**
9  Q.  How long were you there?
10  A.  **Five years.**
11  Q.  And what about before that?
12  A.  **Chair of the Department of Music at Union University**
13  **in Jackson, Tennessee, and that was for eight.**
14  Q.  Did you teach before that?
15  A.  **I did.  So my first faculty appointment was at**
16  **Clemson University in South Carolina.**
17  Q.  And when was that?  Do you recall the year?
18  A.  **2004 to 2008.**
19  Q.  And did you go immediately from there to Union?
20  A.  **I did.**
21  Q.  What about your educational background, what is your
22  terminal degree?
23  A.  **From the University of Kentucky.  I have a doctorate**
24  **of musical arts in choir conducting.  I'm hoping**
25  **we'll spend some time singing.**

Page 7

1  Q.  I saw at some point that students wrote a song for
2  you.  Is that true?
3  A.  **Oh, my word.  I hope not.  I -- I don't think so.  I**
4  **don't know.**
5  Q.  Okay.
6  A.  **I would not be surprised, but I don't -- I don't**
7  **know that.  So can you tell me more?  I understood**
8  **that some students at some point created a Facebook**
9  **for me.  I try not to look at those things, but I**
10  **don't know the song that's been written for me.**
11  Q.  I'll have to send it to your counsel.
12  A.  **Yeah.**
13  Q.  It was a nice song.
14  A.  **Oh, good.**
15  Q.  And what about your -- your undergraduate degree,
16  where did you get that from?
17  A.  **Sure.  It's from Union University so.**
18  Q.  And master's degree?
19  A.  **Southwest Missouri State.  It's now Missouri State**
20  **University in Springfield.**
21  Q.  If we could, I know that Dr. Denton is the president
22  of Crown College; is that right?
23  A.  **Sure.  That's right.**
24  Q.  Is he your direct boss?
25  A.  **He is.**

Page 8

1  Q.  And Dr. Denton, I would assume, reports to the
2  board of trustees for the college?
3  A.  **That's correct.**
4  Q.  How many members are there of the board of trustees,
5  if you know?
6  A.  **I think the current number is 17.  By our policy**
7  **it's 17 to 21.**
8  Q.  And how many employees do you have that report
9  directly to you?
10  A.  **I think the number is 46.  They're in my umbrella**
11  **so.**
12  Q.  Forty-six directly reporting to you?
13  A.  **Well, yeah.  I was about to say, you're probably**
14  **going to define that.  I'm trying to think.**
15  **Academics is 46.  With that, I have -- of that, I**
16  **have six academic deans report directly to me:  The**
17  **director of the library, director of student**
18  **success, the registrar.  Yes.**
19  Q.  And where does the PSEO leadership fit within the
20  structure of the college?
21  A.  **Sure.  That's in our school of online studies, so**
22  **that's presently overseen by the dean of the school**
23  **of online studies.**
24  Q.  And who is that?
25  A.  **Fawn McCracken.**

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 9

1  Q.  And does Dr. McCracken report to you?
2  A.  **In one capacity.  So her -- she's also the chief**
3  **online learning officer, so oversees any of our**
4  **nontraditional programs, and that -- that capacity**
5  **operationally reports directly to the president.**
6  **Administratively, in terms of academics, it reports**
7  **to me so.**
8  Q.  And is there, for lack of a better term, a cabinet
9  at the University?
10  A.  **Sure, and that's the term we use.**
11  Q.  It is?
12  A.  **Yes.**
13  Q.  I've heard senior leadership team or --
14  A.  **Yeah.  It changes everywhere I go so.**
15  Q.  Okay.  Who is on the cabinet at Crown?
16  A.  **So obviously the president is there.  Vice president**
17  **of enrollment and marketing.  Do you need names?**
18  Q.  That would be great.
19  A.  **So Dr. Dee McDonald.**
20  Q.  Okay.
21  A.  **Our vice president of college relations is**
22  **Joel Johnson.**
23  Q.  Okay.
24  A.  **Our chief operations officer is Mike Price.**
25  Q.  Okay.

Page 10

1  A.  **Our chief of staff is Jen Niska.**
2  Q.  Okay.
3  A.  **Our chief online learning officer is Dr. Fawn**
4  **McCracken.  And our vice president of student**
5  **development is Martha Swift.**
6  Q.  Thank you.
7  A.  **Is that seven plus Dr. Denton?**
8  Q.  It is.
9  A.  **Okay.  Great.**
10  Q.  It is.  And how frequently does the cabinet meet?
11  A.  **At least weekly, every Thursday for the morning,**
12  **three to four hours, and then as needed beyond that.**
13  Q.  And are you in attendance typically at the board of
14  trustees' meetings as well?
15  A.  **I am.**
16  Q.  Does the board have any direct oversight over PSEO
17  aside from kind of its normal role as board?
18  A.  **No.  No, nothing in particular.**
19  Q.  I know boards typically leave the operational
20  matters to the actual administrative staff.  Is that
21  what Crown's board does as well?
22  A.  **That's right.  So the terminology that we use is**
23  **the board has one employee and the term president,**
24  **and they empower him to manage the day-to-day**
25  **operations of the institution.**

Page 11

1  Q.  Thank you.  Have you ever given a deposition before?
2  A.  **I have not.**
3  Q.  Okay.  Ever testified in court?
4  A.  **Many years ago.  So just out of college.  I worked**
5  **for a finance company and there was a party that**
6  **did not pay according to obligations, and so I**
7  **was in the box.**
8  Q.  The witness box?
9  A.  **The witness box.  Three minutes, I think.  Something**
10  **long enough for the attorney to say, is this the**
11  **paperwork, did they pay.  So that's the extent of**
12  **my testimony.**
13  Q.  Great.  Well, I'm going to go over just a couple of
14  ground rules --
15  A.  **Thank you.**
16  Q.  -- just so we're all on the same page today.
17      The first will be, let's try not to
18  talk over each other.  I think we'll be fine but --
19  A.  **Okay.**
20  Q.  -- try to let me finish my question and I'll try to
21  let you finish your answer.
22  A.  **Sure.  Sure.**
23  Q.  Second, this is not a marathon.  We can take breaks
24  whenever you need it.
25  A.  **Okay.**

Page 12

1  Q.  The third is that I'm not trying to trick you.
2  A.  **Okay.**
3  Q.  And lawyers oftentimes ask questions that aren't
4  very good, including me.
5  A.  **Sure.**
6  Q.  I've done that plenty of times.  If you don't
7  understand what I'm asking, just tell me.  Okay?
8  A.  **Okay.  Thank you.**
9  Q.  And I'll try to state it in a clearer way for you.
10  A.  **Thank you.**
11  Q.  Also, if you, you know, remember something later on
12  in the day that's relevant to something we discussed
13  earlier, just let me know and we can talk about it
14  then.
15  A.  **Sure.**
16  Q.  We do have a court reporter here today, and it's
17  important that we not shake our head or say um-uhm.
18  So verbal answers would be appreciated.
19      And, lastly, I don't want to know, and
20  I'm not entitled to know, anything that you've
21  discussed with your lawyers.
22  A.  **Okay.**
23  Q.  So they will, I'm sure, be diligent about
24  interjecting if I ask a question that implicates
25  that, but just keep in mind that my questions are

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 13

1  not intended to get at those conversations or
2  communications.
3  **A.  Okay.  Thank you.**
4  Q.  Is Crown -- I am not a native Minnesotan.  Is it
5  pronounced St. Bonifacius?
6  **A.  I think so.  I also am not a native Minnesotan, but,**
7  **yes, St. Bonifacius.**
8  Q.  And that's where Crown is located; correct?
9  **A.  It is, yep.**
10 Q.  How many students roughly, undergraduate students,
11 does Crown have?
12 **A.  Sure.  This semester we're right at 1,500.**
13 Q.  And how -- Is St. Bonifacius pretty small?
14 **A.  It is.  It is.  Our campus is about halfway between**
15 **St. Bonifacius and Waconia, and so most of the**
16 **commerce would take place in Waconia, but our**
17 **mailing address is St. Bonifacius so.  We can -- we**
18 **can go to Subway in St. Bonifacius.**
19 Q.  I'm familiar with Waconia.
20 **A.  Yeah, it's a beautiful area.**
21 Q.  It is.  The lake there is gorgeous.
22 **A.  But it's not making our ice fishermen very happy**
23 **right now.**
24 Q.  No.  It's been a rough year for that.
25 **A.  It has.**

Page 14

1  Q.  Winter tourism is suffering this year.
2      Do you know the next closest
3  institution that provides PSEO?
4      **MS. THOMSON:** Objection; outside the
5  scope, but you can answer if you know.
6  **A.  I don't know.  Yeah.**
7  Q.  Okay.  And aside from meeting with your lawyers,
8  which again I don't want to know anything about,
9  what else did you do to prepare for your deposition
10 today?
11 **A.  Sure.  Reviewed our catalogs, spoke with several**
12 **people across campus, reviewed other documents that**
13 **we have on our website and others.**
14 Q.  And who across campus did you speak with?
15 **A.  Sure.  Martha Swift, who is our vice president of**
16 **student development.  Jen Niska, who is on our**
17 **cabinet.  Emily Cano, who is our director of the**
18 **PSEO program for us.  Gail Grant, who manages our**
19 **data for enrollment.  Kimberly LaQuay, who is our**
20 **college registrar.  Ron Straka, who is our**
21 **controller.  I think that's exhaustive.**
22 Q.  That's a lot of people.  Okay.  And what did you
23 discuss with Martha Swift?
24 **A.  Specifically our student handbook and understanding**
25 **how that's communicated to our students when**

Page 15

1  **they're on campus.**
2  Q.  And what is your understanding with respect to how
3  that's communicated?
4  **A.  So it's public.  It's a forward-facing document.**
5  **We do have orientation sessions for our students**
6  **upon arrival, and so it's communicated through those**
7  **orientation sessions as well.**
8  Q.  And are those orientation sessions that occur after
9  students have matriculated and begun classes or
10 occur prior to enrollment?
11 **A.  Well, they have enrolled in classes.  It's before**
12 **classes begin.**
13 Q.  Okay.
14 **A.  So it's usually in what we term as a welcome week.**
15 Q.  And what did you discuss with Jen Niska?
16 **A.  Some of the process of document collection and**
17 **information collection as we were preparing --**
18 **preparing for the deposition.  And so she was**
19 **appointed by our president when we first learned of**
20 **the potential change in the PSEO language to be our**
21 **lead person in that.  And so understanding more**
22 **of -- her involvement with that, understanding more**
23 **of what she had discovered through that so that I**
24 **would prepared for this time.**
25 Q.  Were you aware that she was kind of in a, for lack

Page 16

1  of a better phrase, a legislative liaison role with
2  respect to the law?
3  **A.  I don't know that I would use that terminology, but,**
4  **yes, I knew that she was engaged in speaking with**
5  **government officials, that she was aware of what**
6  **was going on in the voting process and speaking with**
7  **representatives between that time.**
8  Q.  Great.  And did you have any personal involvement
9  in those discussions or that outreach?
10 **A.  I did not.**
11 Q.  And is it Emily Cano?
12 **A.  Cano, C-a-n-o.**
13 Q.  And you said that she -- Emily is the director of
14 PSEO?
15 **A.  That's right.**
16 Q.  What did you discuss with Emily Cano to prepare for
17 today?
18 **A.  Trying to make sure that I had a clear understanding**
19 **of our application process, our admission process,**
20 **communications that we have with PSEO students,**
21 **understanding any -- any background over the period**
22 **of time that may be -- may be asked in a deposition**
23 **so.**
24 Q.  What about with Gail Grant, what did you discuss
25 with Ms. Grant?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 17

1 A.  Again, better understanding our application process
2 specifically.  And Gail Grant has also been with
3 the institution of that list perhaps the longest,
4 and so trying to understand our process of becoming
5 an eligible institution and how we -- how we
6 attained that and what we do now so.
7 Q.  Do you know when Crown first became an eligible
8 institution?
9 A.  I think it's 2002.
10 Q.  And was Gail Grant working for Crown at the time?
11 A.  That's a great question.  If not, close to that.  I
12 do think she was here in 2002, but I -- I may be off
13 a year or two.
14 Q.  And Kimberly La --
15 A.  LaQuay, L-a-Q-u-a-y.
16 Q.  What did you speak about with Kimberly or about with
17 Kimberly?
18 A.  Understanding the courses that we call nonsectarian.
19 Those that we offer to PSEO students.  And so
20 Kimberly keeps track of those records and also
21 keeps -- maintains our catalog, our course catalog,
22 so again wanting to understand the language that's
23 involved there and know where I can find that
24 information.
25 Q.  Great.  And finally Mr. Straka, what did you

Page 18

1 discuss with Mr. Straka?
2 A.  Only one question, and that's just how our
3 accounting processes work with receivables and
4 expenditures.  And I believe one of the questions
5 had to do with the amount of money that Crown has
6 received through the relevant period.  So I just
7 wanted to understand how that was factored, how
8 that was figured for us.
9 Q.  Great.  And what did you learn with respect to how
10 that works?
11 A.  All funds are attributed to tuition, and then in
12 general our accounting processes are that all our
13 receivables, unless otherwise designated by a donor,
14 are used -- they're all used as receivables, so we
15 don't -- we don't track individual receipts.  So in
16 other words, we don't say this is a graduate tuition
17 versus an undergraduate tuition.  Once it comes in,
18 then it's an overall part of our budget.
19 Q.  Got it.  Just as a formality, I'm going to introduce
20 this as Exhibit 1 to your deposition.  As a matter
21 of course today, when I put documents in front of
22 you, please I'd like you to take your time and
23 review them.
24 A.  Is this one for me?
25 Q.  That's for your lawyer.  We'll mark this one for

Page 19

1 you.
2 A.  Okay.  Got it.
3 Q.  Take your time to review anything I put in front of
4 you.  Again, I'm not trying to trick you and I want
5 you to know what I'm asking questions about before
6 I ask them.
7 A.  Sure.
8 (Exhibit No. 1 marked for
9 identification)
10 A.  (Reviews Exhibit No. 1.)
11 Q.  Have you had a chance to review that?
12 A.  Review, yes.  Should I read it all?
13 Q.  I just wanted to ask, have you seen this before?
14 A.  It looks very familiar.  I've seen a few of these
15 before, but I think so.  I'm struck a little bit by
16 the date at the end, January 25th.  That seems more
17 recent.
18 Q.  And I'll represent, yeah, it's more recent because
19 the date of your deposition changed, so it's the
20 same document --
21 A.  Okay.
22 Q.  -- you'll see second amended on the front there --
23 A.  I see.
24 Q.  -- notifying you that the date has changed.
25 A.  Sure.

Page 20

1 Q.  You understand that you're here today to testify on
2 behalf of Crown to the topics identified in this
3 document?
4 A.  Yes, sir.
5 Q.  And do you feel comfortable doing that?
6 A.  Yes.
7 Q.  I suppose as comfortable as possible?
8 A.  There's an awful lot of attorneys in the room, but,
9 yes, outside of that.
10 MS. THOMSON: We'll try not to be too
11 mean.
12 THE WITNESS: That's right.
13 MR. TIMMERMAN: That's true.  It
14 doesn't get you very far in these things so.
15 BY MR. TIMMERMAN:
16 Q.  Can you explain to me, Dr. Mathews, and I'm going
17 to probably botch the terms here, but I grew up in
18 a specific denomination of the Lutheran, the Lutheran
19 Church.  What is Crown's denomination or doctrinal
20 affiliation?
21 A.  Christian and Missionary Alliance.
22 Q.  And is that a nationwide alliance?
23 A.  It is, with international.  So there's the Christian
24 and Missionary Alliance in the United States, but
25 you'll also hear the term alliance or you may see

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

---

Page 21

1 the term C&MA or CMA, and those are all referring
2 to our denomination.
3 Q.  And if the CMA is like the denominations that I grew
4 up in, does it create doctrinal statements or
5 theology?
6 A.  There is a statement of faith, yes.
7 Q.  And is there any -- are there any other documents
8 that explain CMA's position with respect to biblical
9 issues?
10 A.  There are.
11 Q.  And are members of CMA expected to abide by the
12 theological statements and statement of faith that
13 CMA promulgates?
14 A.  That's right.
15    MS. THOMSON: Objection; outside the
16 scope, but --
17 Q.  Are there any other educational institutions in
18 Minnesota that are members of CMA that you know of?
19 A.  Not in Minnesota.
20 Q.  Are there other educational institutions in other
21 states that are members CMA?
22 A.  There are.  So we're one of three.  The other,
23 De Sota Falls in De Sota Falls, Georgia, and
24 Simpson.  We change university and college often.  I
25 think it's De Sota Falls College and Simpson

Page 22

1 University.
2 Q.  In Iowa?
3 A.  I'm so sorry.  In California, Redding, California.
4 And then the A.W. Tozer Seminary is a part of
5 Simpson University in California.
6 Q.  And does the CMA have any direct oversight over
7 Crown's curriculum?
8 A.  Not direct.  So on our board are representatives
9 from the Christian and Missionary Alliance.  Again,
10 they charge the president with the day-to-day
11 operations, so they -- they do not involve
12 themselves with the curriculum.
13    If we were to change our Christian
14 studies core, we would present that to the board
15 for approval, but they -- they don't direct on those
16 issues.
17 Q.  And do you know, the other schools that participate
18 in CMA, the ones that you've just listed, do you
19 know, do they provide anything equivalent to PSEO?
20    MS. THOMSON: Objection; outside the
21 scope, but you can answer if you know.
22 A.  I don't know.
23    MR. TIMMERMAN: And this is Loe 2966.
24    (Exhibit No. 2 marked for
25 identification)

Page 23

1 A.  The yellow sticker means it's for me; right?
2 Q.  That's correct.
3 A.  (Reviews Exhibit No. 2.)
4 Q.  Have you had a chance to review this one?
5 A.  Yes, sir.
6 Q.  Thank you.  And I'll represent that the numbers in
7 the bottom right-hand corner are what we call Bates
8 labels.
9 A.  Okay.
10 Q.  Essentially it's just a means of ensuring that both
11 parties keep their documents in order so we can
12 identify them.
13 A.  Looking at the same document.
14 Q.  Correct.
15 A.  Yes.
16 Q.  Have you ever seen this document before?
17 A.  This one is unfamiliar to me.
18 Q.  Okay.  I just wanted to ask you a couple questions
19 about it.
20 A.  Okay.
21 Q.  So my first question is, if you look at the
22 modality, it says on-campus 68.
23 A.  Um-uhm.
24 Q.  Is that your understanding of how many students
25 currently attend on-campus PSEO at Crown?

Page 24

1 A.  It is.  The approximate number is 70, and sometimes
2 that waxes and wanes once the semester starts or
3 whatever.  But, yes, 68.  Yes.
4 Q.  And is there an admissions cap for on-campus PSEO
5 at Crown?
6 A.  Again, we usually set it at around 70.  I think the
7 previous year we probably exceeded that by a few
8 students.  I'm assuming this is from this year.
9 This looks right to me to be this year.  I just --
10 Q.  Sure.
11 A.  -- don't know.  But, yes, I think it's 68 this year.
12 Q.  And then online, same section, the modality section,
13 online is 89.  Does that represent students who
14 take PSEO online through Crown?
15 A.  Yes.
16 Q.  Do you know when Crown began offering on-campus
17 PSEO?  Was that back in 2002?
18 A.  That's right.  That was our original modality.
19 Q.  Do you know when the online modality was started at
20 Crown?
21 A.  Not with confidence.
22 Q.  Okay.
23 A.  A few years after that, but I'm not sure I can tell
24 you the exact year.
25 Q.  And under -- again, under the modality section, it

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 25

1 says home school hybrid, 83.  Do you know what home
2 school hybrid references?
3 **A.  I do.  We have several home school groups with whom**
4 **we partner.**
5 Q.  And what does the delivery of that education look
6 like?
7 **A.  I believe it depends on the home school group, and**
8 **so I do believe students through those can take**
9 **those online and they can also, in some cases, we**
10 **have an instructor of record that's usually**
11 **associated with the home school group or sort of**
12 **adjunct basis for us.  I don't know that I can tell**
13 **you what percentage or how often that's done but --**
14 Q.  Sure.  Do any of the home school hybrid students
15 come on campus for courses, to your knowledge?
16 **A.  Not to my knowledge.**
17 Q.  And then the last category is high school hybrid.
18 Do you know what that references?
19 **A.  Sure.  So we have partnerships with schools, such as**
20 **Waconia Public School as well as Southwest Christian**
21 **and others that, again, we partner with.**
22 Q.  And how is that education delivered?  Is that on the
23 high school campus?
24 **A.  In most cases it's on the high school campus.**
25 **Again, I do believe there have been instances or are**

Page 26

1 **instances where there is online modality as well.**
2 Q.  And are those courses taught by a Crown instructor
3 or are they taught by a secondary school instructor;
4 do you know?
5 **A.  They would be a Crown instructor for purposes of the**
6 **course.  So, for instance, there may be a Southwest**
7 **Christian teacher who's a Southwest Christian High**
8 **School teacher who's teaching a course, but we -- we**
9 **hire them as the instructor for that course, ensure**
10 **credentials, the content of the course.**
11 Q.  Great.  And then the nine-year average matriculation
12 rate, according to this document, is 26.2 percent.
13 Is that a figure that Crown routinely monitors?
14 **A.  We do, yeah.  We are happy when students have had**
15 **good experiences with PSEO and choose to continue**
16 **their education at Crown.**
17 Q.  And at least according to this document, it looks
18 like Crown has only high school juniors and high
19 school seniors enrolled in PSEO courses.  Is that
20 your understanding as well?
21 **A.  It is.**
22 Q.  Do you know if high school sophomores have ever
23 been able to enroll in PSEO at Crown?
24 **A.  I am not aware.**
25 Q.  Okay.  Do you know whether any -- so of the 68

Page 27

1 students who are listed in this document as
2 on-campus modality, do you know if any of those
3 students reside in a residence hall on campus?
4 **A.  They do.  We usually have in the single digits,**
5 **usually approximately five, that will reside on**
6 **campus.**
7 Q.  Is that an option that's provided to anyone who
8 wants to take on-campus PSEO at Crown?
9 **A.  It is, but it's predicated on availability of rooms.**
10 Q.  And for those students who reside on campus for
11 PSEO, are they required to pay for room and board?
12 **A.  They are.**
13 Q.  Are they required to participate in the Crown
14 environment or culture or campus activities in any
15 manner that's different than, for example, on-campus
16 students who don't reside in a residence hall?
17 **A.  I want to make sure I understand your question.**
18 **That they are --  Can you ask that again?**
19 Q.  Absolutely.  That was a horrible question.
20 **A.  No.  Who's the they and who is asking it, if you**
21 **don't mind.**
22 Q.  So let me ask it a little bit differently.  High
23 school students who are on campus and living on
24 campus --
25 **A.  Yes.**

Page 28

1 Q.  -- are they required to attend any chapel or
2 religious services or gatherings?
3 **A.  No.  So these are PSEO students.  No, so there's**
4 **not a different requirement for them.**
5 Q.  Are you aware of any occasion or timeframe in which
6 PSEO students who were residing on campus were
7 required to attend chapel or religious meetings?
8 **A.  Not required.**
9 Q.  And in terms of, if we compare the online modality
10 versus the on-campus modality, are the exact same
11 courses offered in each modality?
12 **A.  Yes.  Again, for clarity, some of that is predicated**
13 **on our ability to offer the courses.  So sometimes**
14 **we offer more in a given semester online modality**
15 **than on campus or, again, according to the faculty**
16 **that we have.  But as far as the complement of**
17 **courses we offer, there's no distinction.**
18 Q.  Are there any courses that are offered exclusively
19 on campus; for example, chemistry lab or courses
20 involving science lab work?
21 **A.  Not to my knowledge, no.**
22 Q.  Has Crown ever considered limiting PSEO
23 participation on campus to only students who intend
24 to matriculate to Crown?
25 **A.  No.  Can you ask again?  I'm pretty sure the answer**

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 29

1   is no to that but --
2   Q.   It might be easier if I just show you a document
3   here.
4   A.   Sure.
5       (Exhibit No. 3 marked for
6   identification)
7   Q.   Dr. Mathews, this is Exhibit 3 again.  Please take
8   your time and read it.
9       MS. THOMSON:  For the record, this is
10  Loe 23.
11  A.   (Reviews Exhibit No. 3.)  Um-uhm.
12  Q.   Excellent.  Thank you.
13  A.   Sure.
14  Q.   Who is Darin Mather or Mather?
15  A.   Math-er.  He is our associate dean of the school of
16  online studies.
17  Q.   And who does Darin Mather report to?
18  A.   Fawn McCracken.
19  Q.   And if you look at the paragraph beginning this
20  morning, I was thinking about the internal and
21  external pressure we are getting around on-campus
22  PSEO.  I'm wondering if we should think about
23  limiting online PSEO to students who intend to
24  matriculate to Crown.  The questions I have are,
25  would we want to do this.  I think it would make

Page 30

1   Chris and the SAS faculty happier, but that's not
2   the only thing to consider.  Did I read that
3   correctly?
4   A.   Yes, you read what was there.
5   Q.   Do you know who the SAS faculty is?
6   A.   Oh, sure.  So when we refer to the school of online
7   studies, you may hear SOS, and then you'll hear SAS,
8   is our school of arts and sciences.  It's a previous
9   and fairly recent structure that we have, and so you
10  may often in this process hear us talk about SAS or
11  SOS, and the distinction is the modality in that.
12  Q.   Thank you.  That makes sense.
13      And is the school of arts and sciences
14  the only undergraduate school, for lack of a better
15  term, at Crown?
16  A.   No.  We offer undergraduate degrees online as well.
17  Q.   Okay.  But in terms of on campus, is the school of
18  arts and sciences the exclusive school?
19  A.   You will hear SAS.  When you hear that reference,
20  yes, but, again, we -- we have been moving the last
21  few years in the school of business, the school --
22  And so the structure is changing some.  So you may
23  in this process hear some words that seem different,
24  but in general, to your question, when we're
25  referencing here, Dr. Mather is asking SAS, he's

Page 31

1   referring to our residential faculty, residential
2   campus.
3   Q.   Thank you.
4   A.   Sure.
5   Q.   And he seems to be referencing -- well, he is
6   referencing limiting on-campus PSEO to students who
7   intend to matriculate.  Were you aware of any
8   conversations to that end that occurred at Crown?
9   A.   No.  We typically have conversations about how any
10  of our programs continue to grow, continue to meet
11  our goals, fulfill our mission, and so we --  I'm
12  smiling here because I'm not necessarily surprised
13  that Darin would write this, but I didn't -- I
14  wasn't aware of this e-mail and so --  Yeah.
15  Q.   Okay.  Why aren't you surprised that Darin would
16  write this?
17  A.   Oh, sure.  Because we're always considering how do
18  we grow, how do we attract students, and so it
19  makes sense to me to say, oh, we've got more
20  students we were just on campus and we knew they
21  were all matriculating to campus, that would be a
22  great situation.
23  Q.   I'll give you this document if I could.  It will be
24  the most colorful document we'll have today.
25      (Exhibit No. 4 marked for

Page 32

1   identification)
2   A.   (Reviews Exhibit No. 4.)
3       MS. THOMSON:  For the record, this is
4   Loe 4689 through 4707.
5   Q.   Have you had a chance to review this?
6   A.   I have reviewed it.
7   Q.   I anticipate, given your position at the college,
8   you've probably seen this before?
9   A.   I have.
10  Q.   Okay.  If you turn to Page 3, if you would.  Under
11  the our vision heading, it says the Midwest's Boldly
12  Christian College.  What does, just in practical
13  terms, what does that mean, Boldly Christian
14  College?
15  A.   Yeah.  Thank you for asking.  We have always been a
16  Christian college since our founding in 1916.  As
17  we were developing our strategic plan and thinking
18  about the future of Crown, we felt like it was
19  important to help our prospective students and their
20  families know who we are.  We didn't want to
21  compromise our views, our beliefs, and so as we
22  worked this together with our board and with our
23  faculty and staff, we said we want to be very clear
24  that we are a Christian institution, have been since
25  1916, and intend to move forward that way.

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 10 of 55
Melinda and Mark Loe, et al vs.                    Christopher Mathews                    CHRISTOPHER MATHEWS
Willie Jett, et al                                          1-31-24                                      January 31, 2024

Page 33

1  Q.  Thank you.  That makes sense.
2      And if you turn to Page 11 of this
3  document, it's a slide entitled target audience.
4  And under the first heading, college of arts and
5  sciences, more of a target audience listed is,
6  bullet point, is conservative Christians in the
7  Midwest.  And my question for you, is that also a
8  target audience for on-campus PSEO?
9  A.  No, not directly.  Our PSEO that we offer is a
10 service.
11 Q.  Does Crown have a target audience for PSEO on
12 campus?
13 A.  No.  Again, I think we would be most pleased if
14 those students expressed an interest to continue at
15 Crown.  I think we try to be fairly broad in making
16 those offerings available as much as possible.
17 Q.  If you turn, please, next to Page 14.  If we look
18 at objective two of goal three --  And you're listed
19 as the owner of that objective; correct?
20 A.  That's right.
21 Q.  And the objective of objective two is to create
22 assessment tools and curricular maps to demonstrate
23 integration of faith into all aspects of academic
24 experiences by July 2028; correct?
25 A.  That's right.

Page 34

1  Q.  And does Crown aspire to integrate faith into all
2  aspects of the PSEO academic experience as well?
3  A.  Inasmuch as it's part of our mission.  So our
4  mission is to provide a biblically based education
5  for Christian leadership, and so this has been,
6  again, who we've been since 1916, and the same
7  mission that we had when we were able to partner
8  with the state so.
9  Q.  And what steps has Crown taken or is Crown planning
10 to take to integrate faith into the PSEO academic
11 experience?
12 A.  Yeah.  Again, a great question.  So this is
13 something we continue to discuss and how to best do
14 this.  One of our Christian -- or one of our Crown
15 commitments is also academic excellence, and so
16 we're always striving to make sure that what we are
17 offering in class are of the highest level
18 academically, but at the same time we have a mission
19 to provide biblically based education.
20     And so, I'm part of this, is in our
21 hiring processes that we expect our faculty to align
22 with our statement of faith and our community
23 covenant.  Part of this is in informal interactions
24 with those faculty members as they live in community
25 and discuss their disciplines from a Christian

Page 35

1  perspective.
2      Part of this that we've been
3  discussing since the strategic plan, there are more
4  formal processes and training that we do and how do
5  we know that we're accomplishing our mission in
6  these particular classes.  And so we -- we do some
7  professional development that touches on this, but
8  we're not sure that we're doing it as well as we
9  could be so we continue to lean into that, learn
10 from what other schools are doing, and hopefully
11 grow in our ability to again fulfill -- fulfill the
12 mission.
13 Q.  Is there any professional development that's been
14 provided specific to PSEO that you're aware of?
15 A.  Not that I'm aware of.
16 Q.  Specifically courses that PSEO students on campus
17 would have access to.
18 A.  No.
19 Q.  You mentioned the hiring process.  Are professors --
20 Is there a tenure track at Crown?
21 A.  There is.  Um-uhm.
22 Q.  With respect to, again, going back to the modalities
23 online versus on campus.  Are the academic criteria
24 any different for admission into those two programs?
25 A.  No.

