Ex. 78

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MINNESOTA

3

4                    Case No. 0:23-cv-01527-NEB-JFD

5    _____

6    MELINDA and MARK LOE, et al.,

7         Plaintiffs,

8    v.

9    WILLIE JETT, et al.,

10        Defendants.

11   _____

12

13

14

15

16        DEPOSITION OF COMMISSIONER WILLIE JETT

17         Taken Wednesday, February 7, 2024

18           Scheduled for 9:00 a.m. CST

19

20

21

22

23

24   REPORTED BY:  DANA S. ANDERSON-LINNELL

25   Job No.:  PA 6425281

Page 2

1  DEPOSITION OF COMMISSIONER WILLIE JETT taken on
2  Wednesday, February 7, 2024, commencing at 9:04 a.m.
3  CST, at the offices of Lathrop GPM, 80 South Eighth
4  Street, 3100 IDS Center, Minneapolis, Minnesota,
5  before Dana S. Anderson-Linnell, a Stenographic
6  Shorthand Reporter and Notary Public of and for the
7  State of Minnesota.
8            ***************
9
10            APPEARANCES
11
12  On Behalf of the Plaintiffs:
13  Benjamin A. Fleshman, Esquire
14  Eric S. Baxter, Esquire
15  Diana Verm Thomson, Esquire
16  Andrea Butler, Esquire
17  THE BECKET FUND FOR RELIGIOUS LIBERTY
18  1919 Pennsylvania Avenue, N.W.
19  Washington, D.C. 20006
20  Email: bfleshman@becketlaw.org
21        ebaxter@becketlaw.org
22        dthomson@becketlaw.org
23        abutler@becktlaw.org
24
25  (Appearances continued on next page.)

Page 3

1  APPEARANCES (continued):
2
3  On Behalf of the Plaintiffs:
4  Richard C. Landon, Esquire
5  Lathrop GPM, LLP
6  80 South Eighth Street
7  3100 IDS Center
8  Minneapolis, MN 55402
9  Email:  richard.landon@lathropgpm.com
10
11  On Behalf of the Defendants:
12  Jeffrey Timmerman, Esquire
13  Madeleine DeMeules, Esquire
14  OFFICE OF THE MINNESOTA ATTORNEY GENERAL
15  445 Minnesota Street, Suite 1400
16  St. Paul, MN 55101
17  Email:  jeffrey.timmerman@ag.state.mn.us
18        madeleine.demeules@ag.state.mn.us
19
20  NOTE:  The original transcript will be filed with The
21  Becket Fund for Religious Liberty, pursuant to the
22  applicable Rules of Civil Procedure.
23
24
25

Page 4

1  INDEX                    PAGE
2
3  WITNESS:  WILLIE JETT
4  EXAMINATION BY:
5  Mr. Fleshman                  6
6
7  INSTRUCTIONS NOT TO ANSWER:  (None.)
8
9  PRODUCTION REQUESTS:  50
10
11  INDEX OF EXHIBITS:
12
13  Exhibit 1 - Postsecondary Enrollment
14  Options (PSEO) Reference Guide,
15  Bates MDE001535 to 1568           38
16
17  Exhibit 2 - Rigorous Course Taking:
18  Advance Placement, International Baccalaureate,
19  Concurrent Enrollment and Postsecondary
20  Options Programs, Bates MDE000451 to 522      57
21
22  Exhibit 3 - GoTranscript dated
23  March 8, 2023                  69
24
25

Page 5

1  INDEX OF EXHIBITS (continued):           PAGE
2
3  Exhibit 4 - Email dated 3/16/2023,
4  Bates LOE00001567 to 68            79
5
6  Exhibit 5 - Email dated March 9, 2023,
7  Bates MDE001716 to 1720            87
8
9  (Original exhibits attached to original transcript;
10  copies to counsel as requested.)
11
12  REPORTER'S NOTE:  All quotations from exhibits are
13  reflected in the manner in which they were read into
14  the record and do not necessarily indicate an exact
15  quote from the document.
16
17
18
19
20
21
22
23
24
25

1  WILLIE JETT,
2  called as a witness, being first duly sworn,
3  was examined and testified as follows:
4  EXAMINATION
5  BY MR. FLESHMAN:
6  Q.  Can you please state your full name for
7  the record?
8  A.  Willie Lee Jett, II.
9  Q.  Thank you.  And you understand that
10  today I'm here to ask you questions in the
11  context of the lawsuit Loe versus Jett, is that
12  right?
13  A.  Correct.
14  Q.  And you understand that the lawsuit is a
15  challenge to the 2023 amendment to the PSEO Act
16  that prohibits the use of PSEO funds at schools
17  that restrict admissions based on religion or
18  other protected characteristics, right?
19  A.  Yes.
20  Q.  Okay.  So when I refer to -- I may refer
21  to "the amendment" as we're talking in some of
22  these questions.  And when I refer to "the
23  amendment," that's what I'll be referring to,
24  is that 2023 amendment.
25  A.  Sure.

1  Q.  Is that all right?
2  A.  Yes.
3  Q.  Okay.  And you understand that today
4  you're answering under oath, correct?
5  A.  Yes.
6  Q.  Okay.  And as we're going, the reporter
7  is going to be taking everything down that we
8  say, and so you and I -- I sometimes speak a
9  little fast, but hopefully between the two of
10  us we can slow ourselves down a little bit so
11  that she can catch everything that we're
12  saying.  And last, that we try not to talk over
13  each other, so I'll try to let you finish your
14  answers before I ask any more questions, you
15  just let me finish my questions before you
16  start your answers.  Sound good?
17  A.  Yes.
18  Q.  Okay.  And try to make sure that we're
19  giving verbal answers, so yes or no instead of
20  uh-huh or uh-uh or nodding heads.  Those kinds
21  of things are hard to take down.
22  A.  Understood.
23  Q.  Thank you.  And, of course, if you don't
24  understand a question, just let me know.  I'll
25  try to rephrase it so that it's a little

1  clearer.
2  A.  Okay.
3  Q.  We'll try to take breaks every hour,
4  hour and a half, but if you need a break before
5  then, just let me know.  We'll find a stopping
6  spot so that you can take a break for whatever
7  you need.
8  Commissioner Jett, is there any reason
9  that you wouldn't be able to give full and
10  complete testimony today?
11  A.  No.
12  Q.  Have you ever been deposed before?
13  A.  No.
14  Q.  Have you ever testified in court before?
15  A.  No.  Yes.  As a principal, yes.
16  Q.  Okay.  As a principal?
17  A.  Yes.
18  Q.  Just the one time?
19  A.  Uh-huh.
20  Q.  What was the case about?
21  A.  Some students and an assault.
22  Q.  Okay.  And what was your -- you were
23  testifying as the principal --
24  A.  Yes.
25  Q.  -- in the case?  Were you testifying not

1  as a defendant but just as a witness in the
2  case?
3  A.  Yes.
4  Q.  Do you remember what the name of the
5  case was?
6  A.  No.
7  Q.  About how long ago was that?
8  A.  Eighteen, 19 years ago.
9  Q.  Okay.  Was that here in Minnesota or --
10  A.  Yes.
11  Q.  Have you ever been a plaintiff or a
12  defendant in a case before?
13  A.  No.
14  Q.  Do you keep a journal?
15  A.  No.
16  Q.  Do you maintain a calendar for work?
17  A.  Yes.
18  Q.  Do you keep a to-do list for some items
19  that you have to do on a regular basis?
20  A.  Yes.
21  Q.  Do you have a notebook where you take
22  notes of meetings?
23  A.  No.
24  Q.  Do you keep an electronic record of
25  notes on your computer?

1 A. Yes. It depends.
2 Q. It depends?
3 A. Uh-huh.
4 Q. What would it depend on, just the nature
5 of the meeting or...
6 A. What it has depended on in my recent
7 position was: Did I have technology?
8 Q. Oh, have you not always had access to
9 good technology in your recent position?
10 A. In the very beginning.
11 Q. Okay. Interesting. Since this lawsuit
12 was filed, have you looked in your records for
13 any documents that relate to the lawsuit?
14 A. Yes.
15 Q. What did you find?
16 A. Nothing.
17 Q. What did you do to look?
18 A. Looked in my Outlook calendar. So I do
19 have dates -- or the date.
20 Q. And by "dates," do you mean, like,
21 meeting arrangements on your computer or just,
22 like, entries on the calendar for --
23 A. The meeting date that I met with the
24 president of Crown College and Northwestern.
25 Q. Okay. Is it possible you have any

1 documents anywhere else, any drafts of anything
2 in your files anywhere?
3 A. No.
4 Q. Other than speaking with your
5 attorneys -- which I don't want to know
6 anything that you said with your attorneys.
7 Other than speaking with your attorneys, what
8 have you done to prepare for this deposition?
9 A. Looked at my calendar to see the date.
10 Q. Okay. Did you review any other
11 documents?
12 A. No.
13 Q. Did you meet with anybody besides your
14 attorneys?
15 A. No.
16 Q. Okay. Did you take any notes to kind of
17 refresh your memory and prepare for the
18 deposition?
19 A. No.
20 Q. Okay. And just to double-check, did you
21 speak with Adosh Unni regarding his deposition?
22 A. No.
23 Q. Okay. I'm going to get some background
24 information. Can you tell me, where were you
25 born, Commissioner Jett?

1 A. Minneapolis, Minnesota.
2 Q. Were you raised here in Minneapolis too?
3 A. Yes.
4 Q. Did you attend high school in
5 Minneapolis?
6 A. In the metro area, yes.
7 Q. In the metro area?
8 A. Uh-huh.
9 Q. Did you do PSEO when you were in high
10 school?
11 A. No.
12 Q. What is your religious background, if
13 any?
14 MR. TIMMERMAN: Objection,
15 relevance.
16 You can answer.
17 THE WITNESS: I'm Baptist.
18 BY MR. FLESHMAN:
19 Q. Do you participate in a religious
20 community now, in your Baptist community?
21 MR. TIMMERMAN: Same objection.
22 You can answer.
23 THE WITNESS: Can you clarify the
24 question?
25 BY MR. FLESHMAN:

1 Q. Do you attend a church or participate in
2 other --
3 A. Sporadically.
4 Q. Sporadically?
5 A. Uh-huh.
6 Q. Observe any religious holidays?
7 A. Yes.
8 Q. Which ones?
9 A. Christmas, Easter.
10 Q. Where did you attend college?
11 A. Freshman year, the United States Naval
12 Academy. After that, University of Illinois at
13 Chicago. So after undergrad degree, Ithaca
14 College in New York, and then University of
15 Pittsburgh for my master's degree, and then
16 licensure -- administrative licensure,
17 University of Minnesota.
18 Q. Okay. And what was your area of study
19 at the University of Illinois in Chicago?
20 A. Undergrad, physical education and
21 health.
22 Q. Okay. What year did you graduate?
23 A. '88, 1988.
24 Q. 1988. Okay. And what did you study at
25 Ithaca?

4 (Pages 10 - 13)

Page 14

1    A.    It was the beginning of my graduate
2  degree.  So my master's degree is in education.
3    Q.    Okay.  And so your master's degree from
4  University of Pittsburgh is in education?
5    A.    Correct.
6    Q.    Did you transfer partway through from
7  Ithaca to Pittsburgh?
8    A.    Yes.
9    Q.    Okay.  And so then you continued
10  studying education at Pittsburgh?
11    A.    Correct.
12    Q.    Okay.  Did you have any particular
13  emphasis in your education degree, early
14  education, high school?
15    A.    No.
16    Q.    Okay.  And what year did you graduate
17  from the University of Pittsburgh?
18    A.    1992.
19    Q.    Did you go directly from there to the
20  University of Minnesota for your licensure
21  program, or did you work in between?
22    A.    I was a teacher in between.
23    Q.    Okay.  Where were you teaching?
24    A.    Started out Champlin Park High School in
25  the Anoka-Hennepin District for five years,

Page 15

1  Park Center High School in the Osseo Schools
2  for two, Minneapolis North High School for two.
3         And what was your question in terms
4  of --
5    Q.    Just whether you had taught in between
6  or gone straight to your licensure program.
7    A.    Okay.  Those are the things I did before
8  I started the licensure program; teaching.
9    Q.    Okay.  And how long was the licensure
10  program at the University of Minnesota?
11    A.    Principal license was a year.
12    Q.    Okay.  Did you do an additional license
13  after the principal license?
14    A.    So my administrative licensure is
15  principal licensure, superintendent licensure.
16  Yes, those are the two.
17    Q.    Okay.  While you were teaching in the
18  various school districts here in Minnesota,
19  were you teaching in high schools or in
20  elementary and middle schools?
21    A.    High schools.
22    Q.    High schools.  Okay.  Did you have a lot
23  of students participate in the PSEO program?
24    A.    I'm not understanding the question.  So
25  if I'm teaching -- I'm asking a question.

Page 16

1    Q.    Yep.
2    A.    If I'm teaching health, not -- so within
3  the health class I'm teaching, that's not PSEO.
4  If I'm -- so as I'm teaching, no.  I'm not
5  having students in PSEO.  Are there students in
6  the building that are taking PSEO?  Yes.
7    Q.    Okay.  Yeah, thanks.  That's a good
8  clarification.  I suppose I meant:  Did you
9  have a lot of students that you taught that
10  then went to do PSEO that you knew of?
11    A.    I don't know.
12    Q.    Okay.  And after you obtained your
13  licensure, you finished your licensure program
14  at the University of Minnesota, what did you do
15  then for work?
16    A.    I became an assistant principal at Park
17  Center High School for five years, then I was
18  principal, lead principal at Hopkins High
19  School for five years, then I was the assistant
20  superintendent in St. Paul for two years, then
21  I was the superintendent in St. Cloud for nine
22  years, then I taught at the University of
23  Minnesota in the leadership program for the
24  fall semester, and then I became a commissioner
25  last year in January.

Page 17

1    Q.    Okay.  And while you were teaching at
2  the University of Minnesota, you said you
3  taught in the leadership program?
4    A.    Correct.
5    Q.    Was that a program for graduate students
6  or undergraduate students?
7    A.    Graduate students.
8    Q.    Okay.  So it would not have been open to
9  any PSEO students then?
10    A.    Correct.
11    Q.    Okay.  And during your years before
12  becoming the commissioner, did you ever do any
13  work with Education Minnesota?
14    A.    Teacher's union?  You said Education
15  Minnesota.  So that's the teacher's union.
16    Q.    Yes.  Yeah.
17    A.    Okay.  As a superintendent, there's the
18  union within St. Cloud.
19    Q.    Uh-huh.
20    A.    And so I believe they're Ed Minnesota.
21  As the assistant superintendent in St. Paul, I
22  sat in on negotiations, but I was just a --
23  sitting there at the table like this
24  (indicating), not really talking.  And then Ed
25  Minnesota -- when you're a principal or

5 (Pages 14 - 17)

Page 18

1 assistant principal, the teacher's union within
2 the buildings is usually Ed Minnesota with -- I
3 can't think of the other one. Maybe 15 to
4 20 percent of teachers are in the other union,
5 but that's it.
6 Q. Okay. Thank you. And what is your
7 current position at the Minnesota Department of
8 Education?
9 A. Commissioner of education.
10 Q. How long have you been in that position?
11 A. A year and almost a month.
12 Q. So January of 2023 is when you started?
13 A. Correct.
14 Q. Do you directly report to anybody in
15 that position, or are you kind of the top --
16 A. Within the Department of Education I'm
17 supposedly -- and here use the word
18 "supposedly," the top, but who I directly
19 report to is the governor's office.
20 Q. How many people within the Department of
21 Education directly report to you?
22 A. Directly. So if there's approximately
23 400 people there -- I need to think about
24 sitting at the table of cabinet. I need to
25 look at the org chart. Three. I'm thinking

Page 19

1 about the org chart, three.
2 Q. Okay. And who are they?
3 A. American Indian Affairs, Melanie Franks
4 and Jane Harstad and then the deputy
5 commissioner, Stephanie Graff.
6 Q. Okay. You mentioned two people, Melanie
7 Franks, and then who was the second person?
8 A. Jane Harstad.
9 Q. Is she also with American Indian
10 Affairs?
11 A. Correct.
12 Q. And how did you get the position of
13 commissioner?
14 A. One more.
15 Q. Oh.
16 A. General counsel.
17 Q. General counsel. And who is the general
18 counsel?
19 A. Until recently, Eric Taubel. So that's
20 who it was. And then just hired -- her name
21 is -- and so just hired her. Maren. I don't
22 know Maren's last name.
23 Q. Okay. Thank you.
24 A. Uh-huh.
25 Q. How did you get the position of

Page 20

1 commissioner? Is it an appointed position?
2 A. Correct.
3 Q. Okay. Did you -- who appoints the
4 commissioner?
5 A. The governor.
6 Q. The governor. What's the process like
7 for appointment? Did you have to apply to
8 some -- to the governor's office or notify them
9 that you were interested, or did they kind of
10 reach out and pluck you from where you were?
11 A. You applied, you interviewed, you were
12 chosen -- or I was chosen.
13 Q. Uh-huh. Okay. And during the interview
14 process, did you meet specifically with the
15 governor, or did you meet with somebody else in
16 the governor's office?
17 A. The governor's leadership team.
18 Q. Okay. Do you remember who that was? I
19 know it's been a while.
20 A. It was a room of ten to 12 people.
21 Q. Okay. And the governor wasn't among
22 them or --
23 A. The governor was among them.
24 Q. Okay. Did you know the governor
25 personally before being appointed?

Page 21

1 A. No.
2 Q. I wouldn't expect everybody to know the
3 governor before they come in.
4      Did you personally know any state
5 representatives in the Minnesota House or
6 Senate before joining or before your
7 appointment?
8 A. As the former superintendent of
9 St. Cloud, Senator Aric Putnam, Bernie
10 Perryman. I don't think -- I think she is a
11 representative. I think that's it.
12 Q. Okay.
13 A. Oh, wait a minute. She's from Rocori, I
14 don't know her name, though. But those are the
15 three individuals, as the superintendent of
16 St. Cloud, that I had been in contact with or
17 had met before.
18 Q. Prior to your appointment, had you ever
19 done any work related to the PSEO program?
20      MR. TIMMERMAN: Objection, vague.
21      But you can answer.
22      THE WITNESS: As a principal at
23 Hopkins High School, there were -- so when you
24 say "work," okay, was aware that we had
25 students taking PSEO that generally was handled

6 (Pages 18 - 21)

Page 22

1    through the counseling office. So did I have
2    to do any work personally with that? No. As
3    an assistant principal, the exact same thing.
4    As the superintendent, did I have to do
5    anything personally with that? No. But there
6    were -- yeah, no.
7    BY MR. FLESHMAN:
8    Q.    Okay. And when you were going through
9    the appointment process and doing the
10   interviews, was there any discussion of
11   potential policies that the governor's office
12   was interested in that they wanted to get your
13   take on or anything like that?
14   A.    No.
15   Q.    And during the appointment process, did
16   you meet with any state representatives or just
17   the governor's cabinet?
18   A.    Just the governor's basically.
19   Q.    During the appointment process, did you
20   meet with anybody that was then working at MDE?
21   A.    No.
22   Q.    Did you ever meet with the previous
23   commissioner while you were going through the
24   appointment process?
25   A.    During the appointment process, no.

Page 23

1    Q.    After your appointment, did you meet
2    with the previous commissioner?
3    A.    So Heather Mueller, I have seen her
4    since I've been appointed, yes.
5    Q.    Okay. Did you meet with her to discuss,
6    like, a transition plan?
7    A.    No.
8    Q.    Okay. How many times have you seen her
9    since the transition?
10   A.    Once.
11   Q.    Once. When was that?
12   A.    The administrative assistant's
13   retirement party.
14   Q.    Given that it was a party, I probably
15   know the answer, but did you discuss anything
16   related to the Department of Education's
17   policies or initiatives?
18   A.    No.
19   Q.    Okay. What are your current duties as
20   the commissioner? It's a long list, I'm sure.
21   A.    Sounds like I'm in a class when little
22   kids ask me that. And I don't mean you're a
23   little kid, so no offense to that. Duties?
24   I'm in charge of pre-K to postgraduate age 22
25   education for the state of Minnesota,

Page 24

1    approximately 880,000 students, 350 districts
2    and charters for the education that happens --
3    in the teaching and learning that happens
4    within those buildings. Part of the
5    legislative process. So you report to the
6    capitol or you have legislative moments like
7    the session that's coming. My duties are to be
8    in charge of all 400 individuals within the
9    Department of Education to make sure that -- my
10   duties are to support education across the
11   state of Minnesota.
12   Q.    Okay. And you mentioned that you're
13   part of the legislative process, that --
14   A.    Uh-huh. Yes.
15   Q.    -- your responsibilities touch on that
16   legislative process?
17   A.    Yes.
18   Q.    Can you tell me a little bit more about
19   that? What do you do as part of the
20   legislative process?
21   A.    So you can meet with -- so there's
22   moments -- so a session is coming up. And so
23   there are moments in time where you're meeting
24   with the House and the Senate. Last year was
25   75 percent budget, you know, the budget process

Page 25

1    or the budget to support schools. And then the
2    other 25 percent is policy. There's moments
3    where you're meeting with the House, the
4    Senate, the chairs usually. And so I would
5    meet with the four chairs of the education
6    committees.
7    Q.    Okay. And who are the --
8    A.    The other piece to that, I'm also --
9    sovereign nation, so the 11 tribes. I have to
10   meet with them. They are different. They are
11   not necessarily part of the legislative
12   process. They are their own piece.
13   Q.    Okay. And so you take some of the
14   things that you learn from the tribes and
15   present it to the legislature?
16   A.    Correct.
17   Q.    Okay.
18   A.    And then things from the legislative
19   process I bring to the tribes.
20   Q.    Okay. Who are the four chairs of the
21   education committees?
22   A.    Chair Youakim, Cheryl Youakim, Chair
23   Laurie Pryor, Senator Steve Cwodzinksi and
24   Senator Mary Kunesh.
25   Q.    Okay. And what are the committees that

7 (Pages 22 - 25)

1    they respectively are in charge of?
2    A.    Policy is -- House policy is Laurie
3    Pryor.  And Youakim is finance.  And then
4    Cwodzinksi and Kunesh.  Kunesh is finance.
5    Cwodzinksi is policy.
6    Q.    Okay.  And so you usually meet with just
7    the chairs.  Do you ever meet with the
8    committees as a whole?
9    A.    Yes.
10   Q.    Okay.
11   A.    During the legislative session.
12   Q.    During the legislative session?
13   A.    Correct.
14   Q.    Okay.  And what do you usually discuss
15   during those meetings?
16   A.    During the chairs meetings or during the
17   legislative session meetings?
18   Q.    Start with the chairs, then we'll go to
19   the legislative session meetings.
20   A.    With the chairs it could be -- last year
21   it was budget.  So discussing the budget that
22   was proposed and the policies that were
23   proposed.  With the -- in front of committee --
24   Q.    Uh-huh.
25   A.    -- it would be presenting -- sorry.

