**Ex. 116**

# In The Matter Of:

*Melinda and Mark Loe, et al vs.*

*Willie Jett, et al*

---

*DAWN ERICKSON*

*February 9, 2024*

*Dawn Erickson - 2-9-24*

---

*Shaddix & Associates*

*7400 Lyndale Avenue South*

*Suite 190*

*Richfield, MN 55423*

*Min-U-Script® with Word Index*

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 2 of 33

Melinda and Mark Loe, et al vs.   Dawn Erickson    DAWN ERICKSON
Willie Jett, et al         2-9-24       February 9, 2024

---

**Page 1**

1   UNITED STATES DISTRICT COURT

2    DISTRICT OF MINNESOTA

3 ---------------------------------------------

4 Melinda and Mark Loe, on their
  own behalf and as next friends
5 of their children R.L. and O.L.;
  Dawn Erickson, on her own behalf
6 and as next friend of her child
  J.G.; Crown College; and
7 University of Northwestern
  St. Paul,

8
    Plaintiffs,

9
  vs.       Case No. 23-CV-1527

10          (NEB/JFD)
  Willie Jett, in his official

11 capacity as Minnesota
  Commissioner of Education;

12 and Minnesota Department of
  Education,

13
    Defendants.

14 ---------------------------------------------

15

16

17      Deposition of

18      Dawn Erickson

19     February 9, 2024

20    8:40 a.m. - 11:09 a.m.

21

22

23 Taken by:   Jackie Young, RPR

24

25

---

**Page 2**

1 APPEARANCES:

2

3 BECKET LAW
  1919 Pennsylvania Avenue Northwest
4 Suite 400
  Washington, D.C. 20006
5 Dthomson@becketlaw.org
  Abutler@becketlaw.org
6

7 By:   Ms. Diana Verm Thomson, Esquire
    Mr. Eric Baxter, Esquire
8     Mr. Benjamin Fleshman, Esquire
    Ms. Andrea Butler, Esquire
9     Appeared on behalf of the Plaintiffs

10

11

12 MINNESOTA ATTORNEY GENERAL'S OFFICE
  445 Minnesota Street
13 Suite 1400
  St. Paul, Minnesota 55101-2131
14 Jeffrey.Timmerman@ag.state.mn.us
  Madeleine.demeules@ag.state.mn.us
15

16 By:   Mr. Jeffrey Timmerman, Esquire
    Ms. Madeleine Demeules, Esquire
17     Appeared on behalf of the Defendants

18

19

20

21

22

23

24

25

---

**Page 3**

1      I N D E X

2            PAGE:

3 TITLE.............................................. 1

4 APPEARANCES........................................ 2

5 INDEX.............................................. 3

6 EXAMINATION BY:

7   MS. DEMEULES.................................... 4

8 EXHIBITS MARKED:

9 No. 1: (Verified Complaint)........................ 6

10 No. 2: (Declaration of Christian Community)....... 60

11 OBJECTIONS BY MS. BUTLER: 11, 12, 18, 19, 20, 25, 30,
  31, 32, 33, 34, 36, 38, 43, 44, 45, 46, 47, 48, 50, 51,
12 52, 54, 55, 57, 58, 58, 59, 64, 65, 66, 67, 68, 69, 70,
  72, 73, 74, 75, 77, 78, 79, 80, 81, 82

13

14 REPORTER'S CERTIFICATE............................ 84

  VERIFICATION..................................... 85

15

16

17 *Original transcript and exhibits are in the custody of
18 Mr. Timmerman.

19

20

21

22

23

24

25

---

**Page 4**

1   P R O C E E D I N G S

2   (Minnesota Statute 486.10 was

3 complied with.)

4   DAWN ERICKSON,

5   called as a witness, being first

6   duly sworn, was examined and

7   testified on her oath as follows:

8   **EXAMINATION**

9   **BY MS. DEMEULES:**

10 Q.   All right. So we have met just 20 minutes ago or

11 so. My name is Madeleine, and I'll start by asking

12 you to please state your full name for the record.

13 **A. Dawn Michelle Erickson.**

14 Q.   And that was perfect in terms of speed and

15 everything. You're aware that we have a court

16 reporter, and just at the start, I'll note a few

17 logistical pieces.

18   If you could please wait for me to

19 finish any questioning prior to starting to respond,

20 and then I'll similarly wait for you to finish any

21 answers before I start speaking again just so that

22 we don't speak over each other and that helps our

23 court reporter take everything down without two

24 people talking at once.

25   Another note is that our court reporter

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 3 of 33

Melinda and Mark Loe, et al vs.      Dawn Erickson      DAWN ERICKSON
Willie Jett, et al      2-9-24      February 9, 2024

Page 5

1  is able to capture words but not nods or head shakes
2  or um-uhms, so if you could please use oral answers
3  and words, like yes or no. That would just help for
4  the record. Sometimes you might catch yourself, and
5  that's fine. You can say, oh, that was a yes, or,
6  oh, that was a no.
7      I can recognize that might be a little
8  bit of an adjustment, so I just wanted to flag that.
9      I'll note that we're just going to keep
10 this depo open, or at least the possibility, for
11 time just depending on if we finish in time before
12 lunch. I anticipate we will, but I just wanted to
13 flag that just in case.
14     And then also wanted to ask if you have
15 any reason why you wouldn't be able to testify
16 truthfully today?
17 A. No reason.
18 Q. Okay. And in terms of the questions I ask, if
19 there's ever anything you don't understand, please
20 let me know. I'm happy to clarify. If you don't
21 clarify, I'll expect that you understood and you
22 can just sort of start answering. Does that all
23 make sense?
24 A. Yes.
25 Q. Okay. Thank you.

Page 6

1      And you understand that you are here to
2  testify under oath in the Loe versus Jett lawsuit;
3  is that correct?
4  A. That is correct.
5  Q. Okay. And I will start with this document, if we
6  could please mark it as Exhibit 1.
7      (Exhibit No. 1 marked for
8  identification.)
9  Q. And so you can take a look at that. I'll give you
10 a few documents throughout the course of the
11 deposition today, and each time I give you one,
12 please take the time you need to review it. And
13 when you're ready to -- when you're done reviewing,
14 you can let me know. So I'll ask that you review
15 this, please.
16 A. Oh, really?
17     MS. BUTLER: You don't need to read
18 all of it. You can just familiarize yourself with
19 what it is.
20 A. (Reviews Exhibit No. 1.)
21 Q. Are you familiar with this document?
22 A. Yes, I'm familiar with it.
23 Q. Okay. And then I think in the last maybe four or
24 five pages, there may be a page with your signature.
25 I'll look for the page number.

Page 7

1  A. 88 -- or 38.
2  Q. Yep, 38. And that's your signature; correct?
3  A. Yes.
4  Q. Okay. And it's dated May of 2023?
5  A. Yes.
6  Q. And you agree that this is a verified Complaint,
7  which means that you signed on to it as true at the
8  time -- to the best of your knowledge under --
9  under the penalty of perjury note referenced here?
10 A. Yes.
11 Q. And this is -- and you agree that this is the case
12 that you're here to testify about today?
13 A. Yes.
14 Q. I will start by asking you just a few questions
15 about your background. Can you please start by
16 telling me where you grew up?
17 A. Here in Minnesota.
18 Q. Where in Minnesota?
19 A. Lakeville.
20 Q. Lakeville. Okay. And where did you go for school?
21 A. Lakeville High School.
22 Q. Okay. And did you go to school after high school?
23 A. I did.
24 Q. Where did you go?
25 A. Oral Roberts University.

Page 8

1  Q. Where is that?
2  A. Tulsa, Oklahoma.
3  Q. And what did you study there?
4  A. Business management.
5  Q. And did you pursue any schooling after that?
6  A. I did not.
7  Q. Okay. And what jobs have you held since college?
8  A. I've been a controller for a general contract --
9  three different general contractors here in the
10 Twin Cities.
11 Q. Okay. And did you come back to Minnesota right
12 after college?
13 A. I did.
14 Q. Okay. And in any of those -- I'll start with the
15 schools -- or college, not high school, but college.
16 Any discipline academic or otherwise?
17 A. No.
18 Q. Okay.
19 A. No.
20 Q. Any discipline in any of your jobs, written
21 reprimands, anything like that?
22 A. No.
23 Q. Have you ever been a party to a lawsuit besides
24 this one?
25 A. I've been divorced.

Dawn Erickson
2-9-24

Page 9

1 Q. Okay. So just a civil divorce suit?
2 A. Correct.
3 Q. Okay. And when was that?
4 A. Almost ten years ago. September of 2014.
5 Q. Okay. And was that divorce proceeding here in
6 Minnesota?
7 A. Yes.
8 Q. Do you remember what county it was in?
9 A. Ramsey County.
10 Q. Okay. And is the -- would your name in that case
11 file, would the last name have been Erickson as well
12 or would it have been a different last name?
13 A. Different.
14 Q. What was the different last name?
15 A. G***.
16 Q. Can you spell that, please?
17 A. G***.
18 Q. And besides that proceeding, any other court cases
19 that you've been a party to?
20 A. No.
21 Q. Have you ever filed any administrative complaints
22 with a government agency?
23 A. Does that include child support?
24 Q. Sure.
25 A. Then yes.

Page 10

1 Q. So yes. So some child support, and I imagine
2 that's related to the divorce proceeding?
3 A. Correct.
4 Q. Okay. Anything else? For instance, filing a
5 complaint with the Human Rights Department in
6 Minnesota?
7 A. No.
8 Q. So nothing with a state agency, federal agency?
9 A. No.
10 Q. Local government?
11 A. No.
12 Q. Okay. And you have children; correct?
13 A. Correct.
14 Q. How many children do you have?
15 A. Four.
16 Q. And what are their names and ages?
17 A. H.G., 22; N.G., 20; J.G., 18; J.G., 17.
18 Q. And so all of them would have been under the age of
19 18 at the time of the divorce proceeding; correct?
20 A. Correct.
21 Q. And were you the custodial parent after the divorce
22 proceeding?
23 A. Yes.
24 Q. Okay. And was there a shared custody arrangement
25 at all?

Page 11

1 A. Yes.
2 Q. Okay. Do you recall if that custody arrangement
3 had -- either the custody arrangement or the
4 judgment and decree for the divorce proceeding, if
5 that had any provisions about where the children
6 would go to school?
7 A. I don't recall.
8 Q. Okay. Do you recall whether you and your former
9 spouse had any disagreements about where the
10 children would go to school following the divorce
11 proceeding?
12 A. Yes.
13 Q. Could you -- I apologize.
14 A. I -- Yes.
15 Q. Could you tell me a little bit about those
16 disagreements? Just describe them.
17     MS. BUTLER: I'm going to object on
18 relevance, but you can go ahead and answer.
19 A. I home schooled them, and upon filing for a divorce,
20 he said he wanted them in the public school.
21 Q. Okay. So to make sure I understand -- Well, I'll
22 back up actually. Who filed the divorce proceeding?
23 A. I did.
24 Q. Okay. Would you say that disagreement about school,
25 school placement or school attendance, contributed

Page 12

1 to the decision to divorce?
2     MS. BUTLER: Object --
3 A. No.
4     MS. BUTLER: Sorry. Objection;
5 relevance.
6     MS. DEMEULES: No, you're fine.
7     BY MS. DEMEULES:
8 Q. And so is it fair to say that any disagreement
9 about that only came up after the divorce filing
10 had been initiated?
11 A. Correct.
12 Q. Okay. And how -- Well, I'll ask, were the
13 disagreements about school resolved?
14 A. Yes.
15 Q. And how did they resolve?
16 A. I continued to home school them.
17 Q. Okay. And so your children were home schooled
18 prior to the divorce?
19 A. Yes.
20 Q. Okay. What -- do you know what public high school
21 they would have been districted for if you had not
22 continued home schooling?
23 A. Mounds View Public High School.
24 Q. Okay. And what was your objection to Mounds View
25 as opposed to home schooling?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

---

Page 13

1  A.  They actually did go to Mounds View part-time.
2  Q.  Okay.  So it wasn't a full-time home school?
3  A.  Not by the time they were in high school.
4  Q.  Okay.  Did they attend any public or private schools
5  other than the home school prior to high school?
6  A.  No.
7  Q.  Okay.  So the sort of split started only in high
8  school?
9  A.  Correct.
10  Q.  And could you describe how that worked?  Was it a
11  partial enrollment at Mounds View?
12  A.  Yes, partial enrollment at Mounds View.
13  Q.  So what did that look like?
14  A.  They took three classes at Mounds View and I home
15  schooled the rest.
16  Q.  Which classes --  Well, did each child take the
17  same classes at Mounds View or was there some
18  variation?
19  A.  A little variation.
20  Q.  Do you recall the classes that were taken at
21  Mounds View?
22  A.  Generally speaking, math, science, and foreign
23  language.
24  Q.  Okay.  And why did -- why did you pursue that
25  partial enrollment for those courses at Mounds View?

---

Page 14

1  A.  My oldest came to me and expressed a desire to go
2  to school, and we considered that together and came
3  to that compromise.
4  Q.  Okay.  And what were some of the factors you
5  considered during that process?
6  A.  Well, her voice.  As a parent, I believe there's a
7  time that you're raising your children to leave you
8  and they need to exercise their voice, and she had
9  a voice and I wanted to honor that.
10  Q.  Okay.  Were there any concerns you had about
11  agreeing to that before you decided to agree?
12  A.  No.
13  Q.  So no concerns.  Then why was it -- why was there a
14  discussion, I guess?
15  A.  Because it was a big transition.
16  Q.  A big transition.  Did you have a --  Correct me if
17  this isn't accurate, but is it fair to say that you
18  had a preference to home school them prior to this
19  conversation, you had sort of made that choice?
20  A.  I did.
21  Q.  Okay.  Why, at the time you decided to home school,
22  why was that your preference over private -- or
23  excuse me, public school?
24  A.  First and foremost, I enjoy my kids, and I believe
25  God gave them to me to raise, and so I did.  I

---

Page 15

1  liked the flexibility.  I liked the ability to
2  plant into my children what was valuable to our
3  family, and I had a great time doing it.
4  Q.  I'm glad to hear that.  How did you think through
5  some of those factors when you decided to agree to
6  the partial enrollment at Mounds View?
7  A.  I prayed.
8  Q.  Okay.  And -- I apologize.  Were you going to say
9  more?
10  A.  No.  I just -- I don't take that trivially.  You
11  know, people say they pray.  I pray, and I trust
12  the Lord to lead me.
13  Q.  Okay.  And do you feel like, by agreeing to partial
14  enrollment, you lost any ability to, for example,
15  plant some of those values that you talked about?
16  A.  No.
17  Q.  Why not?
18  A.  They say you've pretty much done your teaching by
19  the time your kids are eight years old.  I had home
20  schooled them for a long time, the values had been
21  implanted, and I believe they -- part of the
22  experience of them going to the public school was a
23  chance to figure out if those their values or not.
24  Q.  Okay.  You said they say.  I ask just, was it anyone
25  in particular that you recall saying that or is

---

Page 16

1  that just sort of an idea that you've encountered
2  throughout your home schooling experience?
3  A.  Yes, that's an idea that I've encountered
4  consistently throughout my experience.
5  Q.  And do you feel that was true for your kids?
6  A.  Yes.
7  Q.  And from your vantage point, what -- how did the --
8  how did the partial enrollment at Mounds View seem
9  to go?  Positively?  Negatively?  Somewhere in
10  between?
11  A.  Positively.  COVID hit during part of it, so that
12  changed things up.
13  Q.  Yeah.  Was a big part of that change the switch to
14  all online?
15  A.  Well, yes, and --  Yes.
16  Q.  Anything else?
17  A.  Well, the going to school, being with your friends,
18  obviously that was gone once COVID hit.
19  Q.  And from your perspective, was that a positive
20  thing or a negative thing for your kids?
21  A.  Negative.
22  Q.  And why was it negative?  Why did it seem negative?
23  A.  Another transition.
24  Q.  Anything else besides the transition aspect?
25  A.  Being with their friends.

---

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 17

1 Q.  Do your kids enjoy being with their friends?
2 A.  Of course.  Don't we all?
3 Q.  And do you think that -- do you see value with them
4 being -- I'll start over.
5     As a parent, do you see value in your
6 kids having the opportunity to spend time with
7 friends in a school setting?
8 A.  Yes.
9 Q.  And what's the value that you see?
10 A.  Learning -- learning who they are, growing into
11 adulthood.  As children get older, your influence
12 as a parent decreases and the peer influence
13 increases.  So I believe them having positive peer
14 influences puts them on a good projection for life.
15 Q.  And did you feel that your children had positive
16 peer influences when they attended public school in
17 Mounds View?
18 A.  Some yes, some no.
19 Q.  Can you give me an example?  And I'm not asking for
20 names of peers, but just what was positive about
21 some of their friend relationships.
22 A.  Some of the friend relationships they had before
23 they started going to the public high school, so
24 now they just got to see them more.
25 Q.  And then it sounded like there might have been some

Page 18

1 negative peer experiences.  Can you talk a little
2 bit about that?
3 A.  The exposure to things that they had not been
4 exposed to before in a school setting.  In a home
5 school setting, you're not exposed to people doing
6 some vaping in the bathroom or, you know, things
7 like that.
8 Q.  Okay.  Anything else besides vaping, specifically
9 things that either you know because your kids have
10 told you or you would expect contradicted with some
11 of the family values you mentioned?
12     MS. BUTLER: Objection to the extent
13 it misstates prior testimony.
14     You can continue.  You can answer.
15 A.  Oh, I --
16 Q.  Would you like me to repeat the question?
17 A.  Yes, please.
18 Q.  Okay.  So when -- Just for context, it's my
19 recollection that you had said something to the
20 effect that one benefit of home schooling that you
21 had identified when you made that decision was the
22 chance to share some values that are important to
23 your family with your kids.
24     So keeping that in mind, I am looking
25 to learn about what you felt like were some of the

Page 19

1 negative peer encounters in public school separate
2 from the vaping example.  Are there any examples
3 that are examples essentially of encounters that
4 would have conflicted with some of those family
5 values that you referenced earlier?
6     MS. BUTLER: Same objection.  You can
7 answer.
8 A.  The way the kids would speak to one another, crass
9 language.
10 Q.  So the way I hear that, it's sort of modality of
11 speaking, for example.  Crass language versus
12 politely perhaps.  Is that -- Am I sort of
13 understanding?
14 A.  Yes.
15 Q.  Besides modality, were there any concerns with the
16 content of conversations or interactions that your
17 children would have with peers that you felt like
18 were negative?
19 A.  I don't know.  I wasn't there.
20 Q.  Okay.  Did you have any -- did you have any concern
21 that your children would have negative peer
22 encounters on the basis of ideas they were perhaps
23 being exposed to?
24     MS. BUTLER: Objection; vague.  You
25 can answer.

