# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Melinda and Mark Loe, et al., | |
| Plaintiffs, | |
| v. | Case No. 23-cv-1527-NEB-JFD |
| Willie Jett, et al., | |
| Defendants. | |

## BRIEF *AMICUS CURIAE* OF THE FREEDOM FROM RELIGION FOUNDATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...............................................................................................................1

ARGUMENT.......................................................................................................................2

    I. The state may set neutral and generally applicable nondiscrimination conditions on education programs that it funds. ...........................................................................2

        A.  Government action is neutral if it does not infringe upon or restrict practices because of their religious motivation. ................................................................3

        B.  Government action is generally applicable if it prohibits religious and secular conduct that undermine the government's asserted interests in a similar way. ....6

        C.  The Church Autonomy Doctrine is not a de facto shield against anti-discrimination laws. ...........................................................................................7

    II. The state has a significant interest in not funding and perpetuating discrimination in publicly funded education programs. ...................................................................9

        A.  The state must make education opportunities available to all students. .............11

        B.  State-sanctioned discrimination is antithetical to the American public education system......................................................................................................12

CONCLUSION.................................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Addabbo v. Donovan*,
    22 A.D.2d 383, 256 N.Y.S.2d 178, *aff'd*, 16 N.Y.2d 619, 209
    N.E.2d 112 (1965) .................................................................................... 17

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*,
    796 N.E.2d 286 (Ind. 2003) ..................................................................... 10

*Brown v. Bd. of Educ.*,
    347 U.S. 483 (1954) .................................................................................. 12

*Carson v. Makin,*
    596 U.S. 767 (2022) .................................................................................... 4

*Cornerstone Bible Church v. City of Hastings*,
    948 F.2d 464 (8th Cir.1991) ....................................................................... 3

*Drevlow v. Lutheran Church, Missouri Synod*,
    991 F.2d 468 (8th Cir. 1993) ...................................................................... 9

*Emp. Div. v. Smith.*,
    494 U.S. 872 (1990) .................................................................................... 3

*Espinoza v. Mont. Dep't of Revenue*,
    591 U.S. 464 (2020) .................................................................................... 4

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) ............................................................................. 8, 12

*Hill-Murray Fed'n of Teachers v. Hill-Murray High Sch.*,
    487 N.W.2d 857 (Minn. 1992) ................................................................... 2

*Hutterville Hutterian Brethren, Inc. v. Sveen*,
    776 F.3d 547 (8th Cir. 2015) ...................................................................... 9

*LeVake v. Indep. Sch. Dist. No. 656*,
    625 N.W.2d 502 (Minn. Ct. App. 2001) ............................................... 3, 11

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    584 U.S. 617 (2018)................................................................................5, 6

*N.H. v. Anoka-Hennepin Sch. Dist. No. 11*,
    950 N.W.2d 553 (Minn. Ct. App. 2020)............................................................17

*Norwood v. Harrison*,
    413 U.S. 455 (1973)................................................................................17

*Olsen v. Mukasey*,
    541 F.3d 827 (8th Cir. 2008) ......................................................................3

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020)................................................................................10

*Plyler v. Doe*,
    457 U.S. 202 (1982)................................................................................17

*Pro-Life Action Ministries v. City of Minneapolis*,
    700 F. Supp. 3d 687 (D. Minn. 2023)..............................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    143 S.Ct. 2141 (2023).............................................................................15

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
    471 U.S. 290 (1985)................................................................................10

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)................................................................................4

**Statutes**
Minn. Stat. § 124D.09 ..........................................................................passim

Minn. Stat. § 363A.13. ...............................................................................11

Minn. Stat. § 645.16 .................................................................................5

**Other Authorities**
Dan Lips, *The State of Equal Opportunity in American K-12 Education*, FREOPP
    (Nov. 3, 2019), https://freopp.org/whitepapers/the-state-of-equal-opportunity-in-
    american-k-12-education/ .......................................................................13

John Tomlinson, *Public Education, Public Good*, 12 Oxford Rev. Educ., 211, 211–
    22 (1986) *manuscript available at* http://www.jstor.org/stable/1050027............13

