## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Melinda and Mark Loe, et al.,

        Plaintiffs,

   v.

Willie Jett, et al.,

        Defendants.

Case No. 23-cv-1527 (NEB/JFD)

**MEMORANDUM OF LAW OPPOSING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

For more than a decade, the Schools[1] have violated the civil rights of high-school students participating in Minnesota's Postsecondary Enrollment Options (PSEO) program. Their PSEO admissions standards exclude high-school students who are not Christian, straight, and cisgender from setting foot on their campuses.

When it learned of this discrimination via complaints from students and families, the Minnesota Department of Education (MDE) asked the Schools to stop. They refused. So, MDE sought legislation barring all postsecondary institutions participating in PSEO (Institutions) from discriminating on protected-class status. It took five tries, but the legislation finally passed in 2023.[2]

The Amendment is narrow: it forbids discrimination in PSEO admissions only. The Amendment does not regulate Institutions' employment, postsecondary admissions, or

---

[1] Crown College (Crown) and University of Northwestern-St. Paul (Northwestern).

[2] Act of May 24, 2023, ch. 55, art. 2, sec. 45 (Amendment).

other practices. The Amendment's executive and legislative history confirms that eradicating discrimination in PSEO admissions is and always was its sole aim.

Instead of complying with the Amendment, the Schools doubled-down, suing to invalidate it. The Schools posit that the First Amendment gives them license to discriminate to protect their on-campus "culture." Three parents[3] joined the Schools' lawsuit, claiming the Amendment deprives their children of Christian PSEO education, even though state law requires PSEO to be nonsectarian. MDE raised compulsory counterclaims against the Schools, alleging they are state actors in the limited context of PSEO.

The parties now approach the Court with a full evidentiary record. The undisputed facts here demonstrate, as a matter of law, that the Schools engage in state action when they participate in PSEO, that the harm from which MDE seeks to protect our youth is real, and that the Schools have engaged in precisely the discrimination that MDE pleaded. These conclusions end the case, as the Families' tagalong constitutional claims are meritless for multiple reasons—justiciability chief among them.

Setting aside MDE's case-dispositive counterclaims, if the Court proceeds further, Defendants still prevail. Since day one, Plaintiffs have told the Court this case is just Minnesota's version of *Carson v. Makin*, 596 U.S. 767 (2022). It is not, and the Amendment—rooted in paramount state interests—survives every level of constitutional scrutiny and leaves no room to accommodate Plaintiffs' religious beliefs while also protecting our children. Make no mistake: to adopt Plaintiffs' regressive interpretation of

---

[3] Dawn Erickson and Mark and Melinda Loe (Families).

the First Amendment would mean resurrecting free-exercise arguments the Supreme Court long ago rejected as antithetical to our constitutional order and democratic society. On this record, Defendants are also entitled to judgment on Plaintiffs' claims.

## FACTS PLAINTIFFS GET WRONG

Throughout their principal brief, Plaintiffs marshal erroneous interpretations of the PSEO law and take unsupported liberties with the record. Defendants begin by correcting what Plaintiffs get wrong. These errors saturate Plaintiffs' legal arguments and their attempt to pigeonhole this case into ill-fitting precedent.

## I.   THE AMENDMENT DOES NOT REDEFINE "ELIGIBLE INSTITUTION."

Begin with the faulty premise on which all of Plaintiffs' legal claims are constructed: the Minnesota legislature "amended the PSEO Act's definition of 'Eligible Institution.'" (ECF No. 90 (Pls.' Br.) 3, 9.) Not so.

The term "Eligible Institution" was—and still is—defined as:

> [A] Minnesota public postsecondary institution, a private, nonprofit two-year trade and technical school granting associate degrees, an opportunities industrialization center accredited by an accreditor recognized by the United States Department of Education, or a private, residential, two-year or four-year, liberal arts, degree-granting college or university located in Minnesota.[4]

The Schools were each an "Eligible Institution" prior to the Amendment and will still be if the Amendment takes effect. The Amendment just prohibits an already "Eligible Institution" from engaging in one type of conduct: discriminating in PSEO admissions

---

[4] *See* Act of May 24, 2023, ch. 55, art. 2, sec. 45 (Amendment); Minn. Stat. § 124D.09, subd. 3(a).

based on protected-class status—including religious discrimination, of which faith statements are but one permutation. Minn. Stat. § 124D.09, subd. 3(a).

## II.   THE AMENDMENT DOES <u>NOT</u> EXCLUDE THE SCHOOLS FROM PSEO BASED ON RELIGIOUS STATUS OR USE.

Relatedly, Plaintiffs assert that the Amendment categorically excludes the Schools from PSEO based on religious status or religious use of government aid. (Pls.' Br. 1, 16-18.) This too is mistaken.

For nearly forty years, MDE has permitted Institutions to participate in PSEO regardless of religious status.[5] On its face, the Amendment does not disqualify any Institution from PSEO based on religious status or affiliation.

Nor does the Amendment regulate the religious use of PSEO funds. The only religious-use limitation is in an existing provision of the PSEO Act unaffected by the Amendment (and not challenged here): PSEO "courses" and "programs" must be "nonsectarian." Minn. Stat. § 124D.09, subd. 2. There is no evidence linking the Schools' faith statements or social codes to any use of public funds.[6]

---

[5] *See* Act of June 27, 1985, ch. 12, art. 2, sec. 1; Minn. Stat. § 124D.09; ECF No. 97-1; Reynolds Dep. I (ECF No. 97-2), at 17-18, 88-92.

[6] "Religious use" means government aid "used to fund specifically religious *activities* in an otherwise substantially secular setting[,]" like the construction of a building used for religious purposes. *Bowen v. Kendrick*, 487 U.S. 589, 613 (1988) (cleaned up and emphasis added) (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)).

### III.   PRIVATE AND HOMESCHOOLED STUDENTS TAKING PSEO DO BELONG TO MINNESOTA'S SYSTEM OF FREE PUBLIC EDUCATION.

Third, Plaintiffs contend "the PSEO Act recognizes that private and homeschool students do not suddenly become public school students simply by participating in PSEO." (Pls.' Br. 44.) Wrong again.

The PSEO Act provides in relevant part:

> "Alternative pupil" means a 10th, 11th, or 12th grade student … who is not enrolled in a public school district. Alternative pupil includes students attending nonpublic schools and students who are homeschooled. *An alternative pupil is considered a pupil for purposes of this section only.*

Minn. Stat. § 124D.09, subd. 4(a) (emphasis added). When Minnesota's education code uses the term "pupil," it does so in reference to public-school students. *E.g.*, *id*. § 126C.05. The PSEO Act thus brings nonpublic and homeschooled high-school students into Minnesota's public education system as a matter of law. *Id.* § 124D.09, subd. 4(a).

### IV.   THE AMENDMENT IS MEANT TO COMBAT ALL FORMS OF DISCRIMINATION AND ENSURE EQUAL ACCESS TO PSEO.

Next, Plaintiffs mischaracterize Minnesota's compelling interests animating the Amendment. They say the State considered two interests in enacting the Amendment: (1) addressing "perceived religious discrimination;" and (2) "maximize[ing] the number of PSEO offerings." (Pls.' Br. 19-23.) The first is partly true; the second, demonstrably false.

MDE and lawmakers viewed the Amendment as necessary to eliminate *all forms of discrimination*—not just religious discrimination.[7] They were concerned that besides excluding high-school students of other faiths, the Schools' admissions standards screened-out LGBTQ+ students based on sexual orientation and gender identity. (Reynolds Dep. I, at 175-76, 182-84; Unni Dep. 109-10, 189; ECF Nos. 81-60, 81-61, 81-62, 81-64, 97-9, 97-10, 97-11.) Legislators also inquired about the impact of these standards on the racial composition of the Schools' PSEO student bodies. (ECF No. 82-3.) For good reason, as data demonstrate that these standards disparately impact minority high-school students. (ECF No. 82-4.) Plaintiffs' representation that the Amendment was intended to combat religious discrimination is thus only partially correct.

The same cannot be said of Plaintiffs' statement that the State considered "maximiz[ing] the number of PSEO offerings" a goal of the Amendment, which finds zero evidentiary support. The sole source Plaintiffs cite for this proposition is an exhibit stating that the Amendment's "intended results" were "to establish *equitable* access to Minnesota students who would like to enroll in PSEO courses at the institution of their choice." (ECF No. 92-13, at 2.) Maximizing access and equalizing access are not synonymous. MDE and legislators were focused on the latter only. (Reynolds Dep. I, at 175-76, 182-84; Unni Dep. 109-10, 189; ECF Nos. 81-60, 81-61, 81-62, 81-64, 97-9, 97-10, 97-11.) There is no record

---

[7] ECF Nos. 82-1, 97-10; Reynold Dep. I (ECF No. 97-2), at 15-16, 38-40; Unni Dep. (ECF No. 97-5), at 197, 202-03; Jett Dep. (ECF No. 97-12), at 44-45, 73. Salient legislative history of the Amendment is recounted later in this brief.

evidence that increasing the number of students participating in PSEO was ever a consideration—much less a foundational interest of the Amendment.

## V.   THE SCHOOLS' PSEO ADMISSIONS CRITERIA HAVE HARMED OUR YOUTH.

Most troublingly, Plaintiffs tell the Court that MDE "cannot point to any eligible student who was unable to participate in PSEO because of the Schools' religious practices" and "has not identified any student that has been turned away from the Schools' PSEO programs based on protected class characteristics." (Pls.' Br. 23, 36.) The record belies these representations.

Prospective PSEO students and others *have* complained to MDE about not being able to access PSEO because of the Schools' faith statements and anti-LGBTQ+ social code. (Reynolds Dep. I, at 175-76, 182-84; ECF Nos. 81-57, 81-58, 81-63, 81-64.) Indeed, one such student testified at a legislative hearing—*which representatives of the Schools attended*—that she was provisionally accepted to PSEO at Northwestern but could not attend because of her sexual orientation. (ECF No. 78 (Defs.' Br.) 5 n.11.)

Moreover, Plaintiffs' assertion only underscores that exclusionary harm *has* occurred, and their misunderstanding of how that harm manifests. The complaints MDE received establish that otherwise-interested and -eligible students self-select out of applying to the Schools for PSEO *because* their admission policies infringe on protected beliefs and identities.[8] Why would a student apply to a program they know will decline to

---

[8] *See* Exhibit 117 to the Supplemental Declaration of Jeff Timmerman in Support of Defendants' Motion for Summary Judgment (Suppl. Timmerman Decl.).

even consider their application? This purported lack of proof is not a bug in MDE's argument—it is a feature of the Schools' admissions policies.

## VI.   THE AMENDMENT AFFORDS <u>NO</u> EXCEPTIONS.

Plaintiffs suggest that the Amendment provides exceptions permitting discrimination in PSEO admissions because the Minnesota Human Rights Act (MHRA) permits the Schools to discriminate in college admissions and the Amendment does not eliminate objective PSEO admissions criteria like academic achievement and grade level. (Pls.' Br. 24-25, 31-32.) This is a red herring. There is no evidence that the Amendment permits any Institution, secular or religious, to discriminate in PSEO admissions. Put differently, the Amendment prohibits discrimination *with no exceptions*.

## VII.   MDE <u>DOES</u> MANAGE PSEO.

Next, Plaintiffs strenuously downplay MDE's management of PSEO, suggesting MDE is merely a passive regulator because it permits Institutions to establish their own PSEO admissions standards and courses. (*Id*. 4, 38-41.) The record demonstrates that MDE's oversight of PSEO is far from nominal, however.

