## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

Melinda and Mark Loe, et al.,

                Plaintiffs,

     v.

Willie Jett, et al.,

                Defendants.

Case No. 23-cv-1527 (NEB/JFD)

**MINNESOTA DEPARTMENT OF EDUCATION & COMMISSIONER JETT'S SUPPLEMENTAL BRIEF ON SEVERABILITY**

The Court asks whether: (1) the Amendment's Faith Statement Ban is severable from the Amendment's Nondiscrimination Requirement; and (2) the Nondiscrimination Requirement, by itself, is constitutional. (ECF No. 135.)[1]

Yes and yes. Under Minnesota law, the Faith Statement Ban and Nondiscrimination Provision are not essentially or inseparably connected, and the Nondiscrimination Provision can be fully and completely implemented without the Faith Statement Ban. The Faith Statement Ban is thus severable as a matter of law. Further, regardless of the level of scrutiny applied, the Nondiscrimination Provision does not offend the Free Exercise Clause or any other constitutional provision.

### LEGAL STANDARD

Severability is a question of state law. *Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 518 (8th Cir. 2004) (citing *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996)). Minnesota law enshrines a strong presumption in favor of severability. Minn. Stat.

---

[1] Per the Court's order for supplemental briefing, (ECF 135), this brief assumes the Faith Statement Ban is unconstitutional but does not concede or waive any arguments on that issue, nor any arguments relating to the Amendment's constitutionality.

§ 645.20; *cf. Assoc. Builders & Contractors v. Ventura*, 610 N.W.2d 293, 305 (Minn. 2000) (describing wholesale invalidation as "draconian"). Thus, Minnesota statutes must be treated as severable unless a statute expressly states its provisions are not severable. *Id.* (instructing "the provisions of all laws *shall* be severable" (emphasis added)). Any provision of a Minnesota statute found to be unconstitutional should simply be severed, leaving the remaining, valid provisions intact. *Id.* State and federal courts routinely embrace Minnesota's presumption in favor of severability, retaining valid statutes whenever possible. *See, e.g.*, *State v. Melchert-Dinkel*, 844 N.W.2d 13, 24 (Minn. 2014); *Styczinski v. Arnold*, 727 F. Supp. 3d 821, 825-28 (D. Minn. 2024), *appeal filed* No. 24-1828 (8th Cir. Apr. 18, 2024).

Only two exceptions to Minnesota's strong presumption in favor of severability exist. First, a statute should not be severed if its valid provisions are "so essentially and inseparably connected with, and so dependent upon, the void provisions" that a court is forced to conclude the legislature would not have enacted the remaining valid provisions without the void one. Minn. Stat. § 645.20. Second, a statute should not be severed if the remaining valid provisions are incomplete and incapable of being executed under legislative intent without the invalid provision. *Id.* In analyzing severability, courts must seek to "effectuate the intent of the legislature had it known that a provision of the law was invalid." *In re Welfare of A.J.B.*, 929 N.W.2d 840, 848 (Minn. 2019) (quoting *Melchert-Dinkel*, 844 N.W.2d at 24); *see also Back v. State*, 902 N.W.2d 23, 30-31 (Minn. 2017) ("[I]n general, we are to sever as little as possible of an unconstitutional law." (Citations omitted)).

2

# ARGUMENT

## I.    SEVERABILITY.

When confronted with constitutionally-flawed statutes, as this brief assumes, courts "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006). The Amendment lacks an express statement prohibiting severance of any unconstitutional provision, Minn. Stat. § 124D.09, subd. 3(a), thereby triggering Minnesota's pro-severability presumption, *id.* § 645.20. Therefore, as the party that sought the Amendment's invalidation and now opposes severability, it was incumbent upon Plaintiffs to make any arguments against Minnesota's pro-severability presumption when briefing summary judgment, had they wanted to foreclose the possibility of severability should the Court accept their constitutional arguments. *See, e.g.*, *Hodgson v. State of Minn.*, 648 F. Supp. 756, 780 (D. Minn. 1986)[2] (applying Minnesota law and explaining legislative presumption in favor of severability places the burden of this issue on "the litigant who would escape [a statute's] operation" (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 335 (1936) (Cardozo, J.))); *Dakota*, 362 F.3d at 518-19 (same, when applying analogous presumption under South Dakota law). Plaintiffs did not previously do so, and, accordingly, should be deemed to have forfeited their opportunity to argue against severability.

