# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

MELINDA and MARK LOE, *et al.*,

 *Plaintiffs*,

 v.

WILLIE JETT, *et al.*,

 *Defendants*.

Civil No. 0:23-cv-01527-NEB-JFD

**PLAINTIFFS'
SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 2

I.  The Faith Statement and Nondiscrimination Provisions
    Are Not Severable ........................................................................... 2

    A.  Both Provisions Were Conceived Together as a Unified
        Effort to Regulate Faith Statements. .......................................... 2

        1.  The Provisions' Genesis ...................................................... 4

        2.  Consideration by the Legislature ........................................ 6

        3.  Real-World Effect .............................................................. 9

    B.  Certification to the Minnesota Supreme Court
        Is Inappropriate. ...................................................................... 11

II.  Standing Alone, the Nondiscrimination Provision Still
     Violates the Free Exercise Clause. .................................................. 12

    A.  Plaintiffs Brought Both a Facial and As-Applied
        Challenge. ................................................................................ 12

    B.  The Nondiscrimination Provision Burdens Plaintiffs'
        Religious Exercise. ................................................................... 14

    C.  The Nondiscrimination Provision Violates *Carson*. ................. 14

    D.  The Nondiscrimination Provision Is Not Neutral
        or Generally Applicable. ........................................................... 17

        1.  The Nondiscrimination Provision Is Not Neutral
            Because It Targets Religious Exercise. ............................... 17

        2.  The Nondiscrimination Provision Is a Religious
            Gerrymander. .................................................................... 20

        3.  The Nondiscrimination Provision Is Not Neutral
            Because It Was Enacted with Religious Hostility. .............. 21

4.  The Nondiscrimination Provision Is Not Generally Applicable. ...................................................... 23

E.  The Nondiscrimination Provision Fails Strict Scrutiny. ........... 25

1.  The Nondiscrimination Provision Does Not Serve a Compelling State Interest. ...................................... 25

2.  The Nondiscrimination Provision Is Not Narrowly Tailored. ............................................................... 27

III. The Nondiscrimination Provision Further Violates the First Amendment as Applied to Plaintiffs. .............................. 29

A.  The Nondiscrimination Provision Violates the Church Autonomy Doctrine. .................................................... 29

B.  The Nondiscrimination Provision Violates the Free Speech Clause. ............................................................ 30

C.  The Nondiscrimination Provision Violates the Unconstitutional Conditions Doctrine. ............................ 32

CONCLUSION ................................................................... 33

CERTIFICATE OF COMPLIANCE ........................................ 34

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023)......................................................................16, 26

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott,*
   717 F.3d 851 (11th Cir. 2013)...............................................................13

*Back v. Minnesota,*
   902 N.W.2d 23 (Minn. 2017)..............................................................3, 8

*Bob Jones Univ. v. United States,*
   461 U.S. 574 (1983)...............................................................................26

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000).......................................................................26, 31

*Carson v. Makin,*
   596 U.S. 767 (2022)....................................................................*passim*

*Cellco P'ship v. Hatch,*
   431 F.3d 1077 (8th Cir. 2005)....................................................*passim*

*Cent. Rabbanical Cong. of U.S. & Can. v. N.Y.C. Dep't of
   Health & Mental Hygiene,*
   763 F.3d 183 (2d Cir. 2014) .................................................................21

*Christian Legal Soc'y v. Walker,*
   453 F.3d 853 (7th Cir. 2006)................................................................31

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)....................................................................*passim*

*Cuffley v. Mickes,*
   208 F.3d 702 (8th Cir. 2000)..................................................30, 31, 32

*Culberson v. Chapman,*
   496 N.W.2d 821 (Minn. Ct. App. 1993) .............................................6-7

iv

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ................................................................ 11-12, 27

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
    *Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) ............................................................ 28

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................................................... *passim*

*Gonzales v. O Centro,*
    546 U.S. 418 (2006) ........................................................................ 26

*State ex rel. Grozbach v. Common Sch. Dist. No. 65,*
    54 N.W.2d 130 (Minn. 1952) ..................................................... 2-3, 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ................................................................... 26, 31

*Iowa Right to Life Comm., Inc. v. Tooker,*
    717 F.3d 576 (8th Cir. 2013) ............................................................ 12

*Kedroff v. St. Nicholas Cathedral,*
    344 U.S. 94 (1952) .......................................................................... 29

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ........................................................ 8, 21, 23, 27

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) .......................................................... 12

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    584 U.S. 617 (2018) ................................................................. *passim*

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ............................................................ 22

*Meyer v. Berlandi,*
    40 N.W. 513 (Minn. 1888) ...................................................... 3, 9, 10-11

v

*Minn. Voters All. v. Ellison*,
  No. 23-cv-2774, 2024 WL 4222829
  (D. Minn. Sept. 17, 2024) ................................................................. 13

*Minnesota v. Cannady*,
  727 N.W.2d 403 (Minn. 2007) ......................................................... 6, 8

*Native Am. Council of Tribes v. Weber*,
  750 F.3d 742 (8th Cir. 2014) ............................................................. 28

*New Hope Family Servs., Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020) ....................................................... 18, 22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) .......................................................................... 29

*Pro-Life Action Ministries v. City of Minneapolis*,
  700 F. Supp. 3d 687 (D. Minn. 2023) ............................................... 18

*Ramos v. Town of Vernon*,
  353 F.3d 171 (2d Cir. 2003) .............................................................. 13

*S. Dakota Educ. Ass'n v. Barnett*,
  582 N.W.2d 386 (S.D. 1998) .............................................................. 3

*S. Glazer's Wine & Spirits, LLC v. Harrington*,
  594 F. Supp. 3d 1108 (D. Minn. 2022) ...................................... 2-3, 10

*Serbian E. Orthodox Diocese v. Milivojevich*,
  426 U.S. 696 (1976) .......................................................................... 29

*St. Dominic Acad. v. Makin*,
  No. 2:23-cv-246, 2024 WL 3718386 (D. Me. Aug. 8, 2024) ................ 16

*St. Mary Catholic Parish in Littleton v. Roy*,
  736 F. Supp. 3d 956 (D. Colo. 2024) ................................................. 16

