# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MELINDA and MARK LOE, on their own behalf and as next friends of their children R.L. and O.L.; DAWN ERICKSON, on her own behalf and as next friend of her child J.G.; CROWN COLLEGE; and UNIVERSITY OF NORTHWESTERN – ST. PAUL, | Case No. 23-CV-1527 (NEB/JFD) |
| Plaintiffs, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| WILLIE JETT, in his official capacity as Minnesota Commissioner of Education; and MINNESOTA DEPARTMENT OF EDUCATION, | |
| Defendants. | |

The State of Minnesota, by and through the Minnesota Department of Education and its Commissioner Willie Jett (together, "MDE"), administers a unique program for Minnesota secondary school students: the postsecondary enrollment option ("PSEO"). The purpose of Minnesota's PSEO program is:

> [T]o promote rigorous academic pursuits and to provide a wider variety of options to high school pupils by encouraging and enabling secondary pupils to enroll full time or part time in nonsectarian courses or programs in eligible postsecondary institutions.

Minn. Stat. § 124D.09, subdiv. 2. Through the program, the State reimburses participating postsecondary institutions for academic credits provided to PSEO-enrolled students. Minn. Stat. § 124D.09, subdiv. 13. PSEO thus provides Minnesota high school students with the opportunity to obtain secondary and postsecondary academic credits concurrently at no additional cost to the student.

Although a publicly-funded program, PSEO is offered not only through public universities, but also through "private, residential, two-year or four-year, liberal arts, degree-granting college[s] or universit[ies] located in Minnesota." Minn. Stat. § 124D.09, subdiv. 3(a). Historically, the only limitation on private-school participation was that credits were only available in "nonsectarian courses." Minn. Stat. § 124D.09, subdivs. 3(c), 5(a). But tensions have arisen between MDE's public charge and the religious mission of private-school participants in the PSEO program, including Plaintiffs Crown College ("Crown") and the University of Northwestern – St. Paul ("Northwestern") (together, the "Schools"). (*See* ECF No. 90 (sealed) at 20–23; ECF No. 79 (sealed) at 11–18.[1])

In 2023, the Minnesota State Legislature amended the definition of "eligible institutions" under the Postsecondary Enrollment Options Act ("PSEO Act"). *See* Minn. Stat. § 124D.09, subdiv. 3(a), as amended by H.F. 2497, 5th Engrossment, 93d Leg. at 74.12–74.15 (Minn. 2023), ("the Amendment"). The Amendment imposes two new

---

[1] Page numbers reflect CM/ECF pagination, except for citations to deposition transcripts which reflect native pagination.

requirements on participating institutions in the PSEO program: (1) the Faith Statement Ban and (2) the Nondiscrimination Requirement. *Id*. The Faith Statement Ban requires that "[a]n eligible institution must not require a faith statement from a secondary student seeking to enroll in a postsecondary course under this section during the application process." *Id*. The Nondiscrimination Requirement dictates that "[a]n eligible institution must not . . . base any part of the admission decision on a student's race, creed, ethnicity, disability, gender, or sexual orientation or religious beliefs or affiliations." *Id*. Both of these eligibility requirements are limited to PSEO admissions and do not constrain post-admission conduct by institutional participants.

The Schools claim that the Amendment is unconstitutional under the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment of the United States Constitution; under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution; and under the Freedom of Conscience Clause of Article One, Section Sixteen of the Minnesota Constitution. (ECF No. 1 at 23–34.) The Schools are joined by Melinda and Mark Loe and Dawn Erickson (together, the "Families"), who bring suit on behalf of their children, and who wish for their children to have the opportunity to benefit from the PSEO program at religious schools of their choosing.

MDE counterclaims that it is the Schools, not the State, that violate the Constitution. MDE argues that the Schools' PSEO admissions policies are unconstitutional under the Free Exercise, Establishment, Free Speech, and Equal

Protection Clauses of the United States Constitution; and under the Freedom of Conscience, Establishment, and Equal Protection Clauses of the Minnesota Constitution. (ECF No. 27 at 63–68.) MDE also counterclaims that the Schools' PSEO admissions policies violate the proscriptions in the Minnesota Human Rights Act ("MHRA") against discrimination on the bases of sex and sexual orientation. (*Id*. at 68–69.)

The parties now cross-move for summary judgment on the claims and counterclaims. (ECF No. 76; ECF No. 87.) This dispute requires the Court to venture into the delicate constitutional interplay of religion and publicly-funded education. *Cf. Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring). In doing so, the Court heeds the Supreme Court's instruction that the First Amendment "gives *special solicitude* to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012) (emphasis added).

For the reasons below, Plaintiffs' motion for summary judgment (ECF No. 87) is granted and MDE's motion for summary judgment (ECF No. 76) is denied. The Faith Statement Ban is unconstitutional under the Free Exercise Clause of the United States Constitution and the Freedom of Conscience Clause of the Minnesota Constitution. The Faith Statement Ban is inseverable from the Nondiscrimination Requirement, and so the Amendment must be stricken in its entirety. As for MDE's counterclaims, MDE lacks standing to assert its constitutional counterclaims, and its statutory counterclaim fails on the merits under the MHRA.

4

## BACKGROUND

### I.    The Parties

#### A.    The Schools

Crown was founded as a Christian college in 1916 in St. Bonifacius, Minnesota, and has offered PSEO opportunities since 2002. (ECF No. 91-5 at 32:15–25, 34:1–8; ECF No. 92-3 (sealed).) Crown is associated with the Christian and Missionary Alliance denomination, and is "connected and subordinate to" it.[2] U.S. Dep't of Educ., Off. for C.R., Title IX Exemption Letter, at 1 (Jan. 18, 2017), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/t9-rel-exempt/crown-college-response-01182017.pdf [https://perma.cc/ESN3-VZHY] ("Crown Exemption Letter"). Crown's mission is "to provide a Biblically-based education for Christian leadership in the Christian and Missionary Alliance, the church-at-large, and the world." (ECF No. 91-5 at 37:9–13; ECF No. 92-2 (sealed) at 4.)

To cultivate this learning environment, Crown requires that all applicants for on-campus instruction attest to the Community Covenant.[3] (ECF No. 94 ¶¶ 5, 10–11.) The

_____

[2] The Court takes judicial notice of the public records of the Title IX exemption letters filed by the United States Department of Education, Office for Civil Rights. Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[3] Applicants for Crown's online PSEO courses need not attest to the Community Covenant. (*See* ECF No. 94 ¶ 11.)

Community Covenant requires applicants to pledge: "to the Word of God as our authority," "to the Lordship of Christ," and "to live out Christian character toward one another." (ECF No. 91-7 at 2.) Pursuant to the Community Covenant, applicants must attest to "submi[t] to Christ's authority" and to not engage in certain conduct, such as "all sexual relations outside the bounds of marriage between a man and a woman."[4] (*Id.*) Between the 2017–2018 and 2022–2023 school years, MDE paid Crown $5,751,053.65 for its PSEO course offerings. (ECF No. 85 ¶ 6.)

Northwestern was founded in 1902 as a non-denominational Christian college, and has offered PSEO at its St. Paul campus since 2012. (ECF No. 91-8 at 30:10–18, 39:4–8.) Northwestern is "completely controlled by, and receives its financial support from University of Northwestern-St. Paul, Inc., a non-profit religious corporation." U.S. Dep't of Educ., Off. for C.R., Title IX Exemption Letter at 1 (Sept. 22, 2016), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/t9-rel-exempt/university-of-northwestern-st-paul-response-09222016.pdf    [https://perma.cc/GVH4-AL7J] ("Northwestern Exemption Letter"). Northwestern's mission is "to provide Christ-centered higher education equipping students to grow intellectually and spiritually, to serve effectively in their professions, and to give God-honoring leadership in the home, church, community and world." Mission & Vision, Univ. of Northwestern – St. Paul,

---

[4] Crown represents that an applicant's LGBTQ+ self-identification is not grounds, by itself, to exclude them from the campus community. (ECF No. 91-5 at 40:13–41:21; ECF No. 94 ¶ 13.)

https://www.unwsp.edu/about-us/christian-values/mission-and-vision/
[https://perma.cc/A4QB-VVE9]; (*see* ECF No. 91-9 at 2–3 (similar).)

To further this mission, Northwestern requires that all on-campus members of the school community sign a Declaration of Christian Community.[5] (ECF No. 91-8 at 31:10–33:3, 38:20–39:5; ECF No. 95 ¶¶ 7–9.) Pursuant to Northwestern's Declaration of Christian Community, applicants must agree to "honor Christ," "seek Christ-centered community," and "stand together against all that the Bible clearly condemns." (ECF No. 91-10 at 2–3.) In particular, the Declaration describes same-sex romantic intimacy and sexual relations as "sexual immorality," and states that transgender identification reflects "confusion and brokenness."[6] (*Id.* at 3–4.) As of Fiscal Year 2021, Northwestern was Minnesota's largest provider of PSEO education. (*See* ECF No. 91-1 at 53–55.) Between 2017–2018 and 2022–2023, it received $33,248,093.18 from MDE for its PSEO offerings. (ECF No. 85 ¶ 5.)

**B.      *The Families***

Melinda and Mark Loe are long-time Minnesota residents with seven children, whom they educate through home-schooling. (ECF No. 97-28 at 6:22–7:14, 11:4–12, 21:13–

---

[5] Like Crown, Northwestern does not impose the Declaration of Christian Community requirement on students applying exclusively for online learning options. (ECF No. 91-8 at 44:12–22; ECF No. 95 ¶ 10.)

[6] Northwestern represents that it would not exclude a student from on-campus learning solely based on a LGBTQ+ identification. (ECF No. 97-13 at 16:2–18:4; ECF No. 95 ¶ 11.)

14.) But their two eldest children participated in Minnesota's PSEO program at Crown and Northwestern, respectively, when they were eligible to do so.[7] (*Id.* at 11:19–12:23.) Their third child, R.L., was a high school senior at the time the briefs were filed, and enrolled in Northwestern as an on-campus and online PSEO student.[8] (*Id.* at 17:24–19:3.) Their fourth child, O.L., is set to become a high school junior beginning in fall 2025.[9] (*See id.* at 20:5–11.) O.L. hopes to participate in on-campus PSEO courses offered by the Schools, "because of their on-campus faith communities." (ECF No. 91-12 at 11; *see also* ECF No. 97-28 at 20:12–18.) According to Melinda Loe, O.L. has both the academic prowess and the interest to make her a competitive candidate for admission into PSEO courses at the Schools. (ECF No. 97-28 at 20:5–18, 84:18–22.)

Melinda Loe testified that she expects for her children to attend PSEO at the Schools with students who attest honestly to faith statements that are aligned with her family's sincere religious convictions. (*Id.* at 80:25–81:6.) That said, she acknowledged that she would still support her children if they attended PSEO through the University

---

[7] Under the PSEO Act, "students attending nonpublic schools and students who are home schooled" are considered "alternative pupils," and are treated like public high school students for purposes of participation in PSEO. Minn. Stat. § 124D.09, subdivs. 4(a), 17.

[8] The Court does not know if R.L. has since graduated from high school during the pendency of these cross-motions for summary judgment.

[9] Participation in the PSEO program at postsecondary institutions is generally limited by statute to high school juniors and seniors. *See* Minn. Stat. § 124D.09, subdiv. 5; *but see* Minn. Stat. § 124D.09, subdivs. 5a, 5b (delineating exceptions—inapplicable here—allowing for high school freshmen and sophomore students to participate in PSEO).

of Minnesota. (*Id.* at 17:13–20.) And she agreed that she would not have a problem with non-Christians or LGBTQ+ students participating in the same PSEO courses as her children, provided that the school environment was "Christ centered." (*Id.* at 42:24–44:1.)

Dawn Erickson is a Minnesota resident and single mother of four children. (ECF No. 97-27 at 8:8–9:4, 10:12–20.) Erickson home-schooled her children on a part-time basis, but her eldest three children each attended PSEO courses at Northwestern when they were eligible to do so. (*Id.* at 11:19–13:23, 21:11–15.) Erickson's youngest child, J.G., wants the opportunity to participate as a senior in PSEO offerings as "part of a faith-based community" at Northwestern.[10] (ECF No. 91-12 at 12.) Dawn Erickson testified that although she "like[s] the idea of a conduct statement," she would "not disallow" her children from attending PSEO at an institution that does not require a faith statement. (ECF No. 97-27 at 55:6–18.)

C.    **MDE**

MDE is designated by statute as the governmental entity responsible for administering the PSEO program. Minn. Stat. § 120A.02(b). In this capacity, MDE evaluates the eligibility of institutions seeking to offer PSEO courses to Minnesota students, including for compliance with the nonsectarian requirement in the PSEO Act and for dual-credit eligibility. (ECF No. 91-3 at 138:21–139:12; ECF No. 91-4 at 33:19–24,

---

[10] The Court does not know if J.G. has since graduated from high school during the pendency of its consideration of these cross-motions for summary judgment.

35:15–24.) MDE also is responsible for reviewing reimbursement requests from participating institutions. (ECF No. 97-3 at 26–27; ECF No. 91-3 at 139:3–12; *e.g.*, ECF No. 81-10 (sealed).) But MDE does not limit PSEO enrollment at any participating institution or review particular admissions decisions. (ECF No. 91-3 at 25:25–26:13, 30:3–9; ECF No. 91-4 at 12:11–16.)