Page 36

1  Q.  GPA, for example?
2  A.  No.  I think the only distinction in the academic
3  requirements is a junior in high school versus a
4  senior in high school.  I think it's 3.25 for
5  juniors and 3.-- No.  3.5 and 3.25.  But, no,
6  they're not -- they're not distinct modalities, to
7  answer your question.
8  Q.  Okay.
9      (Exhibit No. 5 marked for
10 identification)
11     MS. THOMSON: It's Loe 4675.
12     MR. TIMMERMAN:
13     MS. THOMSON: 4675 through 4682.
14 A.  (Reviews Exhibit No. 5.)
15 Q.  Dr. Mathews, are you familiar with this document?
16 A.  I believe you pulled this from our website and
17 perhaps from our catalog.
18 Q.  Yeah.  I think your lawyers maybe did, and we'll go
19 over some ridiculously small print documents that
20 I'll apologize for in advance here that I did pull
21 from your website.
22 A.  Okay.
23 Q.  But for now this is at least a manageable print
24 size.
25 A.  This looks to be from the profile of our catalog,

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 37

1 which is available online.
2 Q.   And could you explain what this document is?
3 A.   Sure.  I believe it just outlines the profile, our
4 school mission and vision, our professional
5 organizations accreditation.  The statement of faith
6 is there.  Is this -- is this what you're asking?
7 Q.   Yeah.
8 A.   Okay.  Great.  Covenant standards.
9 Q.   And under the mission statement it says:  The
10 mission of Crown College is to provide a
11 biblically-based education for Christian leadership
12 in the Christian and Missionary Alliance, the
13 church-at-large, and the world.  Did I read that
14 correctly?
15 A.   You did.
16 Q.   Does that same mission statement apply to the
17 delivery and provision of PSEO education on-campus?
18 A.   It's our institutional mission statement.  It guides
19 all that we do.
20 Q.   Great.  So Crown aspires to provide a
21 biblically-based education to off-campus PSEO
22 students?
23 A.   It's our mission statement, yes.
24 Q.   If you turn to the next page, please, under the
25 large heading philosophy of education.  Numbered

Page 38

1 Paragraph 2 reads:  Education must be fashioned
2 within the framework of a Christian worldview with
3 its primary purpose to develop a biblical
4 perspective from which individuals can assimilate,
5 synthesize, and respond to situations of life and
6 learning.  Did I read that correctly?
7 A.   You did.
8 Q.   Does that philosophy of education apply to PSEO
9 courses taught on campus at Crown?
10 A.   It does.
11 Q.   Going back to that same paragraph, Dr. Mathews.  Is
12 it expected that PSEO courses delivered on campus
13 at Crown will be fashioned within the framework of
14 a Christian worldview?
15 A.   Yes.  Again, it's part of our mission.
16 Q.   And are the PSEO courses provided on campus at
17 Crown taught from a Christian worldview?
18 A.   All of our courses are taught from a Christian
19 worldview.
20 Q.   And if you could turn, please --  And I apologize,
21 this is not numbered.
22 A.   I think I see the headings.  Are you looking for the
23 community covenant page?
24 Q.   Yes, community covenant page, exactly.  Thank you.
25     In the second sentence of the first

Page 39

1 paragraph under that heading it says:  We desire to
2 be a community whose belief and behavior is
3 inextricably intertwined in order that we might
4 reflect the kingdom of God to the world.
5     Could you tell me what the phrase,
6 belief and behavior inextricably intertwined, means
7 to the best of your understanding?
8 A.   It's probably summarizing the word integrity.  That
9 our desire is for those of us who profess Christ, to
10 live a life that is true to that.  And so we see the
11 pursuit of education, the offering of education, how
12 we engage in all of life, as being tied to our
13 understanding of the Bible and what God has revealed
14 in it.
15 Q.   It is Crown's understanding of the Bible that it's
16 inerrant?
17 A.   It is.  That is part of our statement of faith.
18 Q.   And we'll talk a little bit about the statement of
19 faith.  We'll get there.  I promise.
20 A.   Okay.
21 Q.   Can you turn to the following page, please.  Start
22 with the paragraph that -- I guess it's the last
23 paragraph on the page.  It begins with The Word of
24 God.  Feel free to take a moment to review that.
25 A.   (Reviews document.)  Okay.

Page 40

1 Q.   And I just wanted to confirm with you, it's fair to
2 say that homosexuality is defined by this mission
3 statement as a sexually immoral behavior?
4 A.   It's not the mission statement, but yes.
5 Q.   You're right.  I'm looking at the overall title of
6 the document.
7 A.   Sure.  I understand.  Yes.
8 Q.   Let me just ask it a little bit differently.
9 A.   That's fine.
10 Q.   At Crown is homosexuality considered a sexually
11 immoral behavior?
12 A.   It is.
13 Q.   So if a student identifies as gay, that would be
14 considered sexually immoral from Crown's
15 perspective?
16 A.   Identifying is not the same as action, so no.
17 Q.   Okay.  And how -- what is the difference there?
18 A.   Well, we believe that we all deal with desires that
19 are not in line with what God would have us do.
20 That's different from engaging in an action.  So
21 I'm not sure in this context --  I'll give you an
22 example, but I don't always desire to fill out my
23 taxes, but I fill out my taxes.
24 Q.   Sure.  Can a gay student attend Crown as long as
25 they don't act on their sexual orientation?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 41

1  A.  I think that would be predicated on how that
2  aligned with our community covenant, how the student
3  was behaving, expressing; right?  So I -- I have no
4  doubt, because we deal with students, that many of
5  them wrestle with identity, they wrestle with who
6  they are created to be in Christ, so that -- that
7  by itself, no.
8  Q.  If a student openly proclaimed their homosexuality
9  while taking on-campus courses at Crown, how would
10  Crown respond?
11  A.  Our goal is always one of reconciliation and growth.
12  We -- we come into community in order to growth in
13  our understanding of the Bible and a Christian life
14  together.  And so, again, it would be predicated on
15  a particular circumstance, but in most, a confidant,
16  a mentor or whoever, would spend time praying with
17  the student, seeking the Lord's will for the
18  student.
19       So, again, it depends on the
20  circumstance, but by and large, no, that's not
21  enough for there to be any type of action.
22  Q.  Okay.  And you mentioned the word reconciliation.
23  What does that look like for a student who has
24  openly announced that they're homosexual?
25  A.  Sure.  Well, I utilize that term because it's one

Page 42

1  that is used in the Bible.  So we're called to a
2  ministry of reconciliation.  First reconciling us
3  to God.  We are all separated from God outside of
4  what Christ has accomplished.  And that term that
5  Paul uses is that's a reconciling of bringing into
6  a right relationship with God.
7       So regardless of whether it be
8  plagiarism on an exam or whether it would be
9  whatever, our goal is an environment of
10  reconciliation whenever we are not in line with
11  what we believe to be God's teaching as outlined in
12  our statement of faith, and we -- we want to pray
13  and talk and discuss and learn and walk that path.
14  And so we would use the term reconciliation in
15  reference to what Paul has mentioned in, I think
16  it's First Corinthians, when he talks about a
17  ministry of reconciliation.
18  Q.  And is the end goal for a student -- the end goal
19  of reconciliation for a student who's homosexual,
20  to change their sexual identity to heterosexual?
21       MS. THOMSON: Objection; vague and
22  ambiguous, but you can answer.
23  A.  The goal is a right relationship with Christ.
24  Q.  Okay.  And would a right relationship with Christ
25  be exclusively a heterosexual sexual identity?

Page 43

1  A.  Again, I don't -- I'm not -- I'm not sure where to
2  go.  Identity is the part that we're probably
3  struggling with; right?  What we're interested in
4  is the right relationship with God following
5  biblical principles as -- as we understand them, as
6  we've outlined in the statement of faith and other
7  places.
8  Q.  And does Crown provide any counseling to students
9  around sexual orientation?
10  A.  Not specifically.  We do have a counseling service
11  that's open to students but --
12  Q.  And is that exclusively a self-referral service?
13  A.  It is.
14  Q.  Students have to --
15  A.  Yes.
16  Q.  -- affirmatively take action to seek out that
17  service?
18  A.  That's right.  It's a service.  That's right.
19  Q.  Are you aware of any students on campus ever being
20  referred by someone else to counseling based on
21  gender identity or sexual orientation?
22  A.  I -- I am not aware.
23  Q.  And I'm sure I know the answer to this, but are you
24  familiar with the term conversion therapy?
25  A.  I am.

Page 44

1  Q.  And does Crown undertake any type of conversion
2  therapy efforts?
3  A.  (No response.)
4       COURT REPORTER: Excuse me.  You have
5  to answer out loud.
6  A.  I'm sorry.  No.  Please forgive me.
7  Q.  Are you aware of any students who identify as gay
8  or LGBTQ-plus who take classes on campus at Crown?
9  A.  I am not.
10  Q.  If a married gay student applied for on-campus
11  courses at Crown, would that person be admitted?
12  A.  I would not think that student would sign our
13  community covenant or align with our statement of
14  faith.
15  Q.  Okay.  So the statement of faith and community
16  covenant would exclude them?
17  A.  Yes.
18  Q.  Okay.
19       MR. TIMMERMAN: We've been going for
20  about an hour.  Would you like a break?
21  Q.  Would you like a break, Dr. Mathews?
22  A.  I'm fine, yeah.
23       MR. TIMMERMAN: We can go a little
24  longer.  Just let us know.  We usually try and time
25  it to your --

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 13 of 55
Melinda and Mark Loe, et al vs.          Christopher Mathews          CHRISTOPHER MATHEWS
Willie Jett, et al                       1-31-24                      January 31, 2024

Page 45

1  **MR. BAXTER:** Why don't we take a ten
2  minute break.
3  **MR. TIMMERMAN:** Okay.
4  (Recess taken from 10:04 a.m. to
5  10:17 a.m.)
6  **BY MR. TIMMERMAN:**
7  Q.  We're back on the record.  Dr. Mathews, if you
8  could turn to the last page of Exhibit 5, and I'm
9  looking specifically at the third to last sentence.
10  If some find themselves unable to honor these
11  commitments, withdrawal may be in order.
12  Are you aware of any students who have
13  withdrawn from Crown because of their sexual
14  orientation?
15  **A.  No.**
16  Q.  Are you aware of any students who have withdrawn
17  from Crown because of their gender identity?
18  **A.  No.**
19  Q.  And in the course of preparing for today, did you
20  speak with people who would know whether that has
21  ever occurred?
22  **A.  I did.**
23  Q.  Okay.  Who did you speak with on that?
24  **A.  Jen Niska was a part of that, and, again, it's our**
25  **representative to investigate in preparation for**

Page 46

1  **this.**
2  Q.  Are you aware of any student who's either
3  voluntarily unenrolled or been expelled from Crown
4  because they no longer believe in Jesus Christ?
5  **A.  No.**
6  Q.  Any student who has withdrawn or -- either
7  voluntarily or involuntarily because of their
8  religious beliefs have changed?
9  **A.  No.**
10  Q.  Let's move to Exhibit 6, if we could.
11  (Exhibit No. 6 marked for
12  identification)
13  Q.  Dr. Mathews, feel free to review this.
14  **A.  Sure.  (Reviews Exhibit No. 6.)**
15  Q.  Have you had a chance to review this?
16  **A.  I have.**
17  Q.  And so, as best I can tell, it looks like Crown's
18  handbook or policies are kind of broken up into
19  different sections on its website.  Is that -- is
20  that fair to say?
21  **A.  It is.**
22  Q.  Okay.  And what is this document that we're looking
23  at here?
24  **A.  The student handbook.**
25  Q.  Okay.  And does the student handbook, is it

Page 47

1  comprised of different parts, different policies?
2  **A.  Yes.**
3  Q.  And this is the part of the handbook that addresses,
4  at least preliminarily, the Crown College community
5  covenant; correct?
6  **A.  Yes.**
7  Q.  Does this part of the Crown College student handbook
8  apply to PSEO students on campus?
9  **A.  The community covenant?**
10  Q.  Correct.  This -- this document that you're looking
11  at here is part of the Crown College student
12  handbook.  Is this applicable to on-campus PSEO
13  students?
14  **A.  Yes.**
15  Q.  And are PSEO students who take classes on campus
16  required to agree to abide by the community
17  covenant?
18  **A.  The community covenant, yes.**
19  Q.  And what form does that agreement to abide by the
20  community covenant take?
21  **A.  In the application process, if a student checks**
22  **through that process that they desire to be on**
23  **campus, it takes them to the community covenant and**
24  **the statement of faith and asks them to agree to**
25  **that.**

Page 48

1  Q.  And is that like a check box?  You check the box to
2  agree?
3  **A.  I believe so.  Yes, sir.**
4  Q.  Okay.  And do you know, is this community covenant
5  hyperlinked within that application?
6  **A.  It is.**
7  Q.  So if we look at the third paragraph of this
8  community covenant on the first page, it says:  We
9  commit to the Lordship of Christ.  Are PSEO students
10  required to agree that they're committing themselves
11  to the Lordship of Christ if they take on-campus
12  classes?
13  **A.  They agree to our community covenant, yes.**
14  Q.  And they're agreeing here also to abstain from
15  sexually immoral behavior; correct?
16  **A.  Yes.**
17  Q.  And sexually immoral behavior is defined in the
18  covenant as all sexual relations outside the bounds
19  of marriage between a man and a woman; correct?
20  **MS. THOMSON:** Can you point to where
21  that is?
22  **MR. TIMMERMAN:** Yeah.  Sure.
23  **THE WITNESS:** It's very small.
24  **MR. TIMMERMAN:** Very small.  I
25  apologize.  It's in that paragraph.

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Christopher Mathews
1-31-24
CHRISTOPHER MATHEWS
January 31, 2024

Page 49

1    MS. THOMSON: Okay.
2    BY MR. TIMMERMAN:
3  Q.  And so you can read along as well.  It starts with
4  living.
5  A.  Yes.
6  Q.  Okay.
7  A.  Thank you.
8  Q.  And I'm sorry.  You answered the question yes?
9  A.  I did, yes.
10  Q.  Okay.  Okay.  And there's some section of the
11  community covenant called human sexuality and gender
12  identity.  Do you see that?
13  A.  I do.
14  Q.  And as far as I can discern, that's a relatively
15  recent addition to the community covenant.  Do you
16  know when that provision of the covenant became
17  effective?
18  A.  I -- I don't believe that's a part of our community
19  covenant.  I believe that our community covenant
20  ends with we, will hold.
21  Q.  Okay.  So the last sentence of the covenant is, this
22  community covenant is subject to change only by
23  action of the board of trustees?  Here.
24  A.  I -- I believe it ends with, we will hold.  Yes.
25  Q.  Okay.  That makes sense.

Page 50

1      And then, for example, the next
2  section is entitled drug and alcohol-free campus.
3  Is that -- is that simply a handbook policy?
4  A.  That's right.  So this policy goes -- defines
5  further as you go.
6  Q.  And the human sexuality and gender identity policy,
7  do you know when that was integrated into this
8  document for the first time?
9  A.  I do not.
10  Q.  Were you part of any discussions about that
11  particular policy?
12  A.  I was not.
13  Q.  Do you know who approved that policy for inclusion?
14  A.  I'm sorry.  I do not.
15  Q.  What is the typical process for a student handbook
16  policy to be approved?
17  A.  Sure.  This would -- this would work through our
18  vice president of student development and her team.
19  Q.  And do you know if policy changes are something
20  that the board of trustees ultimately has to
21  approve?
22  A.  No, not for the student handbook.  They do not
23  approve.
24  Q.  Does the president have to approve?
25  A.  I do not believe so.

Page 51

1  Q.  Okay.  So it's exclusively within that division of
2  the organization that has approval authority?
3  A.  For the handbook, yes.
4  Q.  Okay.  Is it Crown's belief that there are only two
5  genders?
6  A.  Yes.
7  Q.  And is it Crown's belief that an individual's
8  biological gender is immutable?
9  A.  Yes.
10  Q.  As part of --
11    MS. THOMSON: If you're quoting,
12  could you just point to where you're quoting.
13    MR. TIMMERMAN: I'm not quoting, but,
14  yeah, I will.  If I quote, I definitely will.  I'm
15  just under that provision, that policy provision.
16    MS. THOMSON: Okay.
17    BY MR. TIMMERMAN:
18  Q.  All right.  Are PSEO students who take on-campus
19  courses at Crown required to abide by the human
20  sexuality and gender identity policy?
21  A.  Yes.
22  Q.  Are you aware of any -- any individual whose gender
23  identity differed from their biological sex ever
24  attending on-campus courses at Crown?
25  A.  I'm not aware.

Page 52

1  Q.  Did you inquire to see if that has ever been the
2  case?
3  A.  I did not inquire of that specific question.
4  Q.  Do you know who would have firsthand knowledge of
5  that?
6  A.  I do not.
7  Q.  If a student attending on-campus courses at Crown
8  dressed in a manner that was different from their
9  biological sex, how would Crown respond?
10  A.  As we've discussed earlier, our process is one of
11  reconciliation, and so I don't -- I don't even know
12  the we, but the person closest to that student, a
13  residence director or a faculty member or someone
14  from our student development who knows that student,
15  would likely have a conversation, ask, talk,
16  dialogue.
17    Our goal is not disciplinary but
18  reconciliation, and so we would ask questions;
19  right?
20  Q.  And if that individual in my example persisted on
21  dressing in a manner contrary to their biological
22  sex, would that person be allowed to continue taking
23  classes on-campus at Crown?
24  A.  It would be circumstantial.  You would have to
25  define what that meant.  So if it were a flagrant

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 53

1  disregard for our statement of faith and community
2  covenant, we would continue pursuing conversations
3  that may eventually lead to withdrawal, but that's
4  not automatic on our campus.
5  Q.   It could potentially lead to dismissal, though;
6  correct?
7  A.  Based on the circumstance.
8  Q.   Okay.  And are students on campus at Crown required
9  to use restrooms that align with their biological
10  sex?
11  A.  Yes.
12  Q.   Are they required to use locker rooms or any other
13  clothes-changing facilities that align with their
14  biological sex?
15  A.  Yes.
16  Q.   Is there any process for a student to request an
17  accommodation in that regard?
18  A.  We do have an appeals process.
19  Q.   And how does that work?
20  A.  Depending on the circumstance and for what the
21  appeal is, they can approach the person closest to
22  the circumstance.  So, again, depending on your
23  scenario, the athletic director, residence housing
24  director, whoever that may be, can submit an appeal.
25  Ultimately, in this case, that would go to the vice

Page 54

1  president of student development.
2      There's an outline.  I think it's in
3  the student handbook about the vice president of
4  student development would convene a panel that
5  would include faculty and students to hear the
6  appeal and make a decision.
7  Q.   Are you aware of any appeals ever occurring in that
8  regard?
9  A.  Not in that regard, no.
10  Q.   Are you aware of any appeals that have occurred
11  involving sexual identity or orientation or gender
12  identity?
13  A.  I'm not aware.
14  Q.   Are you aware of any appeals that have occurred
15  regarding religion?
16  A.  No.
17  Q.   Fair to say that the appeals that have occurred are
18  probably conduct infractions?
19  A.  I believe so, yes.
20  Q.   Okay.  If a peer observes that one of their fellow
21  students on campus is violating a handbook policy
22  or the community covenant or the statement of faith,
23  is the expectation that peer will report the
24  policy violation?
25  A.  Not necessarily.  Again, I think it's important to

Page 55

1  understand who we are as a community.  So if that
2  student, friend, peer, is the closest to that
3  person, the anticipation would be that they would
4  discuss, pray, seek God and his Word.  So there's
5  not an expectation, then, that that student would
6  tell an authority of what's going on.  We -- we
7  don't have that -- that environment.
8  Q.   Are you aware of any students who have reported that
9  another student is gay?
10  A.  I -- I don't have record of that.  I'm not aware.
11  Q.   Are you aware of any students who reported that
12  another student is transgender?
13  A.  I do not have that information.  I'm not aware.
14  Q.   Do you know who would have that information?
15  A.  That would probably go through our dean of students.
16  Q.   Are you aware of a report ever being made to Crown
17  of sexual orientation discrimination?
18  A.  No.
19  Q.   Do you --  Have you inquired about that as part of
20  today's preparation?
21  A.  It was part of the questions that we asked as we
22  gathered our information.  I'm not aware.
23  Q.   Are you aware of any complaints or investigations
24  regarding gender identity discrimination?
25  A.  I'm not.

Page 56

1  Q.   If such a complaint were submitted to Crown, what
2  would be the investigative process?  Is that handled
3  through your Title 9 office?
4  A.  Yes.  Yes.  Can you -- again, can you ask the
5  question -- the first question --  I just want to
6  make sure I'm understanding the nature of that
7  question.
8  Q.   Sure.  If Crown received a complaint that a student
9  had been discriminated against --
10  A.  Oh, yes.
11  Q.   -- based on sexual orientation --
12  A.  Yes, that would be our Title 9 coordinator.  That's
13  Amy Luesse.
14  Q.   How do you spell Amy's last name?
15  A.  L-u-e-s-s-e.
16  Q.   Thank you.  And I assume that would be handled like
17  any other complaint of discrimination by the Title 9
18  office?
19  A.  That's right.
20  Q.   Does Crown prohibit discrimination on the basis of
21  sexual orientation?
22  A.  Does Crown prohibit --  Yes, we do not discriminate.
23  Q.   And is that memorialized in a policy?
24  A.  We do have a nondiscrimination policy, yes.
25  Q.   And do you know where that is located?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

---

Page 57

1  A.   There's a nondiscrimination policy, I believe, in
2  the profile that -- You may have found that on our
3  website.  So when you're looking under the profile,
4  it should be there at the bottom.  I'm sorry.  I
5  said website.  Catalog.
6  Q.   Catalog; okay.
7  A.   Yes.  Thank you.
8  Q.   And are you aware of any provision of the student
9  handbook that prohibits discrimination?
10  A.   I believe that word is used in our community
11  covenant.  This is so small.
12  Q.   I apologize.
13  A.   That's okay.  Covenant -- Oh, we use the word
14  prejudice there.
15  Q.   And where are you reading that from?
16  A.   I'm sorry.  One, two, three, four, five, six.
17  Living -- Again, it's so small.  Living out
18  Christ's character, that paragraph.
19  Q.   Okay.  And prejudice there is defined specifically
20  as based on race, gender, or socioeconomic status;
21  correct?
22  A.   Um-uhm.
23  Q.   There's no reference to sexual orientation there;
24  correct?
25  A.   There's not.

---

Page 58

1  Q.   Or to gender identity; correct?
2  A.   There's not.
3  Q.   Do you know why prejudice is limited to these three
4  protected categories?
5  A.   I do not.
6     (Exhibit No. 7 marked for
7  identification)
8  A.   (Reviews Exhibit No. 7.)
9  Q.   This is Exhibit 7, Dr. Mathews.  You spoke earlier
10  about the appeals process, and I believe that's set
11  forth in this document, or at least the framework
12  is set forth in this document; is that correct?
13  A.   It is.  Page 34.
14  Q.   Thank you.
15  A.   I'm sorry.  Three of four.
16  Q.   Thank you.  And does this student conduct,
17  discipline and grievances policy also apply to PSEO
18  students?
19  A.   It does. I'm sorry. On-campus PSEO students.
20  Q.   Correct.  I should have clarified that.  But it
21  doesn't apply to online; correct?
22  A.   It does not.  This applies to our students on campus
23  per the student handbook.
24  Q.   Is there a reason why the student handbook doesn't
25  apply to online students?

---

Page 59

1  A.   The modalities are different, and so we have an
2  anticipation for our community, because we interact,
3  we have a relationship with one another, we're
4  building our community, we have a set of guidelines
5  that clarify what that is.
6     The online learning community is
7  different.  We obviously have a different
8  relationship with those students than those that
9  are on our campus and seeing us every day.
10  Q.   And how is that relationship different?
11  A.   Just interaction.  So our online classes are
12  asynchronous.  Students learn the material and work
13  at their own pace.  The interaction that they have
14  with other students is through discussion boards,
15  usually in a more formal learning basis than the
16  informal interaction, in and out of classes, eating
17  meals together, that type of thing.
18  Q.   So is all PSEO online education asynchronous?
19  A.   The online education is, yes.
20  Q.   Is there a separate handbook that applies for
21  online or separate policies?
22  A.   We do have an etiquette policy that we use for
23  online and so, again, you'll see that in our
24  catalog outlined for online students.  That pertains
25  much more how to interact online in discussion

---

Page 60

1  boards and e-mails and responsiveness and that type
2  of thing.
3  Q.   If a student professed a faith in Islam, for
4  example, online in the context of a PSEO online
5  course, would there be any ramifications for that
6  student?
7  A.   Can you define ramifications?
8  Q.   Yeah.  Would there be any discipline that was
9  administered or consequences in terms of ability to
10  continue on?
11  A.   There would not be a discipline, no.
12  Q.   Would there be any discussion with that student?
13  A.   Likely, yes.
14  Q.   Okay.  And why?
15  A.   Well, we're a biblically-based education, and so
16  we -- we hope to have some level of relationship
17  even online.  And so if the student felt the need in
18  that context to say, I disagree with that, we would
19  enter into a relationship to say, tell us more,
20  tell us about you, tell us what you're thinking,
21  but that would have no ramifications beyond that.
22  Q.   Is the expectation that students who take online
23  PSEO are also Christian?
24  A.   Expectations, no.  I'd probably use the word
25  anticipation.  We -- we try to be very clear as an

---

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

---

Page 61

1  institution who we are. We referenced that earlier.
2  We're boldly Christian. We've been clear in our
3  mission from the beginning, and so I think there
4  would be an anticipation that students who are drawn
5  to that are probably drawn to who we are in terms
6  of our Christian identity, but there's no, if I can
7  parse out those two words, expectation of sorts, a
8  burden.
9  Q. Yeah, that makes sense. Are the same syllabi used
10  for online and on-campus PSEO courses?
11  A. No, in that we use different designations to help
12  us know the modality type and then faculty members,
13  particularly those that are residential, have the
14  autonomy of the classroom. So they -- they can make
15  decisions in terms of taking a course and those
16  types of things.
17      Online PSEO classes are more
18  regimented because typically they follow an online
19  process of when assignments are due and those types
20  of things that are not connected to an individual
21  faculty member so much as the system that works for
22  our online modality.
23  Q. Are there professors who teach the same course both
24  online and on campus simultaneously?
25  A. Your last word threw me.

---

Page 62

1  Q. Simultaneously. Let's just say --
2  A. In a given semester?
3  Q. Yeah.
4  A. Rare. I'm not sure that we have, but perhaps.
5  Q. And are there different credentials for professors
6  who deliver online modality versus on-campus
7  modality?
8  A. No.
9  Q. Are all of the professors who provide online PSEO
10  adjunct faculty?
11  A. Yes.
12  Q. And what about the professors who deliver on-campus
13  PSEO, are they adjunct or tenure tracked faculty?
14  A. Both.
15  Q. Okay. The second page of this document in front of
16  you, heading E, is the pregnancy policy; correct?
17  A. Yes.
18  Q. Are you aware of any students who have been
19  dismissed from Crown because they're pregnant?
20  A. No.
21  Q. Are you aware of any students who have been
22  encouraged to voluntarily withdraw from Crown
23  because they're pregnant?
24  A. No.
25  Q. Does Crown deserve the right to dismiss students

---

Page 63

1  who are pregnant?
2  A. (No response.)
3  Q. And feel free to read that entire page.
4  A. Yeah, I was going to say, I would have to look at
5  the wording for that.
6  Q. Yeah, please.
7  A. I think the way that we communicate that is a
8  continuation on-campus residency and/or enrollment
9  as a student at Crown College be considered as to
10  what is best for all involved.
11  Q. And would all involved include the community?
12  A. And mother and child and family, yes.
13  Q. Are you aware of any instances where this particular
14  policy, the pregnancy policy, has had to be
15  implemented?
16  A. I'm not.
17  Q. Is it important for Crown to have students -- to
18  not have students on campus who are engaged in same
19  sex relationships?
20      MS. THOMSON: Objection; vague,
21  ambiguous, but you can answer.
22  A. I -- I don't understand the question, so I --
23  Q. I guess let me ask this. Is it important from
24  Crown's perspective not to have students in the
25  on-campus environment who are openly engaged in

---

Page 64

1  same sex relationships?
2  A. I would answer it's important that we have students
3  who are committed to our community covenant. So
4  inasmuch that we would expect all of the conditions
5  of our community covenant to be followed, we would
6  also expect expressions of sexuality to be followed
7  in the same way.
8  Q. Are you aware of any complaints to Crown about
9  pregnancy discrimination?
10  A. I am not.
11  Q. I promise you we're almost done with the small
12  print.
13  A. Okay. Thank you.
14      (Exhibit No. 8 marked for
15  identification)
16  A. (Reviews Exhibit No. 8.)
17  Q. Dr. Mathews, have you had a chance to review
18  Exhibit 8?
19  A. Yes, sir.
20  Q. Okay. This also looks to be a somewhat different --
21  at least differently formatted iteration of Crown's
22  mission and vision; correct?
23  A. Yes.
24  Q. Is this another part of the SAS student handbook?
25  A. It is.

---

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 65

1  Q.   And does this policy in front of you, Exhibit 8,
2  apply to PSEO students?
3  **A.   It does.  Those on campus.**
4  Q.   Thank you for that clarification.  I keep forgetting
5  to do that.
6       And if you look down at the bottom of
7  this page, there's a heading called student
8  outcomes.
9  **A.   Um-uhm.**
10  Q.   Is it expected that PSEO students will embrace their
11  identity in Christ?
12  **A.   Again, it's a goal, so I would probably just use**
13  **caution with the use of the word expected.**
14  Q.   Is one of the goals of PSEO on campus to help
15  students embrace their identity in Christ?
16  **A.   One of the goals of our student development.**
17  Q.   Okay.  And is that a student development goal for
18  PSEO students on campus as well?
19  **A.   Yes.**
20  Q.   Is it also a goal for student development for
21  on-campus PSEO students to form a personal and
22  growing faith in Christ?
23  **A.   Yes.**
24  Q.   If you can turn the page, please.  Is it also a
25  goal for on-campus PSEO students' development to

Page 66

1  understand and apply the Bible to their daily life?
2  **A.   Yes.**
3       **MS. THOMSON:** Could you show where
4  you're quoting from?
5       **MR. TIMMERMAN:** It's the top.  So I
6  pointed on Page 2.
7       **MS. THOMSON:** Okay.  Thank you.
8  Q.   Is it also a goal, if you go down to the who am I
9  with others, the goal there is -- the stated goal
10  is students will intentionally engage in a
11  Christian community.  Is that a student development
12  goal for on-campus PSEO students?
13  **A.   All on-campus students, yes.**
14  Q.   Is it also a goal that on-campus PSEO students
15  actively participate and worship within the
16  Christian community?
17  **A.   It is a goal, yes.**
18  Q.   What does Crown do to further these goals?
19  **A.   I think we start by communicating who we are.  So**
20  **we try to be very clear and we communicate our**
21  **mission, our strategic plan, and we communicate our**
22  **expectations through the community covenant.  So**
23  **when students choose or their families choose to**
24  **become a part of our on-campus community, we try to**
25  **be very clear in what our expectations are, our**

Page 67

1  **heritage, and what our goals are involved there.**
2       **In general for the community at large**
3  **we offer times of worship twice a week, we offer**
4  **Bible study.  We offer other opportunities to be**
5  **mentored by faculty members or staff members if**
6  **students choose to do that.**
7  Q.   Okay.  Thank you.
8  **A.   Sure.**
9       **(Exhibit No. 9 marked for**
10  **identification)**
11  **A.   (Reviews Exhibit No. 9.)  I think I'm ready.**
12  Q.   Okay.  And I'm going to try not to refer to this
13  as the PFA, which is sunscreen, but this is the SFP,
14  the spiritual formation program FAQ; correct?
15  **A.   I'm sorry.  Yes, it is.**
16  Q.   Is this another part of the SAS student handbook?
17  **A.   It is.**
18  Q.   And does this part of the student handbook apply to
19  PSEO students?
20  **A.   It does not.**
21  Q.   Okay.  It does not.  Are on-campus PSEO students
22  required to earn SFP credits?
23  **A.   They are not.**
24  Q.   Even ones who live on campus?
25  **A.   That's correct.**

Page 68

1  Q.   Let's move away from the tiny print.
2  **A.   Thank you.**
3       **(Exhibit No. 10 marked for**
4  **identification)**
5       **MS. THOMSON:** It's still pretty tiny.
6       **MR. TIMMERMAN:** When you go to the
7  print icon, this is what you get.
8  **A.   This is part of our catalog.**
9  Q.   Okay.  Yeah, I just was going to ask you.  So this
10  is a print-off from Crown's catalog under the
11  heading admissions.  Can you just tell us what this
12  is?
13  **A.   Sure.  Well, it's a print-off of the admissions**
14  **section of our catalog.**
15  Q.   Okay.  There you go.  I got it right.  Okay.
16       And so this also, if you turn to
17  Page 7 of 8, this also includes a section on PSEO;
18  correct?
19  **A.   It does.**
20  Q.   And this is a public-facing document.  Do you know,
21  are PSEO applicants referred to this document at
22  any point in the application or enrollment process?
23  **A.   I anticipate they are, yes.**
24  Q.   Turn to the following page, 8 of 8.  There's a
25  heading that says PSEO resident requirements.  Do

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 69

1  you see that?
2  A.  I do.
3  Q.  And the second paragraph of that section reads, all
4  residential students are required to abide by the
5  community covenant as outlined in the School of Art
6  and Sciences Catalog and the student handbook.  And
7  then the next section reads, residential students
8  are also required to fulfill the chapel attendance
9  requirements as outlined in the student handbook.
10     You agree with me that this is telling
11  PSEO students that if they want to live on campus,
12  they have to complete a chapel requirement; correct?
13  A.  I do not agree with you.
14  Q.  Okay.  What is the difference?  What is this saying?
15  A.  It refers to the student handbook and the student
16  handbook identifies as degree-seeking students.
17  This does not include the degree-seeking students,
18  and that's the designation that we make.  Our PSEO
19  students are not degree seeking.
20  Q.  And does anywhere in this SFP document that we
21  looked at, the last exhibit, specifically exempt
22  PSEO students residing on campus from the chapel
23  attendance requirement?
24  A.  It -- it is in the handbook that says --  I'm not
25  sure I can quote.  Under the section that begins,

Page 70

1  do all students have to participate in spiritual
2  formation.  It says degree-seeking students at Crown
3  College.
4  Q.  Okay.  So this requirement or this reference, then,
5  in the admissions policy is requiring -- that
6  residential on-campus PSEO students are required to
7  fulfill the chapel attendance requirements.  Your
8  testimony is that there are no requirements because
9  of the SFP policy?
10  A.  That's right.  Yes.
11  Q.  Okay.  Who's the highest ranking person at Crown
12  with direct oversight and responsibility for PSEO?
13  A.  It would probably be Dr. Mather.
14  Q.  I want to walk through the admissions process.  If
15  you would indulge me, pretend like I'm a high school
16  kid who's found my way on Crown's website and is
17  interested in potentially taking on-campus PSEO
18  courses.
19     First of all, how do I know that you
20  offer on-campus PSEO?  How does Crown market or
21  advertise that?
22  A.  Sure.  It's on our website, so you can find that
23  information if you look at the Crown website.  We
24  also do some marketing through our partner schools,
25  and so that's part of our agreement with those

Page 71

1  schools.  They would share that information with
2  students.  So we send fliers or ask them to
3  communicate that.
4  Q.  Any other marketing or outreach that you can think
5  of?
6  A.  I believe that we have sent representatives to the
7  home school network that would have communicated
8  through that avenue.
9  Q.  And you referenced your partner schools.  Who are
10  those schools?
11  A.  I don't know that I could give you an exhaustive
12  list, but I mentioned earlier that we have a
13  partnership with Waconia Public School and I think
14  Watertown-Mayer, and there's a handful of others, as
15  well as Southwest Christian.
16  Q.  And the home school network, I think there's an
17  acronym that I've heard, NHSE or NHSA?
18  A.  I can't speak with confidence to that so.
19  Q.  Okay.  Do you know what that --  You said maybe
20  sending representatives to the home school network.
21  Tell me kind of what that looks like.  Is it a
22  convention or --
23  A.  That's my understanding.  I have not been.
24  Q.  Is that typically Emily Cano --
25  A.  It is.