1    Willie Jett, commissioner, into his team or my
2    team could be talking about budget, or we could
3    be talking about policy.
4    Q.    Do they ever -- do the chairs of these
5    committees ever request additional information
6    from you or from the Department of Education?
7    A.    They request it from the Department of
8    Education.  And I'm in charge of the Department
9    of Education, so yes.
10   Q.    Okay.  Are you usually aware of the
11   requests that come through from the various
12   chairs or other representatives?
13   A.    It will come through -- usually requests
14   will come through our government relations
15   team, and I will be cc'd on it, or I will be
16   privy to it.
17   Q.    Okay.  So most of the time you are at
18   least aware of it even if you're not directly
19   involved?
20   A.    Correct.
21   Q.    Okay.  Are you also responsible for
22   coordinating policy initiatives with the
23   governor's office?
24   A.    Can you repeat that question, please?
25   Q.    Yeah.  So you coordinate policy and

1    budget with the legislature.  Do you do a
2    similar thing with the governor's office?
3    A.    Yes.
4    Q.    Okay.  And what does that usually look
5    like?
6    A.    Governor's office -- government
7    relations will -- from the governor's office
8    will speak to our governor's -- or our
9    government relations team.  And so we'll be
10   sitting there and they -- that's how that --
11   the flow of it goes from government relations
12   to government relations, commissioner's
13   involved in that.
14   Q.    Okay.  And does the Department of
15   Education usually propose policies, or are
16   they -- is it the other way around?  Does the
17   governor's office come to the Department of
18   Education with policies that it wants to
19   consider?
20   A.    So last year as the new commissioner I
21   walked into it, it was done.  Okay?
22   Q.    That's nice.
23   A.    That's the way I'll phrase it.  Because
24   the session was coming within two to three
25   weeks.  And so how that happened at that time,

1    I just knew that that was worked out between
2    MDE and the governor's office, and then
3    legislative moment was happening.  This year
4    what I'm witnessing is we have some proposals
5    that happen in the fall, and then it goes to
6    the governor's office, and then they come back
7    to say yea or nay.  And then now we bring it to
8    the legislative session.
9    Q.    Okay.  What did those -- those
10   proposals, are they usually written proposals?
11   A.    Written such as on a computer or written
12   handwritten?  What do you mean by "written"?
13   Q.    Do you submit a written form, whether
14   it's typed or, I guess, handwritten, to the
15   governor's office?
16   A.    Yes.
17   Q.    Okay.  And is there some email traffic
18   around that that you're usually cc'd on?
19   A.    Our government relations team will --
20   after that happens, he will share --
21   Q.    Okay.
22   A.    -- so yes.
23   Q.    Okay.  So he'll share it with you after
24   the fact, but you're not usually on the emails
25   that go -- like, when they're transmitting the

Page 30

1  forms to the governor's office?
2  A.  I'm not sure.  I don't know.
3  Q.  Okay.  That's fine.  Does the governor's
4  office ever approach MDE with policy proposals
5  and say:  Can you work out the details of this
6  idea, or is it all kind of Department of
7  Education driven in your experience from this
8  year?
9  A.  My example will be SROs, okay, the law
10  enforcement in schools.
11  Q.  Uh-huh.
12  A.  And so we had a proposal -- a different
13  department within the enterprise had a
14  proposal.  The governor's office said:  Work
15  that out.  And so it went to law last year.
16  There was a big hubbub about it.  And then we
17  were given orders to work that out before this
18  next legislative session.  So if I'm
19  understanding your question correctly, the
20  answer is yes, the governor's office can tell
21  us to work things out, if I'm understanding
22  your question correctly.
23  Q.  Okay.  Thank you.  Within the Department
24  of Education, at least in your experience this
25  past year, where do the policy proposals

Page 31

1  typically come from?  Are they -- can anybody
2  in the Department of Education come up with a
3  policy proposal and send it up the chain, or
4  are there certain departments that are
5  responsible for that?
6  A.  So I would like to think that anybody
7  can have a thought --
8  Q.  Uh-huh.
9  A.  -- okay, but it has to come from their
10  particular department.  And so then when it
11  comes to their department, then that's run up
12  the chain of MDE to potentially a cabinet-level
13  type of discussion, and then from there it's
14  proposed to the governor's office.
15  Q.  Okay.  And --
16  A.  That's my understanding of how it
17  happens.
18  Q.  Okay.  And have you -- did you propose
19  any yourself this year or during this latest
20  session?
21  A.  So during the session that we're
22  discussing --
23  Q.  For this upcoming session.  Sorry.
24  A.  For this upcoming session, say that one
25  more time, did I propose anything?

Page 32

1  Q.  Yeah.  Did you have any personal --
2  A.  No.
3  Q.  Anything that you had come --
4  A.  No.
5  Q.  Okay.
6  A.  In the past -- well, I won't
7  [unintelligible] anything.  Okay.
8  Q.  So are you aware whether any previous
9  commissioners have made proposals on their own?
10  A.  I have no idea.
11  Q.  Okay.
12  A.  I do not know.
13  Q.  When a proposal comes up from any of the
14  departments that you're responsible for, do you
15  have an opportunity to look at and approve
16  it before it goes to the governor's office or
17  to the legislature?
18  A.  Do I have the opportunity to see it?
19  Q.  Uh-huh.
20  A.  Yes.
21  Q.  Okay.  Do you have to approve it before
22  it goes out?
23  A.  Anything that supposedly goes to the
24  governor's office would take my stamp of
25  approval, so yes.

Page 33

1  Q.  Are there some that you don't look at
2  before they go out, or do you typically look at
3  all of them?
4  A.  One of the assistant commissioners or
5  deputy commissioner within their department
6  could shut that down before it makes it to
7  cabinet-level discussion.
8  Q.  Uh-huh.
9  A.  So no, I don't see them all.
10  Q.  Uh-huh.  So when a proposal comes up
11  from a department, it goes to the cabinet for
12  approval, is that --
13  A.  If it comes up -- it starts within a
14  department, and then that assistant
15  commissioner or deputy commissioner or director
16  could bring it to the cabinet level to have a
17  discussion about it.  And then from cabinet, we
18  would decide yea or nay if we're going to bring
19  it to the governor's office.
20  Q.  Okay.  During this past year, so in the
21  year that you've been there, have you rejected
22  any policy proposals from the cabinet -- that
23  have come before the cabinet?
24  A.  Have I?  No.
25  Q.  Okay.  Has the cabinet rejected any?

9 (Pages 30 - 33)

1   A.   No.
2   Q.   Okay.  How familiar are you with the
3   PSEO program?
4   A.   Would you like to clarify that question
5   in terms of what do you mean by that?
6   Q.   Yeah.  So what -- before coming to the
7   Department of Education, did you have any
8   experience with the PSEO program?
9   A.   I had students who were taking PSEO as a
10  superintendent or as an assistant
11  superintendent or as a principal, yes.
12  Q.   Okay.  Did you have any family members
13  participating in the PSEO program?
14       MR. TIMMERMAN:  Objection,
15  relevance.
16       You can answer.
17       THE WITNESS:  I want to say no, but
18  I have to think about my daughter because she
19  may have done a summer school class, but I
20  don't know if that was -- so the answer is no.
21  BY MR. FLESHMAN:
22  Q.   Okay.
23  A.   I really have to think about my
24  daughter, but no.  No.
25  Q.   Okay.  And since joining the Department

1   of Education, as the commissioner, are you --
2   how involved are you with the PSEO program?
3   A.   Not very -- not involved very much at
4   all.
5   Q.   Okay.  What is the extent of your
6   involvement?
7   A.   Potentially within one of the
8   departments it might be a two-minute report out
9   at cabinet.  Do I remember that per se?  No.
10  But it would be something that would come up at
11  a cabinet-level-type discussion.
12  Q.   Okay.  Are you familiar with how the
13  program operates mechanically in terms of a
14  student going to the school and the school is
15  getting reimbursed and all the requirements
16  that go into that?
17  A.   Do I know all the requirements?  No.
18  Q.   Okay.
19  A.   When you say the mechanics of, do I know
20  all the inner workings?  No.  I know that
21  students have the opportunity to take course --
22  or college-level courses.  I know the State --
23  I know districts -- I believe districts can get
24  reimbursed -- well, that's not true when I
25  think about that out loud.  So do I know all

1   the mechanics?  No.
2   Q.   Okay.  Are you aware of the requirements
3   that institutions are under to participate in
4   the PSEO program, the requirements that are --
5   sorry, what the Department of Education
6   requires of institutions that want to
7   participate in the PSEO program?
8   A.   Specifically, no.
9   Q.   Okay.  Are you aware of any of the
10  requirements?
11  A.   Of institutions?
12  Q.   Of institutions.
13  A.   Not specifically, no.
14  Q.   Okay.  Do you know what kind of course
15  requirements there are for PSEO classes?
16  A.   Course requirements at the
17  institution --
18  Q.   Yes.
19  A.   -- or course requirements at high
20  school?  No.
21  Q.   Okay.  And are you -- do you know what
22  any of the requirements are for students to
23  participate in the PSEO program?
24  A.   At the institutions --
25  Q.   Yes.

1   A.   -- or from a high school perspective?
2   Q.   So for a high school student who wants
3   to go and take PSEO at a college, what would be
4   the -- do you know any of the requirements for
5   the student to be able to do that?
6   A.   So as a high school principal -- so most
7   of my experience is from a student -- from the
8   public school perspective.  So understanding
9   what is required of them at the college or at
10  the university, no, I do not know that piece.
11  I just remember, as a principal, basically the
12  student had to be in good standing at their
13  high school.  Usually -- once it goes to age
14  kind of requirement, usually didn't see a PSEO
15  student or a high school student doing that
16  until they were either a junior or a senior in
17  high school.  That's my understanding of it.
18  Q.   Okay.  What's your understanding of the
19  purposes of the PSEO program?
20  A.   From a student perspective, to earn
21  college credits while they're in high school.
22  Q.   Okay.  And is that also the main benefit
23  in your view of the PSEO program, that the
24  student can gain college credits while still in
25  high school?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 38

1   A.   Is that one of the benefits or is that
2   usually a benefit from a high school
3   perspective or a student or family's
4   perspective?  Yes.
5   Q.   All right.
6        (Exhibit Number 1 marked for
7   identification.)
8        MR. TIMMERMAN:  Take a moment to
9   review it.
10  BY MR. FLESHMAN:
11  Q.   Yeah.  Go ahead and take a minute to
12  review it and let me know when you're ready.
13  A.   (Views document.)  Okay.
14  Q.   Ready?
15  A.   Sure.
16  Q.   Okay.  Do you recognize this document?
17  A.   Do I recognize it?  Not necessarily, so
18  no.
19  Q.   Okay.  So what -- based on your review
20  of the document, what is it?
21  A.   It's just kind of what it says.  It's
22  the -- it just seems like the requirements --
23  it's the nuts and bolts of PSEO program for the
24  State of Minnesota.
25  Q.   Okay.  So if you -- so the Postsecondary

Page 39

1   Enrollment Options Reference Guide, let's turn
2   to the page -- down in the bottom right corner
3   you'll see page numbers.  Those are just --
4   they call them Bates numbers, but -- so if you
5   could turn to page MDE ending in 1550.  All
6   right.  And do you see at the very bottom of
7   the page at the very last two lines beginning
8   with, "A postsecondary institution..."?
9   A.   Yes.  You're talking about the very
10  last -- okay.  Yes.
11  Q.   Yes.  Would you please read those two
12  sentences in -- could you read those two
13  sentences for me?
14  A.   Out loud?
15  Q.   Yes, please.
16  A.   "A postsecondary institution must make a
17  request in writing to the commissioner of
18  education asking to be recognized as an
19  approved institution for participation in the
20  PSEO program.  Along with the request, the
21  institution must submit its mission statement,
22  PSEO course catalog (including course
23  descriptions), and any other information
24  required by the commissioner."
25  Q.   Thank you.  So this says that

Page 40

1   postsecondary institutions that want to
2   participate in the PSEO program need to send --
3   make a request in writing to you.  What -- do
4   you usually review those requests personally,
5   or do you have -- does somebody else within the
6   department review them?
7   A.   Somebody else in the department reviews
8   them.
9   Q.   Okay.  And it also says that they need
10  to submit their mission statement, their course
11  catalog and any other information required by
12  the commissioner.  Do you set those
13  requirements, or does somebody else within the
14  department usually set those?
15  A.   Somebody else.
16  Q.   Do you approve their requirements
17  when -- do you approve the list of requirements
18  before an institution is -- submits their
19  application?
20  A.   Do I personally?  I'm sure it has my
21  stamp.
22  Q.   Do you know what other information is
23  generally required from an institution when
24  they're applying?
25  A.   No.

Page 41

1   Q.   Do you know how the department comes up
2   with this list of information that's required
3   from applicants?
4   A.   No.
5   Q.   Do you know if any of the required
6   information is required by statute --
7   A.   No.
8   Q.   -- or by any Department of Education
9   regulations?
10  A.   No.
11  Q.   Do you know if the list of required
12  information varies depending on who the
13  applicant is, or if it's a standard set of
14  information for everybody?
15  A.   Do I personally know that?  No.
16  Q.   Okay.  Do you know whether institutions
17  are asked to submit their admissions policies
18  or standards as part of their application?
19  A.   No.
20  Q.   Okay.  Down the page on 1551 just after
21  the set of bullet point lists there's a bold
22  sentence starting with, "Postsecondary
23  institutions determine..."
24       Do you see that?
25  A.   Yes.

11 (Pages 38 - 41)

1    Q.   All right.  Can you read that out loud
2  for us, please?
3    A.   "School districts do not make this
4  determination.  The postsecondary institution
5  also determines the eligibility of a PSEO
6  student to continue in the program if his/her
7  grades fall below a certain threshold."
8    Q.   I apologize.  I meant could you read the
9  bold sentence that starts that paragraph, being
10  "Postsecondary institutions determine..."
11    A.   "Postsecondary institutions determine
12  admissions standards to participate in specific
13  PSEO programs and courses."
14    Q.   Thank you.  To your knowledge, is an
15  institution's eligibility to participate in the
16  PSEO program based on their admissions
17  criteria?
18    A.   I do not know.
19    Q.   Prior to your appointment, were you
20  aware of any efforts to change the law to
21  prevent postsecondary institutions from
22  requiring statements of faith as part of their
23  PSEO admissions process?
24    A.   No.
25    Q.   Okay.  Prior to your appointment, did

1  you think that there was a need for such an
2  amendment to the law?  In other words, did you
3  think that schools should be prevented from
4  having admissions criteria that required
5  students to sign a statement of faith?
6    A.   Did I think that?
7    Q.   Right.
8    A.   That's a personal-type question, so I
9  have no idea.  That would be my response.  I
10  have no idea.
11    Q.   When did you first become aware of the
12  amendment?
13    A.   Sometime during 2023 legislative
14  session.
15    Q.   How did you become aware of it?
16    A.   I'm sure that we were proposing it at
17  a -- during the legislative session at, like, a
18  hearing.
19    Q.   Did you speak with anybody at the
20  Department of Education before that hearing to
21  kind of learn about what was included in the
22  bill?
23    A.   I would have spoke to Adosh Unni or
24  government relations -- the government
25  relations team.

1    Q.   Okay.  And do you recall what you would
2  have spoken about?
3    A.   They would have given me some talking
4  points as I'm getting ready to speak in front
5  of the House or the Senate.  So it could have
6  just been strictly what the talking points were
7  for that particular presentation.
8    Q.   Would they have given you any deeper
9  information or more -- any broader information
10  than just the talking points or just
11  information to go and present?
12    A.   Information for me to go and present for
13  me to digest what it was.
14    Q.   What was your opinion of the amendment
15  when you first learned of it?
16    A.   I understood it.  I agreed with it.
17    Q.   You agreed with it?
18    A.   Yes.
19    Q.   Did it raise any concerns in your mind?
20    A.   No.
21    Q.   And why did you agree with it?
22    A.   It was about -- for me, it's about
23  access and opportunity for all.
24    Q.   And what do you mean by that?
25    A.   My understanding -- in other words, not

1  trying to create a barrier for someone to
2  participate in the program or to go or attend a
3  specific institution.
4    Q.   Okay.
5    A.   This was removing barriers.
6    Q.   Removing barriers.  Okay.  And which
7  barriers was it intended to remove?
8    A.   My understanding, a student's -- I'll
9  give you an example.  A student that wants to
10  attend Bethel, Crown College, whomever, for
11  them -- in other words, if I'm of a different
12  faith, and I want to go to a specific
13  institution, that I do not have to give up my
14  beliefs to attend that institution as a high
15  school student.  It's different if I choose to
16  attend that college postsecondary.  But as a
17  high school student, about removing barriers
18  and obstacles.
19    Q.   And why would it be different for a
20  postsecondary student rather than a high school
21  student?
22    A.   A high school graduate can choose where
23  they want to -- hopefully, they can choose
24  where they want to attend for their
25  postsecondary education.  A high school

1    student, potentially there's barriers, such as
2    transportation. There's some other things.
3    And so a lot of times a high school student is
4    going to choose for PSEO a place that is close
5    or accessible.
6    Q.    Makes sense. Okay. And so in your mind
7    the requirement that students sign a faith
8    statement was a barrier to these students
9    attending institutions of their choice?
10   A.    My understanding was if it was online,
11   there was no barrier. But if all of a sudden I
12   had to -- if I wanted to attend that university
13   or that institution, be -- physically step foot
14   on their campus, then that for me is a barrier,
15   my understanding was a barrier.
16   Q.    Okay. Were there any other barriers
17   that you were aware of that the amendment would
18   have addressed?
19   A.    No.
20   Q.    So you were not aware of any other
21   schools rejecting students based on any
22   protected characteristics like race, sex or
23   disability?
24   A.    I don't know. So I would say no.
25   Q.    Were you personally aware of any

1    students who had actually been prevented from
2    attending a school because of this faith
3    statement requirement?
4    A.    And so your question was me personally.
5    No.
6    Q.    After your appointment, did you become
7    aware of any?
8    A.    Me personally, no.
9    Q.    Have you heard about any students since
10   you've been at the Department of Education?
11   A.    Me personally, no.
12   Q.    And since your appointment, have you
13   heard of any postsecondary institutions
14   rejecting students based on any kind of
15   protected characteristics, such as race, sexual
16   orientation, disability?
17   A.    Me personally, no.
18   Q.    And did you believe that the amendment
19   was necessary to accomplish the goals of the
20   PSEO program to allow students to -- I believe
21   you said the goals before were to allow
22   students to access those postsecondary credits
23   while still in high school. Did you believe
24   that the amendment was necessary to accomplish
25   that purpose?

1    A.    Yes.
2    Q.    Why?
3    A.    As stated earlier, it removes barriers,
4    it provides opportunity, access and
5    opportunity.
6    Q.    Are you aware that the Minnesota Human
7    Rights Act already prohibits discrimination on
8    the basis of protected characteristics?
9         MR. TIMMERMAN: Objection to the
10   extent it calls for a legal conclusion.
11        You can answer if you know.
12        THE WITNESS: I do not know.
13   BY MR. FLESHMAN:
14   Q.    Did you consider during the legislative
15   process whether the Minnesota Human Rights Act
16   would be a viable solution to the problem that
17   you identified, the barriers that you
18   identified?
19   A.    Did I consider that? No.
20   Q.    Did you ever discuss whether that would
21   be a viable solution with anybody within the
22   Department of Education?
23   A.    No.
24   Q.    With the governor's office?
25   A.    No.

1    Q.    Anybody in the legislature?
2    A.    No.
3         MR. FLESHMAN: We're coming up on an
4    hour. Would you like to take a break?
5         THE WITNESS: I'm fine.
6         MR. BAXTER: Let's take a break.
7         MR. FLESHMAN: Okay. Take a break.
8         (Off the record 9:57 to 10:14.)
9    BY MR. FLESHMAN:
10   Q.    Back on the record. Before we broke, I
11   noticed that you were referring to your tablet
12   a lot while you're talking. Are you looking at
13   something on your tablet in particular?
14   A.    Looking at my -- Crown College,
15   Northwestern, so the answer is yes.
16   Q.    Okay. And what are you looking at?
17   A.    It's just my things for this. So, like,
18   when I looked up the email -- or the date of
19   the meeting, that's not the email, the date of
20   the meeting, I just typed in so I wouldn't
21   forget the dates and the who, Dr. Denton from
22   Crown College and Dr. Hoornbeek from
23   Northwestern. And then who else is on there,
24   the address to this building, what time I'm
25   supposed to be there.

1    Q.    Okay.  Did you give your calendar
2    information in the email that you referenced to
3    your counsel to produce?
4    A.    The calendar email?
5    Q.    The calendar entry that you were looking
6    at.
7    A.    It's not a calendar email.  It's on a
8    note.
9    Q.    Okay.  Did you give that note to your
10   counsel to produce?
11   A.    To my counsel to produce?
12   Q.    (Indicating.)
13   A.    No.
14   Q.    Okay.
15   A.    I'm not sure what you mean by that.
16   Q.    That's all right.
17   A.    Okay.
18         MR. FLESHMAN:  We'd like to request
19   that.
20   BY MR. FLESHMAN:
21   Q.    Before we broke, we were discussing some
22   of the barriers that students may face to
23   participating in the PSEO program.
24   A.    Okay.
25   Q.    And you had mentioned that the only

1    barrier you were aware of was this faith
2    statement requirement?
3    A.    Uh-huh.
4    Q.    Okay.  So would you consider a GPA
5    requirement to be a barrier to entry, students
6    who can't meet that GPA can't get into that
7    school?
8    A.    To meet their high school GPA or to be
9    in good standing?
10   Q.    Yeah.  So a high school student with a
11   GPA below a certain threshold wouldn't meet the
12   requirements of the postsecondary institution,
13   would that be a barrier to entry?
14   A.    Potentially.
15   Q.    What do you mean by "potentially"?
16   A.    So what I mean by that -- so GPA,
17   usually a GPA in high school is -- it's a --
18   not necessarily a standard, but it's an
19   indicator of if you are going to be successful
20   or be able to handle the college course or the
21   level or the rigor of a college course.  So do
22   I see that as a barrier?  No.  If they are
23   handling what they're doing at high school and
24   they're ready for that next piece, that's just
25   one of barriers -- not barriers, that's just

1    one of the indicators that they're going to be
2    able to be successful doing that concurrent
3    enrollment.
4    Q.    Okay.  So if a school -- so let's say
5    the University of Minnesota had a minimum GPA
6    to participate in the PSEO program, must be at
7    3.5 or whatever it is, and any student who
8    doesn't meet that threshold cannot participate
9    in the PSEO program at this university, is that
10   a barrier to that student participating in the
11   PSEO program at that school?
12   A.    So I need to clarify my earlier answer.
13   Q.    Uh-huh.
14   A.    My understanding was your high school
15   GPA.
16   Q.    Correct.
17   A.    And so my understanding -- what I was
18   saying was you're speaking with your high
19   school counselors and they're looking at your
20   GPA.  I was not referring to it's the
21   university or the institution, the higher -- or
22   the postsecondary institution's requirement.
23   That's not what I was referring to.
24   Q.    Uh-huh.
25   A.    I was strictly talking about, as a high

1    school student, what your high school
2    recommendation from your counselors there are.
3    So I was not talking about the University of
4    Minnesota or some other institution's GPA.
5    Q.    Uh-huh.  Okay.  Now -- so back to my
6    question then about the university with the
7    minimum GPA requirement --
8    A.    Okay.
9    Q.    -- says a high school student must have
10   a high school GPA of 3.5 --
11   A.    Okay.
12   Q.    -- is that a barrier to entry for that
13   student?
14   A.    Potentially.
15   Q.    Now what do you mean by "potentially"?
16   A.    I don't know the -- my answer would
17   be -- or how I would respond to that is I'm
18   applying to -- I've graduated, and I have a
19   3.45 GPA, and I want to attend the University
20   of Minnesota, but their requirements say I need
21   a 3.5, yes, that is now a barrier.  And so to
22   answer your question, then yes, that would be a
23   barrier.
24   Q.    Okay.  Is MDE concerned about barriers
25   like that for PSEO students participating in

14 (Pages 50 - 53)

Page 54

1    schools -- does MDE have any concerns about
2    schools imposing a minimum GPA requirement as a
3    barrier to PSEO students attending at their
4    school?
5    A.    I do not know.
6    Q.    Okay.  Have you ever heard anybody
7    within the Department discuss whether that
8    would be a problem?
9    A.    GPA?  No.
10   Q.    Okay.  So the only barrier that you're
11   aware of that the Department was trying to
12   address is this faith statement requirement, is
13   that correct?
14   A.    Correct.
15   Q.    Okay.  So earlier I believe you said
16   that if a school offered online PSEO that
17   didn't have this barrier, then that would be an
18   okay solution, is that correct?
19         MR. TIMMERMAN:  Objection,
20   mischaracterizes prior testimony.
21         You can answer.
22         THE WITNESS:  My understanding is
23   that if I was going to be online -- I'm a
24   student.  If I am going to attend a college,
25   university that's online, that the faith

Page 55

1    statement or -- the terminology I'm not going
2    to use correctly, that there's no -- that I can
3    still attend a particular university or
4    college.
5    BY MR. FLESHMAN:
6    Q.    Uh-huh.
7    A.    But if I'm in person, stepping foot on
8    the campus, then I need to fill something
9    out -- now I need to fill out the statement and
10   now there's -- now that creates a barrier in
11   terms of if I'm a -- yeah, it just creates a
12   barrier because now my faith is involved in
13   that, so yes.  So to me, there was a
14   discrepancy -- not a discrepancy, but a
15   difference between if I am going to be an
16   online student versus being an in-person
17   student.
18   Q.    Are you aware of how many schools in
19   Minnesota have a faith statement requirement?
20   A.    No.
21   Q.    Do you know if anybody at the Department
22   of Education is aware of that information?
23   A.    I'm sure someone is, but I don't know.
24   Q.    Do you know who that would be?
25   A.    No.