Page 20

1 A.  Vague.  I don't understand the question.
2 Q.  Okay.  That means it was a bad question, so I will
3 try again.  Any -- So let me try to think of an
4 example.  Politics, for instance, can be
5 controversial, whether or not an individual supports
6 a war that is being fought overseas; the Vietnam
7 War, for instance.  Say that war had been going on
8 and your family had strong belief A about it.  Are
9 there topics like that that you would have been
10 concerned; what if my kids encounter the opposite
11 opinion from our family's opinion as a byproduct of
12 spending time outside of the home school?
13     MS. BUTLER: Objection; calls for
14 speculation.  You can answer.
15 A.  Was I concerned they would come upon conflicting
16 views?
17 Q.  Exactly.
18 A.  I was not concerned.  I was confident they would.
19 Q.  Okay.  And is that something -- so it sounds like
20 that's something -- Is it fair to say you saw that
21 as a benefit of that experience?
22 A.  I saw it as a reality of the experience.
23 Q.  Okay.  Do you think, yes or no, that it is positive
24 to encounter ideas that one disagrees with while in
25 high school?

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Dawn Erickson
2-9-24
DAWN ERICKSON
February 9, 2024

Page 21

1 A. Yes.
2 Q. We've talked a lot about Mounds View. I'm going to
3 shift gears a little bit and ask about your kids'
4 experiences with PSEO. When I say PSEO, I'm
5 referring to Minnesota's Post-Secondary Enrollment
6 Options Program. It's my understanding that you're
7 familiar with that program; is that correct?
8 A. It is.
9 Q. Okay. And I'll just say PSEO instead of the full
10 name, and you may feel free to do so as well.
11    Which of your children have done PSEO?
12 A. The three oldest.
13 Q. The three oldest. And what schools did each of them
14 attend for PSEO?
15 A. University of Northwestern-St. Paul.
16 Q. Okay. And Northwestern -- You may have to help me
17 on this because I'm certain you know more about it
18 than me. It's my understanding that when an
19 individual home schools their children in Minnesota,
20 they have to set graduation requirements, but you
21 have the ability to set what those are. Is that
22 generally correct?
23 A. Yes.
24 Q. Okay. Did you set graduation requirements for your
25 three oldest children?

Page 22

1 A. Yes.
2 Q. What were those requirements?
3 A. Very similar to Mounds View's high school.
4 Q. Okay. And if you recall, what were Mounds View's
5 requirements?
6 A. I don't recall, but there's math, science, foreign
7 language, electives, English, history. There's a --
8 there's a sheet that I followed.
9 Q. Okay. Is it fair to say that the requirements could
10 be summarized both in terms of content and then also
11 credits or hours?
12 A. Yes.
13 Q. Okay. And did you allocate credits based on the
14 PSEO course work that your three oldest did against
15 each of their high school home school graduation
16 requirements that you set?
17 A. I don't understand your question.
18 Q. Another poorly worded question by me. I apologize.
19    So for PSEO, it's a dual enrollment
20 program; correct?
21 A. Correct.
22 Q. And so the idea is that, I'm a high school student,
23 I go to a post-secondary institution, I take a PSEO
24 course at that institution, and then I get
25 essentially dual credit for it. I get secondary --

Page 23

1 or excuse me, post-secondary credits from that
2 post-secondary institution, but my understanding is
3 that there's also supposed to be a notation or
4 award of high school credits; correct?
5 A. Correct.
6 Q. And so what I attempted poorly to ask is, did you
7 count their PSEO courses, your children's PSEO
8 courses, against the graduation requirements that
9 you had set for them for their home school
10 graduation checklist?
11 A. Yes.
12 Q. Okay. Did you keep records of that?
13 A. Yes.
14 Q. Do you still have those records?
15 A. Yes.
16 Q. Did you produce those to counsel?
17 A. I don't remember.
18 Q. Okay. That's fine.
19    MS. BUTLER: Yes.
20 Q. I may follow up on that, but thank you for
21 clarifying.
22    Do you recall -- Strike that.
23    Do you have records from their
24 enrollment at PSEO?
25 A. Yes.

Page 24

1 Q. From the post-secondary institution Northwestern?
2 A. Yes.
3 Q. Okay. How did -- I'll start with your oldest.
4 H.G.; correct?
5 A. Correct.
6 Q. How did your family decide that H.G. would do PSEO?
7 A. Again, she had a voice. Their dad went to the
8 University of Northwestern-St. Paul, and she's a
9 highly academic student and she wanted to be more
10 challenged.
11 Q. Okay. And did H.G. participate in the PSEO decision
12 making process?
13 A. No.
14 Q. Do you recall how your family first learned that
15 PSEO existed?
16 A. I don't recall. It seems like I've always known.
17 Q. That's all right.
18    When -- And I'll use H.G. as an
19 example. When H.G. was -- did H.G. -- And if you
20 don't recall this, that's all right. Do you recall
21 whether H.G. was -- do you recall whether H.G.
22 wanted to go to Northwestern and sort of just find
23 a way to go there, or was it more learning about
24 PSEO first and then narrowing in on an institution
25 to do PSEO? Does that make sense?

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 25

1  A.  Um-uhm.  I'm -- I'm trying to recall.  Northwestern
2  was in our mind because of their dad, so I don't --
3  I don't recall which came first, the chicken or the
4  egg.
5  Q.  Fair enough.  Did H.G. consider any schools other
6  than Northwestern for PSEO?
7  A.  Bethel.
8  Q.  Any other than Bethel?
9  A.  No.
10  Q.  Why not?
11  A.  Location, location, location.
12     MS. BUTLER:  Sorry.  I'm going to
13  object to the -- or objection; calls for
14  speculation.  You're fine.
15  Q.  And I apologize actually.  I neglected to mention
16  at the beginning when I was talking about logistics,
17  I talked about us leaving space for each other to
18  finish and respond.  Sometimes counsel will jump in
19  with an objection, and so it's also okay to pause a
20  moment before answering just to make sure that
21  everyone has time to make the objections they need.
22     MS. BUTLER:  That's fine.
23  Q.  It's just not always a natural way of speaking.
24     So going back to which PSEO
25  institutions were considered.  It sounds like

Page 26

1  Northwestern and Bethel and no others; correct?
2  A.  Correct.
3  Q.  And the reason you gave for that was location,
4  location, location?
5  A.  Correct.
6  Q.  Tell me a little bit about that.
7  A.  We live nearby.  I'm a single mom with four kids
8  and I needed to be able to get her there.
9  Q.  Okay.  So were you --  Did you transport H.G. to
10  campus for her classes?
11  A.  I started to before she got her license.
12  Q.  And after H.G. got her license, did she ever drive
13  herself?
14  A.  She did.
15  Q.  And so how many --  Do you recall how many vehicles
16  your household had access to at the time?
17  A.  Two.
18  Q.  Two.  So part of what allowed H.G. to drive herself
19  is the fact that she had a car and a car that you
20  didn't need at the time she was using it; correct?
21  A.  Correct.
22  Q.  Okay.  And did H.G. take on-campus courses?
23  A.  Yes.
24  Q.  Exclusively?
25  A.  Yes.

Page 27

1  Q.  Any --
2  A.  I believe so.  I don't remember if she took any --
3  I don't think she took any online courses.
4  Q.  Would it be fair to say the majority were on campus?
5  A.  Yes.
6  Q.  And did H.G. have a sense of subjects she wanted to
7  study?  Any specific, I know I want to do physics
8  and that's the first class I'm signing up for, or
9  was there not a specific subject in mind at the
10  start of PSEO?
11  A.  She wanted to study psychology.
12  Q.  Okay.  And I imagine she took some psychology
13  classes then?
14  A.  She did.  I'm not sure if it was through PSEO or
15  undergrad.
16  Q.  Did H.G. do anything else on campus besides classes.
17  A.  No.
18  Q.  Any activities?
19  A.  Sorry.
20  Q.  No, that was me.  So no activities?
21  A.  No.
22  Q.  Do you know if H.G. ever used on-campus resources,
23  like a school library?
24  A.  I don't know.
25  Q.  Do you know if H.G. ever did office hours or a

Page 28

1  professor?
2  A.  I don't know.
3  Q.  Do you know whether H.G. made any friends that
4  you're aware of?
5  A.  Yes.
6  Q.  From PSEO?
7  A.  Yes.
8  Q.  And to your knowledge were those individuals that
9  H.G. met on campus?
10  A.  Yes.
11  Q.  From your perspective, was the ability to meet and
12  make friends a positive aspect of the experience
13  for H.G., negative, or neutral?
14  A.  Positive.
15  Q.  And so -- and I know that you couldn't recall
16  exactly whether or not there might have been an
17  online class or a couple.  It sounds like if H.G.
18  had wanted to take an online class or take a
19  particular class that was only offered online,
20  would you have allowed that?
21  A.  Yes.
22  Q.  And were there any classes that H.G. took that you
23  recall having some sort of lab component?
24  A.  I don't --  Like I said, my three oldest have all
25  gone there.  I believe they've all done some

Page 29

1 **science. I would assume that would include a lab,**
2 **but I don't remember particularly which child did**
3 **which class.**
4 Q. Fair. That's okay. So is it -- I'll ask, do you
5 know -- do you know anything about the current
6 modality of the online PSEO program at Northwestern?
7 **A. What? I don't understand the question.**
8 Q. And this is perhaps a product of COVID. There are
9 now lots of ways to do online school. Some of the
10 terms I'll use, and I'll explain what I mean by
11 each of them. There's synchronous learning where I
12 am in realtime attending a class that is in realtime
13 being taught via the Internet by a teacher and there
14 are other students attending live.
15    Asynchronous would be sort of
16 opposite of that. It's still online but everything
17 is prerecorded by the individual who delivers the
18 class, and then the student takes it independently
19 without the live via Internet teacher and live via
20 Internet classmates. Does that distinction make
21 sense?
22 **A. Yes.**
23 Q. So do you know -- what do you know about the
24 current modality of online PSEO at Northwestern
25 right now? Do you know whether it's synchronous or

Page 31

1 **A. Yes.**
2 Q. And have you also had the experience of watching a
3 movie on Netflix?
4 **A. Yes.**
5 Q. So those are sort of two experiences I'm trying to
6 capture here, watching a video where there's not
7 someone on the other side, so to speak, and then
8 with synchronous, there's still screen, but there
9 are virtually people on the other side of it.
10    So is it fair to say that during an
11 asynchronous course or an asynchronous online
12 experience, there's no physical proximity between
13 classmates?
14    MS. BUTLER: Objection; lacks
15 foundation, calls for speculation. You can answer.
16 **A. There's no physical proximity, meaning they're not**
17 **near each other?**
18 Q. Correct.
19 **A. Correct.**
20 Q. And it's fair to say that in an on-campus physical
21 real life classroom, there is physical proximity
22 between students?
23 **A. Correct.**
24    MS. BUTLER: Same objections.
25 Q. Is it fair to say that during an asynchronous course

Page 30

1 asynchronous?
2 **A. I do not know.**
3 Q. Okay. I'll represent to you that it's fully
4 asynchronous, so that means that -- We'll use H.G.
5 as an example. Let's say that H.G. went to PSEO at
6 Northwestern and did their online version instead
7 of the on-campus version. That would mean that H.G.
8 is taking all of her PSEO classes asynchronously.
9    Do you agree that that would be a
10 different experience than an online but synchronous
11 program?
12    MS. BUTLER: Objection; lacks
13 foundation, calls for speculation, vague. You can
14 answer.
15 **A. In the synchronous, do the students interface with**
16 **the --**
17 Q. Yes.
18 **A. So then, yes, that would be a different experience,**
19 **being able to interface with a classroom or not.**
20 Q. And I'll ask, have you been on Zoom meetings, for
21 instance, yourself?
22 **A. Yes.**
23 Q. Okay. And have you personally had the experience
24 of interacting with an individual via Zoom who's in
25 the Zoom box?

Page 32

1 students would not be able to speak directly with
2 their classmates while viewing the prerecorded
3 class?
4    MS. BUTLER: Objection; lacks
5 foundation, calls for speculation.
6 **A. By your definition, yes.**
7 Q. Okay. Is it fair to say that in a live, on-campus
8 class, students would have the ability to talk and
9 interact with their classmates?
10    MS. BUTLER: Same objections.
11 **A. Yes.**
12 Q. In an asynchronous setting, students would not have
13 the ability to raise their hand and ask a question
14 during class; correct?
15    MS. BUTLER: Same objections, and
16 I'll just put a standing objection that she stated
17 she doesn't have experience with these classes and
18 it's all hypothetical. So standing objections for
19 lack of foundation and speculation. You can
20 continue.
21    MS. DEMEULES: Thank you, Counsel.
22 **A. Yes.**
23 Q. Was that a yes?
24 **A. Yes.**
25 Q. But with an on-campus class, if a student had a

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

---

Page 33

1 question in the middle of a lecture, they could
2 raise their hand; correct?
3 **A.   Correct.**
4 Q.   Okay.  And I'll ask, is it fair to say that --
5 Well, let me back up.
6     You haven't attended PSEO yourself;
7 correct?
8 **A.   Correct.**
9 Q.   But you have attended high school classes as a high
10 school student yourself; correct?
11 **A.   Correct.**
12 Q.   And we talked about you've had experiences of being
13 on Zoom meetings; correct?
14 **A.   Correct.**
15 Q.   And, in fact, you've been a teacher with your own
16 children; correct?
17 **A.   Correct.**
18 Q.   So you've had experiences in classroom settings
19 from multiple vantage points; correct?
20 **A.   Correct.**
21 Q.   Did you ever attend online courses yourself?
22     **MS. BUTLER:** Objection; vague.
23 **A.   Not college courses.  I've taken like online.  I'll**
24 **register for some master class or something.**
25 Q.   Okay.

---

Page 34

1 **A.   So does that --**
2 Q.   Yes.  That's helpful.  So it's fair to say -- I'll
3 ask, your college experience was a physical
4 on-campus experience?
5 **A.   Yes.**
6 Q.   Do you recall taking any online classes in college?
7 **A.   No.**
8 Q.   So it's fair to say that you've had some personal
9 experience with online experience; the master's
10 example you mentioned, for instance?
11 **A.   Correct.**
12 Q.   And because of that, it's fair to say, would you
13 agree, that you have had experience with both
14 in-person learning and online learning?  Correct?
15 **A.   Correct.**
16 Q.   Okay.  Would you agree that engaging in discussions
17 with peer students is a benefit of school?
18 **A.   Yes.**
19 Q.   Would you agree that utilizing school resources,
20 like a library, counseling office, or tutoring
21 center, is a benefit of school?
22     **MS. BUTLER:** Objection; calls for
23 speculation, lacks foundation.
24 **A.   Yes.**
25 Q.   Did you ever utilize the library in college?

---

Page 35

1 **A.   Yes.**
2 Q.   And was that a benefit to you?
3 **A.   Yes.**
4 Q.   Okay.  Did you engage in -- And I'll ask this.
5 Thinking of your own high school experience, did
6 you engage in social interactions with peers?
7 **A.   Yes.**
8 Q.   Did you ask questions of your teachers during class?
9 **A.   Yes.**
10 Q.   Were those social interactions with peers a benefit
11 to your high school experience?
12 **A.   Yes.**
13 Q.   And was the ability to ask questions of your
14 teachers a benefit?
15 **A.   Yes.**
16 Q.   And in your high school experience, were there ever
17 instances -- And you may not recall them.  Well,
18 I'll skip that question.  It's probably -- I don't
19 recall a lot of things from high school so.
20     So thinking of those benefits we just
21 discussed, engaging in discussions with students or
22 peers, utilizing resources like the library, having
23 social interactions, being able to ask questions of
24 teachers, would you agree with me that all of those
25 benefits exist in an on-campus school setting?

---

Page 36

1 **A.   Yes.**
2 Q.   Okay.  If one were to attend an asynchronous school
3 setting, so sort of the Netflix version rather than
4 the Zoom version, is it fair to say that those
5 benefits would be absent --
6     **MS. BUTLER:** Objection; calls for
7 speculation.
8 Q.   -- in the asynchronous version?
9     **MS. BUTLER:** Sorry.  Objection.
10 **A.   Yes.**
11 Q.   Okay.  Do you think -- can you think of any reason
12 why some students should get benefits such as the
13 ones I've just described during their education but
14 not other students?
15 **A.   Why some would be able to use the library and some**
16 **wouldn't?**
17 Q.   Exactly.
18 **A.   No.**
19 Q.   Would it be fair to condition access to those
20 benefits on the basis of someone's sex?
21 **A.   So someone can or cannot use the library because**
22 **they're a male or a female?**
23 Q.   Exactly.
24 **A.   No.**
25 Q.   What about on the basis of their race?

---

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Dawn Erickson
2-9-24
DAWN ERICKSON
February 9, 2024

Page 37

1  A.  No.
2  Q.  What about on the basis of their religion?
3  A.  No.
4  Q.  Okay.  And so I'll back up a little bit.  We were
5  talking about PSEO, and then I represented to you
6  that Northwestern's online PSEO program is fully
7  asynchronous.
8      So based on that representation, is it
9  fair to say that Northwestern -- Northwestern's
10  online PSEO program lacks certain benefits that its
11  on-campus PSEO program provides?
12  **A.  I don't -- I don't know if the online program**
13  **prohibits a student from going to the campus and**
14  **using the library.  They can't -- if they're**
15  **asynchronous, they can't interface with their peers**
16  **during the class.  I don't know that that prohibits**
17  **them from contacting them outside of class.**
18  Q.  Okay.  Let's use maybe asking the teacher a
19  question, for example.  You would agree that
20  mid-lecture, if a question pops up and you're
21  asynchronous, you can't ask that question during
22  the class; correct?
23  **A.  I don't know.  Is there an online chat with someone**
24  **moderating?**
25  Q.  Assume no for the purpose of this hypothetical.

Page 38

1      **MS. BUTLER:** Objection; calls for
2  speculation.
3  **A.  Yeah, there's a lot of ifs there.  I don't know how**
4  **it's run, so I can't with integrity answer that.**
5  **If there is no way to ask a question --  Usually in**
6  **a Zoom call, you can raise your hand, but if it's**
7  **asynchronous, you can't do that.**
8      **So if there's no communication allowed**
9  **in the asynchronous setting, by definition no one**
10  **can ask a question during the class.  You don't need**
11  **my agreement to that.  That's a fact.**
12  Q.  Okay.  And would -- would you agree with me that
13  when you're in a learning setting, it can be
14  helpful to get an answer realtime to a question in
15  order to make sure you are tracking along with the
16  content that's being taught?
17      **MS. BUTLER:** Objection; calls for
18  speculation.
19  **A.  I think in today's learning culture, anything is**
20  **possible.**
21  Q.  Okay.  Well, let's use some of the experiences
22  you've had teaching your children in home school as
23  an example.  Do you ever recall instances you've
24  been going through content with your children and
25  one of them had a question for you?