Joseph G. Krosciw, Caitlin M. Clark, & Leesh Menard, *The 2021 National School
    Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, 32
    (2022), available at https://files.eric.ed.gov/fulltext/ED625378.pdf. ..................10

Kelley Robinson & Tori Cooper, *The Epidemic of Violence Against the
    Transgender and Gender Non-Conforming Community in the United States*,
    HRC (Nov. 2023), https://reports.hrc.org/an-epidemic-of-violence-
    2023#national-emergency...............................................................................11

Minnesota House of Representatives, *House Floor Session 4/20/23 – Part 2*,
    YouTube (Apr. 20, 2023)..............................................................................5, 6

Minnesota Senate, *Senate Floor Session – 04/24/23*, Youtube, (April 20, 2023).....6

Myron Orfield, *Milliken, Meredith, and Metropolitan Segregation*, 62 UCLA L.
    Rev. 364, 430–38 (2015) ................................................................................9

PSEO Reference Guide, https://www.lrl.mn.gov/docs/2023/other/230595.pdf .......2

Report of the Board of Commissioners for the University of Virginia to the
    Virginia General Assembly (Aug. 4, 1818), available at
    https://founders.archives.gov/documents/Madison/04-01-02-0289. ...................12

## INTRODUCTION

The Freedom From Religion Foundation, as amicus curiae, provides additional arguments in support of the Defendants ("the State"). The State's nondiscrimination rules for colleges that apply for Postsecondary Enrollment Options ("PSEO") public funding are legitimate constitutional means to ensure students' access to education. Crown College ("Crown") and Northwestern College ("Northwestern") seek an incorrect, harmful, and unprecedented interpretation of the First Amendment. The proper question before the Court is whether private schools vying to participate in a state-funded education program must comply with the same neutral and generally applicable anti-discrimination laws as all other program participants. Crown and Northwestern petition the court to create a special carveout: They seek the legal right to mandate that students sign divisive declarations of faith—which openly discriminate against protected classes of students—in order to participate in the state-funded, secular PSEO education program. Crown and Northwestern additionally ask the court to declare that they may accept or deny students' PSEO applications based on students' sexual orientation, gender identity, and religion. (Order Mot. Dismiss Countercl., ECF No. 66 at 3; Countercl., ECF No. 27 ¶¶ 35, 38.)

When Crown and Northwestern engage in their privately funded educational activities, they are free to require faith statements, cultivate their desired classes, and continue to teach religious doctrine. There is no dispute in this case whether private religious institutions may provide secular education to students through the state program. However, what Crown and Northwestern ask this court to decide goes beyond precedent—petitioning the Court to rule that they must be allowed to obtain all the benefits from publicly funded programs, while at the same time, being held exempt from the State's generally applicable anti-discrimination laws.

1

Minnesota's PSEO program was designed to provide advanced educational opportunities for Minnesota's students pursuing public graduation requirements, consistent with the state's interest in managing public education. PSEO Reference Guide, pp. 15, 17, 24, https://www.lrl.mn.gov/docs/2023/other/230595.pdf; *see also* Minn. Stat. § 124D.09, subdiv. 12(d). Those interests include ensuring that students in publicly funded schools receive a standardized education; and therefore, schools that apply to participate in PSEO must be approved by the Minnesota Department of Education (MDE) and teach secular courses. The State also has an interest in eliminating discrimination on the basis of religion, sexual orientation, and gender identity to ensure that publicly funded education is open to all students. "[T]he right to free exercise of religion does not include the right to be free from neutral regulatory laws which regulate only secular activities within a church affiliated institution," *Hill-Murray Fed'n of Teachers v. Hill-Murray High Sch.*, 487 N.W.2d 857, 863 (Minn. 1992), including institutions that choose to participate in publicly funded programs.

## ARGUMENT

### I. The state may set neutral and generally applicable nondiscrimination conditions on education programs that it funds.