An Institution cannot participate in PSEO without MDE's approval, and MDE takes its gatekeeping role seriously, rejecting Institutions (including Crown, initially) that do not comply with statutory requirements.[9] MDE trains Institution staff on PSEO and provides annual program guidance and student application materials. (ECF Nos. 81-7, 81-8.) MDE monitors PSEO curricula to ensure that only valid courses are funded and seeks

---

[9] Mathews Dep. (ECF No. 97-7), at 87-89; ECF Nos. 81-3 to 81-6.

reimbursement for illegitimate PSEO offerings. (ECF Nos. 81-9, 81-10, 81-28 to 81-35.) MDE has sole authority to resolve PSEO issues like student and Institution eligibility, dual credit logistics, student fees, and when and where PSEO may be taught. (ECF Nos. 81-11 to 81-35, 97-8.) Tellingly, students and families raise their PSEO complaints to MDE, which coordinates with Institution staff as needed to address them. (Reynolds Dep. I, at 175-76, 182-84; ECF Nos. 81-39 to 81-43, 81-57, 81-58, 81-63, 81-64.)

As to PSEO courses, the PSEO Act dictates that they must be nonsectarian, meet graduation and subject-area requirements of enrollees' high school, and satisfy MDE's curricular standards.[10] That MDE expects Institutions to comply with the PSEO Act, and permits Institutions to determine the minimum grade point average required for PSEO admission, does not mean MDE has abdicated its authority over PSEO.

## VIII.   THERE IS NO EVIDENCE THAT ADMITTING NON-CHRISTIAN OR LGBTQ+ PSEO STUDENTS WOULD HARM PLAINTIFFS.

Finally, the Schools portend that admitting PSEO students who refuse to sign their faith statements and agree to their social codes would jeopardize their "community" and "culture." (Pls.' Br. 4-8.) The Families insinuate that the Amendment endangers their children's ability to obtain "Christian education" in a "religious community." (*Id.* 8-9.)

Yet Plaintiffs have adduced no evidence demonstrating—or even suggesting—that admitting PSEO students who are not Christian, straight, and cisgender will cause any actual harm to their religious beliefs or practices. All Plaintiffs offer is conjecture rooted in stereotypes. Worse, these conjectures are refuted by the Schools' admission that non-

---

[10] Reynolds Dep. II (ECF No. 97-4), at 36.

Christian and LGBTQ+ students are already welcome on campus and the Families' lack of concern with their children attending PSEO with students of other faiths, sexual orientations, and gender identities.[11]

## ARGUMENT

Plaintiffs are not entitled to summary judgment on their claims, nor the Schools on MDE's counterclaims. Before addressing why, MDE first exposes two fundamental errors that permeate Plaintiffs' motion: their misplaced reliance on *Carson*, and their mischaracterization of MDE's compelling interests. MDE then turns to its counterclaims, and finally to Plaintiffs' claims. Defendants win outright.

## I. PLAINTIFFS' SINGULAR FOCUS ON *CARSON* IS MISPLACED.

As they have from the beginning, Plaintiffs continue to herald *Carson* and its companions as outcome-dispositive. (Pls.' Br. 17-18.) They are not.

*Carson* is about a Maine school-voucher program. 596 U.S. 767, 774-75. Unlike Minnesota, Maine—"the most rural state in the Union"—does not operate public schools statewide and has no tradition of doing so earlier in statehood. *Id.* at 773. Nearly half of Maine's public-school districts have no secondary school. *Id.* Accordingly, Maine permits families in remote districts to choose a school for their children, including private schools approved by its Department of Education. Local public-school districts must pay tuition to the schools that families select. *Id.* at 773-74. In other words, Maine maintains a school-voucher program because of its geographic practicalities.

---

[11] Cline-Cole Dep. (ECF No. 97-13), at 16-18; Mathews Dep. 40-41, 97; Erickson Dep. (ECF No. 97-27), at 54-55; Loe Dep. (ECF No. 97-28), at 42-43.

In *Carson*, a Maine law categorically disqualified religious schools from participating in this voucher program. *Id.* at 774-75. Two families sued, claiming this law violated their free exercise rights. *Id*. at 775-76. Maine defended the law on grounds that funding sectarian schools would violate the Establishment Clause. *Id.* at 781.

The Supreme Court sided with the families, holding that Maine's interpretation of the Establishment Clause was too restrictive. *Id.* The law violated the Free Exercise Clause because it categorically excluded religious schools solely because they are religious. *Id.* at 778-80 (citing *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 476 (2020) (Montana law prohibiting aid to sectarian schools based only on their religious status violated Free Exercise Clause); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017) (Missouri policy violated Free Exercise Clause by denying grant funding solely because applicant was operated by a church)). The Supreme Court also rejected Maine's argument that the law was intended to prevent religious schools from using public funds to teach religion. *Id.* at 786-89.

Unlike the Maine law at issue in *Carson*, the Amendment neither categorically excludes the Schools from participating in PSEO because they are religious, nor regulates their use of MDE funding. Rather, the Amendment provides that an already "Eligible Institution"—of which there are many religious colleges and universities—cannot discriminate in PSEO admissions. Nothing more.

Post-*Carson* precedent bears out this distinction. In *St. Mary Catholic Parish in Littleton v. Roy*, two religious parishes that operated preschools and parents of a preschool-aged child sued to invalidate a Colorado law that prohibits preschools from discriminating

on protected-class status in the state's universal preschool program. ___ F.3d ___, 2024 WL 3160324, at *1 (D. Colo. June 4, 2024). Like Plaintiffs here, the parishes and parents argued that "*Carson* dictate[d] the outcome." *Id.* at *21. The district court rejected this argument pointblank, finding that Colorado's law:

> [D]oes not exclude Plaintiffs from the UPK program solely because of their religious status or exercise. The requirement applies to UPK providers, regardless of their religious or non-religious character. The purpose of the requirement is not to invade religious freedom but to further the implementation of a strongly embraced public value. *Carson*, *Espinoza*, and *Trinity Lutheran* are all distinguishable because each involved a program that specifically carved out religious organizations from those eligible to receive funding.

*Id.* (quotations omitted); *see also Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748-49 (4th Cir. 2024) (*Carson*, *Espinoza*, and *Trinity Lutheran* "stand only for the point that religious schools cannot be excluded from grant programs solely because of their religious character"); *B.W.C. v. Williams*, 990 F.3d 614, 621-22 (8th Cir. 2021). In reaching this conclusion, *Roy* notes "the weight of the relevant precedent supports that states administering [educational] programs are not obligated to subsidize discrimination using taxpayer dollars, even when that discrimination is based on religious beliefs." 2024 WL 3160324, at *1.

Roy is on all fours. This case is not *Carson* redux, nor does *Carson* impel judgment in Plaintiffs' favor on their claims or MDE's counterclaims.

## II.    PLAINTIFFS DISTORT MINNESOTA'S OVERRIDING INTERESTS.

Against Plaintiffs' specter of harm to "culture" stand Minnesota's first-order interests animating the Amendment, as fully articulated in Defendants' principal brief.[12] Plaintiffs give these interests short shrift.

Plaintiffs do nothing to rebut the evidence that Dr. Jenifer McGuire offers to support these interests. Plaintiffs retained Dr. Mark Regnerus to respond to Dr. McGuire's testimony.[13] But Plaintiffs do not even mention him, perhaps because he has been disqualified from providing expert testimony in multiple cases, most recently in 2023. *See Brandt v. Rutledge*, 677 F. Supp. 3d 877, 913 n.11 (E.D. Ark. 2023). The first court to disqualify Dr. Regnerus did so in 2014, in the proceeding that gave rise to *Obergefell*. That court found Dr. Regnerus's testimony "entirely unbelievable and not worthy of serious consideration." *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 766 (E.D. Mich. 2014), *rev'd on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015). In part, the court rejected Dr. Regnerus based on its conclusion that the primary study he relied upon, which he conducted, was "hastily concocted at the behest of a third-party funder" with overt political aims. *Id.* ("The funder clearly wanted a certain result, and Regnerus obliged."). The academic community has largely rejected Dr. Regnerus over concerns that he manipulated the peer-review process in this study. (McGuire Dep. 46.)[14]

---

[12] Defs.' Br. 37-40.

[13] Expert Report of Dr. Mark Regnerus, annexed as <u>Exhibit 118</u> to Suppl. Timmerman Decl.

[14] Dr. Jenifer McGuire Deposition Transcript, annexed as <u>Exhibit 119</u> to Suppl. Timmerman Decl.

On this record, Dr. McGuire's testimony stands alone. No reasonable jury could disagree with her evidence accentuating MDE's compelling interest in nondiscriminatory education, and the corresponding health and welfare stakes for Minnesota's youth.

In addition to not rebutting Dr. McGuire's testimony, Plaintiffs err more fundamentally by mischaracterizing Minnesota's compelling interests. Again, there is no evidence that MDE or legislators considered only religious discrimination in advancing the Amendment, or that the Amendment sought to maximize PSEO enrollment. Rather, the Amendment was enacted to eradicate all forms of discrimination in PSEO admissions and ensure equal access for all PSEO students, at all Institutions. (ECF Nos. 82-1, 97-10; Reynolds Dep. I, at 15-16, 38-40; Unni Dep. 197, 202-03; Jett Dep. 44-45, 73.)

Plaintiffs' arguments concerning underinclusivity and narrow tailoring fare no better. They say the Amendment is underinclusive and not narrowly tailored because the MHRA permits the Schools to discriminate in college admissions. (Pls.' Br. 20-21, 24-25.)

To understand this argument is to see its flaws, which another post-*Carson* case exposes. In *Carson*'s aftermath, the Maine legislature amended the state's human rights act to prohibit secondary institutions receiving public funding from discriminating in education based on religion and gender identity. *St. Dominic Acad. v. Makin*, ___ F.3d ___, 2024 WL 3718386, at *5 (D. Me. Aug. 8, 2024). This amendment was unnecessary pre-*Carson* because Maine law categorically excluded sectarian schools from the voucher program. *Id.* at *25. A Catholic diocese, school, and family sued, claiming the amendment violated the Free Exercise Clause. *Id.* at *1. Like the Schools here, St. Dominic Academy required faith and conduct attestations from students. *Id.* at *8.

14

In rejecting the plaintiffs' free exercise claim, the court found that the amendment was necessary post-*Carson* to bring the education provision of Maine's human rights act in line with the act's "broader scheme for exempting only religious organizations that do not receive public funding from certain antidiscrimination provisions." *St. Dominic*, 2024 WL 3718386, at *25. Notwithstanding that Maine's act did not (like the MHRA) prohibit discrimination in private postsecondary education, the court held that the amendment satisfied strict scrutiny. *Id.* at *27-28. It furthered Maine's compelling "interest in eliminating discrimination within publicly funded institutions" and was narrowly tailored *because* it exempted religious organizations that did not receive public funding and private schools that did not participate in the voucher program. *Id.*

As in *St. Dominic*, the Amendment became necessary only once MDE understood it did not possess existing statutory authority to stop the Schools' discriminatory admissions practices. The legislature could have incorporated the Amendment's verbiage in the MHRA but opted to add it to the PSEO Act instead; that choice is of no consequence.

Like the complementary provisions of Maine's law in *St. Dominic*, the Amendment aligns the PSEO Act and the MHRA by making clear that while certain discrimination in private college admissions is permissible, discrimination in public high-school admissions is not. The Amendment and MHRA also work in tandem to limit prohibitions on the conduct of religious institutions. Private religious colleges not participating in PSEO are not subject to the Amendment, and the Amendment does not prohibit private colleges participating in PSEO from discriminating in college admissions.