In any event, if the Court finds the Faith Statement Ban invalid, severability will turn on the exceptions set forth in Section 645.20. The Faith Statement Ban and

---

[2] *Reversed without reaching severability*, 853 F.2d 1452 (8th Cir. 1988).

Nondiscrimination Provision are not essentially or inseparably connected, nor would the Nondiscrimination Provision be incapable of execution without the Faith Statement Ban. Thus, neither exception to severability applies and the Faith Statement Ban is severable.

### A.    The Faith Statement Ban and Nondiscrimination Provision are not essentially or inseparably connected.

The Faith Statement Ban and Nondiscrimination provision are neither essentially nor inseparably connected, as shown by their plain text and their substance.

First, beginning with the Amendment's plain text, the Legislature used disjunctive language to connect the Faith Statement Ban and the Nondiscrimination Provision, separately prohibiting eligible institutions from requiring faith statements *or* from discriminating on the basis of protected classes when admitting PSEO students. *See* Minn. Stat. § 124D.09, subd. 3(a) (emphasis added). The Court's analysis must start and end with this linguistic separation, as the Amendment's very words establish the provisions at issue are separate, not connected. Indeed, courts are "bound by legislative words" and "cannot rewrite [a] statute." *A.J.B.*, 929 N.W.2d at 848. For this reason, the Court must afford the term "or" its disjunctive meaning, which separates the Faith Statement Ban from the Nondiscrimination Provision as a matter of grammar, substance, and law. *See, e.g.*, *Nash v. Comm'r of Pub. Safety*, 4 N.W.3d 812, 818 n.7 (Minn. 2024) (treating "or" as disjunctive); *A.J.B.*, 929 N.W.2d at 863 (concluding that stalking statute's disjunctive listing of categories of intended harm demonstrated that valid and constitutionally overbroad provisions were not essentially or inseparably connected).

Second, the Faith Statement Ban and Nondiscrimination Provision are also substantively separate. The Faith Statement Ban, for instance, highlights one form of prohibited conduct (compelling religious declarations from minor students), while the Nondiscrimination Provision more broadly instructs that eligible institutions may not discriminate against PSEO applicants on the basis of many protected categories. Minn. Stat. § 124D.09, subd. 3(a). Although both provisions seek to curb improper discrimination, they advance this goal with prohibitions of differing breadth.

On this point, *Melchert-Dinkel* is instructive. In that matter, a criminal defendant challenged Minnesota's assisted-suicide statute as unconstitutionally restricting speech. 844 N.W.2d at 16. The statute at issue made it unlawful to "intentionally advise, encourage, or assist another in taking the other's own life." *Id.* (cleaned up). The Court determined that the prohibitions on advising and encouraging encompassed protected speech, but not the prohibition on assisting. *Id.* at 23-24. But the Court then concluded that "assisting," as used in the statute, "is a separate and distinct concept" from "advising or encouraging." *Id.* at 24. Because of this conceptual difference, the Court explained, the statute could be severed to retain the constitutional prohibition against assisting. *Id.*

*Melchert-Dinkel* thus instructs that a conceptual difference between two component provisions of a statute prevents those provisions from being essentially or inseparably connected. Here, there cannot be any question that a prohibition specifically banning compelled faith statements is conceptually distinct from a broad prohibition against protected-class discrimination. The former addresses a particular form of religious discrimination, while the latter addresses discrimination writ large. As such, these

5

provisions are sufficiently distinct and thus neither essentially nor inseparably connected to each other. The Court must strive to determine the Legislature's intent during its severability analysis, *A.J.B.*, 929 N.W.2d at 848, and it would not make any sense to conclude a legislature concerned with eradicating discrimination in public education would have taken an all-or-nothing approach to this task. Certainly, if it knew it could not have the specific prohibition the Faith Statement Ban embodies, the Minnesota Legislature would have preferred a high-level prohibition against discrimination to no prohibition.