*Styczinski v. Arnold*,
  727 F. Supp. 3d 821 (D. Minn. 2024) ...................................... 3, 6, 11

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ...................................................................... 24-25

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019)........................................................ 30, 31

*United States v. Anderson*,
    759 F.3d 891 (8th Cir. 2014)............................................................. 25

*United States v. Scott*,
    450 F.3d 863 (9th Cir. 2006)............................................................. 32

*Willson v. City of Bel-Nor*,
    924 F.3d 995 (8th Cir. 2019)............................................................. 28

**Statutes**

28 U.S.C. § 1331 ........................................................................................ 11

Minn. Stat. § 120A.20, subd. 1................................................................. 15

Minn. Stat. § 124D.09, subd. 3................................................................. 14

Minn. Stat. § 363A.13................................................................... 21, 25

Minn. Stat. § 363A.23............................................................................... 21

Minn. Stat. § 363A.26 (2024) ................................................................. 24

Minn. Stat. § 363A.26............................................................................... 27

Minn. Stat. § 363A.26, subd. 1................................................................. 21

Minn. Stat. § 645.16 .................................................................................. 6

Minn. Stat. § 645.20 .............................................................................. 2, 3

**Other Authorities**

Minnesota Senate Media Services, *Senate Floor Session -
04/24/23*, YouTube (Apr. 24, 2023).......................................... 7, 8, 10

MNHouseInfo, *House Floor Session 4/20/23 - Part 2*,
    YouTube (Apr. 21 2023)...................................................... 6, 7, 8, 10, 19

## INTRODUCTION

The two provisions of the Amendment at issue in this litigation, the "faith statement provision" and the "nondiscrimination provision," are two means of achieving the same goal: banning faith statements in PSEO admissions. They were conceived together by MDE and enacted as a package by the Minnesota Legislature, which declined to sever them when it had the opportunity. They both accomplish only one outcome—the exclusion of schools with faith statements from the PSEO program, resulting in a reduction of options for all PSEO students, including the individual Plaintiffs here. For these reasons, the nondiscrimination provision is not severable from the faith statement provision.

But a severability analysis is unnecessary in any case, because even standing alone, the nondiscrimination provision remains unconstitutional. It was enacted with the same targeted, invidious purpose and with the sole effect of excluding Plaintiffs from an otherwise available public benefit because of their religious exercise. It thus contains the same flaws that render the faith statement provision unconstitutional under the First Amendment's Free Exercise and Free Speech Clauses and the church autonomy and unconstitutional conditions doctrines.

Considered either separately or as a whole, the Amendments' two provisions violate Plaintiffs' constitutional rights. This Court should thus enter summary judgment for Plaintiffs without further delay.

1

## ARGUMENT

### I. The Faith Statement and Nondiscrimination Provisions Are Not Severable.

Although Minnesota presumptively favors severability, Minn. Stat. § 645.20, the Amendment overcomes the presumption because the faith statement and nondiscrimination provisions were "conceived together as a unified effort" to "regulate" the use of religious admissions requirements in the PSEO program. *Cellco P'ship v. Hatch*, 431 F.3d 1077, 1084 (8th Cir. 2005). By severing the faith statement provision— the Amendment's "motivating force," *id.*—this Court would cut the nondiscrimination provision off from the very ███████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████ The extensive record evidence makes this crystal clear. Furthermore, with the law of severability firmly settled, there is no need to certify any questions to the Minnesota Supreme Court.

### A. Both Provisions Were Conceived Together as a Unified Effort to Regulate Faith Statements.

Minnesota's pro-severability presumption is overcome where "the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed the legislature would have passed the one without the other." *S. Glazer's Wine & Spirits, LLC v. Harrington*, 594 F. Supp. 3d 1108, 1124 (D. Minn. 2022) (quoting *State*

*ex rel. Grozbach v. Common Sch. Dist. No. 65*, 54 N.W.2d 130, 133 (Minn. 1952)); Minn. Stat. § 645.20. This standard is satisfied "when the valid sections were 'conceived together as a unified effort to regulate certain practices,'" *S. Glazer's Wine & Spirits*, 594 F. Supp. 3d at 1124 (quoting *Cellco*, 431 F.3d at 1084), or where the void provision was the "motivating force" or "chief inducement" for the valid provision's inclusion. *Cellco*, 431 F.3d at 1084; *see Meyer v. Berlandi*, 40 N.W. 513, 518 (Minn. 1888), *overruled on other grounds by State v. Anderson*, 199 N.W. 6 (Minn. 1924).

Both are true here. From their conception by MDE, to their consideration on the Minnesota House and Senate floors, to their eventual real-world effect, the faith statement and nondiscrimination provisions have been tandem provisions concerned solely with barring the use of faith statements in PSEO admissions.[1]

---

[1] MDE contends that the Schools forfeited their severability argument. ECF No. 136 at 3 (MDE's Suppl. Br.). But courts routinely consider severability to minimize separation of powers concerns inherent in altering statutes. *See Back v. Minnesota*, 902 N.W.2d 23, 33 (Minn. 2017) (J. Lillehaug, concurring in part) (discussing risk of "damag[ing] the separation of powers" posed by severance); *Styczinski v. Arnold*, 727 F. Supp. 3d 821, 824-28 (D. Minn. 2024) (concluding that language within an unconstitutional statute was severable, thereby curing the constitutional defect). This is true even when severability has not been adequately briefed by the parties. *S. Dakota Educ. Ass'n v. Barnett*, 582 N.W.2d 386, 394 (S.D. 1998) (conducting independent "review of the record" despite the party opposing severance "fail[ing] to carry [its] burden").

### 1. The Provisions' Genesis

The Amendment's genesis was at MDE, where the faith statement and nondiscrimination provisions were "conceived together" as a "unified effort" to prevent schools from implementing religious admissions criteria in PSEO by requiring applicants to sign a faith statement. *Cellco*, 431 F.3d at 1084. ███████████████████████████████████

███ ████████████████████████████████████████████

█████████████████████████ Further, the *only* discriminatory practice MDE identified as necessitating this proposal—in the entirety of Minnesota—was the use of faith statements by religious schools. *Id.* at 2 (Listing the "requirement of a faith statement" as the only "example" of "discriminatory" "admissions procedures"). This had been true for years, with each of MDE's prior proposed Amendments relying on the same solitary justification. *See* ECF No. 97-9 at 2 (MDE's 2019 Proposal) (noting that "the problem" is that "Christian-based institutions" require "a faith statement prior to enrollment approval"); ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ ; *see also infra* Part II.D.1.