MDE has received multiple complaints about the Schools' PSEO admissions practices. (*See*, *e.g.*, ECF No. 81-57 (sealed); ECF No. 81-58 (sealed); ECF No. 81-63 (sealed); ECF No. 81-64 (sealed); ECF No. 91-3 at 175:7–176:17, 182:8–183:6.) In response to these concerns, beginning in 2018, MDE sought to curtail Northwestern's use of faith statements. (ECF No. 91-14 at 41:3–42:7; ECF No. 92-5 (sealed) at 2, 4.) But when MDE brought the issue to the Minnesota Attorney General's Office, it was advised that it lacked the statutory authority to force Northwestern to changes its admissions practices. (ECF No. 91-14 at 42:8–13, 110:22–111:10, 165:14–166:8.)

## II.    The Amendment

MDE thus proposed amending the PSEO Act to address the Schools' admissions practices in four different legislative sessions: 2019, 2020, 2021, and 2022. (ECF No. 92-6 (sealed); ECF No. 81-60 (sealed); ECF No. 81-61 (sealed); ECF No. 81-62 (sealed).) MDE consistently articulated its belief that an amendment to the PSEO Act was necessary to cease the use of faith statement admissions criteria by the Schools. (*See*, *e.g.*, ECF No. 91-3 at 157:9–10 (testimony of MDE representative that "MDE was attempting to address the

10

concerns and complaints that we received from the community, which happened to be about those two [schools]"); ECF No. 91-15 at 73:1–10 (testimony of MDE Commissioner Jett regarding the Amendment that "[t]he hope was that [the Schools] would remove barriers," such as faith statement requirements); ECF No. 92-12 (sealed) at 2 (tracking the efforts to amend the PSEO Act as the "Northwestern issue").)

In the 2023 legislative session, the Legislature finally took up MDE's proposal, and passed the Amendment as part of an omnibus education finance bill. H.F. 2497, 5th Engrossment, 93d Leg. at 74.12–74.15 (Minn. 2023); Minn. H.J., Reg. Sess. 8275–76, 8485–86 (2023). As passed, the Amendment imposes the Faith Statement Ban and the Nondiscrimination Requirement limitations on the admissions practices of eligible institutions seeking to offer PSEO courses. *See* Minn. Stat. § 124D.09, subdiv. 3(a).

In passing the Amendment, the House and Senate authors of the Amendment echoed MDE's concerns about the faith statement admissions requirements used by the Schools. *See* Minn. House of Representatives, *House Floor Sess. 4/20/23 – Part 2*, at 3:28:04–30 (YouTube, Apr. 20, 2023), https://www.youtube.com/watch?v=Klc95g-ovm4&t=12175s [https://perma.cc/NM2M-UKRN] ("4/20/23 Minn. H.F. Sess. YouTube video") (Rep. Laurie Pryor stating that "the intent of the provision . . . is to make sure that our high school students can go to the postsecondary institutions of their choice . . . and they will not be compelled to sign a statement as a barrier to admission"); Minn. Senate, *Senate Floor Session — Part 3 — 05/16/23*, at 5:59:09–24, 6:01:16–26, (YouTube, May 16,

2023), https://www.youtube.com/watch?v=VNvoXLleUvo [https://perma.cc/Y5VM-6YTQ] ("5/16/23 Minn. S.F. Sess. YouTube video") (Sen. Mary Kunesh remarking that "what we're talking about here are schools, private schools, who require a religious faith statement in order to be accepted into those schools," and that "the removal of the requirement of these faith-based questions is absolutely appropriate").

After the Legislature passed the omnibus education finance bill, MDE relayed to the Office of Minnesota Governor Tim Walz that the bill addressed a policy that it "ha[s] sought for years" "that eligible PSEO higher education institut[ions] not require a statement of faith to admit PSEO students." (ECF No. 97-11 at 2.) On May 24, 2023, Governor Walz signed H.F. 2497 (including the Amendment) into law.[11] Minn. H.J., Reg. Sess. 11113 (2023).

_____

[11] As enacted, the Amendment was set to go into effect on July 1, 2023. *See* H.F. 2497, 5th Engrossment, 93d Leg. at 75.4 (Minn. 2023).

### III.    The Litigation

That same day, Plaintiffs filed the nine-count Complaint against MDE.[12] Plaintiffs

challenge the Amendment[13] on federal and state constitutional grounds.[14] (ECF No. 1.)

Plaintiffs seek declaratory relief that the Amendment is unconstitutional, injunctive relief

prohibiting MDE from enforcing the Amendment against the Schools' admissions

practices, and damages. (*Id.* at 34–35.) The parties stipulated to a preliminary injunction

enjoining the Amendment from going into effect "for the duration of this action and any

subsequent appeals." (ECF No. 18 at 1.) The Court granted the stipulated preliminary

injunction. (ECF No. 20.)

---

[12] Plaintiffs initially named Governor Walz, in his official capacity, as an additional Defendant. (ECF No. 1 at 1.) But in July 2023, Plaintiffs voluntarily dismissed Governor Walz under Rule 41(a)(1) of the Federal Rules of Civil Procedure. (ECF No. 23.)

[13] In Plaintiffs' brief in opposition to MDE's motion for summary judgment, Plaintiffs raised a separate argument against the constitutionality of the PSEO Act's preexisting requirement in Minnesota Statute Section 124D.09, subdivision 5 that courses be nonsectarian. (ECF No. 118 (sealed) at 40–41.) No such claim was raised in Plaintiffs' Complaint, and so the Court declines to consider that argument.

[14] Counts One through Six of the Complaint allege that MDE violated the Free Exercise Clause of the United States Constitution under various legal theories. (ECF No. 1 at 23–30.) Counts Three and Four also allege that MDE violated the Establishment Clause of the United States Constitution under different legal theories. (*Id.* at 26–28.) Counts Seven and Eight allege that MDE violated the Free Speech and Equal Protection Clauses of the United States Constitution. (*Id.* at 31–33.) Finally, Count Nine alleges that MDE violated the Freedom of Conscience Clause of the Minnesota Constitution. (*Id.* at 33–34.)

As part of its Amended Answer, MDE filed six counterclaims against the Schools, alleging that their admissions policies[15] are unlawful.[16] (ECF No. 27 at 56–70.) MDE requests declaratory relief and injunctive relief enjoining the Schools' admissions practices of (1) requiring faith statements and (2) giving preference to applicants who share the Schools' religion and tenets of belief. (*Id.* at 69–70.) In July 2023, the Schools moved to dismiss MDE's counterclaims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 34.) The Court denied that motion, finding that MDE pled grounds for jurisdiction and stated plausible claims for relief. (ECF No. 66.)

The parties each move for summary judgment. Specifically, MDE moves for full summary judgment on both their counterclaims and Plaintiffs' claims,[17] while Plaintiffs seek judgment on just Counts One through Four of their Complaint and on all of MDE's

---

[15] In MDE's memorandum in support of its motion for summary judgment, MDE raised separate allegations that the PSEO courses offered by the Schools violate the PSEO Act's nonsectarian requirement. (ECF No. 79 at 17–18.) No such counterclaim was raised in MDE's Amended Answer, and so the Court does not consider it.

[16] Counterclaim Counts One and Four allege that the Schools' admissions practices violate the religion clauses of the United States and Minnesota Constitutions. (ECF No. 27 at 56–70 ¶¶ 40–55, 67–72.) Counterclaim Count Two alleges that the practices violate the Free Speech Clause of the United States Constitution. (*Id.* ¶¶ 56–61.) Counterclaim Counts Three and Five allege that the practices violate the equal protection provisions of the United States and Minnesota Constitutions. (*Id.* ¶¶ 62–66, 73–78.) And Counterclaim Count Six alleges that the practices violate the education provisions of the MHRA. (*Id.* ¶¶ 79–84.)

[17] The Freedom From Religion Foundation, Inc. and Gender Justice each filed amicus curiae briefs in support of MDE's motion for summary judgment. (ECF Nos. 110, 112.)

counterclaims. (ECF No. 76; ECF No. 87.) In addition to the briefs filed by the parties and amici on the cross-motions for summary judgment (ECF Nos. 79, 90, 110, 112, 113, 118, 122, 123), the Court asked the parties to provide supplemental briefing on the issue of whether the Amendment is severable. (ECF No. 135; *see* ECF Nos. 136, 138 (sealed).)

## ANALYSIS

### I.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute of fact is "genuine" if a factfinder could reasonably determine the issue in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the Court views the record in the light most favorable to the plaintiff when considering the defendant's motion and in the light most favorable to the defendant when considering the plaintiff's motion. *Fjelstad v. State Farm Ins.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### II.    Plaintiffs' Standing

To begin, the Court must determine whether it has jurisdiction to rule on the claims brought by the Schools and the Families. *Advantage Media, L.L.C. v. City of Eden*

*Prairie*, 456 F.3d 793, 799 (8th Cir. 2006) (considering Article III standing to bring a First Amendment challenge to be "an inescapable threshold question" (citation omitted)). The standing requirement ensures that the Court's jurisdiction extends only to actual, justiciable cases or controversies. U.S. Const. art. III, § 2, cl.1; *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). To satisfy Article III standing, a claimant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). The party invoking jurisdiction bears the burden of establishing each of these elements. *Id*.

MDE challenges the Schools' standing by arguing that the Schools are purportedly state actors when administering PSEO, and thus have no standing to seek redress for constitutional injuries. MDE also challenges the Families' standing, arguing that they have not alleged a concrete, non-speculative injury caused by MDE.

## A.    *Schools' Standing*

The Schools' standing to bring each of their constitutional claims against MDE hinges on whether the Schools engage in state action through their PSEO admissions practices.[18] *See Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1,

---

[18] Minnesota courts look to federal state-action precedents in cases brought under the United States Constitution to analyze state-action issues in suits brought for relief under the Minnesota Constitution. *See Brennan v. Minneapolis Soc'y for the Blind, Inc.*, 282 N.W.2d 515, 524 (Minn. 1979) (citing United States Supreme Court precedents and noting that "[t]he state action requirement may be satisfied even though the actor is a private entity

14 (Okla. 2024) (explaining that constitutional precedents "do not apply to the governmental action" by the plaintiff), *aff'd*, 605 U.S. 165 (2025) (per curiam). And MDE does not seriously dispute that if the Schools are private actors, then they do have standing to bring their constitutional claims.[19] (ECF No. 79 at 37.) To assess whether a private actor engages in state action subject to the Constitution, courts consider two questions: (1) "whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority," and (2) "whether the party engaging in the deprivation may be appropriately characterized as a state actor." *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022) (citations omitted).

As an initial matter, the Schools' conduct stems "from the exercise of a right or privilege having its source in state authority." *Id.* (citation omitted). The PSEO Act creates

---

if the conduct that is formally private has become so entwined with governmental character as to become subject to the constitutional limitations placed upon state action"); *see also State v. Beecroft*, 813 N.W.2d 814, 837 (Minn. 2012) (similar). Thus, the state-action inquiry also controls the Schools' standing to bring suit for *state* constitutional relief.

[19] The closest MDE comes to challenging the concreteness of the Schools' injury is a conclusory remark that the Schools "have adduced no evidence demonstrating—or even suggesting—that admitting PSEO students who are not Christian, straight, and cisgender will cause any actual harm to their religious beliefs or practices." (ECF No. 113 at 9.) But this framing misstates the nature of the Schools' alleged constitutional injury, which is that its eligibility for an otherwise available public benefit is unconstitutionally conditioned by MDE on the basis of the Schools' religious exercise and free expression. The Supreme Court has repeatedly reaffirmed that the conditioning of a public benefit on an otherwise-eligible recipient's religious exercise or free expression is a constitutional injury in-fact. *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 778 (2022) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." (citation omitted)).

an identifiable state-created privilege for eligible institutions to receive public reimbursement for the provision of PSEO education to Minnesota students. Minn. Stat. § 124D.09, subdiv. 13. The Schools' conduct in circumscribing admissions to their PSEO offerings derives from the fact that the PSEO program exists in the first place.[20] So whether the Schools engage in state action depends on if they "may be appropriately characterized as [] state actor[s]" when they engage in the disputed PSEO admissions practices. *Roberson*, 42 F.4th at 928 (citations omitted); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (describing the relevant question as whether the conduct at issue is "fairly attributable to the State" (citation omitted)). This question is answered in the affirmative if: "(1) the private entity performs a traditional, exclusive public function, or (2) the government acts jointly with the private entity." *Roberson*, 42 F.4th at 928–29 (citations and quotation marks omitted).

In the Court's ruling on Plaintiffs' motion to dismiss counterclaims, the Court declined to resolve the state-action question on the pleadings. (ECF No. 66 at 9–12.) In so ruling, the Court emphasized that the state-action analysis is a "necessarily fact-bound inquiry," in which "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true

---

[20] Courts are instructed to not analyze state-action issues at a high-level of generality; courts are to instead focus narrowly on whether there is a "close nexus . . . between the state and the *alleged deprivation itself.*" *Roberson*, 42 F.4th at 929 (citation omitted) (emphasis added). Thus, the relevant conduct here is the Schools' discriminatory circumscription of admissions to the publicly-funded PSEO educational opportunities.

significance." (*Id.* at 10 (first citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982); and then citing *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007)).) Now, with a robust factual record, the Court addresses MDE's state action theory under both tests.