Page 72

1  Q.  -- who handles that?
2  A.  And I believe Darin Mather attended those as well.
3  Q.  Is the home school audience a population that Crown
4  specifically wants to target for on-campus PSEO?
5  A.  I don't know that I would use the word specifically.
6  We would be delighted if home school students would
7  come be a part of Crown.
8  Q.  In your experience or in Crown's experience, are
9  home-schooled students typically -- do they
10  typically tend to be more Christian families than
11  not?
12  A.  I -- I don't know that I can speak to that.  Again,
13  I would say that we try to be very clear in who we
14  are as an institution, and so we tend to attract
15  students who want to be a part of that community.
16  So anecdotally it seems like we probably have more
17  home-schooled students that are looking for that,
18  but I don't know that I can say that's a specific
19  home-schooled student.
20  Q.  If Crown's faith statement, and if this law at
21  issue in this lawsuit is upheld and Crown is no
22  longer able to require students taking on-campus
23  PSEO to sign a faith statement or agree to your
24  community covenant, could Christian students
25  nonetheless still attend PSEO classes on campus at

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 20 of 55

Melinda and Mark Loe, et al vs.          Christopher Mathews          CHRISTOPHER MATHEWS
Willie Jett, et al                              1-31-24                    January 31, 2024

Page 73

1  Crown?
2  **A.  Well, they wouldn't be PSEO classes because we**
3  **couldn't offer that.**
4  Q.  You would do away with PSEO?
5  **A.  If I'm understanding your question.**
6  Q.  Yes.
7  **A.  Can you rephrase?**
8  Q.  Yes, and it was a poorly asked question.  But my
9  question might -- the root of my question is, could
10  Christian students still attend on-campus PSEO at
11  Crown if the law at issue in this lawsuit is
12  upheld?
13  **A.  The law issued would not allow --**
14      MS. THOMSON: Objection; calls for a
15  legal conclusion.
16  **A.  Yeah.**
17  Q.  Would Crown -- would Crown cease offering on-campus
18  PSEO if the law at issue in this lawsuit is upheld?
19  **A.  We've not made a final decision, but as I can speak**
20  **for myself and understanding where we are as an**
21  **institution, yes, we would cease that offering and**
22  **offer it only through online.**
23  Q.  Okay.  Do you know roughly --  So we've gone over
24  the numbers.  It looks like -- you said 68 to 70 it
25  typically fluctuates for on-campus PSEO.

Page 74

1  **A.  That's right.**
2  Q.  Do you know how many kids apply for on-campus PSEO
3  in any given year?
4  **A.  I can't give you an exact number.  It's probably**
5  **between 10 to 20 more than that.**
6  Q.  Is the student's residential proximity to Crown
7  considered at all in the on-campus enrollment
8  process?
9  **A.  No.**
10  Q.  Is the student's inability to commute to another
11  institution considered at all in the on-campus
12  enrollment process?
13  **A.  No.**
14  Q.  What about a student's financial status; is that
15  considered at all?
16  **A.  For PSEO students?**
17  Q.  For on campus, correct.
18  **A.  No.**
19      **(Exhibit No. 11 marked for**
20  **identification)**
21  **A.  (Reviews Exhibit No. 11.)**
22      MS. THOMSON: This is Loe 2498, for
23  the record, to Loe 2050 -- 2500.
24  **A.  (Reviews Exhibit No. 11.)**
25  Q.  Have you had a chance to review this document?

Page 75

1  **A.  I have.  Thank you.**
2  Q.  Okay.  And I'll represent to you, I think this is
3  the only iteration of what purports to be the
4  application questions for on-campus PSEO that I've
5  seen as Dr. Denton has recounted to Gene Pfeifer,
6  who looks to be the head executive at Bethany
7  College; is that correct?
8  **A.  I think he's the president of Bethany Lutheran.**
9  Q.  Okay.  So in numbers one, two, and three of this
10  e-mail that Dr. Denton, President Denton sends to
11  President Pfeifer, has President Denton accurately
12  captured the questions that on-campus PSEO students
13  are required to answer through the application
14  process?
15  **A.  I haven't spoken with Dr. Denton about this**
16  **particular e-mail exchange, so I -- there are two**
17  **acronyms, PELSB and PSEO.  I'm assuming, based on**
18  **Dr. Pfeifer's question, that Dr. Denton is**
19  **referencing that, but, again, in this context, if**
20  **I read this alone, I don't know that for sure.**
21      **If you're asking me, does this**
22  **accurately reflect what we ask PSEO students to do,**
23  **PSEO students to do, no.  Our on-campus students and**
24  **degree-seeking students, yes.**
25  Q.  What about on-campus PSEO students, are they

Page 76

1  required to answer questions?
2  **A.  On-campus --  I'm sorry, Jeff.  I'm not seeing**
3  **where you're referencing answer questions.**
4  Q.  Yeah.  I'm just asking you generally.  Are there
5  questions in the application process, if I want to
6  go take on-campus PSEO at Crown, are there
7  questions about my faith in the application process
8  that I'm required to answer?
9  **A.  I believe we do have a question after the community**
10  **covenant comes up in that section.**
11  Q.  Do you know if students applying for on-campus PSEO
12  at Crown are required to answer the question, please
13  tell us how you've committed your life to Jesus?
14  **A.  We don't ask for a testimony, so I apologize that I**
15  **don't know the exact question -- the phraseology**
16  **there without seeing it.**
17  Q.  Are you aware of any documents that reflect those
18  questions that are asked?
19  **A.  I'm assuming it would be on an application.**
20  Q.  I know there's a state application, and that's a
21  standard state use form, but I believe all PSEO
22  institutions use it.  So this would be something
23  that's unique to Crown, I believe.
24  **A.  Yes.  We have an application for PSEO students.**
25  Q.  Okay.  And we'll come back to that.

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 21 of 55
Melinda and Mark Loe, et al vs.                Christopher Mathews                CHRISTOPHER MATHEWS
Willie Jett, et al                                    1-31-24                              January 31, 2024

Page 77

1  A.  Okay.
2  Q.  But it's your understanding, at least that -- if
3  I'm applying to take on-campus PSEO at Crown, I'm
4  not required to provide any type of a testimonial?
5  A.  Again, I apologize because I don't know the wording
6  of the question.
7  Q.  Yes.  So it's your understanding that there's no
8  testimonial requirement for students who are
9  applying for on-campus PSEO; correct?
10  A.  I'm sorry.  I can't answer that question
11  confidently.
12  Q.  Okay.  You don't know one way or the other?
13  A.  I don't know without seeing the application again.
14  Q.  Okay.  If you turn to the last page of this
15  document.  That is what appears to be the community
16  covenant, and then at the bottom of the community
17  covenant there are a couple of questions or
18  inquiries that are made.
19     One is an acknowledgment that you've
20  read the covenant to commit myself to full
21  compliance while enrolled at Crown College.
22  A.  Um-uhm.
23  Q.  And that's a yes or no radio button; right?  Or
24  check box?
25  A.  Yes.

Page 78

1  Q.  Is that question required for on-campus PSEO
2  applicants?
3  A.  Yes.
4  Q.  Okay.  Are you aware of anyone ever answering that
5  question no?
6  A.  I believe I'm aware of a student answering -- not
7  answering the question and followed up with our
8  director of PSEO to inquire.  My understanding from
9  that situation was that that was a mistake.  The
10  student just didn't know that it happened, but,
11  again, that's my understanding of that circumstance.
12  But in general, no.
13  Q.  Just skipped over it somehow?
14  A.  That again is my understanding so.
15  Q.  Outside of that one instance, are you aware of any
16  other occasions?
17  A.  I am not.
18  Q.  What would happen to my application if I'm applying
19  for on-campus PSEO at Crown and I click no?
20  A.  Sure.  So, again, this goes back to your former
21  question.  My understanding is, this application
22  is -- I think the term is Truelogic.  That as you
23  fill it out, various windows open up.
24     So it appears on the example that you
25  have, this is what happens when a student hits no,

Page 79

1  is that we inquire further.  Again, without seeing
2  it, I don't have a high level of confidence, but I
3  think we try to inquire further.  Our goal is to be
4  clear about who we are and that students have that
5  understanding.
6  Q.  Are students applying for on-campus PSEO required
7  to list references?
8  A.  I don't think so.
9  Q.  Are they required to have a home church?
10  A.  I do not believe so.
11     MR. TIMMERMAN: If we can take ten
12  minutes, I'm going to see if I can find a document.
13  Thank you.  Ten minutes.
14     (Recess taken from 11:18 a.m. to
15     11:30 a.m.)
16     BY MR. TIMMERMAN:
17  Q.  Dr. Mathews, we'll go back on the record here.
18  A.  Thank you.
19  Q.  So just to close the loop on this, you're not sure
20  if these three areas, one, two, and three
21  highlighted in Dr. Denton's e-mail, are currently
22  admissions questions for PSEO on campus at Crown;
23  correct?
24  A.  That's correct.
25  Q.  And you don't know what those questions are;

Page 80

1  correct?
2  A.  That's correct.
3     (Exhibit No. 12 marked for
4  identification.)
5     MS. THOMSON: This is MDE 1893.
6  A.  (Reviews Exhibit No. 12.)
7  Q.  Dr. Mathews, I'm showing you Exhibit 12.  Have you
8  ever seen this document before?
9  A.  I have.
10  Q.  Do you know when this application form was in use
11  at Crown?
12  A.  I believe this particular form was submitted along
13  with our materials to become an eligible
14  institution, so I think in 2002.
15  Q.  And has the application changed since 2002?
16  A.  It has.
17  Q.  How?
18  A.  We now use -- again, I believe the title is a
19  Truelogic application.
20  Q.  And I think you said that by Truelogic you mean
21  that certain areas of the application open up based
22  on your response?
23  A.  The student's response, yes, sir.
24  Q.  Any other changes between this 2002 application and
25  the current application that you know of?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 81

1 A.  No.
2 Q.  And according to this 2002 application, at this
3 point in time is there any reference to students
4 attesting their faith in Jesus Christ as part of
5 the application process?
6 A.  To this application?
7 Q.  Correct.
8 A.  Is that what you're asking?  Not in this
9 application.
10 Q.  And is there any instruction or obligation in this
11 application to affirm Crown's community covenant?
12 A.  Not in this application.
13 Q.  When did the faith statement become a requirement?
14 A.  My understanding of our progress is that we've
15 always -- always had an understanding of community
16 connection, understanding of our faith, tried to be
17 very clear even in this.  We -- we try to
18 acknowledge who we are, our biblical basis for
19 teaching and for Christian leadership.
20    My understanding is that in 2002, we
21 offered only residential or only online so we didn't
22 have a commuter --  I'm sorry.  Let me make sure
23 I'm saying that right.  We offered a commuter then.
24 2008, we only offered at that time residential or
25 online.  So no commuter option at that time.  I

Page 82

1 think that was 2008, 2009.
2 Q.  Okay.  So just I'm following the timeline here --
3 A.  Right.
4 Q.  -- you initially started, I think you testified
5 earlier, that online was not available initially,
6 which makes sense because it was 2002 when you --
7 A.  I think it was because of options, right.  Yes.
8 Just -- just what we were doing in terms of our
9 offerings in the main courses.
10 Q.  So this form, 2002, Exhibit 12, that would have
11 been used with on-campus applicants only?
12 A.  Right.  Yes.  My hesitation is, I don't know when
13 we started offering the online to PSEO students.
14 Q.  Okay.  So my question for you is, when -- when did
15 the requirement --  Let me just ask this.  When did
16 the requirement that students agree to abide by the
17 community covenant first find its way into the
18 application process?
19 A.  Sure.  I think, based on what we discovered, we
20 know that it was for all on-campus students no
21 later than 2013, which was when we resumed on-campus
22 commuter students for PSEO.  Because prior to that
23 time, residential students would have seen and
24 acknowledged the statement of faith through the
25 residential process.

Page 83

1 Q.  So prior to 2013, there was only residential?
2 A.  From 2009 into 2013.  So, again, 2008, 2009, there
3 was -- we did not offer commuter students the
4 opportunity to be on campus.
5 Q.  So 2002 to 2008, 2009, there is a commuter option.
6 2008, 2009, to 2013, is residential only?
7 A.  For on campus, yes.
8 Q.  So prior to 2008, so from 2002 until the 2008 or
9 2009 era, for students who wanted to commute to take
10 on-campus PSEO at Crown, there was no requirement
11 in the application process that they agree to abide
12 by the community covenant?
13 A.  That's my understanding.
14 Q.  And was there any requirement of a faith statement
15 in the application process at that point?
16 A.  Not to my knowledge.
17 Q.  And so then from 2008 or 2009 until 2013, we're
18 talking about only residential PSEO on campus?
19 A.  Yes.
20 Q.  Was there a requirement to abide -- or agree to
21 abide by the faith statement in that application?
22 A.  Not the PSEO application.  My understanding is part
23 of the residential, we're choosing to live on
24 campus.
25 Q.  Okay.  And was there any requirement for a faith

Page 84

1 statement in the PSEO application process during
2 that time?
3 A.  Not to my knowledge.
4 Q.  Okay.  So why, in 2013 was the decision made to
5 start requiring students to agree to abide by the
6 community covenant?
7 A.  My understanding is that at that point we were
8 aligning what our residential and our on-campus
9 students were doing in terms of the application, so
10 we didn't distinguish at that point.
11 Q.  So essentially making commuters subject to the same
12 provisions that residential PSEO students had been
13 subjected to?
14 A.  I believe all students had been expected to abide
15 by our faith statement or community covenant when
16 you talk about application, yes.
17 Q.  And when that change in 2013 occurred, do you know
18 if Crown or anyone at Crown notified the Minnesota
19 Department of Education that that change had taken
20 place?
21 A.  I'm not aware.
22 Q.  And do you know, prior to 2013, when, at least with
23 respect to residential on-campus PSEO students, you
24 testified that they would have required through the
25 residential process to agree to the community

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 23 of 55
Melinda and Mark Loe, et al vs.                    Christopher Mathews                    CHRISTOPHER MATHEWS
Willie Jett, et al                                         1-31-24                              January 31, 2024

Page 85

1 covenant; correct?
2 **A. I believe so.**
3 Q. Do you know whether the MDOE was ever made aware of
4 that?
5 **A. I'm not aware.**
6 Q. Do you know when Crown first communicated to the
7 Minnesota Department of Education that students
8 were required to abide by its faith -- its
9 community covenant in order to take on-campus PSEO
10 courses?
11 **A. I'm not aware.**
12 Q. Is there anyone who would know?
13 **A. I don't know. Gail Grant perhaps knows our**
14 **application process.**
15 Q. Thank you. And has that requirement to agree to
16 abide by the community covenant been consistently
17 in place in the PSEO application process since 2013?
18 **A. That's my understanding.**
19 Q. And have questions related to applicant's faith
20 been a part of the application process for on-campus
21 PSEO since 2013?
22 **A. That's my understanding.**
23 Q. Again, you don't know what those questions are,
24 though; correct?
25 **A. I don't. I'm sorry.**

Page 86

1 Q. So fair to say you don't know how those questions
2 evolved?
3 **A. I do not.**
4 Q. Okay. Who would be the best person to speak to
5 that?
6 **A. Again, I think Gail Grant understands our**
7 **application process the best.**
8 **MR. TIMMERMAN:** MDE 1886.
9 (Exhibit No. 13 marked for
10 identification)
11 **BY MR. TIMMERMAN:**
12 Q. Dr. Mathews, this is Exhibit 13.
13 **A. Yes, sir. (Reviews Exhibit No. 13.)**
14 Q. Have you seen this document before?
15 **A. Yes, I have.**
16 Q. When did you first see it?
17 **A. As we were gathering information for the deposition.**
18 Q. And this is a letter to Dr. Scott Moats. Do you
19 know who Dr. Moats is?
20 **A. I do know, yes.**
21 Q. Was he an associate dean at Crown in May of 2022?
22 **A. That's correct.**
23 Q. And this looks to be from an assistant commissioner
24 of the Department of Education, Jessie Montano, I
25 believe it is.

Page 87

1 **A. Um-uhm.**
2 Q. And if you look at the second paragraph here, that
3 reads that Crown's current admission process
4 requires applicants to "give satisfactory evidence
5 of Christian conversion" and be recommended by a
6 pastor. Since Children, Families & Learning, (CFL)
7 approves distribution of public funding for PSEO,
8 access to your PSEO program should not be this
9 highly restrictive. We request that Crown develop
10 a separate, less restrictive application process
11 for PSEO students. Once that process is ready to
12 go, our approval of Crown College to receive PSEO
13 funding will become effective. Did I read that
14 correctly?
15 **A. Yes, sir.**
16 Q. So do you know -- And this purports to be
17 communication that occurred prior to you, Crown,
18 officially being approved for PSEO?
19 **A. It seems that way, yes.**
20 Q. And do you know whether this 2002 application that
21 we just looked at, Exhibit No. 12, was modified in
22 any way as a result of this letter, this May 22
23 letter?
24 **MS. THOMSON:** Objection; ambiguous,
25 but you can answer if you know.

Page 88

1 **A. I do not know. I do not know how these relate in**
2 **terms of timing.**
3 Q. Okay. So you don't know, for example, if -- I
4 don't know whose handwriting this is on Exhibit 12,
5 but on the top right it says second draft with
6 changes. You don't know if this was -- Exhibit 12
7 was in response to the letter that's Exhibit 13?
8 **A. Not with confidence. I can only assume.**
9 Q. Do you know how Crown responded, if at all, to this
10 inquiry from the Department of Education in May
11 of -- May of 2002?
12 **A. I believe that I saw a response from Dr. Moats in**
13 **the information that we collected that said --**
14 **acknowledge this and said we'll provide the**
15 **information that you need.**
16 Q. But you have no knowledge on or about how this
17 letter impacted the application process at Crown;
18 correct?
19 **A. I don't.**
20 Q. Okay. That's fair enough. You don't know what you
21 don't know. That's fine.
22 **A. It's been a few years ago.**
23 Q. And is it fair -- Let me ask you one more question
24 about Exhibit 13.
25 The last sentence of that second

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 24 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 89

1 paragraph is again, once that process is ready to
2 go, our approval of Crown College to receive PSEO
3 funding will become effective. Fair to read this
4 letter as saying one of the conditions for Crown's
5 eligibility to participate in the PSEO program was
6 to develop a separate and less restrictive
7 application process?
8 A.  I see that, yes.
9 Q.  Thank you.  You would agree with me, though, in
10 looking at Exhibit 12, the old application, at some
11 point in time the application process became --
12 became more restrictive again; correct?
13 A.  I -- I don't know that I agree with that particular
14 question, so can you reword it?
15 Q.  Sure.  At some point in time you testified that the
16 agreement to abide by the community covenant and
17 the faith statement were introduced into the PSEO
18 application process.  I believe you said in 2013.
19 A.  That's right.
20 Q.  Do you know, was there any discussion about how
21 this letter from MDE in 2002 would impact, if at
22 all, that decision in 2013 to reintegrate those
23 questions into the application process?
24 A.  Again, I don't know the application that was
25 submitted for 2002, so I only have this document in

Page 90

1 front of me.
2 Q.  Okay.
3 A.  So, again, I'd have to be making a conjecture to
4 know that.
5 Q.  Do you know whether there was any discussion in
6 2013 about whether it would be prudent to advise MDE
7 of the changes to the application process?
8 A.  I'm not aware.
9 Q.  And, again, I think -- would Gail Grant be the
10 person who would know these answers?
11 A.  She would be the person closest to know, yes.
12 Q.  Any other employees involved in PSEO who are at
13 Crown now that were also there in 2013?
14 A.  Well, we have employees that have been there from
15 2013, but I don't think with knowledge of this
16 application process.
17 Q.  Is a faith statement something that's required in
18 the application process by -- I'll get the acronym
19 here.  I apologize.  -- by the CMA or is that
20 something that Crown decided on its own?
21 A.  The CMA does anticipate that we will follow the
22 statement of faith.  They do not explicitly say we
23 have to include it in our PSEO application.  Is that
24 your question?
25 Q.  It is.

Page 91

1 A.  Okay.
2 Q.  And does the CMA dictate that you're required to
3 have students living on campus to agree to abide by
4 the community covenant or, again, is that something
5 that Crown has arrived at on its own?
6 A.  No, the CMA does not dictate.
7      (Exhibit No. 14 marked for
8 identification)
9      MS. THOMSON: This is Loe 795.
10      MR. TIMMERMAN: And Counsel, before I
11 ask questions about this, I have a question for
12 you.  We can put this on the record.
13      I believe that Ms. Nash may have been
14 on this call, and I'm not sure if privilege is
15 asserted with respect to the contents.
16      MS. THOMSON: I do believe it is
17 privileged with respect to the discussion on the
18 call.
19      MR. TIMMERMAN: Did Ms. Nash
20 represent Bethany Lutheran, Bethel, Concordia,
21 Martin Luther College or North Central University
22 at the time?
23      MS. THOMSON: I do not know if she
24 represented those schools, but I do know that they
25 have a common interest with Crown, and with

Page 92

1 Northwestern she did represent them.
2      MR. TIMMERMAN: So it's your position
3 that questions about what occurred during this call
4 would be privileged?
5      MR. BAXTER: Yes.
6      MS. THOMSON: Um-uhm.
7      MR. TIMMERMAN: Based on the common
8 interest --
9      MS. THOMSON: Yes.
10      MR. TIMMERMAN: -- privilege?
11      MS. THOMSON: Yes.  And possibly
12 representation, but I can't confirm that.  It's
13 attorney-client.
14      BY MR. TIMMERMAN:
15 Q.  Well, I'm going to ask you some questions about
16 this exhibit hopefully, and I think we'll probably
17 challenge the common interest privilege here, but
18 we can take that up later.  But let me ask you some
19 peripheral questions in the meantime.
20      Do you recall participating in a
21 discussion on February 20, 2013, regarding PSEO?
22 A.  Only -- only when you presented me the document, but
23 yes.
24 Q.  Okay.  So this may be moot.  Do you recall anything
25 that was discussed during that call?

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 25 of 55
Melinda and Mark Loe, et al vs.                    Christopher Mathews                    CHRISTOPHER MATHEWS
Willie Jett, et al                                      1-31-24                            January 31, 2024

Page 93

1  A.  I'm not sure I can provide you much information
2  from that call.
3  Q.  Do you recall having --  And, again, I don't want
4  to know about any conversations that Ms. Nash or
5  any other lawyer was involved with, but do you
6  recall having any conversations directly with
7  Dr. Denton either in advance of or in preparation
8  for this call or any after this call?
9  A.  I do not think so.
10  Q.  What about with anybody else other than an attorney?
11  A.  Again, I can't answer with confidence, no.
12  Q.  Do you know why these particular schools were
13  chosen to participate in this call?
14  A.  I believe --
15      MS. THOMSON: Objection.  Don't --
16  don't answer anything that would have been shared
17  by your attorney, but you can answer to the extent
18  that it's not reflecting attorney-client privilege.
19  A.  I would like to at least make the observation that
20  these are all schools that are faith based.
21  Q.  Okay.  Do you know whether -- with the exception of
22  Northwestern, which for obvious reasons we know
23  about, did any of the other schools listed on
24  Exhibit 14 require a faith statement as part of
25  their admissions?

Page 94

1      MS. THOMSON: Objection; outside the
2  scope.
3  Q.  You can answer.
4      MS. THOMSON: Yes, you can answer.
5  A.  I'm unaware.
6  Q.  Okay.  You don't know one way or the other?
7  A.  I'm sorry, I don't know one way or the other, so I
8  couldn't speak for them.
9  Q.  Same with the community covenant, you don't know
10  one way or the other?
11  A.  I don't know one way or the other.
12      MS. THOMSON: Same objection.
13  Q.  Did you participate in any meetings with any
14  Minnesota legislators about the proposed legislative
15  change?
16  A.  No.
17  Q.  Did you ever attend any meetings with Representative
18  Tom Emmer about the legislative change?
19  A.  No.  We -- in disclosure, we -- I was at a meeting
20  with Congressman Emmer, but I do not recall the
21  topic that time that I was with him dealing with
22  the legislation.
23  Q.  Okay.
24      (Exhibit No. 15 marked for
25  identification)

Page 95

1      MS. THOMSON: For the record, this is
2  Loe 120 through 122.
3  A.  (Reviews Exhibit No. 15.)  Thank you.
4  Q.  Yeah, thank you.  Have you seen this document
5  before?
6  A.  I have.
7  Q.  Okay.  And when's the first time you saw this?
8  A.  As we were collecting materials for the deposition.
9  Q.  So this is not something that would have come
10  across your desk or your inbox in your current role?
11  A.  I don't believe so, no.
12  Q.  Do you know why this memorandum --  Let me ask you
13  this first actually.
14  A.  Sure.
15  Q.  Do you know who prepared this memorandum?
16  A.  I do not.
17  Q.  Do you know why Representative Jim Abeler was the
18  chosen recipient of this memo?
19  A.  I do not.
20  Q.  Who at Crown would normally be responsible for
21  preparing a memorandum like this one?
22  A.  In this particular case, probably Jen Niska.
23  Q.  And Ms. Niska's spouse is a Minnesota legislator;
24  correct?
25  A.  That's correct.

Page 96

1  Q.  So the impact on Crown College and the University
2  of Northwestern section, the first bullet says:  The
3  Crown and Northwestern campus communities integrate
4  faith and learning and, as such, are heavily based
5  on scripture and an agreement to biblical/scriptural
6  standards.  Did I read that correct?
7  A.  Yes.  Yes, sir.
8  Q.  Would you agree that Crown's on-campus PSEO
9  offerings are also heavily based on scripture?
10  A.  Part of our mission statement is a biblically-based
11  education, and so yes.
12  Q.  The third bullet references, if you see at the end
13  of that sentence, "without risking the culture".
14  A.  I see that.
15  Q.  Do you know what that means?
16  A.  I do not know entirely.
17  Q.  Is there a concern at Crown that the culture will
18  be risked if non-Christian students are admitted?
19  A.  Well, certainly we have a community covenant, a
20  statement of faith for a purpose.  Again, our
21  desire is to be as transparent and forthright in
22  who we are as we possibly can be.  Our mission
23  statement guides what we do.
24      You've seen our strategic plan to try
25  again to be very clear in what we do.  And so

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 97

1  inasmuch as accepting students with lower GPAs or
2  something of that nature, it would impact who we
3  strive to be.
4  Q.   What about accepting students who aren't Christian?
5  A.   Who aren't Christian?
6  Q.   Correct.
7  A.   Who would not sign our community covenant or
8  statement of faith?
9  Q.   Yes.
10 A.   Correct.
11 Q.   How would that risk the culture?
12    MS. THOMSON: Objection; vague.
13 Q.   Would that risk the culture?
14 A.   I don't know that I would use the word risk.
15 Q.   What word would you use?
16 A.   But, again, it would change our culture because,
17 again, we've asked our faculty, staff and students
18 to agree together to live in community with one
19 another and to choose to follow a particular set of
20 standards.
21 Q.   Have you ever heard the phrase contamination used
22 in context of allowing non-Christian students to
23 take PSEO?
24 A.   I have not.
25 Q.   In the context of allowing gay or transgender

Page 98

1  students to take PSEO?
2  A.   No, sir.
3  Q.   Any concern ever raised that you're aware of about
4  cultural contamination?
5  A.   I'm not aware of the use of the word contamination.
6  Q.   From Crown's perspective, would allowing
7  non-Christian students to take PSEO on campus
8  imperil the culture or worsen the culture?
9     MS. THOMSON: Objection; vague, but
10 you can answer if you have an answer.
11 A.   Would you ask again?
12 Q.   Yeah. From Crown's perspective, would allowing
13 students who aren't Christian to attend on-campus
14 PSEO imperil or worsen the culture?
15 A.   It would impact the culture.
16 Q.   Negatively?
17 A.   It would not align with our community covenant.
18 Q.   Would allowing students who were openly gay and in a
19 same sex relationship to attend on-campus PSEO at
20 Crown threaten or impact culture?
21    MS. THOMSON: Objection; asked and
22 answered.
23 A.   I'll defer to my counsel.
24    MS. THOMSON: You can answer.
25 Q.   Well, I asked specifically at first about including

Page 99

1  non-Christians. I'm asking now about --
2     MS. THOMSON: Objection; compound.
3     MR. TIMMERMAN: Okay.
4  A.   I -- I think, Jeff, I understand your train of
5  question there.
6  Q.   Yeah.
7  A.   But, again, I appreciate the role you need to play.
8  Our -- our community is not defined in that way;
9  right? We want to be clear and upfront about who
10 we are, and we believe that our students' success
11 at Crown is understanding that and abiding by that.
12 That's part of their ability to succeed. That's
13 part of families' abilities to choose Crown.
14    And so I'm -- I'm concerned about
15 words like a negative impact. The Christian and
16 Missionary Alliance has always been about spreading
17 Christ love for everyone around the world. That
18 would be our desire for everyone.
19    But in our context, we have decided
20 and ask everyone who comes to our campus to agree
21 to our community covenant in all of its aspects. So
22 to be men and women of integrity and honesty, to
23 love one another and treat each other well, and to
24 live lives that would honor Christ. We believe
25 that's important for who we are and something that

Page 100

1  as a group we've committed to.
2  Q.   Would you agree that the community covenant excludes
3  certain groups of people?
4  A.   Those that would not align with our statement of
5  faith or community covenant.
6  Q.   In the last bullet point on the first page of this
7  document there's discussion about, it's entirely
8  possible a more local student could apply and get
9  accepted without fully realizing the culture in
10 which they're taking PSEO.
11    Have you been part of any
12 conversations where that particular concern has
13 been discussed?
14 A.   I have not. Not outside of this document.
15 Q.   Would you agree that a Muslim student, high school
16 student in St. Bonifacius, can't attend on-campus
17 PSEO at Crown without affirming that Jesus Christ
18 is the one true Lord?
19 A.   They would sign our community covenant and our
20 statement of faith.
21 Q.   Which affirms that; correct?
22 A.   That's right.
23 Q.   And would you agree that a gay student in
24 St. Bonifacius who wants to take PSEO on campus at
25 Crown can't do that unless they affirm in writing

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 27 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 101

1 that their sexual identity is --
2    MS. THOMSON: Objection; vague.
3 Q. -- sexually immoral?
4    MS. THOMSON: But you can answer if
5 you know.
6 A. Again, I find that question a little confusing.
7 Q. Sure. Would you agree that a gay student in
8 St. Bonifacius can't take on-campus PSEO courses at
9 Crown without affirming that their sexual identity
10 is immoral?
11    MS. THOMSON: Same objection, but you
12 can answer.
13 A. I think the adjective at the beginning, a gay
14 student. Any student who would not commit to our
15 community covenant and our statement of faith would
16 not take classes on our campus as a PSEO student.
17 Q. Would not or could not?
18 A. Well, could not, I suppose. Again, we're cautious.
19 We -- Well, I'll stop.
20    (Exhibit No. 16 marked for
21    identification)
22    MS. THOMSON: This is Loe 2158, for
23 the record, through 2159.
24 A. (Reviews Exhibit No. 16.) Okay.
25 Q. Dr. Mathews, have you seen this document before?