Page 56

1    Q.    Did anybody ever mention any schools to
2    you that have that requirement?
3    A.    Crown College, Northwestern is the two
4    when I was going to this meeting that I was
5    aware of.
6    Q.    Uh-huh.
7    A.    I knew -- so the answer is no, other
8    than that's what I've honed in on since this
9    moment in time.
10   Q.    Okay.  Has the Department ever looked at
11   any other schools to determine whether they
12   have a -- since -- sorry, not ever, but
13   since -- sorry.  Has the Department ever looked
14   at other schools to determine whether they have
15   a faith statement requirement as part of their
16   PSEO admissions?
17   A.    I don't know.
18   Q.    Do you know who would know that?
19   A.    They're always telling me not to assume,
20   but I would say our government relations team.
21   Q.    Okay.  Do they usually look into -- why
22   would they know that information?
23   A.    Government relations, if we're getting
24   ready to impose a policy --
25   Q.    Uh-huh.

Page 57

1    A.    -- somebody on the legislative -- as
2    we're doing the hearings or whatever, somebody
3    is going to ask that question, the impact.
4    Q.    Okay.  Are you aware of what the -- do
5    you know if the government relations team did
6    look at the impact of this --
7    A.    I do not know.
8    Q.    Okay.  Did they ever discuss it with you
9    after your appointment --
10   A.    No.
11   Q.    -- what the potential impact was going
12   to be?
13   A.    No.
14   Q.    Okay.  Did they discuss the goals that
15   the amendment was supposed to serve?
16   A.    The goals of the amendment, yes.
17   Q.    Okay.  And what did they tell you?
18   A.    Talking about access and opportunity,
19   removing barriers.
20   Q.    Okay.  I'm going to give you another
21   document to look at.
22         MR. FLESHMAN:  We'll mark this one
23   as Exhibit 2.
24         (Exhibit Number 2 marked for
25   identification.)

15 (Pages 54 - 57)

1    BY MR. FLESHMAN:
2    Q.    Go ahead and take a look at the
3    document.  Take as much time as you need to
4    review it.
5    A.    (Views document.)  Okay.
6    Q.    Do you recognize this document?
7    A.    No.
8    Q.    What is the document?
9    A.    The document -- the title of it is
10   Rigorous Course Taking:  Advanced Placement,
11   International Baccalaureate, Concurrent
12   Enrollment and Postsecondary Options Programs.
13   Q.    Thank you.  And the document notes that
14   it is a, "Report to the Legislature as required
15   by Minnesota 2022 Statutes, Section 120B.13,"
16   is that correct?  On the front cover.
17   A.    Correct.
18   Q.    Would you normally review a statutorily
19   mandated report before it went to the
20   legislature?
21   A.    Me personally?
22   Q.    Uh-huh.
23   A.    No.
24   Q.    Would the cabinet review it?
25   A.    Someone would.

1    Q.    Who would review it?
2    A.    Depending on -- so this one, when you
3    read the first part, it says Career and College
4    Success Division on the inside cover.  I'm
5    looking at the number that you have where it
6    says MDE and the last three digits are 452.
7    Q.    Okay.  So your understanding is that the
8    head of the Career and College Success Division
9    would review this before it goes to the
10   legislature?
11   A.    They would review it and then bring it
12   to their assistant commissioner and then
13   potentially that could come to a cabinet-level
14   moment potentially and then from there.
15   Q.    Okay.  Who is the assistant commissioner
16   that's responsible for the Career and College
17   Success Division?
18   A.    Dr. Angela Mansfield.
19   Q.    Angela Mansfield.
20   A.    Uh-huh.
21   Q.    And under what circumstances would a
22   report like this come to the cabinet?
23   A.    If we asked to see it or to review it,
24   if I asked to see it or review it.
25   Q.    Are you usually aware of when these

1    reports are being generated?
2    A.    No.
3    Q.    Okay.  So under what circumstances would
4    you ask to see a report like this?
5    A.    If somebody requested that I review it
6    or see it, or if the assistant commissioner
7    brought it to my attention.
8    Q.    Uh-huh.  Why would he bring it to your
9    attention, or she?
10   A.    Why would she?
11   Q.    Yeah.
12   A.    If there was a concern, if they knew
13   that I needed to have my eyes on it and to get
14   my opinion.
15   Q.    Is it fair to say that this report
16   reflects the Department's views on the programs
17   that are discussed in the report?
18   A.    Yes.
19   Q.    Let's turn to the page ending in 455.
20   Do you see the first paragraph on the page
21   beginning with, "The Minnesota Legislature..."?
22   A.    Yes.
23   Q.    Okay.  Could you please read that for
24   the record?
25   A.    "The Minnesota Legislature has long

1    supported the Advanced Placement (AP),
2    International Baccalaureate (IB), Postsecondary
3    Enrollment Options (PSEO) and concurrent
4    enrollment programs with legislation to expand
5    participation and specific appropriations to
6    support schools, teachers and students.  These
7    programs offer pathways to Minnesota students,
8    provide opportunities and preparation for the
9    world beyond high school.  And gives students
10   the opportunity to earn college credit while in
11   high school.  This report provides analysis of
12   data trends from 2019 to 2021 and highlights
13   student participation data and fiscal
14   expenditures from 2020 to 2021 school year."
15   Q.    Thank you.  So does this also reflect
16   your understanding of the Department's goals in
17   offering the PSEO program?  Where it says,
18   "These programs offer pathways to Minnesota
19   students, provide opportunities and preparation
20   for the world beyond high school and gives
21   students the opportunity to earn college credit
22   while in high school."
23   A.    So your question is?
24   Q.    Yeah.  Does that reflect your
25   understanding of the Department's goals in

1  offering the PSEO program?
2  A.   Yes.
3  Q.   Let's turn to the next page, 456.  Would
4  you please read that first paragraph beginning
5  with, "Challenging rigorous learning
6  opportunities..."?
7  A.   "Challenging rigorous learning
8  opportunities are essential in preparing
9  students for success in postsecondary
10  institutions and ensuring career and college
11  readiness.  Minnesota's rigorous course
12  programs include advanced placement,
13  International Baccalaureate, Postsecondary
14  Enrollment Options and concurrent enrollment.
15  These programs allow high school students the
16  opportunity to take rigorous college-level
17  courses and the potential to earn college
18  credit while in high school.  Research shows
19  that participation in rigorous courses,
20  specifically dual enrollment, leads to better
21  outcomes in high school as well as college
22  enrollment and persistence."
23  Q.   Thank you.  Is it fair to say that the
24  PSEO program has positive impacts for high
25  school students that participate in the

1  program?
2       MR. TIMMERMAN:  Objection, calls for
3  speculation.
4       You can answer.
5       THE WITNESS:  I do not know.
6  BY MR. FLESHMAN:
7  Q.   Okay.  Well, it says here, "Research
8  shows that participation in rigorous courses,
9  specifically dual enrollment, leads to better
10  outcomes in high school as well as college
11  enrollment and persistence."  Is it the
12  Department's view that the PSEO program, which
13  offers dual enrollment, leads to these better
14  outcomes for high school students?
15       MR. TIMMERMAN:  I'm just going to
16  object on the grounds that he's not here as a
17  30(b)(6) witness.
18       You can testify in your individual
19  capacity as to your personal understanding.
20       THE WITNESS:  My personal
21  understanding based on reading that would be
22  yes.
23  BY MR. FLESHMAN:
24  Q.   Thank you.  And is that because it
25  prepares students for success in postsecondary

1  institutions?
2  A.   Potentially, yes.
3  Q.   What do you mean "potentially"?
4  A.   For some students it's best or it's
5  better for.  I'm not going to speculate for
6  all.
7  Q.   Understood.  Is another one of these
8  benefits that it allows students to earn
9  college credit while in high school?
10  A.   Yes.
11  Q.   And as the report says, that it leads to
12  better high school and college outcomes,
13  correct?
14  A.   Yes.
15  Q.   So is it fair to say that the Department
16  of Education wants to encourage as many
17  students -- in your understanding of what the
18  Department's goals are, that the Department
19  wants to encourage as many students as possible
20  to participate in these dual enrollment
21  programs?
22  A.   I believe the Department of Education's
23  goal is to encourage students who want to
24  pursue this -- because I heard you say "as many
25  students."

1  Q.   Uh-huh.
2  A.   But for students who want to pursue
3  this, the answer would be yes.
4  Q.   Okay.  And to reduce barriers for those
5  students that do want to?
6  A.   Yes.
7  Q.   And one way to encourage or enable
8  students who want to participate would be to
9  ensure that as many postsecondary institutions
10  as possible can participate in the PSEO
11  program, correct?
12  A.   Correct.
13  Q.   But not every postsecondary institution
14  can open all their classes to students,
15  right --
16       MR. TIMMERMAN:  Objection --
17  BY MR. FLESHMAN:
18  Q.   -- based on limitations of -- sorry.
19       MR. TIMMERMAN:  Sorry.  I should
20  have let you finish your question.  Go ahead
21  and finish.
22  BY MR. FLESHMAN:
23  Q.   Based on limitations in the classroom or
24  other factors?
25       MR. TIMMERMAN:  Objection, calls for

Page 66

1   speculation.
2          You can answer.
3          THE WITNESS:  I do not know.
4   BY MR. FLESHMAN:
5   Q.    So it would be in -- in your view, would
6   it be in the Department's best interest
7   encouraging students to -- for the purposes of
8   encouraging students to participate who want to
9   participate, would it be in the Department's
10  best interest to allow as many institutions as
11  possible to participate in the PSEO program?
12  A.    Make sure I understand the question.
13  Can you repeat that one more time, please?
14  Q.    Yeah.  It would be in the Department's
15  interest to have as many eligible institutions
16  as possible for the PSEO program so that as
17  many students who want to participate can
18  participate, is that correct?
19  A.    Yes.
20  Q.    Did you ever publicly advocate in favor
21  of the amendment at issue in this case?
22  A.    I'm sure I -- so the answer is yes,
23  because I did a talking points moment to the
24  legislature.
25  Q.    Okay.  How many times did you do a

Page 67

1   talking points moment to the legislature?
2   A.    This is policy.  I don't know exactly.
3   But I'm going to say twice, one for the House
4   policy and one for the Senate policy.  So I
5   would say twice.  That's my guess to that.
6   Q.    Okay.  Would that have been before the
7   committees, or with just the chairs and -- of
8   those --
9   A.    Committees.
10  Q.    -- with the committees and
11  [unintelligible] committees?
12  A.    Correct.
13  Q.    Do you remember when that occurred?
14  A.    No.  During the legislative session.
15  Q.    Okay.  Do you recall what you said?
16  A.    Nope.  No.
17  Q.    Did you ever advocate for the amendment
18  within the Department of Education?
19  A.    Within the Department of Education,
20  like --
21  Q.    Uh-huh.
22  A.    -- in a meeting with only MDE folks?
23  Q.    Yeah.
24  A.    No.
25  Q.    Okay.  Did you ever speak with anybody

Page 68

1   within MDE regarding the amendment advocating
2   in kind of a more personal conversation with
3   anybody --
4   A.    No.
5   Q.    -- not in a meeting?  Okay.
6          Did you ever speak with the governor
7   regarding the amendment?
8   A.    No.
9   Q.    Did you speak with anybody from the
10  governor's office regarding the amendment?
11  A.    No.  Hold on.  Government relations team
12  person for the governor, her name would've been
13  Sidney Spreck.  And so if I'm walking into a
14  hearing with -- for the House or for the Senate
15  and our government relations team with Adosh
16  Unni and his team was there, Sidney would have
17  been sitting there.  So yep, she would have
18  been part of the conversation as we're walking
19  through a door.
20  Q.    Okay.  Do you recall any -- or -- so
21  this would have been just before the testimony?
22  A.    Correct.
23  Q.    Did she help you prepare for your
24  testimony in any way?
25  A.    No.

Page 69

1   Q.    Okay.  She was just present when you
2   were about to give the testimony?
3   A.    Yes.
4   Q.    Did she help with preparing the talking
5   points?
6   A.    No.
7   Q.    Did she ever say anything to you
8   personally about the amendment?
9   A.    No.
10  Q.    Did you overhear her speaking with Adosh
11  or any of the other government relations staff
12  about it?
13  A.    No.
14         (Exhibit Number 3 marked for
15  identification.)
16  BY MR. FLESHMAN:
17  Q.    This is just a printout, a transcript of
18  your remarks before the House education policy
19  committee on March 8th.  Go ahead and take a
20  minute to review and let me know when you're
21  ready.
22  A.    (Views document.)  Okay.
23  Q.    Do you recall testifying before the
24  House education policy committee last March?
25  A.    Yes.

18 (Pages 66 - 69)

Page 70

1    Q.    And you mentioned that your government
2    relations team had prepared some talking points
3    for you?
4    A.    Yes.
5    Q.    Were you reading from those talking
6    points here when you gave your testimony?
7    A.    Yes.
8    Q.    Okay. Were those typed up for you and
9    printed out?
10   A.    Yes.
11   Q.    Okay. Did you give those to the
12   attorney general's office to produce?
13   A.    I did not.
14   Q.    Okay. Do you know if they're still
15   saved someplace -- you have just a physical
16   copy, it was never emailed to you?
17   A.    I'm sure it was emailed to me.
18   Q.    Okay.
19   A.    So usually I would get that the morning
20   of or the night before.
21   Q.    Uh-huh. Okay.
22   A.    It would have came from government
23   relations office, Adosh Unni.
24   Q.    Okay.
25         MR. TIMMERMAN: Counsel, I'll just

Page 71

1    represent that those were produced yesterday.
2          MR. FLESHMAN: Thank you.
3          MR. TIMMERMAN: Yeah.
4    BY MR. FLESHMAN:
5    Q.    All right. So if you would turn to
6    page 3. These have just regular page numbers.
7    And the bottom of page 3 in the last paragraph,
8    the very last sentence that starts with, "There
9    are so many other provisions..."
10         Do you see that?
11   A.    Yes.
12   Q.    All right. Would you read that sentence
13   carrying over on to page 4?
14   A.    Sure. "There are so many other
15   provisions in this bill that allow for our
16   students to have a world-class education and to
17   succeed academically, like making sure that our
18   students pursue Postsecondary Enrollment
19   Options with the support of public education
20   funding."
21   Q.    Thank you. Do you recall saying this
22   during your testimony?
23   A.    Yes.
24   Q.    Is this referencing the proposed change
25   to the PSEO eligibility requirements?

Page 72

1    A.    Yes.
2    Q.    What do you mean by "making sure that
3    our students pursue Postsecondary Enrollment
4    Options"?
5    A.    That they have the ability to access --
6    for them to have an access opportunity so that
7    they can pursue what they want to do after high
8    school.
9    Q.    So your requirements are again
10   discussing opening up access to any institution
11   the student wants to attend?
12   A.    Yes, yes.
13   Q.    Was there a concern at that time that
14   there were not enough students enrolling in
15   PSEO?
16   A.    I do not know.
17   Q.    Have you learned about such a concern
18   since then?
19   A.    No.
20   Q.    Do you know if anybody at the Department
21   of Education expressed that concern internally?
22   A.    I do not know.
23   Q.    Do you know of anybody who would know
24   that?
25   A.    No.

Page 73

1    Q.    So what did you hope that the amendment
2    would accomplish?
3    A.    As I said before, to remove barriers,
4    obstacles, provide opportunities for all
5    students or as many students as possible.
6    Q.    So the hope was that the schools that
7    had faith statement requirements would get rid
8    of those requirements, is that correct?
9    A.    The hope was that they would remove
10   barriers, so yes.
11   Q.    Did you ever consider whether the
12   schools that had faith statement requirements
13   would simply stop offering PSEO as a result of
14   the amendment?
15   A.    In my conversation or discussion with
16   the two presidents, one of them said the
17   potential of that.
18   Q.    Uh-huh. Was that before or after you
19   testified before the committee?
20   A.    After.
21   Q.    Okay. If those institutions stopped
22   offering PSEO, would that have furthered the
23   goal of expanding access to students?
24   A.    No.
25   Q.    Because there would be fewer

19 (Pages 70 - 73)

Page 74

1   institutions offering PSEO?
2   A.   My example would be -- I don't know the
3   number.  But if there was ten, and one decided
4   not to do that, and there would be nine, the
5   answer would be yes, correct.
6   Q.   So your conversation with the schools
7   was the first time that you had ever heard that
8   there was potential for schools to just leave
9   the PSEO program behind?
10  A.   Correct.
11  Q.   Okay.  Do you know if anybody at the
12  Department of Education had ever considered
13  that alternative?
14  A.   I do not know.
15  Q.   Do you know if anybody at the governor's
16  office had considered that?
17  A.   I don't know.
18  Q.   Anybody at the legislature?
19  A.   I don't know.
20  Q.   Did anybody ever raise it with the
21  committees during the legislative process?
22  A.   I do not know.
23  Q.   If the schools stopped offering PSEO
24  because of the amendment, would you be in favor
25  of allowing them to reinstate their faith

Page 75

1   statement policies to restore access to the
2   PSEO programs?
3        MR. TIMMERMAN:  Objection, vague.
4        You can answer if you understand.
5        THE WITNESS:  I do not understand
6   the question.
7   BY MR. FLESHMAN:
8   Q.   Okay.  So let's say the schools that are
9   affected by this, schools that have the faith
10  statement requirement stop offering PSEO, that
11  reduces the number of institutions that offer
12  PSEO, correct?
13  A.   Yes.
14  Q.   Would you be in favor of allowing them
15  to resume under the old system where they could
16  have their faith statement requirements thereby
17  restoring additional providers of PSEO courses?
18       MR. TIMMERMAN:  Objection, calls for
19  a speculation.
20       You can answer.
21       THE WITNESS:  If I am understanding
22  your question correctly, so for them to go
23  against the amendment, the answer would be no.
24  BY MR. FLESHMAN:
25  Q.   And why not?

Page 76

1   A.   Because I believe that it is creating a
2   barrier for students.
3   Q.   More of a barrier than not having a PSEO
4   program at all?
5   A.   Yes.
6   Q.   How?
7   A.   Because what I believe is you are having
8   the student have to talk about their -- in
9   other words, they have to talk about their
10  faith to be accepted to the specific
11  institution.  I believe that that creates a
12  barrier.
13  Q.   More of a barrier than not having a PSEO
14  program at all, though?  If a student wants to
15  take a PSEO course at Northwestern currently,
16  they sign the statement of faith and they can
17  take the online campus class.  So that student
18  has access to the PSEO program.  If
19  Northwestern stops offering PSEO altogether,
20  even the student that's willing to sign the
21  statement of faith doesn't have access to that
22  program.  Isn't not having an institution
23  offering PSEO more of a barrier than a
24  statement of faith requirement?
25       MR. TIMMERMAN:  Objection, asked and

Page 77

1   answered, compound.
2        You can answer.
3        THE WITNESS:  I do not believe so.
4   BY MR. FLESHMAN:
5   Q.   So this is really just an objection to
6   the faith statement requirement then?  The
7   amendment is focused on this faith statement
8   issue?
9   A.   My understanding, yes.
10  Q.   Thank you.  Apart from your formal
11  testimony, did you ever speak with members of
12  the legislature regarding the amendment?
13  A.   No.
14  Q.   During the committee --
15  A.   Hold on one second.  Say your question
16  one more time.
17  Q.   Apart from your formal testimony when
18  you spoke before the committees, did you speak
19  with any members of the legislature regarding
20  the amendment?
21  A.   Jim Abeler.
22  Q.   Who is Jim Abeler?
23  A.   He is -- I can't recall if he's a --
24  it's Senator Abeler.  He's a senator.  He's on
25  one of the committees.  And he came to talk to

**20 (Pages 74 - 77)**

1  me about different things that the Department
2  of Education -- whether it was budget or
3  policy, he had a list of things that he wanted
4  to talk about. And I believe one of the things
5  that he talked about or wanted to discuss was
6  this.
7  Q.   Okay.
8  A.   As a matter of fact, he's the one that
9  asked me if he could put me in contact with the
10  presidents from those two particular colleges.
11  Q.   Okay. Do you recall when this
12  conversation took place?
13  A.   During the legislative session.
14  Q.   Okay. Was it before or after you
15  testified, do you recall?
16  A.   I'm going to assume after, but I don't
17  know.
18  Q.   Okay. Did you take any notes on that
19  meeting?
20  A.   No.
21  Q.   Was it a calendared meeting, or he just
22  showed up at your office or called you?
23  A.   He set an appointment.
24  Q.   And what did he tell you about the
25  amendment?

1  A.   Just that he had concerns, and that
2  colleges and universities had concerns, and
3  would meet with them to hear their concerns.
4  Q.   What concerns did he express?
5  A.   He didn't express. He didn't get
6  into -- I don't remember the specifics of what
7  he said. I just know he asked me to meet with
8  the presidents.
9  Q.   Okay. And he just said: We have some
10  concerns. Can you meet with the presidents?
11  That's all?
12  A.   That's my recollection.
13  Q.   Okay.
14       (Exhibit Number 4 marked for
15  identification.)
16  BY MR. FLESHMAN:
17  Q.   Go ahead and take your time to review
18  the document.
19  A.   (Views document.) Okay.
20  Q.   Thank you. Have you ever seen this
21  document before?
22  A.   No.
23  Q.   Based on your review of it, what does it
24  appear to be?
25  A.   I believe it's Senator Bakeberg, Ben

1  Bakeberg, and it looks like an email exchange
2  from him to Greg. Or maybe it's from Greg to
3  Ben. It looks like an exchange from Greg, who
4  is the vice president for strategy and chief of
5  staff at the University of Northwestern. And
6  it looks like Greg sent something to Senator
7  Bakeberg. And then I don't know who Kristin
8  is. But then it goes -- then there's a
9  response from Senator Bakeberg.
10  Q.   Thank you. Is Senator Bakeberg on any
11  of the education committees?
12  A.   I believe so.
13  Q.   Do you remember which one?
14  A.   No.
15  Q.   Just below the address to Kristin
16  there's a sentence that starts with, "I've got
17  a lot of thoughts." Would you mind reading
18  that, please?
19       MR. TIMMERMAN: I'm going to object
20  on foundation grounds to this exhibit.
21       But you can answer.
22       THE WITNESS: "I've got a lot of
23  thoughts on this and have ongoing conversations
24  with families, Crown, Northwestern, MDE staff
25  and the commissioner. Below are a few high

1  points."
2  BY MR. FLESHMAN:
3  Q.   Thank you. He says he's got ongoing
4  conversations with you. Do you recall having
5  any conversations with Representative Bakeberg
6  about the PSEO amendment?
7  A.   No, I do not remember.
8  Q.   Do you recall whether he ever sent you
9  any emails or left you any voice messages about
10  it?
11  A.   I do not remember.
12  Q.   Any communication with Representative
13  Bakeberg at all?
14  A.   I do not remember.
15  Q.   Do you know whether anybody within the
16  Department of Education was speaking with
17  Representative Bakeberg about this issue?
18  A.   Never want to assume, but I'm going to,
19  our government relations team.
20  Q.   Did they ever loop you into any of those
21  conversations or make you aware of them?
22  A.   No.
23  Q.   The fifth bullet point down starts with,
24  "I shared that many see this bill..."
25  A.   Yep.