Page 39

1  A.  Yes.
2  Q.  Okay.
3  A.  Ad nauseam.
4  Q.  Do you typically -- if that happens, would it be
5  your typical practice for you to say, hold that
6  question until the end of my content delivery?
7  **A.  It depends.  My actual typical response is, have**
8  **you looked for the answer.**
9  Q.  Okay.
10  **A.  I don't believe in giving answers.  Part of**
11  **educating is self-educating and being a problem**
12  **solver.  So if my kids ask me a question, I wouldn't**
13  **necessarily give them the answer on the spot just**
14  **because it was easier.**
15  Q.  What if it's not the sort of question that you,
16  know, has a fixed answer like is two plus two four
17  or five.  What if the question is, you know, what's
18  your opinion about this, that book we read for
19  literature?  Have your kids ever asked sort of
20  questions to engage in conversation or content?
21  **A.  Well, of course.  Those are discussion classes, not**
22  **teaching classes.**
23  Q.  Okay.  So let's -- let's talk about discussion
24  classes.  Is it important to be able to have
25  discussions in the discussion classes?

Page 40

1  **A.  Yes.**
2  Q.  Okay.  And do you think that -- put aside any
3  social experience, peer experience -- there is
4  academic value that is lost without discussion in
5  some subject matters?
6  **A.  I don't know how to measure that.  I don't know**
7  **how --**
8  Q.  Well, think about --  I'd invite you to think about
9  again your experience with your children.  Have
10  there ever been classes that you've delivered to
11  them where one of your goals was to engage in
12  discussion about the teaching materials?
13  **A.  Yes.**
14  Q.  Okay.  And why was that one of your goals?
15  **A.  To create critical thinkers and not regurgitators.**
16  Q.  Okay.  So with that in mind, is it fair to say that
17  the ability to have realtime interactions during a
18  class can add academic value?
19  **A.  It can.**
20  Q.  Okay.  I have to switch gears a little bit.
21      **MS. BUTLER:** You're a little bit short
22  of an hour, but if you're about to switch to a new
23  topic, now might be a good time for a break.
24      **MS. DEMEULES:** That sounds good.  I
25  will just note, I forgot to mention this at the

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

---

Page 41

1 beginning, but we can take breaks anytime. It will
2 typically be around the hour mark, and if I've
3 forgotten or haven't kept track of time or your
4 lawyer hasn't reminded me, at any point just raise
5 your hand and we can take a break.
6 **MS. BUTLER:** Yes.
7 **MS. DEMEULES:** Okay. Thank you.
8 We're off the record.
9 (Recess taken from 9:31 a.m. to
10 9:37 a.m.)
11 (Mr. Timmerman is no longer present)
12 **BY MS. DEMEULES:**
13 Q. Just a couple of housekeeping questions before we
14 move to a topic that I think we'll spend some more
15 time on.
16 Have you communicated about this
17 lawsuit with anyone besides your lawyers? And I
18 don't want to know anything that have been part of
19 conversations with your lawyers, about advice or
20 the case or anything like that. Nothing privileged.
21 **A. Yes.**
22 Q. Who?
23 **A. My kids.**
24 Q. Okay. All four of them?
25 **A. Yes.**

---

Page 42

1 Q. And have you communicated with your hus -- excuse
2 me, your former spouse?
3 **A. No.**
4 Q. Okay. And anyone besides your children?
5 **A. Yes, a few friends.**
6 Q. Okay. And did that communication occur orally or
7 in writing?
8 **A. Orally.**
9 Q. Okay. Do you remember approximately when?
10 **A. I do not.**
11 Q. Do you recall if it was prior to the date the
12 lawsuit was filed in court or after that public
13 filing?
14 **A. One friend I know was before, and then other than**
15 **that, I would guess -- I would say after.**
16 Q. Okay. And what are the names of those friends?
17 **A. Annie Ramirez.**
18 Q. Anyone else?
19 **A. Laura Fixsen, F-i-x-s-e-n.**
20 Q. Anyone besides those two?
21 **A. Julie Sampson.**
22 Q. Anyone else?
23 **A. Diane Lysiak, L-y-s-i-a-k.**
24 Q. Anyone else?
25 **A. No.**

---

Page 43

1 Q. And then your children?
2 **A. Um-uhm.**
3 Q. Okay. There's obviously facts and issues about
4 religion and faith at issue in this lawsuit, so I'm
5 going to ask some questions about that. Again, the
6 questions are for the purposes of this lawsuit and
7 this deposition, and I would like to make every
8 effort to do so as respectfully as possible.
9 And if there's anything that I -- if
10 it appears like I don't understand or use the wrong
11 word, I'll apologize in advance, and also invite
12 you to clarify or point out if I've asked something
13 or used a term incorrectly.
14 So do you subscribe to a particular
15 religion?
16 **MS. BUTLER:** Objection; vague.
17 **A. Yes.**
18 Q. Okay. Do you have a faith that you consider
19 yourself a part of?
20 **A. It's still vague.**
21 Q. Do you consider yourself religious?
22 **A. No.**
23 Q. Okay. Do you hold religious beliefs?
24 **A. I'm a believer in Jesus Chris.**
25 Q. Do you consider that to be a religious belief?

---

Page 44

1 **MS. BUTLER:** Objection to the extent
2 it calls for a legal conclusion, but you can answer.
3 **A. Yeah. I -- Religion is manmade. Faith is God**
4 **made.**
5 Q. Tell me a little bit about that, about that
6 distinction.
7 **A. Well, religion is Catholicism, Lutheran,**
8 **Presbyterian. These are all manmade. Jesus is God.**
9 **That is what and who I believe in.**
10 Q. Do you consider yourself a Christian?
11 **A. I do.**
12 Q. Is it fair to say that Christianity is a religion?
13 **MS. BUTLER:** Again, objection to the
14 extent it calls for a legal conclusion.
15 Go ahead and answer.
16 **A. Define religion.**
17 Q. I'll use the definition that you gave me earlier. A
18 manmade group of individuals that --
19 **MS. DEMEULES:** Well, would you be able
20 to reread the -- read back religion versus faith
21 distinction, please.
22 (Requested question read back)
23 Q. So you were able to identify from the read back, it
24 appears, a few what I will call faith traditions or
25 religions, such as Catholicism or Lutheranism. Is

---

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 13 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 45

1 that fair?
2 A.  Yes.
3 Q.  Okay.  So whatever definition of religion you had
4 in your mind when you answered that --  I apologize.
5 I am forgetting my question.  I am so sorry.
6     MS. DEMEULES: Could you please read
7 back the question I asked before we did the read
8 back?
9     (Following question read back:
10 Q: Is it fair to say that
11 Christianity is a religion?)
12 Q.  So based on that prior definition that we clarified,
13 I'll ask again, is it fair to say that Christianity
14 is a religion?
15 A.  No.
16     MS. BUTLER: Objection to the extent
17 that it calls for a legal conclusion.  I'm just
18 going to put that as a standing objection to this
19 line of questioning.
20 Q.  Is your belief in Jesus a sincerely held belief of
21 yours?
22 A.  Yes.
23 Q.  Okay.  Do you consider yours a Christian family?
24 A.  Yes.
25 Q.  Okay.  Are you familiar with what I'll call a text

Page 46

1 that's called the Bible?  And --  Yes.  Are you
2 familiar with the Bible?
3 A.  I am.
4 Q.  Okay.  And what is your understanding of what the
5 Bible is?
6     MS. BUTLER: Objection; vague.
7 A.  The foundation of our faith, foundation of
8 Christianity.
9 Q.  And when you say foundation, what do you mean?
10 A.  By definition foundation is the foundation.  It is
11 the -- it is God's Word.
12 Q.  And what or whom are you referring to when you say
13 God?
14 A.  God the Father, Son, Holy Spirit.
15 Q.  Do you own a Bible?
16 A.  I do.
17 Q.  Do you know what version it is?
18 A.  I have an IV, King James, New Revised Standard,
19 Amplified.
20 Q.  Do the different --  Is there any significance
21 between the different versions for you?
22 A.  No.
23 Q.  Is it fair to say that there are wording differences
24 between the different versions?
25 A.  Yes.

Page 47

1 Q.  And do those wording differences -- are those
2 wording differences of any significance to what you
3 believe in terms of your faith?
4     MS. BUTLER: Objection; vague.
5 A.  Yeah, I don't understand your question.
6 Q.  So, for instance, if one version described certain
7 conduct as not good, and the phrase not good, and
8 another described that conduct as an abomination,
9 would that difference in wording mean anything to
10 you?
11 A.  No.
12 Q.  Okay.  So is it fair to say that you sort of extract
13 underlying principles from the words across the
14 different versions?
15 A.  Yes.
16 Q.  Okay.  Could we go back to faith and what it means
17 to you, the word faith.  What does the word faith
18 mean to you?
19 A.  The chasm between facts and God.
20 Q.  And to make sure I'm understanding correctly, you
21 consider yourself to have faith but not religion;
22 is that correct?
23 A.  Yes.
24     MS. BUTLER: Object to the extent it
25 calls for a legal conclusion.

Page 48

1 Q.  Is it fair to say, just based on sort of your time
2 in the world, that some people use -- or that the
3 term Christianity is used to refer to religions in
4 the same way that you used the word Catholicism or
5 Lutheran?
6 A.  Say again.
7     MS. BUTLER: Objection; vague.
8 Q.  Do you think it's fair to say that Christianity is
9 a type of religion in the world?
10 A.  I can't speak for how people use the word
11 Christianity.  I know how I view it and that's all
12 I can speak to.
13 Q.  And you do not view Christianity as a religion?
14 A.  I do not.
15 Q.  Okay.
16     MS. BUTLER: Object to the extent it
17 calls for a legal conclusion.
18 Q.  I'd like to talk a little bit about the free
19 exercise claim you brought in this lawsuit.  Is it
20 your position that there is conduct you wish to
21 engage in that you believe is protected by your
22 First Amendment free exercise rights?
23     MS. BUTLER: Object to the extent it
24 calls for a legal conclusion.
25 Q.  You can answer.

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

1  A.  Okay.  I get -- I get lost when she objects.  I'm
2  listening and I'm like, what does that even mean.
3      MS. BUTLER: Tune me out.
4  A.  So I'm sorry.
5  Q.  I certainly will not speak for your counsel, but I
6  expect that if your counsel does not want you to
7  answer something --
8      MS. BUTLER: Yes.
9  Q.  -- counsel will instruct you.
10     MS. BUTLER: You can answer unless I
11  tell you don't answer.
12  Q.  So I apologize if that came off abruptly from me.
13     MS. DEMEULES: And I apologize as
14  well, Andrea.
15     MS. BUTLER: No.
16     BY MS. DEMEULES:
17  Q.  So I'll repeat the question.  Is there conduct you
18  wish to engage in that you believe is protected by
19  your free exercise rights that you can't because of
20  the law that's at issue?
21     MS. BUTLER: Same objection.
22  A.  The law that's at issue.
23  Q.  And I apologize.  I didn't --
24  A.  Like --
25  Q.  -- use the reference like with PSEO.  So you are

1  aware that there is a new Minnesota state law
2  that's at issue in this lawsuit; correct?
3  A.  Correct.
4  Q.  And it's a law that pertains to what post-secondary
5  institutions can require in their admissions
6  process.  Is that fair?
7  A.  Yes.
8  Q.  And I will probably refer to that specific law as
9  either the law or the amendment, and that's what
10  I'll be referring to.  Does that make sense?
11  A.  Yes.
12  Q.  Okay.  So that amendment/law, what conduct do you
13  wish to engage in that you believe is protected by
14  your free exercise rights that you believe that law
15  prevents?
16     MS. BUTLER: Object to the extent it
17  calls for a legal conclusion.  You can answer.
18  A.  Freedom of speech, freedom of religion.
19  Q.  Okay.  What speech do you wish to engage in that
20  you feel you can't?
21     MS. BUTLER: Same objection.
22  A.  I don't feel personally that I can't.
23  Q.  Okay.  Am I correct that it's your youngest child
24  that you feel there's speech that your youngest
25  child can't engage in as a product of this law?

1  A.  This law, as it stands, prevents my youngest child
2  from going to the University of
3  Northwestern-St. Paul.
4  Q.  Are you aware of any prohibition from the State of
5  Minnesota that says your son cannot apply to
6  Northwestern?
7      MS. BUTLER: Object to the extent it
8  calls for a legal conclusion.
9  A.  This law prohibits Northwestern from offering PSEO;
10  therefore, he would not be able to apply.
11  Q.  Okay.  So that's -- that's your understanding?
12  A.  Yes.
13  Q.  Okay.  Has anyone from the State of Minnesota, any
14  government official, told your son that he is not
15  allowed to apply to Northwestern?
16  A.  No.
17  Q.  Okay.  And is there anything beyond --  Let's
18  imagine that -- put aside whether or not
19  Northwestern is offering PSEO.  Let's assume they
20  are.  Is there anything about this law or anything
21  else you're aware of that prevents your son from
22  applying to Northwestern?
23     MS. BUTLER: Objection; calls for
24  speculation and to the extent it calls for a legal
25  conclusion.

1  Q.  To the extent you're aware of.
2  A.  No.
3  Q.  Okay.  So if Northwestern offers PSEO, based on what
4  you know, your son is allowed to apply; is that
5  correct?
6  A.  From what I know, yes.
7  Q.  Okay.  It's also the case that your son, based on
8  what you know, is allowed to apply to other
9  post-secondary institutions for PSEO in Minnesota;
10  correct?
11  A.  Correct.
12  Q.  Okay.  And in the scenario where Northwestern were
13  to --  Okay.  The amendment has been passed.  I
14  believe you may be aware, and if not, I'll represent
15  to you that there's an injunction in place that has
16  paused its implementation essentially.  If it were
17  to go into effect and Northwestern were to stop
18  offering PSEO, is there anything else that you feel
19  your son is being prevented from doing by this law
20  besides being able to apply to Northwestern?
21     MS. BUTLER: Objection; vague.
22  A.  He can't apply to Crown either from my
23  understanding.
24  Q.  Okay.
25  A.  It limits his choices, from what I understand.

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 53

1 Q. Okay.
2 A. And I understand he could apply to other places.
3 Q. Okay. So besides an inability to apply to
4 Northwestern and Crown, is there anything else that
5 you believe your son won't be able to do because of
6 this amendment? Yes or no.
7 A. No.
8 Q. Okay. And when you signed on to this Complaint,
9 Exhibit 1, is it fair to say, is it accurate to say
10 that that's the basis for your allegations?
11    MS. BUTLER: Object to the extent that
12 it calls for a legal conclusion.
13 A. Define that, that's the basis.
14 Q. Is there any other -- I'll use the word injury or
15 harm. Anything else that you hope to -- that you
16 hope this lawsuit will rectify besides your son's
17 inability to apply to Crown or Northwestern?
18    MS. BUTLER: Again, object to the
19 extent it calls for a legal conclusion. Go ahead.
20 A. Through that inability to -- to go to Northwestern,
21 it limits -- it's a family culture for us. It's a
22 value system for us. Their dad went there. All
23 three of my other children have. He will not be
24 able to follow in those footsteps, and that you
25 can't measure in my opinion.

Page 54

1 Q. Okay. Do you agree that your son will still have --
2 or would still have access to the PSEO program at
3 least one institution throughout the State of
4 Minnesota, access to the ability to apply?
5 A. Yes, not with the same values.
6 Q. Okay. And what specific values are those?
7 A. Faith values.
8 Q. Are there specific faith values that you believe
9 Northwestern has?
10 A. Not specific, but generally it's a culture of faith
11 values that wouldn't exist in an institution that
12 doesn't uphold those.
13 Q. Okay. Do you believe that Crown and Northwestern
14 are the only PSEO post-secondaries available that
15 uphold those values to your satisfaction?
16 A. I can't say that I -- I know that would be an
17 extensive list and I'd have to do a lot of research
18 to answer that with credibility.
19 Q. Well, I believe you mentioned Bethel as an option
20 you considered for one of your other children.
21 A. Um-uhm.
22 Q. Was Bethel -- Did that live up to your values? Was
23 that a reasonable option?
24 A. It was. They didn't accept juniors.
25 Q. Okay. Was there anything besides Bethel not

Page 55

1 accepting juniors that was unacceptable to -- Was
2 that H.G.'s application?
3 A. Correct.
4 Q. Okay.
5 A. Not unacceptable. Northwestern was preferred.
6 Q. Okay. And I'll represent to you that Bethel does
7 not use a faith statement admissions requirement
8 like Crown or Northwestern. Does that impact how
9 you view Bethel as a PSEO option for your children?
10    MS. BUTLER: Objection; lacks
11 foundation, but you can answer.
12 A. I like the idea of a conduct statement. I'm more
13 familiar with Northwestern than Bethel obviously, so
14 I'm not as familiar with the culture there.
15 Q. Okay. Would you disallow any of your children from
16 attending PSEO at an institution that does not have
17 a required faith statement?
18 A. I would not disallow that.
19 Q. Okay. Are there any aspects of your faith that you
20 believe require you to abstain from certain conduct?
21 A. Sin.
22 Q. Okay. So would it be fair to say that if there's
23 conduct that you believe is sinful or you've
24 determined is sinful, that as a matter of your faith
25 you need to avoid that conduct?