Private entities that seek to obtain state funding and access to public school students are reasonably required to abide by certain conditions for state funding. The Supreme Court has held that neutral and generally applicable laws are not subject to constitutional strict scrutiny under the Free Exercise Clause. *See Emp. Div. v. Smith.*, 494 U.S. 872, 878–82 (1990); *see also LeVake v. Indep. Sch. Dist. No. 656*, 625 N.W.2d 502, 507 (Minn. Ct. App. 2001) (reasoning that if a law of general application incidentally infringes on religious practices, it does not contravene the free exercise clause). The Supreme Court traced the principle behind *Smith* back to the late nineteenth

century, citing a series of cases that "consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div. v. Smith.*, 494 U. S. at 879.

The Eighth Circuit has held that "[a]bsent evidence of an 'intent to regulate religious worship,' a law is a neutral law of general applicability."*Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) (quoting *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir.1991)). Minnesota's amendment to § 124D.09 does not reflect an organized and malicious effort to target religious schools; but rather, reflects the principle that students should have equal access in pursuing educational opportunities. (Memo Supp. Defs.' Mot. Summ. J., ECF No. 78 at 5). As the amendment prohibits discriminatory conduct for all schools interested in hosting PSEO programs, regardless of belief system, the rules are neutral and generally applicable.

### A. Government action is neutral if it does not infringe upon or restrict practices because of their religious motivation.

In the Supreme Court's recent decisions regarding grant programs, the Court held that grant programs cannot bar public funds from going to religious actors solely because of their religious character. *See Carson v. Makin,* 596 U.S. 767, 780 (2022) (holding that a Maine program, which provided tuition assistance to parents in remote regions without public schools, violated free exercise since the assistance could go only to "nonsectarian" schools); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 476 (2020) (finding a free exercise violation where a Montana program provided scholarships to private schools but not religious schools based on the state constitution's barring of aid to the latter); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458, (2017) (holding that a Missouri program to help nonprofits pay for playground resurfacing

3

violated free exercise by disqualifying any organization "owned or controlled by a church, sect, or other religious entity"). However, Minn. Stat. § 124D.09 does not preclude religious schools from being approved as PSEO schools. Rather, the law creates an anti-discrimination policy for any school interested in receiving state funding to administer a PSEO program. Indeed, at least one private religious institution, Bethel University, currently participates in PSEO and has not run afoul of the anti-discrimination statute. (Memo Supp. Pls.' Mot. Summ. J., ECF No. 89 at 32–33)

A law is not religiously neutral "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons," and "if the object of a law is to infringe upon or restrict practices because of their religious motivation." *Pro-Life Action Ministries v. City of Minneapolis*, 700 F. Supp. 3d 687, 701 (D. Minn. 2023) (internal citations and quotations omitted). When analyzing if a law prohibits or restricts practices because of their religious motivation, the State must give proper weight to a practitioner's belief system. For instance, in *Masterpiece Cakeshop*, the Supreme Court held that the Colorado Civil Rights Commission impermissibly targeted a baker's religious motivation, rather than basing its ruling on a neutral nondiscriminatory purpose. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* 584 U.S. 617, 638 (2018). Writing for the majority, Justice Kennedy noted that the Civil Rights Commission had failed to act neutrally when investigating a discrimination complaint against the baker: "The neutral and respectful consideration to which [the baker] was entitled was compromised here, however. The Civil Rights Commission's treatment of his case has some elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated his objection." *Id.* at 634. The Court listed factors relevant to the assessment of if a governmental body acted with religious neutrality, including "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and

the legislative or administrative history, including contemporaneous statements made by members of the decision making body." *Id.* at 639 (internal citations omitted).

1. *Background and Legislative Reasoning*

Minnesota Statutes outline what factors may be used to determine legislative intent. To the extent that laws are not explicit, Minn. Stat. § 645.16 states the intention of the legislature may be ascertained by considering, among other factors: "the occasion and necessity for the law; the circumstances under which it was enacted; the mischief to be remedied; the object to be attained; the former law, if any, including other laws upon the same or similar subjects; the consequences of a particular interpretation; the contemporaneous legislative history; and, legislative and administrative interpretations of the statute."