Plaintiffs cite no authority for the proposition that a law is overly broad, or a state's interests less compelling, because it prohibits conduct that a different law partly permits in wholly-distinct circumstances. The harm the Amendment combats is discrimination in public high-school admissions, not discrimination in private college admissions. There is no evidence these forms of discrimination "are equally dangerous[,]" *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019), particularly as some youth may have no PSEO option but the Schools, while matriculation at the Schools for undergraduate education is entirely voluntary. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").[15] Nor does that Amendment "pick[] and choos[e] what kind of discrimination [is] okay"—it prohibits all forms of discrimination by all Institutions. *Intervarsity Christian Fellowship/USA v. Univ. of Ia.*, 5 F.4th 855, 865 (8th Cir. 2021) ("If the University honestly wanted a campus free of discrimination, it could have adopted an 'all-comers' policy[.]").

Plaintiffs' complaints about insufficient tailoring reflect the scope of their conduct, not the Amendment. As the parties challenging the Amendment, the Schools "have the ultimate burden of establishing that [the Amendment] is not narrowly tailored." *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 971 (8th Cir. 2003) (citation omitted). This requires the Schools to show the Amendment is not "specifically and narrowly framed" to accomplish MDE's asserted purpose. *Id.* Here, the Amendment addresses its

---

[15] *See also* <u>Exhibit 119</u>, at 226-30 (identifying differences between high-school and college students).

purpose—no more, and no less. The discriminatory conduct MDE sought to remedy pertains to PSEO admissions procedures at Institutions, and the Amendment addresses admissions without regulating post-admissions conduct. Nor does the Amendment bar Institutions from inviting or considering faith statements—just from *requiring* them, which corresponds to the nature of past discrimination the Amendment is designed to rectify. In other words, the Amendment reaches religious conduct not because it is overbroad, but because this conduct is the very injury to Minnesota's compelling interests that the Amendment seeks to remedy.

At bottom, Plaintiffs want it both ways. First, they claim the Schools are altogether exempt from the MHRA, so the Amendment must regulate conduct the MHRA does not reach. On the other, they intimate that the MHRA does reach the Schools, but say the Amendment cannot regulate them because of the MHRA's religious-education exemption.[16] Ultimately, the Court need not break this circular reasoning because the Amendment advances multiple compelling, and no less-restrictive means exists to eliminate discriminatory barriers to PSEO, protect the rights of PSEO students, avoid passively participating in discrimination, or fulfill Minnesota's mandate to provide free and uniform public education. The Amendment does not violate the Constitution simply because these compelling interests leave no room to accommodate the Schools' religiously-based conduct. *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983).

---

[16] Surely, Plaintiffs cannot mean the Amendment would be narrowly tailored only if the MHRA applied to all operations of religious colleges. The Schools would never stand for that, which illustrates why Plaintiffs' underinclusivity and narrow-tailoring arguments are too clever by half.

*Bob Jones* is undistinguishable. The Free Exercise Clause gives way to laws outlawing discrimination in education, which keeps with the framer's understanding of our constitutional balance. *E.g.*, *Fulton v. City of Phila.*, 593 U.S. 522, 575-81 (2021) (Alito, J., concurring) (explaining founding-era Congress and state legislatures provided "broad protection for the free exercise of religion except where public 'peace' or 'safety' would be endangered"). It is Minnesota's longstanding conviction, codified in law, that discrimination "threatens the rights and privileges" of Minnesotans and "menaces the institutions and foundations of democracy." Minn. Stat. § 363A.02, subd. 1(b); *cf. Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630-31 (1991) (lamenting the "continued hurt" caused by discriminatory stereotypes). The brand of discrimination the Schools cause endangers "safety" in ways the framers grasped. *Fulton*, 593 U.S. at 579 (Alito, J., concurring) (noting that Samuel Johnson's 1755 dictionary defined "safety" to mean "1. Freedom from danger ….2. Exemption from hurt. 3. Preservation from hurt…."); *see also* ECF No. 97-25. That this discrimination occurs in public education—a traditional and exclusive locus of state authority—only strengthens Minnesota's compelling interests. *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954) (discrimination in education "generates a feeling of inferiority as to [students'] status in the community that may affect their hearts and minds in a way unlikely ever to be undone").

Properly construed, Minnesota's apex interests defeat all of Plaintiffs' claims. And like the MHRA, the Amendment is a classic example of a law that narrowly bans discrimination in a discrete context, not a law that categorically excludes or targets religion. Defendants, not Plaintiffs, are entitled to complete summary judgment.

### III.   MDE's Counterclaims Prevail.

Turning to MDE's counterclaims, the Schools' summary judgment motion is unwarranted. MDE has established beyond dispute that it has standing to litigate these claims against the Schools as state actors, and that MDE's compelling interests override any burdening the Amendment might impose.[17]

### A.   MDE's standing is stronger now than before.

The Schools make three attacks on MDE's parens patriae standing. (Pls.' Br. 35-37.) First, they recycle their argument that MDE lacks a quasi-sovereign interest in protecting high-school students from discrimination. The Court previously rejected this argument. (ECF No. 66, at 4.) The Schools offer no grounds for revisiting it, relying instead on the same authority the Court already found unpersuasive.

Second, Plaintiffs revisit another already-failed argument: that MDE lacks standing under the MHRA because it is not an "aggrieved person." (Pls.' Br. 37.) MDE is a "person" under the MHRA, Minn. Stat. § 363A.03, subd. 30, which demonstrates that the legislature contemplated parens patriae standing is available under the MHRA. *See E.E.O.C. v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 197-98 (E.D.N.Y. 2003) (finding parens patriae standing because Congress included governments in Title VII's definition of "persons"). The authority Plaintiffs rely on is inapposite. None addresses parens patriae standing. Further, the MHRA provision under which MDE proceeds—section 363A.13— does not contain the limiting language of the Title VII provision at issue in *Tovar v. Essentia Health*,

---

[17] The Schools offer no merits defense to MDE's counterclaims. If Court concludes the Schools are state actors, MDE is entitled to summary judgment on its counterclaims.

857 F.3d 771 (8th Cir. 2017), and proscribes discrimination in education, not contracting. *See Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d 956, 964 (E.D. Mo. 2022) (distinguishing Title IX from *Tovar* on this basis); *Scott v. CSL Plasma, Inc.*, 151 F. Supp. 3d 961, 966-67 (D. Minn. 2015) (recognizing that *Krueger v. Zeman Const. Co.*, 781 N.W.2d 858 (Minn. 2010), is limited to "alleged discrimination in the performance of a contract").

The Schools' final assault on standing is premised on one of their above-cataloged misapprehensions: that their discriminatory admissions standards have not actually harmed any students. Once more, this is mistaken; the record is riddled with instances of non-Christian or LGBTQ+ students being deterred from applying to or attending PSEO at the Schools because of these admissions standards. (Reynolds Dep. I, at 175-76, 182-84; ECF Nos. 81-57, 81-58, 81-63, 81-64; Defs.' Br. 5 n.11.) MDE's principal brief also catalogs numerous other direct and indirect consequences of these discriminatory admissions criteria, including the significant threat the pose to the wellbeing of LGBTQ+ youth, the risk of forced religious conversions for students of different faiths, (Defs.' Br. 19-22), and harm to all students from negative school climates, (ECF No. 97-25). In any event, the Supreme Court has consistently held that the existence of a protected interest "does not depend on the gravity of the loss inflicted[.]" *Engele v. Ind. Sch. Dist. No. 19*, 846 F. Supp. 760, 765 (D. Minn. 1994) ("The court must look not to the weight but to the *nature* of the interests at stake." (cleaned up; emphasis in original)). Here, MDE's unrebutted evidence establishes that the interests it advances are quasi-sovereign in nature.

20

In addition to MDE's evidence, the admissions policies themselves constitute undisputed evidence of injury to students in protected classes who seek to exercise their right to apply for PSEO. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (erecting a barrier that "makes it more difficult for members of one group to obtain a benefit than it is for members of another group" is itself a cognizable injury). These policies are thus evidence that students do not compete for PSEO admission at the Schools on an equal playing field.

The undisputed evidence confirms MDE's standing is even stronger now than at the pleadings stage.

**B.     The Schools are state actors when providing PSEO.**

With standing firmly established and no merits defenses from the Schools, all that stands in the way of summary judgment on MDE's counterclaims is state action. That is no obstacle: The Schools are state actors under the public-function and joint-action tests.

**1.     The nucleus of PSEO is a traditional and exclusive state function.**

Plaintiffs' argument against public-function also rehashes their Rule 12 position: that *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), ends the inquiry. (Pls.' Br. 44.) Again, however, *Rendell-Baker* is not controlling.

*Rendell-Baker* was an employment case, and the alleged public function at issue—educating maladjusted high-school students—was too far removed from the challenged personnel decisions to render those decisions state action. 457 U.S. at 841-42; *Peltier v.*

*Charter Day Sch., Inc.*, 37 F.4th 104, 120 (4th Cir. 2022). And Massachusetts did not traditionally or exclusively perform that public function, having historically outsourced this niche form of education entirely to private entities. *Rendell-Baker*, 457 U.S. at 842. The Supreme Court explicitly "contrasted this narrow subset of education with 'traditional public schools.'" *Peltier*, 37 F.4th at 120.

By relying exclusively on *Rendell-Baker*, Plaintiffs commit a cardinal state-action foible: analyzing public function at too-high a level of generality. *See West v. Atkins*, 487 U.S. 42, 55-56 (1988) (cautioning that proper inquiry is narrow). Neither factor militating against state action in *Rendell-Baker* exists here. This case is about education, not employment, and it is undisputed that Minnesota has never farmed-out its state-constitutional duty to provide free and uniform public education. Indeed, Minnesota *cannot* delegate this responsibility. (Defs.' Br. 23-24.) Courts across the country consistently distinguish *Rendell-Baker* on similar grounds. (*Id.* 22-25.)

*Rendell-Baker* dictates that while education writ large is not a traditional-and-exclusive public function, free public education *is* when historically performed by a state pursuant to state-constitutional obligations.[18] PSEO fits this nuance to a tee, and the Schools offer no contrary evidence.

---

[18] The Schools offer no authority for their claim that PSEO is not part of the education guaranteed by Minnesota's Constitution. (Pls.' Br. 44.) At least two states have considered programs like PSEO in gauging whether students received constitutionally-adequate education under state law. *Boyd v. State*, 275 A.3d 155, 162-63 (Vt. 2022); *Davis v. State*, 804 N.W.2d 618, 655-56 (S.D. 2011). If the Court disagrees, certification to the Minnesota Supreme Court is appropriate. Minn. Stat. § 480.065, subd. 3; *Salier v. Walmart, Inc.*, 76 F.4th 796, 804 (8th Cir. 2023).

At its core, PSEO is—and has always been—free public education with the added benefit of collegiate credit. The Schools insist PSEO is college education only, (Pls.' Br. 42), but this misconstrues how PSEO actually works. When the Schools teach PSEO courses, they teach high-school students who do not stop being high-schoolers simply by attending these classes. The dual credits these students earn apply to—and must by law satisfy—high-school graduation requirements. Although Institutions transcript courses, those courses only yield college credits once a student completes high school, matriculates at college, and seeks to apply their PSEO credits to their college transcript—all steps that happen *after* a student concludes PSEO. And if a PSEO student decides not to pursue additional education, their credits still satisfy high-school requirements even if they never attend or transfer their credits to a college. The Loes' oldest child proves this point. G.L. chose Crown for PSEO in part because it is close to home and elected not to attend college. (Loe Dep. 11-12.) PSEO *is* high-school education; any college-level function or benefit only materializes after a student completes high school.