Many components of the summary judgment record support this conclusion. MDE's legislative proposals evince that it pursued the Amendment to eradicate all forms of discrimination in PSEO admissions—not just discrimination caused by faith statement requirements. (ECF Nos. 81-60, 81-61, 81-62, 97-9, 97-11.) This broad intent was echoed in MDE executives' deposition testimony in this case.[3] And legislators were focused on comprehensively ending admissions practices that denied equitable access to PSEO based on all protected-class statuses. (ECF No. 113, at 51-54.)

For both these reasons, the Faith Statement Ban and Nondiscrimination Provision are neither essentially nor inseparably connected, so the first exception to severability under Section 645.20 does not apply.

---

[3] *See* Reynolds Dep. I, at 15-16, 38-40 (ECF No. 97-2); Unni Dep. 197, 202-03 (ECF No. 97-5); and Jett Dep. at 44-45, 73 (ECF No. 97-12).

**B.    The Nondiscrimination Provision is complete and capable of implementation on its own.**

If the Court severs the Faith Statement Ban, the remaining Nondiscrimination Provision is a complete statutory provision that is capable of implementation on its own.

Without the Faith Statement Ban, the remainder of the Amendment reads as follows:

(a) "Eligible institution" means a Minnesota public postsecondary institution, a private, nonprofit two-year trade and technical school granting associate degrees, an opportunities industrialization center accredited by an accreditor recognized by the United States Department of Education, or a private, residential, two-year or four-year, liberal arts, degree-granting college or university located in Minnesota. An eligible institution must not ~~require a faith statement from a secondary student seeking to enroll in a postsecondary course under this section during the application process or~~ base any part of the admission decision on a student's race, creed, ethnicity, disability, gender, or sexual orientation or religious beliefs or affiliations.

Minn. Stat. § 124D.09, subd. 3(a). And as relevant here, the Nondiscrimination Provision would specifically read:

An eligible institution must not base any part of the admission decision on a student's race, creed, ethnicity, disability, gender, or sexual orientation or religious beliefs or affiliations.

*Id.*

In line with these excerpts and the Amendment's disjunctive structure, the Nondiscrimination Provision is a standalone prohibition that does not depend on the Faith Statement Ban to operate. Removing the Faith Statement Ban does not leave any ambiguity about the who, what, when, where, and how of the Legislature's command: Eligible institutions may not discriminate against PSEO applicants during admissions decisions. Nor does the Nondiscrimination Provision's enumeration of "religion" intertwine that provision with the Faith Statement Ban, inseparably or otherwise. In the field of statutory

7

antidiscrimination law, enumeration of the class(es) protected by a particular law "is the essential device used to make the duty not to discriminate concrete and to provide guidance for those who must comply." *Romer v. Evans*, 517 U.S. 620, 628 (1996). Accordingly, the Nondiscrimination Prohibition is neither logically dependent on nor connected with the Faith Statement Ban. Therefore, the Nondiscrimination Provision can operate on its own, even if the Faith Statement Ban is severed.