4

MDE officials have even admitted, several times over, that the Amendment was designed with the sole goal to "regulate" religious schools' use of faith statements. *Cellco*, 431 F.3d at 1084. Amongst other examples, ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ MDE Commissioner Willie Jett stated that "the hope" for the Amendment "was that [the Schools] would remove [the faith statements]." ECF No. 91-15 at 73 (Dep. of Comm'r Willie Jett). ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████ *See also* ECF No. 90 at 11-12 (Pls.' Mem. in Supp. of MPSJ) (detailing similar comments made by MDE).

Singling out this religious practice alone to justify the Amendment was inevitable: the MHRA already outlawed discrimination based on each of the protected characteristics identified in the nondiscrimination provision. *See* ECF No. 90 at 27. The faith statement requirement wasn't just "a particular form" of discrimination MDE wanted to emphasize amidst concerns of "discrimination writ large." ECF No. 136 at 5. Indeed, there is no evidence there was any other form of discrimination MDE was concerned about or evidence of any other discrimination that wasn't already covered. The nondiscrimination provision was nothing more than reinforcement of the Amendment's sole purpose: targeting the

5

"practice[]" of using faith statements in admissions. *Cellco*, 431 F.3d at 1084. The provisions were "conceived together" solely to prohibit that practice. *Id.*

## 2. Consideration by the Legislature

This theme continued at the Legislature. Because the "primary goal" of the severance analysis is to "conform to the legislature's intent," *Minnesota v. Cannady*, 727 N.W.2d 403, 408 (Minn. 2007), this Court can and should make use of legislative history and other non-textual tools in making that determination. *See* Minn. Stat. § 645.16 ("The intention of the legislature may be ascertained by considering, among other matters … the contemporaneous legislative history.").[2] The Amendment's author admitted that the only schools affected by the Amendment would be Crown and Northwestern and clarified that both provisions were intended to accomplish the goal of preventing any student from being "compelled to sign a [faith] statement." MNHouseInfo, *House Floor Session 4/20/23 – Part 2*, at 3:27:45-3:28:30, YouTube (Apr. 21 2023), https://bit.ly/4dXW6kt; *see also Culberson v. Chapman*, 496 N.W.2d 821, 824 n.2 (Minn. Ct. App. 1993) ("Statements

---

[2] MDE's "plain text" argument, claiming that the Court's analysis should "start and end" with the disjunctive use of "or," fails to account for this. ECF No. 136 at 4; *see also Cellco*, 431 F.3d at 1084 (relying heavily on "[t]he Legislative history" to determine that the Legislature would not prefer severance); *Styczinski*, 727 F. Supp. 3d at 827 (relying on legislative history as evidence of legislative intent for severance).

made … by the sponsor of a bill on the purpose or effect of the legislation are generally entitled to some weight" in determining legislative intent.).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

The broader body agreed, hotly debating the Amendment in both the House and Senate because of concerns that it was targeting the religious practice of requiring faith statements in admissions. Representative Nash, for example, stated that "I never thought that I would see the day that my state would open up a season on a subset of the Christian faith. … As Representative Pryor said, [the Bill] is targeted at a subset of the Christian Faith." *House Floor Session* at 3:50:22-3:50:46, https://bit.ly/42Tp1En. And Senator Lucero noted that the Amendment was an "alarming provision" because it discriminated on the basis of religion. Minnesota Senate Media Services, *Senate Floor Session – 04/24/23* at 1:48:17-1:49:01, YouTube (Apr. 24, 2023) https://bit.ly/4jG0QPI. Robust debate followed in both houses. *See, generally*, *House Floor Session* at 3:18:23-4:04:51, https://bit.ly/3Eb2yIj; *Senate Floor Session* at 1:15:39-1:55:47, https://bit.ly/4gkSVnX.

In response to the debate, members of both the House and Senate proposed two different amendments to delete *both* provisions from the

larger bill.[3] *House Floor Session* at 3:08:23-3:09:10, https://bit.ly/3Eg1R0u (introducing proposal); 3:53:00-4:01:04, https://bit.ly/40RYINh (narrow 62-58 vote against passage); *Senate Floor Session* at 1:15:39-1:15:58, https://bit.ly/4jOodqi (introducing proposal); 1:55:33-1:55:48, https://bit.ly/4h7NKsF (split vote prevents adoption). After these proposals failed narrowly, a third amendment deleting both provisions was adopted by majority vote in the Senate before the original language of both provisions was simultaneously restored by the conference committee. *Senate Floor Session* at 5:09:01-5:14:54, https://bit.ly/3PUvozt.

These proposals show that the provisions were treated as a unit by the Legislature, destined to be kept or struck together. When legislators were concerned with the discriminatory nature of targeting Crown and Northwestern's religious practices—the very concern that should render the faith statement provision void—the Legislature's proposed solution (three times over) was to delete *both* provisions. This direct evidence alone should be enough for this Court to conclude that the "legislature's intent" prohibits severance. *Cannady*, 727 N.W.2d at 408. Courts "do the least damage" when they "refrain from speculating as to what the Legislature could have done and instead rely on what the Legislature actually did." *Back*, 902 N.W.2d at 33.

---

[3] *See* ECF No. 97-11 (describing the larger Bill, HF2497; Plaintiffs do not assert that the Amendment is not severable from the larger Bill).

This tracks with how the Legislature treated MDE's proposals in prior years. In 2019, MDE proposed the *exact* language the Court would face post-severance—and the Legislature did not pass it. ECF No. 97-9. █████

████████████████████████████████████████████

██████████████████ ██ ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ ██ █████

In other words, neither provision was intended to operate separately. The Legislature understood they must be passed or discarded together or they might not accomplish their goal. The record leaves no room for doubt: because the provisions encompass a unified effort to prohibit the faith statement requirement, the Legislature treated them as a unit, to be passed or discarded together.