### 1. Traditional and Exclusive Public Function Test

Under the traditional and exclusive public function test, the acts of a private party constitute state action when they (1) serve a "public function" and (2) that function "has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker*, 457 U.S. at 842 (citation omitted). The provision of publicly-funded education is no doubt a public function. But that function has not been "traditionally the *exclusive* prerogative of the State" in Minnesota.[21] *Id.*

---

[21] MDE points to a separate provision in Minnesota's Education Code on public school admissions that states that "[a]ll schools supported in whole or in part by state funds are public schools," to argue that the Schools are public schools. (ECF No. 113 at 23 (citing Minn. Stat. § 120A.20).) First, taken to its logical extreme, such an interpretation of Section 120A.20 would seemingly transform any private school into a public school if it accepted even a penny of public funds. The Court questions whether the Legislature would have intended such an absurd result. *See Am. Fam. Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 278 (Minn. 2000) ("[C]ourts should construe a statute to avoid absurd results and unjust consequences." (citation omitted)). Even so, the fact that a school is considered public for purposes of statutory law does not resolve whether the school is a state actor under the Constitution. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 & n.7 (1974) (holding that even though an entity was designated a "public utility" by statute did not convert its conduct into state action under the United States Constitution); *cf. also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("[O]ur cases are unequivocal in showing that the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies.").

Minnesota has a long history of providing public funding to reimburse education costs at private religious schools.[22] In *Mueller v. Allen*, the Supreme Court affirmed the constitutionality under the Establishment Clause of Minnesota's then-practice—dating back to 1955—of allowing taxpayers to deduct actual expenses incurred, including *tuition*, in providing for the education of their children at public and nonpublic schools.[23] 463 U.S. 388, 390–91 (1983). *Mueller* supports the proposition that actions of religious schools in Minnesota that receive public tuition reimbursement for education chosen by students cannot be imputed to the state.[24] *See id.* at 399 ("Where, as here, aid to parochial schools

---

[22] In the context of state-funded education, as part of the state action inquiry, courts consider "not only [] the factual circumstances of a plaintiff's claim, but also [] the laws of the state regulating the school in question." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 121 (4th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2657 (2023); *see also Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 26–27 (1st Cir. 2002) (considering Maine's tradition of offering high school education at private schools), *cert. denied*, 537 U.S. 1107 (2003).

[23] *Mueller* was decided under the Supreme Court's prior Establishment Clause precedents that were less accommodating of religion, embodied in the seminal case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Lemon* required that a statute: (1) "have a secular legislative purpose," (2) have a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) "not foster 'an excessive government entanglement with religion.'" *Id.* at 612–13 (citations omitted). *Lemon* was overturned in *Kennedy v. Bremerton School District*, 597 U.S. 507, 534 (2022). In *Mueller*, the reimbursement of tuition at parochial schools did not foster an excessive government entanglement with religion under the *Lemon* test. This conclusion bolsters the position that public tuition reimbursement does not transform private schools that receive such funds in Minnesota into state actors.

[24] MDE seeks to distinguish the PSEO Act's reimbursement model from other models of providing public reimbursement for education at private institutions because the state pays PSEO provider institutions directly, and does not to pay the tuition to the families. (ECF No. 79 at 30 n.39.) The Court considers this to be a distinction without a difference. Whether the tuition reimbursement goes directly to the private schools or gets to the

is available only as a result of decisions of individual parents[,] 'no imprimatur of State approval' . . . can be deemed to have been conferred on any particular religion, or on religion generally." (citation omitted)).

Similarly, since the enactment of the PSEO Act in 1985, the statute has authorized the use of public funds to reimburse "public" *and* "private" eligible institutions for the provision of PSEO courses, so long as the courses are nonsectarian. Minn. Stat. § 124D.09, subdiv. 3(a). The facial acknowledgment in the PSEO Act that public and private schools are (and always have been) eligible institutions is another strong indication that PSEO education is not the traditional, exclusive province of the state in Minnesota.

The Supreme Court's holding in *Rendell-Baker* supports this conclusion. There, public schools in Massachusetts contracted to reimburse tuition costs to a then-existing, specialty private school for the education of "maladjusted" public school students. 457 U.S. at 831–33, 842. When the plaintiff was terminated by the private school, she and other teachers sued, alleging that their discharge was unconstitutional. *Id.* at 834–35. The Supreme Court concluded that the private school was not acting as a state actor when it discharged the plaintiff, even though it provided educational services at public expense. *Id*. at 842 ("That a private entity performs a function which serves the public does not make its acts state action.").

---

schools indirectly through the reimbursement to the families, the result is the same—in either case, the state is publicly subsidizing education at private schools.

The First Circuit's extension of *Rendell-Baker* in *Logiodice*, 296 F.3d 22, is also on-point and persuasive. In *Logiodice*, the district responsible for schooling children in three rural Maine communities contracted with a then-existing private high school to educate all of the communities' secondary students. *Id.* at 24–25. After a student was suspended by the private school, the student's family sued on his behalf, alleging that his procedural due process rights under the Constitution were violated. *Id.* at 25. The First Circuit rejected the student's constitutional claims, reasoning that the private school was not a state actor. *Id.* at 26–31. In key language, the First Circuit refuted that "providing a publicly funded education available to all students generally" was the exclusive province of the government, because "even publicly funded education of last resort was not provided exclusively by government in Maine."[25] *Id.* at 27.

MDE tries to distinguish *Rendell-Baker* and *Logiodice* by relying on an analogy to charter schools; a few courts have concluded that charter schools are state actors under the traditional and exclusive public function test. *See, e.g., Drummond*, 558 P.3d at 11–13; *Peltier*, 37 F.4th 104; *Am. C.L. Union v. Tarek Ibn Ziyad Acad.*, No. 09-CV-138 (DWF/JJG),

---

[25] The Court finds *Logiodice* particularly persuasive because there, the private religious school at issue was "the school of last resort," and thus was "the only regular education available for which the state will pay." 296 F.3d at 27, 29. By contrast, Minnesota secondary students have many options for obtaining a publicly-funded advanced education, including taking Advanced Placement and International Baccalaureate courses provided through their public high schools or by enrolling in in-person or online PSEO courses at nonsectarian institutions. (ECF No. 91-1 (describing MDE's efforts to ensure various rigorous learning opportunities for Minnesota secondary students).)

2009 WL 2215072, at *9–10 (D. Minn. July 21, 2009). Assuming for sake of argument that this line of non-binding caselaw is correctly decided,[26] the Court considers it distinguishable in a crucial sense—the charter schools in those cases existed only by state creation. *See Drummond*, 558 P.3d at 12 ("[T]he key difference between *Rendell-Baker* and this case is Oklahoma charter schools are public schools *created through* governmental action, not private like in *Rendell-Baker*." (emphasis added)); *Peltier*, 37 F.4th at 122 ("North Carolina has exercised its sovereign prerogative to treat these *state-created* and state-funded public schools as public institutions that perform the traditionally exclusive government function of operating the state's public schools" (emphasis added)); *Tarek Ibn Ziyad Acad.*, 2009 WL 2215072, at *2 (explaining that the MDE Commissioner "either approves or disapproves *the creation* of the charter school" (emphasis added)).

By contrast, the Schools were privately established as religious institutions in 1902 and 1916—long before the PSEO Act was enacted. (ECF No. 91-8 at 30:10–18; ECF No. 91-5 at 32:15–16.) The courses offered to PSEO high-school enrollees at the Schools are the same courses offered to other postsecondary students attending the Schools full-time. (ECF No. 91-5 at 116:24–117:23, 122:20–123:16; ECF No. 91-8 at 93:5–8, 101:18–24, 103:5–

---

[26] The Ninth Circuit has reached a contrary conclusion, finding that an Arizona charter school was not a state actor, at least in the employment context. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 815 (9th Cir. 2010) (reasoning that Arizona's "legislative policy choice" "to provide alternative learning environments at public expense . . . 'in no way makes these services the exclusive province of the State'" (citing *Rendell-Baker*, 457 U.S. at 842)).

23, 145:1–146:8.) If the Legislature abolished the PSEO Act, the Schools would continue functioning with the same courses for all students not enrolled through PSEO, just like the schools in *Rendell-Baker* and *Logiodice* could continue to operate for privately-enrolled students even if their government contracts were terminated. But if the Oklahoma, North Carolina, or Minnesota Legislatures abolished their respective charter school laws, the charter schools established by those laws would cease to exist in their current form. *See Peltier*, 37 F.4th at 117 ("Charter schools may only operate under the authority granted to them by their charters with the state."). And so, the Court does not consider *Drummond*, *Peltier*, and *Tarek Ibn Ziyad Academy* to govern the state-action question here.[27]

---

[27] Unlike charter schools, the Schools were not established as public schools by Minnesota pursuant to its state constitutional obligation to "establish a general and uniform system of public schools" and "secure a thorough and efficient system of public schools throughout the state." Minn. Const. art. XIII § 1; *compare* Minn. Stat. § 124D.09, subdiv. 3(a) (explaining that eligible PSEO institutions include public and private institutions) *with* Minn. Stat. § 124E.03, subdiv. 1 ("A charter school is a public school and is part of the state's system of public education."). The Court thus does not consider dispositive the Oklahoma Supreme Court's and Fourth Circuit's reliance on similar state constitutional provisions in finding state-created charter schools to be state actors. *Cf. Drummond*, 558 P.3d at 9; *Peltier*, 37 F.4th at 117. Rather, the Court looks to the First Circuit's reasoning in *Logiodice*, in which that court declined to impute state action to religious schools under Maine's tuition assistance program, even though Maine had a similar state constitutional obligation to assure secondary education to all school-aged children. 296 F.3d at 29. Still, even if the Court accepted MDE's argument that PSEO is public education subject to the Minnesota Constitution's Education Clause, that does not compel the conclusion that the Schools are state actors here. In *Manhattan Community Access Corp. v. Halleck*, the Supreme Court recognized that "a private entity *may, under certain circumstances*, be deemed a state actor when the government has outsourced one of its constitutional obligations to a private entity." 587 U.S. 802, 810 n.1 (2019) (emphasis added). Each of the constitutional-obligation cases cited by MDE involved "certain circumstances" relating to the state delegating its penological obligations, which were

Thus, consistent with *Rendell-Baker* and *Logiodice*, the Court concludes that the Schools are not state actors under the traditional and exclusive public function test, because the provision of publicly-funded secondary education has not traditionally been the exclusive province of the state in Minnesota.

### 2.    *Joint-Action/Entwinement Test*

The Court next considers whether MDE and the Schools are so entangled in joint action that the Schools' conduct can be fairly attributed to the state. Under the joint-action test, where "[t]he State has so far insinuated itself into a position of interdependence with [the private actor] that it must be recognized as a joint participant in the challenged activity," then the private actor's conduct is considered state action. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *see also Brentwood Acad.*, 531 U.S. at 298 (considering

---

traditionally the exclusive province of the state. *See West v. Atkins*, 487 U.S. 42, 54 (1988) ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." (citation omitted)); *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 423 (8th Cir. 2007) ("In this case, the state effectively gave [the private residential inmate program] its 24-hour power to incarcerate, treat, and discipline inmates."); *Doe v. N. Homes, Inc.*, 11 F.4th 633, 637 (8th Cir. 2021) ("The power to decide to incarcerate a person rests with the state."); *Roberson*, 42 F.4th at 931 (reasoning that the juvenile detainee's parents "were legally required to comply with [the Division of Juvenile Services'] choices and could not remove her" from the private correctional ranch). But such circumstances are not present here where families have other options to secure the education of their children—including by attending traditional public schools, participating in PSEO at nonsectarian institutions, or even abstaining from public education altogether. Moreover, Minnesota has a long history of publicly subsidizing education at parochial schools, and no court has rejected such practices under the Education Clause of the Minnesota Constitution. Thus, the Court declines MDE's request to certify to the Minnesota Supreme Court whether the Education Clause encompasses PSEO.

state action to be imputed to a private actor when "[t]he nominally private character of the [private actor] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings").[28] But "mere regulation" as "a precondition for the receipt of public funds . . . does not convert a private organization's actions into state action . . . even if the regulation is extensive and detailed." *Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016) (citing *Rendell-Baker*, 457 U.S. at 841) (cleaned up).

MDE's involvement in regulating PSEO provider institutions does not rise to the level of control or entanglement required to impute state action. MDE reviews PSEO course descriptions and regulates PSEO offerings to ensure they are eligible for dual-credits and are nonsectarian. Minn. Stat. § 124D.09, subdivs. 3, 10(a); (ECF No. 91-3 at 138:21–139:12; ECF No. 91-4 at 33:19–24, 35:15–24.) MDE also reimburses a fixed amount to PSEO provider institutions for each credit provided, and will reject reimbursement if the course is sectarian or there are inconsistencies with reporting. Minn. Stat. § 124D.09, subdiv. 13; (*see also* ECF No. 97-3 at 26–27; ECF No. 91-3 at 139:3–12; ECF No. 81-10). But MDE imposes no other curricular, grading, or teaching requirements on PSEO courses

---

[28] The Supreme Court has discussed the joint-action and entwinement tests as separate lines of precedent, but in recent case law, the Eighth Circuit appears to meld entwinement under the joint-action test. *See Wickersham*, 481 F.3d at 598–99 (applying joint-action and entwinement precedents in the same analysis); *see also Roberson*, 42 F.4th at 928–29 (listing the two state action tests as the traditional and exclusive public function test and the joint-action test). The Court thus follows the Eighth Circuit's lead and considers entwinement to be encompassed within the joint-action test.

beyond those minimal statutory requirements. (ECF No. 91-4 at 36:1–37:12.) Aside from the added requirements in the Amendment, MDE does not dictate the admissions policies and practices of PSEO provider institutions. (ECF No. 91-3 at 26:18–27:19.) And MDE does not limit PSEO enrollment at any school or review their admissions decisions. (*Id.* at 25:25–26:13, 30:3–9; ECF No. 91-4 at 12:11–16.) Indeed, MDE has been working to constrain the Schools' admissions practices for years, to no avail. (ECF No. 91-14 at 40:3–42:13; ECF No. 92-5 at 1; ECF No. 92-6; ECF No. 81-60; ECF No. 81-61; ECF No. 81-62.)