Page 102

1 A. Yes, sir.
2 Q. When did you first see this?
3 A. In preparation for our deposition.
4 Q. This is not something that anybody in administration
5 shared with you prior?
6 A. I do not recall. I don't believe that I was on the
7 e-mail chain, so, no, sir.
8 Q. Have you heard of complaints like this before?
9 A. No, sir. Well, I'm sorry. I guess I should clarify
10 like this.
11 Q. Sure.
12 A. It seems this individual had several complaints.
13 Q. Yeah. Sure. Are you aware of any other complaints
14 that Crown has received about an individual being
15 referred to by an epithet that is offensive to
16 their sexual orientation?
17 A. I have not.
18 Q. Would that violate Crown's policies?
19 A. It would.
20 Q. By ministry students here; correct? That's what he
21 is saying?
22 A. That is what he wrote, yes.
23 Q. Is that concerning to you?
24 A. Yes.
25 Q. Why?

Page 103

1 A. It doesn't abide by our community covenant.
2 Q. It's not Christ-like; right?
3    MS. THOMSON: Objection; calls for
4 speculation. You can answer if you didn't.
5 A. I'm not -- I'm not sure that I understand the
6 question, but --
7 Q. It's not Christ-like to call someone an epithet;
8 correct?
9 A. No.
10 Q. Okay. And Mr. Daniel Johnson references innumerable
11 and banal alter (sic) calls at chapel. Do you have
12 any idea what he's referencing there?
13 A. Our chapel services will have times where we open
14 for students to come and to pray or to meet with
15 a minister or a faculty member or a staff member,
16 so I assume by altar call, that's what he means.
17 Q. Are students specifically called to attend chapel or
18 altar at particular times?
19 A. Are specifically called, no.
20 Q. Okay. In your experience, deep experience as an
21 educator, would you agree that bullying and
22 harassment is harmful to students?
23 A. Yes.
24 Q. Especially minors; right? Would you agree that
25 harassment and bullying is particularly difficult,

Page 104

1 if not --
2    MS. THOMSON: Objection; outside the
3 scope.
4 A. I would say it's harmful to any person.
5 Q. Do you know how Crown responded to Mr. Johnson's
6 inquiry?
7    MS. THOMSON: Objection; lacks
8 foundation.
9 A. I do not. No, other -- other than the e-mail
10 exchange that we had so.
11 Q. What would you expect the response of Crown to be
12 to an inquiry like this?
13 A. To the e-mail?
14 Q. Correct.
15 A. Oh, I think Dr. Denton responded to this e-mail and
16 he explained our position as Crown, expressed his
17 sorrow that a student had experienced this at Crown,
18 and committed to continuing to improve our
19 environment where we're committed to our covenant
20 and to loving one another.
21 Q. Do you know whether a Title 9 investigation was ever
22 opened with regard to this complaint?
23    MS. THOMSON: Same objection.
24 A. I don't know.
25 Q. Is that something that you would have expected to

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Christopher Mathews
1-31-24
CHRISTOPHER MATHEWS
January 31, 2024

Page 105

1 happen?
2 A. I -- I don't know in this dialogue, no.
3 Q. Do you know if Mr. Johnson was removed from the
4 mailing list at Crown?
5 A. I do not know if he were removed. I believe that
6 was a part of the e-mail exchange that I read in
7 researching this.
8 (Exhibit No. 17 marked for
9 identification)
10 MS. THOMSON: This is Loe 2355, for
11 the record, through 2357.
12 A. (Reviews Exhibit No. 17.)
13 Q. Have you seen this document before?
14 A. I have.
15 Q. In preparation for the deposition?
16 A. Yes, sir.
17 Q. Have you seen it before then?
18 A. No, sir.
19 Q. Ms. Niska is recommending or suggesting removing
20 Mr. Johnson from PSEO information on e-mails;
21 correct?
22 A. Yes.
23 Q. Is that a common practice at Crown; if someone
24 raises a complaint, they're removed from future
25 communications?

Page 106

1 A. It is not.
2 Q. Do you think Ms. Niska's suggestion here is
3 appropriate?
4 A. It would align with who we are, that her suggestion
5 was also, please contact or you may want to contact.
6 Again, all -- all of these are delicate issues that
7 we want to act respectively and lovingly towards
8 anyone, particularly one of our former students,
9 and so sending repeated e-mails that's going to
10 frustrate a student after the president has
11 clarified that this is the direction we're going,
12 would create frustration, and so we don't want to
13 do that. So, again, my understanding of Jen's
14 suggestion was that perhaps reach out to Dan if that
15 seems wise and have a conversation with him.
16 Q. Do you know if anyone ever did have a conversation
17 with him?
18 A. I do not know.
19 Q. If this had come to you, would you have had a
20 conversation?
21 A. Most likely, yes.
22 Q. Why?
23 A. Again, it's our practice, as I mentioned, for
24 reconciliation. So our desire is to, as Paul says,
25 live peacefully as much as possible with all people.

Page 107

1 And so when we are at odds with own another, again
2 as the Bible says, we -- we try to reconcile those
3 relationships as best we can.
4 Q. Has Crown ever considered eliminating its faith
5 statement for PSEO on-campus students?
6 A. Certainly through this process we've had discussions
7 and prayerfully considered what we believe the next
8 steps will be.
9 Q. And one of the options considered was removal of the
10 faith statement requirement?
11 A. Yes.
12 Q. Was it also considered whether or not to remove the
13 obligation to agree to the covenant?
14 A. Probably --
15 MS. THOMSON: Objection. Don't
16 answer to the extent that it requires you to say
17 something that would violate attorney-client
18 privilege, but you can answer to the extent that it
19 doesn't violate attorney-client privilege.
20 A. Okay. What --
21 Q. I don't want to know -- you know, if these
22 discussions occurred with lawyers, I don't get to
23 know and I don't want to know.
24 A. Oh, no. I'm sorry. I think in that case my answer
25 was simply going to be, I don't know if we

Page 108

1 considered elimination of community covenant and
2 statement of faith as a separate issue. They're --
3 they're intertwined with one another so.
4 Q. And who was part of that discussion?
5 A. I -- I cannot say. Again, it would have been
6 something informally. We would have discussed it
7 as the legislation was coming up. I do believe our
8 board had a discussion about that on a more formal
9 basis about what our response will be. So anywhere
10 from informal conversations about what next steps
11 may need to be, to more formal to say we believe
12 it's our religious freedom and our God-given call
13 to maintain our statement of faith and community
14 covenant.
15 Q. So was it the board's ultimate decision to keep the
16 faith statement and covenant?
17 A. Yes.
18 Q. That's a board-level decision; correct?
19 A. Yes, it's certainly in this circumstance.
20 Q. I'm going to ask you just a couple more questions
21 about the admissions process, understanding that
22 you don't have a ton of knowledge about this, but
23 do you know whether there's any video essay
24 requirement that students video themselves answer
25 questions?

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 29 of 55
Melinda and Mark Loe, et al vs.                Christopher Mathews                CHRISTOPHER MATHEWS
Willie Jett, et al                             1-31-24                           January 31, 2024

Page 109

1  A.  I do not believe there is a video portion.
2  Q.  Is there any in-person interview requirement for
3  on-campus PSEO as part of the application process?
4  A.  I'm hesitant on the word requirement.  I do believe
5  that one of our advisors, usually Emily Cano,
6  reaches out, just introduce the student, welcome,
7  answer any questions they may have.
8  Q.  Okay.  Do you know whether Crown inquires about
9  applicants' social media activity or accounts?
10  A.  Not to my knowledge, no.
11  Q.  Is there any -- I think you said there's no
12  testimonial.  Is there any essay component of the
13  PSEO on-campus application that you're aware of?
14  A.  Again, I can't speak confidently to that.  Sorry.
15  Q.  Who is Kelly Metz?
16  A.  I'm sorry.
17      MS. THOMSON: Objection; foundation.
18      THE WITNESS: I'm sorry.
19      MS. THOMSON: But you can answer.
20  A.  Kelly Metz was also -- I don't remember her title.
21  I think data coordinator or -- but also within PSEO.
22  So Kelly reported to Emily and helped facilitate
23  the administrative aspects of the PSEO program.
24  Q.  Is she with Crown still?
25  A.  She is not.

Page 110

1  Q.  Do you know, did she leave on amicable terms?
2  A.  She did.
3  Q.  Do you know where she is now?
4      MS. THOMSON: Objection; outside the
5  scope, but you can answer if you know.
6  A.  I don't know.  Her son sings in my choir at school
7  so.
8  Q.  And just as a matter of course, college students,
9  traditional college students and on-campus PSEO
10  students are required -- it's the same covenant,
11  community covenant that they're required to attest
12  to; correct?
13  A.  Yes, sir.
14  Q.  Do you know whether, for traditional college
15  students, that the questions they're asked regarding
16  faith in the application process are the same as
17  the questions asked of PSEO students?
18      MS. THOMSON: Objection; outside the
19  scope, but you can answer if you know.
20  A.  I -- I don't know that.  That would be, again,
21  conjecturing that I knew what was in it, and I just
22  don't know.
23  Q.  Okay.
24      (Exhibit No. 18 marked for
25  identification)

Page 111

1      MS. THOMSON: For the record, this is
2  Loe 1652 to 1653.
3      MR. BAXTER: What exhibit is that?
4      MS. THOMSON: 18.
5  A.  (Reviews Exhibit No. 18.)
6  Q.  Have you had a chance to review this?
7  A.  Yes, sir.
8  Q.  This actually looks like one you were copied on;
9  right?
10  A.  Yes.
11  Q.  And Dr. Dean Erickson, is his title still chair of
12  Bible, Theology, and Ministry?
13  A.  Yes.  That's correct.
14  Q.  Does he teach Old Testament classes?
15  A.  He does.
16  Q.  And this appears that Dr. Erickson responded to
17  someone who had an inquiry regarding PSEO; correct?
18  A.  Yes, sir.
19  Q.  And he states, it looks like perhaps NWUSP, and I
20  think that's Northwestern-St. Paul, expects PSEO
21  students to sign their doctrinal and/or lifestyle
22  statement.  We have never felt this was allowed or
23  expected.  Is that wrong?  Is he mistaken?
24  A.  He is.
25  Q.  And then the last sentence of this paragraph says:

Page 112

1  For instance, they, being PSEO applicants, need to
2  know that we pray before classes and that they can
3  choose other PSEO options if this is objectionable.
4  Is that accurate?
5  A.  Yes, in part.  So it's discretion of a faculty
6  member to pray at the beginning of class.
7  Sometimes, all the time, not at all.
8  Q.  Do you know whether faculty members have expressed
9  an expectation that PSEO students must join in that
10  prayer?
11  A.  Not to my knowledge.
12  Q.  Have you checked to see if that's ever been a
13  requirement?
14  A.  It's not been a requirement.  I know that.
15  Q.  Have you --  It's not been an institutional
16  requirement, but do you know one way or the other
17  whether individual instructors have had that
18  requirement?
19  A.  I have not been able to ask every instructor for
20  every class if they've always done it, so I can't --
21  I can't speak to that, but it's not an expectation
22  institutionally.
23  Q.  Is there any communication to PSEO students to the
24  effect that they have the right to opt out of
25  prayer?

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 30 of 55
Melinda and Mark Loe, et al vs.                Christopher Mathews                    CHRISTOPHER MATHEWS
Willie Jett, et al                                      1-31-24                                    January 31, 2024

Page 113

1  A.  Not directly.
2  Q.  Is there any faculty or staff at North Erickson --
3  I don't even know where that came from.
4       Is there any faculty or staff at Crown
5  that have expressed a belief that the faith
6  statement or covenant aren't necessary for PSEO?
7  A.  Not to my knowledge, no.
8  Q.  Do you know whether or not PSEO courses offered at
9  Crown on campus are required to meet high school
10 graduation requirements?
11 A.  Yes.
12 Q.  Okay.  And it looks like there's some interaction
13 between admission staff and high school staff to
14 ensure that courses do satisfy high school
15 graduation requirements; correct?
16 A.  That's correct.  We -- we do all that we can to
17 ensure that, but, again, we -- we don't transcript
18 for the high schools so.
19 Q.  Right.  Let's just look at this document.
20      (Exhibit No. 19 marked for
21 identification)
22 A.  (Reviews Exhibit No. 19.)
23 Q.  Dr. Mathews, you've got Exhibit 19 in front of you.
24 Have you ever seen this before?
25 A.  I have not seen this before.

Page 114

1  Q.  It appears to be some type of an outreach form
2  between Crown staff and high school counselors.  Do
3  you see that?
4  A.  It does.
5  Q.  What does Crown do to ensure that PSEO courses it
6  offers on campus meet high school graduation
7  requirements?
8  A.  Again, I'm not -- we -- I'm pausing because we --
9  we transcript as college classes for what we do.  So
10 we ensure that the classes that we teach meet the
11 college requirement.  We encourage, in the
12 admissions process, for students to inquire of
13 their counselor, and we try to do all we can in
14 advising, again, just as we would with any of our
15 students.  Ultimately they're bound to our catalog
16 to meet requirements, but it's the student's
17 responsibility to fulfill those requirements at
18 Crown.  We try to do all that we can to facilitate.
19 They count for the high school credits, but we -- we
20 can't dictate whether a high school accepts that or
21 not so.
22 Q.  That makes good sense.
23     MS. THOMSON:  Let me just object that
24 the document hasn't been authenticated.
25 Q.  Yeah.  I'll just represent that this was pulled from

Page 115

1  Crown's website so.
2  A.  Okay.
3     MS. THOMSON:  And if we can take a
4  break in the next five minutes or so.
5     MR. TIMMERMAN:  Yeah, absolutely.  I
6  just have one more question before we go on break.
7     BY MR. TIMMERMAN:
8  Q.  Are you aware of any PSEO courses that Crown has
9  offered on campus that did not qualify for high
10 school graduation requirements?
11 A.  I am not.
12     MR. TIMMERMAN:  Okay.  How long would
13 you like to take?
14     MR. BAXTER:  Should we take a lunch
15 break?
16     MR. TIMMERMAN:  Sure.
17     (Recess taken from 12:24 p.m. to
18 1:17 p.m.)
19     (Assistant Attorney General Ian
20 Taylor is now present)
21     BY MR. TIMMERMAN:
22 Q.  Dr. Mathews, before we left off, we were talking
23 about kind of the interaction between high school
24 staff and college staff around PSEO.
25     I'd like to talk next about the PSEO

Page 116

1  curriculum and courses, if we could.  So if I
2  wanted to see what PSEO courses are taught at Crown,
3  where would I go to find that information?
4  A.  The registrar's office.
5  Q.  And is that information also -- I mean, we've
6  looked at the admissions guide.  Is that information
7  also published online?
8  A.  Probably not in detail.  So our -- our course
9  offerings are published online.  Some of those by
10 number would indicate that they're PSEO only.
11 Q.  Okay.
12 A.  Otherwise it would be our advisor.  So Emily Cano
13 or someone with her would help students know, of all
14 of the offerings that we have, which ones were
15 eligible for PSEO students.
16 Q.  And who decides within Crown what PSEO courses are
17 offered?
18 A.  I suppose ultimately me, but that comes up through
19 our department chairs and our academic deans.
20 Q.  And is that something that's reviewed periodically?
21 A.  It is, yeah.  We work on schedules a year in advance
22 and make sure we have adequate seats and adequate
23 compliments of classes each semester.
24 Q.  And for the on-campus PSEO courses at Crown, are
25 there any of those courses that are exclusively

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 117

1 high school students or are all of them a mix of
2 high school and college students?
3 A.  Some are exclusively, and, again, that's predicated
4 on the amount of seats that we have.  So we -- we
5 try to incorporate as much as possible, but
6 occasionally an English section that we just don't
7 have enough seats remaining, we'll open up another
8 section for our PSEO students.
9 Q.  And I've seen some reference in some of the
10 documentation to an SAS honors cohort?
11 A.  Um-uhm.
12 Q.  What is that comprised of?
13 A.  I'm sure we've had honors for many years, but in a
14 couple of years past, again when Dr. Denton started
15 and hired me, was anxious to begin focusing a
16 little bit more on academic excellence, and so we
17 revived our honors program.  And you've probably
18 seen the new iteration of that.  It was called
19 Distinguished Scholars prior to that and I think an
20 Honors Program prior to that.
21 Q.  And are PSEO students eligible for participation in
22 that cohort?
23 A.  They can apply to be a part of that, yes.
24 Q.  And what are the benefits of being a member of that
25 honors cohort?

Page 118

1 A.  Well, it's just additional academic experiences, so
2 you can get a minor in honors.  That's ultimately
3 the goal, but mainly it's just augmenting the
4 academic experiences that they have.
5 Q.  Does it open up additional courses to -- course
6 options for students?
7 A.  It does.  They are required to be on campus, so
8 that is a part of our expectation of all honor
9 students, and then they go through an interview
10 process separate from the admissions process to be
11 accepted into the honors cohort.
12 Q.  Are you aware of any PSEO students on campus that
13 have participated?
14 A.  I should be.  No.  I think the answer to that is
15 yes.  I know that we had PSEO students that applied
16 and interviewed for the program.  I can't speak
17 with confidence if any of those are presently in the
18 program.
19 Q.  And if I'm a PSEO student and I am accepted into
20 the SAS honors cohort, are there any additional
21 requirements for me in terms of attending chapel or
22 religious gatherings or anything of that nature?
23 A.  No.
24 Q.  And kind of who, broadly speaking, is in charge of
25 establishing and developing the curriculum for PSEO?

Page 119

1 A.  For PSEO?  Again, broadly that -- that would happen
2 as all of our curriculum would, so that would come
3 up from the faculty within a department to our
4 chairs and deans, who function as a curriculum
5 committee, to our faculty at large that would vote
6 to have that approved.
7 Q.  Okay.  So it's kind of a bottom-up process?
8 A.  That's --
9 Q.  Do the departments themselves make recommendations
10 for courses and it comes up the food chain, so to
11 speak?
12 A.  It does, yes.
13 Q.  And does that typically the department level filter
14 to department heads?
15 A.  It -- it does.
16 Q.  Okay.  And specific to PSEO, are there any written
17 curriculum standards or guidelines that the
18 institution has to share with departments and
19 professors?
20 A.  No.
21 Q.  Are there any --  Essentially is the development of
22 curriculum process the same as it is for traditional
23 undergraduate students?
24 A.  That's right.
25 Q.  And when we're drilling down here, we're talking

Page 120

1 about kind of general pedagogy, when you get down
2 to the syllabi level, who is responsible for
3 developing course syllabi for PSEO students?
4 A.  For on-campus course syllabi, it's the instructor
5 of record that develops that, usually utilizing a
6 template that's been approved by our deans and
7 chairs.  That template is given to the instructor
8 of record, then, that completes the template and
9 then sends that to the department chair for review.
10 Q.  And so -- and I realize -- I haven't seen this
11 document, but can you recall kind of generally
12 what's included within that template?
13 A.  Sure.  So the course name, ID, information,
14 materials that are required, learning objectives of
15 the course, calendar for the course, and then
16 grading, expectations.
17 Q.  And when you say materials, does that include
18 textbooks and other source materials for use in the
19 course?
20 A.  Any materials for the course that are required, yes.
21 Q.  And those are set at the institutional level as
22 opposed to the instructor level?
23 A.  So the instructor would choose the text but, again,
24 depending on the -- the context or the course, the
25 chair, when reviewing the syllabi, may come back

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Christopher Mathews
1-31-24
CHRISTOPHER MATHEWS
January 31, 2024

Page 121

1  and say we can't use that text.  We do a lot with
2  Cengage Publishers, which provides us online texts,
3  which allows us, for courses that involve PSEO
4  students, to have access to that without charge.  So
5  that's a part of a contract that the institution
6  has.
7      So, again, that might be a case, I'm
8  not actually aware of this happening, but that could
9  be a case that if an instructor were to say, I want
10  this textbook outside of Cengage, the chair would
11  say, no, we need to -- we need to utilize Cengage
12  for this reason.
13  Q.  Okay.  Are there traditional bookstore textbooks
14  that are used as well with PSEO courses?
15  A.  There are some.  I would not be able to give you
16  specifics to that, but we use MBS for that purpose.
17  So I don't remember the acronym, but it's a book
18  seller.  So our tangible books are used for that
19  purpose.  And we tend to also keep copies in our
20  library so students can access there as well.
21  Q.  And do PSEO students on campus bear any costs of
22  textbooks --
23  A.  No.
24  Q.  -- for their courses?  Who pays for the textbooks?
25  A.  Well, if we have tangible textbooks, we do that out

Page 122

1  of our instructional cost.  But, again, this is why
2  we lean a little bit more heavily on our Cengage
3  offering because that's part of an institutional
4  contract and we can furnish all textbooks for all
5  students through that if an instructor chooses to
6  use that for the course.
7  Q.  And does the State of Minnesota provide any
8  reimbursement for textbooks for PSEO courses?
9  A.  No, no textbooks.
10  Q.  No textbooks.  What about for --
11      MS. THOMSON: Objection; calls for a
12  legal conclusion.  Sorry.
13  Q.  I'm just saying like financial reimbursement, does
14  the State of Minnesota --  And we'll talk a little
15  bit more about pupil reimbursement, but does the
16  State of Minnesota pay for any course materials
17  that PSEO students use in on-campus PSEO courses?
18  A.  Not without --  No.  We only utilize -- only bill
19  for the tuition, for the credit.
20  Q.  Okay.  Are there --  Aside from the template, are
21  there any other standards or guidelines that are
22  provided to instructors or departments regarding
23  syllabi development?
24  A.  Not specific.  So obviously in our catalog with the
25  course description, we would offer resources in

Page 123

1  terms of previous syllabi that may have been used
2  by the instructor matching up student outcomes,
3  identifying best practices.
4  Q.  Is it the same process for college courses or
5  traditional --
6  A.  Yes.
7  Q.  -- college courses?
8  A.  That's right.
9  Q.  Is it the same template for college courses or a
10  different template?
11  A.  It's -- it's the same template.  So, again, these
12  are -- by and large these are just our courses that
13  we offer.
14  Q.  Okay.  And high school kids just happen to be
15  participating in that?
16  A.  That's right.  They're college courses, yes.
17  Q.  Do you know whether the Bible has ever been a text
18  referenced as required reading in any on-campus PSEO
19  course?
20  A.  I do not know.
21  Q.  Is it possible that it has; you just don't know?
22  A.  It is possible.  Again, our instructors of record
23  can do that.  It would not be a primary principal
24  text.  But, again, as an example of being literature
25  or an example of historical studies or something, it

Page 124

1  may be used by a faculty member.
2  Q.  Okay.  Is there any expectation from the institution
3  that syllabi will include biblical references and
4  quotes or citations?
5  A.  No.
6  Q.  Have you seen that in syllabi for PSEO students?
7  A.  I have not.
8  Q.  Is that something that you would have sight line to
9  by virtue of your position?
10  A.  I do not review every syllabus that comes in.
11  Again, we -- we look to the chairs to do that.
12  Q.  And do we understand -- does Crown understand that
13  PSEO courses must be nonsectarian?
14  A.  We do.
15  Q.  And how does Crown interpret that requirement?
16  A.  I believe we look to the assurance argument with
17  our agreement with the state.  If I can remember the
18  three points, we do not utilize those courses for a
19  particular Christian vocation.  Those courses are
20  not designed to teach one particular religious
21  belief or --  There's one more.  But, yes.
22  Q.  And I have not seen --  I'll just represent to you
23  that I have not seen any --  I know the form you're
24  talking about, the assurance form.  I have not seen
25  any signed assurance forms for -- from Crown, but

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

---

Page 125

1  I'll introduce this as an exhibit and maybe we can
2  talk about it.  And this is MDE 1745.
3       (Exhibit No. 20 marked for
4  identification.)
5  A.  (Reviews Exhibit No. 20.)
6  Q.  And before we talk about Exhibit 20, Dr. Mathews,
7  hearkening back to course design, PSEO course
8  design.  Is there any expectation that Christian
9  materials other than the Bible, so Christian
10 oriented books, articles, will be part of syllabi?
11 A.  Not an expectation, no.
12 Q.  Is there an expectation that course textbooks and
13 materials will have a biblical viewpoint or
14 worldview?
15 A.  No.
16 Q.  Have there been any occasions where, at the
17 institutional level, you or someone on your team of
18 folks who review syllabi have decided that a
19 particular textbook or course material is not
20 acceptable for PSEO?
21 A.  No.
22 Q.  Has there ever been an occasion where, for a PSEO
23 course, upon review of the syllabus, outcomes have
24 been determined to be not appropriate?
25 A.  No.

---

Page 126

1  Q.  So looking at Exhibit 20, Dr. Mathews.  You
2  referenced the three things.
3  A.  Um-uhm.
4  Q.  This is the 2017-2018 academic year, statement of
5  assurance.  Are these the three nonsectarian factors
6  that you were referencing?
7  A.  They were.
8  Q.  And who within Crown is responsible for ensuring
9  that these criteria are met?
10 A.  The director of PSEO, but, again, that would --
11 that would then funnel up to chairs and deans and
12 me as well.
13 Q.  And what kind of a review process is involved for --
14 with respect to PSEO curriculum or syllabi to ensure
15 that these criteria are met?
16 A.  Sure.  So, again, we -- we teach all of our college
17 courses as college courses and we teach them to the
18 content utilizing the best practices pedagogical
19 practices that we can.  So ensuring at that level
20 is the faculty member, the chair, and the dean
21 ensuring within each of those schools that we're
22 teaching the courses at the highest education level
23 as we can.
24 Q.  And who is responsible specifically for ensuring
25 that each of the courses that are offered PSEO

---

Page 127

1  students meet these nonsectarian criteria?
2  A.  Sure.  We -- we review to ensure that the prefix --
3  the easiest way is our prefix and our number to
4  ensure that these are English courses or these are
5  science courses.  These are not our VIP Bible
6  courses or RTH -- T-H-E, theology courses.
7       And so we do a review of those to make
8  sure that students understand that they're on our
9  campus and that they're able to take those if they
10 choose to, but they are not reimbursed for that.
11 Q.  So aside from reviewing course prefixes, is there
12 any independent review of syllabi to ensure --
13 course syllabi to ensure that the syllabus and the
14 material in the syllabus meets these criteria?
15 A.  Generally, yes.  Specifically, I -- I can't answer
16 that specifically to tell you what each chair does,
17 but there's an understanding of nonsectarian
18 classes.
19 Q.  So the ultimate responsibility is with the chair to
20 ensure that syllabi created under that chair's
21 purview --
22 A.  Right.
23 Q.  -- meet the nonsectarian requirements?
24 A.  Correct.  Our chairs review the syllabi.
25 Q.  Are you aware of a syllabus ever being flagged or

---

Page 128

1  brought to your attention or to the attention of
2  Ms. Cano that may have violated or become sectarian?
3  A.  I'm not.
4  Q.  No issues that you can recall with the syllabus that
5  was questionable not in compliance with these three
6  bullet points?
7  A.  No, sir.
8  Q.  And how frequently is Crown submitting statements
9  of assurance to the Department of Education?
10 A.  I believe it's every other year.  It may be
11 annually.  I've seen the ones for every other year.
12 Q.  And do you know, if you're thinking about right now,
13 who at Crown would be the person that would sign
14 this on behalf of the institution?
15 A.  Our college registrar typically engages with these.
16 Q.  And who is that person?
17 A.  Kimberly LaQuay.  It -- it would have been, a few
18 years prior to that, Cheryl Fisk.
19 Q.  And prior -- if you know, prior to signing the
20 statement of assurance on behalf of the institution,
21 does Kimberly LaQuay or did Cheryl Fisk do any
22 independent review to ensure that each of these
23 criteria for nonsectarian courses have been met?
24 A.  I know that our registrar reviews the courses that
25 are offered.  Again, that's their responsibility to

---

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 129

1  ensure that the courses that are offered fall under
2  this category.
3       I also know that Ms. Fisk, for
4  example, came to a meeting with academic leaders
5  and said, wanting to reiterate the assurance
6  argument, that we all understood nonsectarian to
7  help us understand the tenets of this agreement.
8  Q.  Okay.  And as you sit here today, do you believe
9  that all of the PSEO courses taught on campus at
10 Crown are nonsectarian within the definition of the
11 statement of assurance?
12 A.  I do.
13 Q.  You mentioned earlier that PSEO students might have
14 access to other courses that aren't reimbursed by
15 the state?
16 A.  (Shakes head.)
17 Q.  What does that process look like and what are those
18 courses?
19 A.  Sure again.  The easiest way might be our prefixes.
20 So CHM is our Christian ministries course.  T-H-E is
21 our theology course.  B-I-B is a Bible course.  If
22 a student would choose to register for those, they
23 would know that that would fall onto their bill and
24 that they would be responsible for that.  We don't
25 submit those to MDE.

Page 130

1  Q.  So the students themselves have to pay out-of-pocket
2  for those courses?
3  A.  That's right.
4  Q.  Has that happened?
5  A.  I think it has happened, yes.
6  Q.  Let's pivot, if we could, and talk a little bit
7  about -- kind of generally about PSEO funding.  I
8  assume the funding aspect of PSEO is in the
9  financial services department at Crown?
10 A.  That's right.
11 Q.  Who is the person who is responsible for oversight
12 of the PSEO financing?
13 A.  Well, again, we would not necessarily --  Well,
14 Ron Straka is the controller that I mentioned
15 earlier.
16 Q.  Yes.
17 A.  And so in a very broad sense, what we're seeing
18 what's happening with receipts and expenditures.
19 Beyond that the budget director of that would be
20 Emily Cano, who is deployed in active service right
21 now, so Darin Mather would oversee that.  So they --
22 they function as the budget director of that -- of
23 PSEO.
24 Q.  And you mentioned this earlier.  It sounds like the
25 receivables are kind of co-mingled?

Page 131

1  A.  That's right.
2  Q.  So you get PSEO funds, undergraduate funds, and
3  those are commonly pooled together in a common
4  account?
5  A.  That's right.
6       MS. THOMSON: Object to the form of
7  the question.
8       MR. TIMMERMAN: Yeah, it's not great.
9  I'm not a finance person.  Sorry.
10      THE WITNESS: Nor am I.
11      BY MR. TIMMERMAN:
12 Q.  So with respect to state reimbursement for PSEO
13 classes, what is your understanding of how that
14 works?
15 A.  Our PSEO office compiles paperwork as required by
16 MDE and sends that in per student with a list of
17 classes that they're doing and submits for
18 reimbursement through that process.
19 Q.  If you know, is reimbursement based on credit hours?
20 A.  It is based on credit hours.
21 Q.  And I believe there's some kind of a lag between
22 when courses are completed and when reimbursement
23 comes in the door; is that correct?
24 A.  I think that's correct.
25 Q.  Okay.

Page 132

1  A.  We would always like it sooner.
2  Q.  Yeah, I'm sure.
3       So for PSEO students on campus who are
4  enrolled in one of these courses that are not
5  reimbursed that we spoke of, do those students have
6  any out-of-pocket costs for attending PSEO on
7  campus?
8  A.  No.
9  Q.  The state pays for all of that; correct?
10 A.  We charge for the tuition, yes.
11 Q.  Does Crown incur any out-of-pocket costs itself for
12 PSEO?
13 A.  No.
14 Q.  And is PSEO funding part of the budgetary process
15 for Crown?  For example, is this a revenue stream
16 that the University depends on?
17 A.  It is a revenue stream, yes.
18 Q.  Is it -- Do you think it's a significant or a
19 substantial revenue stream for the college?
20      MS. THOMSON: Objection; vague.
21 Q.  To the extent you know.
22      MS. THOMSON: If you can answer.
23 A.  Well, significant, yes.  We're a tuition driven
24 private school.  A $50 donation is significant.
25 Q.  Sure.  But it sounds like most of that comes in the

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

Page 133

1  form of online reimbursement; correct?
2  **A.  I think it does.  I think roughly 60 to 70 percent.**
3  Q.  And is the reimbursement amount the same for online
4  versus on campus, to your knowledge?
5  **A.  It is.**
6  Q.  Were you involved in any parent or community facing
7  communications regarding the proposed change to the
8  PSEO law?
9  **A.  I was not.**
10  Q.  Do you know who would have spearheaded those
11  efforts?
12  **A.  Again, I'm stumbling on the word spearheaded.**
13  Q.  Sure.
14  **A.  But probably most involved would have been Jen Niska**
15  **or Emily Cano or Darin Mather.**
16  Q.  Okay.
17     (Exhibit No. 21 marked for
18  identification)
19     **MR. TIMMERMAN:** This is Loe 3303
20  through 3304.
21  **A.  (Reviews Exhibit No. 21.)  Okay.**
22  Q.  Dr. Mathews, have you seen this document before?
23  **A.  Yes, sir.**
24  Q.  Just in preparation for today?
25  **A.  Yes.**

Page 134

1  Q.  Okay.  Were you involved in any discussions about
2  messaging to home school leaders or PSEO families?
3  **A.  I was not.**
4  Q.  If you turn to the second page.  The numbering is
5  kind of wonky on this, but do you see the -- while
6  this is targeting faith institutions, including or
7  highlighting that verbiage is not recommended as it
8  could amplify a senator's opposition to our claims.
9  PSEO courses are required to be nonsectarian, so
10  including faith-specific language as part of their
11  experience could deter our efforts.
12     Do you know why that message was
13  communicated to, in this case, home school leaders?
14  **A.  I can only speculate.**
15  Q.  If you don't know, you don't know.  I don't want
16  you to guess.
17  **A.  I don't know.  I would be guessing.**
18  Q.  Okay.
19  **A.  Yep.**
20  Q.  Did you have any conversations with any PSEO
21  families during the legislative session that were
22  concerned about this law change?
23  **A.  I did not.**
24     **MR. TIMMERMAN:** If we could have five
25  minutes, we could probably wrap up pretty quick.