Page 82

1    Q.   Do you see that?
2    A.   Correct.
3    Q.   All right.  Would you read that bullet
4    point for us, please?
5    A.   It's the fourth?
6    Q.   I guess.  Yeah.  There's an internal one
7    there.
8    A.   Okay.  "I shared that many see this bill
9    1269 as an attack on people of faith.
10   Commissioner Jett was surprised by that
11   comment.  The other MDE staff were
12   uncomfortable.  Below is my rationale."
13   Q.   Thank you.  Do you recall whether
14   Representative Bakeberg ever shared with you
15   that many people see this bill as an attack on
16   people of faith?
17   A.   No, I do not recall.
18   Q.   Did anybody in the legislature ever
19   express that to you?
20   A.   Not that I recall.
21   Q.   It says, "Commissioner Jett was
22   surprised by that comment."
23   A.   Uh-huh.
24   Q.   Did anybody ever -- outside of the
25   legislature, did anybody express to you that

Page 83

1    this bill was seen as an attack on people of
2    faith?
3    A.   No.
4    Q.   Would you have been surprised by that?
5    A.   That somebody would view it as an attack
6    on faith, no.
7    Q.   Why not?
8    A.   If I'm someone -- now you're asking me
9    to speculate or put myself in somebody else's
10   shoes.  And so in putting myself in the other
11   individual's shoes, if I am -- it's a viewpoint
12   that that person could potentially have.
13   Q.   Uh-huh.
14   A.   That's why.
15   Q.   Why do you think somebody would have
16   that viewpoint?
17   A.   I didn't say they would.  I said I could
18   understand them having that.
19   Q.   Why could you understand somebody having
20   that?  Why could they have that?
21   A.   Because we're talking about schools or
22   universities that have the faith-based
23   statement.
24   Q.   Are these exclusively religious-based
25   schools that are have a faith-based statement,

Page 84

1    to your knowledge?
2    A.   I think so.  I do not know.
3    Q.   Are you aware of any schools that have a
4    faith statement requirement that are not
5    religious?
6    A.   No.
7    Q.   Did anybody ever express to you that
8    this was -- that this bill was specifically
9    going after a particular set of schools, such
10   as Crown or Northwestern?
11   A.   No.
12   Q.   Are you aware of any other schools that
13   would have been affected by this amendment?
14   A.   No.
15   Q.   He also says, "The other MDE staff were
16   uncomfortable."  Do you know if anybody within
17   the Department of Education ever received a
18   comment like this saying that the bill was an
19   attack on people of faith?
20   A.   I do not know.
21   Q.   Did anybody ever mention anything like
22   that to you?
23   A.   No.
24   Q.   Down below there's a bullet point.  I'll
25   just read it.  It says, "Crown and Northwestern

Page 85

1    presidents have met with Commissioner Jett."
2        Do you see that bullet point?
3    A.   Yes.
4    Q.   Had you already met with presidents of
5    Crown, Northwestern by March 16th?
6    A.   I would have to look to see the date
7    that I met with them.
8    Q.   Understand.  When you met with them, did
9    they express concerns similar to what
10   Representative Bakeberg has laid out here in
11   his email?
12   A.   Can you repeat your question?
13   Q.   Did the schools express any concerns
14   that this bill was an attack on people of faith
15   or that it was targeting them specifically?
16   A.   Yes.
17   Q.   Were you surprised to hear them say
18   that?
19   A.   No.
20   Q.   Why not?
21   A.   Because they were the individuals -- or
22   the institutions that were being impacted by
23   this.
24   Q.   Did they mention any other institutions
25   that they thought would be impacted by it?

22 (Pages 82 - 85)

1   A.   No.  They talked about their schools,
2   that I remember.
3   Q.   Okay.  In the next bullet point, the
4   second sentence of that bullet point, it says
5   -- there's a sentence that begins with, "I
6   reminded them..."
7        Do you see that sentence?
8   A.   The "MDE is dug in on..." and the next
9   sentence after that?
10  Q.   Uh-huh.  Yes.
11  A.   Yes.
12  Q.   Would you read that sentence for us?
13  A.   "I reminded them these faith-based
14  institutions have the right to have a..." I
15  don't know how you pronounce that word,
16  s-t-a-m-e-n --
17  Q.   I think it's supposed to be "statement."
18  A.   Oh.  "...statement of faith, and they
19  will/may not offer on-site PSEO to anyone."
20  Q.   Did Representative Bakeberg ever remind
21  you of this?
22  A.   I answered that before.  I don't
23  remember a conversation with Representative
24  Bakeberg.
25  Q.   Do you know if he said that to anybody

1   within the Department of Education?
2   A.   I do not know.
3   Q.   Did anyone within the Department of
4   Education ever discuss this possibility with
5   you?
6   A.   No.
7   Q.   Did you hear it discussed in any of the
8   legislative sessions?
9   A.   Not that I remember.
10       (Exhibit Number 5 marked for
11  identification.)
12  BY MR. FLESHMAN:
13  Q.   Go ahead and take your time to review
14  the document.
15  A.   (Views document.)  Okay.
16  Q.   Have you ever seen this document before?
17  A.   No.
18  Q.   Based on your review of it, what does it
19  appear to be?
20       MR. TIMMERMAN:  Object on foundation
21  grounds.
22       You can answer.
23       THE WITNESS:  Looks like
24  conversation or email chain with MDE folks
25  talking about demographic breakdown of students

1   enrolled in PSEO.
2   BY MR. FLESHMAN:
3   Q.   All right.  And why are they discussing
4   that information?
5   A.   Because it looks like -- the subject at
6   the top of it says that there was a legislative
7   request.
8   Q.   Do you see -- if you turn to page 1720,
9   it's the last page of the document, it says
10  here, "Senator Kunesh is interested in getting
11  more information about the demographic
12  breakdowns of student populations currently
13  enrolled in Postsecondary Enrollment Options
14  (PSEO) programs at private postsecondary
15  institutions.  She would like info on
16  race/ethnicity religion and, if possible,
17  whether those students are fully online at PSEO
18  or in person/on campus."
19       Did I read that correctly?
20  A.   Yes.
21  Q.   So Senator Kunesh is the one requesting
22  this information, is that right?
23  A.   According to this document, yes.
24  Q.   In your experience, is it common for
25  legislators to request this kind of information

1   from the Department of Education?
2   A.   I've been on the job for a year.  So in
3   my year, yes.
4   Q.   What other kinds of requests have you
5   seen come through?
6   A.   Somebody could potentially have a
7   question about budget.  Someone might have a
8   budget question.  The impact on -- you know,
9   Senator Kunesh, impact on American Indian
10  education or some data.  They want some
11  analytics or some data with that.  So I'm sure
12  there's more than a few.
13  Q.   Okay.  Are you usually informed when a
14  sender makes a request like that?
15  A.   No.
16  Q.   Does it ever come to your attention?
17  A.   If somebody brings it up.  If government
18  relations team or -- yeah, because this is
19  Megan, so she's part of that.  Megan Arriola,
20  she's part of the government relations team.
21  Q.   So if you turn to page 7, MDE ending
22  1718 --
23  A.   Okay.
24  Q.   -- down near the bottom of the page, the
25  lower half, there's an email from Megan Arriola

23 (Pages 86 - 89)

1  on March 7th at 12:33 p.m.
2      Do you see that email?
3  A.    Say that one more time, please.
4  Q.    Down near the bottom, do you see that
5  message?
6  A.    Beginning with the word "Kat"?
7  Q.    Yes.  Can you read the sentence
8  beginning with, "The Senator's main
9  request..."?
10  A.    Yes.  "The Senator's main request is for
11  race/ethnicity of the student bodies of Crown
12  and Northwestern's programs specifically, but
13  also the numbers for private PSIs as a whole.
14  We are also okay with this data spanning a
15  biennium if that would alleviate some of the
16  data privacy concerns."
17  Q.    Thank you.  In your experience, is it
18  common for senators to request information
19  specifically about two institutions?
20  A.    I do not know.
21  Q.    Have you ever seen that happen?
22  A.    Here.  I'm looking at it.
23  Q.    Uh-huh.
24  A.    So, yes, I witnessed it here.
25  Q.    Other than this occasion?

1  A.    No.
2  Q.    Are you aware of it happening prior to
3  your time at the Department of Education?
4  A.    I have no idea, so no.
5  Q.    Were you aware that Senator Kunesh had
6  requested this information?
7  A.    No.
8  Q.    Let's turn to page 1717.  The bottom of
9  that page there's an email from Adosh Unni
10  beginning with, "Just an update on this."
11      Do you see that message?
12  A.    Yes.
13  Q.    Can you read the line beginning with,
14  "The commissioner would like..."?
15  A.    "The commissioner would like to see this
16  information first, so I am hoping we can
17  generate for him internally."
18  Q.    Thank you.  That's good.  Thank you.
19  Did you request to see this information before
20  it went to Senator Kunesh?
21  A.    Say that one more time, please.
22  Q.    Did you request to see this information
23  before it went to Senator Kunesh?
24  A.    I would have asked to let me see what
25  was going to Senator Kunesh so that I would be

1  aware.
2  Q.    Okay.  Do you recall how you first
3  became aware that she had requested this
4  information?
5  A.    I do not recall.  I'm going to make the
6  assumption government relations team.
7  Q.    Would they have elevated it to you?
8  A.    They would have brought it to my
9  awareness, yes.
10  Q.    Why would they would brought something
11  like this to your awareness?
12  A.    Because I'm the commissioner.  I was
13  new.  And so they were bringing me what I
14  perceived as pertinent information.
15  Q.    Why would it be pertinent information?
16  Pertinent to what?
17  A.    To this policy.
18  Q.    Why would it be pertinent to the policy?
19  A.    The amendment change.
20  Q.    Why would it be pertinent to the
21  amendment change?
22  A.    Trying to have all the facts, all the
23  information, all the -- it looks as if I would
24  have asked or Senator Kunesh would have wanted
25  to know, given me all the analytics, the data

1  who this is impacting.
2  Q.    And she was specifically asking about
3  Crown and Northwestern, correct?
4      MR. TIMMERMAN:  Objection, asked and
5  answered.
6      You can answer again.
7      THE WITNESS:  I have to look at the
8  document to -- yep.  It says, "The Senator's
9  main request," so yes.
10  BY MR. FLESHMAN:
11  Q.    Did you see this information before it
12  went to Senator Kunesh?
13  A.    I do not know.
14  Q.    Okay.
15  A.    Or I do not recall.
16  Q.    Did Senator Kunesh ever discuss this
17  information with you?
18  A.    Not that I remember, so I don't recall.
19  Q.    If this data was provided to you, would
20  it have been over email, they would have just
21  sent you the data?
22  A.    It could have been potentially email, or
23  someone says it out loud to me.
24  Q.    In, like, a cabinet meeting or in
25  another setting?

24 (Pages 90 - 93)

1   A.   Yeah, another setting, passing.
2   Q.   Okay.
3   A.   Yeah.
4   Q.   Did you ever ask Senator Kunesh why she
5   wanted this information?
6   A.   Not that I recall.  I think I -- it was
7   speaking specifically to her.  Not that I
8   recall.
9   Q.   Did you ask anybody else why Senator
10  Kunesh would want this information?
11  A.   No.
12  Q.   Did you speak to any other Senators
13  about this information?
14  A.   Not that I recall.
15  Q.   Do you know whether Senator Kunesh
16  shared this data with the committee?
17  A.   I do not remember that.
18  Q.   Did you make any assumptions at the time
19  about why she wanted this data?
20  A.   Besides the fact that she's trying to
21  get the whole picture, no.
22  Q.   By "the whole picture," you mean a
23  picture of the impact of the legislation?
24  A.   Impact on all students.
25  Q.   On all students, and all postsecondary

1   institutions?
2   A.   Can you repeat your question one more
3   time, please?
4   Q.   Yes.  You said the impact on students.
5   Would she also have wanted to know about the
6   impact on the PSEO providers, the schools?
7        MR. TIMMERMAN:  Objection, calls for
8   speculation.
9        THE WITNESS:  I do not know that.
10  BY MR. FLESHMAN:
11  Q.   Would you have wanted to know that
12  information?
13  A.   Would I have wanted to know what
14  information?
15  Q.   The impact on the schools.
16  A.   I would have -- as an -- I would want to
17  know the impact upon the students.
18  Q.   Would the impact on the schools have
19  been -- why wouldn't you have wanted to know
20  the impact on the schools then?
21  A.   Willie Jett, the commissioner's
22  blinders, I'm always looking at the impact on a
23  kid, on students, so that's my focus.
24  Q.   So that's your focus.  But would the
25  impact on the institutions have been relevant

1   to that inquiry then, to the policy?
2        MR. TIMMERMAN:  Objection, vague,
3   calls for speculation.
4        You can answer if you know.
5        THE WITNESS:  I don't know.
6   BY MR. FLESHMAN:
7   Q.   Would it have been relevant to you in
8   your deciding whether to support the amendment,
9   what the impact was on the institutions?
10  A.   No.
11  Q.   Why not?
12  A.   Because, again, my focus is on the
13  impact on the young person, on the student.
14  Q.   Okay.  And what potential impacts did
15  you consider in forming your support for the
16  amendment?
17  A.   Access and opportunity, barriers.
18  Q.   Uh-huh.  Okay.  And that's the only --
19  A.   Uh-huh.
20  Q.   That's it.  Okay.  Did any private
21  citizens ever reach out to you about the
22  amendment, so not schools, not Senators or
23  legislators, but just any students or parents
24  or anybody like that?
25  A.   I do not recall.

1   Q.   Do you know if anybody ever reached out
2   to the Department of Education regarding the
3   amendment?
4   A.   I do not know.
5   Q.   Did any private groups or organizations
6   other than schools reach out to you about the
7   amendment?
8   A.   I do not recall.
9   Q.   Do you know if any private groups or
10  organizations ever reached out to anybody at
11  the Department of Education about the
12  amendment?
13  A.   I do not know.
14  Q.   Did you ever speak with anybody from the
15  organization People for PSEO?
16  A.   People for PSEO, I'm trying to think of
17  who that is.  So Joe Nathan.  And there's other
18  individuals.  So have I ever spoke with them?
19  The answer is yes.  Do I know if it was
20  specific to this?  I do not know that part.
21       MR. FLESHMAN:  Why don't we go ahead
22  and take a break.
23       (Off the record 11:16 to 11:32.)
24  BY MR. FLESHMAN:
25  Q.   Commissioner Jett, before the break, you

Page 98

1    were talking about your role.  You focus on
2    what the impact of the policies are going to be
3    on the students, is that correct?
4    A.    Correct.
5    Q.    And would you say that the impact on an
6    institution is secondary to the impact on the
7    student?
8    A.    My personal view, because I've always
9    been student-centered, and so, yeah, that would
10   be secondary.
11   Q.    Do you know if other people at the
12   Department of Education also hold that view?
13   A.    I do not know.
14   Q.    Okay.  Did you think about how the
15   potential impact of the amendment on an
16   institution would have an effect on any
17   students that want to attend that institution?
18   A.    Can you say that one more time, please?
19   Q.    Yeah.  So in forming your opinion about
20   the amendment, did you think about how the
21   impact on affected institution would have a
22   trickle-down effect on students?
23   A.    Yes.
24   Q.    What did you think about that or what
25   information did you consider?

Page 99

1    A.    My hope was or is that the amendment
2    removes barriers for students.
3    Q.    Uh-huh.
4    A.    That's what I thought.
5    Q.    And if an institution stops offering
6    PSEO because of the amendment, would that be a
7    positive impact for students?
8    A.    It would potentially decrease the amount
9    of or the number of institutions, so that would
10   not be a positive impact.  But in terms of
11   providing equity or access and opportunity, it
12   would be a positive impact.
13   Q.    How do you mean -- can you explain what
14   you mean by that positive impact on equity or
15   access?
16   A.    As I've said earlier, in terms of
17   removing a barrier, so what the amendment is or
18   what we're discussing is for a student to
19   not -- how do I get this correct?  The way that
20   it is without the amendment, students now have
21   to discuss their faith to get into an
22   institution.  So if they choose to do that,
23   they would have to -- in other words, if they
24   don't believe in or if their faith is different
25   than the institution that they were thinking

Page 100

1    about going to, now they would not have access
2    to that.  That's what I mean by that.
3    Q.    If an institution stops offering PSEO
4    courses, would the student have access to those
5    courses anymore?
6    A.    At that particular institution, no.
7    Q.    Would that affect the -- do you know
8    whether other institutions have a limited
9    number of PSEO students that they can accept,
10   like a capacity limitation?
11   A.    I do not know.
12   Q.    Do you know whether students compete to
13   be accepted to PSEO programs at institutions in
14   Minnesota?
15   A.    I do not know.
16   Q.    Would you expect that to be the case?
17   A.    That there's a limited number of seats?
18   Yes.
19   Q.    So if one institution, two institutions
20   were to disappear, no longer offer a PSEO
21   program, would that reduce the overall number
22   of seats that are available to PSEO students in
23   Minnesota?
24        MR. TIMMERMAN:  Objection, calls for
25   speculation.

Page 101

1         You can answer if you know.
2         THE WITNESS:  I don't know.
3    BY MR. FLESHMAN:
4    Q.    Would you expect that it would reduce
5    the number of available seats?
6    A.    Not necessarily.
7    Q.    Why not necessarily?
8    A.    Because students could potentially
9    choose -- so it depends on how you're answering
10   the question.  So certain institutions might
11   only have ten students attending at the moment.
12   But now because they can't choose, or the other
13   institutions it's not offered there, or that
14   program is not there, that other institution
15   might have the capability of doing 20 to 25 or
16   30, and now those students potentially could
17   choose the others.  So I don't know if it would
18   technically reduce the seats.  But if you're
19   talking about the overall -- if you're talking
20   about the capacity of each institution, then
21   yes, it would be reducing the number of seats.
22   Q.    Okay.  Are you aware that there are
23   students in Minnesota that want to attend PSEO
24   at institutions that have a faith statement
25   requirement?

26 (Pages 98 - 101)

Page 102

1  A.  Yes.
2  Q.  How were you made aware of that?
3  A.  Because students attend -- how was I
4  made aware of that?
5  Q.  Uh-huh.
6  A.  As the commissioner, I'm made aware of
7  that because Crown College, Northwestern met
8  with them, and this was a thing in one of the
9  policies, so it became a thing that there's
10 faith-based statements for particular
11 institutions.  That's how I was made aware of
12 it.
13 Q.  Okay.  Did you consider the impact on
14 the amendment on those students that want to
15 attend at Crown College and Northwestern in
16 particular?
17 A.  Specifically, no.
18 Q.  Okay.  And did you consider the impact
19 on students that want to attend an institution
20 with a faith statement requirement?
21 A.  Say that again one more time.  So in
22 other words, if I'm a student who wanted to
23 attend the faith-based institution, and now
24 because the what?
25 Q.  Because the amendment, what's the impact

Page 103

1  on the student that wants to attend an
2  institution that has a faith statement
3  requirement; did you consider that?
4  A.  No.
5  Q.  We talked a little bit before about your
6  testimony before the committees.  Did you --
7  were you aware that people came to testify at
8  those committee meetings in opposition to the
9  amendment?
10 A.  No.  Did not know the legislative
11 process at that time.
12 Q.  Did you know that there would be other
13 people testifying at those committee meetings
14 after you?
15 A.  Sure.  Yes.
16 Q.  Did you stay to listen to any of those
17 testimonies?
18 A.  Not sure specific to this one.  There
19 were times where I sat trying to learn the
20 legislative process, but not sure if it was for
21 this one.
22 Q.  You don't recall whether you decided
23 after testifying to stay and listen to other
24 people discussing their -- people discussing
25 their views about the amendment?

Page 104

1  A.  About this particular amendment, no.
2  Q.  Okay.  Did you think that the -- were
3  you aware that there would be students and
4  their families testifying before the
5  committee --
6  A.  No.
7  Q.  -- on those dates?
8  A.  No.
9  Q.  Did you think it would be important to
10 listen to what those students and their
11 families were saying about the potential impact
12 of the amendment on their PSEO education?
13 A.  Being that I didn't know the first
14 question you asked me before that, and I said
15 no, I didn't know if students or families would
16 be testifying.  To answer this question, no.
17 Q.  You mentioned earlier somebody named Joe
18 Nathan.
19 A.  Yes.
20 Q.  People for PSEO?
21 A.  I know I mentioned Joe, yes.
22 Q.  Who is Joe Nathan?
23 A.  Joe is like a -- I want to use the term
24 "news reporter."  At least that's how I know
25 Joe.  I also know there was one time when I

Page 105

1  mentioned the other person, I don't know his
2  name, I think this other person said the term
3  that you used or the organization that you
4  used.
5  Q.  People for PSEO?
6  A.  Yeah.  So I think somebody spoke to me
7  from that.  And I don't know if Joe said he's
8  part of that.  I just know as he was
9  questioning, conducting the interview he used
10 that terminology.  So I don't know if he's part
11 of that.
12 Q.  So Joe interviewed you about -- what did
13 he interview you about?
14 A.  Joe talked to me specifically about,
15 give me a hot second, schools reporting or
16 districts reporting the number of students
17 having access to -- there's this thing -- so
18 nothing about this.  Okay?  So Joe talked to me
19 nothing about faith based or any of the
20 amendment.  Joe's reporting has always been
21 about school districts across the state
22 providing the opportunity for students to be in
23 PSEO or to take part in PSEO courses, so
24 nothing about this (indicating).  I just had my
25 conversation with Joe about districts being

27 (Pages 102 - 105)

1  able to offer PSEO or districts offering PSEO
2  to their students and notifying their families
3  of the opportunity. That's been his focus with
4  me.
5  Q.  Okay. When you say "districts offering
6  PSEO," do you mean school districts offering
7  the concurrent enrollment stuff at their --
8  A.  Correct.
9  Q.  -- local high schools or their private
10 schools or whatever?
11 A.  Correct.
12 Q.  You mentioned somebody else whose name
13 you couldn't recall from the People for PSEO.
14 Did you discuss the amendment with them?
15 A.  Not that I recall, because it was in
16 conjunction with Joe Nathan. So, like, he put
17 them in contact with me, or they were on the
18 phone call at the same time.
19 Q.  Okay. And do you know if anybody from
20 within the Department of Education ever spoke
21 with people from -- with somebody from People
22 for PSEO?
23 A.  I do not know.
24 Q.  And you mentioned earlier that you met
25 with the presidents from both Crown College and

1  University of Northwestern, is that right?
2  A.  Correct.
3  Q.  Do you recall when that was?
4  A.  Give me a hot second to look it up for
5  you. That meeting took place March 13th, 2023.
6  Q.  What did you discuss during that
7  meeting?
8  A.  For me, it was basically listening.
9  They told me the impact on their respective
10 institutions, their -- they gave me their
11 thoughts in terms of why they did not support
12 that. That was it.
13 Q.  Did you take any notes during that
14 meeting?
15 A.  No.
16 Q.  What did they say would be the impact on
17 their institutions?
18 A.  They got into them not being able to
19 provide opportunities for students, limiting of
20 that. And then they also discussed -- they had
21 a question about students not necessarily lower
22 demo -- lower socioeconomic status but students
23 of color. That was one of the information
24 points.
25 Q.  What did they say about the students of

1  color?
2  A.  That this -- that they provide -- that
3  they had a significant number of students of
4  color participating.
5  Q.  And did they express that if the
6  amendment went into effect, they would no
7  longer be able to provide opportunities for
8  those students?
9  A.  Correct.
10 Q.  Did that concern you at all?
11 A.  I asked a specific question, because,
12 yes, it concerned me when they said that. And
13 I asked the specific question that -- I said:
14 Interesting. Can you give me how many students
15 of color participate? And I don't remember the
16 exact number, but they gave the overall student
17 population that's enrolled in that. And then
18 they named a number of students. If they said
19 this percent -- so I'm just going to make this
20 up. But if they said it impacts 25 percent --
21 25 percent of our students are of color. And
22 then I said: Okay. How many -- give me how
23 many students are in the program. And how many
24 students exactly is that? That's the
25 information they gave me.