Page 56

1 A. Well, underlying that is conduct and love. Anything
2 rooted in love that isn't coming from a good place,
3 and that's conduct that I would like to avoid, and
4 I'm human.
5 Q. Are there any -- Well, I'll give you an example.
6 For instance, are you aware that some individuals
7 who hold Jewish beliefs keep kosher and engage in
8 certain conduct around not eating certain foods, for
9 instance?
10 A. I am.
11 Q. Okay. Are there any examples that you can think of
12 in your faith that might be similar to that, things
13 that you refrain from doing on the basis of your
14 faith?
15 A. I refrain from taking the Lord's name in vain.
16 Q. Okay. So you'd agree that faith beliefs sometimes
17 involve refraining from certain speech or conduct?
18 A. I do.
19 Q. Okay. Do you also agree, is it fair to say, that
20 some faith beliefs involve, rather than refraining,
21 affirmatively doing or saying certain things?
22 A. I do.
23 Q. Okay. If you were to be required by -- if there
24 were some requirement for you to engage in conduct
25 that you believed was sinful or would violate your

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 16 of 33
Melinda and Mark Loe, et al vs.
Willie Jett, et al
Dawn Erickson
2-9-24
DAWN ERICKSON
February 9, 2024

Page 57

1  faith, how would you feel about that?
2      MS. BUTLER: Objection; vague.
3  A.  No one can require anything of anybody else.  They
4  can ask you, they can suggest it, but nobody can
5  require it.  I choose my conduct.
6  Q.  Okay.  So let's --  If you will, put yourself in
7  the shoes of your youngest child, applying to PSEO.
8  I'll make up a school.  School A requires all its
9  students as a condition of admittance for PSEO to
10 take the Lord's name in vain.  What would you do in
11 that situation?
12     MS. BUTLER: Objection; calls for
13 speculation.
14 A.  Where my children choose to go to college is their
15 decision.  My kids don't always do what I want them
16 to do or what I would agree with, and they have the
17 freedom to choose.
18 Q.  And I've asked, what would you do in that situation?
19     MS. BUTLER: Same objection.
20 A.  I would give them the freedom to choose.
21 Q.  I apologize.  Just to refresh the -- sort of
22 scenario I had set up is if you are in your kid's
23 choose, so you are the individual facing that
24 decision.
25     If you, yourself, wants to do PSEO,

Page 58

1  let's imagine you're a high school student, and
2  there's a school and you've decided this is the
3  school I would like to go to, and they require an
4  essay, a transcript, and for you to take the Lord's
5  name in vain, what would you do in that situation?
6  A.  Choose another school.
7      MS. BUTLER: Object to the extent it
8  calls for speculation, and then also I'm going to
9  object to relevance to this hypothetical but --
10 Q.  Okay.  What if that same school but instead of --
11 so the three requirements I'll use, I think it was
12 GPA, transcript, and what about making a Muslim
13 statement of maybe saying you believe in Muslim
14 faith tenets?
15     MS. BUTLER: Same objections.
16 A.  Would I sign something I don't believe in?  Is that
17 what you're asking me?
18 Q.  Yes.
19 A.  No.
20 Q.  Why not?
21 A.  Because I have to live in integrity with myself.
22 Q.  And what does living in integrity mean to you?
23 A.  What I say I mean and what I mean I say.
24 Q.  Would you find it --  And these -- these matters
25 are difficult and difficult to articulate, so I

Page 59

1  apologize if I'm not getting this right.
2      Would it be a difficult matter of
3  conscience for you to sign something you don't
4  believe in?  Is that what you're getting at?
5  A.  Yes.
6  Q.  Okay.  So here's maybe a better way of saying it.
7  Would it violate your conscience?
8  A.  It would go against what I believe and I wouldn't
9  do it.  So my conscience wouldn't have to be
10 involved because I wouldn't do it.
11     MS. BUTLER: I'm going to object that
12 that calls for a legal conclusion but --
13 Q.  Have you had conversations with your youngest son
14 about his faith?
15 A.  Yes.
16 Q.  What is your understanding of your son's faith?
17 A.  He is a Christian.
18 Q.  And how do you know that?
19 A.  Because he told me.
20 Q.  I imagine this has been perhaps an ongoing
21 conversation across your son's life.  Is that fair?
22 A.  Yes.
23 Q.  So it's not that there have been sort of -- there's
24 not been one discrete moment where he has said, I'm
25 a Christian, but it's a larger conversation.  Is

Page 60

1  that fair?
2  A.  Yes.
3  Q.  Okay.  Has your son told you anything about why
4  he's a Christian or why he holds Christian faith?
5  A.  No.  No.
6  Q.  Based on your relationship with your son and sort
7  of this ongoing conversation about faith, do you
8  have a sense of any beliefs that your son might
9  hold as important to his faith?
10 A.  Yes.
11 Q.  Can you give me some examples of those?
12 A.  J.G. is a man of few words, so he lives out loud --
13 or he -- his life and what his life shows is fruit
14 of the Spirit - love for others, peace,
15 self-control.
16     MS. THOMSON: Dawn, do you mind
17 speaking up just a little bit?
18     THE WITNESS: Oh, yes.  Sorry.
19     MS. THOMSON: Everyone wants to hear.
20     THE WITNESS: Sorry.
21 Q.  And I'm going to turn next --
22     (Exhibit No. 2 marked for
23 identification)
24     MS. DEMEULES: For the record it's
25 Loe 261 Bates number.

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 17 of 33

Melinda and Mark Loe, et al vs.    Dawn Erickson     DAWN ERICKSON
Willie Jett, et al         2-9-24        February 9, 2024

Page 61

1  **BY MS. DEMEULES:**
2  Q.  Have you seen -- Well, and I'll invite you first to
3  just take a moment to review it and just familiarize
4  yourself with the document.
5  **A.  (Reviews Exhibit No. 2.)**
6  Q.  Okay.  And you've had a chance to review it?
7  **A.  Yes.**
8  Q.  Have you ever seen this declaration before?
9  **A.  I have not.**
10  Q.  This specific version; is that what you are
11  referring to in that answer?
12  **A.  I have not seen this before.**
13  Q.  You haven't seen this document before.  Including
14  in preparation for this deposition?
15  **A.  Yes.**
16  Q.  Okay.  Does it -- What does it appear to be?
17  **A.  A declaration of Christian community that people**
18  **who work there or go to school there sign.**
19  Q.  And by there, you mean Northwestern?
20  **A.  Correct.  Sorry.**
21  Q.  And to your personal knowledge, you'd agree that
22  Northwestern uses this declaration?
23  **A.  I'm assuming they do since you gave it to me.  I**
24  **don't know that.**
25  Q.  Okay.  Your three oldest have gone to Northwestern

Page 62

1  for PSEO.  At any point during their experiences
2  did you learn about or hear from them that
3  Northwestern has a declaration of Christian
4  community?
5  **A.  No.**
6  Q.  Okay.  When's the first time you learned that
7  Northwestern has a declaration of Christian
8  community?
9  **A.  Gosh, I'm going to guess around a year ago.**
10  Q.  Okay.  So early 2023?
11  **A.  I would guess.**
12  Q.  Okay.  And I'm not going to be able to do all of
13  the mental math.  Were any of your three older
14  children in PSEO at Northwestern around this time
15  last year?
16  **A.  Yes.**
17  Q.  Okay.  So when you learned about the declaration
18  that Northwestern has, it's fair to say that you
19  learned about something that would apply not only
20  potentially to your fourth child were your fourth
21  child were to apply, attend, et cetera, but also to
22  the child or children that were actively at
23  Northwestern?
24  **A.  Yes.**
25  Q.  Okay.  Have you ever had conversations with any of

Page 63

1  your kids about this declaration?
2  **A.  I did about a year ago when I found out about it.**
3  Q.  Okay.  With all of your children?
4  **A.  No, my oldest son.**
5  Q.  Tell me a little bit about that conversation,
6  please.
7  **A.  I had heard about it.  I just asked him is that --**
8  **is that true, and he's like, yeah.  And I said, what**
9  **does it say, and he gave me a synopsis.**
10  Q.  Besides that conversation, have you talked about it
11  with your oldest son on any other occasions?
12  **A.  Not that I recall.**
13  Q.  Have you talked about it with your youngest son?
14  **A.  I have not.**
15  Q.  Okay.  To your personal knowledge, do you know
16  whether your son -- excuse me, your youngest son, is
17  aware that Northwestern has this declaration?
18  **A.  I don't know.**
19  Q.  Okay.  But it is your understanding that your
20  youngest son has said, I would like to do PSEO at
21  Northwestern; correct?
22  **A.  He would like it to be an option.**
23  Q.  He would like it to be an option?
24  **A.  Yes.**
25  Q.  So fair to say he would like the opportunity to

Page 64

1  apply to Northwestern?
2  **A.  Yes.**
3  Q.  Okay.  Do you -- What do you think about this
4  declaration?
5    **MS. BUTLER:** Objection; vague.
6  Q.  I'll start, do you like it or do you dislike it?
7    **MS. BUTLER:** Same objection.
8  **A.  Can you be more specific?**
9  Q.  Sure.  What is your opinion about signed
10  statement -- statements of faith such as this in a
11  high school setting?
12    **MS. BUTLER:** Objection; vague.
13  **A.  Is this being asked to be signed in a high school**
14  **setting?**
15  Q.  For high school students.
16  **A.  But not in a high school setting.**
17  Q.  Yes.  I've also asked about a high school setting.
18  **A.  Well, I would need to see the high school statement**
19  **of conduct to say that.  I don't -- This is a**
20  **college thing, so this is a college thing.  A high**
21  **school student may be attending college.  This is a**
22  **college setting.**
23  Q.  Okay.
24  **A.  And there are different requirements for a college**
25  **setting than a -- than a high school setting.**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 18 of 33
Melinda and Mark Loe, et al vs.                    Dawn Erickson                                    DAWN ERICKSON
Willie Jett, et al                                      2-9-24                                      February 9, 2024

Page 65

1  Q.  I apologize.  Let's use the example of Mounds View
2  where your children have done some classes.  What
3  would your opinion be if this particular declaration
4  was used as a condition of attending Mounds View
5  High School?
6      MS. BUTLER: Objection; calls for
7  speculation.
8  Q.  You can answer if you have an opinion.
9  A.  I don't think a public institution can do that, can
10  ask them to sign that, but I wouldn't have any
11  conflict with it.  I think this requires outstanding
12  conduct of young people and raises the standard.
13  Q.  Did you say it raises the standard?
14  A.  Um-uhm.
15  Q.  What do you mean by that?
16  A.  Personally, in my opinion, in our culture, the
17  standard is low for young people, and I think our
18  young people are competent, smart, a force.
19  Q.  The standard for what?
20  A.  Conduct.  That's what this is about.
21  Q.  Okay.  Do you believe it's about -- or on your read
22  of it, does it appear to be about anything other
23  than conduct?
24      MS. BUTLER: Objection; vague.
25  A.  Can you be more specific?

Page 66

1  Q.  Do you think this implicates faith?
2  A.  Yes.
3  Q.  Okay.  So I asked about a high school setting.  Fair
4  to say -- I believe you said you wouldn't have any
5  conflict with it and that you think it would raise
6  the standard.  Is that -- Is it fair to describe
7  that as a positive assessment, you are assessing
8  this as a positive thing for that use?
9  A.  Yes.
10  Q.  Okay.  Now -- And this is something you brought up
11  earlier.  I'll ask about this being used in a
12  college setting.  What would be your opinion of it
13  there?
14  A.  I have no problem with this being used in any
15  setting.
16  Q.  Do you have any opinion about it being used or
17  being -- being required of an individual on the
18  basis of an individual's age?
19      MS. BUTLER: Objection; vague.
20  Q.  Is there some age that you think is too young to be
21  asked to read, understand, and sign something like
22  this?
23  A.  Developmentally, probably.  I don't know what that
24  age would be.
25  Q.  Fair to say it might depend on individual -- you

Page 67

1  know, individual to individual?
2  A.  Sure.
3  Q.  Okay.  If you -- if you were a school administrator
4  for a high school -- you have experience as an
5  educator -- would you be comfortable making this a
6  requirement of any high school aged student, so
7  anyone in 9th grade, 10th, 11th, 12th grade, which
8  we can approximate 14 to 17 years old, knowing that
9  there is going to be probably individual
10  variability in that group, you know, in terms of
11  development?
12      MS. BUTLER: Objection; calls for
13  speculation.
14  A.  So you're asking me if I would have a problem of
15  anybody aged 14 to 17 being asked to sign this?
16  Q.  Yes.
17  A.  No.
18  Q.  Why not?
19  A.  My experience is limited to my own family.  I've
20  raised my children.  I have raised my children in
21  line with these teachings, so this would be no
22  surprise or no -- this would not be difficult for
23  them to understand.
24  Q.  Okay.
25  A.  I can't say that's true of all 14 to 17 year olds.

Page 68

1  Q.  Why not?
2  A.  Because I don't know.  I don't raise them.
3  Q.  Okay.  Do you agree with me that in the state of
4  Minnesota there are probably some 14-year-old
5  Jewish kids?
6      MS. BUTLER: Objection; lacks
7  foundation.
8  A.  Do I think 14-year-old Jewish children exist?
9  Q.  In Minnesota.
10  A.  Yeah, probably.
11  Q.  What about 14-year-old Muslim kids in Minnesota, do
12  you think they probably exist?
13  A.  Yes.
14      MS. BUTLER: Same objection.
15      So, Dawn, do you need -- do you want
16  to take a break or do you want to keep going?
17      THE WITNESS: No, I'm fine.
18  Q.  So --
19      MS. BUTLER: Sorry.  Can you just let
20  us get a little situated here?
21      MS. DEMEULES: I apologize.
22      MS. BUTLER: Okay.  Go ahead.
23      BY MS. DEMEULES:
24  Q.  And when I say Jewish or Muslim, I'll represent to
25  you that I am specifically trying to identify

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 19 of 33

Melinda and Mark Loe, et al vs.          Dawn Erickson                    DAWN ERICKSON
Willie Jett, et al                          2-9-24                      February 9, 2024

**Page 69**

1  individuals that would have faith beliefs that
2  conflict with the text of this declaration.  As an
3  educator, what would your -- As an educator, would
4  you be willing to require someone who is Jewish or
5  Muslim 14 years old to sign on to this?
6      MS. BUTLER: Objection; calls for
7  speculation.  I'm also going to object to the
8  relevance of this line of questioning.  Go ahead.
9  A.  Say again.
10 Q.  Do you think it's okay to ask a 14-year-old
11 individual who -- let's assume their faith is
12 different than the beliefs that are set out in here
13 that weren't raised Christian.  Do you think it's
14 okay to ask them to sign this?
15     MS. BUTLER: Same objections.
16 **A.  If they want to -- if they want to apply to my**
17 **private Christian institution knowing this is one**
18 **of the requirements, then, yes, I'd ask them to**
19 **sign it.**
20 Q.  Okay.  And do you anticipate that someone who has
21 faith of your own that that could present a
22 difficult choice for individuals who don't share
23 this faith?
24     MS. BUTLER: Same objections.
25 **A.  I don't understand why, if they know this exists,**

**Page 70**

1  **why they wouldn't go to a different place that**
2  **would more align with their values.**
3  Q.  If I recall, one of the -- one of the points you
4  made when we were talking about choice of
5  post-secondaries for some of your older children
6  was location, location, location.
7      What if their -- what if their family
8  doesn't have a car and they would like to
9  participate in the school setting, the institution,
10 but it needs to be a local one, and there is a local
11 one and it's one -- it's the one we're talking
12 about with this declaration.  They just happen to
13 be an individual who doesn't necessarily share its
14 faith.
15     MS. BUTLER: Objection; calls for
16 speculation, lacks foundation, and irrelevant.  Go
17 ahead.
18 **A.  You made the point about the asynchronous learning**
19 **and how prevalent that is.  They could do that at**
20 **an institution that aligned with their values.**
21 Q.  And you would agree, as we talked about earlier,
22 that asynchronous learning is not on-campus
23 learning; correct?
24 **A.  Correct.**
25 Q.  And you agree that they would not receive an equal

**Page 71**

1  experience; correct?
2      MS. BUTLER: Objection; misstates
3  prior testimony.
4  Q.  Would you like me to rephrase?
5  **A.  Yeah.**
6  Q.  Okay.  Would you agree that someone who -- you've
7  said, why don't they just do asynchronous online,
8  would you agree that doing that experience would
9  necessarily mean they do not get all the benefits
10 of the on-campus program?
11     MS. BUTLER: Same objection.  Go ahead
12 and answer.
13 **A.  I think if they have to weigh the choice, they have**
14 **to weigh their values.  What's more important to**
15 **them - being at an institution that aligns with**
16 **their values and not signing this or not being able**
17 **to go to the library because they don't have a car.**
18 **These are decisions they have to make.**
19 Q.  Okay.  I'll return to the question I asked, which
20 was, yes or no, would that student have access to
21 all the benefits of the on-campus program if they
22 took asynchronous?
23     MS. BUTLER: Same objection.
24 **A.  I'm assuming all the things we've talked about.**
25 **They can't raise their hand in the middle of blah,**

**Page 72**

1  **blah, blah.  Then -- then, no, it's a different**
2  **learning environment.**
3  Q.  Okay.  Do you think you personally, your opinion,
4  is it fair to put kids -- Or I won't say put.  To
5  offer high school students different learning
6  environments on the basis of their faith beliefs
7  they hold?
8      MS. BUTLER: Objection; calls for
9  speculation.
10 **A.  Is it fair to offer different learning**
11 **environments?**
12 Q.  Yes.  So let's say we have asynchronous school and
13 on-campus school.  We've talked about those and some
14 of the differences between them.  What if there
15 were a rule that said all Muslim kids have to go to
16 the asynchronous school, no Muslim kids can go to
17 the on-campus school.  What would be your opinion
18 about that?
19     MS. BUTLER: Objection; calls for
20 speculation.
21 **A.  I don't know.  I don't understand how anyone can**
22 **dictate that.  I don't -- I mean --**
23 Q.  Let's say, you know, the amendment that's at issue
24 in this case, the Minnesota legislature passed it.
25 They wrote a bill, you know, and they wrote what

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 73

1  they wrote.  Let's say the legislature writes a law
2  that says Muslim students may only attend
3  asynchronous school.  What would be your opinion
4  about that law?
5      MS. BUTLER: Objection; calls for
6  speculation.
7  **A.  I don't know.  I can't quite wrap my head around**
8  **it --**
9  Q.  Okay.
10  **A.  -- how someone could force that.**
11  Q.  Okay.  What if the law said Muslim students must go
12  to asynchronous school with one exception, they are
13  allowed to go to on-campus school if they sign the
14  document that is Exhibit 2 sitting in front of you.
15  What would be your opinion about that?
16      MS. BUTLER: Objection; calls for
17  speculation and to the extent that it calls for a
18  legal conclusion.
19  Q.  I'm asking for your personal opinion.
20  **A.  I think they'd have a choice to make.**
21  Q.  Okay.  Would you feel positive, neutral, or negative
22  about that law?
23      MS. BUTLER: Objection; vague.
24  **A.  There's so many unfair things in life that how I**
25  **feel about it is really irrelevant.  I've got to go**

Page 74

1  **forward with what I know and make the best decision**
2  **at hand.**
3  Q.  I'll ask again.
4      MS. BUTLER: I'm sorry.  Go ahead.
5  It was involuntary.
6      MS. DEMEULES: Sorry.
7      BY MS. DEMEULES:
8  Q.  I appreciate that you think it might be irrelevant.
9  I asked, do you think it's positive, neutral, or
10  negative?
11      MS. BUTLER: Objection; asked and
12  answered.  Same objections.
13  **A.  And I remain with my answer.**
14  Q.  So is it fair --
15  **A.  I would be neutral and make the next best decision**
16  **for me.**
17  Q.  Okay.
18  **A.  Whatever that is.**
19  Q.  Okay.  So your opinion about a law like that is
20  neutral; correct?
21      MS. BUTLER: Objection to the extent
22  it misstates prior testimony.
23  **A.  (No response.)**
24  Q.  I'm sorry.  Did you say --  I truly didn't hear if
25  you said something.

Page 75

1  **A.  No.  I feel like you're backing me into a corner**
2  **that I don't like, and if I don't have the power to**
3  **change that law, I'm going to have to make the next**
4  **best decision for me.**
5  Q.  Okay.
6      MS. BUTLER: Dawn, I'll just say, go
7  ahead and answer the questions just to the best of
8  your ability.
9  Q.  I will suggest a break soon.  I have one or two
10  questions prior to the break, if that's all right?
11  **A.  (Shakes head.)**
12  Q.  All right.  Is there anything you're able to share
13  about why you feel like those questions make you
14  feel backed into a corner?
15  **A.  No.**
16      MS. BUTLER: Sorry.  Objection; vague
17  and irrelevant, asked and answered.
18  **A.  No.  I don't know what you're asking me.**
19  Q.  You said those questions make you feel backed into
20  a corner.  What about those questions made you feel
21  backed into a corner?
22  **A.  I don't know.  That's just how I felt.**
23  Q.  Just an emotion?
24  **A.  Um-uhm.**
25  Q.  Okay.  And one -- one last question prior to the

Page 76

1  break.  You said if you can't change the law.  Would
2  you agree with me that when there are laws people
3  disagree with, there -- people can -- people can
4  engage in a variety of political activities in
5  response to those laws, such as writing letters to
6  government representatives or engaging in advocacy?
7  Is that a fair statement?
8  **A.  Yes.**
9      MS. DEMEULES: Okay.  Let's take a
10  break.  Ten minutes?
11      MS. BUTLER: Sounds good.
12      MS. DEMEULES: Okay.  Thank you.
13  (Recess taken from 10:38 a.m. to
14  10:45 a.m.)
15      BY MS. DEMEULES:
16  Q.  We'll go back on the record, please.  Could you
17  tell me --  We just started.
18  What's your understanding of your
19  youngest son's beliefs, faith beliefs?
20  **A.  I'm not quite sure what you're asking me.**
21  Q.  Is it your understanding that your son has personal
22  faith beliefs?
23  **A.  Yes.**
24  Q.  Okay.  Do you have an understanding of what those
25  beliefs are?