Crown and Northwestern posit that Representative Laurie Pryor, a co-author of the bill in the Minnesota House of Representatives and self-identified person of faith, "targeted the Schools for their religious beliefs." (Memo Supp. Pls.' Mot. Summ. J., ECF 89 at 13). However, when looking at the contemporaneous legislative history discussing the intent of the bill, there is no evidence demonstrating that Crown and Northwestern were targeted because of what they believe. Instead, Representative Pryor asks her colleagues to think about mandatory faith statements within the PSEO program as a "barrier" between "students and the institutions that they want to go to." *Minnesota House of Representatives, House Floor Session 4/20/23 – Part 2*, YouTube, at 3:15:00-3:16:18 (Apr. 20, 2023), https://www.youtube.com/watch?v=Klc95g-ovm4. Representative Pryor made it clear that "the intent of the provision in this bill is to make sure that our high school students can go to the post secondary institutions of their choice." *House Floor Session 4/20/23 - Part 2,* at 3:28:06-19. Representative Pryor wanted to ensure students could "exercise that option,

5

and they will not be compelled to sign a statement as a barrier to that admission." *Id* at 3:28:20-30.

Far from religious targeting, the legislative discussion mirrors the text of the law, which is anti-discriminatory in nature. During legislative debate, Senator Erin Maye Quade repeated the legislative text and remarked that it was "really important" because "a lot of students go to the nearest place because they have to take public transportation, or be driven by a parent, or pick up a sibling after school. They need to be close by." Minnesota Senate, *Senate Floor Session – 04/24/23*, Youtube, at 1:28:29-1:29:30, (April 20, 2023), www.youtube.com/live/1U5f9k4l3eM. Senator Mary Kunesh said, "What this bill is saying [is] that schools, whether they are faith-based or have other unique interests, cannot ask questions that would discriminate against the opportunity for that student to attend that program." *Id.* at 1:36:43-1:37:06. Senator Kunesh continued, "The question is a question of discrimination…" *Id.* at 1:37:58-04. Contemporaneous legislative history time and time again demonstrates that legislators were drafting this amendment with students in mind to promote equality in public education rather than to nefariously target specific religious beliefs.

### B. Government action is generally applicable if it prohibits religious and secular conduct that undermine the government's asserted interests in a similar way.

A law lacks general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021) (internal citations omitted). As emphasized by a multitude of legislators who drafted and voted for the amendment, the government interest for both the faith-statement provision and the anti-discrimination provision were to ensure schools applying to

6

participate in the government-funded PSEO program would not discriminate against students based on their protected characteristics or beliefs.

Crown and Northwestern argue the statute is not generally applicable as it "does not prohibit secular institutions from requiring PSEO students to affirm their agreement with the institution's secular ideologies or mission statements." (*See* Compl., ECF No. 1 ¶ 184.) However, using the framework outlined in *Fulton*, the government's asserted interest in this case is ensuring equal access to state-funded programs. Ergo, a more suitable comparable secular activity under the Free Exercise Clause is to ask whether, under this law, other schools may force students to sign a statement disavowing religion or their sexual orientation in order to be matriculated through their program, or base admissions decisions on protected characteristics or beliefs. Per the statute's plain language, § 124D.09(3)(a), all schools schools clearly cannot: "An eligible institution **must not**… base any part of the admission decision on a student's race, creed, ethnicity, disability, gender, or sexual orientation or religious beliefs or affiliations" (emphasis added). The key here is whether the state is neutral, without regard to the belief system of the challenged institution, in banning uncompromising faith statements that preclude protected classes of students from being able to join, or base admissions decisions on protected classes. Under § 124D.09(3)(a), no institution is able to do so.