Moreover, while private institutions may offer PSEO, all participating students—public, private, and homeschool—enter the public-education domain by operation of law. Minn. Stat. § 124D.09, subd. 4(a). And like North Carolina law in *Peltier*, which defined charter schools as public, Minnesota law could not be clearer: "All schools supported in whole or in part by state funds are public schools." *Id.* § 12A.20, subd. 1(a).

Thus, the Schools are state actors under the public-function test when they provide PSEO. Nothing about this commonsense application of well-settled law is controversial or an unwarranted expansion of the state-action doctrine.

23

### 2.      PSEO is joint action between MDE and the Schools.

The Schools assert two reasons why they are not engaged in joint action with MDE. (Pls.' Br. 38-41.) One is wrong on the facts; the other on the law.

First, the Schools posit that apart from the Amendment, MDE has zero oversight of Institutions' admissions policies. Yet MDE exercised control over Crown's and other religious Institutions' admissions policies when they first applied to be Institutions, conditioning approval on their elimination of the same faith tests at issue here. (Mathews Dep. 87-89; ECF Nos. 81-3 to 81-6.) MDE had no reason to question Crown's subsequent conduct until students and families complained.

Northwestern likewise lulled MDE into believing it was not discriminating in PSEO admissions. (Reynolds Dep. I, at 155-58.) When MDE discovered otherwise, it sought to end this practice—only to be stonewalled. (Unni Dep. 136-42; ECF No. 81-59.) The record establishes that MDE exerted, or attempted to exert, authority over the discriminatory admissions standards every time issues arose, culminating in the Amendment. The Schools also downplay MDE's management of PSEO, ranging from Institution eligibility to mundane but frequent course-by-course reviews—yet more facts the Schools get wrong.

Second, the Schools insinuate no joint action exists because MDE is not complicit in their discrimination. But this ignores that the Schools have *made* MDE complicit for years by furtively screening out high-school students who are not Christian or will not disavow their identities. *See Norwood v. Harrison*, 413 U.S. 455, 465-66 (1973) ("A State may not grant … tangible financial aid … if that aid has a significant tendency to facilitate, reinforce, and support private discrimination."); *Cooper v. Aaron*, 358 U.S. 1, 19 (1958).

Not surprisingly, when parents, families, and the public encounter the Schools' discriminatory admissions criteria, they complain to MDE—evincing their perception that MDE is at least partly to blame for the discrimination and responsible for rectifying it. (Reynolds Dep. I, at 175-76, 182-84; ECF Nos. 81-57, 81-58, 81-63, 81-64.)

*Reitman v. Mulkey* addresses complicity better than the Schools. 387 U.S. 369 (1967). In *Reitman*, the Supreme Court evaluated an amendment to California's constitution, Proposition 14, which prohibited any legislation restricting real-property transfers, including anti-discrimination legislation. The Court invalidated Proposition 14 under the Equal Protection Clause. *Id.* at 378. By enshrining a right to discriminate, the Court explained, Proposition 14 involved California in private discrimination "to an unconstitutional degree." *Id.*

Without acknowledging the Schools' state action, this is exactly what will happen with PSEO. Institutions admit students, Minn. Stat. § 124D.09, subd. 5, so Institutions interested in limiting their PSEO programs to select classes of students will simply point to Section 124D.09 as sanctioning their private discrimination. Disregarding such conduct will make PSEO constitutionally equivalent to the property-sale regime *Reitman* rejected. Because the Schools leverage state authority when providing PSEO, they significantly and sufficiently involve MDE in their conduct, discriminatory and otherwise, *Reitman*, 387 U.S. at 378, which underscores the importance of treating them as state actors.

In any event, complicity is not a *sine qua non* of joint action. *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406 (8th Cir. 2006). In *Americans United*, the Eighth Circuit determined a private contractor engaged in

joint action, even though its state-agency partner had no involvement in the conduct that caused the constitutional violations. What mattered was that the agency "effectively gave" the contractor its state power and authority. *Id.* at 423.

The same is true here. MDE handed the Schools its authority to provide free public education to Minnesota high-school students, so their discrimination is only "possible *because of* privileges created by" MDE. *Id.* at 422 (emphasis added). It would be incongruous to conclude the Schools are not engaged in joint action simply because they covertly discriminated for a decade-plus and, when finally caught, thwarted MDE's every attempt to stop that discrimination. Their actions, coupled with MDE's oversight of PSEO and grant of a core state power, renders the Schools state actors.

\* \* \*

State action is a fact-intensive inquiry that must be calibrated to each case and assessed precisely. Free public education is a function that Minnesota has traditionally and exclusively performed. Through PSEO, MDE delegates its power to perform this function to Institutions. On these facts, the Schools' discrimination is fairly attributable to MDE (indeed, the public thinks so), which makes the Schools state actors under the public-function and joint-action tests. As the Schools offer no merits defenses, state action seals the deal on MDE's counterclaims.

### C.    The MHRA reaches the Schools and does not hinder expressive association.

Instead of addressing the merits of MDE's MHRA counterclaim, the Schools contend that the MHRA does not reach them because PSEO is sectarian activity. The

Schools also argue that applying the MHRA would violate their expressive-association rights. Neither defense works.

### 1.     PSEO is "secular business activity."

The MHRA's religious-association exemptions do not apply to "secular business activities engaged in by … any institution organized for educational purposes that is operated, supervised, or controlled by" a religious nonprofit. Minn. Stat. § 363A.26(3).[19] "The MHRA defines a secular activity as one 'which is unrelated to the religious and educational purposes for which [the religious association] is organized.'" *Egan v. Hamline United Methodist Church*, 679 N.W.2d 350, 355 (Minn. App. 2004) (quoting *id*. § 363A.26(2)). Minnesota courts have interpreted the phrase "secular business activities" only once. *Thorson v. Billy Graham Evangelistic Ass'n*, 687 N.W.2d 652, 656-58 (Minn. App. 2004).

*Thorson*, which held that the phrase "secular business activities" must be "considered in light of the purpose and mission of the entire [religious] entity," does not help the Schools. *Id.*. The entity's purpose in *Thorson* was promoting evangelical ministry, and the activity at issue—disseminating promotional materials—was "exclusively in furtherance" of that purpose. *Id.* In contrast, the MHRA's exemptions do not apply "when a nonprofit religious association's business activity cannot be attributed to its religious purpose[,]" like "ordinary commerce, such as operating a hospital or printing press[.]" *Id.*

---

[19] Section 363A.26 was recently amended. Act of May 14, 2024, ch. 105, sec. 12. Unlike its predecessor, the current version prohibits religious schools from limiting admission based on religion when engaged in secular business. *Id.*

The Schools say PSEO is "entirely related" to their educational purpose. (Pls.' Br. 46-47.) But they exist to provide Christian education to college students. They cannot bootstrap PSEO to this purpose because, by law, PSEO cannot be Christian education. Minn. Stat. § 124D.09, subd. 2. The legislatively-defined educational "purpose" of PSEO is "nonsectarian courses or programs," which directly conflicts with providing Christian education. *Id.* MDE has routinely enforced this statutory purpose when Institutions apply to provide PSEO and questions arise about specific PSEO courses. (Mathews Dep. 87-89; ECF Nos. 81-3 to 81-6, 81-11 to 81-35, 97-8.) And the Schools have annually promised that they will teach nonsectarian PSEO courses only. (ECF Nos. 81-37, 81-38.) Further, as state actors, the Schools are constitutionally prohibited from using PSEO to provide Christian education. U.S. Const. amend. 1. The Schools' mission cannot legally encompass PSEO, and thus provides no basis to exempt their provision of PSEO from the MHRA.

In electing to participate in PSEO, the Schools voluntarily entered "the economic arena and began trafficking in the [PSEO] marketplace[.]" *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn. 1985). They are no different than a Christian hospital whose mission is to honor Christ when delivering healthcare, or a Christian publisher of self-help books whose mission is to help readers find Jesus. *Thorson*, 687 N.W.2d at 657-58. PSEO is secular no matter how the Schools spin it.

### 2. The Schools' expressive-association defense is baseless.

The First Amendment confers an associational right to engage in speech, assembly, petition for redress, and religious exercise. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). This right protects against "forced inclusion of an unwanted person in a group …

if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (citation omitted). But this right is not absolute and can be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 530 U.S. at 623; *accord Telescope Media Grp. v. Lucero*, 936 F.3d 740, 756 (8th Cir. 2019) ("The unmistakable message is that antidiscrimination laws can regulate conduct, but not expression.").

For three reasons, the Schools' expressive-association rights offer no safe harbor from the MHRA's antidiscrimination provisions. First, the Schools concede they have no problem admitting PSEO students who are non-Christian, gay, or transgender (*i.e.*, students in MHRA-protected classes) for online and on-campus PSEO. (Cline-Cole Dep. 16-18; Mathews Dep. 41-42, 97.) "It is clear, then, that serving, speaking to, and otherwise associating with" non-Christian and LGBTQ+ PSEO students "is not the harm [they] seek to remedy[,]" which forecloses their expressive-association defense. *Telescope*, 936 F.3d at 760; *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* (FAIR), 547 U.S. 47, 69 (2006).

Second, there is zero evidence the MHRA would affect the Schools' ability to advocate their viewpoint, let alone significantly. Their online PSEO has been open to students of all faiths and identities for more than a decade, and there is no proof of any related harm to the Schools. Plus, the students the Schools seek to exclude are children who cannot conceivably influence the Schools' institutional viewpoints. *Roy*, 2024 WL

3160324, at *40. All the MHRA prohibits is discrimination in PSEO admissions. The Schools may express their beliefs to college and PSEO students, and retain their faith statements and social codes as long as PSEO applicants who do not agree are not excluded on that basis. *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez*, 561 U.S. 661, 690 (2010) (nondiscrimination policy "all the more creditworthy" because plaintiffs retained many avenues for expression). The expressive harm the Schools predict is purely hypothetical, which does not suffice to suspend the MHRA. *Dale*, 530 U.S. at 653 (expressive association is not "a shield" that can be erected "against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message").

Third, because PSEO is purely secular, the Schools lack any expressive-association rights when providing PSEO. *Roberts*, 468 U.S. at 635-36 (O'Connor, J., concurring) ("An association must choose its market. Once it enters the marketplace of commerce in any substantial degree it loses the complete control over its membership that it would otherwise enjoy[.]"); *accord* James D. Nelson, *The Freedom of Bus. Assoc.*, 115 Colum. L. Rev. 461, 464 (2015) (discussing distinction between expressive associations and commercial associations). The Schools could avoid the MHRA by exiting the PSEO market or eliminating faith-tests as a condition to PSEO enrollment—which they already do for online PSEO. But for the foregoing, independently-sufficient reasons, they cannot invoke an expressive-association defense to the MHRA.

\* \* \*

PSEO's secular nature ends the MHRA inquiry, as it strips the Schools of any entitlement to an exemption or sphere of purely expressive association. Even if the Schools had evidence that complying with the MHRA would impact their institutional messaging (they do not), they already associate with the students whom the MHRA protects, which renders their defense baseless. MDE thus deserves judgment on this counterclaim as a matter of law.