The Minnesota Supreme Court's decision in *Leiendecker v. Asian Women United of Minnesota*, 895 N.W.2d 623 (Minn. 2017), illustrates this Provision's self-sufficient nature. In *Leiendecker*, the Court assessed the constitutionality of Minnesota's anti-SLAPP statute, which regulates when lawsuits may be brought against individuals for their participation in public discourse. *Id.* at 628.[4] The statute imposed a substantive standard for anti-SLAPP defenses, immunizing "[l]awful conduct or speech that is genuinely aimed in whole or in part at procuring favorable government action," Minn. Stat. § 554.03 (2016), as well as a procedure for dispositive motions raising this defense:

> **Subd. 2**. **Procedure.** On the filing of any motion [alleging an anti-SLAPP defense]:
>
> (1) discovery must be suspended pending the final disposition of the motion, including any appeal; provided that the court may, on motion and after a hearing and for good cause shown, order that specified and limited discovery be conducted;
>
> (2) the responding party has the burden of proof, of going forward with the evidence, and of persuasion on the motion;

---

[4] Anti-SLAPP laws seek to discourage the use of litigation to chill protected speech. *See Middle-Snake-Tarmac Rivers Watershed Dist.*, 784 N.W.2d 834, 838-39 (Minn. 2010).

(3) the court shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from liability under section 554.03; and

(4) any governmental body to which the moving party's acts were directed or the attorney general's office may intervene in, defend, or otherwise support the moving party.

*Id.* § 554.02, subd. 2 (2016). The Court concluded that clauses (2) and (3) of this procedural provision violated tort claimants' right to a jury trial by changing the factfinding process for certain claims. *Leiendecker*, 895 N.W.2d at 635. The Court did not find the immunity defense itself unconstitutional, but nevertheless struck down the entire statute rather than simply severing the unconstitutional procedures set forth in Subdivision 2. *Id*. Because the unconstitutional procedures were two steps of a four-step process that implemented the overall statutory scheme, the Court was forced to conclude that the remaining procedural clauses would be incomplete and, by extension, the immunity defense incapable of application. *Id.* Accordingly, the Court held that the unconstitutional provisions were inseparable from the remainder of the statute and declined to sever them. *Id.*

In contrast, the Faith Statement Ban and Nondiscrimination Provision are not interdependent. The Nondiscrimination Provision is neither implemented nor defined by the Faith Statement Ban. Rather, the Nondiscrimination Provision is a substantively- and procedurally-complete statutory provision, similar to the Minnesota Human Rights Act (MHRA). *See, e.g.*, Minn. Stat. § 363A et seq.; *id.* § 363A.13 (prohibiting discrimination in education). The Nondiscrimination Provision is, therefore, complete and capable of implementation on its own, even if the Faith Statement Ban is severed.

9

For all of these reasons, severability is proper if the Court determines the Faith Statement Ban is invalid. Minnesota law prefers and requires severance in such situations, unless an exception applies. Neither of the two possible exceptions applies here, so the Court must sever the Faith Statement Ban and leave the Nondiscrimination Provision intact.

## II.    CONSTITUTIONALITY OF NONDISCRIMINATION PROVISION.

Plaintiffs asserted a facial challenge to the Amendment and its component Nondiscrimination Provision, and this challenge imposes a heavy burden they cannot carry. Alternatively, even if the Court proceeds on an as-applied basis, the Nondiscrimination Provision is nevertheless constitutional.

### A.    The facial nature of Plaintiffs' challenge compels the conclusion that the Nondiscrimination Provision is valid.

Plaintiffs' challenge to the Amendment, including the Nondiscrimination Provision, is a facial one. Although Plaintiffs tried to recast this as an as-applied challenge when briefing summary judgment, (ECF 118, at 36 n.11), this effort contradicts the express wording of the complaint and is, therefore, futile. (ECF 1, at 34 ¶¶ a-c; *see also* ECF 79, at 36.) In any event, the relief Plaintiffs seek extends beyond just Crown and Northwestern, so their challenge must be treated as a facial one. (ECF 1, at 35 ¶ d (requesting preliminary and permanent injunctive relief as to "Plaintiffs Crown and Northwestern, *as well as other similar institutions*" (emphasis added).)

Plaintiffs chose to frame their claims as facial challenges. "[T]hat decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (vacating and remanding

when lower courts ignored facial nature of claims). A facial challenge is the "most difficult challenge to mount successfully," as such challenges can only succeed if a claimant establishes "no set of circumstances exists" under which the challenged law would be valid.[5] *United States v. Rahimi*, 602 U.S. 680, 693 (2024). Plaintiffs have not come close to meeting this high bar, so any challenge to the Nondiscrimination Provision fails.