### 3. Real-World Effect

If that weren't enough, the Amendment's real-world effect shows that prohibiting faith statements was the "motivating force" and "chief inducement" for passing the Amendment. *Cellco*, 431 F.3d at 1084; *Meyer*, 40 N.W. at 518. As discussed, the MHRA already prohibited all forms of discrimination barred by the Amendment, other than religious

9

discrimination by religious schools. *See* ECF No. 90 at 27. MDE and the Legislature knew this, recognizing that the only known conduct prohibited by the Amendment was the use of faith statements by Crown and Northwestern. *See House Floor Session* at 3:22:41-3:24:15, https://bit.ly/4dXW6kt; *Senate Floor Session* at 1:19:17-1:20:50, 1:26:08-1:30:51, https://bit.ly/40UrH2W; ECF No. 91-03 at 157:7-158:10 (Dep. of Sally Reynolds No. 1); ██████████████████████████████

██████████████████████████

That the two provisions' only real-world effect is to regulate a *single* practice makes them "connected in subject-matter" and "operating together for the same purpose." *S. Glazer's Wine & Spirits,* 594 F. Supp. 3d at 1124 (quoting *State ex rel. Grozbach*, 54 N.W.2d at 133). This Court need not break new ground here: it should follow the Eighth Circuit's lead and hold that "the reason for the genesis of this bill" is that people were "contacting [MDE] and telling [them] that" religious schools were requiring faith statements in PSEO admissions. *Cellco*, 431 F.3d at 1084; *see also* ECF No. 81-62 at 2. Because the faith statement requirement was "central to the development of [the Amendment], and [it is] difficult to presume that the legislature would have enacted the [nondiscrimination provision] standing alone … if it had been precluded at the outset from regulating in the area of principal concern," the Amendment is "not severable." *Cellco*, 431 F.3d at 1084; *see also Meyer*, 40 N.W. at 518 ("It is hardly possible to conceive that, had the Legislature

10

supposed that [the faith statement provision was] invalid, they would have enacted the remainder of the [Amendment]").

**B. Certification to the Minnesota Supreme Court Is Inappropriate.**

MDE avoids specifying exactly what questions it believes require certification to the Minnesota Supreme Court. Instead, it offers to "provide proposed question(s) for the Court's consideration" if the "Court agrees" that certification is appropriate. ECF No. 136 at 20. But severance of a Minnesota law is a common analysis routinely engaged in by federal courts without need for certification. *See, e.g.*, *Styczinski*, 727 F. Supp. 3d at 824-28 (concluding that language within an unconstitutional statute was severable, thereby curing the constitutional defect). And the constitutionality of a state law, whether before or after severance, is precisely the type of question that creates federal jurisdiction. 28 U.S.C. § 1331.

There is nothing unique about this case to justify deviating from the norm. There are no novel questions of state law, because Minnesota's obligations under the *Minnesota* Education Clause, ECF No. 136 at 17-19, do not factor into whether the Amendment accords with the *United States* Constitution. In *Espinoza v. Montana Department of Revenue*, for example, the Supreme Court concluded that a provision of the Montana Constitution that conflicted with the Free Exercise Clause could not be given effect because the "'*supreme* law of the land' condemns

11

discrimination against religious schools and the families whose children attend them." 591 U.S. 464, 488 (2020) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803)). The same is true here: certification would be inappropriate.

## II. Standing Alone, the Nondiscrimination Provision Still Violates the Free Exercise Clause.

Even if the faith statement provision were severable, the nondiscrimination provision independently violates the First Amendment.

### A. Plaintiffs Brought Both a Facial and As-Applied Challenge.

Plaintiffs challenged the Amendment both facially and as applied to them. In addition to requesting a declaration that the Amendment facially violates the First and Fourteenth Amendments, Plaintiffs' complaint independently requests "permanent injunctive relief prohibiting Defendants from enforcing [the Amendment], or otherwise denying PSEO program eligibility to Plaintiffs Crown and Northwestern, as well as other similar institutions." ECF No. 1 at 34-35 (Complaint). The Eighth Circuit has previously held that a nearly identical request for relief constituted an as-applied challenge. *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 587-88 (8th Cir. 2013) ("Here, the 'claim and the relief that would follow'—invalidating discrete disclosure requirements as applied to [Plaintiff] and other [similar] groups—does not require this court to consider the facial validity of Iowa's disclosure laws.").

If there were any doubt from the language of the complaint, Plaintiffs' summary judgment briefing—which emphasizes the ways in which the Amendment violates *their* First Amendment rights in particular—confirms that they have also sought as-applied relief. *See Minn. Voters All. v. Ellison*, --- F. Supp. 3d ---, 2024 WL 4222829, at *3 (D. Minn. Sept. 17, 2024) (construing challenge to be "as-applied" where "the focus of MVA's complaint and brief is the way in which the Election Law violates MVA's First Amendment rights"); *see also Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 864 (11th Cir. 2013) ("[C]ourts construe a plaintiff's challenge, if possible, to be as-applied."). Indeed, it would be manifestly unjust to penalize Plaintiffs post-severance for having highlighted the glaring facial unconstitutionality of the faith statement provision when each of their claims clearly incorporates arguments that the Amendment as a whole is unconstitutional as applied to them. *Cf. Ramos v. Town of Vernon*, 353 F.3d 171, 174 n.1 (2d Cir. 2003) (where a facial challenge in context "would logically include within it an as-applied challenge," courts "cannot ignore the constitutional violation simply because the words 'as applied' were not used"). This Court should therefore consider both Plaintiffs' facial and as-applied challenges to the Amendment, including the nondiscrimination provision.

13

## B. The Nondiscrimination Provision Burdens Plaintiffs' Religious Exercise.

The nondiscrimination provision burdens Plaintiffs' religious exercise in precisely the same way the faith statement provision does—by forcing them to choose between their religious practices and participating in PSEO. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021). By prohibiting eligible institutions from "bas[ing] any part of the admission decision on a student's … religious beliefs or affiliations," Minn. Stat. § 124D.09, subd. 3(a), the nondiscrimination provision bars not only the use of faith statements, but also any other faith-based admissions questions or criteria that the Schools use to ensure that all members of their campus communities share their faith. The nondiscrimination provision thus requires the Schools to abandon their faith-based practices in order to participate in the PSEO program—a quintessential burden under the Free Exercise Clause. *See Carson v. Makin*, 596 U.S. 767, 778 (2022).