Again, *Rendell-Baker* is particularly instructive. In *Rendell-Baker*, the Supreme Court rejected the argument that the private school engaged in joint action with the state, even though "virtually all of the school's income was derived from government funding" and there was "extensive regulation of the school generally." 457 U.S. at 840–41. In so reasoning, the Supreme Court focused on the nexus to the conduct in dispute—the termination of the teachers at the school—and concluded that the school's receipt of public funds and regulation did not transform the school's discharge decisions into state action. *Id.* at 841 (emphasizing that "the relationship between the school and its teachers and counselors is not changed because the State pays the tuition of the students").

Similarly, in *Logiodice*, the First Circuit acknowledged connections between the state, the school district, and the private religious school. *See* 296 F.3d at 28 (noting that (1) 80 percent of the private school's students were sponsored by the district, (2) that the school district contributed half of the private school's budget, and (3) that "in certain

respects . . . [the private school] students are treated as if they were regular public school students"). But the *Logiodice* court still did not find the state to be pervasively entwined in the private school's disciplinary conduct—the specific conduct at issue in that case. *Id.* (emphasizing that the private school was run by private trustees, who were given the "sole right to promulgate, administer and enforce all rules and regulations pertaining to student . . . discipline").

Here, both Schools have received sizable reimbursements from the state through the PSEO program. (ECF No. 85 ¶¶ 5–6 (noting that since the 2017–2018 school year, Northwestern and Crown have received $33,248,093.18 and $5,751,053.65, respectively, for providing PSEO courses).) But the Schools are each privately governed.[29] *Contra Brentwood*, 531 U.S. at 299–300 (emphasizing that 84 percent of the athletic association's board was composed of public school officials acting in their official capacity); *contra also Drummond*, 558 P.3d at 11 (explaining that a governmental board "will provide oversight of the operation of [the charter school], monitor its performance and legal compliance, and decide whether to renew or revoke [the school's] charter"). The Schools also create their own admissions procedures, pursuant to their religious mission. (ECF No. 91-5 at 37:9–23, 47:15–25, 84:4–85:5; ECF No. 91-7; ECF No. 91-8 at 29:22–30:22, 32:22–33:3; ECF

---

[29] Crown is controlled by a board of directors, "of which two-thirds must be comprised of [Christian and Missionary Alliance] church members." Crown Exemption Letter at 1. Northwestern is "completely controlled by, and receives its financial support from University of Northwestern-St. Paul, Inc., a non-profit religious corporation." Northwestern Exemption Letter at 1.

No. 91-10); *see Logiodice*, 296 F.3d at 28 (emphasizing that the relevant disciplinary procedures were created by the private trustees of the private school); *contra Ams. United for Separation of Church & State*, 509 F.3d at 423 (noting that the disciplinary procedures at issue were "effectuated in concert with the [Department of Corrections]").

There is also no evidence in the record that MDE ever coerced or compelled the Schools to include these admissions requirements. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."). In fact, MDE's efforts in regard to the Schools' PSEO admissions practices are quite the opposite. (*E.g.*, ECF No. 92-6; ECF No. 81-60; ECF No. 81-61; ECF No. 81-62.) The evidence does not suggest that MDE took any affirmative action designed to "significantly involve[] itself with invidious discrimination[]" by the Schools. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173 (1972) (citation omitted). Thus, the Schools do not engage in joint action with the state when they circumscribe admissions to publicly-funded PSEO opportunities.

Because the Schools are not state actors under either the traditional and exclusive public function test or under the joint-action/entwinement test, the Schools have standing to proceed on their constitutional claims.

**B.    Families' Standing**

Separately, the Families' standing to pursue their claims against MDE depends on whether they have alleged a concrete injury-in-fact that remains live throughout the pendency of the litigation. Plaintiffs argue that the Families have each alleged a concrete injury caused by MDE to R.L., O.L., and J.G., respectively. As for R.L.—a PSEO-enrollee[30]—Plaintiffs argue she is injured by the threat that Northwestern could cease to participate in the PSEO program, and that her claim has not been mooted by the stipulated preliminary relief. As for O.L. and J.G., Plaintiffs argue that their injury was in being denied an opportunity "to compete for [a] place[]" in the PSEO program at institutions that align with their faith. (ECF No. 123 at 19 (citing *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978)).) MDE, on the other hand, considers the Families' claimed injuries to be speculative or moot.

**1.    Injury**

The Families have alleged an injury—which the Supreme Court has repeatedly addressed on the merits—of having their access to an otherwise-available, publicly-funded educational benefit conditioned by a limitation on their free exercise of religion. *See Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 470–71, 486 (2020); *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 775–76, 781 (2022). Because standing is a "jurisdictional

---

[30] R.L. enrolled in both online and on-campus classes at Northwestern during her junior-year. (ECF No. 97-28 at 17:24–19:3.)

prerequisite that must be resolved before reaching the merits of a suit," *see City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007), each of the requirements for standing must necessarily have been satisfied in *Espinoza* and *Carson*, including the requirement of a concrete injury-in-fact. This is so, even if the issue were not fully briefed by the parties to those actions, because federal courts have an obligation to raise the issue of subject-matter jurisdiction *sua sponte. Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548 (2019).

In *Espinoza*, the Supreme Court reached the merits of a Free Exercise suit brought by three mothers whose children attended a private religious school, and who received or planned to apply to receive scholarships provided by Montana's tuition assistance program. 591 U.S. at 470–71. The *Espinoza* Court held that Montana's prohibition on the use of the scholarships at sectarian schools "burdens not only religious schools *but also the families* whose children attend or hope to attend them."[31] *Id*. at 486 (emphasis added).

Similarly, in *Carson*, the Supreme Court proceeded to the merits of a Free Exercise challenge brought by the parents of students who either attended, or who wished to attend, sectarian schools with the aid of Maine's tuition assistance program. 596 U.S. at 775–76. Although the Supreme Court overturned the First Circuit on the merits in *Carson*, *see id*. at 789, the Supreme Court did not abrogate the First Circuit's jurisdictional holding that "the plaintiffs' injury in fact inheres in their having lost the 'opportunity' to find

---

[31] MDE's reply brief fails to address *Espinoza*, and the grounds upon which MDE attempts to distinguish *Carson* do not apply to *Espinoza*. (*See* ECF No. 122 at 4.)

religious secondary education for their children that would qualify for public funding."
*Carson ex rel. O.C. v. Makin*, 979 F.3d 21, 30–31 (1st Cir. 2020) (citation omitted).

Here, the Families' injury is concrete. The Families assert that their children
"want[] to benefit from the PSEO program like any other Minnesota student by attending
a school of [their] choice," while still being educated in "faith-based communit[ies]."
(ECF No. 91-12 at 11–12.) The families in *Espinoza* and *Carson* similarly wanted to receive
a public benefit that was available to other Montanans and Mainers while also allowing
their children to attend schools that "teach[] the same Christian values that [they] teach
at home," *Espinoza*, 591 U.S. at 471, and that "align[] with their sincerely held religious
beliefs." *Carson*, 596 U.S. at 775.

Likewise, the Families' injuries are not speculative. R.L. is enrolled in PSEO at
Northwestern and wishes to continue to enjoy receipt of the PSEO benefit at the school
of her choice, much like how the parents of the student who had "already received" the
scholarship in *Espinoza* wanted to continue to use the scholarship at the sectarian school
of their choice. 591 U.S. at 471. As for O.L. and J.G., who each want the opportunity to
apply for PSEO programs at the Schools (ECF No. 91-12 at 11–12), the Nelson plaintiffs
in *Carson* are instructive. The Nelson plaintiffs similarly wanted their daughter to have
the future opportunity to attend their preferred sectarian school with the benefit of state
tuition assistance. 979 F.3d at 27. The First Circuit considered the Nelson plaintiffs' injury
to be concrete. *See id.* at 30 ("[T]he loss of that 'opportunity' in and of itself constituted an

injury in fact personal to the parents, as '[e]ven though it is the educational institution, not the parent, that would receive the tuition payments for a student . . . it is the parent who . . . ultimately will benefit from the approval.'" (citation omitted)).

For a "lost opportunity" injury to be non-speculative, the Families must be able to show that O.L. and J.G. would have a "realistic chance" of receiving the "benefit in the absence of [MDE's] constitutional violations." *Nor-W. Cable Commc'ns P'ship v. St. Paul,* 924 F.2d 741, 749 (8th Cir. 1991). There is enough in the record to support that O.L. and J.G. would have a "realistic chance" of benefiting from the PSEO program at the Schools. First, both O.L. and J.G. expressed a "hope[]" and "want[]" to apply to on-campus PSEO programs offered through the Schools, because of their "faith-based communit[ies]." (ECF No. 91-12 at 11–12.) Second, the record reveals that the Schools admit a substantial and growing number of applicants to their PSEO programs each year. (ECF No. 91-1 at 53–54; ECF No. 91-5 at 23:21–24:18; ECF No. 91-8 at 121:24–122:10.) In fact, Northwestern admits about seventy percent of applicants for on-campus PSEO. (ECF No. 91-8 at 122:1–7.) Third, Melinda Loe testified to O.L.'s academic prowess and interest in the Schools. (ECF No. 97-28 at 20:5–18, 84:18–22.) Fourth, Dawn Erickson testified to the importance of faith to J.G. (ECF No. 97-27 at 60:6–15.) And fifth, each of the Loe and Erickson children who have previously been eligible to participate in PSEO courses have applied, and been admitted, as PSEO students at the Schools. (ECF No. 97-28 at 11:19–12:5, 17:24–19:3; ECF

No. 97-27 at 21:11–15.) Under these circumstances, O.L. and J.G. have both a likelihood of applying to PSEO at the Schools and a "realistic chance" at being admitted to them.

### 2.    *Causation*

MDE also makes a passing causation/redressability argument: that it is speculative whether the Schools would forgo offering on-campus PSEO to Minnesota students if the Amendment went into effect. But both Schools testified that they would consider doing so. (ECF No. 91-5 at 73:17–22; ECF No. 91-8 at 99:1–18 (calling Northwestern's faith-based admissions practices an "unwavering commitment[]" of the institution).) The Schools also communicated as much to MDE. (ECF No. 97-12 at 73:11–20; 106:24–107:20.) Under these circumstances, it is "sufficiently predictable how [the Schools] would react to government action or cause downstream injury to [the Families]." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

The First Circuit's standing analysis in *Carson* is again on-point. *See* 979 F.3d at 31. There, the plaintiff parents' theory of injury was based on a "now non-existent opportunity to find religious education for their children that qualifie[d] for public funding." *Id.* (emphasis omitted). The court considered this injury to be caused by the Maine Department of Education, "even though the continued existence of that opportunity would depend on choices that [the religious schools] might make in the future about whether to participate in the tuition assistance program." *Id.* (emphasizing that "neither school ha[d] yet extinguished that opportunity by choosing to disclaim a

willingness to consider participating"). Here, nothing in the record suggests that the Schools would discontinue offering their on-campus PSEO programs as long as they are able to utilize faith-centric admissions practices. And so, "it is not merely likely that the relief that the [Families] seek would redress their injury, it is certain that it would." *Id.*

### 3.    Mootness

Finally, contrary to MDE's argument, the Families' claims for R.L. and J.G. are not moot just because R.L. is already enrolled at Northwestern and J.G. is old enough to have enrolled as well. The only reason that "[t]he Families have everything they want," (ECF No. 79 at 37 n.47), is because the parties stipulated to the preliminary injunction. (ECF Nos. 18, 20.) Absent permanent injunctive relief, R.L. and J.G. would again risk losing the opportunity to benefit from otherwise-available PSEO offerings as high school students through their preferred institutions. And so, a live controversy remains for R.L. and J.G.[32]

Thus, the Families—like the Schools—have standing to proceed with their constitutional claims, which the Court can resolve on the merits.

### III.    Faith Statement Ban — Free Exercise Claim

The Court begins its merits analysis with Plaintiffs' claim that the Amendment's Faith Statement Ban is unconstitutional under the Free Exercise Clause of the First

---

[32] Because the Court does not know for certain if R.L. and J.G. graduated from high school since the briefs were filed, the Court does not know if they are no longer eligible to participate in PSEO courses. So, on the record before the Court, the Court cannot determine if the injuries to R.L. and J.G. have become moot on such grounds.

Amendment of the United States Constitution.[33] Courts employ a familiar three-step framework in analyzing Free Exercise Clause claims. *Fulton v. City of Phila.*, 593 U.S. 522, 532–42 (2022). At step one, courts determine whether the law burdens the plaintiff's free exercise of religion. If so, at step two, courts address the appropriate standard of constitutional scrutiny to apply—rational basis or strict scrutiny. And at step three, courts consider whether the law is properly tailored to achieve the governmental interest under the applicable standard of scrutiny.