Page 135

1     **MS. THOMSON:** Okay.
2     (Recess taken from 1:47 p.m. to
3  1:53 p.m.)
4     **BY MR. TIMMERMAN:**
5  Q.  Dr. Mathews, we can go on.  I just have a couple
6  more questions for you.
7     And my first question is, are you
8  aware of any complaints from PSEO students about
9  the religious nature of PSEO courses?
10  **A.  No.**
11  Q.  If a student did complain about a PSEO course being
12  overly religious, what would the process for
13  responding to that complaint be?
14  **A.  Sure.  Again, it depends on to whom the student was**
15  **speaking originally, but ideally that would happen,**
16  **if not first with a faculty member, with the**
17  **advisor.  In most cases that would be Emily Cano,**
18  **and then Emily Cano would probably connect with a**
19  **faculty member to rectify that.  If that can't be**
20  **resolved at that level, it would go to the chair of**
21  **the department.**
22     **So, again, we have a reconciliation**
23  **process where all of those we would expect would**
24  **eventually come to my office.**
25  Q.  Were you ever aware of any complaints regarding

Page 136

1  PSEO courses being sectarian?
2  **A.  I'm not.  I'm pausing because I believe that in 2003**
3  **we may have learned that a student had expressed**
4  **concern about prayer.  That, to my knowledge, is**
5  **the only thing that we've found.**
6  Q.  Do you know how that was resolved?
7  **A.  Dr. Moats, who we referenced earlier, responded**
8  **back and expressed appreciation for the notification**
9  **and assured that we would make sure that our faculty**
10  **was aware of that, that issue, and ask faculty to be**
11  **mindful of the nonsectarian nature of the classes,**
12  **and then responded back to MDE with that e-mail.**
13  Q.  Okay.  A couple more questions.  How long are
14  course syllabi for PSEO courses on campus at Crown
15  maintained or retained?
16  **A.  I don't know the answer to the hard records.  I'm**
17  **assuming that the digital records, as long as we**
18  **have the computer on.  So I don't want to say in**
19  **perpetuity but --**
20  Q.  My last question for you is, is it Crown's position
21  in this lawsuit that it's protecting the rights of
22  other people by challenging this law?
23     **MS. THOMSON:** Objection; form of the
24  question.
25  Q.  Do you understand the question?

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 36 of 55
Melinda and Mark Loe, et al vs.
Willie Jett, et al
Christopher Mathews
1-31-24
CHRISTOPHER MATHEWS
January 31, 2024

Page 137

1     MS. THOMSON: You can answer.
2  A.  Well, if you give me a minute, I'll think about it.
3  Q.  Yeah.  Sure.
4  A.  If you want to ask it again, that might help.
5  That's an interesting question.
6  Q.  Yeah.  I ask because I've seen some reference, and
7  I can put documents in front of you, some of
8  Dr. Denton's communications.  I just wanted to know
9  kind of from the University's perspective, is it
10  the University's position in this lawsuit that it's
11  protecting the rights of others by challenging this
12  law?
13  A.  I suppose that could be a part.  I do not perceive
14  that to be the driving factor.  We've been committed
15  to our mission since 1916, and we've been pleased
16  with our partnerships with the state and other
17  partnerships that we have.  I would hope that we
18  can reconcile and come to a place of agreement.  We
19  think it would benefit our students and their
20  family.  We think it would benefit the state, but
21  we've also been true to our convictions since 1916.
22     So, again, I think perhaps as a
23  consequence, but I don't know if a driving -- that
24  as an institution that's the driving factor for us.
25  Q.  Has there ever been discussion internally at Crown

Page 138

1  about making the faith statement and covenant
2  optional for PSEO on-campus students whereby it can
3  be presented to them and they would have the option
4  of signing it?
5  A.  It's not been a formal conversation.
6     MR. TIMMERMAN: This is Loe 103 to
7  108.
8     (Exhibit No. 22 marked for
9  identification).
10  Q.  Dr. Mathews, have you ever seen this document
11  before?
12  A.  Yes.
13     MS. THOMSON: Take your time.
14  Q.  And actually I'm just going to ask questions about
15  the first page, so you don't need to read it all.
16  A.  Sure.  (Reviews Exhibit No. 22.)  I have read this.
17  I think it perhaps looked a little different in
18  format, but the content is familiar to me.
19  Q.  Yeah, and I apologize.  I've seen a couple of
20  different iterations as well.
21  A.  Okay.
22  Q.  Did you play any part in drafting this
23  communication?
24  A.  I did not.
25  Q.  If you look at the second full paragraph, the

Page 139

1  second sentence reads:  I want you to know that we
2  are committed to protecting your rights, and this
3  is just the PSEO students, prospects, and parents;
4  correct?
5  A.  It is.
6  Q.  Do you know what Dr. Denton was referring to, this
7  commitment to protecting the rights of PSEO
8  students, prospects, and parents?
9  A.  Well, only as it's presented in that sentence, but,
10  yes.  And, again, I would suggest that this is a
11  consequence but it's not a driving -- our driving
12  goal.
13     So it's certainly a part of our
14  concern that families and their students that would
15  want to have their students involved in a culture
16  that has a commitment, a culture that has a faith
17  statement, would have the ability to do that.
18  Q.  Families that want a Christian education for PSEO?
19  A.  Well, it would look for a Christian community that
20  aligns with our community covenant and the faith
21  statement and the mission and character of Crown.
22     MR. TIMMERMAN: Okay.  I don't have
23  any further questions.
24     I will note that we'll keep this
25  deposition open as we did yesterday just pending a

Page 140

1  dispute over some documents and some other
2  information.  That's it.
3     THE WITNESS: Okay.  I'm assuming I
4  don't take things with me.
5     MR. TIMMERMAN: No.  You can leave
6  those here.  I appreciate your time today.
7     THE WITNESS: Thank you, Jeff.
8     MS. THOMSON: Read and sign.
9
10     (Deposition concluded at 2:01 p.m.)
11     * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 37 of 55

| Melinda and Mark Loe, et al vs. | Christopher Mathews | CHRISTOPHER MATHEWS |
|---|---|---|
| Willie Jett, et al | 1-31-24 | January 31, 2024 |

Page 141

1  STATE OF MINNESOTA)

2  COUNTY OF HENNEPIN)

3

4         BE IT KNOWN, that I took the deposition of
   DR. CHRISTOPHER MATHEWS at the time and place set forth
5  herein;

6         That I was then and there a Notary Public
   in and for the County of Hennepin, State of Minnesota,
7  and by virtue thereof I was duly authorized to
   Administer an oath;

8

9         That the witness before testifying was by
   me first duly sworn to testify to the whole truth
10 relative to said cause;

11        That the testimony of said witness was
   recorded in shorthand and transcribed into typewriting,
12 that the deposition is a true record of the testimony
   given by the witness, to the best of my ability;

13        That I am not related to any of the parties
14 hereto nor interested in the outcome of the action;

15        That the reading and signing of the
   deposition by the witness was not waived and the Notice
16 of Filing was not waived;

17        That the original transcript was charged
   and delivered to the attorney conducting the deposition
18 for filing, that copies were charged at the same rate
   to respective counsel;

19        IN EVIDENCE HEREOF, WITNESS MY HAND AND
20 SEAL THIS 5TH DAY OF FEBRUARY 2024.

21

22        _____
              Jacquelyn M. Young

23

24

25

Page 142

1         READING & SIGNING CERTIFICATE

2      (Crown College vs MN Dept. Of Education)

3

4         BE IT KNOWN, that I, the undersigned

5  Deponent, have on this date, _____, read

6  the transcript of my deposition testimony, noting the

7  following changes (if any):

8

9         _____

10            DR. CHRISTOPHER MATHEWS

11

12 Page & Line No.      Correction         Reason

13 _____   _____   _____

14 _____   _____   _____

15 _____   _____   _____

16 _____   _____   _____

17 _____   _____   _____

18 _____   _____   _____

19 _____   _____   _____

20 _____   _____   _____

21 _____   _____   _____

22 _____   _____   _____

23 _____   _____   _____

24 _____   _____   _____

25 _____   _____   _____

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

**$**

**$50 (1)**
132:24

**A**

**Abeler (1)**
95:17
**abide (16)**
21:11;47:16,19;
51:19;69:4;82:16;
83:11,20,21;84:5,14;
85:8,16;89:16;91:3;
103:1
**abiding (1)**
99:11
**abilities (1)**
99:13
**ability (5)**
28:13;35:11;60:9;
99:12;139:17
**able (6)**
26:23;34:7;72:22;
112:19;121:15;127:9
**Absolutely (2)**
27:19;115:5
**abstain (1)**
48:14
**academic (14)**
5:22;8:16;33:23;
34:2,10,15;35:23;36:2;
116:19;117:16;118:1,
4;126:4;129:4
**academically (1)**
34:18
**Academics (2)**
8:15;9:6
**acceptable (1)**
125:20
**accepted (3)**
100:9;118:11,19
**accepting (2)**
97:1,4
**accepts (1)**
114:20
**access (5)**
35:17;87:8;121:4,20;
129:14
**accommodation (1)**
53:17
**accomplished (1)**
42:4
**accomplishing (1)**
35:5
**according (5)**
11:6;26:12,17;28:15;
81:2
**account (1)**
131:4
**accounting (2)**
18:3,12

**accounts (1)**
109:9
**accreditation (1)**
37:5
**accurate (1)**
112:4
**accurately (2)**
75:11,22
**acknowledge (2)**
81:18;88:14
**acknowledged (1)**
82:24
**acknowledgment (1)**
77:19
**acronym (3)**
71:17;90:18;121:17
**acronyms (1)**
75:17
**across (3)**
14:12,14;95:10
**act (2)**
40:25;106:7
**action (5)**
40:16,20;41:21;
43:16;49:23
**active (1)**
130:20
**actively (1)**
66:15
**activities (1)**
27:14
**activity (1)**
109:9
**actual (1)**
10:20
**actually (4)**
95:13;111:8;121:8;
138:14
**addition (1)**
49:15
**additional (3)**
118:1,5,20
**address (1)**
13:17
**addresses (1)**
47:3
**adequate (2)**
116:22,22
**adjective (1)**
101:13
**adjunct (3)**
25:12;62:10,13
**administered (1)**
60:9
**administration (1)**
102:4
**administrative (2)**
10:20;109:23
**Administratively (1)**
9:6
**admission (4)**
16:19;35:24;87:3;
113:13

**admissions (11)**
24:4;68:11,13;70:5,
14;79:22;93:25;
108:21;114:12;116:6;
118:10
**admitted (2)**
44:11;96:18
**advance (3)**
36:20;93:7;116:21
**advertise (1)**
70:21
**advise (1)**
90:6
**advising (1)**
114:14
**advisor (2)**
116:12;135:17
**advisors (1)**
109:5
**affairs (1)**
5:22
**affiliation (1)**
20:20
**affirm (2)**
81:11;100:25
**affirmatively (1)**
43:16
**affirming (2)**
100:17;101:9
**affirms (1)**
100:21
**afternoon (1)**
5:11
**again (90)**
14:8;17:1,22;19:4;
22:9;24:6,25;25:21,25;
27:18;28:12,15,25;
29:7;30:20;33:13;34:6,
12;35:11,22;38:15;
41:14,19;43:1;45:24;
53:22;54:25;56:4;
57:17;59:23;65:12;
72:12;75:19;77:5,13;
78:11,14,20;79:1;
80:18;83:2;85:23;86:6;
89:1,12,24;90:3,9;
91:4;93:3,11;96:20,25;
97:16,17;98:11;99:7;
101:6,18;106:6,13,23;
107:1;108:5;109:14;
110:20;113:17;114:8,
14;117:3,14;119:1;
120:23;121:7;122:1;
123:11,22,24;124:11;
126:10,16;128:25;
129:19;130:13;133:12;
135:14,22;137:4,22;
139:10
**against (1)**
56:9
**ago (2)**
11:4;88:22
**agree (27)**

47:16,24;48:2,10,13;
69:10,13;72:23;82:16;
83:11,20;84:5,25;
85:15;89:9,13;91:3;
96:8;97:18;99:20;
100:2,15,23;101:7;
103:21,24;107:13
**agreeing (1)**
48:14
**agreement (7)**
47:19;70:25;89:16;
96:5;124:17;129:7;
137:18
**alcohol-free (1)**
50:2
**align (7)**
34:21;44:13;53:9,13;
98:17;100:4;106:4
**aligned (1)**
41:2
**aligning (1)**
84:8
**aligns (1)**
139:20
**Alliance (7)**
20:21,22,24,25;22:9;
37:12;99:16
**allow (1)**
73:13
**allowed (2)**
52:22;111:22
**allowing (5)**
97:22,25;98:6,12,18
**allows (1)**
121:3
**almost (1)**
64:11
**alone (1)**
75:20
**along (2)**
49:3;80:12
**altar (2)**
103:16,18
**alter (1)**
103:11
**always (10)**
31:17;32:15;34:16;
40:22;41:11;81:15,15;
99:16;112:20;132:1
**ambiguous (3)**
42:22;63:21;87:24
**amended (1)**
19:22
**amicable (1)**
110:1
**amount (3)**
18:5;117:4;133:3
**amplify (1)**
134:8
**Amy (1)**
56:13
**Amy's (1)**
56:14

**and/or (2)**
63:8;111:21
**anecdotally (1)**
72:16
**announced (1)**
41:24
**annually (1)**
128:11
**answered (2)**
49:8;98:22
**anticipate (3)**
32:7;68:23;90:21
**anticipation (4)**
55:3;59:2;60:25;
61:4
**anxious (1)**
117:15
**apologize (8)**
36:20;38:20;48:25;
57:12;76:14;77:5;
90:19;138:19
**appeal (3)**
53:21,24;54:6
**appeals (6)**
53:18;54:7,10,14,17;
58:10
**appears (4)**
77:15;78:24;111:16;
114:1
**applicable (1)**
47:12
**applicants (5)**
68:21;78:2;82:11;
87:4;112:1
**applicants' (1)**
109:9
**applicant's (1)**
85:19
**application (55)**
16:19;17:1;47:21;
48:5;68:22;75:4,13;
76:5,7,19,20,24;77:13;
78:18,21;80:10,15,19,
21,24,25;81:2,5,6,9,11,
12;82:18;83:11,15,21,
22;84:1,9,16;85:14,17,
20;86:7;87:10,20;
88:17;89:7,10,11,18,
23,24;90:7,16,18,23;
109:3,13;110:16
**applied (2)**
44:10;118:15
**applies (2)**
58:22;59:20
**apply (12)**
37:16;38:8;47:8;
58:17,21,25;65:2;66:1;
67:18;74:2;100:8;
117:23
**applying (5)**
76:11;77:3,9;78:18;
79:6
**appointed (1)**

Shaddix & Associates - Stenographic Court Reporters
(952)888-7687 - reporters@janetshaddix.com

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 39 of 55

Melinda and Mark Loe, et al vs.                    Christopher Mathews                    CHRISTOPHER MATHEWS
Willie Jett, et al                                    1-31-24                                    January 31, 2024

15:19

**appointment (1)**
6:15

**appreciate (2)**
99:7;140:6

**appreciated (1)**
12:18

**appreciation (1)**
136:8

**approach (1)**
53:21

**appropriate (2)**
106:3;125:24

**approval (4)**
22:15;51:2;87:12;
89:2

**approve (3)**
50:21,23,24

**approved (5)**
50:13,16;87:18;
119:6;120:6

**approves (1)**
87:7

**approximate (1)**
24:1

**approximately (1)**
27:5

**area (1)**
13:20

**areas (2)**
79:20;80:21

**argument (2)**
124:16;129:6

**around (5)**
24:6;29:21;43:9;
99:17;115:24

**arrival (1)**
15:6

**arrived (1)**
91:5

**Art (1)**
69:5

**articles (1)**
125:10

**Arts (6)**
6:5,24;30:8,13,18;
33:4

**aside (4)**
10:17;14:7;122:20;
127:11

**aspect (1)**
130:8

**aspects (4)**
33:23;34:2;99:21;
109:23

**aspire (1)**
34:1

**aspires (1)**
37:20

**asserted (1)**
91:15

**assessment (1)**
33:22

**assignments (1)**
61:19

**assimilate (1)**
38:4

**assistant (2)**
86:23;115:19

**associate (2)**
29:15;86:21

**associated (1)**
25:11

**assume (5)**
8:1;56:16;88:8;
103:16;130:8

**assuming (5)**
24:8;75:17;76:19;
136:17;140:3

**assurance (8)**
124:16,24,25;126:5;
128:9,20;129:5,11

**assured (1)**
136:9

**asynchronous (2)**
59:12,18

**athletic (1)**
53:23

**attained (1)**
17:6

**attend (11)**
23:25;28:1,7;40:24;
72:25;73:10;94:17;
98:13,19;100:16;
103:17

**attendance (4)**
10:13;69:8,23;70:7

**attended (1)**
72:2

**attending (4)**
51:24;52:7;118:21;
132:6

**attention (2)**
128:1,1

**attest (1)**
110:11

**attesting (1)**
81:4

**attorney (4)**
11:10;93:10,17;
115:19

**attorney-client (4)**
92:13;93:18;107:17,
19

**attorneys (1)**
20:8

**attract (2)**
31:18;72:14

**attributed (1)**
18:11

**audience (5)**
33:3,5,8,11;72:3

**augmenting (1)**
118:3

**authenticated (1)**
114:24

**authority (2)**
51:2;55:6

**automatic (1)**
53:4

**autonomy (1)**
61:14

**availability (1)**
27:9

**available (3)**
33:16;37:1;82:5

**avenue (1)**
71:8

**average (1)**
26:11

**AW (1)**
22:4

**aware (52)**
15:25;16:5;26:24;
28:5;31:7,14;35:14,15;
43:19,22;44:7;45:12,
16;46:2;51:22,25;54:7,
10,13,14;55:8,10,11,
13,16,22,23;57:8;
62:18,21;63:13;64:8;
76:17;78:4,6,15;84:21;
85:3,5,11;90:8;98:3,5;
102:13;109:13;115:8;
118:12;121:8;127:25;
135:8,25;136:10

**away (2)**
68:1;73:4

**awful (1)**
20:8

---

**B**

**back (11)**
24:17;35:22;38:11;
45:7;76:25;78:20;
79:17;120:25;125:7;
136:8,12

**background (2)**
6:21;16:21

**banal (1)**
103:11

**Baptist (1)**
6:5

**based (15)**
34:4,19;43:20;53:7;
56:11;57:20;75:17;
80:21;82:19;92:7;
93:20;96:4,9;131:19,
20

**basis (5)**
25:12;56:20;59:15;
81:18;108:9

**Bates (1)**
23:7

**BAXTER (4)**
45:1;92:5;111:3;
115:14

**bear (1)**
121:21

**beautiful (1)**
13:20

**became (4)**
17:7;49:16;89:11,12

**become (6)**
66:24;80:13;81:13;
87:13;89:3;128:2

**becoming (1)**
17:4

**began (1)**
24:16

**begin (2)**
15:12;117:15

**beginning (4)**
29:19;61:3;101:13;
112:6

**begins (2)**
39:23;69:25

**begun (1)**
15:9

**behalf (3)**
20:2;128:14,20

**behaving (1)**
41:3

**behavior (6)**
39:2,6;40:3,11;
48:15,17

**belief (6)**
39:2,6;51:4,7;113:5;
124:21

**beliefs (2)**
32:21;46:8

**benefit (2)**
137:19,20

**benefits (1)**
117:24

**best (9)**
34:13;39:7;46:17;
63:10;86:4,7;107:3;
123:3;126:18

**Bethany (3)**
75:6,8;91:20

**Bethel (1)**
91:20

**better (4)**
9:8;16:1;17:1;30:14

**beyond (3)**
10:12;60:21;130:19

**B-I-B (1)**
129:21

**Bible (12)**
39:13,15;41:13;42:1;
66:1;67:4;107:2;
111:12;123:17;125:9;
127:5;129:21

**biblical (6)**
21:8;38:3;43:5;
81:18;124:3;125:13

**biblical/scriptural (1)**
96:5

**biblically (2)**
34:4,19

**biblically-based (4)**

37:11,21;60:15;
96:10

**bill (2)**
122:18;129:23

**biological (6)**
51:8,23;52:9,21;
53:9,14

**bit (8)**
19:15;27:22;39:18;
40:8;117:16;122:2,15;
130:6

**board (14)**
8:2,4;10:13,16,17,21,
23;22:8,14;27:11;
32:22;49:23;50:20;
108:8

**board-level (1)**
108:18

**boards (3)**
10:19;59:14;60:1

**board's (1)**
108:15

**Boldly (3)**
32:11,13;61:2

**Bonifacius (9)**
13:5,7,13,15,17,18;
100:16,24;101:8

**book (1)**
121:17

**books (2)**
121:18;125:10

**bookstore (1)**
121:13

**boss (1)**
7:24

**botch (1)**
20:17

**both (3)**
23:10;61:23;62:14

**bottom (4)**
23:7;57:4;65:6;
77:16

**bottom-up (1)**
119:7

**bound (1)**
114:15

**bounds (1)**
48:18

**box (6)**
11:7,8,9;48:1,1;
77:24

**break (6)**
44:20,21;45:2;115:4,
6,15

**breaks (1)**
11:23

**bringing (1)**
42:5

**broad (2)**
33:15;130:17

**broadly (2)**
118:24;119:1

**broken (1)**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 40 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

46:18
**brought (1)**
128:1
**budget (3)**
18:18;130:19,22
**budgetary (1)**
132:14
**building (1)**
59:4
**bullet (5)**
33:6;96:2,12;100:6;
128:6
**bullying (2)**
103:21,25
**burden (1)**
61:8
**business (1)**
30:21
**button (1)**
77:23

### C

**C&MA (1)**
21:1
**cabinet (4)**
9:8,15;10:10;14:17
**calendar (1)**
120:15
**California (3)**
22:3,3,5
**call (13)**
17:18;23:7;91:14,18;
92:3,25;93:2,8,8,13;
103:7,16;108:12
**called (7)**
5:5;42:1;49:11;65:7;
103:17,19;117:18
**calls (4)**
73:14;103:3,11;
122:11
**came (2)**
113:3;129:4
**campus (71)**
13:14;14:12,14;15:1;
25:15,23,24;27:3,6,10,
14,23,24;28:6,15,19,
23;30:17;31:2,20,21;
33:12;35:16,23;38:9,
12,16;43:19;44:8;47:8,
15,23;50:2;53:4,8;
54:21;58:22;59:9;
61:24;63:18;65:3,14,
18;67:24;69:11,22;
72:25;74:17;79:22;
83:4,7,18,24;91:3;
96:3;98:7;99:20;
100:24;101:16;113:9;
114:6;115:9;118:7,12;
121:21;127:9;129:9;
132:3,7;133:4;136:14
**can (88)**
7:7;11:23;12:13;

13:17,18;14:5;17:23;
20:16;22:21;23:11;
24:23;25:8,9,12;27:18;
28:25;38:4;39:21;
40:24;42:22;44:23;
46:17;48:20;49:3,14;
53:21,24;56:4,4;60:7;
61:6,14;63:21;65:24;
68:11;69:25;70:22;
71:4;72:12,18;73:7,19;
79:11,12;87:25;88:8;
89:14;91:12;92:18;
93:1,17;94:3,4;96:22;
98:10,24;101:4,12;
103:4;107:3,18;
109:19;110:5,19;
112:2;113:16;114:13,
18;115:3;117:23;
118:2;120:11;121:20;
122:4;123:23;124:17;
125:1;126:19,23;
128:4;132:22;134:14;
135:5;137:1,7,18;
138:2;140:5
**Cano (12)**
14:17;16:11,12,16;
71:24;109:5;116:12;
128:2;130:20;133:15;
135:17,18
**C-a-n-o (1)**
16:12
**cap (1)**
24:4
**capacity (2)**
9:2,4
**captured (1)**
75:12
**Carolina (1)**
6:16
**case (7)**
52:2;53:25;95:22;
107:24;121:7,9;134:13
**cases (3)**
25:9,24;135:17
**catalog (13)**
17:21;21:36;17,25;
57:5,6;59:24;68:8,10,
14;69:6;114:15;122:24
**catalogs (1)**
14:11
**categories (1)**
58:4
**category (2)**
25:17;129:2
**caution (1)**
65:13
**cautious (1)**
101:18
**cease (2)**
73:17,21
**Cengage (9)**
121:2,10,11;122:2
**Central (1)**

91:21
**certain (2)**
80:21;100:3
**certainly (4)**
96:19;107:6;108:19;
139:13
**CFL (1)**
87:6
**chain (2)**
102:7;119:10
**Chair (9)**
6:12;111:11;120:9,
25;121:10;126:20;
127:16,19;135:20
**chairs (6)**
116:19;119:4;120:7;
124:11;126:11;127:24
**chair's (1)**
127:20
**challenge (1)**
92:17
**challenging (2)**
136:22;137:11
**chance (7)**
19:11;23:4;32:5;
46:15;64:17;74:25;
111:6
**change (12)**
15:20;21:24;22:13;
42:20;49:22;84:17,19;
94:15,18;97:16;133:7;
134:22
**changed (4)**
19:19,24;46:8;80:15
**changes (5)**
9:14;50:19;80:24;
88:6;90:7
**changing (1)**
30:22
**chapel (10)**
28:1,7;69:8,12,22;
70:7;103:11,13,17;
118:21
**character (2)**
57:18;139:21
**charge (4)**
22:10;118:24;121:4;
132:10
**check (3)**
48:1,1;77:24
**checked (1)**
112:12
**checks (1)**
47:21
**chemistry (1)**
28:19
**Cheryl (2)**
128:18,21
**chief (4)**
9:2,24;10:1,3
**child (1)**
63:12
**Children (1)**

87:6
**CHM (1)**
129:20
**choir (2)**
6:24;110:6
**choose (10)**
26:15;66:23,23;67:6;
97:19;99:13;112:3;
120:23;127:10;129:22
**chooses (1)**
122:5
**choosing (1)**
83:23
**chosen (2)**
93:13;95:18
**Chris (1)**
30:1
**Christ (15)**
39:9;41:6;42:4,23,
24;46:4;48:9,11;65:11,
15,22;81:4;99:17,24;
100:17
**Christian (42)**
20:21,23;22:9,13;
25:20;26:7,7;32:12,13,
16,24;34:5,14,25;
37:11,12;38:2,14,17,
18;41:13;60:23;61:2,6;
66:11,16;71:15;72:10,
24;73:10;81:19;87:5;
97:4,5;98:13;99:15;
124:19;125:8,9;
129:20;139:18,19
**Christians (1)**
33:6
**Christ-like (2)**
103:2,7
**CHRISTOPHER (2)**
5:4,15
**Christ's (1)**
57:18
**Church (2)**
20:19;79:9
**church-at-large (1)**
37:13
**circumstance (7)**
41:15,20;53:7,20,22;
78:11;108:19
**circumstantial (1)**
52:24
**citations (1)**
124:4
**City (1)**
6:8
**claims (1)**
134:8
**clarification (1)**
65:4
**clarified (2)**
58:20;106:11
**clarify (2)**
59:5;102:9
**clarity (1)**

28:12
**class (3)**
34:17;112:6,20
**classes (23)**
15:9,11,12;35:6;
44:8;47:15;48:12;
52:23;59:11,16;61:17;
72:25;73:2;101:16;
111:14;112:2;114:9,
10;116:23;127:18;
131:13,17;136:11
**classroom (1)**
61:14
**clear (11)**
16:18;32:23;60:25;
61:2;66:20,25;72:13;
79:4;81:17;96:25;99:9
**clearer (1)**
12:9
**Clemson (1)**
6:16
**click (1)**
78:19
**close (2)**
17:11;79:19
**closest (5)**
14:2;52:12;53:21;
55:2;90:11
**clothes-changing (1)**
53:13
**CMA (12)**
21:1,3,11,13,18,21;
22:6,18;90:19,21;91:2,
6
**CMA's (1)**
21:8
**cohort (5)**
117:10,22,25;
118:11,20
**collected (1)**
88:13
**collecting (1)**
95:8
**collection (2)**
15:16,17
**College (42)**
5:21;6:5;7:22;8:2,
20;9:21;11:4;14:20;
21:24,25;32:7,12,14,
16;33:4;37:10;47:4,7,
11;63:9;70:3;75:7;
77:21;87:12;89:2;
91:21;96:1;110:8,9,14;
114:9,11;115:24;
117:2;123:4,7,9,16;
126:16,17;128:15;
132:19
**colorful (1)**
31:24
**comfortable (2)**
20:5,7
**coming (1)**
108:7

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

**co-mingled (1)**
130:25

**commerce (1)**
13:16

**commissioner (1)**
86:23

**commit (3)**
48:9;77:20;101:14

**commitment (2)**
139:7,16

**commitments (2)**
34:15;45:11

**committed (7)**
64:3;76:13;100:1;
104:18,19;137:14;
139:2

**committee (1)**
119:5

**committing (1)**
48:10

**common (5)**
91:25;92:7,17;
105:23;131:3

**commonly (1)**
131:3

**communicate (4)**
63:7;66:20,21;71:3

**communicated (6)**
14:25;15:3,6;71:7;
85:6;134:13

**communicating (1)**
66:19

**communication (3)**
87:17;112:23;138:23

**communications (5)**
13:2;16:20;105:25;
133:7;137:8

**communities (1)**
96:3

**community (73)**
34:22,24;38:23,24;
39:2;41:2,12;44:13,15;
47:4,9,16,18,20,23;
48:4,8,13;49:11,15,18,
19,22;53:1;54:22;55:1;
57:10;59:2,4,6;63:11;
64:3,5;66:11,16,22,24;
67:2;69:5;72:15,24;
76:9;77:15,16;81:11,
15;82:17;83:12;84:6,
15,25;85:9,16;89:16;
91:4;94:9;96:19;97:7,
18;98:17;99:8,21;
100:2,5,19;101:15;
103:1;108:1,13;
110:11;133:6;139:19,
20

**commute (2)**
74:10;83:9

**commuter (6)**
81:22,23,25;82:22;
83:3,5

**commuters (1)**

**84:11**

**company (1)**
11:5

**compare (1)**
28:9

**compiles (1)**
131:15

**complain (1)**
135:11

**complaint (6)**
56:1,8,17;104:22;
105:24;135:13

**complaints (7)**
55:23;64:8;102:8,12,
13;135:8,25

**complement (1)**
28:16

**complete (1)**
69:12

**completed (1)**
131:22

**completes (1)**
120:8

**compliance (2)**
77:21;128:5

**complied (1)**
5:3

**compliments (1)**
116:23

**component (1)**
109:12

**compound (1)**
99:2

**comprised (2)**
47:1;117:12

**compromise (1)**
32:21

**computer (1)**
136:18

**concern (5)**
96:17;98:3;100:12;
136:4;139:14

**concerned (2)**
99:14;134:22

**concerning (1)**
102:23

**concluded (1)**
140:10

**conclusion (2)**
73:15;122:12

**Concordia (1)**
91:20

**conditions (2)**
64:4;89:4

**conduct (2)**
54:18;58:16

**conducting (1)**
6:24

**confidant (1)**
41:15

**confidence (6)**
24:21;71:18;79:2;
88:8;93:11;118:17

**confidently (1)**
77:11;109:14

**confirm (2)**
40:1;92:12

**confusing (1)**
101:6

**Congressman (1)**
94:20

**conjecture (1)**
90:3

**conjecturing (1)**
110:21

**connect (1)**
135:18

**connected (1)**
61:20

**connection (1)**
81:16

**consequence (2)**
137:23;139:11

**consequences (1)**
60:9

**conservative (1)**
33:6

**consider (1)**
30:2

**considered (12)**
28:22;40:10,14;63:9;
74:7,11,15;107:4,7,9,
12;108:1

**considering (1)**
31:17

**consistently (1)**
85:16

**contact (2)**
106:5,5

**contamination (3)**
97:21;98:4,5

**content (3)**
26:10;126:18;138:18

**contents (1)**
91:15

**context (8)**
40:21;60:4,18;75:19;
97:22,25;99:19;120:24

**continuation (1)**
63:8

**continue (9)**
26:15;31:10,10;
33:14;34:13;35:9;
52:22;53:2;60:10

**continuing (1)**
104:18

**contract (2)**
121:5;122:4

**contrary (1)**
52:21

**controller (2)**
14:21;130:14

**convene (1)**
54:4

**convention (1)**
71:22

**confidently (1)**
77:11;109:14

**conversation (5)**
52:15;106:15,16,20;
138:5

**conversations (9)**
13:1;31:8,9;53:2;
93:4,6;100:12;108:10;
134:20

**conversion (3)**
43:24;44:1;87:5

**convictions (1)**
137:21

**coordinator (2)**
56:12;109:21

**copied (1)**
111:8

**copies (1)**
121:19

**core (1)**
22:14

**Corinthians (1)**
42:16

**corner (1)**
23:7

**correctly (4)**
30:3;37:14;38:6;
87:14

**cost (1)**
122:1

**costs (3)**
121:21;132:6,11

**counsel (3)**
7:11;91:10;98:23

**counseling (3)**
43:8,10,20

**counselor (1)**
114:13

**counselors (1)**
114:2

**count (1)**
114:19

**couple (8)**
11:13;23:18;77:17;
108:20;117:14;135:5;
136:13;138:19

**course (37)**
17:21;18:21;26:6,8,
9,10;45:19;60:5;61:15,
23;110:8;116:8;118:5;
120:3,4,13,15,15,19,20,
24;122:6,16,25;
123:19;125:7,7,12,19,
23;127:11,13;129:20,
21,21;135:11;136:14