1  Q.  Okay. You said that when they raised
2  this impact on the students of color, that gave
3  you some concern. What was the concern that
4  you felt?
5  A.  The same thing about equity --
6  Q.  Uh-huh.
7  A.  -- that I said earlier. So I was just
8  trying to understand the access and
9  opportunity.
10 Q.  Okay. And what do you mean by "equity"?
11 A.  Are we creating barriers for students?
12 So this is one of those things, are we creating
13 another -- a barrier for students of color?
14 Q.  And did the schools express to you that
15 the amendment would be a barrier for students
16 of color?
17 A.  They believed it would be, yes.
18 Q.  How did you respond to that?
19 A.  With what I just said earlier in terms
20 of could they gave me specific numbers.
21 Q.  When they gave you those specific
22 numbers, how did you respond?
23 A.  I just thanked them for the information.
24 Q.  Did you consider whether this would
25 actually -- in your view, did the amendment

1  pose a barrier to these students?
2  A.    It would not pose a barrier unless those
3  institutions chose to keep their faith-based
4  statement.
5  Q.    So if Crown and Northwestern stopped
6  offering PSEO, would that be a barrier to these
7  students of color to attend PSEO?
8  A.    At Crown or Northwestern, yes.
9  Q.    More than the faith statement?
10       MR. TIMMERMAN:  Objection, calls for
11  speculation.
12       You can answer if you know.
13       THE WITNESS:  I don't understand the
14  question, so I'm going to say I don't know.
15  BY MR. FLESHMAN:
16  Q.    Okay.  If the school stopped offering
17  PSEO classes, so nobody is taking PSEO on
18  campus --
19  A.    At those two universities?
20  Q.    -- at those two universities.
21  A.    Uh-huh.
22  Q.    -- would that be more of a barrier for
23  the students of color who were previously
24  attending than a statement of faith would be?
25       MR. TIMMERMAN:  Objection, calls for

1  speculation.
2       You can answer if you know.
3       THE WITNESS:  I don't know.
4  BY MR. FLESHMAN:
5  Q.    Do you think it would be a barrier?
6       MR. TIMMERMAN:  Same objection.
7       THE WITNESS:  Same response.
8  BY MR. FLESHMAN:
9  Q.    Prior to that meeting, were you aware of
10  their admissions requirements?
11  A.    No.
12  Q.    Did they express any concerns that the
13  amendment seemed to be targeting them
14  specifically?
15  A.    Because they were institutions that have
16  faith based, yes.
17  Q.    What did you think about that concern?
18  A.    I don't know if I'd use the term "duly
19  noted," but I was listening to it.
20  Q.    Did you -- after that meeting, did you
21  take any steps to address their concerns?
22  A.    No.
23  Q.    Did you think that their concerns needed
24  to be addressed?
25  A.    I needed to understand their concerns.

1  That they needed to be addressed, I believe, in
2  the amendment, so I supported the amendment.
3  Q.    You supported the amendment.  Why didn't
4  you think that their concerns about the
5  amendment needed to be addressed?
6  A.    I needed to understand what their
7  thought process was or that I have all the
8  information.  But then after listening to their
9  concerns or their perspective, I still felt
10  that the amendment -- that without the
11  amendment there's barriers for students.  And
12  so with the amendment it's about removing
13  barriers, equity, access, opportunity.
14  Q.    So did you think that their concerns
15  were unfounded?
16  A.    I understood them, but I didn't think
17  that -- and I don't think that their concerns
18  addressed the barriers that it raises.
19  Q.    What do you mean by "the barriers that
20  it raises"?
21  A.    As I said earlier, for a student to have
22  to now fill out or do the faith-based statement
23  if they want to attend on campus, and if I'm --
24  I'll use this as an example, if I'm of a
25  different faith, all of a sudden now I have

1  to -- if I am someone else of a different
2  faith, then I have to change my beliefs, or I
3  have to be different, or in other words, not
4  going to say being judged, but it's just a
5  requirement that I have to do something
6  different.
7  Q.    Are you aware that both Crown College
8  and University of Northwestern offer online
9  PSEO?
10  A.    Yes.
11  Q.    Are you aware that they do not require
12  students to sign a statement of faith to take
13  online PSEO courses?
14  A.    Yes.
15  Q.    Why does that not address the barrier
16  problem, the barrier of the statement of faith,
17  that they offer these courses to students of
18  any faith without that requirement online?
19  A.    They can do it online.  I understand
20  that.  When the student says:  I would like go
21  onto your campus or participate on campus, now
22  Crown or any other university is saying:  You
23  cannot set foot on our campus.
24  Q.    So is it that there's a barrier to being
25  on campus or a barrier to the access to the

Page 114

1  credits?
2  A.   Talking about equity.  And so if a
3  student would like to set foot on campus, why
4  are they being told that they cannot?
5  Q.   Uh-huh.  So after meeting with the
6  schools, did you recommend to anybody within
7  the Department of Education that they should
8  stop supporting the amendment?
9  A.   Did I recommend to anybody in MDE that
10  we don't follow through with the amendment?
11  Q.   Uh-huh.
12  A.   No, not that I know of.
13  Q.   Did you recommend to any state
14  representative that the amendment should be
15  changed in any way?
16  A.   Not that I recall, no.
17  Q.   To the governor or his office?
18  A.   No.
19         MR. FLESHMAN:  Why don't we take a
20  quick break, maybe five minutes, and we can
21  come back.
22         MR. TIMMERMAN:  Okay.
23         (Off the record 11:51 to 12:06.)
24  BY MR. FLESHMAN:
25  Q.   Earlier we had been discussing barriers

Page 115

1  for students to attend particular institutions.
2  You would say that a -- the faith statement
3  requirement is a barrier only for students of a
4  different faith, correct?
5         MR. TIMMERMAN:  Objection, calls for
6  speculation.
7         You can answer.
8         THE WITNESS:  Potentially.
9  BY MR. FLESHMAN:
10  Q.   What do you mean by "potentially"?
11  A.   If I'm understanding your question
12  correctly, you're saying if they are of a
13  different faith, it could create a barrier,
14  does it create a barrier for somebody within
15  the same faith?  I don't know that, so I say
16  "potentially."
17  Q.   Okay.  Would you expect that a student
18  who shares the same faith with an institution,
19  and who agrees with the statement of faith,
20  that the statement of faith would be a barrier
21  for that student?
22  A.   No.
23  Q.   So it would only be for students whose
24  beliefs differ from the statement of faith that
25  could potentially be a barrier for them?

Page 116

1  A.   Potentially.
2  Q.   All right.  And if Crown and
3  Northwestern stopped offering PSEO altogether,
4  their on-campus PSEO programs, that would be a
5  barrier for all students who want to attend on
6  campus there, correct?
7  A.   For those particular institutions, yes.
8  Q.   So this is really -- the amendment is
9  really just about removing the faith statement
10  requirement, correct?
11         MR. TIMMERMAN:  Objection, asked and
12  answered.
13         You can answer again.
14         THE WITNESS:  I would say yes.
15  BY MR. FLESHMAN:
16  Q.   Earlier you said that if Crown and
17  Northwestern chose not to offer PSEO on campus
18  anymore, students who wanted to attend there
19  could go to another institution potentially, is
20  that right?
21  A.   Potentially, yes.  That's what I said.
22  Q.   If a student doesn't want to sign the
23  statement of faith, they could also go to one
24  of these other institutions, isn't that right?
25  A.   Yes.

Page 117

1  Q.   So if the schools chose not to offer
2  PSEO because they want to keep their statements
3  of faith, the effect for the same -- the effect
4  on those students is the same, correct?
5         MR. TIMMERMAN:  Objection, vague,
6  calls for speculation.
7         You can answer if you know.
8         THE WITNESS:  I don't understand the
9  question, so --
10  BY MR. FLESHMAN:
11  Q.   Okay.
12  A.   -- I don't know.
13  Q.   So a student who doesn't want to sign
14  the statement of faith has to go to a different
15  institution, or they can go to an institution,
16  correct?
17  A.   Correct.
18  Q.   If there is no PSEO requirement, that
19  same student -- or if there is no PSEO offering
20  at Northwestern, that same student has to go to
21  a different institution, correct?
22  A.   Correct.
23  Q.   So the effect for that student is the
24  same whether there's a statement of faith or no
25  program at all, right, they have to go to a

30 (Pages 114 - 117)

1  different institution?
2      MR. TIMMERMAN: Objection, calls for
3  speculation.
4      You can answer if you know.
5      THE WITNESS: I'm lost. I
6  apologize. So I don't understand.
7  BY MR. FLESHMAN:
8  Q.   Okay. I'll try and ask it a little bit
9  more clearly. So if I want to attend at the
10 University of Northwestern, and I disagree with
11 their statement of faith, then I can choose to
12 go to a different institution instead?
13 A.   Correct.
14 Q.   All right. If Northwestern stops
15 offering PSEO altogether, and I'm my same
16 person, and I want to go to Northwestern, but I
17 can't because they don't offer PSEO anymore --
18 A.   Okay.
19 Q.   -- then I can still go to a different
20 institution --
21 A.   Yes.
22 Q.   -- am I in any different position now
23 because Northwestern no longer offers PSEO?
24 A.   If I'm understanding the question the
25 way you just phrased it, no.

1  Q.   I don't have any additional
2  opportunities open to me because Northwestern
3  stopped offering PSEO?
4  A.   No.
5  Q.   Okay. So do you think that Crown and
6  Northwestern should drop their statements of
7  faith for PSEO admissions?
8  A.   That's their personal preference, but I
9  believe that the amendment that's there is fair
10 or is right for students across the state of
11 Minnesota.
12 Q.   Do you believe that it's fair for
13 institutions across Minnesota?
14 A.   Yes.
15 Q.   Even though only a couple of
16 institutions will actually be affected by it?
17 A.   Yes.
18 Q.   Even if it violates their religious
19 beliefs?
20     MR. TIMMERMAN: Objection, calls for
21 a legal conclusion.
22     You can answer if you know.
23     THE WITNESS: Don't know.
24 BY MR. FLESHMAN:
25 Q.   Are you aware that the University of

1  Northwestern is one of your largest PSEO
2  providers in Minnesota?
3  A.   Yes, I know that.
4      MR. FLESHMAN: I think those are all
5  the questions we have for now. We would like
6  to keep the deposition open while we review all
7  the documents that just came in.
8      MR. TIMMERMAN: No questions for me.
9  We will read and sign.
10     (Deposition concluded at 12:13 p.m.)
11     ****************
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1      REPORTER'S CERTIFICATE
2
   STATE OF MINNESOTA  )
3                      ) ss.
   COUNTY OF HENNEPIN  )
4
5      I hereby certify that I reported the
   deposition of COMMISSIONER WILLIE JETT on
6  Wednesday, February 7, 2024, in Minneapolis,
   Minnesota, and that the witness was by me first
7  duly sworn to tell the whole truth;
8      That the testimony was transcribed by me
   and is a true record of the testimony of the
9  witness;
10     That the cost of the original has been
   charged to the party who noticed the deposition,
11 and that all parties who ordered copies have been
   charged at the same rate for such copies;
12
       That I am not a relative or employee or
13 attorney or counsel of any of the parties, or a
   relative or employee of such attorney or counsel;
14
       That I am not financially interested in the
15 action and have no contract with the parties,
   attorneys, or persons with an interest in the
16 action that affects or has a substantial tendency
   to affect my impartiality;
17
       That the right to read and sign the
18 deposition transcript by the witness was reserved.
19
   WITNESS MY HAND AND SEAL THIS 19th day of
20 February, 2024.
21
22
23
                    Dana Anderson
24 Dana J. Anderson Gannon
   Notary Public, Hennepin County, MN
25 My commission expires 1/31/2025

Page 122

1  Jeffrey Timmerman, Esq.

2  jeffrey.timmerman@ag.state.mn.us

3    February 19, 2024

4  RE:   Loe, Melinda And Mark v. Jett, Willie Et Al.

5    2/7/2024, Commissioner Willie Jett (#6425281)

6    The above-referenced transcript is available for

7  review.

8    Within the applicable timeframe, the witness should

9  read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12    The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com.

16   Return completed errata within 30 days from

17  receipt of testimony.

18   If the witness fails to do so within the time

19  allotted, the transcript may be used as if signed.

20

21

22        Yours,

23        Veritext Legal Solutions

24

25

Page 124

1  Loe, Melinda And Mark v. Jett, Willie Et Al.

2  Commissioner Willie Jett (#6425281)

3        ACKNOWLEDGEMENT OF DEPONENT

4    I, Commissioner Willie Jett, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Commissioner Willie Jett        Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15  _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

Page 123

1  Loe, Melinda And Mark v. Jett, Willie Et Al.

2  Commissioner Willie Jett (#6425281)

3        E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Commissioner Willie Jett        Date

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

[01527 - accessible]                                    Page 1

**0**

**01527**   1:4
**0:23**   1:4

**1**

**1**   4:13 38:6
**1/31/2025**
   121:25
**10:14**   49:8
**11**   25:9
**11:16**   97:23
**11:32**   97:23
**11:51**   114:23
**12**   20:20
**120b.13**   58:15
**1269**   82:9
**12:06**   114:23
**12:13**   120:10
**12:33**   90:1
**13th**   107:5
**1400**   3:15
**15**   18:3
**1550**   39:5
**1551**   41:20
**1568**   4:15
**16th**   85:5
**1717**   91:8
**1718**   89:22
**1720**   5:7 88:8
**17932**   121:23
**19**   9:8 122:3
**1919**   2:18
**1988**   13:23,24
**1992**   14:18
**19th**   121:19

**2**

**2**   4:17 57:23,24
**2/7/2024**   122:5
**20**   18:4 101:15
   124:15
**20006**   2:19
**2019**   61:12
**2020**   61:14
**2021**   61:12,14
**2022**   58:15
**2023**   4:23 5:6
   6:15,24 18:12
   43:13 107:5
**2024**   1:17 2:2
   121:6,20 122:3
**22**   23:24
**25**   25:2 101:15
   108:20,21

**3**

**3**   4:22 69:14
   71:6,7
**3.45**   53:19
**3.5**   52:7 53:10
   53:21
**3/16/2023**   5:3
**30**   63:17
   101:16 122:16
**3100**   2:4 3:7
**350**   24:1
**38**   4:15

**4**

**4**   5:3 71:13
   79:14

**400**   18:23 24:8
**445**   3:15
**452**   59:6
**455**   60:19
**456**   62:3

**5**

**5**   5:6 87:10
**50**   4:9
**522**   4:20
**55101**   3:16
**55402**   3:8
**57**   4:20

**6**

**6**   4:5 63:17
**6425281**   1:25
   122:5 123:2
   124:2
**68**   5:4
**69**   4:23

**7**

**7**   1:17 2:2
   89:21 121:6
**75**   24:25
**79**   5:4
**7th**   90:1

**8**

**8**   4:23
**80**   2:3 3:6
**87**   5:7
**88**   13:23
**880,000**   24:1
**8th**   69:19

**9**

**9**   5:6
**9:00**   1:18
**9:04**   2:2
**9:57**   49:8

**a**

**a.m.**   1:18 2:2
**abeler**   77:21,22
   77:24
**ability**   72:5
**able**   8:9 37:5
   51:20 52:2
   106:1 107:18
   108:7
**above**   122:6
   124:7
**abutler**   2:23
**academically**
   71:17
**academy**   13:12
**accept**   100:9
**accepted**   76:10
   100:13
**access**   10:8
   44:23 47:22
   48:4 57:18
   72:5,6,10
   73:23 75:1
   76:18,21 96:17
   99:11,15 100:1
   100:4 105:17
   109:8 112:13
   113:25
**accessible**   46:5

[accomplish - answering]                                    Page 2

**accomplish**
  47:19,24 73:2
**accuracy**  122:9
**acknowledge...**
  124:3
**acknowledg...**
  122:12
**act**  6:15 48:7
  48:15
**action**  121:15
  121:16
**actually**  47:1
  109:25 119:16
**additional**
  15:12 27:5
  75:17 119:1
**additions**  124:6
**address**  49:24
  54:12 80:15
  111:21 113:15
**addressed**
  46:18 111:24
  112:1,5,18
**administrative**
  13:16 15:14
  23:12
**admissions**
  6:17 41:17
  42:12,16,23
  43:4 56:16
  111:10 119:7
**adosh**  11:21
  43:23 68:15
  69:10 70:23
  91:9

**advance**  4:18
**advanced**
  58:10 61:1
  62:12
**advocate**  66:20
  67:17
**advocating**
  68:1
**affairs**  19:3,10
**affect**  100:7
  121:16
**affected**  75:9
  84:13 98:21
  119:16
**affects**  121:16
**ag.state.mn.us**
  3:17,18 122:2
**age**  23:24 37:13
**ago**  9:7,8
**agree**  44:21
**agreed**  44:16
  44:17
**agrees**  115:19
**ahead**  38:11
  58:2 65:20
  69:19 79:17
  87:13 97:21
**al**  1:6,9 122:4
  123:1 124:1
**alleviate**  90:15
**allotted**  122:19
**allow**  47:20,21
  62:15 66:10
  71:15

**allowing**  74:25
  75:14
**allows**  64:8
**alternative**
  74:13
**altogether**
  76:19 116:3
  118:15
**amendment**
  6:15,21,23,24
  43:2,12 44:14
  46:17 47:18,24
  57:15,16 66:21
  67:17 68:1,7
  68:10 69:8
  73:1,14 74:24
  75:23 77:7,12
  77:20 78:25
  81:6 84:13
  92:19,21 96:8
  96:16,22 97:3
  97:7,12 98:15
  98:20 99:1,6
  99:17,20
  102:14,25
  103:9,25 104:1
  104:12 105:20
  106:14 108:6
  109:15,25
  111:13 112:2,2
  112:3,5,10,11
  112:12 114:8
  114:10,14
  116:8 119:9

**american**  19:3
  19:9 89:9
**amount**  99:8
**analysis**  61:11
**analytics**  89:11
  92:25
**anderson**  1:24
  2:5 121:24
**andrea**  2:16
**angela**  59:18
  59:19
**anoka**  14:25
**answer**  4:7
  12:16,22 21:21
  23:15 30:20
  34:16,20 48:11
  49:15 52:12
  53:16,22 54:21
  56:7 63:4 65:3
  66:2,22 74:5
  75:4,20,23
  77:2 80:21
  87:22 93:6
  96:4 97:19
  101:1 104:16
  110:12 111:2
  115:7 116:13
  117:7 118:4
  119:22
**answered**  77:1
  86:22 93:5
  116:12
**answering**  7:4
  101:9

answers 7:14
7:16,19
anybody 11:13
18:14 22:20
31:1,6 43:19
48:21 49:1
54:6 55:21
56:1 67:25
68:3,9 72:20
72:23 74:11,15
74:18,20 81:15
82:18,24,25
84:7,16,21
86:25 94:9
96:24 97:1,10
97:14 106:19
114:6,9
anymore 100:5
116:18 118:17
ap 61:1
apart 77:10,17
apologize 42:8
118:6
appear 79:24
87:19
appearances
2:10,25 3:1
appended
124:7
applicable 3:22
122:8
applicant 41:13
applicants 41:3
application
40:19 41:18

applied 20:11
apply 20:7
applying 40:24
53:18
appointed 20:1
20:25 23:4
appointment
20:7 21:7,18
22:9,15,19,24
22:25 23:1
42:19,25 47:6
47:12 57:9
78:23
appoints 20:3
approach 30:4
appropriations
61:5
approval 32:25
33:12
approve 32:15
32:21 40:16,17
approved
39:19
approximately
18:22 24:1
area 12:6,7
13:18
aric 21:9
arrangements
10:21
arriola 89:19
89:25
asked 41:17
59:23,24 76:25
78:9 79:7

91:24 92:24
93:4 104:14
108:11,13
116:11
asking 15:25
39:18 83:8
93:2
assault 8:21
assistant 16:16
16:19 17:21
18:1 22:3 33:4
33:14 34:10
59:12,15 60:6
assistant's
23:12
assume 56:19
78:16 81:18
assumption
92:6
assumptions
94:18
attached 5:9
122:11
attack 82:9,15
83:1,5 84:19
85:14
attend 12:4
13:1,10 45:2
45:10,14,16,24
46:12 53:19
54:24 55:3
72:11 98:17
101:23 102:3
102:15,19,23
103:1 110:7

112:23 115:1
116:5,18 118:9
attending 46:9
47:2 54:3
101:11 110:24
attention 60:7
60:9 89:16
attorney 3:14
70:12 121:13
121:13 122:13
attorneys 11:5
11:6,7,14
121:15
available
100:22 101:5
122:6
avenue 2:18
aware 21:24
27:10,18 32:8
36:2,9 42:20
43:11,15 46:17
46:20,25 47:7
48:6 51:1
54:11 55:18,22
56:5 57:4
59:25 81:21
84:3,12 91:2,5
92:1,3 101:22
102:2,4,6,11
103:7 104:3
111:9 113:7,11
119:25
awareness 92:9
92:11

**b**

**b** 63:17
**baccalaureate**
4:18 58:11
61:2 62:13
**back** 29:6
49:10 53:5
114:21
**background**
11:23 12:12
**bakeberg** 79:25
80:1,7,9,10
81:5,13,17
82:14 85:10
86:20,24
**baptist** 12:17
12:20
**barrier** 45:1
46:8,11,14,15
51:1,5,13,22
52:10 53:12,21
53:23 54:3,10
54:17 55:10,12
76:2,3,12,13,23
99:17 109:13
109:15 110:1,2
110:6,22 111:5
113:15,16,24
113:25 115:3
115:13,14,20
115:25 116:5
**barriers** 45:5,6
45:7,17 46:1
46:16 48:3,17
50:22 51:25,25

53:24 57:19
65:4 73:3,10
96:17 99:2
109:11 112:11
112:13,18,19
114:25
**based** 6:17
38:19 42:16
46:21 47:14
63:21 65:18,23
79:23 83:22,24
83:25 86:13
87:18 102:10
102:23 105:19
110:3 111:16
112:22
**basically** 22:18
37:11 107:8
**basis** 9:19 48:8
**bates** 4:15,20
5:4,7 39:4
**baxter** 2:14
49:6
**becket** 2:17
3:21
**becketlaw.org**
2:20,21,22
**becktlaw.org**
2:23
**becoming**
17:12
**beginning**
10:10 14:1
39:7 60:21
62:4 90:6,8

91:10,13
**begins** 86:5
**behalf** 2:12 3:3
3:11
**beliefs** 45:14
113:2 115:24
119:19
**believe** 17:20
35:23 47:18,20
47:23 54:15
64:22 76:1,7
76:11 77:3
78:4 79:25
80:12 99:24
112:1 119:9,12
**believed** 109:17
**ben** 79:25 80:3
**benefit** 37:22
38:2
**benefits** 38:1
64:8
**benjamin** 2:13
**bernie** 21:9
**best** 64:4 66:6
66:10
**bethel** 45:10
**better** 62:20
63:9,13 64:5
64:12
**beyond** 61:9,20
**bfleshman** 2:20
**biennium**
90:15
**big** 30:16