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Dawn Erickson
2-9-24
DAWN ERICKSON
February 9, 2024

Page 77

1  A.  As I answered before, he is a man of few words, and
2  he lives his faith out more in action than in word.
3  And I see the fruit of the Spirit in his life in
4  the way he loves others, how he walks in peace, that
5  he is a self-controlled young man.
6  Q.  Okay.  And do you draw any conclusions about what
7  beliefs he might hold based on those actions?
8      MS. BUTLER: Objection; calls for
9  speculation and asked and answered.
10  A.  He has told me he is a Christian.
11  Q.  Okay.  Anything else?
12  A.  No.
13  Q.  Okay.  Do you know whether your son, your youngest
14  son, has any concern about attending PSEO with
15  students who are not Christian?
16      MS. BUTLER: Objection; calls for
17  speculation.
18  A.  I don't know.
19  Q.  You don't know whether or not --  Would you have
20  any concern about that?
21  A.  No.
22  Q.  Okay.  Do you have a personal belief about --  Well,
23  I'll start with Exhibit 2 that's in front of you on
24  Page 2.  It's the second paragraph from the bottom.
25  So in the third line from the bottom of that

Page 78

1  paragraph there's a reference to same sex
2  attractions.  Have you found that?
3  A.  Yes.
4  Q.  Okay.  Do you -- do you have an understanding of
5  what that reference is referring to?
6      MS. BUTLER: Will you just read the
7  first part of the sentence just to make sure we're
8  looking at the same place?
9  Q.  Yes.  We come alongside those experiencing same sex
10  attractions.  The prior sentence has a phrase, same
11  sex romantic intimacy and/or sexual relations.
12  A.  Okay.  What's the question?
13  Q.  I just wanted to make sure you found it.
14  A.  Oh, yes, I did.
15  Q.  No problem.  Part of it is when this gets written
16  up, if we just are pointing, for instance, it's
17  hard to sort of retrace our steps.  So it was a
18  good clarification to make sure we located the same
19  sentence.
20      Do you have an understanding of what
21  that use of the phrase, same sex attraction, is
22  referring to?
23      MS. BUTLER: Same objection.  Go
24  ahead.
25  A.  Just what it says, same sex attraction.

Page 79

1  Q.  If I use the phrase gay people or gay individuals,
2  would you -- that's what I'll be referring to.  Does
3  that make sense?
4  A.  Yes.
5  Q.  Just for the purpose of this conversation.
6  A.  Yes.
7  Q.  Do you have a personal opinion about whether gay
8  marriage is immoral?
9      MS. BUTLER: Objection; relevance, but
10  go ahead.
11  A.  I believe what this paragraph says, we define
12  marriage as being a covenant between one man and
13  one woman.
14  Q.  Do you have a personal opinion about whether gay
15  marriage is immoral?
16      MS. BUTLER: Same objection.
17  A.  And I said -- I just said I agree with this
18  definition of marriage.
19  Q.  Okay.  I appreciate that.  I have not asked whether
20  or not you agree with this definition.  I have asked
21  if you have a personal opinion about whether or not
22  gay marriage is immoral?
23      MS. BUTLER: Same objection.
24  A.  I believe the definition of marriage is one man and
25  one woman period.

Page 80

1  Q.  Are you --
2  A.  Whether you want to assign value to that one way or
3  the other, that's your choice.  I believe this is
4  the definition of marriage.
5  Q.  Do you assign any value to gay marriage?
6      MS. BUTLER: Same objection.  Also
7  vague.
8  A.  Yeah, I don't understand the question.  I believe
9  marriage is defined as a covenant between one man
10  and one woman --
11  Q.  Are you willing --
12  A.  -- period.
13  Q.  Are you willing to answer with a yes or a no whether
14  or not you have a personal opinion on the statement
15  gay marriage is immoral?
16      MS. BUTLER: Same objections.
17  A.  What was the question, that question?
18  Q.  It's a yes/no question.  Do you believe that gay
19  marriage is immoral?
20      MS. BUTLER: Same objections.
21  A.  I don't believe it's my position to assign a value
22  to that.
23  Q.  So you have no opinion on that statement?
24  A.  No comment.
25      MS. BUTLER: Dawn, go ahead and give

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 22 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al
Dawn Erickson
2-9-24
DAWN ERICKSON
February 9, 2024

Page 81

1 an answer.
2 **A.   My answer is, it's -- it's not mine to judge as**
3 **moral or immoral.  This is what I view marriage as**
4 **period.  I'm not in a position of judgment over**
5 **anybody.  My posture, in alignment with my faith,**
6 **is to love people period.**
7 Q.   Okay.  So I'll return briefly to an earlier
8 conversation.  We talked about raising the standards
9 for young people.  Is there any aspects of that
10 that -- do you make any moral assessments when you
11 think about what standards for young people are?
12 **MS. BUTLER:** Objection; vague.
13 **A.   What are you asking?**
14 Q.   Do you assign moral judgments to anything ever?
15 **MS. BUTLER:** Same objection.
16 **A.   Yeah, that's vague.  Moral judgments.  Do I -- Can**
17 **I view things as right or wrong?  Yes, in alignment**
18 **with the scripture, and I cannot look at the speck**
19 **in other people's eyes when I've got a log in my**
20 **own.  That is not what I concern myself with.**
21 Q.   Sorry.  What?  I -- I just didn't catch the last
22 part.
23 **A.   I said I don't concern myself with the speck in**
24 **somebody else's eye when I've got a log in my own.**
25 Q.   Oh, I understand.

Page 82

1 **MS. DEMEULES:** And can you read back,
2 I believe you said something about, do I think some
3 things are good or bad.
4 (Last answer read back)
5 Q.   I apologize.  I recalled incorrectly.  It's not good
6 or bad, right or wrong.  I was distracted by a new
7 metaphor that I was learning.
8 So do you have --  And I'm not asking
9 what the opinion is, but do you have an opinion
10 about whether or not gay marriage is right or wrong?
11 Yes or no.
12 **A.   Yes.**
13 Q.   What is that opinion?
14 **A.   I define marriage as between one man and one woman.**
15 Q.   Is --
16 **A.   I believe marriage outside of that is outside of the**
17 **scriptures.**
18 Q.   Okay.  And I apologize for interrupting.  I thought
19 I saw a pause.
20 I've asked about the right/wrong
21 opinion; and if it helps, I'm happy to phrase it,
22 is it your opinion that gay marriage is right?  Yes
23 or no.
24 **MS. BUTLER:** Objection; asked and
25 answered.  I'm also going to say this is beginning

Page 83

1 to get argumentative.
2 **MS. DEMEULES:** I apologize.  I'm
3 having some difficulty, I think, with getting an
4 answer to the question that I'm asking.  I'm going
5 to --  If it's all right, I'm going to ask for a
6 break.
7 **MS. BUTLER:** Sure.  That's fine.
8 (Recess taken from 10:54 a.m. to
9 11:06 a.m.)
10 **MS. DEMEULES:** Back on the record,
11 please.  I've had a chance to talk with counsel,
12 who I believe had a chance to confer with each
13 other, and we've decided that we're going to wrap
14 this up today and leave the record -- excuse me,
15 leave the depo open.  Is that correct?
16 **MS. BUTLER:** Yes.  That's correct.
17 **MS. DEMEULES:** Thank you.
18
19 (Deposition adjourned at 11:09 a.m.)
20 * * *
21
22
23
24
25

Page 84

1 STATE OF MINNESOTA)
2 COUNTY OF HENNEPIN)
3
4      BE IT KNOWN, that I took the deposition of
DAWN ERICKSON at the time and place set forth herein;
5      That I was then and there a Notary Public
6 in and for the County of Hennepin, State of Minnesota,
and by virtue thereof I was duly authorized to
7 Administer an oath;
8      That the witness before testifying was by
me first duly sworn to testify to the whole truth
9 relative to said cause;
10      That the testimony of said witness was
recorded in shorthand and transcribed into typewriting,
11 that the deposition is a true record of the testimony
given by the witness, to the best of my ability;
12      That I am not related to any of the parties
13 hereto nor interested in the outcome of the action;
14      That the reading and signing of the
deposition by the witness was not waived and the Notice
15 of Filing was not waived;
16      That the original transcript was charged
and delivered to the attorney conducting the deposition
17 for filing, that copies were charged at the same rate to
respective counsel;
18
     IN EVIDENCE HEREOF, WITNESS MY HAND AND
19 SEAL THIS 17TH DAY OF FEBRUARY 2024.
20
21      _____
22           Jacquelyn M. Young
23
24
25

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

Page 85

1    READING & SIGNING CERTIFICATE
2  (Crown College, et al, vs MN Dept. Of Education)
3
4    BE IT KNOWN, that I, the undersigned
5  Deponent, have on this date, _____, read
6  the transcript of my deposition testimony, noting the
7  following changes (if any):
8
9    _____
10    DAWN ERICKSON
11
12  Page & Line No.        Correction           Reason
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25  _____  _____  _____

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

## A

**ability (10)**
15:1,14;26:8;30:19;
32:8,13;35:13;40:17;
54:4;75:8
**able (17)**
5:1,15;26:8;30:19;
32:1;35:23;36:15;
39:24;44:19,23;51:10;
52:20;53:5,24;62:12;
71:16;75:12
**abomination (1)**
47:8
**abruptly (1)**
49:12
**absent (1)**
36:5
**abstain (1)**
55:20
**academic (4)**
8:16;24:9;40:4,18
**accept (1)**
54:24
**accepting (1)**
55:1
**access (5)**
26:16;36:19;54:2,4;
71:20
**accurate (2)**
14:17;53:9
**across (2)**
47:13;59:21
**action (1)**
77:2
**actions (1)**
77:7
**actively (1)**
62:22
**activities (3)**
27:18,20;76:4
**actual (1)**
39:7
**actually (3)**
11:22;13:1;25:15
**Ad (1)**
39:3
**add (1)**
40:18
**adjourned (1)**
83:19
**adjustment (1)**
5:8
**administrative (1)**
9:21
**administrator (1)**
67:3
**admissions (2)**
50:5;55:7
**admittance (1)**
57:9
**adulthood (1)**

17:11
**advance (1)**
43:11
**advice (1)**
41:19
**advocacy (1)**
76:6
**affirmatively (1)**
56:21
**again (11)**
4:21;20:3;24:7;40:9;
43:5;44:13;45:13;48:6;
53:18;69:9;74:3
**against (3)**
22:14;23:8;59:8
**age (4)**
10:18;66:18,20,24
**aged (2)**
67:6,15
**agency (3)**
9:22;10:8,8
**ages (1)**
10:16
**ago (4)**
4:10;9:4;62:9;63:2
**agree (24)**
7:6,11;14:11;15:5;
30:9;34:13,16,19;
35:24;37:19;38:12;
54:1;56:16,19;57:16;
61:21;68:3;70:21,25;
71:6,8;76:2;79:17,20
**agreeing (2)**
14:11;15:13
**agreement (1)**
38:11
**ahead (12)**
11:18;44:15;53:19;
68:22;69:8;70:17;
71:11;74:4;75:7;78:24;
79:10;80:25
**al (1)**
85:2
**align (1)**
70:2
**aligned (1)**
70:20
**alignment (2)**
81:5,17
**aligns (1)**
71:15
**allegations (1)**
53:10
**allocate (1)**
22:13
**allowed (7)**
26:18;28:20;38:8;
51:15;52:4,8;73:13
**Almost (1)**
9:4
**along (1)**
38:15
**alongside (1)**

78:9
**always (3)**
24:16;25:23;57:15
**Amendment (5)**
48:22;50:9;52:13;
53:6;72:23
**amendment/law (1)**
50:12
**Amplified (1)**
46:19
**and/or (1)**
78:11
**Andrea (1)**
49:14
**Annie (1)**
42:17
**answered (6)**
45:4;74:12;75:17;
77:1,9;82:25
**anticipate (2)**
5:12;69:20
**apologize (16)**
11:13;15:8;22:18;
25:15;43:11;45:4;
49:12,13,23;57:21;
59:1;65:1;68:21;82:5,
18;83:2
**appear (2)**
61:16;65:22
**appears (2)**
43:10;44:24
**application (1)**
55:2
**apply (15)**
51:5,10,15;52:4,8,20,
22;53:2,3,17;54:4;
62:19,21;64:1;69:16
**applying (2)**
51:22;57:7
**appreciate (2)**
74:8;79:19
**approximate (1)**
67:8
**approximately (1)**
42:9
**argumentative (1)**
83:1
**around (5)**
41:2;56:8;62:9,14;
73:7
**arrangement (2)**
10:24;11:2,3
**articulate (1)**
58:25
**aside (2)**
40:2;51:18
**aspect (2)**
16:24;28:12
**aspects (2)**
55:19;81:9
**assessing (1)**
66:7
**assessment (1)**

66:7
**assessments (1)**
81:10
**assign (4)**
80:2,5,21;81:14
**assume (4)**
29:1;37:25;51:19;
69:11
**assuming (2)**
61:23;71:24
**Asynchronous (22)**
29:15;30:1,4;31:11,
11,25;32:12;36:2,8;
37:7,15,21;38:7,9;
70:18,22;71:7,22;
72:12,16;73:3,12
**asynchronously (1)**
30:8
**attempted (1)**
23:6
**attend (6)**
13:4;21:14;33:21;
36:2;62:21;73:2
**attendance (1)**
11:25
**attended (3)**
17:16;33:6,9
**attending (5)**
29:12,14;55:16;
64:21;65:4;77:14
**attraction (2)**
78:21,25
**attractions (2)**
78:2,10
**available (1)**
54:14
**avoid (2)**
55:25;56:3
**award (1)**
23:4
**aware (9)**
4:15;28:4;50:1;51:4,
21;52:1,14;56:6;63:17

## B

**back (16)**
8:11;11:22;25:24;
33:5;37:4;44:20,22,23;
45:7,8,9;47:16;76:16;
82:1,4;83:10
**backed (3)**
75:14,19,21
**background (1)**
7:15
**backing (1)**
75:1
**bad (3)**
20:2;82:3,6
**based (8)**
22:13;37:8;45:12;
48:1;52:3,7;60:6;77:7
**basis (9)**

66:7
**assessments (1)**
81:10
19:22;36:20,25;37:2;
53:10,13;56:13;66:18;
72:6
**Bates (1)**
60:25
**bathroom (1)**
18:6
**beginning (3)**
25:16;41:1;82:25
**belief (5)**
20:8;43:25;45:20,20;
77:22
**beliefs (13)**
43:23;56:7,16,20;
60:8;69:1,12;72:6;
76:19,19,22,25;77:7
**believer (1)**
43:24
**benefit (7)**
18:20;20:21;34:17,
21;35:2,10,14
**benefits (8)**
35:20,25;36:5,12,20;
37:10;71:9,21
**besides (14)**
8:23;9:18;16:24;
18:8;19:15;27:16;
41:17;42:4,20;52:20;
53:3,16;54:25;63:10
**best (5)**
7:8;74:1,15;75:4,7
**Bethel (9)**
25:7,8;26:1;54:19,
22,25;55:6,9,13
**better (1)**
59:6
**beyond (1)**
51:17
**Bible (4)**
46:1,2,5,15
**big (3)**
14:15,16;16:13
**bill (1)**
72:25
**bit (12)**
5:8;11:15;18:2;21:3;
26:6;37:4;40:20,21;
44:5;48:18;60:17;63:5
**blah (3)**
71:25;72:1,1
**book (1)**
39:18
**both (2)**
22:10;34:13
**bottom (2)**
77:24,25
**box (1)**
30:25
**break (8)**
40:23;41:5;68:16;
75:9,10;76:1,10;83:6
**breaks (1)**
41:1

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 25 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

**briefly (1)**
81:7
**brought (2)**
48:19;66:10
**Business (1)**
8:4
**BUTLER (99)**
6:17;11:17;12:2,4;
18:12;19:6,24;20:13;
23:19;25:12,22;30:12;
31:14,24;32:4,10,15;
33:22;34:22;36:6,9;
38:1,17;40:21;41:6;
43:16;44:1,13;45:16;
46:6;47:4,24;48:7,16,
23;49:3,8,10,15,21;
50:16,21;51:7,23;
52:21;53:11,18;55:10;
57:2,12,19;58:7,15;
59:11;64:5,7,12;65:6,
24;66:19;67:12;68:6,
14,19,22;69:6,15,24;
70:15;71:2,11,23;72:8,
19;73:5,16,23;74:4,11,
21;75:6,16;76:11;77:8,
16;78:6,23;79:9,16,23;
80:6,16,20,25;81:12,
15;82:24;83:7,16
**byproduct (1)**
20:11

**C**

**call (3)**
38:6;44:24;45:25
**called (2)**
4:5;46:1
**calls (35)**
20:13;25:13;30:13;
31:15;32:5;34:22;36:6;
38:1,17;44:2,14;45:17;
47:25;48:17,24;50:17;
51:8,23,24;53:12,19;
57:12;58:8;59:12;65:6;
67:12;69:6;70:15;72:8,
19;73:5,16,17;77:8,16
**came (5)**
12:9;14:1,2;25:3;
49:12
**campus (5)**
26:10;27:4,16;28:9;
37:13
**can (55)**
5:5,7,22;6:9,14,18;
7:15;9:16;11:18;17:19;
18:1,14,14;19:6,25;
20:4,14;30:13;31:15;
32:19;36:11,21;38:6,
10,13;40:18,19;41:1,5;
44:2;48:12,25;49:10;
50:5,17;55:11;56:11;
57:3,4,4,4;60:11;64:8;
65:8,9,9,25;67:8;