### C. The Church Autonomy Doctrine is not a de facto shield against anti-discrimination laws.

The Church Autonomy Doctrine is an affirmative defense that religious institutions can raise in response to litigation brought against them in secular courts. The doctrine generally aims to ensure that religious institutions can manage their internal religious affairs without government interference. The doctrine does not provide absolute blanket immunity for all actions taken by

7

religious institutions, including private religious colleges. Courts "may not resolve disputes of religious doctrine or ecclesiastical polity … however, a court need not defer to an ecclesiastical tribunal on secular questions and permissibly may resolve a matter by applying neutral principles of law." *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 553 (8th Cir. 2015).

Religious organizations cannot use the doctrine as a complete shield against purely secular disputes; the application of this affirmative defense requires a determination that the issue at hand involves ecclesiastical matters instead of secular legal claims. *See, e.g.*, *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 471 (8th Cir. 1993) (holding that the First Amendment does not shield religious organization's employment decisions from civil court review where the employment decisions do not implicate religious procedures, beliefs, or law); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 290 (Ind. 2003) ("A court with general authority to hear matters like employment disputes is not ousted of subject matter or personal jurisdiction because the defendant pleads a religious defense."); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305–06 (1985) (internal citations omitted) (noting that religious organizations are not exempt from secular government regulations.); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (explaining that the church autonomy doctrine "does not mean that religious institutions enjoy a general immunity from secular laws").

The faith statement and admissions anti-discrimination provisions of § 124D.09, supported by the Minnesota Human Rights Act (MHRA), regulate secular activity funded by the state instead of dictating religious beliefs for Crown and Northwestern. The MDE has a secular interest in this suit, challenging "whether the Schools may accept taxpayer money to perform a traditional, secular, public function in a manner that discriminates against public high-school students." (Defs.' Crosscl., ECF No. 39 at 42) The anti-discrimination statute does not prohibit Crown or

8

Northwestern from practicing the religion of their choice. *See, e.g.*, *LeVake*, 625 N.W.2d at 507. The statute does not interfere with Crown's or Northwestern's doctrinal beliefs, ministerial hiring practices, or ecclesiastical matters. By its plain language, § 124D.09 imposes conditions on the Schools' secular conduct, not their sectarian beliefs. This suit concerns questions of secular law, and does not require this court to delve into or opine on Plaintiffs' internal ecclesiastical affairs: The church autonomy doctrine does not apply.

## II. The state has a significant interest in not funding and perpetuating discrimination in publicly funded education programs.

Eliminating discrimination in education is a compelling government interest. Studies have found that the educational landscape has become increasingly resegregated over the last several decades because of diminished access to educational equality. *See, generally*, Myron Orfield, *Milliken, Meredith, and Metropolitan Segregation*, 62 UCLA L. Rev. 364, 430–38 (2015) (discussing the concerning trend of racial resegregation within America's cities and educational systems). Government funds should not be used to demand adherence to identities and religious beliefs from students who have valid personal reasons to apply for an institution's secular PSEO program—such as proximity to their primary school, transportation, unique course offerings, specific faculty, or seeking co-enrollment with peers—but who do not share the institution's underlying religious beliefs. Evidence in the record suggests that the Schools' mandatory faith statements contribute to continued student segregation along racial lines and other protected characteristics. (Memo Supp. Defs.' Mot. Summ. J., ECF No. 78 at 10–12) There "is no evidence that any non-Christian or LGBTQ+ students has ever attended on-campus PSEO at Northwestern." *Id*. at 10. Likewise, Crown "is not aware" of any LGBTQ+ students ever participating in its on-campus classes, and Crown excludes all on-campus PSEO applicants who do not share its beliefs.

*Id*. at 12. In addition, 88% of Northwestern's and 90% of Crown's on-campus PSEO students are white. *Id.* at 10–12.

Further, § 124D.09 prohibits all participating schools from basing admissions to a PSEO program on the basis of a student's race, creed, ethnicity, disability, gender, or sexual orientation or religious beliefs or affiliations, regardless of the school's reasoning for discrimination. There is no mechanism for individualized exceptions, strengthening the State's blanket equality interest. *See Fulton*, 593 U.S. at 533 (internal citations omitted) (cleaned up) ("A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.")