### D. The church autonomy defense is unavailable and otherwise inapposite.

As state actors, the Schools cannot invoke the church autonomy doctrine to oppose MDE's counterclaims. But even if they could, this defense is inapplicable because the parties' dispute is secular and the Schools placed their religious belief at issue.

### 1. The church autonomy doctrine is for churches, not state actors.

Because the Schools are state actors, they cannot invoke church autonomy. This is an affirmative defense that, as its name suggests, protects churches and other religious organizations. *See* W. Cole Durham & Robert Smith, *Church Autonomy*, Religious Orgs. & the Law § 19:5 (2d ed. Dec. 2023) (describing church autonomy as prohibition against interference with "ecclesiastical and administrative affairs of *religious organizations*" (emphasis added)). State actors, however, are not churches or religious organizations, and accordingly cannot raise this defense.

The Schools' arguments reinforce the conclusion that they are, in fact, state actors. Without treating them as such, any decision about church autonomy will produce religious-versus-secular, interreligious, and/or intrareligious preferencing. The Schools believe their religious rights will be trammeled if this doctrine is not applied to exempt them from

31

litigation. But if the Court applies the doctrine, the Schools will obtain a benefit by virtue of their status as religious litigants—a benefit not afforded to secular litigants that preferences the Schools' religious rights over those of PSEO students. *Cf., e.g.*, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 351 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2852 (Mem.) (June 28, 2021) ("[T]he First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships, which would impermissibly place a religious leader in a preferred position in our society." (quotation omitted)); *King's Garden, Inc. v. FCC*, 498 F.2d 51, 56-58 (D.C. Cir. 1974) (rejecting church-autonomy cases on Establishment grounds and discussing equal protection concerns in dicta). Either way, church autonomy pits this Court as the arbiter of a religious dispute, exactly the sort of entanglement the Schools claim this doctrine should prevent. But treating the Schools as the state actors they are makes these tensions disappear.

The Schools' religious character is no bar to the conclusion that they are state actors, and church autonomy inapplicable. Religious litigants are routinely subject to litigation. Religious organizations that enter public debates may expose themselves to defamation claims, for instance, just as churches and religious officials that engage in misconduct within the secular world expose themselves to tort liability. *E.g.*, *Nash v. Post*, No. 04-cv-4668 (FLN), 2006 WL 8445091, at *8 (D. Minn. Aug. 30, 2006) (rejecting autonomy in defamation case); *Ondrisek v. Hoffman*, 698 F.3d 1020, 1024-25 (8th Cir. 2012) (same in tort case). Similarly, the Schools exposed themselves to constitutional standards of conduct

by asking to join a secular program that enmeshes them with the State and its constitutional obligations, and by accepting the conditions MDE set forth. *See Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) ("Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights."). This litigation simply holds the Schools to the same rules as all other Institutions, allowing the Court to apply neutral principles of law without infringing on any protected beliefs (state actors have none) or entangling religious institutions in litigation (state actors cannot be religious organizations).

### 2.  This defense does reach the parties' secular dispute.

Its implications for state action aside, church autonomy is not applicable for four reasons. First, it is a defense, not a categorical bar to litigation, as the Eighth Circuit and many other courts recognize.[20] The Schools presumably agree since they pleaded church autonomy as an affirmative defense here, (ECF 69-1, at 30 ¶ 4), and in other recent litigation, *Schmidt* v. *Univ. of Nw.-St. Paul*, 23-cv-2199 (JRT/JFD), 2024 WL 477166, at

---

[20] *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012) (explaining ministerial exception, a subset of church autonomy, is an affirmative defense and "not a jurisdictional bar"); *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1112 (7th Cir. 2024), *pet. for rehr'g & rehr'g en banc denied*, 2024 WL 1892433 (Apr. 30, 2024); *Wells by & through Grover v. Creighton Prep. Sch.*, 82 F.4th 586, 594 n.4 (8th Cir. 2023); *Belya v. Kapral*, 45 F.4th 621, 630-34 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2609 (Mem.) (June 12, 2023); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1028-32 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (Mem.) (June 12, 2023); *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 966 F.3d 346, 351 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2852 (Mem.) (June 28, 2021); *Puri v. Khalsa*, 844 F.3d 1152, 1162-68 (9th Cir. 2017); *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 534-35 (Minn. 2016); *Kelly v. Marcantonio*, 187 F.3d 192, 197 (1st Cir. 1999) (distinguishing church autonomy from jurisdictional issues under Article III).

*3-4 (D. Minn. Feb. 7, 2024). *See Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 2609 (Mem.) (June 12, 2023) ("[S]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery.").

Second, this defense applies only when disputes cannot be resolved "without extensive inquiry … into religious law and polity." *Wells by & through Grover v. Creighton Prep. Sch.*, 82 F.4th 586, 594 n.4 (8th Cir. 2023) (quoting *Serbian E. Orthodox Dioceses v. Milivojevich*, 426 U.S. 696, 709 (1976)). Here, the parties' claims require the Court to determine whether the Schools' admissions processes treat all students equally, not to evaluate the Schools' beliefs or question their truth or reasons for any such beliefs.

The Eighth Circuit rejects the Schools' absurdly-limitless interpretation of this defense, recognizing that disputes involving seemingly-religious parties "often stray outside the ecclesiastical arena into areas of secular concern," and that in such instances courts can resolve cases by applying "neutral principles of law." *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 552-53 (8th Cir. 2015); *accord Wells*, 82 F.4th at 594 n.4; *Ondrisek*, 698 F.3d at 1024-25; *Church of God in Christ, Inc. v. Graham*, 54 F.3d 522, 525-26 (8th Cir. 1995); *Drevlow v. Lutheran Church*, 991 F.2d 468, 471 (8th Cir. 1993). At the very least, the Schools have not "adequately developed a factual record for asserting the church autonomy defense." *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1032 (10th Cir. 2022), *cert. denied*, 143 S.Ct. 2608 (Mem.) (June 12, 2023). Thus, they cannot prevail at summary judgment on the "necessary threshold question," namely, whether the parties' dispute is "rooted in a difference in religious belief or doctrine." *Id.*

34

Third, when religious organizations affirmatively invoke federal jurisdiction, it is unfair and illogical to permit those same organizations to selectively evade the court when it serves their interests. *Cf. Hutterville*, 776 F.3d at 556-57; *Fulton*, 593 U.S. at 575-76 (Alito, J., concurring) (agreeing First Amendment yields to certain "carveouts"). The Schools state that church autonomy will allow them to avoid "hav[ing] to be so wary of administrative or judicial review … that they make religious decisions with any eye to avoiding litigation." (Pls.' Br. 49 (cleaned up)). But this litigation only exists because the Schools independently decided to apply to provide PSEO two decades ago, not because of anything MDE or a third party forced them to do.[21] In applying to become Institutions, the Schools knew about and expressly consented to MDE's requirements for nondiscriminatory admissions practices in PSEO. (Mathews Dep. 87-89; ECF Nos. 81-3, 81-37, 81-38.) Shielding the Schools from those same requirements now would turn that consensual promise on its head. *Petruska*, 462 F.3d at 310.

Fourth, by asking the Court to apply church autonomy and to do so in an overbroad fashion, the Schools are really asking this Court to craft a new legal rule that vastly and improperly expands this doctrine. Courts regularly recognize that church autonomy applies to certain types of cases, such as theological controversies and employment claims against

---

[21] The Court may also reject church autonomy under the "fraud or collusion" exception, given the Schools' breach of their original promises to MDE. *Cf. Puri*, 844 F.3d at 1168 (citation omitted). "A doctrinally grounded decision made during litigation to insulate questionable church actions from civil court review may indeed raise an inference of fraud or bad faith," such that "the integrity of the judicial system may outweigh First Amendment concerns such that a civil court may inquire into the decision." *Askew v. Trs. of Gen. Assembly*, 684 F.3d 413, 420 (3d Cir. 2012).

religious organizations. *E.g.*, *Serbian E. Orthodox*, 426 U.S. at 721-24. But courts otherwise prefer to resolve cases on the merits, and that is no different in cases such as this one that can be resolved by applying neutral principles of law. *Cf. Oberstar v. FDIC*, 987 F.2d 494, 504 (8th Cir. 1993) ("The judicial preference for adjudication on the merits goes to the fundamental fairness of the adjudicatory process.").

As even sightly probing the Schools' logic reveals, the rule they request would yield unworkable outcomes that conflict with years of precedent. Cases that have been adjudicated by courts without issue for decades would suddenly occupy a law-free zone. Religious hospitals could avoid lawsuits pertaining to Medicare and Medicaid, even when the underlying issues pertain to secular concerns such as billing or fraud, by asserting that merely participating in litigation constitutes entanglement. So too with religious organizations facing lawsuits about patently criminal conduct. *E.g.*, *Ondrisek*, 698 F.3d at 1024-25 (rejecting church autonomy in tort suit: "Alamo believes he should be free from liability because he is able to exercise his religion freely. The First Amendment allows freedom of religious belief, but not injuries to the equal rights of others." (cleaned up)).

At its core, this case is not about a dispute between rival religious factions, the defrocking of a pastor, or an adult discharged from a religious job to which they have no constitutional entitlement. It is about government partners that prohibit kids from attending, or even applying to, programs comprising part of their fundamental and constitutionally-guaranteed right to public education. Church autonomy simply does not fit.

### 3.   This litigation does not implicate church autonomy.

The Schools' complaints about this lawsuit's procedural history ring hollow and arrive late. Litigation and discovery occurred not because MDE brought counterclaims but because the Schools brought claims requiring proof, entitling MDE to assert defenses and requiring MDE to assert compulsory counterclaims. Fed. R. Civ. P. 13(a).[22] The Schools cannot unilaterally make the same issues they put in controversy off limits.

Courts routinely permit discovery on religious issues when litigants put those issues in controversy. *E.g.*, *Witham v. Hershey Co.*, No. 23-cv-1563 (ECT/JFD), 2024 WL 4053028, at *3 (D. Minn. Sep. 5, 2024) (compelling discovery into "nature of [Witham's] claimed religious beliefs"); *Dolquist v. Heartland Presbytery*, No. Civ.A. 032150KHVDJW, 2004 WL 624962, at *2 (D. Kan. Mar. 9, 2004) (rejecting church autonomy as basis for avoiding depositions). Factfinders and courts can decide whether beliefs "are truly held and whether they are religious." *Witham*, 2024 WL 4053028, at *5. These issues are properly subject to discovery because the party alleging a belief, whether to claim relief or raise an affirmative defense, bears a corresponding burden of proof. *E.g.*, *Cole v. Grp. Health Plan, Inc.*, 105 F.4th 1110, 1113 (8th Cir. 2024) ("To establish a prima facie case of religious discrimination, *a plaintiff must show* . . . she is a member of a protected class *because of her religious beliefs*." (emphasis added)); *Hamilton v. Schriro*,

---

[22] *S. Const. Co. v. Pickard*, 371 U.S. 57, 60 (1962) ("The requirement that counterclaims arising out of the same transaction or occurrence as the opposing party's claim 'shall' be stated in the pleadings was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters."); *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015).

74 F.3d 1545, 1550 (8th Cir. 1996) (requiring free-exercise claimant to establish facts showing that challenged policy "infringes upon a sincerely held religious belief").

In *Wisconsin v. Yoder*, for example, the Supreme Court relied heavily on the factual record to resolve Amish litigants' claim that Wisconsin's law violated their free exercise rights. 406 U.S. 205, 215-16 (1972).

> [W]e must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief.