As relevant to this facial challenge, the summary judgment record establishes beyond dispute that the Nondiscrimination Provision can be constitutionally applied to most—if not all—other eligible institutions within the PSEO program. Consider all the public postsecondary institutions that participate in PSEO, which comprise a majority of the program's eligible institutions. (ECF No. 91-1, at 52-54.) Each public institution and most private institutions already must comply with state and federal antidiscrimination laws such as the MHRA and Title IX. *E.g.*, Minn. Stat. §§ 363A.03, .13; 20 U.S.C. §§ 1681(a)-(c). Laws like these "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) (collecting cases); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628-29 (1984) (upholding MRHA); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 754 (8th Cir. 2019) (describing state interest served by MHRA as "compelling" and of "substantial constitutional pedigree"). The

---

[5] In the context of certain speech-related claims, the standard is slightly-less demanding, but still "rigorous," asking whether the challenged law's unconstitutional applications "substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 723.

Nondiscrimination Provision is sufficiently analogous to such laws for the Court to conclude this provision is also constitutionally enforceable.

Put simply, it is not unconstitutional to prohibit schools from discriminating against students on the basis of protected characteristics, a schools' religious character notwithstanding. *St. Dominic Acad. v. Makin*, __ F. Supp. 3d __, 2024 WL 3718386 (D. Me. Aug. 8, 2024), *on appeal* No. 24-1739 (1st Cir. 2024); *St. Mary Cath. Par. in Littleton v. Roy*, __ F. Supp. 3d __, 2024 WL 3150324 (D. Colo. June 4, 2024), *on appeal* No. 24-1267 (10th Cir. 2024); *see also Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.*, 600 U.S. 181, 213, 218 (2023); *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983); *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 495 (1954). Indeed, under state law, Minnesota is constitutionally obligated to ensure no such discrimination occurs in its public-education system. *See Cruz-Guzman v. State*, 916 N.W.2d 1, 11-12 (Minn. 2018) (interpreting Education Clause of Minnesota's Constitution); *see also, e.g.*, Minn. Stat. § 120A.20, subd. 1(a) ("All schools supported in whole or in part by state funds," which includes PSEO, "are public schools."). It makes no sense to conclude that it is unconstitutional for Minnesota to prohibit discrimination in education, when Minnesota is required by law to *prevent* such discrimination.

When legislation and the Constitution brush up against each other, courts must "seek harmony," not conflict. *Rahimi*, 602 U.S. at 701. Properly construed, the Nondiscrimination Provision is not only enforceable, but also constitutionally required given Minnesota's affirmative obligation to provide discrimination-free education for its youth. It is, therefore, impossible for Plaintiffs to establish that the Nondiscrimination

Provision is unconstitutional in a sufficient number of circumstances for any invalid applications to "substantially outweigh" the constitutional ones, *Moody*, 603 U.S. at 723; certainly, this provision is not unconstitutional in every possible application, *Rahimi*, 602 U.S. at 693. Plaintiffs' facial challenge thus fails.

### B. Even on an as-applied basis, the Nondiscrimination Provisions clears every level of constitutional scrutiny.

Alternatively, the Nondiscrimination Provision passes constitutional muster even as applied to Plaintiffs alone. The Schools are state actors and thus lack standing to claim constitutional injury from any application of the Nondiscrimination Provision. (ECF Nos. 79, 113, 122.)[6] And even if the Court rejects state action for purposes of the standing defense to Plaintiffs' affirmative claims, the Nondiscrimination Provision is nevertheless constitutional because it simply asks Plaintiffs to abide by the same nondiscrimination requirements that apply to every other postsecondary institution participating in PSEO. Neutral and generally-applicable laws of this sort are completely constitutional, much like other antidiscrimination laws found throughout Minnesota and the nation. And even if the Court concludes the Nondiscrimination Provision must be evaluated under strict scrutiny, this provision is narrowly tailored to serve multiple compelling state interests.