## C. The Nondiscrimination Provision Violates *Carson*.

As Plaintiffs argued in summary judgment briefing, ECF Nos. 90 at 16-18 and 123 at 1-4 (Pls.' Reply in Supp. of MPSJ), the nondiscrimination provision violates the Free Exercise Clause by excluding Crown and Northwestern from the PSEO program because they select students based on their "religious beliefs." Minn. Stat. § 124D.09, subd. 3(a). The nondiscrimination provision, no less than the

14

faith statement provision, "excludes religious observers from otherwise available public benefits." *Carson*, 596 U.S. at 778.

Because it is only the schools' religious observance that results in their exclusion from the PSEO program under the nondiscrimination provision, *Carson* controls. ECF No. 123 at 2-3. A religious nondiscrimination requirement will always ban communities of shared faith, thus "exclud[ing] otherwise eligible schools on the basis of their religious exercise." *Carson*, 596 U.S. at 789.

Defendants' attempts to dodge *Carson* are unavailing.[4] *See* ECF No. 123 at 3-4. There is no carveout from *Carson* that allows governments to use nondiscrimination provisions to override Free Exercise protections. Rather, the Supreme Court has repeatedly held that when a nondiscrimination law is applied in a way that violates First Amendment rights, the Constitution must prevail. *Masterpiece Cakeshop, Ltd. v. Colo.*

---

[4] Defendants repeat their erroneous reliance on Minn. Stat. § 120A.20, subd. 1(a) for the proposition that any school receiving PSEO funds is a "public school." *See* ECF No. 123 at 15-17. But this provision applies only to K-12 schools, not to postsecondary PSEO providers. If it were otherwise, all public and private PSEO schools would be required to admit any student who "resides within the district that operates the school" and who meets certain age requirements. Minn. Stat. § 120A.20, subd. 1(a). That is not the case. ECF No. 91-2 at 9 (MDE PSEO Reference Guide) ("Each participating college and university sets its own requirements for admission in to PSEO"); ECF No. 91-3 at 25-28 (Reynolds Tr.) ("postsecondaries determine how students are admitted to their [PSEO] courses").

*C.R. Comm'n*, 584 U.S. 617, 640 (2018); *Fulton*, 593 U.S. at 542; *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023) (collecting cases).

Defendants ignore *Carson* and these recent cases. The cases they point to instead don't help. In *St. Dominic*, the district court failed altogether to analyze the nondiscrimination admissions criteria under *Carson*, without explanation. *St. Dominic Acad. v. Makin*, No. 2:23-cv-246, 2024 WL 3718386, at *19-22 (D. Me. Aug. 8, 2024).

The district court in *St. Mary* held that *Carson* didn't apply because it found that the purpose of the nondiscrimination provision there was not to exclude religious schools. *St. Mary Catholic Parish in Littleton v. Roy*, 736 F. Supp. 3d 956, 989 (D. Colo. 2024). But discovery here has demonstrated that prohibiting the Schools' religious exercise was the *sole* purpose of Minnesota's nondiscrimination provision, especially considering that every other form of discrimination under the protected categories was already prohibited by the MHRA. *See* ECF No. 90 at 27-28; ECF No. 123 at 2-3; *infra* Part I.D.i.

Moreover, *Carson* prohibits not just discriminatory intent, but also programs that "'effectively penalize[] the free exercise' of religion." 596 U.S. at 781. It is "because of" Crown's and Northwestern's religious exercise of maintaining a community of shared faith that they are excluded from the PSEO program under the nondiscrimination provision. *Id*. Indeed, even after severance, the sole *effect* of the nondiscrimination provision would be to exclude schools like Crown and Northwestern from

16

the PSEO program. ECF No. 123 at 2-3. The nondiscrimination provision thus cannot survive *Carson*.

### D. The Nondiscrimination Provision Is Not Neutral or Generally Applicable.

*Carson* aside, any law burdening religious exercise must face strict scrutiny unless it is both neutral toward religion and generally applicable. *Fulton*, 593 U.S. at 533. The nondiscrimination provision is neither and must therefore meet this exacting standard.

#### 1. The Nondiscrimination Provision Is Not Neutral Because It Targets Religious Exercise.

The nondiscrimination provision is not neutral because it was enacted with the purpose of stopping Crown's and Northwestern's religious practices. "[A] law targeting religious beliefs as such is never permissible." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Even if a law is facially neutral, the Free Exercise Clause "extends beyond facial discrimination." *Id.* at 534. Indeed, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it" satisfies strict scrutiny. *Id.* at 533.

Courts must "survey meticulously the circumstances" surrounding an enactment to determine the legislature's purpose—whether "subtle" or "overt." *Id.* at 534 (cleaned up). To do so, courts look to both "the effect of a law in its real operation" as "strong evidence of its object," *id.* at 535, as well as to the "historical background" of the enactment; "the specific

17

series of events leading to the enactment"; and "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Pro-Life Action Ministries v. City of Minneapolis*, 700 F. Supp. 3d 687, 701 (D. Minn. 2023); *accord New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020).

Here, all these considerations point to the same conclusion: the Amendment as a whole—including the nondiscrimination provision—was enacted specifically to stop the Schools' practice of requiring PSEO students to sign faith statements. First, because the Minnesota Human Rights Act already prohibits education discrimination, the only real-world effect of the nondiscrimination provision is to prohibit the Schools' use of faith statements or other religious admissions criteria. *See infra* II.D.ii. Second, the administrative history confirms that the Amendment was the culmination of a years-long effort to stop the use of faith statements. *See* ECF No. 90 at 10-13, 29. Indeed, there were no other forms of discrimination that MDE was targeting, or even aware of, taking place at eligible institutions across the state. *See* ECF No. 91-14 at 112:18-113:8 (Dep. of Adosh Unni); *see also* ECF No. 91-15 at 46:20-47:17. Finally, the legislative history confirms that the legislature was focused exclusively on the use of faith statements in PSEO admissions, and that the legislature was aware of only two schools—Crown and Northwestern—that use such statements. *See* ECF No. 90 at 11-14.