Applying this framework, Plaintiffs argue that the Faith Statement Ban infringes their rights under the Free Exercise Clause because it: (1) burdens their religious exercise, (2) is not neutral and generally applicable, and (3) is not the least restrictive means of achieving a compelling state interest.

### A.    Burden

The Free Exercise Clause is triggered if a plaintiff's free exercise of religion is burdened by a governmental action. *Carson*, 596 U.S. at 778. Even "indirect coercion or penalties on the free exercise of religion" demands constitutional scrutiny.[34] *Id.* (citing

---

[33] The Supreme Court has incorporated "the prohibitions of the First [Amendment] applicable to state action abridging religious freedom" to apply against state governments. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).

[34] MDE's reply brief cites *New Doe Child #1 v. United States* for the proposition that "[s]ubstantial burdens on religion exist only 'when the Government forces a person to act, or refrain from acting, in violation of his or her religious beliefs.'" (ECF No. 122 at 6 (citing 901 F.3d 1015, 1026 (8th Cir. 2018)).) This proposition is misleading. Although the Faith Statement Ban does not literally "force" Plaintiffs to violate their religious beliefs, it

*Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988)). But the burden must arise from the plaintiff's sincerely held religious beliefs, and not just from "philosophical and personal" convictions. *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972).

The Schools and Families assert that the Faith Statement Ban burdens their free exercise by "forc[ing them] to choose between participating in PSEO and maintaining their faith statements (or choosing schools) that accord with their religious beliefs." (ECF No. 118 at 37.) The Court agrees. If the Schools' eligibility to participate in PSEO is conditioned on not using faith statements as an admissions requirement, their free exercise in maintaining a campus community of like-minded believers is burdened. *See Carson*, 596 U.S. at 778 ("[W]e have repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."[35]). Likewise, if the Families cannot obtain the public benefit of PSEO reimbursement for their

---

does compel Plaintiffs to choose between adherence to sincerely held religious beliefs and their receipt of an otherwise available public benefit. That is enough to establish a sufficient burden on religious free exercise to require constitutional review. *See Fulton*, 593 U.S. at 532 ("As an initial matter, it is plain that the [defendant's] actions have burdened [plaintiff's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs.").

[35] In *Carson*, the Supreme Court emphasized that the public benefit provided under Maine's tuition assistance program was not Maine "offering . . . a free public education," but rather "*tuition* at a public *or* private school, selected by the parent." 596 U.S. at 782–83. Similarly, the benefit under the PSEO Act to the Schools is public reimbursement for PSEO student tuition; and for the Families, the benefit is public coverage for PSEO tuition at an eligible institution of the student's choice.

children at a school of their choice of like-minded believers, their free exercise is also burdened.

So whether Plaintiffs have made out a Free Exercise claim turns on whether their choices to decline the receipt of otherwise-available PSEO public benefits stem from sincerely held religious convictions.[36] *Cf. Stevens v. Optimum Health Inst.—San Diego*, 810 F. Supp. 2d 1074, 1096 (S.D. Cal. 2011) (finding "no evidence" that the burden on the defendant from California's public accommodation law "originates from a religious conviction or belief"). In considering whether a religious conviction is sincerely held, "courts must not presume to determine . . . the plausibility of a religious claim." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990). The record supports that the Schools sincerely consider their faith statement criteria to be an exercise of their religious beliefs. (ECF No. 91-5 at 34:1–23, 38:22–39:14; ECF No. 91-8 at 30:10–22.) Moreover, the Loes, at least, expect that students who attend PSEO at the Schools with their children honestly attest to sharing their sincere religious beliefs. (ECF No. 91-11 at 80:25–81:6). Plaintiffs have thus established that the Faith Statement Ban burdens their free exercise of religion.

---

[36] Entities—like the Schools—can have sincerely held religious beliefs. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 (2014).

**B.    *Appropriate Standard of Scrutiny***

The Court must next determine the appropriate standard of scrutiny to apply to its review of the Faith Statement Ban. If a law that burdens religious exercise is neutral and generally applicable, the law is subject to only rational basis review. *Smith*, 494 U.S. at 878–82;[37] *Doe v. Parson*, 960 F.3d 1115, 1119 (8th Cir. 2020). But if a law is neither neutral nor generally applicable, then strict scrutiny is triggered. *Fulton*, 593 U.S. at 540–41. A law is not neutral if the state "restricts practices because of their religious nature." *Id.* at 533 (citing, among others, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). Put differently, a law that operates "to 'disqualify some private schools' from funding 'solely because they are religious' . . . must be subjected to 'the strictest scrutiny.'" *Carson*, 596 U.S. at 780 (citing *Espinoza*, 591 U.S. at 478).

In *Carson*, the Supreme Court held that Maine's tuition assistance program that excluded "sectarian" private schools was not neutral to religion, even if construed as applying only to those schools that "promote[d] [their] faith or belief system" or "taught through the lens of this faith." 596 U.S. at 775, 781; *see also Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1152–53 (9th Cir. 2024) (finding California's nonsectarian requirement for nonpublic schools contracting with the state to provide students with a "free appropriate public education" to be not neutral to religion). MDE tries to distinguish *Carson* by

---

[37] As recently as 2021, the Supreme Court was asked to overrule *Smith*, but it did not do so. *Fulton*, 593 U.S. at 533.

arguing that the Faith Statement Ban does not target religious conduct since it does not "categorically exclude[] the Schools from participating in PSEO because they are religious." (ECF No. 113 at 11.) But the effect of the Faith Statement Ban is precisely that— it only excludes institutions from PSEO eligibility that require applicants to attest to their *faith*.[38] It does not exclude institutions from PSEO eligibility that require applicants to make non-religious attestations, such as to an honor code. In that sense, the Faith Statement Ban "restricts" PSEO admissions practices only "because of their religious motivation." *Lukumi*, 508 U.S. at 533.

An illustration is helpful. Northwestern requires PSEO applicants to agree to a Declaration of Christian Community, by which applicants attest to "honor Christ," "seek Christ-centered community," and "stand together against all that the Bible clearly condemns." (ECF No. 91-10 at 2–3.) Such an admissions requirement is facially proscribed by the Faith Statement Ban. Now, consider a hypothetical secular private college that participates in the PSEO program. If that secular school required that all PSEO applicants attest to "honor reason," "seek reason-centered community," and "stand together against

---

[38] Although the word "faith" has various meanings, when read in the context of the Faith Statement Ban's legislative background, the Court is compelled to give "faith" its ordinary meaning in that context. *See* Merriam-Webster Online Dictionary, "Faith," def. 2(a)(1)–(2), https://www.merriam-webster.com/dictionary/faith [https://perma.cc/K6BC-AAYT] (defining "faith" as "belief and trust in and loyalty to God" and "belief in the traditional doctrines of a religion").

all that rationalism clearly condemns," such an admissions requirement would seemingly not be proscribed by the Faith Statement Ban.

The only difference between the two statement requirements is that Northwestern's is of a religious—and not a secular—nature. Such a distinction on the face of the Faith Statement Ban is not neutral to religion, and thus triggers strict scrutiny.[39] *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations . . . trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.").

### C.    *Strict Scrutiny Review*

To survive strict scrutiny review, the Faith Statement Ban must "advance[] 'interests of the highest order' and [be] narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (citing *Lukumi*, 508 U.S. at 546). This standard of scrutiny is demanding, and "[a] law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780–81 (citing *Lukumi*, 508 U.S. at 546).

---

[39] Relatedly, the Faith Statement Ban is not generally applicable, because "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. In the hypothetical discussed above, a devout Christian PSEO applicant would be discriminated against on the basis of their free exercise of religion by an admissions requirement from a secular school that they attest to "honor reason" to the extent that it would conflict with their sincerely held beliefs to honor God above all else. And this secular conduct would "undermine[] the government's asserted interests" in non-discrimination in admissions to publicly-funded PSEO opportunities "in a similar way" to the Schools' religious conduct. *Id*.

1.      *Compelling Interest*

When MDE proposed the Amendment to the Legislature in 2022, it described the

state's interest as follows:

> The intended results are to establish equitable access to Minnesota students
> who would like to enroll in PSEO courses at the institution of their choice.
> Participation in PSEO is a publicly-funded program and [PSEO provider
> institutions] should not discriminate against students on the basis of
> gender, sexual orientation, sexual identity, religion, or ethnicity.

(ECF No. 81-62 at 2.) Similarly, the Amendment's House and Senate sponsors framed the

state's interest in the Amendment in terms of "mak[ing] sure that our high school

students can go to the postsecondary institutions of their choice" regardless of their

protected characteristics, because PSEO institutions are receiving "public dollars, these

are tax dollars."[40]  4/20/23 Minn. H.F. Sess. YouTube video, at 3:28:10–20

[https://perma.cc/NM2M-UKRN]; 5/16/23 Minn. S.F. Sess. YouTube video, at 6:00:58–

6:01:04 [https://perma.cc/Y5VM-6YTQ].  In short, Minnesota's interest is in

nondiscrimination in admissions to publicly-funded PSEO opportunities.[41]

---

[40] MDE posits other state interests, including: "educating [Minnesota's] school-aged
citizens" and "complying with the Minnesota Constitution's Education Clause." (ECF
No. 79 at 40–41.) But courts consider the "legislature's 'actual purpose'" in enacting the
legislation in evaluating compelling interests under strict scrutiny. *Shaw v. Hunt*, 517 U.S.
899, 908 n.4 (1996); *see also Kennedy*, 597 U.S. at 543 n.8 (2022) ("Government justifications
for interfering with First Amendment rights must be genuine, not hypothesized or
invented *post hoc* in response to litigation." (cleaned up and citation omitted)).

[41] Setting aside whether the Schools' faith statement admissions requirements
discriminate against prospective applicants on the basis of an applicant's sexual
orientation or gender identity, (ECF No. 97-13 at 16:2–18:4; ECF No. 91-5 at 40:13–41:21),

The Court concludes that such an interest animating the Faith Statement Ban is compelling.[42] *See St. Dominic Acad. v. Makin*, 744 F. Supp. 3d 43, 78 (D. Me. 2024) ("Maine's asserted interest in eliminating discrimination within publicly funded institutions is compelling."), *appeal filed*, No. 24-1739 (1st Cir. Aug. 16, 2024); *St. Mary Cath. Par. in Littleton*, 736 F. Supp. 3d at 1005 (finding Colorado's interest in "ensuring eligible children and their families do not face discriminatory barriers" to receiving a public benefit to be compelling). The Court's conclusion is buttressed by recent reasoning from the Supreme Court underscoring that students should be evaluated for educational admissions based

---

they certainly discriminate against prospective applicants on the basis of an applicant's religious exercise. For example, an otherwise-eligible Muslim student who could not attest—consistent with their religious beliefs—to "honor Christ" would be disqualified from admission to Northwestern just because of their religious exercise. (ECF No. 91-10 at 2; *see* ECF No. 91-8 at 12:21–13:1.)

[42] The Court considers the state's interest in not using public monies to facilitate discrimination to be different in kind from a state antiestablishment interest in not using public monies to fund education at religious institutions. The state interest analyzed in *Carson* was an antiestablishment interest. 596 U.S. at 781. Thus, the Supreme Court's conclusion in *Carson* that the antiestablishment interest was not compelling does not bind the Court in evaluating MDE's interest in not publicly funding private discrimination. *See St. Mary Cath. Par. in Littleton v. Roy*, 736 F. Supp. 3d 956, 963 (D. Colo. 2024) ("While it is settled at this point that states may not generally decline to fund religious schools as part of an educational benefits program, the weight of the relevant precedent supports that states administering such programs are not obligated to subsidize discrimination using taxpayer dollars, even when that discrimination is based on religious beliefs."), *appeal filed*, No. 24-1267 (10th Cir. June 24, 2024).

on their individual character and merit, and not based on their protected characteristics.

*Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 231 (2023).[43]

### 2.    *Narrow Tailoring*

Even though MDE's interest in nondiscrimination in admissions to publicly-funded PSEO offerings is compelling, the Faith Statement Ban still fails strict scrutiny because it is not narrowly tailored to achieve that interest. To survive strict scrutiny, the Faith Statement Ban must be "the least restrictive means of achieving" the state's interest. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Under this standard, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. The Supreme Court describes the least restrictive means test as "exceptionally demanding." *Burwell*, 573 U.S. at 728.

As the Court noted at oral argument, there is an obvious alternative that is less restrictive on Plaintiffs' free exercise of religion—limiting PSEO to only *public*

---

[43] Plaintiffs cite *Students for Fair Admissions* for the proposition that "equitable access [is] 'not sufficiently coherent for . . . strict scrutiny.'" (ECF No. 123 at 11.) In that case, the Supreme Court found that the asserted state interests were "not sufficiently coherent" to justify discriminatory admissions practices by Harvard and the University of North Carolina. *Students for Fair Admissions*, 600 U.S. at 214. Put another way, none of the interests asserted by the universities were as weighty as the applicants' interest in being considered for admission on equal footing with their peers of different racial identities. Here, the state's interest is in eliminating specific discriminatory admissions practices to state-funded PSEO courses, which is "sufficiently measurable to permit judicial review under the rubric of strict scrutiny," compared with "standardless" interests, such as "maintaining an equitable environment free of discrimination." *Cf. Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 87 (D.D.C. 2024) (citing *Students for Fair Admissions*) (cleaned up).

postsecondary institutions.[44] (ECF No. 133 at 44:3–5, 44:21–24.) MDE conceded that this

alternative would achieve its interest. (*Id.* at 44:8–11, 44:18–19, 44:25.) And although

Plaintiffs did not initially raise this alternative, they agreed in supplemental briefing that

they would not suffer a constitutional injury if the PSEO program was limited to only

public postsecondary institutions.[45] (ECF No. 138 at 35–36.)