**courses (69)**
17:18;25:15;26:2,19;
28:11,13,17,18,19;
35:16;38:9,12,16,18;
41:9;44:11;51:19,24;
52:7;61:10;70:18;82:9;
85:10;101:8;113:8,14;
114:5;115:8;116:1,2,
16,24,25;118:5;
119:10;121:3,14,24;

**122:8,17;123:4,7,9,12,
16;124:13,18,19;
126:17,17,22,25;127:4,
5,6,6;128:23,24;129:1,
9,14,18;130:2;131:22;
132:4;134:9;135:9;
136:1,14**

**court (3)**
11:3;12:16;44:4

**covenant (67)**
34:23;37:8;38:23,24;
41:2;44:13,16;47:5,9,
17,18,20,23;48:4,8,13,
18;49:11,15,16,19,19,
21,22;53:2;54:22;
57:11,13;64:3,5;66:22;
69:5;72:24;76:10;
77:16,17,20;81:11;
82:17;83:12;84:6,15;
85:1,9,16;89:16;91:4;
94:9;96:19;97:7;98:17;
99:21;100:2,5,19;
101:15;103:1;104:19;
107:13;108:1,14,16;
110:10,11;113:6;
138:1;139:20

**create (3)**
21:4;33:21;106:12

**created (3)**
7:8;41:6;127:20

**credentials (2)**
26:10;62:5

**credit (3)**
122:19;131:19,20

**credits (2)**
67:22;114:19

**criteria (6)**
35:23;126:9,15;
127:1,14;128:23

**Crown (150)**
5:21;7:22;9:15;13:4,
8,11;17:7,10;18:5;
20:2;23:25;24:5,14,16,
20;26:2,5,13,16,18,23;
27:8,13;28:22,24;
29:24;30:15;31:8;
32:18;33:11,15;34:1,9,
9,14;35:20;37:10,20;
38:9,13,17;40:10,24;
41:9,10;43:8;44:1,8,
11;45:13,17;46:3;47:4,
7,11;51:19,24;52:7,9,
23;53:8;55:16;56:1,8,
20,22;62:19,22,25;
63:9,17;64:8;66:18;
70:2,11,20,23;72:3,7,
21;73:1,11,17,17;74:6;
76:6,12,23;77:3,21;
78:19;79:22;80:11;
83:10;84:18,18;85:6;
86:21;87:9,12,17;88:9,
17;89:2;90:13,20;91:5,
25;95:20;96:1,3,17;

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 42 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

98:20;99:11,13;
100:17,25;101:9;
102:14;104:5,11,16,17;
105:4,23;107:4;109:8,
24;113:4,9;114:2,5,18;
115:8;116:2,16,24;
124:12,15,25;126:8;
128:8,13;129:10;
130:9;132:11,15;
136:14;137:25;139:21
**Crown's (23)**
10:21;20:19;22:7;
39:15;40:14;46:17;
51:4,7;63:24;64:21;
68:10;70:16;72:8,20;
81:11;87:3;89:4;96:8;
98:6,12;102:18;115:1;
136:20
**cultural (1)**
98:4
**culture (14)**
27:14;96:13,17;
97:11,13,16;98:8,8,14,
15,20;100:9;139:15,16
**current (4)**
8:6;80:25;87:3;
95:10
**currently (3)**
5:20;23:25;79:21
**curricular (1)**
33:22
**curriculum (9)**
22:7,12;116:1;
118:25;119:2,4,17,22;
126:14

**D**

**daily (1)**
66:1
**Dan (1)**
106:14
**Daniel (1)**
103:10
**Darin (7)**
29:14,17;31:13,15;
72:2;130:21;133:15
**data (2)**
14:19;109:21
**date (3)**
19:16,19,24
**day (2)**
12:12;59:9
**day-to-day (1)**
10:24;22:10
**De (3)**
21:23,23,25
**deal (2)**
40:18;41:4
**dealing (1)**
94:21
**dean (7)**
6:4;8:22;29:15;

55:15;86:21;111:11;
126:20
**deans (5)**
8:16;116:19;119:4;
120:6;126:11
**decided (3)**
90:20;99:19;125:18
**decides (1)**
116:16
**decision (6)**
54:6;73:19;84:4;
89:22;108:15,18
**decisions (1)**
61:15
**Dee (1)**
9:19
**deep (1)**
103:20
**defer (1)**
98:23
**define (3)**
8:14;52:25;60:7
**defined (4)**
40:2;48:17;57:19;
99:8
**defines (1)**
50:4
**definitely (1)**
51:14
**definition (1)**
129:10
**degree (4)**
6:22;7:15,18;69:19
**degrees (1)**
30:16
**degree-seeking (4)**
69:16,17;70:2;75:24
**delicate (1)**
106:6
**delighted (1)**
72:6
**deliver (2)**
62:6,12
**delivered (2)**
25:22;38:12
**delivery (2)**
25:5;37:17
**demonstrate (1)**
33:22
**denomination (3)**
20:18,19;21:2
**denominations (1)**
21:3
**Denton (13)**
7:21;8:1;10:7;75:5,
10,10,11,15,18;93:7;
104:15;117:14;139:6
**Denton's (2)**
79:21;137:8
**Department (13)**
6:12;84:19;85:7;
86:24;88:10;116:19;
119:3,13,14;120:9;

128:9;130:9;135:21
**departments (3)**
119:9,18;122:22
**Depending (3)**
53:20,22;120:24
**depends (4)**
25:7;41:19;132:16;
135:14
**deployed (1)**
130:20
**deposition (12)**
11:1;14:9;15:18;
16:22;18:20;19:19;
86:17;95:8;102:3;
105:15;139:25;140:10
**description (1)**
122:25
**deserve (1)**
62:25
**design (2)**
125:7,8
**designated (1)**
18:13
**designation (1)**
69:18
**designations (1)**
61:11
**designed (1)**
124:20
**desire (7)**
39:1,9;40:22;47:22;
96:21;99:18;106:24
**desires (1)**
40:18
**desk (1)**
95:10
**detail (1)**
116:8
**deter (1)**
134:11
**determined (1)**
125:24
**develop (3)**
38:3;87:9;89:6
**developing (3)**
32:17;118:25;120:3
**development (15)**
10:5;14:16;35:7,13;
50:18;52:14;54:1,4;
65:16,17,20,25;66:11;
119:21;122:23
**develops (1)**
120:5
**dialogue (2)**
52:16;105:2
**dictate (3)**
91:2,6;114:20
**differed (1)**
51:23
**difference (2)**
40:17;69:14
**different (19)**
27:15;28:4;30:23;

35:24;40:20;46:19;
47:1,1;52:8;59:1,7,7,
10;61:11;62:5;64:20;
123:10;138:17,20
**differently (3)**
27:22;40:8;64:21
**difficult (1)**
103:25
**digital (1)**
136:17
**digits (1)**
27:4
**diligent (1)**
12:23
**direct (6)**
7:24;10:16;22:6,8,
15;70:12
**direction (1)**
106:11
**directly (7)**
8:9,12,16;9:5;33:9;
93:6;113:1
**director (11)**
8:17,17;14:17;16:13;
52:13;53:23,24;78:8;
126:10;130:19,22
**disagree (1)**
60:18
**discern (1)**
49:14
**disciplinary (1)**
52:17
**discipline (3)**
58:17;60:8,11
**disciplines (1)**
34:25
**disclosure (1)**
94:19
**discovered (2)**
15:23;82:19
**discretion (1)**
112:5
**discriminate (1)**
56:22
**discriminated (1)**
56:9
**discrimination (6)**
55:17,24;56:17,20;
57:9;64:9
**discuss (9)**
14:23;15:15;16:16,
24;18:1;34:13,25;
42:13;55:4
**discussed (6)**
12:12,21;52:10;
92:25;100:13;108:6
**discussing (1)**
35:3
**discussion (11)**
59:14,25;60:12;
89:20;90:5;91:17;
92:21;100:7;108:4,8;
137:25

**discussions (5)**
16:9;50:10;107:6,22;
134:1
**dismiss (1)**
62:25
**dismissal (1)**
53:5
**dismissed (1)**
62:19
**dispute (1)**
140:1
**disregard (1)**
53:1
**distinct (1)**
36:6
**distinction (3)**
28:17;30:11;36:2
**distinguish (1)**
84:10
**Distinguished (1)**
117:19
**distribution (1)**
87:7
**division (1)**
51:1
**doctorate (1)**
6:23
**doctrinal (1)**
20:19;21:4;111:21
**document (43)**
15:4,16;19:20;20:3;
23:13,16;26:12,17;
27:1;29:2;31:23,24;
33:3;36:15;37:2;39:25;
40:6;46:22;47:10;50:8;
58:11,12;62:15;68:20,
21;69:20;74:25;77:15;
79:12;80:8;86:14;
89:25;92:22;95:4;
100:7,14;101:25;
105:13;113:19;114:24;
120:11;133:22;138:10
**documentation (1)**
117:10
**documents (8)**
14:12;18:21;21:7;
23:11;36:19;76:17;
137:7;140:1
**donation (1)**
132:24
**done (4)**
12:6;25:13;64:11;
112:20
**donor (1)**
18:13
**door (1)**
131:23
**doubt (1)**
41:4
**down (4)**
65:6;66:8;119:25;
120:1
**Dr (46)**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 43 of 55

Melinda and Mark Loe, et al vs.        Christopher Mathews        CHRISTOPHER MATHEWS
Willie Jett, et al                          1-31-24                 January 31, 2024

5:10;7:21;8:1;9:1,
19;10:3,7;20:16;29:7;
30:25;36:15;38:11;
44:21;45:7;46:13;58:9;
64:17;70:13;75:5,10,
15,18,18;79:17,21;
80:7;86:12,18,19;
88:12;93:7;101:25;
104:15;111:11,16;
113:23;115:22;117:14;
125:6;126:1;133:22;
135:5;136:7;137:8;
138:10;139:6
**draft (1)**
88:5
**drafting (1)**
138:22
**drawn (2)**
61:4,5
**dressed (1)**
52:8
**dressing (1)**
52:21
**drilling (1)**
119:25
**driven (1)**
132:23
**driving (5)**
137:14,23,24;
139:11,11
**drug (1)**
50:2
**due (1)**
61:19
**duly (1)**
5:6
**during (4)**
84:1;92:3,25;134:21

## E

**earlier (10)**
12:13;52:10;58:9;
61:1;71:12;82:5;
129:13;130:15,24;
136:7
**earn (1)**
67:22
**easier (1)**
29:2
**easiest (2)**
127:3;129:19
**eating (1)**
59:16
**education (24)**
25:5,22;26:16;34:4,
19;37:11,17,21,25;
38:1,8;39:11,11;59:18,
19;60:15;84:19;85:7;
86:24;88:10;96:11;
126:22;128:9;139:18
**educational (3)**
6:21;21:17,20

**educator (1)**
103:21
**effect (1)**
112:24
**effective (3)**
49:17;87:13;89:3
**efforts (3)**
44:2;133:11;134:11
**eight (1)**
6:13
**either (3)**
46:2,6;93:7
**eligibility (1)**
89:5
**eligible (5)**
17:5,7;80:13;116:15;
117:21
**eliminating (1)**
107:4
**elimination (1)**
108:1
**else (3)**
14:9;43:20;93:10
**e-mail (10)**
31:14;75:10,16;
79:21;102:7;104:9,13,
15;105:6;136:12
**e-mails (3)**
60:1;105:20;106:9
**embrace (2)**
65:10,15
**Emily (12)**
14:17;16:11,13,16;
71:24;109:5,22;
116:12;130:20;133:15;
135:17,18
**Emmer (2)**
94:18,20
**employed (1)**
6:3
**employee (1)**
10:23
**employees (3)**
8:8;90:12,14
**empower (1)**
10:24
**encourage (1)**
114:11
**encouraged (1)**
62:22
**end (5)**
19:16;31:8;42:18,18;
96:12
**ends (2)**
49:20,24
**engage (2)**
39:12;66:10
**engaged (3)**
16:4;63:18,25
**engages (1)**
128:15
**engaging (1)**
40:20

**English (2)**
117:6;127:4
**enough (1)**
11:10;41:21;88:20;
117:7
**enroll (1)**
26:23
**enrolled (4)**
15:11;26:19;77:21;
132:4
**enrollment (7)**
9:17;14:19;15:10;
63:8;68:22;74:7,12
**ensure (13)**
26:9;113:14,17;
114:5,10;126:14;
127:2,4,12,13,20;
128:22;129:1
**ensuring (5)**
23:10;126:8,19,21,
24
**enter (1)**
60:19
**entire (1)**
63:3
**entirely (2)**
96:16;100:7
**entitled (3)**
12:20;33:3;50:2
**environment (5)**
27:14;42:9;55:7;
63:25;104:19
**epithet (2)**
102:15;103:7
**equivalent (1)**
22:19
**era (1)**
83:9
**Erickson (3)**
111:11,16;113:2
**Especially (1)**
103:24
**essay (2)**
108:23;109:12
**Essentially (3)**
23:10;84:11;119:21
**establishing (1)**
118:25
**etiquette (1)**
59:22
**even (5)**
52:11;60:17;67:24;
81:17;113:3
**eventually (2)**
53:3;135:24
**everyone (3)**
99:17,18,20
**everywhere (1)**
9:14
**evidence (1)**
87:4
**evolved (1)**
86:2

**exact (4)**
24:24;28:10;74:4;
76:15
**exactly (1)**
38:24
**exam (1)**
42:8
**EXAMINATION (1)**
5:8
**examined (1)**
5:6
**example (13)**
27:15;28:19;36:1;
40:22;50:1;52:20;60:4;
78:24;88:3;123:24,25;
129:4;132:15
**exceeded (1)**
24:7
**excellence (2)**
34:15;117:16
**Excellent (1)**
29:12
**exception (1)**
93:21
**exchange (3)**
75:16;104:10;105:6
**exclude (1)**
44:16
**excludes (1)**
100:2
**exclusive (1)**
30:18
**exclusively (6)**
28:18;42:25;43:12;
51:1;116:25;117:3
**Excuse (1)**
44:4
**executive (1)**
75:6
**exempt (1)**
69:21
**exhaustive (2)**
14:21;71:11
**Exhibit (67)**
18:20;19:8,10;22:24;
23:3;29:5,7,11;31:25;
32:2;36:9,14;45:8;
46:10,11,14;58:6,8,9;
64:14,16,18;65:1;67:9,
11;68:3;69:21;74:19,
21,24;80:3,6,7;82:10;
86:9,12,13;87:21;88:4,
6,7,24;89:10;91:7;
92:16;93:24;94:24;
95:3;101:20,24;105:8,
12;110:24;111:3,5;
113:20,22,23;125:1,3,
5,6;126:1;133:17,21;
138:8,16
**expect (5)**
34:21;64:4,6;104:11;
135:23
**expectation (11)**

54:23;55:5;60:22;
61:7;112:9,21;118:8;
124:2;125:8,11,12
**Expectations (4)**
60:24;66:22,25;
120:16
**expected (7)**
21:11;38:12;65:10,
13;84:14;104:25;
111:23
**expects (1)**
111:20
**expelled (1)**
46:3
**expenditures (2)**
18:4;130:18
**experience (7)**
34:2,11;72:8,8;
103:20,20;134:11
**experienced (1)**
104:17
**experiences (4)**
26:15;33:24;118:1,4
**explain (3)**
20:16;21:8;37:2
**explained (1)**
104:16
**explicitly (1)**
90:22
**expressed (6)**
33:14;104:16;112:8;
113:5;136:3,8
**expressing (1)**
41:3
**expressions (1)**
64:6
**extent (5)**
11:11;93:17;107:16,
18;132:21
**external (1)**
29:21

## F

**Facebook (1)**
7:8
**facilitate (2)**
109:22;114:18
**facilities (1)**
53:13
**facing (1)**
133:6
**factor (2)**
137:14,24
**factored (1)**
18:7
**factors (1)**
126:5
**faculty (29)**
6:15;28:15;30:1,5;
31:1;32:23;34:21,24;
52:13;54:5;61:12,21;
62:10,13;67:5;97:17;

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

103:15;112:5,8;113:2,
4;119:3,5;124:1;
126:20;135:16,19;
136:9,10
**fair (7)**
40:1;46:20;54:17;
86:1;88:20,23;89:3
**fairly (2)**
30:9;33:15
**faith (53)**
21:6,12;33:23;34:1,
10,22;37:5;39:17,19;
42:12;43:6;44:14,15;
47:24;53:1;54:22;60:3;
65:22;72:20,23;76:7;
81:4,13,16;82:24;
83:14,21,25;84:15;
85:8,19;89:17;90:17,
22;93:20,24;96:4,20;
97:8;100:5,20;101:15;
107:4,10;108:2,13,16;
110:16;113:5;134:6;
138:1;139:16,20
**faith-specific (1)**
134:10
**fall (2)**
129:1,23
**Falls (3)**
21:23,23,25
**familiar (5)**
13:19;19:14;36:15;
43:24;138:18
**families (8)**
32:20;66:23;72:10;
87:6;134:2,21;139:14,
18
**families' (1)**
99:13
**family (3)**
5:17;63:12;137:20
**FAQ (1)**
67:14
**far (3)**
20:14;28:16;49:14
**fashioned (2)**
38:1,13
**Fawn (3)**
8:25;10:3;29:18
**February (1)**
92:21
**feel (4)**
20:5;39:24;46:13;
63:3
**fellow (1)**
54:20
**felt (3)**
32:18;60:17;111:22
**few (6)**
19:14;24:7,23;30:21;
88:22;128:17
**figure (1)**
26:13
**figured (1)**

18:8
**fill (3)**
40:22,23;78:23
**filter (1)**
119:13
**final (1)**
73:19
**finally (1)**
17:25
**finance (2)**
11:5;131:9
**financial (3)**
74:14;122:13;130:9
**financing (1)**
130:12
**find (7)**
17:23;45:10;70:22;
79:12;82:17;101:6;
116:3
**Fine (5)**
6:5;11:18;40:9;
44:22;88:21
**finish (2)**
11:20,21
**first (26)**
5:5;6:15;11:17;
15:19;17:7;23:21;33:4;
38:25;42:2,16;48:8;
50:8;56:5;70:19;82:17;
85:6;86:16;95:7,13;
96:2;98:25;100:6;
102:2;135:7,16;138:15
**firsthand (1)**
52:4
**fishermen (1)**
13:22
**Fisk (3)**
128:18,21;129:3
**fit (1)**
8:19
**Five (5)**
6:10;27:5;57:16;
115:4;134:24
**flagged (1)**
127:25
**flagrant (1)**
52:25
**fliers (1)**
71:2
**fluctuates (1)**
73:25
**focusing (1)**
117:15
**folks (1)**
125:18
**follow (3)**
61:18;90:21;97:19
**followed (3)**
64:5,6;78:7
**following (4)**
39:21;43:4;68:24;
82:2
**follows (1)**

5:7
**food (1)**
119:10
**forgetting (1)**
65:4
**forgive (1)**
44:6
**form (12)**
47:19;65:21;76:21;
80:10,12;82:10;114:1;
124:23,24;131:6;
133:1;136:23
**formal (5)**
35:4;59:15;108:8,11;
138:5
**formality (1)**
18:19
**format (1)**
138:18
**formation (2)**
67:14;70:2
**formatted (1)**
64:21
**former (2)**
78:20;106:8
**forms (1)**
124:25
**forth (2)**
58:11,12
**forthright (1)**
96:21
**Forty-six (1)**
8:12
**forward (1)**
32:25
**forward-facing (1)**
15:4
**found (3)**
57:2;70:16;136:5
**foundation (2)**
104:8;109:17
**founding (1)**
32:16
**four (3)**
10:12;57:16;58:15
**framework (3)**
38:2,13;58:11
**free (3)**
39:24;46:13;63:3
**freedom (1)**
108:12
**frequently (2)**
10:10;128:8
**friend (1)**
55:2
**front (8)**
18:21;19:3,22;62:15;
65:1;90:1;113:23;
137:7
**frustrate (1)**
106:10
**frustration (1)**
106:12

**fulfill (6)**
31:11;35:11,11;69:8;
70:7;114:17
**full (3)**
5:14;77:20;138:25
**fully (1)**
100:9
**function (2)**
119:4;130:22
**funding (6)**
87:7,13;89:3;130:7,
8;132:14
**funds (3)**
18:11;131:2,2
**funnel (1)**
126:11
**furnish (1)**
122:4
**further (5)**
50:5;66:18;79:1,3;
139:23
**future (2)**
32:18;105:24

## G

**Gail (7)**
14:18;16:24;17:2,10;
85:13;86:6;90:9
**gathered (1)**
55:22
**gathering (1)**
86:17
**gatherings (2)**
28:2;118:22
**gay (10)**
40:13,24;44:7,10;
55:9;97:25;98:18;
100:23;101:7,13
**gender (11)**
43:21;45:17;49:11;
50:6;51:8,20,22;54:11;
55:24;57:20;58:1
**genders (1)**
51:5
**Gene (1)**
75:5
**general (6)**
18:12;30:24;67:2;
78:12;115:19;120:1
**generally (4)**
76:4;120:11;127:15;
130:7
**Georgia (1)**
21:23
**given (6)**
11:1;28:14;32:7;
62:2;74:3;120:7
**goal (20)**
33:18;41:11;42:9,18,
18,23;52:17;65:12,17,
20,25;66:8,9,9,12,14,
17;79:3;118:3;139:12

**goals (5)**
31:11;65:14,16;
66:18;67:1
**God (9)**
39:4,13,24;40:19;
42:3,3,6;43:4;55:4
**God-given (1)**
108:12
**God's (1)**
42:11
**goes (2)**
50:4;78:20
**Good (6)**
5:11,18;7:14;12:4;
26:15;114:22
**gorgeous (1)**
13:21
**Gotcha (1)**
5:13
**government (1)**
16:5
**GPA (1)**
36:1
**GPAs (1)**
97:1
**grading (1)**
120:16
**graduate (1)**
18:16
**graduation (4)**
113:10,15;114:6;
115:10
**Grant (8)**
14:18;16:24,25;17:2,
10;85:13;86:6;90:9
**great (13)**
9:18;10:9;11:13;
16:8;17:11,25;18:9;
26:11;31:22;34:12;
37:8;20;131:8
**grew (2)**
20:17;21:3
**grievances (1)**
58:17
**ground (1)**
11:14
**group (3)**
25:7,11;100:1
**groups (2)**
25:3;100:3
**grow (3)**
31:10,18;35:11
**growing (1)**
65:22
**growth (2)**
41:11,12
**guess (4)**
39:22;63:23;102:9;
134:16
**guessing (1)**
134:17
**guide (1)**
116:6

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

**guidelines (3)**
59:4;119:17;122:21
**guides (2)**
37:18;96:23

# H

**half (1)**
5:24
**halfway (1)**
13:14
**hall (2)**
27:3,16
**handbook (25)**
14:24;46:18,24,25;
47:3,7,12;50:3,15,22;
51:3;54:3,21;57:9;
58:23,24;59:20;64:24;
67:16,18;69:6,9,15,16,
24
**handful (1)**
71:14
**handled (2)**
56:2,16
**handles (1)**
72:1
**handwriting (1)**
88:4
**happen (5)**
78:18;105:1;119:1;
123:14;135:15
**happened (3)**
78:10;130:4,5
**happening (2)**
121:8;130:18
**happens (1)**
78:25
**happier (1)**
30:1
**happy (2)**
13:22;26:14
**harassment (2)**
103:22,25
**hard (1)**
136:16
**harmful (2)**
103:22;104:4
**head (3)**
12:17;75:6;129:16
**heading (8)**
32:11;33:4;37:25;
39:1;62:16;65:7;68:11,
25
**headings (1)**
38:22
**heads (1)**
119:14
**hear (8)**
20:25;30:7,7,10,19,
19,23;54:5
**heard (4)**
9:13;71:17;97:21;
102:8

**hearkening (1)**
125:7
**heavily (3)**
96:4,9;122:2
**help (6)**
32:19;61:11;65:14;
116:13;129:7;137:4
**helped (1)**
109:22
**heritage (1)**
67:1
**hesitant (1)**
109:4
**hesitation (1)**
82:12
**heterosexual (2)**
42:20,25
**high (26)**
25:17,23,24;26:7,18,
18,22;27:22;36:3,4;
70:15;79:2;100:15;
113:9,13,14,18;114:2,
6,19,20;115:9,23;
117:1,2;123:14
**highest (3)**
34:17;70:11;126:22
**highlighted (1)**
79:21
**highlighting (1)**
134:7
**highly (1)**
87:9
**hire (1)**
26:9
**hired (1)**
117:15
**hiring (2)**
34:21;35:19
**historical (1)**
123:25
**hits (1)**
78:25
**hold (2)**
49:20,24
**home (14)**
25:1,1,3,7,11,14;
71:7,16,20;72:3,6;
79:9;134:2,13
**home-schooled (3)**
72:9,17,19
**homosexual (2)**
41:24;42:19
**homosexuality (3)**
40:2,10;41:8
**honesty (1)**
99:22
**honor (3)**
45:10;99:24;118:8
**honors (8)**
117:10,13,17,20,25;
118:2,11,20
**hope (3)**
7:3;60:16;137:17

**hopefully (1)**
35:10;92:16
**hoping (1)**
6:24
**horrible (1)**
27:19
**hour (1)**
44:20
**hours (3)**
10:12;131:19,20
**housing (1)**
53:23
**human (2)**
49:11;50:6;51:19
**hybrid (4)**
25:1,2,14,17
**hyperlinked (1)**
48:5

# I

**Ian (1)**
115:19
**ice (1)**
13:22
**icon (1)**
68:7
**ID (1)**
120:13
**idea (1)**
103:12
**ideally (1)**
135:15
**identification (22)**
19:9;22:25;29:6;
32:1;36:10;46:12;58:7;
64:15;67:10;68:4;
74:20;80:4;86:10;91:8;
94:25;101:21;105:9;
110:25;113:21;125:4;
133:18;138:9
**identified (1)**
20:2
**identifies (2)**
40:13;69:16
**identify (2)**
23:12;44:7
**Identifying (2)**
40:16;123:3
**identity (19)**
41:5;42:20,25;43:2,
21;45:17;49:12;50:6;
51:20,23;54:11,12;
55:24;58:1;61:6;65:11,
15;101:1,9
**Immediately (2)**
6:4,19
**immoral (7)**
40:3,11,14;48:15,17;
101:3,10
**immutable (1)**
51:8
**impact (6)**

89:21;96:1;97:2;
98:15,20;99:15
**impacted (1)**
88:17
**imperil (2)**
98:8,14
**implemented (1)**
63:15
**implicates (1)**
12:24
**important (7)**
12:17;32:19;54:25;
63:17,23;64:2;99:25
**improve (1)**
104:18
**inability (1)**
74:10
**Inasmuch (3)**
34:3;64:4;97:1
**inbox (1)**
95:10
**include (6)**
54:5;63:11;69:17;
90:23;120:17;124:3
**included (1)**
120:12
**includes (1)**
68:17
**including (4)**
12:4;98:25;134:6,10
**inclusion (1)**
50:13
**incorporate (1)**
117:5
**incur (1)**
132:11
**independent (2)**
127:12;128:22
**indicate (1)**
116:10
**individual (7)**
18:15;51:22;52:20;
61:20;102:12,14;
112:17
**individuals (1)**
38:4
**individual's (1)**
51:7
**indulge (1)**
70:15
**inerrant (1)**
39:16
**inextricably (2)**
39:3,6
**informal (3)**
34:23;59:16;108:10
**informally (2)**
5:10;108:6
**information (17)**
15:17;17:24;55:13,
14,22;70:23;71:1;
86:17;88:13,15;93:1;
105:20;116:3,5,6;

120:13;140:2
**infractions (1)**
54:18
**initially (2)**
82:4,5
**innumerable (1)**
103:10
**in-person (1)**
109:2
**inquire (6)**
52:1,3;78:8;79:1,3;
114:12
**inquired (1)**
55:19
**inquires (1)**
109:8
**inquiries (1)**
77:18
**inquiry (4)**
88:10;104:6,12;
111:17
**instance (3)**
26:6;78:15;112:1
**instances (3)**
25:25;26:1;63:13
**institution (17)**
10:25;14:3;17:3,5,8;
32:24;61:1;72:14;
73:21;74:11;80:14;
119:18;121:5;124:2;
128:14,20;137:24
**institutional (5)**
37:18;112:15;
120:21;122:3;125:17
**institutionally (1)**
112:22
**institutions (4)**
21:17,20;76:22;
134:6
**instruction (1)**
81:10
**instructional (1)**
122:1
**instructor (13)**
25:10;26:2,3,5,9;
112:19;120:4,7,22,23;
121:9;122:5;123:2
**instructors (3)**
112:17;122:22;
123:22
**integrate (3)**
34:1,10;96:3
**integrated (1)**
50:7
**integration (1)**
33:23
**integrity (2)**
39:8;99:22
**intend (4)**
28:23;29:23;31:7;
32:25
**intended (1)**
13:1

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 46 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

**intentionally (1)**
66:10
**interact (2)**
59:2,25
**interaction (5)**
59:11,13,16;113:12;
115:23
**interactions (1)**
34:23
**interest (4)**
33:14;91:25;92:8,17
**interested (2)**
43:3;70:17
**interesting (1)**
137:5
**interjecting (1)**
12:24
**internal (1)**
29:20
**internally (1)**
137:25
**international (1)**
20:23
**interpret (1)**
124:15
**intertwined (3)**
39:3,6;108:3
**interview (2)**
109:2;118:9
**interviewed (1)**
118:16
**into (16)**
33:23;34:1,10;35:9,
24;41:12;42:5;46:18;
50:7;60:19;82:17;83:2;
89:17,23;118:11,19
**introduce (3)**
18:19;109:6;125:1
**introduced (1)**
89:17
**investigate (1)**
45:25
**investigation (1)**
104:21
**investigations (1)**
55:23
**investigative (1)**
56:2
**involuntarily (1)**
46:7
**involve (2)**
22:11;121:3
**involved (11)**
17:23;63:10,11;67:1;
90:12;93:5;126:13;
133:6,14;134:1;139:15
**involvement (2)**
15:22;16:8
**involving (2)**
28:20;54:11
**Iowa (1)**
22:2
**Islam (1)**

60:3
**issue (5)**
72:21;73:11,18;
108:2;136:10
**issued (1)**
73:13
**issues (4)**
21:9;22:16;106:6;
128:4
**iteration (3)**
64:21;75:3;117:18
**iterations (1)**
138:20

## J

**Jackson (1)**
6:13
**January (1)**
19:16
**Jeff (4)**
5:12;76:2;99:4;
140:7
**Jen (6)**
10:1;14:16;15:15;
45:24;95:22;133:14
**Jen's (1)**
106:13
**Jessie (1)**
86:24
**Jesus (4)**
46:4;76:13;81:4;
100:17
**Jim (1)**
95:17
**Joel (1)**
9:22
**Johnson (4)**
9:22;103:10;105:3,
20
**Johnson's (1)**
104:5
**join (1)**
112:9
**July (1)**
33:24
**junior (1)**
36:3
**juniors (2)**
26:18;36:5

## K

**keep (6)**
12:25;23:11;65:4;
108:15;121:19;139:24
**keeps (2)**
17:20,21
**Kelly (3)**
109:15,20,22
**Kentucky (1)**
6:23
**kid (1)**