**bill** 43:22 71:15
81:24 82:8,15
83:1 84:8,18
85:14
**bit** 7:10 24:18
103:5 118:8
**blinders** 95:22
**bodies** 90:11
**bold** 41:21 42:9
**bolts** 38:23
**born** 11:25
**bottom** 39:2,6
71:7 89:24
90:4 91:8
**break** 8:4,6
49:4,6,7 97:22
97:25 114:20
**breakdown**
87:25
**breakdowns**
88:12
**breaks** 8:3
**bring** 25:19
29:7 33:16,18
59:11 60:8
**bringing** 92:13
**brings** 89:17
**broader** 44:9
**broke** 49:10
50:21
**brought** 60:7
92:8,10
**budget** 24:25
24:25 25:1
26:21,21 27:2

[budget - college]                                                          Page 5

28:1 78:2 89:7
89:8
**building**  16:6
49:24
**buildings**  18:2
24:4
**bullet**  41:21
81:23 82:3
84:24 85:2
86:3,4
**butler**  2:16

**c**

**c**  3:4
**cabinet**  18:24
22:17 31:12
33:7,11,16,17
33:22,23,25
35:9,11 58:24
59:13,22 93:24
**calendar**  9:16
10:18,22 11:9
50:1,4,5,7
**calendared**
78:21
**call**  39:4
106:18
**called**  6:2 78:22
**calls**  48:10 63:2
65:25 75:18
95:7 96:3
100:24 110:10
110:25 115:5
117:6 118:2
119:20

**campus**  46:14
55:8 76:17
88:18 110:18
112:23 113:21
113:21,23,25
114:3 116:4,6
116:17
**capability**
101:15
**capacity**  63:19
100:10 101:20
**capitol**  24:6
**career**  59:3,8
59:16 62:10
**carrying**  71:13
**case**  1:4 8:20
8:25 9:2,5,12
66:21 100:16
**catalog**  39:22
40:11
**catch**  7:11
**cc'd**  27:15
29:18
**center**  2:4 3:7
15:1 16:17
**centered**  98:9
**certain**  31:4
42:7 51:11
101:10
**certificate**
121:1
**certify**  121:5
**chain**  31:3,12
87:24

**chair**  25:22,22
**chairs**  25:4,5
25:20 26:7,16
26:18,20 27:4
27:12 67:7
**challenge**  6:15
**challenging**
62:5,7
**champlin**  14:24
**change**  42:20
71:24 92:19,21
113:2 123:4,7
123:10,13,16
123:19
**changed**
114:15
**changes**  122:10
124:6
**characteristics**
6:18 46:22
47:15 48:8
**charge**  23:24
24:8 26:1 27:8
**charged**  121:10
121:11
**chart**  18:25
19:1
**charters**  24:2
**check**  11:20
**cheryl**  25:22
**chicago**  13:13
13:19
**chief**  80:4
**choice**  46:9

**choose**  45:15
45:22,23 46:4
99:22 101:9,12
101:17 118:11
**chose**  110:3
116:17 117:1
**chosen**  20:12
20:12
**christmas**  13:9
**church**  13:1
**circumstances**
59:21 60:3
**citizens**  96:21
**civil**  3:22
**clarification**
16:8
**clarify**  12:23
34:4 52:12
**class**  16:3
23:21 34:19
71:16 76:17
**classes**  36:15
65:14 110:17
**classroom**
65:23
**clearer**  8:1
**clearly**  118:9
**close**  46:4
**cloud**  16:21
17:18 21:9,16
**college**  10:24
13:10,14 35:22
37:3,9,21,24
45:10,16 49:14
49:22 51:20,21

[college - correct]

54:24 55:4
56:3 59:3,8,16
61:10,21 62:10
62:16,17,21
63:10 64:9,12
102:7,15
106:25 113:7
**colleges**  78:10
79:2
**color**  107:23
108:1,4,15,21
109:2,13,16
110:7,23
**come**  21:3
27:11,13,14
28:17 29:6
31:1,2,9 32:3
33:23 35:10
59:13,22 89:5
89:16 114:21
**comes**  31:11
32:13 33:10,13
41:1
**coming**  24:7,22
28:24 34:6
49:3
**commencing**
2:2
**comment**  82:11
82:22 84:18
**commission**
121:25
**commissioner**
1:16 2:1 8:8
11:25 16:24

17:12 18:9
19:5,13 20:1,4
22:23 23:2,20
27:1 28:20
33:5,15,15
35:1 39:17,24
40:12 59:12,15
60:6 80:25
82:10,21 85:1
91:14,15 92:12
97:25 102:6
121:5 122:5
123:2,24 124:2
124:4,12
**commissioner's**
28:12 95:21
**commissioners**
32:9 33:4
**committee**
26:23 69:19,24
73:19 77:14
94:16 103:8,13
104:5
**committees**
25:6,21,25
26:8 27:5 67:7
67:9,10,11
74:21 77:18,25
80:11 103:6
**common**  88:24
90:18
**communication**
81:12
**community**
12:20,20

**compete**  100:12
**complete**  8:10
124:8
**completed**
122:16
**compound**  77:1
**computer**  9:25
10:21 29:11
**concern**  60:12
72:13,17,21
108:10 109:3,3
111:17
**concerned**
53:24 108:12
**concerns**  44:19
54:1 79:1,2,3,4
79:10 85:9,13
90:16 111:12
111:21,23,25
112:4,9,14,17
**concluded**
120:10
**conclusion**
48:10 119:21
**concurrent**
4:19 52:2
58:11 61:3
62:14 106:7
**conducting**
105:9
**conjunction**
106:16
**consider**  28:19
48:14,19 51:4
73:11 96:15

98:25 102:13
102:18 103:3
109:24
**considered**
74:12,16
**contact**  21:16
78:9 106:17
**context**  6:11
**continue**  42:6
**continued**  2:25
3:1 5:1 14:9
**contract**
121:15
**conversation**
68:2,18 73:15
74:6 78:12
86:23 87:24
105:25
**conversations**
80:23 81:4,5
81:21
**coordinate**
27:25
**coordinating**
27:22
**copies**  5:10
121:11,11
122:14
**copy**  70:16
**corner**  39:2
**correct**  6:13
7:4 14:5,11
17:4,10 18:13
19:11 20:2
25:16 26:13

27:20 52:16
54:13,14,18
58:16,17 64:13
65:11,12 66:18
67:12 68:22
73:8 74:5,10
75:12 82:2
93:3 98:3,4
99:19 106:8,11
107:2 108:9
115:4 116:6,10
117:4,16,17,21
117:22 118:13
124:8
**corrections**
124:6
**correctly** 30:19
30:22 55:2
75:22 88:19
115:12
**cost** 121:10
**counsel** 5:10
19:16,17,18
50:3,10,11
70:25 121:13
121:13 122:14
**counseling** 22:1
**counselors**
52:19 53:2
**county** 121:3
121:24
**couple** 119:15
**course** 4:17
7:23 35:21
36:14,16,19

39:22,22 40:10
51:20,21 58:10
62:11 76:15
**courses** 35:22
42:13 62:17,19
63:8 75:17
100:4,5 105:23
113:13,17
**court** 1:1 8:14
**cover** 58:16
59:4
**create** 45:1
115:13,14
**creates** 55:10
55:11 76:11
**creating** 76:1
109:11,12
**credit** 61:10,21
62:18 64:9
**credits** 37:21
37:24 47:22
114:1
**criteria** 42:17
43:4
**crown** 10:24
45:10 49:14,22
56:3 80:24
84:10,25 85:5
90:11 93:3
102:7,15
106:25 110:5,8
113:7,22 116:2
116:16 119:5
**cs** 122:15

**cst** 1:18 2:3
**current** 18:7
23:19
**currently** 76:15
88:12
**cv** 1:4
**cwodzinksi**
25:23 26:4,5

**d**

**d.c.** 2:19
**dana** 1:24 2:5
121:24
**data** 61:12,13
89:10,11 90:14
90:16 92:25
93:19,21 94:16
94:19
**date** 10:19,23
11:9 49:18,19
85:6 123:24
124:12
**dated** 4:22 5:3
5:6
**dates** 10:19,20
49:21 104:7
**daughter** 34:18
34:24
**day** 121:19
124:15
**days** 122:16
**decide** 33:18
**decided** 74:3
103:22
**deciding** 96:8

**declare** 124:4
**decrease** 99:8
**deemed** 124:6
**deeper** 44:8
**defendant** 9:1
9:12
**defendants**
1:10 3:11
**degree** 13:13
13:15 14:2,2,3
14:13
**demeules** 3:13
**demo** 107:22
**demographic**
87:25 88:11
**denton** 49:21
**department**
18:7,16,20
23:16 24:9
27:6,7,8 28:14
28:17 30:6,13
30:23 31:2,10
31:11 33:5,11
33:14 34:7,25
36:5 40:6,7,14
41:1,8 43:20
47:10 48:22
54:7,11 55:21
56:10,13 64:15
64:18,22 67:18
67:19 72:20
74:12 78:1
81:16 84:17
87:1,3 89:1
91:3 97:2,11

98:12 106:20
114:7
**department's**
60:16 61:16,25
63:12 64:18
66:6,9,14
**departments**
31:4 32:14
35:8
**depend** 10:4
**depended** 10:6
**depending**
41:12 59:2
**depends** 10:1,2
101:9
**deponent**
122:13 124:3
**deposed** 8:12
**deposing**
122:13
**deposition** 1:16
2:1 11:8,18,21
120:6,10 121:5
121:10,18
**deputy** 19:4
33:5,15
**descriptions**
39:23
**details** 30:5
**determination**
42:4
**determine**
41:23 42:10,11
56:11,14

**determines**
42:5
**diana** 2:15
**differ** 115:24
**difference**
55:15
**different** 25:10
30:12 45:11,15
45:19 78:1
99:24 112:25
113:1,3,6
115:4,13
117:14,21
118:1,12,19,22
**digest** 44:13
**digits** 59:6
**directly** 14:19
18:14,18,21,22
27:18
**director** 33:15
**disability** 46:23
47:16
**disagree**
118:10
**disappear**
100:20
**discrepancy**
55:14,14
**discrimination**
48:7
**discuss** 23:5,15
26:14 48:20
54:7 57:8,14
78:5 87:4
93:16 99:21

106:14 107:6
**discussed** 60:17
87:7 107:20
**discussing**
26:21 31:22
50:21 72:10
88:3 99:18
103:24,24
114:25
**discussion**
22:10 31:13
33:7,17 35:11
73:15
**district** 1:1,2
14:25
**districts** 15:18
24:1 35:23,23
42:3 105:16,21
105:25 106:1,5
106:6
**division** 59:4,8
59:17
**document** 5:15
38:13,16,20
57:21 58:3,5,6
58:8,9,13
69:22 79:18,19
79:21 87:14,15
87:16 88:9,23
93:8
**documents**
10:13 11:1,11
120:7
**doing** 22:9
37:15 51:23

52:2 57:2
101:15
**door** 68:19
**double** 11:20
**dr** 49:21,22
59:18
**drafts** 11:1
**driven** 30:7
**drop** 119:6
**dthomson** 2:22
**dual** 62:20 63:9
63:13 64:20
**dug** 86:8
**duly** 6:2 111:18
121:7
**duties** 23:19,23
24:7,10

---

**e**

**e** 86:16 123:3,3
123:3
**earlier** 48:3
52:12 54:15
99:16 104:17
106:24 109:7
109:19 112:21
114:25 116:16
**early** 14:13
**earn** 37:20
61:10,21 62:17
64:8
**easter** 13:9
**ebaxter** 2:21
**ed** 17:20,24
18:2

[education - express]                                      Page 9

**education**
  13:20 14:2,4
  14:10,13,14
  17:13,14 18:8
  18:9,16,21
  23:25 24:2,9
  24:10 25:5,21
  27:6,8,9 28:15
  28:18 30:7,24
  31:2 34:7 35:1
  36:5 39:18
  41:8 43:20
  45:25 47:10
  48:22 55:22
  64:16 67:18,19
  69:18,24 71:16
  71:19 72:21
  74:12 78:2
  80:11 81:16
  84:17 87:1,4
  89:1,10 91:3
  97:2,11 98:12
  104:12 106:20
  114:7
**education's**
  23:16 64:22
**effect**  98:16,22
  108:6 117:3,3
  117:23
**efforts**  42:20
**eighteen**  9:8
**eighth**  2:3 3:6
**either**  37:16
**electronic**  9:24

**elementary**
  15:20
**elevated**  92:7
**eligibility**  42:5
  42:15 71:25
**eligible**  66:15
**else's**  83:9
**email**  2:20 3:9
  3:17 5:3,6
  29:17 49:18,19
  50:2,4,7 80:1
  85:11 87:24
  89:25 90:2
  91:9 93:20,22
**emailed**  70:16
  70:17
**emails**  29:24
  81:9
**emphasis**  14:13
**employee**
  121:12,13
**enable**  65:7
**encourage**
  64:16,19,23
  65:7
**encouraging**
  66:7,8
**enforcement**
  30:10
**enrolled**  88:1
  88:13 108:17
**enrolling**  72:14
**enrollment**
  4:13,19 39:1
  52:3 58:12

  61:3,4 62:14
  62:14,20,22
  63:9,11,13
  64:20 71:18
  72:3 88:13
  106:7
**ensure**  65:9
**ensuring**  62:10
**enterprise**
  30:13
**entries**  10:22
**entry**  50:5 51:5
  51:13 53:12
**equity**  99:11,14
  109:5,10
  112:13 114:2
**eric**  2:14 19:19
**errata**  122:11
  122:13,16
**esq**  122:1
**esquire**  2:13,14
  2:15,16 3:4,12
  3:13
**essential**  62:8
**et**  1:6,9 122:4
  123:1 124:1
**ethnicity**  88:16
  90:11
**everybody**  21:2
  41:14
**exact**  5:14 22:3
  108:16
**exactly**  67:2
  108:24

**examination**
  4:4 6:4
**examined**  6:3
**example**  30:9
  45:9 74:2
  112:24
**exchange**  80:1
  80:3
**exclusively**
  83:24
**exhibit**  4:13,17
  4:22 5:3,6 38:6
  57:23,24 69:14
  79:14 80:20
  87:10
**exhibits**  4:11
  5:1,9,12
**expand**  61:4
**expanding**
  73:23
**expect**  21:2
  100:16 101:4
  115:17
**expenditures**
  61:14
**experience**  30:7
  30:24 34:8
  37:7 88:24
  90:17
**expires**  121:25
**explain**  99:13
**express**  79:4,5
  82:19,25 84:7
  85:9,13 108:5
  109:14 111:12

[expressed - furthered]                                              Page 10

**expressed**
72:21
**extent** 35:5
48:10
**eyes** 60:13

**f**

**face** 50:22
**fact** 29:24 78:8
94:20
**factors** 65:24
**facts** 92:22
**fails** 122:18
**fair** 60:15
62:23 64:15
119:9,12
**faith** 42:22
43:5 45:12
46:7 47:2 51:1
54:12,25 55:12
55:19 56:15
73:7,12 74:25
75:9,16 76:10
76:16,21,24
77:6,7 82:9,16
83:2,6,22,25
84:4,19 85:14
86:13,18 99:21
99:24 101:24
102:10,20,23
103:2 105:19
110:3,9,24
111:16 112:22
112:25 113:2
113:12,16,18
115:2,4,13,15

115:18,19,20
115:24 116:9
116:23 117:3
117:14,24
118:11 119:7
**fall** 16:24 29:5
42:7
**familiar** 34:2
35:12
**families** 80:24
104:4,11,15
106:2
**family** 34:12
**family's** 38:3
**fast** 7:9
**favor** 66:20
74:24 75:14
**february** 1:17
2:2 121:6,20
122:3
**felt** 109:4 112:9
**fewer** 73:25
**fifth** 81:23
**filed** 3:20 10:12
**files** 11:2
**fill** 55:8,9
112:22
**finance** 26:3,4
**financially**
121:14
**find** 8:5 10:15
**fine** 30:3 49:5
**finish** 7:13,15
65:20,21

**finished** 16:13
**first** 6:2 43:11
44:15 59:3
60:20 62:4
74:7 91:16
92:2 104:13
121:6
**fiscal** 61:13
**five** 14:25
16:17,19
114:20
**fleshman** 2:13
4:5 6:5 12:18
12:25 22:7
34:21 38:10
48:13 49:3,7,9
50:18,20 55:5
57:22 58:1
63:6,23 65:17
65:22 66:4
69:16 71:2,4
75:7,24 77:4
79:16 81:2
87:12 88:2
93:10 95:10
96:6 97:21,24
101:3 110:15
111:4,8 114:19
114:24 115:9
116:15 117:10
118:7 119:24
120:4
**flow** 28:11
**focus** 95:23,24
96:12 98:1

106:3
**focused** 77:7
**folks** 67:22
87:24
**follow** 114:10
**follows** 6:3
**foot** 46:13 55:7
113:23 114:3
**foregoing**
124:5
**forget** 49:21
**form** 29:13
**formal** 77:10
77:17
**former** 21:8
**forming** 96:15
98:19
**forms** 30:1
**foundation**
80:20 87:20
**four** 25:5,20
**fourth** 82:5
**franks** 19:3,7
**freshman**
13:11
**front** 26:23
44:4 58:16
**full** 6:6 8:9
**fully** 88:17
**fund** 2:17 3:21
**funding** 71:20
**funds** 6:16
**furthered**
73:22

[gain - heather]                                                        Page 11

| g |
|---|

**gain** 37:24
**general** 3:14
  19:16,17,17
**general's** 70:12
**generally** 21:25
  40:23
**generate** 91:17
**generated** 60:1
**getting** 35:15
  44:4 56:23
  88:10
**give** 8:9 45:9,13
  50:1,9 57:20
  69:2 70:11
  105:15 107:4
  108:14,22
**given** 23:14
  30:17 44:3,8
  92:25 124:9
**gives** 61:9,20
**giving** 7:19
**go** 14:19 26:18
  29:25 33:2
  35:16 37:3
  38:11 44:11,12
  45:2,12 58:2
  65:20 69:19
  75:22 79:17
  87:13 97:21
  113:20 116:19
  116:23 117:14
  117:15,20,25
  118:12,16,19

**goal** 64:23
  73:23
**goals** 47:19,21
  57:14,16 61:16
  61:25 64:18
**goes** 28:11 29:5
  32:16,22,23
  33:11 37:13
  59:9 80:8
**going** 7:6,7
  11:23 22:8,23
  33:18 35:14
  46:4 51:19
  52:1 54:23,24
  55:1,15 56:4
  57:3,11,20
  63:15 64:5
  67:3 78:16
  80:19 81:18
  84:9 91:25
  92:5 98:2
  100:1 108:19
  110:14 113:4
**good** 7:16 10:9
  16:7 37:12
  51:9 91:18
**gotranscript**
  4:22
**government**
  27:14 28:6,9
  28:11,12 29:19
  43:24,24 56:20
  56:23 57:5
  68:11,15 69:11
  70:1,22 81:19

  89:17,20 92:6
**governor** 20:5
  20:6,15,21,23
  20:24 21:3
  68:6,12 114:17
**governor's**
  18:19 20:8,16
  20:17 22:11,17
  22:18 27:23
  28:2,6,7,8,17
  29:2,6,15 30:1
  30:3,14,20
  31:14 32:16,24
  33:19 48:24
  68:10 74:15
**gpa** 51:4,6,8,11
  51:16,17 52:5
  52:15,20 53:4
  53:7,10,19
  54:2,9
**gpm** 2:3 3:5
**grades** 42:7
**graduate** 13:22
  14:1,16 17:5,7
  45:22
**graduated**
  53:18
**graff** 19:5
**greg** 80:2,2,3,6
**grounds** 63:16
  80:20 87:21
**groups** 97:5,9
**guess** 29:14
  67:5 82:6

| **guide** 4:14 39:1 |
|---|
| h |

**h** 123:3
**half** 8:4 89:25
**hand** 121:19
**handle** 51:20
**handled** 21:25
**handling** 51:23
**handwritten**
  29:12,14
**happen** 29:5
  90:21
**happened**
  28:25
**happening** 29:3
  91:2
**happens** 24:2,3
  29:20 31:17
**hard** 7:21
**harstad** 19:4,8
**he'll** 29:23
**head** 59:8
**heads** 7:20
**health** 13:21
  16:2,3
**hear** 79:3 85:17
  87:7
**heard** 47:9,13
  54:6 64:24
  74:7
**hearing** 43:18
  43:20 68:14
**hearings** 57:2
**heather** 23:3

[help - information]                                                    Page 12

**help** 68:23 69:4
**hennepin** 14:25
   121:3,24
**hereto** 124:7
**high** 12:4,9
   14:14,24 15:1
   15:2,19,21,22
   16:17,18 21:23
   36:19 37:1,2,6
   37:13,15,17,21
   37:25 38:2
   45:14,17,20,22
   45:25 46:3
   47:23 51:8,10
   51:17,23 52:14
   52:18,25 53:1
   53:9,10 61:9
   61:11,20,22
   62:15,18,21,24
   63:10,14 64:9
   64:12 72:7
   80:25 106:9
**higher** 52:21
**highlights**
   61:12
**hired** 19:20,21
**hold** 68:11
   77:15 98:12
**holidays** 13:6
**honed** 56:8
**hoornbeek**
   49:22
**hope** 73:1,6,9
   99:1

**hopefully** 7:9
   45:23
**hoping** 91:16
**hopkins** 16:18
   21:23
**hot** 105:15
   107:4
**hour** 8:3,4 49:4
**house** 21:5
   24:24 25:3
   26:2 44:5 67:3
   68:14 69:18,24
**hubbub** 30:16
**huh** 7:20 8:19
   10:3 12:8 13:5
   17:19 19:24
   20:13 24:14
   26:24 30:11
   31:8 32:19
   33:8,10 51:3
   52:13,24 53:5
   55:6 56:6,25
   58:22 59:20
   60:8 65:1
   67:21 70:21
   73:18 82:23
   83:13 86:10
   90:23 96:18,19
   99:3 102:5
   109:6 110:21
   114:5,11
**human** 48:6,15

**i**

**ib** 61:2
**idea** 30:6 32:10
   43:9,10 91:4
**identification**
   38:7 57:25
   69:15 79:15
   87:11
**identified**
   48:17,18
**ids** 2:4 3:7
**ii** 6:8
**illinois** 13:12
   13:19
**impact** 57:3,6
   57:11 89:8,9
   94:23,24 95:4
   95:6,15,17,18
   95:20,22,25
   96:9,13 98:2,5
   98:6,15,21
   99:7,10,12,14
   102:13,18,25
   104:11 107:9
   107:16 109:2
**impacted** 85:22
   85:25
**impacting** 93:1
**impacts** 62:24
   96:14 108:20
**impartiality**
   121:16
**important**
   104:9

**impose** 56:24
**imposing** 54:2
**include** 62:12
**included** 43:21
**including** 39:22
**index** 4:1,11
   5:1
**indian** 19:3,9
   89:9
**indicate** 5:14
**indicating**
   17:24 50:12
   105:24
**indicator** 51:19
**indicators** 52:1
**individual**
   63:18
**individual's**
   83:11
**individuals**
   21:15 24:8
   85:21 97:18
**info** 88:15
**information**
   11:24 27:5
   39:23 40:11,22
   41:2,6,12,14
   44:9,9,11,12
   50:2 55:22
   56:22 88:4,11
   88:22,25 90:18
   91:6,16,19,22
   92:4,14,15,23
   93:11,17 94:5
   94:10,13 95:12

95:14 98:25
107:23 108:25
109:23 112:8
**informed** 89:13
**initiatives**
23:17 27:22
**inner** 35:20
**inquiry** 96:1
**inside** 59:4
**institution**
36:17 39:8,16
39:19,21 40:18
40:23 42:4
45:3,13,14
46:13 51:12
52:21 65:13
72:10 76:11,22
98:6,16,17,21
99:5,22,25
100:3,6,19
101:14,20
102:19,23
103:2 115:18
116:19 117:15
117:15,21
118:1,12,20
**institution's**
42:15 52:22
53:4
**institutions**
36:3,6,11,12,24
40:1 41:16,23
42:10,11,21
46:9 47:13
62:10 64:1