**choices (1)**
52:25
**choose (6)**
57:5,14,17,20,23;
58:6
**Chris (1)**
43:24
**Christian (13)**
44:10;45:23;59:17,
25;60:4,4;61:17;62:3,
7;69:13,17;77:10,15
**Christianity (8)**
44:12;45:11,13;46:8;
48:3,8,11,13
**Cities (1)**
8:10
**civil (1)**
9:1
**claim (1)**
48:19
**clarification (1)**
78:18
**clarified (1)**
45:12
**clarify (3)**
5:20,21;43:12
**clarifying (1)**
23:21
**class (18)**
27:8;28:17,18,19;
29:3,12,18;32:3,8,14,
25;33:24;35:8;37:16,
17,22;38:10;40:18
**classes (18)**
13:14,16,17,20;
26:10;27:13,16;28:22;
30:8;32:17;33:9;34:6;
39:21,22,24,25;40:10;
65:2
**classmates (4)**
29:20;31:13;32:2,9
**classroom (3)**
30:19;31:21;33:18
**college (16)**
8:7,12,15,15;33:23;
34:3,6,25;57:14;64:20,
20,21,22,24;66:12;85:2
**comfortable (1)**
67:5
**coming (1)**
56:2
**comment (1)**
80:24
**communicated (2)**
41:16;42:1
**communication (2)**
38:8;42:6
**community (3)**
61:17;62:4,8
**competent (1)**
65:18
**Complaint (3)**
7:6;10:5;53:8

**complaints (1)**
9:21
**complied (1)**
4:3
**component (1)**
28:23
**compromise (1)**
14:3
**concern (5)**
19:20;77:14,20;
81:20,23
**concerned (3)**
20:10,15,18
**concerns (3)**
14:10,13;19:15
**conclusion (13)**
44:2,14;45:17;47:25;
48:17,24;50:17;51:8,
25;53:12,19;59:12;
73:18
**conclusions (1)**
77:6
**condition (3)**
36:19;57:9;65:4
**conduct (19)**
47:7,8;48:20;49:17;
50:12;55:12,20,23,25;
56:1,3,8,17,24;57:5;
64:19;65:12,20,23
**confer (1)**
83:12
**confident (1)**
20:18
**conflict (3)**
65:11;66:5;69:2
**conflicted (1)**
19:4
**conflicting (1)**
20:15
**conscience (3)**
59:3,7,9
**consider (7)**
25:5;43:18,21,25;
44:10;45:23;47:21
**considered (4)**
14:2,5;25:25;54:20
**consistently (1)**
16:4
**contacting (1)**
37:17
**content (6)**
19:16;22:10;38:16,
24;39:6,20
**context (1)**
18:18
**continue (2)**
18:14;32:20
**continued (2)**
12:16,22
**contract (1)**
8:8
**contractors (1)**
8:9

**contradicted (1)**
18:10
**contributed (1)**
11:25
**controller (1)**
8:8
**controversial (1)**
20:5
**conversation (9)**
14:19;39:20;59:21,
25;60:7;63:5,10;79:5;
81:8
**conversations (4)**
19:16;41:19;59:13;
62:25
**corner (4)**
75:1,14,20,21
**Correction (1)**
85:12
**correctly (1)**
47:20
**counsel (7)**
23:16;25:18;32:21;
49:5,6,9;83:11
**counseling (1)**
34:20
**count (2)**
23:7
**county (2)**
9:8,9
**couple (2)**
28:17;41:13
**course (7)**
6:10;17:2;22:14,24;
31:11,25;39:21
**courses (7)**
13:25;23:7,8;26:22;
27:3;33:21,23
**court (5)**
4:15,23,25;9:18;
42:12
**covenant (2)**
79:12;80:9
**COVID (3)**
16:11,18;29:8
**crass (2)**
19:8,11
**create (1)**
40:15
**credibility (1)**
54:18
**credit (1)**
22:25
**credits (4)**
22:11,13;23:1,4
**critical (1)**
40:15
**Crown (6)**
52:22;53:4,17;54:13;
55:8;85:2
**culture (3)**
38:19;53:21;54:10;
55:14;65:16

**capture (2)**
5:1;31:6
**car (4)**
26:19,19;70:8;71:17
**case (6)**
5:13;7:11;9:10;
41:20;52:7;72:24
**cases (1)**
9:18
**catch (2)**
5:4;81:21
**Catholicism (3)**
44:7,25;48:4
**center (1)**
34:21
**certain (8)**
21:17;37:10;47:6;
55:20;56:8,8,17,21
**certainly (1)**
49:5
**CERTIFICATE (1)**
85:1
**cetera (1)**
62:21
**challenged (1)**
24:10
**chance (5)**
15:23;18:22;61:6;
83:11,12
**change (3)**
16:13;75:3;76:1
**changed (1)**
16:12
**changes (1)**
85:7
**chasm (1)**
47:19
**chat (1)**
37:23
**checklist (1)**
23:10
**chicken (1)**
25:3
**child (11)**
9:23;10:1;13:16;
29:2;50:23,25;51:1;
57:7;62:20,21,22
**children (33)**
10:12,14;11:5,10;
12:17;14:7;15:2;17:11,
15;19:17,21;21:11,19,
25;33:16;38:22,24;
40:9;42:4;43:1;53:23;
54:20;55:9,15;57:14;
62:14,22;63:3;65:2;
67:20,20;68:8;70:5
**children's (1)**
23:7
**choice (5)**
14:19;69:22;70:4;
71:13;73:20;80:3

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 26 of 33

Melinda and Mark Loe, et al vs.          Dawn Erickson                    DAWN ERICKSON
Willie Jett, et al                          2-9-24                       February 9, 2024

**current (2)**
29:5,24
**custodial (1)**
10:21
**custody (3)**
10:24;11:2,3

**D**

**dad (3)**
24:7;25:2;53:22
**date (2)**
42:11;85:5
**dated (1)**
7:4
**DAWN (7)**
4:4,13;60:16;68:15;
75:6;80:25;85:10
**decide (1)**
24:6
**decided (5)**
14:11,21;15:5;58:2;
83:13
**decision (8)**
12:1;18:21;24:11;
57:15,24;74:1,15;75:4
**decisions (1)**
71:18
**declaration (12)**
61:8,17,22;62:3,7,
17;63:1,17;64:4;65:3;
69:2;70:12
**decreases (1)**
17:12
**decree (1)**
11:4
**Define (4)**
44:16;53:13;79:11;
82:14
**defined (1)**
80:9
**definition (10)**
32:6;38:9;44:17;
45:3,12;46:10;79:18,
20,24;80:4
**delivered (1)**
40:10
**delivers (1)**
29:17
**delivery (1)**
39:6
**DEMEULES (24)**
4:9;12:6,7;32:21;
40:24;41:7,12;44:19;
45:6;49:13,16;60:24;
61:1;68:21,23;74:6,7;
76:9,12,15;82:1;83:2,
10,17
**Department (1)**
10:5
**depend (1)**
66:25
**depending (1)**

5:11
**depends (1)**
39:7
**depo (2)**
5:10;83:15
**Deponent (1)**
85:5
**deposition (5)**
6:11;43:7;61:14;
83:19;85:6
**Dept (1)**
85:2
**describe (1)**
11:16;13:10;66:6
**described (3)**
36:13;47:6,8
**desire (1)**
14:1
**determined (1)**
55:24
**development (1)**
67:11
**Developmentally (1)**
66:23
**Diane (1)**
42:23
**dictate (1)**
72:22
**difference (1)**
47:9
**differences (4)**
46:23;47:1,2;72:14
**different (16)**
8:9;9:12,13,14;
30:10,18;46:20,21,24;
47:14;64:24;69:12;
70:1;72:1,5,10
**difficult (5)**
58:25,25;59:2;67:22;
69:22
**difficulty (1)**
83:3
**directly (1)**
32:1
**disagree (1)**
76:3
**disagreement (2)**
11:24;12:8
**disagreements (3)**
11:9,16;12:13
**disagrees (1)**
20:24
**disallow (2)**
55:15,18
**discipline (2)**
8:16,20
**discrete (1)**
59:24
**discussed (1)**
35:21
**discussion (6)**
14:14;39:21,23,25;
40:4,12

**discussions (3)**
34:16;35:21;39:25
**dislike (1)**
64:6
**distinction (3)**
29:20;44:6,21
**distracted (1)**
82:6
**districted (1)**
12:21
**divorce (12)**
9:1,5;10:2,19,21;
11:4,10,19,22;12:1,9,
18
**divorced (1)**
8:25
**document (5)**
6:5,21;61:4,13;73:14
**documents (1)**
6:10
**done (6)**
6:13;15:18;21:11;
28:25;65:2
**down (1)**
4:23
**draw (1)**
77:6
**drive (2)**
26:12,18
**dual (2)**
22:19,25
**duly (1)**
4:6
**during (12)**
14:5;16:11;31:10,25;
32:14;35:8;36:13;
37:16,21;38:10;40:17;
62:1

**E**

**earlier (5)**
19:5;44:17;66:11;
70:21;81:7
**early (1)**
62:10
**easier (1)**
39:14
**eating (1)**
56:8
**educating (1)**
39:11
**education (2)**
36:13;85:2
**educator (3)**
67:5;69:3,3
**effect (2)**
18:20;52:17
**effort (1)**
43:8
**egg (1)**
25:4
**eight (1)**

15:19
**either (4)**
11:3;18:9;50:9;
52:22
**electives (1)**
22:7
**else (14)**
10:4;16:16,24;18:8;
27:16;42:18,22,24;
51:21;52:18;53:4,15;
57:3;77:11
**else's (1)**
81:24
**emotion (1)**
75:23
**encounter (2)**
20:10,24
**encountered (2)**
16:1,3
**encounters (3)**
19:1,3,22
**end (1)**
39:6
**engage (12)**
35:4,6;39:20;40:11;
48:21;49:18;50:13,19,
25;56:7,24;76:4
**engaging (3)**
34:16;35:21;76:6
**English (1)**
22:7
**enjoy (2)**
14:24;17:1
**enough (1)**
25:5
**enrollment (9)**
13:11,12,25;15:6,14;
16:8;21:5;22:19;23:24
**environment (1)**
72:2
**environments (2)**
72:6,11
**equal (1)**
70:25
**ERICKSON (4)**
4:4,13;9:11;85:10
**essay (1)**
58:4
**essentially (3)**
19:3;22:25;52:16
**et (2)**
62:21;85:2
**even (1)**
49:2
**everyone (2)**
25:21;60:19
**Exactly (4)**
20:17;28:16;36:17,
23
**EXAMINATION (1)**
4:8
**examined (1)**
4:6

**example (12)**
15:14;17:19;19:2,11;
20:4;24:19;30:5;34:10;
37:19;38:23;56:5;65:1
**examples (4)**
19:2,3;56:11;60:11
**exception (1)**
73:12
**Exclusively (1)**
26:24
**excuse (5)**
14:23;23:1;42:1;
63:16;83:14
**exercise (5)**
14:8;48:19,22;49:19;
50:14
**Exhibit (8)**
6:6,7,20;53:9;60:22;
61:5;73:14;77:23
**exist (4)**
35:25;54:11;68:8,12
**existed (1)**
24:15
**exists (1)**
69:25
**expect (3)**
5:21;18:10;49:6
**experience (27)**
15:22;16:2,4;20:21,
22;28:12;30:10,18,23;
31:2,12;32:17;34:3,4,9,
9,13;35:5,11,16;40:3,3,
9;67:4,19;71:1,8
**experiences (7)**
18:1;21:4;31:5;
33:12,18;38:21;62:1
**experiencing (1)**
78:9
**explain (1)**
29:10
**exposed (3)**
18:4,5;19:23
**exposure (1)**
18:3
**expressed (1)**
14:1
**extensive (1)**
54:17
**extent (16)**
18:12;44:1,14;45:16;
47:24;48:16,23;50:16;
51:7,24;52:1;53:11,19;
58:7;73:17;74:21
**extract (1)**
47:12
**eye (1)**
81:24
**eyes (1)**
81:19

**F**

**facing (1)**

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

57:23
**fact (3)**
26:19;33:15;38:11
**factors (2)**
14:4;15:5
**facts (2)**
43:3;47:19
**fair (42)**
12:8;14:17;20:20;
22:9;25:5;27:4;29:4;
31:10,20,25;32:7;33:4;
34:2,8,12;36:4,19;
37:9;40:16;44:12;45:1,
10,13;46:23;47:12;
48:1,8;50:6;53:9;
55:22;56:19;59:21;
60:1;62:18;63:25;66:3,
6,25;72:4,10;74:14;
76:7
**faith (41)**
43:4,18;44:3,20,24;
46:7;47:3,16,17,17,21;
54:7,8,10;55:7,17,19,
24;56:12,14,16,20;
57:1;58:14;59:14,16;
60:4,7,9;64:10;66:1;
69:1,11,21,23;70:14;
72:6;76:19,22;77:2;
81:5
**familiar (7)**
6:21,22;21:7;45:25;
46:2;55:13,14
**familiarize (2)**
6:18;61:3
**family (11)**
15:3;18:11,23;19:4;
20:8;24:6,14;45:23;
53:21;67:19;70:7
**family's (1)**
20:11
**Father (1)**
46:14
**federal (1)**
10:8
**feel (16)**
15:13;16:5;17:15;
21:10;50:20,22,24;
52:18;57:1;73:21,25;
75:1,13,14,19,20
**felt (3)**
18:25;19:17;75:22
**female (1)**
36:22
**few (7)**
4:16;6:10;7:14;42:5;
44:24;60:12;77:1
**figure (1)**
15:23
**file (1)**
9:11
**filed (3)**
9:21;11:22;42:12
**filing (4)**

10:4;11:19;12:9;
42:13
**find (2)**
24:22;58:24
**fine (7)**
5:5;12:6;23:18;
25:14,22;68:17;83:7
**finish (4)**
4:19,20;5:11;25:18
**first (10)**
4:5;14:24;24:14,24;
25:3;27:8;48:22;61:2;
62:6;78:7
**five (2)**
6:24;39:17
**fixed (1)**
39:16
**Fixsen (1)**
42:19
**F-i-x-s-e-n (1)**
42:19
**flag (2)**
5:8,13
**flexibility (1)**
15:1
**follow (2)**
23:20;53:24
**followed (1)**
22:8
**following (3)**
11:10;45:9;85:7
**follows (1)**
4:7
**foods (1)**
56:8
**footsteps (1)**
53:24
**force (2)**
65:18;73:10
**foreign (2)**
13:22;22:6
**foremost (1)**
14:24
**forgetting (1)**
45:5
**forgot (1)**
40:25
**forgotten (1)**
41:3
**former (2)**
11:8;42:2
**forward (1)**
74:1
**fought (1)**
20:6
**found (3)**
63:2;78:2,13
**foundation (13)**
30:13;31:15;32:5,19;
34:23;46:7,7,9,10,10;
55:11;68:7;70:16
**four (5)**
6:23;10:15;26:7;

39:16;41:24
**fourth (2)**
62:20,20
**free (5)**
21:10;48:18,22;
49:19;50:14
**Freedom (4)**
50:18,18;57:17,20
**friend (3)**
17:21,22;42:14
**friends (8)**
16:17,25;17:1,7;
28:3,12;42:5,16
**front (2)**
73:14;77:23
**fruit (2)**
60:13;77:3
**full (2)**
4:12;21:9
**full-time (1)**
13:2
**fully (2)**
30:3;37:6

## G

**G*** (2)**
9:15,17
**gave (5)**
14:25;26:3;44:17;
61:23;63:9
**gay (10)**
79:1,1,7,14,22;80:5,
15,18;82:10,22
**gears (2)**
21:3;40:20
**general (2)**
8:8,9
**Generally (3)**
13:22;21:22;54:10
**gets (1)**
78:15
**giving (1)**
39:10
**glad (1)**
15:4
**goals (2)**
40:11,14
**God (6)**
14:25;44:3,8;46:13,
14;47:19
**God's (1)**
46:11
**good (10)**
17:14;40:23,24;47:7,
7;56:2;76:11;78:18;
82:3,5
**Gosh (1)**
62:9
**government (4)**
9:22;10:10;51:14;
76:6
**GPA (1)**

58:12
**grade (2)**
67:7,7
**graduation (5)**
21:20,24;22:15;23:8,
10
**great (1)**
15:3
**grew (1)**
7:16
**group (2)**
44:18;67:10
**growing (1)**
17:10
**guess (4)**
14:14;42:15;62:9,11

## H

**hand (6)**
32:13;33:2;38:6;
41:5;71:25;74:2
**happen (1)**
70:12
**happens (1)**
39:4
**happy (2)**
5:20;82:21
**hard (1)**
78:17
**harm (1)**
53:15
**head (2)**
5:1;73:7;75:11
**hear (5)**
15:4;19:10;60:19;
62:2;74:24
**heard (1)**
63:7
**held (2)**
8:7;45:20
**help (2)**
5:3;21:16
**helpful (2)**
34:2;38:14
**helps (2)**
4:22;82:21
**here's (1)**
59:6
**herself (2)**
26:13,18
**HG (26)**
10:17;24:4,6,11,18,
19,19,21,21;25:5;26:9,
12,18,22;27:6,16,22,
25;28:3,9,13,17,22;
30:4,5,7
**HG's (1)**
55:2
**High (34)**
7:21,22;8:15;12:20,
23;13:3,5,7;17:23;
20:25;22:3,15,22;23:4;

33:9,9;35:5,11,16,19;
58:1;64:11,13,15,16,
17,18,20,25;65:5;66:3;
67:4,6;72:5
**highly (1)**
24:9
**history (1)**
22:7
**hit (5)**
16:11,18
**hold (5)**
39:5;43:23;56:7;
60:9;72:7;77:7
**holds (1)**
60:4
**Holy (1)**
46:14
**home (19)**
11:19;12:16,17,22,
25;13:2,5,14;14:18,21;
15:19;16:2;18:4,20;
20:12;21:19;22:15;
23:9;38:22
**honor (1)**
14:9
**hope (2)**
53:15,16
**hour (2)**
40:22;41:2
**hours (2)**
22:11;27:25
**household (1)**
26:16
**housekeeping (1)**
41:13
**Human (2)**
10:5;56:4
**hus (1)**
42:1
**hypothetical (3)**
32:18;37:25;58:9

## I

**idea (4)**
16:1,3;22:22;55:12
**ideas (2)**
19:22;20:24
**identification (2)**
6:8;60:23
**identified (1)**
18:21
**identify (2)**
44:23;68:25
**ifs (1)**
38:3
**imagine (5)**
10:1;27:12;51:18;
58:1;59:20
**immoral (6)**
79:8,15,22;80:15,19;
81:3
**impact (1)**

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

55:8
**implanted (1)**
  15:21
**implementation (1)**
  52:16
**implicates (1)**
  66:1
**important (4)**
  18:22;39:24;60:9;
  71:14
**inability (3)**
  53:3,17,20
**include (2)**
  9:23;29:1
**Including (1)**
  61:13
**incorrectly (2)**
  43:13;82:5
**increases (1)**
  17:13
**independently (1)**
  29:18
**individual (12)**
  20:5;21:19;29:17;
  30:24;57:23;66:17,25;
  67:1,1,9;69:11;70:13
**individuals (6)**
  28:8;44:18;56:6;
  69:1,22;79:1
**individual's (1)**
  66:18
**influence (2)**
  17:11,12
**influences (2)**
  17:14,16
**initiated (1)**
  12:10
**injunction (1)**
  52:15
**injury (1)**
  53:14
**in-person (1)**
  34:14
**instance (9)**
  10:4;20:4,7;30:21;
  34:10;47:6;56:6,9;
  78:16
**instances (2)**
  35:17;38:23
**instead (3)**
  21:9;30:6;58:10
**institution (13)**
  22:23,24;23:2;24:1,
  24;54:3,11;55:16;65:9;
  69:17;70:9,20;71:15
**institutions (3)**
  25:25;50:5;52:9
**instruct (1)**
  49:9
**integrity (3)**
  38:4;58:21,22
**interact (1)**
  32:9