As held by *Brown v. Board of Education*, when analyzing the equality of segregational laws, "we must consider public education in the light of its full development and its present place in American life throughout the Nation." *Brown v. Bd. of Educ.*, 347 U.S. 483, 492–93 (1954). Similarly, when challenging the validity of gender or sexual orientation anti-discrimination laws, it's important to consider the current climate for LGBTQ+ youth. According to a 2021 survey of more than ten thousands LGBTQ+ persons conducted by the Gay, Lesbian and Straight Education Network (GLSEN), roughly 59% of respondents experienced discrimination at school related to their sexual orientation or gender expression.  Joseph G. Krosciw, Caitlin M. Clark, & Leesh Menard, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, 32 (2022), available at https://files.eric.ed.gov/fulltext/ED625378.pdf. LGBTQ+ students who reported experiencing anti-LGBTQ+ discriminatory policies or practices in school were more than twice as likely to have seriously considered suicide in the past year than students who did not report experiencing any discrimination. *Id.* at 43. Of these respondents, roughly 84% wanted to go on to earn college credits after high school. *Id.* at 36.

Today, LGBTQ+ youth are under intense national scrutiny and are subject to inordinate numbers of restrictive laws. In 2023, for the first time in its history, the Human Rights Campaign declared a national state of emergency for LGBTQ+ Americans in response to over 550 anti-LGBTQ+ bills introduced into state houses across the country, more than 80 of which were passed into law. Kelley Robinson & Tori Cooper, *The Epidemic of Violence Against the Transgender and Gender Non-Conforming Community in the United States*, HRC (Nov. 2023), https://reports.hrc.org/an-epidemic-of-violence-2023#national-emergency. 2022 alone saw the highest number of anti-LGBT hate crimes reported by the FBI to date, with the number of hate crimes based on gender identity increasing by over 32% from 2021 to 2022. *Id*. In light of the dramatic increase of exclusionary LGBTQ+ rules and their severe negative effects on students, it is now more important than ever to protect educational equity for students regardless of their sex, gender identity, or sexual orientation.

### A. The state must make education opportunities available to all students.

When performing secular functions funded by the state, Crown and Northwestern are called to abide by the State's neutral and generally applicable rules and the conditions of the MHRA, which clearly dictate that persons must not be discriminated against on the basis of religion, sexual orientation, or gender identity. Minn. Stat. § 363A.13. The unyielding faith statements that Plaintiffs seek to require as a mandatory condition of in-person PSEO enrollment on their campuses include statements that mandate:

> (1) Adherence to one religion: "All men are born with a sinful nature, are separated from the life of God, and can be saved only through the atoning work of the Lord Jesus Christ."
>
> (2) Rejection of other religious beliefs: "Souls of [Christian] unbelievers remain, after death, in conscious misery until the second resurrection… and shall be cast into the Lake of Fire to suffer everlasting, conscious punishment," and to "reject any

11

>philosophy that does not recognize the existence and nature of God as taught in the Bible"
>
>(3) Rejection of homosexuality: Marriage is a "covenant between one man and one woman," same-sex relationships are "sexual immorality" and "perversions of God's intended purposes," and that homosexuality is a sexual peversion comparable with "bestiality and incest"
>
>(4) Sex and Gender discrimination: Non-cisgender persons are mired in "confusion and brokenness" and students cannot "affirm or support transgender identity or expression"

(Def.'s Amm. Answer Compl., ECF No. 27 at 60–63) Students who refuse to agree to these covenants are not allowed on-campus and those who violate them face institutional discipline, including expulsion. *Id.* at 63. Crown and Northwestern are free to believe and practice these tenets when administering their own programs. The problem is that their faith statements prevent public school students from participating in the secular, publicly funded PSEO programs because of students' protected identities or religions. The Supreme Court recently affirmed hat "the right to a public education 'must be made available to all on equal terms.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S.Ct. 2141, 2147 (2023) (quoting *Brown v. Bd. of Educ.*, at 493). In following these principles, PSEO programs are prohibited from basing admissions decisions on any protected classes.