*Id.* at 215-19 (citing record evidence, expert witness, and trial testimony); *Mahmoud v. McKnight*, 102 F.4th 191, 211 (4th Cir. 2024) (discussing Supreme Court's reliance on the "unique record" in *Yoder*).

*Yoder*'s reliance on evidence makes sense: proving a free exercise claim or invoking a similar defense requires proof that one's beliefs are burdened. The logical predicate to such proof is proving the existence of a religious belief. Otherwise, courts would have to treat pleadings and allegations of sincerely-held beliefs as legally conclusive, "a rule that, if generally accepted, would tremendously change litigation in the federal courts" by "convert[ing] factual pleadings into conclusive findings." *Witham*, 2024 WL 4053028, at *4. The Court should reject the Schools' unfounded request for special treatment in the form of an exception to their burden of proof.

The Schools' overbroad reliance on church autonomy also falters given their acquiescence to multiple aspects of litigation they now contend were unnecessary.

Plaintiffs did not challenge Judge Docherty's scheduling order requiring discovery on their claims, nor his order compelling their participation in discovery, even though Local Rules allowed them to. LR 72.2. The Schools also never sought protective orders, stays, or permission for interlocutory appeal. Their reliance on church autonomy amounts to an overbroad and talismanic invocation of an immunity that does not exist, nothing more.

In sum, this litigation commenced when the Schools invoked the Court's jurisdiction and put their conduct into controversy. They "can hardly be said to be prejudiced by having to prove a lawsuit [they] chose to initiate." *Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995).

*  *  *

The undisputed evidence proves that the Schools are state actors when providing PSEO and have unremorsefully violated the civil rights of Minnesota high-school students for decades. MDE has standing to protect our youth and prevails as a matter of law on its counterclaims. This effectively ends the case.

## IV.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' RELIGION CLAIMS.

If the Court proceeds to Plaintiffs' claims, things get no better for them. The Schools and Families lack standing. *Carson* remains distinguishable. And because the Amendment is neutral and generally applicable, it need only be supported by a rational basis (it is). The Amendment also furthers highest-order interests and clears strict scrutiny. There is no Establishment Clause violation and there is no such thing as a church-autonomy or unconstitutional-condition claim (were there, those claims would fail). Defendants prevail at every turn.

### A.   Plaintiffs lack standing.

The Schools and Families must establish standing at the time they commenced litigation and their maintenance of the same thereafter. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). To establish standing, a party "must support each element of standing 'with the manner and degree of evidence required at the successive stages of litigation.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

In their brief, Plaintiffs attack MDE's standing but neglect to address their own. For the Schools, standing rises and falls on their status as state actors. State actors have no constitutional rights of their own, so the Schools' claims are nonstarters. The Families also lack standing because no children, and thus none of the parents, are injured. Lack of injury is sufficient to preclude standing, though Defendants note the Families also fail to address causation and redressability.

**R.L.** R.L., a senior, already started PSEO at Northwestern. (Loe Dep. 17-18.) Therefore, R.L. can complete PSEO there no matter what happens with the Amendment.[23] It is thus indisputable that R.L. has received exactly what she wanted and has no remaining controversy with Defendants.[24]

**O.L.** Plaintiffs attempt to establish O.L.'s standing by asserting that "she hopes to attend on-campus [PSEO] at Crown or Northwestern." (Pls.' Br. 9.) In interrogatories, however, Ms. Loe stated that O.L. merely "hopes to apply for the on-campus PSEO

---

[23] *See* Exhibit 120 to Suppl. Timmerman Decl.

[24] Claims about R.L. are moot for the same reason.

program offered at Crown or Northwestern." (ECF No. 91-12, at 10.) Hoping to apply is "simply not enough," *Lujan*, 555 U.S. at 564 (rejecting speculative future desires).

Thus, O.L. must establish that she actually intends to apply to on-campus PSEO at the Schools, and that she is "able and ready" to do so. *E.L. by White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 935 (8th Cir. 2017) (quotation omitted). Ms. Loe's deposition testimony appears to be the only evidence in the record on this matter, but she could not confirm O.L.'s final choice, or even that O.L. has specific goals that would require her to attend PSEO at a certain Institution. (Loe Dep. 46 (O.L. "doesn't have a firm, you know, thought of what she wants to do after high school.")). Ms. Loe also testified that she does not know whether O.L. wants to do PSEO in-person versus online, (*id.* 20), and declined to testify that the Loes would prohibit O.L. from attending another Christian Institution, such as Bethel, if she wanted to, (*id.* 27). And Ms. Loe provided *no* testimony or documentary evidence about O.L.'s academic qualifications for PSEO.

In terms of standing, O.L. is categorically different from plaintiffs who demonstrate interest and ability in future opportunities. When hockey players sued a college for eliminating its hockey team, for example, the court found standing for plaintiffs who identified academic and athletic qualifications establishing their ability to gain admission and try out for the hockey team. *Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 596-97 (8th Cir. 2024). The court found standing because these plaintiffs supplied "academic credentials" putting them in the "qualified range" for admission, and evidence of hockey experience on state-championship teams that showed they were "able and ready to compete" for a spot on the college's team. *Id.* (cleaned up).

41

O.L. does, however, resemble the aspiring judge from *Carney*, whom the Supreme Court determined lacked standing to challenge Delaware's political-party requirement for judgeships. 592 U.S. at 60-61. The Court rejected standing because the only evidence of his ability and readiness to apply for a judgeship was a statement that "he wants to be, and would apply to be, a judge on any of Delaware's five courts." *Id.* at 60-61. O.L. is the same: she may, indeed, want to apply to PSEO at the Schools. But "other than the act of filing the lawsuit itself, the summary judgment record contains no evidence of conversations or other actions taken by [O.L.] suggesting that she was 'able and ready' to apply for" on-campus PSEO at the Schools. *Id.* at 62.

The Loes offer no evidence establishing O.L.'s commitment to applying to the Schools, her qualifications to do so, or even one step O.L. has taken to prepare an application. Any harm to O.L. is thus a speculative and generalized grievance, not an injury within the meaning of Article III.

**J.G.** Ms. Erickson cites no evidence to establish J.G. had standing when litigation commenced or maintains any such standing now. The record lacks evidence, for instance, of J.G.'s academic qualifications. And to the extent J.G. has applied to and/or obtained admission for on-campus PSEO at one of the Schools since June 2023, the record likewise lacks evidence of continued standing: J.G. will benefit from the same ability to continue PSEO as R.L., and thus has no injury to vindicate.[25]

---

[25] J.G.'s claims would also be moot.

**B.** **Plaintiffs fail to establish categorical exclusion (Count I) or burden (Counts I-II, V-VI).**

Plaintiffs' singular reliance on *Carson* is a red herring that should be rejected.

*Carson* and its companions address legislation drafted in terms of religious status, *see*

*B.W.C.*, 990 F.3d at 621-22, which categorically distinguishes those cases from this one.

The Amendment plainly identifies its regulated entities as "eligible institution[s]."

Minn. Stat. § 124D.09, subd. 3. An eligible institution, in turn, is a

> Minnesota public postsecondary institution, a private, nonprofit two-year trade and technical school granting associate degrees, an opportunities industrialization center accredited by an accreditor recognized by the United States Department of Education, or a private, residential, two-year or four-year, liberal arts, degree-granting college or university located in Minnesota.

*Id.* This definition obviously includes private colleges without any language that could be

read to exclude religious colleges from the plain meaning of "private colleges." In contrast,

the laws at issue in *Carson*, *Trinity*, and *Espinoza* all utilize language that expressly singles

out religious institutions. *E.g.*, *Trinity*, 582 U.S. at 455 (describing state's "express policy"

to deny grants to any applicant affiliated with a "church, sect, or other religious entity"). If

those laws are apples, the Amendment is an orange. Comparing the Amendment to *Carson*

and related cases only highlights its lack of burden on religion and religious entities, and

accordingly dooms Plaintiffs' claims.

With *Carson* dismantled, the Court must reject Plaintiffs' claims altogether because

they assume the Amendment burdens their beliefs without establishing any undisputed

evidence that it, in fact, does. *See* Fed. R. Civ. P. 56(c)(1)(A). Plaintiffs' entire burden

argument consists of their assertion that the Amendment excludes the Schools from PSEO because of their religion. (Pls.' Br. 16, 26.)

What the Amendment actually does is prohibit Plaintiffs from requiring religious expression by others—it does not limit Plaintiffs' own religious expression. *Cf. Anderson v. Laird*, 466 F.2d 283, 291 (D.C. Cir. 1972) (striking down military college requirement that all students attend Christian chapel: "Abolition of the attendance requirements enhances rather than violates the free exercise rights of cadets and midshipmen"). By protecting PSEO applicants of all faiths while permitting the Schools to proclaim their own beliefs and solicit voluntary faith statements, the Amendment does not burden, and in fact promotes, free exercise rights for all involved in the Schools' PSEO application processes.

### C. The Amendment clears every level of scrutiny.

Because this case does not fit *Carson*'s mold, the Amendment only needs a rational basis as long as it is neutral and generally applicable. The Amendment is both, and furthers a preeminent interest. Regardless of what level of scrutiny applies, therefore, the Amendment survives.

#### 1. Rational basis review under *Smith* (Counts II, V).

Apart from their overreliance on *Carson*, Plaintiffs attempt to distance the Amendment from *Employment Division v. Smith*, 494 U.S. 872 (1990), in two ways. Plaintiffs claim the Amendment is not neutral because it targets religion and was enacted with "religious hostility." (Pls.' Br. 26-30.) And Plaintiffs assert the Amendment is not generally applicable because Institutions remain free to establish their own academic criteria for PSEO admission and MDE permits a tribal college to "provide education

grounded in Native American culture and values." (*Id.* 30-33.) These arguments completely miss the mark.

### a.      The Amendment is generally applicable.

A "generally applicable anti-discrimination regulation will usually be understood to indicate neutrality rather than religious animosity." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir. 2020). It is undisputed that the Amendment forbids all Institutions from engaging in all forms of protected-class discrimination—without exception. Antidiscrimination laws that regulate conduct, like the Amendment, are generally applicable. *E.g.*, *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142 (W.D. Wash. 2023) (Title VII and state antidiscrimination law applied generally).

Plaintiffs try to avoid this principle with more false trails. First, they rehash their argument that the Amendment is underinclusive, and thus not generally applicable, because it does not regulate non-protected classes such as academic ability. Problem is, no evidence proves or event hints that academic or grade-level admissions criteria proxy for or cause illegal discrimination. Indeed, this argument rests on Plaintiffs' mischaracterization of the Amendment as seeking to maximize—rather than equalize—PSEO admissions. Absent evidence that other admissions criteria are at least as harmful to equitable PSEO access as discrimination is, these criteria have no bearing on the Amendment's general applicability. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 208 U.S. 520 535-38 (1993).

Second, Plaintiffs theorize the Amendment is not generally applicable because a tribal Institution teaches PSEO classes on Anishinaabe philosophy and values. But the Amendment addresses discrimination in PSEO admission, not what PSEO classes MDE

approves or disapproves. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[W]here two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."). Plaintiffs do not challenge the nonsectarian requirement, and MDE has not claimed in this lawsuit that the Amendment implicates its authority to enforce that requirement. What matters here is that the Schools have identified no evidence suggesting any Institution—tribal or otherwise— requires secular pledges for admission to PSEO. Nor is there statutory language, evidence that MDE interprets the Amendment as permitting secular pledges, or evidence that MDE treats any secular activity more favorably than the Schools' conduct. Instead, the record indisputably reveals that the Amendment allows no exceptions.