On its own, the Nondiscrimination Provision is a "neutral law of general applicability." *Emp. Div. v. Smith*, 494 U.S. 872, 878-79 (1990); *see also, e.g., Boone v.*

---

[6] As established in Defendants' principal briefing on summary judgment, state action is relevant not only to MDE's counterclaims but also to Plaintiffs' affirmative claims. (ECF Nos. 79, 113, 122.) Accordingly, this supplemental brief incorporates by reference the parties' prior state action arguments so the Court can address severability, its disposition of MDE's counterclaims notwithstanding.

*Boozman*, 217 F. Supp. 2d 938, 953 (E.D. Ark. 2002) (explaining remainder of severed statute must be evaluated on its own merit, without any reference to unconstitutional aspects of severed provision). Under this provision, all institutions, religious and secular alike, are prohibited from discriminating in PSEO admissions. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) (laws generally applicable when they do not selectively burden religion). Nothing in the record establishes that this provision affords any exceptions or treats any comparable secular activity more favorably than the Schools' conduct. Accordingly, the Nondiscrimination Provision needs to clear only rational-basis review to withstand Plaintiffs' constitutional challenge.

"Rational-basis review sets a low bar. The challenged law is presumptively valid, and a plaintiff can only overcome that presumption by showing that no 'reasonably conceivable state of facts' could support the law.'" *Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 883 (D. Minn. 2021) (quoting *FCC v. Beach Comm's, Inc.*, 508 U.S. 307, 313-15 (1993)). Under rational-basis review, the state decisionmakers' 'subjective motives' for imposing the challenged restrictions are 'irrelevant for constitutional purposes.'" *Id.* (quoting *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 241 (8th Cir. 1994)). As explained in Defendants' summary judgment briefing, multiple interests of the highest order support this legislation, so the Nondiscrimination Provision easily clears rational-basis review. (ECF 79, at 40-43.)

Alternatively, if the Court concludes the Nondiscrimination Provision must be subjected to strict scrutiny, the law is nevertheless constitutional because it is narrowly tailored to serve a compelling state interest. For Minnesota, multiple compelling interests

are at stake in this legislation. *Id*. The Nondiscrimination Provision is narrowly tailored to serve these interests because it fairly addresses the issue of discrimination against students of protected classes during PSEO admissions, thereby ensuring Minnesota's youth can compete for spots in PSEO on a fair and equitable basis.

The Nondiscrimination Provision is finely-tailored to the conduct the legislature sought to address. First, the Provision makes no exceptions, arbitrary or otherwise. *See Williams-Yulee v. Fl. Bar*, 575 U.S. 433, 449 (2015) (describing truly underinclusive laws as those that are "riddled with exceptions"); *St. Mary's*, 2024 WL 3160324, at *38 (striking down aspect of Colorado legislation otherwise similar to the Nondiscrimination Provision, as a religious-affiliation exception for regulated preschools undermined Colorado's stated interest in preventing discrimination). And second, the provision's focus on the PSEO admissions process is a feature, not a bug. Admissions is the aspect of PSEO that has the single-most important effect on whether a student can access this public-education program. Admissions decisions should turn on merit, not invidious discrimination. Any attempt to regulate post-admissions aspects of PSEO would have stretched this provision beyond its animating interest of equitable access and strayed from the legislative purpose at issue (equity in admissions). *See Williams-Yulee*, 575 U.S. at 451 (explaining underinclusivity creates a constitutional concern when legislation regulates one aspect of a problem but not another only when the other, non-regulated aspect affects the state's interest in a comparable way). The same is true of Plaintiff's straw-man argument that the legislature also should have regulated non-PSEO programs to avoid underinclusivity issues, (ECF 123, at 12). The legislature set out to address discrimination in PSEO

admissions, not all discrimination throughout all aspects of Minnesota's education system. The Nondiscrimination Provision thus addresses the most germane aspect of the PSEO program—admissions—nothing more, and nothing less, and thereby threads strict scrutiny's constitutional needle with precision and care.