18

The legislative record further confirms that the nondiscrimination provision and the faith statement provision shared the same purpose of prohibiting Crown's and Northwestern's religious practices. Representative Pryor, the Amendment's sponsor, stated from the House floor that both provisions were meant to accomplish the same goal: the "barrier" imposed by the use of faith statements "reject[s] people based on who they are, and that's why there is also language that comes from our human rights statute." *See House Floor Session* at 3:15:43-3:16:13, https://bit.ly/4dXW6kt.

And when legislators raised concerns that the Amendment targeted religious institutions during discussions with MDE staff,



To ensure that the

nondiscrimination provision would have the same effect of prohibiting faith statements, both provisions were kept.

MDE has never provided any evidence to refute that the State's clear purpose in enacting both the faith statement and nondiscrimination provisions was to stop the use of faith statements in PSEO admissions. To the contrary, MDE confirmed in its briefing that "the Amendment reaches religious conduct not because it is overbroad, but because this conduct is the very injury … that the Amendment seeks to remedy." ECF No. 113 at 17 (MDE's Mem. in Opp'n to Pls.' MPSJ). Accordingly, "on this record it cannot be maintained" that Minnesota "had in mind" any practices other than Crown's and Northwestern's faith-based admissions policies when it enacted the nondiscrimination provision. *Lukumi*, 508 U.S. at 535. Because the "object of" the nondiscrimination provision is to "restrict" the Schools' religious practices, it is invalid unless it can pass strict scrutiny. *Id.* at 533; *see also id.* at 547 ("The laws here in question were enacted contrary to these constitutional principles, and they are void.").

### 2. The Nondiscrimination Provision Is a Religious Gerrymander.

The nondiscrimination provision further violates the Free Exercise Clause because it "impose[s] burdens only on conduct motivated by religious belief," *id.* at 543, resulting in a "religious gerrymander[]." *Carson*, 596 U.S. at 784; *see also* ECF No. 90 at 27-28; ECF No. 123 at 2-

3. When the Amendment was enacted, the Minnesota Human Rights Act already prohibited every PSEO provider from discriminating against applicants based on each of the categories protected by the Amendment's nondiscrimination provision. *See* Minn. Stat. § 363A.13. The only schools exempted from the MHRA are religious schools, who are free to require students to adhere to their religious beliefs. *See* Minn. Stat. §§ 363A.23, 363A.26, subd. 1. The Amendment's sole effect was to remove those exemptions when it comes to PSEO students. Because "in 'practical terms' … the burdens of the [Amendment] fall on only a particular religious group," it is not neutral or generally applicable and must pass strict scrutiny to survive. *Cent. Rabbanical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 195-96 (2d Cir. 2014); *accord Lukumi*, 508 U.S. at 536.

### 3. The Nondiscrimination Provision Is Not Neutral Because It Was Enacted with Religious Hostility.

In an inquiry related to, but distinct from, the purpose behind a law's enactment, "[a] plaintiff may also prove a free exercise violation by showing that official expressions of hostility to religion accompany laws or policies burdening religious exercise." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (cleaned up). Courts must "set aside such policies without further inquiry," meaning there is no strict scrutiny defense to such a claim. *Id.* (cleaned up).

Evidence of religious hostility can be found in "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 584 U.S. at 639. This can include statements by government officials unfavorably comparing the plaintiff to other religious organizations that "have decided to compromise," or suggestions that there is "no place for providers that choose not to follow the law." *Poole*, 966 F.3d at 168. Statements by government officials that "deride[]" an organization's "good-faith convictions" also indicate official hostility toward religion. *Meriwether v. Hartop*, 992 F.3d 492, 514 (6th Cir. 2021).

Plaintiffs have catalogued the numerous hostile comments from legislators improperly deriding Crown's and Northwestern's religious beliefs as ████████ and "unacceptable," insisting that the Schools should not be able to maintain their religious practices in PSEO and justifying the Amendment by unfavorably comparing Crown and Northwestern with other schools that have different religious practices. *See* ECF No. 90 at 28-30 (collecting statements). Each of these comments match the kinds of statements found to be impermissibly hostile toward religion in *Masterpiece*, *Poole*, and *Meriwether*.

MDE's chief response has been to argue that this evidence of animus is insufficient because the derogatory comments were made by only a few legislators, who cannot speak for the entire legislature. *See* ECF No. 113 at 50. But that's inconsistent with the Supreme Court's decision in

22

*Masterpiece*. There, not every member of the commission disparaged the plaintiff's beliefs. *See* 584 U.S. at 635-36. But because the "record show[ed] no objection to these comments from other commissioners," and the other commissioners never "express[ed] concern with their content" or "disavowed" them, the Court had no difficulty determining that the commission acted with impermissible animus toward the plaintiff's religious beliefs. *Id.* at 636.

The same is true here. Not every legislator who voted to pass the Amendment derided the Schools beliefs. But several did, including two of the Amendment's authors—Representative Pryor and Senator Kunesh. *See* ECF No. 90 at 29-30 (collecting statements). And not a single legislator speaking in support of the Amendment expressed concern with or disavowed the hostile comments that had been made. *See Masterpiece*, 584 U.S. at 636. Given the extensive record of hostility toward the Schools' religious practices, every piece of the Amendment must be "'set aside' … without further inquiry." *Kennedy*, 597 U.S. at 525 n.1 (cleaned up); *accord Masterpiece*, 584 U.S. at 639.

### 4. The Nondiscrimination Provision Is Not Generally Applicable.

The nondiscrimination provision is also not generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 597 U.S. at 526. As explained in Plaintiffs' primary briefing,

23

the nondiscrimination provision prohibits religious admissions criteria while still allowing eligible institutions to exclude students based on secular criteria, such as their grade level or academic ability. *See* ECF No. 90 at 30-32; ECF No. 118 at 41-42 (Pls.' Mem. in Opp'n to Defs.' MSJ). And as detailed at oral argument, the nondiscrimination provision regulates only the admissions process for PSEO; but neither it nor the Minnesota Human Rights Act impose comparable regulations on admissions at religious high schools, admissions at religious colleges— even where state funding is involved—or any aspect of PSEO students' participation at religious schools after admissions. ECF No. 133 at 11-12 (Mots. Hr'g Tr.). That leaves students open to the same risks of discrimination that the nondiscrimination provision is trying to prevent.