Such an alternative was recently upheld by the Fourth Circuit as a "textbook

neutral and generally applicable selection criterion." *See Kim v. Bd. of Educ. of Howard*

*Cnty.*, 93 F.4th 733, 749 (4th Cir. 2024). In reaching that conclusion, the *Kim* court

emphasized that excluding "any private schools, religious or nonreligious," from

---

[44] The Court notes that this is also a less-restrictive alternative to achieving MDE's other asserted interests in "educating its school-aged citizens" and "complying with the Minnesota Constitution's Education Clause." (ECF No. 79 at 40–41.) Another less-restrictive alternative that could achieve those asserted interests would be that Minnesota could simply not offer the PSEO program option at all, and instead redirect public monies set aside for PSEO back into advanced course offerings at public high schools. *See Carson*, 596 U.S. at 785 (rejecting the claim that the Court's decision would require Maine to fund religious education, because Maine "retains a number of options: it could expand the reach of its public school system, increase the availability of transportation, provide some combination of tutoring, remote learning, and partial attendance, or even operate boarding schools of its own"). So even if these other asserted interests are compelling, the Faith Statement Ban would still fail strict scrutiny under a narrow tailoring analysis. Thus, there is no reason for the Court to accept MDE's invitation to certify to the Minnesota Supreme Court the question of whether Minnesota's interest in complying with the Education Clause of the Minnesota Constitution is compelling.

[45] The Court surmises that Plaintiffs did not raise this alternative in their briefings because it is not in the interests of either the Schools or the Families for the Legislature to cease funding PSEO at all private institutions, which would necessarily include the Schools. But under this alternative, Plaintiffs would suffer no injury of a *constitutional* dimension.

participating in the selection of the student member of the county's board of education "does not exclude students because of their religious exercise. Rather, it excludes students who choose not to attend public school for whatever reason." *Id*.

It is true that limiting the PSEO program to only public postsecondary institutions would have collateral consequences, including limiting the availability of convenient PSEO opportunities to Minnesota high school students.[46] But MDE firmly rejected the proposition that Minnesota's interest in passing the Amendment was to "maximiz[e] the number of PSEO offerings." (ECF No. 113 at 6.) Rather, MDE was clear that "[m]aximizing access and equalizing access are not synonymous," and that "MDE and legislators were focused on the latter only." (*Id*.) That limiting the PSEO program to only public postsecondary institutions would not "maximize access" to PSEO is "a policy debate that belongs in the halls of [the Legislature]," not in the Court. *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 237 (2007). Because the alternative identified by the Court of limiting PSEO to only public postsecondary institutions is a less-restrictive means of achieving the state's interest in not subsidizing discrimination in PSEO

---

[46] There are presently eighteen private colleges in Minnesota that participate in the PSEO program, which each provide the most geographically proximate option for obtaining on-campus PSEO education to many Minnesota students in all parts of the state. *See* Minn. Dep't of Educ., *Postsecondary Enrollment Options (PSEO), Eligible Insts. & Courses, Participating Insts.*, https://education.mn.gov/MDE/dse/ccs/pseo/040787 [https://perma.cc/ZWV4-5QW3].

admissions, the Faith Statement Ban fails strict scrutiny.[47] *See Espinoza*, 591 U.S. at 487 ("A state need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious.").[48]

In sum, the Faith Statement Ban is unconstitutional on its face under the Free Exercise Clause of the First Amendment of the United States Constitution because it burdens religious exercise, is not neutral and generally applicable, and is not narrowly tailored to achieve MDE's compelling interest. Necessarily, this means that the Faith Statement Ban is also unconstitutional under the Freedom of Conscience Clause of Article One, Section Sixteen of the Minnesota Constitution. *See Edina Cmty. Lutheran Church v. State*, 745 N.W.2d 194, 203 (Minn. Ct. App. 2008) ("[T]he Minnesota Constitution affords

---

[47] Because the Court concludes that the Faith Statement Ban fails strict scrutiny under the *Carson* framework, the Court need not address Plaintiffs' alternative Free Exercise argument, pursuant to *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), that the Faith Statement Ban was enacted with hostility toward religion.

[48] The Court's conclusion here does not suggest that a state needs to subsidize sectarian ministerial education if it chooses to fund private education. In *Locke v. Davey*, the Supreme Court upheld Washington's prohibition on the use of state aid for postsecondary theological education. 540 U.S. 712, 725 (2004). Although the holding in *Locke* has been narrowly circumscribed to its facts, it has never been overturned. *See Carson*, 596 U.S. at 788 (noting how *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), and *Espinoza* emphasized the "narrow reach" of *Locke*). In any event, *Locke* is not implicated here, as the PSEO Act already provides—separate from the Amendment—that PSEO courses must be nonsectarian. Minn. Stat. § 124D.09, subdiv. 5. And, as already stated, the Court declines to consider Plaintiffs' improper challenge to that provision presented for the first time in Plaintiffs' opposition brief.

47

greater protection against governmental action affecting religious liberties than the First Amendment of the federal constitution.").

## IV.    Severability

Because the Court concludes that the Faith Statement Ban is unconstitutional, the Court must next determine whether the Faith Statement Ban may be severed from the Nondiscrimination Requirement. If the Faith Statement Ban is inseverable from the Nondiscrimination Requirement, then the Amendment must be struck down in full.[49]

Drawing upon general principles of constitutional avoidance, the Court considers that the analysis of whether the Amendment may be severed ought to precede the consideration of the constitutional merits of the Nondiscrimination Requirement, standing alone. *Lyng*, 485 U.S. at 445 ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *cf. Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 892–93 (8th Cir. 2013) ("It is a bedrock principle of statutory interpretation that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" (citation omitted)). Neither party raised the issue of severability, so the Court asked counsel for each party about the issue at oral

---

[49] At oral argument, Plaintiffs' counsel agreed that if the Amendment was found to be unconstitutional under the Free Exercise Clause, then Plaintiffs would be afforded "complete relief" before reaching other counts. (ECF No. 133 at 27:16–23.)

argument. (ECF No. 133 at 9:1–9, 38:3–4.) The Court subsequently ordered the parties to submit supplemental briefing on that issue.[50] (ECF No. 135.)

In its supplemental briefing, MDE argues that the Faith Statement Ban is severable from the Nondiscrimination Requirement. (ECF No. 136 at 1.) In making this argument, MDE asserts that no exception applies to overcome the "strong presumption" under Minnesota law against the "draconian" remedy of wholesale invalidation of a statute.[51] (*Id*. at 1–2 (citing Minn. Stat. § 645.20; *Assoc. Builders & Contractors v. Ventura*, 610 N.W.2d 293, 305 (Minn. 2000)).) By contrast, Plaintiffs maintain that the Amendment is inseverable. In so arguing, Plaintiffs assert that the Faith Statement Ban and the Nondiscrimination Requirement "were 'conceived together as a unified effort' to

---

[50] MDE argues that Plaintiffs forfeited the opportunity to argue against severability because they raised no such arguments against severability in their prior briefing. But Plaintiffs have made arguments throughout this litigation that are not incompatible with their supplemental brief on severability. That is, Plaintiffs have consistently argued that the statute is unconstitutional in full and that it was conceived as a unified whole. The Court does not consider Plaintiffs to have waived an argument against severability.

[51] MDE makes a passing argument that the severability of the Amendment should be certified in the first instance to the Minnesota Supreme Court. But courts in this Circuit routinely consider the severability of statutes under Minnesota law, and there is ample precedent to guide the Court in its severability analysis. *S. Glazer's Wine & Spirits, LLC v. Harrington*, 594 F. Supp. 3d 1108, 1125–26 (D. Minn. 2022) (declining to certify to the Minnesota Supreme Court the question of severability of a statute). The Court thus rejects MDE's invitation to certify the question of severability to the Minnesota Supreme Court. *See id*. ("Certification 'is not a procedure by which federal courts may abdicate their responsibility to decide a legal issue when the relevant sources of state law available to it provide a discernible path for the court to follow.'" (citation omitted)).

'regulate' the use of religious admissions requirements in the PSEO program." (ECF

No. 138 at 9 (citing *Cellco P'ship v. Hatch*, 431 F.3d 1077, 1084 (8th Cir. 2005)).)

## A.    *Severability Framework*

Whether the Amendment may be severed is a question of Minnesota state law.

*Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Minnesota law favors severing—rather than

wholly invalidating—state laws:

> Unless there is a provision in the law that the provisions shall not be
> severable, the provisions of all laws shall be severable. If any provision of a
> law is found to be unconstitutional and void, the remaining provisions of
> the law shall remain valid, unless the court finds the valid provisions of the
> law are so essentially and inseparably connected with, and so dependent
> upon, the void provisions that the court cannot presume the legislature
> would have enacted the remaining valid provisions without the void one;
> or unless the court finds the remaining valid provisions, standing alone, are
> incomplete and are incapable of being executed in accordance with the
> legislative intent.

Minn. Stat. § 645.20; *see also State v. Cannady*, 727 N.W.2d 403, 408 (Minn. 2007) ("When

we hold a statute to be unconstitutional, we invalidate only as much of the law as is

unconstitutional."). Section 645.20 thus creates a presumption of severability, unless:

(1) the statute contains a non-severability provision; (2) the valid portions of the statute

are "essentially and inseparably connected with" the void provisions; or (3) the valid

provisions, by themselves, are "incomplete and . . . incapable of being executed in

accordance with the legislative intent." The "primary goal" of this severability

framework is to "creat[e] a remedy that would conform to the legislature's intent had it

known a provision of the law was invalid." *Cannady*, 727 N.W.2d at 408.

The PSEO Act does not contain a provision on severability. *See* Minn. Stat. § 124D.09. Thus, the severability of the Amendment turns on whether the "essentially and inseparably connected with" exception or the "incomplete and . . . incapable of being executed in accordance with legislative intent" exception to the presumption of severability apply. *See also S. Glazer's Wine & Spirits*, 594 F. Supp. 3d at 1124–25.

### B.    *Essentially and Inseparably Connected*

In considering whether the Faith Statement Ban and the Nondiscrimination Requirement are essentially and inseparably connected with one another, the Court must look to whether "the interrelationship of the void and non-void provisions . . . precludes the presumption that the legislature would have enacted only the latter provision." *Cellco P'ship*, 431 F.3d at 1083 (citing *Archer Daniels Midland Co. v. State*, 315 N.W.2d 597, 600 (Minn. 1982)). In doing so, the Court is not limited to considering just the plain text of the statute, but may also use other interpretative tools, such as contemporaneous legislative history, to ascertain the intent of the Legislature. *See id*. at 1084 (analyzing statements made by the principal House and Senate sponsors of the Minnesota legislation, as well as those of legislators who were "active in the legislative process").

Textually, the Faith Statement Ban and the Nondiscrimination Requirement are distinct from one another, as shown by the statute's use of the disjunctive conjunction— "or"—between the two provisions. *See*, *e.g.*, *State v. Melchert-Dinkel*, 844 N.W.2d 13, 16, 24 (Minn. 2014) (severing provisions of a statute that criminalized "intentionally advis[ing],

encourag[ing], *or* assist[ing] another in taking the other's own life," which were unconstitutional under the First Amendment (emphasis added)); *Styczinski v. Arnold*, 141 F.4th 950, 958 (8th Cir. 2025) ("A disjunctive list is strong evidence that the legislature intended each portion to stand on its own to be sufficient even if another was removed."). But the statute's text is not dispositive, and here, strong evidence of legislative intent leads the Court to conclude that the Faith Statement Ban and the Nondiscrimination Requirement are essentially and inseparably connected.

In *Cellco Partnership*, the Eighth Circuit found a subdivision of Article 5 of Minnesota House File No. 2151 on "Wireless Consumer Protection" regulating "[p]rovider-initiated substantive change" to be preempted by federal law. *See* 431 F.3d at 1079–83. The court then considered whether the remaining subdivisions of Article 5 could stand without the preempted subdivision, and determined that the rest of Article 5 was inseverable. *Id*. at 1083–84. In its reasoning, the court pointed to statements in the law's legislative history, which suggested that the void subdivision was the "motivating force" behind the remainder of Article 5's passage. *Id*. at 1084 (citing the principal Senate sponsor's statement that the void subdivision was "the reason for the genesis of the bill").

In addition to its "motivating force" analysis, the *Cellco Partnership* court cited to other legislative history revealing that each substantive subdivision was "conceived together as a unified effort to regulate certain practices of wireless telecommunications

providers." *Id*. Put differently, the court considered that the void and non-void subdivisions "work[ed] in tandem" to achieve the desired legislative ends. *Id*.