70:16
**kids (2)**
74:2;123:14
**Kimberly (7)**
14:19;17:14,16,17,
20;128:17,21
**kind (15)**
10:17;15:25;46:18;
71:21;115:23;118:24;
119:7;120:1,11;
126:13;130:7,25;
131:21;134:5;137:9
**kingdom (1)**
39:4
**knew (3)**
16:4;31:20;110:21
**knowledge (14)**
25:15,16;28:21;52:4;
83:16;84:3;88:16;
90:15;108:22;109:10;
112:11;113:7;133:4;
136:4
**knows (2)**
52:14;85:13

## L

**La (1)**
17:14
**lab (2)**
28:19,20
**labels (1)**
23:8
**lack (3)**
9:8;15:25;30:14
**lacks (1)**
104:7
**lag (1)**
131:21
**lake (1)**
13:21
**language (3)**
15:20;17:22;134:10
**LaQuay (4)**
14:19;17:15;128:17,
21
**L-a-Q-u-a-y (1)**
17:15
**large (5)**
37:25;41:20;67:2;
119:5;123:12
**last (14)**
25:17;30:20;39:22;
45:8,9;49:21;56:14;
61:25;69:21;77:14;
88:25;100:6;111:25;
136:20
**lastly (1)**
12:19
**later (3)**
12:11;82:21;92:18
**law (9)**
16:2;72:20;73:11,13,

18;133:8;134:22;
136:22;137:12
**lawsuit (5)**
72:21;73:11,18;
136:21;137:10
**lawyer (2)**
18:25;93:5
**lawyers (5)**
12:3,21;14:7;36:18;
107:22
**lead (3)**
15:21;53:3,5
**leaders (3)**
129:4;134:2,13
**leadership (5)**
8:19;9:13;34:5;
37:11;81:19
**lean (2)**
35:9;122:2
**learn (4)**
18:9;35:9;42:13;
59:12
**learned (2)**
15:19;136:3
**learning (8)**
9:3;10:3;38:6;59:6,
15;87:6;96:4;120:14
**least (9)**
10:11;26:17;36:23;
47:4;58:11;64:21;77:2;
84:22;93:19
**leave (3)**
10:19;110:1;140:5
**left (1)**
115:22
**legal (2)**
73:15;122:12
**legislation (2)**
94:22;108:7
**legislative (4)**
16:1;94:14,18;
134:21
**legislator (1)**
95:23
**legislators (1)**
94:14
**less (2)**
87:10;89:6
**letter (7)**
86:18;87:22,23;88:7,
17;89:4,21
**level (11)**
34:17;60:16;79:2;
119:13;120:2,21,22;
125:17;126:19,22;
135:20
**LGBTQ-plus (1)**
44:8
**liaison (1)**
16:1
**library (2)**
8:17;121:20
**life (6)**

38:5;39:10,12;41:13;
66:1;76:13
**lifestyle (1)**
111:21
**likely (3)**
52:15;60:13;106:21
**limited (1)**
58:3
**limiting (3)**
28:22;29:23;31:6
**line (3)**
40:19;42:10;124:8
**list (5)**
17:3;71:12;79:7;
105:4;131:16
**listed (5)**
22:18;27:1;33:5,18;
93:23
**literature (1)**
123:24
**little (11)**
19:15;27:22;39:18;
40:8;44:23;101:6;
117:16;122:2,14;
130:6;138:17
**live (8)**
34:24;39:10;67:24;
69:11;83:23;97:18;
99:24;106:25
**lives (1)**
99:24
**living (5)**
27:23;49:4;57:17,17;
91:3
**local (1)**
100:8
**located (1)**
13:8;56:25
**locker (1)**
53:12
**Loe (13)**
22:23;29:10;32:4;
36:11;74:22,23;91:9;
95:2;101:22;105:10;
111:2;133:19;138:6
**long (7)**
5:23;6:9;11:10;
40:24;115:12;136:13,
17
**longer (1)**
44:24;46:4;72:22
**longest (1)**
17:3
**look (17)**
7:9;23:21;25:5;
29:19;33:17;41:23;
48:7;63:4;65:6;70:23;
87:2;113:19;124:11,
16;129:17;138:25;
139:19
**looked (4)**
69:21;87:21;116:6;
138:17

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 47 of 55

Melinda and Mark Loe, et al vs.      Christopher Mathews      CHRISTOPHER MATHEWS
Willie Jett, et al.                        1-31-24                        January 31, 2024

**Looking (10)**
23:13;38:22;40:5;
45:9;46:22;47:10;57:3;
72:17;89:10;126:1
**looks (13)**
19:14;24:9;26:17;
36:25;46:17;64:20;
71:21;73:24;75:6;
86:23;111:8,19;113:12
**loop (1)**
79:19
**Lord (1)**
100:18
**Lord's (1)**
41:17
**Lordship (2)**
48:9,11
**lot (3)**
14:22;20:8;121:1
**loud (1)**
44:5
**love (2)**
99:17,23
**loving (1)**
104:20
**lovingly (1)**
106:7
**lower (1)**
97:1
**Luesse (1)**
56:13
**L-u-e-s-s-e (1)**
56:15
**lunch (1)**
115:14
**Luther (1)**
91:21
**Lutheran (4)**
20:18,18;75:8;91:20

**M**

**mailing (2)**
13:17;105:4
**main (1)**
82:9
**mainly (1)**
118:3
**maintain (1)**
108:13
**maintained (1)**
136:15
**maintains (1)**
17:21
**makes (7)**
30:12;31:19;33:1;
49:25;61:9;82:6;
114:22
**making (5)**
13:22;33:15;84:11;
90:3;138:1
**man (1)**
48:19

**manage (1)**
10:24
**manageable (1)**
36:23
**manages (1)**
14:18
**manner (3)**
27:15;52:8,21
**many (8)**
8:4,8;11:4;13:10;
23:24;41:4;74:2;
117:13
**maps (1)**
33:22
**marathon (1)**
11:23
**mark (1)**
18:25
**marked (22)**
19:8;22:24;29:5;
31:25;36:9;46:11;58:6;
64:14;67:9;68:3;74:19;
80:3;86:9;91:7;94:24;
101:20;105:8;110:24;
113:20;125:3;133:17;
138:8
**market (1)**
70:20
**marketing (3)**
9:17;70:24;71:4
**marriage (1)**
48:19
**married (1)**
44:10
**Martha (3)**
10:5;14:15,23
**Martin (1)**
91:21
**master's (1)**
7:18
**matching (1)**
123:2
**material (1)**
59:12;125:19;127:14
**materials (9)**
80:13;95:8;120:14,
17,18,20;122:16;125:9,
13
**Mather (8)**
29:14,14,17;30:25;
70:13;72:2;130:21;
133:15
**Math-er (1)**
29:15
**MATHEWS (24)**
5:4,10,15,16;20:16;
29:7;36:15;38:11;
44:21;45:7;46:13;58:9;
64:17;79:17;80:7;
86:12;101:25;113:23;
115:22;125:6;126:1;
133:22;135:5;138:10
**matriculate (3)**

28:24;29:24;31:7
**matriculated (1)**
15:9
**matriculating (1)**
31:21
**matriculation (1)**
26:11
**matter (2)**
18:20;110:8
**matters (1)**
10:20
**may (27)**
16:22,22;17:12;
20:25;26:6;30:7,10,22;
45:11;53:3,24;57:2;
86:21;87:22;88:10,11;
91:13;92:24;106:5;
108:11;109:7;120:25;
123:1;124:1;128:2,10;
136:3
**maybe (3)**
36:18;71:19;125:1
**MBS (1)**
121:16
**McCracken (4)**
8:25;9:1;10:4;29:18
**McDonald (1)**
9:19
**MDE (8)**
80:5;86:8;89:21;
90:6;125:2;129:25;
131:16;136:12
**MDOE (1)**
85:3
**meals (1)**
59:17
**mean (4)**
20:11;32:13;80:20;
116:5
**means (5)**
23:1,10;39:6;96:15;
103:16
**meant (1)**
52:25
**meantime (1)**
92:19
**media (1)**
109:9
**meet (9)**
10:10;31:10;103:14;
113:9;114:6,10,16;
127:1,23
**meeting (3)**
14:7;94:19;129:4
**meetings (4)**
10:14;28:7;94:13,17
**meets (1)**
127:14
**member (10)**
52:13;61:21;103:15,
15;112:6;117:24;
124:1;126:20;135:16,
19

**members (9)**
8:4;21:11,18,21;
34:24;61:12;67:5,5;
112:8
**memo (1)**
95:18
**memorandum (3)**
95:12,15,21
**memorialized (1)**
56:23
**men (1)**
99:22
**mentioned (8)**
35:19;41:22;42:15;
71:12;106:23;129:13;
130:14,24
**mentor (1)**
41:16
**mentored (1)**
67:5
**message (1)**
134:12
**messaging (1)**
134:2
**met (4)**
5:10;126:9,15;
128:23
**Metz (2)**
109:15,20
**Midwest (1)**
33:7
**Midwest's (1)**
32:11
**might (7)**
29:2;39:3;73:9;
121:7;129:13,19;137:4
**Mike (1)**
9:24
**mind (2)**
12:25;27:21
**mindful (1)**
136:11
**minister (1)**
103:15
**ministries (1)**
129:20
**ministry (4)**
42:2,17;102:20;
111:12
**Minnesota (10)**
5:2;21:18,19;84:18;
85:7;94:14;95:23;
122:7,14,16
**Minnesotan (2)**
13:4,6
**minor (1)**
118:2
**minors (1)**
103:24
**minute (2)**
45:2;137:2
**minutes (5)**
11:9;79:12,13;115:4;

**134:25
mission (23)**
31:11;34:3,4,7,18;
35:5,12;37:4,9,10,16,
18,23;38:15;40:2,4;
61:3;64:22;66:21;
96:10,22;137:15;
139:21
**Missionary (5)**
20:21,24;22:9;37:12;
99:16
**Missouri (2)**
7:19,19
**mistake (1)**
78:9
**mistaken (1)**
111:23
**mix (1)**
117:1
**Moats (4)**
86:18,19;88:12;
136:7
**modalities (1)**
35:22;36:6;59:1
**modality (16)**
23:22;24:12,18,19,
25;26:1;27:2;28:9,10,
11,14;30:11;61:12,22;
62:6,7
**modified (1)**
87:21
**moment (1)**
39:24
**money (1)**
18:5
**monitors (1)**
26:13
**Montano (1)**
86:24
**moot (1)**
92:24
**more (29)**
7:7;15:21,22;19:16,
18;28:14;31:19;33:5;
35:3;59:15,25;60:19;
61:17;72:10,16;74:5;
88:23;89:12;100:8;
108:8,11,20;115:6;
117:16;122:2,15;
124:21;135:6;136:13
**morning (2)**
10:11;29:20
**most (9)**
13:15;25:24;31:24;
33:13;41:15;106:21;
132:25;133:14;135:17
**mother (1)**
63:12
**move (3)**
32:25;46:10;68:1
**moving (1)**
30:20
**much (6)**

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 48 of 55
Melinda and Mark Loe, et al vs.                     Christopher Mathews                          CHRISTOPHER MATHEWS
Willie Jett, et al                                        1-31-24                                    January 31, 2024

33:16;59:25;61:21;
93:1;106:25;117:5
**Music (1)**
6:12
**musical (1)**
6:24
**Muslim (1)**
100:15
**must (3)**
38:1;112:9;124:13
**myself (2)**
73:20;77:20

**N**

**name (3)**
5:14;56:14;120:13
**names (1)**
9:17
**Nash (3)**
91:13,19;93:4
**nationwide (1)**
20:22
**native (2)**
13:4,6
**nature (5)**
56:6;97:2;118:22;
135:9;136:11
**necessarily (3)**
31:12;54:25;130:13
**necessary (1)**
113:6
**need (10)**
9:17;11:24;60:17;
88:15;99:7;108:11;
112:1;121:11,11;
138:15
**needed (1)**
10:12
**negative (1)**
99:15
**Negatively (1)**
98:16
**network (3)**
71:7,16,20
**new (1)**
117:18
**next (9)**
14:2;33:17;37:24;
50:1;69:7;107:7;
108:10;115:4,25
**NHSA (1)**
71:17
**NHSE (1)**
71:17
**nice (1)**
7:13
**nine-year (1)**
26:11
**Niska (7)**
10:1;14:16;15:15;
45:24;95:22;105:19;
133:14

**Niska's (2)**
95:23;106:2
**non-Christian (1)**
96:18;97:22;98:7
**non-Christians (1)**
99:1
**nondiscrimination (2)**
56:24;57:1
**nonetheless (1)**
72:25
**nonsectarian (11)**
17:18;124:13;126:5;
127:1,17,23;128:23;
129:6,10;134:9;136:11
**nontraditional (1)**
9:4
**Nor (1)**
131:10
**normal (1)**
10:17
**normally (1)**
95:20
**North (2)**
91:21;113:2
**Northwestern (4)**
92:1;93:22;96:2,3
**Northwestern-St (1)**
111:20
**note (1)**
139:24
**noticing (1)**
5:17
**notification (1)**
136:8
**notified (1)**
84:18
**notifying (1)**
19:24
**number (6)**
8:6,10;24:1;74:4;
116:10;127:3
**Numbered (2)**
37:25;38:21
**numbering (1)**
134:4
**numbers (3)**
23:6;73:24;75:9
**NWUSP (1)**
111:19

**O**

**oath (1)**
5:7
**object (2)**
114:23;131:6
**Objection (27)**
14:4;21:15;22:20;
42:21;63:20;73:14;
87:24;93:15;94:1,12;
97:12;98:9,21;99:2;
101:2,11;103:3;104:2,
7,23;107:15;109:17;

110:4,18;122:11;
132:20;136:23
**objectionable (1)**
112:3
**objective (4)**
33:18,19,21,21
**objectives (1)**
120:14
**obligation (2)**
81:10;107:13
**obligations (1)**
11:6
**observation (1)**
93:19
**observes (1)**
54:20
**obvious (1)**
93:22
**obviously (3)**
9:16;59:7;122:24
**occasion (2)**
28:5;125:22
**occasionally (1)**
117:6
**occasions (2)**
78:16;125:16
**occur (2)**
15:8,10
**occurred (9)**
31:8;45:21;54:10,14,
17;84:17;87:17;92:3;
107:22
**occurring (1)**
54:7
**odds (1)**
107:1
**off (2)**
17:12;115:22
**off-campus (1)**
37:21
**offensive (1)**
102:15
**offer (15)**
17:19;28:13,14,17;
30:16;33:9;67:3,3,4;
70:20;73:3,22;83:3;
122:25;123:13
**offered (11)**
28:11,18;81:21,23,
24;113:8;115:9;
116:17;126:25;128:25;
129:1
**offering (7)**
24:16;34:17;39:11;
73:17,21;82:13;122:3
**offerings (5)**
33:16;82:9;96:9;
116:9,14
**offers (1)**
114:6
**office (5)**
56:3,18;116:4;
131:15;135:24

**officer (3)**
9:3,24;10:3
**officially (1)**
87:18
**officials (1)**
16:5
**often (3)**
21:24;25:13;30:10
**oftentimes (1)**
12:3
**Oklahoma (2)**
6:5,8
**old (2)**
89:10;111:14
**on-campus (78)**
23:22,25;24:4,16;
27:2,8,15;28:10;29:21;
31:6;33:8;37:17;41:9;
44:10;47:12;48:11;
51:18,24;52:7,23;
58:19;61:10;62:6,12;
63:8,25;65:21,25;
66:12,13,14,24;67:21;
70:6,17,20;72:4,22;
73:10,17,25;74:2,7,11;
75:4,12,23,25;76:2,6,
11;77:3,9;78:1,19;
79:6;82:11,20,21;
83:10;84:8,23;85:9,20;
96:8;98:13,19;100:16;
101:8;107:5;109:3,13;
110:9;116:24;120:4;
122:17;123:18;138:2
**Once (4)**
18:17;24:2;87:11;
89:1
**one (46)**
5:16;9:2;10:23;18:2,
4,24,25;21:22;23:4,17;
34:14,14;41:11,25;
52:10;54:20;57:16;
59:3;65:14,16;75:9;
77:12,19;78:15;79:20;
88:23;89:4;94:6,7,10,
11;95:21;97:18;99:23;
100:18;104:20;106:8;
107:9;108:3;109:5;
111:8;112:16;115:6;
124:20,21;132:4
**ones (4)**
22:18;67:24;116:14;
128:11
**online (49)**
8:21,23;9:3;10:3;
24:12,13,14,19;25:9;
26:1;28:9,14;29:16,23;
30:6,16;35:23;37:1;
58:21,25;59:6,11,18,
19,21,23,24,25;60:4,4,
17,22;61:10,17,18,22,
24;62:6,9;73:22;81:21,
25;82:5,13;116:7,9;
121:2;133:1,3

**Only (27)**
18:2;26:18;28:23;
30:2,14;36:2;49:22;
51:4;73:22;75:3;81:21,
21,24;82:11;83:1,6,18;
88:8;89:25;92:22,22;
116:10;122:18,18;
134:14;136:5;139:9
**onto (1)**
129:23
**open (7)**
43:11;78:23;80:21;
103:13;117:7;118:5;
139:25
**opened (1)**
104:22
**openly (4)**
41:8,24;63:25;98:18
**operational (1)**
10:19
**operationally (1)**
9:5
**operations (3)**
9:24;10:25;22:11
**opportunities (1)**
67:4
**opportunity (1)**
83:4
**opposed (1)**
120:22
**opposition (1)**
134:8
**opt (1)**
112:24
**option (4)**
27:7;81:25;83:5;
138:3
**optional (1)**
138:2
**options (4)**
82:7;107:9;112:3;
118:6
**order (5)**
23:11;39:3;41:12;
45:11;85:9
**organization (1)**
51:2
**organizations (1)**
37:5
**orientation (13)**
15:5,7,8;40:25;43:9,
21;45:14;54:11;55:17;
56:11,21;57:23;102:16
**oriented (1)**
125:10
**original (1)**
24:18
**originally (1)**
135:15
**others (5)**
14:13;25:21;66:9;
71:14;137:11
**otherwise (2)**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 49 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

18:13;116:12

**out (13)**
11:4;40:22,23;43:16;
44:5;57:17;59:16;61:7;
78:23;106:14;109:6;
112:24;121:25

**outcomes (3)**
65:8;123:2;125:23

**outline (1)**
54:2

**outlined (5)**
42:11;43:6;59:24;
69:5,9

**outlines (1)**
37:3

**out-of-pocket (3)**
130:1;132:6,11

**outreach (3)**
16:9;71:4;114:1

**outside (14)**
6:8;14:4;20:9;21:15;
22:20;42:3;48:18;
78:15;94:1;100:14;
104:2;110:4,18;121:10

**over (9)**
10:16;11:13,18;
16:21;22:6;36:19;
73:23;78:13;140:1

**overall (2)**
18:18;40:5

**overly (1)**
135:12

**oversee (1)**
130:21

**overseen (1)**
8:22

**oversees (1)**
9:3

**oversight (4)**
10:16;22:6;70:12;
130:11

**own (4)**
59:13;90:20;91:5;
107:1

**owner (1)**
33:19

**P**

**pace (1)**
59:13

**page (23)**
11:16;32:10;33:2,17;
37:24;38:23,24;39:21,
23;45:8;48:8;58:13;
62:15;63:3;65:7,24;
66:6;68:17,24;77:14;
100:6;134:4;138:15

**panel (1)**
54:4

**paperwork (2)**
11:11;131:15

**paragraph (14)**

29:19;38:1,11;39:1,
22,23;48:7,25;57:18;
69:3;87:2;89:1;111:25;
138:25

**parent (1)**
133:6

**parents (2)**
139:3,8

**parse (1)**
61:7

**part (48)**
18:18;22:4;34:3,20,
23;35:2;38:15;39:17;
43:2;45:24;47:3,7,11;
49:18;50:10;51:10;
55:19,21;64:24;66:24;
67:16,18;68:8;70:25;
72:7,15;81:4;83:22;
85:20;93:24;96:10;
99:12,13;100:11;
105:6;108:4;109:3;
112:5;117:23;118:8;
121:5;122:3;125:10;
132:14;134:10;137:13;
138:22;139:13

**participate (7)**
22:17;27:13;66:15;
70:1;89:5;93:13;94:13

**participated (1)**
118:13

**participating (2)**
92:20;123:15

**participation (2)**
28:23;117:21

**particular (16)**
10:18;35:6;41:15;
50:11;63:13;75:16;
80:12;89:13;93:12;
95:22;97:19;100:12;
103:18;124:19,20;
125:19

**particularly (3)**
61:13;103:25;106:8

**parties (1)**
23:11

**partner (5)**
25:4,21;34:7;70:24;
71:9

**partnership (1)**
71:13

**partnerships (3)**
25:19;137:16,17

**parts (1)**
47:1

**party (1)**
11:5

**past (1)**
117:14

**pastor (1)**
87:6

**path (1)**
42:13

**Paul (4)**

42:5,15;106:24;
111:20

**pausing (2)**
114:8;136:2

**pay (5)**
11:6,11;27:11;
122:16;130:1

**pays (2)**
121:24;132:9

**peacefully (1)**
106:25

**pedagogical (1)**
126:18

**pedagogy (1)**
120:1

**peer (3)**
54:20,23;55:2

**PELSB (1)**
75:17

**pending (1)**
139:25

**people (6)**
14:12,22;45:20;
100:3;106:25;136:22

**per (2)**
58:23;131:16

**perceive (1)**
137:13

**percent (2)**
26:12;133:2

**percentage (1)**
25:13

**perhaps (8)**
17:3;36:17;62:4;
85:13;106:14;111:19;
137:22;138:17

**period (2)**
16:21;18:6

**periodically (1)**
116:20

**peripheral (1)**
92:19

**perpetuity (1)**
136:19

**persisted (1)**
52:20

**person (15)**
15:21;44:11;52:12,
22;53:21;55:3;70:11;
86:4;90:10,11;104:4;
128:13,16;130:11;
131:9

**personal (2)**
16:8;65:21

**perspective (7)**
35:1;38:4;40:15;
63:24;98:6,12;137:9

**pertains (1)**
59:24

**PFA (1)**
67:13

**Pfeifer (2)**
75:5,11

**Pfeifer's (1)**
75:18

**philosophy (2)**
37:25;38:8

**phrase (3)**
16:1;39:5;97:21

**phraseology (1)**
76:15

**pivot (1)**
130:6

**place (4)**
13:16;84:20;85:17;
137:18

**places (1)**
43:7

**plagiarism (1)**
42:8

**plan (4)**
32:17;35:3;66:21;
96:24

**planning (1)**
34:9

**play (2)**
99:7;138:22

**please (11)**
18:22;29:7;33:17;
37:24;38:20;39:21;
44:6;63:6;65:24;76:12;
106:5

**pleased (2)**
33:13;137:15

**plenty (1)**
12:6

**plus (1)**
10:7

**pm (5)**
115:17,18;135:2,3;
140:10

**point (13)**
7:1,8;33:6;48:20;
51:12;68:22;81:3;
83:15;84:7,10;89:11,
15;100:6

**pointed (1)**
66:6

**points (2)**
124:18;128:6

**policies (4)**
46:18;47:1;59:21;
102:18

**policy (23)**
8:6;50:3,4,6,11,13,
16,19;51:15,20;54:21,
24;56:23,24;57:1;
58:17;59:22;62:16;
63:14,14;65:1;70:5,9

**pooled (1)**
131:3

**poorly (1)**
73:8

**population (1)**
72:3

**portion (1)**

109:1

**position (8)**
5:20;21:8;32:7;92:2;
104:16;124:9;136:20;
137:10

**possible (7)**
20:7;33:16;100:8;
106:25;117:5;123:21,
22

**possibly (2)**
92:11;96:22

**potential (1)**
15:20

**potentially (2)**
53:5;70:17

**practical (1)**
32:12

**practice (2)**
105:23;106:23

**practices (3)**
123:3;126:18,19

**pray (5)**
42:12;55:4;103:14;
112:2,6

**prayer (3)**
112:10,25;136:4

**prayerfully (1)**
107:7

**praying (1)**
41:16

**predicated (5)**
27:9;28:12;41:1,14;
117:3

**prefix (2)**
127:2,3

**prefixes (2)**
127:11;129:19

**pregnancy (3)**
62:16;63:14;64:9

**pregnant (3)**
62:19,23;63:1

**prejudice (3)**
57:14,19;58:3

**preliminarily (1)**
47:4

**preparation (6)**
45:25;55:20;93:7;
102:3;105:15;133:24

**prepare (2)**
14:9;16:16

**prepared (2)**
15:24;95:15

**preparing (4)**
15:17,18;45:19;
95:21

**present (2)**
22:14;115:20

**presented (3)**
92:22;138:3;139:9

**presently (2)**
8:22;118:17

**president (20)**
5:22;7:21;9:5,16,16,

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

21;10:4,23;14:15;
15:19;22:10;50:18,24;
54:1,3;75:8,10,11,11;
106:10
**pressure (1)**
29:21
**pretend (1)**
70:15
**pretty (4)**
13:13;28:25;68:5;
134:25
**previous (4)**
6:4;24:7;30:8;123:1
**Price (1)**
9:24
**primary (2)**
38:3;123:23
**principal (1)**
123:23
**principles (1)**
43:5
**print (5)**
36:19,23;64:12;68:1,
7
**print-off (2)**
68:10,13
**prior (12)**
15:10;82:22;83:1,8;
84:22;87:17;102:5;
117:19,20;128:18,19,
19
**private (1)**
132:24
**privilege (6)**
91:14;92:10,17;
93:18;107:18,19
**privileged (2)**
91:17;92:4
**probably (22)**
8:13;20:17;24:7;
32:8;39:8;43:2;54:18;
55:15;60:24;61:5;
65:12;70:13;72:16;
74:4;92:16;95:22;
107:14;116:8;117:17;
133:14;134:25;135:18
**process (64)**
15:16;16:6,19,19;
17:1,4;30:10,23;35:19;
47:21,22;50:15;52:10;
53:16,18;56:2;58:10;
61:19;68:22;70:14;
74:8,12;75:14;76:5,7;
81:5;82:18,25;83:11,
15;84:1,25;85:14,17,
20;86:7;87:3,10,11;
88:17;89:1,7,11,18,23;
90:7,16,18;107:6;
108:21;109:3;110:16;
114:12;118:10,10;
119:7,22;123:4;
126:13;129:17;131:18;
132:14;135:12,23

**processes (4)**
18:3,12;34:21;35:4
**proclaimed (1)**
41:8
**profess (1)**
39:9
**professed (1)**
60:3
**professional (3)**
35:7,13;37:4
**professors (6)**
35:19;61:23;62:5,9,
12;119:19
**profile (4)**
36:25;37:3;57:2,3
**program (5)**
14:18;67:14;87:8;
89:5;109:23;117:17,
20;118:16,18
**programs (3)**
9:4;31:10;35:24
**progress (1)**
81:14
**prohibit (2)**
56:20,22
**prohibits (1)**
57:9
**promise (2)**
39:19;64:11
**promulgates (1)**
21:13
**pronounced (1)**
13:5
**proposed (2)**
94:14;133:7
**prospective (1)**
32:19
**prospects (2)**
139:3,8
**protected (1)**
58:4
**protecting (4)**
136:21;137:11;
139:2,7
**provide (11)**
22:19;34:4,19;37:10,
20;43:8;62:9;77:4;
88:14;93:1;122:7
**provided (4)**
27:7;35:14;38:16;
122:22
**provides (2)**
14:3;121:2
**provision (5)**
37:17;49:16;51:15,
15;57:8
**provisions (1)**
84:12
**proximity (1)**
74:6
**prudent (1)**
90:6
**PSEO (205)**

8:19;10:16;14:3,18;
15:20;16:14,20;17:19;
22:19;23:25;24:4,14,
17;26:15,19,23;27:8,
11;28:3,6,22;29:22,23;
31:6;33:8,9,11;34:2,
10;35:14,16;37:17,21;
38:8,12,16;47:8,12,15;
48:9;51:18;58:17,19;
59:18;60:4,23;61:10,
17;62:9,13;65:2,10,14,
18,21,25;66:12,14;
67:19,21;68:17,21,25;
69:11,18,22;70:6,12,
17,20;72:4,23,25;73:2,
4,10,18,25;74:2,16;
75:4,12,17,22,23,25;
76:6,11,21,24;77:3,9;
78:1,8,19;79:6,22;
82:13,22;83:10,18,22;
84:1,12,23;85:9,17,21;
87:7,8,11,12,18;89:2,5,
17;90:12,23;92:21;
96:8;97:23;98:1,7,14,
19;100:10,17,24;101:8,
16;105:20;107:5;
109:3,13,21,23;110:9,
17;111:17,20;112:1,3,
9,23;113:6,8;114:5;
115:8,24,25;116:2,10,
15,16,24;117:8,21;
118:12,15,19,25;119:1,
16;120:3;121:3,14,21;
122:8,17,17;123:18;
124:6,13;125:7,20,22;
126:10,14,25;129:9,13;
130:7,8,12,23;131:2,
12,15;132:3,6,12,14;
133:8;134:2,9,20;
135:8,9,11;136:1,14;
138:2;139:3,7,18
**public (4)**
15:4;25:20;71:13;
87:7
**public-facing (1)**
68:20
**published (2)**
116:7,9
**Publishers (1)**
121:2
**pull (1)**
36:20
**pulled (2)**
36:16;114:25
**pupil (1)**
122:15
**purports (2)**
75:3;87:16
**purpose (4)**
38:3;96:20;121:16,
19
**purposes (1)**
26:5

**pursuing (1)**
53:2
**pursuit (1)**
39:11
**purview (1)**
127:21
**put (4)**
18:21;19:3;91:12;
137:7

**Q**

**qualify (1)**
115:9
**questionable (1)**
128:5
**quick (1)**
134:25
**quote (2)**
51:14;69:25
**quotes (1)**
124:4
**quoting (4)**
51:11,12,13;66:4

**R**

**race (1)**
57:20
**radio (1)**
77:23
**raised (1)**
98:3
**raises (1)**
105:24
**ramifications (3)**
60:5,7,21
**ranking (1)**
70:11
**Rare (1)**
62:4
**rate (1)**
26:12
**reach (1)**
106:14
**reaches (1)**
109:6
**read (17)**
19:12;29:8;30:2,4;
37:13;38:6;49:3;63:3;
75:20;77:20;87:13;
89:3;96:6;105:6;
138:15,16;140:8
**reading (2)**
57:15;123:18
**reads (5)**
38:1;69:3,7;87:3;
139:1
**ready (3)**
67:11;87:11;89:1
**realize (1)**
120:10
**realizing (1)**

100:9
**reason (2)**
58:24;121:12
**reasons (1)**
93:22
**recall (9)**
6:17;92:20,24;93:3,
6;94:20;102:6;120:11;
128:4
**receipts (2)**
18:15;130:18
**receivables (4)**
18:3,13,14;130:25
**receive (2)**
87:12;89:2
**received (3)**
18:6;56:8;102:14
**recent (4)**
19:17,18;30:9;49:15
**Recess (4)**
45:4;79:14;115:17;
135:2
**recipient (1)**
95:18
**recommendations (1)**
119:9
**recommended (2)**
87:5;134:7
**recommending (1)**
105:19
**reconcile (2)**
107:2;137:18
**reconciliation (11)**
41:11,22;42:2,10,14,
17,19;52:11,18;
106:24;135:22
**reconciling (2)**
42:2,5
**record (16)**
5:14;25:10;29:9;
32:3;45:7;55:10;74:23;
79:17;91:12;95:1;
101:23;105:11;111:1;
120:5,8;123:22
**records (3)**
17:20;136:16,17
**recounted (1)**
75:5
**rectify (1)**
135:19
**Redding (1)**
22:3
**refer (2)**
30:6;67:12
**reference (7)**
30:19;42:15;57:23;
70:4;81:3;117:9;137:6
**referenced (5)**
61:1;71:9;123:18;
126:2;136:7
**references (6)**
25:2,18;79:7;96:12;
103:10;124:3

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 51 of 55

Melinda and Mark Loe, et al vs.    Christopher Mathews    CHRISTOPHER MATHEWS
Willie Jett, et al    1-31-24    January 31, 2024

**referencing (7)**
30:25;31:5,6;75:19;
76:3;103:12;126:6
**referred (3)**
43:20;68:21;102:15
**referring (3)**
21:1;31:1;139:6
**refers (1)**
69:15
**reflect (3)**
39:4;75:22;76:17
**reflecting (1)**
93:18
**regard (4)**
53:17;54:8,9;104:22
**regarding (8)**
54:15;55:24;92:21;
110:15;111:17;122:22;
133:7;135:25
**regardless (1)**
42:7
**regimented (1)**
61:18
**register (1)**
129:22
**registrar (4)**
8:18;14:20;128:15,
24
**registrar's (1)**
116:4
**reimbursed (3)**
127:10;129:14;132:5
**reimbursement (9)**
122:8,13,15;131:12,
18,19,22;133:1,3
**reintegrate (1)**
89:22
**reiterate (1)**
129:5
**relate (1)**
88:1
**related (1)**
85:19
**relations (2)**
9:21;48:18
**relationship (10)**
42:6,23,24;43:4;
59:3,8,10;60:16,19;
98:19
**relationships (3)**
63:19;64:1;107:3
**relatively (1)**
49:14
**relevant (2)**
12:12;18:6
**religion (1)**
54:15
**religious (8)**
28:2,7;46:8;108:12;
118:22;124:20;135:9,
12
**remaining (1)**
117:7