65:9 66:10,15
73:21 74:1
75:11 85:22,24
86:14 88:15
90:19 95:1,25
96:9 99:9
100:8,13,19
101:10,13,24
102:11 107:10
107:17 110:3
111:15 115:1
116:7,24
119:13,16
**instructions**
4:7
**intended** 45:7
**interest** 66:6,10
66:15 121:15
**interested** 20:9
22:12 88:10
121:14
**interesting**
10:11 108:14
**internal** 82:6
**internally**
72:21 91:17
**international**
4:18 58:11
61:2 62:13
**interview** 20:13
105:9,13
**interviewed**
20:11 105:12
**interviews**
22:10

**involved** 27:19
28:13 35:2,3
55:12
**involvement**
35:6
**issue** 66:21
77:8 81:17
**items** 9:18
**ithaca** 13:13,25
14:7

**j**

**jane** 19:4,8
**january** 16:25
18:12
**jeffrey** 3:12
122:1
**jeffrey.timme...**
3:17 122:2
**jett** 1:9,16 2:1
4:3 6:1,8,11
8:8 11:25 27:1
82:10,21 85:1
95:21 97:25
121:5 122:4,5
123:1,2,24
124:1,2,4,12
**jfd** 1:4
**jim** 77:21,22
**job** 1:25 89:2
**joe** 97:17
104:17,21,22
104:23,25
105:7,12,14,18
105:25 106:16

**joe's** 105:20
**joining** 21:6
34:25
**journal** 9:14
**judged** 113:4
**junior** 37:16

**k**

**k** 23:24
**kat** 90:6
**keep** 9:14,18,24
110:3 117:2
120:6
**kid** 23:23 95:23
**kids** 23:22
**kind** 11:16
18:15 20:9
30:6 36:14
37:14 38:21
43:21 47:14
68:2 88:25
**kinds** 7:20 89:4
**knew** 16:10
29:1 56:7
60:12
**know** 7:24 8:5
11:5 16:11
19:22 20:19,24
21:2,4,14
23:15 24:25
30:2 32:12
34:20 35:17,19
35:20,22,23,25
36:14,21 37:4
37:10 38:12
40:22 41:1,5

41:11,15,16
42:18 46:24
48:11,12 53:16
54:5 55:21,23
55:24 56:17,18
56:18,22 57:5
57:7 63:5 66:3
67:2 69:20
70:14 72:16,20
72:22,23,23
74:2,11,14,15
74:17,19,22
78:17 79:7
80:7 81:15
84:2,16,20
86:15,25 87:2
89:8 90:20
92:25 93:13
94:15 95:5,9
95:11,13,17,19
96:4,5 97:1,4,9
97:13,19,20
98:11,13 100:7
100:11,12,15
101:1,2,17
103:10,12
104:13,15,21
104:24,25
105:1,7,8,10
106:19,23
110:12,14
111:2,3,18
114:12 115:15
117:7,12 118:4
119:22,23

120:3
**knowledge**
42:14 84:1
**kristin** 80:7,15
**kunesh** 25:24
26:4,4 88:10
88:21 89:9
91:5,20,23,25
92:24 93:12,16
94:4,10,15

**l**

**laid** 85:10
**landon** 3:4
**largest** 120:1
**latest** 31:19
**lathrop** 2:3 3:5
**lathropgpm.c...**
3:9
**laurie** 25:23
26:2
**law** 30:9,15
42:20 43:2
**lawsuit** 6:11,14
10:11,13
**lead** 16:18
**leadership**
16:23 17:3
20:17
**leads** 62:20
63:9,13 64:11
**learn** 25:14
43:21 103:19
**learned** 44:15
72:17

**learning** 24:3
62:5,7
**leave** 74:8
**lee** 6:8
**left** 81:9
**legal** 48:10
119:21 122:23
**legislation** 61:4
94:23
**legislative** 24:5
24:6,13,16,20
25:11,18 26:11
26:12,17,19
29:3,8 30:18
43:13,17 48:14
57:1 67:14
74:21 78:13
87:8 88:6
103:10,20
**legislators**
88:25 96:23
**legislature**
25:15 28:1
32:17 49:1
58:14,20 59:10
60:21,25 66:24
67:1 74:18
77:12,19 82:18
82:25
**level** 31:12 33:7
33:16 35:11,22
51:21 59:13
62:16
**liberty** 2:17
3:21

**license** 15:11
15:12,13
**licensure** 13:16
13:16 14:20
15:6,8,9,14,15
15:15 16:13,13
**limitation**
100:10
**limitations**
65:18,23
**limited** 100:8
100:17
**limiting** 107:19
**line** 91:13
123:4,7,10,13
123:16,19
**lines** 39:7
**linnell** 1:24 2:5
121:24
**list** 9:18 23:20
40:17 41:2,11
78:3
**listen** 103:16
103:23 104:10
**listening** 107:8
111:19 112:8
**lists** 41:21
**little** 7:9,10,25
23:21,23 24:18
103:5 118:8
**llp** 3:5
**local** 106:9
**loe** 1:6 6:11
122:4 123:1
124:1

**[loe00001567 - mentioned]**                     Page 15

| loe00001567 | m | 79:14 87:10 | **meet**  11:13 |
|---|---|---|---|

**loe00001567**
  5:4
**long**  9:7 15:9
  18:10 23:20
  60:25
**longer**  100:20
  108:7 118:23
**look**  10:17
  18:25 28:4
  32:15 33:1,2
  56:21 57:6,21
  58:2 85:6 93:7
  107:4
**looked**  10:12
  10:18 11:9
  49:18 56:10,13
**looking**  49:12
  49:14,16 50:5
  52:19 59:5
  90:22 95:22
**looks**  80:1,3,6
  87:23 88:5
  92:23
**loop**  81:20
**lost**  118:5
**lot**  15:22 16:9
  46:3 49:12
  80:17,22
**loud**  35:25
  39:14 42:1
  93:23
**lower**  89:25
  107:21,22

**m**

**m**  86:16
**made**  32:9
  102:2,4,6,11
  124:5
**madeleine**  3:13
**madeleine.de...**
  3:18
**main**  37:22
  90:8,10 93:9
**maintain**  9:16
**make**  7:18 24:9
  39:16 40:3
  42:3 66:12
  81:21 92:5
  94:18 108:19
**makes**  33:6
  46:6 89:14
**making**  71:17
  72:2
**mandated**
  58:19
**manner**  5:13
**mansfield**
  59:18,19
**march**  4:23 5:6
  69:19,24 85:5
  90:1 107:5
**maren**  19:21
**maren's**  19:22
**mark**  1:6 57:22
  122:4 123:1
  124:1
**marked**  38:6
  57:24 69:14

79:14 87:10
**mary**  25:24
**master's**  13:15
  14:2,3
**matter**  78:8
**mde**  22:20 29:2
  30:4 31:12
  39:5 53:24
  54:1 59:6
  67:22 68:1
  80:24 82:11
  84:15 86:8
  87:24 89:21
  114:9
**mde000451**
  4:20
**mde001535**
  4:15
**mde001716**  5:7
**mean**  10:20
  23:22 29:12
  34:5 44:24
  50:15 51:15,16
  53:15 64:3
  72:2 94:22
  99:13,14 100:2
  106:6 109:10
  112:19 115:10
**meant**  16:8
  42:8
**mechanically**
  35:13
**mechanics**
  35:19 36:1

**meet**  11:13
  20:14,15 22:16
  22:20,22 23:1
  23:5 24:21
  25:5,10 26:6,7
  51:6,8,11 52:8
  79:3,7,10
**meeting**  10:5
  10:21,23 24:23
  25:3 49:19,20
  56:4 67:22
  68:5 78:19,21
  93:24 107:5,7
  107:14 111:9
  111:20 114:5
**meetings**  9:22
  26:15,16,17,19
  103:8,13
**megan**  89:19
  89:19,25
**melanie**  19:3,6
**melinda**  1:6
  122:4 123:1
  124:1
**members**  34:12
  77:11,19
**memory**  11:17
**mention**  56:1
  84:21 85:24
**mentioned**  19:6
  24:12 50:25
  70:1 104:17,21
  105:1 106:12
  106:24

**message** 90:5
91:11
**messages** 81:9
**met** 10:23
21:17 85:1,4,7
85:8 102:7
106:24
**metro** 12:6,7
**midatlantic**
122:15
**middle** 15:20
**mind** 44:19
46:6 80:17
**minimum** 52:5
53:7 54:2
**minneapolis**
2:4 3:8 12:1,2
12:5 15:2
121:6
**minnesota** 1:2
2:4,7 3:14,15
9:9 12:1 13:17
14:20 15:10,18
16:14,23 17:2
17:13,15,20,25
18:2,7 21:5
23:25 24:11
38:24 48:6,15
52:5 53:4,20
55:19 58:15
60:21,25 61:7
61:18 100:14
100:23 101:23
119:11,13
120:2 121:2,6

**minnesota's**
62:11
**minute** 21:13
35:8 38:11
69:20
**minutes** 114:20
**mischaracteri...**
54:20
**mission** 39:21
40:10
**mn** 3:8,16
121:24
**moment** 29:3
38:8 56:9
59:14 66:23
67:1 101:11
**moments** 24:6
24:22,23 25:2
**month** 18:11
**morning** 70:19
**mueller** 23:3

**n**

**n** 86:16
**n.w.** 2:18
**name** 6:6 9:4
19:20,22 21:14
68:12 105:2
106:12
**named** 104:17
108:18
**nathan** 97:17
104:18,22
106:16
**nation** 25:9

**nature** 10:4
**naval** 13:11
**nay** 29:7 33:18
**near** 89:24 90:4
**neb** 1:4
**necessarily**
5:14 25:11
38:17 51:18
101:6,7 107:21
**necessary**
47:19,24 124:6
**need** 8:4,7
18:23,24 40:2
40:9 43:1
52:12 53:20
55:8,9 58:3
**needed** 60:13
111:23,25
112:1,5,6
**negotiations**
17:22
**never** 70:16
81:18
**new** 13:14
28:20 92:13
**news** 104:24
**nice** 28:22
**night** 70:20
**nine** 16:21 74:4
**nodding** 7:20
**nope** 67:16
**normally** 58:18
**north** 15:2
**northwestern**
10:24 49:15,23

56:3 76:15,19
80:5,24 84:10
84:25 85:5
93:3 102:7,15
107:1 110:5,8
113:8 116:3,17
117:20 118:10
118:14,16,23
119:2,6 120:1
**northwestern's**
90:12
**notary** 2:6
121:24 124:13
124:19
**note** 3:20 5:12
50:8,9 122:10
**notebook** 9:21
**noted** 111:19
124:7
**notes** 9:22,25
11:16 58:13
78:18 107:13
**noticed** 49:11
121:10
**notify** 20:8
**notifying** 106:2
**number** 38:6
57:24 59:5
69:14 74:3
75:11 79:14
87:10 99:9
100:9,17,21
101:5,21
105:16 108:3
108:16,18

**numbers** 39:3,4
71:6 90:13
109:20,22
**nuts** 38:23

**o**

**oath** 7:4
**object** 63:16
80:19 87:20
**objection** 12:14
12:21 21:20
34:14 48:9
54:19 63:2
65:16,25 75:3
75:18 76:25
77:5 93:4 95:7
96:2 100:24
110:10,25
111:6 115:5
116:11 117:5
118:2 119:20
**observe** 13:6
**obstacles** 45:18
73:4
**obtained** 16:12
**occasion** 90:25
**occurred** 67:13
**offense** 23:23
**offer** 61:7,18
75:11 86:19
100:20 106:1
113:8,17
116:17 117:1
118:17
**offered** 54:16
101:13

**offering** 61:17
62:1 73:13,22
74:1,23 75:10
76:19,23 99:5
100:3 106:1,5
106:6 110:6,16
116:3 117:19
118:15 119:3
**offers** 63:13
118:23
**office** 3:14
18:19 20:8,16
22:1,11 27:23
28:2,6,7,17
29:2,6,15 30:1
30:4,14,20
31:14 32:16,24
33:19 48:24
68:10 70:12,23
74:16 78:22
114:17
**offices** 2:3
**oh** 10:8 19:15
21:13 86:18
**okay** 6:20 7:3,6
7:18 8:2,16,22
9:9 10:11,25
11:10,16,20,23
13:18,22,24
14:3,9,12,16,23
15:7,9,12,17,22
16:7,12 17:1,8
17:11,17 18:6
19:2,6,23 20:3
20:13,18,21,24

21:12,24 22:8
23:5,8,19
24:12 25:7,13
25:17,20,25
26:6,10,14
27:10,17,21
28:4,14,21
29:9,17,21,23
30:3,9,23 31:9
31:15,18 32:5
32:7,11,21
33:20,25 34:2
34:12,22,25
35:5,12,18
36:2,9,14,21
37:18,22 38:13
38:16,19,25
39:10 40:9
41:16,20 42:25
44:1 45:4,6
46:6,16 49:7
49:16 50:1,9
50:14,17,24
51:4 52:4 53:5
53:8,11,24
54:6,10,15,18
56:10,21 57:4
57:8,14,17,20
58:5 59:7,15
60:3,23 63:7
65:4 66:25
67:6,15,25
68:5,20 69:1
69:22 70:8,11
70:14,18,21,24

73:21 74:11
75:8 78:7,11
78:14,18 79:9
79:13,19 82:8
86:3 87:15
89:13,23 90:14
92:2 93:14
94:2 96:14,18
96:20 98:14
101:22 102:13
102:18 104:2
105:18 106:5
106:19 108:22
109:1,10
110:16 114:22
115:17 117:11
118:8,18 119:5
**old** 75:15
**once** 23:10,11
37:13
**ones** 13:8
**ongoing** 80:23
81:3
**online** 46:10
54:16,23,25
55:16 76:17
88:17 113:8,13
113:18,19
**open** 17:8
65:14 119:2
120:6
**opening** 72:10
**operates** 35:13
**opinion** 44:14
60:14 98:19

**opportunities**
61:8,19 62:6,8
73:4 107:19
108:7 119:2
**opportunity**
32:15,18 35:21
44:23 48:4,5
57:18 61:10,21
62:16 72:6
96:17 99:11
105:22 106:3
109:9 112:13
**opposition**
103:8
**options**   4:14,20
39:1 58:12
61:3 62:14
71:19 72:4
88:13
**ordered**   121:11
**orders**   30:17
**org**   18:25 19:1
**organization**
97:15 105:3
**organizations**
97:5,10
**orientation**
47:16
**original**   3:20
5:9,9 121:10
**osseo**   15:1
**outcomes**   62:21
63:10,14 64:12
**outlook**   10:18

**outside**   82:24
**overall**   100:21
101:19 108:16
**overhear**   69:10
**own**   25:12 32:9

**p**

**p.m.**   90:1
120:10
**pa**   1:25
**page**   2:25 4:1
5:1 39:2,3,5,7
41:20 60:19,20
62:3 71:6,6,7
71:13 88:8,9
89:21,24 91:8
91:9 123:4,7
123:10,13,16
123:19
**paragraph**
42:9 60:20
62:4 71:7
**parents**   96:23
**park**   14:24
15:1 16:16
**part**   24:4,13,19
25:11 41:18
42:22 56:15
59:3 68:18
89:19,20 97:20
105:8,10,23
**participate**
12:19 13:1
15:23 36:3,7
36:23 40:2
42:12,15 45:2

52:6,8 62:25
64:20 65:8,10
66:8,9,11,17,18
108:15 113:21
**participating**
34:13 50:23
52:10 53:25
108:4
**participation**
39:19 61:5,13
62:19 63:8
**particular**
14:12 31:10
44:7 49:13
55:3 78:10
84:9 100:6
102:10,16
104:1 115:1
116:7
**parties**   121:11
121:13,15
**partway**   14:6
**party**   23:13,14
121:10
**passing**   94:1
**past**   30:25 32:6
33:20
**pathways**   61:7
61:18
**paul**   3:16 16:20
17:21
**pennsylvania**
2:18
**people**   18:20,23
19:6 20:20

82:9,15,16
83:1 84:19
85:14 97:15,16
98:11 103:7,13
103:24,24
104:20 105:5
106:13,21,21
**perceived**
92:14
**percent**   18:4
24:25 25:2
108:19,20,21
**perryman**
21:10
**persistence**
62:22 63:11
**person**   19:7
55:7,16 68:12
83:12 88:18
96:13 105:1,2
118:16
**personal**   32:1
43:8 63:19,20
68:2 98:8
119:8
**personally**
20:25 21:4
22:2,5 40:4,20
41:15 46:25
47:4,8,11,17
58:21 69:8
**persons**   121:15
**perspective**
37:1,8,20 38:3
38:4 112:9

**[pertinent - printout]** Page 19

**pertinent** 92:14
92:15,16,18,20
**phone** 106:18
**phrase** 28:23
**phrased** 118:25
**physical** 13:20
70:15
**physically**
46:13
**picture** 94:21
94:22,23
**piece** 25:8,12
37:10 51:24
**pittsburgh**
13:15 14:4,7
14:10,17
**place** 46:4
78:12 107:5
**placement** 4:18
58:10 61:1
62:12
**plaintiff** 9:11
**plaintiffs** 1:7
2:12 3:3
**plan** 23:6
**please** 6:6
27:24 39:11,15
42:2 60:23
62:4 66:13
80:18 82:4
90:3 91:21
95:3 98:18
**pluck** 20:10
**point** 41:21
81:23 82:4

84:24 85:2
86:3,4
**points** 44:4,6
44:10 66:23
67:1 69:5 70:2
70:6 81:1
107:24
**policies** 22:11
23:17 26:22
28:15,18 41:17
75:1 98:2
102:9
**policy** 25:2
26:2,2,5 27:3
27:22,25 30:4
30:25 31:3
33:22 56:24
67:2,4,4 69:18
69:24 78:3
92:17,18 96:1
**population**
108:17
**populations**
88:12
**pose** 110:1,2
**position** 10:7,9
18:7,10,15
19:12,25 20:1
118:22
**positive** 62:24
99:7,10,12,14
**possibility** 87:4
**possible** 10:25
64:19 65:10
66:11,16 73:5

88:16
**postgraduate**
23:24
**postsecondary**
4:13,19 38:25
39:8,16 40:1
41:22 42:4,10
42:11,21 45:16
45:20,25 47:13
47:22 51:12
52:22 58:12
61:2 62:9,13
63:25 65:9,13
71:18 72:3
88:13,14 94:25
**potential** 22:11
57:11 62:17
73:17 74:8
96:14 98:15
104:11
**potentially**
31:12 35:7
46:1 51:14,15
53:14,15 59:13
59:14 64:2,3
83:12 89:6
93:22 99:8
101:8,16 115:8
115:10,16,25
116:1,19,21
**pre** 23:24
**preference**
119:8
**preparation**
61:8,19

**prepare** 11:8
11:17 68:23
**prepared** 70:2
**prepares** 63:25
**preparing** 62:8
69:4
**present** 25:15
44:11,12 69:1
**presentation**
44:7
**presenting**
26:25
**president** 10:24
80:4
**presidents**
73:16 78:10
79:8,10 85:1,4
106:25
**prevent** 42:21
**prevented** 43:3
47:1
**previous** 22:22
23:2 32:8
**previously**
110:23
**principal** 8:15
8:16,23 15:11
15:13,15 16:16
16:18,18 17:25
18:1 21:22
22:3 34:11
37:6,11
**printed** 70:9
**printout** 69:17

**prior** 21:18
42:19,25 54:20
91:2 111:9
**privacy** 90:16
**private** 88:14
90:13 96:20
97:5,9 106:9
**privy** 27:16
**probably** 23:14
**problem** 48:16
54:8 113:16
**procedure** 3:22
**process** 20:6,14
22:9,15,19,24
22:25 24:5,13
24:16,20,25
25:12,19 42:23
48:15 74:21
103:11,20
112:7
**produce** 50:3
50:10,11 70:12
**produced** 71:1
**production** 4:9
**program** 14:21
15:6,8,10,23
16:13,23 17:3
17:5 21:19
34:3,8,13 35:2
35:13 36:4,7
36:23 37:19,23
38:23 39:20
40:2 42:6,16
45:2 47:20
50:23 52:6,9

52:11 61:17
62:1,24 63:1
63:12 65:11
66:11,16 74:9
76:4,14,18,22
100:21 101:14
108:23 117:25
**programs** 4:20
42:13 58:12
60:16 61:4,7
61:18 62:12,15
64:21 75:2
88:14 90:12
100:13 116:4
**prohibits** 6:16
48:7
**pronounce**
86:15
**proposal** 30:12
30:14 31:3
32:13 33:10
**proposals** 29:4
29:10,10 30:4
30:25 32:9
33:22
**propose** 28:15
31:18,25
**proposed** 26:22
26:23 31:14
71:24
**proposing**
43:16
**protected** 6:18
46:22 47:15
48:8

**provide** 61:8,19
73:4 107:19
108:2,7
**provided** 93:19
**providers**
75:17 95:6
120:2
**provides** 48:4
61:11
**providing**
99:11 105:22
**provisions** 71:9
71:15
**pryor** 25:23
26:3
**pseo** 4:14 6:15
6:16 12:9
15:23 16:3,5,6
16:10 17:9
21:19,25 34:3
34:8,9,13 35:2
36:4,7,15,23
37:3,14,19,23
38:23 39:20,22
40:2 42:5,13
42:16,23 46:4
47:20 50:23
52:6,9,11
53:25 54:3,16
56:16 61:3,17
62:1,24 63:12
65:10 66:11,16
71:25 72:15
73:13,22 74:1
74:9,23 75:2

75:10,12,17
76:3,13,15,18
76:19,23 81:6
86:19 88:1,14
88:17 95:6
97:15,16 99:6
100:3,9,13,20
100:22 101:23
104:12,20
105:5,23,23
106:1,1,6,13,22
110:6,7,17,17
113:9,13 116:3
116:4,17 117:2
117:18,19
118:15,17,23
119:3,7 120:1
**psis** 90:13
**public** 2:6 37:8
71:19 121:24
124:19
**publicly** 66:20
**purpose** 47:25
**purposes** 37:19
66:7
**pursuant** 3:21
**pursue** 64:24
65:2 71:18
72:3,7
**put** 78:9 83:9
106:16
**putnam** 21:9
**putting** 83:10

**[question - relations]**                                    Page 21

| q |
|---|

**question** 7:24
   12:24 15:3,24
   15:25 27:24
   30:19,22 34:4
   43:8 47:4 53:6
   53:22 57:3
   61:23 65:20
   66:12 75:6,22
   77:15 85:12
   89:7,8 95:2
   101:10 104:14
   104:16 107:21
   108:11,13
   110:14 115:11
   117:9 118:24
**questioning**
   105:9
**questions** 6:10
   6:22 7:14,15
   120:5,8
**quick** 114:20
**quotations** 5:12
**quote** 5:15

| r |
|---|

**r** 123:3,3
**race** 46:22
   47:15 88:16
   90:11
**raise** 44:19
   74:20
**raised** 12:2
   109:1
**raises** 112:18
   112:20

**rate** 121:11
**rather** 45:20
**rationale** 82:12
**reach** 20:10
   96:21 97:6
**reached** 97:1
   97:10
**read** 5:13 39:11
   39:12 42:1,8
   59:3 60:23
   62:4 71:12
   82:3 84:25
   86:12 88:19
   90:7 91:13
   120:9 121:17
   122:9 124:5
**readiness** 62:11
**reading** 63:21
   70:5 80:17
**ready** 38:12,14
   44:4 51:24
   56:24 69:21
**really** 17:24
   34:23 77:5
   116:8,9
**reason** 8:8
   122:11 123:6,9
   123:12,15,18
   123:21
**recall** 44:1
   67:15 68:20
   69:23 71:21
   77:23 78:11,15
   81:4,8 82:13
   82:17,20 92:2