**interacting (1)**
  30:24
**interactions (5)**
  19:16;35:6,10,23;
  40:17
**interface (3)**
  30:15,19;37:15
**Internet (3)**
  29:13,19,20
**interrupting (1)**
  82:18
**intimacy (1)**
  78:11
**into (7)**
  15:2;17:10;52:17;
  75:1,14,19,21
**invite (3)**
  40:8;43:11;61:2
**involuntary (1)**
  74:5
**involve (2)**
  56:17,20
**involved (1)**
  59:10
**irrelevant (4)**
  70:16;73:25;74:8;
  75:17
**issue (5)**
  43:4;49:20,22;50:2;
  72:23
**issues (1)**
  43:3
**IV (1)**
  46:18

**J**

**James (1)**
  46:18
**Jesus (3)**
  43:24;44:8;45:20
**Jett (1)**
  6:2
**Jewish (5)**
  56:7;68:5,8,24;69:4
**JG (3)**
  10:17,17;60:12
**jobs (2)**
  8:7,20
**judge (1)**
  81:2
**judgment (2)**
  11:4;81:4
**judgments (2)**
  81:14,16
**Julie (1)**
  42:21
**jump (1)**
  25:18
**juniors (2)**
  54:24;55:1

**K**

**keep (4)**
  5:9;23:12;56:7;
  68:16
**keeping (1)**
  18:24
**kept (1)**
  41:3
**kids (21)**
  14:24;15:19;16:5,20;
  17:1,6;18:9,23;19:8;
  20:10;26:7;39:12,19;
  41:23;57:15;63:1;68:5,
  11;72:4,15,16
**kids' (1)**
  21:3
**kid's (1)**
  57:22
**King (1)**
  46:18
**knowing (2)**
  67:8;69:17
**knowledge (4)**
  7:8;28:8;61:21;
  63:15
**known (2)**
  24:16;85:4
**kosher (1)**
  56:7

**L**

**lab (2)**
  28:23;29:1
**lack (1)**
  32:19
**lacks (8)**
  30:12;31:14;32:4;
  34:23;37:10;55:10;
  68:6;70:16
**Lakeville (3)**
  7:19,20,21
**language (4)**
  13:23;19:9,11;22:7
**larger (1)**
  59:25
**last (8)**
  6:23;9:11,12,14;
  62:15;75:25;81:21;
  82:4
**Laura (1)**
  42:19
**law (19)**
  49:20,22;50:1,4,8,9,
  14,25;51:1,9,20;52:19;
  73:1,4,11,22;74:19;
  75:3;76:1
**laws (2)**
  76:2,5
**lawsuit (9)**
  6:2;8:23;41:17;

42:12;43:4,6;48:19;
50:2;53:16
**lawyer (1)**
  41:4
**lawyers (2)**
  41:17,19
**lead (1)**
  15:12
**learn (2)**
  18:25;62:2
**learned (2)**
  24:14;62:6,17,19
**Learning (15)**
  17:10,10;24:23;
  29:11;34:14,14;38:13,
  19;70:18,22,23;72:2,5,
  10;82:7
**least (2)**
  5:10;54:3
**leave (3)**
  14:7;83:14,15
**leaving (1)**
  25:17
**lecture (1)**
  33:1
**legal (13)**
  44:2,14;45:17;47:25;
  48:17,24;50:17;51:8,
  24;53:12,19;59:12;
  73:18
**legislature (2)**
  72:24;73:1
**letters (1)**
  76:5
**library (8)**
  27:23;34:20,25;
  35:22;36:15,21;37:14;
  71:17
**license (2)**
  26:11,12
**life (7)**
  17:14;31:21;59:21;
  60:13,13;73:24;77:3
**liked (2)**
  15:1,1
**limited (1)**
  67:19
**limits (2)**
  52:25;53:21
**line (5)**
  45:19;67:21;69:8;
  77:25;85:12
**list (1)**
  54:17
**listening (1)**
  49:2
**literature (1)**
  39:19
**little (14)**
  5:7;11:15;13:19;
  18:1;21:3;26:6;37:4;
  40:20,21;44:5;48:18;
  60:17;63:5;68:20

**live (7)**
  26:7;29:14,19,19;
  32:7;54:22;58:21
**lives (2)**
  60:12;77:2
**living (1)**
  58:22
**Local (3)**
  10:10;70:10,10
**located (1)**
  78:18
**Location (9)**
  25:11,11,11;26:3,4,
  4;70:6,6,6
**Loe (2)**
  6:2;60:25
**log (2)**
  81:19,24
**logistical (1)**
  4:17
**logistics (1)**
  25:16
**long (1)**
  15:20
**longer (1)**
  41:11
**look (4)**
  6:9,25;13:13;81:18
**looked (1)**
  39:8
**looking (2)**
  18:24;78:8
**Lord (1)**
  15:12
**Lord's (3)**
  56:15;57:10;58:4
**lost (3)**
  15:14;40:4;49:1
**lot (4)**
  21:2;35:19;38:3;
  54:17
**lots (1)**
  29:9
**loud (1)**
  60:12
**love (4)**
  56:1,2;60:14;81:6
**loves (1)**
  77:4
**low (1)**
  65:17
**lunch (1)**
  5:12
**Lutheran (1)**
  44:7;48:5
**Lutheranism (1)**
  44:25
**Lysiak (1)**
  42:23
**L-y-s-i-a-k (1)**
  42:23

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 29 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

## M

Madeleine (1)
4:11
majority (1)
27:4
making (3)
24:12;58:12;67:5
male (1)
36:22
man (7)
60:12;77:1,5;79:12,
24;80:9;82:14
management (1)
8:4
manmade (3)
44:3,8,18
many (4)
10:14;26:15,15;
73:24
mark (2)
6:6;41:2
marked (2)
6:7;60:22
marriage (16)
79:8,12,15,18,22,24;
80:4,5,9,15,19;81:3;
82:10,14,16,22
master (1)
33:24
master's (1)
34:9
materials (1)
40:12
math (3)
13:22;22:6;62:13
matter (2)
55:24;59:2
matters (2)
40:5;58:24
may (9)
6:24;7:4;21:10,16;
23:20;35:17;52:14;
64:21;73:2
maybe (4)
6:23;37:18;58:13;
59:6
mean (4)
29:10;30:7;46:9;
47:9,18;49:2;58:22,23,
23;61:19;65:15;71:9;
72:22
meaning (1)
31:16
means (4)
7:7;20:2;30:4;47:16
measure (2)
40:6;53:25
meet (1)
28:11
meetings (2)
30:20;33:13

mental (1)
62:13
mention (2)
25:15;40:25
mentioned (3)
18:11;34:10;54:19
met (2)
4:10;28:9
metaphor (1)
82:7
Michelle (1)
4:13
middle (2)
33:1;71:25
mid-lecture (1)
37:20
might (10)
5:4,7;17:25;28:16;
40:23;56:12;60:8;
66:25;74:8;77:7
mind (6)
18:24;25:2;27:9;
40:16;45:4;60:16
mine (1)
81:2
Minnesota (16)
4:2;7:17,18;8:11;
9:6;10:6;21:19;50:1;
51:5,13;52:9;54:4;
68:4,9,11;72:24
Minnesota's (1)
21:5
minutes (2)
4:10;76:10
misstates (3)
18:13;71:2;74:22
MN (1)
85:2
modality (4)
19:10,15;29:6,24
moderating (1)
37:24
mom (1)
26:7
moment (3)
25:20;59:24;61:3
moral (4)
81:3,10,14,16
more (12)
15:9;17:24;21:17;
24:9,23;41:14;55:12;
64:8;65:25;70:2;71:14;
77:2
Mounds (17)
12:23,24;13:1,11,12,
14,17,21,25;15:6;16:8;
17:17;21:2;22:3,4;
65:1,4
move (1)
41:14
movie (1)
31:3
much (1)

15:18
multiple (1)
33:19
Muslim (9)
58:12,13;68:11,24;
69:5;72:15,16;73:2,11
must (1)
73:11
myself (3)
58:21;81:20,23

## N

name (10)
4:11,12;9:10,11,12,
14;21:10;56:15;57:10;
58:5
names (3)
10:16;17:20;42:16
narrowing (1)
24:24
natural (1)
25:23
nauseam (1)
39:3
near (1)
31:17
nearby (1)
26:7
necessarily (3)
39:13;70:13;71:9
need (9)
6:12,17;14:8;25:21;
26:20;38:10;55:25;
64:18;68:15
needed (1)
26:8
needs (1)
70:10
negative (11)
16:20,21,22,22;18:1;
19:1,18,21;28:13;
73:21;74:10
Negatively (1)
16:9
neglected (1)
25:15
Netflix (2)
31:3;36:3
neutral (5)
28:13;73:21;74:9,15,
20
new (4)
40:22;46:18;50:1;
82:6
next (3)
60:21;74:15;75:3
NG (1)
10:17
nobody (1)
57:4
nods (1)
5:1

Northwestern (38)
21:16;24:1,22;25:1,
6;26:1;29:6,24;30:6;
37:9;51:6,9,15,19,22;
52:3,12,17,20;53:4,17,
20;54:9,13;55:5,8,13;
61:19,22,25;62:3,7,14,
18,23;63:17,21;64:1
Northwestern's (2)
37:6,9
Northwestern-St (3)
21:15;24:8;51:3
notation (1)
23:3
note (5)
4:16,25;5:9;7:9;
40:25
noting (1)
85:6
number (2)
6:25;60:25

## O

oath (2)
4:7;6:2
object (14)
11:17;12:2;25:13;
47:24;48:16,23;50:16;
51:7;53:11,18;58:7,9;
59:11;69:7
Objection (66)
12:4,24;18:12;19:6,
24;20:13;25:13,19;
30:12;31:14;32:4,16;
33:22;34:22;36:6,9;
38:1,17;43:16;44:1,13;
45:16,18;46:6;47:4;
48:7;49:21;50:21;
51:23;52:21;55:10;
57:2,12,19;64:5,7,12;
65:6,24;66:19;67:12;
68:6,14;69:6;70:15;
71:2,11,23;72:8,19;
73:5,16,23;74:1,11,21;
75:16;77:8,16;78:23;
79:9,16,23;80:6;81:12,
15;82:24
objections (11)
25:21;31:24;32:10,
15,18;58:15;69:15,24;
74:12;80:16,20
objects (1)
49:1
obviously (3)
16:18;43:3;55:13
occasions (1)
63:11
occur (1)
42:6
off (2)
41:8;49:12
offer (2)

72:5,10
offered (1)
28:19
offering (3)
51:9,19;52:18
offers (1)
52:3
office (2)
27:25;34:20
official (1)
51:14
Oklahoma (1)
8:2
old (3)
15:19;67:8;69:5
older (3)
17:11;62:13;70:5
oldest (10)
14:1;21:12,13,25;
22:14;24:3;28:24;
61:25;63:4,11
olds (1)
67:25
on-campus (15)
26:22;27:22;30:7;
31:20;32:7,25;34:4;
35:25;37:11;70:22;
71:10,21;72:13,17;
73:13
once (2)
4:24;16:18
one (36)
6:11;8:24;18:20;
19:8;20:24;36:2;38:9,
25;40:11,14;42:14;
47:6;54:3,20;57:3;
59:24;69:17;70:3,3,10,
11,11,11;73:12;75:9,
25,25;79:12,13,24,25;
80:2,9,10;82:14,14
ones (1)
36:13
ongoing (2)
59:20;60:7
online (22)
16:14;27:3;28:17,18,
19;29:6,9,16,24;30:6,
10;31:11;33:21,23;
34:6,9,14;37:6,10,12,
23;71:7
only (6)
12:9;13:7;28:19;
54:14;62:19;73:2
open (2)
5:10;83:15
opinion (6)
20:11,11;39:18;
53:25;64:9;65:3,8,16;
66:12,16;72:3,17;73:3,
15,19;74:19;79:7,14,
21;80:14,23;82:9,9,13,
21,22
opportunity (2)

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 30 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

17:6;63:25
**opposed (1)**
  12:25
**opposite (2)**
  20:10;29:16
**option (5)**
  54:19,23;55:9;63:22,
  23
**Options (1)**
  21:6
**oral (2)**
  5:2;7:25
**orally (2)**
  42:6,8
**order (1)**
  38:15
**others (3)**
  26:1;60:14;77:4
**otherwise (1)**
  8:16
**out (7)**
  15:23;43:12;49:3;
  60:12;63:2;69:12;77:2
**outside (4)**
  20:12;37:17;82:16,
  16
**outstanding (1)**
  65:11
**over (4)**
  4:22;14:22;17:4;
  81:4
**overseas (1)**
  20:6
**own (4)**
  33:15;35:5;46:15;
  67:19;69:21;81:20,24

### P

**page (4)**
  6:24,25;77:24;85:12
**pages (1)**
  6:24
**paragraph (3)**
  77:24;78:1;79:11
**parent (4)**
  10:21;14:6;17:5,12
**part (10)**
  15:21;16:11,13;
  26:18;39:10;41:18;
  43:19;78:7,15;81:22
**partial (6)**
  13:11,12,25;15:6,13;
  16:8
**participate (2)**
  24:11;70:9
**particular (4)**
  15:25;28:19;43:14;
  65:3
**particularly (1)**
  29:2
**part-time (1)**
  13:1

**party (2)**
  8:23;9:19
**passed (2)**
  52:13;72:24
**Paul (3)**
  21:15;24:8;51:3
**pause (2)**
  25:19;82:19
**paused (1)**
  52:16
**peace (1)**
  60:14;77:4
**peer (8)**
  17:12,13,16;18:1;
  19:1,21;34:17;40:3
**peers (6)**
  17:20;19:17;35:6,10,
  22;37:15
**penalty (1)**
  7:9
**people (17)**
  4:24;15:11;18:5;
  31:9;48:2,10;61:17;
  65:12,17,18;76:2,3,3;
  79:1;81:6,9,11
**people's (1)**
  81:19
**perfect (1)**
  4:14
**perhaps (4)**
  19:12,22;29:8;59:20
**period (4)**
  79:25;80:12;81:4,6
**perjury (1)**
  7:9
**personal (10)**
  34:8;61:21;63:15;
  73:19;76:21;77:22;
  79:7,14,21;80:14
**personally (4)**
  30:23;50:22;65:16;
  72:3
**perspective (2)**
  16:19;28:11
**pertains (1)**
  50:4
**phrase (5)**
  47:7;78:10,21;79:1;
  82:21
**physical (5)**
  31:12,16,20,21;34:3
**physics (1)**
  27:7
**pieces (1)**
  4:17
**place (4)**
  52:15;56:2;70:1;
  78:8
**placement (1)**
  11:25
**places (1)**
  53:2
**plant (2)**

15:2,15
**please (15)**
  4:12,18;5:2,19;6:6,
  12,15;7:15;9:16;18:17;
  44:21;45:6;63:6;76:16;
  83:11
**plus (1)**
  39:16
**point (5)**
  16:7;41:4;43:12;
  62:1;70:18
**pointing (1)**
  78:16
**points (2)**
  33:19;70:3
**politely (1)**
  19:12
**political (1)**
  76:4
**Politics (1)**
  20:4
**poorly (2)**
  22:18;23:6
**pops (1)**
  37:20
**position (5)**
  48:20;80:21;81:4
**positive (11)**
  16:19;17:13,15,20;
  20:23;28:12,14;66:7,8;
  73:21;74:9
**Positively (2)**
  16:9,11
**possibility (1)**
  5:10
**possible (2)**
  38:20;43:8
**post-secondaries (2)**
  54:14;70:5
**Post-Secondary (7)**
  21:5;22:23;23:1,2;
  24:1;50:4;52:9
**posture (1)**
  81:5
**potentially (1)**
  62:20
**power (1)**
  75:2
**practice (1)**
  39:5
**pray (2)**
  15:11,11
**prayed (1)**
  15:7
**preference (2)**
  14:18,22
**preferred (1)**
  55:5
**preparation (1)**
  61:14
**prerecorded (2)**
  29:17;32:2
**Presbyterian (1)**

44:8
**present (2)**
  41:11;69:21
**pretty (1)**
  15:18
**prevalent (1)**
  70:19
**prevented (1)**
  52:19
**prevents (3)**
  50:15;51:1,21
**principles (1)**
  47:13
**prior (12)**
  4:19;12:18;13:5;
  14:18;18:13;42:11;
  45:12;71:3;74:22;
  75:10,25;78:10
**private (3)**
  13:4;14:22;69:17
**privileged (1)**
  41:20
**probably (7)**
  35:18;50:8;66:23;
  67:9;68:4,10,12
**problem (4)**
  39:11;66:14;67:14;
  78:15
**proceeding (8)**
  9:5,18;10:2,19,22;
  11:4,11,22
**process (3)**
  14:5;24:12;50:6
**produce (1)**
  23:16
**product (2)**
  29:8;50:25
**professor (1)**
  28:1
**Program (12)**
  21:6;7;22:20;29:6;
  30:11;37:6,10,11,12;
  54:2;71:10,21
**prohibition (1)**
  51:4
**prohibits (3)**
  37:13,16;51:9
**projection (1)**
  17:14
**protected (3)**
  48:21;49:18;50:13
**provides (1)**
  37:11
**provisions (1)**
  11:5
**proximity (3)**
  31:12,16,21
**PSEO (47)**
  21:4,4,9,11,14;22:14,
  19,23;23:7,7,24;24:6,
  11,15,24,25;25:6,24;
  27:10,14;28:6;29:6,24;
  30:5,8;33:6;37:5,6,10,

11;49:25;51:9,19;52:3,
9,18;54:2,14;55:9,16;
57:7,9,25;62:1,14;
63:20;77:14
**psychology (2)**
  27:11,12
**public (11)**
  11:20;12:20,23;13:4;
  14:23;15:22;17:16,23;
  19:1;42:12;65:9
**purpose (2)**
  37:25;79:5
**purposes (1)**
  43:6
**pursue (2)**
  8:5;13:24
**put (7)**
  32:16;40:2;45:18;
  51:18;57:6;72:4,4
**puts (1)**
  17:14

### Q

**quite (2)**
  73:7;76:20

### R

**race (1)**
  36:25
**raise (8)**
  14:25;32:13;33:2;
  38:6;41:4;66:5;68:2;
  71:25
**raised (3)**
  67:20,20;69:13
**raises (2)**
  65:12,13
**raising (2)**
  14:7;81:8
**Ramirez (1)**
  42:17
**Ramsey (1)**
  9:9
**rather (2)**
  36:3;56:20
**read (14)**
  6:17;39:18;44:20,22,
  23;45:6,7,9;65:21;
  66:21;78:6;82:1,4;85:5
**READING (1)**
  85:1
**ready (1)**
  6:13
**real (1)**
  31:21
**reality (1)**
  20:22
**really (2)**
  6:16;73:25
**realtime (4)**
  29:12,12;38:14;