### B. State-sanctioned discrimination is antithetical to the American public education system.

In a report of the Commissioners for the University of Virginia in 1818, Thomas Jefferson urged the case for publicly funded universal general education and outlined the numerous ways that an educated citizenry invariably benefits all of society. Report of the Board of Commissioners for the University of Virginia to the Virginia General Assembly (Aug. 4, 1818), available at https://founders.archives.gov/documents/Madison/04-01-02-0289. The historic American

12

approach to education has centered on a pursuit of liberty and equality. *See* John Tomlinson, *Public Education, Public Good*, 12 Oxford Rev. Educ., 211, 211–22 (1986) *manuscript available at* http://www.jstor.org/stable/1050027. In recognition of these principles, for more than half a century courts and legislatures have routinely expanded access and opportunities for education and created standards to promote equal opportunity as a consistent focus of federal education policy.

Congressional measures targeting discrimination in education include the 1966 Equality of Opportunity Study (examining the condition of "equal educational opportunities in public schools"), the 1972 Title IX of Education Amendments Act ("No person in the United States shall, on the basis of sex be excluded from participation in, be denied benefits of or be subjected to discrimination under any education program or activity receiving Federal financial assistance"), the Rehabilitation Act of 1973 ("No otherwise handicapped individual… shall be subjected to discrimination under any program or activity receiving Federal financial assistance"), the 1974 Equal Educational Opportunities Act ("No state shall deny equal educational opportunity on account of his or her race, color, sex, or national origin"), and the Improving America's Schools Act of 1994 ("a high-quality education for all individuals and a fair and equal opportunity to obtain education are a societal good, are a moral imperative, and improve the life of every individual"), to name a few. Dan Lips, *The State of Equal Opportunity in American K-12 Education*, FREOPP (Nov. 3, 2019), https://freopp.org/whitepapers/the-state-of-equal-opportunity-in-american-k-12-education/.

Likewise, courts have continually struck down state-funding for discriminatory education, and recognized various ways segregation may play out. *See Addabbo v. Donovan*, 22 A.D.2d 383, 388, 256 N.Y.S.2d 178, 183, *aff'd*, 16 N.Y.2d 619, 209 N.E.2d 112 (1965) (where a court considered the distance from home to school, utilization of the school pace, and the superiority of

13

educational opportunities made available to children who were bussed to another school when combatting discriminatory educational access); *Norwood v. Harrison*, 413 U.S. 455, 468–70 (1973) (holding that Mississippi could not give textbooks to students attending racially segregated private schools because "discriminatory treatment exerts a pervasive influence on the entire educational process" and finding that "the Constitution . . . places no value on discrimination as it does on the values inherent in the Free Exercise Clause"); *Plyler v. Doe*, 457 U.S. 202, 224–30 (1982) (holding that Texas violated the Equal Protection Clause of the 14th Amendment when it denied undocumented children access to the same educational opportunities as other children, emphasizing the long-lasting impact that education has on the life of a child)*; N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553, 562 (Minn. Ct. App. 2020) (holding that, under the Minnesota Human Rights Act, a school may not enact practices that discriminate against a transgender student in any manner which prevent them from utilizing the full benefits offered, or services provided, by the school district).

      Crown and Northwestern ask this court to create a carveout in the law especially for them. Plaintiffs want to accept public money but avoid the neutral, generally applicable rules that attach. The special religious exemption they seek would severely undermine the State's efforts and legitimate, compelling interest in ensuring equality in public education programs. Through a bipartisan effort, Minnesota chose to ensure that all students have the same educational opportunities regardless of students' religion, sexual orientation, or gender identity. Plaintiffs ask the court to second-guess the legislature in the name of limiting students' access to a publicly funded education program. Finally, Plaintiffs' desired carveout would prove particularly dangerous in a time when LGBTQ+ students across America are increasingly targeted for no reason other than existing as themselves.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the Defendants.

September 18, 2024                                    Respectfully Submitted,

Patrick C. Elliott (#0397792)
*Counsel of Record*
Freedom From Religion Foundation
P.O. Box 750
Madison, WI 53701
(608) 256-8900
pelliott@ffrf.org

15