Ms. Loe's testimony underscores this point and clarifies that Plaintiffs actually seek an exclusive exemption from the Amendment. When asked during her deposition whether she thinks it is fair to require high-school kids to profess belief in Christianity in order to attend PSEO—even if they do not share that faith—Ms. Loe testified, "[s]ure." (Loe Dep. 63-64.) But just seconds earlier, she implied that it would *not* be "fair for Christian students to have to sign a faith statement" or "wear a hijab" in order to apply for PSEO "if the Islamic University of Minnesota offered PSEO classes," (*id.*). The contrast in Ms. Loe's positions illustrates that the only exception to the Amendment conceivably at issue in this lawsuit is the special carve-out that Plaintiffs seek.

The Amendment neither exempts nor condones the Schools' discrimination in admissions any more or any less than it would discrimination by other Institutions, secular and religious. The Amendment is thus generally applicable.

### b.   The Amendment is neutral.

As to neutrality, any law proscribing discrimination will of course "target" those discriminatory actors—that is unavoidable. *See, e.g.*, *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 750 F.3d 184, 193 (2d Cir. 2014) ("[R]ules and policies designed to keep a governmental entity in conformity with its [constitutional] obligations … must of necessity focus on religious subject matter."); *Nat'l Inst. of Fam. & Life Advocs. v. Schneider*, 484 F. Supp. 3d 596, 624-25 (N.D. Ill. 2020) (rejecting argument that conscience-objector law targeted religion, even though it only applied to those with religiously-motivated objections, because law did "no more than bring regulation of conscience objectors into conformity with that of other medical professionals"). Still, the Amendment does not impermissibly target religion for "distinctive treatment," *Lukumi*, 508 U.S. at 533-34; rather, it safeguards the civil rights of Minnesota high-school students by narrowly proscribing unlawful conduct. Nor does the legislative history of the Amendment evince hostility toward Plaintiffs' beliefs.

***Facial Targeting***. Plaintiffs' facial-targeting argument "extend[s] the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Locke v. Davey*, 540 U.S. 712, 720 (2004). In *Locke*, the Supreme Court upheld as facially neutral a Washington law denying scholarships for the "essentially religious endeavor" of training ministers. *Id.* at 721. The plaintiff in *Locke* "was denied a scholarship because of what he proposed to *do*— use the funds to prepare for the ministry." *Trinity Lutheran*, 582 U.S. at 464 (emphasis original). Washington had an "historic and substantial" interest in not funding clergy training and "merely chose[ ] not to fund a distinct category of instruction." *Locke*, 540

U.S. at 721, 725. Washington's law was of "a far milder kind" than the law at issue in *Lukumi* (which criminalized religious conduct) and did not forbid students from using scholarships at religious schools. *Id.* at 720-21; *Bronx Household*, 750 F.3d at 192-96.

*Bronx Household* provides a useful framework for rejecting Plaintiffs' facial-targeting argument. There, an education board made its "school facilities available outside of school hours for use by outside users" and subsidized "such use[.]" 750 F.3d at 187. These facilities were not available for holding religious worship services, however, so a church claimed this exclusion violated its free-exercise rights. *Id.* Even though the regulation "focuse[d] on a religious activity with no secular analog[,]" the Second Circuit held the regulation did not violate the Free Exercise Clause because religious targeting was "inevitable." *Id.* at 191-92. The regulation was necessary for the board to conform with its constitutional obligations and fulfill its constitutional mandates, it did "not represent invidious discrimination against religion," and it was "not constitutionally suspect simply because its limitations addressed religion. *Id.*

The Amendment "is a slightly different manifestation of the same historical and constitutional aversion to the use of public funds to support" similar unconstitutional practices. *Id.* at 194-95 (citing *Locke*, 540 U.S. at 720-21). Minnesota is constitutionally obligated to provide public education free from discrimination. The Amendment satisfies this command and is narrowly tailored to protect high-schools students' civil rights. Moreover, the Amendment is milder still than the Washington law challenged in *Locke*: it does not condition the Schools' *use* of funds; rather, it simply prohibits the Schools from discriminating in PSEO admissions. And the Amendment is even more neutral than the

regulation upheld in *Bronx Household*, as it forbids all forms of discrimination—not just religious discrimination—by all Institutions (secular and religious alike). Simply put, the Amendment and laws like it that are designed to prevent constitutional violations by a governmental entity are not "automatically constitutionally suspect and subject to strict scrutiny," even if such laws inescapably "target religion in order to give effect to" such designs. *Id.* at 192-93. Plaintiffs' targeting argument wholly ignores this distinction, which is dispositive of facial neutrality.[26]

*Hostility*. Plaintiffs' attempt to depict the Amendment as motivated by religious animus rings equally hollow. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018) ("Factors relevant to the assessment of governmental neutrality" include historical background, the series of events leading to the Amendment, and legislative history). In *Masterpiece*, the Supreme Court found that certain statements made by members of the Colorado Civil Rights Commission when adjudicating a baker's religious objection to an antidiscrimination law, combined with the Commission's disparate treatment of other bakers, demonstrated "elements of a clear and impermissible hostility toward the sincere religious beliefs that motivated [the plaintiff's] objection." *Id.* at 634. Particularly damning, the Court highlighted a commissioner's statement comparing

---

[26] Plaintiffs' argument that the MHRA is proof of the Amendment's targeting highlights their misunderstanding of how to the two laws work together. Again, because PSEO is secular conduct, the Schools are subject to the MHRA's prohibition of discrimination in PSEO admissions. The Amendment reenforces this point by importing the MHRA's educational antidiscrimination provisions into the PSEO Act.

religious beliefs to slavery and the Holocaust, and describing religion as "one of the most despicable pieces of rhetoric that people can use[.]" *Id.*

This statement persuaded the Court that more benign comments made by other commissioners "that might mean simply that a business cannot refuse to provide services based on sexual orientation" collectively demonstrated "lack of due consideration" of the baker's religious beliefs. *Id.* The Commission's grant of conscience-based exemptions for three other individuals bolstered this conclusion. *Id.* at 636-37.

*Masterpiece* is distinguishable on two grounds: the speakers and the speech. The comments in *Masterpiece* were made in an adjudicatory context, by members of the decisionmaking body. "The Court in *Masterpiece* acknowledged the distinction between hostile comments made by an adjudicatory body when deciding a case in front of it, and comments made by legislators when debating a bill." *Tingly v. Ferguson*, 47 F.4th 1055, 1086 (9th Cir. 2022) (citing *id.* at 636). While Plaintiffs identify statements made by four legislators (out of 201 total), these statements, as a matter of law, cannot establish that the legislature as a whole acted with animosity toward the Schools. *Id.* at 1087 (describing legislator's "allegedly hostile comments" as "weak evidence of the intent of the entire legislature in enacting the challenged law"); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253-54 (2022) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." (quotation omitted)). Further, unlike *Masterpiece*, Minnesota's legislature has not treated the Schools differently than any other Institution; again, the Amendment bars *all* Institutions from discriminating in

PSEO admissions. MDE staff are even further removed; all they did was propose the Amendment in response to years of complaints from students and families.

Nor are the comments Plaintiffs flag overtly-hostile toward religion. What tipped the balance in *Masterpiece* was one commissioner's inflammatory statement that "expressed deep and open skepticism as to whether the [baker's] religious beliefs were sincerely held[,]" coupled with the Commission's preferential treatment of other bakers seeking exemptions. *Calif. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019-20 (9th Cir. 2020) (citing *Masterpiece*, 584 U.S. at 634-35). Advancing a cherrypicked version of the record and the Amendment's legislative debate, Plaintiffs insinuate that mere reference to the Schools' faith-based admissions criteria taints the Amendment with religious hostility.

That supposition is wrong, for several reasons. First, it stems from an incomplete and skewed picture of what actually happened. The Amendment has a multi-year history composed of agency expertise, public complaints, numerous policy proposals, and an entire legislative session. In contrast to the few statements Plaintiffs have plucked out of context, MDE proposed the Amendment to eliminate discriminatory barriers to PSEO. (ECF Nos. 81-60 to 81-62, 97-9 to 97-11.) The exhibits Plaintiffs rely on reflect as much. For instance, when MDE first proposed the Amendment in 2019, staff reflected that:

> The problem is that admissions procedures by some private postsecondary institutions are discriminatory in nature by requiring that a high school student must provide a faith statement prior to enrollment approval.

* * *

> The intended results [of the Amendment] are to equalize access to Minnesota students who would like to enroll in PSEO courses at the institution of their choice. Participation in a publicly-funded program should not discriminate against students on the basis of gender, sexual orientation, sexual identity, religion, or ethnicity.

(ECF No. 92-6, at 2.) Adosh Unni, MDE's Director of Government Relations, told legislative staff that "faith statements are the general problem here" *because* "[o]ur main concern is that a state-funded PSEO opportunity has a barrier to entry because a faith statement is required." (ECF No. 92-9, at 1.) And in response to a complaint about these admissions requirements, MDE staff lamented that "[t]his is just an example of things we have gotten over the years" and questioned how MDE could intervene. (ECF No. 92-7.) Deposition testimony by MDE staff—including its Commissioner—confirms that eliminating discrimination was always the Amendment's sole impetus. (Reynolds Dep. I, at 175-76, 182-84; Unni Dep 197, 202-03; Jett Dep. 44-45, 73; ECF Nos. 81-57, 81-58, 81-63, 81-64.)

Plaintiffs' cramped portrayal of the Amendment's legislative history is likewise flawed. In proper context, the statements Plaintiffs highlight show legislators also focused exclusively on eliminating discriminatory barriers to PSEO. *See Tingley*, 47 F.4th at 1086 (recognizing allegedly-hostile comments must be contextualized). During floor debate on the Amendment, Representative Laurie Pryor stated:

> I've looked at the faith statement. I am a person of faith and practicing. I cannot sign that faith statement that they put before me and that would be a barrier for me attending. They're rejecting me based on my beliefs. And they're also rejecting people based on who they are. And that's why there's also

> language that comes from our human rights statute saying that
> we don't discriminate based on these characteristics.
>
> * * *
>
> We are talking about public dollars. And we're saying don't
> discriminate against students based on characteristics and
> belief.
>
> * * *
>
> The intent of the provision that we have in this bill is to make
> sure that our high school students can go to the postsecondary
> institutions of their choice. They can exercise that option and
> they will not be compelled to sign a statement as a barrier to
> admission. So that is the intent of this legislation.

Minn. H.R., *House Floor Session 4/20/23 – Part 2*, at 3:15:30-3:16:45, 3:28:05-3:28:35

(Apr. 20, 2023), https://perma.cc/E8M5-8GHP.[27] Representative Mike Frieberg depicted

the Amendment as "prohibit[ing] discrimination based on students' race, creed, ethnicity,

disability, gender, or sexual orientation, or religious beliefs or affiliations … consistent

with [the MHRA]." *Id.* at 3:40:25-3:41:05.

　　During another debate, Senator Erin Maye Quade, who is married to a woman, noted

that for her daughter to attend PSEO at Northwestern, "she would be required to sign a

faith statement that says sexual immorality includes her mothers' marriage." Minn. S.,

*Senate Floor Session 4/24/23 – Part 3*, at 1:30:00-1:30:25 (Apr. 24, 2023),

https://perma.cc/K2ZZ-EWZN.[28] She further noted "the reality" that "a lot of students go

to the nearest place [for PSEO] because they have to take public transportation or be driven

by a parent, or pick up a sibling afterschool. They need to be close by." *Id.* at 1:29:00-

---

[27] Also at https://www.house.mn.gov/hjvid/93/896842.