Plaintiffs have advanced no alternative legislation that could cure the problem Minnesota's Legislature sought to address, and certainly no less-restrictive alternative. There are none. The Nondiscrimination Provision is constitutional.

\*\*\*

To be sure, Plaintiffs assert that the Nondiscrimination Provision burdens their religious beliefs and expressive conduct. But what matters at the end of the day is that imposing any such burden was never the point of this law. The Legislature passed the Nondiscrimination Provision to protect Minnesota's students and ensure a discrimination-free admissions process for PSEO, in as narrowly-tailored a manner as possible. In some cases, even the narrowest of tailoring might not be perfect. *See Roberts*, 468 U.S. at 628 ("Even if enforcement of the [MHRA] causes some incidental abridgment of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes.") But strict scrutiny is about constitutional adequacy, not perfection.

Even if the Nondiscrimination Provision approaches Plaintiffs' protected beliefs and rights, this site of overlap is where the Constitution's rubber meets reality's road. *Cf., e.g.*, *Romer*, 517 U.S. at 631 ("The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to

various groups or persons."). The specter of legislative classification does not an equal-protection violation make, and similarly, merely mentioning religion in a statute does not activate an impenetrable free-exercise shield. Concluding otherwise reduces the Constitution to a winner-take-all paradigm that will only honor one's rights at the expense of another's. This cramped construction is contrary to the Constitution's purpose and promise. *Cf. M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819) ("[W]e must never forget that it is a constitution we are expounding . . . intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs."). And under this construction of the Constitution, complaining parties that can show any burden, no matter how incidental, would be licensed to wholesale invalidate the antidiscrimination laws that are essential to civil society.

Make no mistake: invalidating antidiscrimination laws like the Nondiscrimination Provision and prohibiting such legislation altogether are simply two sides of the same coin. The Supreme Court rejected such prohibitions in *Romer* when a Colorado referendum purported to outlaw civil-rights legislation protecting LGBTQ+ people, the "personal or religious objections" of the referendum's proponents notwithstanding. 517 U.S. at 624, 635. For all of these reasons, Plaintiff's facial challenge to the Nondiscrimination Provision fails, and the provision is, in any event, constitutional even on an as-applied basis.

## III.    Certification to the Minnesota Supreme Court is warranted.

The issues briefed here should be certified to the Minnesota Supreme Court. Proper interpretation of the Amendment and its component provisions unavoidably implicate Minnesota's weighty interests in preventing discrimination and fulfilling its own

constitutional obligations, specifically, Minnesota's obligations under the Education Clause of the Minnesota Constitution. *See Cruz-Guzman*, 916 N.W.2d at 11-12; Minn. Const. art. XIII § 1. These legal issues are of unique and utmost importance to Minnesota, directly implicate state law, and have never been addressed by *any* Minnesota court. Certification is, therefore, appropriate.

Federal courts may certify questions of law to the Minnesota Supreme Court. Certification is appropriate when two factors are met: (1) the answer "may be determinative of an issue in pending litigation in the certifying court," and (2) there is no "controlling appellate decision, constitutional provision, or statute" under Minnesota that the certifying court can employ to resolve the issue itself. Minn. Stat. § 480.065, subd. 3; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997) ("Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." (Citation omitted)). The issues here satisfy both factors, and none of the factual quirks that have made courts hesitant to certify in other cases are present. For these reasons, certification to the Minnesota Supreme Court is appropriate.

First, the constitutionality of the Amendment and its component provisions, as well as any potential severability analyses, are central to the parties' claims, counterclaims, and defenses. The corresponding legal questions are dispositive. Second, there is no Minnesota caselaw or other authority that sufficiently addresses the Amendment or the aspects of the Minnesota's Education Clause implicated here. *See McKesson v. Doe*, 592 U.S. 1, 4-6

18

(2020). The Minnesota Supreme Court has never construed the Amendment, leaving this Court with no express instructions for addressing severability and the standalone constitutionality of the Nondiscrimination Provision. Both factors thus favor certification.