Such underinclusivity undermines Minnesota's asserted interests in reducing discrimination and increasing equitable access to PSEO. And yet, Minnesota has recently *expanded* the ability of religious schools to take actions in comparable contexts that the nondiscrimination provision seeks to prevent in PSEO admissions. *See* Minn. Stat. § 363A.26(2) (2024) (expanding religious exemption under the MHRA). Because the nondiscrimination provision leaves open exemptions for comparable secular (and religious) activity, it is not generally applicable and must meet strict scrutiny. *See, e.g.*, *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[W]hether two activities are comparable for purposes of the Free

24

Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue.").

### E. The Nondiscrimination Provision Fails Strict Scrutiny.

### 1. The Nondiscrimination Provision Does Not Serve a Compelling State Interest.

To the extent strict scrutiny applies, MDE has not provided any compelling interest that justifies the nondiscrimination provision. *See* ECF No. 90 at 18-24; ECF No. 118 at 28-36; *supra* Part II.D.3. MDE has not even identified "an actual problem in need of solving," or presented any evidence that "curtailment" of Plaintiffs' First Amendment freedoms is "actually necessary to the solution." *United States v. Anderson*, 759 F.3d 891, 895 (8th Cir. 2014). The Minnesota Human Rights Act already prohibits PSEO providers from discriminating based on any of the characteristics listed in the Amendment's nondiscrimination provision, with appropriate exemptions for religious institutions. *See* Minn. Stat. § 363A.13. And MDE has provided no evidence that any school— including Crown and Northwestern—has denied admission to a PSEO applicant based on any of these protected characteristics, apart from the Schools' legitimate use of faith statements to limit admission to members of their own faith. *See* ECF No. 90 at 10-13, 29; ECF No. 118 at 31. Eradicating religious practices is not a compelling government interest. *See Lukumi*, 508 U.S. at 546-47.

25

In its principal briefing, MDE relied on extremely broad interests—educating children, preventing discrimination, and complying with the Minnesota Constitution—to justify the Amendment. *See* ECF No. 79 at 37-38 (MDE's Mem. in Supp. of Defs.' MSJ). Plaintiffs have explained why each of these "broadly formulated interests" is insufficient under the First Amendment. *Gonzales v. O Centro*, 546 U.S. 418, 431 (2006); *see, e.g.*, ECF No. 90 at 19-20; ECF No. 118 at 31-32.[5]

In addition to being overbroad, MDE's asserted interests cannot be considered compelling because the nondiscrimination provision is underinclusive in its service of those interests. *See* ECF No. 90 at 20-21. MDE resists this conclusion, arguing that the nondiscrimination provision's myopic "focus on the PSEO admissions process" to the exclusion of everything else is appropriate. ECF No. 136 at 15-16. To the contrary, Minnesota's failure to regulate anything beyond PSEO admissions—leaving its high school students open to the same alleged harm on several other fronts—"undermines [MDE's] contention that its

---

[5] While the Supreme Court held in *Bob Jones University v. United States* that the specific need to end the centuries-old legacy of racial discrimination in America was sufficient to satisfy the First Amendment, 461 U.S. 574, 604 (1983), the Court has recently and repeatedly rejected the argument that a general interest in reducing discrimination on other grounds is adequately compelling to overcome the exercise of First Amendment rights. *See, e.g., 303 Creative*, 600 U.S. at 592; *Fulton*, 593 U.S. at 542; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995).

non-discrimination policies can brook no departures." *Fulton*, 593 U.S. at 542. As noted above, Minnesota has cracked down on PSEO admissions while simultaneously *broadening* the MHRA exemption that now enables schools to take "any action," respecting any protected category, as long as it is "[]related to [their] religious and educational purposes." Minn. Stat. § 363A.26. A religious school could therefore be required to admit a student under the Amendment's nondiscrimination provision only to immediately expel them for failing to comply with the school's religious tenets (or essentially any other reason), as the MHRA now permits. That would undermine each of MDE's asserted interests by denying that student access to PSEO education. *See* ECF No. 123 at 6-7. And yet, Minnesota law allows it. Because the nondiscrimination provision "leaves appreciable damage to [Minnesota's] supposedly vital interest[s] unprohibited," it "does not advance an interest of the highest order," thus failing strict scrutiny. *Espinoza*, 591 U.S. at 486 (cleaned up).

## 2. The Nondiscrimination Provision Is Not Narrowly Tailored.

Even if MDE could identify a compelling interest justifying the nondiscrimination provision, it has failed to show that its means of advancing its interests is "narrowly tailored." *Kennedy*, 597 U.S. at 525. Strict scrutiny requires that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. If the government fails "to offer any showing that

27

it has even considered less restrictive measures," then "it fails at least the tailoring prong of the strict scrutiny test." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc); *accord Native Am. Council of Tribes v. Weber*, 750 F.3d 742, 751 (8th Cir. 2014) (government must offer evidence that it "meaningfully considered any of the alternatives or tested the effectiveness of such alternatives").

Here, Plaintiffs have offered up several less-restrictive alternatives to the Amendment, and MDE has never confronted *any* of them. *See* ECF No. 90 at 24-25; ECF No. 118 at 36-38. Perhaps most relevant to the nondiscrimination provision in particular, MDE has never explained why the Minnesota Human Rights Act—which already prohibits discrimination in education, but provides critical exemptions for religious institutions—is insufficient to protect the antidiscrimination interests it has asserted. *See Willson v. City of Bel-Nor*, 924 F.3d 995, 1002 (8th Cir. 2019) (government must show "that enforcement of … existing [laws] is insufficient" to serve its interests). Moreover, when this Court asked MDE's counsel at oral argument whether Minnesota could have simply limited PSEO to public institutions as a more narrowly tailored means of achieving their goals, MDE's counsel conceded that was a viable alternative. ECF No. 133 at 44:2-24. This demonstrates that Minnesota has multiple avenues for protecting students against discrimination that do not infringe on Plaintiffs' religious exercise, yet it has not used or even

28

considered any of them. The nondiscrimination provision is thus not narrowly tailored.