The legislative history of the Amendment evinces that the Schools' use of faith statements was the Amendment's initial "genesis" and "motivating force" from MDE's first proposed amendment to the PSEO Act in 2019 all the way through its ultimate passage in 2023. To explain: when MDE first floated amending the PSEO Act in 2019,[52] MDE described "[t]he problem" it sought to address as being "admissions procedures by some private postsecondary institutions [that] are discriminatory in nature by requiring that a high school student must provide a faith statement prior to enrollment approval." (ECF No. 92-6 at 3 (emphasis omitted).) In 2020, MDE again identified "the problem [it was] trying to solve" by amending the PSEO Act as "[a]dmissions procedures by some private postsecondary institutions . . . requiring that a high school student must provide an *approved* faith statement prior to enrollment." (ECF No. 81-60 at 2.) In 2021, when MDE first added the Faith Statement Ban language to its proposal, MDE tripled down on its issue with the faith statements, emphasizing that "[i]n its current state, [the PSEO Act] does not address these discriminatory practices *explicitly*." (ECF No. 81-61 at 2 (emphasis added).) Finally, when the ultimate proposal was presented in 2022, MDE again pointed

---

[52] MDE first proposed amending the PSEO Act after being told by the Minnesota Attorney General's Office in 2018 that it lacked the statutory authority to ban the use of faith statements in admissions by Northwestern. (ECF No. 91-14 at 42:8–13, 110:22–111:10.)

to only one "example" of a discriminatory admissions procedure meant to be addressed by the Amendment—faith statement requirements. (ECF No. 81-62 at 2.)

Statements by legislators, including sponsors of the bill, confirm that concerns about faith statements were the Amendment's reason for existence. The Amendment's primary House sponsor, Representative Laurie Pryor, testified during debate on the Amendment on the House Floor that "the intent of the provision . . . is to make sure that our high school students can go to the postsecondary institutions of their choice . . . and they will not be compelled to sign a statement as a barrier to admission."[53] 4/20/23 Minn. H.F. Sess. YouTube video, at 3:28:05–30 [https://perma.cc/NM2M-UKRN].

This understanding of the intent of the legislation was echoed by other key supporters of the Amendment who were "active in the legislative process" in both the House and the Senate. *Cellco P'ship*, 431 F.3d at 1084. For example, Representative Mike Frieberg stated on the House Floor that if institutions "want to participate in the PSEO program and receive public funds, they just shouldn't be able to require students to sign faith statements using public funds. *The underlying language is needed*." 4/20/23 Minn. H.F. Sess. YouTube video, at 3:41:54–3:42:06 [https://perma.cc/NM2M-UKRN] (emphasis added). Similarly, during debate on the Amendment on the Senate Floor, the Senate

---

[53] In considering legislative intent, Minnesota courts consider that "[s]tatement[s] made . . . by the sponsor of a bill on the purpose or effect of the legislation are generally entitled to some weight." *Culberson v. Chapman*, 496 N.W.2d 821, 824 n.2 (Minn. Ct. App. 1993) (citing *Handle With Care, Inc. v. Dep't of Hum. Servs.*, 406 N.W.2d 518, 522 (Minn. 1987)).

sponsor of the Amendment, Senator Mary Kunesh stated that "what we're talking about here are schools, private schools, who require a religious faith statement in order to be accepted into those schools," and emphasized that "the removal of the requirement of these faith-based questions is absolutely appropriate. It . . . simply says you cannot ask these faith-based questions in order for students to attend the school if you are receiving our state taxpayer dollars." 5/16/23 Minn. S.F. Sess. YouTube video, at 5:59:09–24, 6:01:16–50 [https://perma.cc/Y5VM-6YTQ].

Tellingly, a proposal to include only broad nondiscrimination language was discussed and rejected. At one point while the Legislature was considering the Amendment, another backer of the legislation, Representative Sandra Feist, proposed a change to the Amendment in an email to a pair of the Amendment's House sponsors and legislative staff. (ECF No. 92-11 (sealed) at 6.) Representative Feist suggested replacing the Amendment's language that "[a]n eligible institution must not require a faith statement from a secondary student" with language that "an eligible institution must not discriminate against any secondary student," believing that such facially neutral language could still "get[] to the heart of what we're trying to prohibit — the use of these faith statements as an excuse to discriminate." (*Id.*) But after Representative Feist forwarded the email along to MDE's Director of Government Relations, Adosh Unni, who weighed in that such a change could "indicat[e] that the intent of the law was not to prohibit [faith] statements," the proposed language was never introduced. (*Id.* at 2.)

True, the legislative history also includes evidence that banning faith statements was not the sole purpose of the Amendment. MDE described the "intended results" of the Amendment in broad terms as being that the Amendment sought to "equalize access to Minnesota students who would like to enroll in PSEO courses at the institution of their choice." (ECF No. 92-6 at 3.) Similarly, Representative Pryor acknowledged that the Nondiscrimination Requirement was included because the Schools are "rejecting people based on who they are, and that's why there's also language that comes from [Minnesota's] human rights statute saying that we don't discriminate because of these characteristics." 4/20/23 Minn. H.F. Sess. YouTube video, at 3:16:02–18 [https://perma.cc/NM2M-UKRN].

But such considerations were "ancillary to the heart of the legislation's purpose," which was to ban the use of faith statements. *S. Glazer's Wine & Spirits*, 594 F. Supp. 3d at 1124. That is, the Nondiscrimination Requirement "worked in tandem with" the Faith Statement Ban to achieve the statute's principal purpose—ending PSEO admissions practices requiring student applicants to attest to specific tenets of faith, including as to their religious beliefs, sexual orientation, and gender identity. *Id.* At bottom, the Faith Statement Ban was "central to the development of [the Amendment]." *Cellco P'ship*, 431 F.3d at 1084. As in *Cellco Partnership*, it is "difficult to presume that the legislature would have enacted the [Nondiscrimination Requirement] standing alone . . . if it had been

precluded at the outset from regulating in the area of principal concern," the faith statement requirements.[54] *Id.*

Because the Nondiscrimination Requirement is essentially and inseparably connected with the Faith Statement Ban, the Court declines to sever the two provisions.[55] Plaintiffs are thus entitled to summary judgment on Counts One[56] and Nine of the Complaint. The Amendment is stricken in its entirety as facially unconstitutional under

---

[54] The Eighth Circuit instructs courts to consider "if the legislature could keep only the severed statute, would it prefer retaining the statute or removing it altogether." *Styczinski*, 141 F.4th at 959 (citing *Melchert-Dinkel*, 844 N.W.2d at 24). The Court cannot conclude that the Legislature would prefer to maintain the severed Amendment without the Faith Statement Ban. MDE twice proposed to the Legislature amending the PSEO Act with only general nondiscrimination language reminiscent of the Nondiscrimination Requirement. (ECF No. 97-9 at 2–3; ECF No. 81-60 at 3.) But in 2019, and again in 2020, the Legislature did not enact such language as proposed. The Legislature did not pass the Amendment to the PSEO Act until the language of the Faith Statement Ban was added. And when a key supporter, Representative Feist, proposed eliminating the Faith Statement Ban from the language of the Amendment, MDE warned that doing so could "indicat[e] that the intent of the law was not to prohibit [faith] statements," and Representative Feist never moved forward with her proposal. (ECF No. 92-11 at 2, 6.)

[55] The Court need not determine whether the Amendment is separately inseverable under the "incomplete and . . . incapable of being executed in accordance with legislative intent" exception to the presumption of severability. Minn. Stat. § 645.20.

[56] Although Plaintiffs also raise overlapping Free Exercise Clause claims in Counts Two through Six of the Complaint, the Court's ruling here is just that the Amendment violates the Free Exercise Clause by excluding the Schools and the Families from otherwise-available government benefits on the basis of Plaintiffs' religious exercise.

the Free Exercise Clause of the First Amendment of the United States Constitution and

under the Freedom of Conscience Clause of Article One of the Minnesota Constitution.[57]

## V.    Plaintiffs' Remaining Claims

By striking the entire Amendment, the Court has provided complete relief to

Plaintiffs.[58] (ECF No. 133 at 27:16–23.) Consistent with general principles of constitutional

avoidance, the Court declines to reach Plaintiffs' remaining constitutional claims. *See*

*Fulton*, 593 U.S. at 543 ("In view of our conclusion that the actions of the [defendant]

violate the Free Exercise Clause, we need not consider whether they also violate the Free

Speech Clause."). The Court thus considers the parties' motions for summary judgment

on these remaining claims in Counts Two through Eight of the Complaint to be moot.

## VI.    MDE's Counterclaims Standing

As for MDE's counterclaims, MDE brings claims against the Schools for

constitutional injury and for statutory injury under the MHRA. (ECF No. 27 at 57, 63–69.)

---

[57] Because the Court concludes that the Faith Statement Ban is unconstitutional under the Free Exercise Clause of the United States Constitution and the Freedom of Conscience Clause of the Minnesota Constitution, and concludes that the Amendment is inseverable, the Court does not address whether the Nondiscrimination Requirement is separately unconstitutional in its own right as applied to the Schools' admissions practices. To be clear, the Court's ruling here does not foreclose future legislation mirroring just the language of the Nondiscrimination Requirement.

[58] In the Complaint, Plaintiffs also requested damages remediation. (ECF No. 1 at 35.) But Plaintiffs can adduce no evidence of any damages that they have suffered as a result of the Amendment, given that the parties stipulated to enjoining the Amendment from going into effect during the pendency of this litigation. (ECF No. 18; *see also* ECF No. 20 (granting stipulated preliminary injunction).)

The Court previously allowed MDE to proceed on its counterclaims pursuant to *parens patriae* standing. (ECF No. 66.) Now with the benefit of a factual record, the Court reassesses MDE's standing to bring these counterclaims in federal court.[59]

Plaintiffs reiterate many of the same arguments raised in their prior motion to dismiss MDE's counterclaims, including: (1) that MDE cannot satisfy the requirements of *parens patriae* standing; (2) that MDE's constitutional counterclaims cannot proceed because the Schools are not state actors; and (3) that MDE is not a "person aggrieved" with standing to bring suit for discrimination under the MHRA. In response, MDE argues that its *parens patriae* standing and statutory standing under the MHRA have already been litigated and affirmed by the Court, and MDE maintains that discovery has confirmed that the Schools are indeed state actors.

### 1. Constitutional Counterclaims

Because the Court has determined above that the Schools are not state actors when they admit PSEO students, MDE's constitutional counterclaims against the Schools necessarily must fall. *See Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 50 (1999) ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how

---

[59] The Court's order on the Schools' motion to dismiss MDE's counterclaims was not a final judgment. *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992). Thus, the Court is not bound by—and may revisit—its prior ruling on MDE's standing with the benefit of a developed factual record.

discriminatory or wrongful.'" (citing *Blum*, 457 U.S. at 1002)); *see also State v. Wicklund*, 589 N.W.2d 793, 801 (Minn. 1999) ("The Minnesota Constitution does not accord affirmative rights to citizens against each other; its provisions are triggered only by state action."). In other words, MDE has no Article III standing to sue the Schools for a constitutional injury if the Schools engaged in private action, because a private actor engaged in wholly private action cannot *cause* a constitutional injury—only a state actor (or private actor engaged in state action) can. *See All. for Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement is central to Article III standing. Like the injury in fact requirement, the causation requirement screens out plaintiffs who were not injured by the defendant's action."). Plaintiffs are thus entitled to summary judgment on MDE's constitutional counterclaims, Counts One through Five.

### 2.    *Statutory Counterclaim*

MDE's only remaining counterclaim is Count Six, its state-law claim that the Schools' PSEO admissions policies and practices violate the MHRA.[60] MDE brings its statutory counterclaim under Minnesota's *parens patriae* authority. The Court reaffirms its prior holding that MDE has plausibly asserted (1) an injury to its "quasi-sovereign interest" and (2) that the injury affects a "sufficiently substantial segment of its

---

[60] At oral argument, MDE expressly disclaimed that it was challenging any of the Schools' *post-admissions* policies or practices under the MHRA. (ECF No. 133 at 37:1–2.)

population."[61] (ECF No. 66 at 4–8 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607–09 (1982)).)

MDE has a quasi-sovereign interest in protecting Minnesota high school students against discrimination in PSEO admissions on the basis of sexual orientation and gender identity. *Cf. New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024) (recognizing that the New York Attorney General "adequately alleged" a quasi-sovereign interest in "'the health and welfare' . . . of [New York public high school] students exposed to gender-based violence and harassment whether as victims, perpetrators, or bystanders" (citing *Snapp*, 458 U.S. at 607)), *petition for cert. filed*, No. 24-1167 (U.S. May 14, 2025). Such an interest is injured when PSEO provider institutions, such as the Schools, impose admissions barriers to publicly-funded PSEO offerings that discriminate on the basis of a student's protected characteristics.

Moreover, the injury to this interest inures to the thousands of Minnesota students who participate each year in the PSEO program (*See* ECF No. 85 ¶ 2), which is a

---

[61] As an agency of the State of Minnesota, MDE has the authority to represent Minnesota's sovereign interests *parens patriae*. MDE is designated by statute as the agency responsible for administering and overseeing the PSEO program. Minn. Stat. § 120A.02(b). And courts in this District have held that the Commissioner of MDE can act in a *parens patriae* capacity. *Am. C.L. Union of Minn. v. Tarek Ibn Ziyad Acad.*, No. 09-CV-138 (DWF/JJG), 2010 WL 1840301, at *9 (D. Minn. May 7, 2010) ("[T]he Commissioner acting in her official capacity is properly considered a governmental entity. Under the doctrine of *parens patriae*, the Commissioner [is] presumed to adequately represent the interests of students and parents in the district.").