**remember (4)**
12:11;109:20;
121:17;124:17
**removal (1)**
107:9
**remove (1)**
107:12
**removed (3)**
105:3,5,24
**removing (1)**
105:19
**repeated (1)**
106:9
**rephrase (1)**
73:7
**report (6)**
8:8,16;9:1;29:17;
54:23;55:16
**reported (3)**
55:8,11;109:22
**reporter (2)**
12:16;44:4
**reporting (1)**
8:12
**reports (3)**
8:1;9:5,6
**represent (8)**
19:18;23:6;24:13;
75:2;91:20;92:1;
114:25;124:22
**representation (1)**
92:12
**representative (3)**
45:25;94:17;95:17
**representatives (4)**
16:7;22:8;71:6,20
**represented (1)**
91:24
**request (2)**
53:16;87:9
**require (2)**
72:22;93:24
**required (35)**
27:11,13;28:1,7,8;
47:16;48:10;51:19;
53:8,12;67:22;69:4,8;
70:6;75:13;76:1,8,12;
77:4;78:1;79:6,9;
84:24;85:8;90:17;91:2;
110:10,11;113:9;
118:7;120:14,20;
123:18;131:15;134:9
**requirement (23)**
28:4;69:12,23;70:4;
77:8;81:13;82:15,16;
83:10,14,20,25;85:15;
107:10;108:24;109:2,
4;112:13,14,16,18;
114:11;124:15
**requirements (13)**
36:3;68:25;69:9;
70:7,8;113:10,15;
114:7,16,17;115:10;

**118:21;127:23**
**requires (2)**
87:4;107:16
**requiring (2)**
70:5;84:5
**researching (1)**
105:7
**reside (4)**
27:3,5,10,16
**residence (4)**
27:3,16;52:13;53:23
**residency (1)**
63:8
**resident (1)**
68:25
**residential (19)**
31:1,1;61:13;69:4,7;
70:6;74:6;81:21,24;
82:23,25;83:1,6,18,23;
84:8,12,23,25
**residing (2)**
28:6;69:22
**resolved (2)**
135:20;136:6
**resources (1)**
122:25
**respect (10)**
15:2;16:2;18:9;21:8;
35:22;84:23;91:15,17;
126:14;131:12
**respectively (1)**
106:7
**respond (2)**
38:5;41:10;52:9
**responded (6)**
88:9;104:5,15;
111:16;136:7,12
**responding (1)**
135:13
**response (8)**
44:3;63:2;80:22,23;
88:7,12;104:11;108:9
**responsibility (4)**
70:12;114:17;
127:19;128:25
**responsible (6)**
95:20;120:2;126:8,
24;129:24;130:11
**responsiveness (1)**
60:1
**restrictive (4)**
87:9,10;89:6,12
**restrooms (1)**
53:9
**result (1)**
87:22
**resumed (1)**
82:21
**retained (1)**
136:15
**revealed (1)**
39:13
**revenue (3)**

**132:15,17,19**
**review (22)**
18:23;19:3,11,12;
23:4;32:5;39:24;46:13,
15;64:17;74:25;111:6;
120:9;124:10;125:18,
23;126:13;127:2,7,12,
24;128:22
**Reviewed (4)**
14:11,12;32:6;
116:20
**reviewing (2)**
120:25;127:11
**Reviews (23)**
19:10;23:3;29:11;
32:2;36:14;39:25;
46:14;58:8;64:16;
67:11;74:21,24;80:6;
86:13;95:3;101:24;
105:12;111:5;113:22;
125:5;128:24;133:21;
138:16
**revived (1)**
117:17
**reword (1)**
89:14
**ridiculously (1)**
36:19
**right (54)**
7:22,23;10:22;13:12,
23;16:15;20:12;21:14;
23:1;24:9,18;33:20,25;
40:5;41:3;42:6,23,24;
43:3,4,18,18;50:4;
51:18;52:19;56:19;
62:25;68:15;70:10;
74:1;77:23;81:23;82:3,
7,12;88:5;89:19;99:9;
100:22;103:2,24;
111:9;112:24;113:19;
119:24;123:8,16;
127:22;128:12;130:3,
10,20;131:1,5
**right-hand (1)**
23:7
**rights (4)**
136:21;137:11;
139:2,7
**risk (3)**
97:11,13,14
**risked (1)**
96:18
**risking (1)**
96:13
**role (5)**
5:23;10:17;16:1;
95:10;99:7
**Ron (2)**
14:20;130:14
**room (2)**
20:8;27:11
**rooms (2)**
27:9;53:12

**root (1)**
73:9
**rough (1)**
13:24
**roughly (3)**
13:10;73:23;133:2
**routinely (1)**
26:13
**RTH (1)**
127:6
**rules (1)**
11:14

**S**

**same (28)**
11:16;19:20;23:13;
24:12;28:10;34:6,18;
37:16;38:11;40:16;
61:9,23;63:18;64:1,7;
84:11;94:9,12;98:19;
101:11;104:23;110:10,
16;119:22;123:4,9,11;
133:3
**SAS (10)**
30:1,5,7,10,19,25;
64:24;67:16;117:10;
118:20
**satisfactory (1)**
87:4
**satisfy (1)**
113:14
**saw (3)**
7:1;88:12;95:7
**saying (5)**
69:14;81:23;89:4;
102:21;122:13
**scenario (1)**
53:23
**schedules (1)**
116:21
**Scholars (1)**
117:19
**school (55)**
8:21,22;25:1,2,3,7,
11,14,17,20,23,24;
26:3,8,18,19,22;27:23;
29:15;30:6,8,13,14,17,
18,21,21;36:3,4;37:4;
69:5;70:15;71:7,13,16,
20;72:3,6;100:15;
110:6;113:9,13,14;
114:2,6,19,20;115:10,
23;117:1,2;123:14;
132:24;134:2,13
**schools (13)**
22:17;25:19;35:10;
70:24;71:1,9,10;91:24;
93:12,20,23;113:18;
126:21
**science (2)**
28:20;127:5
**sciences (5)**

30:8,13,18;33:5;69:6

**scope (7)**
14:5;21:16;22:21;
94:2;104:3;110:5,19

**Scott (1)**
86:18

**scripture (2)**
96:5,9

**seats (3)**
116:22;117:4,7

**Second (11)**
11:23;19:22;38:25;
62:15;69:3;87:2;88:5,
25;134:4;138:25;139:1

**secondary (1)**
26:3

**sectarian (2)**
128:2;136:1

**section (14)**
24:12,12,25;49:10;
50:2;68:14,17;69:3,7,
25;76:10;96:2;117:6,8

**sections (1)**
46:19

**seeing (6)**
59:9;76:2,16;77:13;
79:1;130:17

**seek (2)**
43:16;55:4

**seeking (2)**
41:17;69:19

**seem (1)**
30:23

**seems (6)**
19:16;31:5;72:16;
87:19;102:12;106:15

**self-referral (1)**
43:12

**seller (1)**
121:18

**semester (5)**
13:12;24:2;28:14;
62:2;116:23

**Seminary (1)**
22:4

**senator's (1)**
134:8

**send (2)**
7:11;71:2

**sending (2)**
71:20;106:9

**sends (3)**
75:10;120:9;131:16

**senior (2)**
9:13;36:4

**seniors (1)**
26:19

**sense (8)**
30:12;31:19;33:1;
49:25;61:9;82:6;
114:22;130:17

**sent (1)**
71:6

**sentence (8)**
38:25;45:9;49:21;
88:25;96:13;111:25;
139:1,9

**separate (6)**
59:20,21;87:10;89:6;
108:2;118:10

**separated (1)**
42:3

**service (6)**
33:10;43:10,12,17,
18;130:20

**services (3)**
28:2;103:13;130:9

**session (1)**
134:21

**sessions (3)**
15:5,7,8

**set (6)**
24:6;58:10,12;59:4;
97:19;120:21

**seven (1)**
10:7

**several (3)**
14:11;25:3;102:12

**sex (8)**
51:23;52:9,22;53:10,
14;63:19;64:1;98:19

**sexual (15)**
40:25;42:20,25;43:9,
21;45:13;48:18;54:11;
55:17;56:11,21;57:23;
101:1,9;102:16

**sexuality (4)**
49:11;50:6;51:20;
64:6

**sexually (6)**
40:3,10,14;48:15,17;
101:3

**SFP (4)**
67:13,22;69:20;70:9

**shake (1)**
12:17

**Shakes (1)**
129:16

**share (2)**
71:1;119:18

**shared (2)**
93:16;102:5

**Shawnee (1)**
6:8

**show (2)**
29:2;66:3

**showing (1)**
80:7

**sic (1)**
103:11

**sight (1)**
124:8

**sign (7)**
44:12;72:23;97:7;
100:19;111:21;128:13;
140:8

**signed (1)**
124:25

**significant (3)**
132:18,23,24

**signing (2)**
128:19;138:4

**simply (2)**
50:3;107:25

**Simpson (3)**
21:24,25;22:5

**simultaneously (2)**
61:24;62:1

**singing (1)**
6:25

**single (1)**
27:4

**sings (1)**
110:6

**sit (1)**
129:8

**situation (2)**
31:22;78:9

**situations (1)**
38:5

**six (2)**
8:16;57:16

**size (1)**
36:24

**skipped (1)**
78:13

**slide (1)**
33:3

**small (7)**
13:13;36:19;48:23,
24;57:11,17;64:11

**smiling (1)**
31:12

**social (1)**
109:9

**socioeconomic (1)**
57:20

**somehow (1)**
78:13

**someone (7)**
43:20;52:13;103:7;
105:23;111:17;116:13;
125:17

**sometimes (3)**
24:1;28:13;112:7

**somewhat (1)**
64:20

**son (1)**
110:6

**song (3)**
7:1,10,13

**sooner (1)**
132:1

**sophomores (1)**
26:22

**sorrow (1)**
104:17

**sorry (21)**
22:3;44:6;49:8;

50:14;57:4,16;58:15,
19;67:15;76:2;77:10;
81:22;85:25;94:7;
102:9;107:24;109:14,
16,18;122:12;131:9

**sort (1)**
25:11

**sorts (1)**
61:7

**SOS (2)**
30:7,11

**Sota (3)**
21:23,23,25

**sounds (2)**
130:24;132:25

**source (1)**
120:18

**South (1)**
6:16

**Southwest (5)**
7:19;25:20;26:6,7;
71:15

**speak (13)**
14:14;17:16;45:20,
23;71:18;72:12;73:19;
86:4;94:8;109:14;
112:21;118:16;119:11

**speaking (4)**
16:4,6;118:24;
135:15

**spearheaded (2)**
133:10,12

**specific (6)**
20:18;35:14;52:3;
72:18;119:16;122:24

**Specifically (15)**
14:24;17:2;35:16;
43:10;45:9;57:19;
69:21;72:4,5;98:25;
103:17,19;126:24;
127:15,16

**specifics (1)**
121:16

**speculate (1)**
134:14

**speculation (1)**
103:4

**spell (1)**
56:14

**spelling (1)**
5:18

**spend (2)**
6:25;41:16

**spiritual (2)**
67:14;70:1

**spoke (3)**
14:11;58:9;132:5

**spoken (1)**
75:15

**spouse (1)**
95:23

**spreading (1)**
99:16

**Springfield (1)**
7:20

**St (9)**
13:5,7,13,15,17,18;
100:16,24;101:8

**staff (13)**
10:1,20;32:23;67:5;
97:17;103:15;113:2,4,
13,13;114:2;115:24,24

**standard (1)**
76:21

**standards (5)**
37:8;96:6;97:20;
119:17;122:21

**Start (3)**
39:21;66:19;84:5

**started (4)**
24:19;82:4,13;
117:14

**starts (2)**
24:2;49:3

**state (16)**
5:14;7:19,19;12:9;
34:8;76:20,21;122:7,
14,16;124:17;129:15;
131:12;132:9;137:16,
20

**stated (1)**
66:9

**statement (51)**
21:6,12;34:22;37:5,
9,16,18,23;39:17,18;
40:3,4;42:12;43:6;
44:13,15;47:24;53:1;
54:22;72:20,23;81:13;
82:24;83:14,21;84:1,
15;89:17;90:17,22;
93:24;96:10,20,23;
97:8;100:4,20;101:15;
107:5,10;108:2,13,16;
111:22;113:6;126:4;
128:20;129:11;138:1;
139:17,21

**statements (3)**
21:4,12;128:8

**States (3)**
20:24;21:21;111:19

**status (2)**
57:20;74:14

**Statute (1)**
5:2

**steps (3)**
34:9;107:8;108:10

**sticker (1)**
23:1

**still (5)**
68:5;72:25;73:10;
109:24;111:11

**stop (1)**
101:19

**Straka (2)**
14:20;17:25;18:1;
130:14

CASE 0:23-cv-01527-NEB-JFD    Doc. 97-7    Filed 09/04/24    Page 53 of 55

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Christopher Mathews
1-31-24
CHRISTOPHER MATHEWS
January 31, 2024

**strategic (4)**
32:17;35:3;66:21;
96:24
**stream (3)**
132:15,17,19
**strive (1)**
97:3
**striving (1)**
34:16
**struck (1)**
19:15
**structure (3)**
8:20;30:9,22
**struggling (1)**
43:3
**student (81)**
8:17;10:4;14:16,24;
40:13,24;41:2,8,17,18,
23;42:18,19;44:10,12;
46:2,6,24,25;47:7,11,
21;50:15,18,22;52:7,
12,14,14;53:16;54:1,3,
4;55:2,5,9,12;56:8;
57:8;58:16,23,24;60:3,
6,12,17;63:9;64:24;
65:7,16,17,20;66:11;
67:16,18;69:6,9,15,15;
72:19;78:6,10,25;
100:8,15,16,23;101:7,
14,14,16;104:17;
106:10;109:6;118:19;
123:2;129:22;131:16;
135:11,14;136:3
**students (183)**
7:1,8;13:10,10;
14:25;15:5,9;16:20;
17:19;23:24;24:8,13;
25:8,14;26:14;27:1,3,
10,16,23;28:3,6,23;
29:23;31:6,18,20;
32:19;33:14;35:16;
37:22;41:4;43:8,11,14,
19;44:7;45:12,16;47:8,
13,15;48:9;51:18;53:8;
54:5,21;55:8,11,15;
58:18,19,22,25;59:8,
12,14,24;60:22;61:4;
62:18,21,25;63:17,18,
24;64:2;65:2,10,15,18,
21;66:10,12,13,14,23;
67:6,19,21;69:4,7,11,
16,17,19,22;70:1,2,6;
71:2;72:6,9,15,17,22,
24;73:10;74:16;75:12,
22,23,23,24,25;76:11,
24;77:8;79:4,6;81:3;
82:13,16,20,22,23;
83:3,9;84:5,9,12,14,23;
85:7;87:11;91:3;96:18;
97:1,4,17,22;98:1,7,13,
18;102:20;103:14,17,
22;106:8;107:5;
108:24;110:8,9,10,15,

17;111:21;112:9,23;
114:12,15;116:13,15;
117:1,2,8,21;118:6,9,
12,15;119:23;120:3;
121:4,20,21;122:5,17;
124:6;127:1,8;129:13;
130:1;132:3,5;135:8;
137:19;138:2;139:3,8,
14,15
**students' (2)**
65:25;99:10
**student's (5)**
74:6,10,14;80:23;
114:16
**studies (6)**
8:21,23;22:14;29:16;
30:7;123:25
**study (1)**
67:4
**stumbling (1)**
133:12
**subject (2)**
49:22;84:11
**subjected (1)**
84:13
**submit (2)**
53:24;129:25
**submits (1)**
131:17
**submitted (3)**
56:1;80:12;89:25
**submitting (1)**
128:8
**substantial (1)**
132:19
**Subway (1)**
13:18
**succeed (1)**
99:12
**success (2)**
8:18;99:10
**suffering (1)**
14:1
**suggest (1)**
139:10
**suggesting (1)**
105:19
**suggestion (3)**
106:2,4,14
**summarizing (1)**
39:8
**sunscreen (1)**
67:13
**suppose (4)**
20:7;101:18;116:18;
137:13
**Sure (76)**
5:15;6:2,4;7:17,23;
8:21;9:10;11:22,22;
12:5,15,23;13:12;
14:11,15;16:18;19:7,
25;24:10,23;25:14,19;
27:17;28:25;29:4,13;

30:6;31:4,17;34:16;
35:8;37:3;40:7,21,24;
41:25;43:1,23;46:14;
48:22;50:17;56:6,8;
62:4;67:8;68:13;69:25;
70:22;75:20;78:20;
79:19;81:22;82:19;
89:15;91:14;93:1;
95:14;101:7;102:11,
13;103:5;115:16;
116:22;117:13;120:13;
126:16;127:2,8;
129:19;132:2,25;
133:13;135:14;136:9;
137:3;138:16
**surprised (3)**
7:6;31:12,15
**Swift (3)**
10:5;14:15,23
**sworn (1)**
5:6
**syllabi (17)**
61:9;120:2,3,4,25;
122:23;123:1;124:3,6;
125:10,18;126:14;
127:12,13,20,24;
136:14
**syllabus (6)**
124:10;125:23;
127:13,14,25;128:4
**synthesize (1)**
38:5
**system (1)**
61:21

**T**

**talk (12)**
11:18;12:13;30:10;
39:18;42:13;52:15;
84:16;115:25;122:14;
125:2,6;130:6
**talking (4)**
83:18;115:22;
119:25;124:24
**talks (1)**
42:16
**tangible (2)**
121:18,25
**target (5)**
33:3,5,8,11;72:4
**targeting (1)**
134:6
**taught (7)**
26:2,3;38:9,17,18;
116:2;129:9
**taxes (2)**
40:23,23
**Taylor (1)**
115:20
**teach (7)**
6:14;61:23;111:14;
114:10;124:20;126:16,

17
**teacher (2)**
26:7,8
**teaching (4)**
26:8;42:11;81:19;
126:22
**team (3)**
9:13;50:18;125:17
**telling (1)**
69:10
**template (8)**
120:6,7,8,12;122:20;
123:9,10,11
**ten (3)**
45:1;79:11,13
**tend (3)**
72:10,14;121:19
**tenets (1)**
129:7
**Tennessee (1)**
6:13
**tenure (2)**
35:20;62:13
**term (12)**
9:8,10;10:23;15:14;
20:25;21:1;30:15;
41:25;42:4,14;43:24;
78:22
**terminal (1)**
6:22
**terminology (2)**
10:22;16:3
**terms (14)**
9:6;20:17;28:9;
30:17;32:13;60:9;61:5,
15;82:8;84:9;88:2;
110:1;118:21;123:1
**Testament (1)**
111:14
**testified (5)**
5:7;11:3;82:4;84:24;
89:15
**testify (1)**
20:1
**testimonial (3)**
77:4,8;109:12
**testimony (3)**
11:12;70:8;76:14
**textbook (2)**
121:10;125:19
**textbooks (10)**
120:18;121:13,22,
24,25;122:4,8,9,10;
125:12
**texts (1)**
121:2
**T-H-E (2)**
127:6;129:20
**theological (1)**
21:12
**theology (4)**
21:5;111:12;127:6;
129:21

**therapy (2)**
43:24;44:2
**thinking (4)**
29:20;32:17;60:20;
128:12
**third (4)**
12:1;45:9;48:7;
96:12
**THOMSON (64)**
14:4;20:10;21:15;
22:20;29:9;32:3;36:11,
13;42:21;48:20;49:1;
51:11,16;63:20;66:3,7;
68:5;73:14;74:22;80:5;
87:24;91:9,16,23;92:6,
9,11;93:15;94:1,4,12;
95:1;97:12;98:9,21,24;
99:2;101:2,4,11,22;
103:3;104:2,7,23;
105:10;107:15;109:17,
19;110:4,18;111:1,4;
114:23;115:3;122:11;
131:6;132:20,22;
135:1;136:23;137:1;
138:13;140:8
**though (3)**
53:5;85:24;89:9
**threaten (1)**
98:20
**three (14)**
10:12;11:9;21:22;
33:18;57:16;58:3,15;
75:9;79:20,20;124:18;
126:2,5;128:5
**threw (1)**
61:25
**Thursday (1)**
10:11
**tied (1)**
39:12
**timeframe (1)**
28:5
**timeline (1)**
82:2
**times (4)**
12:6;67:3;103:13,18
**timing (1)**
88:2
**TIMMERMAN (42)**
5:9,12,19;20:13,15;
22:23;36:12;44:19,23;
45:3,6;48:22,24;49:2;
51:13,17;66:5;68:6;
79:11,16;86:8,11;
91:10,19;92:2,7,10,14;
99:3;115:5,7,12,16,21;
131:8,11;133:19;
134:24;135:4;138:6;
139:22;140:5
**tiny (2)**
68:1,5
**title (8)**
40:5;56:3,12,17;

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

80:18;104:21;109:20;
111:11
**today (11)**
11:16;12:16;14:10;
16:17;18:21;20:1;
31:24;45:19;129:8;
133:24;140:6
**today's (1)**
55:20
**together (5)**
32:22;41:14;59:17;
97:18;131:3
**Tom (1)**
94:18
**ton (1)**
108:22
**tools (1)**
33:22
**top (2)**
66:5;88:5
**topic (1)**
94:21
**topics (1)**
20:2
**touches (1)**
35:7
**tourism (1)**
14:1
**towards (1)**
106:7
**Tozer (1)**
22:4
**track (3)**
17:20;18:15;35:20
**tracked (1)**
62:13
**traditional (5)**
110:9,14;119:22;
121:13;123:5
**train (1)**
99:4
**training (1)**
35:4
**transcript (2)**
113:17;114:9
**transgender (2)**
55:12;97:25
**transparent (1)**
96:21
**treat (1)**
99:23
**trick (2)**
12:1;19:4
**tried (1)**
81:16
**true (5)**
7:2;20:13;39:10;
100:18;137:21
**Truelogic (3)**
78:22;80:19,20
**trustees (4)**
8:2,4;49:23;50:20
**trustees' (1)**

10:14
**try (20)**
7:9;11:17,20,20;
12:9;20:10;33:15;
44:24;60:25;66:20,24;
67:12;72:13;79:3;
81:17;96:24;107:2;
114:13,18;117:5
**trying (5)**
8:14;12:1;16:18;
17:4;19:4
**tuition (6)**
18:11,16,17;122:19;
132:10,23
**turn (12)**
32:10;33:2,17;37:24;
38:20;39:21;45:8;
65:24;68:16,24;77:14;
134:4
**twice (1)**
67:3
**two (12)**
5:19,24;17:13;33:18,
21;35:24;51:4;57:16;
61:7;75:9,16;79:20
**type (7)**
41:21;44:1;59:17;
60:1;61:12;77:4;114:1
**types (2)**
61:16,19
**typical (1)**
50:15
**typically (10)**
10:13,19;31:9;61:18;
71:24;72:9,10;73:25;
119:13;128:15

**U**

**ultimate (2)**
108:15;127:19
**ultimately (5)**
50:20;53:25;114:15;
116:18;118:2
**umbrella (1)**
8:10
**um-uhm (11)**
12:17;23:23;29:11;
35:21;57:22;65:9;
77:22;87:1;92:6;
117:11;126:3
**unable (1)**
45:10
**unaware (1)**
94:5
**under (13)**
24:25,25;32:10;33:4;
37:9,24;39:1;51:15;
57:3;68:10;69:25;
127:20;129:1
**undergraduate (7)**
7:15;13:10;18:17;
30:14,16;119:23;131:2

**understands (1)**
86:6
**understood (2)**
7:7;129:6
**undertake (1)**
44:1
**unenrolled (1)**
46:3
**unfamiliar (1)**
23:17
**Union (3)**
6:12,19;7:17
**unique (1)**
76:23
**United (1)**
20:24
**University (13)**
6:6,12,16,23;7:17,
20;9:9;21:24;22:1,5;
91:21;96:1;132:16
**University's (2)**
137:9,10
**unless (1)**
18:13;100:25
**up (17)**
20:17;21:4;46:18;
76:10;78:7,23;80:21;
92:18;108:7;116:18;
117:7;118:5;119:3,10;
123:2;126:11;134:25
**upfront (1)**
99:9
**upheld (3)**
72:21;73:12,18
**upon (2)**
15:6;125:23
**use (24)**
9:10;10:22;16:3;
42:14;53:9,12;57:13;
59:22;60:24;61:11;
65:12,13;72:5;76:22;
80:10,18;97:14,15;
98:5;120:18;121:1,16;
122:6,17
**used (11)**
18:14,14;42:1;57:10;
61:9;82:11;97:21;
121:14,18;123:1;124:1
**uses (1)**
42:5
**usually (9)**
15:14;24:6;25:10;
27:4,5;44:24;59:15;
109:5;120:5
**utilize (4)**
41:25;121:11;
122:18;124:18
**utilizing (2)**
120:5;126:18

**V**

**vague (6)**

42:21;63:20;97:12;
98:9;101:2;132:20
**various (1)**
78:23
**verbal (1)**
12:18
**verbiage (1)**
134:7
**versus (6)**
18:17;28:10;35:23;
36:3;62:6;133:4
**Vice (8)**
5:22;9:16,21;10:4;
14:15;50:18;53:25;
54:3
**video (3)**
108:23,24;109:1
**viewpoint (1)**
125:13
**views (1)**
32:21
**violate (3)**
102:18;107:17,19
**violated (1)**
128:2
**violating (1)**
54:21
**violation (1)**
54:24
**VIP (1)**
127:5
**virtue (1)**
124:9
**vision (3)**
32:11;37:4;64:22
**vocation (1)**
124:19
**voluntarily (3)**
46:3,7;62:22
**vote (1)**
119:5
**voting (1)**
16:6

**W**

**Waconia (5)**
13:15,16,19;25:20;
71:13
**walk (2)**
42:13;70:14
**wanes (1)**
24:2
**wants (3)**
27:8;72:4;100:24
**Watertown-Mayer (1)**
71:14
**waxes (1)**
24:2
**way (17)**
12:9;32:25;63:7;
64:7;70:16;77:12;
82:17;87:19,22;94:6,7,

10,11;99:8;112:16;
127:3;129:19
**Wayne (1)**
5:15
**website (10)**
14:13;36:16,21;
46:19;57:3,5;70:16,22,
23;115:1
**week (2)**
15:14;67:3
**weekly (1)**
10:11
**welcome (2)**
15:14;109:6
**what's (4)**
5:20;55:6;120:12;
130:18
**whenever (2)**
11:24;42:10
**when's (1)**
95:7
**whereby (1)**
138:2
**who's (7)**
26:7,8;27:20;42:19;
46:2;70:11,16
**whose (3)**
39:2;51:22;88:4
**windows (1)**
78:23
**Winter (1)**
14:1
**wise (1)**
106:15
**withdraw (1)**
62:22
**withdrawal (2)**
45:11;53:3
**withdrawn (3)**
45:13,16;46:6
**within (13)**
8:19;38:2,13;48:5;
51:1;66:15;109:21;
116:16;119:3;120:12;
126:8,21;129:10
**without (9)**
76:16;77:13;79:1;
96:13;100:9,17;101:9;
121:4;122:18
**witness (9)**
5:5;11:8,9;20:12;
48:23;109:18;131:10;
140:3,7
**woman (1)**
48:19
**women (1)**
99:22
**wondering (1)**
29:22
**wonky (1)**
134:5
**word (16)**
7:3;39:8,23;41:22;

Shaddix & Associates - Stenographic Court Reporters
(952)888-7687 - reporters@janetshaddix.com

**(17) today - word**

**CASE 0:23-cv-01527-NEB-JFD   Doc. 97-7   Filed 09/04/24   Page 55 of 55**

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Christopher Mathews
1-31-24

CHRISTOPHER MATHEWS
January 31, 2024

55:4;57:10,13;60:24;
61:25;65:13;72:5;
97:14,15;98:5;109:4;
133:12
**wording (2)**
63:5;77:5
**words (4)**
18:16;30:23;61:7;
99:15
**work (7)**
5:25;18:3;28:20;
50:17;53:19;59:12;
116:21
**worked (2)**
11:4;32:22
**working (1)**
17:10
**works (3)**
18:10;61:21;131:14
**world (3)**
37:13;39:4;99:17
**worldview (5)**
38:2,14,17,19;
125:14
**worsen (2)**
98:8,14
**worship (2)**
66:15;67:3
**wrap (1)**
134:25
**wrestle (2)**
41:5,5
**write (2)**
31:13,16
**writing (1)**
100:25
**written (2)**
7:10;119:16
**wrong (1)**
111:23
**wrote (2)**
7:1;102:22

## Y

**year (14)**
6:17;13:24;14:1;
17:13;24:7,8,9,11,24;
74:3;116:21;126:4;
128:10,11
**years (9)**
5:24;6:10;11:4;
24:23;30:21;88:22;
117:13,14;128:18
**yellow (1)**
23:1
**yep (2)**
13:9;134:19
**yesterday (1)**
139:25

## 1

**1 (3)**
18:20;19:8,10
**1,500 (1)**
13:12
**1:17 (1)**
115:18
**1:47 (1)**
135:2
**1:53 (1)**
135:3
**10 (2)**
68:3;74:5
**10:04 (1)**
45:4
**10:17 (1)**
45:5
**103 (1)**
138:6
**108 (1)**
138:7
**11 (4)**
33:2;74:19,21,24
**11:18 (1)**
79:14
**11:30 (1)**
79:15
**12 (8)**
80:3,6,7;82:10;
87:21;88:4,6;89:10
**12:24 (1)**
115:17
**120 (1)**
95:2
**122 (1)**
95:2
**13 (5)**
86:9,12,13;88:7,24
**14 (3)**
33:17;91:7;93:24
**15 (2)**
94:24;95:3
**16 (2)**
101:20,24
**1652 (1)**
111:2
**1653 (1)**
111:2
**17 (4)**
8:6,7;105:8,12
**1745 (1)**
125:2
**18 (3)**
110:24;111:4,5
**1886 (1)**
86:8
**1893 (1)**
80:5
**19 (3)**
113:20,22,23
**1916 (5)**
32:16,25;34:6;
137:15,21

## 2

**2 (4)**
22:24;23:3;38:1;
66:6
**2:01 (1)**
140:10
**20 (6)**
74:5;92:21;125:3,5,
6;126:1
**2002 (16)**
17:9,12;24:17;80:14,
15,24;81:2,20;82:6,10;
83:5,8;87:20;88:11;
89:21,25
**2003 (1)**
136:2
**2004 (1)**
6:18
**2008 (9)**
6:18;81:24;82:1;
83:2,5,6,8,8,17
**2009 (7)**
82:1;83:2,2,5,6,9,17
**2013 (16)**
82:21;83:1,2,6,17;
84:4,17,22;85:17,21;
89:18,22;90:6,13,15;
92:21
**2017-2018 (1)**
126:4
**2022 (1)**
86:21
**2028 (1)**
33:24
**2050 (1)**
74:23
**21 (3)**
8:7;13:17,21
**2158 (1)**
101:22
**2159 (1)**
101:23
**22 (3)**
87:22;138:8,16
**23 (1)**
29:10
**2355 (1)**
105:10
**2357 (1)**
105:11
**2498 (1)**
74:22
**2500 (1)**
74:23
**25th (1)**
19:16
**26.2 (1)**
26:12
**2966 (1)**
22:23

## 3

**3 (4)**
29:5,7,11;32:10
**3- (1)**
36:5
**3.25 (2)**
36:4,5
**3.5 (1)**
36:5
**3303 (1)**
133:19
**3304 (1)**
133:20
**34 (1)**
58:13

## 4

**4 (2)**
31:25;32:2
**46 (2)**
8:10,15
**4675 (2)**
36:11,13
**4682 (1)**
36:13
**4689 (1)**
32:4
**4707 (1)**
32:4
**486.10 (1)**
5:2

## 5

**5 (3)**
36:9,14;45:8

## 6

**6 (3)**
46:10,11,14
**60 (1)**
133:2
**68 (5)**
23:22;24:3,11;26:25;
73:24

## 7

**7 (4)**
58:6,8,9;68:17
**70 (4)**
24:1,6;73:24;133:2
**795 (1)**
91:9

## 8

**8 (7)**
64:14,16,18;65:1;

68:17,24,24
**83 (1)**
25:1
**89 (1)**
24:13

## 9

**9 (6)**
56:3,12,17;67:9,11;
104:21