92:5 93:15,18
   94:6,8,14
   96:25 97:8
   103:22 106:13
   106:15 107:3
   114:16
**receipt** 122:17
**received** 84:17
**recent** 10:6,9
**recently** 19:19
**recognize**
   38:16,17 58:6
**recognized**
   39:18
**recollection**
   79:12
**recommend**
   114:6,9,13
**recommendat...**
   53:2
**record** 5:14 6:7
   9:24 49:8,10
   60:24 97:23
   114:23 121:8
**records** 10:12
**reduce** 65:4
   100:21 101:4
   101:18
**reduces** 75:11
**reducing**
   101:21
**refer** 6:20,20
   6:22
**reference** 4:14
   39:1

**referenced** 50:2
   122:6
**referencing**
   71:24
**referring** 6:23
   49:11 52:20,23
**reflect** 61:15,24
**reflected** 5:13
**reflects** 60:16
**refresh** 11:17
**regarding**
   11:21 68:1,7
   68:10 77:12,19
   97:2
**regular** 9:19
   71:6
**regulations**
   41:9
**reimbursed**
   35:15,24
**reinstate** 74:25
**rejected** 33:21
   33:25
**rejecting** 46:21
   47:14
**relate** 10:13
**related** 21:19
   23:16
**relations** 27:14
   28:7,9,11,12
   29:19 43:24,25
   56:20,23 57:5
   68:11,15 69:11
   70:2,23 81:19
   89:18,20 92:6

**relative** 121:12 121:13
**relevance** 12:15 34:15
**relevant** 95:25 96:7
**religion** 6:17 88:16
**religious** 2:17 3:21 12:12,19 13:6 83:24 84:5 119:18
**remarks** 69:18
**remember** 9:4 20:18 35:9 37:11 67:13 79:6 80:13 81:7,11,14 86:2,23 87:9 93:18 94:17 108:15
**remind** 86:20
**reminded** 86:6 86:13
**remove** 45:7 73:3,9
**removes** 48:3 99:2
**removing** 45:5 45:6,17 57:19 99:17 112:12 116:9
**repeat** 27:24 66:13 85:12 95:2

**rephrase** 7:25
**report** 18:14,19 18:21 24:5 35:8 58:14,19 59:22 60:4,15 60:17 61:11 64:11
**reported** 1:24 121:5
**reporter** 2:6 7:6 104:24
**reporter's** 5:12 121:1
**reporting** 105:15,16,20
**reports** 60:1
**represent** 71:1
**representative** 21:11 81:5,12 81:17 82:14 85:10 86:20,23 114:14
**representatives** 21:5 22:16 27:12
**request** 27:5,7 39:17,20 40:3 50:18 88:7,25 89:14 90:9,10 90:18 91:19,22 93:9
**requested** 5:10 60:5 91:6 92:3
**requesting** 88:21

**requests** 4:9 27:11,13 40:4 89:4
**require** 113:11
**required** 37:9 39:24 40:11,23 41:2,5,6,11 43:4 58:14 124:13
**requirement** 37:14 46:7 47:3 51:2,5 52:22 53:7 54:2,12 55:19 56:2,15 75:10 76:24 77:6 84:4 101:25 102:20 103:3 113:5,18 115:3 116:10 117:18
**requirements** 35:15,17 36:2 36:4,10,15,16 36:19,22 37:4 38:22 40:13,16 40:17 51:12 53:20 71:25 72:9 73:7,8,12 75:16 111:10
**requires** 36:6
**requiring** 42:22
**research** 62:18 63:7

**reserved** 121:18
**respective** 107:9
**respectively** 26:1
**respond** 53:17 109:18,22
**response** 43:9 80:9 111:7
**responsibilities** 24:15
**responsible** 27:21 31:5 32:14 59:16
**restore** 75:1
**restoring** 75:17
**restrict** 6:17
**result** 73:13
**resume** 75:15
**retirement** 23:13
**return** 122:13 122:16
**review** 11:10 38:9,12,19 40:4,6 58:4,18 58:24 59:1,9 59:11,23,24 60:5 69:20 79:17,23 87:13 87:18 120:6 122:7
**reviews** 40:7

**richard**  3:4
**richard.landon**
  3:9
**rid**  73:7
**right**  6:12,18
  7:1 38:5 39:2,6
  42:1 43:7
  50:16 65:15
  71:5,12 82:3
  86:14 88:3,22
  107:1 116:2,20
  116:24 117:25
  118:14 119:10
  121:17
**rights**  48:7,15
**rigor**  51:21
**rigorous**  4:17
  58:10 62:5,7
  62:11,16,19
  63:8
**rocori**  21:13
**role**  98:1
**room**  20:20
**rules**  3:22
**run**  31:11

**s**

**s**  1:24 2:5,14
  86:16 121:24
  123:3
**sat**  17:22
  103:19
**saved**  70:15
**saying**  7:12
  52:18 71:21
  84:18 104:11

113:22 115:12
**says**  38:21
  39:25 40:9
  53:9 59:3,6
  61:17 63:7
  64:11 81:3
  82:21 84:15,25
  86:4 88:6,9
  93:8,23 113:20
**scheduled**  1:18
**school**  12:4,10
  14:14,24 15:1
  15:2,18 16:17
  16:19 21:23
  34:19 35:14,14
  36:20 37:1,2,6
  37:8,13,15,17
  37:21,25 38:2
  42:3 45:15,17
  45:20,22,25
  46:3 47:2,23
  51:7,8,10,17,23
  52:4,11,14,19
  53:1,1,9,10
  54:4,16 61:9
  61:11,14,20,22
  62:15,18,21,25
  63:10,14 64:9
  64:12 72:8
  105:21 106:6
  110:16
**schools**  6:16
  15:1,19,20,21
  15:22 25:1
  30:10 43:3

46:21 54:1,2
  55:18 56:1,11
  56:14 61:6
  73:6,12 74:6,8
  74:23 75:8,9
  83:21,25 84:3
  84:9,12 85:13
  86:1 95:6,15
  95:18,20 96:22
  97:6 105:15
  106:9,10
  109:14 114:6
  117:1
**se**  35:9
**seal**  121:19
**seats**  100:17,22
  101:5,18,21
**second**  19:7
  77:15 86:4
  105:15 107:4
**secondary**  98:6
  98:10
**section**  58:15
**see**  11:9 32:18
  33:9 37:14
  39:3,6 41:24
  51:22 59:23,24
  60:4,6,20
  71:10 81:24
  82:1,8,15 85:2
  85:6 86:7 88:8
  90:2,4 91:11
  91:15,19,22,24
  93:11

**seemed**  111:13
**seems**  38:22
**seen**  23:3,8
  79:20 83:1
  87:16 89:5
  90:21
**semester**  16:24
**senate**  21:6
  24:24 25:4
  44:5 67:4
  68:14
**senator**  21:9
  25:23,24 77:24
  77:24 79:25
  80:6,9,10
  88:10,21 89:9
  91:5,20,23,25
  92:24 93:12,16
  94:4,9,15
**senator's**  90:8
  90:10 93:8
**senators**  90:18
  94:12 96:22
**send**  31:3 40:2
**sender**  89:14
**senior**  37:16
**sense**  46:6
**sent**  80:6 81:8
  93:21 122:14
**sentence**  41:22
  42:9 71:8,12
  80:16 86:4,5,7
  86:9,12 90:7
**sentences**  39:12
  39:13

**[serve - state]** Page 24

| | | | |
|---|---|---|---|
| **serve** 57:15 | **signature** | **sounds** 23:21 | 118:3 |
| **session** 24:7,22 | 121:23 | **south** 2:3 3:6 | **spoke** 43:23 |
| 26:11,12,17,19 | **signed** 122:19 | **sovereign** 25:9 | 77:18 97:18 |
| 28:24 29:8 | **significant** | **spanning** 90:14 | 105:6 106:20 |
| 30:18 31:20,21 | 108:3 | **speak** 7:8 11:21 | **spoken** 44:2 |
| 31:23,24 43:14 | **similar** 28:2 | 28:8 43:19 | **sporadically** |
| 43:17 67:14 | 85:9 | 44:4 67:25 | 13:3,4 |
| 78:13 | **simply** 73:13 | 68:6,9 77:11 | **spot** 8:6 |
| **sessions** 87:8 | **site** 86:19 | 77:18 94:12 | **spreck** 68:13 |
| **set** 40:12,14 | **sitting** 17:23 | 97:14 | **sros** 30:9 |
| 41:13,21 78:23 | 18:24 28:10 | **speaking** 11:4,7 | **ss** 121:3 |
| 84:9 113:23 | 68:17 | 52:18 69:10 | **st** 3:16 16:20,21 |
| 114:3 | **slow** 7:10 | 81:16 94:7 | 17:18,21 21:9 |
| **setting** 93:25 | **socioeconomic** | **specific** 42:12 | 21:16 |
| 94:1 | 107:22 | 45:3,12 61:5 | **staff** 69:11 80:5 |
| **sex** 46:22 | **solution** 48:16 | 76:10 97:20 | 80:24 82:11 |
| **sexual** 47:15 | 48:21 54:18 | 103:18 108:11 | 84:15 |
| **share** 29:20,23 | **solutions** | 108:13 109:20 | **stamp** 32:24 |
| **shared** 81:24 | 122:23 | 109:21 | 40:21 |
| 82:8,14 94:16 | **somebody** | **specifically** | **standard** 41:13 |
| **shares** 115:18 | 20:15 40:5,7 | 20:14 36:8,13 | 51:18 |
| **sheet** 122:11 | 40:13,15 57:1 | 62:20 63:9 | **standards** |
| **shoes** 83:10,11 | 57:2 60:5 83:5 | 84:8 85:15 | 41:18 42:12 |
| **shorthand** 2:6 | 83:9,15,19 | 90:12,19 93:2 | **standing** 37:12 |
| **showed** 78:22 | 89:6,17 104:17 | 94:7 102:17 | 51:9 |
| **shows** 62:18 | 105:6 106:12 | 105:14 111:14 | **start** 7:16 |
| 63:8 | 106:21 115:14 | **specifics** 79:6 | 26:18 |
| **shut** 33:6 | **someplace** | **speculate** 64:5 | **started** 14:24 |
| **sidney** 68:13,16 | 70:15 | 83:9 | 15:8 18:12 |
| **sign** 43:5 46:7 | **sorry** 26:25 | **speculation** | **starting** 41:22 |
| 76:16,20 | 31:23 36:5 | 63:3 66:1 | **starts** 33:13 |
| 113:12 116:22 | 56:12,13 65:18 | 75:19 95:8 | 42:9 71:8 |
| 117:13 120:9 | 65:19 | 96:3 100:25 | 80:16 81:23 |
| 121:17 122:12 | **sound** 7:16 | 110:11 111:1 | **state** 2:7 6:6 |
| | | 115:6 117:6 | 21:4 22:16 |

**[state - suite]**                                                      Page 25

23:25 24:11
35:22 38:24
105:21 114:13
119:10 121:2
**stated** 48:3
**statement**
39:21 40:10
43:5 46:8 47:3
51:2 54:12
55:1,9,19
56:15 73:7,12
75:1,10,16
76:16,21,24
77:6,7 83:23
83:25 84:4
86:17,18
101:24 102:20
103:2 110:4,9
110:24 112:22
113:12,16
115:2,19,20,24
116:9,23
117:14,24
118:11
**statements**
42:22 102:10
117:2 119:6
**states** 1:1 13:11
**status** 107:22
**statute** 41:6
**statutes** 58:15
**statutorily**
58:18
**stay** 103:16,23

**stenographic**
2:5
**step** 46:13
**stephanie** 19:5
**stepping** 55:7
**steps** 111:21
**steve** 25:23
**stop** 73:13
75:10 114:8
**stopped** 73:21
74:23 110:5,16
116:3 119:3
**stopping** 8:5
**stops** 76:19
99:5 100:3
118:14
**straight** 15:6
**strategy** 80:4
**street** 2:4 3:6
3:15
**strictly** 44:6
52:25
**student** 35:14
37:2,5,7,12,15
37:15,20,24
38:3 42:6 45:9
45:15,17,20,21
46:1,3 51:10
52:7,10 53:1,9
53:13 54:24
55:16,17 61:13
72:11 76:8,14
76:17,20 88:12
90:11 96:13
98:7,9 99:18

100:4 102:22
103:1 108:16
112:21 113:20
114:3 115:17
115:21 116:22
117:13,19,20
117:23
**student's** 45:8
**students** 8:21
15:23 16:5,5,9
17:5,6,7,9
21:25 24:1
34:9 35:21
36:22 43:5
46:7,8,21 47:1
47:9,14,20,22
50:22 51:5
53:25 54:3
61:6,7,9,19,21
62:9,15,25
63:14,25 64:4
64:8,17,19,23
64:25 65:2,5,8
65:14 66:7,8
66:17 71:16,18
72:3,14 73:5,5
73:23 76:2
87:25 88:17
94:24,25 95:4
95:17,23 96:23
98:3,17,22
99:2,7,20
100:9,12,22
101:8,11,16,23
102:3,14,19

104:3,10,15
105:16,22
106:2 107:19
107:21,22,25
108:3,8,14,18
108:21,23,24
109:2,11,13,15
110:1,7,23
112:11 113:12
113:17 115:1,3
115:23 116:5
116:18 117:4
119:10
**study** 13:18,24
**studying** 14:10
**stuff** 106:7
**subject** 88:5
**submit** 29:13
39:21 40:10
41:17
**submits** 40:18
**subscribed**
124:14
**substantial**
121:16
**succeed** 71:17
**success** 59:4,8
59:17 62:9
63:25
**successful**
51:19 52:2
**sudden** 46:11
112:25
**suite** 3:15

**summer** 34:19

**superintendent** 15:15 16:20,21 17:17,21 21:8 21:15 22:4 34:10,11

**support** 24:10 25:1 61:6 71:19 96:8,15 107:11

**supported** 61:1 112:2,3

**supporting** 114:8

**suppose** 16:8

**supposed** 49:25 57:15 86:17

**supposedly** 18:17,18 32:23

**sure** 6:25 7:18 23:20 24:9 30:2 38:15 40:20 43:16 50:15 55:23 66:12,22 70:17 71:14,17 72:2 89:11 103:15 103:18,20

**surprised** 82:10,22 83:4 85:17

**sworn** 6:2 121:7 124:14

**system** 75:15

**t**

**t** 86:16 123:3,3

**table** 17:23 18:24

**tablet** 49:11,13

**take** 7:21 8:3,6 9:21 11:16 22:13 25:13 32:24 35:21 37:3 38:8,11 49:4,6,7 58:2,3 62:16 69:19 76:15,17 78:18 79:17 87:13 97:22 105:23 107:13 111:21 113:12 114:19

**taken** 1:17 2:1

**talk** 7:12 76:8,9 77:25 78:4

**talked** 78:5 86:1 103:5 105:14,18

**talking** 6:21 17:24 27:2,3 39:9 44:3,6,10 49:12 52:25 53:3 57:18 66:23 67:1 69:4 70:2,5 83:21 87:25 98:1 101:19,19 114:2

**targeting** 85:15 111:13

**taubel** 19:19

**taught** 15:5 16:9,22 17:3

**teacher** 14:22

**teacher's** 17:14 17:15 18:1

**teachers** 18:4 61:6

**teaching** 14:23 15:8,17,19,25 16:2,3,4 17:1 24:3

**team** 20:17 27:1,2,15 28:9 29:19 43:25 56:20 57:5 68:11,15,16 70:2 81:19 89:18,20 92:6

**technically** 101:18

**technology** 10:7,9

**tell** 11:24 24:18 30:20 57:17 78:24 121:7

**telling** 56:19

**ten** 20:20 74:3 101:11

**tendency** 121:16

**term** 104:23 105:2 111:18

**terminology** 55:1 105:10

**terms** 15:3 34:5 35:13 55:11 99:10,16 107:11 109:19

**testified** 6:3 8:14 73:19 78:15

**testify** 63:18 103:7

**testifying** 8:23 8:25 69:23 103:13,23 104:4,16

**testimonies** 103:17

**testimony** 8:10 54:20 68:21,24 69:2 70:6 71:22 77:11,17 103:6 121:8,8 122:9,17 124:8

**thank** 6:9 7:23 18:6 19:23 30:23 39:25 42:14 58:13 61:15 62:23 63:24 71:2,21 77:10 79:20 80:10 81:3 82:13 90:17 91:18,18

**thanked** 109:23

**thanks** 16:7

**thing** 22:3 28:2 102:8,9 105:17

109:5

**things** 7:21
15:7 25:14,18
30:21 46:2
49:17 78:1,3,4
109:12

**think** 18:3,23
21:10,10,11
31:6 34:18,23
35:25 43:1,3,6
83:15 84:2
86:17 94:6
97:16 98:14,20
98:24 104:2,9
105:2,6 111:5
111:17,23
112:4,14,16,17
119:5 120:4

**thinking** 18:25
99:25

**thomson** 2:15

**thought** 31:7
85:25 99:4
112:7

**thoughts** 80:17
80:23 107:11

**three** 18:25
19:1 21:15
28:24 59:6

**threshold** 42:7
51:11 52:8

**time** 8:18 24:23
27:17 28:25
31:25 49:24
56:9 58:3

66:13 72:13
74:7 77:16
79:17 87:13
90:3 91:3,21
94:18 95:3
98:18 102:21
103:11 104:25
106:18 122:18

**timeframe**
122:8

**times** 23:8 46:3
66:25 103:19

**timmerman**
3:12 12:14,21
21:20 34:14
38:8 48:9
54:19 63:2,15
65:16,19,25
70:25 71:3
75:3,18 76:25
80:19 87:20
93:4 95:7 96:2
100:24 110:10
110:25 111:6
114:22 115:5
116:11 117:5
118:2 119:20
120:8 122:1

**title** 58:9

**today** 6:10 7:3
8:10

**told** 107:9
114:4

**took** 78:12
107:5

**top** 18:15,18
88:6

**touch** 24:15

**traffic** 29:17

**transcribed**
121:8

**transcript** 3:20
5:9 69:17
121:18 122:6
122:19 124:5,8

**transfer** 14:6

**transition** 23:6
23:9

**transmitting**
29:25

**transportation**
46:2

**trends** 61:12

**tribes** 25:9,14
25:19

**trickle** 98:22

**true** 35:24
121:8 124:8

**truth** 121:7

**try** 7:12,13,18
7:25 8:3 118:8

**trying** 45:1
54:11 92:22
94:20 97:16
103:19 109:8

**turn** 39:1,5
60:19 62:3
71:5 88:8
89:21 91:8

**twice** 67:3,5

**two** 7:9 15:2,2
15:16 16:20
19:6 28:24
35:8 39:7,11
39:12 56:3
73:16 78:10
90:19 100:19
110:19,20

**type** 31:13
35:11 43:8

**typed** 29:14
49:20 70:8

**typically** 31:1
33:2

## u

**uh** 7:20,20,20
8:19 10:3 12:8
13:5 17:19
19:24 20:13
24:14 26:24
30:11 31:8
32:19 33:8,10
51:3 52:13,24
53:5 55:6 56:6
56:25 58:22
59:20 60:8
65:1 67:21
70:21 73:18
82:23 83:13
86:10 90:23
96:18,19 99:3
102:5 109:6
110:21 114:5
114:11

**uncomfortable**
82:12 84:16
**under**  7:4 36:3
59:21 60:3
75:15
**undergrad**
13:13,20
**undergraduate**
17:6
**understand**  6:9
6:14 7:3,24
66:12 75:4,5
83:18,19 85:8
109:8 110:13
111:25 112:6
113:19 117:8
118:6
**understanding**
15:24 30:19,21
31:16 37:8,17
37:18 44:25
45:8 46:10,15
52:14,17 54:22
59:7 61:16,25
63:19,21 64:17
75:21 77:9
115:11 118:24
**understood**
7:22 44:16
64:7 112:16
**unfounded**
112:15
**unintelligible**
32:7 67:11

**union**  17:14,15
17:18 18:1,4
**united**  1:1
13:11
**universities**
79:2 83:22
110:19,20
**university**
13:12,14,17,19
14:4,17,20
15:10 16:14,22
17:2 37:10
46:12 52:5,9
52:21 53:3,6
53:19 54:25
55:3 80:5
107:1 113:8,22
118:10 119:25
**unni**  11:21
43:23 68:16
70:23 91:9
**upcoming**
31:23,24
**update**  91:10
**use**  6:16 18:17
55:2 104:23
111:18 112:24
**used**  105:3,4,9
122:19
**usually**  18:2
25:4 26:6,14
27:10,13 28:4
28:15 29:10,18
29:24 37:13,14
38:2 40:4,14

51:17 56:21
59:25 70:19
89:13

**v**

**v**  1:8 122:4
123:1 124:1
**vague**  21:20
75:3 96:2
117:5
**varies**  41:12
**various**  15:18
27:11
**verbal**  7:19
**verify**  122:9
**veritext**  122:14
122:23
**veritext.com.**
122:15
**verm**  2:15
**versus**  6:11
55:16
**viable**  48:16,21
**vice**  80:4
**view**  37:23
63:12 66:5
83:5 98:8,12
109:25
**viewpoint**
83:11,16
**views**  38:13
58:5 60:16
69:22 79:19
87:15 103:25
**violates**  119:18

**voice**  81:9

**w**

**wait**  21:13
**walked**  28:21
**walking**  68:13
68:18
**want**  11:5
34:17 36:6
40:1 45:12,23
45:24 53:19
64:23 65:2,5,8
66:8,17 72:7
81:18 89:10
94:10 95:16
98:17 101:23
102:14,19
104:23 112:23
116:5,22 117:2
117:13 118:9
118:16
**wanted**  22:12
46:12 78:3,5
92:24 94:5,19
95:5,11,13,19
102:22 116:18
**wants**  28:18
37:2 45:9
64:16,19 72:11
76:14 103:1
**washington**
2:19
**way**  28:16,23
65:7 68:24
99:19 114:15
118:25

[wednesday - young]                                    Page 29

**wednesday**
  1:17 2:2 121:6
**weeks**  28:25
**went**  16:10
  30:15 58:19
  91:20,23 93:12
  108:6
**willie**  1:9,16
  2:1 4:3 6:1,8
  27:1 95:21
  121:5 122:4,5
  123:1,2,24
  124:1,2,4,12
**willing**  76:20
**witness**  4:3 6:2
  9:1 12:17,23
  21:22 34:17
  48:12 49:5
  54:22 63:5,17
  63:20 66:3
  75:5,21 77:3
  80:22 87:23
  93:7 95:9 96:5
  101:2 110:13
  111:3,7 115:8
  116:14 117:8
  118:5 119:23
  121:6,9,18,19
  122:8,10,12,18
**witnessed**
  90:24
**witnessing**  29:4
**word**  18:17
  86:15 90:6

**words**  43:2
  44:25 45:11
  76:9 99:23
  102:22 113:3
**work**  9:16
  14:21 16:15
  17:13 21:19,24
  22:2 30:5,14
  30:17,21
**worked**  29:1
**working**  22:20
**workings**  35:20
**world**  61:9,20
  71:16
**would've**  68:12
**writing**  39:17
  40:3
**written**  29:10
  29:11,11,12,13

**y**

**yea**  29:7 33:18
**yeah**  16:7
  17:16 22:6
  27:25 32:1
  34:6 38:11
  51:10 55:11
  60:11 61:24
  66:14 67:23
  71:3 82:6
  89:18 94:1,3
  98:9,19 105:6
**year**  13:11,22
  14:16 15:11
  16:25 18:11
  24:24 26:20

  28:20 29:3
  30:8,15,25
  31:19 33:20,21
  61:14 89:2,3
**years**  9:8 14:25
  16:17,19,20,22
  17:11
**yep**  16:1 68:17
  81:25 93:8
**yesterday**  71:1
**york**  13:14
**youakim**  25:22
  25:22 26:3
**young**  96:13

Minnesota Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

Rule 30.05 Review by Witness; Changes; Signing
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
Rule 30.06(1) whether any review was requested and,
if so, shall append any changes made by the
deponent during the period allowed.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.