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 31 of 33

Melinda and Mark Loe, et al vs.                    Dawn Erickson                                    DAWN ERICKSON
Willie Jett, et al                                  2-9-24                                         February 9, 2024

40:17
**reason (5)**
    5:15,17;26:3;36:11;
    85:12
**reasonable (1)**
    54:23
**recall (25)**
    11:2,7,8;13:20;
    15:25;22:4,6;23:22;
    24:14,16,20,20,21;
    25:1,3;26:15;28:15,23;
    34:6;35:17,19;38:23;
    42:11;63:12;70:3
**recalled (1)**
    82:5
**receive (1)**
    70:25
**Recess (3)**
    41:9;76:13;83:8
**recognize (1)**
    5:7
**recollection (1)**
    18:19
**record (7)**
    4:12;5:4;41:8;60:24;
    76:16;83:10,14
**records (3)**
    23:12,14,23
**rectify (1)**
    53:16
**refer (2)**
    48:3;50:8
**reference (3)**
    49:25;78:1,5
**referenced (2)**
    7:9;19:5
**referring (7)**
    21:5;46:12;50:10;
    61:11;78:5,22;79:2
**refrain (2)**
    56:13,15
**refraining (2)**
    56:17,20
**refresh (1)**
    57:21
**register (1)**
    33:24
**regurgitators (1)**
    40:15
**related (1)**
    10:2
**relations (1)**
    78:11
**relationship (1)**
    60:6
**relationships (2)**
    17:21,22
**relevance (5)**
    11:18;12:5;58:9;
    69:8;79:9
**religion (15)**
    37:2;43:4,15;44:3,7,
    12,16,20;45:3,11,14;

47:21;48:9,13;50:18
**religions (2)**
    44:25;48:3
**religious (1)**
    43:21,23,25
**remain (1)**
    74:13
**remember (5)**
    9:8;23:17;27:2;29:2;
    42:9
**reminded (1)**
    41:4
**repeat (2)**
    18:16;49:17
**rephrase (1)**
    71:4
**reporter (3)**
    4:16,23,25
**represent (4)**
    30:3;52:14;55:6;
    68:24
**representation (1)**
    37:8
**representatives (1)**
    76:6
**represented (1)**
    37:5
**reprimands (1)**
    8:21
**Requested (1)**
    44:22
**require (6)**
    50:5;55:20;57:3,5;
    58:3;69:4
**required (3)**
    55:17;56:23;66:17
**requirement (3)**
    55:7;56:24;67:6
**requirements (10)**
    21:20,24;22:2,5,9,
    16;23:8;58:11;64:24;
    69:18
**requires (2)**
    57:8;65:11
**reread (1)**
    44:20
**research (1)**
    54:17
**resolve (1)**
    12:15
**resolved (1)**
    12:13
**resources (3)**
    27:22;34:19;35:22
**respectfully (1)**
    43:8
**respond (2)**
    4:19;25:18
**response (3)**
    39:7;74:23;76:5
**rest (1)**
    13:15
**retrace (1)**

78:17
**return (2)**
    71:19;81:7
**review (4)**
    6:12,14;61:3,6
**reviewing (1)**
    6:13
**Reviews (2)**
    6:20;61:5
**Revised (1)**
    46:18
**right (13)**
    4:10;8:11;24:17,20;
    29:25;59:1;75:10,12;
    81:17;82:6,10,22;83:5
**right/wrong (1)**
    82:20
**Rights (4)**
    10:5;48:22;49:19;
    50:14
**Roberts (1)**
    7:25
**romantic (1)**
    78:11
**rooted (1)**
    56:2
**rule (1)**
    72:15
**run (1)**
    38:4

---

## S

**same (33)**
    13:17;19:6;31:24;
    32:10,15;48:4;49:21;
    50:21;54:5;57:19;
    58:10,15;64:7;68:14;
    69:15,24;71:11,23;
    74:12;78:1,8,9,10,18,
    21,23,25;79:16,23;
    80:6,16,20;81:15
**Sampson (1)**
    42:21
**satisfaction (1)**
    54:15
**saw (3)**
    20:20,22;82:19
**saying (4)**
    15:25;56:21;58:13;
    59:6
**scenario (2)**
    52:12;57:22
**school (84)**
    7:20,21,22,22;8:15;
    11:6,10,20,24,25,25;
    12:13,16,20,23;13:2,3,
    5,5,8;14:2,18,21,23;
    15:22;16:17;17:7,16,
    23;18:4,5;19:1;20:12,
    25;22:3,15,15,22;23:4,
    9;27:23;29:9;33:9,10;
    34:17,19,21;35:5,11,

16,19,25;36:2;38:22;
    57:8,8;58:1,2,3,6,10;
    61:18;64:11,13,15,16,
    17,18,21,25;65:5;66:3;
    67:3,4,6;70:9;72:5,12,
    13,16,17;73:3,12,13
**schooled (4)**
    11:19;12:17;13:15;
    15:20
**schooling (5)**
    8:5;12:22,25;16:2;
    18:20
**schools (5)**
    8:15;13:4;21:13,19;
    25:5
**science (3)**
    13:22;22:6;29:1
**screen (1)**
    31:8
**scripture (1)**
    81:18
**scriptures (1)**
    82:17
**second (1)**
    77:24
**secondary (1)**
    22:25
**seem (2)**
    16:8,22
**seems (1)**
    24:16
**self-control (1)**
    60:15
**self-controlled (1)**
    77:5
**self-educating (1)**
    39:11
**sense (7)**
    5:23;24:25;27:6;
    29:21;50:10;60:8;79:3
**sentence (3)**
    78:7,10,19
**separate (1)**
    19:1
**September (1)**
    9:4
**set (7)**
    21:20,21,24;22:16;
    23:9;57:22;69:12
**setting (19)**
    17:7;18:4,5;32:12;
    35:25;36:3;38:9,13;
    64:11,14,16,17,22,25,
    25;66:3,12,15;70:9
**settings (1)**
    33:18
**sex (6)**
    36:20;78:1,9,11,21,
    25
**sexual (1)**
    78:11
**shakes (2)**
    5:1;75:11

share (4)**
    18:22;69:22;70:13;
    75:12
**shared (1)**
    10:24
**sheet (1)**
    22:8
**shift (1)**
    21:3
**shoes (1)**
    57:7
**short (1)**
    40:21
**shows (1)**
    60:13
**side (2)**
    31:7,9
**sign (10)**
    58:16;59:3;61:18;
    65:10;66:21;67:15;
    69:5,14,19;73:13
**signature (2)**
    6:24;7:2
**signed (4)**
    7:7;53:8;64:9,13
**significance (2)**
    46:20;47:2
**signing (3)**
    27:8;71:16;85:1
**similar (2)**
    22:3;56:12
**similarly (1)**
    4:20
**Sin (1)**
    55:21
**sincerely (1)**
    45:20
**sinful (3)**
    55:23,24;56:25
**single (1)**
    26:7
**sitting (1)**
    73:14
**situated (1)**
    68:20
**situation (3)**
    57:11,18;58:5
**skip (1)**
    35:18
**smart (1)**
    65:18
**social (4)**
    35:6,10,23;40:3
**solver (1)**
    39:12
**somebody (1)**
    81:24
**someone (7)**
    31:7;36:21;37:23;
    69:4,20;71:6;73:10
**someone's (1)**
    36:20
**Sometimes (3)**

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 32 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

5:4;25:18;56:16

**Somewhere (1)**
16:9
**Son (22)**
46:14;51:5,14,21;
52:4,7,19;53:5;54:1;
59:13;60:3,6,8;63:4,11,
13,16,16,20;76:21;
77:13,14
**son's (4)**
53:16;59:16,21;
76:19
**soon (1)**
75:9
**Sorry (15)**
12:4;25:12;27:19;
36:9;45:5;49:4;60:18,
20;61:20;68:19;74:4,6,
24;75:16;81:21
**sort (19)**
5:22;13:7;14:19;
16:1;19:10,12;24:22;
28:23;29:15;31:5;36:3;
39:15,19;47:12;48:1;
57:21;59:23;60:6;
78:17
**sounded (1)**
17:25
**sounds (5)**
20:19;25:25;28:17;
40:24;76:11
**space (1)**
25:17
**speak (7)**
4:22;19:8;31:7;32:1;
48:10,12;49:5
**speaking (5)**
4:21;13:22;19:11;
25:23;60:17
**specific (9)**
27:7,9;50:8;54:6,8,
10;61:10;64:8;65:25
**specifically (2)**
18:8;68:25
**speck (2)**
81:18,23
**speculation (23)**
20:14;25:14;30:13;
31:15;32:5,19;34:23;
36:7;38:2,18;51:24;
57:13;58:8;65:7;67:13;
69:7;70:16;72:9,20;
73:6,17;77:9,17
**speech (4)**
50:18,19,24;56:17
**speed (1)**
4:14
**spell (1)**
9:16
**spend (2)**
17:6;41:14
**spending (1)**
20:12

**Spirit (3)**
46:14;60:14;77:3
**split (1)**
13:7
**spot (1)**
39:13
**spouse (2)**
11:9;42:2
**Standard (6)**
46:18;65:12,13,17,
19;66:6
**standards (2)**
81:8,11
**standing (3)**
32:16,18;45:18
**stands (1)**
51:1
**start (13)**
4:11,16,21;5:22;6:5;
7:14,15;8:14;17:4;
24:3;27:10;64:6;77:23
**started (4)**
13:7;17:23;26:11;
76:17
**starting (1)**
4:19
**state (7)**
4:12;10:8;50:1;51:4,
13;54:3;68:3
**stated (1)**
32:16
**statement (9)**
55:7,12,17;58:13;
64:10,18;76:7;80:14,
23
**statements (1)**
64:10
**Statute (1)**
4:2
**steps (1)**
78:17
**still (6)**
23:14;29:16;31:8;
43:20;54:1,2
**stop (1)**
52:17
**Strike (1)**
23:22
**strong (1)**
20:8
**student (10)**
22:22;24:9;29:18;
32:25;33:10;37:13;
58:1;64:21;67:6;71:20
**students (16)**
29:14;30:15;31:22;
32:1,8,12;34:17;35:21;
36:12,14;57:9;64:15;
72:5;73:2,11;77:15
**study (3)**
8:3;27:7,11
**subject (2)**
27:9;40:5

**subjects (1)**
27:6
**subscribe (1)**
43:14
**suggest (2)**
57:4;75:9
**suit (1)**
9:1
**summarized (1)**
22:10
**support (2)**
9:23;10:1
**supports (1)**
20:5
**supposed (1)**
23:3
**Sure (13)**
9:24;11:21;25:20;
27:14;38:15;47:20;
64:9;67:2;76:20;78:7,
13,18;83:7
**surprise (1)**
67:22
**switch (3)**
16:13;40:20,22
**sworn (1)**
4:6
**synchronous (5)**
29:11,25;30:10,15;
31:8
**synopsis (1)**
63:9
**system (1)**
53:22

**T**

**talk (5)**
18:1;32:8;39:23;
48:18;83:11
**talked (10)**
15:15;21:2;25:17;
33:12;63:10,13;70:21;
71:24;72:13;81:8
**talking (5)**
4:24;25:16;37:5;
70:4,11
**taught (2)**
29:13;38:16
**teacher (4)**
29:13,19;33:15;
37:18
**teachers (3)**
35:8,14,24
**teaching (4)**
15:18;38:22;39:22;
40:12
**teachings (1)**
67:21
**telling (1)**
7:16
**ten (2)**
9:4;76:10

**tenets (1)**
58:14
**term (2)**
43:13;48:3
**terms (6)**
4:14;5:18;22:10;
29:10;47:3;67:10
**testified (1)**
4:7
**testify (3)**
5:15;6:2;7:12
**testimony (4)**
18:13;71:3;74:22;
85:6
**therefore (1)**
51:10
**thinkers (1)**
40:15
**Thinking (2)**
35:5,20
**third (1)**
77:25
**THOMSON (2)**
60:16,19
**thought (1)**
82:18
**three (11)**
8:9;13:14;21:12,13,
25;22:14;28:24;53:23;
58:11;61:25;62:13
**throughout (4)**
6:10;16:2,4;54:3
**Timmerman (1)**
41:11
**today (4)**
5:16;6:11;7:12;
83:14
**today's (1)**
38:19
**together (1)**
14:2
**told (5)**
18:10;51:14;59:19;
60:3;77:10
**took (6)**
13:14;27:2,3,12;
28:22;71:22
**topic (2)**
40:23;41:14
**topics (1)**
20:9
**track (1)**
41:3
**tracking (1)**
38:15
**traditions (1)**
44:24
**transcript (3)**
58:4,12;85:6
**transition (4)**
14:15,16;16:23,24
**transport (1)**
26:9

**trivially (1)**
15:10
**true (4)**
7:7;16:5;63:8;67:25
**truly (1)**
74:24
**trust (1)**
15:11
**truthfully (1)**
5:16
**try (2)**
20:3,3
**trying (3)**
25:1;31:5;68:25
**Tulsa (1)**
8:2
**Tune (1)**
49:3
**turn (1)**
60:21
**tutoring (1)**
34:20
**Twin (1)**
8:10
**two (8)**
4:23;26:17,18;31:5;
39:16,16;42:20;75:9
**type (1)**
48:9
**typical (2)**
39:5,7
**typically (2)**
39:4;41:2

**U**

**Um-uhm (5)**
25:1;43:2;54:21;
65:14;75:24
**um-uhms (1)**
5:2
**unacceptable (2)**
55:1,5
**under (4)**
6:2;7:8,9;10:18
**undergrad (1)**
27:15
**underlying (2)**
47:13;56:1
**undersigned (1)**
85:4
**understood (1)**
5:21
**unfair (1)**
73:24
**University (4)**
7:25;21:15;24:8;
51:2
**unless (1)**
49:10
**up (16)**
7:16;11:22;12:9;
16:12;23:20;27:8;33:5;

CASE 0:23-cv-01527-NEB-JFD   Doc. 97-27   Filed 09/04/24   Page 33 of 33

Melinda and Mark Loe, et al vs.
Willie Jett, et al

Dawn Erickson
2-9-24

DAWN ERICKSON
February 9, 2024

37:4,20;54:22;57:8,22;
60:17;66:10;78:16;
83:14
**uphold (2)**
54:12,15
**upon (2)**
11:19;20:15
**use (20)**
5:2;24:18;29:10;
30:4;36:15,21;37:18;
38:21;43:10;44:17;
48:2,10;49:25;53:14;
55:7;58:11;65:1;66:8;
78:21;79:1
**used (8)**
27:22;43:13;48:3,4;
65:4;66:11,14,16
**uses (1)**
61:22
**using (2)**
26:20;37:14
**Usually (1)**
38:5
**utilize (1)**
34:25
**utilizing (2)**
34:19;35:22

## V

**vague (20)**
19:24;20:1;30:13;
33:22;43:16,20;46:6;
47:4;48:7;52:21;57:2;
64:5,12;65:24;66:19;
73:23;75:16;80:7;
81:12,16
**vain (3)**
56:15;57:10;58:5
**valuable (1)**
15:2
**value (9)**
17:3,5,9;40:4,18;
53:22;80:2,5,21
**values (17)**
15:15,20,23;18:11,
22;19:5;54:5,6,7,8,11,
15,22;70:2,20;71:14,16
**vantage (2)**
16:7;33:19
**vaping (3)**
18:6,8;19:2
**variability (1)**
67:10
**variation (2)**
13:18,19
**variety (1)**
76:4
**vehicles (1)**
26:15
**verified (1)**
7:6
**version (8)**

30:6,7;36:3,4,8;
46:17;47:6;61:10
**versions (3)**
46:21,24;47:14
**versus (3)**
6:2;19:11;44:20
**via (4)**
29:13,19,19;30:24
**video (1)**
31:6
**Vietnam (1)**
20:6
**View (20)**
12:23,24;13:1,11,12,
14,17,21,25;15:6;16:8;
17:17;21:2;48:11,13;
55:9;65:1,4;81:3,17
**viewing (1)**
32:2
**views (1)**
20:16
**View's (2)**
22:3,4
**violate (2)**
56:25;59:7
**virtually (1)**
31:9
**voice (4)**
14:6,8,9;24:7
**vs (1)**
85:2

## W

**wait (2)**
4:18,20
**walks (1)**
77:4
**wants (2)**
57:25;60:19
**war (3)**
20:6,7,7
**watching (2)**
31:2,6
**way (9)**
19:8,10;24:23;25:23;
38:5;48:4;59:6;77:4;
80:2
**ways (1)**
29:9
**weigh (2)**
71:13,14
**weren't (1)**
69:13
**what's (5)**
17:9;39:17;71:14;
76:18;78:12
**When's (1)**
62:6
**who's (1)**
30:24
**willing (3)**
69:4;80:11,13

**wish (4)**
48:20;49:18;50:13,
19
**without (3)**
4:23;29:19;40:4
**witness (4)**
4:5;60:18,20;68:17
**woman (4)**
79:13,25;80:10;
82:14
**word (8)**
43:11;46:11;47:17,
17;48:4,10;53:14;77:2
**worded (1)**
22:18
**wording (2)**
46:23;47:1,2,9
**words (5)**
5:1,3;47:13;60:12;
77:1
**work (2)**
22:14;61:18
**worked (1)**
13:10
**world (2)**
48:2,9
**wrap (2)**
73:7;83:13
**writes (1)**
73:1
**writing (2)**
42:7;76:5
**written (2)**
8:20;78:15
**wrong (4)**
43:10;81:17;82:6,10
**wrote (3)**
72:25,25;73:1

## Y

**year (4)**
62:9,15;63:2;67:25
**years (4)**
9:4;15:19;67:8;69:5
**Yep (1)**
7:2
**yes/no (1)**
80:18
**young (7)**
65:12,17,18;66:20;
77:5;81:9,11
**youngest (10)**
50:23,24;51:1;57:7;
59:13;63:13,16,20;
76:19;77:13

## Z

**Zoom (6)**
30:20,24,25;33:13;
36:4;38:6

## 1

**1 (4)**
6:6,7,20;53:9
**10:38 (1)**
76:13
**10:45 (1)**
76:14
**10:54 (1)**
83:8
**10th (1)**
67:7
**11:06 (1)**
83:9
**11:09 (1)**
83:19
**11th (1)**
67:7
**12th (1)**
67:7
**14 (4)**
67:8,15,25;69:5
**14-year-old (4)**
68:4,8,11;69:10
**17 (4)**
10:17;67:8,15,25
**18 (2)**
10:17,19

## 2

**2 (5)**
60:22;61:5;73:14;
77:23,24
**20 (2)**
4:10;10:17
**2014 (1)**
9:4
**2023 (2)**
7:4;62:10
**22 (1)**
10:17
**261 (1)**
60:25

## 3

**38 (2)**
7:1,2

## 4

**486.10 (1)**
4:2

## 8

**88 (1)**
7:1

## 9

**9:31 (1)**
41:9
**9:37 (1)**
41:10
**9th (1)**
67:7