[28] Also at https://mnsenate.granicus.com/player/clip/11814.

1:29:45. Senator Mary Kunesh described the intent of the Amendment as "a question of discrimination. We're not saying that these schools cannot provide PSEO programs, we're just saying that they can't sort [students] out by those who are Christian and those who are not." *Id.* at 1:38:00-1:38:18.

No legislator or MDE employee made any statement even remotely as abhorrent as the one that swayed the Supreme Court to find hostility in *Masterpiece.* Rather, as the complete executive and legislative history of the Amendment establishes, any discussion of religious beliefs always occurred in the context of and in relation to the Amendment's goal of ending discrimination in PSEO admissions. *See We The Patriots USA, Inc. v. Conn. Office of Early Childhood Dev.*, 76 F.4th 130, 148 (2d Cir. 2023) (finding no hostility where "[m]any of the Act's proponents acknowledged the impact it would have on children and families who hold religions objections to vaccination but balanced that impact against the risks to public health"); *Tingley*, 47 F.4th at 1085-86 (same, when legislators supporting ban on conversation therapy called the practice "barbaric" and referenced those who try to "pray the gay away"). Construed as a whole, nothing in the record or the Amendment's history supports Plaintiffs' hostility theory.

In ignoring such evidence, Plaintiffs shirk their burden to canvas the record and present a full and fair account of the Amendment's history. Plaintiffs also rely on inapposite cases. In *New Hope*, for example, the Second Circuit concluded remarks about antidiscrimination obligations evinced hostility toward an adoption agency, but only after distinguishing that agency from organizations in "contractual and compensatory" relationships with the state, like the Schools are here. 966 F.3d 145, 164 (2d Cir. 2020).

Plaintiffs also neglect to mention that *New Hope* evaluated the statements at issue pursuant to Rule 12, a lighter burden than Rule 56, and reached a remarkably conditional conclusion. *Id.* at 165 (finding pleadings gave rise to "*slight*" suspicion of animosity (emphasis added)). Here, however, Plaintiffs must establish the entire record would require reasonable jurors to conclude MDE acted with impermissible animus, with every reasonable inference drawn in MDE's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 241 (1986) (citation omitted). Under this standard, Plaintiffs utterly fail to carry their burden.

\* \* \*

Because the Amendment is generally applicable and facially neutral, and Plaintiffs cannot carry their burden of demonstrating that the Amendment targets or stems from religious hostility, rational basis review applies. *Smith*, 494 U.S. at 876. The Amendment easily satisfies this standard, meaning Defendants are entitled to judgment on Plaintiffs' religion claims.

### 2.    Strict scrutiny under *Fulton*.

The Amendment also satisfies strict scrutiny because it furthers Minnesota's first-order interests, (Defs.' Br. 37-40). *Fulton*, 593 U.S. at 533. By criticizing the Amendment for protecting students' protected characteristics over non-protected characteristics such as grade level or academic ability, the Schools miss the "entire point of the Equal Protection Clause." *FAIR*, 600 U.S. at 220 ("[T]reating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well." (emphasis in original)).

To be clear, Defendants' compelling interest is in removing discriminatory barriers from public education, not disparaging or diminishing religion. It is not the beliefs advanced with which Defendants take issue, but the Schools' insistence on a constitutional right to impose those beliefs on students—whose own constitutionally-protected beliefs may differ—as a condition of entry to a public-education program. *Cf. Obergefell*, 576 U.S. at 672 ("But when that sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied.").

The Schools need only look to *Obergefell* to understand the roots of MDE's position. *Obergefell* reached its conclusion about the marital rights of LGBTQ+ individuals by relying on cases involving other constitutionally-protected classes. *Id.* at 664-74 (citing *Loving v. Virginia*, 388 U.S. 1 (1967)). Here, in relying on cases involving the educational rights of other constitutionally-protected classes, Defendants employ the same analytical principles. *See, e.g.*, *Roy*, 2024 WL 3160324, at *24 (explaining "the law is predicated on the application of general principles to the varying facts of individual cases" and approving analogical use of cases about race discrimination in education to elucidate effects of differential treatment in education); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 620 (4th Cir. 2020) (same). Defendants' purpose is not to belittle sacred beliefs, but to establish a legally-principled foundation for their argument that Minnesota's students are entitled to public education free from discrimination. The Constitution has room enough for Minnesota's students and the Schools alike to exercise their rights during PSEO.

**D.      The Establishment Clause is not implicated (Count III).**

Plaintiffs' argument that the Amendment discriminates among religions warrants scant attention. While they say "[l]aws that discriminate between religions violate the Free Exercise Clause," (Pls.' Br. 42), the authority they cite demonstrates that such laws instead implicate the *Establishment* Clause. *Lukumi*, 508 U.S. at 536 ("We need not discuss whether this differential treatment of two religions is an independent constitutional violation.") (citing *Larson v. Valente*, 456 U.S. 228, 244-46 (1982) (recognizing "denominational neutrality" is "clearly manifested in the history and logic of the Establishment Clause")); *accord Child.'s Healthcare Is a Legal Duty, Inc v. Min De Parle*, 212 F.3d 1084, 1090-93 (8th Cir. 2000) (addressing whether a law permissibly accommodated one religion under Establishment Clause).

There is no Establishment Clause violation here. "[A] state does not establish religion by passing a law that just happens to coincide or harmonize with the tenets of some or all religions." *Doe v. Parson*, 960 F.3d 1115, 1118 (8th Cir. 2020) (quotation omitted). Religious Institutions that do not require a faith statement are still prohibited from discriminating based on religion in PSEO admissions; the Amendment aligns with these Institutions only insofar as they do not engage in one form of outlawed religious discrimination (faith statements). *Id.* ("Mere alignment with certain religious beliefs … is not enough."). Plaintiffs' Establishment Clause claim is futile.

**E.      Church autonomy is an inapplicable affirmative defense (Count IV).**

For the reasons set forth above, the church autonomy doctrine is a defense, not a standalone claim. *See* Argument § III.D, *supra*; *accord Foothills Christian Ministries v.*

*Johnson*, No. 22-cv-0950-BAS-DLL, 2024 WL 2306282, at *11 (S.D. Cal. May 20, 2024) (requiring ministerial exception, a component of church autonomy, to "be raised as a shield against claims brought against the church, rather than as sword, or claim by the church against the state"). There is accordingly no legal basis for the Schools' standalone church-autonomy claim.

### F.    The Amendment imposes no illegal condition (Count VII).

Finally, Plaintiffs purport to raise an unconstitutional-conditions claim, but none exists. The unconstitutional-conditions doctrine does not give rise to a standalone claim; challenged conditions must actually violate a substantive First Amendment right to implicate this doctrine. *See FAIR*, 547 U.S. at 59-60 (declining to address unconsititutional conditions because no underlying violation arose from regulation at issue); *Dolan v. City of Tigard*, 512 U.S. 374, 407 n.12 (1994) (noting unconstitutional-conditions doctrine "has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question"). Properly understood, an unconstitutional condition is but one way to establish burdening under the Free Exercise Clause. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981).

Plaintiffs' unconstitutional-conditions claim, therefore, merely repackages their religion claims and offers no independent basis for relief. *E.g.*, *Telescope*, 936 F.3d at 762; *Cath. Charities of Me., Inc. v. City of Portland*, 304 F. Supp. 2d 77, 95 (D. Me. 2004); *see also* Michael A. Hefland, *There are No Unconstitutional Conditions on Free Exercise*, 98 Notre Dame L. Rev. S50, S64-S67 (2023). As Plaintiffs' religion claims all fail, so does their unconstitutional-conditions claim.

Were more required, the Amendment is not unconstitutional because the condition it imposes (no discrimination in PSEO admissions) relates directly to the benefit offered (participation in PSEO). *Agency for Int'l Dev. v. All. for Open Soc'y Int'l*, 570 U.S. 205, 213 (2013) (AOSI) (emphasizing that "relevant distinction" is between "conditions that define the limit of the government spending program—those that specify the activities Congress wants to subsidize" and those that "seek to leverage speech outside the contours of the program itself"). For example, in *AOSI*, the Supreme Court held that conditioning disease-prevention funding on adopting a policy expressly opposing prostitution was unconstitutional because the condition was too unrelated to the funding's purpose, and thus reached speech beyond the confines of the subject funding program. *Id*. at 217.

How would *AOSI* have been decided if funding was instead conditioned on a promise not to use grants in a discriminatory manner? *AOSI* suggests that such a condition would have been constitutional given its direct relationship to the underlying government program, *id*. at 215-17, and its progeny confirms as much. *See, e.g.*, *Ostergren v. Frick*, 856 Fed. Appx. 562, 572 (6th Cir. 2021) (holding that non-disclosure agreement required to access study materials was not unconstitutional condition because benefit of access related directly to promise not to share materials); *Roy*, 2024 WL 3160324, at *43 ("The equal opportunity requirement is tied logically and closely to the interests of the [preschool] program. It is limited to preschool services only and does not seek to impact participating providers' admissions policies outside of the preschool context.").

If the Amendment prohibited the Schools from discriminating in employment or collegiate admissions, Plaintiffs would have a better argument, because then the

Amendment would implicate free-exercise rights beyond PSEO. But the Amendment prohibits discrimination in PSEO admissions only. Even if Plaintiffs could maintain an unconstitutional-conditions claim, therefore, it would fail as a matter of law. The claim would also fail because Plaintiffs do not even attempt to meet their summary-judgment burden. Fed. R. Civ. P. 56(a), (c)(1)(A). They have not identified any material facts relevant to this claim or cited to any part of the record, instead offering formulaic assertions that do not even meet plausibility standards.

The unlawful conditions in this case are actually those the Schools impose on PSEO applicants. Unlike the Amendment, the Schools' admissions policies explicitly compel the adoption of certain beliefs and the rejection of others in order to apply for their programs. *Anderson*, 466 F.2d 120 (rejecting notion that compelled faith professions do not constitute coercion of belief). This remains true even if students could attend Institutions other than the Schools for PSEO, which the parties agree is not always feasible, (Loe Dep. 85-87; Erickson Dep. 25, 69-72). *See Anderson*, 466 F.2d at 122 (A student's "voluntary assumption of an . . . educational relationship with the government is not a waiver of First Amendment rights."). For all these reasons, the unconstitutional-conditions claim fails.

\* \* \*

The Court can dispense of Plaintiffs' claims on standing alone. Those claims also fail on the merits because the Amendment is constitutional under every level of scrutiny and does not implicate the Establishment Clause or impose any unlawful condition. Defendants are likewise entitled to judgment as a matter of law on Plaintiffs' claims.

## CONCLUSION

"As important as the question[s] we decide today are ones we do not." *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2087 (2024). The Court can and should resolve this case on state action alone, and need not decide whether Minnesota must countenance and support public-education discrimination in the name of religious freedom. But Defendants triumph on that issue, too. MDE is entitled to summary judgment on its counterclaims and Plaintiffs' claims must be dismissed.

Dated:  September 24, 2024

KEITH ELLISON
Attorney General
State of Minnesota

s/ Jeff Timmerman
JEFF TIMMERMAN (#0352561)
MARTHA J. CASSERLY (#0148271)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
(651) 757-1214 (Casserly)
(651) 300-6807 (DeMeules)

jeffrey.timmerman@ag.state.mn.us
marty.casserly@ag.state.mn.us
madeleine.demeules@ag.state.mn.us

**ATTORNEYS FOR DEFENDANTS**