In particular, the second factor looms large. No Minnesota caselaw provides sufficient guidance for this Court to account for how Minnesota's Education Clause might impact the issues at hand. In many cases involving state constitutional provisions with federal counterparts, federal courts can simply refer to a state supreme court's interpretative guidance, making certification unnecessary. *See, e.g.*, *Saunders v. Thies*, 38 F.4th 701, 718 (8th Cir. 2022) (affirming noncertification when Iowa Supreme Court's guidance explained relevant state constitutional provision should be interpreted in "identical fashion" to relevant federal provisions). But state constitutional education clauses are unique creatures of state law. *See* Clint Bolick, *Principles of State Constitutional Interpretation*, 53 Ariz. State L. J. 771, 773, n.8 (2021); *cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973) (emphasizing primacy of states in administering public education). There is thus no Minnesota caselaw comparing Minnesota's Education Clause to a federal analogue that could be relied on for guidance. *Contra, e.g.*, *State v. Fox*, 868 N.W.2d 206, 218-19 (Minn. 2015) (explaining whether to analyze state constitutional protection against self-incrimination in lockstep with federal counterpart). Nor has the Minnesota Supreme Court ever construed Minnesota's Education Clause in the context of state or federal antidiscrimination legislation like the Amendment. *See Cruz-Guzman*, 916 N.W.2d at 8 (noting even the Minnesota Supreme Court has "not had many occasions to

interpret or apply the Education Clause"). This lack of guidance injects genuine uncertainty into issues that are difficult and close in their own right, making certification appropriate.

As a final matter, there are no factual impediments to certification. Here, the parties seeking certification are not the parties who chose a federal forum at the outset of litigation. *See Salier v. Walmart, Inc.*, 76 F.4th 796, 804 (8th Cir. 2023) (declining certification when party seeking certification initiated underlying lawsuit, "intentionally forgoing a state court action where an adverse decision may be appealed ultimately to the Supreme Court of Minnesota"). Nor did Defendants delay raising certification, having identified the import of Minnesota's Education Clause since the outset of litigation. *See Floyd Cnty. Mut. Ins. Ass'n ex rel. McGregor v. CNH Indus. Am. LLC*, 18 F.4th 1024, 1027 n.2 (8th Cir. 2021) (refusing certification when request came after entry of adverse judgment). Here, Defendants identified this concern in their Answer, (ECF 27, at 54 ¶ 8; 57 ¶ 13), when briefing Plaintiffs' motion to dismiss, (ECF 39, at 32), and when briefing summary judgment, (ECF 79, at 26 n.36; ECF 113, at 22 n.18).

In sum, the questions at issue here are closer than close, and no extant caselaw addresses how the Minnesota Supreme Court might address the state-law issues implicated in this Court's resolution of the parties' claims and counterclaims, including the severability question briefed here. Certification is thus warranted. If the Court agrees, Defendants can provide proposed question(s) for the Court's consideration.

## CONCLUSION

Under Minnesota law, the Faith Statement Ban is severable, and the Nondiscrimination Provision is constitutional. If the Court reaches these issues, Defendants

respectfully request the Court sever only the Faith Statement Ban and retain the Nondiscrimination Provision, which is valid and constitutional.

Dated:  January 17, 2025

KEITH ELLISON
Attorney General
State of Minnesota

s/ Madeleine DeMeules
JEFF TIMMERMAN (#0352561)
MARTHA J. CASSERLY (#0148271)
MADELEINE DEMEULES (#0402648)
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
(651) 757-1214 (Casserly)
(651) 300-6807 (DeMeules)

jeffrey.timmerman@ag.state.mn.us
marty.casserly@ag.state.mn.us
madeleine.demeules@ag.state.mn.us

**ATTORNEYS FOR DEFENDANTS**