## III. The Nondiscrimination Provision Further Violates the First Amendment as Applied to Plaintiffs.

### A. The Nondiscrimination Provision Violates the Church Autonomy Doctrine.

The nondiscrimination provision also infringes on the Schools' right "to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (cleaned up); *see also Carson*, 596 U.S. at 787 ("scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement" with religion (citing *Our Lady*, 591 U.S. at 759-62)). This right protects the Schools' complete autonomy regarding all "questions of discipline, or of faith, or of ecclesiastical rule, custom, or law," *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 115 (1952), as well as "the conformity of the members of the church to the standard of morals required of them," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976).

The nondiscrimination provision impermissibly intrudes on this right by banning not only the use of the Schools' faith statements in PSEO admissions—each of which lays out the "standard of morals required of" members of Crown's and Northwestern's communities, *Milivojevich*, 426 U.S. at 714—but also *any* religious criteria for selecting PSEO students. It would thus force Schools to accept into their membership students who

29

disagree with and refuse to abide by their respective religious missions and teachings. That violates the church autonomy doctrine under both Religion Clauses.

## B. The Nondiscrimination Provision Violates the Free Speech Clause.

The nondiscrimination provision violates Plaintiffs' free speech and expressive association rights for the reasons articulated in Plaintiffs' principal briefing. *See, e.g.*, ECF No. 118 at 46-49. Indeed, the Eighth Circuit's decisions in *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) and *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000), directly control the analysis of the nondiscrimination provision in isolation.

In *Telescope Media*, the Eighth Circuit explained that a law can still "operate[] as a content-based regulation of" a plaintiff's "speech" even if it "does not, on its face, aim at the suppression of speech." 936 F.3d at 752-53 (cleaned up). There, the Minnesota Human Rights Act—which parallels the nondiscrimination provision at issue here—acted as a content-based regulation of a wedding-video vendor's speech. *See id.* Even though the law did not facially target the vendor's speech, "it still exact[ed] a penalty" based on their speech and led to "self-censorship." *Id.* at 754.

The same is true here. The nondiscrimination provision prohibits Crown and Northwestern from using their faith statements and other religious criteria in the PSEO admissions process. Though the

30

nondiscrimination provision, like the Human Rights Act in *Telescope Media*, might not facially target speech, "it still exacts a penalty" on the Schools because of their speech. *Id.*

In *Cuffley,* the Eighth Circuit held that "direct application" of a "nondiscrimination law" would "violate" a group's "freedom of … association" by forcing the group "essentially to alter its message" by accepting members that conflicted with the group's message. 208 F.3d at 708. The same is true here. If the Schools were required to admit students who refuse to uphold their doctrinal and moral precepts, that would inhibit their ability to sincerely and effectively advocate for those views. *See, e.g.*, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) ("There can be little doubt that requiring CLS to" admit members who disagreed with its stance on homosexuality "would impair its ability to express disapproval of active homosexuality.").

The nondiscrimination provision must therefore satisfy strict scrutiny, which it cannot do. "In an as-applied challenge[,] … the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court." *Telescope Media*, 936 F.3d at 754. And as the Eighth Circuit and Supreme Court have repeatedly held, "regulating speech because it is discriminatory or offensive is not a compelling state interest, however hurtful the speech may be." *Id.* at 755 (discussing *Hurley*, *Dale*, and *Masterpiece Cakeshop*).

For this reason, and those articulated above, the nondiscrimination provision fails strict scrutiny as applied to Crown and Northwestern.

## C. The Nondiscrimination Provision Violates the Unconstitutional Conditions Doctrine.

The nondiscrimination provision also runs afoul of the unconstitutional conditions doctrine, which prohibits laws that "attach[] strings strategically" to "end-run[] around the [constitutional] barriers to direct commands." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006); *see* ECF No. 90 at 34-35. Such laws can include antidiscrimination laws like the one at issue here. In *Cuffley*, for example, the Eighth Circuit upheld the right of even the Ku Klux Klan to participate in a state "Adopt-A-Highway" program—which included getting its name placed on a state-erected highway sign—despite the program's nondiscrimination requirement. *Cuffley*, 208 F.3d at 705, 708-09. The Court held that, despite the provision, the state could not "condition participation in its [public] program on the manner in which a group exercises its constitutionally protected freedom" under the First Amendment. *Id*. at 709.

The Amendment's nondiscrimination provision requires the Schools to abandon their faith-based admissions practices as a precondition for participating in the PSEO program. It thus imposes an unconstitutional condition on the Schools under *Cuffley*, as well as other Eighth Circuit and Supreme Court precedent. *See* ECF No. 90 at 34-35; ECF No. 118 at

CASE 0:23-cv-01527-NEB-JFD    Doc. 137    Filed 01/31/25    Page 40 of 41

45-46; ECF No. 123 at 12. Plaintiffs are therefore entitled to summary judgment on this claim as well.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted.


Respectfully submitted this 31st day of January, 2025.

/s/ *Eric S. Baxter*
Eric S. Baxter*
  (DC Bar No. 479221)
Diana Verm Thomson*
Benjamin A. Fleshman*
Andrea R. Butler*
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
ebaxter@becketfund.org

Richard C. Landon
  (No. 0392306)
Lathrop GPM
80 South Eighth Street
500 IDS Center
Minneapolis, MN 55402

*Admitted pro hac vice*

*Counsel for Plaintiffs*

33

**CERTIFICATE OF COMPLIANCE**

This memorandum complies with the word limit of Local Rule 7.1(f) because it contains 7,388 words. The word count was generated using Microsoft Word, and the word count function was set to include all text, including headings, footnotes, and quotations, except those portions exempted by Local Rule 7.1(f)(1)(C). This memorandum also complies with the type-size limitations set out in Local Rule 7.1(h).

/s/ *Eric S. Baxter*
Eric S. Baxter

*Counsel for Plaintiffs*