"sufficiently substantial segment of [Minnesota's] population."[62] *Snapp*, 458 U.S. at 607. MDE has also presented evidence of at least four students who complained of the Schools' admissions practices, and MDE introduced an expert report on the effects of such admissions practices on school climates for all students. (ECF No. 97-2 at 175:4–176:17; ECF No. 81-57; ECF No. 81-58; ECF No. 81-63; ECF No. 97-25); *cf. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F. 4th at 282–83 (concluding that the New York Attorney General satisfied the substantial-segment prong where: (1) claims were presented of four students "allegedly subjected to their peers' sexual assault and harassment, gender-based violence, and bullying"; (2) there were plausible allegations of "dozens of others students whose similar complaints were also ignored by the School District"; and (3) "the School District's failures indirectly affect both its entire student body and the students' parents"). Thus, MDE has Article III standing to pursue its statutory counterclaims.

But the standing inquiry does not end there; the MHRA imposes a separate statutory standing requirement that a party bringing a claim under the statute must be a "person aggrieved." Minn. Stat. § 363A.28, subdiv. 1. The MHRA's definition of a "person" includes "the state and its departments, agencies, and political subdivisions." Minn. Stat. § 363A.03, subdiv. 30. As a department of the state, MDE is thus a person under the MHRA. So MDE's statutory standing turns on whether it is "aggrieved."

---

[62] As the Court noted in its prior order, the historical roots of the *parens patriae* doctrine trace to a sovereign's responsibility to take care of people legally unable to care for themselves, including minors. (ECF No. 66 at 7–8 (citing *Snapp*, 458 U.S. at 600).)

Under the MHRA, "a person is 'aggrieved' in the legal sense when [it] has suffered the denial or infringement of a legal right." *Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 862 (Minn. 2010). Plaintiffs argue that MDE is not "aggrieved," because it is not itself "a person who 'suffer[s] discrimination on the basis of [its] own protected characteristic.'" (ECF No. 90 at 47 (citing *Tovar v. Essentia Health*, 857 F.3d 771, 776 (8th Cir. 2017)).) In the Court's order on Plaintiffs' motion to dismiss MDE's counterclaims, the Court concluded that MDE was a person aggrieved, because the Schools' admissions policies prevent it from protecting Minnesota students from the harmful effects of discrimination in PSEO admissions. (ECF No. 66 at 9.) The Court now reaffirms and elaborates on its prior ruling.

In *Tovar*, the plaintiff's teenage son was diagnosed with gender dysphoria, and needed various treatments, including medications and gender reassignment surgery. 857 F.3d at 773. The plaintiff's employer-provided health plan denied coverage for the plaintiff's son's treatments. *Id.* The plaintiff's son—and not the plaintiff—was the named beneficiary under the health plan. *Id.* The plaintiff then sued *on her own behalf* for her own injuries caused by the coverage dispute, charging that the defendant employer discriminated on the basis of sex in denying the coverage to her son, in violation of Title VII and the MHRA. *Id.* at 773–75 & n.2.

The Eighth Circuit held that the plaintiff lacked statutory standing under Title VII to bring the claims, because the plaintiff did "not allege[] that she was discriminated against on the basis of her own sex; rather, she alleges that she was discriminated against

because of her son's sex." *Id.* at 775. And the Eighth Circuit likewise affirmed the district court's same holding under the MHRA "that [plaintiff's] son was the real 'person aggrieved' by [defendant's] actions, not [plaintiff]."[63] *Id.* at 775; *see id.* at 777; *see also Krueger*, 781 N.W.2d at 864 (holding that the plaintiff sole proprietor of an LLC lacked a viable sex discrimination claim against the defendant in the performance of the contract with the LLC, because the plaintiff had never *herself* contracted with the defendant—only her LLC had—and so she was not the person "aggrieved").

Here, by contrast, the *parens patriae* injury to MDE's quasi-sovereign interest coalesces with the discrimination injury to the individual Minnesota public high school students applying to enroll in PSEO. Put differently, MDE's quasi-sovereign interest is also injured by the exact same discrimination that injures the individual student applicants. MDE thus has statutory standing under the MHRA as a "person aggrieved." *Cf. E.E.O.C. v. Fed. Express Corp.*, 268 F. Supp. 2d 192, 197–98 (E.D.N.Y. 2003) (concluding that the New York Attorney General could intervene *parens patriae* in a Title VII discrimination suit).

## VII.    MDE's Statutory Counterclaim Merits

Finally, the Court turns to the merits of MDE's statutory counterclaims under the educational institution provision of the MHRA, Minnesota Statute Section 363A.13,

---

[63] In *Tovar*, the Eighth Circuit assumed that "the protections of Title VII and the MHRA are the same for purposes of this case." 857 F.3d at 775.

subdivisions 1–2.[64] Subdivision 1 provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of . . . religion, . . . sex, gender identity, . . . [or] sexual orientation."[65] Minn. Stat. § 363A.13, subdiv. 1. Relatedly, subdivision 2, considers it to be "an unfair discriminatory practice to exclude . . . or otherwise discriminate against a person seeking admission as a student . . . because of . . . religion, . . . sex, gender identity, . . . [or] sexual orientation." Minn. Stat. § 363A.13, subdiv. 2. MDE claims that the Schools' PSEO admissions practices violate these provisions because they discriminate against, and disparately impact, applicants on the bases of their sex and sexual orientation. (ECF No. 27 at 69 ¶¶ 82–83.)

The Schools move for summary judgment on the MHRA count, arguing that their admissions practices are exempt from the reach of the MHRA under the religious association and education exemptions codified in Minnesota Statute Sections 363A.26 and 363A.23. Section 363A.26 generally exempts from the MHRA "any institution organized for educational purposes that is operated, supervised, or controlled by a

---

[64] MDE does not bring its counterclaim pursuant to subdivision 3 of Section 363A.13, which provides that "[i]t is an unfair discriminatory practice to make or use a . . . form of application for admission that elicits or attempts to elicit information, or to make or keep a record, concerning the . . . religion, gender identity, [or] sexual orientation . . . of a person seeking admission."

[65] The MHRA was amended in 2023 before MDE filed its counterclaims to add "gender identity" as a protected classification to each subdivision of Minnesota Statute Section 363A.13. 2023 Minn. Laws Ch. 52, Art. 19, §§ 64–67, eff. July 1, 2023.

religious association, religious corporation, or religious society that is not organized for private profit," to the extent that the institution "(1) limit[s] admission to or giv[es] preference to persons of the same religion or denomination; [or] (2) tak[es] any action with respect to education." Minn. Stat. § 363A.26. But these exemptions do not apply to "secular business activities engaged in by the [institution] . . . the conduct of which is unrelated to the religious and educational purposes for which it is organized."[66] *Id.*

The education exemption in Section 363A.23, subdivision 1 exempts from the MHRA the practice of "limit[ing] admission or giv[ing] preference to applicants of the same religion" by "religious or denominational institution[s]." Minn. Stat. § 363A.23, subdiv. 1. Importantly, the education exemption in Section 363A.23, subdivision 1 does not contain a "secular business activities" carveout.[67]

---

[66] At the time MDE filed its counterclaims, the carveout for "secular business activities" only applied to the second exemption under Section 363A.26. In 2024, Section 363A.26 was amended to apply the "secular business activities" carveout to all the exemptions listed in the section on religious association exemptions. 2024 Minn. Laws Ch. 105, § 12, eff. Aug. 1, 2024. Because MDE is only seeking prospective relief, the Court applies the current version of the statutory language to its analysis. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 273–74 (1994) (reasoning that because "relief by injunction operates *in futuro*," courts apply the intervening statute to analyze claims for prospective injunctive relief (citation omitted)); *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1023 (8th Cir. 2015) ("Because the appellees seek only forward-looking injunctive relief, we consider the [intervening] regulations in rendering our decision.").

[67] In Plaintiffs' initial memorandum in support of their motion for summary judgment, Plaintiffs only cited to the religious association exemptions in Section 363A.26. (ECF No. 90 at 55–57; *see also* ECF No. 36 (citing only to religious association exemptions in Section 363A.26 in memorandum in support of motion to dismiss counterclaims).) Plaintiffs did not raise the separate education exemption in Section 363A.23,

The MHRA counterclaims fail because the education exemption in Section 363A.23, subdivision 1 exempts the Schools' admissions practices. So the Court need not address whether the religious association exemptions in Section 363A.26 separately apply or are limited by the "secular business activities" carveout.

First, the Schools are "religious or denominational institution[s]" covered by the education exemption. Minn. Stat. § 363A.23, subdiv. 1. In relevant part, the MHRA defines a "[r]eligious or denominational educational institution" as "an educational institution which is operated, supervised, controlled or sustained primarily by a religious or denominational organization." Minn. Stat. § 363A.03, subdiv. 40. Although MDE does

---

subdivision 1 in support of their summary judgment motion until their reply brief. (ECF No. 123 at 24.) But MDE never asked the Court for permission to file a sur-reply brief on this issue (which the Court would have granted had it been requested), nor did MDE raise any concern at oral argument about Plaintiffs' citation to Section 363A.23 for the first time on reply. Moreover, Plaintiffs' reply brief was not the first time that they made this argument; they cited to this exemption in opposition to MDE's motion for summary judgment. (ECF No. 118 at 30.) MDE never responded to that argument in its reply brief in support of its motion for summary judgment when it had the opportunity to do so. (ECF No. 122 at 3–4.) The Court thus does not consider Plaintiffs' argument under the exemption in Section 363A.23 to have been waived, and will consider it on the merits. That said, it appears to the Court that Plaintiffs were not forthright about making the argument under the Section 363A.23 education exemption for the first time in support of their motion for summary judgment on reply. The Court is concerned that Plaintiffs chose to address it in their reply brief because Section 363A.26(1)—which includes near-identical language to Section 363A.23, subdivision 1 regarding exemptions for "limiting admission to or giving preference to persons of the same religion or denomination"— was amended in 2024 to add a "secular business activities" carveout. In both Plaintiffs' initial memorandum and in their reply memorandum, Plaintiffs refer to only two exemptions and quote the near-identical language described above, but they do not acknowledge that the two exemptions cited in each brief are different.

not make the argument,[68] Amicus Gender Justice disputes that the Schools are controlled by a religious organization. (ECF No. 112 at 10–11.) To the contrary, Crown is "connected and subordinate to" the Christian and Missionary Alliance. Crown Exemption Letter at 1. Crown is controlled by a board of directors, "of which two-thirds must be comprised of [Christian and Missionary Alliance] church members." *Id.* Similarly, Northwestern is "completely controlled by, and receives its financial support from University of Northwestern-St. Paul, Inc., a non-profit religious corporation." Northwestern Exemption Letter at 1. The Court thus considers both Schools to be educational institutions that are "operated, supervised, controlled or sustained primarily by a religious or denominational organization." Minn. Stat. § 363A.03, subdiv. 40.

Second, the Schools' admissions practices of (1) requiring applicants to attest to a faith statement consistent with the Schools' tenets of belief and (2) giving preference to applicants who share the Schools' religion and tenets of belief each fall into the MHRA education exemption for "limit[ing] admission or giv[ing] preference to applicants of the same religion." Minn. Stat. § 363A.23, subdiv. 1. Crown's Community Covenant requires applicants to pledge to commit: "to the Word of God as our authority," "to the Lordship of Christ," and "to live out Christian character toward one another." (ECF No. 91-7 at 2.)

---

[68] MDE does not challenge the Schools' fit under the similar standard to "religious or denominational institution[s]" that is included in Section 363A.26, which applies to "institution[s] organized for educational purposes that [are] operated, supervised, or controlled by a religious association, religious corporation, or religious society."

Similarly, under Northwestern's Declaration of Christian Community, applicants must attest to "honor Christ," "seek Christ-centered community," and "stand together against all that the Bible clearly condemns." (ECF No. 91-10 at 2–3.) These faith statement requirements are means for the Schools to achieve the ends of limiting admission and giving preference to applicants who share their religious beliefs. Thus, the Schools' PSEO admissions practices are exempt from the MHRA's proscriptions against unfair discriminatory practices under the education exemption for "religious or denominational institution[s]" in Section 363A.23, subdivision 1.[69] The Schools are entitled to summary judgment on MDE's Counterclaim Count Six brought under the MHRA.

---

[69] That the Schools' PSEO admissions practices also have the concomitant effect of disparately impacting certain applicants on the bases of sexual orientation and gender identity is irrelevant to this legal analysis. The exemption in Section 363A.23, subdivision 1 expressly considers that practices by religious or denominational institutions to limit admission or give preference to applicants of the same religion are *not* unfair discriminatory practices. Moreover, the Schools confirmed that they would admit an otherwise-eligible LGBTQ+ PSEO applicant, as long as they attested to the faith statements. (ECF No. 97-13 at 16:2–18:4; ECF No. 91-5 at 40:13–41:21.) And MDE effectively concedes this fact. (ECF No. 113 at 9–10, 29.) A separate issue is whether it would be an unfair discriminatory practice for the Schools to take adverse action against any admitted PSEO student on the bases of their sexual orientation or gender identity (or protected conduct consistent with those identities). But as MDE confirmed at oral argument, its counterclaims are only about the Schools' *admissions* practices. (ECF No. 133 at 37:1–2.) So the Court need not consider that issue.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.   Plaintiffs' Motion for Partial Summary Judgment (ECF No. 87) is

     GRANTED;

2.   Defendants' Motion for Summary Judgment (ECF No. 76) is DENIED; and

3.   The Amendment shall be stricken from Minnesota Statute Section 124D.09,

     subdivision 3(a).

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: August 22, 2025                    BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge